UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
--------------------------------------------------------------------------------x

ULTIMA SERVICES CORPORATION,                          :

    Plaintiff,                                    :

       -against-                            :          No. 2:20-cv-00041-
                                DCLC-CRW
U.S. DEPARTMENT OF AGRICULTURE,                       :
U.S. SMALL BUSINESS ADMINISTRATION,
SECRETARY OF AGRICULTURE, and ADMINISTRATOR          :
OF THE SMALL BUSINESS ADMINISTRATION,

                                              :

    Defendants.

                                              :
--------------------------------------------------------------------------------x

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS

Plaintiff Ultima Services Corporation ("Ultima") submits this memorandum of law in opposition to defendants' motion to dismiss pursuant to Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

The cases cited in defendants' memorandum in support of their motion, and the cases cited herein, show that defendants' motion is straight out of the standard playbook for defending programs like the one at issue in this case. That playbook calls for avoiding the merits of the program in any way possible and raising any jurisdictional or similar argument possible toward that end. For the most part, and certainly in cases like the instant one where they are made at the outset of the litigation and rely solely on the allegations of the complaint, these motions fail, as well they should. The merits of defendants' program should be reached.

## Background

This is an action for discrimination in violation of the U.S. Constitution and federal law. Plaintiff alleges that defendants have precluded plaintiff from competing for contracts for administrative and technical services by reserving such contracts for the "Section 8(a) Program," and that the Section 8(a) Program improperly discriminates and violates the equal protection component of the Fifth Amendment's Due Process Clause and 42 U.S.C. § 1981.

The complaint in this action (the "Complaint") alleges that the plaintiff, Ultima Services Corporation ("Ultima") is a small business as defined by defendant Small Business Administration ("SBA"). Dkt. No. 1 ("Compl.") ¶ 6. It further alleges that Ultima bids on contracts to provide services for the Natural Resources Conservation Service ("NRCS"), an agency of the U.S. Department of Agriculture ("USDA"), to provide administrative and/or technical support for NRCS programs that are designed to improve agricultural conservation and protect the environment. *Id.* ¶ 7. It has, in the past, been reasonably successful in obtaining these contracts, and NRCS has been sufficiently satisfied with its work that it renewed contracts under which Ultima provided these services. *Id.* ¶¶ 8-9. More recently, however, the USDA has not only not renewed any contracts, but has refused to allow Ultima (and many other small businesses) to even bid for new ones. *Id.*

¶ 10. Instead, it has reserved contracts for the provision of administrative and/or technical services for NRCS programs to the Section 8(a) Program. *Id.*

The Complaint alleges that the Section 8(a) Program was created in 1978 when Section 202(a) of Public Law 95-507 substantially amended Section 8(a) of the Small Business Act and the SBA promulgated regulations under the amended law. *Id.* ¶ 11. The Section 8(a) Program reserves contracts for the provision of goods and services to "socially and economically disadvantaged small business concerns," *id.* ¶ 12, which, in turn, is defined as small business concerns that are at least 51% owned by individuals who are socially and economically disadvantaged. *Id.* ¶ 14. Defendant SBA identifies the firms that qualify for the Section 8(a) Program. *Id.* ¶ 17.

"Socially disadvantaged individuals" and "economically disadvantaged individuals" have both statutory and regulatory components to them. "Socially disadvantaged individuals" are defined in the statute as those who have "been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to individual qualities." *Id.* ¶ 15; 15 U.S.C. § 637(a)(5). However, the SBA presumes that individual members of certain racial and ethnic groups are "socially disadvantaged." These include Black Americans, Hispanic Americans, Native Americans, Asian Pacific Americans, and Subcontinent Asian Americans. Compl. ¶ 18; 13 CFR § 124.103(b).

"Economically disadvantaged individuals" are defined in the statute as "those socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged." Compl. ¶ 16; 15 U.S.C. § 637(a)(6). The Complaint alleges, however, that defendant SBA lacks the information to assess whether individuals can meet the second part of this statutory definition. Compl. ¶¶ 23-24. Instead, the SBA reviews the personal financial condition of the owners of the firm. Its guidelines permit those who have amassed a

2

substantial amount of wealth to qualify as "economically disadvantaged." *Id.* ¶¶ 26-27.[1]

Thus, both definitions give racial minorities an advantage: there is a presumption of social disadvantage for members of certain races and national origins, and social disadvantage is a necessary prerequisite for showing economic disadvantage.

The Complaint alleges that defendants do not examine whether companies owned by any particular racial group are underrepresented in a particular industry and that, in fact, have no evidence of underrepresentation in Ultima's industry or (if there were such evidence) that any underrepresentation results from discrimination in which the federal government was involved in any way. *Id.* ¶¶ 28, 30-32.

The Complaint alleges that the vast majority of Section 8(a) firms are owned and controlled by members of the racial or ethnic groups advantaged by the racial presumption. *Id.* ¶ 35. It further alleges that the USDA has had a racial motive in utilizing the Section 8(a) Program for contracts in Ultima's industry. *Id.* The Complaint alleges violations of the Fifth Amendment to the United States Constitution and 42 U.S.C. § 1981. The first claim alleges that, in the absence of declaratory or injunctive relief, defendants will continue to award NRCS contracts in Ultima's industry through the Section 8(a) Program, and that Ultima will be harmed by that continuing reservation because it will be unable to bid on and compete for contracts. Compl. ¶¶ 46-47. Accordingly, the Complaint seeks "[i]njunctive relief precluding defendants from reserving NRCS contracts for the Section 8(a) Program." *Id.* 10 (¶ B). The second claim alleges that Ultima lost contracts and suffered damages; it seeks damages under 42 U.S.C. § 1981, but only against defendant SBA. *Id.* ¶ 48.

---

[1] *See also* Dkt. No. 22, Defendants' Memorandum In Support Of Motion To Dismiss ("Dfs' MTD Memo."), 5. In this recitation, defendants omit the fact that the regulations have recently been amended to make it even easier for "socially disadvantaged" individuals to qualify initially as "economically disadvantaged." 85 FR 27650, 27660 (May 11, 2020). Moreover, it would seem that it is not too difficult to manipulate one's assets to stay or become "economically disadvantaged." A person who plows profit from his or her business back into the business and into retirement accounts (rather than take it as salary or other regular income), and uses other assets to pay down the mortgage on his or her house – even one worth millions of dollars – would qualify.

3

<u>Argument</u>

Defendants claim that (1) the allegations of the Complaint do not suffice to show that Ultima has standing to challenge the Section 8(a) Program or to show that it can state a claim for unequal treatment, (2) this Court lacks jurisdiction to consider Ultima's request for reinstatement of any past contracts that Ultima once had but which are now no longer in existence, (3) Section 1981 of Title 42 does not cover allegations of discrimination by the defendants here because they were acting under color of federal authority, and (4) the claim for damages against the SBA is barred by sovereign immunity.

