IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | |
|---|---|---|
| ULTIMA SERVICES CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:20-cv-00041-DCLC-CRW |
| | ) | |
| U.S. DEPARTMENT OF AGRICULTURE, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

## REPLY IN SUPPORT OF MOTION TO DISMISS

Plaintiff has failed to establish this Court's jurisdiction over its claims or that the Complaint states a claim for relief. Plaintiff's effort to overcome the substantial authority compelling the conclusion that it lacks standing, requiring dismissal under Rule 12(b)(1), is based on distinguishable or otherwise unpersuasive case law. Plaintiff fails to address any of the legal authority defendants cited that shows that the Complaint fails to state an equal protection claim under Rule 12(b)(6) and that plaintiff's claim for relief on specific contracts is beyond this Court's jurisdiction. As for plaintiff's 42 U.S.C. § 1981 claim, plaintiff asks the Court to ignore overwhelming judicial precedent in favor of arguments unsupported by the statutory text or any controlling judicial authority. For the reasons set forth below, as well as those set forth in defendants' Memorandum of Law ("Def. Mem."), defendants' Motion to Dismiss should be granted, and the entire Complaint should be dismissed.

## ARGUMENT

### I.    Plaintiff Lacks Standing to Assert Its Claims

The Fourth Circuit has held that a plaintiff who is unable to meet the 8(a)

1

program's race-neutral economic disadvantage requirement, such as Ultima, lacks standing to challenge alleged race discrimination in the 8(a) program. *See SRS Techs., Inc. v. U. S. Dep't of Defense*, 112 F.3d 510, 1997 WL 225979, at *1 (4th Cir. 1997) (per curiam) (holding that because the "requirement of economic disadvantage for entry into the 8(a) program is a raceneutral criteria" and because "[i]t was by virtue of this race-neutral criterion that plaintiff failed to qualify for a contract award [plaintiff's] standing to challenge the race-conscious criteria is therefore lacking"). The Tenth Circuit, too, has held that a plaintiff who cannot meet a race-neutral requirement for a similar contracting program lacks standing to challenge the program on equal protection grounds. *See Cache Valley Elec. Co. v. Utah Dep't of Transp.*, 149 F.3d 1119, 1123-24 (10th Cir. 1998) (holding that we "must conclude that plaintiff lacks standing because any anticipated redress from a favorable decision is wholly speculative").

The same conclusion is compelled here by Sixth Circuit precedent holding that a plaintiff lacks standing to challenge an allegedly discriminatory barrier to a benefit where, as here, that plaintiff cannot satisfy independent, nondiscriminatory requirements for the benefit. *See Yeager v. Gen. Motors Corp.*, 265 F.3d 389, 395 (6th Cir. 2001); *Stefanovic v. Univ. of Tenn.*, 173 F.3d 856, 1999 WL 196570, at *4 (6th Cir. 1999); *Brunet v. City of Columbus*, 1 F.3d 390, 398-99 (6th Cir. 1993). Plaintiff has not alleged that it can meet the 8(a) program's economic disadvantage requirements, which apply to all 8(a) participants regardless of race, and offers no convincing reason why the principles announced in these cases should not apply here. Plaintiff's opposition makes plain that this is not a mere pleading deficiency; Ultima does not aver that it can or will establish that it meets the regulatory economic thresholds to otherwise qualify for the

2

8(a) program. The authority it relies on to have the Court ignore this precedent is readily distinguishable and unpersuasive.

### A. Plaintiff's Analysis of Sixth Circuit Precedent and Other Authority is Flawed

As an initial matter, plaintiff's assertion that "none of [the Sixth Circuit cases] involved plaintiffs who sought forward-looking relief against the application of a rule creating an uneven playing field in the future" is untrue. Pl. Opp. at 15. The plaintiffs in *Yeager*, *Stefanovic*, and *Brunet* all sought forward-looking relief in the form of an injunction eliminating the programs those plaintiffs challenged on equal protection grounds. *Yeager*, 265 F.3d at 396; *Stefanovic*, 1999 WL 196570, at *4; *Brunet*, 1 F.3d at 392-93. Next, plaintiff tries to brush aside this controlling authority because the cases involve racial or gender preferences in *hiring* decisions rather than *contracting* programs. But the Sixth Circuit recognized *Northeastern Florida Chapter of the Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656 (1993), as controlling in each of these cases despite involving a different factual context. *Yeager*, 265 F.3d at 395; *Stefanovic*, 1999 WL 196570, at *4; *Brunet*, 1 F.3d at 397. Indeed, as plaintiff recognizes, in *Northeastern Florida*, the Supreme Court relied primarily on *Regents of University of California v. Bakke*, 438 U.S. 265 (1978), a case involving racial preferences in university admissions, not a contracting program. Plaintiff relies heavily on *Bakke*, failing to see any contradiction in its efforts to analogize the 8(a) program to the university admissions program at issue there while protesting any comparison to cases involving hiring decisions. Pl. Opp. at 9, 15. Plaintiff also attempts to distinguish these and other cases defendants rely on by asserting that they involved plaintiffs who "were simply ineligible for a benefit." Pl. Opp. at 17. Such a basis for

3

distinction proves fatal for plaintiff here, however, since Ultima also is ineligible to compete for contracts reserved for the 8(a) program by virtue of the fact that it has not alleged that it can qualify for the 8(a) program's race-neutral criterion of economic disadvantage (or, for that matter, otherwise prove "social disadvantage").

Plaintiff similarly fails in its attempts at distinguishing defendants' other authority. Plaintiff's only effort to distinguish the Fourth Circuit's decision on point in *SRS Technologies* is to note that the plaintiff there was a business owned by a racial minority. Pl. Opp. at 17. But this fact played no role in the Court's analysis of standing, which turned solely on the plaintiff's inability to satisfy the "race-neutral" requirement of economic disadvantage. *SRS Techs.*, 1997 WL 225979, at *2. As for the Tenth Circuit's decision in *Cache Valley*, plaintiff asserts that the plaintiff there "did not apparently allege that the entire program at issue was motivated by race." Pl. Opp. at 14. To the contrary, the court explicitly addressed and rejected defendants' argument that the plaintiff did not challenge the entire program, and concluded, based on the language used in the Complaint's prayer for relief, that "plaintiff's position is clearly a challenge to the *entire program* based on its usage of allegedly improper race and gender preferences." *Cache Valley*, 149 F.3d at 1122 n.2 (emphasis added). Plaintiff also states that the plaintiff there (and in *Klaver Constr. Co. v. Kansas Dep't of Transp.*, 211 F. Supp. 2d 1296 (D. Kan. 2002)) was not a small business. As discussed *infra* in Section I.B.2, there is no meaningful analytical distinction between a plaintiff's inability to meet race-neutral financial thresholds that determine business size or its owner's inability to meet race-neutral financial thresholds that determine economic disadvantage.

