UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
------------------------------------------------------------------------x
ULTIMA SERVICES CORPORATION,                :
                                            :
    Plaintiff,                              :
                                            :
        -against-                       :
                                            :
                                            : No.2:20-cv-00041
                                            : DCLC-CRW
U.S. DEPARTMENT OF AGRICULTURE,             :
U.S. SMALL BUSINESS ADMINISTRATION,         :
SECRETARY OF AGRICULTURE, and               :
ADMINISTRATOR OF THE SMALL BUSINESS         :
ADMINISTRATION,                             :
                                            :
    Defendants.                             :
                                            :
------------------------------------------------------------------------x

PLAINTIFF'S BRIEF IN SUPPORT OF ITS MOTION TO EXCLUDE
TESTIMOMY OF DEFENDANTS' EXPERT DANIEL CHOW

Plaintiff submits this memorandum in support of its motion to exclude testimony of Defendants' proffered expert, Mr. Daniel Chow under Fed. R. Civ. P. 26(a)(2)(B)(ii) and Fed. R. Evid. 702.

### I. Background of the Chow Report

On February 7, 2022, Defendants first produced an expert report (hereinafter "Chow Report") written by Daniel Chow. Mr. Chow's report discusses two sources of data he analyzed, the System for Award Management (referred to as SAM) and Federal Procurement Data Systems (referred to as FPDS). The SAM database holds information for businesses that have registered to work with the federal government. The FPDS is a database of federal contracting information administered by the General Services Administration. Notably, for reasons that will be explained later, key paragraphs in the Chow Report failed to disclose the existence of a 50 variable file that was integral to Mr. Chow's analysis and conclusions. Instead, the Chow Report states:

> From the original raw datasets, I compiled a list of relevant variables from both SAM registrants' data (7,466,447 observations and 42 variables) and FPDS awards (5,104,224 observations and 55 variables).
>
> SAM registrant data contains reported six-digit North American Industry Classification System (NAICS) codes and DUNS numbers [DUNS numbers come from the Dunn and Bradstreet data universal numbering system.]. Size standards were based on the parent company's six-digit NAICS code as reported in the SAM database. Each company was designated as "small" in each industry if it was small in any of its corresponding six-digit

> NAICS codes. Firms were designated "not small" if they were not flagged as small in their six-digit NAICS codes. As in the Rubinovitz study, industry-level comparisons were at the three-digit NAICS level. Unique observations for SAM registrants were identified by DUNS number and collapsed by three-digit NAICS code. A given DUNS number may have more than one NAICS code, indicating a firm may register in SAM to compete in one or more industries. Merging and removal of redundant and extraneous observations by DUNS number resulted in a combined file of 5,659,740 registration observations and 64 variables.

Rosman Stmt. par. 1, Exhibit 1, Chow Report at 3.

Plaintiff, after consulting with its own experts, requested Defendants produce Mr. Chow's data files so that Plaintiff's expert, could reproduce and evaluate Mr. Chow's analysis. Rosman Stmt. par. 2. On February 24, 2022, Defendants produced two of the files Mr. Chow used. *Id.* par. 3. One is named "SAM_1904_2009_SB_D.dta" (7,466,447 obs and 42 variables), and the other is "Awards_Combined_FY19FY20_SBNonSB.dta" (5,659,740 obs and 64 variables). *Id.* The "Awards_Combined" file contained the exact same number of observations and variables as the last sentence quoted *supra* in the excerpt from the Chow Report. Given the reference to it at the end of the quoted excerpt, in a paragraph largely about SAM data, Plaintiff assumed that the latter file was a combination of FPDS and SAM data, and nothing in the Chow Report suggested otherwise.

On March 10, 2022, Plaintiff deposed Mr. Chow. Rosman Stmt. par. 4. In his deposition, Plaintiff asked Mr. Chow whether the 64 variable, 5.6 million observation file he referred to in his report is the combined FPDS-

SAM file. Mr. Chow confirmed that it is. Rosman Stmt. par. 4, Exhibit 2, Chow Dep. Tr. 60-61.

On March 17, 2022, Mr. Chow's deposition transcript became available. Rosman Stmt. par. 5. After reviewing Mr. Chow's deposition transcript along with the two data files Defendants produced, Plaintiff's expert determined it would be impossible to replicate Mr. Chow's analysis with the files he had been given, and the information in Mr. Chow's deposition transcript. Guryan Stmt. par. 6. Accordingly, on March 23, 2022, Plaintiff first orally requested the computer code used by Mr. Chow. Plaintiff followed up with a written document request on March 25, 2022. Rosman Stmt. par. 5.

