IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | | |
|---|---|---|
| ULTIMA SERVICES CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:20-cv-00041-DCLC-CRW |
| | ) | |
| U.S. DEPARTMENT OF AGRICULTURE, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY AND OPINIONS OF PLAINTIFF'S EXPERT DR. JONATHAN GURYAN

Defendants United States Department of Agriculture, the Secretary of Agriculture, the United States Small Business Administration, and the Administrator of the United States Small Business Administration ("Defendants"), by their attorneys, move to exclude the testimony and opinions of Plaintiff's rebuttal expert, Dr. Jonathan Guryan, pursuant to Rule 702 of the Federal Rules of Evidence.

This case arises from Plaintiff Ultima Services Corporation's ("Ultima") constitutional challenge to certain aspects of the Small Business Administration's Section 8(a) Business Development Program ("8(a) program")—namely, the regulation that confers a rebuttable presumption of social disadvantage on members of certain minority groups. To defend against such a challenge, Defendants are required to show that the government had "a strong basis in evidence" to conclude that race-based action was needed to further the government's compelling interest in remedying discrimination that has impeded the ability of minority business enterprises ("MBEs") to compete equally in the marketplace. *City of Richmond v. J.A. Croson Co.*, 488 U.S.

1

469, 500 (1989). Defendants have presented the reports of two experts, Dr. Jon Wainwright and Mr. Daniel Chow, in addition to voluminous evidence in the congressional record, to demonstrate that the government had, and continues to have, a strong basis in evidence to conclude that discrimination and its lingering effects have impeded the ability of MBEs to compete in public contracting, including federal government contracting. Ultima proffers the testimony and opinions of Dr. Jonathan Guryan in an effort to rebut the reports of Defendants' two experts.

The undisputed record shows that Dr. Guryan's report and testimony should be excluded for the purposes of summary judgment and at trial because it does not constitute expert testimony as defined by Rule 702. Dr. Guryan's opinions are neither reliable nor relevant, and therefore fail both prongs of the test in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). While Dr. Guryan has impressive credentials as an economist, his report consists entirely of his "subjective belief or unsupported speculation," rather than the scientifically reliable analysis that Rule 702 demands. Not only has Dr. Guryan failed to support his opinions with evidence, but he assumes an entirely different standard for establishing discrimination than the one that applies to this case. As a result, Dr. Guryan's opinions will not help the trier of fact to understand any relevant issues, and admitting his report and testimony will sow confusion rather than clarity.

## RELEVANT FACTUAL BACKGROUND

During discovery, Defendants filed two expert reports: one by Dr. Jon Wainwright and one by Daniel Chow, both economists.

### I. Wainwright Report

Dr. Wainwright is a recognized expert in measuring the utilization of minority- and women-owned businesses in contracting and assessing data regarding business formation and success. He has authored or directed numerous disparity and availability studies for state and local

2

governments through his work with NERA Economic Consulting ("NERA"), for whom he served as Managing Director before retiring, and his methodology is well-tested. Indeed, courts in multiple jurisdictions have relied upon Dr. Wainwright's analysis in upholding race-conscious contracting programs. *See, e.g., Concrete Works of Colo., Inc. v. City and Cnty. of Denver*, 321 F.3d 950, 990-91 (10th Cir. 2003) (upholding a race-conscious contracting program based in part on Dr. Wainwright's NERA study); *N. Contracting, Inc. v. Illinois*, 473 F.3d 715, 723 (7th Cir. 2007) (same); *Rothe Dev., Inc. v. Dep't of Def. (Rothe IV)*, 107 F. Supp. 3d 183, 208 (D.D.C. 2015) (upholding facial constitutionality of 8(a) program based in part on Dr. Wainwright's expert testimony). Dr. Wainwright has also testified before Congress on numerous occasions regarding the disparities faced by MBEs in public and private contracting markets.[1]

In his expert report in this case, Dr. Wainwright analyzed 205 disparity studies performed by state and local governments between 2010 and 2021, covering 32 states and the District of Columbia. *See* Ex. 1, Expert Report of Jon Wainwright, Ph.D. ("Wainwright Rpt."), at 14, 21. Broadly speaking, a disparity study compares the utilization of MBEs by public contracting entities with their availability in a given market area and also compiles statistical and anecdotal evidence of discrimination that might explain such disparities. *Id.* at 14, 18, 19. Dividing utilization percentage by availability percentage results in a disparity index. *Id.* at 17. A disparity index of 100 indicates that the utilization of a particular category of businesses is equivalent to the availability of those businesses in the relevant market. As a general rule, a disparity index of less than 80 indicates a substantial disparity. *Uniform Guidelines on Employee Selection Procedures*,

---

[1] *See, e.g., Driving Equity: The U.S. Department of Transportation's Disadvantaged Business Enterprise Program*, *Hearing Before H. Comm. on Transp. and Infrastructure*, 116th Cong. 38 (2020) (testimony of Jon Wainwright); *The Department of Transportation's Disadvantaged Business Enterprise Program: Hearing Before H. Comm. on Transp. and Infrastructure*, 111th Cong. 326 (2009) (statement of Jon Wainwright).

29 C.F.R. § 1607.4 (D); *Connecticut v. Teal*, 457 U.S. 440, 443 n.4 (1982).

To analyze the findings across the 205 studies, Dr. Wainwright assembled all of the availability and utilization statistics from the studies, as well as the disparity indexes derived from those statistics, into a single database. Ex. 1, Wainwright Rpt., at 19. Each record was categorized along several key dimensions, including the race and sex of the business owner, major procurement category, and level of contractor, among others. *Id.* at 20-21. Although the studies used different methodologies and covered different geographic areas and time periods, the similarities across their results are striking: in the overwhelming number of markets, all across the country, the studies found that MBEs were significantly underutilized compared to their availability. After analyzing 4,327 disparity indexes from the 205 studies, Dr. Wainwright found that 80% were adverse (*i.e.*, less than 100), 74% were large and adverse (*i.e*, less than 80), and, of these, the average disparity index was just 25 and the median was just 18. *Id.* at 29.

