# EXHIBIT

# 6

1    UNITED STATES DISTRICT COURT

2    EASTERN DISTRICT OF TENNESSEE

3     - - - - - - - - - - - - - - - - - - -x

4    ULTIMA SERVICES CORPORATION,

5                        Plaintiff,

6                  No. 2:20-cv-00041-DCLC-CRW

7          -against-

8    U.S. DEPARTMENT OF AGRICULTURE, U.S.

     SMALL BUSINESS ADMINISTRATION, SECRETARY

9    OF AGRICULTURE, and ADMINISTRATOR OF THE

     SMALL BUSINESS ADMINISTRATION,

10

                        Defendants.

11

      - - - - - - - - - - - - - - - - - - -x

12

                        March 7, 2022

13                      10:03 a.m. (EST)

14

15       DEPOSITION of Dr. Jon Wainwright, the

16   Expert Witness in the above-entitled

17   action, held at the above time and place,

18   taken before Garry J. Torres, a

19   Stenographer and Notary Public of the

20   State of New York, pursuant to the Federal

21   Rules of Civil Procedure, Notice and

22   stipulations between Counsel.

23

24            *     *     *

25

Case 2:20-cv-00041-DCLC-CRW     Document 59-6     Filed 06/21/22     Page 2 of 10
                          PageID #: 773

1 APPEARANCES:
2
   CENTER FOR INDIVIDUAL RIGHTS
3    Attorneys for Plaintiff
    ULTIMA SERVICES CORPORATION
4    1100 Connecticut Ave, NW
    Suite 625
5    Washington, D.C. 20036
    TEL: (202) 833-8400
6    EMAIL: scott@cir-usa.org
7 BY: MICHAEL E. ROSMAN, ESQ.
8
9 CHRISTINE DINAN, ESQ.
    Attorneys for Defendants
10
11
   ALSO PRESENT:
12
    MICHELLE SCOTT
13   ANDREW BRANIFF
    K'SHAANI SMITH
14   JULIET GRAY
      *  *  *
15
16
17
18
19
20
21
22
23
24
25

1    STIPULATIONS
2   IT IS HEREBY STIPULATED AND AGREED, by
3 and among counsel for the respective
4 parties hereto, that the filing, sealing
5 and certification of the within deposition
6 shall be and the same are hereby waived;
7   IT IS FURTHER STIPULATED AND AGREED
8 that all objections, except as to form of
9 the question, shall be reserved to the
10 time of the trial;
11   IT IS FURTHER STIPULATED AND AGREED
12 that the within deposition may be signed
13 before any Notary Public with the same
14 force and effect as if signed and sworn to
15 before the Court.
16      *  *  *
17
18
19
20
21
22
23
24
25

1 J O N  W A I N W R I G H T, the Expert
2 Witness herein, having first been duly
3 sworn by the Notary Public, was examined
4 and testified as follows:
5    MR. ROSMAN: Dr. Wainwright, I'm
6 Michael Rosman. I'm the -- one of the
7 attorneys for the plaintiff in this
8 case. I'll be asking you a series of
9 questions which you should wait 'til I
10 finish the question and then answer.
11 If you don't understand a question
12 that I've asked please feel free to
13 let me know on what you don't
14 understand and I might choose to
15 rephrase it.
16    If we need to take break at
17 points or we will need to take a break
18 at points, but if you need to take a
19 break at points let us know and I'll
20 try to find an appropriate spot to do
21 that.
22    You have been deposed before,
23 sir?
24    THE WITNESS: Yes.
25    MR. ROSMAN: All right. I'm

1 going to try to introduce your CV.
2 You have a copy of it though, right?
3    THE WITNESS: I do.
4    MR. ROSMAN: Okay. Let me see
5 if this -- I'm new to this virtual.
6 Now, can everybody else -- I tried to
7 introduce the CV as an exhibit as
8 Exhibit 1. Does everybody else have
9 that available to them now?
10    MS. DINAN: No, it's not showing
11 up on any of my screens.
12    MR. ROSMAN: It says my exhibit
13 has been introduced.
14    (Whereupon, an off-the-record
15 discussion was held.)
16    MR. ROSMAN: Why don't we just
17 go through some of your background,
18 Dr. Wainwright, and we'll worry about
19 the introduction of the exhibit at
20 some point.
21 EXAMINATION
22 BY MR. ROSMAN:
23  Q.  What is your name?
24  A.  Jon Wainwright.
25  Q.  Where do you reside?

