UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
----------------------------------------------------------------------------x

ULTIMA SERVICES CORPORATION,                    :

    Plaintiff,                                          :

        -against-                                  :    No. 2:20-cv-00041-
                                                                DCLC-CRW

U.S. DEPARTMENT OF AGRICULTURE,                 :
U.S. SMALL BUSINESS ADMINISTRATION,
SECRETARY OF AGRICULTURE, and ADMINISTRATOR     :
OF THE SMALL BUSINESS ADMINISTRATION,
                                                :
    Defendants.
                                                :
----------------------------------------------------------------------------x

## PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Plaintiff Ultima Services Corporation ("Ultima") submits this statement of facts that it contends are material and undisputed in support of its motion for summary judgment.

A.    <u>Plaintiff</u>

1.    Plaintiff Ultima is a small business that competes for federal service contracts. It was incorporated in 1999 and, in 2002, purchased by Celeste Bennett, a white woman. Statement of Celeste Bennett ("Bennett St.") ¶ 2.

2.    Currently, Ultima is 100% owned and operated by Ms. Bennett, who is in charge of its operations. Bennett St. ¶ 3.

3.    Beginning in 2004, Ultima has won contracts from defendants United States Department of Agriculture ("USDA") for providing administrative and technical support to offices of the Natural Resources Conservation Service ("NRCS"), an agency within USDA.

1

Bennett St. ¶ 4.

4.  Until recently, Ultima had been successful in procuring such contracts, largely through competition with other small businesses. Bennett St. ¶ 5.

5.  In 2017, it won four regional Indefinite Delivery Indefinite Quantity ("IDIQ") contracts to provide administrative services to NRCS offices, covering all of the United States. These contracts each had one base year with four option years available. Each year (and each option) was for $2 million. Accordingly, the total funds committed for each contract was $10 million. Bennett St. ¶ 6.

6.  Contracting officers with the USDA could issue task orders pursuant to the IDIQ for services in particular NRCS state offices. Bennett St. ¶ 7; Statement of Michael Rosman ("Rosman St.") Ex. 29 (Stover Dep. Tr.) 52-53.

7.  In two of the regions (Region II and III), demand for Ultima's services was quite high, and the issued task orders soon depleted the funds available for the base year. Bennett St. ¶ 8; Rosman St. Ex. 1 (Int. No. 4).

8.  The USDA exercised options early for those regions. In fact, within the first year, all or almost all of the options for Regions II and III were exercised, and the funds allocated to those contracts were significantly (although not completely) expended. Bennett St. ¶ 9; Rosman St. Ex. 1 (Int. No. 4).

9.  In the other two regions (Regions I and IV), few, if any, options were exercised and substantial funds remained unspent. Bennett St. ¶ 10; Rosman St. Ex. 27 (Stonebraker Dep. Tr.) 60-61.

10. In 2018, the USDA decided not to exercise any further options for all four

2

regional contracts.  Answer ¶ 10; Bennett St. ¶ 11.

11. This had the effect of precluding the USDA from exercising any previously unexercised options on task orders issued pursuant to the IDIQ contracts or issuing any new task orders.  Bennett St. ¶ 12.

12. Where funds had been committed under the task orders, though, Ultima completed its obligations as required thereunder.  Bennett St. ¶ 13.

13. After the USDA ended the IDIQ contracts, it still had to provide services for the NRCS offices.  In some instances, it did so by using sole source contracts with companies qualified under the program described in 13 C.F.R. Part 124, Subpart A (the "8(a) Program"). Bennett St. ¶¶ 14-15; Answer ¶ 10.

14. Because Ultima is not a participant in the 8(a) Program, it was completely precluded from bidding on those contracts.  Bennett St. ¶ 16.

15. From the period 2018-21, there were contracts for the provision of administrative and technical services to NRCS offices, including the ones identified in Bennett Statement paragraph 18, that Ultima was ready, willing, and able to perform, but could not bid on because they were reserved for the 8(a) Program.  Bennett St. ¶¶ 17-19.

16. Ultima remains ready, willing, and able to perform such contracts in the future. Bennett St. ¶ 20.

17. Because contracts to provide administrative and technical support to NRCS offices constituted (and still constitutes) a significant portion of Ultima's business, the reservation of such contracts for the 8(a) Program has caused a significant drop in Ultima's revenues, and will continue to reduce its revenues in the future.  Bennett St. ¶ 21.

