UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
--------------------------------------------------------------------------------x

ULTIMA SERVICES CORPORATION,                          :

    Plaintiff,                                      :

      -against-                                 :    No. 2:20-cv-00041-
                                                                       DCLC-CRW
U.S. DEPARTMENT OF AGRICULTURE,                       :
U.S. SMALL BUSINESS ADMINISTRATION,
SECRETARY OF AGRICULTURE, and ADMINISTRATOR          :
OF THE SMALL BUSINESS ADMINISTRATION,

    Defendants.                                     :

                                                      :
--------------------------------------------------------------------------------x

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**

Plaintiff Ultima Services Corporation ("Ultima") submits this memorandum of law in support of its motion, Fed. R. Civ. P. 56, for summary judgment on its claim for declaratory relief and an injunction precluding defendants from reserving contracts for administrative and technical support to the 8(a) program described below.

Background

This is an action for discrimination in violation of the U.S. Constitution and federal law. Plaintiff alleges that defendants have precluded plaintiff from competing for contracts for administrative and technical services by reserving such contracts for the "8(a) Program," and that the 8(a) Program improperly discriminates and violates the equal protection component of the Fifth Amendment's Due Process Clause.

A.    Ultima Services Corporation

Plaintiff Ultima Services Corporation ("Ultima") is a small business that competes for federal service contracts. It was incorporated in 1999 and, in 2002, purchased by Celeste Bennett, a white woman. Today, it is 100% owned and operated by Ms. Bennett. Plaintiff's Statement of Undisputed Material Facts ("Pl's SUMF") ¶¶ 1-2.

Beginning in 2004, Ultima has won contracts from defendant United States Department of Agriculture ("USDA") for providing administrative and technical support to offices of the Natural Resources Conservation Service ("NRCS"), an agency within USDA. Until recently, it had been successful in procuring such contracts, largely through competition with other small businesses. In 2017, it won four regional Indefinite Delivery Indefinite Quantity ("IDIQ") contracts to provide administrative services to NRCS offices, covering all of the United States. These contracts each had one base year with four option years available. Each year (and each option) was for $2 million. Accordingly, the total funds committed for each contract was $10 million. Contracting officers with the USDA could issue task orders pursuant to the IDIQ for services in particular NRCS state offices. Pl's SUMF ¶¶ 3-6.

In two of the regions (Region II and III), demand for Ultima's services was quite high, and the

issued task orders soon depleted the funds available for the base year. Accordingly, the USDA exercised options early for those regions. In fact, within the first year, all or almost all of the options for Regions II and III were exercised, and the funds allocated to those contracts were significantly (although not completely) expended. In the other two Regions (Regions I and IV), few, if any, options were exercised and substantial funds remained unspent. Pl's SUMF ¶¶ 7-9.

Nonetheless, in 2018, the USDA decided to bring all four regional contracts to an end. Answer ¶ 10. This had the effect of precluding the USDA from exercising any previously unexercised options on task orders issued pursuant to the IDIQ contracts. (Where funds had been committed under the task orders, though, Ultima completed its obligations as required thereunder.) Pl's SUMF ¶¶ 10-12.

After the USDA ended the IDIQ contracts, it still had to provide services for the NRCS offices. In some instances, it used the 8(a) Program described herein to contract with companies to provide those services. *See* Statement of Michael Rosman ("Rosman St"), Ex. 16. Because Ultima is not a participant in the 8(a) Program, it was completely precluded from bidding on those contracts. From the period 2018-21, there were any number of contracts for the provision of administrative and technical services to NRCS offices that Ultima was ready, willing, and able to perform, but could not bid on because they were reserved for the 8(a) Program. Ultima remains ready, willing, and able to perform such contracts in the future. Pl's SUMF ¶¶ 13-16.

Because contracts to provide administrative and technical support to NRCS offices constituted (and still constitutes) a significant portion of Ultima's business, the reservation of such contracts for the 8(a) Program has caused a significant drop in Ultima's revenues, and will continue to reduce its revenues in the future. Pl's SUMF ¶ 17. Ultima currently meets the size standards for all North American Industry Classification System ("NAICS") codes relevant to the performance of contracts providing administrative and technical support for NRCS offices. Pl's SUMF ¶ 18.

B.   The 8(a) Statutory Scheme

In 1978, Congress passed Public Law 95-507, which substantially amended the Small Business Act and created a "small business and capital ownership development program," which it called,

simply, the "Program," to be housed within defendant Small Business Administration ("SBA"). P.L. 95-507, § 204, 92 Stat. 1765; 15 U.S.C. § 636(j)(10). The statute stated (and still states) that management of the Program is vested in the Associate Administrator for Minority Small Business and Capital Ownership Development (the "Associate Administrator") in the SBA. *Id.* Its purpose was and is to assist "socially and economically disadvantaged small business concerns." 92 Stat. at 1761, 1765; 15 U.S.C. §§ 637(a)(1)(B), (C).

Those business concerns are eligible for a wide variety of financial benefits. These include loans up to $750,000 (15 U.S.C. §§ 636(a)(20), 636(j)(13)(B)), assistance in the development of business plans (15 U.S.C. § 636(j)(10)(A)(i)), loan packaging, financial counseling and other similar assistance (15 U.S.C. § 636(j)(10)(A)(ii)), assistance in obtaining debt and equity financing (15 U.S.C. § 636(j)(10)(A)(iii)), assistance in obtaining surety bonds (15 U.S.C. § 636(j)(10)(A)(vi)), financial assistance to obtain skills training for employees and potential employees (15 U.S.C. § 636(j)(13)(E)), and the transfer of technology or surplus property owned by the United States (15 U.S.C. § 636(j)(13)(F)). *See also* 13 C.F.R. §§ 120.375, 124.404, 124.405; Rosman St. Ex. 5 (pp. 138, 284-299).

Of most significance for purposes of this litigation, qualified business concerns can obtain contracts to provide goods or services to government agencies that are reserved for the program. 15 U.S.C. §§ 636(j)(13)(A), 637(a)(1)(B), (C). These contracts may be given on a sole source basis (without any competition) or on the basis of competition solely among those who are eligible for the 8(a) Program. 15 U.S.C. §§ 637(a)(1)(D), 637(a)(16); 13 C.F.R. § 124.501(b). Only those businesses that have been certified as participants can procure contracts reserved for the 8(a) Program. 13 C.F.R. § 124.501(b); 13 C.F.R. § 124.503(a)(1).

The 8(a) Program is divided into two stages, a developmental stage lasting no more than four years and a transitional stage lasting no more than five years. 15 U.S.C. §§ 636(j)(12), 636(j)(15). Participants can procure contracts reserved for the 8(a) Program in both phases. 15 U.S.C. §§ 636(j)(13)(A), 636(j)(13)(J), 636(j)(14).

The statute defines a "socially and economically disadvantaged business concern" as one that is at least 51% unconditionally owned, and whose operations are managed by, (1) one or more socially or economically disadvantaged individuals, (2) an economically disadvantaged Indian tribe (which is defined to include Alaskan Native Corporations), or (3) an economically disadvantaged Native Hawaiian organization. 15 U.S.C. §§ 637(a)(4), 637(a)(13), 637(a)(15).[1] "Socially disadvantaged individuals are those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities." 15 U.S.C. § 637(a)(5). "Economically disadvantaged individuals are those socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged." 15 U.S.C. § 637(a)(6). Congress established a Division of Program Certification and Eligibility (the "Certification Division"), headed by a Director, to review and assess applications and make recommendations on them. 15 U.S.C. § 636(j)(11)(E).

The Administrator of the SBA must submit a report to Congress each April 30 regarding various aspects of the 8(a) Program, including a listing of all participants and the race or ethnicity of the disadvantaged owners. 15 U.S.C. § 636(j)(16). These are called 408 reports. *See* Rosman St. Ex. 6 (FY 2015 408 Report) p. 1 and Ex. 23 (Klein Dep. Tr.) 21. In addition, the Director of the Certification Division must report his or her findings regarding various aspects of the 8(a) Program to the Associate Administrator by September 30, after which the latter is supposed to issue various policy directives that establish priorities and assign staffing levels by October 31. 15 U.S.C. § 636(j)(11)(I).

