# EXHIBIT 5

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TENNESSEE

_____

ULTIMA SERVICES CORPORATION,

        Plaintiff,

   v.                                    Case No.

U.S. DEPARTMENT OF AGRICULTURE,    2:20-cv-0041-

U.S. SMALL BUSINESS ADMINISTRATION, DCLD-CRW

SECRETARY OF AGRICULTURE, and

ADMINISTRATOR OF THE SMALL BUSINESS

ADMINISTRATION,

        Defendants.

_____

             VIDEOCONFERENCE DEPOSITION OF

                  AMY STONEBRAKER

DATE:          Wednesday, May 25, 2022

TIME:          9:32 a.m.

LOCATION:      Remote Proceeding - DC

               Washington, DC 20005

REPORTED BY:   Timothy Guevara, Notary Public

JOB NO.:       5242863

Veritext National Court Reporting Company
202-857-3376 302-571-0510    410-837-3027    610-434-8588 215-241-1000
Case 2:20-cv-00041-DCLC-CRW   Document 61-5   Filed 06/21/22   Page 2 of 7
PageID #: 995

```
 1            A P P E A R A N C E S
 2   ON BEHALF OF PLAINTIFF ULTIMA SERVICES CORPORATION:
 3        MICHAEL E. ROSMAN, ESQUIRE (by videoconference)
 4        MICHELLE SCOTT, ESQUIRE (by videoconference)
 5        Center for Individual Rights
 6        1100 Connecticut Avenue Northwest, Suite 625
 7        Washington, DC 20036
 8        rosman@cir-usa.org
 9        scott@cir-usa.org
10        (202) 833-8402
11
12   ON BEHALF OF DEFENDANTS U.S. DEPARTMENT OF
13   AGRICULTURE, U.S. SMALL BUSINESS ADMINISTRATION,
14   SECRETARY OF AGRICULTURE, AND ADMINISTRATOR OF THE
15   SMALL BUSINESS ADMINISTRATION:
16        JULIET GRAY, ESQUIRE (by videoconference)
17        Department of Justice Civil Rights Division
18        Employment Litigation Section
19        150 M Street Northeast
20        Washington, DC 20530
21        juliet.gray@usdoj.gov
22        (202) 514-3831
```

```
 1             P R O C E E D I N G S
 2        THE REPORTER:  Good morning.   My name
 3   is Timothy Guevara; I am the reporter assigned by
 4   Veritext to take the record of this proceeding.   We
 5   are now on the record at 9:32 a.m.
 6        This is the deposition of Amy
 7   Stonebraker taken in the matter of Ultima Services
 8   Corporation against U.S. Department of Agriculture,
 9   U.S. Small Business Administration, Secretary of
10   Agriculture, and Administrator of the Small Business
11   Administration, Case Number 2:20-cv-00041-DCLC-CRW, on
12   May 25, 2022, taken remotely via Zoom.
13        I am a notary authorized to take
14   acknowledgements and administer oaths in the District
15   of Columbia.   Parties agree that I will swear in the
16   witness remotely outside of her presence.
17        Additionally, absent an objection on
18   the record before the witness is sworn, all parties
19   and the witness understand and agree that any
20   certified transcript produced from the recording,
21   virtually, of this proceeding:
22        - is intended for all uses permitted
```

```
 1                I N D E X
 2   EXAMINATION:                               PAGE
 3        By Mr. Rosman                          6
 4        By Ms. Gray                           99
 5
 6           E X H I B I T S
 7   NO.       DESCRIPTION                      PAGE
 8   Exhibit 1    MS1 Status Emails             34
 9   Exhibit 2    MS2 Status Emails             39
10   Exhibit 3    MS3 NRCS Request Letter, 9/6/18  43
11   Exhibit 4    MS4 Denison Adverse Impact Letter
12             To USDA, 9/20/18                 45
13   Exhibit 5    Decision Memo                 56
14   Exhibit 6    VA1 PCI Offer Letter          76
15   Exhibit 7    VA2  PCI Contract (2021)      80
16   Exhibit 8    VA3 2019 Offer Letter         85
17   Exhibit 9    VA4 2019 Acceptance Letter    86
18   Exhibit 10   GA1 Rividium Contract         94
19             (Exhibits attached.)
20
21
22
```

```
 1   under applicable procedural and
 2   evidentiary rules and laws in the same
 3   manner as a deposition recorded by
 4   stenographic means; and
 5        - shall constitute written stipulation
 6   of such.
 7        At this time will everyone in
 8   attendance please identify yourself for the record.
 9   We can begin with you, Mr. Rosman.
10        MR. ROSMAN:  I'm Michael Rosman.   I'm
11   representing the plaintiff in this matter.
12        THE REPORTER:  Ms. Scott.
13        MS. SCOTT:  I'm Michelle Scott.   I
14   represent the plaintiff in this matter.
15        THE REPORTER:  Ms. Gray.
16        MS. GRAY:  I'm Juliet Gray.   I
17   represent the defendants in this matter.
18        THE REPORTER:  Thank you.   And Ms.
19   Stonebraker, will you please just identify yourself
20   for the record, please?
21        MS. STONEBRAKER:  Yes.   My name is Amy
22   Stonebraker.
```

