# EXHIBIT 17

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| ULTIMA SERVICES CORPORATION | |
| v. | Case No. 2:2020cv00041 |
| U.S. DEPARTMENT OF AGRICULTURE, et al., | |

Monday, April 25, 2022

30(b)(6) Zoom Videoconference deposition of JOHN KLEIN, taken with the witness participating from his residence, beginning at 9:38 a.m., Eastern Standard Time, before Ryan K. Black, a Registered Professional Reporter, Certified Livenote Reporter and Notary Public.

Page 2

A P P E A R A N C E S:

THE CENTER FOR INDIVIDUAL RIGHTS
BY: MICHAEL E. ROSMAN, ESQ. - Via Zoom
MICHELLE A. SCOTT, ESQ. - Via Zoom
1100 Connecticut Ave., N.W.
Suite 625
Washington, DC 20036
202.833.8400
rosman@cir-usa.org
scott@cir-usa.org
Representing - Ultima Services Corporation

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL RIGHTS DIVISION
BY: K'SHAANI SMITH, ESQ. - Via Zoom
950 Pennsylvania Avenue NW
Washington, DC 20530
k'shaani.smith@usdoj.gov

- and -

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL RIGHTS DIVISION
BY: JULIET GRAY, ESQ. - Via Zoom
CHRISTINE DINAN, ESQ. - Via Zoom
150 M Street NE
Washington, DC 20002
juliet.gray@usdoj.gov
christine.dinan@usdoj.gov
Representing - U.S. Department of Agriculture

SMALL BUSINESS ADMINISTRATION
BY: DAVID FISHMAN, ESQ. - Via Zoom
KAREN HUNTER, ESQ. - Via Zoom
409 3rd Street SW
Washington, DC 20416
800.827.5722
david.fishman@sba.gov
karen.hunter@sba.gov

Representing - Small Business Administration

Page 3

I N D E X

TESTIMONY OF: JOHN KLEIN PAGE

By Mr. Rosman..............................6, 211

By Ms. Smith..................................206

E X H I B I T S

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Klein 1 | a document Bates Numbered US0050764 through US0050774 | 26 |
| Klein 2 | a document Bates Numbered US0071620 through US0071621 | 37 |
| Klein 3 | a document titled Federal Register, dated Thursday, October 12, 2002, Executive Order 13170 - Increasing Access and Opportunities for Disadvantaged Businesses | 41 |
| Klein 4 | a document titled Form 1010, 8(a) Application | 61 |
| Klein 5 | a document titled Form 1010-IND | 61 |
| Klein 6 | a document Bates Numbered US0051094 through US0051215 | 122 |
| Klein 7 | a document Bates Numbered US0050780 through US0050923 | 122 |
| Klein 8 | a document Bates Numbered US0050948 through US0050970 | 122 |

Page 4

I N D E X (Cont'd)

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Klein 9 | a document Bates Numbered US104099 through US104103 | 144 |
| Klein 10 | a document Bates Numbered US0104107 through US0104108 | 145 |
| Klein 11 | a document Bates Numbered US0063188 through US0063190 | 151 |
| Klein 12 | a document Bates Numbered US0063899 through US0063905 | 151 |
| Klein 13 | a document Bates Numbered US0062817 through US0062818 | 155 |
| Klein 14 | a document Bates Numbered US0052929 through US0052938 | 155 |
| Klein 15 | a document Bates Numbered US0054376 through US0054378 | 163 |
| Klein 16 | a document Bates Numbered US0054351 through US0054352 | 166 |
| Klein 17 | a document Bates Numbered US0063192 through US0063194 | 168 |
| Klein 18 | a document Bates Numbered US0114698 through US0114701 | 171 |
| Klein 19 | a document Bates Numbered US0063336 through US0063339 | 172 |

Page 5

I N D E X (Cont'd)

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Klein 20 | Incorrectly marked | 173 |
| Klein 21 | a document Bates Numbered US063333 through US063335 | 173 |
| Klein 22 | a document Bates Numbered US0052868 through US0052870 | 176 |
| Klein 23 | a document Bates Numbered US0063537 through US0063538 | 177 |
| Klein 24 | a document Bates Numbered US0052943 through US0052945 | 181 |
| Klein 25 | Incorrectly marked | 181 |
| Klein 26 | a document Bates Numbered US0053299 through US0053300 | 181 |

Case 2:20-cv-00041-DCLC-CRW Document 61-17 Filed 06/21/22 Page 3 of 15 PageID #: 1544

do you, by any chance, have standard operating procedures for the SBA with you?

