IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION


ULTIMA SERVICES CORPORATION,    )
    )
        Plaintiff,    )
    )
v.    )   No. 2:20-cv-00041-DCLC-CRW
    )
U.S. DEPARTMENT OF AGRICULTURE,    )
et al.,    )
    )
        Defendants.    )


**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Ultima Services, Inc. ("Ultima") is a federal government contractor that alleges that the 8(a) Business Development Program ("8(a) program"), and in particular the presumption of social disadvantage for certain minority small business owners, violates its rights under the equal protection component of the Fifth Amendment to the Constitution. The 8(a) program has twice faced this exact challenge and passed constitutional muster. *See Rothe Dev., Inc. v. Dep't of Def. (Rothe IV)*, 107 F. Supp. 3d 183 (D.D.C. 2015), *aff'd on other grounds*, 836 F.3d 57 (D.C. Cir. 2016); *DynaLantic Corp. v. U.S. Dep't of Def.*, 885 F. Supp. 2d 237 (D.D.C. 2012). The legal standard for evaluating race-conscious remedial action remains the same as in these past cases, and the evidence supporting the 8(a) program is even stronger today. Accordingly, the Court should grant Defendants' motion for summary judgment and keep this important program in place.

Congress enacted the 8(a) program in 1978 to provide assistance to small businesses owned and controlled by socially and economically disadvantaged individuals. It is designed to allow businesses that have been impeded by discriminatory barriers to receive temporary training, management, and federal contracting opportunities so they can compete effectively in the American economy without assistance. The 8(a) program is open to businesses owned by socially and economically disadvantaged persons of any race; however, Congress expected that the majority of qualifying firms would be small businesses owned and operated by certain racial and ethnic minorities. This was based on Congress's findings that "Black Americans, Hispanic Americans, Native Americans, and other minorities" faced discriminatory barriers in many business arenas and thus were socially disadvantaged. Consequently, the Small Business Administration ("SBA") promulgated a regulation providing that members of certain racial and ethnic groups are entitled to a rebuttable presumption of social disadvantage. 13 C.F.R. § 124.103(b)(1). Supreme Court precedent makes clear that the government can employ such

remedial race-based measures within constitutional constraints where, as here, it is necessary to further the compelling interest of remedying "[t]he unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country" and where such action is narrowly tailored to meet that interest. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 237 (1995). The 8(a) program is both.

## BACKGROUND[1]

### I. Overview of the 8(a) Business Development Program

Congress enacted the Small Business Act of 1953 ("the Act"), to "aid, counsel, assist and protect . . . the interests of small-business concerns in order to preserve free competitive enterprise" and to ensure a "fair proportion" of government contracts go to small businesses. 15 U.S.C. § 631(a). The Act requires federal agencies to reserve certain contracts for small businesses. *Id.* § 644(j)(1). It also includes programs that create contracting preferences for specific types of small businesses, including those owned and controlled by women ("WOSB"), *id.* § 637(m); small businesses owned and controlled by service-disabled veterans, *id.* § 657f; small businesses located in historically underutilized business zones, *id.* § 657a; and small businesses owned and controlled by "socially and economically disadvantaged" individuals, *i.e.*, the 8(a) program, *id.* § 637(a).

The 8(a) program provides contract, financial, technical, and management assistance to promote eligible small businesses. *Id.* § 631(f)(2). Contracts awarded through the 8(a) program may be awarded competitively with other 8(a) firms or may be reserved for a particular firm (*i.e.*, sole source awards). 13 C.F.R. § 124.501(b). The Act contains no quotas, but instead creates an aspirational goal for the federal government to spend at least five percent of its contracting dollars with businesses owned by socially and economically disadvantaged individuals, which is not

---

[1] Defendants fully incorporate their Statement of Undisputed Material Facts ("SOF").

limited to businesses in the 8(a) program. *See* 15 U.S.C. § 644(g)(1)(A)(i), (iv).

Eligibility for the 8(a) program is limited to small businesses that are at least 51 percent unconditionally owned and controlled by one or more U.S. citizens of good character who are "socially and economically disadvantaged" and who demonstrate a potential for success in competing in the private sector.[2] *Id.* at § 637(a)(4)(A), (7)(A). Socially disadvantaged individuals are "those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities" and due to "circumstances beyond their control." *Id.* at § 637(a)(5). An SBA regulation provides a rebuttable presumption of social disadvantage for members of certain groups, including Black Americans, Hispanic Americans, Native Americans, Asian Pacific Americans, and Subcontinent Asian Americans. 13 C.F.R. § 124.103(b)(1). This presumption may be rebutted with "credible evidence to the contrary." *Id.* at § 124.103(b)(3). Individuals who are not members of one of these groups may demonstrate social disadvantage by submitting evidence that shows, by a preponderance of the evidence, that a distinguishing characteristic has contributed to substantial social disadvantage, which has limited their entry or advancement in the business world. *Id.* § 124.103(c)(1)-(2).

Applicants for the 8(a) program also must meet the standard for economic disadvantage. An economically disadvantaged individual is one whose "ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged." 15 U.S.C. § 637(a)(6)(A). To evaluate economic disadvantage, the SBA considers the personal financial condition of the individual claiming disadvantaged status, including income, net worth, and the fair market value

---

[2] Also eligible to participate in the 8(a) program are small businesses owned by Alaska Native Corporations, Community Development Corporations, Indian Tribes, and Native Hawaiian Organizations. 13 C.F.R. § 124.109-111.

3

of all assets. 13 C.F.R. § 124.104(c). Participation in the 8(a) program is limited to a maximum of nine years, *see id.* § 124.2, but participants graduate from the program earlier if they achieve certain business goals. *Id.* § 124.302(a)(1)-(2). Participants also must certify annually that they continue to meet program requirements and provide financial and other information to allow the SBA to verify continued eligibility. *See* 15 U.S.C. § 637(a)(4)(C), (6)(B); 13 C.F.R. § 124.112.

## II.  <u>General Background</u>

Ultima is a corporation owned by Celeste Bennett that provides services to the federal government by recruiting staff to fill positions in a variety of industries. Compl. ¶ 3; SOF ¶ 3. Until 2022, Ultima was a fully-owned subsidiary of Lusa Associates, Inc. ("Lusa"), another company owned by Ms. Bennett, which also provides services in the public sector. SOF ¶¶ 1-2; Ex. 1, Pl. Supp. Resp. First ROGs ¶ 4. Ultima has provided services as varied as alarm monitoring, crossing guards, postal services, and administrative support. Ex. 2, Bennett dep. 44:18-45:2; 69:1-9; 126:4-15; 129:6-9. In 2004, Ultima earned its first administrative services contract with the Natural Resources Conservation Service ("NRCS"), an agency of the U.S. Department of Agriculture ("USDA"). *Id.* at 126:21-127:3. In 2017, NRCS awarded four IDIQ[3] contracts to Ultima for administrative support services in four regions covering most of the United States. Compl. ¶ 8. Each IDIQ had a one-year base period and four one-year option periods, with a $2 million ceiling price for each year, and a total value of $10 million. Bennett dep. 139:21-140:16. As soon as the IDIQs were in place, it was clear the demand for administrative services from NRCS's field offices far exceeded expectations; in approximately one year, two of the four contracts had exercised all four options and were approaching their $10 million ceiling—an amount expected to last five

---

[3] An IDIQ (Indefinite Quantity Indefinite Delivery) is a contract vehicle through which an agency can issue multiple task orders to perform work. Bennett dep. 138:19-139:3.

4

years. Ex. 3, Atkinson dep. 208:21-209:21; SOF ¶ 7.

To prevent gaps in service, NRCS decided that soliciting administrative services contracts using a state-based model would "yield the lowest overall cost," "afford[] easier access to more localized small business vendors," and "reduce the workload of the . . . contracting services branch." SOF ¶ 8. As a result, NRCS stopped exercising task orders against the IDIQs, although any open task orders continued until they reached the end of their period of performance or the funds obligated to them were exhausted. Ex. 5, Stonebraker dep. 63:14-22. This decision was based on program efficiencies, not expanding the 8(a) program. SOF ¶¶ 7-9. While some of the requirements for services that Ultima had performed under the IDIQs were awarded through the 8(a) program, many were not. NRCS contracts in the same category of services valued at over $10 million were awarded to Lusa.[4] SOF ¶ 11. At least $10.8 million of the new contracts were solicited either through full and open competition or through competition among all small businesses, including through the GSA's Federal Supply Schedule Program, for which any small business is eligible and must only register to participate. SOF ¶ 13; Stonebraker dep. 102:7-103:21. Ultima has never registered for this program. SOF ¶ 14.[5]

In total, Ultima has earned over $37 million in revenue from USDA contracts since 2015. SOF ¶ 4. At varying points in recent years, Ultima's revenue exceeded the threshold to qualify as a small business, including when it filed this lawsuit. *Id.* ¶ 6. Despite these successes, and a corporate structure outside of the qualifications of the 8(a) program, Plaintiff brought this action alleging that the existence of the rebuttable presumption of social disadvantage in the 8(a) program

---

[4] Both before and after Ultima's reorganization in 2022, Ultima and Lusa's affiliation means that their revenues are combined in determining the value of either company. *See* 13 C.F.R. § 121.103(a)(1); Bennett dep. 212:7-19.

