IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | |
|---|---|
| ULTIMA SERVICES CORPORATION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 2:20-cv-00041-DCLC-CRW |
| ) | |
| U.S. DEPARTMENT OF AGRICULTURE, ) | |
| et al., ) | |
| ) | |
| Defendants. ) | |

## DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1. Prior to January 1, 2022, Ultima Services Corporation ("Ultima") was a fully-owned subsidiary of Lusa Associates, Inc. ("Lusa"). Deposition of Celeste Bennett ("Bennett Dep.") 71:6-8; 75:11-12 (cited excerpts attached to Defendants' Motion for Summary Judgment as Exhibit 2).

2. Lusa is 100% owned and operated by Celeste Bennett. Bennett Dep. 51:15-17; 52:8-21 (Exhibit 2).

3. As of January 1, 2022, Ms. Bennett restructured her businesses so that she now owns and operates Ultima. Bennett Dep. 70:22-71:8; 75:11-12; 77:1-12 (Exhibit 2).

4. Ultima has earned over $37 million in revenue from USDA contracts since 2015. Declaration of Sheryl Welch ("Welch Decl.") ¶ 4 (attached to Defendants' Motion for Summary Judgment as Exhibit 6).

5. Ultima has not applied to participate in the 8(a) program. Bennett Dep. 249:17-19 (Exhibit 2).

6. At the time it filed the Complaint, Ultima exceeded the size requirements to be considered a small business under NAICS code 561110 ($8 million), which is the NAICS code that applied to its IDIQs. Ultima SAM.gov Representations and Certifications, at 3 (attached to Defendants' Motion for Summary Judgment as Exhibit 9); Bennett dep. 139:18-20 (Exhibit 2).

7. In a Decision Memorandum approved on March 30, 2018, NRCS noted that two of the four IDIQs that had been awarded to Ultima were nearing their maximum value of $10 million in approximately one year. Decision Memorandum, at US0050556 (attached to Defendants' Motion for Summary Judgment as Exhibit 4).

8. In the March 30, 2018 Decision Memorandum, NRCS determined that re-soliciting the work awarded through the regional IDIQs on a state basis would "yield the lowest overall cost," "afford[] easier access to more localized small business vendors," and "reduce the workload of the . . . contracting services branch." Decision Memorandum, at 1 (Exhibit 4).

9. In the March 30, 2018 Decision Memorandum, NRCS determined that the regional IDIQ model "is the second highest cost option," that "States may not get the services they actually need as States' needs differ across the region," and "[i]t places an undue workload burden on [contracting services branch]," among other things. Decision Memorandum, at 2 (Exhibit 4).

10. Since NRCS made the decision not to exercise additional options on the IDIQs, Ultima has essentially stopped bidding on contracts while it awaits the results of this litigation. Bennett dep. 105:11-106:8; 106:17-107:10 (Exhibit 2).

11. In 2019, Lusa was awarded NRCS contracts valued at over $10.4 million. Welch Decl. ¶ 9 (Exhibit 6).

12. In 2019, Lusa was awarded two sole-source NRCS contracts valued at over $3.8 million though the women-owned small business program. Welch Decl. ¶ 11 (Exhibit 6).

13. Since 2019, NRCS has awarded contracts valued at over $10.8 million for administrative or technical support services through full and open competition or competition among all small businesses, including through the GSA Federal Supply Schedule program. Declaration of Amy Stonebraker ("Stonebraker Decl.") ¶ 5 (attached to Defendants' Motion for Summary Judgment as Exhibit 7).

14. Ultima has not registered for the GSA's Federal Supply Schedule Program. *See* Plaintiff's Response to Defendants' Third Set of Requests for Admission, ¶ 8 (attached to Defendants' Motion for Summary Judgment as Exhibit 8).

15. On average, in all industries since 2015, the federal government has obligated 3.7 percent of all small business eligible dollars through the 8(a) program. Declaration of Samuel Powers ("Powers Decl.") ¶ 5 (attached to Defendants' Motion for Summary Judgment as Exhibit 21).

16. Since 2015, the federal government has spent about $3.87 trillion. Powers Decl. ¶ 6 (Exhibit 21).

17. Since 2015, the federal government has spent about $3.75 trillion outside of the 8(a) program. Powers Decl. ¶ 7 (Exhibit 21).

18. Since fiscal year ("FY") 2010, the USDA has awarded 3.76 percent of all contract actions through the 8(a) program. Total Funding Agency Dollars (attached to Defendants' Motion for Summary Judgment as Exhibit 22).

19. Since FY2010, the contract actions USDA has awarded through the 8(a) program have been worth five percent of obligated contract dollars. Total Funding Agency Dollars (Exhibit 22).

20. In NAICS codes 561110 and 541611, USDA has awarded 11 percent of contract actions through the 8(a) program since 2015. USDA NAICS Spending (attached to Defendants' Motion for Summary Judgment as Exhibit 24).

