# EXHIBIT 15

In the matter of:

"Application of Opportunity Development
Association and Others for Designation of
Hasidic Jews as a Socially and Economically.
Disadvantaged Group Pursuant to
13 C.F.R. § 124.1-1(c)(3)(iii)"


William A. Clement, Jr.
Associate Administrator for
   Minority Small Business and
   Capital Ownership Development
Small Business Administration


A. Vernon Weaver
Administrator
Small Business Administration


Date:   April 9, 1980

## INTRODUCTION

On December 27, 1979, the Opportunity Development Association (ODA) of Brooklyn, New York, and six Hasidic Jewish businessmen filed an application on behalf of Hasidic Jewish Americans for designation as a minority group comprised of "socially disadvantaged" individuals, pursuant to 13 C.F.R. § 124.1-1(c)(3)(iii). In accordance with SBA regulations, a Federal Register notice soliciting public comment on the application was published. 1/ SBA has received a total of 151 comments on the application. The exhibits which accompanied the application are listed in Appendix A. Public comments on the application are listed in Appendix B. 2/

Under SBA regulations, the group designation which is sought by the Hasidim 3/ would, if granted, ease the access of individual Hasidic Jews to two programs established in the Small Business Act, 4/ as amended by Public Law 95-507, enacted October 24, 1978. The first program, commonly referred to as "the 8(a) program", 5/ is a business development program in which SBA enters into contracts with other Federal agencies and then arranges for the performance of such contracts by negotiating or otherwise letting subcontracts to socially and economically disadvantaged small business concerns. The second program, hereafter referred to as "the 8(d) program", 6/ involves Federal contracts above certain amounts awarded to private firms. Under the 8(d) program, the prime contractor is required to take steps towards the end of awarding subcontracts to firms owned and controlled by socially and economically disadvantaged individuals, among others. 7/

---

1/    45 F.R. 7666 (February 4, 1980).

2/    Throughout this decision, references will be made to specific exhibits and public comments. Exhibits will be referenced as listed in Appendix A, e.g., A-1, B-2, C-3, etc. Public comments will be designated by the prefix "PC".

3/    The term "Hasidim" is synonymous with "Hasidic Jews".

4/    15 U.S.C. § 631 et seq.

5/    Section 8(a) of the Small Business Act, 15 U.S.C. § 637(a).

6/    Section 8(d) of the Small Business Act, 15 U.S.C. § 637(d).

7/    The 8(d) program also encourages subcontracting with small business concerns, as defined in the Small Business Act and SBA regulations.

With respect to the 8(a) program, approving a group designation of "social disadvantage" would specifically identify the applicant group as being composed of individuals who have been subjected to racial or ethnic prejudice or cultural bias because of their membership in the group. 8/ If a firm seeking 8(a) certification is owned and operated by members of such groups, it would still have to make an individualized showing of economic disadvantage. If, on the other hand, the firm is not so owned and operated, it would have to make an individualized showing of both social and economic disadvantage. The value, then, of group designation of social disadvantage is that the entry of members of such groups into the 8(a) program is expedited; it does not, however, prohibit others from gaining access to the program. 9/

Approving a group designation of social disadvantage for purposes of the 8(a) program would mean that prime contractors could, with respect to their 8(d) subcontracting responsibilities, presume that any firm owned and operated by members of the group is owned and operated by socially and economically disadvantaged individuals. 10/ In other words, for purposes of the 8(d) program, Congress has concluded that members of socially disadvantaged groups are also economically disadvantaged. Here again, as in the 8(a) program, membership in a group designated as socially disadvantaged is not a requirement of participation in the subcontracting program. If a firm is not owned and operated by individuals who have such status, it has to meet the 8(a) standard of individual social and economic disadvantage. Once SBA made that determination, the firm would be eligible.

Thus, what is ultimately at issue is whether the expedited processing into the 8(a) and 8(d) programs that is available to members of groups designated to be socially disadvantaged is also available to the Hasidim.

---

8/   13 C.F.R. 124.1-I(c)(3)(i)(A).

9/   Indeed, even if a firm is established -- by whatever route -- to be socially and economically disadvantaged, there are further issues that determine ultimate certification of 8(a) program eligibility, e.g., viability and the availability of SBA support resources.

10/   44 F.R. 30812 (May 29, 1979); see also 44 F.R. 30672 (May 29, 1979).

3

The factual and legal issues raised by the voluminous application and numerous public comments are complex and have been exceedingly difficult to resolve. The decision which follows represents this Agency's best efforts to respond to the application in a manner consistent with Congressional intent and constitutional constraints.

## THE FACTUAL ISSUES

A.  Description of the Hasidim  11/

The religious movement known as Hasidism originated in the mid-eighteenth century in Eastern Europe and has, to a large extent, been passed down from one generation to the next. A significant number of Hasidic Jews emigrated to the United States prior to World War II. A second wave of Hasidic Jewish immigration occurred during World War II and shortly thereafter. Many Hasidic Jewish Americans are survivors of the Holocaust or descendants of those who lived through -- or perished in -- the Holocaust.

There are approximately 100,000 to 150,000 Hasidic Jews in the United States. They are principally located in three areas in Brooklyn, New York -- Williamsburg, Crown Heights, and Borough Park. Other smaller communities of Hasidim are scattered across the United States, for example, in Monroe, New York; Monsey, New York; Lakewood, New Jersey; Boston, Massachusetts; and Los Angeles, California.

There are a number of different Hasidic sects in this country. Two of the principal sects are the Satmar sect and the Lubavitch sect. The Satmars principally reside in the Williamsburg area and are mainly of Hungarian extraction. The Lubavitchers principally reside in the Crown Heights area and are mainly of Russian extraction. There are other Hasidic sects as well, chiefly comprised of immigrants from various Eastern European areas or descendants of immigrants from those areas.

