# EXHIBIT 23

1          UNITED STATES DISTRICT COURT FOR THE
                EASTERN DISTRICT OF TENNESSEE

2

3    _____

                                        :

4    ULTIMA SERVICES CORPORATION    :

                                        :

5              v.              :  Case No.

                                        :    2:2020cv00041

6    U.S. DEPARTMENT OF         :

     AGRICULTURE, et al.,       :

7    _____:

8

9              Monday, April 25, 2022

10

11          30(b)(6) Zoom Videoconference

12   deposition of JOHN KLEIN, taken with the witness

13   participating from his residence, beginning at

14   9:38 a.m., Eastern Standard Time, before Ryan K.

15   Black, a Registered Professional Reporter,

16   Certified Livenote Reporter and Notary Public.

17

18

19

20

21

22

23

24

25

```
 1          A P P E A R A N C E S:
 2
 3          THE CENTER FOR INDIVIDUAL RIGHTS
            BY:  MICHAEL E. ROSMAN, ESQ. - Via Zoom
 4               MICHELLE A. SCOTT, ESQ. - Via Zoom
            1100 Connecticut Ave., N.W.
 5          Suite 625
            Washington, DC  20036
 6          202.833.8400
            rosman@cir-usa.org
 7          scott@cir-usa.org
 8          Representing - Ultima Services Corporation
 9          UNITED STATES DEPARTMENT OF JUSTICE
            CIVIL RIGHTS DIVISION
10          BY:  K'SHAANI SMITH, ESQ. - Via Zoom
            950 Pennsylvania Avenue NW
11          Washington, DC  20530
            k'shaani.smith@usdoj.gov
12
                 - and -
13
            UNITED STATES DEPARTMENT OF JUSTICE
14          CIVIL RIGHTS DIVISION
            BY:  JULIET GRAY, ESQ. - Via Zoom
15               CHRISTINE DINAN, ESQ. - Via Zoom
            150 M Street NE
16          Washington, DC  20002
            juliet.gray@usdoj.gov
17          christine.dinan@usdoj.gov
18          Representing - U.S. Department of Agriculture
19          SMALL BUSINESS ADMINISTRATION
            BY:  DAVID FISHMAN, ESQ. - Via Zoom
20               KAREN HUNTER, ESQ. - Via Zoom
            409 3rd Street SW
21          Washington, DC  20416
            800.827.5722
22          david.fishman@sba.gov
            karen.hunter@sba.gov
23
            Representing - Small Business Administration
24
25
```

Case 2:20-cv-00041-DCLC-CRW   Document 65-7   Filed 06/21/22   Page 3 of 51
PageID #: 1801

1                        I N D E X

2     TESTIMONY OF:  JOHN KLEIN                     PAGE

3     By Mr. Rosman.............................6, 211

4     By Ms. Smith...............................206

5

6                      E X H I B I T S

7     EXHIBIT           DESCRIPTION                 PAGE

8     Klein 1    a document Bates Numbered US0050764

9               through US0050774..................26

10    Klein 2    a document Bates Numbered US0071620

11               through US0071621..................37

12    Klein 3    a document titled Federal Register,

13               dated Thursday, October 12, 2002,

14               Executive Order 13170 - Increasing

15               Access and Opportunities for

16               Disadvantaged Businesses...........41

17    Klein 4    a document titled Form 1010, 8(a)

18               Application........................61

19    Klein 5    a document titled Form 1010-IND.....61

20    Klein 6    a document Bates Numbered US0051094

21               through US0051215.................122

22    Klein 7    a document Bates Numbered US0050780

23               through US0050923.................122

24    Klein 8    a document Bates Numbered US0050948

25               through US0050970.................122

Case 2:20-cv-00041-DCLC-CRW   Document 65-7   Filed 06/21/22   Page 4 of 51
PageID #: 1802

1                    I N D E X (Cont'd)

2        EXHIBIT            DESCRIPTION              PAGE

3        Klein 9   a document Bates Numbered US104099

4                  through US104103...................144

5        Klein 10  a document Bates Numbered US0104107

6                  through US0104108..................145

7        Klein 11  a document Bates Numbered US0063188

8                  through US0063190..................151

9        Klein 12  a document Bates Numbered US0063899

10                 through US0063905..................151

11       Klein 13  a document Bates Numbered US0062817

12                 through US0062818..................155

13       Klein 14  a document Bates Numbered US0052929

14                 through US0052938..................155

15       Klein 15  a document Bates Numbered US0054376

16                 through US0054378..................163

17       Klein 16  a document Bates Numbered US0054351

18                 through US0054352..................166

19       Klein 17  a document Bates Numbered US0063192

20                 through US0063194..................168

21       Klein 18  a document Bates Numbered US0114698

22                 through US0114701..................171

23       Klein 19  a document Bates Numbered US0063336

24                 through US0063339..................172

25

1                    I N D E X (Cont'd)

2        EXHIBIT           DESCRIPTION              PAGE

3        Klein 20    Incorrectly marked.................173

4        Klein 21    a document Bates Numbered US063333

5                    through US063335...................173

6        Klein 22    a document Bates Numbered US0052868

7                    through US0052870..................176

8        Klein 23    a document Bates Numbered US0063537

9                    through US0063538..................177

10       Klein 24    a document Bates Numbered US0052943

11                   through US0052945..................181

12       Klein 25    Incorrectly marked.................181

13       Klein 26    a document Bates Numbered US0053299

14                   through US0053300..................181

15

16

17

18

19

20

21

22

23

24

25

1      things of that sort.  They're also part of --
2      our headquarters in the Office of Business
3      Development has two field offices that deal with
4      8(a) eligibility cases, one in Philadelphia and
5      one from San Francisco.  We also have several
6      disaster offices throughout the country, as well.
7          Q.   Were you done with your answer?
8          A.   Yeah.
9          Q.   Okay.  Are the offices in San Francisco
10     and Philadelphia also called central office duty
11     stations?
12         A.   I think that's probably true, yes.
13         Q.   So the General Contracting and Business
14     Development Office is a division of the Small
15     Business Administration, correct?
16         A.   Yes.
17         Q.   Okay.  And give me a general description
18     of what it does.
19         A.   Well, you know, SBA has three basic
20     functions:  Credit, capital and contracts.  So
21     there's different parts of those things.  The
22     Office of Government Contracting and Business
23     Development has all the government contracting
24     programs, in addition to 8(a) Business
25     Development Program.  It oversees the Small

1    Disadvantaged Business Programs, the Service

2    Disabled Vet Program, Women-Owned Small Business

3    Program, the Hub Zone Program, Small Business

4    Set-asides, Size Standards, 8(a) Business

5    Development, generally.  That's what's within

6    that program area.

