# EXHIBIT 29

1 UNITED STATES DISTRICT COURT
2 FOR THE EASTERN DISTRICT OF TENNESSEE
3 ****************************************************
ULTIMA SERVICES CORPORATION,
4
Plaintiff,
5
6 -vs- Case No. 2:2020-cv-00041
7
U.S. DEPARTMENT OF AGRICULTURE, et al.,
8
Defendants.
9 ****************************************************
10 VIDEOCONFERENCED DEPOSITION OF HOWARD STOVER
11 Thursday, May 5, 2022
12 10:02 a.m.
13 Pages 1 - 116
14
15
16
17
18
19 REPORTED BY: KARINA L. JENNINGS
20
21
22
23
24
25

```
 1
 2      Videoconferenced deposition of HOWARD STOVER, taken
 3    pursuant to Notice before Karina L. Jennings, Court
 4    Reporter, and Notary Public for the Commonwealth of
 5    Virginia.
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                 A P P E A R A N C E S
 2
 3     ON BEHALF OF THE PLAINTIFF:
 4            MICHAEL E. ROSMAN, ESQUIRE
 5            CENTER FOR INDIVIDUAL RIGHTS
 6            1100 Connecticut Avenue, N.W., Suite 625
 7            Washington, D.C.  20036
 8            rosman@cir-usa.org
 9
10
11     ON BEHALF OF THE AGENCY:
12            JULIET GRAY, ESQUIRE
13            U.S. DEPARTMENT OF JUSTICE
14                Civil Rights Division
15            150 M Street, N.E.
16            Washington, D.C.  20002
17            juliet.gray@usdoj.gov
18
19
20
21
22
23
24
25
```

C O N T E N T S

EXAMINATION OF HOWARD STOVER                          PAGE

      By Mr. Rosman                                    6

      By Ms. Gray                                    109

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 1 | Decision memo | 32 |
| Exhibit 2 | LUSA sole source | 47 |
| Exhibit 3 | Acq Plan one | 49 |
| Exhibit 4 | SBA acceptance | 50 |
| Exhibit 5 | Market research report | 53 |
| Exhibit 6 | Acq Plan two | -- |
| Exhibit 7 | POWTEC contract | 56 |
| Exhibit 8 | SBA acceptance TE | 57 |
| Exhibit 9 | Acq Plan TE | 60 |
| Exhibit 10 | Ultima contract | 63 |
| Exhibit 11 | Proposal | 67 |
| Exhibit 12 | Time Systems | 69 |
| Exhibit 13 | Solicitation | 70 |
| Exhibit 14 | Stover e-mail proposal | 73 |
| Exhibit 15 | SBA acceptance | 76 |

Page 5

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 16 | Acceptance letter | 78 |
| Exhibit 17 | Blank English-El contract | 78 |
| Exhibit 18 | Stover e-mails Re contract | 82 |
| Exhibit 19 | Consolation letter | 82 |
| Exhibit 20 | SBA acceptance letter | 84 |
| Exhibit 21 | Memo Re terminations | 87 |
| Exhibit 22 | More complete proposal | 94 |
| Exhibit 23 | SBA acceptance letter | 95 |
| Exhibit 24 | Ultima | 95 |
| Exhibit 25 | Offer e-mail | 101 |
| Exhibit 26 | SBA acceptance | 102 |
| Exhibit 27 | MEC contract | 102 |
| Exhibit 28 | Stover e-mail | 104 |
| Exhibit 29 | SBA acceptance | 107 |

```
 1    someone else's workload.
 2         Q      So you don't know one way or the other
 3    whether there was a task order issued to the State of
 4    Washington -- or sorry --
 5         A      Yeah, I --
 6              MS. GRAY:  Object to form.  Asked and
 7    answered.
 8    BY MR. ROSMAN:
 9         Q      Well, let me just try it again.  There
10    was a lot of talking.  You don't know one way or the
11    other whether there was a task order issued under the
12    IDIQ for services performed in the State of
13    Washington?
14         A      I -- I don't -- it was not assigned to
15    me, so I don't know -- I don't know what happened in
16    the State of Washington.  I don't remember doing a
17    task order for the State of Washington.
18         Q      So going to ask you some questions about
19    the 8(a) program now.  Prior to the IDIQs being
20    issued, did you use the 8(a) program to provide any
21    administrative services to the NRCS?
22         A      I -- yes, I did.  I did.  I did.
23         Q      For what states?
24         A      Okay.  There you are.  Now I recall I
25    think -- it was right, it was -- I think it was
```

```
 1    Washington.  They -- instead of doing -- and I
 2    don't -- I don't recall the reason why, but it seems
 3    like that there was some sort of emergency, and it
 4    was -- I think it was before the IDIQ -- and it may
 5    not have been -- it may have been after the IDIQ --
 6    but I know there was an emergency, because it was the
 7    first time I used the 8(a) program, and they said
 8    that they needed the contract in place in like 48
 9    hours.  I mean, it was really, really quick.  And I
10    don't know what caused the emergency, I don't know
11    whether they had said that they were no longer using
12    Ultima, or that Ultima had reached their ceiling -- I
13    don't remember the reason.  I just remember it was
14    emergency.  And I called the 8(a) -- excuse me -- I
15    called the Small Business Administration in the State
16    of Washington, and I said, I would like to e-mail you
17    a solicitation for requirement that I have, and I
18    really need to get something in place in the next 48
19    hours, and that the new contractor would have to hire
20    the current employees.  So -- but I just don't
21    remember what the emergency was, or rather -- whether
22    the contract had been Ultima before -- I don't
23    remember.  I just know that I was given the task to
24    get something on the -- a viable contract in place
25    within like 48 hours or so.  So I called the Small
```

