# EXHIBIT 2

```
 1   UNITED STATES DISTRICT COURT
 2   EASTERN DISTRICT OF TENNESSEE
 3   - - - - - - - - - - - - - - - - - - - -x
 4   ULTIMA SERVICES CORPORATION,
 5                      Plaintiff,
 6               No. 2:20-cv-00041-DCLC-CRW
 7         -against-
 8   U.S. DEPARTMENT OF AGRICULTURE, U.S.
     SMALL BUSINESS ADMINISTRATION, SECRETARY
 9   OF AGRICULTURE, and ADMINISTRATOR OF THE
     SMALL BUSINESS ADMINISTRATION,
10
                        Defendants.
11
     - - - - - - - - - - - - - - - - - - - -x
12
                       March 7, 2022
13                     10:03 a.m. (EST)
14
15      DEPOSITION of Dr. Jon Wainwright, the
16   Expert Witness in the above-entitled
17   action, held at the above time and place,
18   taken before Garry J. Torres, a
19   Stenographer and Notary Public of the
20   State of New York, pursuant to the Federal
21   Rules of Civil Procedure, Notice and
22   stipulations between Counsel.
23
24            *     *     *
25
```

Page 6

1  A.   4109 Avenue F, Austin, Texas
2  78751.
3  Q.   How old are you, sir?
4  A.   58.
5  Q.   And you're now retired; is that
6  right?
7  A.   Semi-retired, yes.
8  Q.   Maybe you could describe for us
9  what semi-retired is --
10  A.   I retired --
11  Q.   -- and how I can aspire to it?
12  A.   I retired from NERA National
13  Economic -- NERA Economic Consulting in
14  2018, the end of 2018, but as obvious from
15  today I'm still doing some consulting work
16  occasionally, but mostly retired.
17  Q.   Okay.  There's a number of
18  articles on your CV.  Have any of them
19  been published in peer review journals?
20  A.   I don't believe so.  Is there
21  any in particular you're referring to?
22  But I don't believe so.
23  Q.   Okay.  So you -- in 1995 started
24  as a consultant at NERA; is that right?
25  A.   Yes.

Page 7

1  Q.   And at that time you were still
2  in your own company doing work as well; is
3  that right?
4  A.   Yes.
5  Q.   And you were still teaching at
6  University of Texas?
7  A.   Not by '95 I don't think.
8  Q.   Okay.  Well, you were -- your
9  résumé says that you were a research
10  associate professor from '92 to '98 at the
11  LBJ school of public affairs; is that
12  accurate?
13  A.   That's accurate.
14  Q.   But you weren't teaching, is
15  that the mistake I made?
16  A.   That was not a teaching
17  position, that's correct.
18  Q.   Okay.  And then in 1998 did you
19  move to NERA full time?
20  A.   Yes.
21  Q.   And you worked there steadily
22  until the end of 2018 and now working as a
23  consultant thereafter?
24  A.   That's correct.
25  Q.   Okay.  Can you just describe in

Page 8

1  general terms what kind of economic
2  analysis you did for NERA?
3  A.   Yeah.  As it says on my CV I was
4  a principal investigator on matters
5  involving discrimination, economic
6  damages, statistical liability, class
7  discrimination and employment
8  discrimination cases, wrongful termination
9  cases, contracting discrimination cases
10  and related matters.
11  Q.   Okay.  Can you give us
12  approximate percentage of your time that
13  you were doing economic analysis related
14  to lawsuits?
15  A.   That's tough to quantify.  Some
16  engagements were taken on in anticipation
17  of potential litigation that never ended
18  up arising.  So if you mean actual
19  litigation, I'm not sure I can give you a
20  precise percentage.
21  Q.   Okay.  Would you say most?
22  A.   No.
23  Q.   Okay.  More than half?
24  A.   I would say no because many
25  cases that could have resulted in

Page 9

1  litigation never do.  So...
2  Q.   So if we expanded the category
3  that I'm referring to to include both
4  lawsuits and potential lawsuits would you
5  say that most of your time was spent in
6  that category?
7  A.   Yes.
8  Q.   So you reviewed a number of
9  disparity studies in preparation for the
10  report that you submitted in this case and
11  a number of them were done by NERA,
12  correct?
13  A.   Yes.
14  Q.   And you were involved in at
15  least a supervisory role with all of the
16  ones that were included in I think it's
17  table 2.1 of your report?
18  A.   Of the NERA studies?
19  Q.   That's what I meant.  I
20  apologize.  Yes.  Of the NERA studies?
21  A.   Yes.
22  Q.   And were you involved in other
23  than a supervisory role in some of them?
24  A.   What -- I don't understand what
25  you mean.

