# EXHIBIT 3

1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF TENNESSEE
2

      --------------------------------:
3     ULTIMA SERVICES CORPORATION,     :
                                       :
4                Plaintiff,            :
                                       :
5          vs.                         : Case No.:
                                       : 2:20-cv-00041-
6     U.S. DEPARTMENT OF AGRICULTURE,  : DCLC-CRW
      et al.,                          :
7                                      :
                 Defendants.           :
8     --------------------------------:
9
10
11           REMOTE DEPOSITION OF DANIEL CHOW
12
13    DATE:            March 10, 2022
14    TIME:            10:06 a.m.
15    LOCATION:        Rockville, Maryland
16    REPORTED BY:     Shari R. Broussard, RPR, CSR
                       Reporter, Notary
17
18
19
20
21            Veritext Legal Solutions
              1250 Eye Street, NW, Suite 350
22               Washington, D.C. 20005

1 wondering whether any of those articles were in
2 peer-reviewed journals.
3     A   Yes, one of my works -- actually two of
4 them: The BLS Monthly Labor Review were peer
5 reviewed, the one on Behavioral Economics and the
6 other on Price Measures of New Vehicles.
7     Q   Okay. And those are listed on the
8 second page of your CV under "Publications,"
9 correct?
10    A   Correct, correct.
11    Q   Those two articles are the first two
12 items under that heading?
13    A   Correct.
14    Q   Okay. And the BLS Monthly Labor Review
15 is a peer-reviewed journal, correct?
16    A   It is. Yes, it is heavily peer
17 reviewed -- reviewed within the Bureau.
18    Q   It's a publication of the Bureau of
19 Labor Statistics?
20    A   Correct.
21    Q   Is it a government publication?
22    A   Correct.

1     Q   Okay. All right. Very good.
2         Your current position with the Minority
3 Business Development Agency, could you just state
4 for the record what that position is?
5     A   I'm a senior economist at the U.S.
6 Bureau of Labor -- I mean, I'm sorry, Minority
7 Business Development Agency. I serve as the
8 economic data concepts methodological expert for
9 quantitative concepts and ideas as well as
10 developing data products that support the agency's
11 missions.
12    Q   Is that a civil service position or a
13 political appointment?
14    A   Civil service.
15    Q   Are you in the Senior Executive Service?
16    A   No, I'm -- I am not.
17    Q   Okay. Could you tell me what your level
18 in the government is?
19    A   I'm sorry. Can you clarify "level"?
20    Q   Yeah, that wasn't a great question, was
21 it?
22         Do you have a GS number associated with

1 your job?
2    A   Yes.
3    Q   And what is it?
4    A   Thirteen.
5    Q   Okay. Thank you.
6        Can you just explain in general terms
7 what the Minority Business Development Agency
8 does?
9    A   Yes. The Minority Business Development
10 Agency, or MBDA, provides technical assistance to
11 small or even medium and large minority-owned
12 firms with access to capital, management
13 expertise, trading. This is done through various
14 business centers throughout the country that
15 provide these services. And we also provide
16 networking assistance -- assistances to various
17 kinds of minority-owned and women-owned firms.
18    Q   Okay. I can call it the MBDA and you'll
19 know what I'm talking about?
20    A   Correct.
21    Q   Good. All right. Amongst the things
22 you identified as within your duties there, your

1 CV states that you are involved with working
2 groups to implement Executive Orders; is that
3 right?
4    A   Correct.
5    Q   Okay. And which Executive Orders do you
6 assist in the implementation of?
7    A   13085, equity -- equity and racial
8 inclusion. There's also working groups on
9 Evidence Act and I believe one on learning --
10 learning and action plans for strategic -- for
11 strategic development of the agency.
12    Q   Okay. Let's just go through each of
13 those.
14        What does Executive Order 13085
15 generally provide?
16    A   It asks each federal agency to determine
17 if there are underserved communities or customers
18 within their sphere of services that have not been
19 fully addressed in past government programs and to
20 provide a plan to address those possible gaps in
21 the Government's provision of services to those
22 communities.

Page 98

1 and ethnicity categories.
2  Q  Okay. Did you do any analysis to
3 determine why minority-owned firms had lower odds
4 ratios?
5  A  Not for this study, no, I -- I did not
6 get into that level of detail.
7  Q  Well, do you have an expert opinion as
8 to whether you can attribute the lower ratios that
9 you found through discrimination by a particular
10 actor?
11  A  "By a particular actor." Can -- can you
12 clarify that?
13  Q  Sure. Let's use the Federal Government
14 as our particular actor.
15     Do you have an expert opinion as to
16 whether or not your study of lower ratios can be
17 attributed to discrimination by the Federal
18 Government?
19  A  No.
20  Q  Okay. And if I understand the analysis
21 correctly, one variable that was not used was
22 failure to bid, right?

