UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

---------------------------------------------------------------------------------x

ULTIMA SERVICES CORPORATION,                    :

    Plaintiff,                                  :

      -against-                              :       No. 2:20-cv-00041-
                                          DCLC-CRW
U.S. DEPARTMENT OF AGRICULTURE,                  :
U.S. SMALL BUSINESS ADMINISTRATION,
SECRETARY OF AGRICULTURE, and ADMINISTRATOR      :
OF THE SMALL BUSINESS ADMINISTRATION,
                                                 :
    Defendants.
                                                 :

---------------------------------------------------------------------------------x

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT (Doc. 61)**

Plaintiff Ultima Services Corporation ("Ultima") submits this memorandum of law in opposition to defendants' motion for summary judgment (Doc. 61).

<u>Argument</u>

There are a variety of reasons why defendants have not met their initial burden on summary judgment. They have misstated the law and mischaracterized the challenge here. But perhaps most striking of all is their failure to submit competent evidence as required by Rule 56. Instead, they have submitted unsworn disparity studies, expert reports, and privately-created reports. Although this absence of competent evidence alone is sufficient to doom defendants' motion, it would do them no good even if the Court considered the content of their incompetent evidence. That "evidence" would not constitute a strong basis in evidence sufficient to meet strict scrutiny.

For the most part, defendants ignore the holding in the Sixth Circuit's recent case of *Vitolo v. Guzman*, 999 F.3d 353 (2021), both on the requirements of strict scrutiny and its analysis of standing in a case addressing near-identical arguments.

I.     DEFENDANTS MISSTATE CERTAIN BURDENS AND STANDARDS

As set forth in Plaintiff's Memorandum in Support of its motion for summary judgment (Doc. 60-2, "Pl's SJ Memo."), when government uses race, it bears the burden of demonstrating that its use meets strict scrutiny. Pl's SJ Memo. 15-16 (Page ID # 821-22). Defendants claim nonetheless that they bear only the burden of producing evidence to show a strong basis in evidence and that, if they do, the burden shifts back to Plaintiff to prove the unconstitutionality of the program. Doc. 62 ("Dfs' SJ Memo.") 6-7 (Page ID # 1600-01). Defendants cite an unreported Sixth Circuit decision (*Rutherford v. City of Cleveland*, 179 Fed. Appx. 366 (6th Cir. 2006)) and *Aiken v. City of Memphis*, 37 F.3d 1155 (6th Cir. 1994) in support.

*Aiken* was decided before any of the Supreme Court authorities set forth in Plaintiff's summary judgment memo, and *Rutherford* itself acknowledged that the law was in flux. *Rutherford*, 179 Fed. Appx. at 374 n.5 (noting the difference of opinion, citing various cases, including *Middleton v. City of Flint*, 92 F.3d 396 (6th Cir. 1996), supporting the proposition that the government using

race bears the complete burden, and leaving for another day the resolution of the issue). Since *Rutherford*, the Supreme Court has reiterated several times that the government defendants bear the burden in cases of this type, and the United States itself has taken this position. *United States v. City of Cincinnati*, 2021 U.S. Dist. LEXIS 175084, at *10 (S.D. Ohio Sept. 15, 2021) (holding that, on a motion by the United States to amend a consent decree to eliminate race-based and sex-based hiring and promotion goals in the Cincinnati Police Department, "[t]he burden is on the party defending the governmental action to satisfy both requirements [*viz.*, compelling interest and narrow tailoring]"); *id.* at *10 n.8 (noting that the parties disputed the burden of proof, that the United States "contends that the burden is on the City to demonstrate that the race-based goals survive strict scrutiny," and that the City argued that the ultimate burden lay with the United States; after stating that *Rutherford* lent some support to the City's position, the Court notes that "*Rutherford*, however, predates the Supreme Court's decision in *Fisher*"); *Holman v. Vilsack*, 2021 U.S. Dist. LEXIS 127334, at *13 (W.D. Tenn. July 8, 2021) ("Under strict scrutiny, the government has the burden of proving that racial classifications 'are narrowly tailored measures that further compelling governmental interests.'") (quoting *Johnson v. California*, 543 U.S. 499, 505 (2005)). Now that federal agencies are defendants in a lawsuit challenging race-conscious decision-making, the government apparently has changed its position from the one it took in *City of Cincinnati.*

Defendants also assert that Plaintiff is making a "facial" challenge to the 8(a) Program, and cite *United States v. Salerno*, 481 U.S. 739 (1987) for the proposition that Plaintiff must show that there is "no set of circumstances" under which the "Act" would be valid. Dfs' SJ Memo. 9-10 (Page ID # 1603-04). It is not clear what Defendants mean here by a "facial" challenge. That word is not used in Plaintiff's complaint, and Plaintiff is plainly not challenging an "Act" but rather the regulatory program as implemented by defendants. To be sure, Plaintiff is making certain arguments here that would be applicable in many, if not all, applications of the program, but that is simply the nature of the strict scrutiny inquiry. If there is insufficient evidence to support a compelling governmental interest, for example, it is hard to envision a "set of circumstances" under which the

8(a) Program would be valid. As the Federal Circuit noted some time ago, the application of *Salerno* to an equal protection challenge is a poor fit. *Rothe Development Corp. v. U.S. Dep't of Defense*, 413 F.3d 1327, 1337-38 (Fed. Cir. 2005) ("Because, as we held before and hold again today, the strict scrutiny doctrine sets forth the test for determining facial unconstitutionality in this case, *Salerno* is of limited relevance here, at most describing a conclusion that could result from the application of the strict scrutiny test.").

II.  DEFENDANTS FAIL TO MEET THEIR BURDEN OF DEMONSTRATING THE ABSENCE OF A GENUINE ISSUE OF MATERIAL FACT ON THE EXISTENCE OF A COMPELLING GOVERNMENTAL INTEREST

On their motion for summary judgment, defendants have the burden of demonstrating the absence of a genuine issue of material fact on the two issues comprising the strict scrutiny inquiry: the existence of a compelling governmental interest and means narrowly-tailored to achieve that interest. Here, defendants argue that they have a compelling governmental interest in remedying discrimination. But their evidence fails to demonstrate the absence of a genuine issue of material fact on that question.

As described in plaintiff's summary judgment motion, there are significant limitations to the kind of discrimination that can serve as a compelling governmental interest. Evidence must disclose discrimination that involves (1) specific instances of (2) intentional discrimination, that is (3) of a kind that the defendant employing the race-conscious mechanism itself participated in or promoted (even if passively). *Vitolo*, 999 F.3d at 361; *Holman*, 2021 U.S. Dist. LEXIS 127334, at *17 (granting preliminary injunction against federal farm loan forgiveness program because, *inter alia*, the federal defendants "have not provided evidence of 'specific episodes' of present intentional discrimination by Defendants"). Here, for reasons described below, defendants failed to produce an adequate amount of competent evidence. But, even if they had, their evidence is primarily evidence of disparities that fail to identify any specific instances of discrimination. Indeed, their defense appears to be that the evidence of statistical discrimination is so pervasive that they need not identify any specific instances in which they participated.

The mere existence of statistical studies showing that groups have not received contracts, or own fewer businesses, or make lower salaries, fail to identify the kind of specific, egregious discrimination that would support a compelling governmental interest.

> Where there is a significant statistical disparity between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors actually engaged by the locality or the locality's prime contractors, an inference of discriminatory exclusion could arise. . . Under such circumstances, the city could act to dismantle the closed business system by taking appropriate measures against those who discriminate on the basis of race or other illegitimate criteria. . . In the extreme case, some form of narrowly tailored racial preference might be necessary to break down patterns of deliberate exclusion.

*City of Richmond v. J. A. Croson Co.*, 488 U.S. 469, 509 (1989). Thus, the Court has explained that statistical evidence may permit the government to take "appropriate measures against those who discriminate," but it does not give it license to itself engage in discrimination. Rather, only when the evidence supports the conclusion that an "extreme case" involving "patterns of deliberate exclusion" is present may the government use a racial preference.[1]

A.    Defendants Fail To Show That They Had Evidence Of Discrimination

The first flaw in defendants' effort to demonstrate the absence of a genuine issue of material fact concerning the existence of a compelling government interest is their heavy reliance on evidence before Congress. *E.g.*, Dfs' SJ Memo. 8 (PageID # 1602) ("Congress [h]as a [c]ompelling [i]nterest in [r]emedying [d]iscrimination"); *id.* at 10 (PageID # 1604) ("Congress had a strong basis in

---

[1]    Citing page 500 from the *Croson* opinion, defendants claim that a "strong basis in evidence" is that approaching a prima facie case of a constitutional or statutory violation. Dfs' SJ Memo. 8 (PageID # 1602). The Court did not so state or rule. Rather, it simply pointed out that (1) the City of Richmond did not have a strong basis in evidence and (2) there was nothing approaching a prima facie case of a constitutional or statutory violation by *anyone* in Richmond. *Croson*, 488 U.S.at 500. It never said that the latter would be sufficient to constitute the former. Indeed, the quotation in the text – stating that racial preferences are permissible in the "extreme case" of a "pattern of deliberate exclusion" – makes no sense at all if defendants' interpretation were correct. Defendants' argument is also inconsistent with the requirement that the discrimination being addressed be *intentional* discrimination. Prima facie cases of statutory violations in many instances require only a selection device with disparate impact, and do not require intentional discrimination. *Serrano v. Cintas Corp.*, 699 F.3d 884, 892 (6th Cir. 2012) (under Title VII, "[p]laintiffs asserting a disparate-treatment claim must prove discriminatory motive or intent, while plaintiffs asserting a disparate-impact claim need not.").

evidence when it enacted the 8(a) program and when it amended it to its current form."); *id.* at 13 ("Evidence before Congress in the years since the 8(a) program's amendment demonstrates that minorities continue to face discriminatory barriers"); *id.* at 13 n.7 ("Congress cannot anticipate every scenario in which a nationwide program might be utilized"); *id.* at 19 ("Evidence before Congress also has consistently shown [less access to capital and credit]").   But, as defendants acknowledge, Congress did not create a race-conscious program.  Dfs' SJ Memo. 6 n.6 (PageID # 1600) ("Section 8(a) . . . does not contain a racial classification").

