IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | |
|---|---|
| ULTIMA SERVICES CORPORATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 2:20-cv-00041-DCLC-CRW |
| | ) |
| U.S. DEPARTMENT OF AGRICULTURE, et al., | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS (DOC. 63)**

1. Prior to January 1, 2022, Ultima Services Corporation ("Ultima") was a fully-owned subsidiary of Lusa Associates, Inc. ("Lusa"). Deposition of Celeste Bennett ("Bennett Dep.") 71:6-8; 75:11-12 (cited excerpts attached to Defendants' Motion for Summary Judgment as Exhibit 2).

Undisputed.

2. Lusa is 100% owned and operated by Celeste Bennett. Bennett Dep. 51:15-17; 52:8-21 (Exhibit 2).

Undisputed.

3. As of January 1, 2022, Ms. Bennett restructured her businesses so that she now owns and operates Ultima. Bennett Dep. 70:22-71:8; 75:11-12; 77:1-12 (Exhibit 2).

Undisputed that Celeste Bennett directly owns Ultima as of January 1, 2022 instead of owning it through Lusa. Disputed that there was any change in the manner in which Ultima was operated as of January 1, 2022. Defs' Ex. 2, Bennett Dep. 77.

4.	Ultima has earned over $37 million in revenue from USDA contracts since 2015. Declaration of Sheryl Welch ("Welch Decl.") ¶ 4 (attached to Defendants' Motion for Summary Judgment as Exhibit 6).

Undisputed.

5.	Ultima has not applied to participate in the 8(a) program. Bennett Dep. 249:17-19 (Exhibit 2).

Undisputed.

6.	At the time it filed the Complaint, Ultima exceeded the size requirements to be considered a small business under NAICS code 561110 ($8 million), which is the NAICS code that applied to its IDIQs. Ultima SAM.gov Representations and Certifications, at 3 (attached to Defendants' Motion for Summary Judgment as Exhibit 9); Bennett dep. 139:18-20 (Exhibit 2).

Undisputed.

7.	In a Decision Memorandum approved on March 30, 2018, NRCS noted that two of the four IDIQs that had been awarded to Ultima were nearing their maximum value of $10 million in approximately one year. Decision Memorandum, at US0050556 (attached to Defendants' Motion for Summary Judgment as Exhibit 4).

Disputed because the cited page does not support the statement asserted. Other parts of the same memo indicate that there was at least $700,000 in remaining funding for even the region with the least amount of funds remaining. Regardless, the document is inadmissible hearsay for defendants and cannot be used by defendants to support the truth of any underlying statement contained therein.

8.	In the March 30, 2018 Decision Memorandum, NRCS determined that re-soliciting the work awarded through the regional IDIQs on a state basis would "yield the lowest

overall cost," "afford[] easier access to more localized small business vendors," and "reduce the workload of the . . . contracting services branch." Decision Memorandum, at 1 (Exhibit 4).

Undisputed that the document is quoted accurately but note that the evidence is inadmissible hearsay for defendants for purposes of demonstrating the truth of those matters.

9. In the March 30, 2018 Decision Memorandum, NRCS determined that the regional IDIQ model "is the second highest cost option," that "States may not get the services they actually need as States' needs differ across the region," and "[i]t places an undue workload burden on [contracting services branch]," among other things. Decision Memorandum, at 2 (Exhibit 4).

Undisputed that the document is quoted accurately, but note that the evidence is inadmissible hearsay for defendants for purposes of demonstrating the truth of those matters.

10. Since NRCS made the decision not to exercise additional options on the IDIQs, Ultima has essentially stopped bidding on contracts while it awaits the results of this litigation. Bennett dep. 105:11-106:8; 106:17-107:10 (Exhibit 2).

Disputed. See Statement of Celeste Bennett executed on July 12, 2022 ("Bennett Opp. St.") ¶ 9.

11. In 2019, Lusa was awarded NRCS contracts valued at over $10.4 million. Welch Decl. ¶ 9 (Exhibit 6).

Disputed because defendants do not define "NRCS contracts" and do not explain how to "value" the contracts. Many contracts have option years, but the government is not obligated to exercise the options so no money for those years is guaranteed. Ultima admits that over the four years beginning in January 2019 and ending in December 2022, LUSA Associates expects

3

revenue from contracts to provide administrative and technical support services at NRCS offices above $8.5 million. Bennett Opp. St. ¶ 12.

