# EXHIBIT 33

1   UNITED STATES DISTRICT COURT

2   EASTERN DISTRICT OF TENNESSEE

3   - - - - - - - - - - - - - - - - - - - - -x

4   ULTIMA SERVICES CORPORATION,

5                  Plaintiff,

6             No. 2:20-cv-00041-DCLC-CRW

7      -against-

8   U.S. DEPARTMENT OF AGRICULTURE, U.S.

     SMALL BUSINESS ADMINISTRATION, SECRETARY

9   OF AGRICULTURE, and ADMINISTRATOR OF THE

     SMALL BUSINESS ADMINISTRATION,

10

                 Defendants.

11

   - - - - - - - - - - - - - - - - - - - - -x

12

             March 7, 2022

13            10:03 a.m. (EST)

14

15    DEPOSITION of Dr. Jon Wainwright, the

16   Expert Witness in the above-entitled

17   action, held at the above time and place,

18   taken before Garry J. Torres, a

19   Stenographer and Notary Public of the

20   State of New York, pursuant to the Federal

21   Rules of Civil Procedure, Notice and

22   stipulations between Counsel.

23

24         *     *    *

25

```
 1   APPEARANCES:
 2

         CENTER FOR INDIVIDUAL RIGHTS
 3           Attorneys for Plaintiff
             ULTIMA SERVICES CORPORATION
 4            1100 Connecticut Ave, NW
             Suite 625
 5           Washington, D.C. 20036
             TEL: (202) 833-8400
 6           EMAIL: scott@cir-usa.org
 7       BY:  MICHAEL E. ROSMAN, ESQ.
 8
 9       CHRISTINE DINAN, ESQ.
             Attorneys for Defendants
10
11
         ALSO PRESENT:
12
             MICHELLE SCOTT
13           ANDREW BRANIFF
             K'SHAANI SMITH
14           JULIET GRAY
                 *       *       *
15
16
17
18
19
20
21
22
23
24
25
```

Veritext Legal Solutions
212-267-6868                www.veritext.com                516-608-2400
Case 2:20-cv-00041-DCLC-CRW    Document 70-11   Filed 07/12/22   Page 3 of 50
PageID #: 2561

1          STIPULATIONS

2       IT IS HEREBY STIPULATED AND AGREED, by

3    and among counsel for the respective

4    parties hereto, that the filing, sealing

5    and certification of the within deposition

6    shall be and the same are hereby waived;

7       IT IS FURTHER STIPULATED AND AGREED

8    that all objections, except as to form of

9    the question, shall be reserved to the

10   time of the trial;

11      IT IS FURTHER STIPULATED AND AGREED

12   that the within deposition may be signed

13   before any Notary Public with the same

14   force and effect as if signed and sworn to

15   before the Court.

16                 *      *      *

17

18

19

20

21

22

23

24

25

Case 2:20-cv-00041-DCLC-CRW   Document 70-11   Filed 07/12/22   Page 4 of 50
PageID #: 2562

1      A.      4109 Avenue F, Austin, Texas

2   78751.

3      Q.      How old are you, sir?

4      A.      58.

5      Q.      And you're now retired; is that

6   right?

7      A.      Semi-retired, yes.

8      Q.      Maybe you could describe for us

9   what semi-retired is --

10     A.      I retired --

11     Q.      -- and how I can aspire to it?

12     A.      I retired from NERA National

13  Economic -- NERA Economic Consulting in

14  2018, the end of 2018, but as obvious from

15  today I'm still doing some consulting work

16  occasionally, but mostly retired.

17     Q.      Okay.  There's a number of

18  articles on your CV.  Have any of them

19  been published in peer review journals?

20     A.      I don't believe so.  Is there

21  any in particular you're referring to?

22  But I don't believe so.

23     Q.      Okay.  So you -- in 1995 started

24  as a consultant at NERA; is that right?

25     A.      Yes.

Case 2:20-cv-00041-DCLC-CRW    Document 70-11    Filed 07/12/22    Page 5 of 50
PageID #: 2563

1      Q.     Okay.  That doesn't study

2   availability in the same kind of way that

3   the NERA studies of government contracting

4   did though; is that right?

5      A.     I wouldn't say that's right.

6      Q.     Okay.  Tell me why you think the

7   study of survey evidence is the same as

8   the study of availability and utilization

9   that NERA did for government entities?

10            MS. DINAN:  Objection.

11      Mischaracterizes previous testimony.

12      You can answer.

13            MR. ROSMAN:  Okay.

14      Q.     You can try.  Go ahead.

15      A.     The SBO data, for example, gives

16   you the entire universe of businesses in a

17   given geographic or industrial division.

18   It also identifies the number of

19   minority-owned businesses in that -- in a

20   given division and that is -- that's a

21   census of businesses and the one number

22   into the other is, in fact, an

23   availability statistic.

24      Q.     Right.  But it relies on survey

25   evidence, right?

Case 2:20-cv-00041-DCLC-CRW    Document 70-11    Filed 07/12/22    Page 6 of 50
PageID #: 2564

1    you did not yourself test for statistical

2    significance?

3              MS. DINAN:  Objection.

4        Foundation.

5        Q.    Okay.  Let's start again then.

6              MR. ROSMAN:  That's fair.

7        Q.    So if we go back to page 21,

8    which you were reading from previously,

9    the first bullet below the first part --

10   two lines of text refers to statistical

11   significance testing for disparity

12   indexes.

13             As I understand it from your

14   testimony and from reading your report, a

15   specific record would get coded as

16   statistically significant only if the

17   underlying study said it was statistically

18   significant; is that right?

19       A.    Only if the underlying study

20   included a test for statistical

21   significance.

22       Q.    Right.

23       A.    So yes.

24       Q.    I think we're saying the same

25   thing?

Case 2:20-cv-00041-DCLC-CRW   Document 70-11   Filed 07/12/22   Page 7 of 50
PageID #: 2565

1    A.    I think so.

2    Q.    Okay.  And do you have some

3  estimate as to what percentage of the

4  records that you viewed had an entry for

5  statistical significance?

