# EXHIBIT 34

1            UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF TENNESSEE
2

     -------------------------------:
3   ULTIMA SERVICES CORPORATION,    :
                                    :
4               Plaintiff,          :
                                    :
5          vs.                      : Case No.:
                                    : 2:20-cv-00041-
6   U.S. DEPARTMENT OF AGRICULTURE,: DCLC-CRW
    et al.,                         :
7                                   :
                Defendants.         :
8   -------------------------------:
9

10

11           REMOTE DEPOSITION OF DANIEL CHOW
12

13  DATE:            March 10, 2022
14  TIME:            10:06 a.m.
15  LOCATION:        Rockville, Maryland
16  REPORTED BY:     Shari R. Broussard, RPR, CSR
                     Reporter, Notary
17

18

19

20

21           Veritext Legal Solutions
             1250 Eye Street, NW, Suite 350
22               Washington, D.C. 20005

```
 1                A P P E A R A N C E S
 2      On behalf of Plaintiff:
 3            MICHAEL E. ROSMAN, ESQUIRE
              MICHELLE A. SCOTT, ESQUIRE
 4            Center for Individual Rights
              1100 Connecticut Avenue, Northwest
 5            Suite 625
              Washington, D.C. 20036
 6            (202) 833-8400
              rosman@cir-usa.gov
 7
        On behalf of Defendants:
 8
              CHRISTINE DINAN, ESQUIRE
 9            JULIET GRAY, ESQUIRE
              ANDREW BRANIFF, ESQUIRE
10            Department of Justice
              Civil Rights Division
11            Employment Litigation Section
              150 M Street, Northeast
12            Washington, D.C. 20530
              christine.dinan@usdoj.gov
13            juliet.gray@usdoj.gov
              andrew.braniff@usdoj.gov
14
15      ALSO PRESENT:
16            Josephine Arnold, Esquire, MBDA
17
18
19
20
21
22
```

Case 2:20-cv-00041-DCLC-CRW   Document 70-12   Filed 07/12/22   Page 3 of 22
PageID #: 2611

1                   C O N T E N T S

2    EXAMINATION BY:                              PAGE

3        Counsel for Plaintiff                4, 113

4        Counsel for Defendant                   109

5

6

7    CHOW DEPOSITION EXHIBITS:    *              PAGE

8  Exhibit  1   Curriculum Vitae                  5

9  Exhibit  2   Executive Order 12432             15

10 Exhibit  3   Update to the Assessment of Contracting

            Outcomes for Small Disadvantaged

11          Businesses, 2/7/22                    33

12

13

14

15

16

17

18

19

20

21

22    (* Exhibits attached to transcript.)

1    thing.

2        Q    Okay.  So to get in the SAM database,

3    does a company need to do anything more than

4    simply register for it?

5        A    That's my understanding, yes.

6        Q    Okay.  What kinds of information about

7    the company other than the two or three things

8    that you just identified, what kinds of

9    information does it contain about the company?

10       A    It also contains their -- not only their

11   business info but their -- their CAGE codes, their

12   DUNS numbers, mostly administrative data, that

13   sort of thing.

14       Q    Can you just explain what a CAGE code

15   is?

16       A    A CAGE code is a government identifier.

17   I believe it's a number used to identify -- simply

18   to uniquely identify a company.  I think it was

19   used by the Department of Defense several years

20   ago.  It is -- it is used to help identify

21   companies.

22       Q    CAGE stands for Commercial and

1    speculation.

2           MR. ROSMAN:  I asked if he knows.

3           THE WITNESS:  My best guess is that SBA

4    does some minimum level of checking to ensure that

5    the data is consistent, that there are no mistakes

6    in the submitted data, but I'm not aware of any

7    federal agency that checks this data -- any other

8    agency.

9    BY MR. ROSMAN:

10      Q    Does the SAM database have information

11    about a company's number of employees?

12      A    I believe so, yes.

13      Q    Does it have information about a

14    company's annual revenues?

