# EXHIBIT 39

1          UNITED STATES DISTRICT COURT

2        FOR THE EASTERN DISTRICT OF TENNESSEE

3   *******************************************************

ULTIMA SERVICES CORPORATION,

4

                    Plaintiff,

5

6   -vs-                    Case No. 2:2020-cv-00041

7

U.S. DEPARTMENT OF AGRICULTURE, et al.,

8

                    Defendants.

9   *******************************************************

10      VIDEOCONFERENCED DEPOSITION OF HOWARD STOVER

11              Thursday, May 5, 2022

12                  10:02 a.m.

13              Pages 1 - 116

14

15

16

17

18

19          REPORTED BY:  KARINA L. JENNINGS

20

21

22

23

24

25

1

2    Videoconferenced deposition of HOWARD STOVER, taken

3    pursuant to Notice before Karina L. Jennings, Court

4    Reporter, and Notary Public for the Commonwealth of

5    Virginia.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    A P P E A R A N C E S

2

3      ON BEHALF OF THE PLAINTIFF:

4           MICHAEL E. ROSMAN, ESQUIRE

5           CENTER FOR INDIVIDUAL RIGHTS

6           1100 Connecticut Avenue, N.W., Suite 625

7           Washington, D.C.  20036

8           rosman@cir-usa.org

9

10

11     ON BEHALF OF THE AGENCY:

12          JULIET GRAY, ESQUIRE

13          U.S. DEPARTMENT OF JUSTICE

14               Civil Rights Division

15          150 M Street, N.E.

