IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | | |
|---|---|---|
| ULTIMA SERVICES CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:20-cv-00041-DCLC-CRW |
| | ) | |
| U.S. DEPARTMENT OF AGRICULTURE, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN OPPOSITION TO**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff has not met its burden to establish that the 8(a) program is unconstitutional as a matter of law, either on its face or as applied here. As an initial matter, the undisputed facts show that Plaintiff does not have standing to challenge the 8(a) program. While the Court considered Defendants' *facial* challenge to Plaintiff's standing at the motion to dismiss stage, Plaintiff has not produced evidence to support the speculative allegations the Court was required to accept as true at that stage of the proceedings. In fact, Plaintiff now concedes that section 8(a) of the Small Business Act ("the Act") is race-neutral. Accordingly, it is undisputed that the only aspect of the 8(a) program that includes a race-conscious classification—and therefore the only aspect that is subject to strict scrutiny—is the SBA regulation's rebuttable presumption of social disadvantage for small business owners of certain racial and ethnic groups. Importantly, even in the absence of the regulation's rebuttable presumption, the federal government would continue to be able to set aside contracts for socially and economically disadvantaged businesses through the 8(a) program. Consequently, Plaintiff cannot show that a favorable ruling on its equal protection challenge would redress its inability to compete for contracts set aside for the 8(a) program.

Given that Plaintiff concedes, as it must, that the Act is race-neutral, it is left to argue that Congress could not have delegated to SBA the authority to promulgate a race-conscious regulation. In support of this assertion, Plaintiff implicitly argues that the SBA's implementation of the 8(a) program violates the nondelegation doctrine, even though Plaintiff never directly identifies such doctrine or sets forth its controlling legal principles in either its motion or Complaint. This argument, however, also fails, and has already been rejected by both the district and appellate courts in *Rothe Development, Inc. v. Department of Defense*, 107 F. Supp. 3d 183, 211-12 (D.D.C. 2015), *aff'd*, 836 F.3d 57, 73-74 (D.C. Cir. 2016). As discussed in greater detail below, the Act not only explicitly delegates to SBA the authority to make determinations as to social

1

disadvantage, but it also provides specific findings to aid the SBA in making such determinations.

Plaintiff's concession that the Act itself is race-neutral raises doubts about whether Plaintiff has actually asserted a valid facial challenge to the 8(a) program, or if it is limited only to an as-applied challenge. As the Supreme Court and the Sixth Circuit have recognized, "[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that *no set of circumstances* exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987) (emphasis added); *see also Dean v. McWherter*, 70 F.3d 43, 45 (6th Cir.1995). Plaintiff makes no attempt to meet this standard.

Rather than meeting the relevant legal and factual standards for mounting a facial challenge to the constitutionality of the 8(a) program, Plaintiff relies primarily on the Sixth Circuit's recent decision in *Vitolo v. Guzman*, 999 F.3d 353 (6th Cir. 2021). But since *Vitolo* involved an as-applied challenge to an entirely different piece of legislation, not a facial challenge, it is of little relevance in evaluating a facial challenge to the 8(a) program. *Id*. at 360. As for its as-applied challenge, Plaintiff fails to acknowledge crucial differences between the programs at issue here and in *Vitolo* and the limited record before the court in *Vitolo* on emergency motion for preliminary injunction. *Id.* at 358. Instead, Plaintiff simply contends that the court's findings in *Vitolo* automatically apply here. That is contrary to the careful and searching inquiry that strict scrutiny requires.

As a result of Plaintiff's misconception that the SBA, rather than Congress, is responsible for making the findings that support the 8(a) program, Plaintiff ignores the vast amount of evidence Congress has considered in support of the rebuttable presumption of social disadvantage and instead simply asserts that the SBA itself did not consider such evidence. Plaintiff's failure to even address—much less rebut—the evidence supporting the government's compelling interest in the 8(a) program is fatal to its motion for summary judgment, as is its superficial examination of the

2

narrow tailoring analysis. For these reasons, and those set forth below, the Court should deny Plaintiff's motion for summary judgment and uphold the constitutionality of the 8(a) program.

## I.    Plaintiff Does Not Have Standing to Challenge the 8(a) Program

Plaintiff bears the burden of establishing standing. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Plaintiff has failed to address any of the three elements of standing—injury in fact, traceability, and redressability—much less shown that it meets them. *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). While the Court initially addressed Plaintiff's standing in denying the Defendant's motion to dismiss, both a change in Plaintiff's position and facts that have arisen during discovery require Plaintiff's standing to be revisited.[1]

### A.    Plaintiff Cannot Establish an Injury in Fact Due to a Discriminatory Policy

To establish an injury in fact, plaintiff must have suffered "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal citations and quotations omitted). In an equal protection challenge to a race-conscious government contracting program, a plaintiff must allege "that it is able and ready to bid on contracts and that a *discriminatory policy* prevents it from doing so on an equal basis." *Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993) (emphasis added). Ultima contends that it has suffered an injury in fact because it remains "ready, willing, and able to bid on, and perform, contracts to provide administrative and technical support for NRCS," but the 8(a) program prevents it from

---

[1] *See* Fed. R. Civ. P. 12(h)(3) (providing that "if the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action"); *Lujan*, 504 U.S. at 561 ("Since [the standing requirements] are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation.").

doing so. Pl.'s Mem. Supp. Mot. Summ. J., Doc. 60-2 ("Pl. Mem.") at 16-17.

The evidence before the Court, and Plaintiff's own admission, does not support Plaintiff's claim that a discriminatory policy caused its inability to compete for contracts set aside for the 8(a) program. Where a plaintiff asserts a constitutional claim, the injury must be the deprivation of a constitutional right. *See Warth v. Seldin*, 422 U.S. 490, 500 (1975); *Cone Corp. v. Fla. Dep't of Transp.*, 921 F.2d 1190, 1204 (11th Cir. 1991). Plaintiff was ineligible for the 8(a) program based on its corporate structure and thus cannot identify a constitutional right it could possibly implicate.

Based on information learned in discovery, it is now undisputed that when Plaintiff filed its Complaint[2] (and at all times it claims to have been unable to compete for contracts awarded through the 8(a) program), Plaintiff was not a small business owned by an individual; rather, it was a subsidiary of another corporation. Def.'s Mem. Supp. Mot. Summ. J., Doc 62 ("Def. Mem.") at 4. The 8(a) program is limited to participants that are "at least 51 percent unconditionally and directly owned by one or more socially and economically disadvantaged *individuals* who are citizens of the United States . . . ." 13 C.F.R. § 124.105 (emphasis added). A business owned by another business entity, and not directly owned by an individual, does not count. *Id.* at § 124.105(a). Accordingly, Plaintiff was unable to compete for contracts set aside for the 8(a) program regardless of its owner's race.[3] Plaintiff therefore has not established an injury in fact. *See, e.g.*, *Yeager v. General Motors Corp.*, 265 F.3d 389, 395 (6th Cir. 2001); *Brunet v. City of Columbus*, 1 F.3d 390, 395 (6th Cir. 1993).

---

[2] "Standing to bring suit must be determined at the time the complaint is filed." *See Smith v. Jefferson Cnty. Bd. of Sch. Com'rs*, 641 F.3d 197, 206 (6th Cir. 2011); *see also*, *Lujan*, 504 U.S. at 569 n.4 (1992) (noting the Supreme Court's "longstanding rule that jurisdiction is to be assessed under the facts existing when the complaint is filed").

[3] It is also undisputed that Plaintiff could not have bid on many of these contracts because it did not qualify as a small business under the North American Industrial Classification System ("NAICS") codes applied to those contracts because it earned too much revenue. Pl. Mem. at 17.

Moreover, Plaintiff's contention that it was ready, willing, and able to bid on NRCS contracts is contradicted by Ultima's actual behavior. During the same period of time that Plaintiff complains it was unable to bid on 8(a) contracts to perform administrative or technical support services to NRCS, it could have bid on contracts to perform the same type of work for NRCS that were valued at over $10 million, yet it did not do so. *See* Ex. 1, Decl. of Amy Stonebraker ("Stonebraker Decl.") ¶. Plaintiff's assertion that it was ready, willing, and able to bid on the contracts that NRCS awarded through the 8(a) program in recent years is speculative at best considering it made no attempt to bid on similar contracts for which it was eligible to bid. *Id.*

Plaintiff's reliance on *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995), to support its standing argument is also unavailing. In *Adarand*, the plaintiff challenged a subcontractor compensation clause that gives prime contractors a financial incentive to hire subcontractors certified as small businesses controlled by socially and economically disadvantaged individuals, as defined by the SBA regulation at issue here. *Id.* at 212. The Court found the plaintiff had standing there because, not only did the evidence show that the plaintiff bid on every contract of the type at issue there (unlike Ultima, as discussed above), but the subcontractor compensation clause meant that the plaintiff bid on unequal footing against small disadvantaged businesses, which prime contractors received a financial incentive to hire. *Id.* Here, by contrast, Ultima does not compete for a benefit on unequal footing. Rather, it has removed itself from the competition entirely because of its corporate structure, not because of its owner's race.

