IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | | |
|---|---|---|
| ULTIMA SERVICES CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:20-cv-00041-DCLC-CRW |
| | ) | |
| U.S. DEPARTMENT OF AGRICULTURE, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

**REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff's Response to Defendants' Motion for Summary Judgment ("Pl. Opp.") fails to adequately respond to the factual evidence and legal arguments put forward by Defendants in defense of the constitutionality of the rebuttable presumption of social disadvantage for certain minority groups in the 8(a) program. Plaintiff similarly fails to proffer any evidence that its business has been impacted by the presumption of disadvantage such that it has suffered an injury in fact traceable to the presumption or that the elimination of the presumption would redress that alleged injury, and consequently cannot establish standing to maintain this action.

The parties do not dispute that "[t]here is no question that remedying the effects of past discrimination constitutes a compelling governmental interest." *Associated Gen. Contractors of Ohio v. Drabik*, 214 F.3d 730, 735 (6th Cir. 2000) (citing *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 492 (1989)). While Plaintiff purports to dispute whether Defendants have demonstrated a "strong basis in evidence" that supports this interest, and that the 8(a) program is narrowly tailored to achieve this interest, Plaintiff has not created a *genuine* issue of any *material* fact as to either of these issues. Instead, Plaintiff twists the strict scrutiny analysis the Sixth Circuit applied in *Vitolo v. Guzman*, 399 F.3d 353 (6th Cir. 2021), into an entirely new paradigm that has no support in Supreme Court precedent. Plaintiff then argues that Defendants' evidence does not rise to this novel standard by raising specious and misleading concerns about whether Defendants' evidence is authentic or admissible, and speculative arguments without evidentiary support concerning Defendants' experts' methodologies. But Plaintiff has not presented *any* evidence— not a single study, report, analysis, or congressional finding—showing that any of the groups granted the rebuttable presumption of disadvantage are no longer affected by either the current or lingering effects of discriminatory barriers to their ability to compete for federal contracts on an equitable basis. Instead, because the evidence presented supports the government's compelling

1

interest in establishing and continuing the 8(a) program, Plaintiff makes every effort to have the Court ignore it.

Even more troubling, Plaintiff asks the Court to reject the evidence in the record in favor of Plaintiff's belief that perhaps the overwhelming evidence of discrimination against minority-owned businesses ("MBEs") is actually caused by some other unknown factor. In doing so, Plaintiff asks the Court to rely on racial stereotypes by speculating that some races may be impeded, not by discrimination, but because they just won't "work very hard." Pl. Opp. at 11. It is precisely this type of racial stereotyping that makes the 8(a) program necessary.

## I. **Plaintiff Does Not Have Standing**

Ultima asks this Court to confer standing based on its generalized complaint that somewhere in the federal contracting space there are minority-owned small businesses that are being awarded contracts through a program that Ultima has been unqualified to participate in and to which it has not applied. Plaintiff asserts that this conclusion is mandated by *Vitolo*, but Plaintiff's circumstances bear no similarity to *Vitolo*, where the Sixth Circuit examined a novel time-limited and capped government benefit for which the plaintiff in that case had submitted an application. *See Vitolo*, 399 F.3d at 359-60. The Court found that the plaintiffs had standing in *Vitolo*, in part, because they "continue to suffer a real and concrete injury by having their application [for the benefit] considered behind the priority applications because of race and sex." *Id.* at 360. Thus, the Court specifically found that a "court order ending those [race and gender based] preferences will relieve the plaintiffs' injury and allow *Vitolo's application* to be considered sooner than it otherwise would." *Vitolo,* 399 F.3d at 359 (emphasis added).

Here, by contrast, Plaintiff not only has not applied for the benefit it seeks, but it was ineligible to apply, both based on its contracting successes—notably all obtained during the

existence of the 8(a) program—and because of its corporate structure. Defendants addressed these differences in its opening brief and response to Plaintiff's opening brief and will not repeat them here. Def.'s Mem. Supp. Mot. Summ. J., Doc. 62 ("Def. Mem.") at 34-35 & Def.'s Opp. Pl. Mot. Summ. J., Doc. 72 ("Def. Opp.") at 3-7. Instead, Plaintiff makes a novel argument: *if* the rebuttable presumption in the 8(a) program were eliminated, and *if* the SBA were to process new 8(a) program applications in the absence of the presumption, there *may* be a 90-day window of opportunity where there would be fewer 8(a) program participants. *See* Pl. Opp. at 32. Having described the improbable, Plaintiff now asks the Court to do the impossible. There is no evidence that during this potential limited bureaucratic window of opportunity that the United States Department of Agriculture ("USDA") would solicit small business-eligible contracts for administrative or technical services that otherwise would have been set aside into the 8(a) program, for which Ultima would be qualified to bid, for which Ultima would satisfy the small business size limits, and for which Ultima would actually bid. In fact, there is evidence to the contrary. *See* Def. Opp. at 4-5 (detailing Plaintiff's business structure, size, and failure to bid during the time period in question in this suit). This is insufficient to describe an injury in fact that would be redressable by the elimination of the presumption of disadvantage in the 8(a) program. *See* Def. Mem. at 33-35; Def. Opp. at 3-7.

## II. The Legal Standards Applicable Here Are Well-Settled

Plaintiff's filings may leave the Court with the impression that there is a lack of clarity in the standard of review applicable in this case or the type of evidence relevant to reviewing the constitutionality of a race-conscious contracting program. This is largely due to Plaintiff's inconsistent statements about the nature of its claims. But the standard that applies to reviewing the constitutionality of remedial contracting programs such as the 8(a) program at issue here is

3

well-settled, and the Supreme Court has made clear the type of evidence that courts should consider in evaluating such a program.

### A. Plaintiff Claims to Bring Only an As-Applied Challenge

In Defendants' Motion to Dismiss Plaintiff's claim for lack of standing, Defendants asserted that the Complaint challenged only the SBA regulation containing the rebuttable presumption of disadvantage. Doc. 21 at 8. In its response, Plaintiff claimed that Defendants had "misread" the Complaint and insisted that it was challenging the entire "Section 8(a) Program." Doc. 24 at 6. The Court accepted Plaintiff's representation at face value and relied on it in determining that Plaintiff had standing. *See* Doc. 32 at 7 ("But Plaintiff's challenge is not just to the Program's race-based presumption but to the Program as a whole. It seeks the Court to enjoin Defendants from reserving *any* contracts for the Section 8(a) Program because the Program violates the Fifth Amendment."). Plaintiff has now reversed course.

