# EXHIBIT 2

```
 1   UNITED STATES DISTRICT COURT
 2   EASTERN DISTRICT OF TENNESSEE
 3    - - - - - - - - - - - - - - - - - - - - -x
 4   ULTIMA SERVICES CORPORATION,
 5                     Plaintiff,
 6                No. 2:20-cv-00041-DCLC-CRW
 7        -against-
 8   U.S. DEPARTMENT OF AGRICULTURE, U.S.
     SMALL BUSINESS ADMINISTRATION, SECRETARY
 9   OF AGRICULTURE, and ADMINISTRATOR OF THE
     SMALL BUSINESS ADMINISTRATION,
10
                     Defendants.
11
      - - - - - - - - - - - - - - - - - - - - -x
12
                     March 7, 2022
13                   10:03 a.m. (EST)
14
15      DEPOSITION of Dr. Jon Wainwright, the
16   Expert Witness in the above-entitled
17   action, held at the above time and place,
18   taken before Garry J. Torres, a
19   Stenographer and Notary Public of the
20   State of New York, pursuant to the Federal
21   Rules of Civil Procedure, Notice and
22   stipulations between Counsel.
23
24            *      *      *
25
```

Case 2:20-cv-00041-DCLC-CRW    Document 74-2    Filed 07/19/22    Page 2 of 11
PageID #: 3058

1 APPEARANCES:
2

CENTER FOR INDIVIDUAL RIGHTS
3    Attorneys for Plaintiff
     ULTIMA SERVICES CORPORATION
4     1100 Connecticut Ave, NW
      Suite 625
5     Washington, D.C. 20036
      TEL: (202) 833-8400
6     EMAIL: scott@cir-usa.org
7 BY:  MICHAEL E. ROSMAN, ESQ.
8
9 CHRISTINE DINAN, ESQ.
     Attorneys for Defendants
10
11

ALSO PRESENT:
12

   MICHELLE SCOTT
13   ANDREW BRANIFF
     K'SHAANI SMITH
14   JULIET GRAY
          *   *   *
15
16
17
18
19
20
21
22
23
24
25

1        STIPULATIONS
2    IT IS HEREBY STIPULATED AND AGREED, by
3 and among counsel for the respective
4 parties hereto, that the filing, sealing
5 and certification of the within deposition
6 shall be and the same are hereby waived;
7    IT IS FURTHER STIPULATED AND AGREED
8 that all objections, except as to form of
9 the question, shall be reserved to the
10 time of the trial;
11   IT IS FURTHER STIPULATED AND AGREED
12 that the within deposition may be signed
13 before any Notary Public with the same
14 force and effect as if signed and sworn to
15 before the Court.
16       *    *    *
17
18
19
20
21
22
23
24
25

1 J O N   W A I N W R I G H T, the Expert
2 Witness herein, having first been duly
3 sworn by the Notary Public, was examined
4 and testified as follows:
5      MR. ROSMAN:  Dr. Wainwright, I'm
6 Michael Rosman.  I'm the -- one of the
7 attorneys for the plaintiff in this
8 case.  I'll be asking you a series of
9 questions which you should wait 'til I
10 finish the question and then answer.
11 If you don't understand a question
12 that I've asked please feel free to
13 let me know on what you don't
14 understand and I might choose to
15 rephrase it.
16    If we need to take break at
17 points or we will need to take a break
18 at points, but if you need to take a
19 break at points let us know and I'll
20 try to find an appropriate spot to do
21 that.
22    You have been deposed before,
23 sir?
24    THE WITNESS:  Yes.
25    MR. ROSMAN:  All right.  I'm

1 going to try to introduce your CV.
2 You have a copy of it though, right?
3    THE WITNESS:  I do.
4    MR. ROSMAN:  Okay.  Let me see
5 if this -- I'm new to this virtual.
6 Now, can everybody else -- I tried to
7 introduce the CV as an exhibit as
8 Exhibit 1.  Does everybody else have
9 that available to them now?
10    MS. DINAN:  No, it's not showing
11 up on any of my screens.
12    MR. ROSMAN:  It says my exhibit
13 has been introduced.
14    (Whereupon, an off-the-record
15 discussion was held.)
16    MR. ROSMAN:  Why don't we just
17 go through some of your background,
18 Dr. Wainwright, and we'll worry about
19 the introduction of the exhibit at
20 some point.
21 EXAMINATION
22 BY MR. ROSMAN:
23   Q.   What is your name?
24   A.   Jon Wainwright.
25   Q.   Where do you reside?

