# EXHIBIT
# 5

1            UNITED STATES DISTRICT COURT

2         FOR THE EASTERN DISTRICT OF TENNESSEE

3     ****************************************************

      ULTIMA SERVICES CORPORATION,

4

                   Plaintiff,

5

6     -vs-                Case No. 2:2020-cv-00041

7

      U.S. DEPARTMENT OF AGRICULTURE, et al.,

8

                   Defendants.

9     ****************************************************

10        VIDEOCONFERENCED DEPOSITION OF HOWARD STOVER

11                 Thursday, May 5, 2022

12                     10:02 a.m.

13                   Pages 1 - 116

14

15

16

17

18

19          REPORTED BY:  KARINA L. JENNINGS

20

21

22

23

24

25

Case 2:20-cv-00041-DCLC-CRW   Document 74-5   Filed 07/19/22   Page 2 of 5
PageID #: 3081

1

2    Videoconferenced deposition of HOWARD STOVER, taken

3  pursuant to Notice before Karina L. Jennings, Court

4  Reporter, and Notary Public for the Commonwealth of

5  Virginia.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           A P P E A R A N C E S

2

3   ON BEHALF OF THE PLAINTIFF:

4       MICHAEL E. ROSMAN, ESQUIRE

5       CENTER FOR INDIVIDUAL RIGHTS

6       1100 Connecticut Avenue, N.W., Suite 625

7       Washington, D.C.  20036

8       rosman@cir-usa.org

9

10

11  ON BEHALF OF THE AGENCY:

12      JULIET GRAY, ESQUIRE

13      U.S. DEPARTMENT OF JUSTICE

14         Civil Rights Division

15      150 M Street, N.E.

16      Washington, D.C.  20002

17      juliet.gray@usdoj.gov

18

19

20

21

22

23

24

25

1            C O N T E N T S

2

3   EXAMINATION OF HOWARD STOVER          PAGE

4       By Mr. Rosman              6

5       By Ms. Gray               109

6

7           E X H I B I T S

8

9   NO.       DESCRIPTION           PAGE

10  Exhibit 1    Decision memo          32

11  Exhibit 2    LUSA sole source        47

12  Exhibit 3    Acq Plan one          49

13  Exhibit 4    SBA acceptance         50

14  Exhibit 5    Market research report     53

15  Exhibit 6    Acq Plan two          --

16  Exhibit 7    POWTEC contract         56

17  Exhibit 8    SBA acceptance TE        57

18  Exhibit 9    Acq Plan TE          60

19  Exhibit 10   Ultima contract        63

20  Exhibit 11   Proposal          67

21  Exhibit 12   Time Systems          69

22  Exhibit 13   Solicitation         70

23  Exhibit 14   Stover e-mail proposal      73

24  Exhibit 15   SBA acceptance         76

25

1           E X H I B I T S

2

3   NO.        DESCRIPTION          PAGE

4   Exhibit 16   Acceptance letter        78

5   Exhibit 17   Blank English-El contract     78

6   Exhibit 18   Stover e-mails Re contract     82

7   Exhibit 19   Consolation letter       82

8   Exhibit 20   SBA acceptance letter       84

9   Exhibit 21   Memo Re terminations       87

10  Exhibit 22   More complete proposal      94

11  Exhibit 23   SBA acceptance letter       95

12  Exhibit 24   Ultima           95

13  Exhibit 25   Offer e-mail        101

14  Exhibit 26   SBA acceptance        102

15  Exhibit 27   MEC contract        102

16  Exhibit 28   Stover e-mail        104

17  Exhibit 29   SBA acceptance        107

18

19

20

21

22

23

24

25

2 (Pages 2 - 5)

1 looking at the chart for Region 4.
2    A    Okay.
3    Q    All right.  And this describes the
4 amount that had been committed in the region for task
5 orders, as I understand it.  Is that your
6 understanding as well?
7    A    Yes.
8    Q    And when you saw this back in 2018, did
9 you generally agree with the -- the figures that are
10 identified here?
11    A    Yes.
12    Q    Okay.  And so if I understand the chart
13 correctly, at the bottom of the chart on the last
14 page, it says, balance remaining, and there's about
15 7.9 million dollars; is that right?
16    A    That's what it says, yes.
17    Q    Okay.  And do you have any -- was that
18 your understanding at the time that that was about
19 the amount that was remaining in the region for IDIQ?
20    A    I -- just looking at this, because
21 that -- that seems like it's high.  I noticed that
22 the State of California is not included on -- on this
23 list.  I know the State of California was a part of
24 Region 4, so I would say that the document is
25 probably in error.

