# EXHIBIT 2

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TENNESSEE

_____

ULTIMA SERVICES CORPORATION,

       Plaintiff,

   v.                                       No.

U.S. DEPARTMENT OF AGRICULTURE,     2:20-cv-00041-

U.S. SMALL BUSINESS               DCLC-CRW

ADMINISTRATION, SECRETARY OF

AGRICULTURE, and ADMINISTRATOR

OF THE SMALL BUSINESS

ADMINISTRATION,

       Defendants.

_____

          VIDEOCONFERENCE DEPOSITION OF

                DANNY MANDELL

DATE:          Monday, May 16, 2022

TIME:          9:26 a.m.

LOCATION:      Remote Proceeding

              Washington, D.C. 20005

REPORTED BY:   Richard Livengood, Notary Public

JOB NO.:       5230091

Veritext National Court Reporting Company
202-857-3376 302-571-0510    410-837-3027    610-434-8588 215-241-1000
Case 2:20-cv-00041-DCLC-CRW   Document 75-2   Filed 07/19/22   Page 2 of 7
PageID #: 3107

## Page 2

APPEARANCES

ON BEHALF OF PLAINTIFF ULTIMA SERVICES CORPORATION:

MICHAEL E. ROSMAN, ESQUIRE (by videoconference)
MICHELLE SCOTT, ESQUIRE (by videoconference)
Center for Individual Rights
1100 Connecticut Avenue Northwest, Suite 625
Washington, D.C. 20036
rosman@cir-usa.org
scott@cir-usa.org
(202) 833-8400

ON BEHALF OF DEFENDANTS U.S. DEPARTMENT OF AGRICULTURE, U.S. SMALL BUSINESS ADMINISTRATION, SECRETARY OF AGRICULTURE, and ADMINISTRATOR OF THE SMALL BUSINESS ADMINISTRATION:

JULIET GRAY, ESQUIRE (by videoconference)
Department of Justice Civil Rights Division
Employment Litigation Section
150 M Street Northeast
Washington, D.C. 20530
juliet.gray@usdoj.gov

## Page 3

INDEX

| EXAMINATION: | PAGE |
|---|---|
| By Mr. Rosman | 7 |
| By Ms. Gray | 146 |
| By Mr. Rosman | 154 |
| By Ms. Gray | 158 |

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 0001 | Decision Memo | 46 |
| Exhibit 0002 | Document Signed by Witness, Offer Letter | 61 |
| Exhibit 0003 | E-mail Chain | 66 |
| Exhibit 0004 | Adverse Impact Determination Letter | 75 |
| Exhibit 0005 | Offer Letter for Kentucky NRCS | 87 |
| Exhibit 0006 | Acceptance Letter from SBA Allowing to Proceed | 99 |
| Exhibit 0007 | Letter, July 9 to Mr. White, Sole Source Offer Letter | 102 |
| Exhibit 0008 | Letter of Service and Acceptance of Offer | 108 |

## Page 4

EXHIBITS (Cont'd)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 0009 | Alabama Offer Letter to SBA in Alabama | 109 |
| Exhibit 0010 | Acceptance Letter from Alabama to Use the Contractor | 112 |
| Exhibit 0011 | Sole Source Letter to Ms. Mackin, General Clerk | 118 |
| Exhibit 0012 | Acceptance Letter | 121 |
| Exhibit 0013 | Offer Letter to State of Virginia, Administrative Support | 125 |
| Exhibit 0014 | Acceptance Letter | 133 |
| Exhibit 0015 | Order for Supplies or Services | 133 |
| Exhibit 0016 | Letter Written by Mr. Mandell | 128 |
| Exhibit 0017 | Contract for Support Services, State of Tennessee | 130 |
| Exhibit 0018 | Offer Letter | 132 |
| Exhibit 0019 | Modification to Contract | 139 |

(Exhibits attached.)

## Page 5

PROCEEDINGS

THE REPORTER: My name is Richard Livengood; I am the reporter assigned by Veritext to take the recording of this proceeding. We are now on the record at 9:26 a.m.

This is the deposition of Danny Mandell taken in the matter of Ultima Services Corporation vs. United States Department of Agriculture, United States Small Business Administration, Secretary of Agriculture, and Administrator of the Small Business Administration on May 16, 2022, remote via Zoom meeting.

I am a notary authorized to take acknowledgements and administer oaths in Maryland. Parties agree that I will swear in the witness remotely, outside of his or her presence.

