UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

--------------------------------------------------------------------------------x

ULTIMA SERVICES CORPORATION,                                   :

    Plaintiff,                                                    :

       -against-                                         :         No. 2:20-cv-00041-DCLC-CRW

U.S. DEPARTMENT OF AGRICULTURE,                               :
U.S. SMALL BUSINESS ADMINISTRATION,
SECRETARY OF AGRICULTURE, and ADMINISTRATOR         :
OF THE SMALL BUSINESS ADMINISTRATION,

    Defendants.                                                   :

                                                                  :

--------------------------------------------------------------------------------x

**PLAINTIFF'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT (Doc. 60)**

Plaintiff Ultima Services Corporation ("Ultima") submits this reply memorandum of law in further support of its motion for summary judgment (Doc. 60) and in response to defendants' opposition memorandum (Doc. 72, "Dfs' SJ Opp. Memo.") and other papers.

## Introduction

As defendants describe it, the 1978 amendments to the Small Business Act is quite the unicorn. In their telling, Congress passed a statute creating a race-neutral Section 8(a), Dfs' SJ Opp. Memo. 1 (PageID # 2937), and then told the Small Business Administration ("SBA") (1) it (the SBA) should decide whether to use race preferences in the 8(a) Program, and then (2) decide what kind of race preferences to employ in the 8(a) Program. Congress made some findings, but offered no insight into how the SBA should make these weighty decisions.

The SBA then adopted a race-neutral case-by-case method of assessing whether someone was socially disadvantaged. Plaintiffs' Memorandum In Support of Its Motion for Summary Judgment (Doc. 60-2, "Pl's SJ Memo.") 5-6 (PageID # 811-12). It changed its policy in the mid-1980's, and adopted a presumption that members of certain groups were "socially disadvantaged." In announcing that proposed change, it did not identify any problem in administering the case-by-case method, but simply said that its perception of Congress's intent was that most of the beneficiaries should be minorities. *Id.* at 6 (PageID # 812).

After that, the program blithely continued with a unique division of labor: Congress held hearings, took evidence, and changed nothing at all in the statute; while the SBA continued to implement the presumption of social disadvantage, also without much change, but never examining any evidence that would justify it. Thus, defendants' brief is replete with references to all the evidence before Congress, even though all agree that Congress passed a race-neutral 8(a) statute and never amended it to require anything else. *E.g.*, Dfs' SJ Opp. Memo. 16 (PageID # 2952) ("the substantial evidence before Congress at the time the 8(a) program was enacted and amended"), 17 (PageID # 2953) ("Congress had a strong basis in evidence to conclude that a race-conscious remedy was necessary prior to the enactment of the 8(a) program"), 19 (PageID # 2955) ("Congress had

substantial evidence of the federal government's participation in the pervasive discrimination against MBEs at the time it enacted and amended the 8(a) program"), 21 (PageID # 2957) ("recent evidence Congress has considered in relation to discrimination against minority-owned bsinesses . . ."), 23 (PageID # 2959) ("substantial circumstantial evidence . . . available to Congress"), 31 (PageID # 2967) ("Congress has continuously made findings of racial discrimination for each group presumed socially disadvantaged since the 8(a) program was codified."), and 32 (PageID # 2968) ("Congress satisfied its obligation to consider the efficacy of race-neutral alternatives").

This division of labor – and inaction on both parties' part – continued even after the D.C. Circuit handed down an opinion stating that the statute did not permit the consideration of race.

Defendants do not identify any other statute where Congress simply delegated the decision to use (or not use) racial preferences to an agency, and then the agency made that decision without doing its own analysis of whether those racial preferences are needed. Ultima is not aware of any.

Much of Defendants' opposition memorandum defending this state of affairs offers up non-existent evidence (*e.g.*, Congress's determining that the SBA's initial case-by-case method was "ineffective," Dfs' SJ Opp. Memo. 32 (PageID # 2968)), peculiar burdens of proof (*e.g.*, proposing that those citing executive orders must present "*evidence* that . . . the executive orders . . . have *not* been implicitly or explicitly repealed by a subsequent act of Congress" *id.* at 33 n.12 (PageID # 2969) (emphasis added)), and straw man arguments that Ultima has never made (*e.g.*, the non-delegation doctrine argument).

As for narrow tailoring, defendants ignore the fact that they have already conceded that they believe that the beneficiaries of the presumption easily could qualify as "socially disadvantaged" without the presumption, Doc. 62-1, Defendants' Memorandum In Support of Their Motion for Summary Judgment ("Dfs' SJ Memo.") 35, demonstrating that it is hardly necessary and adopted solely for administrative convenience. They also make disingenuous efforts to deny that the "rebuttable" presumption is anything but, and their efforts to distinguish binding case law on that point are meritless.

2

<u>Argument</u>

I.   DEFENDANTS MISCONSTRUE BINDING CASE LAW ON STANDING AND, ACCORDINGLY, FAIL TO RAISE A GENUINE ISSUE OF MATERIAL FACT

As previous papers have demonstrated, there is no genuine issue of material fact with respect to standing because (1) the 8(a) Program indisputably has a racial component and Ultima is unable to compete for contracts that are reserved for that program, and (2) the current 8(a) Program indisputably would discriminate against Ultima based on its owner's race were it to apply for inclusion. Defendants' arguments to the contrary are meritless.

A.   Ultima Has Standing Because The Current Program Has A Racial Component And Ultima Is Unable To Compete On An Even Playing Field

In *Vitolo v. Guzman*, 999 F.3d 353 (6th Cir. 2021), the court held that plaintiffs there had standing because eliminating a *race-based* inability to compete would mean that "the race of the applicant would not factor into the order in which applications are processed by SBA." *Id.* at 359. And this was so, *even if* plaintiffs "might not otherwise qualify for priority consideration." *Id.* at 359. That is, even if eliminating the presumption of social disadvantage still left the plaintiffs there outside the priority group because of some other disqualification, they *still* had standing.

