Reply Brief of United States in U.S. v. City of Cincinnati, S.D. Ohio No. C-1-80369

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

CITY OF CINCINNATI, OHIO, *et al.*,

        Defendants.

Case No. C-1-80-369

**PLAINTIFF UNITED STATES' REPLY IN SUPPORT OF MOTION
TO MODIFY THE CONSENT DECREE**

The United States is committed to working with the City to achieve its aim of having a diverse police force. Workforce diversity is an important and laudable goal that the United States fully supports. Particularly in light of the current public conversation regarding policing and racial justice which the City references in its Response, the City's desire for a police force that reflects the diversity of the community it serves is commendable.

However, in light of jurisprudential changes since the Consent Decree was entered in 1981, the City must rely on current best practices for hiring, retaining, and promoting African Americans and women. The City's Response to the United States' Motion to Modify the Consent Decree makes evident that, 40 years after the Consent Decree was entered, the City is no longer using the Decree's numerical hiring and promotional goals to remedy the discrimination from the 1980's that the United States originally sued to eradicate. The City's evidence is insufficient to support continued reliance on those goals, which were envisioned as "interim measures." Dkt. 25 ¶ 2. The United States has proposed alternatives to the goals in the Decree and, when the City rejected those alternatives, the United States moved for a modification, rather than a termination, of the Decree.

The United States remains committed to partnering with the City to implement race- and sex-neutral employment practices that will enable the City to achieve its important objectives.

## I.     __The Court Can Modify the Decree Without Determining Substantial Compliance.__

The City's assertion that the Court can only decide the United States' Motion after developing a full factual record regarding its substantial compliance with all provisions of the Consent Decree misconstrues the relief the United States seeks. Contrary to the City's contention, the United States is not seeking to terminate the Decree. Dkt. 194 at 5-7. Rather, the United States seeks to modify the Decree to remove the race- and sex-conscious hiring and promotional goals in the absence of the City's demonstration that it can satisfy the requirements of strict and intermediate scrutiny, respectively. As such, the more rigorous standard for termination of a consent decree, established in *Gonzales v. Galvin*, 151 F.3d 526, 531 (6th Cir. 1998), requiring a determination as to whether substantial compliance with the terms of the Decree has been achieved, is inapplicable. The Sixth Circuit has previously rejected the City's position that a determination of substantial compliance must precede a constitutional determination.[1] *Cleveland Firefighters for Fair Hiring Pracs. v. City of Cleveland*, 669 F.3d 737, 742 (6th Cir. 2012) ("And thus the core issue to be resolved in this litigation is whether, 31 years out, the decree's racial classifications continue to remedy past discrimination by the Fire Department. The questions whether the decree's goals have been met, and whether the parties have stipulated to extend its terms, are ultimately subordinate to that core issue. The Constitution trumps a consent decree.").

---

[1] While the Court must hold a "complete hearing," it is not required to conduct a full evidentiary hearing on issues beyond the scope of the requested modification. *United States v. Wayne Cnty., Michigan*, 369 F.3d 508, 512 (6th Cir. 2004) (citing *Vanguards of Cleveland v. City of Cleveland*, 23 F.3d 1013, 1017 (6th Cir.1994)). Rather, the Court need only make appropriate findings of fact before ordering any modification. *Wayne Cnty*, 369 F. 3d at 512; s*ee also Gonzales*, 151 F.3d at 535 (noting that "a 'complete hearing' of an issue does not necessarily require a full-blown evidentiary hearing").

As in *Cleveland Firefighters*, even if the parties agreed that substantial compliance had not been achieved and desired to extend the Decree, the Court would have an independent obligation to examine the constitutionality of the goals.

Should the Court grant the United States' Motion, several key parts of the Decree will remain in full effect, including an injunction prohibiting the City from discriminating against African Americans and women, as well as the United States' ability to continue reviewing the City's hiring and promotional processes to ensure that they are not having an unlawful disparate impact on African Americans or women and otherwise comply with Title VII of the Civil Rights Act of 1964, as amended. Dkt. 25 ¶¶ 1, 7. And of course, the rights of those claiming job discrimination because of race or sex are independently protected by Title VII.