The first two of these arguments have a common flaw: they fail to read properly the allegations of the Complaint. The latter two arguments are just wrong as a matter of law.

I. THE ALLEGATIONS OF THE COMPLAINT SUFFICE TO SHOW THAT ULTIMA HAS STANDING TO ASSERT A CLAIM FOR UNEQUAL TREATMENT

Ultima has asserted a claim for discrimination against defendants under the Fifth Amendment to the United State Constitution and 42 U.S.C. § 1981. It seeks relief for both the loss of contracts in the past and equitable relief to prevent such discrimination in the future. Compl. ¶¶ 46-48.

The Due Process Clause of the Fifth Amendment has an "equal protection" component that parallels the Equal Protection Clause of the Fourteenth Amendment. *E.g.*, *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 213-18 (1995). Racial classifications are viewed skeptically and must be analyzed under strict scrutiny. *Id.* at 227. Other classifications are subject to lower levels of scrutiny. *Id.* at 212-13.

Defendants claim that the allegations of the Complaint do not suffice to show that Ultima has standing to make a claim for discrimination. Their 12(b)(1) motion is a "facial" attack on Ultima's standing; that is, it relies solely on the allegations of the Complaint. Dfs' MTD Memo. 7 ("[D]efendants bring a facial attack as [Ultima] has not sufficiently pleaded jurisdiction."). As they concede, the standard for such facial attacks is the same as for motions pursuant to Rule 12(b)(6). *Id.* Thus, the allegations of the Complaint must be assumed to be true, with all reasonable inferences

4

made in Ultima's favor. *Mills v. Bernard*, 869 F.3d 473, 479 (6th Cir. 2017). The allegations do not need to be detailed, although they cannot simply recite the elements of a claim. *Siefert v. Hamilton County*, 951 F.3d 753, 759 (6th Cir. 2020). *See also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (holding that, when standing is challenged "'[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" (quoting *Lujan v. National Wildlife Federation*, 497 U.S. 871, 889 (1990)).

Constitutional standing (which is, for the most part, what defendants challenge)[2] has three parts: a plaintiff must show that it has suffered an "injury in fact" that is concrete and particularized, that the injury is traceable to the challenged action of the defendant, and that a favorable decision is likely to redress the injury. *School District of the City of Pontiac v. Sec'y Of the United States Dep't of Education*, 584 F.3d 253, 260-61 (6th Cir. 2009) (en banc) (quoting *Friends of the Earth v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 180-81 (2000)). When discriminatory policies are at issue, the harm need not be direct. *E.g.*, *Smith v. City of Cleveland Heights*, 760 F.2d 720, 722 (6th Cir. 1985) (holding that African American resident of mixed racial neighborhood (75% white and 25% black) had standing to challenge municipal policy of steering designed to maintain those racial ratios because the policies "stigmatize him as an inferior member of the community in which he lives" and "he is forced to interact on a daily basis within the . . . community under the weight of this imposed badge of inferiority.").

---

[2] In a brief footnote, defendants claim that Ultima cannot meet prudential standing requirements because it is seeking to vindicate the rights of third parties, and that only firms owned by economically disadvantaged white persons can challenge the Section 8(a) Program. Dfs' MTD Memo. 17 n.5. Even assuming this brief footnote were sufficient to raise the argument, defendants ignores all of the cases cited in this memo in which challenges to race-disadvantage type programs were permitted by firms whose owners were not economically disadvantaged or for whom there was no allegation that they were. As even defendants' own authority acknowledges, "where the plaintiff has established injury in fact, it may assert third party rights." *Donnet Bay Construction Co. v. Borggren*, 799 F.3d 676, 693 (7th Cir. 2015).

5

A. The Complaint Adequately Alleges Facts Sufficient To Show Ultima's Standing To Seek Forward-Looking Relief

When a plaintiff complains of unequal treatment from a government entity, and seeks a declaratory judgment or injunctive relief to prevent that treatment going forward, the injury is the inability to compete on an equal basis, not the inability to obtain a specific benefit. *Northeastern Florida Chapter of the Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656, 666 (1993) ("When the government erects a barrier that makes it more difficult for members of one group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit."). *See also* Dfs' MTD Memo. 13,

Here, the Complaint alleges just such a barrier: the Section 8(a) Program. It alleges that Ultima cannot compete for contracts reserved for the program, and will be unable to compete for them in the future, and has thus identified an injury in fact (Compl. ¶¶ 21, 47); that its injury is traceable to defendants because they have caused that injury, and will cause future injury, by reserving contracts for the Section 8(a) Program (*Id.* ¶¶ 10, 46); and that Ultima is a repeat player for NRCS contracts for administrative and/or technical support (*id.* ¶¶ 7, 20, 47), and thus adequately alleges that it would bid on contracts in the future if permitted to do so. It seeks the remedy of an injunction precluding defendants from reserving contracts for administrative and/or technical support for NRCS programs for the Section 8(a) Program in the future (or equivalent declaratory relief) (*Id.* 10 ¶¶ A, B). Accordingly, it alleges all three elements of standing.

1. Defendants Misread The Complaint and The Case Law. – Defendants challenge each of the three elements (although they say very little about injury in fact, *see* Dfs' MTD Memo. 8), but their arguments all depend on misreading the Complaint as alleging only a challenge to "the rebuttable presumption of social disadvantage." *Id.* But that is not what the Complaint alleges. The Complaint alleges an injury caused by the Section 8(a) Program.

Defendants argue that there are facially race-neutral elements in the Section 8(a) Program,

6

and that, to allege adequately the requisite elements of standing, Ultima must (1) identify those elements, and (2) allege that it can meet them. That argument fails for any number of reasons.[3]

*First*, the Complaint alleges that defendants have a racial motive in using the Section 8(a) Program. Compl. ¶ 35. *See also id.* ¶ 42 ("Defendants do not have a compelling governmental interest to support *the discrimination in the operation of the Section 8(a) Program*.") (emphasis added). And this is hardly an idle allegation; the Complaint alleges that the vast majority of Section 8(a) firms qualify as "socially disadvantaged" *because of* the racial presumption and that defendants' assessment of "economic disadvantage" avoids the requirement that Congress set forth and eliminates only the extremely wealthy. The combination allows defendants to maximize minority-owned firms in the Section 8 Program. *See also* n.1, *supra*; *Dynalantic Corp. v. Dep't of Defense*, 115 F.3d 1012, 1016 (D.C. Cir. 1997) ("Appellant . . . claims that the *entire* 8(a) program – which injures it by foreclosing business opportunities – is infected by unconstitutional race consciousness and therefore its constitutional claim is not logically distinct from its injury") (emphasis in original); *Harrison & Burrowes Bridge Constructors, Inc. v. Cuomo*, 981 F.2d 50, 53 (2d Cir. 1992) (noting that two federal transportation acts requiring 10% of authorized appropriations to be expended with small business concerns owned and controlled by socially and economically disadvantaged individuals as defined in the Small Business Act "were designed to achieve stated *minority* business participation goals primarily through the use of set-asides for qualified contractors.") (emphasis added). Accordingly, whether the Section 8(a) Program has requirements that are *facially* "race-neutral" is just irrelevant. The racially-motivated implementation of a so-called "neutral" selection process is