The Sixth Circuit's decision in *Aiken v. Hackett*, 281 F.3d 516, 519 (6th Cir. 2002), is also binding precedent on the test for establishing standing in a claim for

retrospective relief—that is, where a plaintiff alleges that a racial preference cost it some benefit, it must "allege and show that 'under a race-neutral policy' they would have received the benefit." Def. Mem. at 17-18. Plaintiff cannot make this showing because it cannot show that in the absence of the race-conscious presumption in the regulation— the only aspect of the program that can arguably be challenged as involving race— plaintiff would have been awarded any particular contract as it still would have been precluded from competing for race-neutral reasons.[1] Plaintiff's reliance on *Bakke* is misplaced as the plaintiff in *Bakke* was seeking prospective, not retrospective relief. 438 U.S. at 277 (Opinion of Powell, J.); Pl. Opp. at 18. Plaintiff has not justified ignoring the binding Sixth Circuit precedent in this area or the persuasive authority from the Fourth and Tenth Circuits that demonstrate its lack of standing.

### B. Plaintiff's Attempt to Recast Its Claim in Its Opposition Fails and Would Not Support Standing in Any Event

Because it cannot avoid clear precedent fatal to its claim, plaintiff asserts that defendants "misread" the Complaint and contend that beyond the rebuttable presumption of social disadvantage available to members of certain racial groups, the "Complaint alleges an injury caused by the Section 8(a) Program." Pl. Opp. at 6. Plaintiff's effort to recast its claim is unsupported by the text of the Complaint. But even

---

[1] Plaintiff asserts in a footnote that defendants' contention that "plaintiff has not alleged that it would have received or retained such contracts but for the allegedly unlawful criteria it challenges," *see* Def. Mem. at 18, would have been obviated had plaintiff amended its Complaint. Pl. Opp. at 17 n.5. Plaintiff's counsel explained in a July 7, 2020 email to defendants' counsel that they believed the Complaint adequately alleged that "had they not been reserved for the Section 8(a) Program, Ultima would have received additional contracts for the provision of administrative and technical services from NRCS" and asked if an amendment using "exactly those words" would obviate any part of defendants' motion. This purely conclusory and speculative allegation would not have altered defendants' position as thus defendants did not suggest that it would.

if the Complaint did allege that the entire 8(a) program is unconstitutional, plaintiff still would lack standing.

1. The Complaint Challenges Only the Rebuttable Presumption

Plaintiff's Complaint alleges purported discrimination on the basis of race. Compl. at 1 ("This is an action for race discrimination in violation of the Fifth Amendment to the United States Constitution and federal law."). The only policy the Complaint alleges discriminates on the basis of race is the rebuttable presumption in the SBA regulation. *See* Compl. ¶ 41 ("By presuming that members of certain racial groups are socially disadvantaged, defendants and the Section 8(a) Program discriminate on the basis of race."). The next two paragraphs simply assert that the alleged race discrimination in the 8(a) program, which plaintiff identified in the prior paragraph as the rebuttable presumption, cannot withstand strict scrutiny.[2] Compl. ¶¶ 42-43.

Plaintiff now argues in its opposition, without citation to any paragraphs in the Complaint, that the Complaint actually challenges the 8(a) program as a whole because "the Complaint challenges defendants' treatment of economic disadvantage and alleges that the Section 8(a) Program is not narrowly tailored because its benefits are extended to the wealthy." Pl. Opp. at 14. This theory that the economic threshold fails narrow tailoring because it extends too high appears nowhere in the Complaint. To the contrary, the Complaint's allegations related to economic disadvantage merely quote the statute's definition of "economically disadvantaged individuals," *see* Compl. ¶ 16, and cite the

---

[2] To satisfy strict scrutiny, a government action must be narrowly tailored to serve a compelling governmental interest. *See, e.g.*, *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 227 (1995).

6

economic criteria required by regulation. *See id.* ¶¶ 25-27.[3] In any case, race-neutral economic criteria are not subject to strict scrutiny and therefore do not need to be narrowly tailored. *See Borman's, Inc. v. Mich. Prop. & Cas. Guar. Ass'n*, 925 F.2d 160, 162 (6th Cir. 1991) ("When the legislation is economic or social in nature . . . and neither a fundamental right nor a suspect class is involved, the level of scrutiny required is rational basis review" meaning it "will not be set aside if any state of facts reasonably may be conceived to justify it") (citation omitted). Plaintiff also asserts that the statute's definition of "economically disadvantaged" gives racial minorities an advantage because it is limited to socially disadvantaged individuals. Pl. Opp. at 2-3.

Nowhere in the Complaint does plaintiff allege that the economic disadvantage requirements are racially discriminatory or in any way in violation of the Fifth Amendment, as it clearly does with respect to the presumption of social disadvantage. *See* Compl. ¶ 41. And even if it did, plaintiff would need to overcome the Supreme Court's contrary conclusion, namely, that only the race conscious aspects of a contracting program are subject to strict scrutiny. *See Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 212-13 (1995) (identifying "the race-based rebuttable presumption" as the only aspect of the program that was "subject to some heightened level of scrutiny" and noting that "[t]o the extent that the statutes and regulations involved in this case are race neutral, we agree").

---

[3] Plaintiff notes that the SBA regulations were recently amended to change the criteria for economic disadvantage. Pl. Opp. at 3 n.1. On July 15, 2020, after defendants filed their Motion to Dismiss, regulations revising some of the financial thresholds for admission to the 8(a) program went into effect. The changes to the economic disadvantage criteria, which were based on a commissioned study on the appropriate economic disadvantage threshold, *see* 85 FR 27650, are immaterial here as they apply to all applicants to the 8(a) program regardless of race. Plaintiff does not assert its owner could qualify as economically disadvantaged under the revised (or original) criteria.