On March 30, 2022, Defendants responded by asking Plaintiff to provide legal authority supporting their request for Mr. Chow's code. Rosman Stmt. par. 7.

On April 4, 2022, Plaintiff produced its rebuttal expert report. Rosman Stmt. par. 8. In his report, Plaintiff's expert Dr. Jonathan Guryan identified the 64 variable 5.6 million observation "Awards Combined" file as Mr. Chow's "analysis" file, as Mr. Chow had testified, combining the data from the SAM and FPDS files. Guryan Stmt. par. 5.

On or about April 20, 2022, Defendants agreed to provide the computer code Mr. Chow used, subject to a confidentiality agreement. Rosman Stmt. par. 9. On April 27, 2022, Defendants deposed Guryan. Rosman Stmt. par.

10. On April 28, 2022, the parties jointly moved for a protective order covering Mr. Chow's code, and the Court entered the order on May 6, 2022. Doc. Nos. 51, 54.

On May 9, 2022, Defendants produced part of the Chow code. Rosman Stmt. par. 11. The code refers to a file called "FPDS_SAM_PPIRS_2019_2020_matching_Test4." The code indicates that this "matching file" is used to create the "finalize" file that Mr. Chow utilized for his analysis to reach his conclusions. Guryan Stmt. par. 7. However, the derivation of the "matching file" is not clear. *Id.*

In reviewing Mr. Chow's computer code, Dr. Guryan realized that, in all other instances, the end result of one program is a file that is used at the outset of the next program, sequentially. Guryan Stmt. par. 8. But the program prior to the use of the "matching" file program does not end with the "matching" file. Further, the "matching" file has a key variable – "winner" – but there is no code showing how Mr. Chow created that variable or how it was determined whether a given company was a "winner." *Id.*

On May 17, 2022, Defendants produced a "matching file," named "FPDS_SAM_PPIRS_2019_2020_matching_Test4." (having 1,259,129 obs and 50 variables). Rosman Stmt. par. 12.

On May 18, Defendants sent Plaintiff an errata sheet with an attached declaration from Mr. Chow dated May 17, 2022. Rosman Stmt. par. 13. In his declaration, Mr. Chow stated that he was "mistaken" in response to some

of his answers to his deposition:

> 6. As I describe in my report, I combined the two FPDS datasets and removed redundant and extraneous observations to create one file which contains 5,659,740 registration observations and 64 variables. This file was labeled "Awards_Combined_FY19FY20_SBNonSB"
>
> 7. I then merged the combined FPDS dataset with the SAM.gov dataset and collapsed, sorted, matched, and removed duplicates to create a file that contains 1,259,129 observations and 50 variables. This file is labeled "FPDS_SAM_PPIRS_2019_2020_matching_Test4."

Rosman Stmt. par. 13, Exhibit 3, Chow Decl. par. 6-7. These two statements had not appeared, in any form, in Mr. Chow's report. Mr. Chow did not "describe in [his] report" that he "combined the two FPDS datasets" to create the 64 variable, 5.6 million observation file. To the contrary, the reference to that file appears at the end of a paragraph (quoted above) mostly about SAM data, not FPDS data, and the sentence in question did not state that Mr. Chow was combining two FPDS datasets. Moreover, Mr. Chow testified at his deposition that the 64 variable, 5.6 million observation file was a combined SAM-FPDS dataset. And there was no reference at all to any 50 variable, 1.2 million observation "matching" file in Mr. Chow's report. Rosman Stmt. par. 4; Chow Dep. Tr. 60-61.

This new information was provided long after the initial report was due, long after Plaintiff's expert filed his report, and long after both experts were deposed. Moreover, his methodology still cannot be reproduced.

Mr. Chow's declaration states that he "collapsed" duplicates to create the "matching file." Mr. Chow used STATA software, a very popular software for statistical analysis. Guryan Stmt. par. 10. The term "collapse" in STATA is a term of art that can mean a wide variety of different actions. *Id.* Without knowing exactly what Mr. Chow did to "collapse" the data, it is impossible to replicate his work. *Id.* And just as Mr. Chow's report makes no reference to a file that has 1,259,129 observations and 50 variables, it also neglects to make any mention of "collapsing" data when combining the FPDS and SAM data. *Id.* Indeed, neither fact was even mentioned until far too late. *Id.*

## II. Chow's Expert Report Does Not Satisfy the Requirements of F.R. Civ. P. 26(a)(2)(B).

Under Fed. R. Civ. P. 26(a)(2)(B), an expert's report must contain, *inter alia*, "a complete statement of all opinions the witness will express *and the basis and reasons for them*" and "the facts or data considered by the witness in forming them." Mr. Chow's report does not meet that standard, and accordingly, it should be excluded.