In the second section of his report, Dr. Wainwright analyzed data from the only two national surveys dedicated to MBEs, the Census Bureau's *Survey of Business Owners and Self-Employed Persons* ("SBO") and *Annual Business Survey* ("ABS"). *Id.* at 39. After summarizing the SBO results for each race group (e.g., the number of firms, average sales and receipts, number of employees, and annual payroll expenses), Dr. Wainwright converted them into percentage distributions within each category. *Id.* at 40. This allowed him to determine, for example, that Blacks owned 9.51 percent of all firms and earned only 1.26 percent of all sales and receipts. *Id.* He then calculated the disparities between the availability and utilization of MBEs by dividing each racial group's share of sales and receipts by the share of firms and multiplying the result by 100, resulting in a disparity index. *Id.* at 41 n.48. He tested these results for statistical significance, and found that all of them were statistically significant. *Id.* at 44 (see Table 3.1). Dr. Wainwright

Case 2:20-cv-00041-DCLC-CRW    Document 59    Filed 06/21/22    Page 4 of 27
PageID #: 414

also compared the sales and receipts per firm among all firms to determine, for example, that for every dollar earned by non-MBEs, Black-owned firms received 8 cents and Hispanic-owned firms received 20 cents. *Id*. at 41. Likewise, he calculated the average payroll per employee and compared the results between MBEs and non-MBEs, broken down by racial groups. *Id*. at 43. Finally, Dr. Wainwright disaggregated the results into major procurement categories and industry sectors. *Id*. at 45-49. Dr. Wainwright performed all of these same calculations using ABS data, presenting economy-wide results for each race group (Table 3.3) as well as industry-specific results (Table 3.4). *Id*. at 50-57. Summarizing his findings, Dr. Wainwright concluded that, regardless of whether the SBO data or ABS data is used, "a pattern of large, adverse, and statistically significant disparities is consistently observed" across the economy as a whole, in each major procurement category, and for every minority group in the data. *Id*. at 57.

In the final section of his report, Dr. Wainwright tested the likelihood that race-neutral factors alone could account for the large adverse disparities observed in his other analyses. First, he documented the extent of the disparities observed in the data using the statistical technique of regression analysis to explain three key economic outcomes: annual wages and salaries, business formation rates, and annual business owner earnings. Ex. 1, Wainwright Rpt., at 58. He referred to this as his "baseline model." *Id*. Next, Dr. Wainwright added several independent variables to the regression that are indicators of qualifications and capacity. In his "qualifications model," he controlled for schooling, age, and geographic location in order to compare similarly situated individuals to see how much, if any, the disparities in the baseline model are reduced when these additional factors are accounted for. *Id*. at 58-59. Finally, in his "qualifications plus capacities" model, Dr. Wainwright incorporated "a large number of additional independent variables . . . that are materially related to the propensity to become a business owner" including measures of

individual financial assets, family structure, mobility, immigration status, military status, and local macroeconomic conditions by state. *Id*. at 59. After controlling for these additional non-discriminatory variables, he found that the disparities facing minority business owners remain large, adverse, and statistically significant in the vast majority of cases. *Id*. at 80. Consequently, Dr. Wainwright concluded that "these results are fully consistent with the conclusion that discrimination continues to adversely affect minorities and women operating in United States business markets, and in particular those markets that are relevant to the SBA Section 8(a) Business Development Program." *Id*.

## II.    Chow Report

Mr. Chow's expert report examined disparities in successful outcomes between minority and non-minority business owners in federal contracting. *See* Ex. 2, Update to the Assessment of Contracting Outcomes for Small Disadvantaged Businesses ("Chow Rpt."), at 1. It was modeled after a similar study conducted by Dr. Robert Rubinovitz in 2012, which was relied upon by another federal court in upholding the constitutionality of the 8(a) program and presented to Congress. *Id*.; *see Rothe*, 107 F. Supp. 3d at 208.[2]

Using federal contracting data from April 2019 to August 2020, Mr. Chow constructed a database of firms that were reasonably expected to compete for federal contracts, along with information on which of these firms won contract awards and other characteristics of the firms. Ex. 2, Chow Rpt., at 2. He then utilized logit regressions to determine whether small disadvantaged businesses ("SDBs") were more or less likely to win federal prime contracts relative to other small

---

[2] Dr. Rubinovitz also found significant disparities in the odds of MBEs winning federal contracts. Specifically, he found that SDBs not participating in the 8(a) program had roughly 11 percent lower odds of winning federal prime contracts compared to non-SDBs, and that all MBEs had roughly 30 percent lower odds of winning federal prime contracts than other small firms.

6

businesses, just as Dr. Rubinovitz had in his previous study. *Id*. As Mr. Chow explains, "A logit model of regression estimates the relationship between a variable to be explained (the 'dependent' variable) and one or more explanatory variables (the 'independent' variables). The resulting estimated relationship between the dependent and independent variables is called the odds ratio." *Id*. Mr. Chow's model generated odds ratios for winning contract awards in various industries and for a number of different variables. *Id*. To minimize potential errors, Mr. Chow also used firthlogit, a variant on the logit model, which "adjusts for possible estimation biases for industries that have a very low contract win rate and in cases where winning or not winning a contract is perfectly or nearly perfectly equal to a linear function of one of the control variables" and "minimizes the generation of the extremely large standard errors or highly inflated coefficients that might occur from these perfectly associated relationships" during a logistic regression. *Id*. at 6.