Veritext Legal Solutions
www.veritext.com
212-267-6868                                   516-608-2400

1 testimony that some of the 53,000 initial
2 records never got used in the report
3 because you didn't want to, I think you
4 said, muddy the waters by including them.
5        Could you explain a little bit
6 more what you meant by that?
7    A.   Yeah, muddy the waters maybe
8 isn't the right phrase.  It was more to
9 keep things clear and understandable in my
10 own mind as much as anything else.  I
11 think I mentioned there were --
12        I'll just take a hypothetical
13 study that would have looked at all the
14 contracts in construction, all the prime
15 contracts in construction and all the
16 subcontracts in construction.
17        But then went further and
18 divided the construction contracts up into
19 contracts over $200,000, contracts under
20 $25,000, contracts between $25,000 and
21 $200,000 or contracts that were subject to
22 MBE goals versus contracts that weren't
23 subject to MBE goals.
24        I think looking at those
25 statistics would all be interesting in

1 their own right, but I was -- I didn't
2 want to be asked a question possibly,
3 well, if you included these others, how
4 did they make the resulting disparities
5 larger or smaller or change them.
6        And so I was trying to come
7 up -- those 27,000 records are -- you
8 know, roughly all looking at the same kind
9 of items in those disparity studies
10 because not all studies looked at
11 contracts with and without goals or broke
12 contracts down by size categories or just
13 looked at federal funding versus state
14 funding.
15        And since none of those issues
16 as far as I knew were really at issue in
17 this report, I took them out.  I
18 didn't -- I don't even know what the
19 results would be if they would be stronger
20 or weaker or different at all if I
21 included those.
22        It's not like I ran the results
23 and didn't like them and threw that stuff
24 out.  I just was trying to come up with a
25 data set that -- you know, really was as

1 consistent across the studies -- the 205
2 studies and what was being measured as it
3 could be and save those other records for
4 an analysis for another day.
5    Q.   So would it be fair to say that
6 that data was excluded because it was not
7 necessarily consistent with what you were
8 trying to doing with your analysis?
9    A.   Yes.
10       MR. ROSMAN:  Objection to form.
11    Q.   So for the disparity studies in
12 the group of 205 that you looked at that
13 didn't use statistical significance
14 testing, do you think the evidence from
15 those studies is still reliable?
16    A.   Yes.  That was the whole point
17 of doing the metaanalysis was to see what
18 we could learn regardless of the -- some
19 significant differences between the
20 studies and how they were performed.
21       They were done by different
22 consultants, at different points in time,
23 with different levels of resources and
24 using different methodologies for either
25 assessing statistical significance or not,

1 or measuring availability and -- you know,
2 that was kind of the whole point of my
3 metaanalysis is to see -- you know, what,
4 if anything, we could learn regardless of
5 some of those differences or something you
6 might be able to critique about any single
7 study standing alone.
8    Q.   Earlier Mr. Rosman asked you
9 about whether NERA studies account for
10 capacity and you mentioned that you don't
11 know if capacity, as Mr. Rosman defined
12 it, then could be measured.
13       Would you explain a bit more
14 what you meant by that?
15    A.   Well, I think I'm not sure it's
16 fair to say Mr. Rosman actually defined
17 it, but he gave me an example, I believe,
18 which was the ability to do work, which is
19 not something I'm aware of any statistical
20 measure of.
21       You know, it's like
22 qualifications.  There's all different
23 aspects to qualifications and capacity.  I
24 tried to control for and include as many
25 as I could in the different sections of

42 (Pages 162 - 165)

Case 2:20-cv-00041-DCLC-CRW    Document 58    Filed 06/21/22    Page 4 of 10
PageID #: 775
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

1 the report. I can do that better in --
2 with some data sets than with others.
3     So in the PUMS data there's all
4 kinds of additional variables that speak
5 to qualifications and capacities that I
6 was able to include. Some of the
7 disparity studies attempt to directly
8 incorporate capacity into their measures
9 or whatever capacity means.
10     It means different things for
11 different consultants and different
12 attorneys. But -- you know, some
13 disparity study consultants try to
14 incorporate some aspects of capacity
15 directly into their availability measures.
16     And I -- you know, we looked at
17 those as well. I have my own way of doing
18 it and I think I've outlined -- you know,
19 in great detail how and why I choose to do
20 it that way, but the main reason is to
21 avoid including variables that themselves
22 could be negatively impacted by
23 discrimination.
24     So to try to measure and test
25 for the presence of discrimination by