3

Case 2:20-cv-00041-DCLC-CRW    Document 60-1    Filed 06/21/22    Page 3 of 14
PageID #: 794

18. Today, Ultima meets the size standards for almost all NAICS codes, and certainly all NAICS codes relevant to the performance of contracts providing administrative and technical support for NRCS offices. Bennett St. ¶ 22.

B. The Small Business Administration And Reports On The 8(a) Program

19. Under the statute passed by Congress, the Administrator of the Small Business Administration ("SBA") must submit a report to Congress each April 30 regarding various aspects of the program created under 15 U.S.C. §§ 636(j) and 637(a), including a listing of all participants and the race or ethnicity of the disadvantaged owners. 15 U.S.C. § 636(j)(16). These are called 408 reports. Rosman St. Ex.6 (FY 2015 408 Report) p. 1 & Ex. 23 (Klein Dep. Tr.) 21.

20. In this lawsuit, defendants produced 408 Reports for Fiscal Years 2015, 2016, and 2017. Rosman St. ¶ 7 & Exs. 6-8.

21. Although the SBA has drafted reports for at least two more recent fiscal years, it has not sent them to Congress. Rosman St. Ex. 23 (Klein Dep. Tr.) 22.

22. Defendants have claimed deliberative process privilege with respect to the more recent reports and have not produced them in discovery. Rosman St. ¶ 8 & Ex. 9.

23. The Office of Business Development and Government Contracting is a division of the SBA currently headed by Bibi Hidalgo that supervises government contracting, the 8(a) Program, and various other special contracting programs. Rosman St. Ex. 23 (Klein Dep. Tr.) 11-12.

24. The Office of Business Development is a suboffice within the Office of Business Development and Government Contracting. The current Associate Administrator for Business

4

Case 2:20-cv-00041-DCLC-CRW   Document 60-1   Filed 06/21/22   Page 4 of 14
PageID #: 795

Development, Donna Peebles, reports to Ms. Hidalgo. Rosman St. Ex. 23 (Klein Dep. Tr.) 13-14.

25. In administering the 8(a) Program, the SBA identifies those firms that qualify for the program. Other agencies, like the USDA rely on the SBA's determination of which companies are 8(a) firms in utilizing the 8(a) Program and offering contracting opportunities to companies under that program. Complaint (D.E. 1) ¶ 17; Answer (D.E. 35) ¶ 17.

C. Social and Economic Disadvantage for Individuals

26. Firms seeking to become qualified to participate in the 8(a) Program, and that are owned by individuals, must be 51% owned by individuals who are socially and economically disadvantaged. 15 U.S.C. § 637(a)(4).

27. Regulations governing the 8(a) Program state that there is a "rebuttable presumption" that certain individuals who are members of specified minority groups are "socially disadvantaged." 13 C.F.R. § 124.103(b)(1).

28. Regulations governing the 8(a) Program state that the "rebuttable" presumption "may be overcome with credible evidence to the contrary." 13 C.F.R. 124.103(b)(3).

29. The SBA has no process for a third party to question someone's social disadvantage status as part of the application process. Rosman St. Ex. 23 (Klein Dep. Tr.) 111.

30. No one has ever successfully challenged the presumption of social disadvantage for someone whose identification as one of the enumerated racial and ethnic minorities is clear. Rosman St. Ex. 1 (Int. No. 7) & Ex. 23 (Klein Dep. Tr.) 113-14.

31. No one has even challenged the presumption of social disadvantage for someone whose identification as one of the enumerated racial and ethnic minorities is clear. Rosman St.

5

Ex. 23 (Klein Dep. Tr.) 113-14.

32. Individuals in the presumed groups need not need not provide any narrative to support the proposition that they have been victims of racial or ethnic prejudice or cultural bias because of their identities as members of those groups. Rosman St. Ex. 23 (Klein Dep. Tr.) 66-67.

33. It would be difficult for such individuals to do so with the current online application process. Rosman St. Ex. 23 (Klein Dep. Tr.) 66-67.

34. Defendants do not have any database to compare the access to capital of owners of applicants to, or participants in, the 8(a) Program to others in the same or similar lines of business who are not deemed socially disadvantaged. Answer (D.E. 35) ¶¶ 23-24; Rosman St. Ex. 23 (Klein Dep. Tr.) 81, 186-87.