In this case, defendants produced 408 Reports for Fiscal Year 2015, 2016, and 2017. Although it has drafted reports for at least two more recent fiscal years, it has not sent them to Congress. It

---

[1] In the initial 1978 amendment, only businesses owned and managed by socially and economically disadvantaged individuals were eligible. P.L. 95-507, § 202, 92 Stat. 1762 (adding Section 8(a)(4)). Indian tribes (including Alaskan Native villages or corporations) and Native Hawaiian Organizations were defined and added in 1986 and 1988 (respectively). P.L. 99-272, § 18015, 100 Stat. 370-71; P.L. 100-656, § 207, 102 Stat. 3861-62.

claimed deliberative process privilege with respect to them and has not produced them in discovery. Pl's SUMF ¶¶ 19-22.

Congress made findings in the initial 1978 amendments that "many" persons are socially disadvantaged because of their identification as members of certain groups that have suffered discrimination, and that such groups "include but are not limited to, Black Americans, Hispanic Americans, Natives Americans, and other minorities." Pub. L. 95-507, § 201, 92 Stat. 1760.[2]

C. The SBA's Structure And Regulations Regarding The 8(a) Program

The Office of Business Development and Government Contracting is a division of the SBA currently headed by Bibi Hidalgo that supervises government contracting, the 8(a) Program, and various other special contracting programs. Rosman St. Ex. 23 (Klein Dep. Tr.) 11-12. The Office of Business Development, headed by the Associate Administrator, is a suboffice within the Office of Business Development and Government Contracting. The current Associate Administrator, Donna Peebles, reports to Ms. Hidalgo. Pl's SUMF ¶¶ 23-24.[3]

1.  Social Disadvantage. – Shortly after the 1978 amendments, the SBA promulgated regulations related to the program. Specifically, with respect to "socially disadvantaged individuals," the SBA parroted the definition provided by Congress. Moreover, it concluded that, while certain *groups* could be deemed socially disadvantaged groups, individual members of those groups could qualify as socially disadvantaged only on a case-by-case basis. 44 Fed. Reg. 30,674 (May 29, 1979) (setting forth then 13 C.F.R. § 124.1-1(3)(ii)); *Rothe Development, Inc. v. United States Dep't of*

---

[2]  Asian Pacific Americans were added to this list in 1980. Pub. L. 96-302, § 118(b), 94 Stat. 840 (1980). The public laws identified in the previous footnote added "Indian tribes" and "Native Hawaiian Organizations" to the list, which currently appears in 15 U.S.C. § 631(f), aside from the change to Section 637(a)(5) stating that those entities, if economically disadvantaged, could directly own firms qualified to participate in the 8(a) Program.

[3]  The SBA uses different names than the ones bestowed by Congress in the statute. Thus, what Congress simply called the "Program," 15 U.S.C. § 636(j)(10), the SBA refers to as Minority Small Business and Capital Ownership Development Program or, more succinctly, the 8(a) BD Program. 13 C.F.R. § 124.1. The Division of Program Certification and Eligibility created by Congress (15 U.S.C. § 636(j)(11)(E)) is called the Office of Certification and Eligibility by the SBA. Rosman St. Ex. 23 (Klein Dep. Tr.) 15-16.

*Defense*, 836 F.3d 57, 67 (D.C. Cir. 2016) ("The SBA's first regulation implementing the statutory definition of social disadvantage . . . required individualized social-disadvantage showings."); Brief for the Federal Defendants in Opposition in *Rothe Development, Inc. v. Dep't of Defense*, Sup. Ct. No. 16-1239 (the "*Rothe* Brief") 10 ("Section 8(a)'s original implementing regulations did not contain . . . a [racial] presumption").[4]  The regulations also provided a process whereby groups could petition the SBA to be included among the socially-disadvantaged groups.  44 Fed. Reg. 30,674 (May 29, 1979) (setting forth then 13 C.F.R. § 124.1-1(3)(iii)).

In 1986, though, the SBA created the presumption of social disadvantage that continues, with some variation in language, to this day.  51 Fed. Reg. 36144 (Oct. 8, 1986) (setting forth 13 C.F.R. 124.105(b)) ("In the absence of evidence to the contrary, the following individuals are considered socially disadvantaged: Black Americans, Hispanic Americans, Native Americans (American Indians, Eskimos, Aleuts, or Native Hawaiians); Asian Pacific Americans . . . ; Subcontinent Asian Americans.").  The SBA "believe[d] that this [change was] consistent with the Congressional mandate that the primary beneficiaries of the 8(a) program be members of the statutorily designated minority groups."  48 Fed. Reg. 56686 (Dec. 22, 1983).

In the regulations applicable today, the general definition, following the one provided by Congress, is set forth in Section 124.103(a).  Section 124.103(b)(1) then states that there is a "rebuttable presumption" that certain individuals are "socially disadvantaged," and proceeds to list various minorities and specifications as to the "origins" that someone should have to fall within some of those minority groups (like Asian Pacific Americans and Subcontinent Asian Americans).

Section 124.103(b)(3) states that the "rebuttable" presumption "may be overcome with credible evidence to the contrary."  In fact, though, it has never been overcome.  It appears that no one has ever even challenged (much less challenged successfully) the presumption of social disadvantage for someone whose identification as one of the enumerated racial and ethnic minorities is clear.

---

[4]     Plaintiff attaches a copy of the *Rothe* brief to this memo for the Court's convenience. The SBA was one of the defendants represented by the Department of Justice in *Rothe*.  *Rothe*, 836 F.3d at 57.

Individuals in the presumed groups need not provide any narrative to support the proposition that they have been victims of racial or ethnic prejudice or cultural bias because of their identities as members of those groups, and it would be difficult to do so with the current online application process. Pl's SUMF ¶¶ 29-33.

In contrast to minorities, other individuals must demonstrate social disadvantage by a preponderance of the evidence. They must demonstrate a social disadvantage that is "chronic and substantial," 13 C.F.R. § 124.103(c)(2)(iii), and that disadvantage "must have negatively impacted on [the individual's] entry into or advancement in the business world." 13 C.F.R. §§ 124.103(c)(2)(iv), 124.103(c)(3). If there is a legitimate alternative ground to explain an adverse action and the person has not demonstrated that bias is a more likely explanation, the SBA may reject the claim of social disadvantage. 13 C.F.R. § 124.103(c)(3)(ii). Thus, the regulations state, if a woman claims social disadvantage because she was paid less than male counterparts, that claim would be insufficient because "[w]ithout additional facts, it is no more likely that the individual . . . was paid less than her male counterpart because he had superior qualifications or because he had greater responsibilities." Example 1 to 13 C.F.R. § 124.103(c)(3)(ii). Similarly, even if discriminatory conduct is demonstrated, it must connect to some difficulty to succeed in the business world. Thus, if a woman's clients make derogatory statements about her because she is a woman but nonetheless continue to do business with her, she has not demonstrated social disadvantage. Example to 13 C.F.R. § 124.103(c)(3)(iii).

2.    Economic Disadvantage. – As noted, the statute states that "economically disadvantaged individuals" must (1) be socially disadvantaged and (2) have less access to capital and credit as compared to others in the same business area who are not socially disadvantaged. 15 U.S.C. § 637(a)(6)(A). The SBA paraphrases this definition in 13 C.F.R. § 124.104(a).[5] But the SBA does

---

[5]    The regulations refer to the requirement that the owner have "diminished capital and credit opportunities as compared to others in the same *or similar* line of business who are not socially disadvantaged." 13 C.F.R. § 124.104(a) (emphasis added). The "same or similar line of business" is defined as business activities within the same four-digit Industry Group in the book published by the U.S. Office of Management and Budget utilizing the North American Industry Classification System ("NAICS"). 13 C.F.R. § 124.3.

not have any database to compare owners of applicants to the 8(a) Program to others in particular lines of business. Pl's SUMF ¶ 34.