1  a problem. And -- and I don't recall ever receiving a
2  complaint in regards to Ultima as -- as the contract
3  holder. I recall a situation with a -- with one of
4  Ultima's contracted employees in an office and some
5  kind of relationship situation that was occurring, and
6  it was addressed. So -- but that's really not about
7  Ultima itself. So, no, I did not ever receive any
8  negative feedback about Ultima.
9      Q  Did anyone discuss with you the possibility
10 of canceling the IDIQ contracts?
11     A  No. There wouldn't have been a discussion
12 to cancel them. Because the contracts had option
13 years, there would be a discussion, which I think is
14 what this decision memo is -- is based on is the
15 decision on whether or not to exercise option periods.
16     Q  Okay. Did you have any discussions with
17 anyone about that?
18     A  No. So I provided input to the decision
19 memo, but the decision was a business decision, which
20 would be made by the customer, which would've been
21 leadership at that time, because this was for a
22 national requirement.

1      Q  Okay. And at some point, leadership decided
2  not to exercise any options or any remaining options
3  on the IDIQ contracts. Is that right?
4      A  I believe that's what this decision memo
5  states.
6      Q  But at the time, that was your
7  understanding?
8      A  That was my understanding of the memo that
9  was signed. Yes.
10     Q  Okay. Oh, when you saw it, it had been
11 signed?
12     A  I provided data that went into the decision
13 memo, and then I saw it once it was signed.
14     Q  Okay. And was it your understanding that
15 that essentially ended the IDIQ contracts?
16     A  That was the customer notifying us, that
17 they did not wish to exercise any remaining options.
18     Q  And I'm asking you about the practical
19 effect of that decision. Is the practical effect of
20 that decision is that those IDIQ contracts had ended?
21     A  If an option is not exercised, then it ends
22 when the current period of performance expires.

1      Q  Okay. And when would the current period of
2  performance have expired when that decision was made?
3      A  I would have to look at those contracts to
4  see what the award date -- where it began and what the
5  periods -- how they ran. I don't recall what the
6  base-year and option-year periods start and stop dates
7  were.
8      Q  But that was short shortly after the
9  decision memo was written. Correct?
10     A  Whatever the next -- whatever the next
11 option period would have been, the date -- the end
12 date would have stopped. I don't know what date that
13 is.
14     Q  Okay. I think you said earlier that there
15 were some task orders for which there were option
16 years and other task orders, which had no options. Is
17 that right?
18     A  Based on what I recall.
19     Q  Okay. Did the decision to not renew the
20 option on the IDIQ mean that the option on the task
21 orders would also not be exercised?
22     A  I don't -- I don't recall. I believe

1  that -- well, so for Section -- for Region 2, looking
2  at the memo and looking at the balance obligated,
3  there would not been a -- the ability to exercise
4  options if there were any on any of those awarded
5  states, because we were already at about $9 million.
6  As far as the other contracts, I didn't oversee the
7  IDIQ for Region 3 and Region 4, so I can't speak to
8  whether there were option years on those contracts.
9      Q  Well, let me follow up on that. There was
10 still a million dollars or so left in the Region 2
11 IDIQ. Right?
12     A  Yes.
13     Q  So it wouldn't have been impossible to
14 exercise an option on a Region 2 task order provided
15 that the additional money being committed wasn't more
16 than a million dollars. Right?
17     A  True. Yes.
18     Q  Okay. And I'm trying to understand whether
19 the decision not to exercise the options on the IDIQs
20 also meant that you would not exercise options on any
21 task orders, regardless of whether there was funding
22 left for it or not.