A. I do not have them with me. I mean, I'm sure it's on our website somewhere.

Q. I'll ask you about that in a moment or two. All right. Let me see if I can get them up here.

Well, for some reason, I can't understand the -- that particular document, although it's on my computer somewhere is not appearing in the Share Screen box.

MS. SCOTT: I can put it into the Exhibit Share, if you want.

MR. ROSMAN: Well, does Mr. Klein have access to Exhibit Share? I thought that was why we were getting --

MS. SCOTT: No. No. I thought someone was working on getting that to him. I don't know.

MR. FISHMAN: I got a new password, and I tried to go in and it still wouldn't let me in. So I am doubtful that Mr. Klein has access now.

BY MR. ROSMAN:

Q. Well, could you give it a shot, Mr. Klein, to see if you have access to Exhibit

Share?

Do you?

A. I'm trying to look right now.

Q. Okay.

A. "Permission denied. You do not have permission to view this folder."

Q. Okay. Well, let's see if we can do it this way, then. I'm just going to scroll down a few of these pages.

This is a document that was produced to us beginning with the Bates Number US0051216, and I'm just going to scroll down and ask you whether this looks like -- I'm not going to go through all 300-some odd pages, but whether this looks like the Standard Operating Procedures Manual for the Small Business Administration?

A. It looks like it, yes.

MR. FISHMAN: And let me just interrupt, Michael. I got into the system, but there's no exhibits in the box.

MR. ROSMAN: Well, that's because you guys didn't have access. We can put exhibits in the box.

MR. FISHMAN: If you can do that, then we can share the screen, but anyway.

Please continue. I didn't mean to interrupt.

MR. ROSMAN: That's fine. That's fine.

MS. SMITH: Are we going to mark this as an exhibit.

MR. ROSMAN: No. That's okay. He identified it and said it looks like the -- I'm not going to introduce the --

THE WITNESS: This is --

MS. SCOTT: I can introduce it as an exhibit, because I have Exhibit Share, if you want me to?

MR. ROSMAN: No. That's okay.

I just want to -- I want to see if I can exit Exhibit Share more than readily than I did the last time.

THE REPORTER: I'll do it for you, Mr. Rosman.

BY MR. ROSMAN:

Q. So the version that I was showing you was dated sometime in 2020. If you go to the SBA website version that's up there, it was the one that was published in 2016, do you know why the most recent version of the standard operating procedure is not on the SBA website?

A. I don't know the answer to that. I don't think we've done a whole new version in the last few years. We've changed a few sections here and there. So maybe you need to look at that particular page where the change is and see whether or not that was changed or not. But we have not put out a whole new SOP in the last few years.

Q. Okay. Are you familiar with 408 reports?

A. Yes.

Q. Could you just identify what a 408 report is?

A. Well, it was a authorized by Section 408 of this law way back when. And it authorizes -- I mean it requires SBA to report to Congress certain types of data regarding of participants in a program, dollars, things of that sort.

Q. Does the SBA still produce 408 reports?

A. It does do it. Unfortunately, it is not up to date in doing them, but it does do them, yes.

Q. The last one that was produced to us was for fiscal year 2017. Has one been done since then?

A. I think it has not been done since then, because several years were produced, but then they had to get 508 compliant. And that stopped the process, unfortunately, and we have a contractor working on that as we speak.
Q. And so what kind of compliance did it need to get? Say it again, please.
A. 508 compliant for the blind and handicapped.
Q. And so have drafts of subsequent years' reports been made?
A. I believe that's true, yes.
Q. Do you know for what years?
A. At least two more years.
Q. So that would be fiscal year 2018 and fiscal year 2019; --
A. I think that's correct.
Q. -- is that right?
A. I think that's correct. I'm not positive, but I think that's correct.
Q. Describe for me in general terms what the respective roles of the SBA and other federal agencies are in the program of the 8(a) Business Development Program.
A. So SBA is involved in all aspects of the