[5] Ultima also has never applied for the 8(a) program. Bennett dep. 249:17-19. As a subsidiary of Lusa, it was ineligible because it was not owned by an individual. 13 C.F.R. § 124.105(a).

5

violates its right to equal protection under the Fifth Amendment, both facially and as applied. Compl. ¶¶ 41, 44, 46.

## **LEGAL STANDARD**

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one identified by the substantive law as affecting the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A genuine dispute exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Because the presumption of social disadvantage includes a racial classification, it is subject to strict scrutiny, which means it must be narrowly tailored to further a compelling governmental interest.[6] *See Adarand*, 515 U.S. at 227. The government "bears the initial burden of demonstrating" that the program is constitutional. *Rutherford v. City of Cleveland*, 179 F. App'x 366, 373 (6th Cir. 2006) (quoting *Associated Gen. Contractors of Ohio v. Drabik*, 214 F.3d 730, 735 (6th Cir. 2000)). Once the government has satisfied that burden by presenting evidence, the burden shifts to the plaintiff to prove its unconstitutionality. *See id.*; *Aiken v. City of Memphis*, 37 F.3d 1155, 1162 (6th Cir. 1994) ("The party challenging the [race-based affirmative action] plan,

---

[6] Absent the regulation's presumption, Section 8(a) of the Act itself is subject to rational basis review because it does not contain a racial classification. *See Rothe*, 836 F.3d at 62, 450 (finding that "the provisions of the Small Business Act that Rothe challenges [Section 8(a)], do not on their own classify individuals by race" and noting that "both the Supreme Court and this court's discussions of the 8(a) program have identified the regulations—not the statute—as the source of its racial presumption") (*citing Adarand*, 515 U.S. at 207). In *Rothe*, the Court of Appeals applied rational basis review because the plaintiff challenged only the statute, not the SBA regulation containing the presumption. *Id.* at 73. Rational basis review requires only that the challenged action "bears a rational relation to some legitimate end." *Romer v. Evans*, 517 U.S. 620, 631 (1996). The statute easily survived this review because "[c]ounteracting discrimination is a legitimate end . . . and the statutory scheme is rationally related to that end." *Rothe*, F.3d at 73. Plaintiff can provide no evidence or argument that would alter this conclusion.

6

however, retains the ultimate burden of proving its unconstitutionality.").

Here, the rebuttable presumption in the 8(a) program survives strict scrutiny both facially and as-applied because the government had, and continues to have, a strong basis in evidence to support the rebuttable presumption and the program is narrowly tailored. Plaintiff has not met its burden to prove otherwise. In addition, Plaintiff has not, as a matter of law, established standing to challenge the program facially or as-applied to the contracts USDA awarded through the 8(a) program in the "administrative and technical support industry."

## ARGUMENT

### I. The 8(a) Program Survives Strict Scrutiny

To the extent the rebuttable presumption includes race-conscious criteria, it is subject to strict scrutiny. *Adarand*, 515 U.S. at 227. Although strict scrutiny is a demanding standard, the Supreme Court has "dispel[led] the notion" that it is "strict in theory, but fatal in fact." *Id.* at 237. To demonstrate a compelling interest for a race-conscious remedy, the government must show that it is intended to remedy past intentional discrimination the government played a role in, even as a passive participant. *See Vitolo v. Guzman*, 999 F.3d 353, 361 (6th Cir. 2021).

For the 8(a) program, there is substantial evidence that the government had a compelling interest in using a limited race-conscious remedial measure to remedy discrimination that has affected the ability of particular minority groups to compete equally for federal contracts. Plaintiff cannot produce the "credible, particularized evidence" necessary to create a dispute of fact as to the government's compelling interest for the 8(a) program. *See Adarand Constrs, Inc. v. Slater (Adarand VII)*, 228 F.3d 1147, 1174 (10th Cir. 2000); *accord Concrete Works of Colo., Inc. v. City & Cnty. of Denver (Concrete Works VI)*, 321 F.3d 950, 958 (10th Cir. 2003).

7

## A. Congress Has a Compelling Interest in Remedying Discrimination

"There is no question that remedying the effects of past discrimination constitutes a compelling governmental interest." *Drabik*, 214 F.3d at 735. This includes not only discrimination perpetrated by Defendants, or even by the federal government in general, as the Sixth Circuit has recognized that "[i]t is clear that a government 'has a compelling interest in assuring that public dollars . . . do not serve to finance the evil of private prejudice." *Id.* at 734-35 (quoting *Croson*, 488 U.S. at 492). Thus, the government can act to ensure it does not "become a passive participant in a system of racial exclusion." *Croson*, 488 U.S. at 492; *see also Vitolo*, 999 F.3d at 361; *DynaLantic*, 885 F. Supp. 2d at 252. The 8(a) program was enacted to remedy specific, well-documented discriminatory practices that have prevented minority business owners from accessing capital and credit and competing equally in the free market, in the industries in which Plaintiff operates and across the economy. Further, undisputed evidence shows that the federal government is, at the very least, a passive participant in this long-standing system of racial exclusion.

## B. A Strong Basis in Evidence Supports the 8(a) Program

To survive strict scrutiny, Defendants must show that the government had "a strong basis in evidence" to conclude that race-based action was needed to further the compelling interest in remedying discrimination that has impeded the ability of minority business enterprises ("MBEs") to compete equally. *Croson*, 488 U.S. at 500. Defendants need not "conclusively prove the existence of past or present racial discrimination to establish a strong basis in evidence." *H.B. Rowe Co., Inc. v. Tippett*, 615 F.3d 233, 241 (4th Cir. 2010); *see also Midwest Fence*, 840 F.3d 945; *Concrete Works VI*, 321 F.3d at 958. Rather, a "strong basis in evidence" is that "approaching a prima facie case of a constitutional or statutory violation." *Croson*, 488 U.S. at 500.

Because it is well-settled that "[t]he Equal Protection Clause forbids only intentional

8

discrimination," Defendants must present evidence of intentional discrimination in the marketplace. *Horner v. Ky. High Sch. Athletic Ass'n*, 43 F.3d 265, 276 (6th Cir. 1994) (citing *Washington v. Davis*, 426 U.S. 229 (1976)). A litigant can demonstrate "a claim of intentional discrimination using either direct *or* circumstantial evidence." *Foster v. Mich.*, 573 F. App'x 377, 392 (6th Cir. 2014) (emphasis added); *see also Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 534 (6th Cir. 2002). It is well-settled that statistical evidence is one type of circumstantial evidence that may be used for this purpose. *Aiken*, 37 F.3d at 1163. In this context, "[w]here there is a significant statistical disparity between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors actually engaged by the locality or the locality's prime contractors, an inference of discriminatory exclusion could arise." *Croson*, 488 U.S. at 509; *see also Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) ("[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the [practice] bears more heavily on one race than another."). This was recently reaffirmed by the Sixth Circuit. *Vitolo*, 999 F.3d at 361 (noting that "statistical disparities . . . may be used as evidence to establish intentional discrimination"). While the *Vitolo* court made clear that "broad statistical disparities," are insufficient, statistical disparities do support an inference of discrimination when combined with evidence of past discrimination in which the government has actively or passively participated. *Id*. at 361-62. As Ultima challenges the 8(a) program on its face and as-applied to the "administrative and technical support industry," Defendants address each type of evidence in turn.