21. In NAICS codes 561110 and 541611, the contract actions USDA has awarded through the 8(a) program have been worth 10 percent of obligated contract dollars. USDA NAICS Spending (Exhibit 24).

22. Congress's stated purpose in enacting the 8(a) program was to provide contract, financial, technical, and management assistance to small businesses owned and controlled by socially and economically disadvantaged individuals. Pub. L. No. 95-507, § 201, 92 Stat. 1757, 1760 (1978).

23. When it enacted the 8(a) program, Congress found that "the opportunity for full participation in our free enterprise system by socially and economically disadvantaged persons is essential if we are to obtain social and economic equality for such persons and improve the functioning of our national economy." Pub. L. No. 95-507, § 201, 92 Stat. 1757, 1760 (1978).

24. When it enacted the 8(a) program, Congress found that "many [socially and economically disadvantaged] persons are socially disadvantaged because of their identification as members of certain groups that have suffered the effects of discriminatory practices or similar invidious circumstances over which they have no control." Pub. L. No. 95-507, § 201, 92 Stat. 1757, 1760 (1978).

25. When it enacted the 8(a) program, Congress found that "such groups include, but are not limited to, Black Americans, Hispanic Americans, Native Americans, and other minorities." Pub. L. No. 95-507, § 201, 92 Stat. 1757, 1760 (1978).

26. Congress subsequently amended this list to include Asian Pacific Americans and Native Hawaiian Organizations. 15 U.S.C. § 631(f)(1)(C).

27. In enacting the 8(a) program, Congress found that "it is in the national interest to expeditiously ameliorate the conditions of socially and economically disadvantaged groups." Pub. L. No. 95-507, § 201, 92 Stat. 1757, 1760 (1978).

28. In enacting the 8(a) program, Congress found that "such development can be materially advanced through the procurement by the United States of articles, equipment, supplies, services, materials, and construction work from such concerns" and "that such procurements also benefit the United States by encouraging the expansion of suppliers for such procurements, thereby encouraging competition among such suppliers and promoting economy in such procurements." Pub. L. No. 95-507, § 201, 92 Stat. 1757, 1760 (1978).

29. Dr. Jon Wainwright conducted several analyses of disparity studies and other data and concluded that "taken as a whole, they provide strong evidence of large, adverse, and statistically significant disparities facing minority-owned business enterprises in the United States" and that "these disparities cannot be adequately explained by differences between the relevant populations in factors untainted by the effects of discrimination and are therefore consistent with the presence of discrimination in the business market." Report of Defendant's Expert Jon Wainwright ("Wainwright Report"), at 81 (attached to Defendants' Motion for Summary Judgment as Exhibit 11).

30. Dr. Wainwright found that this was the case in each of the major markets for government contracting and procurement, including in the industries Plaintiff identified as relevant to this matter. Wainwright Report, at 29, 81 (Exhibit 11).

31. Dr. Wainwright also found that this was the case when the results were disaggregated into race and ethnicity categories. Wainwright Report, at 30; see Table 2.2 (Exhibit 11).

32. Dr. Wainwright also found large, adverse disparities in the utilization of minority-owned businesses even when his analysis was restricted to studies published since 2017. Wainwright Report, at 30 (Table 2.6) (Exhibit 11).

33. Daniel Chow, an economist at the Department of Commerce, Minority Business Development Agency, analyzed federal contracting data and determined that small disadvantaged businesses and minority-owned businesses had statistically significant lower odds of winning a prime contract with the federal government compared to firms not in those categories. Expert Report of Daniel Chow ("Chow Report") p. 1-2, 7 (attached to Defendants' Motion for Summary Judgment as Exhibit 13).

34. Mr. Chow found that these disparities persisted even after controlling for factors that might affect a firm's odds for success, including firm size, firm age, and level of security clearance. Chow Report, at 2-3 (Exhibit 13).

35. Mr. Chow concluded that the lower odds identified in his analysis are consistent with the presence of discrimination. Deposition of Daniel Chow ("Chow dep.") 110:21-112:2 (attached to Defendants Motion for Summary Judgment as Exhibit 15).

36. Mr. Chow also analyzed data in NAICS codes 541 and 561, and he also found that both socially-disadvantaged businesses and minority-owned businesses had statistically

significant lower odds of winning a federal prime contract in these industries than other small firms, even after controlling for non-discriminatory factors. Chow Report, at 11-18 (Table 5) (Exhibit 13).

37. In 2018, Congress heard testimony describing the explicit discrimination faced by minority-owned businesses in contracting, including the lack of timely bid notification, higher and double standards, and the refusal to use minorities except when they are required in a contract." *Strengthening Access to Capital for Minority-Owned Small Businesses, Hearing Before S. Comm. on Small Bus. and Entrepreneurship*, 115th Cong. 42 (2018) (statement of Kenneth E. Clark, Business Consultant, MBDA Business Center-Capital Region).