---

11/  This description is based largely on representations contained in the application and accompanying exhibits. Public comments submitted in opposition to the application did not in any significant way take issue with those representations.

Hasidic Jewish Americans are ultra-Orthodox Jews who in many identifiable ways are marked as culturally different from other Americans. They strictly adhere to the commands of Jewish law (in Hebrew, "hasid" means "pious one"), which is complex and voluminous. Many Hasidics devote major portions of their lives to the study of Jewish law.

Many commands of Jewish law, as interpreted by the Hasidim, are behavioral. Hasidism is, in short, a system of religious belief which requires its adherents to engage in certain forms of behavior and refrain from other forms of behavior.

It should be recognized that within and among the different Hasidic sects there are variations in the extent to which certain behavioral practices are maintained. Furthermore, not all persons subscribing to Hasidic beliefs have been raised in the Hasidic culture; nor do all of those raised in that culture remain Hasidim. Notwithstanding these qualifications, those practices of the Hasidim which are most significant (for purposes of evaluating the Hasidic application) are summarized below. 12/

Appearance. Hasidic men typically wear beards and side-locks, along with black hats, long black coats, white shirts, and no ties. Hasidic women, when married, typically shave their heads and wear wigs. Hasidic women tend to dress modestly, wearing long-sleeved attire and long skirts and coats, and refraining from wearing slacks. Hasidic male children, like their fathers, wear distinctive hairstyles and clothing.

Dietary laws. Strict adherence to Jewish dietary laws requires that Hasidics avoid certain foods altogether, avoid others unless they have been prepared according to Jewish ritual, and avoid still others unless they are served in accordance with Jewish law.

Worship. Hasidics strictly observe the Jewish Sabbath (from sundown on Friday until sundown on Saturday) as well as various religious holidays. They typically incorporate three periods of worship into their daily schedules.

---

12/ The ability of individuals to move in and out of a culture which disadvantages them is, of course, one factor for SBA to consider in determining whether a group designation is appropriate.

Relationships between the sexes. As ultra-Orthodox Jews, Hasidics follow religious practices and customs which emphasize the segregation of the sexes and which dictate separate roles for men and women. This emphasis on segregation of the sexes sometimes is transposed into secular life. For example, many male Hasidic Jews will not ride the subway during rush hour because it will force them to come in close contact with women. As another example, some males refrain from socializing with women in their business contacts.

Birth control and family life. Hasidic Jews tend to have large families because birth control is prohibited and child rearing is encouraged. Family life tends to reflect the traditional roles of husband and wife, with the husband as principal breadwinner and the wife as homemaker.

Language. The principal written and spoken language of most Hasidic Jews is Yiddish. English usually is a second or third language. Hasidic children are typically raised in homes where Yiddish is spoken and spend many hours in religious classes conducted in Yiddish. As a consequence, many -- but by no means all -- Hasidim have severe language problems, manifested most conspicuously in a thick accent or broken English.

Education. Male children raised as Hasidim usually begin their education at age three with intensive instruction in religious subjects. Hasidic boys and girls are typically raised in parochial schools where religious courses occupy a major part of the curriculum. The Satmar sect, for example, maintains its own school system for approximately 5,000 children. In Hasidic parochial schools, religious subjects are taught in English. Higher education is discouraged among the Hasidim. As a consequence, there are few Hasidic professionals. Many -- but by no means all -- Hasidim are at an educational disadvantage when they venture into the secular world.

Child rearing. Hasidic children are raised in an insular culture where the use of radio or television is prohibited and travel outside the Hasidic community is restricted. Within the home, children are inculcated with Hasidic tenets and behavioral norms.

In summary, most Hasidim live in a culture which is radically different from that of the larger society and American Jews in general. To many Americans, their lifestyle is strange and their behavior eccentric. The extent to which this results in cultural bias toward the Hasidim is discussed below.

B.    Prejudice and Discrimination Suffered By the Hasidim

The evidence of prejudice and discrimination experienced by the Hasidim is overwhelming and essentially unrefuted. Relatively few comments submitted in opposition to the Hasidic application even addressed this factual issue. Of those which did, most conceded that the Hasidim have suffered from prejudice and discrimination, 13/ but argued that such prejudice and discrimination (1) had not resulted in the exclusion of Jews from this country's economic mainstream; 14/ (2) was something over which Hasidic Jews had control; 15/ (3) was not the type of bias which Congress meant to address in P.L. 95-507; 16/ and (4) existed only within the Jewish community. 17/ The first point is addressed below in the discussion of the socio-economic conditions in the Hasidic community; the second and third points raise legal questions which are discussed below; the fourth point is simply inaccurate.

Without purporting to detail every nuance of prejudice against the Hasidim or every instance of discrimination which Hasidic Jews have experienced, discussion of three types of discrimination will graphically illustrate the cultural bias imposed by the larger society upon the Hasidim.

Employment discrimination. Employment discrimination is directly related to the ability of individuals to gain entrepreneurial skills and opportunities. If jobs are unavailable, individuals will be unable to amass equity capital through savings. If job opportunities are limited to those within one's own community or to menial or non-managerial positions, individuals will be unable to gain experience which would be invaluable in an effort to become a successful entrepreneur.

_____

13/  Sadly, a few of the comments reflected negative stereotyping of Hasidic Jews. For an extreme example, see PC-122.

14/  See, e.g., PC-67; PC-99; PC-115.

15/  See, e.g., PC-48.

16/  See, e.g., PC-119.

17/  See, e.g., PC-44.