7         Q.   Okay.  Then let me just make sure I

8    understood your answer.  Within their aegis is

9    size standards; is that right?

10        A.   Yes.

11        Q.   And it also supervises the 8(a) Business

12   Development Program; is that right?

13        A.   Yes.

14        Q.   Okay.  Mr. Hidalgo, is he the associate

15   administrator for the Government Contracting and

16   Business Development Office?

17        A.   Yes, she is.  Bibi Hidalgo.

18        Q.   Mm-hmm.  And Bibi is B-i-b-i, correct?

19        A.   Correct.

20        Q.   All right.  And other than supervising

21   the general duties of that office, does he have

22   any other duties?

23             MR. FISHMAN:  It's a she.  He's a

24   syndicated.

25             MR. ROSMAN:  Oh, I apologize.  My bad.

1    I didn't hear you.

2    BY MR. ROSMAN:

3        Q.   So I'll repeat the question but use the

4    correct pronoun.  Does she have any other office

5    -- sorry.  Start again.

6        Does she have any other responsibilities

7    other than supervising that office?

8        A.   I don't think so.

9        Q.   Okay.  Is the Office of Business

10   Development a separate office within the General

11   Contracting and Business Development Office?

12       A.   It is a cell office.  There are

13   several cell offices under BCBD, the Office of

14   Business Development, the Office of Government

15   Contracting, the Office of Hub Zones and the

16   Office of Procurement Policy and Liaison are all

17   underneath the government contracting and

18   business development big office.

19       Q.   I don't think I heard the word that you

20   used at the beginning of your answer.  What kind

21   of offices are considered?

22       A.   I don't understand that question.

23   What kinds of offices are considered?  That

24   doesn't make sense.  What does that mean?

25       Q.   No.  No.  You used a word at the

Case 2:20-cv-00041-DCLC-CRW   Document 65-7   Filed 06/21/22   Page 9 of 51
PageID #: 1807

1      beginning of your response to my last question

2      and I didn't hear it.  Was it a suboffice?

3            A.   Maybe that's what I said, sure.

4            Q.   Ms. Peebles is the administrator of the

5      Office of Business Development; is that right?

6            A.   I'm sorry?

7            Q.   Is Ms. Peebles --

8            A.   Yes.

9            Q.   -- the Administrator of the Office of

10     Business Development?

11           A.   She's the associate administrator for

12     Business Development.

13           Q.   And does she report to Ms. Hidalgo?

14           A.   Yes.

15           Q.   Okay.  Generally, what are her duties?

16           A.   She oversees the running of the Business

17     Development -- 8(a) Business Development Program,

18     all aspects of it, in terms of eligibility, in

19     terms of Business Development 7(j) assistance, in

20     terms of eligibility for contracting.  All those

21     sorts of issues.

22           Q.   Okay.  In the Small Business

23     Act, there's a position called the Associate

24     Administrator for Minority Small Business and

25     Capital Ownership Development.  Is that

1       a different position from the one that

2       Ms. Peebles has?

3           A.   No.  That is the exact position.  They

4       just changed the name in practice.

5           Q.   When was the name changed in practice?

6           A.   Many years ago.

7           Q.   Do you know why?

8           A.   I do not know why.  That's a political

9       issue.

10          Q.   Okay.  Oh, I should have asked this at

11      the outset:  Are you a political appointee?

12          A.   No.

13          Q.   Are you in the senior executive service?

14          A.   Yes.

15          Q.   Is there something within the Office

16      of Business Development called the Office of

17      Certification and Eligibility?

18          A.   Yes.

19          Q.   And can you tell me what that is?

20          A.   That is the office that processes all

21      8(a) applications to be admitted to the program.

22      It also oversees certain annual reviews to ensure

23      continued 8(a) eligibility, and it initiates

24      termination and suspension actions when

25      firms should no longer be in the program.

1      Q.    There's something in the Small Business

2      Act called the Division of Program Certification

3      and Eligibility.  Is that different from the

4      Office of Certification and Eligibility?

5      A.    No.

6      Q.    There was a name change at some point?

7      A.    From time to time, depending upon -- you

8      know, sometimes different administrations called

9      it an office, sometimes they called it a

10     division, but it is the same office.

11     Q.    Who's the current director of that

12     office?

13     A.    Sandra Barrett.

14     Q.    I referred earlier to the central office

15     duty stations.  Are they a part of the Office of

16     Certification and Eligibility?

17     A.    Yes.  Those two are.

18     Q.    I'm sorry.  Those two ... I didn't hear

19     the last word.

20     A.    Yes.  They are part of that office, yes.

21     Q.    Okay.  Is there something within the

22     Office of Business Development called the Office

23     of Management and Technical Assistance?

24     A.    That is a suboffice underneath the

25     Office of Business Development, correct.

Case 2:20-cv-00041-DCLC-CRW   Document 65-7   Filed 06/21/22   Page 12 of 51
PageID #: 1810

1           A.    I don't know the answer to that.  I

2      don't think we've done a whole new version in the

3      last few years.  We've changed a few sections

4      here and there.  So maybe you need to look at

5      that particular page where the change is and see

6      whether or not that was changed or not.  But we

7      have not put out a whole new SOP in the last few

8      years.

9           Q.    Okay.  Are you familiar with 408

10     reports?

11          A.    Yes.

12          Q.    Could you just identify what a 408

13     report is?

14          A.    Well, it was a authorized by Section 408

15     of this law way back when.  And it authorizes

16     -- I mean it requires SBA to report to Congress

17     certain types of data regarding of participants

18     in a program, dollars, things of that sort.

19          Q.    Does the SBA still produce 408 reports?

20          A.    It does do it.  Unfortunately, it is not

21     up to date in doing them, but it does do them,

22     yes.