1   Business Administration, and they arranged for a
2   Native American concern to look at the solicitation.
3   They provided me some numbers.  Their numbers were
4   fairly close to the government estimate, and we
5   awarded that contract, a sole source under the 8(a)
6   program, to this Native American firm.  But I -- I
7   just can't remember whether it was before the IDIQ or
8   after the IDIQ.  I'm thinking it was before, and I
9   don't remember what the emergency was, why that we
10  had to do something right away, but I do remember
11  that it was -- at the time it seemed like that's the
12  only thing in the world was important was to get that
13  contract in place.
14       Q     So would you say that the time crunch
15  was a primary motivation for you using an 8(a) sole
16  source contract?
17       A     Yes, no other way I could have did it.
18       Q     Can you recall any other instance prior
19  to the IDIQs -- and I know you said you're not sure
20  this one was prior to the IDIQs -- but can you recall
21  any other instance which may have been before the
22  IDIQs in which you utilized the 8(a) program to
23  provide administrative services to an NRCS office?
24       A     No, because we had the -- we had the
25  IDIQ with Ultima, and it was -- it was fairly simple

```
 1    would have been able to do a contract, because
 2    California would have used it all.  So for Colorado
 3    or Wyoming or -- and all the other states in Region 4
 4    to have a contracting vehicle to do contracts, we
 5    couldn't include California in the -- in the IDIQ
 6    contract.
 7              MR. ROSMAN:  Okay.  Michelle, if you could
 8    put CA4 and CA5 into Exhibit Share now, I'd
 9    appreciate it.
10    BY MR. ROSMAN:
11         Q    Mr. Stover, so I take it -- my question
12    was, was that your understanding.  I take it that
13    that was your understanding -- what was presented in
14    Exhibit 3 was your understanding of why the 8(a)
15    program was used --
16         A    Yeah, it jarred my memory, yes.  I
17    didn't know why, but when I read that I remembered,
18    yeah, that there was a problem with California
19    because it was so big.
20         Q    Okay.  And did you have the authority to
21    keep California out of the IDIQ contract?
22         A    Absolutely.  The IDIQ contract --
23    there's nothing in there that prohibited us from
24    using another contractor.
25         Q    So let me be clear about that.  Was
```

1   there anything in the IDIQ contract that would have
2   prohibited you from say competing a task order under
3   the IDIQ contract?
4       A    Well, that's a whole different thing.
5   If you're talking about a task order, the answer
6   would be all task orders had to be -- had to be done
7   against the IDIQ contract.  But for example, there
8   was a state that came up, for whatever reason you
9   decided not to use the IDIQ contract, you were
10  perfectly within your rights to do so.  There was
11  no -- there was no exclusive deal with Ultima to do
12  all the administrative contracts.  The IDIQ was there
13  as a convenience for contracting officers who wanted
14  to use it.  We didn't have to use it.  We could use
15  other contractors if we so desired.
16      Q    Okay.  Good.  So let me just make sure
17  I'm clear on this.  So if you wanted to compete a
18  contract in Wyoming for administrative services to
19  the NRCS as a total small business set aside
20  contract, that was within your authority; is that
21  right?
22      A    Yes.
23      Q    Okay.  Great.  Okay.  So let's go back
24  to our exhibits.  And let's take a look at Exhibit 5.
25  I'm going to ask you if you've ever seen this