3 (Pages 6 - 9)

1 statistical significance?
2   A.   Some of them probably were, but
3 that's not presented in the table.
4   Q.   And I take it all of the NERA
5 studies that are included in table 2.8 at
6 least use the same methodology for
7 calculating disparity indexes or ratios;
8 is that right?  I'm sorry.
9   A.   Is all the NERA studies?
10  Q.   Sorry?
11  A.   The same methodology --
12  Q.   There were 21 NERA studies
13 included in table 2.8, right?
14  A.   No.  I don't know if all 21
15 studies had those particular categories
16 but that would be the most that could be
17 and -- but all the NERA studies use,
18 basically, the same approach to measuring
19 disparity.
20  Q.   That's what I was asking.  Thank
21 you.  So -- and just make sure I
22 understand the numbers here.  In the
23 employment services category there was
24 54 percent of the disparities for
25 minorities were less than a hundred and

1 61 percent of the disparities for
2 nonminorities males were less than a
3 hundred; is that right?
4   A.   That is correct.
5   Q.   I think you've sort of answered
6 this before but I'm going to ask it
7 anyway, does any of the underlying studies
8 for table 2.8 account for any other
9 factors that may account for the
10 disparities, like capacity?
11  A.   What do you mean by "capacity"?
12  Q.   The ability of a firm to do
13 larger contracts?
14  A.   Measured how?  No.
15  Q.   You may not have -- you may have
16 decided not to measure it.  I'm just
17 asking whether you made any effort to do
18 so?
19  A.   I don't know that it could be
20 measured but that is not part of our
21 availability measure.
22  Q.   Okay. All right.  When you did
23 the coding, you did do coding for
24 nonminority, women-owned companies,
25 correct?

1   A.   I pulled out data for everybody
2 from the reports.
3   Q.   Right.
4   A.   So I -- yes.
5   Q.   Okay.  So why didn't you include
6 observations including nonminority,
7 female-owned companies in tables 2.2
8 through 2.8?
9   A.   My understanding is they're not
10 relevant to the 8(a) program.
11  Q.   So I guess the question I want
12 to ask as a follow up is this:  When you
13 see disparities in a group that includes
14 women, how do you know that disparities
15 are not caused by sex instead of race?
16  A.   Not sure I understand the
17 question.
18  Q.   Okay.  Let me see if I can think
19 of a better way to phrase it.  Let me try
20 it this way:  So when you see in table 2.2
21 that there was a 78 percent of the
22 disparities that you observed for Asians
23 were less than or equal to 80 whereas only
24 7 percent of the disparities you observed
25 for nonminority males were less than or

1 equal to 80, how do you know that isn't
2 caused by the fact that there's
3 discrimination against woman-owned firms,
4 which were included in the Asian category
5 but not in the nonminority male category?
6   A.   Because then the -- my
7 regression analyses in the final section
8 of the document would show coefficients
9 that are neither large or adverse nor
10 insignificant for minorities and the
11 opposite for by sex and they do not.  I'll
12 leave it at that.
13  Q.   That's fine, but I just
14 want -- let's say I didn't have those
15 other parts of your study, how would I
16 know that the differences that we're
17 seeing here in the numbers weren't caused
18 by the inclusion of woman-owned firms in
19 the Asian categories and their exclusion
20 in the nonminority male category?
21  A.   I think that's exactly how you
22 do know is you turn to other evidence that
23 allows you to tease out those factors.
24  Q.   Okay.  But this by itself
25 wouldn't tell you that?