Page 99

1  A  Correct, I have nothing in here about
2 bidding.
3  Q  Okay. And so some of these odds might
4 be attributable to the fact that different groups
5 bid less often or more often?
6  A  Might be attributable, yes.
7  Q  Okay. There's nothing in your analysis
8 that would eliminate that possibility; is that
9 right?
10  A  Correct.
11  Q  Okay.
12     MR. ROSMAN: So, Christine, I'm not too
13 far from being done, but if you have a significant
14 amount of cross, then maybe we should take lunch
15 now and then come back and finish up in an hour or
16 so. I just wanted to take your opinion about
17 that.
18     MS. DINAN: I'm not sure. I need to
19 look at my notes and I'd like to take a break
20 regardless before we do the cross, so the question
21 is whether you want to finish up and then take a
22 break or you want to take a break now.

Page 100

1     MR. ROSMAN: Why don't we take our lunch
2 break. And Andrew is shaking his head up and
3 down, so I'm going to go --
4     MS. DINAN: He's pro lunch break.
5     MR. ROSMAN: We can either come back at
6 2:00 or just come back at 1:45 or 1:50 or 1:55,
7 whatever people favor.
8     MS. DINAN: I'm fine. I mean, go ahead,
9 Andy.
10     MR. BRANIFF: I think 1:45 is good.
11     MR. ROSMAN: All right. 1:45 it is.
12 Let's be back at 1:45 and we'll finish up. Thank
13 you.
14     MS. DINAN: Sounds good. Thank you.
15     (Whereupon, at 12:51 p.m., a
16     luncheon recess was taken.)
17     * * * * *
18
19
20
21
22

Page 101

1     A F T E R N O O N   S E S S I O N
2         (1:45 p.m.)
3 Whereupon,
4     DANIEL CHOW
5 was called for continued examination, and having
6 been previously duly sworn, was examined and
7 testified further as follows:
8     RESUMED EXAMINATION BY COUNSEL FOR
9     PLAINTIFF
10 BY MR. ROSMAN:
11  Q  All right. Homestretch.
12     Mr. Chow, I'm just going to ask you to
13 interpret some of the numbers in your report.
14     In Table 3 the odds ratio you identify
15 for 8(a) firms is 2.606.
16     Does that mean that the odds of winning
17 a contract for an 8(a) business is more than two
18 and-a-half times greater than for a business that
19 is not an 8(a) business?
20  A  Well, it's greater than one and it's
21 twice -- twice as likely, but it is a -- yes, it
22 is a -- larger than -- larger than one, correct.

26 (Pages 98 - 101)

Case 2:20-cv-00041-DCLC-CRW  Veritext Legal Solutions Filed 07/05/22   Page 4 of 6
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Document 67-4
PageID #: 2253

1  A  No.
2  Q  Okay. Are you offering any opinion
3  about what the cause of these different odds
4  ratios that you identify in your tables is or are?
5  A  Offering an opinion. Well, I -- I
6  certainly didn't look into all of the causative
7  factors, but because the fact that I control for
8  all these other variables and -- it's -- I -- I
9  tend to think that there is some kind of
10  potential -- potential discrimination as well as,
11  you know, potential problems with how these firms
12  are able to win contracts.
13      So, for example, there may be -- these
14  firms come from -- these SDBs are trying to enter
15  a contract in a very competitive contracting
16  situation in which they have not been able to
17  compete well with firms that were more better
18  prepared for instance. So to that extent there --
19  there -- there could be some kind of --
20  potentially some discrimination. We -- we know
21  that discrimination does exist in -- in -- in
22  various markets around the country in the various

1  contracting areas.
2  Q  I guess my question is whether you're
3  offering that as an expert opinion in this case?
4  A  As opposed to what?
5  Q  As opposed to nothing.
6  A  Oh, as opposed to nothing.
7  Q  As opposed to not offering it as an
8  expert opinion in this case.
9  A  I'm -- I'm offering that as -- yes, I
10  would say I'm offering that as an expert opinion.
11  Q  Okay. Could there be nondiscriminatory
12  reasons for the estimated differences that you've
13  identified in your tables?
14  A  Nondiscriminatory. It's possible but
15  unlikely since we are looking at minority firms
16  and if there were other nondiscriminatory factors
17  I don't know how those would necessarily show up
18  in here. That would be I think unusual because
19  the variables are not looking at outside factors
20  beyond the study.
21      MR. ROSMAN: Could I just ask to have
22  that answer read back, please.