Rather, the Small Business Administration ("SBA") adopted and continues to implement a race-conscious program without Congressional authority.  Even assuming that it has the authority to do so (*but see* Pl's SJ Memo. 17-20 (Page ID# 823-26)), the SBA does not review disparity studies (Doc. 60-5 at 3 (PageID # 862, Rosman St. ¶ 17) & Doc. 65-7 at 40-41 (Page ID# 1838-39, Klein Dep. Tr. 190-91) and they have produced no evidence that they hold hearings to gather evidence to support that presumption.  It is defendants who must, under strict scrutiny, demonstrate that *they* had and have a strong basis in evidence to believe remedial measures were needed.  The evidence they submit on their motion for summary judgment fails to demonstrate this prerequisite, much less the absence of a genuine issue of material fact concerning it.

Thus, whether Congress received evidence in the 1980's concerning problems faced by minority contractors in general (Dfs' SJ Memo. 10-13 (PageID ## 1604-07)) is thrice irrelevant.  First, Congress did not implement a race-conscious program.  Second, it fails to identify "specific" instances of discrimination.  Third, it is dated and could no longer support a program of race preferences even if Congress had adopted one.[2]

---

[2]    In addition, of course, statements by individual members of Congress in 1988 regarding what the purpose of Congress was in 1978 (or, for that matter, in 1988) are entitled to little weight.  Dfs' SJ Memo. 12-13 (PageID # 1606-07) (quoting comments of Sen. Sasser).  So, too, a statement by an individual member of Congress regarding what Congress has "considered" is hardly evidence of the deliberations of either (much less both) houses.  Dfs' SJ Memo. 13 n.8 (PageID # 1607) (statement of Sen. Carper); *id.* at 14 n.9 (PageID # 1608) (statement of Rep. Maloney).  *See generally United States v. Walgreen Co.*, 2022 U.S. Dist. LEXIS 44561, at *36 (E.D. Tenn. March 14, 2022).

Similarly, the evidence supplied by defendants' experts is inadequate because neither expert can identify a source of discrimination from their analysis. Rosman Statement dated July 12, 2022 ("Rosman Opp. St.") Ex. 33 (Wainwright Dep. Tr. 94) (disparity studies cannot tell you whether the disparities are caused by specific individuals or larger institutional forces), 132 (not testing for specific kinds of discrimination), 136 (cannot say who is doing the discrimination); Rosman Opp. St. Ex. 34 (Chow Dep. Tr. 98) (no opinion as to whether the disparities were caused by the federal government). Indeed, Mr. Chow's conclusion that his results were "consistent with discrimination" means only that discrimination could not be eliminated as a possible cause of the disparities from his analysis. Doc. 61-15 (PageID # 1534, Chow Dep. Tr. 113, ll. 18-22). But it is defendants' burden to demonstrate a strong basis in evidence of discrimination that is both specific and intentional. Defendants cannot meet that burden if they cannot even identify who is engaging in discrimination.

B.    <u>Defendants' Evidence Is Incompetent On Summary Judgment</u>

Defendants rely on "three meta-analyses" (Dfs' SJ Memo. 13 (PageID # 1607)) to support their allegedly compelling governmental interest: a report of their expert, Jon Wainwright, a report from their attorneys at the Department of Justice, and a report published by the Minority Business Development Agency ("MBDA") of 100 disparity studies. Dfs' SJ Mot. Exs. 10-12 (Docs. 61-10 to 61-12). They also refer to a list of disparity studies, some of which they claim were before Congress (Dfs' SJ Memo. 17-18 (PageID ## 1611-12), citing Dfs' SJ Mot. Ex. 14 (Doc. 61-14)) and the report of their other expert Daniel Chow (Dfs' SJ Memo. 20-21 (PageID # 1614-15), citing Dfs' SJ Mot. Ex. 13 (Doc. 61-13)).

To the extent that defendants wish to rely on statements contained in these reports for the truth of the matters stated in them, they are hearsay. Unsworn expert reports are inadmissible on a motion for summary judgment. *E.g.*, *Shaffer v. CSX Transp., Inc.*, 462 Fed. Appx. 597, 601 n.2 (6th Cir. Feb. 22, 2012) ("Unsworn expert reports are hearsay and may not be considered on summary judgment" and cases cited therein); *Filous v. Dunbar*, 2019 U.S. Dist. LEXIS 80302, at *37 (N.D. Ohio May 7, 2019) ("the report is not sworn to and, thus, is not properly before the Court"); *FNBN-RESCON*

*I LLC v. Ritter*, 2014 U.S. Dist. LEXIS 130128, at *12 (D. Nev. March 12, 2014) ("for an expert opinion to be considered on summary judgment, it must be accompanied by a proper affidavit or deposition testimony").

So, too, with the statement in the document that defendants call the MBDA Report. Although there is no sworn testimony with respect to it, the report appears to be a document that was prepared *for* the MBDA by a private company pursuant to a contract. Doc. 61-12, p. 4 (PageID # 1379). The DOJ Report was largely prepared for purposes of this litigation, and, for that reason, DOJ declined to produce a witness to testify concerning the underlying preparation of it. Rosman Opp. St. ¶ 4; Docs. 60-5 at 3 (PageID # 862 (Rosman St. ¶ 15) & Doc. 65-5 (PageID # 1796, Rosman St. Ex. 21). Only some of the disparity studies listed by defendants in their Exhibit 14 were "before Congress" at all. Even if there were disparity studies "before Congress," that does not demonstrate the truth of the underlying statements in the disparity studies or support a race preference program adopted by the SBA. Indeed, in many instances, the underlying statements are hearsay-on-hearsay. Dfs' SJ Memo. 17-18 (PageID # 1611-12).

> C.     Even If They Had Been Presented With Competent Evidence, Defendants' Expert Reports and Other Evidence Fail To Demonstrate The Absence Of A Genuine Issue <u>Of Material Fact On The Question Of Defendants' Past Or Present Discrimination</u>

Aside from their evidentiary problems, defendants' expert reports fail to demonstrate substantively that defendants had a strong basis in evidence for concluding that a race preference was needed. Their other evidence is similarly misplaced.

     1.     <u>Wainwright</u>. – The first thing to note concerning the expert report by Dr. Wainwright that defendants submit on their motion for summary judgment is that it is *not* the expert report submitted on the date the parties agreed upon (February 7, 2022). Rather, it is a "corrected" version defendants served several months later (on April 25, 2022), and long after Dr. Wainwright's deposition on March 7, 2022. Doc. 61-11 (PageID # 1153); Rosman Opp. St. ¶ 3 & Ex. 31. This "corrected" version, according to defendants, only corrected "typographical errors" and made no

"substantive changes."[3]  A reasonable trier of fact might disagree.

Among other things that Dr. Wainwright changed was the description of how business survey census data categorized the various racial and ethnic groups he studied.  Doc. 61-11 at 39 n.47 (PageID # 1191); Rosman Opp. St. ¶ 3 & Ex. 31.  (Dr. Wainwright's deposition testimony was not terribly clear on this point.  Rosman Opp. St. Ex. 33 (Wainwright Dep. Tr. 98-102).)  This is not a "typographical" error, but  substantive, since one cannot make any assessment about discrimination against a group being favored by defendants here if the statistical analysis combines that group in with others.  And, *even as corrected*, Dr. Wainwright states that Pacific Islanders are included in two *different* groups: with Native Hawaiians *and* with Asian and Subcontinent Asians.  (Or, perhaps, all four are considered as one, which would explain how Pacific Islanders are included with the other three.)  Yet his charts summarizing the data make no mention of the latter problem (that is, the charts fail to identify the inclusion of Pacific Islanders in the Asian category).  Doc. 61-11 at 44, 47-49, 52, 55-57 (PageID ## 1196, 1199-1201, 1204, 1207-09) (Tables 3.1 through 3.4).