12. In 2019, Lusa was awarded two sole-source NRCS contracts valued at over $3.8 million though the women-owned small business program. Welch Decl. ¶ 11 (Exhibit 6).

Disputed for the reasons stated in response to No. 11.

13. Since 2019, NRCS has awarded contracts valued at over $10.8 million for administrative or technical support services through full and open competition or competition among all small businesses, including through the GSA Federal Supply Schedule program. Declaration of Amy Stonebraker ("Stonebraker Decl.") ¶ 5 (attached to Defendants' Motion for Summary Judgment as Exhibit 7).

Disputed because the evidence cited demonstrates that NRCS did not itself award any contracts. Moreover, plaintiff disputes that the contracts issued through the GSA Federal Supply Schedule program (which are four of the five listed) were awarded through "full and open competition or competition among all small businesses." Bennett Opp. St. ¶¶ 6-7.

14. Ultima has not registered for the GSA's Federal Supply Schedule Program. *See* Plaintiff's Response to Defendants' Third Set of Requests for Admission, ¶ 8 (attached to Defendants' Motion for Summary Judgment as Exhibit 8).

Undisputed.

15. On average, in all industries since 2015, the federal government has obligated 3.7 percent of all small business eligible dollars through the 8(a) program. Declaration of Samuel Powers ("Powers Decl.") ¶ 5 (attached to Defendants' Motion for Summary Judgment as Exhibit 21).

Undisputed.

16. Since 2015, the federal government has spent about $3.87 trillion. Powers Decl. ¶ 6 (Exhibit 21).

Disputed. Publicly-available documents demonstrate that the federal government's annual budget since 2015 has exceeded the identified number in most fiscal years. *E.g.*, Office of Management and Budget, Budget of the United States Government Fiscal Year 2022, 37 (Table S-1).

17. Since 2015, the federal government has spent about $3.75 trillion outside of the 8(a) program. Powers Decl. ¶ 7 (Exhibit 21).

Disputed. Publicly-available documents demonstrate that the federal government's annual budget since 2015 exceeds the identified number by a substantial margin. See Response to No. 16.

18. Since fiscal year ("FY") 2010, the USDA has awarded 3.76 percent of all contract actions through the 8(a) program. Total Funding Agency Dollars (attached to Defendants' Motion for Summary Judgment as Exhibit 22).

Disputed because the evidence cited is not verified or authenticated.

19. Since FY2010, the contract actions USDA has awarded through the 8(a) program have been worth five percent of obligated contract dollars. Total Funding Agency Dollars (Exhibit 22).

Disputed because the evidence cited is not verified or authenticated.

20. In NAICS codes 561110 and 541611, USDA has awarded 11 percent of contract actions through the 8(a) program since 2015. USDA NAICS Spending (attached to Defendants' Motion for Summary Judgment as Exhibit 24).

Disputed because the evidence submitted is not verified or authenticated, and the information contained therein would be hearsay even if authenticated.

21. In NAICS codes 561110 and 541611, the contract actions USDA has awarded through the 8(a) program have been worth 10 percent of obligated contract dollars. USDA NAICS Spending (Exhibit 24).

Disputed because the evidence submitted is not verified or authenticated, the information contained therein would be hearsay even if authenticated, and no time frame is provided.

22. Congress's stated purpose in enacting the 8(a) program was to provide contract, financial, technical, and management assistance to small businesses owned and controlled by socially and economically disadvantaged individuals. Pub. L. No. 95-507, § 201, 92 Stat. 1757, 1760 (1978).

Undisputed, provided that the phrase "the 8(a) program" refers to the "Program" as identified in amended Section 7(j)(10) of the Small Business Act as amended in Section 204 of the identified public law at 92 Stat. 1765.

23. When it enacted the 8(a) program, Congress found that "the opportunity for full participation in our free enterprise system by socially and economically disadvantaged persons is essential if we are to obtain social and economic equality for such persons and improve the functioning of our national economy." Pub. L. No. 95-507, § 201, 92 Stat. 1757, 1760 (1978).

Undisputed that the quoted finding was made with respect to "the [Small Business] Administration's business development programs," of which "the 8(a) program" is one, and provided that the phrase "the 8(a) program" refers to the "Program" as identified in amended Section 7(j)(10) of the Small Business Act as amended in Section 204 of the identified public law at 92 Stat. 1765.