6    A.    Maybe roughly a fifth to a

7  quarter of the total.

8    Q.    Okay.  If there was a test for

9  statistical significance and the

10  underlying study concluded that the

11  specific disparity number was not

12  statistically significant, would that be

13  coded in the record by you?

14    A.    Yes.

15    Q.    So the 20 to 25 percent number

16  is the number where there was a test for

17  statistical significance regardless of

18  whether the number was statistically

19  significant; is that correct?

20    A.    I believe that's right.

21    Q.    So of the 20 to 25 percent, do

22  you have an estimate of how many of those

23  or what percentage of those were

24  statistically significant?

25    A.    I believe that's what I tried to

Veritext Legal Solutions
212-267-6868                   www.veritext.com                   516-608-2400
Case 2:20-cv-00041-DCLC-CRW   Document 70-11   Filed 07/12/22   Page 8 of 50
PageID #: 2566

1       A.      I cannot as I sit here.

2       Q.      The studies had various methods

3    of determining availability.  Did you

4    review the underlying documents that went

5    into their availability calculations?

6       A.      For the non-NERA studies, no.

7       Q.      Did you do it for the NERA

8    studies?

9       A.      Obviously.

10      Q.      Oh, I meant in creating this

11   report in the last year, did you review

12   the availability --

13      A.      No, I took them at face value.

14      Q.      All right.  I'm just going to

15   ask you a couple of questions about the

16   custom census approach that you've

17   identified on page 16 of your report.

18              So the first step is to create a

19   database of representative public

20   contracts and when you create that

21   database, do you actually take a sample of

22   the contracts?  Is that what the word

23   "representative" is supposed to mean?

24      A.      Not necessarily.  That would

25   vary depending on the study in question.

Veritext Legal Solutions
212-267-6868                    www.veritext.com              516-608-2400
Case 2:20-cv-00041-DCLC-CRW   Document 70-11   Filed 07/12/22   Page 9 of 50
PageID #: 2567

1   for the city of Baltimore, we would ask

2   firms if they had tried or attempted to

3   try to work with the city of Baltimore in

4   the previous five years or other public

5   entities in the region.  State of

6   Maryland, Prince George County, the

7   community college, what have you, the

8   private sector.

9        Q.    And would you eliminate

10  businesses both minority and nonminority

11  from the study if their answers were they

12  hadn't really?

13       A.    No.

14       Q.    Why not?

15       A.    It was just too subjective to, I

16  guess, to make that decision, an interest

17  in doing business can change from one year

18  to another.  Firms that are -- I

19  just -- we did not do that.  That was part

20  of our anecdotal survey just to gauge

21  interest in doing business.

22            But it was not something that we

23  used to restrict the statistic partly

24  because we had no good reason to believe

25  that that interest or should in a race

Case 2:20-cv-00041-DCLC-CRW   Document 70-11   Filed 07/12/22   Page 10 of 50
PageID #: 2568

1    neutral market be any different between

2    the numerator and the denominator.

3         Q.    Okay.  Did you review how the

4    firms other than NERA did their

5    availability analysis?

6         A.    For this report?

7         Q.    Yes.

8         A.    No, but I have in the past.

9         Q.    Well, when you say you have in

10   the past, how far in the past and

11   what -- well, let's start with how far in

12   the past?

13        A.    That was a principal subject in

14   the guidelines document that we did for

15   the National Academy of Sciences.  It's

16   something we did in developing our own

17   approach to measuring availability to try

18   to take what we thought was the best and

19   most accurate approach to it.

20             And -- you know, one of the

21   other purposes of doing this metaanalysis

22   was to attempt to establish is despite the

23   fact that different consultants measure

24   availability quite differently from the

25   way NERA does, could we still draw any

Case 2:20-cv-00041-DCLC-CRW   Document 70-11   Filed 07/12/22   Page 11 of 50
PageID #: 2569

1  market?

2      A.    That's correct.

3      Q.    So when NERA did it, they didn't

4  make any adjustment in the availability

5  statistic for the size of the business; is

6  that right?

7      A.    That's right.

8      Q.    To your knowledge, did any of

9  the underlying disparity studies that you

10  used in your report analyze utilization

11  only of those businesses that had been

12  specifically certified as minority

13  business enterprises as opposed to all

14  minority-owned businesses?

15      A.    I'm not positive about that, but

16  it would not surprise me if there's some

17  that used just that approach.

18      Q.    Okay.  And that didn't concern

19  you that it might not have been getting

20  all of the minority businesses in a

21  particular market in their availability

22  statistics?

23      A.    No.  Because the purpose of this

24  report was to see what we could learn

25  across the entire universe of disparity

1  percent in a minority category just

2  looking at the first column, 55 percent

3  were large adverse and statistically

4  significant.  So the other 45 percent

5  could have been large and adverse or some

6  of them -- a portion of them anyway but

7  just not statistically significant.

8      Q.    Got it.  All right.  And so for

9  example, with Asian Americans fewer than

10  half of the large adverse disparities were

11  statistically significant, correct?

12     A.    47 percent.

13     Q.    Okay.  And just to close the

14  loop here, there were --

15     A.    It's just similarly in the final

16  column the nonminorities is three percent.

17     Q.    Yes.  Right.  If I can just go

18  back to -- so table 2.2 told us that there

19  were 4,327 overall observations in the

20  minority category, right?

21     A.    Yes.

22     Q.    And table 2.7 tells us that only

23  940 of those 4,327 had any information one

24  way or the other about statistical

25  significance; is that right?

1      A.    Just slightly more than a fifth,
2   that's right.
3      Q.    Slightly more than a fifth had
4   some information and of that 55 percent of
5   that 1/5 of the large adverse disparities
6   were statistically significant --
7      A.    Yes.
8      Q.    -- is that right?
9      A.    I think that's right.
10      Q.    Okay.  Good.  So what would you
11   say the relevant market is in this case?
12           MS. DINAN:  Objection.  Vague.
13           MR. ROSMAN:  Okay.
14      A.    Yeah, one of your earlier
15   questions and I -- seems to be that I'm
16   only interested in the plaintiff's market,
17   but I think what I was asked to do was
18   what conclusions can you draw in general
19   across markets, across geographies from
20   these 205 disparity studies and the other
21   data that you looked at as -- I guess you
22   might say as an extra added bonus, I tried
23   to also where I could look at results
24   similarly for those NAICS codes that
25   appear to correspond generally to the

1  justify a preference program in a

2  different market?