15      A    I -- I'm not sure.  It is possible.  I'd

16    have to recheck that.

17      Q    Okay.  Do you know if there is any fee

18    for registering in the SAM database?

19      A    I don't believe there is a fee.

20      Q    So for the company it is essentially

21    free; is that right?

22      A    To my understanding, yes.

1    to get at that three-digit code.

2        Q    No, I think I understand it.  Okay.  I

3    think we sort of understand each other now.

4            Does the FPDS database identify which

5    agency awarded a specific contract?

6        A    I don't know the answer to that.  I

7    didn't look at that that deeply as -- as to

8    whether that occurred and with the variables that

9    I was given, which may be a subset of all the

10   possible variables for the FPDS, I did not see a

11   particular field for agency.

12       Q    Okay.  So you didn't do any specific

13   analysis for the Defendant, U.S. Department of

14   Agriculture; is that right?

15       A    Correct.

16       Q    Okay.  I'm going to ask some questions

17   about both databases now.  I asked this about I

18   think the SAM database before, but let me make

19   sure I understand.

20           Did either of the databases -- let's

21   just say any of the data- -- did any of the

22   databases tell you whether a registrant had bid on

1   a federal contract and not received it?

2        A    I have no knowledge of whether they bid

3   or did not bid on a contract.  What I do --

4        Q    Okay.

5        A    What I do have is -- what I do have is

6   some count of contracts, but I don't have any bid

7   data as far as I know.  I've not seen anything

8   called bid.

9        Q    Is there anything in either of the two

10  databases or any of the databases that you looked

11  at which would tell you whether a specific

12  registrant was eligible to bid on a contract?

13       A    No.  I didn't look at -- I did not see

14  any field that talked about eligibility criteria

15  for bidding.

16       Q    Okay.  Were there any entries in the

17  FPDS database that provided contract data that did

18  not match up with a registrant in the SAM

19  database?

20       A    No, I did not look so deeply, but we --

21  I used the DUNS number or CAGE code to match

22  registered firms with their counterpart in the

1    A    Yeah.  Perhaps, as an example, that firm

2    didn't report enough of its variables or that they

3    didn't re- -- register or recertify or they had

4    like a strange outlier variable.  Maybe they had

5    an employment of 10 million or something.  Yeah,

6    those kinds of things.

7    Q    Okay.  Anomalous entries; is that fair?

8    A    That's fair to say.  I call them

9    outliers.

10    Q    Outliers is good too.  Yes, thank you.

11    Okay.

12    So this Table 1 does not include all

13    minority-owned companies though; is that right?

14    A    Correct.  There is a "not classified"

15    entry here.  It was somehow marked as minority,

16    but we could not -- I could not attribute it to

17    one of the subcategories of Black, Hispanic, Asian

18    Pacific, and so forth.

19    Also the -- for the data, in response to

20    your question, in the data that I was provided,

21    you have to remember that is a sample based on

22    SBA, it is not a universal -- it is not a list of

1      A    Yes.  Correct.  As seen in Table 3, that

2    I have woman-owned and minority-owned odds ratios.

3      Q    Right.  But I guess what I was asking

4    was this:  Did you assess whether .899 was

5    statistically significantly different from .858?

6      A    No, I did not.  That would have required

7    a different type of study all together.

8      Q    Okay.  Okay.  So let me just ask you a

9    few questions about Tables 4 and 4a.

10          Table 4 gives us the odds of non-8(a)

11    SDBs and these would include SDBs that are owned

12    by non-minorities; is that right?

13      A    Yes.

14      Q    Okay.  And you didn't do any separate

15    analysis focusing solely on minority-owned

16    non-8(a) SDBs; is that right?

17      A    Correct, just minority in Table 4a.

18      Q    Right.  Right.  So let's move to

19    Table 4a.

20          MR. ROSMAN:  I'm sorry, I'm going to

21    have to ask the reporter to read back the last

22    question and answer.