16          Washington, D.C.  20002

17          juliet.gray@usdoj.gov

18

19

20

21

22

23

24

25
```

Case 2:20-cv-00041-DCLC-CRW   Document 70-17   Filed 07/12/22   Page 4 of 21
PageID #: 2679

1    as my memory goes, I believe that is accurate.

2         Q     Okay.  But you did administer those

3    contracts, correct?

4         A     I did.

5         Q     Okay.  Now, during that same period of

6    time, were you actually soliciting contracts for

7    other services for NRCS?

8         A     Yes.

9         Q     Okay.  Just generally -- very generally

10   how would that process work?

11        A     Well, there's three main processes that

12   we use.  The first one is of course full and open

13   through the government public network, what at the

14   time was known as the business opportunities web

15   site, and -- to get on that web site -- for a

16   contractor to be -- to get a contract from that web

17   site or to participate in a solicitation, he only

18   needed to be registered with -- with SAM, so he

19   had -- had to be registered with the government, but

20   that was the only requirement.

21             The other type of contracts we did was

22   from the Federal Schedule, and for a contractor to be

23   awarded a contract from the Federal Schedule, he

24   already had to have a contract on the Federal

25   Schedule.

1           And the third procurement method we used

2    was through the 8(a) program, which we awarded

3    contracts to disadvantaged businesses.  And to be a

4    8(a) contractor, you had to be registered with the

5    Small Business Administration.

6           So basically those are the three tools

7    for use.  Once in a while something quirky would come

8    up, like for furniture we would use the prison

9    system, but by and large -- oh, excuse me -- there's

10   one more -- we would also use a Ability One, which is

11   for handicapped people, and it worked somewhat like

12   the 8(a) program.  But -- so basically those are the

13   methods we used to contract for services -- for

14   supplies and services.

15        Q    Okay.  Let me just ask you a question

16   about the Federal Supply Schedule.  You said in order

17   to obtain a contract pursuant to the Federal Supply

18   Schedule -- I thought what you said is you had to

19   have a contract with the Federal Supply Schedule, but

20   I may have misunderstood.

21        A    No, you didn't misunderstand.

22        Q    Okay.  How -- how do you get the first

23   contract with the Federal Supply Schedule, I guess is

24   my question?

25        A    Well, you call up the GSA and you tell

1      that time was named Allen Johnson.

2              Q       Allen Johnson?

3              A       Yes.

4              Q       Okay.  Thank you.  And was the option

5      for Region 4 exercised early?

6              A       I do recall it was, yes, shockingly

7      early.

8              Q       You thought it was shockingly early?

9              A       Yes.

10             Q       During this period of time that Ultima

11     was performing task orders under the IDIQ, did you

12     continue to communicate with permanent staff at the

13     NRC offices regarding Ultima's performance?

14             A       Yes.

15             Q       Do you recall which NRCS offices you

16     communicated with?

17             A       All of them.

18             Q       All of them?

19             A       All of them -- excuse me -- let me take

20     that back.  Every state where I was the

21     administrative contract officer over the task order,

22     I communicated with those states more or less on a

23     daily basis, and I've gotten feedback about the

24     Ultima contract, yes.

25             Q       And did they communicate to you their

Case 2:20-cv-00041-DCLC-CRW  Document 70-17  Filed 07/12/22  Page 7 of 21
PageID #: 2682

1    opinion of Ultima's performance in their office?

2         A    Yes.

3         Q    And generally speaking, what were their

4    comments about Ultima's performance?

5         A    Without exception, they were described

6    as outstanding or excellent.

7         Q    Did you have any involvement with the

8    decision to cancel the IDIQ contract?

9         A    No.

10        Q    Were you surprised when the IDIQ

11   contracts were canceled?

12        A    Yes.

13        Q    Okay.  Why?

14        A    It -- it seemed to be a win-win

15   situation for both the government, the contractor,

16   and the customers.  The contracts ran smoothly, there

17   was little turnover of personnel.  Ms. Bennett, the

18   owner of Ultima, had excellent rapport with the

19   customers.  It was -- it was a smooth sailing ship.

20             MR. ROSMAN:  So Michelle, if you could put

21   the decision memo into Exhibit Share.