### B.    A Favorable Ruling Will Not Redress Plaintiff's Alleged Injury

Because the 8(a) program can continue to exist without the regulation's presumption, Plaintiff cannot establish that it is "likely, as opposed to merely speculative," that its alleged injury will be redressed by a favorable decision. *Lujan*, 504 U.S. at 560-61 (internal quotations omitted).

5

The Complaint alleged that but for the presumption of social disadvantage, "fewer firms would qualify" for the 8(a) program and "Ultima would have far more opportunities to bid on contracting opportunities with USDA." Compl. ¶¶ 19-20. At the motion to dismiss stage, this Court noted that it was required to accept these allegations as true. Doc. 32, at 8 ("At this stage of the proceedings, however, the Court must construe the allegations in the complaint in the light most favorable to the plaintiff."). That is no longer the case. *See, e.g., Glob. Tech, Inc. v. Yubei (XinXiang) Power Steering Sys. Co., Ltd.*, 807 F.3d 806, 810 (6th Cir. 2015).

The parties have since engaged in extensive discovery, and Plaintiff has produced no evidence to support its speculation about what might happen if the presumption were eliminated. Def. Mem. at 34. The structure and purpose of the Act make clear that the 8(a) program would continue to exist even absent the presumption. Indeed, courts have found that the presumption is severable from the rest of the program. *See Cache Valley Elec. Co. v. State of Utah Dep't of Transp.*, 149 F.3d 1119, 1123 (10th Cir. 1998) (finding that "it would be pure speculation to conclude that invalidating the allegedly unconstitutional preferences would ameliorate plaintiff's ability to compete in any way . . . [because] "the disputed preferences are severable from the rest of the DBE program . . . [and] "the plaintiff has adduced no evidence that the elimination of the preferences would result in any meaningful reduction in the number of qualifying DBEs"); *Ellsworth Assocs., Inc. v. United States*, 926 F. Supp. 207, 210 (D.D.C. 1996) (finding the plaintiff lacked standing to challenge the 8(a) program because "even if the presumption were unconstitutional, the 8(a) Program . . . would remain intact. It would merely be shorn of the presumption . . . ."). *Cf. Vitolo*, 999 F.3d at 366 (enjoining only the race-conscious presumption based on how it interacted with the 21-day priority period, but leaving the 21-day priority period and the Restaurant Revitalization Fund in place). Plaintiff fails to address the severability of the

6

presumption and its effect on standing here. Accordingly, it cannot show how elimination of the presumption would redress its alleged injury since contracts would continue to be set aside for socially and economically disadvantaged business (which Plaintiff does not purport to be) even without the presumption.

This conclusion is not altered by the Sixth Circuit decision in *Vitolo*, 999 F.3d 353. Plaintiff contends that the *Vitolo* court "rejected an argument nearly identical to the one proffered by defendants here on their motion to dismiss." Pl. Mem. at 16. Namely, that the plaintiff in *Vitolo* did not have standing because it might not otherwise qualify for priority consideration for an SBA grant even absent the presumption. In *Vitolo*, however, the plaintiff was not challenging the entire statute nor seeking to abolish the entire RRF scheme. Rather, the plaintiff in *Vitolo* wanted to eliminate the presumption of disadvantage so that it could compete directly for a grant from the RRF. Accordingly, the Court found that precluding the SBA from using a race-based presumption of social disadvantage would redress the plaintiff's injury "[b]ecause the race of the applicant would not factor into the order in which applications were processed by SBA." *Vitolo*, 999 F.3d at 359. The analogous situation would be if Plaintiff was seeking to apply to participate in the 8(a) program and wanted to eliminate the race-based presumption so that it could compete on equal footing with other applicants. But Plaintiff does not want to apply for the 8(a) program. Rather, Plaintiff wants to eliminate the 8(a) program in its entirety, or at least to prevent the USDA from setting aside administrative and technical support contracts through the 8(a) program. But unlike *Vitolo*, eliminating the race-based presumption would not level the playing field for Plaintiff. Rather, the 8(a) program will continue to exist, and Defendants will continue to be able to set aside contracts for 8(a) participants, because the race-based presumption is just one existing method for small business owners to qualify as socially disadvantaged. *See* 13 C.F.R. § 124.103(c)(1).

## II.     The 8(a) Program Does Not Violate the Nondelegation Doctrine

Plaintiff asserts that the SBA lacked authority to "impose a racial presumption" and that "even if Congress had delegated such authority, the statute lacks sufficient guidance for the SBA to exercise it." Pl. Mem. at 17-20. Without explicitly stating it or addressing the relevant legal standards, Plaintiff essentially argues that SBA's implementation and enforcement of the 8(a) program violates the nondelegation doctrine. The court in *Rothe* rejected this argument, and it fails here as well for the same reasons. *See* 836 F.3d at 73-74.

### A.     Courts Rarely Second-Guess the Degree of Policy Judgment Congress Delegates to Agencies

The nondelegation doctrine stems from the Constitution's Article I clause that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. CONST. art. I § 1. Courts have interpreted this provision as restricting Congress's ability to "transfer" its legislative powers to another branch, *Wayman v. Southard*, 23 U.S. 1, 45 (1825), while allowing it to confer "substantial discretion on executive agencies to implement and enforce [] laws." *Gundy v. United States*, 139 S. Ct. 2116, 2119 (2019) (plurality opinion). Whether such a delegation is authorized turns on whether Congress has provided, by statute, an "intelligible principle" for an agency to exercise its delegated authority. *See Mistretta v. United States*, 488 U.S. 361, 372 (1989); *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 474 (2001). This is a question of statutory interpretation, which must account for the text of the statute, as well as its context, purpose, and history. *See, e.g.*, *Gundy*, 139 S. Ct. at 2123-24 (considering the "context, purpose, and history" of a statute to determine that the Attorney General's discretion was properly delegated).

The Supreme Court has routinely upheld "Congress' ability to delegate power under broad standards." *Mistretta*, 488 U.S. at 373; *see also Gundy*, 139 S. Ct. at 2130. Even in "sweeping regulatory schemes," the Supreme Court has "never demanded . . . that statutes provide a

8

determinate criterion for saying how much of the regulated harm is too much . . . [or] how imminent was too imminent, or how necessary was necessary enough." *Whitman*, 531 U.S. at 475. Significantly, the Supreme Court has "almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law," and only twice has the Court found the "intelligible principle" lacking."[4] *Id.* at 474-75 (citing *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 541-52 (1935) (declaring an "unconstitutional delegation of legislative power" where an act supplied no standards or rules of conduct for agency to follow) and *Panama Refining Co. v. Ryan*, 293 U. S. 388, 430 (1935) (finding that "Congress [] declared no policy, [] established no standard, [and] laid down no rule" regarding the transportation of petroleum under the National Industrial Recovery Act). Thus, to succeed, Plaintiff must prove that Congress failed to provide an "intelligible principle" for SBA to make these determinations. Plaintiff cannot meet this burden.

### B.    Congress Delegated Authority to Regulate the 8(a) Program to the SBA

When Congress conferred authority upon SBA through 15 U.S.C. § 637(a), Congress

---

[4] Recent cases where the Supreme Court and the Sixth Circuit have held that agencies exceeded their statutory authority because they implicated "major questions" of "deep economic and political significance," are not relevant here. *See West Virginia v. EPA*, --- S. Ct. ---, 2022 WL 2347278, at *18 (2022) (concluding that the EPA's attempt to regulate carbon dioxide emissions at a level that would "force a nationwide transition away from the use of coal" exceeded its authority under the Clean Air Act); *see also Nat'l Fed'n of Indep. Bus. v. DOL, OSHA*, 142 S. Ct. 661, 666 (2022) (holding that OSHA exceeded its statutory authority when it issued a nationwide vaccination mandate for employers with more than 100 employees because the agency is charged with regulating occupational dangers, not public health); *id.* (Alito, J., concurring) (asserting that OSHA's vaccination mandate for 84 million was unprecedented and untethered to the workplace); *Tiger Lily, LLC v. HUD*, 5 F.4th 666, 673 (6th Cir. 2021) (finding that the CDC lacked statutory authority to implement a nationwide eviction moratorium). Plaintiff has made no suggestion that this case involves a "major question," and it clearly does not under the Supreme Court authority defining what constitutes a major question. *See, e.g.*, *West Virginia*, 2022 WL 2347278, at *13. The SBA's administration of the 8(a) program, which dates back to 1978 and has twice withstood judicial scrutiny, can hardly be considered novel, unprecedented, or untethered to the SBA's purpose of assisting small businesses in obtaining access to government contracting.