Plaintiff now insists it is not bringing a facial challenge to the 8(a) program, or to any part of Section 8(a) of the Small Business Act. Pl. Opp. at 2 (stating it "is plainly not challenging an 'Act' but rather the regulatory program as implemented by defendants"). In fact, Plaintiff now insists for the first time that it does not want to prevent the federal government from setting aside contracts for the 8(a) program, rather it just wants to eliminate the presumption of disadvantage so that it can apply for the program. Bennett Stmt., Doc. 70-2 at ¶ 11. While Plaintiff's description of its challenge is muddled, it is clear that Plaintiff has now expressly disclaimed that it is challenging the 8(a) program on its face. Pl. Opp. at 2 ("It is not clear what Defendants mean here by a 'facial' challenge. That word is not used in Plaintiff's complaint . . . .").[1]

---

[1] Plaintiff's opposition is still less than clear about the exact nature of its challenge. But even if Plaintiff were challenging the "regulatory program" or the rebuttable presumption on its face,

## B. The Burden of Proof

Regardless of the how Plaintiff seeks to characterize its challenge to the 8(a) program, the standard of proof in equal protection challenges is clear. In this matter, Supreme Court and Sixth Circuit precedent hold that the government "bears the initial burden of demonstrating" that a race-conscious remedial program is supported by a strong basis in evidence and is narrowly tailored to that interest. *Rutherford v. City of Cleveland*, 179 F. App'x 366, 373-74 (6th Cir. 2006) (citing *Drabik*, 214 F.3d at 735). The government has done so in this matter by submitting evidence of intentional discrimination supported by statistical and anecdotal reports in areas of public contracting in which the federal government is currently participating.[2]

However, "[t[he ultimate burden remains with the [party challenging the program] to demonstrate the unconstitutionality of an affirmative-action program." *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 277-78 (1986); *see also Aiken v. City of Memphis*, 37 F.3d 1155, 1162 (6th Cir. 1994) ("The party challenging the [race-based affirmative action] plan, however, retains the ultimate burden of proving its unconstitutionality."). In this case, that means that on summary judgment, Ultima must show that there is a genuine issue of material fact that the evidence that the government has produced fails to demonstrate the constitutionality of the presumption of social disadvantage in the 8(a) program. To rebut Defendants' showing, Plaintiff must present "credible,

---

despite claiming not to understand what a "facial" challenge is, it would have to show that there is "no set of circumstances under which such regulation(s) would be invalid. *See United States v. Salerno*, 481 U.S. 739, 745 (1987). Plaintiff has made no attempt to do so.

[2] Contrary to Plaintiff's mischaracterization, this is consistent with the position taken by the United States in *United States v. City of Cincinnati*, 2021 U.S. Dist. LEXIS 175084, at *10 (S.D. Ohio Sept. 15, 2021). There, the United States simply stated that it was the government's initial burden to establish both prongs of the equal protection analysis, namely the compelling interest and narrowly tailored prongs. The United States did not address which party bears the ultimate burden of proof. *See* Pl. United States' Reply Brief in Support of Mot. to Modify the Consent Decree at 3-5, Doc 197 Filed Aug. 20, 2021, Case No. C-1-80-369 (S.D. Ohio).

particularized evidence." *See Rothe Dev., Inc. v. Dep't of Def.*, 107 F. Supp. 3d 183 (D.D.C. 2015), *aff'd on other grounds*, 836 F.3d 57, 207-08 (D.C. Cir. 2016); *DynaLantic Corp. v. U.S. Dep't of Def.*, 885 F. Supp. 2d 237, 271 (D.D.C. 2012); *H.B. Rowe Co., Inc. v. Tippett*, 615 F.3d 233, 241-42 (4th Cir. 2010); *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 321 F.3d 950, 959 (10th Cir. 2003); *Adarand Constrs, Inc. v. Slater (Adarand VII)*, 228 F.3d 1147, 1174 (10th Cir. 2000). Plaintiff fails to meet this burden.[3]

### C. Plaintiff Applies the Wrong Standard to the Strong Basis in Evidence Inquiry

Plaintiff alleges that in order to demonstrate a strong basis in evidence Defendants' "[e]vidence must disclose discrimination that involves (1) specific instances of (2) intentional discrimination, that is (3) of a kind that the defendant employing the race-conscious mechanism itself participated in or promoted (even if passively)." Pl. Opp. at 3. However, as Defendants explained in their opening brief, a strong basis in evidence is that "approaching a prima facie case of a constitutional or statutory violation." *Croson*, 488 U.S. at 500. Plaintiff insists that Defendants' reading of *Croson* is incorrect. Pl. Opp. at 4 n.4. But Defendants' reading is the same as that of the Sixth Circuit (and many other circuits), which has held—on numerous occasions—that "a prima facie case of intentional discrimination is sufficient to support a public employer's affirmative action plan." *Brunet v. City of Columbus*, 1 F.3d 390, 406 (6th Cir. 1993) ("The Brunet plaintiffs are correct that a strong basis in evidence to support a public employer's affirmative action plan does not require a formal finding of past discrimination.") (citing *Croson*, 488 U.S. at 497); *see also Aiken*, 37 F.3d at 1162 ("It is settled that '[a]ppropriate statistical evidence setting forth a prima facie case of discrimination is sufficient to provide a strong basis in evidence to

---

[3] Ultimately, the Court does not have to decide which party bears the ultimate burden here because even if Defendants did have the ultimate burden of proof, the evidence presented by Defendants more than meets that burden and has not been properly rebutted.

support a public employer['s] affirmative action plan.") (quoting *Brunet*, 1 F.3d at 407 and citing *Croson*, 488 U.S. at 501); *United Black Firefighters Ass'n v. City of Akron*, 976 F.2d 999, 1011 (6th Cir. 1992) ("Such prima facie proof presents a strong basis in evidence to support a finding of a compelling governmental interest.") (citing *Croson*, 488 U.S. at 503).