2 (Pages 2 - 5)

Case 2:20-cv-00041-DCLC-CRW   Veritext Legal Solutions   Filed 07/19/22   Page 3 of 11
212-267-6868   Document 74-2   www.veritext.com   516-608-2400
PageID #: 3059

1   A.   Okay.
2   Q.   So you were given the complaint
3 and other relevant litigation documents by
4 the defendants.  What other documents did
5 they give you?
6   A.   They had collected a number of
7 disparity studies that have been published
8 in recent years and provided me those.  I
9 believe that's -- I believe at the outset
10 I believe that was everything they
11 provided.
12   Q.   Okay.  Were you given additional
13 disparity studies later on?
14   A.   I was not given any additional
15 disparity studies later on.
16   Q.   Were you given any additional
17 documents or information later on?
18   A.   Yeah.  I think at one point I
19 was given a -- I don't even know what to
20 call it.  I was given a document that the
21 defendants are or have published in the
22 federal register.  Christine maybe can
23 tell you what that was.
24        I believe I was given a copy of
25 another expert's -- another defense

1 expert's report from the Rothy case.  I
2 think that's it.
3   Q.   I just want to make sure I
4 understand what you said.  Were you given
5 a defendant's expert from the Rothy case?
6   A.   Yes.
7   Q.   Okay.  That was the same Rothy
8 case that you referred to previously; is
9 that right?
10   A.   I believe so, yes.
11   Q.   Okay.  I think you said that you
12 were being paid $600 per hour for your
13 work in this case; is that right?
14   A.   Yes.
15   Q.   Not that you said it, but that
16 you are being paid $600 per hour?
17   A.   Yes.
18   Q.   How many hours have you worked
19 so far?
20   A.   About 300.
21   Q.   How long did it take for you to
22 write the report?
23   A.   About 299.  No.  Well, all of
24 that went into writing the report.  I mean
25 I couldn't have written the report without

1 bringing all the data in from the studies
2 and putting it together in a form that was
3 accessible.  So I mean all those hours
4 went into that.
5   Q.   Okay.  Did you review the report
6 carefully before submitting it to the
7 Department of Justice?
8   A.   I certainly tried.
9   Q.   Okay.  How many times did you
10 review it?
11   A.   I don't know that I counted --
12 you know, that's once all the way through,
13 this is twice all the way through.  I
14 don't know that I counted it that way.
15   Q.   Would a lot be a fair
16 characterization?
17   A.   I'm not sure what you're asking.
18   Q.   I'm just trying to understand
19 how carefully you reviewed the report
20 before you submitted it, that's all.  It's
21 not a trick question.
22   A.   As carefully as I could.
23   Q.   Okay.  Did you work -- I'm
24 sorry.  Were you done with that answer?
25   A.   Yes.

1   Q.   Did you work with anyone else in
2 creating the report?
3   A.   No.
4   Q.   So did -- the government gave
5 you a bunch of disparity studies for you
6 to review.  Did you make a selection among
7 those studies?
8   A.   Only if there was a study on
9 that list that turned out to be unusable.
10   Q.   Were there?
11   A.   On the list of the studies that
12 DOJ provided me I'm not sure, but there
13 probably were one or two.
14   Q.   Okay.  Do you remember which of
15 those were unusable?
16   A.   Without looking it up, I
17 couldn't tell you names and dates, but
18 there were several that were just
19 availability studies.  So they -- you
20 couldn't pull a disparity statistic out of
21 them.  So those were unusable for my
22 purposes.
23        There were a couple that weren't
24 actually contracting disparity studies.  I
25 think one was a workforce study so that

7 (Pages 22 - 25)