1    Q    Is that what you thought --
2    A    Unless the State of California is
3 accounted for somewhere else.
4    Q    I think we'll get to California in a
5 little while, but my question is, is that what you
6 thought at the time, that this was inaccurate?
7    A    Sir, that was five years ago.  I don't
8 know what I thought at the time.  I received this
9 letter and I took it as -- this is what the agency
10 was going to do.  I didn't argue with it, I didn't
11 analyze it, I just thought this is the decision that
12 the agency made, and at that point my job was to
13 execute their plan.
14    Q    Okay.  Well, would you -- was it your
15 understanding at the time at the very least that
16 Region 4 still had some money left on its IDIQ
17 contract?
18    A    No, that -- I -- I'll repeat -- I'll say
19 again -- I do not know what my thought was at the
20 time because it was so long ago.
21    Q    Okay.  So just a couple of questions on
22 this chart.  There's -- looks to be three different
23 task orders for the State of Oregon?
24    A    Yeah -- yes, there is.  Eventually they
25 were -- they were morphed into one, but I guess you

1 want to know why there's three, and the reason why is
2 because through some quirk -- and I don't know who
3 made this decision -- but the -- when the states did
4 the requisitions of identifying the requirement and
5 providing the contract -- contracting with the money,
6 the -- the requisitions were assigned to three
7 different contracting officers.  And I was one of the
8 three.
9    Q    Okay.
10    A    That's why they have -- that's why
11 there's three of them, because they were assigned to
12 different contracting officers.
13    Q    Do you recall sitting here today whether
14 you as a contracting officer issued any task orders
15 under the IDIQ for the State of Washington?
16    A    I -- I cannot -- I cannot recall that.
17 I -- I think there was one, but I cannot recall
18 whether I issued that one or not.
19    Q    Well, do you recall hearing that there
20 was a task order issued under the IDIQ for the State
21 of Washington, regardless of whether you were the
22 administrative contracting officer?
23    A    I don't remember.  I mean, if it -- if
24 it wasn't assigned to me, you know -- and at the
25 time, I had more than enough work than to worry about

1 someone else's workload.
2    Q    So you don't know one way or the other
3 whether there was a task order issued to the State of
4 Washington -- or sorry --
5    A    Yeah, I --
6       MS. GRAY:  Object to form.  Asked and
7 answered.
8 BY MR. ROSMAN:
9    Q    Well, let me just try it again.  There
10 was a lot of talking.  You don't know one way or the
11 other whether there was a task order issued under the
12 IDIQ for services performed in the State of
13 Washington?
14    A    I -- I don't -- it was not assigned to
15 me, so I don't know -- I don't know what happened in
16 the State of Washington.  I don't remember doing a
17 task order for the State of Washington.
18    Q    So going to ask you some questions about
19 the 8(a) program now.  Prior to the IDIQs being
20 issued, did you use the 8(a) program to provide any
21 administrative services to the NRCS?
22    A    I -- yes, I did.  I did.  I did.
23    Q    For what states?
24    A    Okay.  There you are.  Now I recall I
25 think -- it was right, it was -- I think it was

10 (Pages 34 - 37)