Additionally, absent an objection on the record before the witness is sworn, all parties and witness understand and agree that any certified transcript produced from the recording, virtually, of this proceeding:

- is intended for all uses permitted

1 **Q** Did -- during the course of the conversation
2 that you had with your supervisors, did they say
3 anything that indicated that they had the same
4 understanding?
5 **A** I believe so. They didn't understand why.
6 **Q** Okay. All right.
7 **A** So.
8 **Q** All right. Why don't we go back to Exhibit
9 Share, and let's just take a look one brief moment
10 again at Exhibit 4. Okay. And this is a letter from
11 the district director, Terri Denison, to you,
12 basically saying that the SBA would not recommend
13 acceptance of the contract into the 8(a) program
14 because of adverse impact.
15 **A** Yes. That's what the letter's saying.
16 **Q** Were you done with your answer?
17 **A** Yes, sir.
18 **Q** Okay. Good. All right. So why don't we go
19 back to Exhibit Share. And this is to -- I'm sorry.
20 One more question. This is dated September 20; right?
21 **A** Yes. That's correct.
22 **Q** Okay. Let's go to Exhibit 5, please.

1 (Exhibit 0005 was marked for
2 identification.)
3 **A** Okay. This is to Washington, D.C., SBA.
4 **Q** Okay. Okay. And so why don't you tell us
5 what this document is, if you recognize it.
6 **A** It's also an offer letter.
7 **Q** And what is it an offer letter for?
8 **A** Thirty-seven program support specialists for
9 Kentucky.
10 THE REPORTER: Can you repeat that,
11 please?
12 THE WITNESS: It says here for 37
13 program support specialists for Kentucky NRCS. In
14 Kentucky.
15 THE REPORTER: Thank you.
16 BY MR. ROSMAN:
17 **Q** Was it for Kentucky, though?
18 **A** No. This is for Mississippi.
19 **Q** And is this the same requirement that we saw
20 in Exhibit 2?
21 **A** Yes. It is but on a different template.
22 **Q** Okay. By the way, had you been in contact

1 with Ausdanbrook Properties during the period of time
2 that you were communicating with the SBA about any
3 adverse impact analysis?
4 **A** No. Not in, not in reference to the adverse
5 impact analysis. I have talked to them but not in, in
6 reference to that.
7 **Q** Okay. Okay. Well, did you talk to them
8 about the requirement, generally, that -- for support
9 services in Mississippi?
10 **A** Correct. But not specifically.
11 **Q** Let me try that again. Did you -- so from
12 the time that you sent the offer letter to the SBA
13 'til the time that Ms. Denison wrote to you about the
14 adverse impact, were you in communication with
15 Ausdanbrook Properties about the Mississippi
16 requirement?
17 **A** No.
18 **Q** Okay. You didn't speak to them at all
19 during that period of time?
20 **A** No. Only initially when I asked them if
21 they had the, if they could meet such type of
22 requirement.

1 **Q** Right. Did they ever withdraw their offer?
2 **A** No, because they can't submit an offer yet
3 and the, and get an SBA acceptance letter.
4 **Q** Well, I guess I'm asking you whether
5 Ausdanbrook Properties, during this period of time,
6 communicated to you to tell you that they were no
7 longer interested in that requirement.
8 **A** No.
9 **Q** Okay. All right. Who is Ms. Mackin?
10 **A** One second. My Internet's going down.
11 Ms. Mackin, I believe, is a, a, is another
12 SBA representative in a different state.
13 **Q** Why were you writing to her?
14 **A** Why was -- after we talked about it,
15 supervisor said try getting SBA, explain them the
16 situation, and tell them that you had a adverse impact
17 when you, you had a talk with the other SBA office,
18 and see what they will come up with.
19 **Q** So you thought they just might, you could
20 just write to a different SBA office and maybe get a
21 different result?
22 MS. GRAY: Object to form.

1  A  No. That wasn't for the purpose of that.
2  Q  Okay. Why were you writing to Ms. Mackin?
3  A  Purpose of writing to Ms. Mackin -- or I'm
4  not sure if she was the one that called directly --
5  explained that I have initially talked different SBA
6  in Georgia and informed, and they informed me that --
7  I told them why -- I -- what, what kind of requirement
8  I have and the, on the phone that our discussion
9  was -- this will be an adverse impact on the contract,
10 on that contract if we awarded to an 8(a).
11     After my conversation -- that was before my
12 conversation with my supervisor. My supervisor told
13 me to get hold of the SBA, see what they say, inform
14 them of the conversation, inform them about the
15 adverse impact. Why wouldn't you? But that's the
16 reason why that letter was sent out. The -- what they
17 would -- what would they find versus what Georgia SBA
18 office find.
19  Q  I'm a little unclear about that, so let's,
20 let me just ask a few more questions. What did you
21 understand the part of SBA that Ms. Mackin was working
22 for to be?