1.   <u>Corporate Structure</u>. – Thus, defendants' argument that Ultima lacks standing because it did not have the right corporate form at the outset of this litigation (Dfs' SJ Opp. Memo. 4 (PageID # 2940)) is just irrelevant. That it could not "otherwise qualify" for the 8(a) Program does not affect standing. *See also, e.g.*, *Regents of the University of California v. Bakke*, 438 U.S. 265, 280 n.14 (1978) (rejecting attacks on medical school applicant's standing to challenge program that set aside admission places for disadvantaged minorities; "Nor is it fatal to Bakke's standing that he was not a 'disadvantaged' applicant.'"); *Cortez III Service Corp. v. National Aeronautics and Space Administration*, 950 F. Supp. 357, 360 (D.D.C. 1996) (holding that plaintiff had standing to challenge an award of a contract under the Section 8(a) Program even though plaintiff was neither a small business nor a socially and economically disadvantaged business, but rather a large business

3

owned by a non-minority that wanted the contract awarded under full and open competition; "Under the standing analysis: (1) plaintiff faces the threatened injury of losing the right to compete for a valuable contract; (2) that injury is fairly traceable to the decision by NASA and SBA to offer the contract under 8(a); and (3) if the Court finds that defendants violated either the APA or the Constitution, such a decision would put plaintiff in a position to compete for the contract, which it is now precluded from doing."); *Milwaukee County Pavers Ass'n v. Fiedler*, 707 F. Supp. 1016, 1019, 1021, 1032 (W.D. Wisc. 1989) (holding that plaintiff corporations, which "were not actually managed and controlled by disadvantaged individuals," were irreparably harmed, sufficient to warrant preliminary injunctive relief, by state program that presumed that members of certain racial minorities were disadvantaged for purposes of identifying firms entitled to the benefits of state's DBE program, even though the "disadvantaged" businesses "must prove that [they] satisf[y] the size and ownership and control requirements of [federal regulation]").

There are three other considerations regarding this argument. First, it is just plain disingenuous for defendants to assert that they first learned of this fact during discovery. Dfs' SJ Opp. Memo. 4 (PageID # 2940) ("learned in discovery"). Defendants *themselves* produced a document in discovery that Ultima had submitted to the SBA long before this litigation commenced in which the fact that Ultima was a subsidiary was disclosed. Rosman Statement dated July 19, 2022 ("Rosman R. St.") ¶ 2 & Ex. 42. Accordingly, defendants easily could have raised this at the motion to dismiss stage. Second, as previously discussed, Ultima would still have been at a disadvantage had it been owned directly by Celeste Bennett, and it was not obligated to take futile acts in order to have standing. Doc. 70, Plaintiff's Memorandum in Opposition To Defendants' Motion for Summary Judgment ("Pl's SJ Opp. Memo.") 33 (PageID # 2444) (citing *Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Michigan Gaming Control Bd.*, 172 F.3d 397, 406 (6th Cir. 1999)). Third, Ultima *is* currently owned directly by Ms. Bennett, and it simply makes no sense to dismiss this lawsuit when Ultima could (and would) just file a new one.

       2.    <u>Alleged Inability / Unwillingness To Bid</u>. – Defendants also assert that Ultima

could not bid on "many" of the contracts at the outset of this lawsuit because of its size. Dfs' SJ Opp. Memo. 4 n.3 (PageID # 2940). But "many" is not all, and Ultima was always eligible for some contracts. Doc. 60-4 at 3, ¶ 17 (PageID # 857). Indeed, defendants themselves argue that Ultima failed to bid on some contracts for administrative support that it was eligible for. Dfs' SJ Opp. Memo. at 5 (PageID # 2941). Defendants cannot have it both ways. If Ultima was eligible for contracts for administrative support outside the 8(a) Program, it would have been eligible for the same type of contracts reserved for the 8(a) Program had it been able to bid on them. And, in any event, defendants' reservation of contracts for the 8(a) Program prior to the commencement of this lawsuit meant that Ultima was losing revenue at such a great rate that it would again be small enough to bid on administrative support contracts for *every* NAICS relevant code. That was clear at the outset of this litigation and, in fact, it came to pass during the litigation. Doc. 60-4 at 4-5, ¶¶ 21-22 (PageID # 858-59). So, again, even if Ultima's size at the outset of this litigation were an actual impediment to standing, dismissal would just result in Ultima filing a new lawsuit.

Defendants' argument (Dfs' SJ Opp. Memo. 5 (PageID # 2941) that Ultima is not ready, willing, and able to bid on contracts because it did not bid on contracts in the past is based on a false premise. Ultima was *not* eligible to bid for most of those contracts defendants identify – 4 of the 5 – because those  contracts were limited to a program that required qualification and that Ultima had not participated in. Doc. 70-2 at 2-3, ¶¶ 6-7 (PageID ## 2464-65); Doc. 61-8 at 2, Req. No. 8 (PageID # 1082). Ultima continues to seek business and would bid on the contracts reserved for the 8(a) Program were they open to competition. Doc. 60-4 at 3-4, ¶¶ 17-19 (PageID ## 857-58); Doc. 70-2 at 3-4, ¶ 9 (PageID ## 2465-66).

3. Redressability. – Defendants also assert that Ultima's injury will not be redressed by a favorable ruling. Dfs' SJ Opp. 5-7 (PageID ## 2941-43). But this argument simply misconstrues the nature of the injury. The injury is not merely an inability to compete on an even playing field, but the fact that the uneven playing field has a racial component (even if not everyone with an advantage was there because of race). *Vitolo*, 999 F.3d at 359 (upholding standing because

5

a favorable ruling would mean that "the race of the applicant" would not factor into the order in which applicants were given priority). Defendants' own discussion of *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995) shows this. As defendants state, the Court in *Adarand* found that the plaintiff there had standing because "the subcontractor compensation clause meant that the plaintiff bid on unequal footing against *small disadvantaged businesses*." Dfs' SJ Opp. Memo. 5 (PageID # 2941) (emphasis added). The unequal footing was against SDBs generally, not those SDBs that received a presumption. The fact that *some* SDBs received a racial presumption was enough.

This argument also seems to depend upon an argument that the presumption is severable from the rest of the statute. Dfs' SJ Opp. Memo. 6 (PageID # 2942).[1] As Ultima noted in its papers opposing defendants' motion to dismiss, the weight of authority shows that, when programs employ a presumption of the kind the SBA uses, courts enjoin the entire program, and not just the presumption. Doc. 25 at 12 (PageID # 128). And, for the reasons given above, the severability issue would have no effect on standing in any event.

Defendants' opposing papers also reprise their argument from their moving papers that Ultima cannot show what would happen if the presumption were eliminated. Dfs' SJ Opp. Memo. 6 (PageID # 2942). Ultima has addressed this argument in its opposition memorandum. Pl's SJ Opp. Memo. 32-33 (PageID ## 2443-44).