The City "strongly concurs" that the Consent Decree must be modernized to implement current best practices that will ensure diversity remains a high priority within the City's Police Department, but objects, in part, based on "what the change might communicate to [its] diverse community and members of CPD." Dkt. 194 at 4. While the United States acknowledges that the City's concerns are significant, they do not serve as a legally adequate justification for its desire to retain the Decree's interim goals. The United States is committed to working with the City to address these concerns and expects that following any modification, the parties will be able to work swiftly towards their shared goal of ensuring that the Police Department's diversity does not backslide. Simply put, the constitutional questions stemming from the continuation of the 40-year-old race- and sex-conscious goals are fully ripe for the Court's resolution.

The City does not dispute that the United States has met its initial burden of showing a significant change in the law regarding race- and sex-conscious remedial action since the Decree was entered in 1981. Dkt. 193 at 7; *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384 (1992).

3

Therefore, the Court should determine whether the proposed modification eliminating the goals is "suitably tailored to the changed circumstance." *Id.* at 391. The Court can make this determination by simply examining whether the evidence put forth by the City satisfies current constitutional requirements for race- and sex-conscious action in light of the changes in the law.

## II.    The City Misstates the Burden of Evidence under the Equal Protection Clause.

The City has misstated the burden of evidence that must be produced to demonstrate that the Consent Decree's interim goals can survive an as-applied challenge under the Equal Protection Clause. As set forth in the United States' Motion, the equal protection analysis for an as-applied challenge to race- and sex-based action has two prongs, and the City bears the burden of producing evidence in *both* prongs. *See* Dkt. 193 at 8-10. Even if the City is correct that the United States would bear the ultimate burden of persuasion regarding whether the evidence is sufficient to justify continued use of the interim goals under current constitutional standards, the City must produce evidence—not merely assertions—regarding its continued need to rely on the interim goals.

The Sixth Circuit has stated that government policies that classify people by race or sex are "presumptively invalid" under the Equal Protection Clause. *Vitolo v Guzman*, 999 F.3d 353, 360, 364 (6th Cir. 2021) (citing U.S. CONST. amend. XIV). To overcome this presumption, the City must produce evidence that its race-conscious goals (1) further a "compelling governmental interest"; and (2) are "narrowly tailored" to achieve that interest. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995); *see Vitolo*, 999 F.3d at 360. The City must demonstrate that its sex-conscious goals (1) serve "important governmental objectives" or interests; and (2) are "substantially and directly related" to those interests. *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724, 730 (1982); *see Vitolo*, 999 F.3d at 364.

4

The City relies on outdated case law and erroneously argues that it need only "produce evidence" of the first prong of the equal protection analysis—*i.e.*, that the Decree's goals satisfy a compelling or important governmental interest. *See* Dkt. 194 at 4. According to the City, once it produces evidence that it possesses such governmental interests for its race- and sex-conscious goals, the burden shifts to the United States to prove the "unconstitutionality" of the goals, including that they are not narrowly tailored or substantially related to the City's stated interests. *See* Dkt. 194 at 4-5, 16. In doing so, the City has improperly relieved itself of the burden of producing evidence to support the second prong of the equal protection analysis.

Both the Supreme Court and the Sixth Circuit have rejected the City's argument regarding the burden of producing evidence in an equal protection suit. In *Fisher v. University of Texas at Austin*, 570 U.S. 297, 312 (2013) ("*Fisher I*"), the Supreme Court clarified that the plaintiff bears the initial burden of "placing the validity of . . . an affirmative action plan in issue." *Accord Brunet v. City of Columbus*, 1 F.3d 390, 404 (6th Cir. 1993) (noting a plaintiff need only prove that "a racial preference existed" before shifting the burden to the defendant). Once the plaintiff discharges its burden of showing that a racial classification exists, then the burden shifts to the defendant to show not only that it has a compelling governmental interest for the racial classification but also to demonstrate "that *the means chosen by [the defendant] . . . are narrowly tailored to that goal*." *Fisher I*, 570 U.S. at 311 (emphasis added); *see also Fisher v. Univ. of Tex. at Austin*, 136 S. Ct. 2198, 2208 (2016) ("*Fisher II*").