---

[3] Defendants are unclear as to whether they contend that the statutory definition of "social disadvantage" is one of the elements that is "race-neutral." *Compare* Dfs' MTD Memo. 8 ("[Ultima] is unable to compete for a race-neutral reason: it is not economically disadvantaged.") and 17 n.5 (suggesting that firms owned by economically disadvantaged individuals would have standing) *with id.* at 22 ("[Ultima] is unable to compete for such contracts not because of race, but because its owner is not socially or economically disadvantaged"). *Compare also Rothe Development, Inc. v. United States Dep't of Defense*, 836 F.3d 57, 62 (D.C. Cir. 2016) (holding that statutory terms are race-neutral) *with id.* at 75 (Henderson, J., concurring and dissenting) (concluding that the statute classifies by race) and *Dynalantic Corp. v. Dep't of Defense*, 115 F.3d 1012, 1017 (D.C. Cir. 1997) (characterizing the government's contention that the statute is not itself race-conscious as "rather dubious"). The Complaint makes no such contention.

7

treated the same as a facial classification. *E.g.*, *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979) ("A racial classification, regardless of purported motivation, is presumptively invalid and can be upheld only upon an extraordinary justification . . . This rule applies as well to a classification that is ostensibly neutral but is an obvious pretext for racial discrimination"); *Lane v. Wilson*, 307 U.S. 268, 276-77 (1939) (holding that Oklahoma's statute requiring voting registration for qualified voters who had not voted in 1914 within a twelve day period in 1916, the failure to do so resulting in the permanent loss of the right to register, violated the Fifteenth Amendment prohibition on race discrimination in voting); *Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886) (holding that regulation of laundries in San Francisco was applied in a manner as to discriminate against Chinese).

*Second*, even ignoring the allegation that defendants' use of the Section 8(a) Program is racially motivated, cases do not support the proposition that one cannot challenge the operation of a race-plus-disadvantage program as a whole. For example, *Adarand* involved a clause that the federal government put in its prime contracts giving prime contractors a financial incentive to hire subcontractors certified as small businesses controlled by "socially and economically disadvantaged individuals." *Adarand*, 515 U.S. at 205. Certification as such a small business could come from the SBA, either through the same Section 8(a) Program at issue in this case or a separate program under Section 8(d) of the Small Business Act, or from a state agency. Thus, if one removed the racial presumptions that enabled a firm to be certified as eligible for the subcontracting preference, there would still be, at least, the purportedly race-neutral provisions of the Section 8(a) Program that defendants rely upon here. (The Court was uncertain as to whether the 8(d) program required an individualized showing of economic disadvantage. *Id.* at 208.) Under the theory propounded by defendants in this case, Adarand would not be harmed by the racial presumptions in certification in the future if it did not meet those supposed race-neutral provisions because it would have been at the same disadvantage without the racial presumptions as it was with them. If Adarand's standing depended upon its owners qualifying under racially-neutral definitions of "socially disadvantaged" and "economically disadvantaged," one would expect that the Supreme Court would have paid

8

careful attention to that question.

It did not. Rather, in assessing Adarand's standing under *Northeastern Florida Contractors*, the Court held that Adarand merely had to show that it would bid on subcontracts in the future and that the subcontractor clause – not the *racial presumptions*, but rather the *clause itself* – put it at a disadvantage. *Adarand*, 505 U.S. at 211 ("Adarand's claim that the Government's use of subcontractor compensation clauses denies it equal protection of the laws of course alleges an invasion of a legally protected interest . . ."). That alone was sufficient to show that Adarand had standing to challenge the program without any demonstration that it would be the low bidder on a specific contract. *Id.*

When "race plus disadvantage" programs are involved, the question is whether the program as a whole, not some isolated part of it, places the plaintiff on an unequal footing. *See also, e.g.*, *Regents of the University of California v. Bakke*, 438 U.S. 265, 280 n.14 (1978) (rejecting attacks on medical school applicant's standing to challenge program that set-aside admission places for disadvantaged minorities; "even if Bakke had been unable to prove that he would have been admitted in the absence of the special program, it would not follow that he lacked standing. . . Nor is it fatal to Bakke's standing that he was not a 'disadvantaged' applicant."); *Sherbrooke Turf, Inc. v. Minnesota Department of Transportation*, 345 F.3d 964, 967 (8th Cir. 2003) (holding that plaintiffs had standing to challenge TEA-21 set aside of 10% of federal contracting dollars to firms owned by socially and economically disadvantaged individuals, including those so certified under Section 8(a); "The stipulated facts demonstrate that [plaintiffs] have bid on federally assisted highway projects in the past, will continue to bid in the future, and suffer competitive harm when contracts are awarded to others under DOT's Disadvantaged Business Enterprises (DBE) program."); *W.H. Scott Construction Co. v. City of Jackson*, 199 F.3d 206, 213 n.5 (5th Cir. 1999) (holding that plaintiffs had standing to challenge city's policy of maximizing the participation of Disadvantaged Business Enterprises, defined as businesses owned and controlled by socially and economically disadvantaged individuals under the Small Business Act; "[T]he City argues . . . that DBE classifica-

9

tion is *not* dependent on race, but rather disadvantage. The distinction, however, is relevant only to our constitutional analysis and the degree of scrutiny to be applied to the classification. It is not relevant to an Article III 'case or controversy' requirement. Therefore, for clarity's sake, we presume no such racial classification in our standing analysis and address only the differing obligations of DBEs and non-DBEs, whether race-based or not."); *Concrete Works v. City & County of Denver*, 36 F.3d 1513, 1516, 1518 (10th Cir. 1994) (holding that white- and male-owned plaintiff construction company had standing to challenge municipal ordinance that gave minority- and women-owned firms an advantage for city contracts even though eligible minority- and women-owned firms also had to show annual revenues below certain thresholds; "the Ordinance prevented [plainitff] from competing on an equal basis with minority and women-owned prime contractors"); *Gross Seed Co. v. Nebraska Dep't of Roads*, 2002 U.S. Dist. LEXIS 27125, *9 (D. Neb. May 6, 2002) (holding that plaintiff had standing to challenge TEA-21, the federal transportation act passed in 1998, which provides for the participation of disadvantaged business enterprises, owned by individuals defined as socially and economically disadvantaged under the Small Business Act, in federally-funded highway programs); *Cortez III Service Corp. v. National Aeronautics and Space Administration*, 950 F. Supp. 357, 360 (D.D.C. 1996) (holding that plaintiff had standing to challenge an award of a contract under the Section 8(a) Program even though plaintiff was neither a small business nor a socially and economically disadvantaged business, but rather a large business owned by a non-minority that wanted the contract awarded under full and open competition; "Under the standing analysis: (1) plaintiff faces the threatened injury of losing the right to compete for a valuable contract; (2) that injury is fairly traceable to the decision by NASA and SBA to offer the contract under 8(a); and (3) if the Court finds that defendants violated either the APA or the Constitution, such a decision would put plaintiff in a position to compete for the contract, which it is now precluded from doing."). *See also Rothe Development Corp. v. Dep't of Defense*, 545 F.3d 1023, 1035 (Fed. Cir. 2008) ("Because [Defense Authorization Act] incorporates an explicit racial classification – the presumption that members of certain minority groups are 'socially disadvan-