7

The argument that the statute itself contains a racial classification was explicitly rejected in *Rothe Development, Inc. v. U.S. Dep't of Defense*, 836 F.3d 57, 70 (D.C. Cir. 2016). There, the court recognized that *Adarand*'s "discussions of the 8(a) program have identified the regulations—not the statute—as the source of its racial presumption." *Id*. The D.C. Circuit also held that the statute—where the definition of "economically disadvantaged individuals" that includes the qualification that they must also be socially disadvantaged is found—lacks an express racial classification. 836 F.3d at 71.

Plaintiff also suggests that defendants believe that "distinctions other than race are immune from challenge under equal protection principles." Pl. Opp. at 11. This is incorrect. Litigants may certainly assert equal protection challenges based on factors other than race, but this plaintiff in this Complaint has not. The only alleged equal protection violation plaintiff alleges in the Complaint is race discrimination. Compl. at 1 ("This is an action for race discrimination in violation of the Fifth Amendment to the United States Constitution and federal law.").

Finally, plaintiff contends that courts treat "race-plus-disadvantage" programs as a whole. Pl. Opp. at 8. Even if the 8(a) program could be described as a "race-plus-disadvantage" program, which it is not, courts routinely examine a plaintiff's specific allegations to determine the scope of the challenge. *See Rothe*, 836 F.3d at 62 (noting that the plaintiff there challenged only 8(a)'s statutory provisions and not the SBA regulations); *Cache Valley*, 149 F.3d at 1122 n.2 (considering the scope of the plaintiff's challenge by examining the Complaint's prayer for relief and determining that the "plaintiff's position is clearly a challenge to the entire program"); *Dynalantic Corp. v. Dep't of Defense*, 115 F.3d 1012, 1016 (D.C. Cir. 1997) (determining, not assuming, that the plaintiff was challenging "the *entire* 8(a) program").

8

2. <u>Plaintiff Lacks Standing to Challenge the 8(a) Program as a Whole</u>

Even if the Complaint could be read as alleging that the 8(a) program as a whole violates the Fifth Amendment, that does not alter the conclusion that plaintiff lacks standing. Plaintiff argues that the Complaint pleads an injury in fact based on the 8(a) program as a whole because it cannot compete for contracts reserved for the program. Pl. Opp. at 6. As defendants explained in their opening brief, plaintiff may allege it suffers harm by not being able to compete for all contracts for which it wishes to compete, but this harm does not constitute an injury in fact for purpose of its race-based equal protection challenge. Def. Mem. at 8. Where, as here, a plaintiff asserts a constitutional claim, the injury must be the deprivation of a constitutional right. *See Warth v. Seldin*, 422 U.S. 490, 500 (1975); *Cone Corp. v. Fla. Dep't of Transp.*, 921 F.2d 1190, 1204 (11th Cir. 1991). Plaintiffs do not have a constitutional right to compete for all government contracts. The government can certainly, consistent with the Constitution, set aside contracts for certain types of firms. Indeed, Ultima itself benefits from being awarded contracts withdrawn from full and open competition and reserved exclusively for small businesses. Plaintiff even appears to accept it as obvious that a business not classified as "small" would lack standing to challenge discrimination in the 8(a) program as it is a program intended solely for small businesses. Pl. Opp. at 14 (attempting to distinguish *Cache Valley*, 149 F.3d 1119 and *Klaver Constr. Co.*, 211 F. Supp. 2d at 1301, on the basis that the plaintiffs in those cases were not small businesses).

Plaintiff's effort to reframe its allegations as challenging the 8(a) program as a whole run into the further obstacle that the regulation's presumption of social disadvantage is severable from the rest of the program. *See Cache Valley*, 149 F.3d at 1123 (holding, in a challenge to the entire contracting preference program at issue, that

9

the program would remain because the race-conscious presumption is severable from the rest of the program); *Ellsworth Assocs., Inc. v. United States*, 926 F. Supp. 207, 210 (D.D.C. 1996) (finding that "even if the presumption were unconstitutional, the 8(a) Program . . . would still remain intact. It would merely be shorn of the presumption"); Def. Mem. at 11-12. Plaintiff asserts that eliminating the presumption still would redress its alleged injury because it would cause a significant reduction in the size of the 8(a) program, even temporarily. Pl. Opp. at 13. Plaintiff suggests that its allegation that the majority of 8(a) firms were certified as socially disadvantaged through the presumption rather than through the race-neutral means necessarily means that in the absence of the presumption, fewer firms would qualify for the program and it would have more opportunities to bid on contracts. Pl. Opp. at 13. As defendants have argued, this is too speculative to support constitutional standing. *See, e.g.*, *Cache Valley*, 149 F.3d at 1123; Def. Mem. at 10-11. As the court cogently explained in *Interstate Traffic Control v. Beverage*, 101 F. Supp. 2d 445, 453 (S.D.W.V. 2000), "[a]bsent fraud, removing . . . the allegedly unconstitutional rebuttable presumption . . . from the application process would not alter the number or identity of socially and economically disadvantaged individuals eligible to participate in DBE." Accordingly, as the Complaint includes no allegation of fraud in the process of qualifying as socially disadvantaged, there is no plausible basis to conclude that 8(a) firms that have qualified for the program through the presumption would not also meet the existing race-neutral criteria for certification.[4]

---

[4] Plaintiff is correct that a divided panel of the D.C. Circuit court was willing to engage in this type of speculation in *Dynalantic*, but this Court should not repeat that error, particularly in light of Sixth Circuit and Supreme Court authority instructing that a speculative and attenuated chain of events is insufficient to show causation for purpose of standing. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 566-69 (1992); *DeBolt v. Espy*, 47 F.3d 777, 781-82 (6th Cir. 1995). In Chief Judge Harry T. Edwards's dissent in

In an effort to avoid this authority on the severability of the rebuttable presumption, plaintiff cites to three cases in which successful challenges to the 8(a) program resulted in court-ordered remedies other than the cessation of the use of the regulatory presumption.[5] Pl. Opp. at 12. These cases are either distinguishable or in conflict with more persuasive precedent.