In *R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262, 271-72 (6th Cir. 2010), the Sixth Circuit affirmed the district court's decision to exclude the plaintiff's expert because the expert report failed to comply with Rule 26(a)(2)(B). The court held that the expert's report failed to meet the requirement that it be a "complete statement of all opinions that the

witnesses will express and the basis and reasons for them." *Id.* at 270 (quoting Fed. R. Civ. P. 26(a)(2)(B)(i)). Instead, the expert only provided "cursory support for his conclusion" that the software which was the subject matter of the lawsuit was copied. *Id.* at 271. The court explained that reading the expert's report would leave the defendant "only slightly more informed about the basis of [plaintiff's] argument" than defendant would have been by reading the complaint." *Id.* Here, calling Plaintiff "slightly more informed" after reading Chow's report would be quite charitable.

The court in *Olmstead* explained that an expert report "must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions." *Id.* (quoting *Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 n.6 (7th Cir. 1998)). The Court held that the expert report there "plainly failed this hurdle" and exclusion was appropriate. *Id.*

Here, Mr. Chow's report, originally provided on February 7, 2022, made no mention of a critical 50 variable file which was vital to his conclusions and analysis. Without that file, Plaintiff and its experts were in the dark as to how to evaluate the methods and means by which Mr. Chow reached his conclusions. Further, not knowing that the 50 variable file even existed, Plaintiff was not only unable to ask for it, Plaintiff was also unable to question Mr. Chow about it during his deposition. And, even when questioned during his deposition as to how the "combined file" was created, Mr. Chow misleadingly referred to the 64 variable 5.6 million observation file

that he subsequently claimed was just a file that combined two FPDS files. He completely failed to mention any 50 variable "matching" file.

Over a month later, Mr. Chow finally disclosed the existence of the 50 variable file. Yet to date, Mr. Chow did not disclose exactly how he "collapsed" data when he created the 50 variable file. Accordingly, having not mentioned that file at all in his report, Plaintiff was completely foreclosed from being able to effectively question Mr. Chow during his deposition. Without that information, Mr. Chow's report cannot be evaluated.[1] Likewise Mr. Chow's expert opinions. Accordingly, his testimony should be excluded.

### III. Mr. Chow's Report is Substantively Suspect and Does not Satisfy the Requirements of Federal Rule of Evidence 702.

According to *Daubert v. Merrell Dow*, the trial court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993). The party offering expert testimony has the burden to prove its admissibility by a preponderance of the evidence. *Id.* at 593 n.10 (citing Fed. R. Evid. 104(a) and *Bourjaily v. United*

---

1. Mr. Chow asserted in his "declaration errata" that his misstatements during his deposition were because he did not have his datasets and documents in front of him. Chow Decl. par. 10. Mr. Chow's expert report was marked as an exhibit at his deposition it was available to him to examine if he was uncertain about any references in it. In any event, Mr. Chow's declaration does not explain the complete absence of any reference to a 50 variable 1.2 million observation file in his expert report.

*States,* 483 U.S. 171, 175-176 (1987)). *See also Pride v. BIC Corp.,* 218 F.3d 566, 578 (6th Cir. 2000); *Goldman v. Healthcare Mgmt. Sys.*, 2008 U.S. Dist. LEXIS 22304, \*3 (W.D. Mich. March 11, 2008). This Court exercises a gatekeeping role with respect to any proffered expert testimony, and must insure that "any and all scientific testimony or evidence admitted is not only relevant, but *reliable.*" *Daubert*, 509 U.S. at 589 (emphasis added). *See also Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147-49 (1999) (the gatekeeper function of trial judges applies to all expert testimony, regardless of whether such testimony is based upon scientific, technical, or other specialized knowledge."); *United States v. Mallory*, 902 F.3d 584, 593 (6th Cir. 2018). The court must "strike a balance between a liberal admissibility standard for relevant evidence on the one hand and the need to exclude misleading junk science on the other." *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 176-77 (6th Cir. 2009).

*Daubert* and Rule 702 likewise apply during the summary judgment phase of litigation. If proffered expert testimony fails to meet the threshold for admissibility, the court must exclude it from consideration in ruling upon a motion for summary judgment. *See Cortes-Irizarry v. Corporacion Insular De Seguros*, 111 F.3d 184, 188 (1st Cir. 1997); *Cavallo v. Star Enter.*, 100 F.3d 1150, 1159 (4th Cir. 1996); *Petizmeier v. Hennessy Indus., Inc.*, 97 F.3d 293, 297-99 (8th Cir. 1996); *Claar* v. *Burlington N.R.R.*, 29 F.3d 499, 502-05 (9th

Cir. 1994); *Porter v. Whitehall Lab., Inc.*, 9 F.3d 607, 612, 616-17 (7th Cir. 1993).