Mr. Chow concluded that SDBs[3] not participating in the 8(a) program had 37 percent lower odds of winning a prime contract with the federal government compared to firms not identified as SDBs, a difference that he found to be statistically significant. *Id*. at 7. He also found that MBEs (which include minority-owned small businesses, SDBs that are minority-owned, and minority-owned 8(a) participants) had roughly 15 percent lower odds of winning a federal prime contract than other small firms.[4] *Id*. at 2. Mr. Chow found these disparities exist in federal government contracting despite controlling for all other factors that might increase a firm's odds for success, including the ownership of the firm (minority-owned, women-owned, and veteran-owned), type of organization (e.g., corporation, partnership, or some other type), firm size (in terms of both numbers of employees and revenues), level of security clearance, the firm's age, and whether the

---

[3] The vast majority of SDBs (88.4%) are minority-owned. Ex. 2, Chow Rpt., at 4 (see Table 1).
[4] Unsurprisingly, including firms participating in the 8(a) program in the group of MBEs under study increases the group's odds of winning a contract overall since the 8(a) program is designed to bolster the success of program participants in contracting.

firm identifies itself as an SDB (and if so, whether it is part of the 8(a) program). *Id*. at 2-3. When comparing similar firms, Mr. Chow determined that SDBs had a statistically significantly lower chance of winning a contract in over 93% of contract actions. *Id*. at 10 (see Table 4). As a result, Mr. Chow concluded that the results of the disparities in his study were consistent with the presence of discrimination. *See* Ex. 3, Deposition of Daniel Chow ("Chow Dep."), at 110:21-111:3.

### III.    Guryan Rebuttal

Plaintiff did not identify an affirmative expert, but it filed a rebuttal expert report by Dr. Jonathan Guryan, critiquing the reports of Dr. Wainwright and Mr. Chow. *See* Ex. 4, Expert Report of Jonathan Guryan, Ph.D. ("Guryan Rpt."). Although Dr. Guryan is an economist, with degrees from Princeton and the Massachusetts Institute of Technology, he did not complete any calculations, run any regression analyses, or compute any odds ratios. Indeed, he did not complete *any* statistical analysis or independently analyze any data in preparing his report. Moreover, Dr. Guryan has never performed a disparity study, nor has he conducted any research on the availability of minority-owned businesses or business formation rates. *See* Ex. 5, Deposition of Jonathan Guryan ("Guryan Dep."), at 131:17-132:5, 133:4-21.

Nevertheless, Dr. Guryan raises a number of generalized and speculative critiques about disparity studies and the statistical methods used by Dr. Wainwright and Mr. Chow, including the following: (1) that the disparity studies on which Dr. Wainwright relies are flawed; (2) that regression analysis is a flawed method of testing for discrimination; (3) that Dr. Wainwright's and Mr. Chow's regression analyses may suffer from omitted variable bias; (4) that the evidence of disparities in Ultima's industries is insufficient; and (5) that Mr. Chow's data and methodology do not support his conclusions. None of these arguments withstand scrutiny, as they are not grounded

in scientifically reliable methodology. Dr. Guryan has employed no statistical methodology whatsoever to support his arguments, and many are based on unfounded assertions that are clearly contradicted by record evidence. This is not expert testimony, and it is therefore not relevant, as it would in no way assist the trier of fact in establishing the necessary facts or understanding the relevant issues.

## LEGAL STANDARD

Pursuant to Rule 702 of the Federal Rules of Evidence, a witness qualified as an expert by "knowledge, skill, experience, training, or education" may offer an expert opinion if four conditions are met:

    (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

    (b) the testimony is based on sufficient facts or data;

    (c) the testimony is the product of reliable principles and methods; and

    (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Determining whether a witness meets this standard is left to the discretion of the trial court, which serves an important "gatekeeping" role. *Daubert*, 509 U.S. at 597. In this role, "the trial judge has discretion in determining whether a proposed expert's testimony is admissible based on whether the testimony is both relevant and reliable." *Rose v. Truck Centers, Inc.*, 388 Fed. App'x 528, 533 (6th Cir. 2010). As the Sixth Circuit has explained, trial courts must undertake a two-step inquiry in determining the admissibility of expert testimony, considering: (1) whether the reasoning or methodology underlying the expert's testimony is scientifically valid and can properly be applied to the facts at issue; and (2) whether the proposed testimony is relevant to the task at hand and will aid the trier of fact. *United States v. Smithers*, 212 F.3d 306, 313 (6th Cir. 2000) (citing *Daubert*, 509 U.S. at 592-93).

**ARGUMENT**

**I.** **The Methodology Used in Dr. Guryan's Report and Testimony is not Scientifically Reliable.**

"The first prong of the *Daubert* examination, reliability, requires the Court to assess carefully the methodology, reasoning, or technique employed by the expert." *Wynacht v. Beckman Instruments, Inc.*, 113 F. Supp. 2d 1205, 1207 (E.D. Tenn. 2000) (citing *Pride v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000) and *Smithers*, 212 F.3d at 313). The Court's role is to "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 153 (1999).

The factors relevant in evaluating the reliability of the testimony include "whether a method is testable, whether it has been subjected to peer review, the rate of error associated with the methodology, and whether the method is generally accepted within the scientific community." *Coffey v. Dowley Mfg., Inc.*, 187 F. Supp. 2d 958, 970 (M.D. Tenn. 2002) (citing *Daubert*, 509 U.S. at 593-94). "[T]he function of this inquiry is to distinguish between two types of expert opinions: 'An expert opinion that is based on scientifically valid principles will satisfy Fed. R. Evid. 702; an expert's subjective belief or unsupported speculation will not.'" *Wynacht*, 113 F. Supp. 2d at 1207 (citing *Smelser v. Norfolk Southern Ry. Co.*, 105 F.3d 299, 303 (6th Cir. 1997)). Expert evidence must be excluded if it is connected to existing data only by the *"ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997).

The lack of testing has been cited by this Circuit as one of several "red flags" that caution against certifying an expert. *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012); *see also Wynacht*, 113 F. Supp. 2d at 1209-10 (excluding opinion of expert who "[had] not personally undertaken any testing that would support her conclusion," finding "there has been

10

neither verification through testing of Dr. Ziem's conclusions, nor have they been subject to peer review, nor has Dr. Ziem identified any rate of error" and that it therefore "falls well short of the *Daubert* reliability standard"). "Like a hunch, an untested and unvalidated hypothesis may be correct, but it cannot be *knowledge*, since it is not based on sufficient facts or data and is not the product of reliable methods." *United States v. Lang*, 717 F. App'x 523, 535 (6th Cir. 2017). Courts in the Sixth Circuit have rejected expert testimony that is "at most a working hypothesis, not admissible scientific 'knowledge'" because "Rule 702 requires 'more than subjective belief or unsupported speculation.'" *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 670 (6th Cir. 2010) (citing *Daubert*, 509 U.S. at 590); *see also Hayes Outdoor Media, LLC v. S. Trust Ins. Co.*, No. 120-CV-01213-STA-jay, 2021 WL 5746678, at *4 (W.D. Tenn. Dec. 2, 2021) (excluding expert testimony because it "lacks a reliable foundation" and is "at most a working hypothesis") (quoting *Tamraz*, 620 F.3d at 670).