1 using variables that are themselves
2 potentially subject to discrimination,
3 like, most economists will tell you is
4 wrong headed.
5     So -- you know, that's why I did
6 what I did, but again, the purpose of the
7 metaanalysis was to say -- you know, all
8 those different approaches are welcome.
9 Let's see if we can determine any
10 commonalities across these studies despite
11 that or did they all reach completely
12 different conclusions.
13     Q. Are some measures for capacity
14 as you might define it included in your
15 studies?
16     A. Yes.
17     Q. How would you define capacity?
18     A. Well, again, I don't know that
19 there's a single definition but we, for
20 example, in our measures of availability
21 we're only looking at firms that are
22 currently in business, in the relevant
23 geographic market, in those relevant NAICS
24 codes, product markets that matter, all of
25 those things speak to capacity.

1     I mean you're not in business
2 unless you're trying to do business, by
3 and large, and further in the regression
4 analyses in those NERA studies, there's
5 all kinds of different measures in
6 qualifications and capacity. Human
7 capital or education levels being one of
8 the most important.
9     Q. In your opinion, do you believe
10 the disparities you talked about earlier
11 in tables 2.2 to 2.8 could be caused
12 exclusively by sex discrimination?
13     A. No. That's -- having researched
14 in this area for over a quarter of a
15 century now or maybe a third of a century,
16 I would say absolutely not.
17     I see evidence routinely of both
18 kinds. It's also the case and this is
19 just anecdotal as I sit here today but
20 most of those ethic groupings, the
21 majority of businesses in those groupings
22 by race and ethnicity are male.
23     So to -- you know, the concept
24 that somehow there is -- no race
25 discrimination and sex discrimination is

1 exclusively driving the results I'm seeing
2 does not comport with my own experience as
3 a researcher over all that time, nor does
4 it I think mathematically make sense
5 because women still tend to be
6 significantly less than half of the
7 businesses in those ethic categories.
8     Q. Just to confirm one point in
9 your answer, were you saying to your
10 knowledge that the majority of those -- of
11 the businesses in the data sets were owned
12 by men?
13     A. You broke up a little bit there.
14     Q. I was just trying to confirm.
15 Were you in your answer saying that the
16 majority of the business you looked at in
17 the data that you studied were owned by
18 men?
19     A. Yes.
20     Q. In your opinion do you believe
21 the disparities in tables 4.1 to 4.9 could
22 be caused exclusively by sex
23 discrimination?
24     A. No.
25     Q. Just stepping back a moment as

Case 2:20-cv-00041-DCLC-CRW   Document 58-4   Filed 06/21/22   Page 5 of 10
PageID #: 776
Veritext Legal Solutions
212-267-6868                        www.veritext.com                        516-608-2400

1 we've discussed there were three main
2 sections of your report. Could you just
3 briefly explain why that is and how you
4 believe they interact with each other?
5    A.  Sure.  The first section, just
6 looking at the disparity studies, what
7 that establishes primarily, at least to my
8 mind, is that there are very large and
9 adverse disparities facing every single
10 kind of minority business, pretty much in
11 every single state of the union that at
12 least the 30 or 40 that are represented
13 here, and across different time periods
14 pretty much, if not consistently, across
15 procurement categories.  You know, no one
16 single category stands out as having no
17 disparities.
18        So the first section of the
19 report was simply to establish that do
20 these disparities exist in the first
21 place, and what you can learn from this
22 metaanalysis of the 205 studies is yes,
23 they do.
24        They tend to be -- they tend to
25 exist for all these different minority

1 groups.  They tend to exist across all the
2 different consultants that do the studies
3 across all the different periods of time
4 that we looked at and across all the
5 different industry categories at whatever
6 level of disaggregation that we were able
7 to look at.
8        But I think as I even opened the
9 second or third section of my report with
10 is it's fair to ask and the reason those
11 other sections are in there is A, there's
12 not a whole lot of data anyway that's
13 dedicated to minority business owners or
14 minority businesses.
15        So it behooves us to try to look
16 at everything that is out there and is
17 available, but it's fair to ask if the
18 disparities that we see in these 205
19 studies are due to some factor could be
20 caused or explained by factors other than
21 discrimination.
22        And so really the -- the second
23 section of the report is really partly
24 meant to, A, to just look at the SBO data
25 and the ABS data because it exists and