35. When companies apply for the 8(a) Program, the SBA does not compare the access to capital or credit of the owners claiming to be socially disadvantaged to the access to capital or credit of individuals who are not socially disadvantaged in the same or similar line of business. Rosman St. Ex. 23 (Klein Dep. Tr.) 77.

36. The SBA looks at the individual financial circumstances of the owners and managers claiming social disadvantage. 13 C.F.R. § 124.104(b).

37. The criteria for determining economic disadvantage are the same regardless of the particular industry or line of business in which the applicant does business. Rosman St. Ex. 23 (Klein Dep. Tr.) 81.

D.  Group Petitions

38. Under SBA regulations, groups can apply to be included as one of the

"presumptive" groups. 13 C.F.R. § 124.103(d).

39. The SBA accepted the petitions of the following two groups who sought status as socially disadvantaged groups: Asian Pacific Americans in 1979 and Asian Indian Americans (now called Subcontinent Asian Americans) in 1982. Rosman St. Ex. 3 (Int. No. 1).

40. On March 23, 1989, the SBA proposed an amendment to the then-relevant regulation identifying the groups whose members are deemed presumptively socially disadvantaged to (among other things) include Indonesian Americans as Asian Pacific Americans. 54 Fed. Reg. 12057 (March 23, 1989).

41. The SBA is not sure that Indonesian Americans had made an official application. Rosman St. Ex. 23 (Klein Dep. Tr.) 108-09.

42. To the extent that Indonesian Americans made an application to be included among the groups either deemed Asian Pacific Americans or to be included as a group whose members are deemed presumptively socially disadvantaged, it was made on April 27, 1989. Rosman St. Ex. 3 (Int. No. 1).

43. Aside from those applications mentioned in the previous four paragraphs, all other group applications pursuant to Section 124.103(d) (or its predecessor regulations) have been denied. There has not been an application since 1999. Rosman St. Ex. 3 (Int. No. 1).

44. Rosman Exhibit 13 is the SBA decision denying an application on behalf of women. Rosman St. ¶ 12 & Ex. 13.

45. Rosman Exhibit 14 is the SBA decision denying an application on behalf of disabled veterans. Rosman St. ¶ 12 & Ex. 14.

46. Rosman Exhibit 15 is the SBA decision denying an application on behalf of

Hasidic Jews. Rosman St. ¶ 12 & Ex. 15.

47. No racial or ethnic group ever has been removed from the list on the ground that that group is no longer adversely affected by the present effects of discrimination. Answer ¶ 40; Rosman St. Ex. 2 (Req. To Adm. No. 7).

48. The SBA has no identified criteria by which it could make a determination that a group should be removed for any reason from the list of groups whose members are presumed to be socially disadvantaged. Answer ¶¶ 38-39.

E. Graduation And Completion Of Participation

49. Upon entry into the 8(a) Program, a participant must submit a business plan. 15 U.S.C. § 636(j)(10)(D)(i). The SBA must approve the business plan prior to the participant being eligible for a contract under the program. *Id.*

50. There are various requirements of the business plan, including the identification of "[s]pecific targets, objectives, and goals." 15 U.S.C. § 636(j)(10)(D)(ii)(III).

51. After nine years, the eligibility of a participant in the 8(a) Program ends, although it may still complete contracts that it entered into prior to that time and even receive competitive 8(a) contracts that it submitted a bid prior to that time. Rosman St. Ex. 5 (p. 168).

52. The 8(a) Program distinguishes between "graduation" and completion of the term. Rosman St. Ex. 5 (p. 243) & Ex. 23 (Klein Dep. Tr.) 120.

53. Graduation is defined in the statute as "successfully completing the program by substantially achieving the targets, objectives, and goals contained in the concern's business plan thereby demonstrating its ability to compete in the marketplace without assistance . . .". 15 U.S.C. § 636(j)(10)(H).

8

54. At the end of a nine-year program term, the SBA does not always assess whether a firm has achieved the objectives of its business plan. Rosman St. Ex. 23 (Klein Dep. Tr.) 124.