When companies apply for the 8(a) Program, the SBA does not compare the owners' access to capital or credit to the same kind of access for individuals who are not socially disadvantaged in the same or similar line of business. Pl's SUMF ¶ 35. Instead, it looks at the individual financial circumstances of the owners and managers claiming social disadvantage. Specifically, the SBA examines (1) net worth, (2) net income, and (3) the fair market value of the owner's assets. It presumes that an individual with a "net worth" in excess of $750,000 is not economically disadvantaged; "net worth" excludes the value of the owners' homes, their interest in the business applying for the 8(a) Program, and any retirement accounts but "[e]xclusions for net worth purposes are not exclusions for . . . access to capital and credit purposes." 13 C.F.R. § 124.104(b)(2). The SBA makes a rebuttable presumption that an individual is not economically disadvantaged if his or her adjusted gross income averaged over the three preceding years exceeds $350,000; the presumption can be rebutted by, *inter alia*, a showing that the income level was unusual. 13 C.F.R. § 124.104(b)(3). An individual will generally not be considered economically disadvantaged if the fair market value of all his or her assets (including the home and interest in the business, but excluding any retirement accounts) exceeds $6 million. 13 C.F.R. § 124.104(b)(4).

To the extent that access to capital is considered at all, the SBA takes the position that SBA loans to participants themselves do not count. 63 Fed. Reg. 35731 (June 30, 1988).

The criteria for assessing economic disadvantage are the same regardless of the particular industry in which the applicant does business. Pl's SUMF ¶ 37.

3. <u>Group Inclusion</u>. – Under SBA regulations, groups can apply to be included as one of the "presumptive" groups. 13 C.F.R. § 124.103(d). Pursuant to this procedure, the SBA early on added two groups to those it deems to be socially disadvantaged, albeit their inclusion was during the period that it assessed individuals' social disadvantage on a case-by-case basis: Asian Pacific Americans in 1979 and Asian Indian Americans (now called Subcontinent Asian Americans) in 1982.

An application by Indonesian Americans in 1987 was superseded by regulation. (In fact, the SBA already had proposed an amendment to the relevant regulation including Indonesian Americans, among others, as Asian Pacific Americans prior to that group's application. 54 Fed. Reg. 12057 (March 23, 1989).) The SBA's Rule 30(b)(6) representative was not sure that Indonesian Americans had made an official application. All other group applications have been denied. There has not been an application since 1999. Pl's SUMF ¶¶ 39-43.

The rationales for the decisions denying applications have been eclectic. The SBA denied an application on behalf of women (even though it presented extensive evidence of discrimination against women in business), based on their "findings" that "presumptive group 'social disadvantage' is primarily intended for the traditional 'minority' groups." Rosman St. Ex. 13. Disabled veterans were denied because they "failed to demonstrate that [their] hardships were caused by anything other than the Veterans' own inabilities to perform certain basic tasks." Rosman St. Ex. 14 at 2. The SBA denied the application of Hasidic Jews despite there being "evidence of prejudice and discrimination experienced by the Hasidim [that was] overwhelming and essentially unrefuted" because their inclusion "might establish an impermissible religious classification." Rosman St. Ex. 15 (Factual Issues, Part B and last page before "Decision"). Other federal agencies have identified Hasidic Jews as a disadvantaged group eligible for assistance. 15 C.F.R. § 1400.1(c).

Although the definitions of groups have changed over time, no racial or ethnic group ever has been removed from the list on the ground that that group is no longer adversely affected by the present effects of discrimination. This is not surprising; the SBA has no criteria by which it could make a determination that a group should be removed for any reason. Pl's SUMF ¶¶ 47-48.

4.     Other Requirements. – Applicants to the 8(a) Program must also have prospects for successfully "competing in the private sector." 15 U.S.C. § 637(a)(7)(A). In assessing potential for success, the "SBA considers the concern's access to credit and capital, including but not limited to, access to long-term financing, access to working capital financing, equipment trade credit, access to raw materials and supplier trade credit, and bonding capability." 13 C.F.R. § 124.107(c). Thus, while

the economically disadvantaged *owner* of an applicant must (at least in theory) have *less* access to capital and credit than others who are not socially disadvantaged, the firm itself should have enough access to credit and capital to have potential for success.

The applicant must also be "small" for its primary industry classification. 13 C.F.R. § 124.102(a)(1). The size standards are expressed in either total revenues or total number of employees and differ by NAICS code. 13 C.F.R. § 121.201. The size standards take into account revenues or number of employees of any affiliates. 13 C.F.R. § 121.103.

5.    <u>Entity-Owned Applicants</u>. – An 8(a) Program participant may also be owned by one of three entities: Native Hawaiian Organizations (NHOs), Indian tribes, and Community Development Corporations. An NHO is defined by statute (15 U.S.C. § 637(a)(15)) and must be controlled by "Native Hawaiians" and have business activities that principally benefit that group. The statute does not define "Native Hawaiian," but the SBA defines it as "any individual whose ancestors were natives, prior to 1778" of modern-day Hawaii. 13 C.F.R. § 124.3. Indian tribes are any organized group of Indians recognized under federal or state law, and include Alaska Native Corporations (ANCs). ANCs are defined as various entities organized under the laws of Alaska in accordance with the Alaska Native Claims Settlement Act (43 U.S.C. §§ 1601 *et seq.*). Such entities must be owned by Alaskan Natives which are defined as persons of one-fourth degree or more Alaskan Indian, Eskimo, or Aleut (or some combination thereof). 43 U.S.C. § 1603.

The rules for entity-owned companies differ from those for businesses owned by individuals. Indian tribes (including ANCs) and NHOs are deemed socially disadvantaged. 13 C.F.R. §§ 124.109(b)(1), 124.110(a); Rosman St. Ex. 5 (p. 122). ANCs are deemed economically disadvantaged as well. 13 C.F.R. § 124.109(a)(2). In determining the size of an entity-owned business, the revenues and/or employees of any affiliates are not counted, unless the SBA concludes that the entity would have an unfair advantage. 13 C.F.R. §§ 124.109(c)(2)(iii), 124.110(b). Entity-owned businesses also can receive sole source contracts where the value of the contract would otherwise require that the contract be subject to competition within the 8(a) Program. 13 C.F.R.

§ 124.506(b).

6. <u>The Business Plan, Graduation, And Completion</u>. – Upon entry into the 8(a) Program, a participant must submit a business plan. 15 U.S.C. § 636(j)(10)(D)(i). The SBA must approve the business plan prior to the participant being eligible for a contract under the program. *Id.* There are various requirements of the business plan, including the identification of "[s]pecific targets, objectives, and goals." 15 U.S.C. § 636(j)(10)(D)(ii)(III).

After nine years, the eligibility of a participant in the 8(a) Program ends, although it may still complete contracts that it entered into prior to that time and even receive competitive 8(a) contracts that it submitted a bid for prior to that time. Pl's SUMF ¶ 51. The 8(a) Program distinguishes between "graduation" and completion of the term. 13 C.F.R. §§ 124.112(f), 124.300; Pl's SUMF ¶ 52. Graduation is defined in the statute. 15 U.S.C. § 636(j)(10)(H) (defining graduation as "successfully completing the program by substantially achieving the targets, objectives, and goals contained in the concern's business plan thereby demonstrating its ability to compete in the marketplace without assistance . . ."). *See also* 63 Fed. Reg. 35732 (June 30, 1998) (rejecting commenter's recommendation that the SBA should graduate participants when they have demonstrated the ability to compete in the marketplace without assistance because that standard would be contrary to the statute). Initiating a request to the Associate Administrator for a graduation proceeding is one of the functions of the Certification Division. 15 U.S.C. § 636(j)(11)(F)(v).