## Page 102

would -- you wouldn't move money from one contractor to another contractor because that contractor's contract hit a ceiling. So you have to apply that -- that logic across, even when you're dealing with the same vendor. And again, it would -- could open us up for protests.

Q   Mr. Rosman showed you an email chain in which you -- between you and Ms. Bennett in which you said something about you were sure there'd be other opportunities in the future. Do you recall that?

A   Yes.

Q   And in your understanding, have there been other opportunities that Ultima could have potentially bid on for admin services for NRCS since the IDIQs.

A   Since I returned --

MR. ROSMAN: Objection. Go ahead.

A   Since I returned, and in reviewing contracts that are now in place in the East, there were contracts that were solicited via GSA schedule. So there were not -- not all of the admin support awards were done as an 8(a) award, where it would've been sole sourced and then put into the 8(a) program. So

## Page 103

there were other avenues that were used to award contracts. I can't speak to the other regions, the Central Region or the West Region as they're situated now. But I know for the East Region, that I saw a mixture of how these were awarded for admin support.

Q   You mentioned the GSA supply schedule, what kind of businesses are eligible to obtain contracts through that?

A   Any -- any size business can have a GSA schedule contract. I don't know the exact process to get on to GSA schedule. But I believe that a company can submit at any time, and -- and they would have to work through GSA to do so. And then they would -- they would be a contract holder with GSA. And then, so it's large business, small business, and use of GSA schedule. We don't have that same requirement as we do under open market to set aside for small business or socioeconomic category when we go out to GSA schedule. We're not required to set aside for small business, but contracting officers have the ability to set aside to small business.

Q   Did you ever have a discussion with Ms.

## Page 104

Bennett about why Ultima didn't just apply for GSA federal supply schedule?

A   The discussion that she and I had when she visited the West Virginia state office, I mentioned that, you know, possible avenues for the new procurements to happen, whether it be open market, FedBizOpps at the time, whether it be GSA schedule, or if it would be looked at for the 8(a) program. And she indicated she was not on schedule and she was not 8(a) and that it would be unfair.

Q   Can you just briefly look at Exhibit 2 again?

A   Yes.

Q   If you can, once you have it open, scroll down to the first email in the chain, the email from Ms. Bennett to you.

A   Okay.

Q   Okay. If you just look at this, the second paragraph where she says, "I strongly object and am again" asking "a reconsideration of this decision due to the following," and take your time to read these if you need to, but what is your response to these

## Page 105

objections that she's raising?

MR. ROSMAN: Objection to form.

BY MS. GRAY:

Q   Well, let me ask you this. What was your response at the time, if you can remember, to these objections?

MR. ROSMAN: Well, I'll still object to form.

A   So my response is that we determined for this specific requirement, which I believe this relates to the Mississippi action -- yeah -- "Subject Mississippi contract status." I notified her that the determination was made to use 8(a) for that requirement, which we had authority to do so under FAR Part 19, which talks about set-aside.

We look at new actions that have to be awarded as that, as a new action. So we don't take the incumbent -- the fact that she was doing a great job, we don't disagree with. We feel that she performed the terms of the contract in accordance with the contract, and that the decision lies with the contracting officer.

1  So while, yes, she is the incumbent, the
2  incumbent is not guaranteed the follow-on work. And
3  that new -- that new action that has to be looked at
4  and then put into place, is looked at separately,
5  moving forward and evaluated for that requirement at
6  that time.
7  Q  Is the incumbent give any kind of preference
8  in considering the NAICS contract or fulfilling the
9  new requirement?
10 A  If she would be eligible for -- well, the
11 Mississippi one, it was just determined that 8(a) was
12 the path forward. But for other requirements of the
13 same type of administrative support for another state,
14 depending on the path that it was solicited, if she
15 was eligible to submit an offer, then she would've
16 been evaluated based on the evaluation criteria that
17 would've been established in the solicitation at that
18 time. And those evaluations are performed based on
19 what is in that technical submission for this
20 requirement.
21  And they do look at past performance, but
22 they don't look at -- they can't take what they know