program, obviously. And from certifying firms up front, again, to determining eligibility every year, to terminating firms from the program when they're no longer eligible. We're also involved in setting policies and guidance regarding contracting through the 8(a) Program. And we are involved in accepting offerings into the 8(a) Program when the procuring agency decides to procure through the 8(a) Program.
The 8(a) Program is a discretionary program. The procuring agency has the discretion to use it or not use it depending upon what meets their best needs.
Q. Okay. Does the SBA generally have partnership agreements with other federal agencies to implement the 8(a) Business Development Program?
A. Yes. And the partnership agreement, basically -- I mean, well, let me start again.
By statute SBA is the prime contractor with the procuring agency, and then SBA subcontracts the performance of the contract to 8(a)-certified firms. Through the partnership agreement, we've eliminated that process. The SBA has delegated its contract execution

functions to procuring agencies so they can contract directly with the 8(a) participant.
Q. As I understand it, though, the contracts still have to identify the SBA as the prime contractor; is that right?
A. I think that they do through the partnership agreement, but I think the contract itself does not necessarily have to do that any longer.
Q. So the contract cannot refer to the SBA; is that right?
A. I think it's depending upon the agency. Some do and some don't. I don't want to say what they do across the board because I don't think it's consistent.
MR. ROSMAN: Michelle, would you introduce the partnership agreement as an exhibit.
MS. SCOTT: Yeah. Hold on one second. The partnership agreement?
MR. ROSMAN: Yeah. Partnership AG, I think, is how it's labeled.
BY MR. ROSMAN:
Q. So I looked at a number of partnership agreements that you have on the web. Is there a

template that the SBA uses for these partnership agreement?
A. We're actually in the process of revising that agreement as we speak, and we'll have a new one in the next few months.
Q. When you say "revising that agreement," you mean the template?
A. Correct.
Q. Okay. So I just have a few questions about the general procedures involved with the 8(a) Program. Just identify the limit of sole source contracts under the 8(a) Program?
A. What do you mean by "the limit"?
Q. There's a --
A. There's a threshold --
Q. Let me rephrase the question.
A. There's a threshold above which contracts shall generally be competed and below which they are generally sole sourced, but there can be exceptions to both of those things.
Q. Right. You answered the question I should have asked. Thank you.
Is that 20 million?
A. No.
Q. What is it?

A. The NHO must demonstrate that it is serving that area, is that what you're asking?
Q. I'm asking whether the Business Opportunity Specialist checks that?
A. Yes. They check that.
Q. Okay. And what do they do?
A. They ask -- again, the applicant must demonstrate its eligibility. One of the requirements is that you serve the native community for which you are alleging that you do. And you have to demonstrate to us through your narrative why and how you are serving that community.
Q. Okay. So the size determination for applicants is different for entity-owned participants than it is for individual-owned applicants; is that right?
A. Not really, no.
Q. Well, does a entity-owned applicant need to include the revenues of an affiliate in identifying its revenues?
A. If it's an affiliate, yes. But firms owned by the entity, or the entity itself, are statutorily excluded, so they're not affiliates.
Q. Okay. Well, what would be an affiliate,

then?
A. You can have affiliates based upon other factors. So the mere fact that the ANC owns X and Joe Smith owns 400 percent of one company and owns 100 percent of another company and that company is doing all the work with each other, we can find affiliation with the other company.
Q. Okay. I didn't fully understand it.
You mean if it has common individual ownership, is that --
A. Common individual ownership, common facilities, common employees back and forth. Things of that sort can happen. And we have, in fact, found affiliation on that basis, in fact.
Q. And how frequently does that happen, that an ANC --
A. I don't know the answer to that. That's case by case. You know, if the facts show it, we would find it. If the facts don't show it, we wouldn't find it. You know, the facts presented will dictate where we look in each case.
Q. Okay. I mean, does it happen often?
A. I don't think that it happens often, no.
Q. And as I think you said before, the

mere fact that two entities are owned by the same -- I'm sorry. Let me try that again.
The mere fact that two applicants are owned by the same entity, either an ANC or an NHO, that would not be sufficient to identify those two entities as affiliates, right?
A. That's correct.
Q. And under those circumstances, the revenues of the nonaffiliated firm but commonly owned firm would not be included in the applicant's revenues, right?
A. SBA would never aggregate nonaffiliates' revenues.
Q. Okay. Even if they're owned by the same entity?
A. No matter whom they're owned by.
Q. Okay. What percentage of applications to the 8(a) Business Development Program are submitted by people who are not members of one of the presumptive groups?
A. I don't know the percentage of actual numbers. I can tell you how many are in the program currently, but I don't know -- I don't know how many apply.
Q. Okay. Well, why don't you give me that.