### 1.    Facial challenge

"A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which

9

the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also Aronson v. City of Akron*, 116 F.3d 804, 809 (6th Cir. 1997); *Dean v. McWherter*, 70 F.3d 43, 45 (6th Cir.1995) ("As plaintiffs bring a facial challenge to the statute, it must be rejected unless there exists no set of circumstances in which the statute can constitutionally be applied."). Facial challenges are disfavored by the Supreme Court "for several reasons," including that they "'run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.'" *Rothe*, 107 F.Supp.3d at 206 (citing *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008)). Plaintiffs cannot meet this heavy burden.

      a.      **Congress had a strong basis in evidence when it enacted the 8(a) program and when it amended it to its current form**

The Sixth Circuit requires the government to have had a strong basis in evidence at the time the program was enacted. *See Rutherford*, 179 F. App'x at 376; *Drabik*, 214 F.3d at 737. As courts considering this issue have consistently held, the legislative history of the 8(a) program amply demonstrates that Congress had a strong basis in evidence to conclude that a race-conscious remedy was necessary prior to its enactment, including specific findings as to discrimination faced by members of the presumptively-disadvantaged minority groups. *See, e.g.*, SOF ¶¶ 23-28; *Rothe*, 107 F.Supp.3d at 208; *Dynalantic*, 885 F. Supp. 2d at 272. Crucially, "Congress's fact-finding process is generally entitled to a presumption of regularity and deferential review." *DynaLantic*, 885 F. Supp. 2d at 251. The question is whether there was sufficient evidence for Congress to conclude that a remedial measure was warranted. *See Wygant*, 476 U.S. at 277.

The federal government's efforts to assist minority entrepreneurs began as the result of the 1967 Report of the Commission on Civil Disorders, which investigated civil disorders in inner

10

cities. S. Rep. No. 95-1070, at 14 (1978). The Commission found that disadvantaged individuals did not play a substantial role in America's free enterprise system, and recommended that the federal government take steps "to increase the level of business ownership by minorities so that they would have a better opportunity to materially share in the competitive free enterprise [system]." *Id*. As a result, beginning in 1968, the SBA used its then existing Section 8(a) authority, by regulation, to provide opportunities for businesses owned by "socially or economically disadvantaged persons" to obtain federal procurement contracts. *Id*. at 13.

Before the legislative enactment of the 8(a) program in 1978, Congress repeatedly explored the unique problems MBEs faced as a result of discrimination. It consistently found that MBEs lacked access to capital, bonding, and business opportunities—all of which Congress attributed to discrimination. For example, a 1972 congressional report noted that racial prejudice has "presented almost insurmountable obstacles to business development" that poses a "unique dilemma" for MBEs compared to challenges facing all small business owners. H.R. Rep. No. 92-1615, at 18-19 (1972). Two of the most serious problems identified for MBEs were the lack of access to capital due to discrimination in the banking industry and the lack of business experience due to discrimination limiting MBEs' access to opportunities. *Id*. at 3-4. A 1975 congressional report cited troubling statistics for MBEs, which it attributed to "the effects of past inequities stemming from racial prejudice." H.R. Rep. No. 94-468, at 1-2 (1975). It also took notice of a May 1975 report by the U.S. Commission on Civil Rights regarding barriers faced by MBEs in government contracting, which found that contracting officers often exhibited bias toward MBEs, expressing beliefs that they are "inefficient, sloppy, lacking in business acumen and knowledge of government processes, or are 'just a lot of extra bother.'" U.S. COMM'N ON CIVIL RIGHTS, MINORITIES AND WOMEN AS GOVERNMENT CONTRACTORS, at 20 (1975). In assessing challenges like these, the

11

report noted that "there has developed a business system which has traditionally excluded measurable minority participation . . . [and] because of past overt social and economic discrimination is presently operating, in effect, to perpetuate these past inequities." H.R. Rep. No. 94-840, at 17 (1976). In 1978, Congress found that the 8(a) program had "fallen far short of its goal to develop strong and growing disadvantaged small businesses," and turned toward providing a legislative basis for the program. S. Rep. No. 95-1070, at 14. In codifying the 8(a) program, Congress specifically determined that "Black Americans, Hispanic Americans, Native Americans, and other minorities" were socially disadvantaged. SOF ¶ 25.

In the next decade, Congress heard additional testimony about the effects of discrimination on MBEs, including "outright blatant discrimination directed at disadvantaged and minority business people by majority companies, financial institutions, and government at every level." *Small and Minority Business in the Decade of the 1980s (Part 1): Hearings Before the H. Comm. on Small Bus.*, 97th Cong. 106 (1981). The testimony described numerous obstacles for MBEs, including discrimination by suppliers, unequal access to financing, exclusionary business networks, and racism in the business community. *Id*. Congress also expressed ongoing concern with disparities indicating the presence of discriminatory barriers to business formation, development, and success, and with the fact that federal data indicated that "[s]mall businesses owned and controlled by socially and economically disadvantaged individuals (most of whom are minority) receive a disproportionately small share of Federal purchases." H.R. Rep. No. 100-460, at 18 (1987). The report concluded these disparities were "not the result of random chance." *Id*. Based on these findings, Congress amended the 8(a) program in 1988 to focus "on its original statutory objective . . . to boost minority ownership of small businesses that can compete in a competitive market." *Minority Business Dev. Prog. Reform Act of 1987: Hearings Before the S.*

*Comm. on Small Bus.*, 100th Cong. 18 (1988) (statement of Sen. Sasser).

### b. Recent evidence continues to support the 8(a) program

Evidence before Congress in the years since the 8(a) program's amendment demonstrates that minorities continue to face discriminatory barriers. SOF ¶¶ 37-43. The Sixth Circuit has not definitively addressed the relevance of post-enactment evidence where, as here, the government has shown a strong basis in evidence prior to enactment; however, every circuit that has done so has held that it is admissible to demonstrate the constitutionality of a government program. *W. Tenn. Chapter of Assoc. Builders & Contractors, Inc. v. Bd. of Educ. of the Memphis City Sch.*, 64 F. Supp. 2d 714, 718 (W.D. Tenn. 1999) (citing circuit court cases).[7]

Since 2010, over 200 disparity studies, other reports and studies, and congressional testimony document discrimination that has affected the ability of MBEs to compete equally for government contracts.[8] Ex. 10, DOJ Report (Appendices). Defendants present three meta-analyses that summarize and analyze this voluminous congressional and public evidence. First, Defendants' expert Dr. Jon Wainwright has analyzed over 200 disparity studies and other statistical evidence that shows that MBEs face significant disparities in public and private contracting markets, and he concludes that these disparities are consistent with discrimination. Ex. 11, Wainwright Report, at 7-8, 81. Second, in 2022, the Department of Justice ("DOJ") published in the federal register a

---

[7] Even if the Court does not consider such evidence as part of the strong basis in evidence analysis, the Sixth Circuit considers post-enactment evidence in connection with the narrow tailoring analysis to show the necessity for the program. *See Drabik*, 214 F.3d at 737. Moreover, "post-enactment evidence may certainly be considered in determining whether a racial classification is constitutional as applied," *Rothe Dev. Corp. v. U.S. Dep't of Def.*, 262 F.3d 1306, 1325 (Fed. Cir. 2001), because Congress cannot anticipate every scenario in which a nationwide program might be utilized.

[8] Just since 2015, almost 100 of these disparity studies have been considered by Congress. 167 CONG. REC. S5898-99 (daily ed. August 5, 2021) (statement of Sen. Tom Carper).

13

report compiling and summarizing recent evidence of discriminatory barriers that impede participation by racial minorities in government contracting.[9] Ex. 10, DOJ Report. Third, a 2016 report by the U.S. Department of Commerce's Minority Business Development Agency ("MBDA") reviewed and analyzed approximately 100 disparity studies. Ex. 12, MBDA Report. In addition, Defendants' other expert, economist Daniel Chow, identified disparities in federal government contracting and conducted an analysis that eliminated potentially non-discriminatory reasons for the disparities. Ex. 13, Chow Report As detailed in these reports, and the substantial evidence they analyze, significant evidence of intentional discrimination affecting the ability of MBEs to compete on an equitable basis for federal government contracts continues to support the constitutionality of the 8(a) program.

### i. Disparity studies provide persuasive quantitative and qualitative evidence of discrimination

Since *Croson*, state and local governments have regularly commissioned disparity studies to determine whether racial discrimination exists in their contracting markets sufficient to justify race-conscious remedial action.[10] A disparity study compares the utilization of MBEs by public contracting entities with their availability in a given market and also compiles statistical and anecdotal evidence of discrimination that might explain such disparities. Ex. 11, Wainwright

---

[9] The DOJ Report has been considered by Congress. *See* 168 Cong. Rec. E619-20 (daily ed. June 14, 2022) (statement of Rep. Maloney). The 2022 report updated and expanded upon a 2010 DOJ Report on the same topic, which also was considered by Congress and cited in federal court as evidence of a compelling government interest in the use of race-conscious measures to support the ability of people of color to compete on an equal basis. *See Midwest Fence Corp. v. United States Dep't of Transp.*, No. 10 C 5627, 2011 WL 2551179, at *12 (N.D. Ill. June 27, 2011).