38. In a 2020 hearing, Congress examined the "historical and systemic challenges" faced by minority-owned businesses, including "a lack of access to capital and systemic racism." *Access Denied: Challenges for Women- and Minority-Owned Businesses Accessing Capital and Financial Services*, Hearing Before Subcomm. on Diversity and Inclusion of the H. Comm. on Fin. Servs., 116th Cong. 2 (2020) (opening statement of Rep. Beatty).

39. Congress received testimony in 2021 that Black wealth accumulation has undergone a sustained process of asset underdevelopment "via an array of American programs and practices," including:

- federally sanctioned redlining, which reduced the credit available for Black households, in turn limiting their ability to buy homes;

- discriminatory access to homeownership subsidies in the New Deal legislation;

- denial of the benefits of the G.I. Bill to Black veterans, while White households were able to rely on the G.I. Bill to build wealth;

- racial zoning practices and tax policies; and

- the long-term effects of Jim Crow era state tax policies.

*How Invidious Discrimination Works and Hurts: An Examination of Lending Discrimination and Its Long-term Economic Impacts on Borrowers of Color*, Hearing before Subcomm. on Oversight and Investigations of the H. Comm. on Financial Services, 117th Cong. (2021) (testimony of William Darity Jr., Samuel DuBois Cook Professor of Public Policy, Duke University) (citations omitted).

40. Congress heard similar testimony in a February 2021 hearing that detailed the discriminatory barriers facing minority business owners, including (1) overtly discriminatory practices by lenders; (2) discrimination in capital markets; and (3) structural barriers built into the Paycheck Protection Program, including its reliance on mainstream financial institutions that have long excluded minority business owners. *Supporting Small and Minority-Owned Businesses Throughout the Pandemic, Virtual Hearing Before the Subcomm. on National Security, Int'l Dev. and Monetary Policy, H. Comm. On Fin. Servs*. 117th Cong. 70, 71, 78 (2021) (statement of Center for Responsible Lending and testimony of Ashley C. Harrington, Federal Advocacy Director and Senior Counsel, Center for Responsible Lending).

41. In June 2021, Congress received over 100 disparity studies published from 2015-2021 as evidence in support of the reauthorization of the Department of Transportation's Disadvantaged Business Enterprise Program. 167 Cong. Rec. H3505-07 (daily ed. June 30, 2021) (statement of Rep. DeFazio) (listing disparity studies); 167 Cong. Rec. S5898-99 (daily ed. August 5, 2021) (statement of Sen. Tom Carper) (same).

42. In June 2021, Congress made specific findings as to the value of such studies: "[D]isparity studies contain myriad analyses aimed at answering the question: 'Does business discrimination based on race or gender continue to exist?' Even a cursory review of the studies reveals that the answer is resoundingly 'yes.'" H.R. Rep. No. 117-70, at 392-95 (2021).

43. In February 2022, congressional testimony described the disproportionate effects of the COVID-19 pandemic on minority business owners, which were attributed to the compounding effects of systemic racism and the racial wealth gap, leading to "weak capitalization, limited banking relationships, and little to no cash reserves to cushion the impact of the pandemic" that resulted in the closure of nearly half of Black-owned businesses between February and April 2020, compared to just 17 percent of white-owned businesses. *Small Businesses, Big Impact: Ensuring Small and Minority-Owned Businesses Share in the Economic Recovery, Virtual Hearing Before the Subcomm. on Consumer Prot. and Fin. Inst. of the H. Comm. On Fin. Servs.*, 117th Cong. 7 (2022) (statement of Stephanie Devane, Vice President, Entrepreneurship & Business Development, National Urban League).

Dated: June 21, 2022

Respectfully submitted,

KAREN D. WOODARD
Chief
Employment Litigation Section
Civil Rights Division
United States Department of Justice

OF COUNSEL:

Karen Hunter
Senior Trial Attorney

David A. Fishman
Assistant General Counsel for Litigation

Eric S. Benderson
Associate General Counsel for Litigation
U.S. Small Business Administration

ANDREW BRANIFF (IN Bar No. 23430-71))
Deputy Chief

By: */s/ Juliet E. Gray*
Juliet E. Gray (D.C. Bar No. 985608)
K'Shaani Smith (N.Y. Bar 5059217)
Christine T. Dinan (D.C. Bar No. 979762)
Senior Trial Attorneys
Employment Litigation Section

9

Amar Shakti Nair
Attorney Advisor

Ashley Craig
Attorney Advisor
U.S. Department Of Agriculture

Civil Rights Division
United States Department of Justice
150 M Street, N.E.
Washington, D.C. 20002
(202) 598-1600
Juliet.Gray@usdoj.gov
K'Shaani.Smith@usdoj.gov
Christine.Dinan@usdoj.gov

## CERTIFICATE OF SERVICE

      I hereby certify that on June 21, 2022, I electronically filed the above document and with the Clerk of the Court using the ECF System, which will send notification of such filing to all counsel of record.

                                        */s/ Juliet E. Gray*
                                        Juliet E. Gray
                                        Senior Trial Attorney

11

Case 2:20-cv-00041-DCLC-CRW    Document 63    Filed 06/21/22    Page 11 of 11
PageID #: 1642