Employment discrimination experienced by Hasidic Jews is
massively documented in the Hasidic application and public comment in
support of the application.   The testimony of
non-Hasidic businessman, is instructive.  18/  In 1975,
the President of Equilease Corporation, headed a project of the Young
Presidents' Organization which was designed, in part, to place young
Hasidics in training programs with accounting and commercial firms which
would ultimately lead to employment by those firms, and to find permanent
employment for other Hasidic                    corporate fields in the New
York City metropolitan area.                    has related in detail his
unsuccessful efforts:

>"In furtherance of these objectives I spent extensive
>time discussing the placement of Hasidic trainees and
>already trained professional Hasidic persons with a
>wide variety of both large and medium size New York
>businesses including most of the 'so-called' big 10
>national accounting firms and a number of sizeable
>New York based service and manufacturing entities.
>. . .
>
>"I believe it is important that you know that despite
>a considerable amount of effort on my part and a seem-
>ingly serious indication of initial interest on the part
>of a number of respectable businessmen in the possibil-
>ity . . . hiring Hasidic personnel . . . , not one
>single placement of Hasidic personnel was made . . .
>by those businessmen I contacted.
>
>"I am convinced that the reasons for my failure
>which were confirmed by off the record conversations
>with some of the people I had attempted to influence
>. . . was a prejudice possessed by the officials in
>management positions within the firms I contacted
>(no small part of which, ironically enough, in the
>New York metropolitan area are Jewish) against an
>association with Hasidic Jews.  The prejudice is
>obviously brought about by an intolerence or lack of
>understanding of Hasidic customs, language, dress
>and/or religious practices.  Among those refusing to
>act with whom I later spoke, concern was voiced
>about the adverse affect [sic] that association with
>people whose distinctive dress and habits are so
>blatently 'old country Jewish' would have on fellow

18/  C-1.

employees and management. As well, they feared a
possible alien reaction from non-Jewish employees
and a resentment among Jewish employees whose
desire to assimilate within the non-Jewish community
made them anxious to avoid an identity with Hasidic
types.

> "That a prejudice against the Hasidic community
> must have existed is even more apparent to me
> because the quality of those Hasidics who were
> available for either training or employment positions
> was undisputedly high and the experience of the few
> companies . . . which in the past had agreed to place
> trainees was excellent." (Emphasis in original.)

statement is corroborated by seven independent
sources, each of whom has witnessed or experienced difficulties in attempting
to secure training and employment opportunities for Hasidic Jews. 19/
Numerous first-hand accounts of employment discrimination related by
Hasidic Jews 20/ are corroborated by statements from other witnesses
knowledgeable in the problems of the Hasidic community. 21/

Discrimination by potential business customers. Many Hasidic
firms make or sell products or services that are marketed to other busi-
nesses. These Hasidic entrepreneurs often confront blatant discrimination
in the marketplace. The testimony of                      , a former
Assistant Director of the Office of Minority Business Enterprise (OMBE) 22/
in the Department of Commerce, documents such discrimination:

> "Among major corporations I have visited only one
> minority enterprise coordinator evidenced understanding
> and respect of the customs and traditions of Chassidics.
> All minority enterprise coordinators concurred that
> language difficulties constituted a significant barrier
> for buyers. 'They don't speak very good English.
> They're hard to communicate with' were oft repeated
> phrases. . . .

---

19/ C-5; C-6; C-12; E-7; PC-35; PC-37; PC-151.

20/ B-2; B-12; B-19 to 22.

21/ C-4; C-10; E-1; E-3 to 6; E-8; E-10; PC-15; PC-16; PC-28;
PC-39; PC-78; PC-126; PC-131; PC-132; PC-135.

22/ OMBE is now named the Minority Business Development Agency.

"Several coordinators confided that it would be helpful to have Chassidic businesses represented by sales agents or others whose outer appearance better conformed to 'established norms', thus partially overcoming corporate buyers' 'natural' resentment toward Chassidics." 23/

/ statement is corroborated by numerous other statements submitted as exhibits to the Hasidic application. 24/ Approximately thirty Hasidic businessmen have specifically identified difficulties in their relationships with potential buyers arising out of the cultural gap between buyer and Hasid. 25/ For example, one Hasidic entrepreneur operating an office supply company reported:

"Over the past six months, we have worked hard to increase volume by calling on larger firms, such as banks, insurance companies, and industrial corporations. We have been unsuccessful in obtaining even one such customer.

"The buyers at these large firms have consistently procrastinated, made excuses, raised peripheral issues, and in many other ways made it clear that they preferred to deal with 'their own kind.' As Chassidic Jews we operate at a substantial disadvantage in that the buyer will not deal with us even when we have offered the same quality and delivery at a lower price." 26/

Another Hasidic businessman reported:

"When I look for new accounts, they think that I am there for charity. That is because I dress the way all Hassidics do. Also, I do not speak English well, so it's not easy to speak with clients." 27/

---

23/ C-11.

24/ See, e.g., C-4; C-7; E-1; E-4 to 6.

25/ B-3 to 6; B-8; B-11 to 13; B-15 to 34; PC-63.

26/ B-23.

27/ B-11.

These statements are fairly typical of the difficulties encountered by Hasidic businessmen in search of business customers.

  <u>Discrimination in the financing of Hasidic businesses.</u> The pattern of discrimination against Hasidics that hampers their efforts to seek employment outside their community and cripples the efforts of Hasidic businessmen to attract potential buyers also permeates the relationship between Hasidic businessmen and commercial lending institutions. Knowledgeable, non-Hasidic sources indicate that, "[a]lthough bankers see themselves as probing deeper than the outward signs of dress, beard, speech those initial impressions created by this minority are deterrants [sic]" 28/ and that "financial personnel . . . avoid doing business with Hassidics." 29/ One source familiar with the Hasidic community in Williamsburg stated that "I have seen Chassidic business proposals turned down by banks where my experience would tell me similar majority proposals would likely to [sic] be funded." 30/ Many Hasidic businessmen feel that efforts to obtain loans from certain banks or other lending institutions are futile 31/ or that they are at a disadvantage in obtaining loans through normal banking channels. 32/

C. <u>The Hasidic Business Community</u>

  In addition to suffering from prejudice and discrimination, many Hasidic entrepreneurs -- like other small businessmen -- face an uphill battle to eke out a living for themselves and their families. 33/ Many Hasidic firms are marginal enterprises. 34/ Even some of the more

---

28/ C-7.