23          Q.    The last one that was produced to us was

24     for fiscal year 2017.  Has one been done since

25     then?

1       A.   I think it has not been done since then,

2       because several years were produced, but then

3       they had to get 508 compliant.  And that stopped

4       the process, unfortunately, and we have a

5       contractor working on that as we speak.

6       Q.   And so what kind of compliance did it

7       need to get?  Say it again, please.

8       A.   508 compliant for the blind and

9       handicapped.

10      Q.   And so have drafts of subsequent years'

11      reports been made?

12      A.   I believe that's true, yes.

13      Q.   Do you know for what years?

14      A.   At least two more years.

15      Q.   So that would be fiscal year 2018 and

16      fiscal year 2019; --

17      A.   I think that's correct.

18      Q.   -- is that right?

19      A.   I think that's correct.  I'm not

20      positive, but I think that's correct.

21      Q.   Describe for me in general terms what

22      the respective roles of the SBA and other federal

23      agencies are in the program of the 8(a) Business

24      Development Program.

25      A.   So SBA is involved in all aspects of the

1          program, obviously.  And from certifying firms up

2          front, again, to determining eligibility every

3          year, to terminating firms from the program when

4          they're no longer eligible.  We're also involved

5          in setting policies and guidance regarding

6          contracting through the 8(a) Program.  And we are

7          involved in accepting offerings into the 8(a)

8          Program when the procuring agency decides to

9          procure through the 8(a) Program.

10                 The 8(a) Program is a discretionary

11         program.  The procuring agency has the discretion

12         to use it or not use it depending upon what meets

13         their best needs.

14             Q.   Okay.  Does the SBA generally have

15         partnership agreements with other federal

16         agencies to implement the 8(a) Business

17         Development Program?

18             A.   Yes.  And the partnership agreement,

19         basically -- I mean, well, let me start again.

20                 By statute SBA is the prime

21         contractor with the procuring agency, and then

22         SBA subcontracts the performance of the contract

23         to 8(a)-certified firms.  Through the partnership

24         agreement, we've eliminated that process.  The

25         SBA has delegated its contract execution

1      functions to procuring agencies so they can

2      contract directly with the 8(a) participant.

3         Q.  As I understand it, though, the

4      contracts still have to identify the SBA as

5      the prime contractor; is that right?

6         A.  I think that they do through the

7      partnership agreement, but I think the contract

8      itself does not necessarily have to do that any

9      longer.

10        Q.  So the contract cannot refer to the SBA;

11     is that right?

12        A.  I think it's depending upon the agency.

13     Some do and some don't.  I don't want to say what

14     they do across the board because I don't think

15     it's consistent.

16          MR. ROSMAN:  Michelle, would you

17     introduce the partnership agreement as an

18     exhibit.

19          MS. SCOTT:  Yeah.  Hold on one second.

20     The partnership agreement?

21          MR. ROSMAN:  Yeah.  Partnership AG, I

22     think, is how it's labeled.

23     BY MR. ROSMAN:

24        Q.  So I looked at a number of partnership

25     agreements that you have on the web.  Is there a

1    it.  It could be that or it could be, "do you
2    have any."  "I have firms that can do X, Y and Z.
3    Do you have any firms that can do that kind of
4    -- any opportunities coming up in that area."
5    So it could be one way or the other.  It could
6    be, "do you have anything," or, you know, more of
7    what you said before.
8         Q.   Okay.  All right.
9              And would you say that the majority of
10   contracts that are accepted into the 8(a) Program
11   at this point are accepted through the offering
12   letter process?
13        A.   Yes.
14        Q.   And that there's few of them that are
15   instigated through the requirement letter?
16        A.   Well, the -- nothing's -- even if
17   there's a requirements letter that goes out,
18   the only way it comes into the program is through
19   the offering letter.  So there's still an
20   offering letter in response to that requirements
21   letter, so there's still an offering letter.
22        Q.   Let me rephrase the question.
23             The majority of contracts that are
24   accepted into the 8(a) Program come in without
25   there having been a requirement letter at the

1        outset of the process.

2              A.   I think that's true, yes.

3              Q.   All right.

4                   What is the goal for small businesses

5        that the SBA wants agencies to meet?

6              A.   There's a statutory goal of at least 23

7        percent for small businesses.

8              Q.   And that's set by Congress?

9              A.   Yes.

10             Q.   Is that goal different from -- let me

11       start over.

12                  Does each agency have a separate goal

13       for small businesses?

14             A.   SBA negotiates goals with every agency.

15             Q.   And so it's not necessarily 23 percent

16       for each agency; is that right?

17             A.   No.  That's correct.

18             Q.   Okay.  No, it's not 23 percent; yes,

19       what I said was correct, correct?

20             A.   Some agencies are above 23 percent, some

21       agencies are below.  We have to set goals to

22       ensure that at least 23 percent is

23       government-wide.

24             Q.   Okay.  So the denominator of that

25       percentage calculation is something called Total

1          it's not very long -- but I'm going to ask you to

2          read a particular section.  And, specifically,

3          just read the first paragraph and little "A" in

4          Section 2.

5                      And when you're done with that, scroll

6          down to Section 11, little x, little i, and read

7          that paragraph.

8          A.    Which one?

9          Q.    Little x, little i.  It's the last part

10         of Section A.

11         A.    Okay.

12         Q.    Part of the section that I had you read

13         says that "Each agency shall also establish a

14         goal for awards made to 8(a) firms pursuant to

15         Section 8(a) of the Small Business Act."  Now,

16         does that refresh your recollection as to whether

17         or not there were any Executive Orders requiring

18         agencies --

19         A.    Well, that's not what you asked me.  You

20         didn't ask me if there ever were.  You asked me

21         if we currently do that, and we currently do not

22         do that.  In 2000 we did.

23         Q.    And we stopped -- I'm sorry.  You

24         stopped?

25         A.    Yes.

1          Q.    Why?

2          A.    I don't know.  I'm assuming this

3     Executive Order is no longer in place, because

4     it's not -- the government doesn't require it any

5     longer.

6               Is this Executive Order still in place?

7     Many Executive Orders are repealed.  Is this one

8     repealed?

9          Q.    I haven't seen it repealed.  Have you?

10         A.    I'm asking you.  You're the one that

11    brought it up to me.  I don't know.