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 2:20-cv-00041-DCLC-CRW   Document 65-13   Filed 06/21/22   Page 11 of 19
PageID #: 2012

1   Let's see.  Yeah.  This is -- can you identify this
2   document, Exhibit 8?
3        A     It looks like a -- it looks like it's
4   a -- okay.  I -- well, I'm not sure, so I'm not going
5   to say it, but anyway, this looks like it's a
6   follow-on contract to the POWTEC contract.
7        Q     Okay.  It's a follow-on contract.  Could
8   you just tell us what a follow-on contract is?
9        A     Okay.  For whatever reason, and I'm not
10  sure of why POWTEC could not continue with the
11  contract, and now that I see this document, I'm
12  thinking the reason POWTEC could not continue with
13  the contract is because they graduated from the 8(a)
14  program, and they were -- and when the first bridge
15  contract was awarded to them, they were on the --
16  they only had a year left, which is probably why we
17  only did it for a year, and -- because that's as long
18  as we could do it until they graduated.  And Tetna
19  [sic] came in and took over the contract after them,
20  also under the 8(a) program, because POWTEC, due
21  to -- you can only be an 8(a) program for so long and
22  then you graduate, and you have to compete for
23  contracts like everyone else.  I think that was the
24  case with POWTEC, they graduated.
25       Q     Right.  My question though is what is a

1    follow-on contract?
2         A    Well, I mean, when POWTEC left the
3    contract, we still had a requirement, so we still
4    needed to find a contractor to do it.
5         Q    So a follow-on contract is a contract
6    that basically --
7         A    Well, let -- let me -- let me be a
8    little clearer.  I called it a follow-on contract,
9    but basically that's not a technical name.  This
10   contract was done because POWTEC was unable to
11   continue to do the contract.  We needed a new
12   contractor.  So can you call it a new requirement,
13   well, it's new in as far as we didn't have anyone to
14   do the contract; we had to find someone to do the
15   contract because POWTEC couldn't continue to do it.
16        Q    Okay.  Isn't a follow-on contract a
17   contract that meets the same requirements of an
18   earlier contract?
19        A    Well, I -- I probably would -- I
20   probably would challenge anyone to find, you know,
21   that term about what a follow-on contract -- you hear
22   people use it all the time in different -- different
23   contexts, but I don't think that you'll find
24   follow-on contract in the farm.
25        Q    Okay.  Isn't it the case that the

1    contract had to stay in the 8(a) program unless the
2    SBA released the requirement from the 8(a) program?
3         A    Yeah, that's -- that's true, yeah.  The
4    Small Business Administration has to release it, yes.
5         Q    And that's why it was given to another
6    8(a) contractor, right?
7              MS. GRAY:  Object to form.
8              THE WITNESS:  Yes.  That's -- I would
9    assume that's -- I'm not sure of exactly what
10   happened, but I do know that this contractor was an
11   8(a) contractor.
12   BY MR. ROSMAN:
13        Q    Okay.  Let's take a look at Exhibit 9.
14   It may help us here.  So is this a document you've
15   seen before, Exhibit 9?
16        A    Yes.
17        Q    Okay.  This is -- did you draft this
18   yourself?
19        A    I don't recall.  A lot of times these
20   documents were put together by a team.
21        Q    Okay.  Just take a look and read to
22   yourself the paragraph under B-1, Sources, on the
23   first page.
24        A    Yeah, yeah, just like I thought, that
25   the POWTEC could not continue with the service

```
 1   contract, without it counting against the IDIQ
 2   contract?
 3        A     No, because the -- because the Small
 4   Business Administration wouldn't have allowed it.
 5        Q     Okay.  Let me -- I'm probably being
 6   unclear as to the time frame.  Let's go back a year
 7   when you -- when the contract was awarded to POWTEC.
 8        A     Yes.
 9        Q     Could you have awarded -- could you have
10   tried to meet the requirements for a total small
11   business set aside and not use the 8(a) contract?
12        A     Yes, sure.
13        Q     And if you had done that, would it have
14   counted against the IDIQ contract or would it just be
15   a separate stand alone contract?
16        A     It would have been separate.
17        Q     And did you give consideration to doing
18   it that way?
19        A     I don't remember.
20        Q     But a year later, I think, if I
21   understood your testimony, you couldn't do that
22   because the SBA wouldn't allow it?
23        A     Yes, that's correct.
24        Q     Now, could you have asked the SBA to
25   release the requirement from the 8(a) program?
```