1  Mischaracterizes his prior testimony.
2      MR. ROSMAN: I'm not trying to
3  mischaracterize it. I'm just asking a
4  question and putting a question mark
5  at the end of it.
6   A.  The disparities don't tell you
7  whether the -- the disparities you're
8  seeing are specific individual actors
9  inside the government or outside the
10 government causing them or larger
11 institutional forces causing them or both
12 or actors in the private sector, not
13 naming names as the case may be.
14  Q.  And the same would hold true
15 about the federal government, is that
16 right, you wouldn't be able to make any
17 determination about whether or not the
18 federal government was discriminating
19 based on the analysis in part one of your
20 report?
21  A.  I don't think that's ever the
22 purpose of any of these disparity studies,
23 but I -- so I would say that's correct.
24      MR. ROSMAN: So this is not an
25  actual terrible time for we here on

1  the east coast to take a break for
2  lunch, but I know it's a little early
3  there for you. So why don't you tell
4  me what your preference would be?
5      THE WITNESS: I would defer to
6  the majority of people on this call
7  who are all on the east coast so that
8  certainly precludes me.
9      (Whereupon, an off-the-record
10 discussion was held.)
11     (Whereupon, a lunch break was
12 taken.)
13  Q.  Welcome back. Dr. Wainwright, I
14 probably should have asked this question
15 at the beginning but we're not recording
16 so just state for the record your race and
17 ethnicity?
18  A.  Non-Hispanic, white.
19  Q.  So we're going to move into the
20 second part of your report and surveying
21 the business owners and the annual
22 business survey.
23     And my first question has to do
24 with how the census bureau collects this
25 data. Is there any check on the accuracy

1  of the answers that are provided in these
2  surveys?
3   A.  That's a question you have to
4  ask the census bureau. Generally their
5  surveys are the most professionally,
6  comprehensive, high quality that we get,
7  but -- so I -- you know, and some of the
8  data isn't asked as a question. So for
9  example, the SBO data, some of it is
10 collected from tax records. So --
11  Q.  Okay. So the -- that actually
12 was my next question. So they don't
13 actually ask people their salaries; is
14 that right?
15  A.  You've got two different surveys
16 with a bunch of different elements and
17 questions in them. So I'd have to refer
18 you to the methodology documents for both
19 those surveys to really give you a correct
20 answer and --
21  Q.  Okay. Well, let me ask more
22 generally for economists -- well, let me
23 just ask you your opinion. Is survey
24 evidence generally considered reliable?
25  A.  I considered this data here

1  highly reliable. I mean that's the
2  census -- the decennial census is a survey
3  in that sense so -- you know, and...
4   Q.  Okay. This is more detailed
5  questions though than the general census,
6  correct?
7   A.  The general census asks a lot of
8  detailed questions. So I don't know if
9  that's necessarily correct, but it is some
10 different questions.
11  Q.  What are the different
12 questions?
13  A.  There's a question on the
14 decennial census about whether your
15 household has running water -- you know.
16 There's questions on the SBO about whether
17 about -- you know, how you've capitalized
18 your business. They're asking different
19 questions on different subjects for
20 different reasons.
21  Q.  But they -- so for example, on
22 how you capitalize your business, the
23 census bureau doesn't do anything to check
24 accuracy on the answers provided?
25  A.  I'm not sure that's true at all.

Page 106
1  A.  Well, the American Indian and
2  Alaska Native category is about five times
3  bigger.  I'd probably say definitely
4  smaller than that category, but again, I
5  wouldn't -- I couldn't tell you the number
6  for sure without checking it out.
7     Q.  So most of the omitted firms
8  were nonminority women-owned businesses?
9  That is to say -- and by omitted firms I
10 mean included with all firms, but not
11 separately identified as a line?
12    A.  I want to say, and without going
13 back and checking I can't say for sure,
14 but I think the SBO actually their
15 category is women as a whole.  So that
16 would be minority and nonminority women as
17 their line item.
18        So -- you know, then those
19 numbers really would never add up to 100
20 percent because as you pointed out earlier
21 the minority categories have males and
22 females in there, but I think the SBO --
23 and I could be wrong I'd have to double
24 check, but I don't think their line
25 item -- I think their line item was for

Page 107
1  women, period, and not nonminority women.
2     Q.  Okay.  Well, I guess I have the
3  same -- let me just make sure I understand
4  it.  Women-owned firms -- a firm owned by
5  Hispanic woman would be included in the
6  Hispanic category?
7     A.  Yes.
8     Q.  And so if we included the all
9  women firm it would add up to something
10 more than 100 percent?
11    A.  I think that's right.
12    Q.  So and -- well, I guess you're
13 going to have the same question I asked
14 before which is, how do we know from this
15 chart that any disparities that you see
16 are not attributable to sex?
17    A.  Well, you're free to look at
18 this chart in isolation.  That's not how I
19 did it.  As an economist the document I
20 look at as a whole.  It's a good question
21 and one I try to tackle directly in the
22 next section.
23    Q.  Okay.  So the last part of the
24 footnote says that, N-A indicates the data
25 was not disclosed due to confidentiality