1      (The reporter read the record
2       as requested.)
3  BY MR. ROSMAN:
4  Q  I'm not sure I understood it, so let me
5  follow up just a little.
6      I understand that the study didn't look
7  at variables that were outside the study. The
8  question is could one of those variables outside
9  the study be the cause of some of the
10  discrepancies or odds ratio differences that
11  you've identified?
12  A  Okay. So if there was a factor outside
13  the study that is causing -- that is
14  nondiscriminatory in nature that is causing -- or
15  impacting on the odds ratios. You're asking if
16  that's plausible; is that right?
17  Q  Sure.
18  A  Okay. It's -- I would say that it's --
19  it is plausible, but I can't put a -- I can't put
20  a good exact probability estimate on that.
21      It would be -- it would be very
22  speculative on my part to attribute causation from

1  those nondiscriminatory factors and what their
2  magnitude and direction of impact are on these odd
3  ratios.
4      I would add that given that these firms
5  already exist and are facing both discriminatory
6  and nondiscriminatory factors, these results to
7  the facts that will reflect those circumstances.
8      MR. ROSMAN: Okay. Those are all my
9  questions.
10      Christine, the witness is yours.
11      MS. DINAN: Thank you.
12      EXAMINATION BY COUNSEL FOR DEFENDANTS
13  BY MS. DINAN:
14  Q  Mr. Chow, I just have a few questions.
15  I won't be too long.
16      Mr. Chow, why did you do this report?
17  A  We did this report in order to provide a
18  statistical and quantitative support towards this
19  legal case.
20  Q  And what question did you set out to
21  answer?
22  A  Well, we wanted to determine how and to

28 (Pages 106 - 109)

Case 2:20-cv-00041-DCLC-CRW   Veritext Legal Solutions   Document 67-4   Filed 07/05/22   Page 5 of 6
215-241-1000 ~ 610-434-8588   PageID #: 2254   304-571-0510 ~ 202-803-8830

1 what extent our minority- and small-disadvantaged
2 firms are able to win or not win contracts.
3     Q   And what did you find?
4     A   We found that -- I found that SDBs that
5 are not in the 8(a) program are 30- -- about 37
6 percent less likely to win a contract compared to
7 firms in the 8(a) program, which are like twice as
8 likely to win a contract, and that there are other
9 characteristics of firms that seem to indicate
10 that there are differences in odds ratio for
11 winning contracts.
12     Q   In your study you control for a number
13 of factors in your regression analysis to
14 determine whether any of those factors could
15 impact the odds of a firm winning a contract.
16     Did you control for every factor that
17 the data allowed you to control for?
18     A   I controlled for as many factors as I
19 could within the design of the -- of the -- of the
20 study, yes.
21     Q   In your opinion, would the results from
22 your study be consistent with the presence of

1 discrimination?
2     A   Yes, in my expert opinion it is
3 consistent, yes.
4     Q   And why is that?
5     A   Well, again, we're looking at minority
6 firms and I looked at all of the variables that
7 are relevant in terms of, you know, determining
8 the differential impact on the odds of winning.
9 We're looking at minority firms and I can't
10 think of -- I can't think of any nondiscriminatory
11 factors. And we know that discrimination exists
12 in various workplaces and marketplaces, so looking
13 at the fact that if an SDB is not in the 8(a)
14 program versus a firm that is in the 8(a) program,
15 we see a statistically significant difference
16 between those two. So I -- I tend to look at that
17 as being consistent with some form of
18 discrimination.
19     Q   And that was after controlling for
20 certain nondiscriminatory factors like age and
21 gross receipts and things like that, correct?
22     A   Correct, those -- those factors are part

1 of these firms, so yes, they -- they are included
2 in the study.
3     Q   To your knowledge, were any individual
4 firms removed from the datasets that you were
5 given by SBA either by you or by SBA because of
6 their success in bidding in the federal
7 marketplace?
8     A   No.
9     Q   Are you aware of any economic study or
10 data that would indicate that registered
11 minority-owned firms bid less often on contracts
12 than registered non-minority firms --
13     A   I'm not aware of any.
14     Q   -- non-minority-owned firms?
15     A   I'm not aware of any.
16     Q   Let me look at my motes. Just a moment.
17     Just back to what you were saying a
18 moment ago about the findings, when you indicated
19 that certain firms -- there were 37 percent less
20 likely -- had 37 percent less likely odds of
21 winning a contract as compared to other firms,
22 that was all firms with similar characteristics,

1 correct?
2     A   Correct.
3     Q   And that was not just in comparison to
4 firms in the 8(a) program; is that right?
5     A   Correct.
6     MS. DINAN: I believe that is all that I
7 have. Let me just double check.
8     No, I have no further questions thank
9 you.
10     MR. ROSMAN: Just two quick follow-up
11 questions.
12     FURTHER EXAMINATION BY COUNSEL FOR
13     PLAINTIFF
14 BY MR. ROSMAN:
15     Q   You testified a moment ago that you
16 thought the results were consistent with
17 discrimination.
18     Does this mean that discrimination
19 cannot be eliminated as a possible cause for the
20 discrepancies that you found?
21     A   I would -- cannot be eliminated as -- I
22 would say so, yes.

29 (Pages 110 - 113)

Case 2:20-cv-00041-DCLC-CRW   Document 67-4   Filed 07/05/22   Page 6 of 6
Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
PageID #: 2355