This and other changes could lead a reasonable trier of fact to conclude that Dr. Wainwright is quite sloppy, and his conclusions subject to question.  The fact that none of the articles on Dr. Wainwright's resume have been published in a peer-reviewed journal only lends support to that conclusion.  Rosman Opp. St. Ex. 33 (Wainwright Dep. Tr. 6).  (Indeed, one might conclude that the disparity studies in which he specializes are inadequate to meet peer-review requirements.  Doc. 59 at 10 (PageID # 420) (methodology's testing by peer review is a consideration in determining reliability).)

As defendants state, Dr. Wainwright's report has three parts: an analysis of a collection of

---

[3]     Defendants purported to provide plaintiff with a redlined copy of Dr. Wainwright's report so that plaintiff could identify the changes.  But the accuracy of the redlined copy is dubious. For example, in Table 3.1, the redlined version of Dr. Wainwright's report indicates a change in the formula for the "payroll disparity" in Panel C.  Rosman Opp. St. ¶ 3 & Ex. 31 (pg. 44). While that change would have made some sense – firms with employees will have higher payroll than those without – no such change was made in the "corrected" report.  Doc. 61-11 at 44 (PageID # 1196).  Given this, Ultima cannot be certain as to whether changes not reflected in the redlined copy were made.

local disparity studies, an analysis of business surveys from the Census Bureau, and an analysis of earnings, business formation, and business earnings from a different Census Bureau dataset. Dfs' SJ Memo. 16-17 & n.12 (PageID # 1610-11); *see also* Doc. 59 at 4-6 (PageID # 414-16). Defendants emphasize the need to consider all three of his analyses together. Doc. 59 at 19 (PageID # 429). A reasonable trier of fact might consider the following concerns about them.

First, in his review of disparity studies in the first part of his analysis, only 20-25% of the underlying disparity studies bothered to test for statistical significance. Rosman Opp. St. Ex. 33 (Wainwright Dep. Tr. 54-55). Of those that did, it was often the case that a substantial proportion of the disparities were *not* statistically significant. Rosman Opp. St. Ex. 33 (Wainwright Dep. Tr. 78-79) (discussing Table 2.7). Here, it deserves mention that Dr. Wainwright used a rather generous interpretation of "statistical significance": 10% possibility that the disparity was caused by random chance rather than the typical 5%. *Compare Engineering Contractors Ass'n of South Florida, Inc. v. Metropolitan Dade County*, 122 F.3d 895, 914 (11th Cir. 1997) (noting that two standard deviations, meaning that there is a one in twenty chance that the difference was attributable to random chance, generally used by social scientists to assess statistical significance) (quoting *Peightal v. Metropolitan Dade County*, 26 F.3d 1545, 1556 n.16 (11th Cir. 1994)).

Second, the first part of his report compared firms owned by white males with minority firms owned by both males and females. Dr. Wainwright here acknowledged the obvious: taken alone, any disparities might be a consequence of sex, not race. Rosman Opp. St. Ex. 33 (Wainwright Dep. Tr. 89-90).

Third, Dr. Wainwright did not examine the underlying availability data of the disparity studies that he was not personally involved with (that is, the majority of them). Rosman Opp. St. Ex. 33 (Wainwright Dep. Tr. 58); Doc. 60-9 at 3 (Req. No. 1). Thus, he could not assess whether most of the studies properly measured availability *at all*.

Fourth, with respect to the disparity studies he *was* personally involved with (those performed by the company he worked for, NERA Economic Consulting), the measure of "availability" did not

include size or capacity. Rosman Opp. St. Ex. 33 (Wainwright Dep. Tr. 68, 87). But most authorities recognize that larger firms are able to take on more work, and thus a disparity between the percentage of availability of minority firms and how much work they obtain (utilization) may just be attributable to the fact that the minority firms are generally smaller. *E.g.*, *Michigan Road Builders Ass'n, Inc. v. Milliken*, 834 F.2d 583, 592 (6th Cir. 1987) (holding that defendants had not demonstrated a compelling governmental interest to support set aside for minority owned businesses (MBEs) where "the relative lack of MBEs doing business with the state was coupled with the objective reality that most MBEs were small businesses. Small businesses, *as a result of their size*, were unable to effectively compete for state contracts.") (emphasis in original); *Rothe Development Corp. v. Dep't of Defense*, 545 F.3d 1023, 1042-43 (Fed. Cir. 2008) ("We are even more troubled, however by the failure of five of the studies to account sufficiently for potential differences in size, or *relative capacity*, of the businesses included in those studies.") (emphasis in original); *Metropolitan Dade County*, 122 F.3d at 917 (County's own expert admitted that "firm size plays a significant role in determining which firms win contracts").

Indeed, this omission of size or capacity from Dr. Wainwright's analysis is inconsistent with defendants' other expert, Mr. Chow, who used size in his own regression. Dfs' SJ Memo. 21 (PageID # 1615) (identifying "firm size" as a factor "that might increase a firm's odds for success"); *id.* at 23 (PageID # 1617). It is also inconsistent with the SBA's own position regarding the use of joint ventures by 8(a) participating firms. 63 Fed. Reg. 35727 (June 30, 1998) (justifying the loosening of rules regarding joint venture arrangements because "some contracting officers may feel that requirements are too big for a small business to perform successfully"). Even if small firms could perform certain contracts as well as larger firms, a preference by contracting officers for larger firms would nonetheless be a non-discriminatory factor that might explain disparities.

NERA's "availability" analysis also included firms that never sought government contracts. Rosman Opp. St. Ex. 33 (Wainwright Dep. Tr. 64-65).

Fifth, although defendants emphasize the need to consider all of Dr. Wainwright's analysis,

the second and third parts of his analysis, relying on census data, plainly did not focus on *contracting*. These sections used surveys on "the entire universe of businesses." Rosman Opp. St. Ex. 33 (Wainwright Dep. Tr. 38). Thus, they include many businesses for which "contracting" with the government (or anyone else) is not a significant source of revenue, including owners of McDonald's franchises, mom & pop grocery stores, hardware stores, and countless others. So, too, the survey of individuals (only some of whom are self-employed business owners) in the third part of Dr. Wainwright's analysis does not directly relate to discrimination in contracting. The data regarding labor earnings shows only disparities in earnings in the economy as a whole. Using it to support a broad *contracting* preference for minorities is to rely on societal, rather than specific, discrimination. Rosman Opp. St. Ex. 33 (Wainwright Dep. Tr. 129-31) (earnings comparison might relate to discrimination in the labor market). Those who reported owning a business again could be owners of all sorts of businesses, including those who have nothing to do with government (or any other kind of) contracting. Disparities between minority respondents and others might entirely be based on businesses that own stores selling goods to the public, and not services or goods to the government. Statement of Jonathan Guryan ("Guryan St.") ¶ 3.

Sixth, with respect to the survey of business owners (the second part of Wainwright's analysis), he once again (1) compared businesses owned by white males with minority businesses owned by both females and males and (2) did not take capacity into account. Rosman Opp. St. Ex. 33 (Wainwright Dep. Tr. 104-05, 107, 109). Thus, the business owners' survey analysis has the same problems that the first part of his analysis (disparity study) has. (The fact that firms owned by white females are excluded from the analysis is why the percentages for the various groups in Panel B of Tables 3.1 and 3.3 do not add up to 100%. Rosman Opp. St. Ex. 33 (Wainwright Dep. Tr. 104-05, 128).)

Seventh, comparing the percentage of people who go into business for themselves or their earnings ignores the possibility that certain groups might just have more members who prefer being entrepreneurs or who will work very hard (or in more renumerative industries) if they do. (When

asked if the number of hours one devotes to one's business might affect business earnings, Dr. Wainwright demurred and said he would have to think about it. Rosman Opp. St. Ex. 33 (Wainwright Dep. Tr. 134-35.) Assuming that members of every racial or ethnic group are equally interested in being in business for themselves "rests upon the 'completely unrealistic' assumption that minorities will choose a particular trade in lockstep proportion to their representation in the local population." *J. A. Croson Co.*, 488 U.S. at 507. *Id.* at 503 ("Blacks may be disproportionately attracted to industries other than construction") (citing The State of Small Business: A Report of the President 201 (1986)). *See also, e.g.*, *E.E.O.C. v. Chicago Miniature Lamp Works*, 947 F.2d 292, 301 (7th Cir. 1991) (rejecting government's statistics purporting to show a pattern or practice of discrimination "because considerations of applicant preference were totally ignored"); *Robertson v. Sikorsky Aircraft Corp.*, 2001 U.S. Dist. LEXIS 11662, at *15 (D. Conn. July 5, 2001) ("'Significant disparities in the workplace may result from a variety of other, nonrandom causes [other than unlawful discrimination]. For example, different sex, race and age groups may display very different interests in certain jobs'") (*quoting* Jay W. Waks and Gregory R. Fidlon, *Use and Misuse of Statistics*, Nat'l L.J., April 9, 2001, at B8); *E.E.O.C. v. Consolidated Services Systems*, 777 F. Supp. 599, 605 (N.D. Ill. 1991) (rejecting the statistics presented in a disparate impact case where EEOC's expert "failed to properly consider a major variable potentially responsible for the statistical disparity -- namely whether members of the relevant labor pool were actually interested in the positions available at [employer]. Because the lack of interest is admittedly a key, non-discriminatory reason which could explain any suggested statistical disparity which EEOC claims is evidence of discrimination, the court finds the EEOC's statistics unreliable"), *aff'd*, 989 F.2d 233 (7th Cir. 1993). That broadly-available statistics do not include such an important qualification does not render inadequate statistical analysis acceptable. *Consolidated Services Systems*, 777 F. Supp. at 606.