24. When it enacted the 8(a) program, Congress found that "many [socially and economically disadvantaged] persons are socially disadvantaged because of their identification as members of certain groups that have suffered the effects of discriminatory practices or similar invidious circumstances over which they have no control." Pub. L. No. 95-507, § 201, 92 Stat. 1757, 1760 (1978).

Undisputed that the quoted finding was made with respect to "the [Small Business] Administration's business development programs," of which "the 8(a) program" is one, and provided that the phrase "the 8(a) program" refers to the "Program" as identified in amended Section 7(j)(10) of the Small Business Act as amended in Section 204 of the identified public law at 92 Stat. 1765.

25. When it enacted the 8(a) program, Congress found that "such groups include, but are not limited to, Black Americans, Hispanic Americans, Native Americans, and other minorities." Pub. L. No. 95-507, § 201, 92 Stat. 1757, 1760 (1978).

Undisputed that the quoted finding was made with respect to "the [Small Business] Administration's business development programs," of which "the 8(a) program" is one, and provided that the phrase "the 8(a) program" refers to the "Program" as identified in amended Section 7(j)(10) of the Small Business Act as amended in Section 204 of the identified public law at 92 Stat. 1765.

26. Congress subsequently amended this list to include Asian Pacific Americans and Native Hawaiian Organizations. 15 U.S.C. § 631(f)(1)(C).

Undisputed, provided that "this list" refers to the identified groups in Section 2(e)(1) of the Small Business Act as amended in Section 201 of Pub. Law 95-507 (92 Stat. 1760).

27. In enacting the 8(a) program, Congress found that "it is in the national interest to expeditiously ameliorate the conditions of socially and economically disadvantaged groups." Pub. L. No. 95-507, § 201, 92 Stat. 1757, 1760 (1978).

Undisputed that the quoted finding was made with respect to "the [Small Business] Administration's business development programs," of which "the 8(a) program" is one, and provided that the phrase "the 8(a) program" refers to the "Program" as identified in amended Section 7(j)(10) of the Small Business Act as amended in Section 204 of the identified public law at 92 Stat. 1765.

28. In enacting the 8(a) program, Congress found that "such development can be materially advanced through the procurement by the United States of articles, equipment, supplies, services, materials, and construction work from such concerns" and "that such procurements also benefit the United States by encouraging the expansion of suppliers for such procurements, thereby encouraging competition among such suppliers and promoting economy in such procurements." Pub. L. No. 95-507, § 201, 92 Stat. 1757, 1760 (1978).

Undisputed that the quoted finding was made with respect to "the [Small Business] Administration's business development programs," of which "the 8(a) program" is one, and provided that the phrase "the 8(a) program" refers to the "Program" as identified in amended Section 7(j)(10) of the Small Business Act as amended in Section 204 of the identified public law at 92 Stat. 1765.

29. Dr. Jon Wainwright conducted several analyses of disparity studies and other data and concluded that "taken as a whole, they provide strong evidence of large, adverse, and statistically significant disparities facing minority-owned business enterprises in the United States" and that "these disparities cannot be adequately explained by differences between the

8

relevant populations in factors untainted by the effects of discrimination and are therefore consistent with the presence of discrimination in the business market." Report of Defendant's Expert Jon Wainwright ("Wainwright Report"), at 81 (attached to Defendants' Motion for Summary Judgment as Exhibit 11).

Undisputed that the statement accurately quotes the report, but Ultima notes that the statement is unsworn and inadmissible hearsay for defendants for purposes of demonstrating the truth of the underlying statements or Dr. Wainwright's belief in them.

30. Dr. Wainwright found that this was the case in each of the major markets for government contracting and procurement, including in the industries Plaintiff identified as relevant to this matter. Wainwright Report, at 29, 81 (Exhibit 11).

Undisputed that the statement accurately summarizes certain pages of the report, but Ultima notes that the statement is unsworn and inadmissible hearsay for defendants for purposes of demonstrating the truth of the underlying statements or Dr. Wainwright's belief in them.

31. Dr. Wainwright also found that this was the case when the results were disaggregated into race and ethnicity categories. Wainwright Report, at 30; see Table 2.2 (Exhibit 11).

Undisputed that the statement accurately summarizes the report, but Ultima notes that the statement is unsworn and inadmissible hearsay for defendants for purposes of demonstrating the truth of the underlying statements or Dr. Wainwright's belief in them.