3      A.    It's never been my job to

4  justify any preference program.  That is

5  the job for policymakers and/or the

6  courts.  All I'm trying to do is assemble

7  the best evidence that I can to assist in

8  those kind of determinations.

9      Q.    Okay.  So I'll ask another

10  question which I think I now know the

11  answer to, but -- and so is it your

12  opinion that a disparity in one racial or

13  ethnic group can be used to justify a

14  preference for a different racial or

15  ethnic group?

16      A.    Yeah, I would give you the same

17  answer.

18      Q.    Let's look at table 2.8.  I

19  think I asked before whether the NERA

20  studies covered 11 states.  That was my

21  count.  Did you -- have you of an -- now

22  that the report is in front of you, can

23  you verify that that's the case?

24      A.    I can try.

25      Q.    Well, I'll give you the ones

Veritext Legal Solutions
www.veritext.com
212-267-6868                                                   516-608-2400
Case 2:20-cv-00041-DCLC-CRW   Document 70-11   Filed 07/12/22   Page 15 of 50
PageID #: 2573

1  that I found and you can correct me, how

2  about that.  Florida was included.  There

3  were several --

4      A.    I'd prefer to --

5      Q.    Count them yourself?

6      A.    I'm sorry?

7      Q.    You want to count them yourself?

8      A.    Yeah, I said that would just

9  make it harder.

10      Q.    Good.  Good.

11      A.    Yeah, I get 11 as well.

12      Q.    Okay.  Good.  Let me just go

13  through a few of those.  For the state of

14  Florida there was just one study of

15  Broward county; is that right?

16      A.    That's right.

17      Q.    And the last year under study

18  was 2009?

19      A.    Where did it go?  For the

20  contracting data in the study, yes.

21      Q.    Was there any other kind of

22  data besides --

23      A.    There was census data, small

24  business, surveys of business owners data,

25  but the study period in that table is

Case 2:20-cv-00041-DCLC-CRW   Document 70-11   Filed 07/12/22   Page 16 of 50
PageID #: 2574

1  referring to the contracting statistics
2  that the availability and utilization
3  statistics would have been pulled from.
4      Q.    Okay.  And there was only one
5  study by NERA in Hawaii, right, the Hawaii
6  Department of Transportation study?
7      A.    Yep.
8      Q.    And the last year under study
9  for the contracting data in that study was
10 2008?
11     A.    Yes.
12     Q.    And then for Minnesota there
13 was, again, just one NERA study for the
14 city of Minneapolis; is that right?
15     A.    Yes.
16     Q.    Ant last year under study for
17 the contracting data for that study was
18 2007?
19     A.    Yep.  Yes.
20     Q.    And for Massachusetts -- I'm
21 sorry, not Massachusetts, Mississippi I
22 think we went over the Mississippi one.
23 There was just one NERA study and that was
24 the Jackson Municipal Airport that we
25 talked about earlier?

Case 2:20-cv-00041-DCLC-CRW   Document 70-11   Filed 07/12/22   Page 17 of 50
PageID #: 2575

1      A.      You missed Massachusetts.

2      Q.      I didn't miss it.  I'm just not

3  asking about it.

4      A.      Oh, I see.  So you're asking

5  about Mississippi?

6      Q.      Right.

7      A.      And the question was?

8      Q.      There's just the one study of

9  the Jackson Municipal Airport by NERA?

10      A.      Yes.

11      Q.      And the last year under study

12  for the contracting data for that study

13  was 2010?

14      A.      Yes.

15      Q.      Okay.  And Missouri there was

16  just one NERA study, correct?

17      A.      Yes.

18      Q.      And the last year under study

19  for the contracting data for that study

20  was 2009?

21      A.      Yes.

22      Q.      And for the -- we had two

23  studies by NERA for some part of the state

24  of Ohio, correct?

25      A.      Yes.

1     Q.    And the last year under study

2  for the contracting data for those two

3  studies was 2008 and 2010; is that right?

4     A.    Yes.

5     Q.    And I skipped New York, didn't

6  I?  But NERA only had one study of the

7  state of New York; is that right?

8     A.    Yes.

9     Q.    And the last year under study

10  for that -- sorry, let me try again.  The

11  last year for the contracting data under

12  that study was 2008, right?

13     A.    Yes.

14     Q.    And then finally NERA had just

15  one study in any part of the state of

16  Tennessee; is that right?  The

17  Memphis-Shelby County Airport Authority?

18     A.    Yes.

19     Q.    The last year under study for

20  the contracting data for that study was

21  2011?

22     A.    Yes.

23     Q.    Okay.  All right.  Good.  Let's

24  go back to table 2.8.  So in table 2.8

25  were any of these numbers assessed for

Case 2:20-cv-00041-DCLC-CRW   Document 70-11   Filed 07/12/22   Page 19 of 50
PageID #: 2577

1  statistical significance?

2      A.    Some of them probably were, but

3  that's not presented in the table.

4      Q.    And I take it all of the NERA

5  studies that are included in table 2.8 at

6  least use the same methodology for

7  calculating disparity indexes or ratios;

8  is that right?  I'm sorry.

9      A.    Is all the NERA studies?

10     Q.    Sorry?

11     A.    The same methodology --

12     Q.    There were 21 NERA studies

13 included in table 2.8, right?

14     A.    No.  I don't know if all 21

15 studies had those particular categories

16 but that would be the most that could be

17 and -- but all the NERA studies use,

18 basically, the same approach to measuring

19 disparity.