1        (The reporter read the record

2         as requested.)

3   BY MR. ROSMAN:

4        Q    So in Table 4a we have the odds that

5   minority-owned businesses had.  And if I

6   understand this correctly, a little over half had

7   lower odds statistically although the majority of

8   that was not statistically significant and a

9   little under one-half had higher odds than the

10  average, but most of that was not statistically

11  significant.

12           Did I read that right?

13       A    I'm -- I'm sorry, I'm not following you.

14  Are you at Table 4a?

15       Q    I am.  So I'm looking under "Contracts,"

16  right, and we're looking at whether or not

17  minority-owned businesses had lower odds of

18  winning contracts or higher odds of winning

19  contracts, right?  And what I surmise from your

20  table is that for a bit over half of the contracts

21  minority firms had lower odds of obtaining the

22  contract and for a bit less than half of the

1    contracts minority-owned firms had higher odds

2    although in both cases the lower odds and higher

3    odds were primarily not statistically significant.

4              Did I read that right?

5         A    I think -- I think what you meant for

6    the -- for the category of lower odds -- did you

7    mean 63 percent or 66 to 67 percent, not

8    50 percent?

9         Q    No.  I was looking under "Contracts" not

10   "Awards."

11        A    Yes, I agree with your statement.

12        Q    Okay.  So when you did that analysis,

13   how would you determine what the odds ratio was on

14   a particular contract?

15        A    Okay.  Table 4a is a more aggregate

16   approach, it would not tell me -- it should not

17   indicate what the odds are of winning a particular

18   contract.  As you can see the three categories of

19   Industries, Awards and Contracts, these are gross

20   numbers and not particular contract types or

21   particular contracts for a given firm.

22        Q    Okay.  So then let me ask this next

Case 2:20-cv-00041-DCLC-CRW   Document 70-12   Filed 07/12/22   Page 12 of 22
PageID #: 2620

1    question, which is where it says that 16.9 percent

2    of the contracts had lower odds that were

3    statistically significant, how should we interpret

4    that number?

5         A    Okay.

6         Q    I mean you have a specific number of

7    contracts, 50,249, right?

8         A    Okay.  Yes.  So 16.9 percent means out

9    of all of the contracts of the 297,535, 50,249

10   were in the category of lower odds that -- that

11   statistically significant and that 50,249

12   represents 16.9 percent of all the 297,535.  It is

13   just a percentage figure.

14        Q    Well, I understand, but I'm asking where

15   the 50,000 comes from?

16        A    Right.  So the 50,000 comes from a piece

17   of the code that takes the p-values and looks --

18   and divides them into these four categories you

19   see here and those p-values are associated with

20   the number of contracts and a dollar award amount

21   by industry.  So as a -- as a whole, this is a

22   tabulation essentially.

1      Q    Okay.  So we shouldn't interpret this
2    table to mean that there was 21,195 contracts
3    under study where minority-owned firms had higher
4    odds that were statistically significant; is that
5    right?
6      A    Could you please repeat that question.
7    I was looking at my data.
8      Q    We shouldn't take Table 4a to mean that
9    there were 21,195 specific contracts for which
10   minority-owned businesses had higher odds that
11   were statistically significant?
12     A    Well, you should understand that there
13   are 21,195 contracts representing 7.1 percent of
14   all the contracts in this sample study that
15   were -- that had higher odds but were not
16   statistically significant.
17     Q    Were not?
18     A    I'm sorry.  Higher odds were
19   statistically significant, yes.  I looked at the
20   wrong line.
21     Q    Okay.  All right.  So -- okay.  Then I
22   was wrong.

Case 2:20-cv-00041-DCLC-CRW   Document 70-12   Filed 07/12/22   Page 14 of 22
PageID #: 2622

1         So these do represent numbers of

2     contracts for which the various categories you've

3     identified are true, right?