22             MS. SCOTT:  Hang on just a second.

23             MR. ROSMAN:  We're going to test our

24   technological capabilities now, Mr. Stover.

25             THE WITNESS:  Okay.

Case 2:20-cv-00041-DCLC-CRW  Document 70-17  Filed 07/12/22  Page 8 of 21
PageID #: 2683

1      Q      Okay.  That's really what I was trying

2    to get at.  That's fine.  So did you speak with NRCS

3    personnel in Colorado about Ultima's performance

4    under this task order?

5      A      Several times.

6      Q      Oh, I'm sorry, I meant to -- was there a

7    task order prior to this one, the one that we just

8    looked at, so cover --

9      A      I don't remember.

10      Q      Okay.  Fair enough.  So what did the

11    NRCS person in Colorado communicate with you

12    concerning Ultima's performance in Colorado under

13    that task order?

14      A      Well, they went to the regional

15    conservationist, Mr. Astor Boozer, and had Mr. Boozer

16    call me to do -- change the termination around and to

17    give Ultima back the contract, because they were --

18    they were of the opinion that they could not -- that

19    Ultima had been a really good contractor and they did

20    not want to lose them.

21      Q      So now I'm going to just ask you about

22    your authority after the IDIQ contracts were

23    canceled.  If a task order had been issued pursuant

24    to the IDIQs prior to the time that you learned that

25    the IDIQs had been canceled, did you have the

1       A       Yeah, pretty much, yes.

2       Q       Well, just to close the loop here, let's

3   go out and take a look at Exhibit 12.  And can you

4   just identify this document for us?

5       A       Yes, this is the contract for the 8(a)

6   company, Time Systems, in Colorado.

7       Q       Okay.  Very good.  Thank you.

8           MR. ROSMAN:  Michelle, if you could put HI1

9   into Exhibit Share, that would be great.

10  BY MR. ROSMAN:

11      Q       While she's doing that, Mr. Stover, did

12  you give any thought -- let me rephrase the question.

13  Do you recall whether you considered the possibility

14  of trying to meet the requirements through a total

15  small business set aside in Colorado?

16      A       I don't remember what my thought process

17  was.

18      Q       Do you know someone named Randy Randall?

19      A       Yes, I know Mr. Randall.

20      Q       Did you ever have any conversations with

21  Mr. Randall about the requirement in Colorado for

22  administrative services?

23      A       Yes, Mr. Randall very much wanted to

24  keep the Ultima contract in place.  Him and the

25  Colorado state conservationist went to Mr. Astor

Case 2:20-cv-00041-DCLC-CRW  Document 70-17  Filed 07/12/22  Page 10 of 21
PageID #: 2685

1    Boozer, who was the regional conservationist, and

2    appealed to him to get me to change my mind and to

3    carry on with the Ultima contract.  But as I

4    explained to Mr. Boozer, that decision had already

5    been made by my higher headquarters.

6         Q     All right.  If you could look at Exhibit

7    13 now.  It's a little light.  I was wondering if

8    this is a document that you remember and/or can

9    identify?

10        A     Yeah, this looks like a -- this looks

11   like a answer to a question from a solicitation from

12   Hawaii where the contractor had called in and asked

13   for what was the contract price, who had the contract

14   before, and when did they have it, things of that

15   nature.

16        Q     Got it.  And did you -- is this

17   something you wrote?

18        A     I don't -- I don't remember.  I would

19   suppose I did.

20        Q     You're listed as the contracting officer

21   on the second page?

22        A     Well, yeah, that means I probably wrote

23   it, yeah.

24        Q     Okay.  That's really what I was trying

25   to get at.  So even if you don't remember, it's most

1    number is just an estimate, just -- just like you

2    would on a construction contract, you'd give this --

3    a magnitude of the services, just some kind of

4    ballpark figure of what you think the services should

5    cost.

6        Q    More generally, did you find that the

7    cost of using the 8(a) program were either higher or

8    lower than the costs of using Ultima under the IDIQ

9    contracts?

10       A    Generally speaking -- and not about

11    Ultima, just generally speaking -- 8(a) tends to be

12    higher because there's no competition.  You know,

13    you're comparing a -- you're offering up a sole

14    source contract to one person, and there's not a

15    bidding process.  Just by having a bidding process

16    makes the price lower.  So generally speaking, not

17    specifically to the Ultima contracts, the prices are

18    lower when you compete it.

19       Q    All right.  One more question about this