9

provided SBA with "an intelligible principle" by which the agency was "directed to conform." *See Whitman*, 531 U. S. at 472 (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)). Indeed, 15 U.S.C. § 637(a) and the accompanying congressional findings in 15 U.S.C. § 631(f) contain ample information to guide SBA's decision-making pursuant to its delegated authority to support the development of disadvantaged small businesses. Specifically, section 637(a)(5) of the Act sets forth the definition of "socially disadvantaged individuals" as "those who have been subject to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities." 15 U.S.C. § 637(a)(5). Section 637(a)(1)(8) then explicitly delegates to the SBA the authority to make determinations as to which groups meet this definition. *Id.* § 637(a)(1)(8) ("All determinations made pursuant to paragraph (5) with respect to whether a group has been subjected to prejudice or bias shall be made by the Administrator [of the SBA] after consultation with the Associate Administrator for Minority Small Business and Capital Ownership Development.").

The Act then provides further guidance for making such determinations by making specific findings that "many . . . persons are socially disadvantaged because of their identification as members of certain groups that have suffered the effects of discriminatory practices or similar invidious circumstances over which they have no control" and then specifically providing that "such groups include, but are not limited to, Black Americans, Hispanic Americans, Native Americans, Asian Pacific Americans, Native Hawaiian Organizations; and other minorities." 15 U.S.C. § 631(f)(1)(B), (C). In stating that the relevant groups "include, *but are not limited to*" and in including "and other minorities" along with those specifically listed, Congress could not be more clear that it expects the SBA to make additional determinations as to groups whose members have suffered from discrimination. *Id.* (emphasis added). Certainly, this statutory context provides

10

far more guidance to SBA than the intelligible principles the Supreme Court has found adequate in statutes merely "authorizing regulation in the public interest" or "in a way that is fair and equitable." *See Whitman*, 531 U.S. at 474 (citing cases); *see also Gundy*, 139 S. Ct. at 2129 (same).

### C.      Plaintiff's Nondelegation Arguments Are Belied by the Record

Plaintiff makes three contentions to support its nondelegation argument: (1) the SBA does not claim the authority to impose race-conscious preferences; (2) section 8(a) of the Act does not provide authority for the regulation because it is race-neutral; and (3) Congress's finding that "many" persons are socially disadvantaged due to their race does not mean "*every* member of those groups should be *presumed* to be socially disadvantaged." Pl. Mem. at 17-19. Each of these positions is unsupported by the record and the statutory text and purpose.[5]

First, to support its assertion that the SBA does not claim the authority to impose a race-conscious preference, Plaintiff cites the 30(b)(6) deposition testimony of John Klein, SBA's Acting Deputy General Counsel and Associate Counsel for Procurement Law. Pl. Mem. at 18. But Mr. Klein said nothing of the kind. To the contrary, he testified that the SBA gets its authority for the presumption from Section 2(f) of the Small Business Act and that "SBA follows Congress's intent for us." *Id.* In response to Plaintiff's counsel's continued questioning as to whether SBA had made its own findings, Mr. Klein explained that it was the responsibility of Congress to make those findings. *Id.*[6] Thus, SBA explicitly asserts that Congress made findings and then delegated

---

[5] Plaintiff's reliance on *Michigan Road Builders Ass'n, Inc. v. Milliken*, 834 F.2d 583 (6th Cir. 1987), to argue that the SBA lacks authority to carry out its statutorily conferred mandate is misplaced as *Michigan Road Builders* does not address the nondelegation doctrine. Plaintiff cites to *Michigan Road Builders* solely for the proposition that the court determined that the Michigan legislature was authorized to act to ameliorate the effects of past discrimination. 834 F.2d at 586 n.4. But this determination says nothing about whether Congress had authority to authorize the SBA to act to ameliorate the effects of past discrimination through the 8(a) program.

[6] Mr. Klein explained:

to it the authority to promulgate the race-conscious presumption in 13 C.F.R. § 124.103(b)(1).

Second, Plaintiff asserts that "the 8(a) statute itself is race-neutral." Pl. Mem. at 17 (*citing Rothe*, 836 F.3d at 61). Plaintiff then assumes the conclusion that if the Act is race-neutral, Congress *per se* could not have sufficiently delegated to the SBA the authority to promulgate a race-conscious presumption. *Id.* at 19-20. But one conclusion does not necessarily lead to the next. In *Rothe*, the D.C. Circuit rejected the plaintiff's argument that Congress's findings in the Act created the presumption in the Act (as opposed to the regulation) that all individuals who are members of certain racial groups are socially disadvantaged. *See Rothe*, 836 F.3d at 65. This was at least in part because the applicable language was not located in the operative provisions of the Act that sets forth the program's terms but instead in the findings section. *Id.* at 66. But in determining whether an agency's discretion was properly delegated by Congress, courts consider the "context, purpose, and history" of a statute, which includes its findings, and not just its operative provisions. *See Gundy*, 139 S. Ct. at 2123-24; *see also Radio Ass'n on Def. Airwave Rights, Inc. v. U.S. Dep't of Transp.*, 47 F.3d 794, 802, 806, 809 (6th Cir. 1995) (looking to the Motor Carrier Act's purpose to determine that agency did not exceed its regulatory authority). Thus, in implementing the 8(a) program, it is appropriate for SBA to look to Congress's findings that "many . . . persons are socially disadvantaged because of their identification as members of certain groups that have suffered the effects of discriminatory practices" as well as Congress's

---

> [A]s you know, Congress found that it's important that disadvantaged individuals are part of the economy in order to have a functioning economy and that many people are disadvantaged because of their identification as members of certain groups. Congress has made these findings. And then Congress also found that these groups include, and they set forth certain groups. So, are you asking should SBA ignore Congress's findings? I don't think that's the appropriate response of what SBA should do. We should follow Congress's findings in that regard.

Pl. Mem. at 18.

findings as to specific groups. 15 U.S.C. § 631(f)(1)(B), (C).

To further obfuscate the matter, Plaintiff then interprets these findings to conclude that Congress actually meant that *many*, but not *all*, members of certain groups are socially disadvantaged because of their identification as members of such groups. Pl. Mem. at 19. This is a strained reading of the statute without support in the legislative history. The most straightforward reading of Congress's finding is that other persons may be socially disadvantaged for reasons other than their identification as members of certain groups. Indeed, this is why the SBA's regulations permit individuals of any racial or ethnic group to qualify as socially disadvantaged and allow the presumption to be rebutted for other groups. *See* 13 C.F.R. § 124.103(c). But even accepting Plaintiff's tortured reading that Congress's reference to "many" persons does not mean that "every" member of a particular group is socially disadvantaged, this does not change the fact that SBA was well within its authority in establishing the rebuttable presumption of disadvantage for all members of particular groups. The Supreme Court is clear that a remedial program may reach those not individually subjected to discrimination. *See, e.g.*, *Local 28 of Sheet Metal Workers' Int'l Ass'n v. EEOC*, 478 U.S. 421, 482 (1986) (upholding order "benefitting individuals who are not the actual victims of discrimination").

Significantly, the SBA regulation setting forth the rebuttable presumption of social disadvantage has been in effect for over 35 years. *See* Pl. Mem. at 6 (*citing* 51 Fed. Reg. 36144 (Oct. 8, 1986)). The fact that Congress has not "corrected" SBA's implementation of the 8(a) program despite ample opportunity to do so is strong evidence of congressional approval. *See, e.g.*, *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 535 (1989), *superseded by statute on other grounds as stated in Fox v. Pittsburg State Univ.*, 257 F. Supp. 3d 1112, 1124 (D. Kan. 2017) ("Where 'an agency's statutory construction has been 'fully brought to the attention of the public and the

Congress,' and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned.") (quoting *United States v. Rutherford*, 442 U.S. 544, 544 n. 10 (1979)); *Haig v. Agee*, 453 U.S. 280, 300-01 (1981) (inferring congressional approval of a "longstanding and officially promulgated" executive policy from both inaction and statutory developments that "'left completely untouched the broad rule-making authority granted in the earlier Act.'") (quoting *Zemel v. Rusk*, 381 U.S. 1, 12 (1965)).