Plaintiff ignores this authority, and argues that this standard is inconsistent with the requirement that the discrimination being addressed be intentional discrimination, because in cases alleging *disparate impact* discrimination, a plaintiff can establish a prima facie case without showing discriminatory motive or intent. Pl. Opp. at 4 n.4. Plaintiff has confused different types of discrimination (*i.e.*, disparate treatment (intentional discrimination) vs. disparate impact) with methods of proof (*i.e.*, direct vs. circumstantial evidence).

Plaintiff also entirely ignores that intentional discrimination can be—and most often is—established through circumstantial evidence. *See* Def. Mem. at 9. Courts have long recognized that direct evidence of discrimination is rarely available and, accordingly, intentional discrimination is most often proven through circumstantial evidence. *See* Def. Opp. at 22-23 (citing cases, including *Price Waterhouse v. Hopkins*, 490 U.S. 228, 271 (1989) (O'Connor, J., concurring) ("As should be apparent, the entire purpose of the *McDonnell Douglas* prima facie case is to compensate for the fact that direct evidence of intentional discrimination is hard to come by."); *Robinson v. Runyon*, 149 F.3d 507, 513 (6th Cir. 1998) ("[I]ntentional discrimination is often difficult to prove without significant reliance on circumstantial evidence. Rarely will there be direct evidence from the lips of the defendant proclaiming his or her racial animus.")).[4] Moreover, Defendants only have

---

[4] Equal protection claims are subject to the same standard as Title VII claims. *See, e.g.*, *Gutzwiller v. Fenik*, 860 F.2d 1317, 1325 (6th Cir. 1988) ("[T]he showing a plaintiff must make to recover on a disparate treatment claim under Title VII mirrors that which must be made to recover on an equal protection claim . . . .").

to show that discrimination was a *motivating factor* in the disparities identified for MBEs, not the sole cause. *See, e.g.*, *Wesley v. Collins*, 791 F.2d 1255, 1262 (6th Cir. 1986) ("A plaintiff [in an equal protection case] need not prove that a discriminatory purpose was the sole reason for the action, only that discrimination was a motivating factor."). Thus, Plaintiff's position that Defendants can prevail only upon identifying, through *direct evidence*, the names of individual USDA employees who engaged in intentional discrimination in awarding administrative and technical support services contracts in recent years, has no legal basis.

Plaintiff appears to believe that *Vitolo* requires this showing, *see* Pl. Opp. at 3, but *Vitolo* did not depart from the well-settled Supreme Court and Sixth Circuit authority for establishing a strong basis in evidence, nor could it have ignored this precedent. Indeed, *Vitolo* confirms that circumstantial evidence is relevant to this inquiry, stating that statistical evidence "may be used as evidence to establish intentional discrimination." *See Vitolo,* 399 F. 3d at 361. The 8(a) program is supported by decades of statistical evidence demonstrating disparities caused by discrimination in public contracting, anecdotal reports of discrimination further explaining these disparities, and particularized evidence of disparities in Plaintiff's industries, which cannot be explained by non-discriminatory factors. *See* Def. Mem. at 8-21.

### III.     Plaintiff's Assertions about the Competency of the Evidence Are Baseless

Plaintiff makes assertions about the competency of Defendants' evidence that have no basis in law or the factual record. As an initial matter, Plaintiff's assertions about the lack of authenticity of a number of documents produced in discovery are particularly troubling, considering the parties filed a Stipulation Regarding Authenticity of Documents produced in discovery, and Plaintiff has never raised a question with Defendants as to the authenticity of any of the documents produced. *See* Doc. 55. Moreover, while Plaintiff's argument is not supported by any citation to authority, it

presumably relies on an outdated version of Federal Rule of Civil Procedure 56, which was substantially amended in 2010 and "no longer draws a clear distinction between authenticated and unauthenticated evidence for purposes of summary judgment." *Mangum v. Repp*, 674 F. App'x 531, 536 (6th Cir. 2017); *see also Ganesh v. United States*, 658 F. App'x. 217, 220 (6th Cir. 2016).

Plaintiff's assertions about the inadmissibility of certain of Defendants' documents, including that some are inadmissible hearsay, are equally flawed due to its apparent reliance on an outdated version of Rule 56.[5] The current rule provides that the asserted undisputed material facts need "only to be (1) supported by citation to the record, and (2) capable of being presented at trial in some admissible form." *Wanke v. Invasix Inc.*, No. 3:19-CV-0692, 2021 WL 325923, at *13 (M.D. Tenn. Feb. 1, 2021) (citing Fed. R. Civ. P. 56(c)). Plaintiff cannot demonstrate that any of the information it contends is inadmissible would be incapable of being presented at trial in some admissible form.

## IV.    Defendants Have Demonstrated a Strong Basis in Evidence

Reading Plaintiff's opposition brief, someone unfamiliar with this case might be surprised to learn that the exact federal contracting program at issue here has twice been upheld as constitutional within the last ten years. *See Rothe*, 107 F. Supp. 3d at 183; *DynaLantic*, 885 F. Supp. 2d at 237.[6] Or that another federal contracting program, the Department of Transportation's

---

[5] The Sixth Circuit case Plaintiff cites to support the proposition that Defendants' expert reports are inadmissible hearsay not only relies on authority from before the 2010 amendment of Rule 56, it does not involve an expert report submitted pursuant to Rule 26(a)(2)(B), but rather a professional report submitted outside of discovery. Pl. Opp. at 6 (citing *Shaffer v. CSX Transp., Inc.*, 462 F. App'x. 597, 601 n.2 (6th Cir. Feb. 22, 2012)). In any event, both Dr. Wainwright and Mr. Chow gave sworn testimony about the contents of their reports in deposition. Ex. 1, Chow dep. at 3:10-11; 33:16; Ex. 2, Wainwright dep. at 24:5-25:3. And they will both be able to testify as to the contents of their report at trial.