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

statistical significance?
A. Some of them probably were, but that's not presented in the table.
Q. And I take it all of the NERA studies that are included in table 2.8 at least use the same methodology for calculating disparity indexes or ratios; is that right? I'm sorry.
A. Is all the NERA studies?
Q. Sorry?
A. The same methodology --
Q. There were 21 NERA studies included in table 2.8, right?
A. No. I don't know if all 21 studies had those particular categories but that would be the most that could be and -- but all the NERA studies use, basically, the same approach to measuring disparity.
Q. That's what I was asking. Thank you. So -- and just make sure I understand the numbers here. In the employment services category there was 54 percent of the disparities for minorities were less than a hundred and

61 percent of the disparities for nonminorities males were less than a hundred; is that right?
A. That is correct.
Q. I think you've sort of answered this before but I'm going to ask it anyway, does any of the underlying studies for table 2.8 account for any other factors that may account for the disparities, like capacity?
A. What do you mean by "capacity"?
Q. The ability of a firm to do larger contracts?
A. Measured how? No.
Q. You may not have -- you may have decided not to measure it. I'm just asking whether you made any effort to do so?
A. I don't know that it could be measured but that is not part of our availability measure.
Q. Okay. All right. When you did the coding, you did do coding for nonminority, women-owned companies, correct?

A. I pulled out data for everybody from the reports.
Q. Right.
A. So I -- yes.
Q. Okay. So why didn't you include observations including nonminority, female-owned companies in tables 2.2 through 2.8?
A. My understanding is they're not relevant to the 8(a) program.
Q. So I guess the question I want to ask as a follow up is this: When you see disparities in a group that includes women, how do you know that disparities are not caused by sex instead of race?
A. Not sure I understand the question.
Q. Okay. Let me see if I can think of a better way to phrase it. Let me try it this way: So when you see in table 2.2 that there was a 78 percent of the disparities that you observed for Asians were less than or equal to 80 whereas only 7 percent of the disparities you observed for nonminority males were less than or

equal to 80, how do you know that isn't caused by the fact that there's discrimination against woman-owned firms, which were included in the Asian category but not in the nonminority male category?
A. Because then the -- my regression analyses in the final section of the document would show coefficients that are neither large or adverse nor insignificant for minorities and the opposite for by sex and they do not. I'll leave it at that.
Q. That's fine, but I just want -- let's say I didn't have those other parts of your study, how would I know that the differences that we're seeing here in the numbers weren't caused by the inclusion of woman-owned firms in the Asian categories and their exclusion in the nonminority male category?
A. I think that's exactly how you do know is you turn to other evidence that allows you to tease out those factors.
Q. Okay. But this by itself wouldn't tell you that?

1 I didn't -- you know, I -- you'd really
2 have to go to the census bureau to get a
3 definitive answer on that.
4     Q.   Let me rephrase the question.
5 You don't know whether the census bureau
6 does anything to check the accuracy of the
7 response on how one capitalizes one's
8 business; is that right?
9     A.   That's not right.  I'd have to
10 refer myself to the methodology documents
11 that are out there that detail exactly how
12 these surveys are done and what checks
13 there are.  They do all kinds of quality
14 control checks.
15        Whether you're trying to suggest
16 whether somebody lies on the survey and
17 can the census figure that out, I don't
18 know.
19     Q.   So let me just -- I had some
20 questions about some of the tables in this
21 part of the report.  I don't think they'll
22 take terribly long.  In your footnote 47
23 on page 39 I believe you indicated that
24 Native Hawaiians, Asians, Pacific
25 Islanders and subcontinent Asians are all

1     A.   I did that because the SBO does
2 it that way.  So I missed -- I think I
3 misspoke earlier about that footnote, what
4 was the footnote?
5     Q.   Well, why don't you read the
6 footnote and tell me whether it's accurate
7 or inaccurate?
8     A.   Native Hawaiians and Pacific
9 Islanders are presented as a distinct
10 category in the SBO.
11     Q.   Let me --
12     A.   Right.  Because you've got
13 Asians -- in table 3.1 there's an Asian
14 category and there's a Pacific Islanders
15 category.  The Pacific Islanders category
16 also has Native Hawaiians.
17        So if you were to combine that
18 into Asians and Pacific Islanders
19 together, but they're presented in the SBO
20 as separate line items.  So it may be the
21 phrasing in footnote 47 was a bit
22 inartful, but this is how it's broken out
23 in the SBO.
24     Q.   What was inartful about footnote
25 47?