1  Washington.  They -- instead of doing -- and I
2  don't -- I don't recall the reason why, but it seems
3  like that there was some sort of emergency, and it
4  was -- I think it was before the IDIQ -- and it may
5  not have been -- it may have been after the IDIQ --
6  but I know there was an emergency, because it was the
7  first time I used the 8(a) program, and they said
8  that they needed the contract in place in like 48
9  hours.  I mean, it was really, really quick.  And I
10  don't know what caused the emergency, I don't know
11  whether they had said that they were no longer using
12  Ultima, or that Ultima had reached their ceiling -- I
13  don't remember the reason.  I just remember it was
14  emergency.  And I called the 8(a) -- excuse me -- I
15  called the Small Business Administration in the State
16  of Washington, and I said, I would like to e-mail you
17  a solicitation for requirement that I have, and I
18  really need to get something in place in the next 48
19  hours, and that the new contractor would have to hire
20  the current employees.  So -- but I just don't
21  remember what the emergency was, or rather -- whether
22  the contract had been Ultima before -- I don't
23  remember.  I just know that I was given the task to
24  get something on the -- a viable contract in place
25  within like 48 hours or so.  So I called the Small

1  Business Administration, and they arranged for a
2  Native American concern to look at the solicitation.
3  They provided me some numbers.  Their numbers were
4  fairly close to the government estimate, and we
5  awarded that contract, a sole source under the 8(a)
6  program, to this Native American firm.  But I -- I
7  just can't remember whether it was before the IDIQ or
8  after the IDIQ.  I'm thinking it was before, and I
9  don't remember what the emergency was, why that we
10  had to do something right away, but I do remember
11  that it was -- at the time it seemed like that's the
12  only thing in the world was important was to get that
13  contract in place.
14      Q      So would you say that the time crunch
15  was a primary motivation for you using an 8(a) sole
16  source contract?
17      A      Yes, no other way I could have did it.
18      Q      Can you recall any other instance prior
19  to the IDIQs -- and I know you said you're not sure
20  this one was prior to the IDIQs -- but can you recall
21  any other instance which may have been before the
22  IDIQs in which you utilized the 8(a) program to
23  provide administrative services to an NRCS office?
24      A      No, because we had the -- we had the
25  IDIQ with Ultima, and it was -- it was fairly simple

1  to award a task order to Ultima.
2      Q      I'm trying to get to the period before
3  the IDIQs, so that's what I'm asking about.  Any
4  contracts that you utilized the 8(a) program for to
5  provide administrative services to an NRCS office in
6  the pre-IDIQ time period?
7      A      I'm going to say that I don't think so,
8  but I'm also going to add that that's a long time
9  ago, and maybe the better answer would be I don't
10  remember doing so.
11      Q      Mr. Stover, I think your screen froze,
12  for me at least -- did it freeze for other people, or
13  just me?
14      A      I'm fine here.
15      MR. ROSMAN:  Oh, I know you're fine.  So
16  I'm going to ask the court reporter then to just
17  repeat the answer back, because I didn't hear much of
18  it.
19      THE REPORTER:  "I'm going to say that I
20  don't think so, but I'm also going to add that that's
21  a long time ago, and maybe the better answer would be
22  I don't remember doing so."
23
24      (Discussion off the record)
25

1  BY MR. ROSMAN:
2      Q      Okay.  I don't remember doing so is a
3  fine answer.  Okay.  Now, was there anyone at the
4  Department of Agriculture at any time that suggested
5  that you should use the 8(a) program in order to meet
6  requirements for administrative support for NRCS
7  state offices?
8      A      No.
9      Q      To your knowledge, was there any plan at
10  the Department of Agriculture to increase the NRCS's
11  use of the 8(a) program?
12      A      No.
13      Q      Or FPAC's?
14      A      Well -- no, the answer is no.
15      Q      Okay.  So what is the discretion that a
16  warranted contracting officer has in awarding
17  contracts pursuant to the 8(a) program?
18      A      Well, in the -- it describes the
19  authority of a contracting officer as being broad.  I
20  mean, there's -- unless you were giving guidance
21  otherwise, and as long as it was legal, how you did
22  your contracts were -- you were given broad latitude
23  in doing that, whether you went GSA, whether you went
24  8(a) program, whether you went full open
25  competition -- there was -- up until the time that

11 (Pages 38 - 41)