1  A  That Mackin is working to be?
2  Q  Let me try that again -- let me ask -- let
3  me just ask the question again. Ms. Mackin was
4  working for a different district office; right?
5  A  Okay. That's correct.
6  Q  Okay. And your proposed 8(a) contractor
7  initially was Ausdanbrook Properties; right?
8  A  Correct.
9  Q  And you would normally write an offer letter
10 to the SBA office that supervised the proposed 8(a)
11 contractor for a sole source 8(a) contract; is that
12 right?
13  A  That's correct within that state.
14  Q  Okay. And in this case that was the Georgia
15 office; right?
16     MS. GRAY: Object to form.
17  A  Right. The state of Georgia.
18  Q  Say it again.
19  A  That's correct. State of Georgia.
20  Q  Okay. Did you understand that Ms. Mackin
21 could overrule the determination that had been made in
22 the state of Georgia district office?

1  A  No. That wasn't the purpose of that. We
2  were -- the purpose was us trying to find out whether
3  what, another SBA will come up with the same results.
4  Q  So having received a determination by the
5  Georgia district office that there had been adverse
6  impact, you wanted to see whether a different SBA
7  office would arrive at a different determination; is
8  that right?
9     MS. GRAY: Object to form.
10 A  I didn't get the letter. It was through
11 conversation by phone.
12 Q  With whom?
13 A  With Ms. Collins.
14 Q  I'm sorry. What did Ms. Collins say in this
15 phone conversation?
16 A  When I finally got in contact with Ms.
17 Collins, we were talking about the adverse impact.
18 She was saying that there would be an adverse impact
19 if, if we approved the offer letter. And I asked her
20 why because the contract's ending September 30th. We
21 can no longer execute a task order under that
22 contract. And that's when -- after that conversation

1  that's when I went to my supervisor and explained to
2  them about the adverse impact study that was done by
3  Ms. Collins.
4  Q  Okay. I'm still not at the point where I
5  understand why you were writing to Ms. Mackin. Was it
6  your understanding that a different SBA district
7  office could come up with a different conclusion as to
8  whether there was or was not adverse impact?
9     MS. GRAY: Object to form.
10 A  That's correct.
11 Q  You thought they, it could; right?
12 A  We wanted to know what the, what kind of,
13 what, what was the main reason that Georgia came up
14 with adverse impact 'cause we did not understand it.
15 Q  Well --
16 A  The reason for it. Explained to Ms. Collins
17 that I don't understand why there would be an adverse
18 impact when the contract, as of September 30, no more
19 viable, is no longer viable.
20 Q  Was it your understanding that you could
21 appeal the decision of the Georgia district office to
22 some other part of the SBA?

Page 150

1  have to use a, the, the, that IDIQ to fulfill that
2  requirement by using task orders executed against it.
3    Q  So did the IDIQs guarantee that Ultima would
4  get all admin work at NRCS offices?
5    A  It's a priority to the IDIQ but doesn't
6  guarantee it.
7    Q  And how -- what do you mean by that?
8    A  Even though we -- and even though we have an
9  IDIQ, doesn't necessarily -- it's not a -- I mean, we,
10 we -- it's a priority, but in addition if we believe
11 there's only, like, one or two requirements, so
12 instead of using that IDIQ vehicle and just competed.
13   Q  Okay.
14   A  And -- oh.  Okay.  Never mind.
15   Q  Mr. Rosman asked you some questions about
16 whether it would've been possible to extend Ultima's
17 task order so that there would be time to bid it.
18 What is the time limit on extending a task order?
19   A  Extending a task order?
20   Q  Yes.  Do you recall what I'm talking about?
21   A  Normally -- we don't normally extend the
22 task order.

Page 151

1    Q  Right.  But do you remember we were looking
2  at a particular document that mentioned that the
3  contract might be extended for two months?
4    A  Yes.
5    Q  And then you talked about how you might
6  extend it so that you could get another contract in
7  place.  Do you remember that?
8    A  Right.  Similar to what we saw in "mod" 1.
9    Q  So --
10   A  Where it was extended because of the issue
11 of onboarding instruction.
12   Q  So is there -- what is the time limit on
13 extending a contract or task order?
14   A  I believe two months is, is the most.  Or is
15 it three months?
16   Q  Okay.
17   A  I have to look at the regulation for that
18 particular extension authorization.
19   Q  Okay.  That's something that would be in the
20 FAR?
21   A  Right.  I think it's -- can't -- I don't
22 remember what that regulation is.  But as long, as

Page 152

1  long as there's still existing funds, we could use, we
2  could extend it.  But we could only extend it to the
3  amount that the funds allows us.  No more than that.
4  In other words, we can't extend it and put additional
5  funds.  That would be outside the scope of the
6  original contact -- contract.
7    Q  Okay.  When we were discussing after you got
8  the adverse impact determination from Georgia, you
9  were then shown the offer letter that you sent to the
10 D.C. district office.  Do you recall that?
11   A  Which district office, ma'am?  The Georgia
12 or the Washington?
13   Q  So after you received the adverse impact
14 determination from Georgia, you then sent an offer
15 letter to the Washington, D.C. district office; is
16 that right?
17   A  I believe I did not receive that offer
18 letter, I mean, that adverse impact letter from
19 Georgia before I sent the offer letter --
20   Q  Okay.  Right.  Okay.  But you had heard from
21 them.
22   A  -- conversation.