Defendants suggest that *Vitolo* supports their severance theory, but they read far too much into the holding. They emphasize that the court only enjoined "the race-conscious presumption," Defs' SJ Opp. Memo. 6 (PageID # 2942), but they concede that the plaintiff there only *sought* to eliminate "the presumption of disadvantage," *id.* at 7 (PageID # 2943). Accordingly, the last paragraph in *Vitolo* says nothing about severability, much less standing. Plaintiff in *Vitolo* had

---

[1]     Defendants assert that "[t]he structure and purpose *of the Act* make clear that the 8(a) program would continue to exist even absent the presumption." Dfs' SJ Opp. Memo. 6 (PageID # 2942) (emphasis added). This is certainly true because the Act itself has no presumption. The question is whether the *SBA's* program would continue to exist in the same form even absent the presumption, given that 94% of the current participants qualified with the presumption. Pl's SJ Opp. Memo. 32 (PageID # 2443).

6

standing even if (a) only a few companies received a presumption of social disadvantage due to race and (b) plaintiff did not receive any appreciable benefit in its place on line for emergency funds by its elimination.

B.    Ultima Has Standing Because It Would Apply To A Race-Neutral Program To Aid The Socially And Economically Disadvantaged

Defendants argue that the situation in *Vitolo* is analogous to Ultima "seeking to apply to participate in the 8(a) program and want[ing] to eliminate the race-based presumption so that it could compete on equal footing with other applicants." Dfs' SJ Opp. Memo. 7 (PageID # 2943). They claim the analogy does not work because Ultima "does not want to apply for the 8(a) program." *Id.* Defendants misunderstand the law. Ultima does not need to express an intention to apply for the *current* 8(a) Program, with its racially-discriminatory presumption, to have standing. It is enough that it would apply to a racially-neutral 8(a) Program, just like the plaintiff in *Gratz v. Bollinger* expressed an intention to apply to transfer to the University of Michigan *if* it eliminated race-considerations from its admission programs. *Gratz v. Bollinger*, 539 U.S. 244, 261-62 (2003). *See* Pl's SJ Opp. Memo. 32 (PageID # 2444). Ultima already has stated that it would; it thus has standing. Doc. 70-2 at 4 (¶ 11) (PageID # 2466). Accordingly, even if this Court were limited to enjoining the racial presumption, Ultima has standing. Defendants fail to address this argument.

Defendants try to bolster this argument by asserting that Ultima "does not purport to be" socially and economically disadvantaged. Dfs' SJ Opp. Memo. 7 (PageID # 2943). This is both wrong and somewhat disingenuous on defendants' part. This argument was the heart of their motion to dismiss at the outset of the case, and they focused a great deal of their discovery efforts on it. Ultima produced Ms. Bennett's tax returns going years back and loan applications. Rosman R. St. ¶ 3. At the end, though, it is clear that Ms. Bennett *is* economically disadvantaged, at least as the SBA has been applying that term, and was so economically disadvantaged at the outset of the litigation (using the criteria that were imminently going into place). Statement of Celeste Bennett

dated July 19, 2022.[2]   As for social disadvantage, this lawsuit alleges that Ultima has been discriminated against because of its owner's race, and a judgment so holding would make it much more likely that the SBA would agree.  *See* Doc. 70-2 at 4 (¶ 11) (PageID # 2466).

## II.   DEFENDANTS FAIL TO DEMONSTRATE THE SBA'S AUTHORITY TO ADOPT RACE PREFERENCES AND THEIR NONDELEGATION DOCTRINE ARGUMENT IS AN IRRELEVANT STRAW MAN

In its moving papers, Ultima cited *Michigan Road Builders Ass'n, Inc. v. Milliken*, 834 F.2d 583 (6th Cir. 1987), an Equal Protection Clause case involving a preference program not unlike the 8(a) Program,  for the proposition that the body adopting race preferences must have had authority to act to accomplish its purpose.  Ultima argued that the SBA lacked that authority.  Pl's SJ Memo. 17-21 (PageID ## 823-27).  Instead of addressing that argument, defendants claim that Ultima is making a "nondelegation" argument, and proceed to refute that argument.  Dfs' SJ Opp. Memo. 8-14 (PageID ##2944-50).  In a footnote, they distinguish *Michigan Road Builders* on the not-surprising ground that it was not a nondelegation case.  *Id.* at 11 n.5 (PageID # 2947).

Indeed, it is not.  And Ultima was not making any "nondelegation" argument (or an APA argument or an Appointments Clause argument or anything else).  The nondelegation doctrine is a consideration when Congress unambiguously delegates a task to an administrative agency but fails to provide an intelligible principle for the agency to use in fulfilling that task.  For example, in *Gundy v. United States*, 139 S. Ct. 2116 (2019), Congress unambiguously told the Attorney General that he should decide whether sex offenders who were convicted prior to the passage of the Sex Offenders Registration and Notification Act had to register under that Act.  The question there was whether Congress had provided the Attorney General with enough guidance to exercise that discretion.  The plurality concluded that Congress wanted pre-Act offenders to register and only delegated to the Attorney General the decision of when to require such registration.  *Id.* at 2127-29.

---

[2]      In May 2019, nine months prior to the commencement of this lawsuit, the SBA first proposed the changes to the criteria it would consider for "economic disadvantage," proposing the levels that are currently applicable.  84 Fed. Reg. 21256, 21264 (May 14, 2019).  Comments had to be received by July 15, 2019 (*id.* at 21256), and the new regulations were published in May 2020, effective on July 15, 2020.  85 Fed. Reg. 27650 (May 11, 2020).

Accordingly, there was no violation of the nondelegation doctrine.

This case would be a nondelegation doctrine case if the Small Business Act explicitly said that the SBA should determine whether and how to apply race preferences, but provided little or no guidance to the SBA as to how to exercise that discretion. But that simply is not what the Act says, and defendants cannot point to any part of the statute that suggests otherwise. Their nondelegation argument is a straw man.[3]

Ultima made an "equal protection" argument based on *Michigan Road Builders*. Defendants offer no argument to suggest that the SBA has inherent authority to decide whether to create race preferences and, accordingly, do not seem to dispute the proposition that it does not. Rather, in the midst of their irrelevant nondelegation argument, they suggest that Congress granted it that authority. They do not offer any authority for the proposition that Congress *can* pass on such authority, even quite explicitly, and, again, Ultima is not aware of any. But assuming that it is possible, defendants' arguments are unconvincing. The evidence they cite does not support their argument and they ignore important principles of statutory interpretation which undermine it.