When assessing narrow tailoring, the Supreme Court has stated that the defendant is given "no deference." *Fisher I*, 570 U.S. at 311*; see also id*, at 311-12 ("[A]s the Court stated in *Grutter*, it remains at all times the [defendant's] obligation to demonstrate, and the Judiciary's obligation to determine, that admissions processes 'ensure that each applicant is evaluated as an individual

and not in a way that makes an applicant's race or ethnicity the defining feature of his or her application.'") (quoting *Grutter v. Bollinger*, 539 U.S. 306, 337 (2003)). Narrow tailoring also "imposes on the [defendant] the ultimate burden of demonstrating, before turning to racial classifications, that available, workable race-neutral alternatives do not suffice." *Fisher I*, 570 U.S. at 312-13. With respect to sex-based classifications, the Sixth Circuit has similarly held that it is the defendant's burden to show that a challenged policy "passes the substantial-relation test." *Vitolo*, 999 F.3d at 365.

Ignoring this binding precedent, the City erroneously relies on *Rutherford v. City of Cleveland*, 179 F. App'x 366, 374 (6th Cir. 2006), to support its articulation of its burden. Although the parties in *Rutherford* disputed the appropriate allocation of the burden, the Court did not hold that a defendant has *no* burden to demonstrate narrow tailoring. *Id*. at 374, 374 n.5. As noted above, subsequent decisions of the Supreme Court and the Sixth Circuit have made clear that a defendant has the burden of producing evidence in support of both prongs of the equal protection analysis, contrary to the City's arguments.[2] Here, the City has the burden of

---

[2] Citing *Rutherford*, the City argues that "[w]hen the party defending the remedy produces evidence of a compelling interest, the burden shifts to the party challenging the remedy to prove its unconstitutionality." Dkt. 194 at 4-5. *Rutherford* did not hold that a defendant carries no burden at all (whether phrased as a burden of production or a burden of persuasion) to demonstrate that its race- or sex-conscious classifications are appropriately tailored under strict or intermediate scrutiny, as the City suggests. Nor did *Rutherford* resolve who carries the ultimate burden of proof in an equal protection suit. In fact, the *Rutherford* court expressly stated in a footnote that when it decided the opinion in 2006, "[t]here [was] some dispute on whether the [defendant] should . . . bear the ultimate burden to prove the constitutionality of its affirmative action plan in all cases." *Rutherford*, 179 F. App'x. at 374 n.5 (citing cases). The court ultimately concluded that it did not need to resolve this issue in *Rutherford* because the court believed that even if it had placed the ultimate burden of proof on the defendants, they had provided sufficient evidence to satisfy this burden. *Id*. Earlier Sixth Circuit cases, including *Brunet*, 1 F.3d at 404-05, *Aiken v. City of Memphis*, 37 F.3d 1155, 1162 (6th Cir. 1994), and *Middleton v. City of Flint, Mich*., 92 F.3d 396, 404 (6th Cir. 1996), had not been clear on this point. Regardless of who carries the ultimate burden of proof in an equal protection suit, as explained above, the Supreme Court and Sixth Circuit have

demonstrating both prongs of the equal protection analysis, including that its race- and sex-conscious goals serve a compelling or important governmental interest and that they are appropriately tailored to achieve those interests. As explained below, the City has not met its burden on either prong.[3]

III.     **The City Has Failed to Meet its Burden of Showing that the Race-Conscious Numerical Goals Serve a Compelling Governmental Interest and Are Narrowly Tailored.**

The City's lack of evidence substantiating its interests in remedying the effects of past discrimination and maintaining a diverse police department prevents the City from meeting its burden of proving that a "strong basis in evidence" exists to support its race-conscious hiring and promotional goals. *Rutherford*, 179 F. App'x at 374.

A.     **The City Has Failed to Demonstrate a Compelling Interest.**

1.     **The City Cannot Rely Only on 40-Year-Old Evidence of Discrimination.**

In support of its assertion that the race-conscious goals entered in 1981 continue to remedy past discrimination, the City relies solely upon "evidence of past discrimination in CPD in the 1980s." Dkt. 194 at 11-12. While remedying past discrimination certainly supported entry of the Decree in 1981 and could be used to support race-conscious goals under the appropriate

---

clarified that a defendant has the burden of demonstrating the narrow tailoring and substantially related prongs.