10

taged' for purposes of obtaining SDB status and the benefits that flow from that status . . . – the *statute* is subject to strict scrutiny.") (emphasis added); *Milwaukee County Pavers Ass'n v. Fiedler*, 707 F. Supp. 1016, 1019, 1021, 1032 (W.D. Wisc. 1989) (holding that plaintiff corporations, which "were not actually managed and controlled by disadvantaged individuals," were irreparably harmed, sufficient to warrant preliminary injunctive relief, by state program that presumed that members of certain racial minorities were disadvantaged for purposes of identifying firms entitled to the benefits of state's DBE program, even though the "disadvantaged" businesses "must prove that [they] satisf[y] the size and ownership and control requirements of [federal regulation]").

*Third*, even if the Complaint did not allege a racial motivation, and even if case law did not treat "race-plus-disadvantage" programs as a whole, defendants' "standing" argument appears to be based on the misunderstanding that distinctions other than race are immune from challenge under equal protection principles. But this is not so, and defendants offer no authority to suggest that it is. As the Fifth Circuit noted in *City of Jackson*, *supra*, identifying the discrimination as based on "race" or "disadvantage" might affect the level of scrutiny applied under equal protection principles, but it has nothing to do with standing. *See also* Dfs' MTD Memo. 22 (quoting *Scarborough v. Morgan County Bd. Of Educ.*, 470 F.3d 250 (6th Cir. 2006)). Indeed, in *Rothe Development Corp. v. U.S. Dep't of Defense*, 836 F.3d 57 (D.C. Cir. 2016), the D.C. Circuit concluded that the statutory provisions of Section 8(a) (the only thing challenged there) were race-neutral (*see* n.3, *supra*) – but it still assessed those provisions under rational basis scrutiny. *Id.* at 72-73.

Defendants' analysis of each of the three elements of constitutional standing is marred by their misunderstanding of the Complaint and the case law. As noted earlier, their exiguous discussion of "injury in fact" (Dfs' MTD Memo. 8) presupposes that Ultima is only challenging the racial presumption of social disadvantage rather than the larger program of which it is a part. Their discussion of "traceability" (Dfs' Memo. 8-11) claims that Ultima's "economic status" (presumably meaning its failure to allege economic disadvantage of its owner) prevents it from competing rather than the racial presumption of social disadvantage (which is a requirement of economic disadvan-

11

tage).  But it is the entirety of the Section 8(a) Program, which the Complaint alleges is being used for racial purposes, that prevents Ultima from competing.

So, too, defendants' discussion of "redressability" (Dfs' Memo. MTD 11-12) assumes that this Court would be limited to enjoining only the racial presumption of social disadvantage and nothing else.  This is odd because there have been successful challenges to various aspect of the Section 8(a) Program (and similar programs) in the past, and none of them resulted in an injunction against only a regulatory presumption.  *E.g.*, *Dynalantic v. Dep't of Defense*, 885 F. Supp. 2d  237, 293 (D.D.C.  2012) (enjoining the SBA and Department of Defense "from awarding procurements for military simulators under the Section 8(a) program without first  articulating a strong basis in evidence for doing so"); *Cortez III*, 950 F. Supp. at 363 (granting motion of plaintiff, a large non-minority owned firm, for a preliminary injunction and enjoining defendants SBA and NASA from setting aside a contract for the Section 8(a) program); *Fordice Constr. Co.v. Marsh*, 773 F. Supp. 867, 882 (S.D. Miss. 1990) (declaring that set-aside of contracts from the Army Corps of Engineers to SBA for consideration in the Section 8(a) program violated federal law).  *See also, e.g.*, *Rothe Development Corp.*, 545 F.3d at 1050 (holding that Defense Department program to increase participation by businesses owned by socially and economically disadvantaged individuals violated the equal protection component of the Fifth Amendment right to due process); *Milwaukee County Pavers Ass'n*, 707 F. Supp. at 1034 (granting preliminary injunction motion by plaintiff corporations, who were not managed and controlled by disadvantaged individuals, against state-funded projects under state DBE statute).  Indeed, in *Dynalantic*, after the case went on appeal, the government settled by *agreeing* not to use the Section 8(a) Program in the relevant industry.  *See Dynalantic Corp. v. U.S. Dep't of Defense*, Civ. No. 95-2301, Dkt No. 260 ¶ 1 (D.D.C. Jan. 31, 2014) (copy attached as Ex. 1).

        2.    <u>Defendants' Argument Fails Even On Its Own Terms</u>. – Even assuming that the premise of defendants' argument, that Ultima is not challenging or could not challenge anything but the race-conscious presumption of social disadvantage, were correct, their standing argument

is still without merit.

The Complaint alleges that the vast majority of Section 8(a) firms are owned by individuals advantaged by the presumption, and that, in the absence of the racial presumption, far fewer firms would qualify for Section 8(a) Program and Ultima would have far more opportunities to bid on contracts. Compl. ¶¶ 19-20, 35. Thus, the Complaint ties Ultima's disadvantage in competing not only to the Section 8(a) Program as a whole, but to the racial presumption in particular.

Defendants acknowledge this tie, but argue that this Court should ignore these allegations because they are speculative. Dfs' MTD Memo. 10 ("These are not factual allegations entitled to the presumption of truth, but pure speculation."). But these are the same allegations that the D.C. Circuit in *Dynalantic* relied upon to show that the presumption of social disadvantage was harming the plaintiff there, and that declaratory or injunctive relief, even if confined to the presumption, would benefit the plaintiff. *Dynalantic Corp.*, 115 F.3d at 1017 ("It seems more than likely that without the regulatory presumption there would be considerably fewer 8(a) contractors . . . Appellant would thus suffer a considerably lessened injury: a smaller number of 8(a) firms means a smaller number of contracts procured under the 8(a) program."). It is hardly "speculative" to assume that a presumption that a requirement is met is designed to make it easier to meet the requirement – and that elimination of the presumption will make it harder. Defendants argue that this Court should not assume that "socially disadvantaged businesses will not be able to qualify for the program through existing means" (whatever those are), Dfs' MTD Memo. 11, but it is certainly reasonable to assume that they will not be able to do so *immediately* and even a temporary reduction in the size of the Section 8(a) Program will benefit Ultima.[4]

---

[4]     Defendants also claim that they might put contracts into a different program for which Ultima is ineligible. Dfs' MTD Memo. 11. So what? Ultima claims unequal treatment from the Section 8(a) Program. If defendants choose to end the program in Ultima's industry, and cease benefitting Section 8(a) firms, Ultima will no longer be treated unequally from that program. Eliminating Section 8(a) firms' advantage is a constitutional remedy. *Barr v. American Ass'n of Political Consultants*, 207 L. Ed. 2d 784, 802 (2020) (holding that favorable treatment in an exception to a robocall prohibition, given to those seeking to collect government debt, would be eliminated in successful suit by political consultants; "When the constitutional violation is

(continued...)