In *Cortez III Serv. Corp. v. NASA*, 950 F. Supp. 357, 360 (D.D.C. 1996), the plaintiff was a former 8(a) participant that successfully built its business and graduated from the 8(a) program. In a challenge to a specific NASA procurement placed into the 8(a) program, the court granted a preliminary injunction. *Id.* at 358, 363. But the plaintiff here is not challenging a specific procurement or seeking a preliminary injunction here so those remedies are not possible. Moreover, *Cortez III* not only is in direct conflict with Sixth Circuit precedent, it is in conflict with precedent in its own district. In *Ellsworth Associates*, 926 F. Supp. at 210, decided the same year as *Cortez III*, the D.C. district court came to the opposite conclusion as *Cortez III*, holding that the plaintiff, who also had graduated from the 8(a) program and thus was no longer eligible

_____

*Dynalantic*, he noted that there was no basis to assume that absent the presumption, work formerly assigned to the 8(a) category would be made available to non-8(a) firms, as plaintiff suggests here. *See* 115 F.3d at 1020. Even assuming the 8(a) program did shrink, there is no more reason to assume that the work would be made available for open bidding. After all, regardless of the outcome of this case, Congress has mandated that 5% of federal prime and subcontracting dollars go to Small Disadvantaged Businesses, 3% of prime and subcontracts go to HUBZone Small Businesses, and 3% of prime and subcontracts go to Service-Disabled Veteran-Owned Small Businesses. *See* 15 U.S.C. § 644(g)(1).

[5] Plaintiff cites to two additional cases that did not involve challenges to the 8(a) program, but to programs that included race-conscious presumptions for both social *and* economic disadvantage, making them entirely inapposite on the severability issue. Pl. Opp. at 12 (*citing Rothe Dev. Corp. v. Dep't of Def.*, 545 F.3d 1023, 1050 (Fed. Cir. 2008); *Milwaukee Cnty. Pavers Ass'n v. Fiedler*, 707 F. Supp. 1016, 1034 (W.D. Wis. 1989) (including no discussion of standing)).

to compete for 8(a) contracts for that reason, lacked standing to challenge the program. As the court explained, "[t]he plaintiffs' injury stems from the fact that they are no longer eligible to participate in the 8(a) Program. This reason is unrelated to the plaintiffs' race or any discriminatory contracting decision. Stated another way, the plaintiffs' inability to bid on the Follow-On Contract rests on a racially neutral and constitutionally unassailable ground." *Ellsworth*, 926 F. Supp. at 210.

*Fordice Construction Co. v. Marsh*, 773 F. Supp. 867 (S.D. Miss. 1990), is also not instructive as it did not involve a challenge to the constitutionality of the 8(a) program, and the Court did not enjoin any use of the 8(a) program going forward. *Id.* at 871, 882. Instead, the court held that a 100% set-aside of all contracts to be let in the Vicksburg, Mississippi area in a fiscal year was an abuse of the program because the defendants did not follow a regulation that required an evaluation of the impact of such a set-aside, as well as other standard operating procedures, and that this resulted in statutory race discrimination. *Id.* at 868.

In *Dynalantic*, the court enjoined the SBA and the Department of Defense from awarding procurements for military simulators under the 8(a) program without first articulating a strong basis in evidence for doing so. *Dynalantic Corp. v. U.S. Dep't of Defense*, 885 F. Supp. 2d 237, 293 (D.D.C. 2012). *Dynalantic* was wrongly decided and is not controlling here. As discussed above, another 8(a) decision by the D.C. district court found, in line with *Cache Valley* and other cases, that "even if the presumption were unconstitutional, the 8(a) Program . . . would still remain intact. It would merely be shorn of the presumption . . . ." *Ellsworth*, 926 F. Supp. at 210. *Ellsworth*'s reasoning on standing is in line with Sixth Circuit precedent and is accordingly more applicable here than *Dynalantic*. Plaintiff also notes that the parties in *Dynalantic* later settled the

12

case and the government agreed not to use the 8(a) program in the military simulator industry. This is immaterial. The government's voluntarily settlement in any case cannot be precedent for constitutional standing. It is inappropriate for plaintiff to use a prior settlement agreement in this manner.

### C. Plaintiff Fails to Recognize a Dispositive Distinction Between the 8(a) Program and the Programs at Issue in the Cases It Cites

 Sixth Circuit authority illustrates that whether a plaintiff can establish standing in the context of an equal protection challenge to a race-conscious program depends on whether the allegedly discriminatory policy was the deciding factor in the plaintiff's injury, as in *Northeastern Florida*, or whether separate, race- or gender-neutral criteria were equally responsible for the plaintiff's inability to compete, as in *Brunet*, *Yeager*, and other cases. Def. Mem. at 15. Courts in other circuits have also recognized this crucial distinction. *See Dunnet Bay Constr. Co. v. Borggren*, 799 F.3d 676, 694 (7th Cir. 2015) (noting that "the race of the plaintiff in *Northeastern Florida* and *Adarand* was the deciding factor. In contrast, the race of [plaintiff's] owners was not the deciding factor because [plaintiff's] size created a barrier to its receipt of any advantages given DBEs"); *Cache Valley*, 149 F.3d at 1123 n.3. This is because if the allegedly unconstitutional criteria is the deciding factor, it follows that the plaintiff can trace its injury to that factor and that removal of that factor would redress the injury. *See Northeastern Florida*, 508 U.S. at 666 n.5; *Cache Valley*, 149 F.3d at 1123 n.3 ("When, as [in *Northeastern Florida*], the set-aside is conditioned solely on race or gender, the definition of the injury as the inability to compete on equal footing makes it explicitly traceable to the disputed preference and the elimination of that preference therefore must redress the injury."). By contrast, where independent, neutral criteria preclude the

13

plaintiff from competing, the plaintiff cannot establish that its injury is traceable to the allegedly unlawful criteria or that the elimination of that criteria would redress its injury. *See Cache Valley*, 149 F.3d at 1123 & n.3.