When determining the reliability of a proposed expert's testimony, the court must examine the soundness of the expert's methodology, not the correctness of his conclusions. *See Daubert*, 509 U.S. at 594-95 (the focus of the Rule 702 inquiry "must be solely on principles and methodology, not on the conclusions that they generate."). Mr. Chow purports to consider whether the data show differences in the odds of contracts being won by minority-owned small businesses (especially those identified as SDBs) and those participating in the 8(a) program, compared to other small businesses. Chow Report at 7. However, Mr. Chow's methodology is flawed in at least two ways: Mr. Chow did not consider bidding data and how differences in bidding activity among different groups of business owners could affect their odds of winning contract awards, and Mr. Chow analyzed the likelihood of "minority owned" businesses to win contract awards, yet failed to separate out individual minority groups.

### A. Chow's analysis failed to consider the effects of differences in bidding behavior.

One of Mr. Chow's underlying assumptions is that in the absence of discrimination, all of the businesses in the database would be equally likely to be awarded contracts. Yet the data on which Mr. Chow bases his analyses does not include any information about which businesses actually bid on contracts (or how often) or any information about individual bids. The SAM

database contains a list of businesses that have registered with SAM, yet it makes no distinction between those businesses that bid on federal contracts (or those that submit bids often) and those that have never bid. Businesses that have never bid on a federal contract, or bid rarely, would necessarily be less likely to be awarded contracts than businesses that regularly bid on federal contracts.

Similarly, even for those firms that do bid on contracts, Mr. Chow's data contains no information about bids. Therefore, any differences in the types or details of bids that various businesses submit was not (and could not be) accounted for in Mr. Chow's analysis.

At his deposition, Mr. Chow admitted that the vitally important variable of the number of bids each business submitted (which was omitted) could explain the differences he observes:

> Q: Okay. And if I understand the analysis correctly, one variable that was not used was failure to bid, right?
>
> A (Mr. Chow): Correct, I have nothing in here about bidding.
>
> Q: Okay. And so some of these odds might be attributable to the fact that different groups bid less often or more often?
>
> A: Might be attributable, yes.
>
> Q: Okay. There's nothing in your analysis that would eliminate that possibility; is that right?
>
> A: Correct.

Rosman Stmt. par. 4, Exhibit 2, Chow Dep. Tr. 98-99. Mr. Chow agrees that his analysis does not account for at least one non-

discriminatory reason (number of bids) for the disparities he observes. Accordingly, without accounting for all possible nondiscriminatory factors, it is not possible to conclude that the disparities were caused by discrimination.

> **B. Chow's analysis failed to separate out individual minority groups and women.**

Mr. Chow's analysis likewise fails to break down groups by individual race or national origin. So, even if one assumes *arguendo* that the disparities he found reflect some type of discrimination, there is no way to tell the extent to which that discrimination occurred against any particular race or national origin group. The broad character of this type of evidence fails to satisfy strict scrutiny. *See Richmond v. J. A. Croson Co.,* 488 U.S. 469, 506 (U.S. 1989) ("If a 30% set-aside was 'narrowly tailored' to compensate black contractors for past discrimination, one may legitimately ask why they are forced to share this 'remedial relief' with an Aleut citizen who moves to Richmond tomorrow? The gross overinclusiveness of Richmond's racial preference strongly impugns the city's claim of remedial motivation."). *See also Wygant v. Board of Education*, 476 U.S. 267, 284 n. 13 (1986) (the haphazard inclusion of racial groups "further illustrates the undifferentiated nature of the plan"); *Kornhass Constr., Inc. v. Okla., Dep't. of Cent. Serv.*, 140 F. Supp. 2d 1232, 1247 (W.D. Okla. 2001) ("the Act broadly extends its bidding preference to several racial minority groups, *ie.*, African Americans, Hispanics, Asian Americans, American Indians and Alaskan Natives, without

regard to whether each of those groups has suffered from the effects of past or present racial discrimination").

## IV. Conclusion

For the foregoing reasons, Plaintiff respectfully requests this Court exclude the testimony of Daniel Chow.

Respectfully submitted,

*/s/ Michael E. Rosman*
Michael E. Rosman
Michelle A. Scott
CENTER FOR INDIVIDUAL RIGHTS
1100 Connecticut Ave, NW, Ste. 625
Washington, D.C. 20036
(202) 833-8400

M. Dale Conder, Jr.
RAINEY KIZER REVIERE & BELL PLC
209 E. Main St.
Jackson, TN 38301
(731) 426-8130