Dr. Guryan fails this prong because he did not employ *any* scientifically reliable methodology to reach the conclusions in his report. As a result, his opinions are merely "unsupported speculation" and do not constitute expert testimony, as they fall well short of the threshold required to be considered reliable.

### a. Dr. Guryan Did Not Conduct Any Independent Statistical Analysis

Dr. Guryan's "reasoning and methodology" regarding perceived flaws in Dr. Wainwright's and Mr. Chow's reports is not reliable because it does not exist. Dr. Guryan did not collect any data, nor did he run any statistical tests or regression analyses of his own. Ex. 5, Guryan Dep., at 27:13-14, 50:2-7; 195:17-18 ("I didn't run any regressions for the purposes of this matter."). Likewise, he did not run any statistical analysis or tests on the data that was relied upon by Defendants' experts in their reports. *Id*. at 28:3-7, 50:2-3. Critically, Dr. Guryan's views are

entirely speculative because he did not complete any tests to determine whether the purported flaws with the methodology used by Defendants' experts in their reports *actually* biased their results, or confirm whether the use of his preferred methodology would have made a difference.

Consequently, Dr. Guryan's rebuttal does not qualify as an expert opinion because he did not deploy any of his expertise in statistical analyses here, which renders his methodology completely absent and his opinions unsupported. *See, e.g., Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 479 (6th Cir. 2008) (affirming court's exclusion of testimony of mechanic whose usual method relied on physical inspection of the vehicle, which he was unable to do, as "[n]othing in Griffin's resume, education, or training suggests he is qualified to offer an expert opinion on a defect in the Accord's airbag *without actually inspecting it*"); *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994) ("[t]he issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question."); *Goebel v. Denver and Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1088 (10th Cir. 2000) ("[N]o matter how good" experts' "credentials" may be, they are "not permitted to speculate.").

### b. Dr. Guryan's Analysis is Unreliable Because He Relies on Supposition, Not Data

Owing to the lack of testing, Dr. Guryan's report and deposition testimony are long on speculative, uncorroborated opinions, but absent of hard data and facts to support his views. Many of his opinions lack any foundation, or are contradicted by evidence in the record. Moreover, several of the opinions he offers are contrary to established legal standards and precedent. Simply put, this is not expert testimony, as Dr. Guryan's failure to proffer specific credible evidence to support his contentions make his views unreliable.

12

### i. Dr. Guryan's Critiques of Disparity Studies are Non-Expert Opinion

Although Dr. Guryan admitted that he did not review all of the disparity studies that Dr. Wainwright analyzed (Ex. 5, Guryan Dep., at 139:3-140:2), this did not prevent him from offering sweeping critiques of the disparity studies based on unfounded assumptions. First, Dr. Guryan critiques disparity studies as a whole (as well as Dr. Wainwright's and Dr. Chow's other findings of disparities) because "disparities and discrimination are not the same thing." Ex. 4, Guryan Rpt., at 7-8. This conclusion evades the question at hand. Disparity studies include both quantitative and qualitative evidence, including accounts from business owners who have been subjected to discrimination, as well as statistical evidence such as regression analyses comparing MBEs and non-MBEs on metrics like owner earnings and business formation rates, in addition to the disparity indexes—all of which bolsters the conclusion that disparities are consistent with the presence of discrimination. Ex. 1, Wainwright Rpt., at 18-19. Moreover, to the extent that Dr. Guryan is critical of the disparity studies because they do not provide direct evidence of discrimination or an individual decisionmaker's discriminatory intent, these arguments are misplaced because they are legal arguments, not expert opinion, and misstate the relevant legal standard as to causation. It is well-established that intentional discrimination can be proven through direct *or* circumstantial evidence. *Foster v. Michigan*, 573 F. App'x 377, 392 (6th Cir. 2014); *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 534 (6th Cir. 2002) (citing *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)).

Second, Dr. Guryan suggests that there may be flaws in the disparity studies and that Dr. Wainwright did not analyze the underlying studies for flaws. Ex. 4, Guryan Rpt., at 14. Again, this is a legal argument. Moreover, courts have contradicted Dr. Guryan's legal opinion here, making clear that such an analysis is not required and experts can rely on these types of studies at face

13

value. *DynaLantic Corp. v. U.S. Dep't of Defense*, 885 F. Supp. 2d 237, 276-77 (D.D.C. 2012) (specifically rejecting the argument that the government "must independently verify the evidence presented to it"); *Rothe*, 107 F.Supp. at 209 (incorporating *DynaLantic c*ourt's reasoning and adopting as its own).

Third, Dr. Guryan hypothesizes that the 205 disparity studies that Dr. Wainwright reviewed "may be a selected sample" because, he assumes, a disparity study published by a state or local government as support for a particular program "is likely to show disparities that the program is intended to remedy." Ex. 4, Guryan Rpt., at 15. But Dr. Guryan admits he has no evidence that any studies were not published because they showed no disparities. Ex. 5, Guryan Dep., at 166:13-168:6. In fact, any lay witness could review the disparity studies and see that they contradict this incorrect assumption, as some of the published studies that Dr. Wainwright analyzed showed no disparities overall and/or no disparities for particular groups. *See, e.g.,* ROSALES BUSINESS PARTNERS LLC, DISADVANTAGED BUSINESS ENTERPRISE AVAILABILITY, UTILIZATION, AND DISPARITY STUDY FOR THE SAN FRANCISCO MUNICIPAL TRANSPORTATION AGENCY (SFMTA) 38 (2015) ("overall, utilization of MBE/WBEs . . . was at least what might be expected based on their availability for those contracts. The disparity index of 104 indicates that all MBE/WBEs considered together received 104 percent of the contract dollars that they might be expected to receive based on their availability."); KEEN INDEP. RESEARCH LLC, CITY OF ATLANTA DISPARITY STUDY SUMMARY REPORT 21 (2015) (overall disparity index for City-funded contracts was 109; for African American-owned firms, it was 161 and for Hispanic-American firms it was 113).[5]

---

[5] These findings are not sufficient to undermine the overwhelming evidence of disparities identified in the disparity studies as a whole, but they do show that Dr. Guryan's assumption that the only disparity studies published are those that find disparities is incorrect.