1 it's really the only dedicated census of
2 minority business.  So it's interesting
3 and valuable I think for the judge and for
4 anybody reading this report in its own
5 right.  It also allows you to across the
6 board test for statistical significance in
7 a way that at least some of the disparity
8 studies in the first section don't always
9 allow you to do.  So I think it helped
10 fill that gap.
11        And then in the final section of
12 the report was really meant to examine
13 this question of -- because it's not the
14 case that the only thing driving
15 disparities is discrimination.  As I
16 mentioned in the report there, tends to be
17 more business ownership tends to rise with
18 age, for example.  Successful business
19 outcomes tend to be positively correlated
20 with education levels, for example.
21        So it is a very fair question to
22 ask if qualifications and capacity factors
23 like that explain these large and adverse
24 and statistically significant disparities.
25        And I think my general

1 conclusion from the third section is that
2 they explain some of the disparities, but
3 they leave huge residuals that are
4 unexplained even after controlling for a
5 very large number of other relevant human
6 capital and financial endowment factors.
7        So to me I think that's why
8 maybe I harped on why all three sections
9 are important to be considered in tandem
10 or as a whole because they address -- you
11 know, it's only --
12        I think only by looking at all
13 three sections together do you -- do you
14 see the clear picture of at least what I
15 was trying to establish is do these
16 disparities exist, did they tend to be
17 isolated to particular groups or
18 particular states or particular
19 industries.
20        You know, do they exist, yes;
21 are they isolated to any of those
22 particular groups or categories, no; do
23 they tend to be statistically significant,
24 yes; and finally can they be explained by
25 other factors besides -- are they

44 (Pages 170 - 173)

Case 2:20-cv-00041-DCLC-CRW   Document 58-9   Filed 06/21/22   Page 6 of 10
PageID #: 777

1  consistent with the possibility that other
2  factors relevant to economic outcomes can
3  explain them and the answer to that is no.
4      So all those things together I
5  think makes the whole package that I've
6  tried to -- that I wanted to look at and
7  tried to present.
8      Q.  Thank you.  That's all the
9  questions I have.
10      MR. ROSMAN:  I'm just going to
11  follow up on one of the things that
12  Ms. Dinan asked you about.
13  EXAMINATION
14  BY MR. ROSMAN:
15      Q.  You said you were concerned
16  about including variables that could
17  themselves be affected by discrimination.
18  How could you assess whether or not a
19  variable like firm size has been affected
20  by discrimination?
21      A.  Assessing it is not easy, but
22  following the logic is a little easier.
23  If there is discrimination in the market
24  aimed at preventing minority business from
25  emerging, how is that going to manifest

1  itself, it's going to manifest itself in
2  lower levels of sales, fewer contracts
3  that are won, higher prices being charged
4  by suppliers, all of those things are
5  going to filter their way into revenues.
6      So controlling for revenues, for
7  example, would be like controlling for pay
8  in a pay discrimination investigation.  So
9  I mean that is -- if there is
10  discrimination in the market, that is one
11  place you're going to see it is in
12  earnings or revenues and whether firms
13  become formed in the first place.
14      So that's why and I -- there's a
15  whole chapter in the national guidelines
16  to try to explain why that is and I think
17  most economists understand why you would
18  not put those variables on the right-hand
19  side of a regression.
20      Q.  Let me follow up.  If you assume
21  that they're caused by discrimination,
22  aren't you just assuming the answer to the
23  question that you're trying to answer?
24      A.  No, and I'm not assuming they're
25  caused by discrimination.  I'm pointing

1  out that if discrimination exists, it
2  doesn't take a great leap of logic to
3  understand that it would manifest itself
4  in lower revenues.
5      Q.  No, to be sure.  But I guess
6  what I'm saying is if they're not caused
7  by discrimination, aren't you omitting a
8  very important variable that you might
9  otherwise attribute to discrimination?
10      A.  I think if you wanted to look at
11  that you'd put revenues on the left-hand
12  side of the equation and look at that and
13  some disparity study consultants have done
14  exactly that and still found large and
15  adverse significant disparities.
16      Q.  I'm done.
17
18      (Whereupon, the Deposition of
19  Dr. Jon Wainwright conducted via Zoom
20  videoconference concluded at 4:13 p.m.
21  (EST) on Monday, March 7, 2022.)
22
23
24
25