55. The SBA's 408 Report to Congress for Fiscal Year 2015 stated that the vast majority of firms that completed their nine-year program term in fiscal years 2012, 2013, and 2014 did not graduate. Rosman St. Ex. 6 (FY 2015 408 Report) Table III, p. 12 & Ex. 23 (Klein Dep. Tr.) 123.

56. The vast majority of firms that completed their nine-year program term in fiscal years 2012, 2013, and 2014 did not graduate. Rosman St. Ex. 6 (FY 2015 408 Report) Table III, p. 12 (US0051108).

57. The SBA's 408 Reports to Congress for Fiscal Years 2016 and 2017 did not distinguish between those exiting businesses that graduated and those that simply completed their term. Rosman St. Ex. 7 (FY 2016 408 Report) Table III, p. 12 (US0050797) & Ex. 8 (FY 2017 408 Report) Table III, p. 12 (US0050965).

F. Reserving Contracts For The 8(a) Program

58. There are a variety of ways that the fulfillment of an agency requirement can be identified for the 8(a) Program; the most common way is for the procuring agency to send an offering letter to the SBA. Rosman St. Ex. 5 (p. 148) & Ex. 23 (Klein Dep. Tr.) 23, 33-34.

59. With respect to sole source contracts, the offering letter identifies a specific 8(a) Program participant and asks that the requirement be fulfilled by a contract in the 8(a) Program with that participant. 13 C.F.R. §§ 124.502(c).

60. The offering letter should also identify any small business contractors which have performed on this requirement during the previous 24 months. 13 C.F.R. §§ 124.502(c)(10).

61. Rosman Statement Exhibit 16 are offering letters produced by defendants in this lawsuit in which either (1) Ultima is identified as a business that performed the service within the previous 24 months or (2) the letter states that the service was performed pursuant to one of the IDIQ contracts. Rosman St. ¶ 13 & Ex. 16.

62. The SBA grants procuring agencies the right to contract directly with Section 8(a) firms. Complaint (D.E. 1) ¶ 13; Answer (D.E. 35) ¶ 13.

63. This is done through a Partnership Agreement that delegates that authority. Rosman St. Ex. 23 (Klein Dep. Tr.) 23-24.

64. Rosman Statement Exhibit 10 is the current Partnership Agreement between the USDA and the SBA. Rosman St. ¶ 9 & Ex. 10.

65. Defendants will utilize the 8(a) Program in any industry and with any contractor if that contractor is an available 8(a) participant who can meet the agency's needs. 48 C.F.R. 19-804-1; Rosman St. Ex. 24 (Atkinson Dep. Tr.) 201-02.

66. The SBA and the U.S. Department of Agriculture ("USDA") do not examine whether any racial group is underrepresented in the industry relevant to a particular contract in determining whether a USDA contract qualifies for the 8(a) Program. Answer ¶ 28.

67. At the USDA, individual contracting officers typically make the determination to ask the SBA's permission to reserve a contract for the 8(a) Program. Rosman St. Ex. 1 (Int. No. 2) & Ex. 24 (Atkinson Dep. Tr.) 36-38, 48, 51.

68. They are frequently motivated by time constraints. Rosman St. Ex. 27 (Stonebraker Dep. Tr.) 41-42 & Ex. 28 (Mandell Dep. Tr) 52-54, 69-70, 103, 109-11, 127-29.

69. A sole source contract through the 8(a) Program takes considerably less time to

effect than a contract for which the agency seeks bids. Rosman St. Ex. 28 (Mandell Dep. Tr.) 52-54, 109-10 & Ex. 29 (Stover Dep. Tr.) 37-39, 68-69.

70. Once a contract has been placed in the 8(a) Program, any "follow on" contract – one that involves substantially the same work – must remain in the 8(a) Program unless the SBA agrees to release it. Rosman St. Ex. 27 (Stonebraker Dep. Tr.) 74, 78-79.

71. The presumption is that a follow-on contract will remain in the 8(a) Program. Rosman St. Ex. 23 (Klein Dep. Tr.) 142 & Ex. 29 (Stover Dep. Tr.) 58-60.

72. Absent release from the SBA, a follow-on contract must remain in the 8(a) Program even if the specific contractor that had performed the contract is no longer eligible to participate in the 8(a) Program. Rosman St. Ex. 23 (Klein Dep. Tr.) 142 & Ex. 29 (Stover Dep. Tr.) 62-63.