But, according to the SBA, sometimes it assesses whether a firm has achieved the objectives of its business plan after the nine-year term, and sometimes it does not. Its report to Congress for Fiscal Year 2015 stated that the vast majority of firms in the prior three fiscal years did not graduate, and thus did not achieve the targets, objectives, and goals in its business plan. Its reports to Congress for Fiscal Years 2016 and 2017 (the last two years for which such reports are available) did not distinguish between those exiting businesses that graduated and those that simply completed their term. Pl's SUMF ¶¶ 54-57.

D.    The Process Of Reserving Contracts For The 8(a) Program

While there are a variety of ways that an agency need (a "requirement") can be identified for the 8(a) Program, the most common way is for the procuring agency to send an offering letter to the SBA. With respect to sole source contracts, the offering letter identifies a specific 8(a) Program participant and asks that the requirement be fulfilled by a contract in the 8(a) Program with that participant. 13 C.F.R. §§ 124.502(c). The letter also identifies any small business contractors which have performed on this requirement during the previous 24 months. 13 C.F.R. §§ 124.502(c)(10). Congress's scheme had 8(a) contracts between the SBA and the procuring federal agency, with the SBA then subcontracting with the 8(a) Program participant for the performance of the service. More recently, the SBA grants procuring agencies the right to contract directly with Section 8(a) firms. This is done through a Partnership Agreement that delegates that authority. Pl's SUMF ¶¶ 62-64.

Section 8(a) contracts can be in any industry with which the federal government has a need. The SBA and the U.S. Department of Agriculture ("USDA") do not examine whether any racial group is underrepresented in the industry relevant to a particular contract in determining whether a USDA contract qualifies for the 8(a) Program. Pl's SUMF ¶¶ 65-66.[6]

At the USDA, individual contracting officers typically make the determination to ask the SBA's permission to reserve a contract for the 8(a) Program. Pl's SUMF ¶ 67. They are frequently motivated by time constraints; a sole source contract through the 8(a) Program takes considerably less time to effect than a contract for which the agency seeks bids. Pl's SUMF ¶ 68.

_____

[6]    Some years ago, the SBA did reserve the right to decline to accept a contract because disadvantaged businesses in the industry in question were not underrepresented. 63 Fed. Reg. 35772 (June 30, 1998) (adopting then 13 C.F.R. 124.108(f), among other provisions). This was done pursuant to advice from the Department of Justice to comply with the constitutional standards established by the Supreme Court in *Adarand Constructors v. Pena*, 515 U.S. 200 (1995). 63 Fed. Reg. 35767 (June 30, 1998). The determination of whether disadvantaged businesses were underrepresented was to be made pursuant to a "benchmark" study performed by the Department of Commerce. 62 Fed. Reg. 43588 (Aug. 14, 1997); 13 C.F.R. 124.108(f) (1998). These provisions were removed when the Department of Commerce failed to update the study. 76 Fed. Reg. 8233 (Feb. 11, 2011). *Rothe Development Corp. v. Dep't of Defense*, 545 F.3d 1023, 1037 (Fed. Cir. 2008) (noting that district court had found Department of Commerce Benchmark study "stale," and that defendants had not appealed that finding); *id.* at 1028 n.2.

Once a contract has been placed in the 8(a) Program, any "follow on" contract – one that involves substantially the same work – must remain in the 8(a) Program unless the SBA agrees to release it. 13 C.F.R. §§ 124.3 (defining "follow-on requirement or contract"), 124.504(d). This is so even if the specific contractor that had performed the contract is no longer eligible to participate in the 8(a) Program. Pl's SUMF ¶¶ 70-72.

E.    Goals

Executive Order 13170, § 2(xi), states: "Each agency shall . . . establish a goal for awards made to 8(a) firms pursuant to section 8(a) of the Small Business Act." 65 Fed. Reg. 60828 (October 12, 2000). Although the SBA once required agencies to have goals for the 8(a) Program, it no longer does. The USDA does not have goals for the 8(a) Program. Pl's SUMF ¶¶ 73-74.

Defendants do have goals for small, disadvantaged businesses ("SDBs"), and the 8(a) Program is included within that goal.[7] Pl's SUMF ¶ 75. The overall statutory goal for the federal government for SDBs is not less than 5%. 15 U.S.C. § 644(g)(iv). President Biden recently set the goal at 11% because the federal government had reached 10%. Pl's SUMF ¶ 78.[8] The SDB goal for the USDA was 5%, although the USDA typically exceeded that goal by a substantial amount. Recently, pursuant to an executive order requiring overall increases in SDB goals, that goal was raised to 21.5%. Pl's SUMF ¶¶ 80-82.

There is no requirement that contracts to meet the SDB goal be spread out among different or diverse NAICS codes, industries, or geographic areas. Pl's SUMF ¶¶ 84-85.

F.    Other Federal Programs

Executive Order 12432 requires every agency with substantial procurement or grantmaking authority to develop a minority business enterprise development plan. These plans must develop

---

[7]    The definition of an SDB is the same as that for an 8(a) participant. 13 C.F.R. 124.1001(b). The primary difference is that an SDB self-certifies that it meets the qualifications. 13 C.F.R. 124.1001(a). Pl's SUMF ¶ 76.

[8]    In an speech in June 2021, President Biden stated that he intended to increase the share of federal dollars going to SDBs, "including Black and Brown small businesses," from 10% to 15%. Pl's SUMF ¶ 79.

objectives for the utilization of minority business enterprises.  They also should "establish programs concerning provision of direct assistance, procurement assistance, and management and technical assistance to minority business enterprises."  Exec. Order 12432, § 2(a).  Similarly, Executive Order 11625 requires the Secretary of Commerce to coordinate agency programs to strengthen minority business enterprises.  The Secretary should "develop comprehensive plans and specific program goals for the minority enterprise program."   Exec. Order § 1(b)(1).  Other agencies shall "continue all current efforts to foster and promote minority business enterprises and to support the program herein set forth, and shall cooperate with the Secretary of Commerce in increasing the total Federal effort." *Id.*, § 3(e).  Each agency is required to designate an individual who would report to the Secretary of Commerce concerning that agency's efforts.  *Id.*, § 3(c)

Plaintiff sought a Rule 30(b)(6) witness on behalf of both the SBA and the USDA to testify concerning their efforts to implement these executive orders.  Neither defendant could produce a witness to so testify.  Pl's SUMF ¶ 87.

<u>Argument</u>

On a motion for summary judgment, the moving party bears the burden of demonstrating the absence of any genuine issue of material fact.  *Queen v. City of Bowling Green*, 956 F.3d 893, 898 (6th Cir. 2020).  Once that burden is met, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact.  *Id.*

It is undisputed here that the 8(a) Program uses race.  Answer ¶ 18.  Members of preferred races are presumed to be "socially disadvantaged," which is a prerequisite for admission into the program for any businesses owned by individuals.  Although nominally a "rebuttable" presumption, defendants cannot identify any instance in which the presumption has been rebutted for a person whose identity as a member of one of the preferred groups was not in doubt.  For all practical purposes, then, the racial presumption is conclusive.  *Vitolo v. Guzman*, 999 F.3d 353, 363 (6th Cir. 2021) ("Since proving someone else has *never* experienced racial or ethnic discrimination is virtually

impossible, this 'presumption' is dispositive.").

"Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943). Accordingly, "Government policies that classify people by race are presumptively invalid." *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021). The Due Process Clause of the Fifth Amendment to the United States Constitution has an "equal protection" component that provides the same protection against federal government classifications on the basis of race that the Equal Protection Clause of the Fourteenth Amendment provides against similar state and local government classifications. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 224 (1995). Such government classifications must meet "strict scrutiny": they must be narrowly-tailored to achieve a compelling governmental interest. *Id.* at 227. One of the primary characteristics of strict scrutiny is skepticism concerning racial classifications. *Id.* at 223 ("'Any official action that treats a person differently on account of his race or ethnic origin is inherently suspect'" *quoting Fullilove v. Klutznick*, 448 U.S. 448, 491 (1980) (Stewart, J., dissenting)); *Vitolo*, 999 F.3d at 360 ("To overcome that presumption [of invalidity], the government must show that favoring one race over another is necessary to achieve a compelling state interest."). Accordingly, "any person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny." *Adarand*, 515 U.S. at 224. The standard does not depend upon the race of those burdened or benefitted. *Id.*

The government actors using race have the burden of demonstrating that its use meets strict scrutiny. *Fisher v. University of Texas at Austin*, 570 U.S. 297, 303 (2013) (reversing the court of appeals because it "did not hold the University to the demanding burden of strict scrutiny"); *id.* at 312 ("[S]trict scrutiny imposes on the [defendant] university the ultimate burden of demonstrating, before turning to racial classifications, that available, workable race-neutral alternatives, do not suffice."); *Parents Involved In Community Schools v. Seattle School Dist. No. 1,* 551 U.S. 701, 720 (2007)

("*Parents Involved*") ("In order to satisfy this searching standard of review [*viz.*, strict scrutiny], the school districts must demonstrate that the use of individual racial classifications in the assignment plans here is 'narrowly tailored' to achieve a 'compelling' government interest"); *id.* at 734 ("'The District has not met its burden of proving these marginal changes . . . outweigh the costs of subjecting hundreds of students to disparate treatment based solely upon the color of their skin'") (*quoting Parents Involved In Community Schools v. Seattle School Dist. No. 1*, 377 F.3d 949, 984-85 (9th Cir. 2004)); *id.* at 783 (Kennedy, J., concurring); *Johnson v. California*, 543 U.S. 499, 505 (2005) ("Under strict scrutiny, the government has the burden . . ."). *Cf. United States v. Virginia*, 518 U.S. 515, 533 (1996) (holding that, for intermediate scrutiny, "[t]he burden of justification is demanding and it rests entirely on the State").

Undisputed facts demonstrate that defendants will not be able to meet their burden here. The SBA is not a legislature and has no authority to institute race preferences. It did not (and does not) investigate the existence of any strong basis in evidence to demonstrate a need for racial preferences. Even if it had, the 8(a) Program is not narrowly tailored to achieve any specific remedial objective. Indeed, there is no specific remedial objective at all.

I.    ULTIMA HAS STANDING BECAUSE IT WAS AND IS READY, WILLING, AND ABLE TO BID ON, AND PERFORM, CONTRACTS TO PROVIDE ADMINISTRATIVE AND TECHNICAL SUPPORT

Since this Court's decision on Defendant's motion to dismiss, the Sixth Circuit has clarified the standard for standing in cases like this one. In *Vitolo*, the Court considered the constitutionality of a grant to restaurant owners in the American Rescue Plan Act of 2021. *Vitolo*, 999 F.3d at 357. Certain restaurants were given priority in obtaining the grants: those that were 51% or more owned by women, veterans, or the socially and economically disadvantaged individuals. *Id.* The last term referred to the definitions under the 8(a) Program. *Id.*

The Court examined standing and rejected an argument nearly identical to the one proferred by defendants here on their motion to dismiss. "It does not matter that the plaintiffs might not otherwise qualify for priority consideration." *Id.* at 359. A judgment precluding the SBA from using

a race-based presumption of social disadvantage would remedy the racially unequal treatment that plaintiffs in *Vitolo* were suffering "[b]ecause the race of the applicant would not factor into the order in which applications are processed by SBA." *Id.* That is, a race-based uneven playing field creates a specific race-based harm that a court may remedy even if plaintiff would still face a non-race based uneven playing field.

Ultima provided administrative and technical support to NRCS offices for years. In 2017, it was providing such services to many NRCS offices throughout the country. While its size has fluctuated over time and, accordingly, it would not have been eligible (because of size standards) to bid on every contract defendants here reserved for the 8(a) Program had those contracts been open to competition, it was *always* qualified to bid on *some* of those contracts. Moreover, because of the foreseeable and substantial loss of revenue defendants' use of the 8(a) Program has caused it, Ultima is currently eligible to bid on virtually every contract to provide administrative and technical support to USDA offices. It was and is ready, willing, and able to do so and, accordingly, it has standing here. *E.g.*, *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211 (1995) (holding that Adarand had standing because it would bid on contracts in the future that might be affected by the subcontractor compensation clause at issue there).

II.     THE SBA LACKED AUTHORITY TO IMPOSE A RACIAL PRESUMPTION AND, EVEN IF CONGRESS HAD DELEGATED SUCH AUTHORITY, THE STATUTE LACKS SUFFICIENT GUIDANCE FOR THE SBA TO EXERCISE IT

"In considering equal protection claims, courts must first determine whether the governmental body imposing the classification at issue had authority to act to accomplish its purpose." *Michigan Road Builders Ass'n, Inc. v. Milliken*, 834 F.2d 583, 586 n.4 (6th Cir. 1987). In *Milliken*, the Sixth Circuit concluded that the "Michigan legislature had jurisdiction to act for the purpose of ameliorating the effects of past discrimination." *Id.*

The SBA is not a legislature and has no general authority to remedy the effects of past discrimination. It has only the authority that Congress provides it. Here, the 8(a) statute itself is race-neutral. *Rothe Development, Inc. v. United States Dep't of Defense*, 836 F.3d 57, 61 (D.C. Cir. 2016)

("Section 8(a) uses facially race-neutral terms of eligibility to identify individual victims of discrimination, prejudice, or bias, without presuming that members of certain racial, ethnic, or cultural groups qualify as such.").  It "envisions an individual-based approach that focuses on experience rather than on a group characteristic."  *Id.* at 64.

The SBA does not dispute that it lacks its own authority to impose a racial presumption:

Q.    So what evidence does the SBA use to justify the presumption of social disadvantage?

A.    Section 2(f) of the Small Business Act.

Q.    Anything else?

A.    I think Congressional findings are pretty important, --

Q.    Okay

A.    – and SBA follows Congress's intent for us.

Q.    Those Congressional findings were made in what year?

A.    I don't know the year specifically.

Q.    Has the SBA looked at any additional evidence since those findings were made?

A.    I'm not understanding the question.  Congress finds that certain groups have been discriminated because of their identity as such groups.  That's what Congress has found.  So are you asking if we questioned Congress?  Is that what you're asking me, because I'm confused by that statement.
      You know, first of all, as you know, Congress found that it's important that disadvantaged individuals are part of the economy in order to have a functioning economy and that many people are disadvantaged because of their identification as members of certain groups.  Congress has made these findings.  And then Congress also found that these groups include, and they set forth certain groups.  So are you asking should SBA ignore Congress's findings?  I don't think that's the appropriate response of what SBA should do.  We should follow Congress's findings in that regard.

      MR. ROSMAN: Could you read back the question, please?
      (Referred-to testimony read back.) . . .

Q.    Can you answer that question, please?

A.    I believe I answered that question.  SBA relied on those findings.

Q.    The question was has the SBA looked at any evidence since those findings were made?

A. And I answered that SBA has relied on those findings. That's what we relied on.

Q. That's not an answer

A. It's my answer

Q, The question is did you look at any evidence subsequent to those findings being made?

A. SBA relied on those findings.

Rosman St. Ex. 23 (Klein Dep. Tr.) 188-190.