1  right now when they're evaluating a technical proposal
2  as part of a submission. They have to read, what did
3  our solicitation say? What were the evaluation
4  criteria that would be used? And did the technical
5  submission meet the criteria as stated in the
6  solicitation? And that is applied across the board to
7  any offer that's received. We can't -- we can't take
8  what we know of the incumbent and -- and automatically
9  score them higher just because we know they're already
10 performing the work, if their technical response would
11 reflect the work that they're doing in response.
12 Q  Did the decision not to issue any more task
13 orders against the IDIQs have anything to do with
14 Ultima?
15 A  No. It was a business decision based on the
16 leadership, whatever they decided, in order to issue
17 that decision memo.
18     MR. ROSMAN: I'm going to object to the
19 question on foundation grounds. Go ahead.
20 BY MS. GRAY:
21 Q  To your knowledge, did the decision not to
22 issue anymore task orders against the IDIQs have

1  anything to do with the 8(a) program?
2  A  No.
3  Q  What type of work were the IDIQs intended to
4  fill?
5  A  If I recall, it was administrative support
6  services and it would've been all of the
7  administrative labor categories as defined by the
8  Service Contract Act. They have a directory of labor
9  categories. It was -- mostly clerical or intended to
10 be clerical administrative-type work.
11 Q  And in your understanding, did that turn out
12 to fulfill the needs of all the NRCS offices?
13 A  Once the test orders were in place, we were
14 seeing situations where states were utilizing the
15 administrative clerical support for other than
16 administrative and clerical duties, having them
17 participate or assist with field work and sending them
18 out on -- on field work activities. One state in
19 particular, Arkansas, was doing that, and we had to
20 notify the state that they could not allow those admin
21 support individuals to go out into the field and
22 assist with any field work, because that wasn't in the

1  general scope of the IDIQ.
2  Q  So in your understanding, did any of the new
3  requirements that came up after the IDIQs have
4  additional type of work in them beyond administrative
5  services?
6      MR. ROSMAN: Objection to form.
7  A  Every state requirement --
8  Q  Go ahead and answer.
9  A  Okay. Every state requirement seems to be
10 different in the duties that they request or need
11 these individuals to perform. You know, it's anywhere
12 from typical receptionist-type duties to clerical-type
13 duties, but we also saw that some states required use
14 of a more, if educated is the right term, but a more
15 professional-level position, like management analyst,
16 program analyst, someone that would have more
17 technical experience or more educational experience to
18 fulfill, that the admin support contract didn't cover.
19 Q  Did you ever use the 8(a) program in order
20 to meet an SDB goal?
21 A  I have never used an 8(a) program to meet an
22 SDB goal.

1  Ultima Services Corporation  v. US Department Of Agriculture Et

2  Amy Stonebraker (#5242863)

3              E R R A T A  S H E E T

4  PAGE __11__ LINE __7__ CHANGE _____

5  _____From: 9 or and 11_____To: 9 or an 11_____

6  REASON __typo_____

7  PAGE __30__ LINE __7__ CHANGE _____

8  _From: beyond 9/30 of 2018  To: 9/30 of 2019_____

9  REASON __misstated ending year in discussion on 2 yr funds

10 PAGE __33__ LINE __22__ CHANGE _____

11 From: past selected    To: path selected_____

12 REASON __misheard word used_____

13 PAGE __35__ LINE __8__ CHANGE _____

14 From:  Let read that    To: Let me read that_____

15 REASON __word left out of statement_____

16 PAGE __61__ LINE __17__ CHANGE _____

17 From: NRC    To: NRCS_____

18 REASON __Wrong typed acronym_____

19 PAGE __84__ LINE __21__ CHANGE _____

20 From: 5611100    To: 561110_____

21 REASON __NAICS code incorrectly typed_____

22 Page __86__ Line __11__ CHANGE- From: Temporary health services
                                  To: Temporary help services
23 REASON  Incorrect word typed in statement

24 Page __108__ Line __13__ CHANGE From: once the test orders
                                  To: once the task orders
25 Reason  Incorrect word typed

   Amy Stonebraker