What is the percentage of those who are in the program currently?
A. There's about 300 firms in the program currently that are, in fact, nongroup member individuals.
Q. Okay. 300.
And how many firms are there in total?
A. About 4800.
Q. So my math isn't great. That's something like 7 percent, roughly?
A. I didn't do the math on that myself, so you can do that whenever you'd like.
Q. Thanks. I will.
And you can't tell me how -- so you can't tell me, in a given year, what percentage of applications from entity applicants owned by non --
A. I bet we could look into that and find that answer for you. I can tell you, though, that approximately 50 percent are, in fact, admitted to the program of those who apply.
Q. 50 percent of those from non -- people -- entities owned by nonpresumptive individuals?
A. That's correct.
Q. Okay. So, presumably, the 300 that are

times a year. No doubt.
Q. I'm sorry. Did you say a few times a year?
A. Yeah. Yeah.
Q. Okay. One of the bases for early graduation is an owner no longer being economically disadvantaged, right?
A. Yes.
Q. Okay. And that's also one of the bases for termination, right?
A. It is.
Q. And how does the SBA determine whether that fact warrants early graduation or termination?
A. You know, the analysis would be the same either way. And whichever way we initiate the process, if it's clear that the firm is ineligible and it is removed from the program, that, really, is all that counts in our minds. We may start as a termination and through the process we may evolve into an early graduation, if that's what the firm wants to call it.
Again, SBA is not caring what we call it. Again, we're caring about getting the firm out of the program if they're no longer eligible.

Q. Okay. So I'm going to ask a few questions about applications by groups to be considered as presumptive groups. You are familiar with those applications?
A. Yes.
Q. Okay. So let's just talk about Asian Indians at first. They had two different applications, one of which was rejected and the other which was accepted. Are you familiar with them?
A. I know that both of those things happened. Obviously, they happened a little bit before my time, but not much.
Q. Did you review these applications in preparation for your deposition?
A. I did not look at the applications themselves, no. I just knew that Asian Indians applied once, they were denied, and then they applied again. I did know that. And they got in the second time.
Q. Well, did you look at the decisions that the SBA issued with respect to those applications?
A. I didn't this time, no.
Q. I'm sorry. I wasn't quite done with my

question.
A. I did not look at them this time, no.
Q. Okay. Are you familiar with those decisions?
A. I have read them in the past.
Q. Okay. Do you know what changed between the first application and the second application to cause a different result?
A. I don't want to get confused between the different applications. Sometimes the problem is that the petition doesn't adequately demonstrate that it represents the entire group. Sometimes the petition will come in and it is not specific as to who they're talking about. So I don't remember if it's this one or a different one, which the case was in that context, but I can find that out for you.
Q. Okay. So there was several applications by women as a group, right?
A. Yes.
Q. And they were about 20 years apart; is that right?
A. Okay.
Q. And in each case the application was denied, --

A. Yes.
Q. -- correct?
Okay. And what was the rationale for denying the application in the first application?
A. The first application -- all right. Hold on a second. Let me -- so the 1982 decision, there was a long analysis that was done back in that time frame that was, again, before my time. But the determination was that the 8(a) Program was intended for traditional minority groups and should not be extended the broader class of women back in that time frame.
Q. Okay. What are you reading from, by the way, or did you just look at something to help answer that question?
A. I did.
Q. What did you look at?
A. I looked at a summary.
Q. A summary of the decision?
A. A summary of the petitions's answer, yes.
Q. I'm sorry. I didn't hear that. Could you repeat that --
A. I have a copy of a summary of those petitions of the decision in the petition.

Page 102

Q. Okay. And is that a -- did you create that summary?
A. I did not create that summary.
Q. Do you know who did?
A. It was someone who worked for me 15 years ago.
Q. Okay. Just out of curiosity, why did someone from you 15 years ago create this particular document?
A. I thought it would be nice to have a copy of all the petitions in one place.
Q. Okay. Great.
So we were up to the second application by women. And my question is, what was the rationale for denying that application?
A. That application was denied just because the deciding official at the time did not believe that they established a full prima facie case.
Q. Was there any specific deficiencies in the application that were identified?
A. It's just a matter of not presenting it -- they didn't believe that -- well, they had move of anecdotal evidence, as opposed to specific evidence, and it did not rise to the level that needed to -- the official did not