[10] Defendants rely on more then 200 disparity studies, each of which can be hundreds of pages long (and all of which have been produced to Plaintiff during discovery). Defendants provide as Exhibit 14 a list of the studies along with links to the documents rather than filing thousands of pages of documents. Defendants can, at the Court's request, provide copies of any of the referenced studies.

14

Report, at 14, 18, 19. Dividing utilization percentage by availability percentage results in a disparity index. A disparity index of 100 indicates that the utilization of a particular category of businesses is equivalent to the availability of those businesses in the relevant market. As a general rule, a disparity index of less than 80 (meaning utilization is less than four fifths of what would be expected based on availability) indicates a substantial disparity. *Uniform Guidelines on Employee Selection Procedures*, 29 C.F.R. § 1607.4 (D); *Connecticut v. Teal*, 457 U.S. 440, 443 n.4 (1982).

Of course, "[t]he presence of substantial disparities does not in itself indicate that discrimination is the cause of the observed disparities." DOJ Report, at 19. But disparity studies consist of much more than simply the "broad statistical disparities" the Sixth Circuit found were "not nearly enough" to show discrimination on the limited record available in *Vitolo*. 999 F.3d at 361. They include additional evidence and statistical methods that tie the disparities to discrimination, including regression analyses,[11] statistical significance, which eliminates the possibility that the disparities could be due to random chance, and surveys, interviews, and other qualitative evidence that documents the personal accounts of business owners and identifies the discriminatory barriers that contribute to much of the disparities. Wainwright Report at 17-19; MBDA Report at vi-vii. Given the rich body of quantitative and qualitative evidence they provide, it is unsurprising that courts consistently find that disparity studies provide persuasive evidence of discrimination and its continuing effects. *See, e.g., Assoc. Gen. Contractors of Am., San Diego Chapter, Inc. v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1196 (9th Cir. 2013); *H.B. Rowe Co.*, 615 F.3d at 257; *Adarand VII*, 228 F.3d at 1174; *Midwest Fence*, 84 F. Supp. 3d at 727; *Rothe*, 107 F.

---

[11] Regression analysis is a statistical technique allowing the comparison between certain outcomes, such as the level of wages, the extent of business formation, the level of business earnings, or the extent of loan denials, and minority status, while holding other, potentially non-discriminatory factors . . . constant." Wainwright Report at 18, n.28.

Supp. 3d at 209-10; *DynaLantic*, 885 F. Supp. 2d at 267.

Dr. Wainwright reviewed and analyzed 205 disparity studies produced by state and local government agencies between 2010 and 2021, covering 32 states and the District of Columbia, which combined account for approximately $710 billion in public spending. Wainwright Report at 14, 21. The studies examine procurement representing practically every industry segment in the United States economy. *Id*. at 22. The similarities across the results are striking: in the overwhelming number of procurement markets, MBEs are significantly underutilized compared to their availability. In sum, out of 4,327 disparity indexes analyzed, 80% were adverse (*i.e.*, MBEs were utilized at less than their availability, or 100), 74% were large and adverse (*i.e.*, less than 80), and, of these, the median disparity index was just 18. *Id.* at 29. Significantly, these disparities exist even though many of the studies test for disparities on contracts already subject to race-conscious contracting goals or requirements. *Id.* at 17. Similar findings resulted across all major industries and for every minority group. SOF ¶¶ 29-31. Moreover, when Dr. Wainwright limited his analysis to studies published since 2017, the numbers did not improve. *Id*. ¶ 32. The 2016 MBDA report reached similar conclusions: an analysis of 100 disparity studies found that over 78% of the observed disparity ratios fell below the .80 threshold signifying a "substantial" disparity, and the median value for the observed disparities was just .19. MBDA Report, at 35. The report further found that the disparity studies reviewed "provided specific, verifiable instances of discrimination which were recorded, catalogued, and analyzed using content analysis." *Id.* at vii.

Dr. Wainwright also analyzed how MBEs fare in the overall U.S. economy, to determine whether the federal government is passively participating in private sector discrimination. Wainwright Report at 39. Using data from the two national surveys dedicated to MBEs, he found "a consistent pattern of large, adverse, and statistically significant disparities in the performance

16

of MBEs across all major industry sectors and for every minority group." *Id.* at 7-8.[12] Next, Dr. Wainwright tested the likelihood that race-neutral factors could account for the substantial disparities observed in his other analyses using regression analysis to control for numerous independent variables that are indicators of qualifications and capacity. *Id.* at 58-59. He concluded that the "large, adverse, and statistically significant disparities facing [MBEs] in the United States . . . cannot be adequately explained by differences between the relevant populations in factors untainted by the effects of discrimination." SOF ¶ 29. Plaintiff cannot provide specific, credible evidence to dispute this conclusion or the overwhelming evidence on which it is based. Moreover, Dr. Wainwright's analysis of the quantitative findings of the disparity studies are corroborated by significant qualitative evidence of discrimination, making these findings much more than simply "broad statistical disparities," as discussed next.

### a.   Discrimination limits access to contracting markets

One of the barriers to equal participation by MBEs arises from "outright prejudicial treatment, attitudes [and] stereotypes" by procurement agencies and prime contractors. MBDA Report, at 54. Disparity studies are replete with examples of such discriminatory treatment. *Id.* at 63 ("Instances of outright discrimination permeated the anecdotal summaries of the disparity studies reviewed in this research."). For instance:

- In a 2018 disparity study commissioned by the City of New Orleans, a business owner reported an instance of a federal agency revoking his contract once it was discovered he was a minority, directly saying to him that they did not want an "'n-word' to have the job." Ex. 14, Disparity Studies, at 9.

- In a 2020 disparity study conducted for the City of San Diego, a Black owner of a towing service firm stated, explained: Is there language that is used that's saying 'I'm

---

[12] The U.S. Census Bureau's *Survey of Business Owners and Self-Employed Persons* and its *Annual Business Survey* provide evidence regarding how MBEs fare in the economy. *Id.* at 39. Dr. Wainwright also used data from the Census Bureau's *American Community Survey 5-year Public Use Microdata Sample* to conduct regression analyses. *Id.* at 58.

not using a ["n-word"] tow company?' Yes, that happens. I'm told, but I don't go. I don't do it because I need the work, I need to earn money. If I'm going to earn any money, I've got to send an ambassador to represent our company." *Id.* at 2.

- In a 2015 disparity study conducted in Arizona, a Black business owner explained: "I have seen everything from looks to gestures, hearing the 'n-word' and different things from Hispanics to whites. . . . Getting your truck sprayed, different things like tearing checks open [to] see what you make, or you are blocked off a job because you are the only woman or African American out there.'" *Id.*

Similarly, examples of double standards to which MBEs are held abound:

- In a 2016 study for the City of Cincinnati, a minority business owner reported that "[s]ome City managers will require me as a minority-owned business to do work that was not required of others doing similar work. . . . I have seen other jobs where the work was not nearly as professional as mine but they did not have to redo it." *Id.* at 16.

- In a 2012 disparity study for the City of Pensacola, a Black specialty contractor relayed a situation in which he was the low bidder for a contract and was required to provide bonding, but while he was acquiring a bond, he learned that another contractor received the contract and was not required to have bonding on the project. *Id.* at 5.

And exclusionary networks frequently deprive MBEs of contracting opportunities. The 2016 MBDA Report found that networking barriers are the most frequently cited barriers identified by MBEs. MBDA Report, at 54-55. While it sometimes can be difficult to identify *direct* evidence that ties instances of exclusionary networks to discrimination, "considering many of these longstanding business and social connections have developed in environments that have historically excluded minorities and women, it is difficult to ignore the discriminatory foundation for such networks." DOJ Report, at 24. The lingering effects of these discriminatory practices from the not-so-distant past continue to have enormous impact on the ability of MBEs to compete equally for government contracts. As the Black co-owner of a professional services firm noted in a 2019 disparity study, he is from the generation that "sat at the back of the bus" and some of his White peers are in charge now and still have that old mentality. Disparity Studies, at 12.