29/ C-4.

30/ C-12.

31/ See, e.g., B-6; B-7; B-9; B-10; B-34.

32/ See, e.g., B-15; B-32; see also E-1; E-4; E-5; PC-78.

33/ See, e.g., B-1; B-8; B-10; B-11; B-13; B-16; B-19; B-20; B-25; B-30; see also PC-17.

34/ See, e.g., B-31.

prosperous firms have narrow profit margins. 35/ Hasidic firms tend to be among the "first hit by recession, . . . downed by imports, . . . knocked by sophisticated machinery that only million dollar corporation[s] can acquire." 36/

Additionally, as with many small businessmen, "the general ability of Chassidics to avail themselves of first rate accounting services, of good legal assistance and other managerial and technical services is almost nil." 37/ There is a serious lack of management skills among many Hasidic entrepreneurs. 38/

Many Hasidic firms are retail or service businesses located within their own communities. They are a major source of employment for Hasidic Jews. 39/ A directory published by ODA gives a rough idea of the relatively narrow spectrum of firms in the Hasidic community. 40/ A large number are clustered in the textile, apparel, and knitting industries. Some firms cater to the special needs of Hasidic and other Orthodox Jews for religious articles, clothing, and kosher food. 41/ On the other hand, participation in fields such as the heavy construction trades is extremely limited. 42/

Some comments submitted in opposition to the Hasidic application took issue with the above description of the business community. Two major points were raised: That Hasidic Jews control large parts of New York City's diamond trade, 43/ and that Jews control a significant portion of the wealth in this country and have generally succeeded in the business world. 44/

35/ See, e.g., B-23.

36/ C-8.

37/ C-7; see also C-8; H-1 at 167; H-6 at 30.

38/ O-2 at 4.

39/ B-18; B-33.

40/ Exhibit M. A synthesis of this exhibit is presented in Appendix C.

41/ See also H-1 at 163; H-4 at 48.

42/ See also C-3.

43/ See, e.g., PC-73; PC-107; PC-108; PC-116; PC-141.

44/ See, e.g., PC-10; PC-44; PC-60; PC-71; PC-115.

There is undoubtedly some truth to the first point. Hasidic . Jews play a significant role in the diamond trade conducted on 47th Street in New York City. 45/ There is no question that some Hasidic businessmen are in the diamond and related industries. 46/ However, the number of Hasidic businesses in such industries appears to be relatively small when compared to the total number of Hasidic businesses. 47/ Further, the diamond industry has periodically suffered recession and provides a marginal and undependable income to most of those engaged in it. 48/ Thus, while the wealthy diamond merchant is probably the most visible of all Hasidic entrepreneurs, it would appear that his numbers are small and that he is not representative of the larger Hasidic business community.

The second point -- that Jews control great wealth and have succeeded in business -- is irrelevant to an evaluation of Hasidic circumstances. Whatever the accuracy of this timeworn stereotype, there is little to suggest that the Hasidim, who are culturally distinct from most other American Jews, 49/ have control over the levers of economic power in this country. The allegation that Jews own a majority of communications properties 50/ ignores the simple truth that the Hasidim -- who disdain radio, television, and most other public media -- own few, if any, communications properties. The argument that Jews have fared well in the legal and accounting fields 51/ ignores the fact that the Hasidim -- who generally disfavor secular and higher education -- have not fared well in those fields. Broad-based allegations about the economic power of American Jews have no probative value in deciding the issues raised by the Hasidic application.

---

45/ See generally "Diamonds: Worst Enemies," The Economist, October 8, 1977, at 51; "The Hard, Hard Sell," The Washington Post, March 19, 1979, at B1.

46/ H-4 at 48; H-6 at 30.

47/ For example, 7.4% of the firms listed in Appendix C are in the fields of "Jewelry, Watches, and Precious Stones." Additionally, according to one study, only 4.3% of the male household heads among the Satmar sect are diamond workers and contractors. See H-1 at 166.

48/ H-4 at 57; O-1 at 20.

49/ C-1; F-6.

50/ PC-82.

51/ PC-67.

Finally, at least one comment suggested that the Hasidic business community was relatively prosperous, appeared to be supported by a large number of Jewish-owned loan companies, and was comparable in cohesiveness to the Cuban business community in Miami. 52/ There is little doubt about the cohesiveness of the Hasidic business community, at least within each Hasidic sect. But with respect to the broader question raised, the bulk of the evidence indicates that many Hasidic businesses are struggling enterprises. Indeed, this Agency has licensed three Brooklyn-based Section 301(d) 53/ small business investment companies in part so that they may provide equity or debt financing to assist in the establishment or expansion of Hasidic businesses.

## D.   Socio-Economic Conditions in the Hasidic Community

There is evidence that some -- but by no means all 54/ -- Hasidic Jews are disadvantaged and lacking in basic social services because of the economic deprivation of their community. This evidence, however, all of which was submitted in support of the Hasidic application, is not without ambiguity.

Poverty, income and employment.   Numerous statements from objective observers characterized the Hasidim as an impoverished group. 55/ Both the South Williamsburg and Crown Heights areas have been designated by governmental agencies as poverty areas. 56/ The import of these classifications, though, is unclear. Those geographic areas are not exclusively populated by Hasidic Jews; they also

---

52/   PC-107.

53/   Section 301(d) of the Small Business Investment Act, 15-U.S.C. § 681(d).