12         Q.    But I'm not the witness, so I can't

13    answer your questions.

14         A.    Okay.

15         Q.    You're not aware of it being repealed;

16    is that right?

17         A.    I am aware that we used to do this and

18    we've stopped doing it.  We would only do so if

19    we were told to do so.  We wouldn't do it on our

20    own.

21         Q.    Okay.  Do you know who told you to do

22    so?

23         A.    I do not.

24         Q.    Okay.  Is there any penalty for

25    exceeding a goal for Small or Disadvantaged

1          Businesses?

2                  A.    A penalty to whom?

3                  Q.    To the agency that exceeds the goal.

4                  A.    No, there's no penalty for exceeding a

5          goal.

6                  Q.    Okay.  Is there an adjustment to future

7          goals if an agency exceeds the goal?

8                  A.    The future goals are set based upon what

9          we believe the agency can actually do.  So if

10         they've reached a higher goal, then maybe that

11         would be taken into account for future goals,

12         unless the agency can talk to us and say why that

13         was an anomaly and they really can't do that in

14         the future.  And then we would go back and forth

15         with them with a discussion to see what they can

16         and can't do for the future.

17                 Q.    Okay.  How does a company become an SDB?

18                 A.    There's no certification process for

19         SDBs.  A firm can self-certify to that generally.

20         If you're an 8(a) firm, obviously you have been

21         certified as an 8(a) firm, and that automatically

22         makes you an SDB, as well.  But other firms, for

23         goaling purposes, can, in fact, self-certify

24         their status.

25                 Q.    Is there any kind of application to be

1      an SDB?

2          A.   Not currently.

3          Q.   And I take it -- describe the process by

4      which a firm can identify or self-certify as an

5      SDB.

6          A.   The process?  "I self-certify as an

7      SDB."

8          Q.   Well, does it do that when it fills out

9      a registration form in SAM, for example?

10          A.   It could do that in SAM, it could do

11     that as part of a con -- an offer for a contract.

12     But, yes, in SAM it can do that.

13          Q.   Okay.  But there's other ways it can do

14     it aside from registering as an SDB in SAM; is

15     that right?

16          A.   SAM is the best way to do it, of course.

17     That's where agencies will look to verify.

18          Q.   And when you say "verify," you mean

19     simply check to make sure that the firm has

20     self-certified as an SDB; is that right?

21          A.   Yes.  That's correct.

22          Q.   Okay.  And just to be clear, if a firm

23     owned by an Irish-American male wishes to certify

24     as an SDB, that firm is an SDB, right?

25          A.   Unless someone protests that status.

1       the tribes, the ANCs, the Native Hawaiian

2       Organizations, the system isn't proper yet, so

3       some of these forms must be filled out on an ad

4       hoc basis for them, but not for the individually

5       owned firms.  Again, this is the individual one.

6       This is different.

7                So in terms of the forms -- I'm

8       just talking generally, in terms of the forms

9       themselves, individually owned firms do not fill

10      out forms any longer.

11          Q.   Okay.  You're familiar with the

12      presumption of social disadvantage, right?

13          A.   I am.

14          Q.   Okay.  Let's break out of this and go

15      back to our screen.

16               Those applying for the 8(a) BD program

17      who identify themselves as a member of a group

18      that is listed in the regulations as having a

19      presumption of social disadvantage, do they have

20      to make any narrative statement concerning their

21      social disadvantage?

22          A.   They are not required to do so.

23          Q.   Well, is there a place for them to do so

24      if they wanted to?

25          A.   I can say that, you know, in the old

1    paper system, firms used to do it sometimes even

2    though they didn't have to.  I think in the

3    certification process online, it's harder to do

4    that.

5         Q.   Okay.  So does someone claiming

6    Native American status on the online form have

7    to identify as either an Alaska Native, a Native

8    Hawaiian or a member of a Indian tribe?

9         A.   Yes.

10        Q.   Okay.  And does the form make clear that

11   Alaskan Natives and Native Hawaiians are Native

12   Americans?

13        A.   Well, I believe they do.  Our

14   regulations certainly say that.

15        Q.   Okay.  So does the SBA keep any

16   information on what percentage of people who

17   self-identify as Native Americans are members of

18   tribes?

19        A.   I'm not understanding.  If you're

20   identifying as a Native American, you must be a

21   member of a federal or state-recognized tribe in

22   order for us to consider you to be such.  So

23   every individual who was identified as an a

24   Native American would be a member of a tribe.

25        Q.   Okay.  That sounds like a no, but let me

1          So if one person owns a hundred percent

2     but is not involved in day-to-day management,

3     but someone else owns zero and is involved in

4     day-to-day management, that person would also

5     have to demonstrate that they are, in fact,

6     economically disadvantaged.

7          Q.   Okay.  Does the business opportunity

8     specialist have access to the general economic

9     position of those in the same or similar

10    businesses as the applicant?

11         A.   We're looking at whether or not the

12    individual who's seeking certification meets the

13    economic disadvantaged criteria.  That's all they

14    are looking at in that regard.

15         Q.   Well, I guess I'm asking whether part of

16    that criteria is a comparison of the individual

17    to others in the same or similar line of

18    business?

19         A.   In establishing those economic

20    disadvantaged criteria, that's where that

21    was considered.  It's not considered for each

22    applicant.  It's considered in establishing the

23    standards themselves.

24         Q.   All right.  I think that answers my

25    question, but let me make sure I understand it.

1          A.   I would think that's an error we should
2     fix.
3          Q.   Okay.  Does the SBA have a database that
4     tells it the value of other firms that are not
5     owned by socially disadvantaged individuals?
6          A.   A database that what?
7          Q.   That tells the SBA the value of
8     ownership interest in other firms that are not
9     owned by socially disadvantaged individuals?
10          A.   I don't believe that there is a database
11     of that.
12          Q.   Okay.  Does the -- the -- and a
13     determination of whether someone is economically
14     disadvantaged, whether an individual is
15     economically disadvantaged, is the same
16     regardless of what line of business that
17     person happens to be in, right?
18          A.   The economic disadvantaged criteria is
19     across the board for all industries, that's
20     correct.
21          Q.   Did the SBA ever have different criteria
22     for economic disadvantage for different lines of
23     business?
24          A.   Not that I know of.
25          Q.   So let's talk for just a moment about

1    changed regs when we thought that was

2    appropriate.