1    A    Sure. I mean, of course you can ask,
2    but their mission is to give awards to disadvantaged
3    business. Why would they let this requirement just
4    walk away.
5    Q    Have you ever tried to create a new
6    requirement in order to take a requirement outside of
7    the 8(a) program?
8    A    No, I haven't.
9    MR. ROSMAN: All right. Michelle, if you
10   could put CO1 into Exhibit Share.
11   BY MR. ROSMAN:
12   Q    I'm going to move to Colorado, Mr.
13   Stover. Do you recall if Ultima was performing task
14   orders under the IDIQ for the State of Colorado?
15   A    Yes, they were.
16   Q    Do you recall approximately when those
17   task orders were issued?
18   A    I would assume that it was sometime
19   around the same time of the awarding of the IDIQ
20   contract.
21   Q    Okay. Let's -- let's try to take a look
22   at Exhibit 10. It's not very clear, so -- having a
23   little trouble making it larger.
24   A    Okay. I see it.
25   Q    Can you see it?

1    A    It's a request to the Small Business
2    Administration to bring on -- time systems on under
3    the 8(a) program.
4    Q    Okay.  And can you tell me -- was this
5    your decision?
6    A    To do the 8(a) contract, yes, it was my
7    decision.
8    Q    Why did you decide to use the 8(a)
9    program to fulfill this particular requirement at
10   this time?
11   A    I don't -- I don't remember the exact
12   reason, what my thinking was.  I do know that when
13   the Ultima contract was canceled, a lot of these
14   contracts were in danger of having a service break,
15   and more importantly, of losing the employees.  So
16   the contractor that I brought on board would take
17   over the -- would take over the employees, so the
18   employees would still continue to work, and the only
19   thing would change was the management.  Why I did a
20   8(a) program, I imagine it had to do with -- well,
21   let me not guess.  Let me just say that I don't know
22   why I did the 8(a) contract, but I did do one.
23   Q    Would you say that time constraints were
24   frequently a motivation for utilizing 8(a) sole
25   source contracts?

```
 1         A      Yeah, pretty much, yes.
 2         Q      Well, just to close the loop here, let's
 3   go out and take a look at Exhibit 12.  And can you
 4   just identify this document for us?
 5         A      Yes, this is the contract for the 8(a)
 6   company, Time Systems, in Colorado.
 7         Q      Okay.  Very good.  Thank you.
 8              MR. ROSMAN:  Michelle, if you could put HI1
 9   into Exhibit Share, that would be great.
10   BY MR. ROSMAN:
11         Q      While she's doing that, Mr. Stover, did
12   you give any thought -- let me rephrase the question.
13   Do you recall whether you considered the possibility
14   of trying to meet the requirements through a total
15   small business set aside in Colorado?
16         A      I don't remember what my thought process
17   was.
18         Q      Do you know someone named Randy Randall?
19         A      Yes, I know Mr. Randall.
20         Q      Did you ever have any conversations with
21   Mr. Randall about the requirement in Colorado for
22   administrative services?
23         A      Yes, Mr. Randall very much wanted to
24   keep the Ultima contract in place.  Him and the
25   Colorado state conservationist went to Mr. Astor
```

```
 1              CERTIFICATE OF COURT REPORTER
 2
 3
 4              I, Karina L. Jennings, do hereby certify
 5     that I recorded verbatim the proceedings in the
 6     aforementioned case on May 5, 2022.
 7              I further certify that the foregoing pages,
 8     numbering 1 through 116 inclusive, constitute a true,
 9     accurate, and complete transcript of said
10     proceedings.
11              Given under my hand this 24th day of May,
12     2022.
13
                    _____
14
15              Karina L. Jennings, Court Reporter
16
17
18
19
20
21
22
23
24
25
```