Page 108
1  or other publication restrictions, but I'm
2  not sure to what part of the chart that
3  applies.  Maybe you could identify it for
4  me?
5     A.  I -- you'll actually in this
6  chart, which is all industries for the
7  United States as a whole, it doesn't show
8  up.  It does show up in the next table in
9  some categories so that probably didn't
10 have to be in that note, but the business
11 bureau won't publish data if it's in such
12 a small category that it might allow
13 somebody to identify individual
14 respondents.
15    Q.  So it's a applicable to table
16 3.2, but not this table; is that right?
17    A.  Yes.
18    Q.  Okay.  So there's also -- I
19 think we spoke about capacity measures
20 earlier on.  There's no effort in this
21 chart at least to try to control for any
22 measure of capacity; is that right?
23    A.  Again you're not defining
24 capacity so I'm not sure --
25    Q.  Let me rephrase.  You know, the

Page 109
1  ability to do a job as capacity because of
2  your capital or your number of employees
3  or something like that.  So let's call it
4  ability to do the job and define it that
5  way.
6     A.  Well, there's a number of
7  columns in this table that speak to that.
8  There's -- it shows you firms -- column
9  three is just firms with paid employees as
10 opposed to column one, which is all firms;
11 column five shows you the number of
12 employees; column six shows the payroll
13 levels.  So there's all kinds of...
14    Q.  Maybe I need to rephrase the
15 question then.  The disparity indices
16 don't take that into account though,
17 right?
18    A.  The some -- vague idea of the
19 ability to do work, no.
20    Q.  Okay.  Well, I mean let me give
21 you an example.  Your -- by the way before
22 I do that, panel C says these are
23 disparity ratios.  Can you tell me why you
24 put disparity ratios instead of disparity
25 indices?

Case 2:20-cv-00041-DCLC-CRW   Document 67-3   Filed 07/05/22   Page 6 of 8
PageID #: 2247

Page 130

way.

So it is -- it's just a way to create a forward picture of where these disparities exist and what factors do and do not explain them, but that really is -- the main reason is that moving up through occupational hierarchies in different industries often leads to -- business ownership is often the end stage of that.

So if there's -- if there's discrimination at lower levels that can suppress the emergence of business owners.

Q. And the disparities that you have identified with respect to salaries and wages in this part of your report, do you think they reflect any specific kind of discrimination?

A. No. I think they reflect an amalgam of all -- can -- you know, you remember in this first section we're looking at unadjusted disparities, but they can -- what we're looking at here is the end result.

They can -- they could reflect

Page 131

discrimination in a variety of arenas, but particularly in the labor market.

Q. So when you say in the labor market, you mean by employers?

A. Well, not all discrimination is by individuals, but it could -- you've got job training programs, you've got government programs that affect the labor market, you've got specific employers, you've got customers. So yes but not exclusively employers.

Q. Okay. With respect to business formation, how do you control for an individual's desire to own a business, if you can?

A. I have no measurement of desire.

Q. You think that's an important omission?

A. If there were reason to believe that minorities and nonminorities were substantially different in being desirous to own businesses, possibly. I'm aware of no research to that effect, but it's not something I can measure.

Q. Okay. Is it fair to

Page 132

assume -- let me start again.

Is it fair to say that you assumed that the desire to own a business was consistent across the various races that you studied?

A. I would put it -- that's close. I would put it somewhat different. I have no reason to assume they should differ in any -- you know, from individual to individual, yes, but should they differ by race, I have no reason or evidence to suggest that they should or do.

Q. Do you think the disparities that you identified in business formation reflect any kind of specific discrimination?

A. I'm not testing for specific kinds of discrimination. As an economist what I'm trying do is look to see if there's quantitative differences in economic outcomes by race that aren't accounted for by differences in productivibility, such as endowments of human capital and financial capital.

But which specific actors or

Page 133

institutional mechanisms may be driving that is not something I've tried to determine here.