As with trades, so with being an entrepreneur. *E.g.*, *Metropolitan Dade County*, 122 F.3d at 922 (affirming district court's rejection of Dr. Wainwright's business ownership analysis that "any significant disparities that exist after accounting for the identified human and financial capital

variables must be due to the ongoing effects of current and past discrimination" because "[i]n a pluralistic and diverse society, it is unreasonable to assume that equality of opportunity will inevitably lead different groups with similar human and financial capital characteristics to make similar career choices"); *id.* ("'Similarly situated' women, men, blacks, white, Native Americans, Italian-Americans, and every other group that might be listed all bring their own values and traditions to the socioeconomic table, and may reasonably be expected to make voluntary choices that give effect to those values and traditions"). Dr. Wainwright continued to assume the opposite – that the desire to form a business is the same across races. Rosman Opp. St. Ex. 33 (Wainwright Dep. Tr. 132).[4]

Finally, many of the statistics Wainwright uses do not properly assess whether there are disparities with respect to each of the groups he claims to be studying. As already noted, Subcontinent Asian Americans and Asian Pacific Americans are lumped together in one group for the statistics based on the business owners' surveys. In the underlying disparity studies, Native Hawaiians were sometimes included with Asian Pacific Americans and sometimes included with Native Americans, and Dr. Wainwright could not recall what he did if that group was separately considered. Rosman Opp. St. Ex. 33 (Wainwright Dep. Tr. 91-92). Dr. Wainwright excluded Hispanic whites from the "white" category, precluding any comparisons that can be called "racial" in any meaningful sense of the term. Rosman Opp. St. Ex. 33 (Wainwright Dep. Tr. 154-55). This is like comparing all women to Catholic males. The groups are mutually exclusive, but it is hard to characterize the difference as one based on sex or religion.

In surveys by the Census Bureau, people all self-identify. Thus, the statistics Dr. Wainwright has for Native Americans would include people who self-identify as such but are not members of an Indian tribe. But the presumption of social disadvantage does not include them. 13 C.F.R.

_____

[4]     The Court in *Metropolitan Dade County* also affirmed the trial court's rejection of Dr. Wainwright's use of PUMS (Public Use Microdata Sample) data from the census bureau, finding his efforts to control for firm size inadequate. *Metropoitan Dade County*, 122 F.3d at 923. This is the same data that Dr. Wainwright used in the third part of his analysis in this case.

§ 124.103(b).  *See* Kathryn E. Kovacs, *Eagles, Indian Tribes, and the Free Exercise of Religion*, 47 Loy. L.A. L. Rev. 53, 77 (2013) ("more than three million people who are not tribal members report having some Native American ancestry.").  *See also, e.g.*, *Vitolo*, 999 F.3d at 364 ("For example, individuals who trace their ancestry to Pakistan and India qualify for special treatment.  But those from Afghanistan, Iran, and Iraq do not.  Those from China, Japan, and Hong Kong all qualify.  But those from Tunisia, Libya, and Morocco do not.  This scattershot approach does not conform to the narrow tailoring strict scrutiny requires.").  Thus, statistics relating to self-identified Native Americans cannot support a preference for the smaller group.

   2. <u>Chow</u>. – As described by defendants, Mr. Chow did an analysis of federal contracting using databases supplied to him by the defendants.  Dfs' SJ Memo. 20-21 (PageID ## 1614-15); *see also* Doc. 59 at 6-8 (PageID ## 416-18).

   Defendants tout two of Mr. Chow's findings: first, that small, disadvantaged businesses (SDBs) not participating in the 8(a) Program had lower odds of winning a contract, and second, that minority-owned businesses had lower odds.

   The first of these findings says nothing about race or national origin disparities, much less discrimination.[5]  Mr. Chow compared SDBs who are *not participating in the 8(a) Program* – which include both minority-owned and non-minority owned firms (*see* Doc. 59 at 7 n.3 (PageID # 417)) – and compared them to everyone else in his study, which included 8(a) participants (most of whom are owned by minorities due to the presumption of social disadvantage – *see* Doc. 61-17 (PageID # 1547, Klein Dep. Tr. 89) – and minority-owned firms that are not SDBs.  Rosman Opp. St. Ex. 34 (Chow Dep. Tr. 71, 92, 102).  So the comparison he made is between two groups, both of which include minority-owned and non-minority-owned firms.  That does not even describe a racial disparity, much less one that can be attributed to any kind of discrimination.

---

[5] Defendants frequently misstate the objective of Mr. Chow's analysis.  *E.g.*, Dfs' SJ Memo. 20 (PageID # 1614) ("economist Daniel Chow utilized statistical analyses to determine whether small disadvantaged businesses were more or less likely to win federal contracts relative to other small businesses.").  As shown in the text, Mr. Chow never considered SDBs as a whole.

The second of the findings does compare minority-owned firms to non-minority-owned firms, but defendants neglect to point out some of the weaker parts of Mr. Chow's analysis. When viewed more granularly, very little of the lower odds for minority groups are statistically significant. Doc. 61-13 at 10 (PageID # 1497, Table 4A); Rosman Opp. St. Ex. 34 (Chow Dep. Tr. 93-97). In only one of three categories (Awards by money) did even roughly one-third of the instances have lower odds that were statistically significant. In all three categories (Contracts, Awards, and Industries), the observations that were statistically insignificant or statistically significant with minority-owned firms having *higher* odds than non-minority-owned firms were a substantial majority of the observations.

Further, Mr. Chow included all firms in the SAM (System for Award Management) dataset he was provided. Anyone can register for that database for free. Rosman Opp. St. Ex. 34 (Chow Dep. Tr. 22, 24). Thus, it is hardly a set of firms "reasonably expected to compete for federal contracts." Doc. 59 at 6 (PageID # 416). Mr. Chow had no information on whether any company in the SAM dataset actually bid on a federal contract and he did not use bidding as a variable to study. Rosman Opp. St. Ex. 34 (Chow Dep. Tr. 47-48, 98-99). Since one usually cannot obtain a federal contract without bidding on it, Mr. Chow's dataset did not analyze firms that were ready, willing, and able to work for the federal government on a contract. He readily concedes that the modestly lower odds he found for minority-owned firms could have been a consequence of bidding behavior and that his analysis does not eliminate that possibility. Rosman Opp. St. Ex. 34 (Chow Dep. Tr. 98-99). *See, e.g.*, *Michigan Road Builders Ass'n*, 834 F.2d at 594 (concluding that state did not have sufficient evidence to support set aside program for minorities where, *inter alia*, "the state . . . acknowledged that it did not maintain records concerning the number of MBEs which bid on state contracts and the number which were awarded state contracts"); *Metropolitan Dade County*, 122 F.3d at 913 ("a disparity index compares the amount of contract awards a group actually got to the amount we would have expected to get based on *that group's bidding activity* and awardee success rate") (emphasis added).

Defendants' response to this obvious problem with Mr. Chow's study is to suggest that it is

somehow Ultima's burden to show that different races have different bidding behavior.  Doc. 59 at 18 (PageID # 428).  This argument, if taken seriously, would obviate the need for any regression analysis at all.  Mr. Chow included various variables like a firm's security clearance, ownership structure, revenues, employees, and age in his analysis.  Under defendants' theory, he could have excluded all of those, as well, and any other variables that could explain outcomes, provided that Ultima does not have evidence that those variables differ by race.  The point of doing any analysis at all, other than comparing gross population statistics, is to determine whether there is a difference in outcomes between and among groups ready, willing, and able to perform.  To assume that there are no racial differences – in bidding behavior, firm size, or anything else – is to assume the conclusion that the studies are trying to assess (whether differences can be attributed to race).  Guryan St. ¶¶ 4-5.

Finally, Mr. Chow treated all minority-owned firms alike.  He made no attempt to determine whether there were lower odds for any particular racial group, and so cannot say whether there were lower odds for any of the groups for which the SBA grants a presumption of social disadvantage.  Rosman Opp. St. Ex. 34 (Chow Dep. Tr. 97-98).  His grouping of different races into one "minority" group may create an appearance of lower odds that would not exist for any one of them individually.  *Metropolitan Dade County*, 122 F.3d at 919 n.4 (discussing "Simpson's Paradox").  *See also Rothe Dev. Corp. v. United States DOD*, 262 F.3d 1306, 1330 (Fed. Cir. 2001) (remanding case to determine "whether there was evidence of discrimination (or the lingering effects thereof) against each minority group included in the 1207 program").

Indeed, Chow now concedes that he did not consider whether there were lower odds for any individual racial group because he could not do so and still get results in industry categories.  Doc. 68-2, pg. 3 (PageID # 2334), ¶ 9.  The absence of adequate data does not justify bypassing legal standards.