32. Dr. Wainwright also found large, adverse disparities in the utilization of minority-owned businesses even when his analysis was restricted to studies published since 2017. Wainwright Report, at 30 (Table 2.6) (Exhibit 11).

9

Undisputed that the statement accurately summarizes the report (although Table 2.6 is not on the cited page), but Ultima notes that the statement is unsworn and inadmissible hearsay for defendants for purposes of demonstrating the truth of the underlying statements or Dr. Wainwright's belief in them.

33. Daniel Chow, an economist at the Department of Commerce, Minority Business Development Agency, analyzed federal contracting data and determined that small disadvantaged businesses and minority-owned businesses had statistically significant lower odds of winning a prime contract with the federal government compared to firms not in those categories. Expert Report of Daniel Chow ("Chow Report") p. 1-2, 7 (attached to Defendants' Motion for Summary Judgment as Exhibit 13).

Disputed because Chow's analysis did not separately analyze small disadvantaged businesses. As Tables 3, 4, and 5 in the Chow Report demonstrate, he only analyzed a subset of such businesses, *viz.*, those not participating in the 8(a) program. Regardless, the document is unsworn and inadmissible hearsay for defendants for purposes of demonstrating the truth of any statements within it or Mr. Chow's belief in them.

34. Mr. Chow found that these disparities persisted even after controlling for factors that might affect a firm's odds for success, including firm size, firm age, and level of security clearance. Chow Report, at 2-3 (Exhibit 13).

Disputed because Mr. Chow's analysis did not separately analyze small disadvantaged businesses. As Tables 3, 4 and 5 in the Chow Report demonstrate, he only analyzed a subset of such businesses, *viz.*, those not participating in the 8(a) program. Ultima also disputes any suggestion that the factors Mr. Chow controlled for constitute all the "factors that might affect a firm's odds for success." Statement of Jonathan Guryan & exhibit thereto. Regardless, the

10

document is unsworn and inadmissible hearsay for purposes of demonstrating the truth of any statements within it or Mr. Chow's belief in them.

35. Mr. Chow concluded that the lower odds identified in his analysis are consistent with the presence of discrimination. Deposition of Daniel Chow ("Chow dep.") 110:21-112:2 (attached to Defendants Motion for Summary Judgment as Exhibit 15).

Undisputed but Ultima notes that Mr. Chow also testified that "consistent with discrimination" means only that discrimination cannot be eliminated as a possible cause. Doc. 61-15 (PageID # 1534) (Chow Dep. Tr. 113, ll. 18-22).

36. Mr. Chow also analyzed data in NAICS codes 541 and 561, and he also found that both socially-disadvantaged businesses and minority-owned businesses had statistically significant lower odds of winning a federal prime contract in these industries than other small firms, even after controlling for non-discriminatory factors. Chow Report, at 11-18 (Table 5) (Exhibit 13).

Disputed because Mr. Chow's analysis did not separately analyze small disadvantaged businesses. As Tables 3, 4 and 5 in the Chow Report demonstrate, he only analyzed a subset of such businesses, *viz.*, those not participating in the 8(a) program. Regardless, the document is unsworn and inadmissible hearsay for purposes of demonstrating the truth of any statements within it or Mr. Chow's belief in them.

37. In 2018, Congress heard testimony describing the explicit discrimination faced by minority-owned businesses in contracting, including the lack of timely bid notification, higher and double standards, and the refusal to use minorities except when they are required in a contract." *Strengthening Access to Capital for Minority-Owned Small Businesses, Hearing*

11

*Before S. Comm. on Small Bus. and Entrepreneurship*, 115th Cong. 42 (2018) (statement of Kenneth E. Clark, Business Consultant, MBDA Business Center-Capital Region).

Disputed because the identified subcommittee does not constitute "Congress," and accordingly "Congress" did not hear the testimony in question.

38. In a 2020 hearing, Congress examined the "historical and systemic challenges" faced by minority-owned businesses, including "a lack of access to capital and systemic racism." *Access Denied: Challenges for Women- and Minority-Owned Businesses Accessing Capital and Financial Services*, Hearing Before Subcomm. on Diversity and Inclusion of the H. Comm. on Fin. Servs., 116th Cong. 2 (2020) (opening statement of Rep. Beatty).

Disputed because the identified subcommittee does not constitute "Congress," and, accordingly, "Congress" did not "examine" the topic identified.