20     Q.    That's what I was asking.  Thank

21 you.  So -- and just make sure I

22 understand the numbers here.  In the

23 employment services category there was

24 54 percent of the disparities for

25 minorities were less than a hundred and

Veritext Legal Solutions
212-267-6868                www.veritext.com                516-608-2400
Case 2:20-cv-00041-DCLC-CRW   Document 70-11   Filed 07/12/22   Page 20 of 50
PageID #: 2578

1  61 percent of the disparities for

2  nonminorities males were less than a

3  hundred; is that right?

4      A.    That is correct.

5      Q.    I think you've sort of answered

6  this before but I'm going to ask it

7  anyway, does any of the underlying studies

8  for table 2.8 account for any other

9  factors that may account for the

10  disparities, like capacity?

11      A.    What do you mean by "capacity"?

12      Q.    The ability of a firm to do

13  larger contracts?

14      A.    Measured how?  No.

15      Q.    You may not have -- you may have

16  decided not to measure it.  I'm just

17  asking whether you made any effort to do

18  so?

19      A.    I don't know that it could be

20  measured but that is not part of our

21  availability measure.

22      Q.    Okay.  All right.  When you did

23  the coding, you did do coding for

24  nonminority, women-owned companies,

25  correct?

1    A.    I pulled out data for everybody

2  from the reports.

3    Q.    Right.

4    A.    So I -- yes.

5    Q.    Okay.  So why didn't you include

6  observations including nonminority,

7  female-owned companies in tables 2.2

8  through 2.8?

9    A.    My understanding is they're not

10  relevant to the 8(a) program.

11    Q.    So I guess the question I want

12  to ask as a follow up is this:  When you

13  see disparities in a group that includes

14  women, how do you know that disparities

15  are not caused by sex instead of race?

16    A.    Not sure I understand the

17  question.

18    Q.    Okay.  Let me see if I can think

19  of a better way to phrase it.  Let me try

20  it this way:  So when you see in table 2.2

21  that there was a 78 percent of the

22  disparities that you observed for Asians

23  were less than or equal to 80 whereas only

24  7 percent of the disparities you observed

25  for nonminority males were less than or

Case 2:20-cv-00041-DCLC-CRW   Document 70-11   Filed 07/12/22   Page 22 of 50
PageID #: 2580

1  equal to 80, how do you know that isn't
2  caused by the fact that there's
3  discrimination against woman-owned firms,
4  which were included in the Asian category
5  but not in the nonminority male category?
6      A.    Because then the -- my
7  regression analyses in the final section
8  of the document would show coefficients
9  that are neither large or adverse nor
10 insignificant for minorities and the
11 opposite for by sex and they do not.  I'll
12 leave it at that.
13     Q.    That's fine, but I just
14 want -- let's say I didn't have those
15 other parts of your study, how would I
16 know that the differences that we're
17 seeing here in the numbers weren't caused
18 by the inclusion of woman-owned firms in
19 the Asian categories and their exclusion
20 in the nonminority male category?
21     A.    I think that's exactly how you
22 do know is you turn to other evidence that
23 allows you to tease out those factors.
24     Q.    Okay.  But this by itself
25 wouldn't tell you that?

1    A.    Not explicitly, no.

2    Q.    Okay.  Very good.  So I just

3  want to go back to footnote 31 and one of

4  the things you said here in footnote 31 on

5  page 20 is that most of the studies you

6  viewed did not distinguish between Asian

7  Pacific and subcontinent Asian.  And so

8  you combined the two of them, right?

9    A.    Yes.

10    Q.    So in this part of the study we

11  wouldn't be able to determine whether or

12  not those disparities that you observed

13  for Asians in general were caused by

14  disparities as to one of those groups

15  rather than the other?

16    A.    If you did -- if you're just

17  applying tunnel vision to look at that one

18  statistic, no, but again that's why I

19  turned to other data to tease out those

20  differences to try to answer that question

21  to see if, in fact, it's only subcontinent

22  Asians that are facing discrimination and

23  Asian Pacific don't face any

24  discrimination at all, and what you find

25  is when you look at data that can break

Case 2:20-cv-00041-DCLC-CRW   Document 70-11   Filed 07/12/22   Page 24 of 50
PageID #: 2582

1   that out is that's not the case.

2        Q.    Okay.  But again just to be

3   clear the -- this part of the study

4   doesn't help us do that?

5        A.    No.

6        Q.    Okay.  And you included Alaskan

7   natives, Native Hawaiians and American

8   Indians in your category called Native

9   Americans; is that right, it is part of

10  the study?

11       A.    No, I think it would have -- if

12  a given disparity study had a category for

13  Native Americans, I took that as however

14  they defined it in that study.

15       Q.    Well, if they had a category for

16  Native Hawaiians though, you would have

17  included it under Native Americans; is

18  that right?

19       A.    Well, not necessarily because

20  depending on the government entity you're

21  looking at Native Hawaiians as that

22  specific example sometimes are classified

23  in the Asian Pacific category and

24  sometimes are classified in the Native

25  American category.

1      Q.     Right.  But what I'm asking is
2  what you did.  If you saw an underlying
3  disparity study that had a separate
4  category and disparity analysis for Native
5  Hawaiians, how would you characterize it
6  for purposes of, say, table 2.2?
7      A.     I would have to go back and
8  check.  As I sit here I couldn't tell you
9  exactly whether that went into the Asian
10  category or the Native American category.
11  I'd have to check.
12      Q.     Okay.  And how about the same
13  question for Alaska natives --
14      A.     Alaska native -- I'm sorry.
15      Q.     If you saw a disparity study
16  that had a specific disparity for Alaska
17  natives, how would you characterize it for
18  purposes of table 2.2?
19      A.     That would be in the Native
20  American category.
21      Q.     Very good.  So in your opinion
22  does the data in these tables, this part
23  of the study reflect discrimination by the
24  government entities studied in the
25  underling individual disparity studies?

Case 2:20-cv-00041-DCLC-CRW   Document 70-11   Filed 07/12/22   Page 26 of 50
PageID #: 2584

1       Mischaracterizes his prior testimony.

2            MR. ROSMAN:  I'm not trying to

3       mischaracterize it.  I'm just asking a

4       question and putting a question mark

5       at the end of it.