4         A    Yes, these are the results.

5         Q    Okay.  Did you do any analysis by

6     individual racial groups or ethnic groups?

7         A    Can you please explain a bit further.

8         Q    Well, did you do odd ratios for African

9     American-owned firms, for example?

10        A    No, I did not.

11        Q    Did you do odds ratios for

12    Hispanic-owned firms?

13        A    No, I didn't do that.

14        Q    Okay.  Is there any way to tell from

15    your analysis whether the lower odds ratios for

16    minority-owned firms generally reflects

17    particularly low odds for one specific ratio or

18    ethnic minority?

19        A    These results are aggregative and not

20    done by that level of breakout, so I would not

21    venture to guess how the odds ratios would

22    distribute themselves among those specific race

Case 2:20-cv-00041-DCLC-CRW   Document 70-12   Filed 07/12/22   Page 15 of 22
PageID #: 2623

1    and ethnicity categories.

2        Q    Okay.  Did you do any analysis to

3    determine why minority-owned firms had lower odds

4    ratios?

5        A    Not for this study, no, I -- I did not

6    get into that level of detail.

7        Q    Well, do you have an expert opinion as

8    to whether you can attribute the lower ratios that

9    you found through discrimination by a particular

10   actor?

11       A    "By a particular actor."  Can -- can you

12   clarify that?

13       Q    Sure.  Let's use the Federal Government

14   as our particular actor.

15            Do you have an expert opinion as to

16   whether or not your study of lower ratios can be

17   attributed to discrimination by the Federal

18   Government?

19       A    No.

20       Q    Okay.  And if I understand the analysis

21   correctly, one variable that was not used was

22   failure to bid, right?

Case 2:20-cv-00041-DCLC-CRW  Document 70-12  Filed 07/12/22  Page 16 of 22
PageID #: 2624

1      A     Correct, I have nothing in here about

2    bidding.

3      Q     Okay.  And so some of these odds might

4    be attributable to the fact that different groups

5    bid less often or more often?

6      A     Might be attributable, yes.

7      Q     Okay.  There's nothing in your analysis

8    that would eliminate that possibility; is that

9    right?

10      A     Correct.

11      Q     Okay.

12            MR. ROSMAN:  So, Christine, I'm not too

13    far from being done, but if you have a significant

14    amount of cross, then maybe we should take lunch

15    now and then come back and finish up in an hour or

16    so.  I just wanted to take your opinion about

17    that.

18            MS. DINAN:  I'm not sure.  I need to

19    look at my notes and I'd like to take a break

20    regardless before we do the cross, so the question

21    is whether you want to finish up and then take a

22    break or you want to take a break now.

1     Q     Well, okay, but I asked whether that

2     meant they were two and-a-half times more likely?

3     A     I would say so, yes.

4     Q     Okay.  And in an earlier part of your

5     report on page seven you say, "The odds of winning

6     a contract for SDBs who do not participate in the

7     8(a) program is about 37 percent less than for

8     other firms."  And I just want to make sure I

9     understand who the other firms are in this

10    context.

11    A     Okay.

12    Q     Would the other firms be 8(a) firms,

13    non-SDB firms, minority-owned firms that are not

14    SDB firms?  Is all of that in your calculation

15    there?

16    A     Yes.  This -- this result says that SDBs

17    that are not 8(a) are -- have odds ratios that are

18    less than one given that the other types of

19    firms -- in this case the other categories, the

20    8(a)s, the minority-owned, the women-owned, et

21    cetera -- are accounted for.