20    document.  I've noticed that a number of offerings

21    that you personally have done tend to be by e-mail;

22    is that right -- was that your tendency?

23       A    Yeah, I kind of evolved to that because

24    of when I first started at NRC -- well, I won't tell

25    any stories.  But because of my experience, I found

Case 2:20-cv-00041-DCLC-CRW  Document 70-17  Filed 07/12/22  Page 12 of 21
PageID #: 2687

1    Q    Oh, okay.  Good, good, good.  Thank you
2    for letting me know that.  You see under Hawaii
3    Administrative Services?
4    A    Yes, I'm seeing that.
5    Q    You see where it says question number 2?
6    A    Yes, I do.
7    Q    Okay.  And then just go one paragraph
8    below that, and just read the first sentence there.
9    A    Yes, that's accurate.
10   Q    Okay.  And is that -- so that was
11   accurate for the Hawaii contract.  Was it also true
12   for the Montana and Utah contracts?
13   A    Yes, everything came together, and it
14   was year end, and this is one of 25 contracts I was
15   working on.
16   Q    Okay.  And so there was -- the end of
17   fiscal year workload was a motivating factor in
18   utilizing the 8(a) program?
19   A    No, not -- not really, because my -- my
20   initial intent was to do full and open competition,
21   and what happened is that the response to the full
22   and open competition was overwhelming, I had over 22
23   pages of questions about the solicitations from
24   people who wanted to bid on it, and I just -- and I
25   would answer one set of questions, and the next

1    morning my e-mail would be filled with another box of
2    questions.  And we were getting closer and closer to
3    the end of the fiscal year, and that more than
4    anything else was the reason why I turned to the
5    8(a).  I simply just couldn't keep up with the amount
6    of questions being asked about these solicitations
7    with the year end coming.
8         Q    So how long does it generally take to
9    award a contract that is competitively bid upon
10   outside of the 8(a) program?
11        A    Well, that's -- it could take three
12   days, it could take three months.  I mean, it depends
13   on what the project is, what's the magnitude, the
14   moving pieces on it, the valuation process, who you
15   need to include in the valuation process, are you
16   going to be the sole -- are you going to be the sole
17   selection authority, are you going to have some sort
18   of valuation board that you have to make time to get
19   together to talk over the proposals?  And of course,
20   it depends on the amount of proposals you can get.
21   If you put out this wide administrative services and
22   you get two bids, you know, you could do it in an
23   afternoon.  But if you put it out and get 157 bids,
24   as I have received one time -- not for Hawaii, but
25   for another state -- it takes more of an effort to go

1

2    BY MR. ROSMAN:

3         Q       The contract says May 2017 to 2022.  Is

4    that unusual for the dates on the signatures to be a

5    year later than the start date of the contract, or

6    almost a year?

7         A       No, if I were to venture -- I would bet

8    that the -- the date itself is wrong, I would

9    venture, because as you said before, the IDID -- the

10   IDIQ contract did not start till 2018.  And this

11   specifically says it was using the LAPSS

12   administrative contract, which did not start till

13   2018.  So this date would have to be wrong.

14        Q       Okay.  So I'm still a little confused,

15   so let me make sure I understand it.  When do you

16   think the task order for Ultima to provide

17   administrative services for the NRCS offices in

18   Washington was issued?

19        A       Well, it would have had to have been

20   issued after the issuance of the IDIQ contract.

21        Q       So that would be 2017; is that right?

22        A       No, I mean -- I think it was -- I

23   thought it was 2018.  Was it 2017?

24        Q       I think we've discussed earlier --

25        A       I mean, I don't remember.  You know,

Case 2:20-cv-00041-DCLC-CRW   Document 70-17   Filed 07/12/22   Page 15 of 21
PageID #: 2690

1    you're asking me about something that happened, you
2    know, four or five years ago.  I mean, I'm sorry, I
3    don't remember the sequence.  And you know -- and
4    there are documents with mistakes in them, so I mean,
5    I don't -- I don't know what you want me to say, you
6    know, if -- it would appear from this that Ultima had
7    the contract, that the contract was ordered
8    terminated because they hit their ceiling, and that I
9    went to the 8(a) program and gave it to POWTEC, and
10   once POWTEC graduated, I passed it on to another
11   8(a) -- that would appear to be the sequence of
12   events to me.