## III.    <u>Legal Standard and Burden of Proof</u>

It is undisputed that the regulation's rebuttable presumption is subject to strict scrutiny. This means it must be narrowly tailored to further a compelling governmental interest. *See Adarand*, 515 U.S. at 227. While strict scrutiny is a demanding standard, the Supreme Court has "dispel[led] the notion" that it is "strict in theory, but fatal in fact." *Id.* at 237. Moreover, the Supreme Court emphasized that "[s]trict scrutiny does not 'trea[t] dissimilar race-based decisions as though they were equally objectionable,' . . . to the contrary, it evaluates carefully all governmental race-based decisions *in order to decide* which are constitutionally objectionable and which are not." *Id.* at 228. The Supreme Court went on to explain that

> strict scrutiny *does* take 'relevant differences' [between programs] into account—indeed that is its fundamental purpose. The point of carefully examining the interest asserted by the government in support of a racial classification, and the evidence offered to show that the classification is needed, is precisely to distinguish legitimate from illegitimate uses of race in governmental decision-making.

*Id.* Plaintiff pays no heed to this guidance and instead relies on precedent without acknowledging crucial distinctions between the facts and circumstances of cases.

Some dispute exists over which party bears the ultimate burden of proof. While Plaintiff contends that the government bears the burden of proof, Defendants aver, and Supreme Court and

Sixth Circuit precedent make clear, that the government only "bears the initial burden of demonstrating" that a race-conscious remedial program is constitutional. *Rutherford v. City of Cleveland*, 179 F. App'x 366, 373-74 (6th Cir. 2006) (citing *Associated Gen. Contractors of Ohio v. Drabik*, 214 F.3d 730, 735 (6th Cir. 2000)). However, "[t]he ultimate burden remains with the [party challenging the program] to demonstrate the unconstitutionality of an affirmative-action program." *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 277-78 (1986); *see also Aiken v. City of Memphis*, 37 F.3d 1155, 1162 (6th Cir. 1994) ("The party challenging the [race-based affirmative action] plan, however, retains the ultimate burden of proving its unconstitutionality."). In any case, this is a question of law that does not preclude summary judgment.

## IV.    A Compelling Interest Supports the 8(a) Program

Under the applicable legal standards, Plaintiff is not entitled to summary judgment on either its facial or as applied challenge because Plaintiff has not met its burden to show the absence of any genuine issue of material fact concerning the constitutionality of the 8(a) program.

### A.    Plaintiff Cannot Succeed on its Facial Challenge to the 8(a) Program

#### 1.    Plaintiff does not address the correct legal standard for a facial challenge

To the extent Plaintiff brings a facial challenge to the 8(a) program, "it must be rejected unless there exists no set of circumstances in which the statute can constitutionally be applied." *Dean*, 70 F.3d at 45. Plaintiff does not address this standard, much less attempt to meet it. Plaintiff relies primarily on *Vitolo* to evaluate its constitutional challenge, but *Vitolo* did not involve a facial challenge. 999 F.3d 353 at 360. The plaintiff in *Vitolo* was not trying to abolish the SBA's Restaurant Revitalization Fund ("RRF") (or the American Rescue Plan Act that created it) as Plaintiff seeks to do here with respect to the 8(a) program. *Id.* at 358. To the contrary, the plaintiff in *Vitolo* hoped to obtain a grant from the RRF and wanted to eliminate the racial presumption of

15

social disadvantage so that it could compete equally for a grant. *Id.* Thus, the plaintiff in *Vitolo* was not required, nor would have wanted, to establish that "no set of circumstances" exists under which the RRF would be valid. *Id.*

The Sixth Circuit has observed that "facial challenges are disfavored for three reasons." *Phelps-Roper v. Strickland*, 539 F.3d 356, 361 (6th Cir. 2008). "First, '[c]laims of facial invalidity often rest on speculation. As a consequence, they raise the risk of premature interpretation of statutes on the basis of factually barebones records.'" *Id.* (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008)). Here, Plaintiff's brief consists largely of speculation and not record evidence. *See, e.g.*, Pl. Mem. at 30 (speculating that "it is at least possible that some groups might no longer need the presumption"). "Second, facial challenges 'run contrary to the fundamental principle of judicial restraint that courts neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.'" *Phelps-Roper*, 539 F.3d at 361. Here too, Plaintiff has not presented the Court with sufficient evidence to determine that no set of circumstances exists under which the 8(a) program would be valid. "Third, 'facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution.'" *Id.* Indeed, in the 35 years that the 8(a) program has been in its current form, Congress has made no effort to eliminate the program, and courts have continuously upheld it and similar contracting programs.

### 2. The 8(a) program is supported by a strong basis in evidence

Plaintiff fails to even address—much less rebut—the substantial evidence before Congress at the time the 8(a) program was enacted and amended, which supports the government's compelling interest in remedying race discrimination in public contracting. This evidence is set

16

forth in Defendants' Memorandum of Law in Support of its Motion for Summary Judgment. *See* Def. Mem. at 10-12. As courts have consistently held, this legislative history amply demonstrates that Congress had a strong basis in evidence to conclude that a race-conscious remedy was necessary prior to the enactment of the 8(a) program, including specific findings as to discrimination faced by members of the presumptively-disadvantaged minority groups. *See Rothe*, 107 F.Supp.3d at 208; *Dynalantic Corp. v. United States DOD*, 885 F. Supp. 2d 237, 272 (D.D.C. 2012); *see also* Def.'s Stmt. of Facts, Doc. 63 ("SOF") ¶¶ 23-28. Crucially, "Congress's fact-finding process is generally entitled to a presumption of regularity and deferential review." *DynaLantic,* 885 F. Supp. 2d at 251. Instead of contending with this evidence, Plaintiff dismisses it wholesale as "too remote" and consisting "mostly of evidence of disparities" rather than discrimination. Pl. Mem. at 21-22. Neither contention is supported by the record nor the legal standard applicable to reviewing it.

### a. Only the regulation's presumption is subject to strict scrutiny

To the extent that Plaintiff still purports to challenge the entire 8(a) program, as it insisted in its opposition to the Defendants' motion to dismiss, and not just the rebuttable presumption of disadvantage, Plaintiff's acknowledgement that the statute is race-neutral means that the statute itself is not subject to strict scrutiny.[7] Instead, because Plaintiff concedes that the operative provisions establishing the terms of the 8(a) program are race-neutral, that means the 8(a) program

---

[7] Although not explicitly argued in its motion, to the extent Plaintiff asserts that the entire program is subject to strict scrutiny because the Act has a goal of remedying the effects of discrimination or includes findings that certain groups have faced discrimination, 15 U.S.C. § 631(f)(1)(B), that argument should be rejected. As the Supreme Court has observed, "mere awareness" or consideration of race does not itself constitute a racial classification. *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.,* 576 U.S. 519, 545 (2015). Nor does a goal of remedying racial disparities itself trigger strict scrutiny. *See Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1,* 551 U.S. 701, 789 (2007) (Kennedy, J., concurring). It is only when a racial classification is employed that strict scrutiny applies. *Id.*

17

without the rebuttable presumption would be subject to rational basis review. The 8(a) program "easily" survives this standard. *See Rothe*, 836 F.3d at 73. As noted by the *Rothe* court, "[t]he statute aims to remedy the effects of prejudice and bias that impede business formation and development and suppress fair competition for government contracts." *See id.* (citing S. Rep. No. 95-1070, at 2). The court concludes that "[c]ounteracting discrimination is a legitimate interest; indeed, in certain circumstances, it qualifies as compelling . . . [a]nd the statutory scheme is rationally related to that end." *Id.*

### b. The Sixth Circuit looks to pre-enactment evidence to evaluate the strong basis in evidence

In determining whether a race-conscious program survives strict scrutiny, the Sixth Circuit requires that courts look at what evidence the entity enacting the program had at the time of the enactment. *See Rutherford*, 179 F. App'x at 376; *Drabik*, 214 F.3d at 736-38. While Plaintiff acknowledges this, *see* Pl. Mem at 22, it nevertheless dismisses such evidence as too remote to provide a strong basis in evidence for the 8(a) program.