[6] There is no support for Plaintiff's suggestion that the analysis of the 8(a) program in *DynaLantic and Rothe*, is "probably no longer viable even in the D.C. Circuit after that Court's opinion in

Disadvantaged Business Enterprise program, which incorporates the same presumption of social disadvantage for certain racial and ethnic groups has been upheld as facially constitutional by every court of appeals that has considered it. *See Midwest Fence Corp. v. Dep't of Transp.*, 840 F.3d 932, 936 (7th Cir. 2016); *Western States Paving Co., Inc. v. Wash. State Dep't of Transp.*, 407 F.3d 983, 995 (9th Cir. 2005); *Sherbrooke Turf, Inc. v. Minn. Dep't of Transp.*, 345 F.3d 964, 967-68 (8th Cir. 2003); *Adarand*, 228 F.3d at 1155.

### A. The Record Evidence Sufficiently Establishes Intentional Discrimination

Defendants have presented hundreds of disparity studies, reports, and data analyses, and no matter what the data source, no matter how the data is analyzed, the overwhelming majority of the analyses lead to the same conclusion—large disparities exist in public contracting for businesses owned by the racial and ethnic groups granted the rebuttable presumption of disadvantage. *See* Def. Mem. at 8-24. Plaintiff's speculation that perhaps some factor other than discrimination may have contributed to the disparities evident in the evidence bears little weight.

Plaintiff's criticisms of individual portions of the evidence in isolation do not create sufficient doubt to avoid the conclusion that the 8(a) program was constitutional when enacted, and continues to be constitutional as-applied. As an example, in support of the decades of statistical evidence showing gross disparities in contracting for minority-owned businesses, Defendants have submitted substantial anecdotal evidence demonstrating that discrimination is a source of these disparities. *See* Def. Mem. at 8-24. But Plaintiff dismisses all of this evidence, contending that "[a]necdotal evidence cannot, by itself, demonstrate the kind of deliberate exclusion required to

---

*Rothe*." Pl. Opp. at 25. The Court of Appeals in *Rothe* did not apply strict scrutiny to section 8(a) of the Small Business Act as it was not addressing a challenge to the rebuttable presumption of disadvantage; therefore, the decision says nothing about the district court's decisions in *DynaLantic* and *Rothe* that the presumption survives strict scrutiny. *See Rothe*, 836 F.3d at 72-73.

create a strong basis in evidence." Pl. Opp. at 20. There is no dispute that anecdotal evidence alone is insufficient to establish a strong basis in evidence. In fact, to the contrary, courts are clear that anecdotal and statistical evidence should be considered together. *See, e.g. DynaLantic*, 885 F. Supp. 2d at 250-51. But Plaintiff cannot knock down one pin at a time and claim to have gotten a strike. Determining whether evidence is sufficient to establish intentional discrimination requires considering the totality of the evidence, not just each piece in isolation. *See, e.g.*, *Farm Labor Organizing Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 534 (6th Cir. 2002) ("[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the [practice] bears more heavily on one race than another.") (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)).

Defendants' expert reports establish not only that large disparities exist in public contracting at local, state, and federal levels, but exclude non-discriminatory reasons for those disparities. *See* Def. Mem. at 8-21. And finally, through the Chow report, Defendants have established that the federal government is a participant in this discrimination as evidenced by the large disparity in federal government contracting success by small, disadvantaged firms in full and open contracting as compared to non-disadvantaged firms in a manner that cannot be explained by non-discriminatory factors. *Id.* Moreover, this disparity is clear in Plaintiff's specific industries at the three digit NAICS code level. *Id.*

## B. Congressional Evidence Is Relevant to Defendants' Strong Basis in Evidence

Plaintiff argues, without citation to authority, that this Court should ignore congressional evidence because it asserts that the federal agency Defendants, rather than Congress, must have reviewed the evidence supporting the compelling interest in establishing a race-conscious rebuttable presumption. *See* Pl. Opp. at 5. As Defendants explained in their opposition brief,

11

Plaintiff is essentially making a nondelegation argument, without stating it or providing the relevant legal standard. *Id.* (contending that "the Small Business Administration ("SBA") adopted and continues to implement a race-conscious program without Congressional authority"). Defendants addressed the significant flaws in Plaintiff's argument in its Opposition to Plaintiff's Motion to Dismiss, and incorporates those arguments here. Def. Opp. at 8-14.

## V. Plaintiff's Criticisms of Defendants' Expert Reports Are Baseless

Plaintiff raises a number of isolated critiques with respect to individual elements in the reports of Defendants' two experts, Dr. Jon Wainwright and Daniel Chow, but Plaintiff consistently misses the forest for the trees. Litigants are not required to prove their entire case through one expert report or one single piece of evidence. *See, e.g.*, *Adams v. Ameritech Servs., Inc.*, 231 F.3d 414, 425 (7th Cir. 2000) ("[T]he question before us is not whether the [expert] reports proffered by the plaintiffs prove the entire case . . . . No one piece of evidence has to prove every element of the plaintiffs' case."); *In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804, 2021 WL 4146245, at *3 (N.D. Ill. Sept. 13, 2021) ("Plaintiffs do not have to prove their entire case through one expert."); *Rothe*, 107 F. Supp. 3d at 198 ("It is well established that a court may not exclude an expert's otherwise reliable and relevant testimony simply because, without more, the testimony is insufficient to prove a proponent's *entire* case."). When viewed as a whole, these reports support that there is a strong basis in evidence for the use of a race-conscious measures in federal government contracting.