1 grouped together in the two surveys that
2 are part of this -- part of your report.
3 Did I understand that correctly?
4     A.   If you said Native Hawaiians,
5 Asians and Pacific Islanders and
6 subcontinent Asians are grouped together
7 as Pacific Islanders, that's correct.
8     Q.   Okay.  So if you can go to table
9 3.1?
10     A.   All right.
11     Q.   In this table Asians are given
12 one line and Native Hawaiians and Pacific
13 Islanders are given another line.
14     A.   Yes.
15     Q.   And I'm --
16        (Whereupon, simultaneous
17     conversation took place disrupting the
18     record and the court reporter
19     requested one person speak at a time
20     without interruption from anyone
21     else.)
22     Q.   So I'm asking how you separated
23 out Asians from Native Hawaiians and
24 Pacific Islanders in your chart in table
25 3.1?

1     A.   Well, as I read it here it seems
2 to suggest that I got one category that's
3 Asians and Pacific Islanders that includes
4 Native Hawaiians, but I've actually got
5 two line items for that in table 3.1.  I
6 have a line item for Asians and a line
7 item for Native Hawaiians and Pacific
8 Islanders.
9     Q.   Okay.  So it's not the case as
10 it says in footnote 47 the Native
11 Hawaiians are grouped with Asians; is that
12 right?
13     A.   Well, they're grouped with
14 Pacific Islanders.  What I was trying to
15 do was differentiate it from the 8(a)
16 categories where Native Hawaiians are
17 included among the Native American
18 grouping.
19     Q.   Right.  I understand.  I'm just
20 trying to make sure I understand your
21 testimony.  Footnote 47 says Native
22 Hawaiians are grouped with Asians, but I
23 think if I understand your testimony now
24 you're saying that's not the case?
25     A.   Right.  I think I would have

26 (Pages 98 - 101)

Case 2:20-cv-00041-DCLC-CRW   Document 74-2   Filed 07/19/22   Page 6 of 11
PageID #: 3062
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Page 102
1 been more accurate to say Native Hawaiians
2 are grouped with Pacific Islanders and
3 Pacific Islanders are frequently grouped
4 with Asians in a lot of other government
5 data.
6     Q.   Well, I understand, but we're
7 talking about the SBO right now.  Okay.
8 So in the next sentence subcontinent
9 Asians are grouped with Asians and Pacific
10 Islanders, is that also incorrect at least
11 insofar as it refers to Pacific Islanders?
12     A.   I would say the better way to
13 state footnote 47 would be to say in the
14 SBO and ADS Native Hawaiians are grouped
15 with Pacific Islanders rather than with
16 Native Americans, also subcontinent Asians
17 are grouped with Asians rather than
18 classified separately.
19     Q.   Okay. So if you could just turn
20 to page 40 of your report under A dot one,
21 economy wide results.  There's a number of
22 references in this part to a table three,
23 which I could not find.  So is that an
24 error?  So you look, for example, in the
25 second line of the second paragraph?

Page 103
1     A.   Yes, Mr. Rosman, I think that
2 should be -- should read table 3.1.
3     Q.   Okay.  And all the other
4 references to table three in this part
5 should they also all read 3.1?
6     A.   I would say probably for this
7 part, yes.
8     Q.   Okay.  Very good.  Let's look at
9 table 3.1 now.  So reading the footnote,
10 part two of the footnote says that the
11 table excludes pubically-owned,
12 foreign-owned and not-for-profit firms.
13         So my question is:  Are
14 they -- is that excluded from all of the
15 categories in table 3.1 including the all
16 firms category?
17     A.   Yes.  What the SBO calls that
18 firms unclassifiable by race.
19     Q.   Okay.
20     A.   So they're...
21     Q.   Why are not-for-profit firms
22 unclassifiable by race?
23     A.   I believe because they don't
24 have owners.  They usually have boards.
25     Q.   And so there's -- even in the