Page 153

1    Q  Okay.  You had heard --
2    A  But it was a phone conversation.  I'm sorry,
3  ma'am.
4    Q  No.  It's okay.  I'm sorry I interrupted
5  you.  I understand.  It was -- you heard that on the
6  phone.  But I believe you testified about a discussion
7  you had with your supervisor after that, and I think
8  there was some, you know, some delay during that time.
9  So I just wanted to confirm that after you received
10 the, you learned from Georgia that they were going to
11 issue an adverse impact determination, what was the
12 conversation that you had with your supervisor about
13 approaching D.C.?
14   A  As -- as I stated earlier, was, we just
15 couldn't understand -- and that -- and same question I
16 had for Ms. Collins was that why would you, why would
17 there be an adverse impact when the contract is no
18 longer viable and would be ending?  And similar
19 discussion was brought up with my supervisor, the same
20 thing.  That was our conversation.
21   Q  And when you spoke with the D.C. district
22 office, did you tell them about the adverse impact

1  determination from Georgia?
2     A  Yes.  I called them up, like I also called
3  up the SBA and -- when I need a requirement.  I, I
4  told them exactly what I need and, or what the issue
5  is.
6           MS. GRAY:  Okay.  I don't have any
7  further questions.
8           MR. ROSMAN:  I just have one or two
9  more.
10              EXAMINATION
11 BY MR. ROSMAN:
12    Q  So you spoke with the Washington, D.C.,
13 office concerning the adverse impact determination
14 that had been made by the Georgia district office;
15 right?
16    A  I believe so, because when my conversation
17 with my supervisor, they did remind me, make sure that
18 you inform them of the recent issue.
19    Q  Okay.  And what did they say when you told
20 them that?
21    A  I think the statement was, if, we will
22 check, we will do our evaluation.  If there is an

1  adverse impact, we will let you know; if not, if
2  there's not an adverse impact, we'll send you an
3  acceptance letter.  And that's the same thing I
4  communicated to my supervisors.
5     Q  So the district office in the District of
6  Columbia didn't feel bound by any determination that
7  had been made by the district office in Georgia.
8           MS. GRAY:  Object to form.
9  BY MR. ROSMAN:
10    Q  Is that right?
11    A  Well, I'm, I'm not sure, sir.
12    Q  Well, they said they were going to do their
13 own analysis; right?
14    A  Right.  But I'm not sure where -- like I
15 said, I'm not part of their, anticipating how they do
16 this stuff.  So.
17    Q  Okay.
18    A  All I could do is provide the information.
19    Q  Why, again, did you write to the district
20 office in Washington, D.C.?
21    A  After our, after we, after my phone call
22 with Ms. Collins on that -- my explanation we had with

1  my supervisor and the fact that if we got less than
2  two weeks before the end of the year, I believe it was
3  my supervisor that gave me the name of the All-Pro and
4  said, "Try these guys, but here's the SBA office.
5  Give them a call.  Explain what's going on.  See what
6  they say."
7     Q  Okay.  But why did using All-Pro require you
8  to write to the office in the District of Columbia?
9     A  'Cause All-Pro belongs to, under the SBA
10 office in District of Columbia.
11    Q  Why is that?  Why?
12    A  What -- what do you mean, why?
13    Q  Why?
14    A  Why is that?
15    Q  Why do they belong to the district of the
16 District of Columbia?
17    A  They, they belong the jurisdiction -- for
18 the District of Columbia, not Georgia.
19    Q  But, in fact, didn't the district of the
20 District of Columbia transfer the entire offer to a
21 different district office?
22    A  I don't remember.  I don't have any document

1  that shows that.  I don't believe they would.
2     Q  Well, why don't we take a look at Exhibit 6
3  again, please.
4     A  Exhibit 6.  Okay.  Baltimore district
5  office.  Maryland.
6     Q  Right.  So --
7     A  Okay.  Yeah.  It's Maryland.
8     Q  Apparently Ms. Mackin in the Washington,
9  D.C., district office didn't handle the offer letter;
10 right?
11    A  That is correct from the what I see now.
12 Yeah -- look like --
13    Q  So why did you send it to the Washington,
14 D.C., district office?
15    A  Because they were the people I was working
16 with.  I initially thought that All-Pro Placement
17 Services -- I probably thought that the All-Pro
18 Placement Services was under Washington district
19 office.
20    Q  Well, the All-Pro Placement Services has an
21 address in Cockeysville, Maryland; right?
22    A  Right.