A.    Defendants' Evidence Does Not Support Their Argument

At the outset, it is not clear whether defendants are arguing that Congress told the SBA to engage in some kind of race-preference or simply that the SBA could decide for itself whether to adopt race preferential policies. *See, e.g.*, Dfs' SJ Opp. Memo. 11-12 ("SBA explicitly asserts that Congress made findings and then delegated to it the authority to promulgate the race-conscious presumption"). *Compare* Brief for the Federal Defendants in Opposition in *Rothe Development, Inc. v. Dep't of Defense*, Sup. Ct. No. 16-1239 ("*Rothe* Brief") 3 (Doc. 60-3, PageID # 845) ("neither

---

[3]    Defendants point out that the D.C. Circuit in *Rothe* rejected a "nondelegation" argument. Dfs' SJ Opp. Memo. 8 (PageID # 2944). This is irrelevant since Ultima is not making such an argument, but it is worth noting that the *Rothe* court rejected the argument that Congress improperly delegated the power to racially classify because it was "premised on the idea that Congress has created a racial classification" and "Congress has done no such thing." *Rothe Development, Inc. v. United States Dep't of Defense*, 836 F.3d 57, 74 (D.C. Cir. 2016). That court also rejected the argument that Congress's delegation to the SBA to enter into contracts that are "fair and equitable" or "in the public interest" violated the nondelegation doctrine. *Id.* Again, this is not an argument Ultima is making.

9

[Section 631] nor [Section 637(a)] requires a race-based presumption of social disadvantage"). Either argument has its problems. If Congress told the SBA to engage in race preference, defendants must explain why it did not do so when the 1978 amendments were first passed. If it told the SBA to decide for itself, it is unclear where Congress did so.

Defendants first propose 15 U.S.C. § 637(a)(8) as a source of authority to the SBA. Dfs' SJ Opp. Memo. 10 (PageID # 2946). (Defendants mistakenly refer to this section as "Section 637(a)(1)(8).") That section certainly is a source of authority, as defendants say, just not authority to presume social disadvantage. Rather, Congress's instructions in that section were to make determinations as to which *groups* have been subjected to discrimination. *Rothe Development, Inc. v. United States Dep't of Defense*, 836 F.3d 57, 68 (D.C. Cir. 2016) (holding that Section 637(a)(8) "does [not] . . . tell the agency to presume that anyone who is a member of any particular group is, by that membership alone, socially disadvantaged."); *Rothe* Brief 10 (Doc. 60-3, PageID # 852) ("Nor does Section 8(a)(8) [637(a)(8)] require the use of a presumption that every member of a particular racial group – even a group identified pursuant to Section 8(a)(8) – has individually suffered prejudice or bias and is therefore socially disadvantaged.").

Defendants then turn to Congressional findings, now in 15 U.S.C. § 631(f). They acknowledge that the Court in *Rothe* found that these findings did not create a racial presumption, but claim that the SBA nonetheless could use those findings as a source of authority because in ascertaining whether Congress gave the agency an intelligible principle, courts can examine the context, purpose, and history of the statute. Dfs' SJ Opp. Memo. 12 (PageID # 2948). But again, this is just an irrelevant nondelegation argument. When Congress *has* delegated authority to an agency, courts can examine these things to determine whether the principle that Congress has articulated is intelligible. But findings are not *themselves* a delegation of authority. *Rothe* Brief 8-9 (PageID ## 850-51) ("Section [631](f)(1)(B) *does not direct agency action* or alter the statutory definition of social disadvantage set out in Section [637](a)(5) . . . [N]othing in Section [631](f)(1)(C) requires such a presumption [of social disadvantage for members of racial groups]

or overrides the focus in Section [637](a)(5) on whether a particular individual has been the target of racial or ethnic prejudice.") (emphasis added).

Moreover, in examining the context, purpose, and history of the findings, defendants conveniently ignore that "Congress affirmatively chose to jettison an express racial presumption that appeared in an earlier version of the bill." *Rothe*, 836 F.3d at 68. The racial presumption in that earlier version was based upon the findings, but Congress specifically chose not to enact it. *Id.* at 69. And Congress *did* enact racial presumptions in other parts of the 1978 amendments. *Id. See also Rothe* Brief 10 n.3 (PageID # 852) ("Section [637](d) . . . shows that Congress knows how to require a race-based presumption when it wants to.").

Defendants make two other arguments related to the findings. First, in an effort to rehabilitate the testimony of the SBA's 30(b)(6) witness, they claim that he "explained that it was the responsibility of Congress to make those findings." Dfs' SJ Opp. Memo. 11 (PageID # 2947). Ultima believes his testimony speaks for itself; the questions posed to him focused on findings *after* the ones made in the 1978 Amendments.

Second, defendants assail Ultima's interpretation of the findings – that "many" meant just that, and not "most" or "all" – as "strained" and "without support in the legislative history." Dfs' SJ Opp. Memo. 13 (PageID # 2949). They argue that the most "straightforward reading" of the findings is that "other persons may be socially disadvantaged for reasons other than their identification as members of certain groups." *Id.* This cannot be correct. The very *definition* of socially disadvantaged individuals is those who have been subjected to prejudice or bias "*because* of their identity as a member of a group." 15 U.S.C. § 637(a)(5) (emphasis added). Defendants' argument would mean that Congress used a completely different definition of that term in the findings. It is their interpretation – apparently, that Congress found that all members of designated racial groups were socially disadvantaged – that is strained. *Rothe*, 836 F.3d at 67 (language in findings do "not create a presumption that a member of a particular racial or ethnic group is necessarily socially disadvantaged . . ."). *Id.* at 64 ("the statute recognizes that not all members of

11

a minority group have necessarily been subjected to racial or ethnic prejudice or cultural bias.").

B.  Defendants' Argument Ignores Basic Principles Of Statutory Interpretation

Defendants' discussion of delegation omits several very important principles of statutory interpretation.  First, courts are reluctant to assume that Congress authorized agency conduct that would raise serious constitutional questions.  *E.g.*, *Solid Waste Agency of Northern Cook County v. Army Corps of Engineers*, 531 U.S. 159, 172 (2001) ("*SWANCC*") (rejecting Army Corps of Engineers' "Migratory Bird" rule interpretation of the Clean Water Act, giving it jurisdiction over ponds in an abandoned excavation and gravel pit because they were home to migratory birds; "Where an administrative interpretation of a statute invokes the outer limits of Congress' power, we expect a clear indication that Congress intended that result."); *Nat'l Labor Relations Bd. v. Catholic Bishop of Chicago*, 440 U.S. 490, 501 (1979) (rejecting NLRB's assertion of jurisdiction over teachers at church-operated schools because of the serious First Amendment issues that jurisdiction would raise; "it is incumbent on us to determine whether the Board's exercise of its jurisdiction here would give rise to serious constitutional questions.  If so, we must first identify 'the affirmative intention of the Congress clearly expressed' before concluding that the Act grants jurisdiction"); *Tiger Lily, LLC v. United States Department of Housing and Urban Development*, 5 F.4th 666, 671 (6th Cir. 2021) (rejecting an eviction moratorium imposed by the Center for Disease Control as a means of slowing the spread of Covid-19; "Our reading of the statute's text accords with the principle that that Congress does not casually authorize administrative agencies to interpret a statute to push the limit of congressional authority.") (internal quotations marks and citation omitted).