[3] Although the City spends a considerable portion of its brief arguing that there "has been no prima facie showing" that it has "discriminated against any person on the basis of race or gender" when using the numerical hiring and promotional goals, *see* Dkt. 194 at 8-9, this is not the proper focus of the Court's analysis for the instant motion. The City does not dispute that the Consent Decree's hiring and promotional goals contain race- and sex-based classifications. The goals therefore are presumed invalid unless the City successfully demonstrates the requirements of strict and intermediate scrutiny, respectively.

7

circumstance, the City has not met the legal standard required to continue to rely on this interest 40 years later.[4] In *Cleveland Firefighters*, which the City has not addressed, the Sixth Circuit crystalized this very distinction, holding that to extend racial classifications contained in a 31-year-old decree, there must be evidence that the "classifications continue to remedy the Fire Department's past discrimination." 669 F.3d at 742. On remand, the district court found that the goals no longer served a remedial purpose after 31 years, explaining that the Sixth Circuit "effectively recognizes a presumption that after a passage of significant time . . . a district court should presume the 'retrospective, remedial purpose of affirmative action satisfied except where it finds that past discrimination continues to taint a particular position.'" *Cleveland Firefighters for Fair Hiring Practices v. City of Cleveland*, 917 F. Supp. 2d 668, 680 (N.D. Ohio 2013) (quoting *Cleveland Firefighters*, 669 F.3d at 742) (quoting *Ensley Branch, N.A.A.C.P. v. Seibels*, 31 F.3d 1548, 1575-76 (11th Cir. 1994)) (internal quotation marks omitted). In light of this precedent, it is the City's obligation to demonstrate that the Consent Decree's goals *currently* serve the compelling interest of remedying past discrimination should it wish to continue relying on them.

But the City has put forth no evidence to meet its burden. In response to a recent Request for Information from the United States, the City indicated that there have been no allegations since 2017 of any residual effects of past discrimination at the Police Department, and aside from Sergeant Kohler's reverse race discrimination case, there have been no challenges to the City's hiring or promotional examinations administered since 2017 which implicate the Consent Decree. Exhibit ("Ex.") A, City of Cincinnati's First Supplement to Responses to United States' First Set of Requests for Information and Documents, Response to Request Nos. 12-13, June 30, 2021. The

---

[4] When the Decree was entered, the City denied that any unlawful discrimination had occurred. Dkt. 25 at 2.

8

City also objected and declined to provide any information showing that its use of the hiring and promotional goals remains remedial at this point in time.  *Id*. at Request No. 14.

The Department's demographics bear out that the City has successfully been able to hire and promote African Americans to the ranks of police officer and sergeant on a consistent basis since 2010, with only minimal reliance on the Consent Decree's hiring and promotional goals. The numbers of African Americans holding the position of sergeant and police officer have remained consistent, ranging between 27 percent to 31 percent for sergeant and 31 percent to 37 percent for police officer, from 2010 to the present.  Ex. B, Summary of Demographic Information Provided by City of Cincinnati, June 4, 2021.  Finally, since the City began using its current written examinations for entry-level hiring and sergeant promotions in 2017, the City has *not* relied upon the numerical goals in the Consent Decree a *single time* in hiring African-American police officers and has only relied upon the goals *three times* in promoting African-American sergeants out of a total of 45 promotions.  Ex. A, Response to Requests Nos. 1, 3-4.  These demographics demonstrate that the City has been able to hire and promote African Americans since 2010, thereby undermining the City's argument that continuation of the Decree's race-conscious numerical goals are necessary to remedy discrimination.

> ### 2.      The City Has Not Established an Operational Need for Diversity.

The City has also failed its evidentiary burden with respect to its interest in an operational need for diversity.  Dkt. 194 at 12-15.  This Court need not decide whether an operational need for diversity could serve as a compelling interest here, because the City fails to make the required evidentiary showing to establish such an interest.  *See Rutherford*, 179 F. App'x. at 374 ("Establishing a strong basis in evidence is not an easy burden to meet.").