13

Defendants' argument also ignores the fact that the Complaint challenges defendants' treatment of economic disadvantage and alleges that the Section 8(a) Program is not narrowly-tailored because its benefits are extended to the wealthy. *See* n.1, *supra*. It also alleges that defendants have no basis for assessing the statutory definition of economic disadvantage (having less access to capital than those who are not socially disadvantaged). A declaration that defendants' regulatory definition is not narrowly-tailored, then, likely would result in a substantially smaller race-conscious program.

In contrast, the plaintiff in *DeBolt v. Espy*, 47 F.3d 777 (6th Cir. 1995) (Dfs' MTD Memo. 10) argued that a change in policy at the federal Farmers' Home Administration would somehow induce private developers to build larger apartments, but could not show that FmHA had denied funding for such projects. *Id.* at 780. Relying on earlier housing precedents requiring a plaintiff to show the a defendant's policies caused the plaintiff's lack of housing, the Sixth Circuit found plaintiff's claims too speculative. *Id.*

Defendants also rely on the Tenth Circuit's decision in *Cache Valley Electric Co. v. Utah Dep't of Transportation*, 149 F.3d 1119 (10th Cir. 1998), Dfs' MTD Memo. 12, but they neglect to mention three substantial differences between that case and this one. First, plaintiff there did not apparently allege that the entire program at issue was motivated by race or that the use of race was not narrowly-tailored. Second, as defendants acknowledge, the plaintiff was not even a *small* business (*id.* at 1121); *see also Klaver Construction Co. v. Kansas Dep't of Transportation*, 211 F. Supp. 2d 1296, 1301 (D. Kan. 2002) (Dfs' MTD Memo. 9) (plaintiff was not a small business); the Tenth Circuit apparently assumed that a contract for disadvantaged small businesses would still, if that program were limited, be used for small businesses. Third, the case was decided on summary judgment (*Cache Valley*, 149 F.3d at 1124), the Tenth Circuit concluding that "plaintiff ha[d]

---

[4](...continued)
unequal treatment, . . . a court can theoretically cure that unequal treatment either by extending the benefits or burdens to the exempted class, or by nullifying the benefits or burdens for all.") (citing *Heckler v. Mathews*, 465 U.S. 728 (1984)).

14

adduced no *evidence* that the elimination of the preferences would result in any meaningful reduc-
tion in the number of qualifying DBEs" (*id.* at 1123, emphasis added), and thus does not support
their argument that Ultima's allegation is inherently speculative. *See also Interstate Traffic Control
v. Beverage*, 101 F. Supp. 2d 445, 449 (D.W.V. 2000) (Dfs' MTD Memo. 9-10) (considering matters
outside the pleadings). Thus, even if *Cache Valley* were correctly decided – it is obviously irrecon-
cilable with Judge Sporkin's holding in *Cortez III* – it would not support defendants' motion.

        3.    <u>Defendants' Other Authorities Do Not Support The Motion</u>. – Defendants
claim that "clear Sixth Circuit precedent" (Dfs' MTD Memo. 13) supports their standing argument.
It does not come close.

        Defendants begin by citing the Supreme Court's decision in *Northeastern Florida Chapter*
and acknowledging the proposition that a plaintiff seeking forward-looking relief need not show that
it would have obtained the benefit, but only that it will apply for the benefit in the future and will
be on an uneven playing field. Dfs' MTD Memo. 13. Defendants claim that *Northeastern Florida
Contractors* is distinguishable in this regard because participants "must meet separate race-neutral
criteria." *Id.* (citing 13 C.F.R. § 124.104). But the Court found "the most closely analogous"
precedent to be *Bakke* (*Northeastern Florida Contractors*, 508 U.S. at 665) – in which participants
*also* had to meet a facially race-neutral requirement of disadvantage. The Court's reference in
*Northeastern Florida Contractors* to a "discriminatory policy" was not to only a racially discrimina-
tory policy, but any policy that created a disadvantage for some group. Further, that *Northeastern
Florida Contractors* case involved a racial exclusion instead of a racial presumption is irrelevant
to standing; either creates such a disadvantage.

        Defendants' Sixth Circuit cases are quite off point. First, none of them involved plaintiffs
who sought forward-looking relief against the application of a rule creating an uneven playing field
in the future. Rather, each involved applicants who did poorly on some entrance requirement of
some sort and who claimed that they were being deprived of an opportunity to obtain the benefit.
Thus, in *Brunet v. City of Columbus*, 1 F.3d 390 (6th Cir. 1993), males had sat for a firefighter exam

15

and had been ranked according to their scores, but pursuant to a consent decree, lower-scoring women were to be hired. The standing question in *Brunet* that defendants rely upon was whether the males' hiring dates were affected by the consent decree. The Sixth Circuit simply held that some already had been hired at the same time they would have otherwise been (and, thus, their claims were moot), one other's hiring date was not affected because he would have been hired in the next "class" regardless, and a fourth ranked quite low and there was nothing in the record as to when he ever would be on a certified list. *Id.* at 398-99. Similarly, in *Yeager v. Gen'l Motors Corp.*, 265 F.3d 389 (6th Cir. 2001), the question was whether the plaintiff's ability to obtain the benefit (an apprentice program) was affected by various race- or sex-conscious programs run by General Motors, and the Sixth Circuit concluded that it did not. *Id.* at 396 ("Our Article III standing analysis focuses on whether [plaintiff] has shown that, but for the training program, he would have been hired for an apprenticeship . . . [Plaintiff's] exclusion from the training program is relevant for this case only as it relates to GMC's failure to hire him as an apprentice."). This is, of course, the exact opposite of the standard articulated by the Supreme Court in *Northeastern Florida Contractors* and *Adarand* for forward-looking relief: in those cases, the plaintiff need not show that it would have obtained a benefit. *But see* Dfs' MTD Memo. 9 (claiming that "a plaintiff who would not have obtained the desired benefit even in the absence of discrimination" lacks standing).