Plaintiff ignores this crucial distinction, relying primarily on cases where the allegedly unlawful policy was the deciding factor. As plaintiff notes, the Court in *Northeastern Florida* found the "most closely analogous" precedent to be *Bakke*. Pl. Opp. at 15. *Bakke*, like *Northeastern Florida*, involved a challenge to a program where race was the deciding factor. *Bakke*, 438 U.S. at 280 n.14 (Opinion of Powell, J.) (noting that "[w]hite disadvantaged students were never considered under the special program, and the University acknowledges that its goal in devising the program was to increase minority enrollment"). In concluding that the plaintiff there had standing to challenge the admissions program, the court noted that the injury was the school's "decision not to permit [him] to compete for all 100 places in the class, *simply because of his race.*" *Id.* (emphasis added). Plaintiff's attempt to analogize the 8(a) program to the higher education program at issue in *Bakke* fails because, unlike the plaintiff in *Bakke*, Ultima was not precluded from competing "simply because of [its owner's] race"; it was precluded from competing because of its owner's financial status.

Plaintiff's reliance on *Adarand* for standing is also misplaced. *Adarand* did not involve a challenge to the 8(a) program, but to the Department of Transportation's practice of using subcontracting compensation clauses, which give general contractors on government projects a direct financial incentive to hire subcontractors controlled by "socially and economically disadvantaged individuals." *Adarand*, 515 U.S. at 204. The *Adarand* plaintiff was not precluded from competing for contracts because it failed to meet independent, race-neutral criteria, like Ultima. *Id.* at 205. Rather, Adarand

competed directly against disadvantaged businesses, but did so at a disadvantage. Indeed, on remand in *Adarand*, the Tenth Circuit specifically noted that Adarand lacked standing to challenge the 8(a) program, and likewise lacked standing to bring "a generalized challenge to the policy of maximizing contracting opportunities for small disadvantaged businesses set forth" in the Act. *Adarand Constructors v. Slater*, 228 F.3d 1147, 1159-60 (10th Cir. 2000). Moreover, *Adarand* did not address traceability or redressability and "the *Adarand* Court is silent on what impact the severability of the disputed preferences and the existence of race- and gender-neutral criteria have on the analysis of traceability and redressability." *Cache Valley*, 149 F.3d at 1123.

Plaintiff's other authority is also inapposite. Plaintiff relies on four other cases that do not involve circumstances, like here, where a contractor was unable to compete against disadvantaged businesses for race-neutral reasons. Pl. Opp. at 9-10 (citing *Sherbrooke Turf, Inc. v. Minn. Dep't of Trans.*, 345 F.3d 964, 968 (8th Cir. 2003); *W.H. Scott Constr. Co. v. City of Jackson*, 199 F.3d 206, 209 (5th Cir. 1999); *Concrete Works of Colo. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994); *Gross Seed Co. v. Neb. Dep't of Rds.*, No. 4:00CV3073, 2002 U.S. Dist. LEXIS 27125 (D. Neb. May 6, 2002)).[6] Rather, the plaintiffs in these cases, as in *Adarand*, did in fact compete directly against minority-owned or disadvantaged businesses, but were unable to compete equally because they were subject to additional burdens not imposed on minority-owned businesses or because race-based participation requirements reduced their chances of being selected. *See id.* Thus, unlike the 8(a) program, the programs

---

[6] *Gross Seed*, 2002 U.S. Dist. LEXIS 27125, is one of the two district court opinions that was reviewed in *Sherbrooke Turf*, *see* 345 F.3d at 967. Accordingly, defendants will not address *Gross Seed* separately.

15

Case 2:20-cv-00041-DCLC-CRW    Document 26    Filed 08/07/20    Page 15 of 27
PageID #: 164

competed directly against disadvantaged businesses, but did so at a disadvantage. Indeed, on remand in *Adarand*, the Tenth Circuit specifically noted that Adarand lacked standing to challenge the 8(a) program, and likewise lacked standing to bring "a generalized challenge to the policy of maximizing contracting opportunities for small disadvantaged businesses set forth" in the Act. *Adarand Constructors v. Slater*, 228 F.3d 1147, 1159-60 (10th Cir. 2000). Moreover, *Adarand* did not address traceability or redressability and "the *Adarand* Court is silent on what impact the severability of the disputed preferences and the existence of race- and gender-neutral criteria have on the analysis of traceability and redressability." *Cache Valley*, 149 F.3d at 1123.

Plaintiff's other authority is also inapposite. Plaintiff relies on four other cases that do not involve circumstances, like here, where a contractor was unable to compete against disadvantaged businesses for race-neutral reasons. Pl. Opp. at 9-10 (citing *Sherbrooke Turf, Inc. v. Minn. Dep't of Trans.*, 345 F.3d 964, 968 (8th Cir. 2003); *W.H. Scott Constr. Co. v. City of Jackson*, 199 F.3d 206, 209 (5th Cir. 1999); *Concrete Works of Colo. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994); *Gross Seed Co. v. Neb. Dep't of Rds.*, No. 4:00CV3073, 2002 U.S. Dist. LEXIS 27125 (D. Neb. May 6, 2002)).[6] Rather, the plaintiffs in these cases, as in *Adarand*, did in fact compete directly against minority-owned or disadvantaged businesses, but were unable to compete equally because they were subject to additional burdens not imposed on minority-owned businesses or because race-based participation requirements reduced their chances of being selected. *See id.* Thus, unlike the 8(a) program, the programs

---

[6] *Gross Seed*, 2002 U.S. Dist. LEXIS 27125, is one of the two district court opinions that was reviewed in *Sherbrooke Turf*, *see* 345 F.3d at 967. Accordingly, defendants will not address *Gross Seed* separately.

15

challenged in these cases did not include race-neutral criteria that prevented the plaintiff from competing. Plaintiff also cites to *Milwaukee County Pavers Ass'n v. Fiedler*, 707 F. Supp. 1016, 1019 (W.D. Wis. 1989), but that case, which also challenged a program that did not include race-neutral factors that prevented the plaintiff from competing, does not discuss standing at all; rather, it determined whether plaintiff met the standard for a preliminary injunction.

### D. <u>Plaintiff Does Not Have Prudential Standing</u>

As defendants have argued, in addition to lacking Article III standing, plaintiff also has failed to overcome prudential limitations on standing because a "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *See Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 206 (6th Cir. 2011). Here, plaintiff has not alleged, and there is no reason for presuming, that a business that meets the criteria for economic disadvantage, but is not entitled to the presumption of social disadvantage, could not litigate its own rights. *See Dunnet Bay*, 799 F.3d at 695-96 (finding that prudential limitations precluded the plaintiff from bringing claims more appropriately brought by a non-minority-owned business that met the size requirements for the program).