Fourth, Dr. Guryan contends that many disparity studies do not accurately measure discrimination because they fail to control for a firm's capacity to perform the work. But when questioned about this at his deposition, Dr. Guryan could not specify how many of the 205 disparity studies he believed failed to control for firm size or capacity. Ex. 5, Guryan Dep., at 158:2-6. Owing to this lack of review, Dr. Guryan fails to appreciate that the various firms that published the disparity studies Dr. Wainwright reviewed *do* have different methods of determining capacity. *See* Ex. 6, Deposition of Jon Wainwright ("Wainwright Dep."), at 165:8-168:8 ("[Capacity] means different things for different consultants . . . . some disparity consultants try to incorporate some aspects of capacity measures into their availability measures.").[6]

Moreover, the assertion that disparity studies are not reliable because they fail to control for capacity is unavailing because Dr. Guryan has not tested it. He made no attempt to perform his own study, controlling for capacity as he sees fit, to determine the effect that it would have on Dr. Wainwright's analysis or any of the individual disparity studies. Ex. 5, Guryan Dep., at 162:3-7. Nor did he attempt to recalculate any of the disparity indexes with capacity measures included. *Id.* at 162:8-11, 168:15-16 ("I did not redo Dr. Wainwright's calculations."). Tellingly, Dr. Guryan also offered no opinion as to the correct way to measure a firm's capacity. *Id.* at 160:12-17.

### ii. Dr. Guryan's Critiques of the Use of Regression Analysis are Non-Expert Opinion

Regression analysis is a statistical technique allowing the comparison between certain outcomes—such as the level of wages, the extent of business formation, the level of business

---

[6] Twenty-one of the disparity studies in the sample were prepared by NERA, which uses a "custom census" approach to determine the availability of small disadvantaged businesses in the relevant marketplace, which is one way of assessing the capacity of those firms to perform work. Ex. 1, Wainwright Rpt., at 16; Ex. 6, Wainwright Dep., at 167:13-168:8. BBC Research and Consulting, author of 45 of the examined studies, also uses a variation of the custom census approach to analyze the availability of MBEs in a particular market. BBC RESEARCH AND CONSULTING, 2020 DISPARITY STUDY FOR THE COMMONWEALTH OF VIRGINIA ES-3 (2020).

earnings, or the extent of loan denials—and minority status, while holding other, potentially non-discriminatory factors, constant. Ex. 1, Wainwright Rpt., at 18 n.28. As discussed above, Dr. Wainwright and Mr. Chow both used regressions to test whether various non-discriminatory factors may have caused the disparities in outcomes between MBEs and non-MBEs identified in their respective reports. Dr. Guryan did not complete any regression analyses.

Dr. Guryan is critical of the use of regression analyses to test for discrimination in general, a view that is contrary to well-established legal precedent. Ex. 4, Guryan Rpt., at 13; Ex. 5, Guryan Dep., at 54:2-18. Courts have long accepted statistical analysis, including regression analysis, as evidence of discrimination. *See, e.g., DynaLantic*, 885 F. Supp. 2d at 259, 261-62; *O'Donnell v. City of Cleveland*, 838 F.3d 718, 727-28 (6th Cir. 2016) (citing *Bazemore v. Friday*, 478 U.S. 385, 400-01 (1986)) (explaining the probative value of regression analyses in Title VII discrimination cases). He proposes a number of alternative methods, including audit studies, correspondence studies, field experiments, natural experiments, and marginal outcome tests, which he asserts are regarded as "superior ways to measure and test for discrimination." Ex. 4, Guryan Rpt., at 13. But when pressed for details at his deposition, Dr. Guryan conceded that he had never actually used any of these methods to test for discrimination, and could not describe how he would use them to measure discrimination in contracting. Ex. 5, Guryan Dep., at 108:16-127:13. In many cases, the flaws with these methods quickly became apparent. For example, in discussing audit studies—which generally require the use of actors who are trained to complete some in-person interaction, like a job interview, in an identical way, with all else constant but their race—Dr. Guryan conceded that audit studies would not be an appropriate method to test for discrimination in evaluating bids, which does not involve interviews:

> Q: Can you think of a way to use an audit study here where we're talking about contracting in a way that wouldn't involve submitting false information?

16

A: Again, if the particular contracting market that we're hypothetically trying to test for discrimination in doesn't commonly involve face-to-face interviews, then an audit study probably wouldn't be the right way to test for discrimination in that market.

*Id.* at 109:13-22. In light of these challenges, Dr. Guryan suggested that a correspondence study (which is a variation on an audit study, using identical documents as opposed to live auditors) might be a better method, as he could recruit businesses to submit real bids. But when asked about how he could actually control for all differences if he were using real business owners, Dr. Guryan punted: "I wasn't asked to design a study like that, so I haven't spent time to think through all of the logistical details and look into all the issues of feasibility." *Id.* at 117:8-11. As these examples make clear, Dr. Guryan's claim that these methods are "superior" ways to test for discrimination in government contracting is entirely hypothetical.

Dr. Guryan is also dismissive of the regressions performed by Defendants' experts in particular, because, he asserts, they have failed to control for "*everything* besides discrimination that might cause the average outcomes of the two groups to be different." Ex. 4, Guryan Rpt., at 12 (emphasis added); Ex. 5, Guryan Dep., at 84:3-10. Setting aside the impossibility of that task, Dr. Guryan's argument that Defendants' experts' analyses are unreliable because they have omitted variables that *might* explain the disparities is completely speculative, and it does not constitute expert testimony.