1      I have read the foregoing transcript
2      of my deposition, and find it to be
3      true and accurate to the best of my
4      knowledge and belief?
5
6
7  _____
8  JON WAINWRIGHT
9
10  Sworn and subscribed to before me,
11  On this _____ day
12  of _____ 2022.
13
14
15
16  Notary_____
17  My Commission Expires_____
18
19
20
21
22
23
24
25

45 (Pages 174 - 177)

ERRATA

p12
line 2 midwest fence should be Midwest Fence
line 3 disadvantaged business enterprise should be Disadvantaged Business Enterprise
line 15 Rothy should be Roth throughout
line 23 Rothy Two should be Rothe II

p13
line 10 DV should be DC

p14
lines 22-23 Cossman should be Kossman

p23
line 5 defendant's expert should be defendant's expert report

p27
lines 21-22 Econ Salt should be Econsult

p34
line 18 alluded should be eluded

p42
line 4 subanalysis should be subanalyses
line 14 MBB should be MBE

p43
line 8 the total should be that total
line 14 MBA should be MBE

p60
line 50 procontractor should be prime contractor

p64
line 60 Prince George should be Prince George's
line 25 interest or should should be interest should

p66
line 9 consensus should be custom census

p67
line 24 minority should be minorities

p69
line 2 consultants should be consultants'
line 19 could should be could have

p80
line 8 DOJ should be did DOJ

p102
line 14 ADS should be ABS

file:///crt/shared/EMP/Ultima/Depositions/Wainwright/Transcripts/Deposition%20errata%20JW.txt[6/21/2022 2:29:49 PM]

p108
line 10 business should be census

p125
line 7 clients should be client's

p129
line 1 American community survey should be American Community Survey

p149
Lowery should be Lowrey throughout

p149
Fairley should be Fairlie throughout

p153
line 3 interest in dividence should be interest and dividend

p157
lines 17-18 bureau of labor statistics should be Bureau of Labor Statistics
lines 21-23 bureau of labor statistics should be Bureau of Labor Statistics,
 bureau of economic analysis should be Bureau of Economic Analysis, census bureau should be Census Bureau

p159
line 5 census bureau should be Census Bureau

p169
line 7 ethic should be ethnic

p170
line 11 union that should be union or

p171
line 10 it's should be it
line 19 factor could should be factor that could

file:///crt/shared/EMP/Ultima/Depositions/Wainwright/Transcripts/Deposition%20errata%20JW.txt[6/21/2022 2:29:49 PM]

```
 1          I N D E X
 2
 3
 4  WITNESS    EXAMINATION BY          PAGE
 5
    DR. JON WAINWRIGHT  MR. ROSMAN    5, 174
 6
    DR. JON WAINWRIGHT  MS. DINAN       160
 7
 8
 9      E X H I B I T S
10  PLAINTIFFS  DESCRIPTION            PAGE
11  Exhibit 1     Curriculum Vitae      5
12
13
14  Attorney Mr. Rosman from Center For
    Individual Rights has retained all
15  exhibits.
16
17        INSERTIONS
18      Page      Line
19      None
20
21      REQUESTS
22      Page      Line
23      None
24
25
```

ERRATA SHEET
VERITEXT LEGAL SOLUTIONS

CASE NAME: ULTIMA SERVICES CORPORATION
v. U.S. DEPARTMENT OF AGRICULTURE et al.
DATE OF DEPOSITION: MARCH 7, 2022
WITNESS' NAME: DR. JON WAINWRIGHT
PAGE/LINE// CHANGE    REASON

*See attached*

Jon Wainwright

JON WAINWRIGHT

SUBSCRIBED AND SWORN TO
BEFORE ME THIS____DAY
OF_____, 2022.

____NOTARY PUBLIC
MY COMMISSION EXPIRES___

```
 1          CERTIFICATION
 2
 3      I, Garry J. Torres, a Notary Public
 4  for and within the State of New York, do
 5  hereby certify:
 6      That, Dr. Jon Wainwright, the witness
 7  whose testimony as herein set forth, was
 8  duly sworn by me; and that the within
 9  transcript is a true record of the
10  testimony given by said witness.
11      I further certify that I am not
12  related to any of the parties to this
13  action by blood or marriage, and that I am
14  in no way interested in the outcome of
15  this matter.
16      IN WITNESS WHEREOF, I have hereunto
17  set my hand this 17th day of March, 2022.
18
19
20  GARRY J. TORRES
21
22
23
24
25
```

46 (Pages 178 - 180)