G. Goals

73. Although the SBA once required agencies to have goals for the 8(a) Program, it no longer does. Rosman St. Ex. 1 (Int. No. 3) & Ex. 23 (Klein Dep. Tr.) 42-43.

74. The USDA does not have goals for the 8(a) Program. Rosman St. Ex. 1 (Int. No. 3) & Ex. 24 (Atkinson Dep. Tr.) 198.

75. Defendants do have goals for small, disadvantaged businesses ("SDBs"), and the 8(a) Program is included within that goal. Rosman St. Ex. 1 (Int. No. 3) & Ex. 25 (Taylor Dep. Tr.) 54-55.

76. An SDB not participating in the 8(a) Program self-certifies that it meets the qualifications, which are the same as for the 8(a) Program. Rosman St. Ex. 23 (Klein Dep. Tr.) 44-45 & Ex. 27 (Stonebraker Dep. Tr.) 73.

11

77. The overall goal for the federal government for SDBs set by statute is not less than 5%. 15 U.S.C. § 644(g)(iv).

78. President Biden recently set the SDB goal at 11% because the federal government had recently reached 10%. Rosman St. Ex. 23 (Klein Dep. Tr.) 205-06.

79. In a speech in June 2021, President Biden stated that he intended to increase the share of federal dollars going to SDBs, "including Black and Brown small businesses," from 10% to 15%. Rosman St. Ex. 4 (Req. To Adm. No. 19) & Ex. 25 (Taylor Dep. Tr.) 44.

80. Until recently, the SDB goal for the USDA was 5%. Rosman St. Ex. 25 (Taylor Dep. Tr.) 53-54.

81. The USDA typically exceeded that SDB goal by a substantial amount. Rosman St. ¶ 11 & Ex. 12.

82. Recently, pursuant to an executive order requiring overall increases in SDB goals, the SDB goal for the USDA was raised to 21.5%. Rosman St. Ex. 25 (Taylor Dep. Tr.) 25, 43-44, 53.

83. The SDB goal for NRCS is likely higher. Rosman St. Ex. 25 (Taylor Dep. Tr.) 26-27.

84. There is no requirement that contracts to meet the SDB goal be spread out among different or diverse NAICS ("North American Industry Classification System") codes, industries, or geographic areas. Rosman St. Ex. 25 (Taylor Dep. Tr.) 21-24, 31 & Ex. 26 (Warren Dep. Tr.) 24-25.

85. There are no goals relating to particular industries or NAICS codes. Rosman St. Ex. 25 (Taylor Dep. Tr.) 16.

86. The 8(a) Program has no sunset or termination date. Answer ¶ 37.

H. Executive Orders

87. Plaintiff sought a Rule 30(b)(6) witness on behalf of both the SBA and the USDA to testify concerning their efforts to implement Executive Orders 12432 and 11625. Neither defendant could produce a witness to so testify. Rosman St. ¶ 14 & Exs. 17-18, 20.

I. Evidence of Past Discrimination

88. Defendants have not identified a specific contracting officer employed by the USDA who, since 2011, has engaged in intentional racial or national origin discrimination in the award of federal contracts against any member of a group listed in 13 C.F.R. § 124.103(b)(1). Rosman St. Ex. 4 (Req. To Adm. 16).

89. The work done by Department of Justice attorneys in support of the document authored by the DOJ entitled The Compelling Interest to Remedy the Effects of Discrimination in Federal Contracting: A Survey of Recent Evidence (2022) was at least in part for purposes of this litigation. Rosman St. ¶ 15 & Ex. 21.

J. Race-Neutral Alternatives

90. The SBA has not considered any race-neutral alternatives since 1986 or considered how the 8(a) Program would operate in the absence of the presumption in Section 124.103(b)(1). Rosman St. Ex. 23 (Klein Dep. Tr.) 191-93.

13

Respectfully submitted,

*/s/ Michael E. Rosman*
Michael E. Rosman
Michelle A. Scott
CENTER FOR INDIVIDUAL RIGHTS
1100 Connecticut Ave, NW, Ste. 625
Washington, D.C. 20036
(202) 833-8400

M. Dale Conder, Jr.
RAINEY KIZER REVIERE & BELL PLC
209 E. Main St.
Jackson, TN 38301
(731) 426-8130

14