The D.C. Circuit in *Rothe* addressed at great length these findings in Section 2(f) of the Small Business Act (15 U.S.C. § 631(f)), and rejected the proposition that they "create[] a 'presumption that all individuals who are members of certain racial groups are socially disadvantaged.'" *Rothe*, 836 F.3d at 65. That court noted that (1) the findings were not part of the operative terms of the statute and "do not . . . impose or necessarily contemplate any race-based classification in the statutory response, nor do such findings supplant the race-neutral definition of social disadvantage found in section 637(a)(5)" (*id.* at 66); and (2) the SBA's first regulation "required individualized social-disadvantage showings" (*id.* at 67). *Id.* ("That [initial] regulation squarely contradicts the view that the statute forecloses the SBA from requiring 'that every individual black American establish *individual* social disadvantage.'") (internal citation omitted).[9]

The court's conclusion in *Rothe* is supported by the plain meaning of the words. Congress found only that "many . . . persons" are socially disadvantaged because they are members of particular groups, and that those groups "include, but are not limited to" certain racial or ethnic minorities. 15 U.S.C. §§ 631(f)(1)(B), (C). "Many" is not "every" or even "most." Few would dispute that "many" Americans died of Covid-19, but the percentage of Americans who did die is well below 1%. To go from a finding that "many" people are socially disadvantaged because they are included in particular groups to a conclusion that *every* member of those groups should be *presumed* to be socially

_____

[9] The *Rothe* court also relied upon legislative history (that an earlier, rejected version of the bill had an explicit racial presumption for Section 8(a)) and the fact that another provision (Section 8(d)) does have an explicit racial presumption. *Rothe*, 836 F.3d at 68-69

disadvantaged is a substantial leap. *Rothe*, 836 F.3d at 64 ("[T]he statute recognizes that not all members of a minority group have necessarily been subjected to racial or ethnic prejudice or cultural bias."). Perhaps Congress can make that leap if it chooses, but it did not do so with 8(a). The best reading of the statute, including the findings relied upon by the SBA, is that it neither requires nor permits a racial presumption. *Id.* at 68 (holding that "the statute . . . neither contains any racial classification nor mandates the SBA to employ one. Even if the statute could be read to permit the agency to use a racial presumption, the canon of constitutional avoidance directs that we not construe the statute in a manner that renders it vulnerable to constitutional challenge on that ground.").

In short, *Milliken* requires that the entity imposing racial preferences be authorized to do so. The SBA does not claim any such authority, and its reliance upon Congress is misplaced because Congress never granted the SBA that authority and it is hardly obvious that it could.

Even if Congress had tried to delegate authority to implement an unidentified racial preference, it would have had to do so with far greater precision than the Section 8(a) statute. The statute states that the SBA may reserve contracts "whenever it determines such action is necessary or appropriate." 15 U.S.C. § 637(a). It does not state what criteria the SBA should use to make that determination. That may be sufficient for a race-neutral program, but the strong presumption against the use of race as a criteria makes it woefully insufficient as a delegation of authority for a racial presumption. Is there some underlying benchmark that the SBA should be trying to achieve? Is there any limitation on the industries in which the 8(a) Program can be used? An interpretation of Section 637(a) that made a broad grant of authority to engage in race-conscious decision making would make it very much like town ordinances that provide for permits to engage in First Amendment-protected activities at the complete discretion of town officials. *E.g.*, *Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 153 (1969) ("a municipality may not empower its licensing officials to roam essentially at will, dispensing or withholding permission to speak, assemble, picket, or parade according to their own opinions regarding the potential effect of the activity in question on the 'welfare,' 'decency,' or 'morals' of the community."). That, of course, is why the D.C. Circuit interpreted the statute as one

which did not even *permit* the use of race. *Rothe*, 836 F.3d at 68. Assuming that Congress had actually delegated to the SBA the authority it has assumed, the extraordinary discretion itself renders the statute unconstitutional.

III. DEFENDANTS CANNOT MEET THEIR BURDEN OF DEMONSTRATING THAT THE 8(a) PROGRAM MEETS STRICT SCRUTINY

To survive strict scrutiny, defendants must demonstrate that the presumption is a narrowly-tailored means of achieving a compelling governmental interest. They cannot meet this burden.

A. Defendants Cannot Show A Compelling Governmental Interest

Defendants claim an interest in remedying discrimination. While "remedial policies can *sometimes* justify preferential treatment based on race, . . . the bar is a high one." *Vitolo*, 999 F.3d at 361. In *Vitolo*, the Sixth Circuit set forth three criteria that the government must meet to demonstrate that it has such a compelling interest. First, the policy must target a specific episode of past discrimination. Second, the evidence must be of intentional discrimination. And third, the government must have had a hand in the past discrimination it now seeks to remedy. *Id.* at 361.

Here, defendants cannot even get off the ground. As the deposition excerpt of the SBA's Rule 30(b)(6) witness quoted earlier demonstrates, the SBA has not targeted any specific discrimination at all, but relies on more-than-40-year old "findings" that Congress made. Even if the SBA had authority to use them to support its use of race, those findings are too remote to use here. *E.g.*, *Associated General Contractors of Ohio, Inc. v. Drabik*, 214 F.3d 730, 735 (6th Cir. 2000) (affirming judgment that enjoined Ohio's Minority Business Enterprise Act, which set aside 5% by value of all state construction projects for bidding by certified MBEs; "[T]his court has ruled that seventeen-year old evidence of discrimination is 'too remote to support a finding of compelling government interest to justify the affirmative action plan,' and struck down a continuing affirmative action program for female firefighters on the ground that outdated evidence does not reflect 'prior unremedied or current discrimination.' . . . The MBEA suffers from the same defect.") (quoting *Brunet v. City of Columbus*, 1 F.3d 390, 409 (6th Cir. 1993)).

The SBA never reviews or updates evidence to support the racial presumption it first adopted

in 1986.  Nor do defendants have any evidence at all that individual contracting officers at the USDA have engaged in racial or ethnic discrimination against the groups identified in Section 124.103(b)(1).  Pl's SUMF ¶ 88.

Rather, it appears that the Department of Justice steps in at intermittent points to aid in litigation.  Rosman St. ¶ 15 & Ex. 21.  Dep't of Justice, The Compelling Interest to Remedy the Effects of Discrimination in Federal Contracting: A Survey of Recent Evidence 2 (2022) (available at https://www.justice.gov/crt/page/file/1463921/download) (prior reports by DOJ created in 2010 and 1996).

Thus, not only does the SBA not itself engage in a regular review of evidence to ascertain whether its use of race is justified, it basically relies upon ad hoc litigation-induced efforts to defend that use of race.  This is improper.  *Drabik*, 214 F.3d at 738 ("[U]nder *Croson*, the state must have had sufficient evidentiary justification for a racially conscious statute *in advance of its passage*; the time of a challenge to the statute, at trial, is not the time for the state to undertake factfinding") (emphasis added); *id.* at 738-39 ("the proper maintenance of current statistics is relevant to the requisite narrow tailoring of such a program, in order to judge its appropriate limits."); *Rothe Development Corp. v. U.S. Dep't of Defense*, 413 F.3d 1327, 1338 (Fed. Cir. 2005) ("to be relevant in the strict scrutiny analysis, the evidence must be proven to have been before Congress prior to enactment of the racial classification").  Thus, prior to this litigation – and prior to 1986 when the SBA first implemented its race-conscious presumption – the SBA would have no way of knowing whether it meets strict scrutiny to provide a preference for each of the groups for which it presumes social disadvantage, and each of the geographic areas and industries in which agencies reserve contracts.  Evidence created to defend the SBA in litigation should be viewed with a jaundiced eye.

Returning to the three considerations laid out in *Vitolo*: a review of the evidence (Rosman St. Ex. 30 (Interrog. No. 2)) that defendants purportedly rely upon to support their compelling interest demonstrates that it does not identify any *specific* episodes of *intentional* discrimination.  Rather, it consists mostly of evidence of disparities.  But "evidence of mere statistical disparities has been firmly

rejected as insufficient by the Supreme Court, particularly in a context such as contracting, where special qualifications are so relevant." *Drabik*, 214 F.3d at 736.

Defendants also do not identify how they have been "passive participants" in any discrimination. Defendants must show that its prior policies were "enacted or administered . . . in a discriminatory way." *Vitolo*, 999 F.3d at 362. Defendants seem to take the position that any expenditure they make in any industry in which there is any indication of discrimination makes them "passive participants." This is wrong as a matter of law. If merely spending money in any industry touched by some discrimination were sufficient, the rule that remedying societal discrimination is *not* a compelling governmental interest would be undermined. *Shaw v. Hunt*, 517 U.S. 899, 909-10 (1996) ("[A]n effort to alleviate the effects of societal discrimination is not a compelling interest").