Page 103

believe at the time was sufficient.
Q. Okay. And I'm just going to ask you to -- I didn't quite hear part of the answer. You contrasted anecdotal evidence with something else, and I didn't hear whether you said specific or statistical?
A. I'm not sure what I said either, honestly.
Q. Well, let's just ask the question again.
It was anecdotal evidence as compared to what?
A. We would like to have seen more specific information as to numbers, as to discriminatory factors, as to lot of things of that sort, and I don't think that was sufficient in that case.
Q. Do you know the name of the group that made the application?
A. I don't know off the top of my head, no.
Q. It doesn't say that on the summary that you have?
A. It does not.
Q. And is that true also for the first application?
A. I don't know the name of that group either.

Page 104

Q. Okay. So Hasidic Jews made an application around 1979 and that application was denied. What was the rationale for denying that application?
A. No. That application was -- was definitely a -- it was a legal analysis prepared by the Office of General Counsel back then. I have read that, but I haven't read that in a while. And so that was, you know, based upon counsel's advice that they didn't meet the eligibility criteria.
Q. Well, do you recall anything specific that the analysis identified as a deficiency in the application?
A. It really -- at the time I think it had something more to do with we thought it would be beyond SBA's authority to establish a religious classification without Congressional authority or direction to do so.
Q. Okay. Was that because of concerns about the Establishment Clause or an absence of authority in the Small Business Act?
A. You know, I have not read that in the last few years, so I can't tell you specifically. I just remember that part of it.

Page 105

Q. You're aware that Hasidic Jews are considered a presumed group for purposes of receiving aid from the Minority Business Development Agency?
A. No, I'm not aware of that.
Q. Okay. So there have been a number of applications from disabled Americans free from slightly different groups. One of them was from disabled veterans. What was the reason for denying that application?
A. So, you know, in terms of disabled veterans, it's hard to say that it's an identifiable group. When you see someone who is disabled, do you know the -- first of all, can you identify that they are, in fact, disabled? Some disabilities are not identifiable.
Secondly, are you a disabled veteran? How do I know that you're a veteran at all by looking at you? Again, Congress has designated that it must be an identifiable feature that has caused discrimination against you. Your veteran status is not discernable by looking at you, I don't believe.
Q. Okay. Another application was by a group representing Americans with severe

disabilities. Why was that application denied?
A. Again, it all has to do with disabilities. When petitions have come in for disabilities, it has been across the board they want all disabled individuals to come into the program with any type of disability. We think that's overly-broad.
Q. Okay. So I guess just to make sure I understand it, there was one application from Americans with severe disabilities and a second application from disabled Americans. And I just wanted to make sure you understood I was referring specifically to the first of those two applications.
Would -- is it -- is it your testimony that people would necessarily -- that Americans with severe disabilities would be an overly-broad group and that was the reason why it was denied?
A. No. There was several reasons for that. The first part of it is was sometimes the petitioner doesn't adequately provide or support its statement that it represents the entire group. That was a part of that severe disabilities problem; that the group itself was not -- they didn't -- they didn't -- well, the

group was not sufficiently detailed, the petitioner failed to show it had the authority to represent the entire group, and it failed to make a showing of discrimination or prejudice of impediments in the business world in response to that. It showed disabled stats, but it doesn't show how the disability adversely affected their entry into advancement into the business world.
Q. Okay. And would the same hold true for the application by disabled Americans?
A. Yes.
Q. Okay. There was an application by Indonesian Americans that was, I guess, superseded by regulation. And my question is did the SBA decide to change the regulation or propose a change in regulation as a consequence of the application?
A. I don't remember the exact timing of that, but from time to time we have heard from, you know, groups saying, you know, country X should be included within Asian Pacific, for instance, or company Y should be included within subcontinent Asian. We added Sri Lankans after the fact. So we have heard those statements from people in general, and in response we have

changed regs when we thought that was appropriate.
Q. Okay. Let me rephrase the question, then.
Were there two different requests made of the SBA at around that time, one to include Indonesian Americans as a presumptive group, and the second to include Indonesian Americans as a subgroup of some other already-recognized presumptive group?
A. I think that is the way we believed is the way it should be, and that's the way we processed it, --
Q. You processed the --
A. -- if that's what --
Q. I'm sorry. Go ahead.
A. I mean, honestly, I'm not even sure it's appropriate to say that they applied as a petition. You know, we've identified that as such. But, in reality, it may have just have been, hey, we think we should be in this group here. And someone may have said, oh, let's call that a petition. And we thought about it and said, you're right, you should be in that group. Is that really a petition or is that just SBA