18

b. Discrimination limiting access to capital affects the
<u>formation and development of MBEs</u>

Evidence before Congress also has consistently shown that minority business owners have far less access to capital and credit than non-minority business owners due to "racial discrimination in lending markets." *See, e.g.*, *Assessing Access: Obstacles and Opportunities for Minority Small Business Owners in Today's Capital Markets: Hearing before S. Comm. on Small Bus. and Entrepreneurship*, 111th Cong. 170-71 (2010) (statement of Robert Fairlie); *Closing the Gap: Exploring Minority Access to Capital and Contracting Opportunities: Hearing Before the S. Comm. on Small Bus. and Entrepreneurship*, 111th Cong. 24-31 (2011) (testimony of Robert Fairlie). Minority business owners are disadvantaged at the outset due to the enormous wealth gap between White and non-White families, making it difficult to access the necessary capital to start and grow a business. *See, e.g.*, *Examining the Racial and Gender Wealth Gap in America: Hearing Before Subcomm. on Diversity and Inclusion of the H. Comm. on Financial Servs.*, 116th Cong. (2019) 5, 105 (statement of Kilolo Kijakazi). This gap is not solely the result of broad and generalized discrimination in society. In 2021, Congress received testimony that this wealth gap is at least partially attributable to historical discriminatory government practices, including federally-sanctioned redlining, denial of the benefits of the G.I. Bill to Black veterans, racial zoning practices, and the long-term effects of Jim Crow-era tax policies. SOF ¶ 39.

As a result of the wealth gap caused by these and other discriminatory programs, minority business owners are especially reliant on loans—but they are far less likely than White male business owners to obtain them. MBEs are two to three times more likely to be denied credit and more likely to receive smaller loans and pay higher interest rates on the loans they do receive. *Strengthening Access to Capital for Minority-Owned Small Business: Field Hearing Before the S. Committee on Small Bus. and Entrepreneurship*, 115th Cong. 78 (2018). A 2017 disparity study

19

found that discrimination against African American-owned small businesses was "particularly acute," as loan denial rates remained substantially higher than for nonminority male-owned small businesses, even after adjusting for differences in assets, liabilities, and creditworthiness. Disparity Studies, at 10. An example of this disparity is borne out by the Plaintiff. Not only did Ms. Bennett purchase Ultima with a $20,000 interest-free loan from her father, but when she quickly needed credit to expand her business, she received credit from her father's business as well as hundreds of thousands of dollars of interest-free credit from her father and her own personal funds to grow Ultima. Bennett dep. 77:13-78:9; 236:20-237-18; 238:8-239:12; 240:12-241:18. The 8(a) program was established to help businesses owners who cannot rely on this type of generational wealth.

### ii. Studies show discrimination in federal contracting

Although the government need not have *actively* participated in discrimination to justify the use of remedial measures, Defendants also provide evidence of discrimination in federal contracting, further justifying the use of race-conscious remedial measures in the 8(a) program. *Vitolo*, 999 F.3d at 361 (noting that "if the government 'show[s] that it had essentially become a "passive participant" in a system of racial exclusion practiced by elements of [a] local . . . industry,' then the government can act to undo the discrimination") (*quoting Croson*, 488 U.S. at 492).

Using federal contracting data from April 2019 to August 2020, economist Daniel Chow utilized statistical analyses to determine whether small disadvantaged businesses (SDBs) were more or less likely to win federal contracts relative to other small businesses. Chow Report at 2. Modeled after a similar study conducted by Dr. Robert Rubinovitz in 2012,[13] Mr. Chow's analysis

---

[13] Dr. Rubinovitz's 2012 study was relied upon by another federal court in upholding the constitutionality of the 8(a) program and presented to Congress *See Rothe*, 107 F.Supp.3d at 208; *Closing the Wealth Gap: Empowering Minority-Owned Business to Reach Their Full Potential for Growth and Job Creation*, Hearing Before the S. Comm. on Small Business & Entrepreneurship, 1134th Cong. (2013).

shows that SDBs not participating in the 8(a) program had 37 percent lower odds of winning a contract with the federal government compared to firms not identified as SDBs, a difference that is statistically significant. SOF ¶ 33. Mr. Chow also found that MBEs had roughly 15 percent lower odds of winning a federal prime contract than other small firms.[14] *Id*. These disparities persist despite controlling for all other factors that might increase a firm's odds for success, including firm size, level of security clearance of the firm, and the firm's age. SOF ¶ 34. In fact, the study concludes that SDBs had a statistically significant lower chance of winning a contract in over 93% of contract actions all else being equal. Chow Report, at 7. As a result, Mr. Chow concluded that the disparities in his study were consistent with the presence of discrimination. SOF ¶ 35.

### 2. As-Applied Challenge

Plaintiff challenges SBA's and USDA's use of the 8(a) program to award contracts in the "administrative and/or technical support" industry. Compl. ¶ 7. In its discovery requests, Plaintiff defined "administrative or technical support" as the areas of work falling under North American Industry Classification System ("NAICS") codes 561110 (Office Administrative Services) or 541611 (Administrative Management and General Management Consulting Services). [15] Ex. 16,

---

[14] Unsurprisingly, including firms participating in the 8(a) program in the group of MBEs under study increases the group's odds of winning a contract overall since the 8(a) program is designed to bolster the success of program participants in contracting.

[15] NAICS is the standard system of industrial classification for the United States. The first two digits of the code designate the sector, the third designates the subsector, the fourth designates the industry group, the fifth designates the NAICS industry, and the sixth designates the national industry. *See* Exec. Off. of the Pres., U.S. Off. of Mgmt. and Budget, N. Am. Indus. Classification Sys. at 18 (2017), *available at* https://www.census.gov/naics/reference_files_tools/ 2017_NAICS_Manual.pdf. The two six-digit NAICS codes identified by Plaintiff are not co-extensive with the relevant industries because many data sources do not use NAICS codes to categorize industries, yet they include the same or similar type of work to that at issue here. Wainwright Report at 31 n. 41. Disparity studies typically use general industry categories, including: construction, architecture, engineering and other construction-related services (AECRS); professional services (other than AECRS); general services; and commodities, supplies,

21

at 1. The evidence cited above, including Defendants' two expert reports, also provides a strong basis in evidence to support Defendants' use of the 8(a) program in the industries relevant here, and Plaintiff has produced no evidence to the contrary.

Dr. Wainwright's analysis found that the substantial disparities present in the economy as a whole also exist in the relevant industries. SOF ¶ 30. In both professional and general services, Dr. Wainwright found significant underutilization for MBEs (81 percent of disparity indexes were large and adverse in professional services and 76 percent were large and adverse in general services). Wainwright Report at 32 (Table 2.2). The analysis also found significant underutilization in Plaintiff's NAICS codes. For MBEs in both 5611 (Office Administrative Services) and in 5416 (Management, Scientific, and Technical Consulting Services), 61 percent of disparity indexes were large and adverse. *Id*. at 37 (Table 2.8). These results remain when each minority group is considered separately. *Id.* Plaintiff has presented no evidence to dispute the overwhelming disparities that exist in its industries.

Analyzing other relevant data to test the likelihood that race-neutral factors can account for the disparities observed in his analyses, Dr. Wainwright also found minorities were significantly underrepresented among business owners in the administrative and technical services industries even after accounting for qualifications and capacity factors untainted by discrimination. For NAICS 561M, the odds of minorities owning a business are only 64 percent as high as the odds of

---

and equipment. *Id.* at 22. Professional services and general services include the industries Plaintiff identifies. *Id.* at 67. Thus, it is appropriate to consider data for these categories in connection with the as-applied challenge, and the Court may determine that the appropriate industry is broader or narrower than the two six-digit NAICS codes Plaintiff proposed. *See DynaLantic*, 885 F.Supp.2d at 282; *Rothe III*, 262 F.3d at 1330.

non-minority males' ownership.[16] *Id.* at 77 (Table 4.8). The same is true when considering Black, Hispanic, and Subcontinent Asian Americans separately. *Id.* Similarly, in NAICS 5416, minorities are only 80% as likely to own a business as compared to non-minority males. *Id.* at 76 (Table 4.8). These results are consistent among each minority group, except Native Americans.[17] *Id.* With only two exceptions, the disparities are large, adverse, and statistically significant for each minority group. *Id.* at 68-69. Dr. Wainwright also found large, statistically significant differences in business earnings rates between minorities and non-minorities in Plaintiff's industries, even when numerous nondiscriminatory factors were held constant.[18] *Id.* at 66-67.

Dr. Wainwright concluded that "taken as a whole," his analyses "provide strong evidence of large, adverse, and statistically significant disparities facing [MBEs] in the United States . . .and that "these disparities cannot be adequately explained by differences between the relevant populations in factors untainted by the effects of discrimination and are therefore consistent with the presence of discrimination in the administrative and technical services industry." SOF ¶ 29.

Similar disparities exist in Plaintiff's industries in federal government contracts. Mr. Chow conducted regression analyses by three-digit NAICS code, comparing the likelihood of MBEs winning federal prime contracts compared to businesses of similar size in the same industry.[19]

---

[16] Dr. Wainwright notes that while Census data identifies NAICS 5416 explicitly, NAICS 5611 is grouped together with NAICS 5612 ("Facilities Support Services") and NAICS 5619 ("Other Support Services") and is collectively referred to as NAICS 561M ("Other Administrative and Other Support Services"). Wainwright Report at 62 n. 69.