54/   The bulk of the sociological and statistical data amassed in support of the application refers to the Hasidic community in Williamsburg -- principally the Satmar sect. A much smaller quantum of evidence has been submitted with respect to other communities and sects. See, e.g., L-1 to 5. It is not clear whether the well-documented deprivation of the Hasidim in Williamsburg is representative of conditions among other Hasidim.

55/   C-3; F-6; F-10; PC-17; see also PC-22.

56/   F-1; L-5 at 14.

include, for example, non-Hasidic Orthodox Jews as well as Hispanics. 57/ There is thus no absolute correlation between poverty in the South Williamsburg area and poverty in the Hasidic community there. 58/

Additionally, certain of the documents submitted in support of the application cast doubt on the contention that the Hasidim are an economically deprived group. For example, one expert reported that the Satmar sect experiences no serious economic deprivation and is characterized by neither great wealth nor extreme poverty. 59/ Another source reported that Crown Heights "is a good middle-class neighborhood" -- and then announced its "poverty area" designation in the next paragraph. 60/ A third source characterized the Village of Kiryas Joel near Monroe, New York, as a model middle-class community, albeit one where household incomes are low. 61/

In any event, it is well recognized that certain features of the Hasidic culture -- large families, parochial schools, expensive Kosher food -- place economic demands on Hasidic Jews beyond those imposed on most other Americans. 62/ Thus, the Hasidic family which is slightly above the poverty line may in fact face economic burdens which are greater than those confronting non-Hasidic families below the poverty line.

---

57/ One comment opposing the application objected to the use of census data to prove economic deprivation within the Hasidic community. PC-110. This objection is valid. Thus, this decision does not heavily rely on census data; and, where such data is used, inferences drawn are corroborated by other sources. This is not to suggest, however, that the presentation of ironclad statistical data is a prerequisite to a group designation of social disadvantage.

58/ Cf. O-1 at 19; PC-122; PC-130.

59/ H-1 at 167; 187; 258-9 n.6.

60/ L-5 at 14.

61/ L-1.

62/ K-1 at 21. It should be noted that some non-Hasidic Orthodox Jews suffer these economic burdens as well.

It is also well established that Hasidic Jews have great difficulty finding jobs in the non-Hasidic private sector. They often encounter blatant discrimination in the job market, and are doubly handicapped by their lack of skills and language problems. 63/ As a result, many un-skilled Hasidic workers have no choice but to take jobs in Hasidic-owned businesses, where wages often are low and opportunities for advancement limited. 64/ The burgeoning number of Hasidim, combined with the marginal lines of industry in which Hasidic firms tend to concentrate, make it impossible for those firms to provide an adequate number of jobs to support the local labor force. 65/ The result is an unemployment rate among the Hasidim which is often estimated in the 18-20% range. 66/

Health care. The evidence is overwhelming that the Hasidim in the Williamsburg area have substantial health and health care problems. The Government has declared the South Williamsburg area to be a Health Manpower Shortage Area, Dental Care Manpower Shortage Area, and Medically Underserved Area. 67/ With their soaring birth rate and large concentration of elderly persons, the Hasidim desperately need medical services; but the lack of doctors in the area (in part due to Hasidic strictures against higher education) makes it difficult to ade-quately provide medical care to the community. 68/

Housing. There is a severe shortage of housing in the South Williamsburg area. According to 1970 census figures, 31.1% of all housing units in the area had one bedroom; 46.7% of the units had two bedrooms; only 21.1% of the units had three or more bedrooms. 69/ The large size and relatively low income of most Hasidic families and the continuous population growth of the Hasidic community exacerbate the shortage of housing in the area. 70/

The foregoing are the facts revealed by the application and the public comments. However, before making a determination with regard to the "social disadvantage" of Hasidic Jews within the meaning of P. L. 95-507, we must first turn to the legal questions involved.

---

63/  C-2; C-5; C-10; E-1; E-7; E-10; O-1 at 28.

64/  PC-33.

65/  E-1; H-4 at 57; O-1 at 28.

66/  C-6; C-10; E-1; F-2; G-2; H-6 at 23; O-1 at 28; O-1 at F4.

67/  F-1; F-7; G-4; G-5; PC-130.

68/  F-2; F-6; F-10; G-5; O-1 at 42; PC-128; PC-129.

69/  G-8.

70/  C-10; O-1 at 24; PC-129.

## THE LEGAL ISSUES

The Hasidic application raises two critical questions. First, are Hasidic Jews eligible to participate in the 8(a) and 8(d) programs? Second, if eligible, can they, upon a proper factual showing, gain the procedural advantages of group designation?

A.    Eligibility of the Hasidim

The application and public comments raise a number of fundamental legal issues pertaining to eligibility. These issues are addressed below.

The volition issue. Numerous comments opposed the application on the basis that disadvantages suffered by the Hasidim are self-imposed. The Hasidic lifestyle, it was argued, is a matter of personal choice arising out of religious beliefs; thus, the consequent discrimination and economic deprivation suffered by the Hasidim is not something "over which they have no control." 71/ Many comments emphasized that, in contrast to the Hasidim, Blacks and other traditional minorities have no choice with respect to the color of their skin and hence literally no control over the social disadvantages imposed on them by race.

From a literal standpoint, this argument is unassailable. The practices of the Hasidim which engender bias -- their distinctive appearance, for example -- are ultimately matters of choice. 72/ No matter how deep rooted the cultural convictions and religious beliefs which prompt behavior that is objectionable to others, the decision

---

71/    This statutory test is found in Section 2(e)(1)(B) of the Small Business Act, 15 U.S.C. § 631(e)(1)(B). It was contained in the preamble to the 1978 amendments to the Act providing a statutory basis for the 8(a) program.