3        Q.   Okay.  Let me rephrase the question,

4    then.

5            Were there two different requests made

6    of the SBA at around that time, one to include

7    Indonesian Americans as a presumptive group, and

8    the second to include Indonesian Americans as a

9    subgroup of some other already-recognized

10   presumptive group?

11       A.   I think that is the way we believed is

12   the way it should be, and that's the way we

13   processed it, --

14       Q.   You processed the --

15       A.   -- if that's what --

16       Q.   I'm sorry.  Go ahead.

17       A.   I mean, honestly, I'm not even sure

18   it's appropriate to say that they applied as

19   a petition.  You know, we've identified that as

20   such.  But, in reality, it may have just have

21   been, hey, we think we should be in this group

22   here.  And someone may have said, oh, let's call

23   that a petition.  And we thought about it and

24   said, you're right, you should be in that group.

25   Is that really a petition or is that just SBA

1      rethinking its regulations?  I don't know the

2      right answer to that question, but it was

3      probably more informal than formal.

4          Q.   I see.  Okay.  But what we have been

5      calling a petition may have just been a request

6      to be included as a part of the Asian Indian

7      protected group; is that right?

8          A.    Correct.

9          Q.   So when a group makes an application,

10     who within the SBA makes the determination about

11     approving or disapproving?

12         A.   So that was done by our associate

13     administrator of business development, or, at the

14     time, may have been called, as you mentioned him

15     before, the Associate Administrator for Minority

16     Small Business and Capital Ownership Development.

17         Q.   Okay.  So, basically, what Ms. Peebles'

18     position is today?

19         A.    That's correct.

20         Q.   Okay.  And it's the case that there

21     hasn't been an application since September of

22     1999; is that right?

23         A.   I have not seen one since then.

24         Q.   Okay.

25         A.   No, none since then.

1      Q.   Has that ever happened?

2      A.   Not to my knowledge.

3      Q.   Okay.  Let's talk about an individual's

4   claim of social disadvantage.  Is there a form

5   for challenging someone's claim of social

6   disadvantage?

7      A.   So, first of all, again, there's no

8   forms at all any longer in the application

9   process.  Everything is done by -- through

10   the certification through the online answering

11   questions.  But I'm not understanding your

12   premise.  Who's questioning social disadvantage,

13   SBA or some third party?  I'm not understanding

14   what you're trying to get at.

15      Q.   Third party.

16      A.   There's no process for a third party to

17   question someone's social disadvantage as part of

18   the application process.

19      Q.   Okay.

20      A.   Although SBA's regulations do, in

21   fact, talk about that, you know, anyone with

22   information that questions the eligibility of

23   participant, once you're in the program, to

24   continue, they can give SBA information and

25   the SBA will consider that information.

1     applicant?

2         A.   I don't understand that question.

3         Q.   Okay.  Well, the regulation, as we

4     both said, says that "The presumption of social

5     disadvantage can be overcome with credible

6     evidence to the contrary," right?  The one kind

7     of credible evidence to the contrary is that the

8     person who owns the applicant does not actually

9     identify with the presumptive group that that

10    person claims to be a part of.  And I'm asking

11    whether there are any challenges -- there have

12    been any challenges to the presumption of social

13    disadvantage other than those kinds of

14    challenges?

15        A.   As I mentioned earlier, the ones that

16    we have are the ones that you're talking about.

17    Failure to identify as that group.  You are

18    Hispanic, but you didn't talk about it until two

19    weeks before this application process started.

20    You are a Native American, but just got your card

21    two weeks ago.  Those are the types of questions

22    that we've run into through the years.  We have

23    not run into someone questioning status based

24    solely on their identity of a group.

25        Q.   So there's been no challenge to

1    someone's social disadvantage based, for example,

2    on the fact that, although they do identify as a

3    member of a presumptive group, they have not been

4    subjected to discrimination; is that right?

5        A.   There has not been a challenge that I'm

6    aware of in that regard.

7        Q.   Okay.  How often is there a challenge

8    to someone's identification as a member of a

9    presumptive group?

10       A.   That, also, is hit or miss.  It will

11   happen sometimes, and sometimes it won't.

12   I don't have a number for you on that.  It just

13   -- does it happen often?  I don't think it's

14   often.  I don't think it's most cases.  I

15   think it's a minority of the cases, but it is a

16   significant number of cases.

17       Q.   Well, could you give me a rough estimate

18   of what "a significant number" means?

19       A.   It happens every year to a certain

20   number of cases.  So it's not something that

21   happens once every five years.  It's not

22   something that happens every case.  It's not

23   something that happens every two cases.  But it

24   happens every year a few times.

25       Q.   And how many applications are there in a

1          Q.   Okay.  I used the wrong word.  I

2     apologize.

3               So the first four years are the

4     developmental stage and the last five years are

5     considered the transitional stage; is that right?

6          A.   Yes.  Yes.

7          Q.   Okay.  And at the end of nine years,

8     a participant either completes the program or

9     graduates from the program, right?

10         A.   Yes.

11         Q.   Okay.  And graduation requires that

12    the participant show that they have met their

13    objectives in their initial business plan, right?

14         A.   Correct.

15         Q.   Okay.  And completion, presumably, means

16    that the nine years are over but the participant

17    has not shown that; is that right?

18         A.   Yes.

19              MR. ROSMAN:  Okay.  So, Michelle, could

20    you put in the 408 form for fiscal year 2015?  I

21    think it starts with FY 2015.

22              MS. SMITH:  Before you get to this

23    exhibit and any questions regarding it, I think

24    we should break for lunch.  It's 12:30.  We can

25    break for an hour, or more, if people want to.

Case 2:20-cv-00041-DCLC-CRW   Document 65-7   Filed 06/21/22   Page 32 of 51
PageID #: 1830

1        on Exhibit 6 or 7?

2                MR. ROSMAN:  Six, right, Michelle?

3                THE WITNESS:  Oh, I'm on 7.  I thought

4        you said 7.  I'm sorry.

5                MR. ROSMAN:  I said 7 at first, and then

6        I corrected myself.

7                MS. SCOTT:  Yeah.  It should be 6, 7 and

8        8, Michael.  Sorry.