Q. Is there anything in the PUMS data that indicates how many hours per week or per month a person is devoting to his or her business?

A. Yes.

Q. Did you -- how did you take that into account in doing your regression analyses of business earnings?

A. Well, the earnings measured in this report is annual earnings. So if a person was working 40 hours a week, 52 weeks a year, that's reflected in their earnings.

If they're working 26 weeks a year, 20 hours a week, that's also reflected --

Q. Well, I guess I'm asking whether you included how many hours they worked as an independent variable that helps to explain the dependent variable?

A. No. Because the dependent variable is already incorporating that

34 (Pages 130 - 133)

Case 2:20-cv-00041-DCLC-CRW  Document 67-3  Filed 07/05/22  Page 7 of 8
                                PageID #: 2248
Veritext Legal Solutions
212-267-6868                    www.veritext.com              516-608-2400

Page 134

1 because it's your total earnings for the
2 year. So to also control for weeks and
3 hours would not be correct.
4  Q. I'm not sure I understand. So
5 I'll ask the question in a different way.
6     If somebody is only working half
7 time for their business, that might
8 explain why they're only earning half as
9 much money, right?
10  A. That would be reflected in their
11 annual figure.
12  Q. Right. And so including it as
13 an independent variable might help explain
14 some of the variation in their annual
15 figures, right?
16  A. I'd have to give that some more
17 thought, but I think because it's already
18 built into the annual earnings figure that
19 it would be inappropriate to also control
20 for weeks or hours but that's a question
21 I'd have to give some more very specific
22 thought to.
23  Q. I take it you didn't include
24 that data point in your regression
25 analysis; is that right?

Page 135

1  A. Hours and weeks were not a -- on
2 the right-hand side of the equation,
3 that's correct.
4  Q. Okay. You also -- you used age
5 as a substitute for experience; is that
6 right?
7  A. Yes. There's a proxy.
8  Q. Well, isn't it the case that
9 people of different ages can
10 have -- excuse me -- people of the same
11 age can have vastly different amounts of
12 experience in a particular field?
13  A. Sure. That's why it's a proxy
14 and not -- there's no measure of actual
15 experience. Just like a measure of desire
16 to own a business, that I'm aware of, and
17 certainly not in the PUMS data.
18  Q. Okay. So there -- if I just go
19 to the charts, you can look at any of the
20 tables, it doesn't really matter, there's
21 a lot of statistical significance here, a
22 lot of numbers that have very high
23 statistical significance.
24     And my question is: Is that a
25 reflection of the large numbers of

Page 136

1 observations that would -- that you
2 managed to collect for purposes of these
3 tables?
4  A. In part, yes. It's a very large
5 data set.
6  Q. In the PUMS analysis in all
7 three categories that you examined, can
8 you tell us who you think is doing the
9 discriminating that causes the
10 disparities?
11     MS. DINAN: Objection. Calls
12 for speculation.
13  A. Oh, I was going to say asked and
14 answered. I thought that's been asked
15 before and I cannot.
16  Q. I asked with respect to specific
17 parts and now I'm just trying to sort of
18 wrap up here.
19  A. No. I can't and again if it's a
20 culmination of overdiscrimination (sic) by
21 individual actors or more institutional
22 discrimination through social and economic
23 mechanisms or all of the above may be the
24 case, but I can't pinpoint that with this
25 data.

Page 137

1  Q. So in the text of this part,
2 Dr. Wainwright, you make a lot of
3 comparisons between various minorities and
4 nonminority men, right?
5  A. Yes.
6  Q. And my question is: Why didn't
7 you include all nonminorities and in the
8 case of business owners all
9 nonminority-owned companies?
10  A. I use nonminority males as the
11 reference group and if -- you don't see it
12 in these tables, but if you look in the
13 appendix nonminority women were already
14 included in the regression as a separate
15 variable.
16  Q. Right. But I'm just
17 asking -- well, all of these -- well, I
18 guess why didn't you include a
19 comparison -- some of the comparisons
20 might be explained by sex, right?
21  A. Sex is already explicitly
22 accounted for in these regression logs.
23  Q. Let me just be explicit then.
24 On page 60 I'm reading from the second
25 full paragraph, the ACS PUMS shows that on

35 (Pages 134 - 137)