3.    Plaintiff's Expert. – In addition to relying on the testimony of defendants' own experts to raise a genuine issue of material fact regarding their conclusions, Ultima also relies on its

own rebuttal expert, Dr. Jonathan Guryan. Unlike defendants' experts, Dr. Guryan is widely published in peer-reviewed journals. He assessed the reports of defendants' experts, and based upon his own knowledge of statistics and economic studies, found them wanting. A full explanation of Dr. Guryan's analysis is set forth in his accompanying statement and report. Guryan St. & Exhibit. He reviewed many of the underlying disparity studies, and virtually none of them adequately accounted for capacity. Accordingly, even if defendants' evidence were sufficient to meet their summary judgment burden, plaintiff has submitted evidence raising a genuine issue of material fact.

        4.    <u>Other Evidence</u>. – In cases assessing whether the evidence supports a finding that race-conscious remedial action is necessary, courts generally do a very serious examination of the statistical or other evidence presented. *E.g.*, *Metropolitan Dade County*, 122 F.3d at 912-926; *Rothe Development Corp. v. Dep't of Defense*, 545 F.3d 1023, 1044-45 (Fed. Cir. 2008) (analyzing six disparity studies used to support a nationwide preference program and concluding that they failed to provide a strong basis in evidence).

        In this case, defendants have opted for quantity over quality. They simply throw hundreds of disparity studies at the court and cherry pick a few choice phrases from several. Their general theory is that there are so many disparity studies, some of them must be okay, and so there is no need for this Court to look closely at any of them.

        These studies cannot be presented on summary judgment to support a strong basis in evidence. By Ultima's count, approximately 20% of those listed in Exhibit 14 have no links at all and another roughly 20% have links that do not work. Roughly 1/3 of the listed studies are focused on the transportation industry and thus have little relevance to this lawsuit.

        Nor does it matter if disparity studies were mentioned in passing on the floor of Congress or in a committee report. Aside from the fact that it is the SBA, not Congress, that has implemented a racially-preferential presumption, such references do not suffice for strict scrutiny. *Rothe*, 545 F.3d at 1047 (studies mentioned by Senator Kennedy to support the Department of Transportation's disadvantaged business program "are not in the record here, and are not even sufficiently described

in this floor excerpt for us to locate them, let alone subject them to 'detailed, skeptical, non-deferential analysis.' . . . Likewise, . . . [studies mentioned in] floor speeches given by Representatives Watt and Menendez . . . are not in the record, and we cannot defer to Representatives Watt and Menendez about the studies' probative value . . . ").

Aside and apart from the evidentiary problems in relying upon hearsay on a summary judgment motion, defendants' tactic here undermines strict scrutiny. Disparity studies cannot create a strong basis in evidence just because they exist. As shown above and in past cases, many disparity studies have substantial weaknesses that preclude them from constituting a "strong basis in evidence." It is defendants' burden to present evidence to demonstrate a strong basis in evidence and listing disparity studies does not fulfill that burden. Parroting their conclusions does not substitute for analysis.

5.      Industry Evidence. – All of the problems with defendants' expert reports identified above are equally applicable to their efforts to show any kind of discrimination within Ultima's relevant industry – administrative and technical support. The failure to consider size or bidding behavior, or (in Dr. Wainwright's case) the use of census statistics that include wide swaths of businesses unrelated to contracting, is just as fatal to the analysis of defendants' experts with respect to the provision of administrative and technical support as it is to their overall analysis.

In addition, there are other problems in the allegedly industry-specific evidence submitted by defendants' experts. In the first part of Dr. Wainwright's study, he could use only his own NERA studies to analyze any industry-specific data. *See* Doc. 61-11 at 37 (Table 2.8) (PageID # 1189). As defendants have conceded, that analysis involved studies in only eleven states, only three of which (Texas, Maryland, and Massachusetts) had a "last year under study" (the last year of the statistics used for the disparity study) past 2011. Doc. 60-9 at 3-4 (PageID ## 904-05) (Req. To Admit Nos. 1-5); Rosman Opp. St. Ex. 33 (Wainwright Dep. Tr. 81-85). Table 2.8 does not assess whether the disparities are statistically significant. Rosman Opp. St. Ex. 33 (Wainwright Dep. Tr. 85-86). A reasonable trier of fact could conclude that such evidence is insufficient to support a nationwide

preference in the administrative and technical support industry. *Rothe*, 545 F.3d at 1046.

In Dr. Wainwright's analysis of the business surveys (SBO and ABS), "Asians" – a group that Dr. Wainwright states includes Asian Pacific Americans, Subcontinent Asian Americans, and Pacific Islanders (*see* discussion *supra* at 8) – have no large adverse statistically significantly disparities in any of the Professional Services categories (two-digit NAICS codes 54, 55, and 56). Indeed, in many instances, the disparity ratio for "Asians" was both greater than "1" and statistically significant, meaning that that group's utilization in these industries exceeded their "availability." For other groups, there were "statistically significant" adverse indexes in these three two-digit NAICS categories that were not large (below 0.8) or were large but not statistically significant. Doc. 61-11 at 47, 55 (PageID ## 1199, 1207) (Tables 3.2, 3.4). Finally, in Dr. Wainwright's analysis of census survey (ACS PUMS) data, in the third part of his analysis, there is only *one* statistically significant variable below one for codes 561M (which combines several different four-digit NAICS codes) and 5613 in his "qualifications and capacities" model for business earnings – and that one (for blacks in 5613) is only statistically significant at the 10% confidence level. Doc. 61-11 at 80 (PageID # 1232) (Table 4.9).

Mr. Chow also tried to identify disparities within industry groups. He used three-digit NAICS codes, which includes widely-disparate firms in the same category. *Compare* 13 C.F.R. § 124.3 (defining "same or similar line of business" as activities within the same four-digit NAICS code). *See also* 13 C.F.R. § 121.201 (listing NAICS codes).

Dr. Guryan's testimony on summary judgment also creates a genuine issue of material fact with respect to industry-specific data. Dr. Guryan opined that the NAICS categories that defendants' experts used included many businesses that bear no resemblance to the administrative and technical support industry in which Ultima competes. Guryan St. Ex., pp. 16-17, 21-22, 22-23, 25. For that reason, he concludes that the disparities identified by both of defendants' experts cannot be used to identify even a disparity, much less discrimination, in the industries in which Ultima competes. This testimony as well creates a genuine issue of material fact.

D.      Defendants Improperly Rely Upon Anecdotal Evidence And Evidence
        Of Societal Discrimination

Anecdotal evidence cannot, by itself, demonstrate the kind of deliberate exclusion required to create a strong basis in evidence. *Rothe*, 545 F.3d at 1048; *Metropolitan Dade County*, 122 F.3d at 925-26. This is because anecdotal evidence rarely involves any effort to investigate the anecdote provided (such as hearing from a person accused of having discriminated). Defendants' excerpts of anecdotal evidence from a few disparity studies, then, cannot make up for the inadequate evidence of statistical proof that would warrant the extreme remedy of a race preference. Dfs' SJ Memo. 17-18 (PageID # 1611-12).

Similarly, defendants' references to the wealth gap caused by redlining, denial of GI benefits, zoning practices and Jim Crow tax policies are not the kind of particular and identified discrimination on which a race-conscious remedy can be supported. Dfs' SJ Memo. 19 (PageID # 1613). *See also, e.g.*, *id.* at 18 (PageID # 1612) (citing the DOJ report for proposition that longstanding business connections have developed in "environments that have historically excluded minorities and women"). In *Croson*, the Court rejected a claim that discrimination in primary and secondary schooling could justify a system of race preferences, either for admission to medical school or in government contracting. *Croson*, 488 U.S. at 499. The problem with relying upon such discrimination was not a lack of specificity in identifying the discrimination. Justice Marshall's dissent in *Croson* pointed out various court decisions which identified many such specific instances *Id.* at 545 (Marshall, J., dissenting). *See also Regents of the University of California v. Bakke*, 438 U.S. 265, 372 (1978) (Brennan, J., concurring in part and dissenting in part).

One can always posit some connection between the discriminatory denial of educational opportunities, Jim Crow policies, racial zoning practices, and similar historical practices and the number of minorities adequately prepared for medical school or to run a business. *See Croson*, 488 U.S. at 499 ("there is no doubt that the sorry history of both private and public discrimination in this country has contributed to a lack of opportunities for black entrepreneurs"). Such connections cannot meet strict scrutiny because the size of the injury caused by the discrimination in question cannot be

ascertained with any degree of certainty:

> It is sheer speculation how many minority firms there would be in Richmond absent past societal discrimination, *just as it was sheer speculation how many minority medical students would have been admitted to the medical school at Davis absent past discrimination in educational opportunities*.

*Croson*, 488 U.S. at 499 (emphasis added); *id.* at 505 ("the history of school desegregation in Richmond . . . does little to define the scope of any injury to minority contractors in Richmond or the necessary remedy.").

Similarly, the "evidence before Congress" regarding lending discrimination (a statement by one witness), Dfs' SJ Memo. 19 (PageID # 1613), is just another form of societal discrimination. If Congress is aware of racially-discriminatory lending, its narrowly-tailored solution is to demand enforcement of the many laws against racially-discriminatory lending.