39. Congress received testimony in 2021 that Black wealth accumulation has undergone a sustained process of asset underdevelopment "via an array of American programs and practices," including:

- federally sanctioned redlining, which reduced the credit available for Black households, in turn limiting their ability to buy homes;
- discriminatory access to homeownership subsidies in the New Deal legislation;
- denial of the benefits of the G.I. Bill to Black veterans, while White households were able to rely on the G.I. Bill to build wealth;
- racial zoning practices and tax policies; and
- the long-term effects of Jim Crow era state tax policies.

*How Invidious Discrimination Works and Hurts: An Examination of Lending Discrimination and Its Long-term Economic Impacts on Borrowers of Color*, Hearing before Subcomm. on Oversight and Investigations of the H. Comm. on Financial Services, 117th Cong. (2021)

(testimony of William Darity Jr., Samuel DuBois Cook Professor of Public Policy, Duke University) (citations omitted).

Disputed because the identified subcommittee does not constitute "Congress" and "Congress" did not receive the testimony in question.

40. Congress heard similar testimony in a February 2021 hearing that detailed the discriminatory barriers facing minority business owners, including (1) overtly discriminatory practices by lenders; (2) discrimination in capital markets; and (3) structural barriers built into the Paycheck Protection Program, including its reliance on mainstream financial institutions that have long excluded minority business owners. *Supporting Small and Minority-Owned Businesses Throughout the Pandemic, Virtual Hearing Before the Subcomm. on National Security, Int'l Dev. and Monetary Policy, H. Comm. On Fin. Servs*. 117th Cong. 70, 71, 78 (2021) (statement of Center for Responsible Lending and testimony of Ashley C. Harrington, Federal Advocacy Director and Senior Counsel, Center for Responsible Lending).

Disputed because the identified committee does not constitute "Congress" and "Congress" did not hear the testimony in question.

41. In June 2021, Congress received over 100 disparity studies published from 2015-2021 as evidence in support of the reauthorization of the Department of Transportation's Disadvantaged Business Enterprise Program. https://congressional.proquest.com/congressional/docview/t49.d48.h.rp._117-70?accountid=14740 167 CONG. REC. H3505-07 (daily ed. June 30, 2021) (statement of Rep. DeFazio) (listing disparity studies); 167 CONG. REC. S5898-99 (daily ed. August 5, 2021) (statement of Sen. Tom Carper) (same).

Disputed because the disparity studies were not received by "Congress."

13

42. In June 2021, Congress made specific findings as to the value of such studies: "[D]isparity studies contain myriad analyses aimed at answering the question: 'Does business discrimination based on race or gender continue to exist?' Even a cursory review of the studies reveals that the answer is resoundingly 'yes.'" H.R. Rep. No. 117-70, at 392-95 (2021).

Disputed because the report in question does not constitute a finding of Congress.

43. In February 2022, congressional testimony described the disproportionate effects of the COVID-19 pandemic on minority business owners, which were attributed to the compounding effects of systemic racism and the racial wealth gap, leading to "weak capitalization, limited banking relationships, and little to no cash reserves to cushion the impact of the pandemic" that resulted in the closure of nearly half of Black-owned businesses between February and April 2020, compared to just 17 percent of white-owned businesses. *Small Businesses, Big Impact: Ensuring Small and Minority-Owned Businesses Share in the Economic Recovery, Virtual Hearing Before the Subcomm. on Consumer Prot. and Fin. Inst. of the H. Comm. On Fin. Servs.*, 117th Cong. 7 (2022) (statement of Stephanie Devane, Vice President, Entrepreneurship & Business Development, National Urban League).

Disputed because the quote is not correct.

<u>Additional Disputed Facts</u>

To the extent that defendants have disputed any of the facts set forth in Plaintiff's Statement of Undisputed Material Facts (Doc. 60-1), Plaintiff incorporates those facts as Additional Disputed Facts, and refers to the citations to evidence set forth in that document as support.

In addition, Plaintiff sets forth the following additional facts.

1. When Howard Stover, a contracting officer with the Department of Agriculture, called Natural Resource Conservation Service offices to inquire about Ultima's performance under the task orders issued pursuant to the IDIQ contract, the representatives in those offices described Ultima's work as outstanding or excellent, without exception. Rosman Opp. St. Ex. 39 (Stover Dep. Tr. 30-31).

2. The IDIQ contracts were a "win-win" situation for the government, the contractor, and the customers. Rosman Opp. St. Ex. 39 (Stover Dep. Tr. 31).