6       A.    The disparities don't tell you

7   whether the -- the disparities you're

8   seeing are specific individual actors

9   inside the government or outside the

10  government causing them or larger

11  institutional forces causing them or both

12  or actors in the private sector, not

13  naming names as the case may be.

14      Q.    And the same would hold true

15  about the federal government, is that

16  right, you wouldn't be able to make any

17  determination about whether or not the

18  federal government was discriminating

19  based on the analysis in part one of your

20  report?

21      A.    I don't think that's ever the

22  purpose of any of these disparity studies,

23  but I -- so I would say that's correct.

24           MR. ROSMAN:  So this is not an

25      actual terrible time for we here on

```
 1   I didn't -- you know, I -- you'd really
 2   have to go to the census bureau to get a
 3   definitive answer on that.
 4        Q.    Let me rephrase the question.
 5   You don't know whether the census bureau
 6   does anything to check the accuracy of the
 7   response on how one capitalizes one's
 8   business; is that right?
 9        A.    That's not right.  I'd have to
10   refer myself to the methodology documents
11   that are out there that detail exactly how
12   these surveys are done and what checks
13   there are.  They do all kinds of quality
14   control checks.
15             Whether you're trying to suggest
16   whether somebody lies on the survey and
17   can the census figure that out, I don't
18   know.
19        Q.    So let me just -- I had some
20   questions about some of the tables in this
21   part of the report.  I don't think they'll
22   take terribly long.  In your footnote 47
23   on page 39 I believe you indicated that
24   Native Hawaiians, Asians, Pacific
25   Islanders and subcontinent Asians are all
```

1  grouped together in the two surveys that

2  are part of this -- part of your report.

3  Did I understand that correctly?

4      A.    If you said Native Hawaiians,

5  Asians and Pacific Islanders and

6  subcontinent Asians are grouped together

7  as Pacific Islanders, that's correct.

8      Q.    Okay.  So if you can go to table

9  3.1?

10     A.    All right.

11     Q.    In this table Asians are given

12 one line and Native Hawaiians and Pacific

13 Islanders are given another line.

14     A.    Yes.

15     Q.    And I'm --

16           (Whereupon, simultaneous

17     conversation took place disrupting the

18     record and the court reporter

19     requested one person speak at a time

20     without interruption from anyone

21     else.)

22     Q.    So I'm asking how you separated

23 out Asians from Native Hawaiians and

24 Pacific Islanders in your chart in table

25 3.1?

```
 1      A.    I did that because the SBO does
 2  it that way.  So I missed -- I think I
 3  misspoke earlier about that footnote, what
 4  was the footnote?
 5      Q.    Well, why don't you read the
 6  footnote and tell me whether it's accurate
 7  or inaccurate?
 8      A.    Native Hawaiians and Pacific
 9  Islanders are presented as a distinct
10  category in the SBO.
11      Q.    Let me --
12      A.    Right.  Because you've got
13  Asians -- in table 3.1 there's an Asian
14  category and there's a Pacific Islanders
15  category.  The Pacific Islanders category
16  also has Native Hawaiians.
17           So if you were to combine that
18  into Asians and Pacific Islanders
19  together, but they're presented in the SBO
20  as separate line items.  So it may be the
21  phrasing in footnote 47 was a bit
22  inartful, but this is how it's broken out
23  in the SBO.
24      Q.    What was inartful about footnote
25  47?
```

212-267-6868

Veritext Legal Solutions
www.veritext.com

516-608-2400

Case 2:20-cv-00041-DCLC-CRW   Document 70-11   Filed 07/12/22   Page 30 of 50
PageID #: 2588

1      A.     Well, as I read it here it seems
2    to suggest that I got one category that's
3    Asians and Pacific Islanders that includes
4    Native Hawaiians, but I've actually got
5    two line items for that in table 3.1.  I
6    have a line item for Asians and a line
7    item for Native Hawaiians and Pacific
8    Islanders.
9      Q.     Okay.  So it's not the case as
10   it says in footnote 47 the Native
11   Hawaiians are grouped with Asians; is that
12   right?
13     A.     Well, they're grouped with
14   Pacific Islanders.  What I was trying to
15   do was differentiate it from the 8(a)
16   categories where Native Hawaiians are
17   included among the Native American
18   grouping.
19     Q.     Right.  I understand.  I'm just
20   trying to make sure I understand your
21   testimony.  Footnote 47 says Native
22   Hawaiians are grouped with Asians, but I
23   think if I understand your testimony now
24   you're saying that that's not the case?
25     A.     Right.  I think I would have

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400
Case 2:20-cv-00041-DCLC-CRW   Document 70-11   Filed 07/12/22   Page 31 of 50
PageID #: 2589

1  been more accurate to say Native Hawaiians

2  are grouped with Pacific Islanders and

3  Pacific Islanders are frequently grouped

4  with Asians in a lot of other government

5  data.

6      Q.    Well, I understand, but we're

7  talking about the SBO right now.  Okay.

8  So in the next sentence subcontinent

9  Asians are grouped with Asians and Pacific

10  Islanders, is that also incorrect at least

11  insofar as it refers to Pacific Islanders?

12      A.    I would say the better way to

13  state footnote 47 would be to say in the

14  SBO and ADS Native Hawaiians are grouped

15  with Pacific Islanders rather than with

16  Native Americans, also subcontinent Asians

17  are grouped with Asians rather than

18  classified separately.

19      Q.    Okay.  So if you could just turn

20  to page 40 of your report under A dot one,

21  economy wide results.  There's a number of

22  references in this part to a table three,

23  which I could not find.  So is that an

24  error?  So you look, for example, in the

25  second line of the second paragraph?

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400
Case 2:20-cv-00041-DCLC-CRW    Document 70-11   Filed 07/12/22   Page 32 of 50
PageID #: 2590

1  all firms category those kinds of firms

2  are not included?