22    Q     Okay.  So the other firms in your

```
 1              CERTIFICATE OF NOTARY PUBLIC
 2          I, SHARI R. BROUSSARD, the officer before
 3      whom the foregoing deposition was taken, do hereby
 4      certify that the witness whose testimony appears
 5      in the foregoing deposition was duly sworn by me;
 6      that the testimony of said witness was taken by me
 7      in stenotype and thereafter reduced to typewriting
 8      under my direction; that said deposition is a true
 9      record of the testimony given by said witness;
10      that I am neither counsel for, related to, nor
11      employed by any of the parties to the action in
12      which this deposition was taken; and, further,
13      that I am not a relative or employee of any
14      counsel or attorney employed by the parties
15      hereto, nor financially or otherwise interested in
16      the outcome of this action.
17
18
19                           SHARI R. BROUSSARD
                         Notary Public in and for the
20                          District of Columbia
21
        My commission expires:
22      August 14, 2025
```

```
 1    Veritext Legal Solutions
      1250 Eye Street, Northwest
 2    Suite 350
      Washington, D.C. 20005
 3    (202) 857-DEPO
 4              E R R A T A   S H E E T
 5    Case Name:  Ultima Services Corporation vs. U.S.
                  Department of Agriculture, et al.
 6

      Witness Name:  DANIEL CHOW
 7

      Deposition Date:  Thursday, March 10, 2022
 8

      Job No.:   5117567
 9

      Page No.   Line No.     Change/Reason for Change
10
11
12
13
14
15
16
17
18
19    See attached declaration
20
21
                                            05/17/2022
      _____     _____
22    Signature                          Date
```

Case 2:20-cv-00041-DCLC-CRW  Document 70-12  Filed 07/12/22  Page 20 of 22
PageID #: 2628

# DECLARATION OF DANIEL CHOW

1. My name is Daniel Chow. I am over 18 years of age and a resident of Rockville, Maryland.

2. I am employed as a Senior Economist with the U.S. Department of Commerce, Minority Business Development Agency.

3. I prepared an expert report on behalf of the Defendants in *Ultima Services Corporation v. U.S. Department of Agriculture, et al*., Case No. 2:20-cv-00041-DCLC-CRW, which was finalized on February 7, 2022 [hereinafter "expert report"].

4. As I describe in the "Data Availability" section on page three of my expert report, I was provided with several datasets by the Small Business Administration (SBA) in order to complete my analysis: one dataset from SAM.gov, and two datasets from the Federal Procurement Data System (FPDS), one for small businesses and one for non-small businesses.

5. The dataset from SAM.gov contains 7,466,447 observations and 42 variables. It was contained in a file labeled "SAM_1904_2009_SB_D."

6. As I describe in my report, I combined the two FPDS datasets and removed redundant and extraneous observations to create one file which contains 5,659,740 registration observations and 64 variables. This file was labeled "Awards_Combined_FY19FY20_SBNonSB."

7. I then merged the combined FPDS dataset with the SAM.gov dataset and collapsed, sorted, matched, and removed duplicates to create a file that contains 1,259,129 observations and 50 variables. This file is labeled "FPDS_SAM_PPIRS_2019_2020_matching_Test4."

8. On March 10, 2022, I was deposed by Plaintiff's counsel, Michael Rosman.

9. In responding to questions from Mr. Rosman about the merging of datasets, I mistakenly agreed that I had combined the 42 variables from the SAM.gov dataset with the 55 variables from the FPDS dataset, resulting in a merged dataset that contained approximately 5.6 million observations and 64 variables, *see* Chow Deposition, 50:4-11, 59:12-61:15, when in fact, the dataset that contains approximately 5.6 million observations and 64 variables consists only of combined FPDS data, not SAM.gov data.

10. There were several steps in my analysis in which I combined datasets. Without the benefit of the documents and datasets that I relied upon to complete my analysis in front of me during the deposition, I could not recall with exact specificity the number of observations in each combined dataset or the titles of each file containing the relevant

datasets, and I misspoke. I did not intend to cause any confusion in explaining my process.

11. Before my expert report was produced to Plaintiff's counsel, it was peer reviewed by Elizabeth Perlman, Ph.D., Economist at the Center for Economic Studies, U.S. Census Bureau. Dr. Perlman concluded that my methodology and statistical analysis were sound.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____05/17/2022_____.

_____
Daniel Chow