13           Q     Okay.  So let's go back then to your
14   decision to award the requirement to POWTEC through
15   the 8(a) program.
16           A     Okay.
17           Q     Why did you do that?
18           A     Well, we've been through this once
19   before.  I went through this in painstaking detail
20   this morning about why I awarded to POWTEC.  Don't
21   you remember that?
22           Q     I think we were talking about a
23   different state.
24           A     No, we were talking about Washington
25   state.

Case 2:20-cv-00041-DCLC-CRW   Document 70-17   Filed 07/12/22   Page 16 of 21
PageID #: 2691

1　California was trying to do a sole source

2　justification to use Ultima on a bridge contract that

3　was going to last a year, I believe -- it may have

4　been six months, but I think it was a year.  You

5　showed me that document this morning.  We were not

6　talking about Washington.  We were talking about

7　California in terms of -- of that particular

8　contract.  And when I told you about POWTEC, we were

9　talking about the State of Washington.

10　　　　Q　　Okay.  All right.  So then let me just

11　make sure I understand your testimony.  You chose to

12　use the 8(a) program to provide NRCS offices in

13　Washington with administrative services because there

14　was a time crunch?

15　　　　A　　Yeah, absolutely there was a time crunch

16　in Washington.

17　　　　　　MR. ROSMAN:  Okay.  Very good.

18　　　　　　　All right.  Michelle, if you could

19　give me OR1 and OR2.  And you might as well do OR3 as

20　well.

21　BY MR. ROSMAN:

22　　　　Q　　Mr. Stover, if you could just take a

23　quick look at Exhibit 25.  Is this a document that

24　you can identify?

25　　　　A　　Yeah, looks like a request to go to the

Case 2:20-cv-00041-DCLC-CRW   Document 70-17   Filed 07/12/22   Page 17 of 21
PageID #: 2692

1      CERTIFICATE OF COURT REPORTER

2

3

4           I, Karina L. Jennings, do hereby certify

5      that I recorded verbatim the proceedings in the

6      aforementioned case on May 5, 2022.

7           I further certify that the foregoing pages,

8      numbering 1 through 116 inclusive, constitute a true,

9      accurate, and complete transcript of said

10     proceedings.

11          Given under my hand this 24th day of May,

12     2022.

13

                    _____

14

15     Karina L. Jennings, Court Reporter

16

17

18

19

20

21

22

23

24

25

1   Ultima Services Corporation  v. US Department Of Agriculture Et

2   Howard Stover (#5214347)

3                    E R R A T A   S H E E T

4   PAGE__6___ LINE___7___ CHANGE___ for to with _____

5   _____

6   REASON_____

7   PAGE__12__ LINE___11__ CHANGE____ USDA _____

8   _____

9   REASON_____

10  PAGE__14___ LINE___12__ CHANGE__ protection to production

11  _____

12  REASON_____

13  PAGE__7___ LINE___13__ CHANGE__admin to administration

14  _____

15  REASON_____

16  PAGE__109_ LINE__5___ CHANGE___ counseling to canceling

17  _____

18  REASON_____

19  PAGE__VARIOUS_ LINE_____ CHANGE___ see below _____

20  28 instances where I was quoted as saying "yeah" should be "yes"

21  REASON_____

22

23  _____   _____

24  Howard Stover                         Date

25

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

1   Ultima Services Corporation  v. US Department Of Agriculture Et

2   Howard Stover (#5214347)

3                   E R R A T A   S H E E T

4   PAGE__59__ LINE___24__ CHANGE____**farm to FAR**_____

5   _____

6   REASON_____

7   PAGE__65___ LINE__17__ CHANGE____**had to hadn't**_____

8   _____

9   REASON_____

10  PAGE__81___ LINE__11__ CHANGE_____**throw to federal**____

11  _____

12  REASON_____

13  PAGE___86__ LINE__23__ CHANGE_____**properly to improperly**

14  _____

15  REASON_____

16  PAGE__87___ LINE__6___ CHANGE__**stitch to stench**_____

17  _____

18  REASON_____

19  PAGE__92___ LINE__18__ CHANGE___**valuation to evaluation**

20  _____--_____

21  REASON_____

22

23  _____  _____

24  Howard Stover                          Date

25

```
1    Ultima Services Corporation  v. US Department Of Agriculture Et
2    Howard Stover (#5214347)
3                    ACKNOWLEDGEMENT OF DEPONENT
4        I, Howard Stover, do hereby declare that I
5    have read the foregoing transcript, I have made any
6    corrections, additions, or changes I deemed necessary as
7    noted above to be appended hereto, and that the same is
8    a true, correct and complete transcript of the testimony
9    given by me.
10
11   _____    23 June 2022
                                     _____
12   Howard Stover                        Date
13   *If notary is required
14                    SUBSCRIBED AND SWORN TO BEFORE ME THIS
15                    _____ DAY OF _____, 20____.
16
17
18                    _____
19                    NOTARY PUBLIC
20
21
22
23
24
25
```

Case 2:20-cv-00041-DCLC-CRW  Document 70-17  Filed 07/12/22  Page 21 of 21
PageID #: 2696