Plaintiff observes that in *Drabik*, the Sixth Circuit noted that "this court has ruled that seventeen-year old evidence of discrimination is 'too remote to support a finding of compelling government interest to justify the affirmative action plan." 214 F.3d at 735 (citing *Brunet*, 1 F.3d at 409). What Plaintiff fails to inform the Court is that the evidence at issue in *Brunet* was already 17 years old *at the time the statute was enacted. See Brunet*, 1 F.3d at 409. Moreover, the court found that, in *Brunet*, in all of the legislative history relating to the enactment of the MBEA "there is not one clear, unambiguous statement of a finding of discrimination to be found." *Drabik*, 214 F.3d at 735. That is plainly not the case here. *See* Def. Mem. at 10-12. Neither *Brunet* nor *Drabik* stand for the proposition that evidence that supported the enactment of a race-conscious provision eventually becomes too stale to establish a strong basis in evidence. As Plaintiff acknowledges,

18

courts in the Sixth Circuit do consider recent evidence, but that is in connection with the necessity for the program prong of the narrow tailoring analysis. *See* Pl. Mem. at 22.[8] Consequently, the cases Plaintiff cites do not support the proposition that courts should simply ignore the evidence that justified the program at the time of its enactment, and it is contrary to Sixth Circuit authority. *See Rutherford*, 179 F. App'x at 376. To the extent the Court deems it appropriate to consider such evidence in connection with the strong basis in evidence, Defendants have presented abundant post-enactment evidence in their Memorandum. Def. Mem. at 13-21.

### c. Evidence shows the federal government has played a role in perpetuating discrimination against minority-owned businesses

Plaintiff contends that Defendants do not "identify any *specific* episodes of *intentional* discrimination." Pl. Mem. at 21-22. This is not true. As discussed in Defendants Memorandum, Congress had substantial evidence of the federal government's participation in the pervasive discrimination against MBEs at the time it enacted and amended the 8(a) program. *See, e.g.*, Def. Mem. at 11 (citing congressional notice of a report regarding barriers faced by MBEs in government contracting, which found that contracting officers often exhibited bias toward MBEs, expressing beliefs that they are "inefficient, sloppy, lacking in business acumen and knowledge of government processes, or are 'just a lot of extra bother'"); *id.* at 12 (discussing congressional testimony concerning "outright blatant discrimination directed at disadvantaged and minority business people by majority companies, financial institutions, and government at every level").[9]

---

[8] Despite acknowledging the relevance of current statistics to the narrow tailoring analysis, Plaintiff fails to address the abundant recent evidence of discrimination against MBEs, statistical or otherwise.

[9] Plaintiff's assertion that Defendants must present specific evidence of intentional discrimination by the USDA does not apply to its facial challenge. The 8(a) program applies to the federal government as a whole. This means that Plaintiff must show that there is no federal agency that could constitutionally set aside any contracts in any industry for businesses owned by socially and economically disadvantaged individuals. Plaintiff has not even attempted to make this showing.

19

While this evidence includes specific discrimination by the federal government, it is also undisputed that the government can act to ensure it does not "become a passive participant in a system of racial exclusion." *City of Richmond v. J.A. Croson*, 488 U.S. 469, 492 (1989); *see also Vitolo*, 999 F.3d at 361; *DynaLantic*, 885 F. Supp. 2d at 252. In *Adarand Constructors, Inc. v. Slater*, the Tenth Circuit recognized that a government can passively participate in private discrimination in at least two ways—(1) discriminatory barriers to the formation of qualified MBEs due to private discrimination preclude competition for public construction contracts by MBEs, and (2) discriminatory barriers to fair competition between MBEs and non-MBEs due to private discrimination preclude MBEs from effectively competing for public construction contracts. 228 F.3d 1147, 1167-68 (10th Cir. 2000). The record includes evidence of both. Def. Mem. at 11-12, 19-21.

> **B.     Plaintiff Cannot Succeed on its As-Applied Challenge**
>
> ### 1.   Ample evidence continues to support the 8(a) program

In Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment, Defendants set forth abundant recent evidence that supports the use of the 8(a) program by the USDA in the administrative and technical support services industry. Def. Mem. at 22-24. Plaintiff fails to even address any of this compelling evidence. Instead, Plaintiff dismisses all such evidence as the result of "ad hoc litigation-induced efforts" and contends that "[e]vidence created to defend the SBA in litigation should be viewed with a jaundiced eye." Pl. Mem. 22. There is no basis in either law or the factual record for such an assertion.

Recent evidence of discrimination against minority-owned businesses is relevant not only to the ongoing need for, and constitutionality of, the 8(a) program, but also to its constitutional application. While the Sixth Circuit has not definitively addressed the relevance of post-enactment

evidence where, as here, the government has shown a strong basis in evidence prior to enactment, every circuit that has done so has held that it is admissible to demonstrate the ongoing constitutionality of a government program. *W. Tenn. Chapter of Assoc. Builders & Contractors, Inc. v. Bd. of Educ. of the Memphis City Sch.*, 64 F. Supp. 2d 714, 718 (W.D. Tenn. 1999) (citing circuit court cases). In any event, "post-enactment evidence may certainly be considered in determining whether a racial classification is constitutional as applied," *Rothe Dev. Corp. v. U.S. Dep't of Def.*, 262 F.3d 1306, 1325 (Fed. Cir. 2001), because Congress cannot anticipate every scenario in which a nationwide program might be utilized. Plaintiff cites no authority to the contrary. The only basis Plaintiff provides in its effort to encourage this Court to ignore all of the recent evidence Congress has considered in relation to discrimination against minority-owned businesses is a citation to the court in *Drabik*, 214 F.3d at 738, noting that "the state must have had sufficient evidentiary justification for a racially conscious statute in advance of its passage; the time of a challenge to the statute, at trial, is not the time for the state to undertake factfinding." *See* Pl. Mem. at 22. This case is not *Drabik*. In *Drabik*, the state was unable to establish that it had a strong basis in evidence at the time of enactment and wanted to stay the litigation so that it could produce a new disparity study.

Here, by contrast, substantial evidence shows that Congress had a strong basis in evidence at the time of enactment—evidence that that other courts have found to be more than sufficient and that Plaintiff fails to address. *See Rothe*, 107 F.Supp.3d at 207-08; *DynaLantic*, 885 F. Supp. 2d at 272-73. There is no authority that supports the proposition that the Court should simply ignore recent evidence in considering whether Defendants' current application of the program passes constitutional muster. Thus, Plaintiff cannot avoid contending with this evidence because

it is supposedly too recent, while at the same time arguing that the evidence Congress considered when passing the Act is too stale.[10]

### 2. Plaintiff has provided no specific, credible evidence to rebut Defendants' abundant evidence supporting the 8(a) program

Plaintiff asserts that "Defendants have not identified a specific contracting officer employed by the USDA who, since 2011, has engaged in intentional racial or national origin discrimination in the award of federal contracts against any member of a group listed in 13 C.F.R. § 124.103(b)(1)." Pl. Mem. at 22. While this is undisputed, it is also immaterial. Plaintiff's belief that intentional discrimination must be established through direct evidence of a specific discriminatory actor with discriminatory intent misunderstands the methods of proof required to establish intentional discrimination.

Courts, including the Sixth Circuit and the Supreme Court, have long recognized that direct evidence of discrimination is rarely available and, accordingly, discrimination is most often proven through circumstantial evidence. *See, e.g.*, *Price Waterhouse v. Hopkins*, 490 U.S. 228, 271 (1989) (O'Connor, J., concurring) ("As should be apparent, the entire purpose of the *McDonnell Douglas* prima facie case is to compensate for the fact that direct evidence of intentional discrimination is hard to come by."); *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997) ("Rarely can

---

[10] Contrary to Plaintiff's contention, Defendants do not solely present "[e]vidence created to defend the SBA in litigation." Pl. Mem. at 22. Plaintiff cites to the DOJ Report *The Compelling Interest to Remedy the Effects of Discrimination in Federal Contracting: A Survey of Recent Evidence* (2022) to support this assertion. *Id.* But as it states in its title, the DOJ Report is merely a "survey of recent evidence"—it does not in itself constitute new, original evidence. None of the 200 plus disparity studies, reports, or congressional evidence compiled and summarized in the DOJ Report were produced for purposes of this litigation, nor was the DOJ report itself. Rather, as DOJ stipulated in response to Plaintiff's request, the report was begun in December 2019, before this lawsuit was filed. *See* Ex. 2, Stipulation Regarding *The Compelling Interest to Remedy the Effects of Discrimination in Federal Contracting: A Survey of Recent Evidence* (May 13, 2022).