### A. Wainwright Report

Dr. Wainwright is a leading economic and statistical expert in measuring the utilization of MBEs in public and private contracting, as supported by his credentials and the numerous times he has been called to testify on these topics as a witness in state and federal courts and before

12

Congress. Doc. 60-11, Expert Report of Jon Wainwright, Ph.D., ("Wainwright Rpt.") at 10-11. Plaintiff declined to file a *Daubert* motion to exclude Dr. Wainwright's testimony, but now attempts to cast doubt on his report and testimony based on typographical errors in his 226-page report, and because Dr. Wainwright has not published articles in peer-reviewed journals.[7]

Indeed, Plaintiff makes much of the fact that Dr. Wainwright produced an updated version of his report in April 2022, correcting typographical errors that came to light while discussing the report during his deposition. Pl. Opp. at 7-8. The changes were decidedly minor: he corrected the names of tables, clarified where he mistakenly described something as a "disparity ratio" instead of a "disparity index," and corrected other minor, non-substantive errors for clarity. Notably, all of the changes that were made to Dr. Wainwright's report had been discussed during his deposition and were identified in a redlined version of the corrected report that Defendants provided to Plaintiff's counsel.[8] Among the changes was a correction to the description of certain racial groups as they are defined by the Census Bureau survey tools (the *Survey of Business Owners and Self-Employed Persons* (SBO) and *Annual Business Survey* (ABS)) that Dr. Wainwright used, in order to clarify where such individuals were included in his analysis. The change was merely descriptive;

---

[7] As Plaintiff well knows, whether an expert's analysis has been subject to peer review is one factor among many that courts may consider in analyzing the reliability of an expert's testimony under *Daubert*. *See Wynacht v. Beckman Instruments, Inc*., 113 F. Supp. 2d 1205, 1208 (E.D. Tenn. 2000) (stating that the list of *Daubert* factors, "while beneficial in many cases, is not exclusive and may not be pertinent to the circumstances of a particular lawsuit as well as the nature of the expert's testimony"). But this matter is not before the court on a *Daubert* motion, so it is unclear what relevance this particular fact has to the present motion.

[8] Plaintiff questions Defendants' representation that no substantive changes were made to the report by pointing to a "change in the formula." Pl. Opp. 8, n. 3. This change was solely a correction in the description of the formula—column 6 divided by column 5—used to calculate average payroll per employee, which was previously discussed at Dr. Wainwright's deposition (Wainwright dep. at 114:3-24) and amended in the text of the corrected report (*see* Wainwright Rpt. at 43 n. 51) but inadvertently omitted from the table itself.

it did not result in double counting, as Plaintiff suggests, nor did it change his analysis in any way. Moreover, this issue was discussed at Dr. Wainwright's deposition (Wainwright dep. at 98:19-102:5), so it would have come as no surprise to Plaintiff, and it is unclear why Plaintiff is now attempting to characterize this as a "substantive" change that warrants suspicion. Plaintiff's other concerns listed below similarly fail to question the admissibility or reliability of the report.

          i.    <u>Statistical Significance</u>: Plaintiff notes that only a small subset of the disparity studies Dr. Wainwright reviewed had tested for statistical significance. Pl. Opp. at 9. However, statistical significance is but one measure of reliability. The fact that the results from across the 205 studies—which used different data and methodology, and covered different geographic markets and time frames—consistently found disparities that were large and adverse, across all industry sectors, is another measure of reliability. Wainwright Rpt. at 29. Plaintiff's own expert concurs. *See* Ex. 3, Deposition of Jonathan Guryan ("Guryan dep.") at 61:11-62:7 (consistency of results across multiple tests provides more confidence that conclusion was correct). Moreover, this critique ignores the fact that the analyses in Sections III and IV of Dr. Wainwright's report contain ample testing for statistical significance. *See generally* Wainwright Rpt at 39-80.

    Plaintiff also criticizes Dr. Wainwright for using 10% as the threshold for statistical significance, rather than the purportedly "typical" 5% threshold. Pl. Opp. at 9. However, the Sixth Circuit has not defined a particular threshold for statistical significance that must be met in order for statistical evidence to be admissible. *See, e.g.*, *Underwood v. Nextel Partners, Inc.,* No. 2:03-cv-389, 2006 WL 6867775, at \*2-3 (E.D. Tenn. July 14, 2006) (acknowledging that the Sixth Circuit has not set a definite limit or threshold with respect to statistical significance testing and rejecting *Daubert* challenge to evidence that tested for statistical significance at 10% rather than 5%); *E.E.O.C. v. AutoZone, Inc*., No. 00-2923 Ma/A, 2006 WL 2524093, \*3 (W.D. Tenn. Aug.

14

29, 2006) (citing *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 318 n.5 (1977) (rejecting critique of plaintiff's expert's evidence because of the significance level that he used, and making clear that no "precise calculations of statistical significance are necessary in employing statistical proof"). This is not a reason to disregard Dr. Wainwright's statistical analysis.

      ii.   <u>Disparities Might be Caused by Sex, Not Race</u>: Plaintiff contends that the disparities identified in Section II of the Wainwright report might be caused by sex, not race, as sex was not explicitly controlled for in that section. Pl. Opp. at 6. However, as Dr. Wainwright made clear in the portion of his deposition testimony to which Plaintiff cites, in Section IV of his report, he performed regression analyses that explicitly controlled for the sex of business owners as well as their race. That Section IV of Dr. Wainwright's analysis shows that significant racial disparities remained even after controlling for sex indicates that sex alone is unlikely to be the cause of the disparities. *See* Wainwright dep. 88:18-89:23; 107:12-22.

      iii.   <u>Examination of Underlying Availability Data</u>: Plaintiff faults Dr. Wainwright for failing to examine the underlying data from the disparity studies that he did not personally conduct. However, courts have made clear that experts can rely on these types of studies at face value. *DynaLantic*, 885 F. Supp. 2d at 276-77 (specifically rejecting the argument that the government "must independently verify the evidence presented to it"); *Rothe*, 107 F.Supp. at 209 (incorporating *DynaLantic* court's reasoning and adopting as its own). Moreover, Dr. Wainwright has acknowledged that the 205 studies that he reviewed utilized different methods for measuring availability, *see* Wainwright Rpt. at 16, but this is a strength of his analysis, rather than a weakness: that the results of such different studies consistently showed large, adverse, and statistically significant disparities for MBEs in the majority of cases generates confidence that these disparities are not the result of random chance. *See* Wainwright Rpt. at 29; Wainwright dep. at 164:11-165:7.