Page 104
1 all firms category those kinds of firms
2 are not included?
3     A.   Yeah.  If I've left something
4 out of the denominator, I leave it out the
5 numerator too.  So yes.
6     Q.   Well, but if you -- before we
7 leave the numerator/denominator topic.  If
8 we add the -- in panel B if we add those
9 percentages, they come out to about
10 75 percent, right?
11     A.   Not added them, but
12 that's -- it's not because of the
13 exclusion of the firms listed in item two
14 of the footnote.
15     Q.   Okay.  What is it attributable
16 to?
17     A.   I probably -- line item for
18 women is not there.
19     Q.   Okay.
20     A.   Or for nonminority women.
21 Excuse me.
22     Q.   Say it again?
23     A.   The line item for females is not
24 there.
25     Q.   Okay.  And does that, you think,

Page 105
1 constitute most or all of the firms that
2 are included in all firms but not listed
3 in a line item?
4     A.   Most but not all.  They also
5 have a category for equally male/female
6 owned, equally minority/nonminority owned,
7 those are pretty small bits and they're
8 not broken out there either.
9     Q.   Did you do any calculations for
10 the equally minority/nonminority owned
11 firms?
12     A.   No, not for this table.
13     Q.   Do you recall approximately what
14 percentage of all firms they constituted?
15     A.   Some -- a very small number, but
16 I couldn't tell you exactly what.
17     Q.   Was it larger than Native
18 Hawaiians and Pacific Islanders or
19 smaller?
20     A.   I couldn't say as I sit here.
21     Q.   Okay.  Was it -- okay.  And I
22 assume you'd give me the same answer if I
23 asked you whether it was larger or smaller
24 than the American Indian and the Alaska
25 Native category?

27 (Pages 102 - 105)

Case 2:20-cv-00041-DCLC-CRW   Document 74-2   Filed 07/19/22   Page 7 of 11   PageID #: 3063
212-267-6868   www.veritext.com   516-608-2400

1  A.  Well, the American Indian and
2 Alaska Native category is about five times
3 bigger.  I'd probably say definitely
4 smaller than that category, but again, I
5 wouldn't -- I couldn't tell you the number
6 for sure without checking it out.
7  Q.  So most of the omitted firms
8 were nonminority women-owned businesses?
9 That is to say -- and by omitted firms I
10 mean included with all firms, but not
11 separately identified as a line?
12  A.  I want to say, and without going
13 back and checking I can't say for sure,
14 but I think the SBO actually their
15 category is women as a whole.  So that
16 would be minority and nonminority women as
17 their line item.
18      So -- you know, then those
19 numbers really would never add up to 100
20 percent because as you pointed out earlier
21 the minority categories have males and
22 females in there, but I think the SBO --
23 and I could be wrong I'd have to double
24 check, but I don't think their line
25 item -- I think their line item was for

1 women, period, and not nonminority women.
2  Q.  Okay.  Well, I guess I have the
3 same -- let me just make sure I understand
4 it.  Women-owned firms -- a firm owned by
5 Hispanic woman would be included in the
6 Hispanic category?
7  A.  Yes.
8  Q.  And so if we included the all
9 women firm it would add up to something
10 more than 100 percent?
11  A.  I think that's right.
12  Q.  So and -- well, I guess you're
13 going to have the same question I asked
14 before which is, how do we know from this
15 chart that any disparities that you see
16 are not attributable to sex?
17  A.  Well, you're free to look at
18 this chart in isolation.  That's not how I
19 did it.  As an economist the document I
20 look at as a whole.  It's a good question
21 and one I try to tackle directly in the
22 next section.
23  Q.  Okay.  So the last part of the
24 footnote says that, N-A indicates the data
25 was not disclosed due to confidentiality

1 or other publication restrictions, but I'm
2 not sure to what part of the chart that
3 applies.  Maybe you could identify it for
4 me?
5  A.  I -- you'll actually in this
6 chart, which is all industries for the
7 United States as a whole, it doesn't show
8 up.  It does show up in the next table in
9 some categories so that probably didn't
10 have to be in that note, but the business
11 bureau won't publish data if it's in such
12 a small category that it might allow
13 somebody to identify individual
14 respondents.
15  Q.  So it's a applicable to table
16 3.2, but not this table; is that right?
17  A.  Yes.
18  Q.  Okay.  So there's also -- I
19 think we spoke about capacity measures
20 earlier on.  There's no effort in this
21 chart at least to try to control for any
22 measure of capacity; is that right?
23  A.  Again you're not defining
24 capacity so I'm not sure --
25  Q.  Let me rephrase.  You know, the