The racial presumption of social disadvantage plainly raises a serious constitutional question, as does any racial preference.  *Vitolo*, 999 F.3d at 360 ("Government policies that classify people by race are presumptively invalid. . . .  [Strict scrutiny] is a very demanding standard, which few programs will survive.").  The statute has no explicit instruction to use a racial presumption.

Indeed, the D.C. Circuit invoked this very doctrine with respect to the 8(a) statute when it held that "[e]ven if the statute could be read to *permit* the agency to use a racial presumption, the

12

canon of constitutional avoidance directs that we not construe the statute in a manner that renders it vulnerable to constitutional challenge on that ground." *Rothe*, 836 F.3d at 68 (emphasis added). The SBA and DOJ then told the Supreme Court: "The court of appeals' use of that canon is consistent with this Court's decisions." *Rothe* Brief at 10 n.3 (PageID # 852).

Second, courts should assume that Congress does not leave major questions to agency discretion. *Tiger Lily*, 5 F.4th at 671 (rejecting an eviction moratorium on assumption that Congress would have spoken clearly if it intended the Public Health Service Act of 1944 to authorize agency action that broad).

Defendants briefly address this second issue in a footnote (Dfs' SJ Opp. Memo. 9 n.4 (PageID # 2945)). Their brusque argument is that the "major questions" doctrine is irrelevant because this case does not involve a "major question." Ultima submits that whether to employ racial preferences as a tool – which, after all, automatically invokes "strict scrutiny"– is a major question by definition.

C.    Congressional Inaction Cannot Support The Racial Presumption

Finally, defendants argue that the SBA has authority to enact a racial presumption of social disadvantage because Congress has not done anything about it since the SBA first did so. Dfs' SJ Opp. Memo. 13 (PageID # 2949). *See also id.* at 25 (PageID # 2961). This is a disfavored approach to interpretation. *SWANCC*, 531 U.S. at 169 (rejecting argument that Congressional failure to repeal the Migratory Bird rule constituted its approval; using "congressional acquiescence" must be done "with extreme care"); *Brown v. Gardner*, 513 U.S. 115, 121 (1994) (rejecting longstanding VA rule requiring fault on VA's part before compensation; "Congressional silence lacks persuasive significance, . . . particularly where the administrative regulations are inconsistent with the controlling statute.") (cleaned up); *Tiger Lily*, 5 F.4th at 673 (rejecting argument that Congress's short extension of the eviction moratorium constituted acquiescence). Defendants here do not supply any evidence that the racial presumption of social disadvantage in the 8(a) Program was well known and considered by Congress, the minimal prerequisites for considering Congressional

13

inaction as support.

Moreover, Congressional inaction here is a two-edged sword. Congress can also be deemed to be familiar with judicial as well as administrative interpretations. Here, the D.C. Circuit ruled that Congress not only did not *require* racial preferences, it did not even *permit* them. *Rothe*, 836 F.3d at 68. Congress has not taken any action in response to that ruling to demonstrate its disagreement. Giving these conflicting interpretations, Congressional inaction in recent years might best be attributed to other causes.

## III. DEFENDANTS' ARGUMENTS DO NOT RAISE A GENUINE ISSUE OF MATERIAL FACT OVER THE STRICT SCRUTINY ANALYSIS

Much of defendants' arguments concerning strict scrutiny were set forth in earlier papers and, accordingly, do not require significant additional discussion.

Defendants repeat their contention that they bear only the initial burden of producing evidence demonstrating constitutionality, with the ultimate burden going on Ultima. They add only a cite to the plurality decision in *Wygant v. Jackson Bd. Of Educ.*, 476 U.S. 267 (1986) – without identifying it as a plurality decision in its citation. Dfs' SJ Opp. Memo. 15 (PageID # 2951). Ultima addressed this issue in its opposing memorandum. Pl's SJ Opp. Memo. 1-2 (PageID # 2412-13). As noted there, the United States took the opposite position in *United States v. City of Cincinnati*. *See* Reply Brief of United States in *U.S. v. City of Cincinnati*, S.D. Ohio No. C-1-80369, 6-7 (copy accompanying hereto) ("the City has the burden of *demonstrating* both prongs of the equal protection analysis") (emphasis added). Defendants also repeat their argument about the standard for facial challenges without identifying where Ultima stated it was making such a challenge or explaining how this would change the strict scrutiny analysis. Dfs' SJ Opp. Memo. 15 (PageID # 2951). Again, Ultima *is* challenging the entire 8(a) Program, but *as it is implemented by defendants*. If the racial presumption is unnecessary (because, as defendants insist, all the beneficiaries of the presumption would successfully meet the standard without it), then "there is no federal agency that could constitutionally" make that presumption. Dfs' SJ Opp. Memo. 19 n.9 (PageID # 2955). The case defendants rely upon, *Phelps-Roper v. Strickland*, 539 F.3d 356 (6th Cir. 2008) was a challenge

14

to an Ohio law that restricted protest activities near a funeral or burial service. There was no instance of a specific violation of the law at issue.

A. <u>Compelling Governmental Interest</u>

Defendants' arguments mostly misconstrue Ultima's arguments.

Ultima has not argued that the evidence before Congress in 1978 could not have been used to support race preferences if Congress, in fact, had adopted them for the 8(a) Program. *Compare* Dfs' SJ Opp. Memo. 18 (PageID # 2954). What they cannot do is support the SBA's later adoption of a race preference, much less its continued use of that preference some forty plus years later. *DynaLantic Corp. v. United States Dep't of Defense*, 885 F. Supp. 2d 237, 258 (D.D.C. 2012) ("the statute is over thirty years old and the evidence . . . is stale for purposes of determining a compelling interest in the present."). If the only thing subject to strict scrutiny is the racial presumption (Dfs' SJ Opp. Memo. 17 (PageID # 2953)), and if all agree that Congress did not adopt that presumption, then the evidence before Congress in the 1970's is irrelevant to the SBA's continued use of it. This is especially so when most of the evidence has nothing to do with the 8(a) Program.