In the education context, the Supreme Court has made clear that diversity goals "cannot be elusory or amorphous—they must be sufficiently measurable to permit judicial scrutiny of the policies adopted to reach them." *Fisher II*, 136 S. Ct. at 2211. At the same time, they cannot "be reduced to pure numbers." *See id*. at 2210. But the City here fails to articulate any "concrete and precise goals," *id*. at 2211, or otherwise explain its objectives beyond its desire to retain the Decree's race-conscious numerical goals. Nor has the City produced any evidence to support a "reasoned, principled explanation" to justify any consideration of race in its hiring and promotional decisions. *Id*. (internal quotation marks omitted). By contrast, in *Fisher II*, the university provided a 39-page proposal following a year-long study, along with depositions and affidavits from admissions officers, to substantiate the university's asserted interest. *See id*.; *see also Detroit Police Officers' Ass'n v. Young*, 608 F.2d 671, 695-696 (6th Cir. 1979) (supporting a "substantial" interest in an operational need for diversity in the police force with testimony from high-ranking police officers and studies regarding the dangers of having "a mostly white police force in minority communities"). Because the City has failed to articulate its operational needs with specificity and to present any evidence in support of such needs, the City has not satisfied its burden with respect to its interest in an operational need for diversity.

**B.      The City Has Failed to Demonstrate that the Consent Decree's Numerical Goals Are Narrowly Tailored to Any Compelling Interest.**

Because the City has failed to support its interests with evidence, the Court need not address the narrow tailoring prong. But if the Court does so, it should conclude that the City has failed to show that the interim goals are narrowly tailored to current circumstances. Courts consider several factors when evaluating whether race-conscious remedies are narrowly tailored, including: (1) the necessity for the relief and the efficacy of alternative remedies; (2) the flexibility and duration of the relief, including the availability of waiver provisions; (3) the relationship of the numerical

10

goals to the relevant labor market; and (4) the impact of the relief on the rights of third parties. *United States v. Paradise*, 480 U.S. 149, 171 (1987).

### 1.    The City Has Failed to Show that Race-Neutral Alternatives Do Not Work.

The first factor above requires the reviewing court to verify that it is "necessary" for a defendant to use race to achieve its compelling interest. *Fisher I*, 570 U.S. at 312. For a policy to survive this aspect of the narrow-tailoring analysis, the defendant must show "serious, good faith consideration of workable race-neutral alternatives." *Grutter*, 539 U.S. at 339. This requires the defendant to "engage in a genuine effort to determine whether alternative policies could address the alleged harm." *Vitolo*, 999 F.3d at 362. And, in turn, a court "must ultimately be satisfied that no workable race-neutral alternatives" would achieve the defendant's compelling interest. *Fisher I*, 570 U.S. at 312.

The City has put forth virtually no evidence showing that the multitude of race-neutral alternatives at its disposal are ineffective. Instead of putting forth such evidence, the City incorrectly claims that it "has no alternatives" to the goals because its hiring and promotional processes are "governed by civil service rules." Dkt. 194 at 16. But the City has not explained how its civil service rules prohibit it from adopting race-neutral alternatives or why the race-neutral practices that the City already uses or could implement are insufficient to meet its governmental interests. This evidence is required under Supreme Court and Sixth Circuit precedent. *See Fisher I*, 570 U.S. at 312 ("[S]trict scrutiny imposes on the [defendant] the ultimate burden of demonstrating, before turning to racial classifications, that available, workable race-neutral alternatives do not suffice."); *Vitolo*, 999 F.3d at 362 (narrow-tailoring requires defendant to "show 'serious, good faith consideration of workable race-neutral alternatives'") (quoting *Grutter*, 539

U.S. at 339); *see also Perrea v. Cincinnati Pub. Schs.*, 709 F. Supp. 2d 628, 642 (S.D. Ohio 2010) (Dlott, J.) (similar).

The City's claim that it has no other options because it has a civil service system is insufficient.  The City's civil service rules are not as constraining as the City suggests.  For example, the City's civil service rules do not specify which civil service exams the City must administer, how the exams are scored, or whether the City may employ alternative uses for them.[5] The civil service rules also do not place any limitations on the City's ability to engage in increased recruitment and training programs to help applicants prepare for the exams.