The Sixth Circuit's unreported decision in *Stefanovic v. University of Tennessee*, 1999 U.S. App. LEXIS 5978 (6th Cir. March 30, 1999), relied upon by defendants (Dfs' MTD Memo. 9, 11), illuminates the distinction. There, a failed job applicant sued the University of Tennessee over its affirmative action policy. The Sixth Circuit held that, for his past application, plaintiff had been permitted to compete, but had not been hired for reasons unrelated to any affirmative action policy. *Id.* at *11. Plaintiff submitted an affidavit that he would apply again in the future, but the Court concluded that *that* allegation was too speculative and remote. *Id.* Here, of course, Ultima is a repeat player in the contracts for administrative and technical support for NRCS programs. Defendants do not dispute that it wants to apply for contracts in the future being reserved for Section 8(a).

16

The other cases cited by defendants are mostly of the same ilk; they either involve whether the plaintiff was affected in the *past* by a possible illegal consideration or whether they were simply ineligible for a benefit, *e.g.*, non-students complaining about sex-segregated housing reserved for students (*Wilson v. Glenwood Intermountain Properties, Inc.*, 98 F.3d 590 (10th Cir. 1996)), or a bar applicant not admitted in any state complaining about citizenship discrimination in a bar admission rule that required being a bar member elsewhere (*Bashir v. Supreme Court of Ohio*, 652 F.2d 641 (6th Cir. 1981)). Only one deserves brief mention, the Fourth Circuit's unpublished decision in *SRS Technologies, Inc. v. U.S. Dep't of Defense*, 1997 U.S. App. LEXIS 10143 (4th Cir. May 6, 1997) (Dfs' MTD Memo. 9, 16), which involved the Section 8(a) Program. Unlike Ultima, though, the plaintiff in *SRS Technologies* was *owned by a racial minority* who was a beneficiary of the racial presumption, and that was the only part of the Section 8(a) Program plaintiff challenged. *Id.* at *3-4.

      B.     The Complaint Adequately Alleges Facts Sufficient To
              Show Ultima's Standing To Seek Retrospective Relief

Defendants also argue that Ultima lacks standing to assert retrospective relief because it has not alleged that it would have obtained any contracts in the absence of Section 8(a) Program. Dfs' MTD Memo. 17-18. This is wrong on the facts and the law. The Complaint alleges that Ultima had been very successful in obtaining such contracts until defendants began reserving them for the Section 8(a) Program. Compl. ¶¶ 8-9. It can be reasonably inferred that Ultima more likely than not would have obtained contracts for administrative and/or technical services for NRCS programs had it been permitted to bid on them in a fair competition, *i.e.*, in the absence of Section 8(a).[5]

---

[5]     Indeed, in communicating pursuant to this Court's March 5, 2020 Order Governing Motions To Dismiss (Dkt. No. 5) prior to defendants' motion being filed, Ultima specifically stated that it believed the Complaint already adequately alleged that it would have received contracts in the absence of defendants reserving them for the Section 8(a) Program. It offered to explicitly amend the Complaint to state so more explicitly if it would obviate any part of defendants' proposed motion. Defendants replied that Ultima's proposed amendment would not obviate *any* part of their proposed motion. Yet this seems to be exactly the allegation defendants claim is missing. Dfs' MTD Memo. 18 ("But plaintiff has not alleged that it would have received or retained such contracts but for the allegedly unlawful criteria it challenges.").

It is wrong on the law because *Bakke* specifically held that the plaintiff there had standing to seek an order requiring his admission to medical school even if he could not show that he would have been admitted in the absence of the special admissions program at issue there. *Bakke*, 438 U.S. at 280 n.14. As one of defendants' own cases (Dfs' MTD Memo. 9 n.1) states, "the *Bakke* footnote represents a rejection of the claim that an unsuccessful candidate must prove to a certainty that s/he would have been admitted before being accorded standing." *Doherty v. Rutgers School of Law-Newark*, 651 F.2d 893, 901 (3d Cir. 1981). *Id.* at 902 ("s/he will . . . have standing if there was a chance of successful admission had s/he not been prohibited from competing for all the seats").

*Aiken v. Hackett*, 281 F.3d 516 (6th Cir. 2002) is not to the contrary. That is yet another case involving a civil service list in which the plaintiff had a disqualifyingly-low score. *Id.* at 519 ("it appears beyond debate that absent the forbidden criterion used by the City, the Appellants still would not have been promoted to sergeant."). *Compare, e.g.*, *Bobo v. United Parcel Service, Inc.*, 665 F.3d 741, 757 (6th Cir. 2012) (employee in a Title VII case "can proceed . . . by demonstrating that race was a motivating factor in his termination, even though other factors also motivated his discharge. . . . If [plaintiff] can make that showing, [employer] is liable, although [employee's] remedies are limited if [employer] can establish that it would have taken the same action in the absence of the impermissible motivating factor."). *Texas v. Lesage*, 528 U.S. 18 (1999) was the same and, it deserves mention, never used the word "standing."

## II. THE COMPLAINT ALLEGES A VIOLATION OF DUE PROCESS

Defendants argue that Ultima has not alleged an "equal protection" claim (Dfs' MTD Memo. 22-24), but their argument is just a retread of their standing argument and fails for all the same reasons. Indeed, it is worse; it is self-contradictory. It cites *Scarborough v. Morgan County Bd. Of Educ.*, 470 F.3d 250 (6th Cir. 2006) for the proposition that the "threshold" requirement of an equal protection claim is disparate treatment, and that the level of scrutiny is determined by the classification used. Dfs' MTD Memo. 22. It then proceeds to assert that Ultima has not asserted an equal protection claim because it has not shown it was treated differently because of *race*. Even if that

18

were true, under *Scarborough* it only would affect the level of scrutiny. *Scarborough*, 470 F.3d at 260-61 (holding that plaintiff's equal protection claim was only entitled to rational basis review, but that it survived summary judgment). Ultima is treated differently from a Section 8(a) firm.

In any event, as discussed previously, Ultima is being treated differently because of the race of its owner. The Complaint alleges that the use of the Section 8(a) Program by defendants to reserve contracts for NRCS programs is racially-motivated. Further, a "successful African American individual" (Dfs' MTD Memo. 23) is being treated differently because she is presumed socially disadvantaged, one of the requirements of economic disadvantage, and will be treated as such in the absence of any objection. She can thus qualify to be economically disadvantaged even with a substantial six figure income and ownership of assets worth millions.

## III. DEFENDANT ERRS IN ARGUING THAT ULTIMA HAS ASSERTED A CONTRACT CLAIM

Defendants' second jurisdictional argument apparently applies only to one request in the Complaint's ad damnum clause: the reinstatement of certain contracts that were not renewed. They contend that this request falls under the exclusive administrative and review procedures of the Contract Disputes Act. Dfs' MTD Memo. 18-21. Defendants err because this request for relief is not a "claim" relating to a contract for purposes of the Contract Disputes Act.

The gist of defendants' argument is that Ultima is complaining that the failure to exercise options on its contracts was unconstitutional. But this is a misreading of the Complaint. Paragraph 10 has the only reference in the Complaint to USDA's refusal to exercise options on contracts with Ultima. But it goes on to allege:

> Moreover, after declining to exercise the contract options, USDA has not offered these contract opportunities to any company willing to bid on the contracts or even all small businesses willing to bid on the contracts. Rather, USDA has repeatedly . . . set aside these contracts for a Section 8(a) contractor.