Plaintiff responds that this argument ignores the cases it cites for other purposes where non-economically disadvantaged business owners were permitted to challenge contracting programs. Pl. Opp. at 5 n.2. Not only are the cases on which plaintiff relies distinguishable in crucial respects, as discussed above, but plaintiff does not indicate that any of these cases even address prudential standing. *Id.* Indeed, none of them do. Plaintiff cites *Dunnet Bay* for the proposition that "where the plaintiff has established injury in fact, it may assert third party rights." *Id.* (*citing Dunnet Bay*, 799 F.3d at 693).

16

That statement was made in connection with a discussion of plaintiff's allegation that it was forced to discriminate against others by participating in a subcontracting program's allegedly discriminatory scheme, not in connection with the court's discussion of prudential standing. *Dunnet Bay*, 799 F.3d at 693. The court in *Dunnet Bay* actually found that the plaintiff could not withstand prudential limitations to standing for the same reasons defendants assert here. *Id.* at 695-96. In any event, the Complaint is silent as to whether plaintiff is seeking to assert the rights of economically disadvantaged businesses ineligible for the presumption of social disadvantage.

## II. Plaintiff's Claim for Relief on Specific Contracts Is Governed by the Contract Disputes Act

Plaintiff has failed to address the authority presented by defendants establishing that plaintiff's claims for relief from the USDA's contracting decisions are governed by the Contract Disputes Act ("CDA"). Def. Mem. at 19-21. Plaintiff fails to cite a single case supporting its assertion that its claim that the USDA refused to exercise options, add funding, and/or extend contracts on which plaintiff was providing services, and its request that the Court reinstate these contracts and award monetary damages, is not contractual in nature. Plaintiff's complete avoidance of the substantial case law presented by defendants that this claim is subject to administrative exhaustion and then the exclusive jurisdiction of the Court of Federal Claims speaks volumes.

Plaintiff cites only one case in its attempt to forestall these claims from being properly dismissed: *Free Enterprise Fund v. Public Co. Accounting Oversight Board*, 561 U.S. 477, 489 (2010). But this case is inapposite. In *Free Enterprise*, the Supreme Court held that a challenge to the constitutionality of the Public Company Accounting Oversight Board (the "Board") could be brought in district court despite a statute

17

requiring that certain actions of the Board first be reviewed by the SEC. 561 U.S. at 489-91. The circumstances that compelled the Court's conclusion in *Free Enterprise* are not present here. *First*, the Court found that the relevant statute neither expressly nor implicitly limited the jurisdiction that other statutes confer on district courts. *Id.* at 489 (noting requirements for agency review "do not restrict judicial review unless the 'statutory scheme' displays a 'fairly discernible' intent to limit jurisdiction, and the claims at issue 'are of the type Congress intended to be reviewed within th[e] statutory structure'") (*quoting Thunder Basin Coal Co. v Reich*, 510 U.S. 200, 212-13 (1994)). By contrast, the Sixth Circuit has held that the CDA is "the paradigm of a 'precisely drawn, detailed statute' that preempts more general jurisdictional provisions." *Campanella v. Com. Exch. Bank*, 137 F.3d 885, 891 (6th Cir. 1998).

Second, the Court in *Free Enterprise* explained that in considering limitations on judicial review, "we presume that Congress does not intend to limit jurisdiction if 'a finding of preclusion could foreclose all meaningful judicial review'; if the suit is 'wholly collateral to a statute's review provisions'; and if the claims are 'outside the agency's expertise.'" *Free Enter. Fund*, 561 U.S. at 489 (*quoting Thunder Basin Coal*, 510 U.S. at 212-13). These circumstances also are not present here. Defendants do not contend that the CDA precludes an appropriate litigant from bringing a constitutional challenge to the 8(a) program nor does the CDA bar this plaintiff's constitutional claims seeking prospective relief. In addition, plaintiff's allegations involving the USDA's failure to exercise options, add funding, and/or extend contracts are squarely within the CDA's review provisions and the expertise of agency contracting officers. The CDA applies to "any express or implied contract . . . made by an executive agency for . . . the procurement of services," and plaintiff's claim for retrospective relief concerns specific

18

contracts. *See* 41 U.S.C. § 7102(a). Having offered no meaningful rebuttal to the substantial case law supporting the conclusion that its claim for retrospective relief on specific contracts is covered by the CDA, the Court should dismiss this claim.

### III.    The Complaint Fails to State an Equal Protection Claim

Plaintiff gives similar short shrift to defendants' argument that it has failed to state an equal protection claim. Plaintiff fails to cite a single case or other legal authority to rebut the authority defendants cited in their opening brief. Instead, plaintiff initially asserts that its failure to allege that it was treated differently than a similarly situated business due to race should be of no concern to this Court. First, it claims that perhaps it is bringing an equal protection claim based not on race, but on some other unidentified basis. Pl. Opp. at 18-19. This argument is unsustainable. The Complaint is determinative of what allegations are asserted therein, and the Complaint is limited to a claim of race discrimination, as discussed *supra*, in Section I.B.1. If, as plaintiff now implies in its opposition, plaintiff were actually making some unidentified equal protection claim not based on race, it has neither stated such a claim in the Complaint nor identified it with any specificity in its brief. In any event, plaintiff's assertion that it is "treated differently from a Section 8(a) firm," *see* Pl. Opp. at 19, fails to state an equal protection claim whatever the basis because plaintiff provides no explanation of how it is similarly situated to an 8(a) firm. *See Am. Atheists, Inc. v. Shulman*, 21 F. Supp. 3d 856, 870 (E.D. Ky. 2014). It is not. An 8(a) firm is owned by an economically disadvantaged individual, and plaintiff has not alleged it is economically disadvantaged.