Although Dr. Guryan states that he cannot provide a complete list of variables that he believes should have been controlled for in Dr. Wainwright's and Mr. Chow's studies, Ex. 5, Guryan Dep., at 184:16-22, 201:8-13, he speculates that various factors—such as bidding behavior, firm capacity, and various characteristics of the business owner—*could* explain the differences in contracting outcomes, wages, and business formation rates that Dr. Wainwright and Mr. Chow observed. But when pressed, Dr. Guryan conceded that nearly all of the variables that

17

he suggested suffered from one or more flaws: (1) Dr. Guryan was aware of no evidence indicating there are measurable differences in variables such as bidding behavior and the desire to be self-employed between individuals of different races,[7] (2) any differences among individuals of different races could be the result of discrimination,[8] or (3) the variable may be difficult or impossible to measure.[9]

Crucially, Dr. Guryan did not attempt to re-run Dr. Wainwright's or Mr. Chow's analyses with any additional variables he believes should have been controlled for. Ex. 5, Guryan Dep., at 195:14-18, 202:9-14; 221:8-14. Thus, he has not identified any factor that Dr. Wainwright or Mr. Chow failed to control for that would have changed their results, making clear that this critique is simply an untested hypothesis. *Id.* at 195:19-196:14; 226:11-18.

Indeed, in his report and at his deposition, Dr. Guryan went to great lengths to make clear that his opinions were purely hypothetical, and he cannot conclusively say whether including additional variable(s) would have made a difference. For example:

- "I'm not saying that if you were able to control for [bidding choices and firm size] then that would necessarily be enough, but my criticism is that Dr. Wainwright draws a conclusion about discrimination based on analyses that don't consider those and *any other* nondiscriminatory factors that *might* explain the disparity." *Id.* at 146:21-147:5 (emphasis added).

- "[W]hat I'm saying is that [Dr. Wainwright] has not controlled for nondiscriminatory factors, one of which *might* be differences in bidding behavior." *Id.* at 148:4-7 (emphasis added).

- "I cannot say what would have happened if he had controlled for a variable that he didn't control for, and neither can Dr. Wainwright." *Id.* at 152:19-21.

---

[7] Ex. 5, Guryan Dep., at 219:11-17 (bidding behavior), 195:10-13 (desire to be self-employed).
[8] *Id.* at 188:19-189:7 (choice of college major), 189:21-190:10 (occupation); 193:13-194:1 (industry), 194:13-21 (parents' socioeconomic background).
[9] *Id.* at 158:19-159:4 (capacity); 195:1-4 (desire to be self-employed); *see also id.* at 201:22-202:2 (list includes "factors that you are very unlikely to be able to control for in a dataset.").

Such pure speculation and circular logic is not evidence of scientifically reliable methodology – nor does it constitute the testimony of an expert qualified under FRE 702. It also overlooks the fact that Dr. Wainwright and Mr. Chow *did* control for a number of non-discriminatory variables in their analyses. Moreover, Dr. Guryan's attempt to critique each section of Dr. Wainwright's report in a vacuum and allege that the individual analyses are insufficient to prove the existence of discrimination does not undermine Dr. Wainwright's overall conclusions. Nowhere does he address the fact that Dr. Wainwright has performed three *separate and distinct* analyses in order to review the best available data and rule out all possible non-discriminatory factors, bolstering confidence in his overall results. As Dr. Wainwright explained:

> I think only by looking at all three sections together do you – do you see the clear picture of at least what I was trying to establish is do these disparities exist, did they tend to be isolated to particular groups or particular states or particular industries. You know, do they exist, yes; are they isolated to any of those particular groups or categories, no; do they tend to be statistically significant, yes; and finally can they be explained by other factors besides – are they consistent with the possibility that other factors relevant to economic outcomes can explain them and the answer to that is no.

Ex. 6, Wainwright Dep., 173:12-174:3.

### iii. Dr. Guryan's Critiques of the Evidence of Disparities in Ultima's Industries are Non-Expert Opinion

Dr. Guryan is also critical of Dr. Wainwright's and Mr. Chow's analyses of disparities in the administrative and technical support industry, which Ultima contends is the industry relevant to its as-applied challenge, because Dr. Guryan asserts that they group together numerous types of businesses that are dissimilar to Ultima. Ex. 4, Guryan Rpt., at 15, 25. As an initial matter, this critique is not relevant to Plaintiff's facial challenge. Dr. Guryan's repeated insinuation that the extensive evidence of discrimination in the majority of industries across the country that Dr. Wainwright and Mr. Chow have marshaled is not relevant to this litigation because it relates to

markets and industries in which Ultima does not operate entirely misses the mark.[10] As Ultima has

brought a facial challenge to a nationwide program, this evidence is plainly relevant. *See, e.g.,*

*Sherbrooke Turf, Inc. v. Minn. Dep't of Transp.*, 345 F.3d 964, 970 (8th Cir. 2003) ("When the

program is federal, the inquiry is (at least usually) national in scope. If Congress or the federal

agency acted for a proper purpose and with a strong basis in the evidence, the program has the

requisite compelling government interest nationwide, even if the evidence did not come from or

apply to every State or locale in the Nation.").[11]

Even as to Plaintiff's as-applied challenge, Dr. Guryan's critique is unfounded. His critique

is primarily based on the fact that Dr. Wainwright and Mr. Chow analyzed firm data by three-digit

NAICS codes,[12] which he believes are imprecise for such analysis, as opposed to the more granular

six-digit codes. But Dr. Guryan did not conduct his own analysis to test for the presence of

---

[10] *See, e.g.,* Ex. 4, Guryan Rpt., at 15-16 ("[D]iscrimination in one market does not necessarily imply that there is discrimination in a different market. Discrimination in one industry does not necessarily imply that there is discrimination in a different industry. In order to test whether discrimination exists in a particular market, a social scientist must analyze that particular market.").