Indeed, courts have rejected more *stringent* understandings of "passive participation." *Rothe Development Corp. v. Dep't of Defense*, 545 F.3d 1023, 1049 (Fed. Cir. 2008) (stating that while "it is likely that some money injected by [defendant Dep't of Defense] into the nationwide contract market has made its way into hands of contractors, subcontractors, or sub-subcontractors *who have engaged in discrimination*, . . . we are skeptical that this bare likelihood would be sufficient to establish DOD's 'passive participation' in discrimination within the meaning of *Croson* . . . . ") (emphasis added). *Cf. Builders Ass'n of Greater Chicago v. County of Cook, Ill.*, 256 F.3d 642, 645 (7th Cir. 2001) ("If prime contractors on County projects were discriminating against minorities and this was known to the County, whose funding of the contracts thus knowingly perpetuated the discrimination, the County might be deemed sufficiently complicit (a kind of joint tortfeasor, coconspirator, or aider and abettor) to be entitled to take remedial action. But of that there is no evidence . . . .").

B.      Defendants Cannot Meet Their Burden Of Showing That
        The 8(a) Program Is Narrowly-Tailored

Undisputed facts demonstrate that the 8(a) Program is not narrowly-tailored because (1) the "rebuttable" presumption is, for all practical purposes, dispositive, (2) it has no time limitation, (3) it has no specific remedial goals, (4) it is overinclusive because it fails to limit its beneficiaries to those

likely to have suffered from discrimination, (5) it fails to limit itself to industries in which there is a strong basis in evidence that discrimination has occurred, (6) it treats all minorities interchangeably without any focus on which groups, if any, have been more affected by the purported discrimination it is intended to remedy, (7) defendants have not seriously considered race-neutral alternatives, (8) defendants have not considered alternatives less harmful to third parties, and (9) there is no standard for determining whether previously-excluded groups should be removed from the list of those whose members are entitled to the presumption.

Before examining each of those issues, though, it is useful to identify some of the ways in which the SBA has ignored Congress's scheme itself, since many of these also suggest a willful refusal to narrowly tailor the use of race.

First, Congress defined "economic disadvantage" for an individual to require a comparison of the owners of an 8(a) applicant or participant to others in the same line of business who are not socially disadvantaged. 15 U.S.C. § 637(a)(6)(A). *See also* 15 U.S.C. § 637(a)(6)(E)(i) (the SBA shall consider the value of a disadvantaged owners' interests in their firms when comparing such concerns to others in the same business area owned by individuals who are not socially disadvantaged). Conceivably, such a comparison might contribute to a conclusion that the program has been limited to individuals affected by discrimination. But the SBA does not do it. Not only do they not make comparisons, but their assessment of "economic disadvantage" is – *contra* to Congress – exactly the same in *every* industry.

Second, Congress instructed the SBA Administrator to make a report each year by April 30 regarding the 8(a) Program so that Congress itself could track it. 15 U.S.C. § 636(j)(16). But the 408 Reports have not been sent to Congress since Fiscal Year 2017.

Third, and relatedly, although the statute defines "graduation" as "substantially achieving the targets, objectives, and goals contained in the concern's business plan," 15 U.S.C. § 636(j)(10)(H), the SBA claims that it does not keep track of how many firms completing the program term actually meet that statutory definition. Doing so would provide a gauge for how successful the 8(a) Program

is at achieving its claimed purpose of remedying the effects of discrimination.

Thus, even apart from traditional narrow-tailoring considerations, the SBA's failure to follow Congress's guidance precludes the 8(a) Program from qualifying as narrowly-tailored. Other factors only reinforce that conclusion.

1.      <u>Flexibility</u>. – Race-conscious remedies should be flexible. *F. Buddie Contracting, Ltd. v. Cuyahoga Community College District*, 31 F. Supp. 2d 584, 588 ((N.D. Ohio 1988) (narrow tailoring includes an assessment of "the flexibility and duration of the relief") (quoting *United States v. Paradise*, 480 U.S. 149, 171 (1987)). The presumption is not flexible. Every individual in the preferred minority groups gets the benefit of the presumption.

Although the presumption of social disadvantage is nominally "rebuttable," it has never, in fact, been rebutted. That, of course, is because it relies on information in possession of third parties that an applicant has not been affected by discrimination. *Vitolo*, 999 F.3d at 363 (noting that proof that someone else has never experienced discrimination is "virtually impossible"). The presumption is only "rebuttable" in theory; in practice, it is dispositive.

SBA does not even require applicants' owners who identify with one of the presumed groups to write anything explaining how they have been stymied in business because of discrimination. Thus, the SBA cannot even make a modest check to determine that the presumption is appropriate in a given case.

2.      <u>No Termination Date</u>. – It is undisputed that the 8(a) Program has no termination date. Answer ¶ 37. This by itself suggests a lack of narrow tailoring. *Drabik*, 214 F.3d at 737-38 ("Narrow tailoring also implies some sensitivity to the possibility that a program might someday have satisfied its purposes. . . The MBEA has remained in effect for twenty years and has no set expiration."); *United States v. City of Cincinnati*, 2021 U.S. Dist. LEXIS 175084, at *17 n.12 (S.D. Ohio Sept. 15, 2021) ("[T]he duration of a race-conscious remedy is a critical factor when analyzing whether such remedy is narrowly tailored" and cases cited therin).

Defendants seem to rely on the fact that beneficiaries' participation in the 8(a) Program is

limited to nine years.  Answer ¶ 37.  This is irrelevant.  The purpose of the "duration" prong of narrow tailoring is not to prevent unjust enrichment, but to avoid undue harm to the disfavored.  Changing the identity of those receiving advantages does nothing to avoid that harm.  That Ultima is unable to compete for a contract in Year 1 because it has been reserved for one 8(a) participant and is unable to compete again in Year 10 because the same contract has been reserved for another 8(a) participant does not mitigate any harm to it or to third parties generally.  And, this is exactly how the 8(a) Program works.  Once a requirement is reserved for the 8(a) Program, all follow-on contracts must also be reserved for the program unless the SBA releases them.

    3.    <u>No Specific Remedial Objectives</u>. – It is also undisputed that the 8(a) Program has no identified goals despite the existence of an Executive Order requiring agencies to adopt such goals.  Defendants seem to take comfort in this, suggesting that it shows that the program is flexible.  But the absence of goals demonstrates a lack of fit between the purported discrimination that justifies the program and the objectives of the program.  *E.g.*, *Michigan Road Builders*, 834 F.2d at 588 ("Racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification.") (cleaned up); *F. Buddie Contracting, Ltd. v. Cuyahoga Community College District*, 31 F. Supp. 2d 584, 588 ((N.D. Ohio 1988) (narrow tailoring includes an assessment of "the relationship of the numerical goals to the relevant labor market") (quoting *United States v. Paradise*, 480 U.S. 149, 171 (1987)); *Rothe Development Corp. v. U.S. Dep't of Defense*, 262 F.3d 1306, 1331 (Fed. Cir. 2001).

    That the 8(a) Program is entirely discretionary with individual agencies (Rosman St. Ex. 23 (Klein Dep. Tr.) 23) means that the agencies that may have had the worst record can ignore the program while those that have never come within miles of participating in any form of discrimination can use it extensively.  That is not flexibility; it is incoherence.

    4.    <u>Overinclusiveness</u>. – Narrow-tailoring also requires an examination of under- and over-inclusiveness.  *F. Buddie Contracting,* 31 F. Supp. 2d at 588.  The  8(a) Program is overinclusive because it includes minorities who, by any reasonable definition, have overcome any possible

discrimination. Individuals with average adjusted gross income of up to $350,000 over a three-year period, net worth (excluding a significant number of assets) up to $750,000, and ownership of assets worth up to $6 million (excluding retirement accounts) are considered "economically disadvantaged."