rethinking its regulations? I don't know the right answer to that question, but it was probably more informal than formal.
Q. I see. Okay. But what we have been calling a petition may have just been a request to be included as a part of the Asian Indian protected group; is that right?
A. Correct.
Q. So when a group makes an application, who within the SBA makes the determination about approving or disapproving?
A. So that was done by our associate administrator of business development, or, at the time, may have been called, as you mentioned him before, the Associate Administrator for Minority Small Business and Capital Ownership Development.
Q. Okay. So, basically, what Ms. Peebles' position is today?
A. That's correct.
Q. Okay. And it's the case that there hasn't been an application since September of 1999; is that right?
A. I have not seen one since then.
Q. Okay.
A. No, none since then.

requirement?
A. I think he should have concluded there was a new requirement.
Q. Okay. Well, how would you know that he should have concluded that this was a new requirement?
A. Because, again, what the previous contract was, compared to this contract, is vastly different in scope and size. That by itself would render this requirement a new requirement.
Q. How do you know that it's vastly different in scope and size from a previous requirement?
A. Because you said that it was under a task order under the larger contract. The task order is not what we look at in determining adverse impact. We look at the contract. The contract was a much larger contract than what's being offered here.
Q. So let me see if I understand this. When you look at the contract for determining whether or not it's a new requirement, you would look at the entire IDIQ contract; is that right?
A. That is the contract versus this

contract is one location. Again, as the example I gave before I knew where you were going, a hundred locations versus one location.
Q. Oh, I see. Well, okay, so the IDIQ is the contract, and because it -- well, let me take a step back. The IDIQ contract, in and of itself, doesn't require that the contractor do anything, does it?
A. No. But there is a estimated value of the contract, and the estimated value of that contract was significantly greater than this, whatever it was, $358,000 here.
Q. Oh, okay. So let me make sure I understand what you're saying. Because Ultima had won IDIQ contracts, which were much larger in value than any of the contracts that we've been looking at that were admitted into the 8(a) Program, all of those 8(a) contracts were necessarily new requirements; is that right?
MS. SMITH: Object. Objection. Misleading.
You can answer.
MR. ROSMAN: I'm not misleading him. I'm asking him a question.
BY MR. ROSMAN:

Q. Go ahead.
A. So, yes, the size of the underlying contract versus the size of each of the 8(a) contracts or requirements being offered to the 8(a) Program would determine whether or not that it's the same or a new requirement. Again, you know, $350,000 versus X million, whatever the case may be, is a new requirement any way we look at it under our rules.
Q. Okay. So let me just go back, then. Let's take at look at Exhibit 13.
Okay. So in this letter, which we don't know if it was sent, but assuming it was sent, the SBA concluded that there was adverse impact, this would have been a mistake, then, right?
MS. SMITH: Objection.
You can answer.
THE WITNESS: So, yes, if the district office concluded that a $300,000 or $800,000 requirement was the same as a X million dollar contract, that would be a mistake. And they should not have done an adverse impact analysis on that requirement. That's correct.
BY MR. ROSMAN:
Q. Okay. And this was -- task orders are

not contracts?
A. That's correct.
MR. ROSMAN: Okay. Michelle, I'm sorry, I sort of dropped the ball with you. Oh, wait. No, I did tell you, right, the two Missouri?
MS. SCOTT: Missouri.
MR. ROSMAN: They're there.
MS. SCOTT: 25 has the sticker in the wrong spot so go to 26. So you're at 24 and 26.
MR. ROSMAN: All right. Thank you.
(Klein Exhibit No. 24, a document Bates Numbered US0052943 through US0052945, was introduced electronically.)
(Klein Exhibit No. 25 incorrectly marked.)
(Klein Exhibit No. 26, a document Bates Numbered US0053299 through US0053300, was introduced electronically.)
BY MR. ROSMAN:
Q. Let's take a look at 24, please.
So could you identify Exhibit 24 for me?
A. This is another sole source requirement offered to SBA on behalf of a particular firm for work done in Missouri.
Q. Okay. Now, I just want you to note

Case 2:20-cv-00041-DCLC-CRW Document 61-17 Filed 06/21/22 Page 10 of 15 PageID #: 1551