[17] Dr. Wainwright explains that these results for Native Americans are not statistically significant, as out of over 16,000 observations in the business formation regression analysis, only 71 were Native American, and only 13 were self-employed. *Id.* ¶ 69, n. 83.

[18] Native Americans earn the least: 46 cents for each dollar of non-minority males. *Id.* at 80 (Table 4.9).

[19] Mr. Chow used three-digit codes to increase reliability, noting that this "provides a compromise between having sufficient data in each industry grouping with the recognition that firms can switch production within the broader three-digit category." Chow Report at 3 n. 9.

23

Chow Report at 7, 11 (Table 5). Mr. Chow found that in NAICS 561, SDBs not participating in the 8(a) program were 36 percent less likely to win prime contracts compared to firms not identified as SDBs, a difference that was statistically significant. *Id.* at 17. He also found that MBEs were 44 percent less likely to win a federal prime contract in 561 than other small firms. *Id.* In NAICS 541, non-8(a) SDBs were 44 percent less likely to win prime contracts and MBEs were about 17 percent less likely to win. *Id.* Not only are these odds statistically significant, but they are present even though the analysis controlled for non-discriminatory factors, meaning they are consistent with the presence of discrimination in the administrative and technical services industries in federal government contracting. *Id.* at 2-3, 7.

### C.    The 8(a) Business Development Program is Narrowly Tailored to Redress the Effects of Ongoing and Past Discrimination

Courts have found that the 8(a) program is narrowly tailored to serve the compelling interest in remedying discrimination in federal contracting. *See Rothe IV*, 107 F. Supp. 3d at 208; *DynaLantic*, 885 F. Supp. 2d at 291. "The purpose of the narrow tailoring requirement is to 'ensure that the means chosen "fit" th[e] compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype.'" *Croson*, 488 U.S. at 493. Courts consider several factors in this analysis: "the necessity for the relief and the efficacy of alternative remedies; the flexibility and duration of the relief, including the availability of waiver provisions; the relationship of the numerical goals to the relevant labor market; and the impact of the relief on third parties." *Rutherford*, 179 F. App'x at 377-78 (*quoting United States v. Paradise*, 480 U.S. 149, 171, 187 (1987)). In addition, "a policy is not narrowly tailored if it is either overbroad or underinclusive in its use of racial classifications." *Vitolo*, 999 F.3d at 362. These are not elements of a test, and defendants need not satisfy each factor. *Rutherford*, 179 F. App'x at 378. Further, "[t]here is no single 'best' remedy—courts and other government bodies enjoy some

24

discretion in remedying racial discrimination." *Id.* at 377 (*citing Paradise*, 480 U.S. at 185).

In *Vitolo*, the Sixth Circuit considered the SBA's distribution of grants from the Restaurant Revitalization Fund ("RRF"), which was intended to aid small privately-owned restaurants affected by the pandemic. *Id.* at 353. During an initial 21-day period, the SBA gave priority access to the funds to restaurants at least 51% owned and controlled by women, veterans, or the socially and economically disadvantaged, defined by reference to the same SBA regulation at issue here. *Id.* at 356. Although the RRF's presumption of social disadvantage for members of certain groups was the same as in the 8(a) program, the Court in *Vitolo* examined a very different program supported by a very different record. While strict scrutiny involves a single, well-settled standard, the Supreme Court has explained that courts must take "relevant differences" between different programs into account. *Adarand*, 515 U.S. at 228.

### 1. <u>Necessity for race-based relief and efficacy of alternative remedies</u>

The necessity for a remedy overlaps with the strong basis in evidence. *See Dean*, 438 F.3d at 458; *Midwest Fence*, 840 F.3d at 954. As shown in Section I.B., *supra*, substantial evidence supports the ongoing need for the race-based presumption. Moreover, "Congress attempted to use race-neutral measures to assist MBEs for at least twenty-five years . . . and these race-neutral measures failed to remedy the effects of discrimination on minority small business owners." *See DynaLantic*, 885 F. Supp. 2d at 283. These efforts began with the Small Business Act of 1953, which authorized programs to aid small businesses without reference to race until the 1978 amendments codifying the 8(a) program. Pub. L. No. 83-163, § 202, 67 Stat. 282 (1953); Pub. L. No. 95-507, §§ 201, 211, 92 Stat. 1760, 1767 (1978). Between 1953 and 1978, Congress utilized numerous race-neutral measures, including: (1) a surety bond guarantee program*,* Pub. L. No. 91-609, 84 Stat. 1813 (1970), *codified at* 15 U.S.C. §§ 694a and b; (2) a new class of small business

investment companies to provide debt and equity capital to socially and economically disadvantaged individuals, Pub. L. No. 92-595, 86 Stat. 1314 (1972); (3) increased authority for the SBA to assist small businesses, particularly those owned by low-income individuals or located in areas of high unemployment, Pub. L. No. 93-386, 88 Stat. 742 (1974); (4) additional financial assistance for small businesses, Pub. L. No. 94-305, 90 Stat. 663 (1976); and (5) improved disaster assistance, Pub. L. No. 95-89, 91 Stat. 553 (1977). *See DynaLantic*, 885 F. Supp. 2d at 284. Yet the evidence before Congress when it codified the 8(a) program in 1978 demonstrated "continuing discriminatory barriers to minority businesses notwithstanding all of the race-neutral measures it had already enacted." *DynaLantic*, 885 F. Supp. 2d at 284; Sec. I.B.1.a., *supra*.

Additionally, Congress has authorized multiple existing race-neutral measures aimed at assisting all small businesses, including mechanisms to increase access to capital and credit and other forms of assistance for *all* small businesses. *See* 15 U.S.C. §§ 636(a) (loans to small businesses); 644(a), (i), (j) (small business set-asides); 648(a) (small business development centers). These efforts reflect "serious, good faith consideration of workable race-neutral alternatives," as required by the Supreme Court. *Grutter*, 539 U.S. at 339. "Narrow tailoring does not require exhaustion of every conceivable race-neutral alternative." *Id.* Given the continued barriers faced by MBEs, see *supra* Sections I.B.1.b., 2, these race-neutral means remain insufficient.

## 2. The 8(a) program is flexible

"[T]he hallmark of an inflexible affirmative action program" is a "rigid racial quota." *DynaLantic*, 885 F. Supp. 2d at 285 (*quoting W. States Paving Co. v. Wash. State Dep't of Transp.*, 407 F.3d 983, 994 (9th Cir. 2005)); *see also Croson*, 488 U.S. at 478-79, 499. The 8(a) program contains no quotas, or even any goals for agencies to enter into a certain number of contracts with

26

8(a) firms.[20] While the Act contains an overall goal of spending five percent of federal contracting dollars with businesses owned by socially and economically disadvantaged individuals, 15 U.S.C. § 644(g), the 8(a) program is only one way for the federal government to meet this goal.[21] Further, this five percent goal is aspirational only, with no penalties for failing to meet it. 15 U.S.C. § 644(g)(1)A)(vi). Courts have found the 8(a) program, and similar programs with non-mandatory goals, to be sufficiently flexible. *See, e.g.*, *Rothe IV*, 107 F. Supp. 3d at 209; *DynaLantic*, 885 F. Supp. 2d at 285; *W. States Paving Co.*, 407 F.3d at 994. The Sixth Circuit has even found a plan that required hiring at least 70 minorities each year to be sufficiently flexible because the city had the option to hire fewer officers in a given year and make up the shortfall later. *See Rutherford*, 179 F. App'x at 381.

Next, the presumption that certain minority applicants are socially disadvantaged is flexible because (1) the presumption may be overcome with credible evidence to the contrary, 13 C.F.R. § 124.103(b)(3); (2) individuals who are not presumptively disadvantaged may qualify for such status if they can demonstrate social disadvantage by a preponderance of the evidence, 13 C.F.R. § 124.103(c); and (3) each applicant must establish economic disadvantage under race-neutral criteria. 13 C.F.R. § 124.104. Courts have found that these factors render the 8(a) program, and race-conscious programs with similar characteristics, flexible. *See Rothe IV*, 107 F. Supp. 3d at 209; *DynaLantic*, 885 F. Supp. 2d at 285–86; *Sherbrooke*, 345 F.3d at 973; *N. Contracting, Inc. v. State of Illinois*, No. 00 C 4515, 2004 WL 422704, at *37 (N.D. Ill. Mar. 3, 2004). Finally, a

---

[20] Because the 8(a) program contains no goals, the Court need not review the relationship of numerical goals to the relevant market.