72/    On the other hand, if a Hasidic is disadvantaged because of his cultural background -- as opposed to his cultural convictions -- it would not be accurate to consider that a matter of choice. The Hasidic youth raised in a home where Yiddish is spoken and sent to a yeshiva for his schooling, who then develops an English language disability, cannot fairly be said to have chosen his disadvantage. That disadvantage was imposed on him by the environment in which he was raised.

to adhere to and act upon those convictions is a voluntary one. In that sense, every individual -- whether raised as a Hasidic Jew, devout Christian, or fervent nonbeliever -- ultimately has free will and is responsible for those actions predicated on his or her religious beliefs.

From a legal standpoint, however, this argument must be rejected. Congress did not intend the control test to be interpreted so literally as to disqualify individual Hasidim from entry into the 8(a) program. The control test originated in the House version of P.L. 95-507. In its report on the bill, the House Committee on Small Business quite clearly defined the test in such a manner that Hasidic firms would not be disqualified from receiving 8(a) assistance:

> "The committee also notes that social dis-
> advantage within the meaning of paragraph (6) can
> arise from an individual's cultural background and
> the committee further realizes that deep rooted
> cultural convictions should not be considered a
> social cause over which the individual has control
> within the context of paragraph (6)." (Emphasis
> added.) 73/

While the referenced section of the House bill did not survive conference, it was closely analogous in concept and language to the control test contained in P.L. 95-507. 74/ There is nothing in the subsequent legislative history suggesting a Congressional desire to reject the House Committee's interpretation of the control test. It is thus not within SBA's discretion to disregard this explicit, considered judgment of Congress and disqualify otherwise eligible Hasidic firms from entry into the 8(a) program.

Even more fundamentally, to exclude such firms from participation in the 8(a) program because their principals refuse to renounce religious beliefs would raise serious constitutional questions. Such a decision might well abridge the right of Hasidic Jews to the free exercise of religion guaranteed them by the First Amendment. 75/

---

73/   H.R. Rep. No. 95-949, 95th Cong., 2nd Sess. 9 (1978).

74/   If anything, the above language in the House Committee's report on the bill supports the interpretation that SBA continue its well-established administrative practice of allowing otherwise eligible Hasidic firms into the 8(a) program.

75/   Cf. Sherbert v. Verner, 374 U.S. 398 (1963).

The race/ethnicity issue. Several comments opposed the application on the assumption that eligibility for the 8(a) program is limited to those who have suffered social disadvantage because of their race or ethnicity. This is simply an inaccurate reading of the law. The Small Business Act defines "socially disadvantaged individuals" as "those who have have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities." 76/ It neither explicitly nor implicitly limits the benefits of the program to racial or ethnic minorities. This plain reading of the statute is confirmed by its legislative history, which makes clear that, while Congress anticipated that the primary beneficiaries of the 8(a) program would be racial and ethnic minorities, no individual could be excluded from the program simply because he was White or a member of a group not considered a traditional minority group. 77/

The viability issue. Before a firm which is owned by socially and economically disadvantaged individuals can be certified as eligible to receive 8(a) assistance, SBA must determine "that with contract, financial, technical, and management support the small business concern . . . has reasonable prospects for success in competing in the private sector." 78/ This statutory test reflects congressional intent that the 8(a) program be a business development program, not a welfare scheme to help marginal firms with little prospects of success. Several comments opposed the Hasidic application on the theory that, since Hasidic Jews will not conform their conduct and appearance to accepted business norms, Hasidic firms will never be able to achieve viability and graduate from the 8(a) program. This argument is defective in two respects.

As a conceptual matter, the issue of a firm's viability is distinct from the issue of whether those who own and control it are socially disadvantaged. The Hasidic application implicates only the latter issue. If a business can establish social and economic disadvantage for purposes

---

76/ Section 8(a)(5) of the Small Business Act, 15 U.S.C. § 637(a)(5). (Emphasis added.)

77/ H.R. Rep. No. 95-949, 95th Cong., 2nd Sess. 9-10 (1978); S. Rep. No. 95-1070, 95th Cong., 2nd Sess. 15 (1978); H.R. Rep. No. 95-1714, 95th Cong., 2d Sess. 21-23 (1978).

78/ Section 8(a)(7) of the Small Business Act, 15 U.S.C. § 637 (a) (7).

of the 8(a) program, SBA will then make a separate determination as to whether the firm has reasonable prospects for success in competing in the private sector. At that juncture, if the business does not appear to be viable, SBA will refrain from certifying it as eligible to receive 8(a) assistance. 79/

More importantly, this Agency must reject the notion that Hasidic entrepreneurs should be denied governmental assistance en masse 80/ because of societal prejudice against them. The 8(a) program is designed to help firms overcome such prejudice by giving them the opportunity to develop a track record which will enhance their business mobility. The Hasidic work ethic -- tenacity, frugality, discipline, and dedication 81/ -- is conducive to success in the business world; and various cultural practices, such as refraining from working on Saturdays, do not substantially impair the Hasidic firm's prospects for success. Under these circumstances, for SBA to turn its back on Hasidic entrepreneurs because some parts of the business community presently reject their lifestyle would in effect sanction and bolster such prejudice, and would be contrary to the spirit and purpose of the 8(a) program.

CONCLUSION. Congress intended, and the law requires, that Hasidic firms owned and controlled by socially and economically disadvantaged persons be eligible to participate in the 8(a) and 8(d) programs.

B.  Availability to the Hasidim of a Group Designation of Social Disadvantage

The application for group designation raises serious constitutional problems which this Agency cannot responsibly ignore in determining whether Congress intended that Hasidic Jews could be designated a socially disadvantaged group upon an appropriate factual showing.

---

79/  The 8(d) program contains no analogous viability requirement.

80/  An individual Hasidic firm, of course, may be unable, based on its particular circumstances, to establish its viability.