9                MR. ROSMAN:  Okay.

10               THE WITNESS:  Okay.  Page Number 12?

11       BY MR. ROSMAN:

12           Q.   It says 12 at the bottom.  There's a

13       Table 3 at the top.  That's what I'm going to ask

14       you about.

15           A.   Okay.

16           Q.   So in Table 3, we have identity of

17       those who reached various actions in the program,

18       right?

19           A.   Okay.

20           Q.   Okay.  And if I'm reading this

21       correctly, it indicates that in, for example,

22       fiscal year 2014, 870 participants completed the

23       program, but only two either graduated or early

24       graduated; is that right?

25           A.   That's what it says.

1    Q.   Okay.  And just so we're going back to

2    the testimony that you said previously, that

3    would mean the vast majority of people who

4    finished the program in 2014 did not meet the

5    objectives of their business plan, right?

6    A.   I don't necessarily think that's true.

7    I think people are -- when it says this, I'm

8    thinking it's early graduation, is my guess,

9    only because when firms are leaving the program,

10   sometimes they do an analysis of the business

11   plan and sometimes they do not.  So I don't think

12   it's fair to say that 868 firms did not meet

13   their plan.  I don't think that's fair.  I think

14   that two firms probably graduated early and SBA

15   didn't necessarily do a full analysis of every

16   other firm coming through or not coming through.

17   Q.   Well, how would you know that to be

18   true?

19   A.   Based upon this table, you probably

20   would not know that.

21   Q.   Okay.  And the term "graduated"

22   indicates that it includes both those firms that

23   left the program early and those programs that

24   left the program after nine years, right?

25   A.   In theory, yes.

1          for me, please?

2                 A.   A follow-on contract is when the same

3          item is being re-procured again by the same end

4          user.

5                 Q.   And the presumption in the 8(a) BD

6          Program is that follow-on contracts should remain

7          in the 8(a) Program, right?

8                 A.   Generally speaking, yes.

9                 Q.   Okay.  And that's true even if a

10         contractor that has been performing the

11         contract is leaving the 8(a) Program, right?

12                A.   Well, when that is -- when that is

13         happening, and that contract is of significant

14         benefit to the firm's viability or business

15         development, that particular firm can ask that

16         SBA release the requirement from the program so

17         that it had the opportunity to compete on it

18         outside of the program.

19                Q.   Okay.  But let's say it's not that

20         important to the individual contractor, this

21         presumption --

22                A.   Then, yes, it would normally stay in the

23         program.

24                Q.   And how often is it the case that a

25         contractor in the 8(a) BD Program asks to have a

1     those two was just performing a smaller contract,

2     then it wouldn't be a new requirement

3     necessarily, right?

4          A.   I think, again, we'd have to find out

5     exactly what the other ones were performing and

6     we would have to compare that to what this is.

7          Q.   Okay.  We'll move on.

8               So I may have asked this question

9     previously, and if I did I apologize, did the

10    SBA perform any adverse impact analysis on any

11    contract in which Ultima Services Corporation was

12    involved?

13         A.   As you've seen through these letters,

14    the one seemed to indicate that they did.  But

15    if they did, in fact, do that, I believe that was

16    incorrect.  And all the other ones found it to be

17    not necessary to do.

18               MR. ROSMAN:  Why don't we take 10

19    minutes?

20               (Recess taken -- 3:10 p.m.)

21               (Resume testimony -- 3:21 p.m.)

22    BY MR. ROSMAN:

23         Q.   Does the SBA have a database of

24    nondisadvantaged individuals or nonparticipants

25    that they use when they determine whether or not

1        someone has less access to capital than someone

2        in the same or similar line of business.

3           A.   I don't believe such a database exists.

4           Q.   Okay.  Do they have any other

5        information in some format, other than a

6        database, that they use to make those

7        comparisons?

8           A.   I don't believe that's -- as I

9        said, we look at that information in establishing

10       the thresholds.  We don't look at it on a

11       case-by-case basis any longer.

12          Q.   What kind of information did it look at

13       in establishing the thresholds?

14          A.   We looked at business owners in similar

15       industries -- and, you know, in small business

16       owners versus small disadvantaged business

17       owners, in general.

18          Q.   Well, I understand that you're looking

19       at small business owners, but my question was

20       what kind of information?

21          A.   We look at the same types of information

22       that they have, in terms of assets and income and

23       net worth and things of that sort.

24          Q.   Okay.  And where do you look for that

25       information for nondisadvantaged individuals.

1      A.   Well, when those analysis are done, we

2   look for -- we find someone that knows how to

3   find that information for us.  You know, I'm not

4   the person who goes to find that information.  We

5   would ask for, can you find the information on

6   such and such, and then we have people go look

7   for that information and they find it.  Where

8   they actually find it, I can't answer that

9   question.

10      Q.   Well, did you ask anyone at SBA who goes

11   about doing that?

12      A.   Did I ask them -- right now did I ask

13   them that?  No, I didn't ask them that.

14      Q.   In preparation for the deposition, did

15   you ask anyone at SBA which individuals go about

16   doing that?

17      A.   Certainly not.

18      Q.   Okay.  So what evidence does the

19   SBA use to justify the presumption of social

20   disadvantage?

21      A.   Section 2(f) of the Small Business Act.

22      Q.   Anything else?

23      A.   I think Congressional findings are

24   pretty important, --

25      Q.   Okay.

1          A.    -- and SBA follows Congress's intent for

2    us.

3          Q.    Those Congressional findings were made

4    in what year?

5          A.    I don't know the year, specifically.

6          Q.    Has the SBA looked at any additional

7    evidence since those findings were made?

8          A.    I'm not understanding the question.

9    Congress finds that certain groups have been

10    discriminated because of their identity as such

11    groups.   That's what Congress has found.   So are

12    you asking if we questioned Congress?   Is that

13    what you're asking me, because I'm confused by

14    that statement.

15          You know, first of all, as you

16    know, Congress found that it's important that

17    disadvantaged individuals are part of the economy

18    in order to have a functioning economy, and that

19    many people are disadvantaged because of their

20    identification as members of certain groups.

21    Congress has made these findings.   And then

22    Congress also found that these groups include,

23    and they set forth certain groups.   So are you

24    asking should SBA ignore Congress's findings?