E.    Defendants' Evidence Fails To Meet Their Summary Judgment Burden To Demonstrate Their Alleged Participation In Any Discrimination

Defendants also fail to demonstrate how they have passively participated in any discrimination. Their only reference to evidence in this regard is their claim that the second part of Dr. Wainwright's analysis was designed "to determine whether the federal government is passively participating in private sector discrimination." Dfs' SJ Memo. 16 (PageID # 1610).[6] But while Dr. Wainwright refers in passing to passive participation (Doc. 61-11 at 18, 39 (PageID ## 1170, 1191)), neither he nor defendants explain how the federal government is doing so – other than by spending federal dollars. As shown in Plaintiff's summary judgment motion (Pl's SJ Memo. 23 (PageID # 829)), this would render the "participation" requirement meaningless. The federal government spends a great deal of money in many industries. If that is all "participation" required it could engage in racial preferences throughout the economy. *Michigan Road Builders v. Milliken*, 834 F.2d at 590 ("this court must determine whether the State of Michigan possessed a compelling interest in purging

---

[6]    According to defendants, the datasets used by Dr. Wainwright in the second part of his analysis, the Survey of Business Owners and the Annual Business Survey, were "two national surveys dedicated to MBEs." Dfs' SJ Memo. 16 (PageID # 1610). They point to nothing in Dr. Wainwright's report, or anything else, to support this proposition.

the present effects of alleged past discrimination by virtue of *its* past inequitable treatment of MBEs") (emphasis in original).

Here, as in *Rothe*, defendants have no evidence that any contracting officer associated with the Department of Agriculture, or any business specialist employed by the SBA, has engaged in intentional discrimination. *Rothe*, 545 F.3d at 1048 (noting that the defendant DoD had not "cited to a single instance of alleged discrimination by DoD in the course of awarding a prime contract, nor to a single instance of alleged discrimination by a private contractor identified as the recipient of a prime defense contract."). The court in *Rothe* found that "lacuna" to be "quite significant." *Id.* It rejected the district court's holding that the mere fact that DoD was a large buyer of good and services was sufficient to constitute passive participation.

III. DEFENDANTS FAIL TO MEET THEIR BURDEN OF SHOWING THAT THE 8(a) PROGRAM IS NARROWLY TAILORED

Defendants argue that the 8(a) Program is narrowly tailored. But their arguments either ignore the facts or the law.

A. Necessity For Relief / Race-Neutral Alternatives

Defendants argue that the history of the Small Business Act, and the "continued barriers faced by MBEs," Defs' SJ Memo. 26 (PageID # 1620), demonstrate the need for a racially-preferential remedy. Defendants also assert that "[t]he necessity for a remedy overlaps with the strong basis in evidence." *Id.* at 25 (PageID # 1619). As demonstrated in Part II of this Argument, there are, at the very least, genuine issues of material fact with respect to defendants' alleged strong basis in evidence. Accordingly, there are such issues with respect to the necessity for any race-conscious relief.

More importantly, the question on narrow-tailoring is not whether *any* race-conscious remedy is needed, but rather whether the particular race-conscious remedy chosen by the SBA – a presumption of social disadvantage – is needed. On this question, defendants concede as follows: "[A]pplicants can and do qualify as socially disadvantaged without the presumption. There is no basis to presume current participants could not qualify as socially disadvantaged under the existing method for doing so." Dfs' SJ Memo. 34-35 (PageID ## 1628-29).

This concession only confirms that *these* defendants have not carefully considered the most obvious race-neutral alternative: eliminating any presumption. If defendants have "no basis" for concluding that "current participants could not qualify as socially disadvantaged" without the presumption of social disadvantage, the only "interest" the presumption serves is administrative convenience. That interest is never compelling.

> Given the existence of an individualized procedure, the city's only interest in maintaining a quota system rather than investigating the need for remedial action in particular cases would seem to be simple administrative convenience. But the interest in avoiding the bureaucratic effort necessary to tailor remedial relief to those who truly have suffered the effects of prior discrimination cannot justify a rigid line drawn on the basis of a suspect classification.

*Croson*, 488 U.S. at 508. *See also Gratz v. Bollinger*, 539 U.S. 244, 275 (2003) ("But the fact that the implementation of a program capable of providing individualized consideration might present administrative challenges does not render constitutional an otherwise problematic system.").

B. <u>Flexibility</u>

Defendants argue that the remedy the SBA has chosen is flexible because, *inter alia*, (1) it is not a quota, and (2) there is only a rebuttable presumption of social disadvantage and applicants must show economic disadvantage. Dfs' SJ Memo. 26-28 (PageID ## 1620-22).

While it is true that the 8(a) Program is not a quota, there is also no goal at all despite an Executive Order (E.O. 13170) requiring all agencies to have one. *See* Pl's SJ Memo. 13 (PageID # 819). Defendants view this as a feature, instead of a bug. Because they have ignored the Executive Order and have no goals, they argue that "the Court need not review the relationship of numerical goals to the relevant market." Dfs' SJ Memo. 27 n.20 (PageID # 1621). But the point of having goals is to tie the remedy into the alleged compelling governmental interest showing the need for a remedy. If the evidence points to a particular race in a particular industry being discriminated against, a goal can address that problem. So, too, a goal can be tied into evidence of the magnitude of the disparity caused by discrimination. The problem, of course, is that the SBA does not review any evidence regarding the continuing need for the 8(a) Program, and so the evidence that purports

to support the compelling governmental interest only arises when it is sued. As for agencies, they simply follow the federal acquisition regulations (FAR), which focus solely on the needs of the government and not the goals of the program. Doc. 65-8 (PageID ## 1862-63, Atkinson Dep. Tr. 201-02). In the case of the USDA, the contracting officers use sole source 8(a) contracts to save themselves the time and effort of competing the contracts. Doc. 60-1 at 10 (¶ 68) (PageID # 801); Doc. 65-13 (PageID ## 2008-10, 2018-19, Stover Dep. Tr. 37-39, 68-69).

Defendants also assert that the "presumption [of social disadvantage] may be overcome with credible evidence to the contrary." Dfs' SJ Memo. 27 (PageID # 1621). This is a repeated mantra in their papers. *E.g.*, *id.* at 1 ("rebuttable presumption"), 3 (a "rebuttable presumption of social disadvantage" that "may be rebutted with 'credible evidence to the contrary'"), 7 ("rebuttable presumption"), 29 ("the groups entitled to the rebuttable presumption"), 30 (qualifying members of designated groups are "entitled to a *rebuttable* presumption of social disadvantage") (emphasis in original), 31 ("the presumption is rebuttable and may be overcome with credible evidence to the contrary"). But, as defendants have conceded, the presumption has *never* been rebutted for any individual whose identity as a member of one of the favored groups is not questioned. Doc. 60-1 at 5 (PageID # 796) (¶¶ 29-31). It is rebuttable only in theory. In reality, it is a dispositive presumption. *Vitolo*, 999 F.3d at 363 ("Since proving someone else has *never* experienced racial or ethnic discrimination is virtually impossible, this 'presumption' is dispositive.") (emphasis in original).

Nor do the requirements of "economic disadvantage" make the preference significantly flexible. The standards have been set so that only the top few percent of the richest Americans are excluded from qualifying for the 8(a) Program. Defendants claim that "[e]vidence before Congress" has "consistently shown" that minority business owners have less access to capital and credit than non-minority business owners. Dfs' SJ Memo. 19 (PageID # 1613). But the SBA does not assess whether any applicant's owner has less access to capital than others in the same line of business during the application process – even though that is, in fact, the *Congressional* definition of an

"economically disadvantaged" individual.  15 U.S.C. § 637(a)(6).

Defendants rely heavily on two cases from the District Court of the District of Columbia, *DynaLantic Corp. v. U.S. Dep't of Defense*, 885 F. Supp. 2d 237 (D.D.C. 2012) and *Rothe Development Corp. v. Dep't of Defense*, 107 F. Supp. 3d 183 (D.D.C. 2015), *aff'd on other grounds*, 836 F.3d 57 (D.C. Cir. 2016).  (For reasons they do not explain, defendants refer to the latter as "*Rothe IV*.") These non-binding cases are distinguishable and/or wrong for a number of different reasons.  For one thing, their analysis of the statute is probably no longer viable even in the D.C. Circuit after that Court's opinion in *Rothe*.  *Rothe*, 107 F. Supp. 3d at 189 ("the *statute* establishes 'a rebuttable presumption' that members of these particular groups, and certain other groups, are "socially disadvantaged.'") (emphasis added).  Most conspicuously, though, this case involves defendants who essentially concede (1) that the race component is for administrative convenience, to avoid the work of individually evaluating the applications of minority-owned businesses and (2) that the "rebuttable" presumption of social disadvantage has never been rebutted and likely never will (as *Vitolo*, binding authority in the Sixth Circuit states).  *Compare DynaLantic*, 885 F. Supp. 2d at 285 (relying on "rebuttable" nature of presumption); *Rothe*, 107 F. Supp. 3d at 209 (same).