3. Individuals in the Colorado office of the NRCS were upset that the USDA was terminating Ultima's task orders because Ultima had been a really good contractor and they did not want to lose Ultima. Rosman Opp. St. Ex. 39 (Stover Dep. Tr. 66, 69-70).

4. Generally speaking, contracts reserved to the 8(a) Program cost the government more because there's no competition. Rosman Opp. St. Ex. 39 (Stover Dep. Tr. 75).

5. The SBA engages in adverse impact analysis very infrequently. Rosman Opp. St. Ex. 35 (Denison Dep. Tr. 24).

6. In this case, the USDA sent an offering letter to the SBA on a proposed contract for inclusion in the 8(a) Program covering administrative and technical support for 37 National Resource Conservation Service offices in the State of Mississippi. Doc. 66-3 (PageID ## 2102-04).

7. The proposed contract would be for about $3 million over two years. In the offering letter by the USDA contracting officer, Danny Mandell, Ultima was identified as the incumbent firm providing those services, and Ausdanbrook Properties was the recommended 8(a) contractor. Doc. 66-3 (PageID ## 2102-04).

15

8. Mr. Mandell wanted to use an 8(a) sole source contract because the fiscal year was drawing to a close and he did not have time to compete the contract. Doc. 65-12 (PageID # 1926-27, Mandell Dep. Tr. 69-70).

9. The business office specialist in the SBA's Georgia office, Uneeda Collins, determined that an adverse impact analysis was necessary, and she asked for, and obtained, information from Ultima's President for that purpose. Statement of Celeste Bennett ("Bennett Opp. St.") ¶¶ 2-5 & Exs. A-C.

10. After receiving that information, Ms. Collins concluded that the contract would have an adverse impact on Ultima in a memo to the director of the Georgia office, Terri Denison. Rosman Opp. St. Ex. 35 (Denison Dep. Tr. 25-26 & Ex. 5 thereto).

11. Ms. Denison agreed with that conclusion, as did others in the office, and apprised Mr. Mandell in a letter on September 20, 2018 that she did not recommend that the SBA accept the contract into the 8(a) Program. Rosman Opp. St. Ex. 35 (Denison Dep. Tr. 25-26 & Ex. 5 thereto); Doc. 61-19 (PageID # 1566).

12. On September 21, 2018, Mr. Mandell sent another offering letter to a different SBA office regarding the same requirement of providing adminstrative and technical support to 37 NRCS offices in Mississippi. Doc. 66-3 (PageID ## 2095-98).

13. Mr. Mandell made no mention of the denial by the Georgia office in this second letter. Doc. 66-3 (PageID ## 2095-98).

14. A different 8(a) contractor, All Pro Placement Service, was the recommended contractor, and the letter stated that there was no other 8(a) participant interested in the requirement. That is, the letter made no mention of Ausdanbrook's interest in the contract,

16

which might have led the SBA to require a competition among 8(a) participants. Doc. 66-3 (PageID ## 2095-98); Doc. 65-12 (PageID # 1932, Mandell Dep. Tr. 118).

15. The new offering letter asserted that the requirement was a "new requirement." Doc. 66-3 (PageID ## 2095-98).

16. This letter was accepted by the SBA a few days later, and the contract went into the 8(a) Program. Rosman Opp. St. Ex. 36 (Mandell Dep. Tr. 100 & Ex. 6 thereto).

17. Weeks later, Ms. Bennett, not having heard anything about the outcome of the adverse impact analysis, left a voicemail for Ms. Collins and sent an email on October 11, 2018 to Ms. Collins and Mr. Ware seeking information on the adverse impact analysis. She never received a response. Bennett Opp. St. ¶ 5.

18. The regulations governing adverse impact analysis state that the SBA should consider all relevant factors. 13 C.F.R. § 124.504(c)(1), (c)(3).

19. The regulations do not provide that the SBA should presume that a small business is not adversely impacted by the reservation of a contract to the 8(a) Program if it has worked on the requirement for less than 24 months. 13 C.F.R. § 124.504(c)(1).

/s/ Michael E. Rosman
Michael E. Rosman
Michelle A. Scott
CENTER FOR INDIVIDUAL RIGHTS
1100 Connecticut Ave, NW, Ste. 625
Washington, D.C. 20036
(202) 833-8400

M. Dale Conder, Jr.
RAINEY KIZER REVIERE & BELL PLC
209 E. Main St.
Jackson, TN 38301
(731) 426-8130