3     A.    Yeah.  If I've left something

4  out of the denominator, I leave it out the

5  numerator too.  So yes.

6     Q.    Well, but if you -- before we

7  leave the numerator/denominator topic.  If

8  we add the -- in panel B if we add those

9  percentages, they come out to about

10  75 percent, right?

11     A.    Not added them, but

12  that's -- it's not because of the

13  exclusion of the firms listed in item two

14  of the footnote.

15     Q.    Okay.  What is it attributable

16  to?

17     A.    I probably -- line item for

18  women is not there.

19     Q.    Okay.

20     A.    Or for nonminority women.

21  Excuse me.

22     Q.    Say it again?

23     A.    The line item for females is not

24  there.

25     Q.    Okay.  And does that, you think,

Case 2:20-cv-00041-DCLC-CRW   Document 70-11   Filed 07/12/22   Page 33 of 50
PageID #: 2591

1  constitute most or all of the firms that

2  are included in all firms but not listed

3  in a line item?

4       A.    Most but not all.  They also

5  have a category for equally male/female

6  owned, equally minority/nonminority owned,

7  those are pretty small bits and they're

8  not broken out there either.

9       Q.    Did you do any calculations for

10  the equally minority/nonminority owned

11  firms?

12       A.    No, not for this table.

13       Q.    Do you recall approximately what

14  percentage of all firms they constituted?

15       A.    Some -- a very small number, but

16  I couldn't tell you exactly what.

17       Q.    Was it larger than Native

18  Hawaiians and Pacific Islanders or

19  smaller?

20       A.    I couldn't say as I sit here.

21       Q.    Okay.  Was it -- okay.  And I

22  assume you'd give me the same answer if I

23  asked you whether it was larger or smaller

24  than the American Indian and the Alaska

25  Native category?

1  women, period, and not nonminority women.

2      Q.    Okay.  Well, I guess I have the

3  same -- let me just make sure I understand

4  it.  Women-owned firms -- a firm owned by

5  Hispanic woman would be included in the

6  Hispanic category?

7      A.    Yes.

8      Q.    And so if we included the all

9  women firm it would add up to something

10  more than 100 percent?

11     A.    I think that's right.

12     Q.    So and -- well, I guess you're

13  going to have the same question I asked

14  before which is, how do we know from this

15  chart that any disparities that you see

16  are not attributable to sex?

17     A.    Well, you're free to look at

18  this chart in isolation.  That's not how I

19  did it.  As an economist the document I

20  look at as a whole.  It's a good question

21  and one I try to tackle directly in the

22  next section.

23     Q.    Okay.  So the last part of the

24  footnote says that, N-A indicates the data

25  was not disclosed due to confidentiality

```
1  ability to do a job as capacity because of
2  your capital or your number of employees
3  or something like that.  So let's call it
4  ability to do the job and define it that
5  way.
6       A.    Well, there's a number of
7  columns in this table that speak to that.
8  There's -- it shows you firms -- column
9  three is just firms with paid employees as
10 opposed to column one, which is all firms;
11 column five shows you the number of
12 employees; column six shows the payroll
13 levels.  So there's all kinds of...
14      Q.    Maybe I need to rephrase the
15 question then.  The disparity indices
16 don't take that into account though,
17 right?
18      A.    The some -- vague idea of the
19 ability to do work, no.
20      Q.    Okay.  Well, I mean let me give
21 you an example.  Your -- by the way before
22 I do that, panel C says these are
23 disparity ratios.  Can you tell me why you
24 put disparity ratios instead of disparity
25 indices?
```

Case 2:20-cv-00041-DCLC-CRW   Document 70-11   Filed 07/12/22   Page 36 of 50
PageID #: 2594

1    Q.    And we are still omitting about
2  28 percent of the firms in all firms the
3  individual line item breakouts?
4    A.    Yes.  For the same exact
5  reasons.
6    Q.    Presumably most of them are
7  going to be women-owned firms?
8    A.    Yes.
9    Q.    And again there's no -- there's
10  no control for the size of the firm in
11  this data, right?
12    A.    Yes.  The same answer for the
13  other table.  I mean it's very similar and
14  I think I might have an answer for your
15  earlier question here in a minute.  Yes.
16  That stray reference to table six should
17  have said table 3.3.
18    Q.    Thank you.
19      (Whereupon, a recess was taken.)
20    Q.    Dr. Wainwright, can you just
21  explain what PUMS data is?
22    A.    Yes.  Different census sources
23  can have PUMS data.  PUMS means public use
24  microdata sample and so there is a PUMS
25  sample from the SBO.  There's a PUMS

1  sample in the American community survey
2  but it's -- the important part is the M
3  for microdata.  It's individual level data
4  taken from a larger survey.
5      Q.    This is also from the census
6  bureau, right?
7      A.    Yeah, I don't know what
8  particular reference you're seeing but
9  yes.
10      Q.    Okay.  So there were three parts
11  to your last section of your report
12  dealing with salary and wages, business
13  formation and business earnings.  Let's
14  start with salary and wages.
15          How do you understand the
16  relevance of salary and wages to
17  contracting issues that are relevant to
18  this case?
19      A.    As -- I'm a labor economist by
20  training and many business owners move up
21  through the ranks in the company.  So a
22  construction contractor may have started
23  out as a laborer and become a foreman so
24  these are -- business ownership is an
25  occupation within the labor market in a

Veritext Legal Solutions
www.veritext.com
212-267-6868                                     516-608-2400
Case 2:20-cv-00041-DCLC-CRW   Document 70-11  Filed 07/12/22   Page 38 of 50
PageID #: 2596

1  way.

2          So it is -- it's just a way to

3  create a forward picture of where these

4  disparities exist and what factors do and

5  do not explain them, but that really is

6  -- the main reason is that moving up

7  through occupational hierarchies in

8  different industries often leads

9  to -- business ownership is often the end

10  stage of that.

11          So if there's -- if there's

12  discrimination at lower levels that can

13  suppress the emergence of business owners.