discriminatory intent be ascertained through direct evidence because rarely is such evidence available. This is the reason for the *McDonnell Douglas-Burdine* burden of proof mechanism, allowing a plaintiff to prove its case through circumstantial evidence."); *Robinson v. Runyon*, 149 F.3d 507, 513 (6th Cir. 1998) ("[I]ntentional discrimination is often difficult to prove without significant reliance on circumstantial evidence. Rarely will there be direct evidence from the lips of the defendant proclaiming his or her racial animus.").[11]

Plaintiffs whistles past this long-standing jurisprudence, making no attempt to grapple with the substantial circumstantial evidence presented to the Court and available to Congress, which supports an inference of discrimination here. Instead, in just one sentence, Plaintiff dismisses this evidence as "consist[ing] mostly of evidence of disparities." Pl. Mem. at 22. Plaintiff then insists that evidence of disparities are in sufficient to prove discrimination. Plaintiff's position is fundamentally flawed. First, Defendants need not "conclusively prove the existence of past or present racial discrimination to establish a strong basis in evidence." *H.B. Rowe Co., Inc. v. Tippett*, 615 F.3d 233, 241 (4th Cir. 2010); *see also Midwest Fence*, 840 F.3d 945; *Concrete Works VI*, 321 F.3d at 958. Rather, a "strong basis in evidence" is that "approaching a prima facie case of a constitutional or statutory violation." *Croson*, 488 U.S. at 500. Second, *Croson* was critical of reliance on disparities between the number of contracts awarded to minority-owned firms and the general minority population of the city of Richmond. *Id.* at 501. By contrast, the court found that "[w]here there is a significant statistical disparity between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors

---

[11] Equal protection claims are subject to the same standard as Title VII claims. *See, e.g.*, *Black v. Columbus Pub. Schs.*, 79 F. App'x 735, 738 (6th Cir. 2003); *Gutzwiller v. Fenik*, 860 F.2d 1317, 1325 (6th Cir. 1988) ("[T]he showing a plaintiff must make to recover on a disparate treatment claim under Title VII mirrors that which must be made to recover on an equal protection claim . . . .").

23

actually engaged by the locality or the locality's prime contractors, an inference of discriminatory exclusion could arise." *Id.* at 509. These are precisely the type of disparities in the record here.

In any case, Plaintiff's contention that Defendants' evidence consists mostly of disparities is untrue. Mere statistical disparities and statistical evidence of discrimination are not the same thing. Noting that MBEs are utilized at a rate lower than their availability in a particular market, without more, evidences a disparity, but does not necessarily provide any information as to the cause of that disparity. But providing additional statistical evidence, including statistical significance and multiple regression analyses, which rules out the possibility that the disparity was caused by mere chance or by non-discriminatory factors is evidence of discrimination. Indeed, courts have long accepted such statistical analysis as evidence of discrimination. *See, e.g.*, *DynaLantic*, 885 F. Supp. 2d at 256; *O'Donnell v. City of Cleveland*, 838 F.3d 718, 727-28 (6th Cir. 2016) (citing *Bazemore v. Friday*, 478 U.S. 385, 400-01 (1986)) (explaining the probative value of regression analyses in Title VII discrimination cases).

Here, Defendants present substantial quantitative and qualitative evidence of discrimination against minority-owned businesses, not only mere disparities, both at the time the 8(a) program was enacted, and today. *See, e.g.*, Def. Mem. at 13-14 (discussing statistical and qualitative evidence that provides evidence that observed disparities are due to discrimination); Exs. 10, 12, 14 to Def. Mem. (compiling and summarizing the vast amount of qualitative evidence contained in disparity studies). Plaintiff does not even mention the expert reports submitted by Jon Wainwright and Daniel Chow, which provide substantial evidence of recent discrimination in public contracting in all industries throughout the United States as well as in the federal government; thus, it can hardly dispute their findings. Plaintiff cannot meet its burden to show there is no genuine issue of material fact as to this evidence without even addressing it.

24

**V.      The 8(a) Business Development Program is Narrowly Tailored to Redress the Effects of Ongoing and Past Discrimination**

Plaintiff has not only failed to address whether there is a strong basis in evidence to support the 8(a) program either facially or as-applied, it has also failed to raise a genuine issue of material fact regarding the narrow tailoring of the 8(a) program. Courts consider multiple factors to determine whether a race-conscious program is narrowly tailored: the necessity for the relief and the efficacy of race-neutral alternatives; flexibility, including any requirements to meet a goal and the goal's relation to the relevant labor market; the over- or under-inclusiveness of the program; the duration of the program; and the impact of the program on third parties. *Rutherford*, 179 F. App'x at 381 (quoting *United States v. Paradise*, 480 U.S. 149, 171, 187, (1987)).

Before addressing any of these relevant factors, Plaintiff argues that the 8(a) program is not narrowly tailored because the SBA has allegedly failed to follow Congress's guidance in implementing and administering the program. Pl. Mem. at 24. Plaintiff provides no support that this is a proper consideration in the narrow tailoring analysis. In addition, Plaintiff's contention that the SBA has acted contrary to Congress's intent for the past 35 years is belied by Congress's inaction in correcting the SBA's supposed "misinterpretation" of the Act. *See supra* Section II.C.

**1.      The 8(a) program is sufficiently flexible**

As an initial matter, Plaintiff contends only that the social disadvantage presumption, not that the 8(a) program as a whole, is inflexible. *See* Pl. Mem. at 25. Plaintiff provides only two bases for the supposed inflexibility of the presumption: (1) "every individual in the preferred minority groups gets the benefit of the presumption," and (2) the presumption is rebuttable only in theory; in practice, it is dispositive. *Id.* Neither argument withstands scrutiny.

First, that every person in the designated group gets the benefit of the presumption, absent credible evidence to the contrary, is the entire point. By its nature, strict scrutiny applies to

measures that apply to an entire group. *See Croson*, 488 U.S. at 493-94. The record before the Court provides the justification for the group-based rebuttable presumption. *See* Def. Mem. at 10-24. Further, the fact that no one is automatically included or excluded from the program on the basis of race alone is enough to deem the program flexible. *See DynaLantic*, 885 F. Supp. 2d at 286 (quoting *Sherbrooke Turf, Inc. v. Minn. Dep't of Transp.*, 345 F.3d 964, 973 (8th Cir. 2003)).

Second, Plaintiff's contention that the presumption is dispositive is simply not true. Plaintiff relies on *Vitolo* for this proposition, as the Sixth Circuit observed there that "[s]ince proving someone else has *never* experienced racial or ethnic discrimination is virtually impossible, this 'presumption' is dispositive." 999 F.3d at 363. While the court was considering the same presumption of social disadvantage for certain groups there, it was applied to a very different program and on a very limited record. There, the court found that the presumption *in combination with* the 21-day priority period was dispositive. This is because the court found that the limited period of time for an applicant to obtain a grant from a dwindling fund made it all but impossible for an applicant to qualify as socially disadvantaged without the presumption. *Id.* at 358. Here, not only is there no limited time period or limited funds at issue, but Defendants have provided evidence that the presumption is not actually dispositive. As an initial matter, proving that someone else has never experienced racial or ethnic discrimination is not the only way to rebut the presumption of disadvantage. The regulation also requires that the individual seeking to rely upon the presumption "demonstrate that he or she has held himself or herself out, and is currently identified by others, as a member of a designated group if SBA requires it." 13 C.F.R. § 124.103(b)(2). The SBA has excluded individuals from the 8(a) program where evidence showed that they had not actually held themselves out as a member of a designated group. *See In the Matter of: DCS Elecs., Inc.*, SBA No. MSBE-91-10-4-26, 1992 WL 558961, at *3 (SBA Office Hearings

26

App. May 8, 1992) (determining that a program applicant who identified herself as Hispanic American was not socially disadvantaged because of her racial identity due to evidence to the contrary); *see also* Ex. 3, Deposition of John Klein 71:1-17 (explaining that "for instance, if you are a Native American and you grew up your entire life not identifying as a Native American, and a week before you applied to the program you finally got a card realizing that your great, great grandfather was a Native American, that may not suffice since you've never held yourself [out] as a Native American and, therefore, no one, in fact, treated you as such or discriminated against you because of that identity"). Unlike the limited record before the court in *Vitolo*, the evidence here shows that the presumption is not in fact dispositive.