15

iv. <u>Controlling for Capacity</u>: Plaintiff also contends that many of the disparity studies and other information Dr. Wainwright reviewed cannot accurately measure discrimination because they fail to control for a firm's size or capacity. Pl. Opp. at 10. As a preliminary matter, Plaintiff fails to appreciate that the various firms that published the disparity studies Dr. Wainwright reviewed (including NERA) *do* have different methods of determining capacity. Wainwright dep. at 166:6-23; 167:13-25. More significantly, Plaintiff's criticism ignores key facts which its own expert concedes to be true. For example, a business's capacity is not static; businesses can (and do) scale up to meet demand. *See* Guryan dep. at 161:1-5; 166:8-12; Ex. 4, Bennett dep. at 64:8-12 (explaining that it would be "very easy" for Ultima to scale up if it won more bids).

Further, because Ultima did not perform its own study controlling for capacity as it suggests, this criticism is merely speculative—a fact which several courts have found renders such an argument unpersuasive. *See, e.g.*, *DynaLantic*, 885 F. Supp. 2d at 277 (finding the plaintiff failed to show "the disparities shown in those studies are eliminated when there is a control for firm capacity" as they would define it); *see also Concrete Works*, 321 F.3d at 991 (finding that the plaintiff's hypothesis that identified disparities could be explained by other factors was not evidence the court could consider because the plaintiff did not conduct its own marketplace disparity studies controlling for the variables it contended should be accounted for).

Finally, Plaintiff's critique once again fails to consider Dr. Wainwright's analysis as a whole.[9] In performing the regression analyses in Section IV of his report, Dr. Wainwright did

---

[9] Here too, in pointing out that Dr. Wainwright did not use firm size in his regression analysis whereas Mr. Chow did, Plaintiff continues to miss the bigger picture. That Mr. Chow found a large disparity in the relative successes of minority-owned businesses and non-minority-owned-businesses after controlling for firm size, *see* Chow Rpt. at 4 (Table 1), bolsters the conclusion that differences in size cannot alone account for the disparities both experts identified.

16

control for a number of factors that are frequently correlated with a firm's size or capacity (identified as his "capacities model"), including measures of the owner's financial assets, demographic and human capital variables, and local economic conditions by state. Wainwright Rpt. at 59. The fact that significant disparities in the business formation rates and owner earnings of minorities remained even after Dr. Wainwright controlled for these variables suggests that they cannot be explained by differences in capacity alone. *Id.* at 66-69.

Plaintiff's citation to *Michigan Road Builders Ass'n, Inc. v. Milliken*, 834 F.2d 583 (6th Cir. 1987), as holding that firm size needs to be considered in disparity studies is inapposite. There the court held that a statewide program that set aside contracts for certain racial and ethnic minorities was unconstitutional, rejecting the entirety of the state's evidence of discrimination against MBEs as woefully inadequate. When asked to identify evidence supporting the legislature's conclusion that minorities had been discriminated against in state contracting, the defendants in *Milliken* referred to "the history of the western world for the past 2000 years." *Id.* at 594. The state also conceded that it maintained no records concerning the number of contracts that were awarded to MBEs. *Id.* Although the court opined that any difficulties minority-owned businesses faced in competing for contracts may be a result of their size (noting that most MBEs are small), this omission was not central to the court's determination that the state's evidence was inadequate.

> v. <u>Racial Differences in Work Ethic or Desire to be an Entrepreneur</u>: Plaintiff contends, without any supporting evidence, that "certain groups might just have more members who prefer being entrepreneurs or who will work very hard (or in more remunerative industries) if they do." Pl. Opp. at 11. To the extent that Plaintiff's critique is that Dr. Wainwright's analysis fails to control for the desire to be self-employed or to work in a particular field, this is incorrect.

17

The data from the *American Community Survey Public Use Microdata Sample* (ACS PUMS)[10] that Dr. Wainwright analyzed in Section IV of his report took these factors into account, as it only looks at people who are already business owners in a field they've chosen. Wainwright Rpt. at 39 n.46, 59-60. Thus, none of the cases cited by Plaintiff in this section of its brief (in which courts have found that the failure to consider employee preferences in statistical analyses of employee availability renders them unreliable) have any relevance.[11]

What is clear from Dr. Wainwright's report is that after controlling for many non-discriminatory variables that might explain differences in business formation and success—such as differences in education, financial capital, and marital status—that significant disparities remained between white and non-white business owners. He reasonably concluded that such differences were consistent with the presence of discrimination rather than innate differences in the relative ambitions of members of different racial groups. Wainwright Rpt. at 62-64. Plaintiff has offered no evidence to doubt that conclusion.

---

[10] Plaintiff's assertion that the court in *Engineering Contractors. Ass'n v. Metropolitan Dade County*, 122 F.3d 895 (11th Cir. 1997) "rejected" Dr. Wainwright's use of PUMS data is incorrect. The court did not reject Dr. Wainwright's analysis as inadmissible in that case, nor did it opine that his use of PUMS data was inappropriate. *Id*. at 921-23. Moreover, it should be noted that the PUMS data that was available at that time, which emerged from the decennial census, is not the same as the ACS PUMS data that is available today. Wainwright Rpt. at 59.

[11] Moreover, several of the cases Plaintiff cites (including *E.E.O.C. v. Chicago Miniature Lamp Works*, 947 F.2d 292 (7th Cir. 1991) and *E.E.O.C. v. Consolidated Services Systems*, 777 F. Supp. 599 (N.D. Ill. 1991)) are not applicable because they address the statistical evidence needed to define the relevant labor market in a Title VII pattern-or-practice case, which is very different from the purpose for which Dr. Wainwright was using statistical evidence here. Additionally, Plaintiff's citation to *Robertson v. Sikorsky Aircraft Corp.,* No. 3:97 CV 1216 (GLG), 2001 U.S. Dist. LEXIS 11662 (D. Conn. July 5, 2001) is very misleading. There the court did not reject any statistical evidence because it failed to account for employee preferences; it merely expressed skepticism about whether the plaintiffs could meet the class action commonality requirements of Fed. R. Civ. P. 23, based on the lack of similarities between the named plaintiffs and the proposed class. *Id*. at *18.

vi. <u>Differentiation Between Racial Groups</u>: Plaintiff is critical of the fact that certain racial and ethnic groups, such as Asians and Native Hawaiians, are defined differently in the various data sets that Dr. Wainwright analyzed. Although the racial categories defined for purposes of the 8(a) program and the Census data have some differences (as Dr. Wainwright explained in his report),[12] these are official categories that are established by the federal government and consistently used for statistical purposes. More significantly, this is another instance in which Plaintiff's granular criticism masks the bigger picture; namely, that Dr. Wainwright found significant, adverse disparities for every racial group, no matter how they were defined. Wainwright Rpt. at 30, 31 (Table 2.2), 40-44 (Table 3.1), 50-52 (Table 3.3).