1 ability to do a job as capacity because of
2 your capital or your number of employees
3 or something like that.  So let's call it
4 ability to do the job and define it that
5 way.
6  A.  Well, there's a number of
7 columns in this table that speak to that.
8 There's -- it shows you firms -- column
9 three is just firms with paid employees as
10 opposed to column one, which is all firms;
11 column five shows you the number of
12 employees; column six shows the payroll
13 levels.  So there's all kinds of...
14  Q.  Maybe I need to rephrase the
15 question then.  The disparity indices
16 don't take that into account though,
17 right?
18  A.  The some -- vague idea of the
19 ability to do work, no.
20  Q.  Okay.  Well, I mean let me give
21 you an example.  Your -- by the way before
22 I do that, panel C says these are
23 disparity ratios.  Can you tell me why you
24 put disparity ratios instead of disparity
25 indices?

Case 2:20-cv-00041-DCLC-CRW   Veritext Legal Solutions   Filed 07/19/22    Page 8 of 11
212-267-6868                    Page ID #: 3064                    516-608-2400
www.veritext.com

1   Q.   Correct?  Is that right?
2   A.   Yes.
3   Q.   Okay.  And in footnote 51 you
4  say you derive that by -- in panel A
5  dividing column four by column three.
6  Column four is sales and receipts.
7   A.   It should be column six by
8  column three, also a mistake.
9   Q.   Oh, okay.  So the figures that
10  you have on page 51 are not using this
11  formula in footnote 51 but six by three;
12  is that right?
13   A.   Yes.
14   Q.   Why would that give you average
15  salary per employee though?  I'm still
16  confused by it.
17   A.   Average payroll per employee.
18   Q.   Okay.  How does it give you
19  payroll by employee?
20   A.   -- six by column three.  No, it
21  should be six by five.
22   Q.   Okay.  So it's not six by three
23  either.  It's six by five?
24   A.   Six by five.  I'm sorry.
25   Q.   So average payroll by employee

1  is calculated by dividing column six in
2  panel A by column five in panel A; is that
3  right?
4   A.   I think that's right.  Yes.
5   Q.   During your preparation of this
6  report, did you calculate any disparity
7  indexes for nonemployer firms?
8   A.   Not separately.  The column one
9  includes employer firms and nonemployer
10  firms --
11   Q.   I got that.  But --
12   A.   -- didn't break out that
13  nonemployer category.  I could have but I
14  didn't.
15   Q.   Is there a reason why you
16  didn't?
17   A.   It's implicit.  You could do it
18  from the table.  It's the difference
19  between column three and column one is
20  nonemployer firms, and the difference
21  between column four and column two is
22  nonemployer sales but I don't know, no big
23  secret reason or anything.  I just didn't
24  do it.
25   Q.   That might be a --

1   A.   I also run out of the space on
2  the table.  So it's there implicitly.  You
3  could actually do that calculation
4  yourself with the data in the table if you
5  wanted to.
6   Q.   That might be a way to control
7  for firm size since all the firms would be
8  exactly the same size?
9   A.   Only in terms of employment.
10   Q.   That's what I meant.
11   A.   Yeah.
12   Q.   Okay.  Why don't we move to
13  table 3.2.  My first question is:  Why did
14  you limit your analysis in table 3.2 to
15  two digit NAICS codes?
16   A.   This is a national survey and
17  it -- that is the -- you know, that's
18  really the best level of national detail
19  that allows you to do a complete table.
20   Q.   Did the SBO data not go into any
21  further detail or any further NAICS codes?
22   A.   I believe it does in certain
23  cases, but then you start to run into a
24  lot of those NAs.
25   Q.   Well, I mean it looked like for