Defendants argue that circumstantial evidence is sufficient to support a conclusion of intentional discrimination, citing Title VII cases invoking the *McDonnell Douglas-Burdine* burden-shifting process. Dfs' SJ Opp. Memo. 22-23 (PageID ## 2958-59). But the evidence in such Title VII cases is always about a specific plaintiff: (s)he was not hired, someone else less qualified but of a different sex, race, or religion was, etc. None of defendants' evidence is analogous to the kind of evidence presented in such cases. Rather, it is all just disparity studies and expert reports, virtually all of them unsworn or unauthenticated.

Defendants concede that a disparity alone – "utilizat[ion] [of a group] at a rate lower than their availability in a particular market" – "does not necessarily provide any information as to the cause of that disparity." Dfs' SJ Opp. Memo. 24 (PageID # 2960). Exactly so. Defendants further argue that other statistical evidence "which rules out the possibility that the disparity was caused by mere chance or by non-discriminatory factors is evidence of discrimination." *Id.* The question is

15

whether any of defendants' evidence "rules out the possibility" of the disparity being caused by "non-discriminatory factors." Or, more precisely on this motion for summary judgment, have defendants shown that their evidence meets that standard and thus creates a strong basis in evidence? Defendants refer to pages 13-14 of their moving memorandum, three unauthenticated pieces of evidence attached to their initial motion, and their unsworn expert reports, Dfs' SJ Opp. Memo. 24 (PageID # 2960), but none of them show how the disparities they rely upon "rule[] out the possibility" of "non-discriminatory factors." Indeed, two-thirds of Dr. Wainwright's expert report does not even deal with contracting. Pl's SJ Opp. Memo. 10-11 (PageID ## 2421-22).

Ultima can meet its summary judgment burden by showing that defendants cannot meet their burden on an issue on which they bear the burden – like the demonstration of a strong basis in evidence. *Pineda v. Hamilton Cty.*, 977 F.3d 483, 491 (6th Cir. 2020). That is the case here.

B.      Narrow Tailoring

Defendants' efforts to demonstrate that they can meet their burden on summary judgment ignore much of what they have said in prior papers and, in several instances, defy common sense.

1.      Statutes and Executive Orders. – As set forth in Ultima's moving papers, the SBA has ignored the guardrails that Congress itself set up to guide the SBA's implementation of the program. Specifically, it has ignored the statutory definition of "economically disadvantaged," failed to provide the annual reports called for by Congress, and not assessed whether those participants completing a nine-year term in the 8(a) Program have met the goals and objectives of their business plans. Pl's SJ Memo. 24-25 (PageID ## 830-31). Defendants do not dispute any of this, but quickly dismiss it as not "a proper consideration in the narrow tailoring analysis." Dfs' SJ Opp. Memo. 25 (PageID # 2961). They also claim that Congress must be OK with all of this because they have not done anything about it. *Id.*

The first part of the argument is belied by the fact that defendants themselves relied upon these factors in their own narrow-tailoring analysis. Dfs' SJ Memo. 27 (PageID # 1621) (arguing that the economic disadvantage requirement demonstrates flexibility); *id.* at 28 (PageID # 1622)

16

(arguing that the program has appropriate durational limits because those participants that meet the goals of their business plans or are no longer economically disadvantaged are graduated early); *id.* at 28-29 (PageID ## 1622-23) (arguing that the annual reports allow Congress "ample opportunity to act if it disagrees with the direction of the program"); *id.* at 31 (PageID # 1625) (arguing that requirement of economic disadvantage mitigates burden).

As for Congressional inaction, defendants do not explain how Congress possibly could know of the SBA's lapses (other than the failure to provide reports). The regulatory definition of economic disadvantage includes a provision quite similar to the statutory definition. 13 C.F.R. § 124.104(a). How would Congress know that the SBA does not consider it in reviewing applications? Or that the SBA does not review those businesses completing the nine-year terms to determine if they have met the goals and objectives of their business plans? Or that the SBA has used "imprecise wording" (in the words of its 30(b)(6) witness) in drafting the reports to Congress? Doc. 73 at 16, No. 55 (PageID # 3002).[4] Given the disfavored status of "approval by inaction," it is hard to see Congress's inaction here as acquiescence.

Not only has the SBA ignored some of Congress's instructions, it has adopted various modifications to the 8(a) Program that were not contemplated at all by Congress and/or are seemingly inconsistent with Congress's purpose. The SBA permits entities owned by Community Development Corporations to participate in the 8(a) Program, although Congress never mentioned them in the statute. 13 C.F.R. § 124.111. In passing P.L. 99-272, § 18015, 100 Stat. 370-71, Congress added "Indian tribes" to the list of groups in what is now Section 631(f), so that the list included (and still includes) *both* "Native Americans" and "Indian tribes." In 2011, in response to

---

[4]  The 408 Report for Fiscal Year 1995 indicates very few 8(a) participants who completed their term actually met the goals and objectives of their business plan. Defendants deny this because, pursuant to an SBA regulation, a firm can also "graduate" because one or more of the owners are no longer economically disadvantaged. Doc. 73 at 16 (PageID # 3002) (Response to No. 55). If it is true that some of the "small number" listed under "Graduated / Early Graduated" in the FY 2015 408 Report graduated pursuant to a regulatory (not statutory) definition, this would only mean that *even fewer* participants met the goals and objectives of their business plans.

public comments, the SBA redefined "Native Americans" from "American Indians, Eskimos, Aleuts, or Native Hawaiians" to "Alaska Natives, Native Hawaiians, or enrolled members of a Federally or State recognized Indian tribe." 76 Fed. Reg. 8229, 8254 (Feb. 11, 2011). The substitution of "enrolled members" for "American Indians" seems inconsistent with Congress's decision to list two different groups.

Defendants also do not dispute that they have ignored Executive Orders that could have considered and promoted alternatives to race-preferential contracting policies, or at least provided guidelines to implement them in a fair way. They have no explanation, for example, why they have dropped goals for the 8(a) Program, despite the explicit requirement of Executive Order 13170. Pl's SJ Memo. 13 (PageID # 819), 26 (PageID # 832). E.O. 12432 and E.O. 11625 require agencies to consider and promote plans to utilize minority businesses in other ways (Pl's SJ Memo. 13-14 (PageID # 819-20), 26 (PageID # 832)). As to all three, defendants only assert that (1) they are old and (2) Ultima has not shown they have not been explicitly or implicitly repealed. Df's SJ Opp. Memo. 33 n.12 (PageID # 2969). It is hard to believe that the defendants' attorneys at the Department of Justice are not capable of determining whether these orders have been repealed, and apprising this Court if they have – or that they made no effort to do so in preparing their opposition memorandum. The official website of the National Archives does not indicate any repeal of the relevant parts of the orders Ultima cited. *See* https://www.archives.gov/federal-register/executive-orders/disposition.