Even within the confines of its civil service rules, it appears the City can implement, and indeed has already implemented, some race-neutral alternatives to the Consent Decree's goals. Over the last decade, the United States has worked with the City to review the City's use of race-neutral alternatives, including new entry-level and promotional exams to minimize any disparate impact on minority applicants.  Courts have recognized that validated, non-discriminatory tests can be an acceptable alternative to race-conscious relief.  *Rutherford*, 179 F. App'x at 378; *see also Aiken v. City of Memphis*, 37 F.3d 1155, 1164 (6th Cir. 1994).  The City has not explained how its use of these exams is not a workable race-neutral alternative to the goals.

---

[5] *See* City of Cincinnati Civil Service Rules, *available at* https://www.cincinnati-oh.gov/hr/about-human-resources/civil-service-rules (last checked August 18, 2021).  For example, Rule 6: Examinations, permits the City to use a wide range of assessments, including written tests, structured oral interviews, physical abilities tests, and other assessment tests in its hiring process. The rule does not specify how the individual components of the examinations will be weighted or scored or what the overall passing scores will be.  Instead, the rule specifies that much of this will be determined later based on the "results of the job analysis, analysis of examination results, consultation with subject matter experts, or other professional methods."  Rule 10, entitled "Promotions," provides the City with similar flexibility when selecting promotional assessment tests, weighting and scoring methods, and overall passing scores for its promotional process.

12

In addition to implementing new exams, the City suggests that it has adopted other measures to ensure diversity in its workforce beyond use of the Decree's goals that may serve as race-neutral alternatives, including enhanced recruitment and development efforts. For example, the City states that its efforts to recruit and develop African-Americans and female officers have been "successful," Dkt. 194 at 16; that it has required "lessened use of the double-fill over the last decade," Dkt. 194 at 16; that it has only used the double-fill policy "to promote six sergeants since 2010," Dkt. 194 at 17; and, perhaps most importantly, that its hiring rates for African-American and female officers have "held steady for the recent past," Dkt. 194 at 16. Indeed, as discussed *supra* at 9 and *infra* at 16-17, the City's ability to hire and promote African-American and female officers without reliance on the Decree's goals is also borne out in its hiring demographics over the last decade. This evidence tends to suggest that the City is already using race- and sex-neutral alternatives and that the Consent Decree's goals are no longer necessary to remedy the effects of past discrimination.

### 2. The Goals Are Inflexible and Have Been in Use for 40 Years.

The Court must also examine the flexibility and duration of the Consent Decree's goals. Limiting the duration of race-conscious remedies is the "keystone of a narrowly tailored plan." *Detroit Police Officers Ass'n v. Young*, 989 F.2d 225, 228 (6th Cir. 1993). Courts "disfavor . . . affirmative action plans that are not temporary and do not terminate when the identified racial imbalances have been eliminated." *Rutherford*, 179 F. App'x at 380. Narrow tailoring also requires "some sensitivity to the possibility that a program might someday have satisfied its purposes." *Associated Gen. Contractors of Ohio, Inc. v. Drabik*, 214 F.3d 730, 737 (6th Cir. 2000). Thus, to be narrowly tailored, the City must demonstrate that the goals' race-conscious remedy is

13

"appropriately limited such that it 'will not last longer than the discriminatory effects it [was] designed to eliminate.'" *Id*. (quoting *Adarand*, 515 U.S. 238) (internal quotation marks omitted).

In this case, the City has been using the Decree's goals for 40 years, and the Decree itself does not contain a sunset provision or an express time limitation for the goals.[6]  Courts have rejected such long-term use of race-conscious remedies.  *See, e.g.*, *Associated Gen. Contractors of Ohio, Inc.*, 214 F.3d at 737-38 (holding affirmative action plan that was in place for over 20 years and did not have an expiration date was not narrowly tailored); *Detroit Police Officers Ass'n*, 989 F.2d at 228 (holding numerical goals in a 19-year old decree were "excessive" and "no longer narrowly tailored" because they did not "serve[ ] the same compelling state interests as [they] once did under the changed circumstances of almost two decades").