As defendants correctly acknowledge, the Sixth Circuit determines the applicability of the CDA by examining whether "plaintiff's claims are essentially contractual in nature." Dfs' MTD Memo. 19. One cannot read Paragraph 10 in its entirety and conclude that Ultima is making a claim that is

19

"essentially contractual." The refusal to exercise options is just the first step in the gravaman of Paragraph 10: setting aside contracts for the Section 8(a) Program. Had defendants simply refused to exercise options and then bid successive contracts out, Ultima likely would have no claim at all, much less a contractual one.

Defendants assert that "monetary damages" and "reinstatement of the contract" is "the type of relief" that is "clearly contractual in nature." Dfs' MTD Memo. 19. Monetary damages can be sought in a wide array of different cases. And while reinstatement of a contract may be appropriate in some contract cases (*viz.*, ones calling for specific performance), reinstatement is also a perfectly appropriate remedy in many discrimination cases, *e.g.*, employment discrimination cases that are non-contractual. Here, reinstatement would be just one of the many possible equitable remedies available to this Court if it finds illegal discrimination.

Further, Congress did not want contracting officers to have the exclusive initial review of difficult constitutional issues. *E.g.*, *Free Enterprise Fund v. Public Company Accounting Oversight Bd.*, 561 U.S. 477, 489 (2010) ("[W]e presume that Congress does not intend to limit jurisdiction if . . . the claims are 'outside the agency's expertise.'") (internal citation omitted); *id.* at 491 (rejecting government's argument that petitioner's separation of powers challenge to the accounting board's structure had to first be presented administratively to accounting board and Securities and Exchange Commission; "Petitioners' constitutional claims are also outside the Commission's competence and expertise.").

## IV. DEFENDANTS' SECTION 1981 ARGUMENTS ARE WRONG OR IRRELEVANT

Defendants argue that 42 U.S.C. § 1981 does not cover actions by the federal government and that it does not waive the government's sovereign immunity. Dfs' MTD Memo. 24-25. The first argument is wrong, and the second is irrelevant.

Defendants' first argument relies upon Section 1981(c), which provides that the rights in Section 1981 "are protected against impairment by nongovernmental discrimination and impairment under color of State law." 42 U.S.C. § 1981(c). Defendants claim "its plain terms" show that it

20

"does not protect against discrimination under color of federal law," Dfs' MTD Memo. 24, but Section 1981(c) does not state one way or the other whether Section 1981 reaches conduct under color of federal law.

To be sure, the principle of *expressio unius est exclusio alterius* does support defendants' argument. That is, by stating that the statute reaches private conduct and conduct under color of state law, and not mentioning federal actors, Section 1981(c) implies that the statute does not apply to the federal government. But while *expressio unius* is an important tool of statutory interpretation, it is not always conclusive. *E.g.*, *Marx v. General Revenue Corp.*, 568 U.S. 371, 381 (2013) (rejecting the government's *expressio unius* argument that provision of Federal Debt Collection Act, providing for costs when a case is brought for improper purposes, precluded district court from awarding costs pursuant to its traditional authority in the absence of such purposes; "[T]he *expressio unius* canon . . . does not apply 'unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it.'") (quoting *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003)); *Ford v. United States*, 273 U.S. 593, 611 (1927)) ("The [*expressio unius*] maxim . . . is often helpful, but its wise application varies with the circumstances."); *id.* at 612 ("'It is often a valuable servant, but a dangerous master to follow in the construction of statutes or documents. The 'exclusio' is often the result of inadvertence or accident . . . .'") (quoting *Colquhoun v. Brooks*, 21 Q.B. Div. 52, 65).

That being said, had all of Section 1981 as it currently appears been passed at the same time, *expressio unius* would have considerable force here. But it was not. Accordingly, *expressio unius* is countered by, and must yield to, a separate, and equally important, interpretive maxim: the strong presumption against implied repeals.

Section 1 of the Civil Rights Act of 1866 is the source for both 42 U.S.C. § 1981 and § 1982. *E.g.*, *Patterson v. McLean Credit Union*, 491 U.S. 164, 196 (1989) ("[T]he language of both § 1981 and § 1982 appeared traceable to § 1 of the Civil Rights Act of 1866 . . . ."); *Runyon v. McCrary*, 427 U.S. 160, 170 (1976) ("both § 1981 and § 1982 derive" from Section 1 of the 1866 Act).

In interpreting Section 1, the Supreme Court has found that it reached conduct under color of federal and state law, as well as private conduct. *District of Columbia v. Carter*, 409 U.S. 418, 422 (1973) (stating that Section 1 of the Civil Rights Act of 1866 is "an 'absolute' bar to *all* such [racial] discrimination, private as well as public, *federal* as well as state") (emphasis added); *id.* ("the same considerations that led Congress to extend the prohibitions of § 1982 to the Federal Government apply with equal force to the District [of Columbia], which is a mere instrumentality of that Government"). Prior to the Civil Rights Act of 1991, lower courts specifically applied that holding to Section 1981. *E.g.*, *Baker v. F&F Investment Co.*, 489 F.2d 829, 833 (7th Cir. 1973); *Bowers v. Campbell*, 505 F.2d 1155, 1157-58 (9th Cir. 1974); *Petteway v. Veterans Admin. Hospital, Houston, Tex.*, 495 F.2d 1223, 1225 (5th Cir. 1974) (claims against federal officials under Section 1981 dismissed only insofar as sovereign immunity would prohibit them).

Section 1981(c) was added by Section 101 of the Civil Rights Act of 1991. Any claim that it impliedly repealed the scope of the Civil Rights Act of 1866, and overruled the authorities holding that Section 1 of the 1866 Act reaches conduct under color of federal authority, must overcome the strong presumption against implied repeals. *Cook County, Ill. v. United States ex rel. Chandler*, 538 U.S. 119, 132 (2003) (relying upon "the 'cardinal rule . . . that repeals by implication are not favored'") (internal citation omitted).

Congress is presumed to know the judicial interpretations previously given by courts to Section 1 of the 1866 Act, and should only be understood to repeal those interpretations if its intent is unmistakable. *E.g.*, *Forest Grove School Dist. v. T.A.*, 557 U.S. 230, 239-40 (2009) (holding that amendment to the Individuals with Disability Education Act (IDEA), providing that a court may order a school district to reimburse a parent for private education when the district has failed to provide proper services to a child who has previously received services from the district, did not limit prior court rulings that permitted reimbursement even when the child had not previously received such services from the district; "'Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute

22

without change.' . . . Accordingly, absent a clear expression elsewhere in the Amendments of Congress' intent . . . to abrogate our decisions . . . , we will continue to read [more general provision] to authorize the relief respondent seeks.") (quoting *Lorillard v. Pena*, 434 U.S. 575, 580 (1978)); *id.* at 243 ("This reading of [the amendment] is necessary to avoid the conclusion that Congress abrogated *sub silentio* our decisions . . . . ").