Plaintiff then changes tacks and claims it *has* asserted an equal protection claim based on race because it is treated differently because of the race of its owner. However, plaintiff bases this assertion on a distortion of the eligibility criteria for certification as

19

an 8(a) firm. Plaintiff asserts that it is treated differently than a "successful African American business owner" who is able to take advantage of the rebuttable presumption because social disadvantage is one of the requirements of economic disadvantage. Pl. Opp. at 19. Contrary to plaintiff's misleading suggestion, all applicants to the 8(a) program must make the exact same financial showing to qualify as economically disadvantaged. Def. Mem. at 4-5. Some of the business owners who apply to be deemed as economically disadvantaged do so after receiving the presumption of social disadvantage; some do not. But all business owners, regardless of race, face the same hurdle. That the definition of economically disadvantaged individuals is limited to those socially disadvantaged individuals who can meet certain economic criteria does not import the race-conscious presumption for social disadvantage into the financial criteria for economic disadvantage. Successful African American business owners who hold the same level of personal wealth as plaintiff's owner are treated just the same as plaintiff— denied the opportunity to compete for contracts reserved for 8(a) firms.

Finally, plaintiff's assertion that defendants' Rule 12(b)(6) argument is just a "retread" of the Rule 12(b)(1) standing argument fails: entirely distinct Sixth Circuit authority demonstrates why plaintiff has failed to state an equal protection claim pursuant to Rule 12(b)(6). Specifically, the Sixth Circuit has held that to state an equal protection claim, a plaintiff must adequately plead that the government treated it "disparately as compared to *similarly situated persons* and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis." *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (emphasis added); *see also* Def. Mem. at 22-23. As plaintiff fails to meet that burden here, its equal protection claim should be dismissed.

## IV. Plaintiff's 42 U.S.C. § 1981 Claim Must Be Dismissed

Plaintiff does not, and cannot, dispute that every circuit court to consider the issue since the Civil Rights Act of 1991 amended 42 U.S.C. § 1981—including the Second, Third, Fourth, Sixth, Seventh, Tenth, and Eleventh—has ruled that a section 1981 claim cannot be maintained against the federal government.[7] Courts have accorded the plain meaning to the statutory text, which provides that "[t]he rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law." 42 U.S.C. § 1981(c). Plaintiff even acknowledges that "a number of cases support defendants' argument." Pl. Opp. at 25.

Plaintiff asks this Court to ignore this overwhelming authority and instead rely on two discredited out-of-circuit district court cases and a law review footnote. Pl. Opp. at 25. In one of the cases, *Carias v. Harrison*, No. 5:13-CT-3264-FL; 5:15-CT-3104-FL, 2016 WL 1171544, at *11 (E.D.N.C. Mar. 23, 2016), the court denied the federal defendants' motion to dismiss a section 1981 claim with no analysis and without recognizing Fourth Circuit precedent to the contrary. In a later decision in the same case, to which plaintiff failed to alert this Court, the district court reversed course and recognized that the Fourth Circuit has held that section 1981 "does not . . . provide a

---

[7] Plaintiff suggests the Court should ignore the Sixth Circuit's pronouncements on this issue since they were made in unpublished opinions. Pl. Opp. at 24. While unpublished cases may not be binding precedent, the Sixth Circuit has stated that "our unpublished case law is valuable insofar as it is persuasive and correctly identifies governing legal principles." *Twumasi-Ankrah v. Checkr, Inc.*, 954 F.3d 938, 944 (6th Cir. 2020). While the court did not engage in a lengthy analysis of section 1981 in *Conner v. Greef*, 99 F. App'x 577, 580 (6th Cir. 2004), the underlying district court case did expressly rely on the plain language of subsection (c) for the proposition that section 1981 is inapplicable to actions taken under color of federal law. *See Connor v. Greef*, 2003 WL 23846645, at *3 (W.D. Tenn. Feb. 26, 2003). Given that this authority is consistent with every other circuit court to have addressed the issue, it is highly persuasive here.

21

remedy against federal officials." *Carias v. Harrison*, 2017 WL 1155749, at \*14 (E.D.N.C. Mar. 27, 2017) (*citing Middlebrooks v. Leavitt*, 525 F.3d 341, 349 (4th Cir. 2008) (dismissing § 1981 claim against federal defendants)). Plaintiff also cites to *La Compania Ocho, Inc. v. U.S. Forest Service*, 874 F. Supp. 1242, 1251 (D.N.M. 1995), but similarly neglects to inform the Court that the Tenth Circuit explicitly rejected this decision's holding on section 1981 in *Davis-Warren Auctioneers, J.V. v. FDIC*, 215 F.3d 1159, 1161 (10th Cir. 2000), where it held that "§ 1981 is inapplicable to alleged discrimination under color of federal law."[8]

Plaintiff also claims that "defendants ignore *binding* Sixth Circuit precedent," referencing *Arendale v. City of Memphis*, 519 F.3d 587 (6th Cir. 2008). Pl. Opp. at 24. But *Arendale* does not address section 1981's applicability to the federal government; it involves the statute's applicability to *state* actors. In *Arendale*, the Sixth Circuit engaged in an analysis of the statutory language and legislative history of section 1981(c) in light of a circuit split as to whether the statute created a private cause of action against state governments, or whether section 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in section 1981 by state governments. *Arendale*, 519 F.3d at 596. There is no such circuit split concerning section 1981's applicability to federal actors, as circuit courts have uniformly held that section 1981 does not apply to actions taken by the federal government. Def. Mem. at 24-25 (citing cases).

Moreover, the reason there is no circuit split—and why a legislative history

---

[8] Plaintiff also cites a law review footnote, but offers no explanation as to how it supports plaintiff here. Pl. Opp. at 25. To the extent such authority should even be considered in light of the substantial circuit court authority on point, the authors of the article concede that section 1981(c) "may make it difficult to apply the statute to the federal government." *See* Neal K. Katyal & Laurence H. Tribe, *Waging War, Deciding Guilt: Trying the Military Tribunals*, 111 Yale L.J. 1259, 1299-1300 (2002).

22

analysis is inappropriate here—is the unambiguous language in section 1981(c). *See In re Koenig Sporting Goods, Inc.*, 203 F.3d 986, 988 (6th Cir. 2000) ("When a statute is unambiguous, resort to legislative history and policy considerations is improper."). Courts have found the language in section 1981(c) unambiguously limits its protection to discrimination by state and private actors. *See, e.g.*, *Davis-Warren Auctioneers*, 215 F.3d at 1161 (finding that "[t]he language of § 1981(c) could hardly be more clear"). Accordingly, the court should decline to engage in the review of legislative history plaintiff suggests and instead follow the statute's plain terms and the holdings of the Sixth Circuit and other circuit courts.