[11] Nor does Dr. Guryan's critique that disparities identified for minorities in general does not indicate the presence of disparities for each minority group individually hold any water because Dr. Wainwright did, in fact, disaggregate his results by racial groups. Ex. 1, Wainwright Rpt., at 30 (see Table 2.2). Moreover, while there may be evidence that some members of some groups may not face disparities in all areas in all industries, this does not undermine the broad and overwhelming evidence justifying the use of race-conscious measures in the 8(a) program. The Supreme Court is clear that a remedial program may reach those not individually subjected to discrimination and maintain its constitutionality. *See, e.g., Local 28 of Sheet Metal Workers' Int'l Ass'n v. EEOC*, 478 U.S. 421, 482 (1986) (upholding order "benefitting individuals who are not the actual victims of discrimination").

[12] The North American Industry Classification System ("NAICS") is the standard system of industrial classification for the United States. The first two digits of the code designate the sector, the third designates the subsector, the fourth designates the industry group, the fifth designates the NAICS industry, and the sixth designates the national industry. *See* Exec. Off. of the Pres., U.S. Off. of Mgmt. and Budget, N. Am. Indus. Classification Sys. at 18 (2017), *available at* https://www.census.gov/naics/reference_files_tools/ 2017_NAICS_Manual.pdf. By design, as more digits are added, the group of firms becomes smaller and the designations become more precise.

discrimination in Ultima's industry (however he would define it), nor could he explain how he would design such a study. Ex. 5, Guryan Dep., at 170:9-22, 226:19-227:9. Indeed, Dr. Guryan admitted that there would be challenges inherent in attempting to analyze firm data at a six-digit NAICS level, including that there would be fewer data points to analyze. *Id.* at 227:17-228:8. This is problematic because smaller sample sizes lead to larger standard errors. *Id.* at 228:9-229:7. As Dr. Guryan explained:

> The larger the standard error, the more imprecise the estimates and the – again, all else equal, the less likely you'll be able to distinguish differences that would occur by chance from differences that are not by chance.

*Id.* at 229:3-7. This is precisely why Mr. Chow analyzed industry data by three-digit NAICS codes. Ex. 2, Chow Rpt., at 3 n.6 ("[A]s more digits are added to the code, the industry classifications become more narrowly defined and data become sparser. Using three-digit NAICS codes provides a compromise between having sufficient data in each industry grouping with the recognition that firms can switch production within the broader three-digit category.") Dr. Guryan was also not aware of whether there were any datasets that look at industries at a six-digit NAICS level. Ex. 5, Guryan Dep., at 171:18-172:4.

Dr. Guryan also contends that even some of the more specific NAICS codes are overinclusive, providing as an example that NAICS code 5416 includes major consulting firms like Booz Allen and Deloitte, which are not the type of firms with which Ultima competes. This criticism is also misplaced, as Dr. Wainwright's and Mr. Chow's analyses typically only analyzed *small* businesses in a given NAICS code, which would exclude these firms.

Moreover, this criticism ignores the fact that businesses can (and do) often pivot to different types of work as demand shifts, which Dr. Guryan concedes is true. Ex. 5, Guryan Dep., at 173:16-19. Indeed, this critique is again belied by Plaintiff's own history and testimony. Ultima has

succeeded, in part, due to its ability to provide services as varied as alarm monitoring, crossing guards, postal services, and administrative support. *See* Ex. 7, Deposition of Celeste Bennett ("Bennett Dep."), at 45:1-2, 124:11-15, 126:5-8, 129:7-10. Furthermore, in testifying about her businesses, Ms. Bennett explained that she is often able to pivot to new lines of work in order to compete for more contracts. *Id.* at 45:3-14 (explaining that she lists a number of NAICS codes in her business profile, even if she has not performed work in those codes before "because I might have something on here that we've never done, but I feel like we could do.")

### iv. Dr. Guryan's Critiques of Mr. Chow's Methodology are Non-Expert Opinion

Finally, Dr. Guryan contends that the conclusions Mr. Chow reaches from his analysis are not supported based on the data and methodology he used in his report, but this assertion is based on unfounded assumptions which have been proven inaccurate.

As discussed above, Mr. Chow compared the odds of small businesses of various ownership types winning a contract with the federal government. To do this, he combined data from the System for Award Management ("SAM"), which includes firm registration data, and data from the Federal Procurement Data System ("FPDS"), which includes information about contract awards. Ex. 2, Chow Rpt., at 3. Defendants produced both of these datasets to Plaintiff, as well as the code Mr. Chow used to analyze the data.

Dr. Guryan asserts that Mr. Chow's analysis is fundamentally flawed, as the data he believes Mr. Chow relied on only includes firms that have a won a contract, making it impossible for Mr. Chow to have determined the differences in the odds of various types of companies winning contracts. Ex. 4, Guryan Rpt., at 27; Ex. 5, Guryan Dep., at 212:18-213:5. But in providing this opinion, Dr. Guryan identified only one of the two datasets Mr. Chow relied upon. Ex. 4, Guryan Rpt., at 27; Ex. 5, Guryan Dep., at 209:18-21; 237:2-10. Since Mr. Chow's report does in

22

fact include odds ratios, it is unclear why Dr. Guryan would draw the conclusion that Mr. Chow could not possibly have calculated the odds ratios included in the report rather than conclude that perhaps he was not looking at all of the relevant data. *See* Ex. 2, Chow Rpt., at 2 (discussing method of calculating odds ratios), 9-18 (Tables 3-5, showing results). In his deposition, Dr. Guryan even acknowledged this possibility, testifying that his analysis was based on assumptions about Mr. Chow's data that may be incorrect, and offered to reconsider his opinions if he were provided with evidence to the contrary. Ex. 5, Guryan Dep., at 214:18-22 ("Based on my understanding of the data, which, you know – if you provide me with other information that suggests I'm wrong, I'm happy to consider it.").