The definition of "economic disadvantage," excludes only a few percent of the richest Americans. 74 Fed. Reg. 55699 (Oct. 28, 2009) (stating that income level of $200,000 was chosen because it "closely approximates the income level of the top two percent of all wage earners."); 76 Fed. Reg. 8230 (Feb. 11, 2011) (adjusting figure upward based on new statistics). Along with the dispositive-in-reality presumption of "social disadvantage," it guarantees that the program will be overinclusive – that is, it will benefit individual racial or ethnic minorities who are very unlikely to have been the victims of chronic discrimination. *E.g.*, *Shaw v. Hunt*, 517 U.S. at 915 (comparing the narrow-tailoring inquiry "to the remedial authority of a federal court" and quoting *Missouri v. Jenkins*, 515 U.S. 70, 88 (1995) as follows: "The remedy must . . . be related to the *condition* alleged to offend the Constitution . . . . and must be *remedial* in nature, that is, it must be designed as nearly as possible to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct.") (emphasis in original, internal citations and quotation marks omitted); *Coral Construction Co. v. King County*, 941 F.2d 910, 925 (9th Cir. 1991) (although narrow tailoring "does not require a finding of specific instances of discriminatory exclusion for each [minority business], . . . if the [minority business] was a newcomer to King County, or otherwise was untarnished by the systemic discriminatory practices, then it may not benefit from the . . . program").

5.    <u>Not Tailored To Industries Or Sectors</u>. – The 8(a) Program is also not narrowly-tailored because the SBA does not assess on an ongoing basis whether it should be applied to particular industries or sectors. Indeed, although it used to reserve to itself the right to do so, it abandoned the project when the Department of Commerce failed to update the "benchmark" study. *See* n.6, *supra*. Use of that study was recommended by the Department of Justice to comply with the Supreme Court's decision in *Adarand*. *DynaLantic Corp. v. United States DOD*, 885 F. Supp. 2d 237, 280-81 (D.D.C 2012) (holding that application of 8(a) Program to a particular industry was unconstitutional where

defendants had no evidence that there was discrimination in that industry). Defendants' position in *DynaLantic* was that they did not need any evidence of industry-specific discrimination because the 8(a) Program "cut across industries." *Id.* at 280.

Defendants' position has not evolved much since then. They concede that in determining whether to reserve a contract for the program, they do not determine whether a particular racial group is underrepresented in that industry. Answer ¶ 27. Accordingly, they cannot say whether a particular use of the 8(a) Program assists towards the goal of remedying discrimination.

6. <u>No Distinction Among Groups</u>. – Related to the program's failure to consider the unique circumstances of particular industries is its treatment of all the preferred groups the same. *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 506 (1989) (holding that contracting set aside was not narrowly-tailored when it included groups against whom there was no evidence of discrimination). But even assuming *arguendo* the existence of evidence of discrimination against each group listed in Section 124.103(b)(1), surely evidence of discrimination for each group is not the same, either in the economy as a whole or in specific industries. Yet defendants will utilize the 8(a) Program in any industry and with any contractor if that contractor is an available 8(a) participant who can meet the agency's needs. 48 C.F.R. § 19.804-1. No consideration is given to whether the 8(a) participant is owned by an individual of a particular racial or ethnic group and/or whether that group is underutilized (much less has a history of intentional discrimination against) in that industry. *Id.*

7. <u>Race-Neutral Alternatives</u>. – Narrow-tailoring requires that "the government . . . show 'serious, good faith consideration of workable race-neutral alternatives.'" *Vitolo*, 999 F.3d at 362 (quoting *Grutter v. Bollinger*, 393 U.S. 306, 339 (2003)). Here, there is an obvious race-neutral alternative: the procedure that the SBA used through 1986. When it changed to the race presumption, it offered no evidence that the race-neutral case-by-case method it had employed was not assisting enough racial minorities who had suffered from discrimination. Rather, it simply stated that the change was "consistent with the Congressional mandate that the primary beneficiaries of the 8(a) Program be members of the statutorily designated minority groups." 48 Fed. Reg. 56686 (Dec. 22,

1983).  That is, it wanted to *increase the proportion* of beneficiaries who were racial minorities pursuant to its (mis)understanding of Congress's "mandate."  This is just discrimination for its own sake, which is a plain violation of the anti-discrimination norm.  *Parents Involved in Community Schools v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 767 (2007) (quoting *Regents of the University of California v. Bakke*, 438 U.S. 265, 307 (1978)) (Opinion of Powell, J.).

The SBA has not considered any race-neutral alternatives since then or considered how the program would operate in the absence of the presumption in Section 124.103(b)(1).  Pl's SUMF ¶ 90.  Indeed, it does not consider the program as a whole to *be* race-conscious even though it acknowledges that the presumption is.  Rosman St. Ex. 23 (Klein Dep. Tr.) 192.

8.  <u>Impact On Third Parties</u>. – Another important narrow-tailoring consideration is the impact of the relief on the rights of third parties.  *F. Buddie Contracting*, 31 F. Supp. 2d at 588 (quoting *United States v. Paradise*, 480 U.S. 149, 171 (1987)).  The 8(a) Program offers a plethora of benefits to those participating – loans, transfers of property, payments for training -- most of which do not have a substantial effect on third parties.  But the reservation of contracts is different; it takes away business opportunities, often (especially in the case of sole source awards) before a third party even knows that the opportunity exists.  The SBA acknowledges that "the benefits of receiving a contract without having to compete are so significant."  63 Fed. Reg. 35736 (June 30, 1998); *see also id.* at 35735 ("it is difficult for other firms to find out about sole source awards").  Just as narrow-tailoring requires the consideration of race-neutral alternatives, it requires the consideration of whether objectives can be met without the most significant harms to third parties.  Here, defendants offer no explanation as to why the various other significant benefits to 8(a) participants do not allow them to compete fairly in competition for federal (and other) contracts.

Similarly, defendants apparently do nothing to comply with Executive Orders requiring them to develop plans to assist minority businesses in other ways.  Such plans might consider alternatives that have far less impact on innocent third parties.

9.  <u>Group Inclusion And Exclusion</u>. – Finally,  although the Section 8(a) regulations

provide for a process for including new groups as "presumptively socially disadvantaged," 13 C.F.R. § 124.103(d), there is a conspicuous absence of either a rule or process for determining whether the included groups *remain* "presumptively socially disadvantaged." This goes directly to the necessity of race-conscious relief, flexibility of the program, *and* consideration of efficacy of alternative remedies. Minority business formation is not a static thing, and it is at least possible that some groups might no longer need the presumption. George R. LaNoue & John Sullivan, *"But For" Discrimination: How Many Minority-Owned Businesses Would There Be?*, 24 Columbia Human Rights Law Review 93, 132 (1993) (noting that the business formation rate per 1000 persons was 47.1 for Asian Indians; 47.9 for persons of Cuban ancestry; 64.8 for persons of Chinese ancestry; and 106.4 for persons of Japanese ancestry, as compared with a United States average of 48.9).

The SBA's treatment of the application of Hasidic Jews demonstrates the race-based approach it takes. It rejected the application despite "overwhelming" evidence of prejudice and discrimination because it was concerned about making an "impermissible" religious classification. But religious classifications are no more or less impermissible than racial classifications. They are both subject to strict scrutiny. *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610, 614 (6th Cir. 2020) (holding that "a law that discriminates against religious practices" must meet strict scrutiny to survive constitutional challenge); *Harkness v. Sec'y of the Navy*, 858 F.3d 437, 447 (6th Cir. 2017) ("we apply strict scrutiny in adjudging its constitutionality" when a law prefers one religion over another).

<u>Conclusion</u>

For the foregoing reasons, plaintiff's motion for summary judgment should be granted.

Respectfully submitted,

*/s/ Michael E. Rosman*
Michael E. Rosman
Michelle A. Scott
CENTER FOR INDIVIDUAL RIGHTS
1100 Connecticut Ave, NW, Ste. 625
Washington, D.C. 20036

(202) 833-8400

M. Dale Conder, Jr.
RAINEY KIZER REVIERE & BELL PLC
209 E. Main St.
Jackson, TN 38301
(731) 426-8130