ERRATA

PAGE LINE CHANGE

_ P. 11; Line 24; insert the word "the" between the words "to" and "8(a)" _ _ _ _ _ _ _ _ _ _ _ _ _ _

Reason for

Change:____Typo

PAGE LINE CHANGE

_ _ P. 13; Line 12 and Line 13; change the word "cell" to "sub" _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

Reason for

Change:____Typo

PAGE LINE CHANGE

_ _P. 17; Lines 2-3: insert the word "and" between the words "Management" and "Technical" _ _ _ _

Reason for

Change:____Typo

PAGE LINE CHANGE

_ _P. 21; Lines 17-18; change "of participants in a program, dollars," to "participants in the 8(a) program, contract dollars,". _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

Reason for

Change:_____Typo; clarity

PAGE LINE CHANGE

_ _P. 40; Lines 8-9; First sentence should read: "I'm sure there are several agencies whose goals for SDBs are greater than 5 percent." _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

Reason for

Change:____Typos

PAGE LINE CHANGE

_ _P. 54; Line 14; Change "certified.gov" to "certify.gov" _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

Reason for

Change:____Typo

Veritext Legal Solutions

PAGE LINE CHANGE

P. 59; Lines 9-10; change "but on the science part, many times it's" to "but if something is incorrect, many times it's"

Reason for

Change: Transcription error

PAGE LINE CHANGE

P. 59; Lines 17-20; sentence should read as follows: "And they do it based upon a certain size standard. Each NAICS code is assigned a corresponding size standard. So I can register as a small business for NAICS Code 123456, and as an other than small business for NAICS Code 123457, depending upon the corresponding size standard corresponding to the NAICS Code."

Reason for

Change: Typos and Clarification

PAGE LINE CHANGE

P. 60; Line 10; change the word "primary" to "apparent"

Reason for

Change: Typo

PAGE LINE CHANGE

P. 74; Lines 3-4; should read "or they look for things as to whether there are any outstanding debts or things of that sort."

Reason for

Change: Transcription error

PAGE LINE CHANGE

P. 83; Line 7; should read "Alaska", not "Alaskan"

Reason for

Change: Typo

PAGE LINE CHANGE

P. 83; Line 9; delete "or it's - -" and add the word "be" between the words "deemed to" and "owned and"

Reason for

Change: Typo

PAGE LINE CHANGE

P. 87; Line 4; change “the ANC owns X and Joe Smith owns 400 percent of one company” to “the ANC owns 51% of X and Joe Smith owns 49 percent of that company”

Reason for

Change: Typo

PAGE LINE CHANGE

P. 107; Line 22; change “company Y” to “country Y”

Reason for

Change: Typo

PAGE LINE CHANGE

P. 127; Line 13: change the word “graduate” to “graduation”

Reason for

Change: Typo

PAGE LINE CHANGE

P. 138; Line 24; Change “SDBO” to “SDVO”; change “SWB” to “WOSB”

Reason for

Change: Typos

PAGE LINE CHANGE

P. 140; Line 12; change “JCBD” to “GCBD”

Reason for

Change: Typo

PAGE LINE CHANGE

P. 140; Line 23; Change “4” to “4.5 million”

Reason for

Change: Typo/clarification

PAGE LINE CHANGE

P. 153; Line 18; change "an it" to "it an"

Reason for

Change: Typo

PAGE LINE CHANGE

P. 194; Lines 18-19; "7(j) is management technical assistance" should be changed to read "7(j) is a management and technical assistance program"

Reason for

Change: Typo

PAGE LINE CHANGE

P. 195; Line 15; Change "with grants" to "or grants"

Reason for

Change: Typo

PAGE LINE CHANGE

P. 195; Lines 22-23; Change "these contractor grantees" to "these contractors or grantees"

Reason for

Change: Typo

PAGE LINE CHANGE

P. 199; Line 18; Change "as SBA's" to "of SBA's"

Reason for

Change: Typo

PAGE LINE CHANGE

Reason for

Change:

ACKNOWLEDGMENT OF DEPONENT

I, John W. Klein, do hereby certify that I have read the foregoing pages 1 to 212 and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

6-10-22

DATE

[signature]

SIGNATURE

Subscribed and sworn to before me this ___________ day of _______________, 2022.

My commission expires:

___________________________

___________________________

Notary Public