[21] President Joseph R. Biden recently issued an Executive Order increasing the goal for SDB utilization to 15 percent federal government-wide by 2025. Exec. Order M-22-03 (Dec. 2, 2021). This goal, which applies to all SDBs and not just 8(a) firms, remains aspirational, and nothing in the Executive Order imposes any penalty on federal agencies for failing to attain it.

contract will not be accepted into the program if the SBA determines it would have an adverse impact on a non-8(a) small business already performing the work. 13 C.F.R. § 124.504.[22]

### 3. The 8(a) program includes appropriate durational limits

While the 8(a) program has no termination date, it contains a number of provisions that render it appropriately time limited. *See Rothe IV*, 107 F. Supp. 3d at 209; *DynaLantic*, 885 F. Supp. 2d at 287. *First*, participation is limited to nine years, giving the participant "a reasonable opportunity" to "overcome its disadvantaged status." *DynaLantic*, 885 F. Supp. 2d at 287. This period is broken into a four-year developmental stage and a five-year transitional stage, in which the firm is required to obtain contracts outside of the 8(a) program and to submit a plan that assures profitable business operations after graduation. 5 U.S.C. § 636(j)(10)(D)(ii)(IV), (j)(10)(I)(iii)(I). *Second*, participation is limited to one-time eligibility. 15 U.S.C. § 636(j)(11)(C). This fulfills Congress's intention that the program be used "solely for economic and business development and not merely to channel contracts at a random pace to a preconceived group of eligibles for the sake of social or political goals." H.R. Rep. No. 1714, at 22-23 (1978). *Third*, each participant must demonstrate eligibility each year, and will graduate early if it has achieved the targets set forth in its business plan and has demonstrated the ability to compete in the marketplace without assistance, 13 C.F.R. § 124.302(a)(1), or if owner(s) upon whom eligibility is based are no longer economically disadvantaged, *Id.* at § 124.302(a)(2). Further, Congress regularly reviews the 8(a) program as SBA is required to report to Congress on the 8(a) program on an annual basis. 15 U.S.C. § 636(j)(16)(B). Thus, Congress has ample opportunity to act if it disagrees with the

---

[22] This provision is discussed further in relation to the undue burden analysis, *infra* in Section I.C.6.

direction of the program or SBA's actions.[23]

Finally, any argument that the 8(a) program has insufficient temporal limits is rebutted by the substantial recent evidence of discrimination affecting MBEs. *See supra* Sections I.B.1.b., 2. Without presenting specific evidence that the groups entitled to the rebuttable presumption are no longer affected by past or present discrimination that affects their ability to compete for federal government contracts—evidence that Plaintiff does not have—a general assertion that the 8(a) program does not have sufficient durational limits is meaningless.

### 4.    The 8(a) program is neither under-nor over--inclusive

The 8(a) program is not under-inclusive because any small business owner may apply if they have suffered discrimination based on any "objective distinguishing feature that has contributed to social disadvantage, such as race, ethnic origin, gender, physical handicap, long-term residence in an environment isolated from the mainstream of American society, or other similar causes not common to individuals who are not socially disadvantaged." 13 C.F.R. § 124.103(c)(1), (c)(2)(i). In fact, approximately half of non-presumptively disadvantaged applicants are successful, and currently about 300 8(a) firms are owned by individuals who are not members of one of the presumptively disadvantaged groups. Ex. 17, Klein dep. 89:3-24. Moreover, the presumptively disadvantaged groups have not remained static; additional groups have been added while others have not based on a review of the evidence presented to justify applying the presumption to an entire group. *Id.* at 99:1-109:25; Ex. 18, SBA Resp. Second ROGs, at No. 1.

---

[23] The last 408 Report SBA submitted to Congress was for Fiscal Year 2017. Klein dep. 21:19-22:5. The Fiscal Year 2018 and 2019 reports are currently in draft form. *Id.* at 22:10-20. Nevertheless, Congress has had ample opportunity to review the 8(a) program in recent years. DOJ Report, at 38 (listing two congressional hearings in 2019 on 8(a) program and a third on all of SBA's contracting programs). In fact, just last year, Congress extended the 9-year time limit for participants by one year to account for the COVID-19 pandemic. William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. 116-283.

29

A finding that the program is not underinclusive is also consistent with *Vitolo*. There, the Court found that the 21-day window to apply for grants from the dwindling RRF made it all but impossible for non-designated racial groups to present evidence of social disadvantage before funds were depleted. 999 F.3d at 363. No such deadline or limited funds are at play here. The Court also found the requirement that a participant be at least 51% owned by women or minorities rendered it underinclusive, positing that "Black investors may have small shares in lots of restaurants, none greater than 51%." 999 F.3d at 363. Here, Congress was clear that the purpose of the 8(a) program is to aid those who own *and* control small businesses, not passive investors. 15 U.S.C. § 631(f)(2)(A). Since 51% is the percentage that gives an individual majority ownership and control over a business, it is perfectly tailored to the determination of ownership and control.

The 8(a) program is not *over-inclusive* because it does not give an advantage to all members of any particular racial or ethnic group, nor does it give any preference solely based on race. *Rothe IV*, 107 F. Supp. 3d at 209; *Dynalantic*, 885 F.Supp.2d at 286. Rather, only members of designated groups who own and control small businesses and who meet a number of race-neutral criteria are entitled to a *rebuttable* presumption of social disadvantage. A finding that the program is not over-inclusive also is consistent with *Vitolo*. There, the Court was troubled by what it perceived as seemingly arbitrary classifications between races, which it termed "racial gerrymandering," because the limited evidence available on the emergency motion for preliminary injunction did not show discrimination for each of the presumptively disadvantaged groups. 999 F.3d at 364. Here, by contrast, substantial evidence shows that members of each of the designated groups have experienced discrimination affecting their advancement in the business world, both at the time the 8(a) program was enacted and in the several decades since. SOF ¶ 25, 29, 31.

### 5. The 8(a) program does not create an undue burden on third parties

The Supreme Court has recognized that even "a limited and properly tailored remedy to cure the effects of prior discrimination" may result in "a sharing of the burden by innocent third parties." *Wygant,* 476 U.S. at 280-81 (plurality) (internal quotations omitted); *see Western States*, 407 F.3d at 995; *Adarand*, 228 F.3d at 1183; *DynaLantic*, 885 F.Supp.2d at 290. A narrowly tailored remedy strives to *reduce* the burdens on those parties not responsible for the discrimination, *Paradise*, 480 U.S. at 182, but cannot eliminate that burden entirely. The question is not whether Ultima or other non-8(a) firms bear *some* burden of the 8(a) program, but whether that burden is "too intrusive" or "unacceptable." *See Concrete Works*, 321 F.3d at 973 (*quoting Wygant*, 476 U.S. at 280-81; *Paradise*, 480 U.S. at 182). As shown next, it is not.

The 8(a) program is specifically designed "to mitigate the adverse impact on firms outside the program." *DynaLantic*, 885 F. Supp. 2d at 290; *see Rothe IV*, 107 F. Supp. 3d at 209. Specifically, the presumption is rebuttable and may be overcome with credible evidence to the contrary. 13 C.F.R. § 124.103(b)(3). Relatedly, those who are not presumptively disadvantaged may qualify for such status if they can demonstrate social disadvantage by a preponderance of the evidence. *Id.* at § 124.103(c). Further, social disadvantage alone is not enough for participants to enter the 8(a) program. Applicants also must show economic disadvantage, further limiting the "'race-based nature of the program,' thereby also minimizing the adverse impact on third parties." *DynaLantic*, 885 F. Supp. 2d at 290 (quoting *Sherbrooke*, 345 F.3d at 972).

Additionally, courts have found that the 8(a) program contains an appropriate waiver that prohibits the SBA from using the 8(a) program "if it determines that [it] would have an adverse impact on small businesses operating outside the Section 8(a) program." *DynaLantic*, 885 F. Supp. 2d at 286; *see also* 13 C.F.R. § 124.504(c). An adverse impact is presumed when another small

business has performed the same requirement for at least 24 months and other criteria are met. 13 C.F.R. § 124.504(c)(1)(i). It does not apply to new requirements (*i.e.*, those not previously procured by the relevant procuring activity), such as those at issue here. *Id.* at § 124.504(c)(ii).[24]

### 6.    The 8(a) program does not create an undue burden on Ultima

Plaintiff's apparent belief that USDA's administrative support contracts were its to keep in perpetuity fundamentally misunderstands federal contracting and the adverse impact provision. One reason NRCS moved away from the regional model was "States' needs differ across the region." SOF ¶ 9. By using a one-size-fits-all contract, some states did not get the services they needed. *Id.* Thus, when states issued new requirements, some included services not included in Ultima's IDIQs. Stonebraker dep. 109:2-18. Also, changing from an entire region to a single state fundamentally changed the scope of the requirement. Klein dep. 178:4-179:3.