81/  C-2; C-3; C-9; see also B-1; B-3 to 5; B-12; B-14; B-15; B-19; B-23; B-25; B-32.

Constitutional constraints. However one wishes to characterize the Hasidim, they are first, foremost, and fundamentally a religious group. Their cultural distinctiveness derives from religious beliefs. The bias they suffer in the marketplace as a result of that cultural distinctiveness stems from adherence to religious doctrine. The Hasidim are not just another group arguably comprised of members who are socially disadvantaged; they are a religious group. Their application in effect asks SBA to designate a religious group for special treatment with respect to the administration of the 8(a) and 8(d) programs.

Government ventures into the thicket of religion threaten First Amendment values. Under our Constitution, no government can "pass laws which aid one religion, aid all religions, or prefer one religion over another."[82] Yet, if SBA approves the Hasidic application, it might be forced to depart from the neutral stance toward religion which the Constitution requires.

At first glance, Hasidic participation in the 8(a) and 8(d) programs does not appear to raise a serious issue with regard to the the Constitution's prohibition of any governmental establishment of religion. It is difficult to conclude that programs to assist the business development of socially and economically disadvantaged individuals have anything other than a secular purpose and effect, or necessitate impermissible governmental entanglement with religion.[83] Moreover, as mentioned above,[84] excluding individuals who are found to have been discriminated against on the basis of culture because that culture proceeds from religious beliefs, may well violate the constitutional guarantee of the free exercise of those beliefs.

If, however, the focus shifts from the programs' end result of contracts for individual businesses to group designation as a discrete process, the constitutional issue becomes more acute. A clear effect of the precise action sought by the application -- administrative designation of the Hasidim as socially disadvantaged -- is that the benefit of expedited processing into the 8(a) and 8(d) programs would be conferred on the Hasidim as Hasidim. On its face, at a minimum, such governmental action hardly suggests a neutral stance toward religion.

---

82/ Everson v. Board of Education, 330 U.S. 1, 15 (1947)

83/ Cf. Lemon v. Kurtzman, 403 U.S. 602, 612-13 (1971).

84/ See text accompanying footnote 75.

With respect to the 8(d) program, a consequence of approving a group designation of social disadvantage is that contractors could presume that any Hasidic firm is owned by socially and economically disadvantaged individuals. Yet, while all Hasidic entrepreneurs arguably may be socially disadvantaged, there undoubtedly are some who may not actually be economically disadvantaged. The significance of allowing Hasidic firms who would not otherwise qualify to participate in the 8(d) program might well be to "aid one religion," at least in the sense of aiding those adherents on the basis of their religious affiliation.

With respect to both the 8(a) and 8(d) programs, the classification would be an underinclusive one as it pertains to members of other religious groups. Consider, for example, the plight of the non-Hasidic Orthodox Jew who is objectively as socially and economically disadvantaged as his Hasidic neighbor. 85/ Notwithstanding the similarity between their objective conditions, the non-Hasidic Orthodox Jew would face a longer route in qualifying for the 8(a) and 8(d) programs than would the Hasidic Jew, if the group designation of social disadvantage is approved for the Hasidim. In that context, the Government could be viewed as "preferring one religion over another", at least in the sense of making it easier for the adherents of Hasidism as compared to similarly situated non-Hasidics to qualify for governmental assistance and subcontracting opportunities.

Of course, if group access is available to a number of religions or religious subgroups, any favoritism involved in approving the group designation for the Hasidim might be overcome. However, if such groups were given a group designation without making as strong a factual showing as the Hasidim, SBA could rightly be accused of lowering its standards in order to accommodate religious groups. This might mean the inevitable obliteration of the statutory test that there be actual discrimination toward the particular culture, and thus might cast doubt on the purportedly secular purpose and effect of the group designations.

These and other constitutional problems raised by the Hasidic application are heightened by the fact that denying their request for a group designation will not alone deny them access to either the 8(a) or 8(d) program. It will only deny them the procedural short-cut to those programs

---

85/ This is not a hypothetical situation. According to information submitted in support of the Hasidic application, many non-Hasidic Orthodox Jews have language and educational deficiencies, suffer from the trauma of the Holocaust and resurgent anti-Semitism, have health and employment problems, and must pay for the same specialized goods and services -- kosher food, parochial schools -- which the Hasidim also purchase.

which Congress has authorized for traditional minority groups. While this consequence may seem burdensome to individual Hasidic firms and, to that extent, offend a general sense of equity, it may be the inevitable price which must be paid to ensure the separation of church and state.

But these weighty constitutional matters need not be resolved in this decision. Given the gravity of the constitutional questions involved, it would be an inappropriate use of this Agency's discretion to establish a religious classification for purposes of the 8(a) and 8(d) programs in the absence of a clear Congressional mandate.

Congressional intent. Neither the language nor legislative history of P. L. 95-507 reveals a mandate to establish such a religious classi- fication. Instead, we interpret P. L. 95-507 as making members of such groups eligible for the 8(a) and 8(d) programs, but solely on an individual basis.

The express language of P. L. 95-507 does not take cognizance of religiously-based cultural groups. The 8(a) program is based in part on a Congressional finding that groups with members who are socially disadvantaged "include, but are not limited to, Black Americans, Hispanic Americans, Native Americans, and other minorities."86/ None of the three groups designated in the statute is a religiously-based cultural group.87/ Thus, the canons of statutory construction neither suggest nor compel the conclusion that the term "other minorities" is meant to include groups such as the Hasidim. If anything, the absence of a statutory reference to a religiously-based cultural group indicates Congressional disinterest in, or disapproval of, such a designation.