25    I don't think that's the appropriate response of

1          what SBA should do.  We should follow Congress's

2          findings in that regard.

3                    MR. ROSMAN:  Could you read back the

4          question, please?

5                    (Referred-to testimony read back.)

6     BY MR. ROSMAN:

7          Q.   Can you answer that question, please?

8          A.   I believe I answered that question.  SBA

9          relied on those findings.

10         Q.   The question was has the SBA looked at

11         any evidence since those findings were made?

12         A.   And I answered that SBA has relied on

13         those findings.  That's what we relied on.

14         Q.   That's not an answer.

15         A.   It's my answer.

16         Q.   The question is did you look at any

17         evidence subsequent to those findings being made?

18         A.   SBA relied on those findings.  That's my

19         answer.

20         Q.   Okay.  I don't consider that a

21         responsive answer, --

22         A.   Okay.

23         Q.   -- and we'll take appropriate steps.

24                   Does anyone in the SBA review disparity

25         studies?

1          A.   For fun?  No, not for fun.

2          Q.   No.  As part of their job.

3          A.   I don't believe that's part of their

4     job.

5          Q.   Has the SBA examined whether the goals

6     of the 8(a) BD program could be achieved with

7     race-neutral alternatives?

8          A.   No.

9          Q.   Has it considered what the program would

10    look like if it eliminated --

11         A.   Can I add on to my answer before you go

12    on?

13         Q.   I'm sorry.  I thought you were done.

14    You sort of paused.

15         A.   I did pause, but I rethought.  Unless

16    you'd rather go on.  I don't care.  Either way.

17         Q.   No.  No.  Please go ahead.  Finish.

18         A.   So, I'm sorry.  Could you tell me the

19    last question again, because I had something in

20    my head, and I forget what it was.  Can you tell

21    me last question again?

22              MR. FISHMAN:  Whether race-neutral

23    aspects have been used previously.

24              MS. SMITH:  Well, let's wait for the

25    question to be read back before responding.

1    Thank you.

2              THE WITNESS:  Yeah.

3              MR. ROSMAN:  Why don't we have both the

4    question and the answer read back because he may

5    have forgotten --

6              THE WITNESS:  Well, so far my answer

7    was no only, and I wanted to add onto it.  So the

8    question is all I need.

9              MR. ROSMAN:  Oh, okay.  Go ahead, then.

10             (Referred-to testimony read back.)

11             THE WITNESS:  Okay.  So my answer was

12   no, and that is the right answer, except that my

13   further thoughts were is that we believe that the

14   program is not race-conscious, generally.  Yes,

15   there is a social disadvantaged portion of it,

16   but there are many people who are not members of

17   those groups who are in the program, and anyone

18   can, in fact, prove his or her disadvantage and

19   be admitted to the program.  So the program, as a

20   whole, is not race-conscious even though there is

21   a portion of it that has a race aspect of it.

22   BY MR. ROSMAN:

23        Q.  Has there been any study by the SBA

24   about how the program would function if the

25   presumption in Section 124.103(b)(1) were

1          eliminated?

2               A.   Has there been a study?  No, there's

3          been no study to that effect.

4               Q.   Has there been analysis of any kind

5          regardless of whether you want to characterize it

6          as a study?

7               A.   I don't believe so.

8               Q.   So how would the SBA know whether the

9          goals of the program could be achieved in the

10         absence of the presumption?

11              A.   I don't -- I don't know why SBA would

12         -- would con -- consider changing something that

13         Congress told us to do.  So we are implementing

14         the statute as Congress presented it to us.  We

15         are not the ones who are considering changing it.

16         That's up to Congress to do so.

17              Q.   By the way, Congress didn't actually say

18         to employ a presumption of social disadvantage,

19         did it?

20              A.   Congress said that certain members

21         -- members of certain identified groups are

22         presumed to be disadvantaged for purposes of

23         the 8(a) Program.  They did say that, yes.

24              Q.   Okay.  Let's talk about some of the

25         other parts of the 8(a) Program.

1        hear you.

2                 Okay.  Why don't we take five minutes.

3        I'm close to done, I think.

4                 MS. SMITH:  Okay.

5                 (Recess taken -- 3:46 p.m.)

6                 (Resume testimony -- 3:52 p.m.)

7        BY MR. ROSMAN:

8             Q.   Has there been any change in the overall

9        governmental goal for SDBs in the last several

10       years?

11            A.   Well, this year the President just

12       increased the SDB goal to 11 percent.

13            Q.   Okay.  When exactly was that, if you

14       know?

15            A.   February/March.  I don't remember

16       exactly.

17            Q.   February or March of 2022?

18            A.   Yes.

19            Q.   And that was from 5 percent?

20            A.   So, again, remember up front I said

21       it's a minimum of 5 percent, and it directs the

22       President to make those determinations.  So even

23       though it's a minimum of 5 percent, the President

24       has decided that 11 percent is the appropriate

25       number right now considering that last year

1          government-wide we reached 10 percent.

2               Q.   Okay.  And is it no less than 11

3          percent, as it was for 5 percent, or is it just

4          11 percent?

5               A.   I think it's 11 percent this year.

6               MR. ROSMAN:  Okay.  Thank you.

7               Well, obviously, for reasons we

8          discussed earlier, I don't believe the witness

9          was adequately prepared on certain of the topics

10         that he was designated to testify on and that

11         he did not answer all of the questions fully.

12         Subject to those caveats, I have nothing further

13         at this time.

14              MS. SMITH:  Okay.  I have a few

15         questions.

16                         EXAMINATION

17         BY MS. SMITH:

18              Q.   Since 2015, has SBA had a goal

19         specifically for the 8(a) Program?

20              A.   No.

21              Q.   Of the applications from individuals who

22         qualify for the presumption in 13 CFR Section

23         124.103(b)(1), what percentage of those

24         applications are approved?