C.    Duration

Defendants concede that the 8(a) Program has no termination date.  Dfs' SJ Memo. 28 (PageID # 1622).  They argue that it is nonetheless "time limited" because individual beneficiaries cannot stay in the program forever or participate more than once.  Again, this argument presumes that the purpose of the durational limit for narrow tailoring is to prevent undeserved largesse rather than protecting the rights of those dispreferred.  That view simply is not consistent with Sixth Circuit law or, for that matter, the general purpose of narrow tailoring.  Pl's SJ Memo. 25 (PageID # 831).  Moreover, the 8(a) Program keeps the *contracts* in the program even if a specific beneficiary has left.  13 C.F.R. § 124.504(d).  *See* Doc. 60-1 at 11 (¶¶ 70-72); Rosman Opp. St. ¶ 5 & Ex. 32; *id.* Ex. 39 (Stover Dep. Tr. 99).

Defendants also argue that the requirement of an annual report demonstrates narrow-tailoring,

but they concede that there has not been one in years. Dfs' SJ Memo. 28-29 & n.23 (PageID # 1622-23). The fact that Congress has the ability to amend the 8(a) Program means little. Congress did not create the presumption of social disadvantage in the first place and, conspicuously, Congress has never adopted any such presumption for the 8(a) Program.

### D. Underinclusive

Defendants assert that the 8(a) Program is not underinclusive because any small business owner may apply. Dfs' SJ Memo. 29 (PageID # 1623). But defendants have no particular answer for why some groups are given a presumption of social disadvantage and other groups are not. It would seem that the SBA excludes certain national origins by characterizing them as white or just not considering them at all. If one never investigates whether there is a "disparity" with respect to Afghans, for example, then one will never have a basis to include them. *Vitolo*, 999 F.3d at 364. Further, defendants' only explanation for why a group like Hasidic Jews is not provided a preference – for whom the evidence of discrimination was undisputed – is that they did not want to make a religious classification. But if the goal is to remedy the effects of discriminatory group treatment, and the statute specifically includes "cultural bias" as a source of that discrimination, defendants must offer some kind of explanation as to why religious classifications should be treated differently from racial ones. So, too, defendants use statistical evidence based upon all who identify as Native Americans, but only provide a preference for those who are members of a federally- or state-recognized Indian tribe (as well as Alaskan Natives and Native Hawaiians). *See* discussion *supra* at 13.

Defendants also assert that the "presumptively disadvantaged groups have not remained static." Dfs' SJ Memo. 29 (PageID # 1623). In fact, there have been no groups added in forty years, and no group ever has been removed. Indeed, the SBA has no standards or procedure for removing a group from the list of those whose members are presumed socially disadvantaged. Doc. 60-1 at 6-8 (¶¶ 38-48) (PageID ## 797-99).

Defendants try to reconcile their underinclusivity argument with *Vitolo*, but they ignore its

holding.  Dfs' SJ Memo. 30 (PageID # 1624).  *Vitolo* held that the requirement that a priority applicant be at least 51% owned by the "socially and economically disadvantaged" was underinclusive because the plaintiff there itself was "50% owned by a Hispanic female" and "[i]t is far from obvious why that 1% difference in ownership is relevant." *Vitolo*, 999 F.3d at 363.  The 8(a) Program has exactly the same requirement: an 8(a) participant owned by individuals must be "at least 51% owned" and controlled by "socially and economically disadvantaged individuals."  13 C.F.R. §§ 124.105, 124.106.  Defendants do not explain why socially and economically disadvantaged individuals who own only 50.5% of a concern – or even less, if the percentage nonetheless permits them control – are excluded from the program.  Nor do they explain why socially and economically disadvantaged individuals who control an entity through another entity are excluded.

     E.    <u>Overinclusive</u>

Defendants argue that the 8(a) Program is not overinclusive "because it does not give an advantage to all members of any particular racial or ethnic group, nor does it give any preference solely based on race" because "only members of designated groups who own and control small businesses and who meet a number of race-neutral criteria are entitled to a *rebuttable* presumption of social disadvantage." Dfs' SJ Memo. 30 (PageID # 1624).  This is wrong in several ways.  *Every* member of the preferred groups is entitled to the presumption of social disadvantage.  That there are *other* requirements for a company to participate in the program does not change that fact, nor is it especially surprising that a small business program is limited to small businesses or the people that own them.  Defendants' argument is akin to arguing that an undergraduate college giving every preferred minority applicant 20 additional points in the admissions process is not overinclusive because the 20 points is only granted to high school students who apply to the college, and 20 points is not enough to be admitted for some.  *Cf. Gratz v. Bollinger*, 539 U.S. 244 (2003).  The so-called rebuttable presumption has never been rebutted for any undisputed member of a preferred group.  Finally, the neutral criteria of economic disadvantage eliminates only very wealthy individuals from the 8(a) Program, and thus the 8(a) Program includes individuals who are unlikely to have suffered

discrimination precluding them from business success. Pl's SJ Memo. 27 (PageID # 833).

       F.    <u>Undue Burden On Third Parties</u>

In arguing that the burden on third parties is not undue, defendants first fall back on their argument that the presumption is "rebuttable," Dfs' SJ Memo. 31 (PageID # 1625), an assertion which is simply not true in practice. This and their other arguments are identical to the ones they used to argue that the 8(a) Program is not overinclusive, and fail for the same reasons.

Defendants also assert that the undue burden is acceptable because the SBA is prohibited from using the 8(a) Program if it would have an adverse effect on other small businesses. Dfs' SJ Memo. 31-32 (PageID ## 1625-26). Defendants only cite the regulation itself and present no evidence as to how frequently this provision is invoked. Regardless, there is at least an issue of fact as to whether this provision provides any relief at all from the burden third parties must bear.

First, the Director of the Georgia office for SBA could remember conducting only about seven adverse impact analyses in her 20 years working for the SBA. Rosman Opp. St. Ex. 35 (Denison Dep. Tr. 24). That hardly suggests a major check on undue burden. Moreover, the specific adverse impact analysis in this case lends substantial support to the proposition that it is not a meaningful check at all on undue burden. In this case, the USDA sent an offering letter to the SBA on a proposed contract for inclusion in the 8(a) Program covering administrative and technical support for 37 National Resource Conservation Service offices in the State of Mississippi. The proposed contract would be for about $3 million over two years. In the offering letter by the USDA contracting officer, Danny Mandell, Ultima was identified as the incumbent firm providing those services, and Ausdanbrook Properties was the recommended 8(a) contractor. Doc. 66-3 (PageID ## 2102-04). Mr. Mandell wanted to use an 8(a) sole source contract because the fiscal year was drawing to a close and he did not have time to compete the contract. Doc. 65-12 (PageID # 1926-27, Mandell Dep. Tr. 69-70). The business office specialist in the SBA's Georgia office, Uneeda Collins, determined that an adverse impact analysis was necessary, and she asked for, and obtained, information from Ultima's President for that purpose. Statement of Celeste Bennett ("Bennett Opp. St.") ¶¶ 2-5 & Exs. A-C.

After receiving that information, Ms. Collins concluded that the contract would have an adverse impact on Ultima in a memo to the director of the Georgia office, Terri Denison. Rosman Opp. St. Ex. 35 (Denison Dep. Tr. 25-26 & Ex. 5 thereto). Ms. Denison agreed with that conclusion, as did others in her office, and apprised Mr. Mandell in a letter on September 20, 2018 that she did not recommend that the SBA accept the contract into the 8(a) Program. Doc. 61-19 (PageID # 1566).

The very *next day* – on September 21, 2018 – Mr. Mandell sent *another* offering letter to a *different* SBA office regarding the *same requirement* of providing adminstrative and technical support to 37 NRCS offices in Mississippi. Doc. 66-3 (PageID ## 2095-98). No mention was made of the denial by the Georgia office. A different 8(a) contractor, All Pro Placement Service, was the recommended contractor, and the letter stated that there was no other 8(a) participant interested in the requirement. That is, the letter made no mention of Ausdanbrook's interest in the contract, which might have led the SBA to require a competition among 8(a) participants. Doc. 65-12 (PageID # 1932, Mandell Dep. Tr. 118). And this time, the offering letter asserted that the requirement was a "new requirement." This letter was accepted by the SBA a few days later, and the contract went into the 8(a) Program. Rosman Opp. St. Ex. 36 (Mandell Dep. Tr. 100 & Ex. 6 thereto).

Weeks after that, Ms. Bennett, not having heard anything, left a voicemail for Ms. Collins and sent an email on October 11, 2018 to Ms. Collins and Mr. Ware seeking information on the adverse impact analysis. She never received a response. Bennett Opp. St. ¶ 5.

A reasonable trier of fact could conclude that the "adverse impact" safety valve does not prevent the reservation of contracts to the 8(a) Program from creating an undue burden on third parties.