14      Q.    And the disparities that you

15  have identified with respect to salaries

16  and wages in this part of your report, do

17  you think they reflect any specific kind

18  of discrimination?

19      A.    No.  I think they reflect an

20  amalgam of all -- can -- you know, you

21  remember in this first section we're

22  looking at unadjusted disparities, but

23  they can -- what we're looking at here is

24  the end result.

25          They can -- they could reflect

1   discrimination in a variety of arenas, but

2   particularly in the labor market.

3         Q.    So when you say in the labor

4   market, you mean by employers?

5         A.    Well, not all discrimination is

6   by individuals, but it could -- you've got

7   job training programs, you've got

8   government programs that affect the labor

9   market, you've got specific employers,

10  you've got customers.  So yes but not

11  exclusively employers.

12        Q.    Okay.  With respect to business

13  formation, how do you control for an

14  individual's desire to own a business, if

15  you can?

16        A.    I have no measurement of desire.

17        Q.    You think that's an important

18  omission?

19        A.    If there were reason to believe

20  that minorities and nonminorities were

21  substantially different in being desirous

22  to own businesses, possibly.  I'm aware of

23  no research to that effect, but it's not

24  something I can measure.

25        Q.    Okay.  Is it fair to

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400
Case 2:20-cv-00041-DCLC-CRW   Document 70-11   Filed 07/12/22   Page 40 of 50
PageID #: 2598

1    assume -- let me start again.

2              Is it fair to say that you

3    assumed that the desire to own a business

4    was consistent across the various races

5    that you studied?

6        A.    I would put it -- that's close.

7    I would put it somewhat different.  I have

8    no reason to assume they should differ in

9    any -- you know, from individual to

10   individual, yes, but should they differ by

11   race, I have no reason or evidence to

12   suggest that they should or do.

13       Q.    Do you think the disparities

14   that you identified in business formation

15   reflect any kind of specific

16   discrimination?

17       A.    I'm not testing for specific

18   kinds of discrimination.  As an economist

19   what I'm trying do is look to see if

20   there's quantitative differences in

21   economic outcomes by race that aren't

22   accounted for by differences in

23   productivibility, such as endowments of

24   human capital and financial capital.

25             But which specific actors or

1  because it's your total earnings for the

2  year.  So to also control for weeks and

3  hours would not be correct.

4      Q.    I'm not sure I understand.  So

5  I'll ask the question in a different way.

6          If somebody is only working half

7  time for their business, that might

8  explain why they're only earning half as

9  much money, right?

10     A.    That would be reflected in their

11  annual figure.

12     Q.    Right.  And so including it as

13  an independent variable might help explain

14  some of the variation in their annual

15  figures, right?

16     A.    I'd have to give that some more

17  thought, but I think because it's already

18  built into the annual earnings figure that

19  it would be inappropriate to also control

20  for weeks or hours but that's a question

21  I'd have to give some more very specific

22  thought to.

23     Q.    I take it you didn't include

24  that data point in your regression

25  analysis; is that right?

Veritext Legal Solutions
www.veritext.com
212-267-6868                                    516-608-2400
Case 2:20-cv-00041-DCLC-CRW   Document 70-11   Filed 07/12/22   Page 42 of 50
PageID #: 2600

1      A.     Hours and weeks were not a -- on
2  the right-hand side of the equation,
3  that's correct.
4      Q.     Okay.  You also -- you used age
5  as a substitute for experience; is that
6  right?
7      A.     Yes.  There's a proxy.
8      Q.     Well, isn't it the case that
9  people of different ages can
10 have -- excuse me -- people of the same
11 age can have vastly different amounts of
12 experience in a particular field?
13     A.     Sure.  That's why it's a proxy
14 and not -- there's no measure of actual
15 experience.  Just like a measure of desire
16 to own a business, that I'm aware of, and
17 certainly not in the PUMS data.
18     Q.     Okay.  So there -- if I just go
19 to the charts, you can look at any of the
20 tables, it doesn't really matter, there's
21 a lot of statistical significance here, a
22 lot of numbers that have very high
23 statistical significance.
24            And my question is:  Is that a
25 reflection of the large numbers of

Case 2:20-cv-00041-DCLC-CRW   Document 70-11   Filed 07/12/22   Page 43 of 50
PageID #: 2601

1   observations that would -- that you

2   managed to collect for purposes of these

3   tables?

4       A.    In part, yes.  It's a very large

5   data set.

6       Q.    In the PUMS analysis in all

7   three categories that you examined, can

8   you tell us who you think is doing the

9   discriminating that causes the

10  disparities?

11           MS. DINAN:  Objection.  Calls

12      for speculation.

13      A.    Oh, I was going to say asked and

14  answered.  I thought that's been asked

15  before and I cannot.

16      Q.    I asked with respect to specific

17  parts and now I'm just trying to sort of

18  wrap up here.

19      A.    No.  I can't and again if it's a

20  culmination of overdiscrimination (sic) by

21  individual actors or more institutional

22  discrimination through social and economic

23  mechanisms or all of the above may be the

24  case, but I can't pinpoint that with this

25  data.

Veritext Legal Solutions
212-267-6868                www.veritext.com                516-608-2400
Case 2:20-cv-00041-DCLC-CRW   Document 70-11   Filed 07/12/22   Page 44 of 50
PageID #: 2602

1     done and I will turn the witness over
2     to you, but I would like to take five
3     minutes at this point to just review.
4          MS. DINAN:  Yeah, I'd like to do
5     the same if you're about to turn over
6     to -- examination.  So --
7          (Whereupon, a recess was
8     taken.)
9          MR. ROSMAN:  I just have a few
10    more questions, Dr. Wainwright, and
11    then I'm going to turn you over to
12    Ms. Dinan.
13    Q.    So in your PUMS analysis you
14 excluded Hispanic whites from your white
15 category; is that right?
16    A.    The nonminority category is
17 non-Hispanic.  So yes, I think that's
18 right.
19    Q.    Okay.  Why?
20    A.    Primarily because Hispanic is
21 one of the reference categories in the
22 8(a) program --
23    Q.    You were trying to establish
24 whether there were distinctions
25 between --

Case 2:20-cv-00041-DCLC-CRW   Document 70-11   Filed 07/12/22   Page 45 of 50
PageID #: 2603

1     A.     I'm sorry.  I wasn't quite

2  finished.