### 2. The 8(a) program has appropriate time limits

Plaintiff wrongly asserts that the 8(a) program is not narrowly tailored solely because it does not have a termination date. Pl. Mem. at 25. Although there is no time limit applicable to the entire program, it does impose temporal limits on program participation sufficient to satisfy the durational aspect of the narrow tailoring inquiry. Specifically, the 8(a) program limits participation to nine years, 15 U.S.C. § 636(j)(10)(C)(i); restricts firms to participate in the program only once, *id.*; and requires a participant to exit early if it "overcomes its disadvantage" or is otherwise no longer eligible prior to the end of its term in the program, *see DynaLantic*, 885 F. Supp. 2d at 287; *see also* Def. Mem. at 28. While Plaintiff dismisses these features as "irrelevant," *see* Pl. Mem. at 15-16, every court to have considered the issue has found that these limits fulfill the temporal aspect of narrow tailoring. *See Rothe*, 107 F. Supp. 3d at 209; *DynaLantic*, 885 F. Supp. 2d at 287 ("Although the Section 8(a) program does not incorporate a specific 'sunset' provision applicable to the entire program, it does impose temporal limits on every individual's participation that fulfill the temporal aspect of narrow tailoring."); *Adarand*, 228 F.3d at 1179.

27

Without support, Plaintiff contends that the "purpose of the 'duration' prong of narrow tailoring is . . . to avoid undue harm to the disfavored." Pl. Mem. at 26. But undue harm is a separate prong of the analysis; the actual purpose of the duration prong is to ensure "that [the remedy] 'will not last longer than the discriminatory effects it is designed to eliminate.'" *Adarand*, 515 U.S. at 238 (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 513 (1980) (Powell, J., concurring)). Defendants have presented recent evidence of discrimination in federal government contracting that demonstrates the 8(a) program has "not last[ed] longer than the discriminatory effects it [was] designed to eliminate." Def. Mem. at 29; *see also Adarand*, 515 U.S. at 238 (citations omitted); *DynaLantic*, 885 F. Supp. 2d at 287. Plaintiffs have not presented any evidence to refute this substantial evidence or that shows that the discriminatory effects the 8(a) program was designed to eliminate are a thing of the past.

### 3. The 8(a) program's lack of rigid goals contributes to its narrow tailoring

It is undisputed that the 8(a) program has no specific goals. Rather, it is one method of achieving the overall goal of awarding five percent of contracting dollars to socially disadvantaged businesses. Def. Mem. at 27. Courts have found the 8(a) program to be flexible in part because it contains no quotas or rigid goals for agencies to enter in a certain percentage of contracts with 8(a) firms. *See Rothe*, 107 F. Supp. 3d at 209; *DynaLantic*, 885 F. Supp. 2d at 288. Indeed, courts have found that "the hallmark of an inflexible affirmative action program" is a "rigid racial quota." *DynaLantic*, 885 F. Supp. 2d at 285 (quoting *W. States Paving Co. v. Wash. State Dep't of Transp.*, 407 F.3d 983, 994 (9th Cir. 2005)); *see also Croson*, 488 U.S. at 478-79, 499.

Plaintiff turns this argument on its head and contends that the lack of specific goals actually belies narrow tailoring. *See* Pl. Mem. at 26. But the authorities Plaintiff cites offer no support for this view. To the contrary, several courts—including the Sixth Circuit—have found similar

programs with non-mandatory goals to be sufficiently flexible and perfectly intelligible. *See Rutherford*, 179 F. App'x at 381 (finding race conscious hiring plan flexible in part because it did not mandate that a certain number of minorities be hired each and every year); *Rothe*, 107 F. Supp. 3d at 209; *DynaLantic*, 885 F. Supp. 2d at 285.

Plaintiff criticizes the 8(a) program's flexibility as "incoherence" because it permits some agencies to choose not to use the program at all without penalty. Pl. Mem. at 26. Case law makes clear that race-conscious remedies that "impose a fixed number or percentage which must be attained, or which cannot be exceeded" are inflexible and disfavored, whereas "a permissible goal . . . requires only a good-faith effort." *W. States Paving Co.*, 407 F.3d at 994 (quoting *Grutter v. Bollinger*, 539 U.S. 306, 335 (2003)). Importantly, the 8(a) program is a federal government-wide program, and thus targets federal contracting generally, not any particular agency. A program that forced every federal agency to use the 8(a) program with the same frequency despite the needs of the agency, would be the opposite of flexible.

### 4. The 8(a) program is not overinclusive

Plaintiff asserts that the 8(a) program is over-inclusive because it *may* include individuals who, according to Plaintiff, have never experienced discrimination in American society. Pl. Mem. at 26-27. Plaintiff attributes this assumption to its belief that the financial thresholds used to determine economic disadvantage are too generous because they "exclude[] only a few percent of the richest Americans." *See id.* at 27. From there, Plaintiff assumes that those racial or ethnic minorities who qualify for economic disadvantage under the maximum permissible economic thresholds "are very unlikely to have been victims of chronic discrimination." Pl. Mem. at 27. Plaintiffs reliance on the race-neutral economic standards to establish a lack of narrow tailoring is fundamentally flawed for a number of reasons.

29

First, because the economic thresholds for participation apply equally to applicants regardless of race, they are not subject to strict scrutiny and therefore have no place in the narrow tailoring analysis. *See Borman's, Inc. v. Mich. Prop. & Cas. Guar. Ass'n*, 925 F.2d 160, 162 (6th Cir. 1991) ("When the legislation is economic or social in nature . . . and neither a fundamental right nor a suspect class is involved, the level of scrutiny required is rational basis review" meaning it "will not be set aside if any state of facts reasonably may be conceived to justify it").

Second, Plaintiff's belief that the standards for establishing economic disadvantage are too high reflects a fundamental misunderstanding of the nature of the 8(a) program. The 8(a) program provides training and technical assistance designed to strengthen the ability of firms to compete effectively in the American economy. 15 U.S.C. § 631(f)(2). The 8(a) program is a tool for experienced socially and economically disadvantaged small business owners, who have already been in business for at least two years or more, and are interested in expanding their footprint in the federal marketplace. 13 C.F.R. § 124.107. The 8(a) program offers unique and valuable business assistance to business owners who have already demonstrated the ability to maintain a business for at least two years, and thus the standards for establishing economic disadvantage cannot be set at a level which would eliminate these exact businesses.

### 5. Narrow tailoring does not require an ongoing assessment of the level of discrimination in every industry or sector

Plaintiff asserts that Defendants have not assessed whether MBEs generally or of a particular racial group are underutilized in specific industries or sectors, but fails to point to any authority requiring such an assessment. Pl. Mem. at 27-28. With respect to Plaintiff's facial challenge, such an assessment is not required. Although if it were, Dr. Wainwright's expert report, which Plaintiff fails to even mention, shows substantial disparities unexplained by non-discriminatory factors across all major industries and for every minority group. Ex. 11 to Def.

30

Mem., at 29 (finding that "large, adverse, and statistically significant disparities are found to exist for minority businesses in the great majority of cases throughout the United States, in the economy as a whole, and in each major procurement category and industry sector"). As for Plaintiff's as-applied challenge, the only specific industries at issue here are the administrative and technical support services industries, and Defendants have presented evidence of discrimination in those particular industries. *See* Def. Mem. at 22-24. Plaintiff has produced no evidence to the contrary.

### 6. Record evidence shows discrimination against all groups entitled to the rebuttable presumption

Plaintiff also complains that all presumed groups benefit from the same presumption of social disadvantage without consideration of the specific discrimination each group has faced throughout the economy or in particular industries. Pl. Mem. at 28. Plaintiff relies on *Croson* for this proposition as the Court there held that a contracting set aside program was not narrowly tailored because it included groups against whom there was no evidence of discrimination. *Id.* But in *Croson*, the Court examined a city ordinance that imposed a contracting quota that benefited all minorities, but was based on limited evidence that identified discrimination as to only one racial group. 488 U.S. at 505-06. That is not the case here. Congress has continuously made findings of racial discrimination for each group presumed socially disadvantaged since the 8(a) program was codified. Def. Mem. at 30; *see also DynaLantic*, 885 F. Supp. 2d at 286 (finding strong "evidence of discrimination [which] is sufficiently pervasive across racial lines to justify granting a preference to all five purportedly disadvantaged groups" at issue); *Rothe*, 262 F.3d at 1330. Dr. Wainwright's analysis also found large, adverse, and statistically significant disparities for each of the race and ethnicity categories covered by the presumption (Black, Hispanic, Asian, and Native American). Ex. 11 to Def. Mem. at 29-30. Plaintiff has produced no evidence to the contrary.