### B. Chow Report

Plaintiff also raises a number of critiques regarding Mr. Chow's report, many of which Defendants have addressed in their opposition to Plaintiff's Motion to Exclude the Testimony of Defendants' Expert Daniel Chow (Doc. 68) and will not repeat here.

Plaintiff raises the new contention that Mr. Chow's findings regarding small disadvantaged businesses (SDBs) not participating in the 8(a) program tell us nothing about racial disparities, as SDBs include both minority-owned firms and non-minority-owned firms. But this ignores that the vast majority of SDBs (88.4%) are minority-owned. Chow Rpt., Doc. 61-13, at 4 (Table 1). Moreover, Plaintiff mischaracterizes the comparison that was drawn in Mr. Chow's report. In estimating the odds of winning a contract for SDBs who did not participate in the 8(a) program, Mr. Chow compared firms who met that criteria—*i.e.*, that were both SDBs, the majority of which are minority-owned, and *not* beneficiaries of the 8(a) program—with firms who did not meet that

---

[12] *See* Wainwright Rpt. at 39 n.47, explaining the differences between the race and ethnicity categories used in the SBO and ABS, as compared to those used in the 8(a) program.

19

criteria—*i.e.*, firms that were *not* SDBs or *were* in the 8(a) program. Chow dep. at 103:19-104:5. This was intended to isolate the effect that status as an SDB had on a firm's odds of success, separating out the benefits that the 8(a) program confers. The fact that non-minority firms are present in both groups being compared does not render this comparison invalid, nor detract from the fact that Mr. Chow's findings are what they purport to be: an estimation of the impact that status as an SDB has on a firm's chances of success in securing government contracts in the absence of other factors. Recognizing that not all SDBs are minority-owned, Mr. Chow also analyzed the odds of success for minority-owned businesses as compared to non-minority-owned businesses, and also found large disparities in contracting success. Chow Rpt., at 10 (Table 4a).

Plaintiff also disputes without evidence that the federal government's System for Award Management (SAM) database constitutes the set of firms that are reasonably expected to compete for federal contracts, purportedly because registration in SAM is free. *See* Pl. Opp. at 15. Regardless of its cost, firms must take the affirmative step of registering in SAM before they can bid on federal government contracts, thus creating the universe of firms ready, willing, and able to contract. *See* SAM.GOV, https://sam.gov/content/entity-registration (last visited July 15, 2022) ("If you want to apply for federal awards as a prime awardee, you need a registration.").

## VI.     The Undisputed Facts Show the 8(a) Program is Narrowly Tailored

Much like its arguments concerning the compelling interest, Plaintiff's response fails to raise genuine issues of material fact demonstrating that the 8(a) program is not narrowly tailored. Defendants have already addressed most of the arguments Plaintiff makes with respect to narrow tailoring in their opposition to Plaintiff's motion, so incorporates those responses by reference.

### A.  Necessity for race-based relief and efficacy of alternative remedies

Since the necessity for the program overlaps with the strong basis in evidence, Plaintiff

20

contends that the same arguments it made regarding Defendants' strong basis in evidence apply here as well. But the same flaws in those arguments, as discussed *supra* in Sections II.C, IV.A, apply here too. Namely, by failing to consider the totality of the evidence and by applying the wrong legal standard, Plaintiff has not created a genuine dispute of material fact about the ongoing need for the program. As for the efficacy of race-neutral alternatives, Plaintiff argues that the SBA should simply return to implementing the 8(a) program without the presumption as it did before 1986. But the SBA already exhausted this method of administering the program prior to adding the presumption.

### B.  The 8(a) program is sufficiently flexible

Plaintiff asserts that Defendants "essentially concede (1) that the race component is for administrative convenience, to avoid the work of individually evaluating the applications of minority-owned businesses and (2) that the 'rebuttable' presumption of social disadvantage has never been rebutted and likely never will (as *Vitolo*, binding authority in the Sixth Circuit states)." Pl. Opp. at 25. Neither has support in the record. Nowhere have Defendants stated that the presumption is for administrative convenience, and Plaintiff provides no citation to the record showing that they have. As to the rebuttable nature of presumption, as Defendants demonstrated in their opposition brief, the presumption has in fact been rebutted. Def. Opp. at 26-27. In any case, there is no more reason to think that the presumption is rarely rebutted because of some flaw in the process than because there is actually little to no basis to rebut that a member of the identified groups has never experienced discrimination.

Plaintiff considers it problematic that the 8(a) program can sometimes be faster or easier to use than other contracting methods. Pl. Opp. at 24. But, if saving time was really such a huge incentive to use the 8(a) program, then surely it would be used more often than for 3.7% of small

business contracts. Def. Mem. at 32-33. Plaintiffs deposed two contracting officers, both of whom testified that their use of the 8(a) program to award NRCS contracts following the decision not to continue exercising options on the Ultima IDIQs was only the first or second time they had ever used it. Ex. 5, Deposition of Howard Stover at 37:18-40:10; Ex. 6, Deposition of Danny Mandell at 48:8-22.

### C. The 8(a) program is neither under- nor overinclusive

Plaintiff argues that Defendants have not justified why some racial groups are entitled to the rebuttable presumption of social disadvantage and other groups are not. Pl. Opp. at 26. But this argument ignores the vast amount of evidence showing that "'discrimination is sufficiently pervasive across racial lines to justify granting a preference to [the] five purportedly disadvantaged groups included' in Section 8(a)." *DynaLantic*, 885 F. Supp. 2d at 258 (quoting *Rothe*, 262 F.3d at 1330)); *see* Def. Mem. at 8-24.