1  example in professional services that
2  there was something along the lines of
3  2.3 million firms.  Did I read that
4  correctly?
5   A.   Yes.
6   Q.   And you're saying that if you
7  broke it down further it would be reduced
8  by such a number that the census bureau
9  might not be able to provide you with the
10  data?
11   A.   No, Mr. Rosman.  Perhaps I could
12  have.  I just didn't.  If you look at the
13  table the two digit NAICS code right above
14  that, there's only 16,000 observations.  I
15  think it was really for a matter of
16  consistency across categories.  It might
17  very well be possible to break it down
18  further.
19   Q.   Okay.
20   A.   But...
21   Q.   So let me make sure I understand
22  the statistics.  Let's look at the
23  professional services NAICS 54 panel.  So
24  the three asterisks next to the disparity
25  indices indicate that those are

30 (Pages 114 - 117)

Case 2:20-cv-00041-DCLC-CRW   Veritext Legal Solutions   Document 74-2   Filed 07/19/22   Page 9 of 11
212-267-6868                         PageID #: 3065
                                     www.veritext.com                       516-608-2400

1 testimony that some of the 53,000 initial
2 records never got used in the report
3 because you didn't want to, I think you
4 said, muddy the waters by including them.
5        Could you explain a little bit
6 more what you meant by that?
7    A.   Yeah, muddy the waters maybe
8 isn't the right phrase.  It was more to
9 keep things clear and understandable in my
10 own mind as much as anything else.  I
11 think I mentioned there were --
12        I'll just take a hypothetical
13 study that would have looked at all the
14 contracts in construction, all the prime
15 contracts in construction and all the
16 subcontracts in construction.
17        But then went further and
18 divided the construction contracts up into
19 contracts over $200,000, contracts under
20 $25,000, contracts between $25,000 and
21 $200,000 or contracts that were subject to
22 MBE goals versus contracts that weren't
23 subject to MBE goals.
24        I think looking at those
25 statistics would all be interesting in

1 consistent across the studies -- the 205
2 studies and what was being measured as it
3 could be and save those other records for
4 an analysis for another day.
5    Q.   So would it be fair to say that
6 that data was excluded because it was not
7 necessarily consistent with what you were
8 trying to doing with your analysis?
9    A.   Yes.
10        MR. ROSMAN:  Objection to form.
11    Q.   So for the disparity studies in
12 the group of 205 that you looked at that
13 didn't use statistical significance
14 testing, do you think the evidence from
15 those studies is still reliable?
16    A.   Yes.  That was the whole point
17 of doing the metaanalysis was to see what
18 we could learn regardless of the -- some
19 significant differences between the
20 studies and how they were performed.
21        They were done by different
22 consultants, at different points in time,
23 with different levels of resources and
24 using different methodologies for either
25 assessing statistical significance or not,

1 their own right, but I was -- I didn't
2 want to be asked a question possibly,
3 well, if you included these others, how
4 did they make the resulting disparities
5 larger or smaller or change them.
6        And so I was trying to come
7 up -- those 27,000 records are -- you
8 know, roughly all looking at the same kind
9 of items in those disparity studies
10 because not all studies looked at
11 contracts with and without goals or broke
12 contracts down by size categories or just
13 looked at federal funding versus state
14 funding.
15        And since none of those issues
16 as far as I knew were really at issue in
17 this report, I took them out.  I
18 didn't -- I don't even know what the
19 results would be if they would be stronger
20 or weaker or different at all if I
21 included those.
22        It's not like I ran the results
23 and didn't like them and threw that stuff
24 out.  I just was trying to come up with a
25 data set that -- you know, really was as

1 or measuring availability and -- you know,
2 that was kind of the whole point of my
3 metaanalysis is to see -- you know, what,
4 if anything, we could learn regardless of
5 some of those differences or something you
6 might be able to critique about any single
7 study standing alone.
8    Q.   Earlier Mr. Rosman asked you
9 about whether NERA studies account for
10 capacity and you mentioned that you don't
11 know if capacity, as Mr. Rosman defined
12 it, then could be measured.
13        Would you explain a bit more
14 what you meant by that?
15    A.   Well, I think I'm not sure it's
16 fair to say Mr. Rosman actually defined
17 it, but he gave me an example, I believe,
18 which was the ability to do work, which is
19 not something I'm aware of any statistical
20 measure of.
21        You know, it's like
22 qualifications.  There's all different
23 aspects to qualifications and capacity.  I
24 tried to control for and include as many
25 as I could in the different sections of