2. The "Rebuttable" Presumption. – Defendants' efforts to show that the presumption of social disadvantage is truly rebuttable are disingenuous. Here is the response to the relevant statement of material fact:

30. No one has ever successfully challenged the presumption of social disadvantage for someone *whose identification as one of the enumerated racial and ethnic minorities is clear.*

RESPONSE: Disputed. Defendants deny this statement because the SBA has excluded individuals from the 8(a) program where evidence showed that they had not actually held themselves out as a member of a designated group.

18

Doc. 73 at 10 (PageID # 2996) (emphasis added, citations omitted). *See also id.* ¶ 31 (same). This is a non sequitur. A person who did not "hold themselves out as a member of a designated group" is not someone whose "identification as one of the enumerated racial and ethnic minorities is clear." The evasion only proves the point (which, in any event, is settled by defendants' discovery responses, which, unlike the quoted response, were made under oath). As long as someone's racial identity is not in question, there is nothing that can be rebutted.

This is exactly the holding of *Vitolo* when it held that the presumption is "dispositive." Defendants try to distinguish *Vitolo* because it was applied to "a very different program," "on a very limited record," and only held that the presumption in combination with the 21-day priority period was dispositive. Dfs' SJ Opp. Memo. 26 (PageID # 2962). (The fact that *others* not eligible for the presumption would have a hard time in qualifying to be "socially disadvantaged" given the short time frame has nothing to do with the dispositive/rebuttable nature of the presumption.) But *Vitolo* did not rely on any of these things in reaching its conclusion, only common sense.

3. <u>Necessity / Race-Neutral Alternatives</u>. – Defendants argue that "Congress satisfied its obligation to consider the efficacy of race-neutral alternatives." Dfs' SJ Opp. Memo. 32 (PageID # 2968). But Congress did not have to consider any race-neutral alternative to the race-neutral statute that it passed.

The SBA, on the other hand, should have considered race-neutral alternatives, including the one that they started out with: individual case-by-case analysis. In response, defendants claim:

> Such a suggestion should be dismissed out of hand as the SBA already exhausted this method of administering the program, and Congress found evidence of its ineffective results in remedying discrimination in federal contracting. *See* [Dfs' SJ Memo.] at 25-26.

*Id.* (PageID # 2968). The cited pages of defendants' moving memorandum say *nothing* about Congress's dissatisfaction with the SBA's case-by-case method in the early-to-mid 1980's. Rather, those two pages only discuss *Congress's* various race-neutral actions taken between 1953 and 1978 and *other* race-neutral programs. Nor have defendants produced anything else to show that anyone thought that the method being used in the 1980's was ineffective. If Congress thought so, it could

19

have just passed a bill. Nor did the SBA suggest any such dissatisfaction. When it proposed adopting the presumption, the SBA said only that it "believe[d] that this [change was] consistent with the Congressional mandate that the primary beneficiaries of the 8(a) program be members of the statutorily designated minority groups." 48 Fed. Reg. 56686 (Dec. 22, 1983).

Defendants' argument is further undermined by their own concession that "applicants can and do qualify as socially disadvantaged without the presumption" and that "*[t]here is no basis to presume current participants could not qualify as socially disadvantaged under the existing method of doing so.*" Dfs' SJ Memo. 34-35 (PageID ## 2970-71) (emphasis added). Of course, it is defendants who must have some basis for believing that those receiving the presumption could not qualify under Section 124.103(c). Otherwise, as is apparently the case, the presumption only serves the not-compelling interest of administrative convenience.

    4.    <u>Goals</u>. – Defendants equate the absence of goals with the absence of hard, rigid quotas, Dfs' SJ Opp. Memo. 28-29 (PageID ## 2964-65), but the two are not the same. A goal can connect the remedy to the harm that provides its justification. Presumably, that is why Executive Order 13170 required them.

    5.    <u>Duration</u>. – Ultima agrees with defendants that the goal of the duration prong is to ensure that the remedy will not last longer than the discriminatory effects it is designed to eliminate. Dfs' SJ Opp. Memo. 28. In the usual case, that means a set time limit, with Congress periodically reviewing the need for the program and making adjustments along the way. *E.g.*, *Rothe Development Corp. v. Dep't of Defense*, 545 F.3d 1023, 1027–08 (Fed. Cir. 2008) (describing history of 10 U.S.C. § 2323, including reenactments and adjustments). As the Supreme Court has noted, "current burdens . . . must be justified by current needs." *Shelby County v. Holder*, 570 U.S. 529, 542 (2013) (internal quotation marks and citation omitted).

The "duration" limitation does not mean just a limitation on individual participation in the program. The "discriminatory effects it is designed to eliminate" does not refer to the discriminatory effects on one person or company, but rather the discriminatory effects that "it" (the whole program)

20

is designed to remedy. Here, the SBA has no time limit, nor even any program for assessing the continuing need for the 8(a) Program. The "duration" factor cuts against narrow tailoring.

6. <u>Overinclusive</u>. – Defendants do not seriously dispute that the standards that the SBA uses to identify the "economically disadvantaged" are expansive, eliminating only the richest Americans. They first argue that "economic thresholds" are not race conscious, not subject to strict scrutiny "and therefore have no place in the narrow tailoring analysis." Dfs' SJ Opp. Memo. 30 (PageID # 2966). This makes no sense; none of the narrow tailoring factors are "race conscious." They do not apply differently by race. Moreover, it is inconsistent with defendants' repeated references to the economic disadvantage requirement in its own narrow tailoring analyses. *See* discussion *supra* at 16.

Defendants then argue that the 8(a) program is a program designed to assist business owners and thus cannot have its economic standards set so low that it would eliminate businesses with experienced owners. Dfs' SJ Opp. Memo. 30 (PageID # 2966). But the question on "overinclusiveness" is not whether the program includes businesses that could benefit from additional assistance, but rather whether it includes many businesses whose owners were unlikely to be victims of discrimination. If defendants want to cast a broad net, they can do so, but not with a racial presumption of social disadvantage.

With respect to the inclusion of the various minorities in the 8(a) Program, defendants assert that "Congress has continuously made findings of racial discrimination for each group presumed socially disadvantaged since the 8(a) program was codified." Dfs' SJ Opp. Memo. 31 (PageID # 2967). They cite page 30 of their moving memorandum for this proposition, but that page has nothing in support. (There are three paragraphs from their statement of undisputed material facts cited at the end of that page. The first only repeats the 1978 findings; the other two refer to the unsworn report from one of their experts.)