The Decree's goals are also inflexible because, unlike in *Grutter*, where the university considered race as one of many factors as part of a "highly individualized, holistic review" of applicants, 539 U.S. at 337, the City's double-fill policy operates as a "quota system" where an applicant's race or ethnicity becomes the "defining feature of his or her application" and determines whether he or she is hired or promoted.  *Id.* at 334, 337; *see id.* at 334 ("To be narrowly tailored, a race-conscious admissions program cannot use a quota system—it cannot insulate each category of applicants with certain desired qualifications from competition with all other applicants.") (internal quotation marks and alterations omitted).

### 3.  The City Cannot Rely on the Goals to Maintain Racial Balance.

Although, as already explained, the City no longer appears to be relying on the Decree's race-conscious goals to remedy the effects of past discrimination or to hire diverse staff, the City

---

[6] The Decree merely states that "[a]t any time after five years from the date of this Decree, the City defendants may notify plaintiff . . . of their desire to terminate this Decree."  Dkt. 25 ¶ 9.

14

states that it wishes to retain the goals to "*maintain diversity*, not increase it." Dkt. 194 at 17 (emphasis added). But the City may not, consistent with equal protection principles, rely on the Decree's goals to maintain a "[r]acial balance" in its workforce "for its own sake." *Grutter*, 539 U.S. at 330 (quoting *Freeman v. Pitts*, 503 U.S. 467, 494 (1992)); *see id.* ("outright racial balancing[] . . . is patently unconstitutional"); *cf. Johnson v. Transp. Agency, Santa Clara Cnty., Cal*., 480 U.S. 616, 640 (1987) (upholding numerical goals because they were being used to "attain" a balanced workforce, not "maintain a permanent racial and sexual balance"); *Local 28 of Sheet Metal Workers' Int'l Ass'n v. EEOC*, 478 U.S. 421, 479 (1986) (upholding goals and noting they operate "as a temporary tool for remedying past discrimination without attempting to 'maintain' a previously achieved balance") (internal quotation marks omitted); *United Steelworkers of Am., AFL-CIO-CLC v. Weber*, 443 U.S. 193, 208 (1979) (similar).

In short, even if the City had adduced evidence to support an interest in retaining the Decree's race-conscious numerical goals, the City has not met its burden of demonstrating that the goals are narrowly tailored in light of the availability of other race-neutral alternatives, the amount of time that the goals have been in place, and the Supreme Court's admonitions against using inflexible quotas and engaging in efforts to maintain racial balance for its own sake.

IV.   **The City Has Failed to Meet Its Burden of Showing that the Sex-Conscious Numerical Goals Serve an Important Governmental Interest and Are Substantially Related to Such Interest.**

As the party seeking to continue its use of a sex-based classification, the City "must carry the burden of showing an exceedingly persuasive justification for the classification." *Miss. Univ. for Women*, 458 U.S. at 724 (internal quotation marks omitted). The City has not carried its evidentiary burden with respect to its sex-conscious goals for many of the same reasons that, as stated above, it has not carried its burden with respect to its race-conscious goals.

15

A.      __The City Has Failed to Substantiate its Asserted Interest__.

The City has provided no evidence to establish that the Consent Decree's sex-conscious goals remain supported by an important governmental interest.  Just as in the context of the Decree's race-conscious goals, the Sixth Circuit requires proof that a long-standing sex-based classification continues to remedy past discrimination.  *Brunet*, 1 F.3d at 409 (invalidating sex-conscious hiring provisions as no longer remedial when past discrimination was "too remote" in time and prior disparate impact discrimination had already been remedied); *see also Cleveland Firefighters*, 669 F.3d at 742 (holding there must be evidence that the racial classifications continue to remedy past discrimination from 31 years earlier); *Ensley Branch, N.A.A.C.P.*, 31 F.3d at 1582 (holding that once gender-neutral selection procedures were developed, the city must stop using affirmative goals for female appointments unless further action was needed to eradicate lingering effects of discrimination against women); *Miss. Univ. for Women*, 458 U.S. at 729 (invalidating affirmative action program where state failed to show women were currently deprived of opportunities in nursing).