Congress did not repeal Section 1981's protection against federal discrimination in 1991. At least two textual clues support that conclusion. First, *expressio unius* strictly applied to Section 1981(c) would eliminate protection from discriminatory acts of territorial governments no less than discriminatory acts by the federal government. *Cf. Carter*, 409 U.S. at 422 ("the District [of Columbia] . . . is a mere instrumentality of [the Federal] Government"). Yet, Congress did not eliminate the word "Territory" from Section 1981(a). Thus, under defendants' theory, citizens in the territories are protected from *private* discrimination under Section 1981, but, counterintuitively, not government discrimination. *Cf. Xia v. Tillerson*, 865 F.3d 643, 659 (D.C. Cir. 2017) (noting this tension).

Second, Congress did not amend Section 1982; it still applies to discrimination by the federal and territorial governments. Under defendants' theory, the protections from Section 1 of the 1866 Act would now be divided: that provision would still protect citizens from federal government acts that discriminate against their property rights, but not their contract rights.

The legislative history of the Civil Rights Act of 1991 gives no indication that Congress intended, by omission of any reference to acts taken pursuant to federal authority in Section 1981(c), either to achieve these results or to modify the interpretation of Section 1 of the 1866 Act in *Carter* and lower court cases. Rather, the legislative history indicates that the addition of Section 1981(c) was to insure the reach of Section 1981 to private conduct; that is, to secure the result reached in *Runyon* and to expand the result in *Patterson*. *E.g.*, H.R. Rep. 102-40 (II) at 35-37, 1991 U.S.C.C.A.N. 694, 728-31 (interpreting Section 12 of H.R. 1, as introduced, substantively identical to Section 101 of the final bill that amended Section 1981); *id.* at 37, 1991 U.S.C.C.A.N. at 731

23

("The Committee intends to prohibit discrimination in all contracts, public and private."); H.R. 1H, 102nd Congress, § 12 (1991) (available at https://www.congress.gov/bill/102nd-congress/house-bill/1/text).

Congress's general purpose in the Civil Rights Act of 1991 was to *expand* rights that it believed had been unduly constricted by Supreme Court decisions. It would be most strange, given that purpose, to conclude that Congress, without so much as a word in the legislative history, decided to cut back on a substantial Reconstruction-era civil rights provision. *E.g.*, *Chisom v. Roemer*, 501 U.S. 380, 396 & n.23 (1991) (holding that 1982 amendments to Section 2 of the Voting Rights Act, designed to expand liability by adding a "results" test, and that used the word "representative" in describing elections covered under the section, did not *sub silentio* amend the statute to remove coverage of judicial elections; "[W]e are convinced that if Congress had such an intent, Congress would have made it explicit in the statute, or at least some of the Members would have identified or mentioned it at some point in the unusually extensive legislative history of the 1982 amendment. . . . Congress' silence in this regard can be likened to the dog that did not bark.").

Defendants rely on two unpublished Sixth Circuit cases, Dfs' MTD Memo. 24, but it is well-established that such cases are not binding precedent. *Twumasi-Ankrah v. Checkr, Inc.*, 954 F.3d 938, 944 (6th Cir. 2020). And the two unpublished cases defendants cite are hardly persuasive; the analysis in each consists of one sentence and a citation to an Eleventh Circuit opinion that does not address the legislative history of the 1991 Civil Rights Act at all.

At the same time, defendants ignore *binding* Sixth Circuit precedent that militates against them. At first glance, Section 1981(c)'s language would lead one to believe that it provides a direct claim against those acting under color of state law. But prior to its addition in the 1991 Civil Rights Act, the Supreme Court had held that Section 1981 does not provide such a direct claim, but can only be enforced against state actors through Section 1983. *Jett v. Dallas Indep. School Dist.*, 491 U.S. 701 (1989). In *Arendale v. City of Memphis*, 519 F.3d 587 (6th Cir. 2008), the Sixth Circuit addressed whether the addition of Section 1981(c) had overruled *Jett*. Carefully going through the

24

legislative history of the 1991 Act, the Sixth Circuit concluded that it was designed to redress certain Supreme Court decisions that Congress believed had unduly cut back on Section 1981 – but that *Jett* was not one of them. *Id.* at 597-99. *See also Xia*, 865 F.3d at 659 (reviewing the same legislative history in addressing whether the 1991 Act repealed Section 1981's reach to federal actors, although not ultimately reaching the issue).

While a number of cases support defendants' argument, only a few of them even acknowledge the pre-1991 case law and none of them address the limits on *expressio unius* or the presumption against implied repeals. Accordingly, and especially in light of *Arendale*'s careful analysis of the 1991 Act's legislative history on a closely-related question, they should not be followed. *See also Carias v. Harrison*, 2016 U.S. Dist. LEXIS 37813, *32 (E.D.N.C. March 23, 2016) (denying federal defendants' motion to dismiss Section 1981 claim even though "plaintiff challenges federal and not state action"); *La Compania Ocho, Inc. v. U.S. Forest Service*, 874 F. Supp. 1242, 1251 (D.N.M. 1995); Neal K. Katyal & Laurence H. Tribe, *Waging War, Deciding Guilt: Trying the Military Tribunals*, 111 Yale L.J. 1259, 1300, n.150 (2002).

Defendants' second Section 1981 argument is that it does not waive sovereign immunity for damages. Dfs' MTD Memo. 25. This is irrelevant because the claim for damages is only against defendant SBA and 15 U.S.C. § 634(b)(1) waives its sovereign immunity. It is true that the Sixth Circuit, in *Selden Apts.v. HUD*, 785 F.2d 152 (6th Cir. 1986) found HUD retained its sovereign immunity against damage claims on a Section 1981 suit, but it relied upon limitations in HUD's "sue and be sued" waiver to certain Housing Acts of the 1930's, not Section 1981. No such limitation appears in Section 634(b)(1). Although that statute was cited in the first numbered paragraph of the Complaint, defendants make no reference to it.

Conclusion

For the foregoing reasons, defendants' motion to dismiss should be denied.

25

Respectfully submitted,


<u>/s/ Michael E. Rosman</u>
Michael E. Rosman
Michelle A. Scott
CENTER FOR INDIVIDUAL RIGHTS
1100 Connecticut Ave, NW, Ste. 625
Washington, D.C. 20036
(202) 833-8400

M. Dale Conder, Jr.
RAINEY KIZER REVIERE & BELL PLC
209 E. Main St.
Jackson, TN 38301
(731) 426-8130

26

<u>Certificate of Service</u>

I certify that I served the foregoing memorandum in opposition by filing it on July 31, 2020 with the Court's CM/ECF system which will serve counsel for defendants.

<u>*/s/ Michael E. Rosman*                    </u>
Michael E. Rosman