Plaintiff concedes that section 1981(c)'s reference to impairment by private actors or under color of state law, with no mention of federal actors, indicates the statute does not apply to the federal government, but asserts that the basic principles of statutory interpretation should be set aside. Pl. Opp. at 21. They should not. A reading of the statute as a whole shows that section 1981(c)'s reference to private and state actors was meant to be exclusive. Section 1981(b), which also was added to the statute together with section 1981(c) in the Civil Rights Act of 1991, contains an illustrative list following the term "including." Section 1981(c) contains no such qualifier, clearly indicating it was only actions against state and private actors that were authorized. *See Brown v. Gardner*, 513 U.S. 115, 120 (1994) (noting that "it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion" of terms). Where the statutory language is "plain and unambiguous," as it is here, courts "must apply the statute according to its terms." *Carcieri v. Salazar*, 555 U.S. 379, 387 (2009).

This clear language also counsels against entertaining plaintiff's argument that the doctrine of implied repeals precludes a finding that section 1981 applies to the

23

federal government.[9] Section 1981 has never expressly applied to the federal government; however, as plaintiff notes, prior to the addition of section 1981(c), some courts held that section 1981 applied to federal conduct. Pl. Opp. at 22. By adding 1981(c) Congress overrode these decisions because courts must "assume that Congress is aware of existing law when it passes legislation." *Hall v. United States*, 132 S. Ct. 1882, 1889 (2012) (citation omitted). This Court should presume that Congress meant what it said in section 1981(c), and follow the uniform judicial authority, which holds that section 1981 does not apply to federal conduct.

## V. The Federal Government Has Not Waived Sovereign Immunity from the Monetary Damages Plaintiff Seeks

Plaintiff does not dispute that section 1981 does not waive the federal government's sovereign immunity from monetary damages, but contends, with no citation to authority, that "[t]his is irrelevant because the claim for damages is only against defendant SBA and 15 U.S.C. § 634(b)(1) waives its sovereign immunity." Pl. Opp. at 25. Since plaintiff only seeks monetary relief for "the loss of contracts in the past," *see* Pl. Opp. at 4, this claim is governed by the CDA's exclusivity provisions; therefore, section 634(b)(1) of the Act does not apply. *See A & S Council Oil Co. v. Lader*, 56 F.3d 234, 242 (D.C. Cir. 1995). As stated above, if plaintiff has a contract dispute with the USDA over which it believes it is owed damages, it is free to bring such a claim in the Court of Federal Claims after meeting jurisdictional administrative exhaustion requirements.

---

[9] The doctrine of implied repeal provides that absent a "clearly expressed congressional intention, . . . [a]n implied repeal will only be found where provisions in two statutes are in irreconcilable conflict, or where the latter [statute] covers the whole subject of the earlier one and is clearly intended as a substitute." *Carcieri*, 555 U.S. at 395 (citation and internal quotation marks omitted).

24

Even if section 634(b)(1) did trump the CDA here, and even if the SBA as opposed to the USDA was the correct entity to pay monetary damages, it does not constitute a blanket waiver of the SBA's sovereign immunity from monetary damages. *See, e.g.*, *Sutton v. SBA*, 92 Fed. App'x 112, 123 n.15 (6th Cir. 2003) ("Although the Small Business Act provides that the SBA Administrator may 'sue and be sued in any court of record,' 15 U.S.C. § 634(b)(1), this provision 'does not establish a waiver of immunity so as to permit entertainment of [a] damages claim."); *Ascot Dinner Theatre, Ltd. v. SBA*, 887 F.2d 1024, 1031 (10th Cir. 1989) ("Despite the constitutional claim injected, the damages claim against the SBA and its Administrator in his official capacity as asserted by [plaintiff] is barred by sovereign immunity."); *DV Diamond Club of Flint, LLC v. SBA*, ---F. Supp. 3d ---, 2020 WL 2315880, at *16 (E.D. Mich. May 11, 2020) (granting request for preliminary injunction in claim that denial of loans violated the First and Fifth Amendments, in part because the plaintiffs "would have no monetary remedy . . . because Defendants have sovereign immunity from any claim for monetary damages"). Some courts have found that the SBA's sue and be sued provision waives sovereign immunity from damages in certain contract claims. *See, e.g.*, *Mar v. Kleppe*, 520 F.2d 867 (10th Cir. 1975). But plaintiff expressly disclaims that it is bringing a claim based on contract. Pl. Opp. at 19-20. Plaintiff cannot have it both ways. Having cited no authority establishing that the SBA has waived sovereign immunity from the monetary damages plaintiff seeks here, the Court should dismiss plaintiff's claim for monetary damages.

## CONCLUSION

For the foregoing reasons, and the reasons set forth in defendants' Memorandum of Law in Support of Motion to Dismiss, defendants respectfully request that the Court grant the Motion to Dismiss in its entirety.

25

Dated: August 7, 2020

Respectfully submitted,

DELORA L. KENNEBREW
Chief
Employment Litigation Section
Civil Rights Division
OF COUNSEL:                          United States Department of Justice

Karen Hunter                         ANDREW BRANIFF (IN Bar No. 23430-71)
Senior Trial Attorney                Special Litigation Counsel

David A. Fishman
Assistant General Counsel for Litigation   By: */s/ Juliet E. Gray*
                                     Juliet E. Gray (D.C. Bar No. 985608)
Eric S. Benderson                    Taryn Wilgus Null (D.C. Bar No. 985724)
Associate General Counsel for Litigation   Senior Trial Attorneys
U.S. Small Business Administration   Employment Litigation Section
                                     Civil Rights Division
Amar Shakti Nair                     United States Department of Justice
Attorney Advisor                     150 M Street, N.E.
                                     Washington, D.C. 20002
Ashley Craig                         (202) 598-1600
Attorney Advisor                     Juliet.Gray@usdoj.gov
U.S. Department Of Agriculture       Taryn.Null@usdoj.gov

26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 7, 2020, I electronically filed the above document with the Clerk of Court using the ECF System, which will send notification of such filing to all counsel of record.

 /s/ Juliet E. Gray 
Juliet E. Gray
Senior Trial Attorney