Defendants did just that.[13] Yet Plaintiff has not taken any steps to retract or amend the portion of Dr. Guryan's report that criticizes Mr. Chow's analysis based on the clearly erroneous understanding of the data upon which he relied. Consequently, Defendants believe the portion of Dr. Guryan's report that criticizes Mr. Chow's methodology (Section 8.3), is patently unreliable and should be struck in its entirety.

---

[13] After Dr. Guryan testified that he believed he had only received one dataset, Defendants' counsel stated on the record that he should have received two datasets: "There is another dataset that you should have been provided with. I'm not sure why you weren't. So we will look into that." Ex. 5, Guryan Dep., at 237:13-15. After Dr. Guryan's deposition, Defendants took affirmative steps to ensure that Plaintiff had all of the relevant information. After confirming that Plaintiff and Dr. Guryan had, in fact, received the two datasets that Dr. Chow relied upon, Defendants took the following additional steps out of an abundance of caution: on May 12, Defendants offered to confer with Plaintiff's counsel to attempt to clarify and resolve the apparent misunderstanding; on May 17, Defendants produced an additional data file, consisting of Mr. Chow's merging of the two datasets already provided; and on May 18, Defendants produced a declaration from Mr. Chow, clarifying the steps taken in his analysis. While Defendants were not obligated to provide this additional work product of Mr. Chow, they did so in an effort to permit Plaintiff every opportunity to properly evaluate Mr. Chow's report.

23

## II. Dr. Guryan's Report Will Not Assist the Court in Establishing Necessary Facts or Understanding Relevant Issues

The purpose of expert testimony is to assist the trier of fact in establishing certain facts or understanding relevant issues. "Expert testimony is relevant, and therefore admissible under Rule 702, when it is helpful to the trier of fact." *Wynacht*, 113 F. Supp. 2d at 1210 (citing *Daubert*, 509 U.S. at 591). "This requirement has been interpreted to mean that scientific testimony must 'fit' the facts of the case, that is, there must be a connection between the scientific research or test result being offered and the disputed factual issues in the case in which the expert will testify." *Pride*, 218 F.3d at 578. *Daubert* tells us that "[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." 509 U.S. at 591. That is the case here, because Dr. Guryan assumes an entirely different standard for establishing discrimination than the one that applies to this case. He is not offering an expert opinion as to the methodology used by Dr. Wainwright and Mr. Chow, and he certainly is not qualified to offer an opinion as to the appropriate legal standards in this case.

As the party challenging a race-based remedial measure, Ultima bears the "ultimate burden" to demonstrate the unconstitutionality of that provision of the 8(a) program. *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 277-78 (1986) (plurality opinion); *Aiken v. City of Memphis*, 37 F.3d 1155, 1162 (6th Cir. 1994). Ultima's expert, Dr. Guryan, is not offering any opinions about the 8(a) program. Ex. 5, Guryan Dep., at 20:11-21:8. Nevertheless, he opines that the evidence put forth by Defendants' experts is lacking based on incorrect beliefs about the relevant legal standards in this case. Specifically, Dr. Guryan incorrectly assumes that Defendants are required to prove that discrimination *caused* the numerous statistical disparities identified by Dr. Wainwright and Mr. Chow; that only evidence of discrimination in the specific industries and localities in which

Ultima operates is relevant;[14] and that evidence of discrimination in other markets, by other actors, or which reflects the lingering effect of past discrimination is not relevant. As discussed *supra* in Section I(b)(i), these assumptions do not reflect the legal standards applicable in this case. Thus, nothing in Dr. Guryan's report or testimony will aid the trier of fact in determining whether the challenged provision of the 8(a) program is constitutional. To the contrary, it risks adding significant confusion as to the appropriate evidentiary standards in this case.

At bottom, Dr. Guryan's opinions do not support Ultima's theory of the case; nor do they contradict Defendants' theory of the case. His criticisms are simply unsupported speculation by a capable scientist applying a standard that may be relevant in his field, but is not the standard applicable in this Court. The Sixth Circuit has been clear: though a witness may be "distinguished" and "his conjecture . . . may be worthy of careful attention," "the courtroom is not the place for scientific guesswork, even of the inspired sort." *Tamraz*, 620 F.3d at 671 (internal citations omitted).

## CONCLUSION

Neither Dr. Guryan's testimony nor his report meet the requirements of FRE 702. Dr. Guryan's report and testimony are wholly unsupported by scientifically reliable reasoning or methods, and he therefore offers no credible evidence that the 8(a) program is flawed or unconstitutional. Consequently, his opinions will not assist the trier of fact in understanding any relevant issues in this case. Defendants therefore request that the Court exclude Dr. Guryan's expert report, testimony, and opinions at summary judgment and trial.

---

[14] Even if this were true, the contracts at issue in this case were for nationwide work that occurred throughout the United States.

25

Dated: June 21, 2022

Respectfully submitted,

KAREN D. WOODARD
Chief
Employment Litigation Section
Civil Rights Division
United States Department of Justice

OF COUNSEL:

ANDREW BRANIFF (IN Bar No. 23430-71)
Deputy Chief

Karen Hunter
Senior Trial Attorney

David A. Fishman
Assistant General Counsel for Litigation

By: /s/ Christine T. Dinan
Juliet E. Gray (D.C. Bar No. 985608)
K'Shaani Smith (N.Y. Bar 5059217)
Christine T. Dinan (D.C. Bar No. 979762)
Senior Trial Attorneys
Employment Litigation Section
Civil Rights Division
United States Department of Justice
150 M Street, N.E.
Washington, D.C. 20002
(202) 598-1600
Juliet.Gray@usdoj.gov
K'Shaani.Smith@usdoj.gov
Christine.Dinan@usdoj.gov

Eric S. Benderson
Associate General Counsel for Litigation
U.S. Small Business Administration

Amar Shakti Nair
Attorney Advisor

Ashley Craig
Attorney Advisor
U.S. Department Of Agriculture

26

## CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2022, I electronically filed the above document and with the Clerk of the Court using the ECF System, which will send notification of such filing to all counsel of record.

/s/ Juliet E. Gray
Juliet E. Gray
Senior Trial Attorney