Moreover, Plaintiff cannot plausibly argue that the 8(a) program precludes it from contracting with the federal government, with the USDA in particular, or within the administrative and technical support industry. On average, the federal government has obligated only around 3.7% of all small business eligible dollars through the 8(a) program since 2015. SOF ¶ 15. Given that the federal government has purchased about $3.87 trillion worth of goods and services since 2015, and $3.75 trillion of that (96.7%) has been spent outside of the 8(a) program, it cannot be viewed as causing an undue burden on third parties. *Id.* ¶¶ 16-17. The same is true for USDA contracting in particular. Between fiscal years 2010-2022, the USDA has set-aside on average only

---

[24] While SBA's Georgia District Office did make a determination that awarding an 8(a) contract for administrative support services in NRCS's Mississippi field office would cause an adverse impact on Ultima, Ex. 19, Adverse Impact Determination, that determination was made in error. Klein dep. 180:12-23. Not only has the District Office Director who signed the determination acknowledged that it never should have been made, but it is clear from the face of the letter that it was in error because it states that Ultima had performed the prior requirement for less than 24 months. Ex. 20, Denison dep. 38:9-39:16; 40:4-19; Ex. 19.

3.76% of all contract actions, worth just 5 percent of obligated contract dollars, for 8(a) firms. SOF ¶¶ 18-19. Specifically, in the two NAICS codes in which Plaintiff performed the majority of its contracting—541611 and 561110—USDA set aside about 11 percent of contract actions worth only 10 percent of obligated contract dollars into the 8(a) program. *Id.* ¶ 20-21.

To the extent Ultima has suffered any burdens, they are unrelated to the 8(a) program. *First*, NRCS decided not to issue any more task orders against Ultima's IDIQs when two of the four IDIQs neared their maximum order value of $10 million—intended to last five years—in just one year. SOF ¶ 7. NRCS found that re-soliciting the contracts on a state basis would produce a number of efficiencies. *Id.* ¶ 8. The decision had nothing to do with the 8(a) program or with Ultima; rather it was made for cost and efficiency reasons. *Id.* ¶ 7-9. *Second*, while Ultima claims it has been decimated due to USDA setting aside contracts for the 8(a) program, that is because it has essentially stopped bidding on contracts as it awaits the result of this litigation. SOF ¶ 10. Ultima has had ample opportunity to bid for contracts with the federal government and even with USDA in either the administrative or technical services industry or any of the many other industries in which it provides services. *Id.* ¶ 13. *Third*, a large portion of the work Ultima had performed for USDA has simply shifted to its affiliate, Lusa. Indeed, since the IDIQs that preceded this lawsuit ended, Lusa has been awarded NRCS contracts valued at over $10.4 million, including two sole-source contracts valued at over $3.8 million through the WOSB program. *Id.* ¶¶ 12.

## II.    Plaintiff Lacks Standing to Challenge the 8(a) Program

On March 31, 2021, this Court denied Defendants' motion to dismiss on standing grounds. Doc. 32. Defendants renew this claim based on new information learned in discovery[25] and

---

[25] Because Ultima was a subsidiary of Lusa when it filed its Complaint, it could not establish that race was the cause of its inability to compete for 8(a) contracts; rather, it did not qualify to compete because it was not a small business owned by an individual. 13 C.F.R. § 124.105(b).

because Plaintiff has provided no evidence to support the speculative assertions the Court was required to construe in the light most favorable to Plaintiff on a motion to dismiss. *Id.* at 8.

To establish standing, Plaintiff must prove (1) "injury in fact," (2) a causal connection between the injury and the complained-of conduct, and (3) the likelihood that a favorable decision will redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Defendants previously argued that even assuming Plaintiff had an injury-in-fact caused by the 8(a) program, which Defendants maintain it does not, the injury was too speculative for the Court to redress. Doc. 21, p. 11. To demonstrate redressability, Plaintiff must plead specific facts showing it is "likely, as opposed to merely speculative," that the injury will be redressed by a favorable decision. *Lujan*, 504 U.S. at 560-61 (internal quotations omitted). The Complaint alleged that but for the presumption of social disadvantage for members of certain groups, "fewer firms would qualify" for the 8(a) program and "Ultima would have far more opportunities to bid on contracting opportunities with USDA." Compl. ¶¶ 19-20. While Defendants argued that these allegations have no factual basis because the 8(a) program can continue to operate without the presumption, Doc. 21, at 11, this Court noted that at the motion to dismiss stage, it must construe the allegations in the Complaint in the light most favorable to Plaintiff. Doc. 32, p. 8.

The parties have since engaged in extensive discovery, and Plaintiff has provided no evidence to bolster its speculation about what might happen if the presumption were eliminated. Defendants requested documents that supported this assertion, but Plaintiff stated it had none. Ex. 23, Pl. Resp. First RFPs, p. 9-10. When asked during deposition what basis she had to support this allegation, Ms. Bennett responded: "[w]ell, because if they're not presumed to be [disadvantaged], then they can't receive the contract under the 8(a) program." Bennett dep. 247:6-14. But of course that is not true because applicants can and do qualify as socially disadvantaged without the

34

presumption. There is no basis to presume current participants could not qualify as socially disadvantaged under the existing method for doing so. A plaintiff's "mere hope that the eventual result of 'leveling the playing field'" would enable it to compete equally for a benefit is insufficient to show standing. *See DeBolt v. Espy*, 47 F.3d 777, 780 (6th Cir. 1995).

In *Vitolo*, the government argued that the plaintiffs lacked standing because even without the race-conscious presumption, they still might not qualify for priority consideration for a COVID-relief grant. 999 F.3d at 366. The Court rejected the argument there, reasoning that enjoining the presumption would mean race would not be a factor in qualifying for the priority period where appropriations for the grants were limited and rapidly dwindling. *See id.* While that logic may apply to a plaintiff is seeking to eliminate a race-based barrier to qualifying for a benefit with limited funding, Ultima does not even seek to qualify for the 8(a) program. Rather, it seeks to prevent the government from setting aside contracts for 8(a) firms at all. But eliminating the presumption would not affect the government's ability to set aside contracts for disadvantaged businesses because the presumption, established by regulation, is severable from the 8(a) program. *See Cache Valley Elec. Co. v. State of Utah Dep't of Transp.*, 149 F.3d 1119, 1123 (10th Cir. 1998); *Ellsworth Assocs., Inc. v. United States*, 926 F. Supp. 207, 210 (D.D.C. 1996). In *Vitolo* the Sixth Circuit did not enjoin the 21-day priority period for socially and economically disadvantaged firms, it enjoined only the race-based presumption of disadvantage based on how it applied to the facts presented there. *See* 999 F.3d at 366. Here, Plaintiff cannot show it is likely that a favorable decision would prevent the government from setting aside contracts for disadvantaged businesses.

## CONCLUSION

For the foregoing reasons, this Court should find that the 8(a) program is constitutional both on its face and as applied by USDA in the administrative and technical support industries.

35

Dated: June 21, 2022

Respectfully submitted,

KAREN D. WOODARD
Chief
Employment Litigation Section
Civil Rights Division
United States Department of Justice

OF COUNSEL:

ANDREW BRANIFF (IN Bar No. 23430-71))
Deputy Chief

Karen Hunter
Senior Trial Attorney

David A. Fishman
Assistant General Counsel for Litigation

By: */s/ Juliet E. Gray*

Juliet E. Gray (D.C. Bar No. 985608)
K'Shaani Smith (N.Y. Bar 5059217)
Christine T. Dinan (D.C. Bar 979762)
Senior Trial Attorneys
Employment Litigation Section
Civil Rights Division
United States Department of Justice
150 M Street, N.E.
Washington, D.C. 20002
(202) 598-1600
Juliet.Gray@usdoj.gov
K'Shaani.Smith@usdoj.gov
Christine.Dinan@usdoj.gov

Eric S. Benderson
Associate General Counsel for Litigation
U.S. Small Business Administration

Amar Shakti Nair
Attorney Advisor

Ashley Craig
Attorney Advisor
U.S. Department Of Agriculture

36

## CERTIFICATE OF SERVICE

       I hereby certify that on June 21, 2022, I electronically filed the above document and with the Clerk of the Court using the ECF System, which will send notification of such filing to all counsel of record.

                                          */s/ Juliet E. Gray*

                                          Juliet E. Gray
                                          Senior Trial Attorney