Indeed, the legislative history suggests Congressional disapproval of such a designation. The House version of P. L. 95-507 88/ contained a proposed Section 8(a)(5) to be added to the Small Business Act which established a presumption that socially and economically disadvantaged groups and group members included, but would not be limited to, Blacks and Hispanics. It was contemplated that pursuant to that section SBA would

---

86/ Section 2(e)(1)(D) of the Small Business Act, 15 U.S.C. § 631(e)(1)(D). (Emphasis added.)

87/ Nor has SBA made any administrative determination that religiously- based cultural groups may receive a group designation of social dis- advantage. The only group which has thus far been administratively determined to be socially disadvantaged is the Asian Pacific Americans. See 44 F.R. 42832 (July 20, 1979).

88/ H.R. 11318, 95th Cong., 2nd Sess. (as passed by the House of Representatives, March 20, 1978).

23

designate other minority groups it believed should be afforded the presumption. 89/ The same bill contained a proposed Section 8(a)(6) which allowed a person not a member of a group presumed to be socially and economically disadvantaged to establish his or her disadvantage on the basis of an individualized showing to SBA.

In construing these two sections of the bill, the House Committee on Small Business indicated that the group designation procedure available under Section 8(a) (5) applied only to racial and ethnic minorities, not to religiously-based cultural groups:

> "It should be noted that the test for racial and ethnic minorities in paragraph (5) involves a finding of disadvantaged also on the basis of status, i.e., identification as a racial or ethnic minority, a factor over which the individual has no control and which can be correlated empirically with business impediments not generally common to all small business people. Therefore the major distinction between applicants under paragraphs (5) and (6) is who bears the burden of proving or disproving disadvantaged status. The designated [i.e., by statute or Agency action] racial and ethnic minorities are presumed socially and economically disadvantaged unless SBA can prove otherwise. Others must prove social and economic disadvantage to SBA's satisfaction.

> "The committee also notes that social disadvantage within the meaning of paragraph (6) can arise from an individual's cultural background and the committee further realizes that deep rooted cultural convictions should not be considered a social cause over which the individual has control within the context of paragraph (6)." (Emphasis added.) 90/

---

89/ H.R. Rep. No. 95-949, 95th Cong., 2nd Sess. 9 (1978).

90/ Id.

Thus, it appears that the House intended that members of religiously-based groups such as the Hasidim could be eligible for the 8(a) and 8(d) programs, but solely on an individual basis.

This decision was grounded, at least in part, on the fear that explicitly designating Hasidic Jews as a socially disadvantaged group would raise the sort of constitutional difficulties highlighted above. In the words of one member of the House Committee:

> "During the mark-up and final passage of
> H. R. 11318 in the Small Business Committee, the
> option was available to every member to offer amend-
> ments to include minority groups other than Blacks
> and Hispanics. . . . While I, for one, could have
> offered an amendment naming the Chassidic Jews,
> I was convinced that reference in legislation to any
> such group . . . would result in lengthy, acrimonious
> and counterproductive debate and possible constitu-
> tional challenge." (Latter emphasis added.) 91/

The only significant change in the conference's version of access to the 8(a) and 8(d) programs other than the inclusion of Native Americans is that the House's rebuttable presumption that each member of a racial and ethnic minority is socially and economically disadvantaged was deleted. Instead, there were two conclusive presumptions: One, designated groups were deemed to be socially disadvantaged for purposes of the 8(a) program, with each member having the burden of establishing his or her economic disadvantage. Two, members of such groups were deemed to be socially and economically disadvantaged for purposes of the 8(d) program. However, this revision hardly constitutes a rejection of the cited legislative history.

Additionally, contemporaneously with the passage of P. L. 95-507, there was considerable Congressional sentiment that the "cultural bias" standard for social disadvantage be narrowly interpreted by SBA. The conference committee report was presented to the House on that basis:

> "Of course, we hope that SBA will narrowly
> confine the use of the 'cultural bias' test to
> those instances where, because of residing in
> a depressed area or similar circumstance,
> one is, through no fault of his or her own, unable
> to overcome social barriers." 92/

---

91/ PC-147.

92/ 124 Cong. Rec. H. 11819 (daily ed. Oct. 6, 1978).

The conference committee report was presented to the Senate on a similarly cautionary note:

> "Thus, although it is expected that the vast majority of 8(a) program participants will come from racial and ethnic minorities, others will be able to participate provided that they can, on a case-by-case basis, satisfy the eligibility criteria." 93/

By requiring that members of religiously-based cultural groups enter the 8(a) and 8(d) programs on an individual track, SBA would simultaneously be faithful to the intent of Congress by narrowly confining the use of the cultural bias standard in group determinations, and avoid the potential constitutional problems which would accompany a group designation in the case of a religiously-based cultural group.

      CONCLUSION. In light of the serious constitutional questions raised by the Hasidic application, it would be an abuse of discretion for SBA, absent express Congressional direction, to render a decision which might establish an impermissible religious classification.

## DECISION

      Hasidic firms owned and controlled by socially and economically disadvantaged persons are eligible to participate in the 8(a) and 8(d) programs, but not on the basis of a group designation of social disadvantage.

      Thus, the Hasidic entrepreneur seeking entry into the 8(a) program must first make an individualized showing of social disadvantage. 94/ In order to be certified into the 8(a) program, the firm would then have to meet the other eligibility requirements imposed by law, just as members of groups designated as socially disadvantaged must meet those requirements. With respect to the 8(d) program, a contractor of the Federal Government shall presume that socially and economically disadvantaged individuals shall include those Hasidic Jewish Americans who have been found by SBA to be socially and economically disadvantaged pursuant to Section 8(a) of the Small Business Act.

---

93/    124 Cong. Rec. S. 17909 (daily ed. Oct. 10, 1978).

94/    Based on the information submitted in support of the Hasidic application and without prejudging any particular case, it is frankly anticipated that the typical Hasidic entrepreneur will have little difficulty in establishing his or her social disadvantage.