25              A.   Of people who are presumed, --

Case 2:20-cv-00041-DCLC-CRW  Document 65-7  Filed 06/21/22  Page 45 of 51
PageID #: 1843

1                       -   -   -

2                    JOHN KLEIN

3                       -   -   -

4              C E R T I F I C A T E

5                       -   -   -

6          I do hereby certify that I am a Notary

7     Public in good standing, that the aforesaid

8     testimony was taken before me, pursuant to

9     notice, at the time and place indicated; that

10    said deponent was by me duly sworn to tell the

11    truth, the whole truth, and nothing but the

12    truth; that the testimony of said deponent was

13    correctly recorded in machine shorthand by me and

14    thereafter transcribed under my supervision with

15    computer-aided transcription; that the deposition

16    is a true and correct record of the testimony

17    given by the witness; and that I am neither of

18    counsel nor kin to any party in said action, nor

19    interested in the outcome thereof.

20

21          WITNESS my hand and official seal this

22    10th day of May, 2022.

23

24

25                             Notary Public

1                                    E R R A T A

2 PAGE LINE CHANGE

3 _ P. 11; Line 24; insert the word "the" between the words "to" and "8(a)" _ _ _ _ _ _ _ _ _ _ _ _ _

4 Reason for

5 Change:_____Typo_____

6 PAGE LINE CHANGE

7 _ _ P. 13; Line 12 and Line 13; change the word "cell" to "sub" _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

8 Reason for

9 Change:_____Typo_____

10 PAGE LINE CHANGE

11 _ _ P. 17; Lines 2-3: insert the word "and" between the words "Management" and "Technical" _ _ _ _

12 Reason for

13 Change:_____Typo_____

14 PAGE LINE CHANGE

15 _ _ P. 21; Lines 17-18; change "of participants in a program, dollars," to "participants in the 8(a)
program, contract dollars,".___ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

16 Reason for

17 Change:_____Typo; clarity_____

18 PAGE LINE CHANGE

19 _ _ P. 40; Lines 8-9; First sentence should read: "I'm sure there are several agencies whose goals for
SDBs are greater than 5 percent." _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

20 Reason for

21 Change:_____Typos_____

22 PAGE LINE CHANGE

23 _ P. 54; Line 14; Change "certified.gov" to "certify.gov" _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

24 Reason for

25 Change:_____Typo_____

Veritext Legal Solutions

1 PAGE LINE CHANGE

2 _ P. 59; Lines 9-10; change "but on the science part, many times it's" to "but if something is incorrect, many times it's" _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

3 Reason for

4 Change:_____ Transcription error_____

5 PAGE LINE CHANGE

6 _ P. 59; Lines 17-20; sentence should read as follows: "And they do it based upon a certain size standard. Each NAICS code is assigned a corresponding size standard. So I can register as a small business for NAICS Code 123456, and as an other than small business for NAICS Code 123457, depending upon the corresponding size standard corresponding to the NAICS Code." _ _ _ _ _

7 Reason for

8 Change:_____ Typos and Clarification_____

9 PAGE LINE CHANGE

10 _ P. 60; Line 10; change the word "primary" to "apparent" _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

11 Reason for

12 Change:_____ Typo_____

13 PAGE LINE CHANGE

14 _ P. 74; Lines 3-4; should read "or they look for things as to whether there are any outstanding debts or things of that sort." _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

15 Reason for

16 Change:_____ Transcription error_____

17 PAGE LINE CHANGE

18 _ P. 83; Line 7; should read "Alaska", not "Alaskan" _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

19 Reason for

20 Change:_____ Typo_____

21 PAGE LINE CHANGE

22 _ P. 83; Line 9; delete "or it's - -" and add the word "be" between the words "deemed to" and "owned and" _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

23 Reason for

24 Change:_____ Typo_____

1 PAGE LINE CHANGE

2 _ _ P. 87; Line 4; change "the ANC owns X and Joe Smith owns 400 percent of one company" to "the ANC owns 51% of X and Joe Smith owns 49 percent of that company" _ _ _ _ _ _ _ _ _ _ _ _ _ _

3 Reason for

4 Change: ___ Typo _____

5 PAGE LINE CHANGE

6 _ ___ P. 107; Line 22; change "company Y" to "country Y" _ _ _ _ _ _

7 Reason for

8 Change: _____ Typo _____

9 PAGE LINE CHANGE

10 _ P. 127; Line 13: change the word "graduate" to "graduation" _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

11 Reason for

12 Change: _____ Typo _____

13 PAGE LINE CHANGE

14 _ _ P. 138; Line 24; Change "SDBO" to "SDVO"; change "SWB" to "WOSB" _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

15 Reason for

16 Change: _____ Typos _____

17 PAGE LINE CHANGE

18 _ _ P. 140; Line 12; change "JCBD" to "GCBD" _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

19 Reason for

20 Change: _____ Typo _____

21 PAGE LINE CHANGE

22 _ P. 140; Line 23; Change "4" to "4.5 million" ___ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

23 Reason for

24 Change: ___ Typo/clarification _____

1 PAGE LINE CHANGE

2 _ _ P. 153; Line 18; change "an it" to "it an" _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

3 Reason for

4 Change:_____ Typo _____

5 PAGE LINE CHANGE

6 _ _ P. 194; Lines 18-19; "7(j) is management technical assistance" should be changed to read "7(j) is a management and technical assistance program" _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

7 Reason for

8 Change:_____ Typo _____

9 PAGE LINE CHANGE

10 _ _ P. 195; Line 15; Change "with grants" to "or grants" _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

11 Reason for

12 Change:_____ Typo _____

13 PAGE LINE CHANGE

14 _ _ P. 195; Lines 22-23; Change "these contractor grantees" to "these contractors or grantees" _ _ _

15 Reason for

16 Change:____ Typo _____

17 PAGE LINE CHANGE

18 _ _ P. 199; Line 18; Change "as SBA's" to "of SBA's" _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

19 Reason for

20 Change:____ Typo _____

21 PAGE LINE CHANGE

22 _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

23 Reason for

24 Change:_____

1    ACKNOWLEDGMENT OF DEPONENT

2        I, _John W. Klein_, do

3    hereby certify that I have read the foregoing

4    pages _i_ to _212_ and that the same is a

5    correct transcription of the answers given by

6    me to the questions therein propounded,

7    except for the corrections or changes in form

8    or substance, if any, noted in the attached

9    Errata Sheet.

10

11    _6-10-22_

12    DATE         SIGNATURE

13

14    Subscribed and sworn to before

15    me this _____ day of _____, 2022.

16

17    My commission expires:

18

19

20

21    Notary Public