While defendants now insist that Ms. Denison made an error, no one can quite agree as to why. The SBA's Rule 30(b)(6) witness insisted that the Mississippi contract was a "new requirement" because Ultima's task order was not a "contract." Doc. 61-17 (PageID # 1551, Klein Dep. Tr. 178-80). Mr. Mandell testified that he and his supervisors thought that Ms. Denison had erred because Ultima's contract had ended (even though both of his offering letters said that the Task

Order was still in effect). Rosman Opp. St. Ex. 36 (Mandell Dep. Tr. 84-86). (Amy Stonebraker, one of Mr. Mandell's supervisors, could not remember there being an adverse impact problem. Rosman Opp. St. Ex. 37 (Stonebraker Dep. Tr. 44-45).) And Ms. Denison, cross-examined by her own attorney, concluded that she erred because Ultima had not been performing the contract for 24 months. Dfs' SJ Memo. 32 n.24 (PageID # 1626).[7]

Defendants also assert that there is no undue burden because 8(a) Program spending only accounts for a small portion of total federal government spending. Dfs' SJ Memo. 32-33 (PageID ## 1626-27). Much of this argument is based on unauthenticated documents whose contents are inadmissible on this motion (*e.g.*, Docs. 61-22, 61-24). In any event, the federal government spends money on many huge defense projects and has many military and civilian employees, so it would hardly be surprising that any group of small business contracts constitutes a small portion of the whole. More interesting is defendants' evidence that there have been a total of *five* contracts for administrative or technical support for NRCS offices that defendants claim were open to competition after the IDIQs were cancelled. Doc. 61-7, Stonebraker Declaration ¶ 3 (PageID # 1074). There were *zero* prior to this lawsuit being filed. *Id.*, PageID # 1077. The value of these five contracts was $10.8 million. Stonebraker Declaration ¶ 5 (PageID # 1075). Plaintiff actually disputes that four of these five were "open to competition," Bennett Opp. St. ¶¶ 6-7, but the comparison to 8(a) contracts is stark. By plaintiff's count there were over *50* contracts to supply NRCS offices with administrative

---

[7]    This last is perhaps the most obviously farfetched *post hoc* rationale. Defendants claim that "the face of [Ms. Denison's] letter . . . states that Ultima had performed the prior requirement for less than 24 months." Dfs' SJ Memo. 32 n.24 (PageID # 1626). It does not. Doc. 61-19 (PageID # 1566). In any event, there is no bar to adverse impact being found on that ground. The regulations state only that *there is* a presumption of adverse impact if the contractor had been performing the requirement for *more* than 24 months (and various other conditions are met). 13 C.F.R. § 124.504(c)(1)(i)(A). There is no opposite presumption – a presumption that there is no adverse impact if the contractor had been performing for less than 24 months -- much less a dispositive one. To the contrary, the regulations explicitly state that the SBA will consider all relevant factors in determining adverse impact. 13 C.F.R. §§ 124.504(c)(1), 124.504(c)(3). Ms. Denison's adverse impact letter stated just that. Doc. 61-19 (PageID # 1566) ("SBA considers other relevant factors, in addition to the presumptive factors . . . After conducting a thorough analysis, SBA has determined that considering all relevant factors, adverse impact exists . . .")

and technical support, with a total value of over $ 95 million, since the IDIQs were cancelled. Rosman Opp. St. ¶¶ 7-8 & Exs. 40-41.

Defendants accuse Ultima of believing that the "USDA's administrative support contracts were its to keep in perpetuity." Dfs' SJ Memo. 32 (PageID # 1626). Nothing could be further from the truth. Ultima wants only to be able to compete on an even playing field for that work. Defendants and the 8(a) Program have prevented it from doing so.

IV.    DEFENDANTS' STANDING ARGUMENTS ARE MERITLESS

Faced with *Vitolo*, defendants relegate their standing argument to a few pages at the end of their brief. (If they were correct on standing, of course, everything that precedes that argument in their brief would be irrelevant since the Court cannot address the merits if it lacks subject matter jurisdiction.) Even there, though, they ignore *Vitolo*.

In opposing defendants' motion to dismiss, plaintiff argued that the complaint alleged that Ultima was on an uneven playing field because of the 8(a) Program as a whole, not the presumption of social disadvantage. Doc. 25 at 7-11 (PageID ## 123-27). Accordingly, the injury was the program, and the remedy of precluding defendants from continuing to use a race-based program would allow Ultima to compete on a playing field not rendered unfair by race. Accordingly, it did not matter whether Ultima was "otherwise qualified" for the 8(a) Program or whether the elimination of the racial presumption of social disadvantage *alone* would provide it with relief. This is exactly what the Sixth Circuit held in *Vitolo*. 999 F.3d at 359 ("It does not matter that the plaintiffs might not otherwise qualify for priority consideration."). Even if, after a judgment in its favor, Ultima were still harmed by a race-neutral program, it nonetheless would have obtained a remedy because "the race of the applicant would not factor into [the manner in which contracts are protected from competition] . . . by SBA." *Id.*

Despite this, defendants focus on a secondary argument that Ultima made in opposing their motion to dismiss, that the elimination of the racial presumption alone would benefit Ultima because there would be fewer companies participating in the 8(a) Program without the racial presumption.

Dfs' SJ Memo. 34-35 (PageID ## 1628-29). Defendants claim that Ultima has no evidence to support that allegation, but, as just shown, that argument is irrelevant. Even if "Plaintiff cannot show it is likely that a favorable decision would prevent the government from setting aside contracts for disadvantaged businesses," Dfs' SJ Memo. 35 (PageID # 1629), the elimination of a *race-based* barrier is sufficient to afford Ultima relief. The plaintiff in *Vitolo* did not have to show that it would receive funds if the companies receiving a race-based presumption of social disadvantage were not given priority, nor even that its place in line would be substantially improved.

In any event, defendants' factual argument is wrong as well. Currently, only 300 participants have obtained 8(a) status by demonstrating social disadvantage; 4500, or roughly 94%, were admitted into the program with a racial presumption. Doc. 61-17 (PageID # 1547, Klein Dep. Tr. 89). Even if there were only an injunction precluding defendants from using a racial presumption, and even if defendants kept the rest of the 8(a) Program intact, those 4500 would have to reapply. Applications can take a while to complete, and the SBA has up to 90 days to process after completion. Rosman Opp. St. Ex. 38 (Klein Dep. Tr. 75-76). (It is reasonable to believe that a flood of 4500 applications all at once would not facilitate speedy bureaucratic resolution.) So it is certain that there would be many fewer participants in the 8(a) Program in the absence of the racial presumption of social disadvantage *at least for some period of time*. And there is no minimum time period that a remedy must benefit a plaintiff in order for that plaintiff to have standing. The benefit to the plaintiff in *Vitolo* would last only as long as the list of applicants for funds was maintained.

Moreover, 50% of those who apply without a presumption are rejected (Dfs' SJ Memo. 29 (PageID # 1623)). That fact alone would surely allow a reasonable trier of fact to conclude that not everyone currently in the 8(a) Program who benefitted from a racial presumption will easily qualify without the presumption. After all, unlike those who applied without a presumption, those individuals knew there would be no assessment at all of their social disadvantage. If they knew that their applications would have to demonstrate such social disadvantage with the same rigor currently required under 13 C.F.R. § 124.103(c) (*see* Pl's SJ Memo. 7 (PageID # 813)), it is hardly speculation

to conclude that *some* might choose not to apply and others would not qualify. A genuine issue of fact exists on that question.

Defendants toss another quick standing argument in the hopper in a brief footnote noting that Ultima was not owned by an individual at the start of this lawsuit. Dfs' SJ Memo. 33 n.25 (PageID # 1627). (Ultima is currently 100% owned by Celeste Bennett. Doc. 60-4, ¶ 3 (PageID # 855).) But *Vitolo* holds that a plaintiff need not be otherwise qualified in order to have standing. This is especially so for a "qualification" that could have been met, but would have still left Ultima at a disadvantage in qualifying for a racially-discriminatory program. Bennett Opp. St. ¶ 10. *Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Michigan Gaming Control Bd.*, 172 F.3d 397, 406 (6th Cir. 1999) (holding that plaintiff did not have to prepare proposals for establishing a casino development to challenge a law that gave preference to others in selecting such developers; "a plaintiff need not make costly futile gestures simply to establish standing").[8]

Finally, Defendants argue that Ultima lacks standing because it is not "seek[ing] to qualify for the 8(a) program." Dfs' SJ Memo. 35. But it is not seeking to qualify for the 8(a) Program precisely because that program is racially-discriminatory. It would apply if that program or some successor program did not treat applicants differently on the basis of race. Bennett Opp. St. ¶ 11. For this reason as well, it has standing. *Gratz v. Bollinger*, 539 U.S. 244, 261-62 (2003) (holding that student who intended to apply as a transfer student when the university stopped considering race in the admissions process had standing).

Conclusion

For the foregoing reasons, defendants' motion for summary judgment should be denied.

Respectfully submitted,

---

[8]    In any event, Ultima currently meets this qualification. Bennett Opp. St. ¶ 10. If the Court were to dismiss this case now based on events that existed at its outset but do not any longer, Ultima would just file a new lawsuit. Defendants' suggestion in this regard would be a waste of judicial resources.

*/s/ Michael E. Rosman*

Michael E. Rosman
Michelle A. Scott
CENTER FOR INDIVIDUAL RIGHTS
1100 Connecticut Ave, NW, Ste. 625
Washington, D.C. 20036
(202) 833-8400

M. Dale Conder, Jr.
RAINEY KIZER REVIERE & BELL PLC
209 E. Main St.
Jackson, TN 38301
(731) 426-8130