3     Q.     Oh, I'm sorry.

4     A.     You can't have them in both

5  categories.

6     Q.     Okay.  But if you're trying to

7  establish a difference in race, don't you

8  want all the people of a given race in the

9  race category?

10     A.     It's race and ethnicity and in

11  almost all of these disparity studies and

12  all the work I've ever done, they're

13  fairly standard categories; African

14  Americans, Hispanic, Asians, Native

15  Americans, there might be some minor

16  definitional differences between studies

17  here and there, but those are the main

18  categories, and those are the categories

19  captured for preferences in the 8(a)

20  program.

21          So I tried to follow those

22  definitions where the data would allow me

23  to as we saw in the middle section of the

24  report.  For example, in the SBO Native

25  Hawaiians are grouped in a different

1                    C E R T I F I C A T I O N

2

3       I, Garry J. Torres, a Notary Public

4    for and within the State of New York, do

5    hereby certify:

6       That, Dr. Jon Wainwright, the witness

7    whose testimony as herein set forth, was

8    duly sworn by me; and that the within

9    transcript is a true record of the

10   testimony given by said witness.

11      I further certify that I am not

12   related to any of the parties to this

13   action by blood or marriage, and that I am

14   in no way interested in the outcome of

15   this matter.

16      IN WITNESS WHEREOF, I have hereunto

17   set my hand this 17th day of March, 2022.

18

19

20      GARRY J. TORRES

21

22

23

24

25

```
 1        I N D E X
 2
 3
 4  WITNESS    EXAMINATION BY        PAGE
 5
    DR. JON WAINWRIGHT  MR. ROSMAN    5, 174
 6
    DR. JON WAINWRIGHT  MS. DINAN      160
 7
 8
 9   E X H I B I T S
10  PLAINTIFFS  DESCRIPTION           PAGE
11  Exhibit 1    Curriculum Vitae      5
12
13
14  Attorney Mr. Rosman from Center For
    Individual Rights has retained all
15  exhibits.
16
17        INSERTIONS
18     Page    Line
19     None
20
21        REQUESTS
22     Page    Line
23     None
24
25
```

```
 1        CERTIFICATION
 2
 3     I, Garry J. Torres, a Notary Public
 4  for and within the State of New York, do
 5  hereby certify:
 6     That, Dr. Jon Wainwright, the witness
 7  whose testimony as herein set forth, was
 8  duly sworn by me; and that the within
 9  transcript is a true record of the
10  testimony given by said witness.
11     I further certify that I am not
12  related to any of the parties to this
13  action by blood or marriage, and that I am
14  in no way interested in the outcome of
15  this matter.
16     IN WITNESS WHEREOF, I have hereunto
17  set my hand this 17th day of March, 2022.
18
19
20  GARRY J. TORRES
21
22
23
24
25
```



```
 1           ERRATA SHEET
            VERITEXT LEGAL SOLUTIONS
 2
    CASE NAME: ULTIMA SERVICES CORPORATION
 3  v. U.S. DEPARTMENT OF AGRICULTURE et al.
    DATE OF DEPOSITION: MARCH 7, 2022
 4  WITNESS' NAME: DR. JON WAINWRIGHT
 5  PAGE/LINE(S)  CHANGE      REASON
 6
 7                                        See attached
 8
 9
10
11
12
13
14
15
16
17
18
19
20           JON WAINWRIGHT
21
    SUBSCRIBED AND SWORN TO
22  BEFORE ME THIS ____ DAY
    OF _____, 2022.
23
24   NOTARY PUBLIC
25  MY COMMISSION EXPIRES _____
```

46 (Pages 178 - 180)

ERRATA
p12
line 2 midwest fence should be Midwest Fence
line 3 disadvantaged business enterprise should be Disadvantaged Business Enterprise
line 15 Rothy should be Roth throughout
line 23 Rothy Two should be Rothe II

p13
line 10 DV should be DC

p14
lines 22-23 Cossman should be Kossman

p23
line 5 defendant's expert should be defendant's expert report

p27
lines 21-22 Econ Salt should be Econsult

p34
line 18 alluded should be eluded

p42
line 4 subanalysis should be subanalyses
line 14 MBB should be MBE

p43
line 8 the total should be that total
line 14 MBA should be MBE

p60
line 50 procontractor should be prime contractor

p64
line 60 Prince George should be Prince George's
line 25 interest or should should be interest should

p66
line 9 consensus should be custom census

p67
line 24 minority should be minorities

p69
line 2 consultants should be consultants'
line 19 could should be could have

p80
line 8 DOJ should be did DOJ

p102
line 14 ADS should be ABS

file:///awoh-ctx-prfls1/UserData$/jcarbajales/Desktop/FOR%20MARIA/New%20folder%20(22)/Deposition%20errata%20JW.doc.txt[5/4/2022 5:17:34 PM]

p108
line 10 business should be census

p125
line 7 clients should be client's

p129
line 1 American community survey should be American Community Survey

p149
Lowery should be Lowrey throughout

p149
Fairley should be Fairlie throughout

p153
line 3 interest in dividence should be interest and dividend

p157
lines 17-18 bureau of labor statistics should be Bureau of Labor Statistics
lines 21-23 bureau of labor statistics should be Bureau of Labor Statistics,
 bureau of economic analysis should be Bureau of Economic Analysis, census bureau should be Census Bureau

p159
line 5 census bureau should be Census Bureau

p169
line 7 ethic should be ethnic

p170
line 11 union that should be union or

p171
line 10 it's should be it
line 19 factor could should be factor that could

file:///awoh-ctx-prfls1/UserData$/jcarbajales/Desktop/FOR%20MARIA/New%20folder%20(22)/Deposition%20errata%20JW.doc.txt[5/4/2022 5:17:34 PM]