31

### 7. Congress satisfied its obligation to consider the efficacy of race-neutral alternatives

Plaintiff contends that the 8(a) program is not narrowly tailored because the SBA has not considered and exhausted race-neutral mechanisms since adopting the presumption of social disadvantage in 1986. *See* Pl. Mem. at 28-29. Plaintiff errs in focusing exclusively on the SBA's role in implementing the 8(a) program and entirely ignores the many race-neutral alternatives Congress considered, and continues to employ, to aid disadvantaged small businesses, as detailed in Def. Mem. at 25-26. These efforts by Congress and the SBA more than constitute the "serious, good faith consideration of workable race-neutral alternatives" required to satisfy narrow tailoring. *Vitolo*, 999 F.3d at 353 (quoting *Grutter v. Bollinger*, 539 U.S. at 339); *see also DynaLantic*, 885 F. Supp.2d at 283. This includes considering the actual and expected success of such alternatives. *See Rothe*, 262 F.3d at 1331 (examining the efficacy of race-neutral alternatives includes determining "whether Congress found [] race-neutral alternatives ineffective," "inquiring into any attempt at the application or success of race-neutral alternatives," and considering whether a "legislative body [made] findings that preexisting antidiscrimination provisions have been enforced but unsuccessfully"). That is exactly what Defendants have done. "Narrow tailoring does not require exhaustion of every conceivable race-neutral alternative." *Grutter*, 539 U.S. at 339.

Plaintiff's only suggestion for a race-neutral alternative is for the SBA to revert back to implementing the 8(a) program without the presumption of disadvantage, as it did prior to 1986. Pl. Mem. at 28. Such a suggestion should be dismissed out of hand as the SBA already exhausted this method of administering the program, and Congress found evidence of its ineffective results in remedying discrimination in federal contracting. *See* Def. Mem. at 25-26. Nothing in *Vitolo*, much less any precedent from the Supreme Court, requires the SBA to reconsider an unsuccessful race-neutral alternative.

32

**8.  The burden imposed on third parties, including plaintiff, is minimal**

Plaintiff asserts that the 8(a) program burdens third parties because it "takes away business opportunities, often (especially in the case of sole source awards) before a third party even knows that the opportunity exists." *See* Pl. Mem. at 29. While this may occur, the narrow tailoring inquiry is not whether use of the 8(a) program limits *some* opportunities for non-8(a) firms, as Plaintiff suggests without legal authority, it is whether the burden on non-participating businesses is "too intrusive" or "unacceptable." *Concrete Works of Colo. v. City & Cnty. of Denver,* 321 F.3d 950, 973 (10th Cir. 2003) (quoting *Wygant*, 476 U.S. at 280-81; *Paradise*, 480 U.S. at 182).[12]

The record shows that the burden on non-8(a) firms is not impermissible. Only 3.7% of federal contracting dollars eligible for small businesses are obligated through the 8(a) program. *See* Def. Mem. at 32. The same is true of USDA contracting in particular, both within and outside of the two NAICS codes at issue here. *See id.* at 32-33 (explaining that since 2010, the USDA has set aside on average only 3.76% of all contract actions, worth just 5% of obligated contract dollars for 8(a) firms, and in the industries at issue here, about 11% of contract actions worth only 10% of contract dollars). Thus, it is evident that there is ample opportunity for Plaintiff to bid on contracts with the federal government, including with USDA.

Plaintiff cannot create the illusion of an undue burden by narrowing its sites to an infinitesimal portion of the government contracts for which it is eligible to bid. But even if this were permissible, Plaintiff cannot show that it was excluded from bidding on all contracts to

---

[12] Plaintiff's citation to decades-old executive orders in connection with the undue burden analysis, and throughout its brief, is curious. For instance, Plaintiff cites to Executive Order 11625, which was signed by President Richard Nixon in 1971 and directs the Department of Commerce to expand the Office of Minority Business Enterprise (now the Minority Business Development Agency) to develop programs and coordinate interagency activities to promote minority business enterprise. Plaintiff has presented no evidence that any of the executive orders it cites have not been explicitly or implicitly repealed by a subsequent act of Congress.

33

provide administrative or technical support to NRCS due to the 8(a) program. The record shows that in recent years, such contracts valued at over $10 million were solicited either through full and open competition or through competition among all small businesses. Def. Mem. at 5. Yet Ultima did not bid on this work. *See* Stonebraker Decl. ¶ 3. Further, much of Ultima's work has simply shifted to its affiliate, Lusa, which has been awarded NRCS administrative support contracts valued at over $10 million since 2019. *See* Def. Mem. at 33. Moreover, Plaintiff concedes it was ineligible to bid on a number of USDA administrative support contracts following the IDIQs awarded in 2017, not due to the 8(a) program, but because it had been so successful that it no longer qualified as a small business under the applicable NAICS codes. Pl. Mem. at 17.

### 9. The "possibility" that "some" groups may cease to need the presumption is not evidence sufficient to abolish the program today

Finally, Plaintiff argues that the presumption is not narrowly tailored because the regulations do not include "a rule or process for determining whether the included groups *remain* 'presumptively socially disadvantaged.'*" Id*. at 30. According to Plaintiff, "it is at least possible" that some racial or ethnic groups may no longer require the presumption of social disadvantage. *Id.* But speculating about the "possibility" of some occurrence is not sufficient for summary judgment. *See, e.g.*, *Thornton v. Spooner*, 872 F.2d 1029, 1989 WL 34026, at *2 (6th Cir. 1989) (Table) ("It is not the intent of Rule 56 [summary judgment] to preserve purely speculative issues of fact for trial."). Plaintiff's only effort to support this possibility is a citation to a 1993 law review article containing business formation statistics from 1980 census data. Pl. Mem. at 27. This single, decades-old article is dwarfed by the substantial evidence, presented in Defendants' brief and before Congress, that members of the designated groups continue to experience discrimination in the marketplace throughout the country. *See* Def. Mem. at 30 (citing SOF at ¶¶ 25, 29, 31).

34

Lastly, Plaintiff acknowledges that the regulations implementing the 8(a) program provide a process for including new groups as presumptively socially disadvantaged, but believes this process is insufficient because the SBA has specifically declined to designate Hasidic Jews as presumptively disadvantaged. *See* Pl. Mem. at 9, 30. The plaintiff in *DynaLantic* made this same argument, which the court there found "puzzling" since "Section 8(a) is designed, in relevant part, to remedy identifiable 'racial or ethnic prejudice or cultural bias,' not . . . religious discrimination." 885 F. Supp. 2d at 287 (quoting 13 C.F.R. § 124.103(a)). As discussed in Defendants' brief, the presumptively socially disadvantaged groups have grown to include additional racial and ethnic groups since the 8(a) Program was enacted. *See* Def. Mem. at 29. Though the presumption has not been extended to Hasidic Jews and some other groups based on a review of the evidence presented to the SBA, a firm owned by an individual in these groups may still qualify as socially and economically disadvantaged and thus participate in the program. *See* Def. Mem. at 27, 29. Moreover, Plaintiff provides no specific, credible evidence to rebut the SBA's determinations as to Hasidic Jews or any other group. These qualities clearly illustrate that both the presumption of social disadvantage and the 8(a) program as a whole are well tailored to their remedial purpose.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should deny Plaintiff's Motion for Summary Judgment.

Dated: July 12, 2022

> Respectfully submitted,
>
> KAREN D. WOODARD
> Chief
> Employment Litigation Section
> Civil Rights Division

35

OF COUNSEL:                              United States Department of Justice

David A. Fishman                         ANDREW BRANIFF (IN Bar No. 23430-71))
Assistant General Counsel for Litigation Deputy Chief

Eric S. Benderson
Associate General Counsel for Litigation By: */s/ Juliet E. Gray*                    
U.S. Small Business Administration       Juliet E. Gray (D.C. Bar No. 985608)
                                         K'Shaani Smith (N.Y. Bar 5059217)
Amar Shakti Nair                         Christine T. Dinan (D.C. Bar 979762)
Attorney Advisor                         Senior Trial Attorneys
                                         Employment Litigation Section
Ashley Craig                             Civil Rights Division
Attorney Advisor                         United States Department of Justice
U.S. Department Of Agriculture           150 M Street, N.E.
                                         Washington, D.C. 20002
                                         (202) 598-1600
                                         Juliet.Gray@usdoj.gov
                                         K'Shaani.Smith@usdoj.gov
                                         Christine.Dinan@usdoj.gov

36

## CERTIFICATE OF SERVICE

I hereby certify that on July 12, 2022, I electronically filed the above document and with the Clerk of the Court using the ECF System, which will send notification of such filing to all counsel of record.

/s/ Juliet E. Gray
Juliet E. Gray
Senior Trial Attorney

37