Plaintiff's contention that "the SBA excludes certain national origins by characterizing them as white or just not considering them at all" is curious. Pl. Opp. 26. Plaintiff's suggestion that a congressional remedy for race discrimination cannot be narrowly tailored unless Congress makes findings about discrimination against people from each country in the world, regardless of their prevalence in the United States as U.S. citizens and regardless of the existence of any substantial history of discrimination against such group in the United States has no basis in law or logic. The 8(a) program includes a process for any group that believes that it meets the criteria to apply to be included among the enumerated presumed groups. *See* 13 C.F.R. § 124.103(d).

Plaintiff's argument that the requirement that a business concern be at least 51% owned and controlled by socially and economically disadvantaged individuals renders it underinclusive, *see* Pl. Opp. at 27, is illustrative of its application of a higher standard of scrutiny than the law

22

requires. Plaintiff specifically complains that "Defendants do not explain why socially and economically disadvantaged individuals who own only 50.5% of a concern . . . are excluded from the program." *Id*. While Plaintiff relies on *Vitolo*, the court noted on the limited record there that "the government fails to explain why that cutoff relates to its stated remedial purpose." 999 F.3d at 363. Here, Defendants have explained that Congress drew the line at 51% to indicate ownership and control because that is the percentage at which an individual has majority ownership and control over a business. Def. Mem. at 30. The heightened strict scrutiny standards that Plaintiff applies would truly render strict scrutiny "fatal in fact" in all circumstances and no race-conscious remedial programs would exist.

### D. The 8(a) program does not unduly burden any third parties, including Plaintiff

Plaintiff alleges that the 8(a) program burdens third parties and primarily takes issue with the provision prohibiting use of the 8(a) program if the SBA determines that doing so would have an adverse impact on non-participating small businesses. Pl. Opp. at 28-30. Though courts have found that "this feature helps narrowly tailor the program," *DynaLantic*, 885 F. Supp. 2d. at 291, Plaintiff disagrees because it is unclear "how frequently the provision is invoked." Pl. Opp. at 28. But Plaintiff supports this assertion only with a citation to the Director of SBA's Georgia District Office's testimony that she could only remember conducting about seven adverse impact analyses in her 20 years working for the SBA. The SBA has approximately 80 district offices. The personal experience of the director of one of those offices does not support Plaintiff's asserted fact that "the SBA engaged in adverse impact analysis very infrequently." Pl. Resp. Def. SOF, Doc. 73, ¶ 5.

Though it is undisputed that SBA's Georgia District Office determined that awarding an 8(a) contract for administrative support services in NRCS's Mississippi field office would cause an adverse impact on Plaintiff, the record evidence demonstrates that the determination was made

in error. *See* Def. Mem. at 32 n.24. Multiple witnesses, including the District Office director who signed the determination, and whose testimony Plaintiff relies on, have explained that an adverse impact analysis was not required because the contract was a new requirement given its change in scope and expanded services. *See* Stonebraker dep., Doc. 61-5, at 109:2-18; Klein dep., Doc. 61-17, at 178:4-179:3; Denison dep., Doc. 61-20, at 39:7-16, 40:11-19; *see also* 13 C.F.R. § 124.504 ("[A]dverse impact does not apply to 'new' requirements."). Additionally, the District Office director testified that an adverse impact analysis is typically not conducted when a non-8(a) firm has been performing the requirement for less than 24 months. Denison dep. at 40:11-19; *see also* 13 C.F.R. § 124.504(c)(1)(i)(A).[13] Thus, a single, demonstrably erroneous adverse impact determination is insufficient to demonstrate that the adverse impact provision undercuts narrow tailoring.[14]

Plaintiff would have this Court hold that the 8(a) program creates an undue burden for Plaintiff any time it is unable to compete for a contract. Pl. Opp. at 30. But that is not the standard for determining undue burden. Plaintiff asserts that she would not have been able to apply to four of the five contracts Defendants identified as being open to competition for all businesses or all small businesses, but that is due to Plaintiff's own choice not to apply for the GSA Supply Schedule Program, which has no race-based requirements.[15] Def. Mem. at 5. Plaintiff cannot create an undue

---

[13] Contrary to Plaintiff's assertions, the fact that there is more than one reason why the adverse impact determination should not have been performed does not create a dispute of fact.

[14] Notably, the requirement was awarded through the 8(a) program to All-Pro Placement Service, Inc., a woman-owned firm that was admitted to the program not based on the presumption of disadvantage, but by demonstrating social disadvantage based on gender. *See* Ex. 7, Declaration of John Klein ¶¶ 2-4. Thus, Plaintiff cannot claim that it was denied an opportunity to compete for this contract based on race.

[15] The requirements for the GSA supply schedule program may be found at https://www.gsa.gov/buying-selling/purchasing-programs/gsa-multiple-award-schedule/mas-roadmap/mas-prospective-contractors-read-me-first (last visited July 19, 2022).

burden by excluding herself from competition for a large portion of government contracts. In sum, the Section 8(a) Program has not created an impermissible burden on non-participating firms.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion for summary judgment.

Dated: July 19, 2022

Respectfully submitted,

KAREN D. WOODARD
Chief
Employment Litigation Section
Civil Rights Division
United States Department of Justice

OF COUNSEL:

David A. Fishman
Assistant General Counsel for Litigation

Eric S. Benderson
Associate General Counsel for Litigation
U.S. Small Business Administration

Amar Shakti Nair
Attorney Advisor

Ashley Craig
Attorney Advisor
U.S. Department Of Agriculture

ANDREW BRANIFF (IN Bar No. 23430-71)
Deputy Chief

By: */s/ Juliet E. Gray*
Juliet E. Gray (D.C. Bar No. 985608)
K'Shaani Smith (N.Y. Bar 5059217)
Christine T. Dinan (D.C. Bar 979762)
Senior Trial Attorneys
Employment Litigation Section
Civil Rights Division
United States Department of Justice
150 M Street, N.E.
Washington, D.C. 20002
(202) 598-1600
Juliet.Gray@usdoj.gov
K'Shaani.Smith@usdoj.gov
Christine.Dinan@usdoj.gov

25

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on July 19, 2022, I electronically filed the above document and with the Clerk of the Court using the ECF System, which will send notification of such filing to all counsel of record.

                        */s/ Juliet E. Gray*
                        Juliet E. Gray
                        Senior Trial Attorney