42 (Pages 162 - 165)

Case 2:20-cv-00041-DCLC-CRW   Document 42-2   Filed 07/19/22   Page 10 of 11
PageID #: 3066
212-267-6868          www.veritext.com          516-608-2400

 1 the report. I can do that better in --
 2 with some data sets than with others.
 3       So in the PUMS data there's all
 4 kinds of additional variables that speak
 5 to qualifications and capacities that I
 6 was able to include. Some of the
 7 disparity studies attempt to directly
 8 incorporate capacity into their measures
 9 or whatever capacity means.
10       It means different things for
11 different consultants and different
12 attorneys. But -- you know, some
13 disparity study consultants try to
14 incorporate some aspects of capacity
15 directly into their availability measures.
16       And I -- you know, we looked at
17 those as well. I have my own way of doing
18 it and I think I've outlined -- you know,
19 in great detail how and why I choose to do
20 it that way, but the main reason is to
21 avoid including variables that themselves
22 could be negatively impacted by
23 discrimination.
24       So to try to measure and test
25 for the presence of discrimination by

 1       I mean you're not in business
 2 unless you're trying to do business, by
 3 and large, and further in the regression
 4 analyses in those NERA studies, there's
 5 all kinds of different measures in
 6 qualifications and capacity. Human
 7 capital or education levels being one of
 8 the most important.
 9    Q.   In your opinion, do you believe
10 the disparities you talked about earlier
11 in tables 2.2 to 2.8 could be caused
12 exclusively by sex discrimination?
13    A.   No. That's -- having researched
14 in this area for over a quarter of a
15 century now or maybe a third of a century,
16 I would say absolutely not.
17       I see evidence routinely of both
18 kinds. It's also the case and this is
19 just anecdotal as I sit here today but
20 most of those ethic groupings, the
21 majority of businesses in those groupings
22 by race and ethnicity are male.
23       So to -- you know, the concept
24 that somehow there is -- no race
25 discrimination and sex discrimination is

 1 using variables that are themselves
 2 potentially subject to discrimination,
 3 like, most economists will tell you is
 4 wrong headed.
 5       So -- you know, that's why I did
 6 what I did, but again, the purpose of the
 7 metaanalysis was to say -- you know, all
 8 those different approaches are welcome.
 9 Let's see if we can determine any
10 commonalities across these studies despite
11 that or did they all reach completely
12 different conclusions.
13    Q.   Are some measures for capacity
14 as you might define it included in your
15 studies?
16    A.   Yes.
17    Q.   How would you define capacity?
18    A.   Well, again, I don't know that
19 there's a single definition but we, for
20 example, in our measures of availability
21 we're only looking at firms that are
22 currently in business, in the relevant
23 geographic market, in those relevant NAICS
24 codes, product markets that matter, all of
25 those things speak to capacity.

 1 exclusively driving the results I'm seeing
 2 does not comport with my own experience as
 3 a researcher over all that time, nor does
 4 it I think mathematically make sense
 5 because women still tend to be
 6 significantly less than half of the
 7 businesses in those ethic categories.
 8    Q.   Just to confirm one point in
 9 your answer, were you saying to your
10 knowledge that the majority of those -- of
11 the businesses in the data sets were owned
12 by men?
13    A.   You broke up a little bit there.
14    Q.   I was just trying to confirm.
15 Were you in your answer saying that the
16 majority of the business you looked at in
17 the data that you studied were owned by
18 men?
19    A.   Yes.
20    Q.   In your opinion do you believe
21 the disparities in tables 4.1 to 4.9 could
22 be caused exclusively by sex
23 discrimination?
24    A.   No.
25    Q.   Just stepping back a moment as

43 (Pages 166 - 169)

Case 2:20-cv-00041-DCLC-CRW   Document 42-2   Filed 07/19/22   Page 11 of 11
212-267-6868                    Veritext Legal Solutions                    516-608-2400
PageID #: 3067                    www.veritext.com