Defendants also miss the point. Defendants do not have any *system* for assessing whether conditions warrant the continued participation of a particular group, or contracts within a particular

21

industry, in the 8(a) Program. Nor do they assess the conditions in a particular industry when reserving contracts to the 8(a) Program. In this case, they reserved many contracts in Ultima's industry without any prior evidence that minorities were discriminated against there. Doc. 72 at 19-20, No. 66 (PageID ## 3005-06). They attack plaintiff's argument as speculation (Dfs' SJ Opp. Memo. 34), but the absence of any periodic review, unassociated with litigation, militates against narrow tailoring.

   7.  <u>Underinclusive</u>. – In response to Ultima's argument that the inclusion of groups appears haphazard, defendants assert that the exclusion of Hasidic Jews makes sense because Section 8(a) was designed to combat racial or ethnic prejudice or cultural bias, not religious discrimination. Dfs' SJ Opp. Memo. 35. The implicit (but unsupported) assertion is that religious discrimination is not a type of "cultural bias" (which raises a few questions about what exactly "cultural bias" is.). Presumably, the same would hold true of sex discrimination. But if this were so, then it is hard to understand how a woman or Hasidic Jew could "still qualify as socially and economically disadvantaged" (*id.*) based on those kinds of discrimination since the definition of "social disadvantage" does not change. That the Court in *DynaLantic*, 885 F. Supp. 2d at 287, did not address this obvious contradiction only demonstrates that its analysis should not be followed.

  C.  <u>Defendants' Cases</u>

  Defendants once again rely heavily upon two district court cases from the District of the District of Columbia, *DynaLantic* and *Rothe Development Corp. v. Dep't of Defense*, 107 F. Supp. 3d 183 (D.D.C. 2015), *aff'd on other grounds*, 836 F.3d 57 (D.C. Cir. 2016). Ultima has addressed these cases previously. Pl's SJ Opp. Memo. 25 (PageID # 2436). There are any number of legal holdings in those cases that are inconsistent with either Sixth Circuit authority or the better-reasoned view of the law, including their conclusions that plaintiff bears the ultimate burden in cases of this kind (*e.g.*, *Rothe*, 107 F. Supp. 3d at 207-08), the application of *Salerno* (*id.* at 207), and the application of the "passive participation" (*DynaLantic*, 885 F. Supp. 2d at 275-76) and "duration" prongs (*id.* at 287) of narrow tailoring. Moreover, neither case tried to assess whether the

22

discrimination that formed the basis of the government's "compelling interest" met the requirements of "specific" and "intentional" discrimination that govern here.

But the cases are also *factually* distinguishable. The 8(a) Program assessed in those cases is not the one before this Court. Both cases relied upon the "rebuttable" nature of the presumption of social disadvantage (*id.* at 244, 250; *Rothe*, 107 F. Supp. 3d at 210), but, in this case, the evidence demonstrates that it only relates to an individual's identification with a particular group (13 C.F.R. § 124.103(b)(2)), and never with respect to that individual's personal history of discrimination (13 C.F.R. § 124.103(b)(3)). Those cases relied on the latter provision. They also relied upon the fact that "[t]he SBA also compares the financial condition of those claiming disadvantaged status to others in the same or similar line of business who are not socially and economically disadvantaged" (*DynaLantic*, 885 F. Supp. 2d at 244), but the evidence in this case shows that the SBA does not do that in assessing 8(a) applications and does not vary its "economic disadvantaged" analysis for different "lines of business." Doc. 73 at 11-12 (PageID ## 2997-98), Nos. 34-37. The standards for assessing income, net worth, and fair market value of assets also have changed. *Compare DynaLantic*, 885 F. Supp. 2d at 244 *with* 13 C.F.R. § 124.104(c). The 8(a) Program had goals at that time. *DynaLantic*, 885 F. Supp. 2d at 285 ("aspirational goals"), 288 ("two percent of the value of prime and subcontract awards"). This allowed the *DynaLantic* court to assess numerical proportionality. *Id.* at 288-89. Since goals have been abandoned, defendants now argue that numerical proportionality is irrelevant. Dfs' SJ Memo. 27 n.20 (PageID # 1621). There was no evidence in those cases that 8(a) firms were not meeting the objectives of their business plan or that the SBA was not even assessing that issue for some firms completing their term. There was no concession by defendants that beneficiaries of the presumption of social disadvantage could qualify without it.

It is also important to consider the assessment of the evidence in those cases. In *DynaLantic*, in a supplementary submission, defendants placed "50 disparity studies into the record with little or no analysis." *DynaLantic*, 885 F. Supp. 2d at 265. The court nonetheless examined them itself.

23

It found "some of the studies without value and accordingly did not rely upon them." *Id.* at 267.

Nonetheless, it examined several of them in great detail, with a particular eye towards their measures

of size, capacity, and availability. *Id.* at 267-70; *see also id.* at 268 (referring to Alaska study that

"measured firm capacity by considering the size of each firm's past bids, past revenue generated,

and revenue generation capacity"), 269 (referring to a Nevada study that "controlled for capacity

(by looking at the size of contracts firms had bid on and been awarded in the past)"). Defendants

do nothing like that here; not even their main expert claims to have examined capacity. Their other

expert concedes that he omitted bidding data from his regression. Ultima does not agree with all of

the *DynaLantic* court's analysis, or its entire reliance on these disparity studies (especially in light

of the many that were deemed worthless), but the analysis there far exceeds what defendants have

presented here.

Finally, DynaLantic's as-applied challenge was sustained by the court because the

government had no evidence of discrimination in its industry. *Id.* at 280. Here, defendants' effort

to show discrimination in Ultima's industry is limited to their expert reports. They had no evidence

of discrimination in Ultima's industry prior to their reservation of contracts in that industry for the

8(a) Program. *E.g.*, *Associated General Contractors of Ohio, Inc. v. Drabik*, 214 F.3d 730, 738 (6th

Cir. 2000) ("[U]nder *Croson*, the state must have had sufficient evidentiary justification for a

racially conscious statute *in advance of its passage*; the time of a challenge to the statute, at trial,

is not the time for the state to undertake factfinding.") (emphasis added).

Conclusion

For the foregoing reasons, and those presented in its moving papers, Ultima's motion for

summary judgment should be granted.

Respectfully submitted,

*/s/ Michael E. Rosman*
Michael E. Rosman

24

Michelle A. Scott
CENTER FOR INDIVIDUAL RIGHTS
1100 Connecticut Ave, NW, Ste. 625
Washington, D.C. 20036
(202) 833-8400

M. Dale Conder, Jr.
RAINEY KIZER REVIERE & BELL PLC
209 E. Main St.
Jackson, TN 38301
(731) 426-8130

25