The City's failure to put forth *any* evidence to meet this standard is fatal to its ability to satisfy constitutional requirements.  Here again, the Department's demographics bear out that the City has been able to successfully hire and promote women on a consistent basis since 2010, with little to no reliance on the hiring and promotional goals contained in the Consent Decree.  The numbers of women holding the position of sergeant and police officer have remained consistent, ranging between 12 percent to 18 percent for sergeant and 23 percent to 24 percent for police officer since 2010.  Ex. B.  Since 2017, the City has *not* relied upon the Consent Decree a *single* time in hiring women as police officers and has only relied upon the Consent Decree *twice* in promoting women to the rank of sergeant out of 45 promotions.  Ex. A, Response to Requests Nos.

16

1, 3-4.  The Department's demographics show that the City has been able to hire and promote women using sex-neutral means since 2010, thereby undermining the City's argument that continuation of the Decree's sex-conscious numerical goals is necessary to further its interests.

### B.      The City Has Failed to Show that the Goals Are Substantially Related.

As described above, the City has failed to demonstrate that the Decree's sex-conscious goals further an important governmental interest.  The Court therefore need not address the substantial-relation prong.  But if the Court does so, it should conclude that the City has failed to show that the sex-conscious goals are "substantially and directly related" to its governmental interest.  *Miss. Univ. for Women*, 458 U.S. at 730.  As with narrow tailoring, the City has the burden of showing that its sex-conscious goals pass the substantial-relation test.  *Vitolo*, 999 F.3d at 365.

The City has not addressed the substantial-relation test, much less provided the evidence necessary to show that the sex-conscious goals are substantially and directly related to its important governmental interests.  The City would fail to meet the substantial-relations test for many of the same reasons that it fails to demonstrate narrow tailoring for its race-conscious goals.  Notably, as discussed *supra* at 11-13, the City has failed to demonstrate that it engaged in a serious, good faith consideration of alternatives prior to relying on the goals.  Such sex-neutral alternatives may include, among other things, the new entry-level and promotional exams that it has implemented with the United States' assistance to minimize disparate impact, alternative scoring methods or uses for the exams, and enhanced recruitment and training programs for female applicants.  The Sixth Circuit has held that sex-conscious policies did not satisfy the substantial-relation test where defendants have failed to consider sex-neutral alternatives.  *See Vitolo*, 999 F.3d at 365.  Given the length of time that the Consent Decree's sex-conscious goals have been in place, and that the City

has failed to demonstrate that there are no available sex-neutral alternatives, the Court should hold

that the City has failed to show that the goals are substantially related to an important governmental

interest.

## **CONCLUSION**

For all of the reasons stated in its Motion and this Reply, the United States respectfully

requests that this Honorable Court grant its Motion.

Respectfully submitted,

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

KAREN D. WOODARD (MD Bar, no number issued)
Chief
Employment Litigation Section
Civil Rights Division

MEREDITH L. BURRELL (MD Bar, no number issued)
Deputy Chief
Employment Litigation Section
Civil Rights Division

*/s/ Jeremy P. Monteiro*
JEREMY P. MONTEIRO (GOVT. DC Bar 977628)
Senior Trial Attorney
United States Department of Justice
Employment Litigation Section
Civil Rights Division
4 Constitution Square
150 M Street, NE, Room 9.930
Washington, DC  20530
(202) 307-6230
(202) 514-1005 (fax)
jeremy.monteiro@usdoj.gov

*/s/ Catherine N. Sellers*
CATHERINE N. SELLERS (GOVT. WA Bar 44563)
Senior Trial Attorney
United States Department of Justice
Employment Litigation Section

18

Civil Rights Division
4 Constitution Square
150 M Street, NE, Room 9.2609
Washington, DC  20530
(202) 514-1005 (fax)
catherine.sellers@usdoj.gov

*Counsel for Plaintiff United States*

19

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 20, 2021, a true and accurate copy of the foregoing PLAINTIFF UNITED STATES' REPLY IN SUPPORT OF MOTION TO MODIFY THE CONSENT DECREE was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system and copies will be emailed to those parties who are not served via the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/  Jeremy P. Monteiro*
JEREMY P. MONTEIRO (GOVT. DC Bar 977628)