UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | | |
|---|---|---|
| ULTIMA SERVS. CORP., | ) | |
| | ) | |
| | ) | 2:20-CV-00041-DCLC-CRW |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| U.S. DEP'T OF AGRIC., *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

This case concerns whether, under the Fifth Amendment's guarantee of equal protection, Defendants the United States' Department of Agriculture ("USDA") and the Small Business Administration ("SBA") may use a "rebuttable presumption" of social disadvantage for certain minority groups to qualify them for inclusion in a federal program that awards government contracts on a preferred basis to businesses owned by individuals in those minority groups. Plaintiff Ultima Services Corporation ("Ultima")—a small business not entitled to that presumption—contends that Defendants' use of the rebuttable presumption violates its right to equal protection because the presumption does not further a compelling governmental interest and is not narrowly tailored to achieve that interest. Defendants disagree and believe that the use of the rebuttable presumption is constitutional.

The parties move for summary judgment [Docs. 60, 61], and they have responded and replied to each motion [Docs. 70, 72, 74, 76]. Accordingly, this matter is now ripe for resolution. Because Defendants' use of the rebuttable presumption does not further a compelling governmental interest and is not narrowly tailored to achieve such interest, Plaintiff's Motion for

Summary Judgment [Doc. 60] is **GRANTED IN PART AND DENIED IN PART**, and Defendants' Motion for Summary Judgment [Doc. 61] is **DENIED**.

## I.    BACKGROUND

Ultima is a small business that provides administrative and technical support services [Doc. 73, ¶¶ 1, 3].  Celeste Bennett, a white woman, currently owns and operates Ultima [Docs. 70-1, ¶ 3; 73, ¶ 2].  The USDA is a cabinet-level agency of the federal government, led by the Secretary of Agriculture [Doc. 1, ¶ 4].  Similarly, the SBA is a cabinet-level agency, led by the Administrator [*Id.*, ¶ 5].

As relevant here, Ultima competed for federal services contracts with Defendant USDA, earning approximately $37 million since 2015 [Docs. 70-1, ¶ 4; 73, ¶ 3].  Ultima began providing its services to the Natural Resources Conservation Service ("NRCS"), a unit within the USDA, in 2004 [Doc. 73, ¶ 3].  In 2017, Ultima won four regional Indefinite Delivery Indefinite Quantity ("IDIQ") contracts to provide its services to different NRCS offices in four regions of the country [*Id.*, ¶ 5].  Each contract included one base year, with the option to renew annually over the next four years following that base year [*Id.*].  Defendants obligated $10 million for each of those IDIQ contracts [*Id.*].

Under the IDIQ contracts, contracting officers issued task orders for services in specific NRCS offices [*Id.*].  In two of those regions, Ultima's services were in high demand, and task orders depleted the funds available for the base year [*Id.*, ¶ 7].  Defendant USDA exercised options for those regions, and "all or almost all" the funds allocated for those IDIQ contracts were expended [*Id.*, ¶ 8].  Substantial funds, however, remained in the other two regions that the IDIQ contracts covered [*Id.*, ¶ 9].

2

In 2018, Defendant USDA decided not to exercise any more options under all four IDIQ contracts [*Id.*, ¶ 10]. Defendant USDA also declined to exercise any further options on pending task orders under the IDIQ contracts or issue new task orders [*Id.*, ¶ 11]. To continue providing services to NRCS offices, Defendant USDA, in some instances, awarded sole source contracts with companies participating in the 8(a) Business Development Program ("the 8(a) program") outlined in 13 C.F.R. § 124.1 [*Id.*, ¶ 13]. Ultima was not a participant in the 8(a) program and, thus, Defendant USDA could not consider it in awarding those sole source contracts [Docs. 70-1, ¶ 5; 73, ¶ 14]. According to Ultima, it stood ready, willing, and able to perform on contracts reserved for the 8(a) program for the provision of administrative and technical services to NRCS offices [Doc. 73, ¶ 15]. But Ultima dramatically reduced bidding on contracts following Defendant USDA's decision not to exercise the remaining options for the IDIQ contracts [Docs. 70-1, ¶ 10; 70-2, ¶ 9; 72-1, ¶ 3]. Ultima experienced a decline in revenue following Defendant USDA's decision to set aside contracts for the 8(a) program [Doc. 73, ¶ 17].[1]

That same year, Danny Mandell, a contracting officer for Defendant USDA, sent a letter to Uneeda Collins, a business opportunity specialist for Defendant SBA in its Georgia office [Doc. 66-3, pgs. 19-21]. Mandell asked to move a contract for administrative services for NRCS offices in Mississippi into the 8(a) program [*Id.*]. He identified Ultima as the firm that was providing administrative services to the Mississippi NRCS offices at that time [*Id.*, pg. 20]. Mandell recommended another firm as the 8(a) contractor [*Id.*, pg. 21]. Collins determined that before Defendant SBA could award the contract to Mandell's recommended 8(a) contractor, "[it] must determine whether [awarding the contract to an 8(a) firm would] cause an adverse impact to

---

[1] Defendants contend that the reason for Ultima's loss in revenue is because of Defendant USDA's decision to change its process for awarding contracts, Ultima's decision to stop bidding on contracts, and Ultima's ineligibility for a number of contracts [Doc. 73, ¶ 17].

[Ultima]." [Docs. 70-2, ¶¶ 2-5; 70-4, pg. 6]. To that end, Robert Ware, another employee for Defendant SBA, obtained information from Ms. Bennett for an analysis of the impact on Ultima [Docs. 70-2, ¶¶ 2-5; 70-3, pgs. 1-3; 70-4, pgs. 1-7]. After reviewing the information Ms. Bennett provided, Collins concluded that moving the proposed contract into the 8(a) program would adversely impact Ultima [Doc. 70-13, pgs. 6-7, 9-11]. Terri Denison, director of Defendant SBA's Georgia office, agreed with Collins's conclusion and did not recommend that Defendant SBA accept the proposed contract into the 8(a) program [Doc. 61-19, pgs. 1-2]. Denison later testified that she reviewed additional documents related to Mandell's request and that those documents showed an adverse impact study should not have been conducted [Doc. 61-20, pg. 4].

Upon learning of Denison's recommendation, Mandell sent another letter to a different SBA office, again asking that the contract for administrative services for Mississippi's NRCS offices be included in the 8(a) program [Doc. 66-3, pgs. 12-15]. He recommended a different 8(a) firm in his second letter and declined to mention his initial letter to Collins [*Id.*]. Mandell proved successful on his second attempt. Defendant SBA accepted Mandell's second letter, placed the proposed contract into the 8(a) program, and removed Ultima as the firm serving the Mississippi NRCS offices [Docs. 70-14, pgs. 7, 12-13].

On March 4, 2020, Ultima filed the instant Complaint, alleging that Defendants engaged in race discrimination in violation of the Fifth Amendment of the United States' Constitution and 42 U.S.C. § 1981 [Doc. 1]. Specifically, Ultima alleged that Defendants' use of the rebuttable presumption for certain groups in the 8(a) program discriminated on the basis of race [*Id.*, ¶¶ 41-47]. Ultima sought declaratory, injunctive, and monetary relief [*Id.*, pgs. 9-11]. Defendants then moved to dismiss Ultima's Complaint [Doc. 20]. The Court granted in part and denied in part Defendants' motion, dismissing only Ultima's claims under 42 U.S.C. § 1981 [Doc. 32]. The

parties then began the discovery phase of litigation.  During discovery, the parties produced expert reports concerning discrimination in federal contracting [Doc. 85].

Defendants produced reports from Mr. Daniel Chow, a senior economist at the United States Department of Commerce, and Dr. Jon Wainwright, a consulting economist [*Id.*, pgs. 4-9]. Mr. Chow found that "woman-owned, minority owned, and other veteran-owned firms have lower odds than other firms to win a contract, all else being equal." [*Id.*, pg. 6].  His study showed that participation in the 8(a) program coincided with a higher likelihood of winning a federal contract and produced a higher odds ratio[2] for successfully winning a government contract [*Id.*, pgs. 6-7]. According to Mr. Chow, the odds of winning contracts for minority owned businesses not participating in the 8(a) program were 37% lower compared to the odds of winning contracts by firms that were not identified as minority owned [*Id.*, pg. 6].  Mr. Chow's report further stated that minority owned businesses' odds of winning contracts across 90% of industries examined were lower than other non-minority owned firms [*Id.*].  Similarly, Dr. Wainwright found, overall, that there was "strong evidence of large, adverse, and statistically significant disparities facing minority-owned business enterprises in the United States." [*Id.*, pg. 9] (internal quotations omitted).

Ultima produced a report from Dr. Jonathan Guryan, a labor economist [*Id.*].  He noted that both Mr. Chow's and Dr. Wainwright's reports were lacking because they failed to control for different variables that could cause the disparities found in their reports [*Id.*, pgs. 10-11]. Additionally, Dr. Guryan explained that both reports were not specific to the industry in which

---

[2]     The Court explained the methodology used in Mr. Chow's study in its order addressing the parties' motions to exclude [Doc. 85, pgs. 5-6].

Ultima operates [*Id.*]. Dr. Guryan asserted that neither report could definitively conclude that the disparities observed were the result of discrimination because of the flaws he noted [*Id.*].

Although the parties produced expert reports related to discrimination in federal contracting, Defendants did not identify any specific contracting officer who engaged in intentional racial or national-origin discrimination against any of the groups entitled to the rebuttable presumption when awarding federal contracts [Doc. 73, ¶ 88]. Ultima subsequently moved to exclude Mr. Chow's report, and Defendants sought to exclude Dr. Guryan's report [Docs. 58, 59]. The Court denied both parties' motions and allowed the experts' report to become part of the record [Doc. 85].

The parties now move for summary judgment on a number of issues [Docs. 60, 61]. The Court will address each issue in turn. But to further understand the parties' dispute, the Court provides a discussion of the underlying statutory framework.

### *The Small Business Act and the regulatory framework of the 8(a) program*

Enacted in 1953, the Small Business Act meant to encourage and develop the capacity of small business in the United States. 15 U.S.C. §§ 631–57. Section 8(a) of the Act grants Defendant SBA the authority to acquire procurement contracts from other government agencies and to award or arrange for performance of those contracts by small businesses "whenever [Defendant SBA] determines such action is necessary[.]" *Id.* § 637(a)(1). Congress directed Defendant SBA "to arrange for the performance of such procurement contracts by negotiating or otherwise letting subcontracts to socially and economically disadvantaged small business concerns[.]" *Id.* § 637(a)(1)(B). To aid Defendant SBA in following its directive, Congress found many socially and economically disadvantaged individuals are socially disadvantaged "because of their identification as members of certain groups that suffered the effects of discriminatory

6

practices or similar invidious circumstances over which they have no control[.]" *Id.* 631(f)(1)(B). Congress noted "that such groups include, but are not limited to, Black Americans, Hispanic Americans, Native Americans, Indian Tribes, Asian Pacific Americans, Native Hawaiian Organizations, and other minorities[.]" *Id.* § 631(f)(1)(C).

Importantly, Congress defined a "socially and economically disadvantaged small business concern" as a business at least 51% owned by a socially and economically disadvantaged individual. *Id.* § 637(a)(4)(A). Congress further defined "socially disadvantaged individuals" as "those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities." *Id.* § 637(a)(5). Congress explained that "economically disadvantaged individuals" were "those socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged." *Id.* § 637(a)(6)(A). Congress further provided that "[a]ll determinations made pursuant to paragraph (5)[—which defines socially disadvantaged individuals—]with respect to whether a group has been subjected to prejudice or bias shall be made by [Defendant SBA.]" *Id.* § 637(a)(8).

Following Congress's direction, Defendant SBA developed the current 8(a) program "to assist eligible small, disadvantaged business concerns compete in the American economy through business development." 13 C.F.R. § 124.1; [Doc. 70-1, ¶ 22]. To qualify for the program, a small, disadvantaged business ("SDB") must be 51% owned by an individual who is socially and economically disadvantaged—as mandated in the Small Business Act [Doc. 73, ¶ 26].

### 1. Social disadvantage under the 8(a) program

Federal regulations match the definition of socially disadvantaged individuals to the

7

statutory definition. *See id.* § 124.103(a). Individuals can establish social disadvantage by presenting evidence of one objective distinguishing feature, such as race or ethnic origin, which has contributed to social disadvantage. *Id.* § 124.103(c)(2)(i). An individual's social disadvantage must be rooted in treatment he experienced in American society and that disadvantage must be chronic and substantial, not fleeting or insignificant. *See id.* § 124.103(c)(2)(ii)–(iii). The social disadvantage must have negatively impacted an individual's entry into, or advancement in, the business world. *Id.* § 124.103(c)(2)(iv). Individuals must satisfy a preponderance of the evidence standard in making their showing of social disadvantage. *Id.* § 124.103(c)(1).

In addition to the process for individuals noted above, Defendant SBA also applies a rebuttable presumption of social disadvantage to individuals of certain minority groups applying to the 8(a) program [Doc. 73, ¶ 27]. *Id.* § 124.103(b)(1). The rebuttable presumption treats certain minority groups as socially disadvantaged, and it applies to Black Americans, Hispanic Americans, Native Americans, Asian Pacific Americans, Subcontinent Asian Americans, "and members of other groups designated from time to time by [Defendant] SBA." *Id.* To qualify for the presumption, members of those groups must hold themselves out as members of their group. 13 C.F.R. § 124.103(b)(2). Individuals who qualify for the rebuttable presumption do not have to submit evidence of social disadvantage through the individual process noted above [*Id.*, ¶ 32].

The rebuttable presumption "may be overcome with credible evidence to the contrary," and individuals with such evidence "should submit the information in writing to the Associate Administrator for Business Development (AA/BD) for consideration." [*Id.*, ¶ 28]; *Id.* § 124.103(b)(3). But Defendant SBA does not have a formal process for submitting evidence that could overcome the rebuttable presumption [*Id.*, ¶ 29]. John Klein, an employee of Defendant

SBA, confirmed that "[t]here's no process for a third party to question someone's social disadvantage as part of the application process." [Doc. 65-7, pg. 29].

Representatives from identifiable groups who believe their members have suffered prejudice or bias may petition Defendant SBA to be included as a presumptively socially disadvantaged group. *Id.* 124.103(d)(1). Groups must present substantial evidence that they have been subject to prejudice or bias, which Defendant SBA will evaluate against a set of standards outlined in separate federal regulations. *Id.* § 124.103(d)(2). Defendant SBA has not added a group to the list of those entitled to the rebuttable presumption since 1999 [Doc. 73, ¶ 43]. Further, Defendant SBA has never removed a group from that list for no longer being adversely affected by the present effects of discrimination, and Defendant SBA does not have criteria to evaluate whether a group should be removed from the list [*Id.*, ¶¶ 47-48]. Defendant SBA has not considered any race-neutral alternatives to the use of the rebuttable presumption since 1986 [*Id.*, ¶ 90].

### 2. Economic disadvantage under the 8(a) program

Federal regulations define economically disadvantaged individuals as those "whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same or similar line of business who are not socially disadvantaged." *Id.* § 124.104(a). Defendants, however, do not maintain a database to compare the access to capital of applicants to the 8(a) program to others in similar lines of businesses who are not socially disadvantaged and do not engage in such comparisons for applicants [Doc. 73, ¶¶ 34-35]. Rather, Defendant SBA examines the individual financial circumstances of applicants

9

and uses the same criteria for determining economic disadvantage regardless of the particular industry in which the applicant operates [*Id.*, ¶¶ 36-37].[3]

Once accepted to the 8(a) program, a participant must submit a business plan, which Defendant SBA must approve before the participant is eligible to perform contracts reserved for the 8(a) program [*Id.*, ¶ 49]. Participants remain in the 8(a) program for a maximum of nine years [*Id.*, ¶ 51]. Participants may also graduate from the 8(a) program before the end of nine-year period by successfully achieving goals outlined in their business plans or if an owner is no longer economically disadvantaged [*Id.*, ¶ 53]. Defendant SBA does not always assess whether a participant met the objectives of their business plan at the end of the nine-year period [*Id.*, ¶ 54].

### 3. Federal contracts set aside for the 8(a) program

Federal agencies typically identify contracts for inclusion in the 8(a) program by sending an offering letter to Defendant SBA, such as the letter Mandell sent to Collins [*Id.*, ¶ 58]. For sole source contracts, the contracting agency identifies a specific program participant and asks that the contract be fulfilled by that participant [*Id.*, ¶ 59]. The offering letter will also identify any other small businesses that have worked under the contract in the past 24 months [*Id.*, ¶ 60]. Additionally, Defendant SBA grants procuring agencies the right to contract directly with program participants through Partnership Agreements [*Id.*, ¶¶ 62-63]. Defendants do not examine whether any racial group is underrepresented in a particular industry relevant to a specific contract in the 8(a) program [*Id.*, ¶ 66]. For Defendant USDA, individual contracting officers determine whether to ask Defendant SBA's permission to reserve a contract for the 8(a) program [*Id.*, ¶ 67]. Those

---

[3]     The parties notified the Court that Defendant SBA recently implemented a final rule stating that individuals will not be presumed economically disadvantaged "if their net worth exceeds $ 850,000, their adjusted gross income exceeds $ 400,000, or their total assets exceed[] $ 6.5 million." [Doc. 84, pg. 1].

10

officers typically consider time constraints, among other factors, in making their determinations [*Id.*, ¶ 68].  Once a contract is reserved for the 8(a) program, any follow-on contract must remain in the program as well, unless Defendant SBA agrees to release the follow-on contract [*Id.*, ¶ 70].

Defendant USDA does not maintain goals for the 8(a) program, and Defendant SBA does not require federal agencies generally to have goals for the program [*Id.*, ¶¶ 73-74].  But the federal government has an overall goal of 5% participation by SDBs in federal contracting [*Id.*, ¶ 77].  Defendant USDA also maintains a goal of 5% participation by SDBs generally, but it routinely exceeds that goal [*Id.*, ¶¶ 80-81].  Since fiscal year 2020, Defendant USDA awarded contracts through the 8(a) program worth approximately 5% of obligated contract dollars [Doc. 70-1, ¶ 19].

### 4.  Congressional findings related to the 8(a) program

When it enacted the 8(a) program, Congress found that "many [socially and economically disadvantaged] persons are socially disadvantaged because of their identification as members of certain groups that have suffered the effects of discriminatory practices or similar invidious circumstances over which they have no control."  [*Id.*, ¶ 24].  Congress determined that those groups included Black Americans, Hispanic Americans, Native Americans, and other minorities [*Id.*, ¶ 25].  Subsequently, Congress included Asian Pacific Americans and Native Hawaiian Organizations in its list of groups that have suffered the effects of discriminatory practices [*Id.*, ¶ 26].  Congress also found that "it is in the national interest to expeditiously ameliorate the conditions of socially and economically disadvantaged groups."  [*Id.*, ¶ 27].

In 2018, the House of Representatives' Subcommittee on Small Business and Entrepreneurship heard testimony describing explicit discrimination faced by minority business enterprises ("MBEs") in contracting [*Id.*, ¶ 37].  The Subcommittee heard that the discrimination faced by MBEs included the lack of timely bid notification, higher and double standards, and the

outright refusal to use MBEs except when required to by contract [*Id.*]. In 2020, the House of Representatives' Subcommittee on Diversity and Inclusion examined the "historical and systemic challenges" faced by MBEs, including "a lack of access to capital and systemic racism." [*Id.*, ¶ 38].

## II.    LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the evidence in the light most favorable to the nonmoving party and makes all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The moving party bears the burden of demonstrating that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The moving party may meet this burden either by affirmatively producing evidence establishing that there is no genuine issue of material fact or by pointing out the absence of support in the record for the nonmoving party's case. *Celotex*, 477 U.S. at 325.

Once the movant has discharged this burden, the nonmoving party can no longer rest on the allegations in the pleadings and must point to specific facts supported by evidence in the record demonstrating that there is a genuine issue for trial. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). At summary judgment, the Court may not weigh the evidence, and its role is limited to determining whether the record contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). A mere scintilla of evidence is not enough. *Id.* at 251–52. The Court must determine

whether a fair-minded jury could return a verdict in favor of the non-movant based on the record. *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If not, the Court must grant summary judgment. *Celotex*, 477 U.S. at 323.

## III.   ANALYSIS

The parties make a number of different arguments in their respective motions. First, Defendants attack Ultima's standing to bring suit [Docs. 60-2, pg. 17; 62, pg. 34]. Second, Ultima challenges Defendants' statutory authority to use the rebuttable presumption in the 8(a) program [Doc. 60-2, pg. 18]. And lastly, Ultima contends that Defendants use of the rebuttable presumption in the 8(a) program violates its equal protection rights [*Id.*, pg. 22]. The Court addresses each argument in turn.

### A.  Whether Ultima has standing to challenge the 8(a) program

Defendants challenge Ultima's standing on summary judgment, arguing that it has not suffered an injury-in-fact and that a favorable judicial ruling would not redress Ultima's alleged injury [Docs. 62, 72]. "Article III limits the judicial power to resolving actual 'Cases' and 'Controversies,' not theoretical questions." *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 860 (6th Cir. 2020) (quoting U.S. Const. Art. III, § 2). "The party invoking federal jurisdiction bears the burden of establishing [standing]." *Lujan v. Def. of Wildlife*, 504 U.S. 555, 561 (1992). To establish standing, "a plaintiff must show that [it] has suffered an injury, that the defendant's conduct likely caused the injury, and that the relief sought will likely redress the injury." *Ass'n of Am. Physicians & Surgeons v. Food & Drug Admin.*, 13 F.4th 531, 537 (6th Cir. 2021). A plaintiff that cannot show all three elements of standing has not presented a case or controversy that this Court can resolve. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). Because

13

Defendants attack Ultima's standing only as to injury and redressability, the Court confines its discussion to those elements.

## 1. Injury

Ultima contends that it has standing to challenge Defendants' use of the rebuttable presumption because it suffered a "specific race-based harm" created by the presumption [Doc. 60-2, pg. 18]. It explains it always qualified to bid on some of the contracts available in the 8(a) program and that it currently is eligible to bid "on virtually every contract to provide administrative and technical support to USDA offices." [*Id.*]. Defendants respond that Ultima cannot establish an injury-in-fact due to a discriminatory policy [Doc. 72, pg. 4]. They assert that there is no evidence to support Ultima's alleged injury [*Id.*, pg. 5]. According to Defendants, Ultima was ineligible for the 8(a) program because of its corporate structure and not because of an unconstitutional policy [*Id.*]. Defendants argue that when Ultima filed its Complaint, it was owned by another corporation, which disqualified it from participation in the 8(a) program [*Id.*]. They further contend that Ultima's lack of bidding on NRCS contracts valued over $10 million renders its assertion that it was ready, willing, and able to bid on contracts in the 8(a) program speculative [*Id.*, pg. 6].

Ultima replies that Ms. Bennett is its current owner, making Defendants' argument about its corporate structure irrelevant [Doc. 76, pg. 5]. Ultima further contends that it always was eligible for some of the contracts in the 8(a) program [*Id.*, pg. 6]. It asserts that Defendants' reservation of contracts in the 8(a) program before the instant lawsuit caused it to lose revenue and become small enough to bid on contracts in every relevant North American Industry Classification System ("NAICS") code [*Id.*].

14

Both Supreme Court and Sixth Circuit precedents make clear that in equal protection cases, the injury-in-fact is "the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Ne. Fla. Chapter, Associated Gen. Contractors of Am. v. Jacksonville*, 508 U.S. 656, 666, (1993); *see also Parents Involved in Cmty. Schs v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007); *Vitolo v. Guzman*, 999 F.3d 353, 359 (6th Cir. 2021). In *Vitolo*, the Sixth Circuit concluded that the plaintiff's injury in an equal protection case stemmed from the unequal treatment to which he was subjected. *Vitolo*, 999 F.3d at 359. The Sixth Circuit reasoned that "[i]t does not matter that the plaintiff[] might not otherwise qualify" for the program he sought to join. *Id.* Here, in joining the 8(a) program, Ultima faces a barrier imposed by Defendants—the rebuttable presumption [Docs. 70-1, ¶ 5; 73, ¶ 14]. Ultima contends that but for the rebuttable presumption, it would bid on the contracts set aside in the 8(a) program [Doc. 60-2, pg. 18]. The Sixth Circuit's decision in *Vitolo* makes Ultima's injury clear.

To be sure, Defendants do not dispute that Ultima now is owned solely by Ms. Bennett, remedying Ultima's ineligibility to apply to the 8(a) program at this stage of litigation [Docs. 70-1, ¶ 3; 73, ¶ 2]. And, as noted above, Ultima is able and willing to apply for the contracts in the 8(a) program [Doc. 60-2, pg. 18]. *Doster v. Kendall*, 54 F.4th 398, 417 (6th Cir. 2022) (reasoning that "[a] contractor who is 'able and ready' to apply for a contract need not proceed through the discriminatory process (and have the application denied) before challenging the policy"). Defendants' use of the rebuttable presumption stands as the barrier to Ultima's participation in the 8(a) program. Therefore, Ultima suffers an injury-in-fact sufficient for Article III standing when Defendants use the rebuttable presumption and set aside certain contracts in the 8(a) program. *See Vitolo*, 999 F.3d at 359.

## 2. Redressability

Defendants next argue that a favorable ruling would not redress Ultima's alleged injury because the 8(a) program would continue to function without the rebuttable presumption [Doc. 72, pgs. 6-7]. Defendants state that the rebuttable presumption is severable from the 8(a) program and that even without the rebuttable presumption, federal contracts still would be set aside in the 8(a) program [Docs. 62, pg. 35-36; 72, pgs. 7-8]. Defendants argue that Ultima does not want to apply to the 8(a) program and, instead, wants to eliminate the program entirely [Docs. 62 , pg. 36; 72, pg. 8].

Ultima replies that the severability of the rebuttable presumption from the 8(a) program would not affect its standing [Doc. 76, pg. 7]. Ultima states that even if it were harmed by a race-neutral program, it still would have obtained a remedy because its race would not have factored into the contracts it was denied [Doc. 70, pg. 32]. Under Ultima's theory, "the elimination of a *race-based* barrier is sufficient to afford [it] relief." [*Id.*, pg. 33] (emphasis in original). It further argues that if the rebuttable presumption were eliminated, there would be fewer participants in the 8(a) program, which would benefit it [*Id.*]. Ultima notes that 50% of companies that apply to the 8(a) program without a presumption are rejected [*Id.*]. Ultima lastly argues that it would apply to a race-neutral 8(a) program and does not need to express an intention to apply to the current allegedly discriminatory program [Docs. 70, pg. 34; 76, pg. 8].

The Sixth Circuit's decision in *Vitolo* again proves instructive here. In that case, the Sixth Circuit reasoned that "[t]he [Defendants'] use of racial preferences causes [the] injury. And the injury is redressable by a decision ordering [Defendants] not to grant priority consideration based on the race of applicants." *Vitolo*, 999 F.3d at 353. The same logic applies with equal force to the instant case. A judgment prohibiting Defendants from using the rebuttable presumption based on

16

race would remove the race-based barrier that injures Ultima. "[I]t does not matter" that Ultima might not otherwise qualify for the 8(a) program with the rebuttable presumption removed because "the playing field in qualifying for the [8(a) program] would be 'leveled.'" *Vitolo*, 999 F.3d at 359. The Court need not decide whether the rebuttable presumption may be severable from the remainder of the 8(a) program because that assertion does not affect the Court's analysis as to Ultima's standing. Accordingly, Ultima's motion for summary judgment [Doc. 60] is **GRANTED** in this respect, and Defendants' motion for summary judgment [Doc. 61] is **DENIED** in this respect.

### B.  Whether Defendants have statutory authority to impose a rebuttable presumption in the 8(a) program

Ultima argues that Defendants lack the authority to impose the race-based rebuttable presumption in the 8(a) program. [Doc. 60-2, pg. 18]. It explains that Defendants do not have the general authority to remedy the effects of past discrimination and that Congress did not authorize them to do so because the 8(a) statute itself is race-neutral [*Id.*, pg. 18]. According to Ultima, Congress envisioned an individual-based approach for evaluating applicants to the 8(a) program [*Id.*, pg. 19]. In support of its argument, Ultima relies on *Mich. Road Builders Ass'n, Inc. v. Milliken*, 834 F.2d 583 (6th Cir. 1987), and *Rothe Dev., Inc. v. United States Dep't of Defense*, 836 F.3d 57 (D.C. Cir. 2016) [*Id.*, pgs. 18-21]. Defendants respond that they have the authority to implement the rebuttable presumption [Doc. 72, pg. 9]. Defendants frame Ultima's argument as one under the nondelegation doctrine [*Id.*]. They contend that Courts rarely second-guess Congress's policy judgments in what matters to delegate to agencies [*Id.*]. Defendants assert that Congress supplied them with an intelligible principle to guide their determinations regarding the 8(a) program [*Id.*, pgs. 9-10].

17

Ultima replies that its argument here is not based on the nondelegation doctrine because Congress did not "unambiguously delegate" a task to Defendants [Doc. 76, pg. 9]. Instead, Ultima attacks whether the "[Defendants] [have] inherent authority to decide whether to create race preferences . . . ." [*Id.*, pg. 10]. Ultima further contends that there is no authority under which Congress "*can*" give Defendants the ability to use the rebuttable presumption [*Id.*, pg. 10] (emphasis in original). Ultima also argues that Congress neither told Defendants to use the rebuttable presumption nor allowed Defendants to decide for themselves whether to adopt such a presumption [*Id.*].

In *Mich. Road Builders Ass'n, Inc.*, the Sixth Circuit reasoned that for equal protection claims, courts must first determine whether "the governmental body imposing the classification at issue had authority to act to accomplish its purpose." *Mich. Road Builders Ass'n, Inc.*, 834 F.3d at 586 n.4. But that general proposition does not support Ultima's argument here. In § 637, Congress directed Defendant SBA to award government contracts to SDBs and provided that "[a]ll determinations made pursuant to [§ 637(a)(5)] with respect to whether a group has been subjected to prejudice or bias shall be made by [Defendant SBA]." 15 U.S.C. § 637(a)(8). Thus, Congress provided Defendant SBA with the authority to carry out its goal of awarding government contracts to SDBs. Whether in carrying out that goal Defendants violated Ultima's equal protection rights is a separate question from whether Defendants had any authority to act in the first instance.

Similarly, the D.C. Circuit's decision in *Rothe* does not support Ultima's argument here. In that case, the D.C. Circuit addressed a challenge to 15 U.S.C. § 637, wherein the plaintiff asserted that the statute itself contained an unconstitutional racial classification. *Rothe Dev., Inc.*, 836 F.3d at 61. The D.C. Circuit concluded that the statute did not contain a racial classification, but it took pains to note that the plaintiff was not challenging the federal regulations at issue here

18

Case 2:20-cv-00041-DCLC-CRW   Document 86   Filed 07/19/23   Page 18 of 41   PageID #: 3273

and that it was not deciding the constitutionality of those regulations.  *Id.* at 62, 64–72.  Thus, Ultima's reliance on that non-binding, out-of-circuit case law is inapposite in this regard.  The D.C. Circuit did not make any conclusions about the federal regulations creating the rebuttable presumption.

Because Ultima expressly rejects the characterization of its argument as a challenge under the nondelegation doctrine, the Court next evaluates Ultima's arguments using the customary tools of statutory interpretation [Doc. 76, pg. 9].  "For questions of statutory interpretation, [the Court] look[s] to the statutory language as 'the starting point for interpretation, and . . . the ending point if the plain meaning of the language is clear.'"  *Davenport v. Lockwood, Andrews & Newnam, Inc.*, 854 F.3d 905, 909 (6th Cir. 2017) (quoting *United States v. Henry*, 819 F.3d 856, 870 (6th Cir. 2016)).  Here, 15 U.S.C. § 637(a)(8) expressly grants authority to Defendant SBA to determine "whether a group has been subjected to prejudice or bias[.]"  15 U.S.C. § 637(a)(8).  Congress authorized Defendant SBA to determine which groups faced prejudice or bias.  *See id.*  Although Ultima is correct that Congress did not mandate that Defendant SBA use a race-based rebuttable presumption, it did contemplate that Defendant SBA would identify group characteristics and accompanying forms of bias that would be considered when evaluating claims of social disadvantage.  *See id.*  Congress's grant of authority to Defendant SBA undercuts Ultima's argument to the contrary.

Moreover, the groups that receive the rebuttable presumption in the 8(a) program track the groups that Congress identified in its finding of which minorities suffered the effects of discriminatory practices, further supporting Defendant SBA's authority to implement a system for awarding contracts to SDBs.  *Compare* 15 U.S.C. § 631(f)(1)(C) *with* 13 C.F.R. § 124.103(b)(1).  Insofar as Defendant SBA is using the rebuttable presumption to "arrange for the performance of

procurement contracts . . . [by] socially and disadvantaged small business concerns," that exercise falls within the statutory framework Congress set out. 15 U.S.C. § 637(a)(1)(B).

Ultima next asserts that Defendants have not made their own findings about whether the use of the rebuttable presumption is justified to remedy past discrimination [Doc. 60-2, pg. 20]. It asserts that Congress found only "many" members of particular groups are socially disadvantaged, which undercuts the rebuttable presumption's treatment of all members of certain groups as socially disadvantaged [*Id.*]. Defendants respond that the congressional findings for the 8(a) program provide enough information to support their decision-making authority and that Congress explicitly delegated Defendant SBA the authority to determine which groups qualified as socially disadvantaged [Doc. 72, pgs. 11-12]. Ultima replies that congressional findings about which groups have faced past discrimination do not constitute a delegation of authority to use a race-based rebuttable presumption [Doc. 76, pg. 11]. Ultima notes that courts hesitate to assume that Congress authorizes agency conduct "that would raise serious constitutional questions." [*Id.*, pg. 13].

The Court addresses Ultima's arguments regarding Defendants' findings, or lack thereof, to support the rebuttable presumption more fully below. To the extent Ultima notes Defendants' alleged lack of findings in relation to its statutory argument, Congress's own findings offer support for Defendants' authority "to arrange for the performance of such procurement contracts by negotiating or otherwise letting subcontracts to socially and economically disadvantaged small business concerns[.]" *Id.* As noted above, whether Defendants violated Ultima's equal protection rights in carrying out their goal of awarding contracts to SDBs is a separate question from whether Defendants had any authority to act in the first instance. Ultima's assertions regarding the lack of

findings to support the rebuttable presumption by Defendants does not undermine Congress's grant of authority to Defendant SBA.

Ultima contends that the 8(a) statute does not require or permit the use of a rebuttable presumption and that Congress did not delegate Defendants that authority [Doc. 60-2, pg. 21]. Defendants contend that the 8(a) statute's neutrality does not mean that they are precluded from implementing the rebuttable presumption within the 8(a) program [*Id.*, pgs. 13-14]. Defendants argue that the rebuttable presumption has been used for 35 years without intervention by Congress, which is "strong evidence of congressional approval." [*Id.*, pg. 14]. Ultima contends that congressional inaction cannot support Defendants' use of the rebuttable presumption [Doc. 76, pgs. 14-15].[4]

Again, the Court agrees that Congress did not mandate the use of a rebuttable presumption in § 637. Instead, Congress generally granted Defendant SBA the ability to make "determinations . . . with respect to whether a group [had] been subjected to prejudice or bias[.]" 15 U.S.C. § 637(a)(8). Congress's decision not to mandate a specific method by which Defendant SBA had to make those "determinations" does not show that Defendant SBA was precluded from using a rebuttable presumption. *Id.* Accordingly, Ultima's motion [Doc. 60] is **DENIED** in this respect.

---

[4]   Ultima also argues—for the first time in its reply—that the Court should not assume that Congress left such a major question to Defendants' discretion [Doc. 76, pg. 14]. Because Ultima did not raise that argument in its opening brief in support of its motion for summary judgment, the Court will not address that argument. *See Goforth v. Tenn. Valley Auth., et al.*, No. 1:20-CV-00254, 2022 WL 1198213, at *11 n.9 (E.D. Tenn. Feb. 7, 2022) (citing *Palazzo v. Harvey*, 380 F. Supp. 3d 723, 730 (M.D. Tenn. 2019).

**C. Whether the rebuttable presumption in the 8(a) program survives strict scrutiny[5]**

Ultima argues that Defendants' use of the rebuttable presumption violates its Fifth Amendment right to equal protection [Doc. 60-2, pg. 22]. The Fifth Amendment to the United States' Constitution provides that no person may be "deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. "The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws." *United States v. Windsor*, 570 U.S. 744, 774 (2013); *see also Bolling v. Sharpe*, 347 U.S. 497, 499 (1954); *Ctr. for Bio-Ethical Reform v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) ("The Fifth Amendment, of course, does not itself contain a guarantee of equal protection, but instead incorporates, as against the federal government, the Equal Protection Clause of the Fourteenth Amendment."). Courts, therefore, "evaluate equal protection claims against the federal government under the Fifth Amendment just as [they] would evaluate equal protection claims against state and local governments under the Fourteenth Amendment." *Ctr. for Bio-Ethical Reform*, 648 F.3d at 379; *see also Buckley v. Valeo*, 424 U.S. 1, 93, 96 (1976) ("Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment.").

The Fifth Amendment's incorporation of the Fourteenth Amendment's Equal Protection Clause prevents the government from "making distinctions that (1) burden a fundamental right; (2) target a suspect class; or (3) intentionally treat one individual differently from others similarly

---

[5] Defendants contend that Ultima makes a facial challenge to the 8(a) program [Docs. 62, pg. 10; 72, pg. 16]. Ultima responds that they are not making a facial challenge "but rather [challenging] the program as implemented by [D]efendants." [Docs. 70, pg. 3; 76, pg. 15]. Because Ultima expressly disavows a facial challenge to the 8(a) program and the rebuttable presumption, the Court construes Ultima's arguments as raising an as-applied challenge to the presumption.

situated without any rational basis." *Johnson v. Bredesen*, 624 F.3d 742, 746 (6th Cir. 2010). When the government engages in any of those actions, courts must scrutinize the government's conduct to determine whether it violates an entity's equal protection rights. The level of scrutiny a government-sponsored distinction receives depends on the nature of the distinction. Certain classifications are subject to strict scrutiny—meaning they are constitutional "only if they are [(1)] narrowly tailored measures that further [(2)] compelling governmental interests." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995). When examining racial classifications, courts apply strict scrutiny.[6] *Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, 143 S. Ct. 2141, 2162 (2023); *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493–94 (1989) (applying strict scrutiny to the city of Richmond's racial classification); *Adarand Constructors, Inc.*, 515 U.S. at 224 (plurality holding that racial classifications are subject to strict scrutiny).

Ultima argues that the rebuttable presumption in the 8(a) program cannot survive strict scrutiny because Defendants cannot show that the rebuttable presumption is narrowly tailored to achieve a compelling governmental interest [Doc. 60-2, pg. 22]. The Court addresses each prong of the strict scrutiny test, beginning with the compelling-interest prong.

### 1. Whether Defendants can show a compelling governmental interest

To satisfy the compelling-interest prong, the government must both identify a compelling interest and provide evidentiary support concerning the need for the proposed remedial action. *See Croson*, 488 U.S. at 498–504; *see also Associated Gen. Contractors of Ohio, Inc. v. Drabik*, 214 F.3d 730, 735 (6th Cir. 2000) (citing *Croson* for the proposition that the government must establish

---

[6]     Neither party disputes that the rebuttable presumption is subject to strict scrutiny [Docs. 60-2, pg. 22; 62, pg. 8].

either that it "discriminated in the past" or "was a passive participant in private industry's discriminatory practices"). The Supreme Court has held that the government has a compelling interest in "remediating specific, identified instances of past discrimination that violated the Constitution or a statute." *Students for Fair Admissions, Inc.*, 143 S. Ct. at 2162; *see also Shaw v. Hunt*, 517 U.S. 899, 909 (1996). Additionally, the government must present goals that are "sufficiently coherent for purposes of strict scrutiny." *Students for Fair Admissions, Inc.*, 143 S. Ct. at 2166.

Defendants assert that their use of the rebuttable presumption in the 8(a) program is to remedy the effects of past racial discrimination in federal contracting [Docs. 60-2, pg. 22; 62, pgs. 8–9]. But Defendant USDA admits it does not maintain goals for the 8(a) program [Doc. 73, ¶ 74]. And Defendant SBA admits that it does not require agencies to have goals for the 8(a) program [*Id.*, ¶ 73]. Defendants also do not examine whether any racial group is underrepresented in a particular industry relevant to a specific contract in the 8(a) program [*Id.*, ¶ 66]. Without stated goals for the 8(a) program or an understanding of whether certain minorities are underrepresented in a particular industry, Defendants cannot measure the utility of the rebuttable presumption in remedying the effects of past racial discrimination. In such circumstances, Defendants' use of the rebuttable presumption "cannot be subjected to meaningful judicial review." *Id.* The lack of any stated goals for Defendants' continued use of the rebuttable presumption does not support Defendants' stated interest in "remediating specific, identified instances of past discrimination[.]" *Id.* at 2162. If the rebuttable presumption were a tool to remediate specific instances of past discrimination, Defendants should be able to tie the use of that presumption to a goal within the 8(a) program.

Even if Defendants stated a sufficiently compelling interest, they still must demonstrate "a strong basis in evidence" to support the use of the race-based rebuttable presumption. *Croson*, 488 U.S. at 500. Although the burden remains on Ultima to demonstrate the unconstitutionality of the presumption, without evidence that the remedial action is warranted, reviewing courts face difficulty in determining whether the program is justified. *See Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 277–78 (1986).

Recently, the Sixth Circuit addressed a challenge similar to the one Ultima raises here. *Vitolo*, 999 F.3d at 361. In *Vitolo*, the Sixth Circuit reviewed the way in which Defendant SBA distributed coronavirus relief funds to help restaurants impacted by the coronavirus pandemic. *Id.* at 356–57. Defendant SBA distributed the funds on a first come, first served basis. *Id.* at 357. But during the first 21 days that the funds were available Defendant SBA distributed funds to priority applicants, which included restaurants that were "socially and economically disadvantaged." *Id.* To determine which restaurants qualified as socially and economically disadvantaged, Defendant SBA relied on the same statutory and regulatory framework at issue here—particularly, the race-based rebuttable presumption. *Id.* The plaintiff, a white, male 50% owner of a restaurant, sued to end Defendant SBA's racial preferences in distributing funding and sought a temporary restraining order and preliminary injunction. *Id.* at 358. The district court denied both of the plaintiff's motions, and the plaintiff appealed those denials. *Id.* The Sixth Circuit concluded that the plaintiff had a likelihood of success on the merits of his claims and that Defendant SBA's rebuttable presumption likely was unconstitutional because it did not serve a compelling interest and was not narrowly tailored. *Id.* at 360, 364–66.

In reaching that conclusion, the Sixth Circuit held that "[t]he government has a compelling interest in remedying past discrimination only when three criteria are met." *Id.* at 361. First, the

government's policy must "target a specific episode of past discrimination [and] . . . . cannot rest on a generalized assertion that there has been past discrimination in an entire industry." *Id.* (quoting *J.A. Croson Co.*, 488 U.S. at 498–99). Ultima contends that Defendants have not targeted any specific past discrimination in achieving their stated interest of remedying discrimination [Doc. 60-2, pg. 22]. Ultima asserts that Defendants rely on "more-than-40-year old" congressional findings to support the rebuttable presumption but do not review or update those findings [Docs. 60-2, pgs. 22-23; 70, pgs. 5-7]. Defendants respond that Congress enacted the 8(a) program to remedy specific discriminatory practices that prevented MBEs from accessing capital and credit and competing equally in the free market [Doc. 62, pgs. 9, 17-19]. They state there was substantial evidence before Congress when the 8(a) program was enacted and that the evidence included specific findings about discrimination faced by members of groups that receive the rebuttable presumption [Docs. 62, pgs. 11-13; 72, pgs. 17-18].[7]

Here, Defendants' evidence includes expert reports and agency studies regarding disparities that MBEs face nationally [Docs. 61-10, 61-12, 85]. Some of those studies are broken down by industry and include national statistics for the industries in which Ultima operates [Doc. 85, pgs. 1-9]. But Defendants do not identify a specific instance of discrimination which they seek to address with the use of the rebuttable presumption. Defendants instead rely on the disparities

---

[7]    Ultima also attacks the authenticity of Defendants' evidence and states their expert reports are inadmissible hearsay [Doc. 70, pgs. 7-8]. Defendants respond that the parties stipulated to the authenticity of the documents produced in discovery [Doc. 74, pgs. 9-10]. Similarly, Defendants assert that the reports would be presented in admissible form at trial [*Id.*, pg. 10]. Ultima's generalized objections to the authenticity of Defendants' evidence—at this stage of litigation—are insufficient for the Court to disqualify that evidence. Indeed, the parties stipulated that documents produced in connection with this lawsuit "shall be deemed authentic[.]" [Doc. 55, pg. 1]. Ultima's objections that certain evidence contains hearsay statements are equally unavailing because it does not specify what statements are hearsay and, instead, seeks to exclude the entirety of Defendants' expert reports [Doc. 70, pgs. 7-8]. Further, the Court has no reason to doubt that Defendants would produce their evidence in admissible form at trial, if necessary.

faced by MBEs nationally as sufficient to justify the use of a presumption that certain minorities are socially disadvantaged [*See generally* Docs. 59-1, 59-2]. "[A]n effort to alleviate the effects of societal discrimination is not a compelling interest," and Defendants' reliance on national statistics shows societal discrimination rather than a specific instance. *Shaw*, 517 U.S. at 909–10; *see also Holman v. Vilsack*, No. 21-1085, 2021 WL 2877915, at *6–*8 (W.D. Tenn. Jul. 8, 2021) (applying *Vitolo* to a similar challenge to a government affirmative-action program for farmers).

Second, the Sixth Circuit explained that the government must support its asserted compelling interest with "evidence of *intentional* discrimination in the past." *Vitolo*, 999 F.3d at 361 (quoting *J.A. Croson Co.*, 488 U.S. at 503) (emphasis in original). According to the Sixth Circuit, statistical disparities alone are insufficient but can be used with other evidence to establish intentional discrimination. *See id.* The Sixth Circuit reasoned that when the government uses a race-based policy, it must operate with precision and support the policy with "data that suggest intentional discrimination." *Id.* It further reasoned that evidence of general social disparities are insufficient because "there are too many variables to support inferences of intentional discrimination" when there are multiple decision makers "behind the disparity." *Id.* at 362. Ultima argues that there is no evidence that Defendants' individual officers engaged in discrimination against the groups benefitting from the rebuttable presumption [Doc. 60-2, pg. 23]. Ultima asserts that Defendants' expert reports do not show specific instances of intentional discrimination but only statistical disparities that are insufficient to show a compelling governmental interest [*Id.*, pgs. 23-24].

Defendants respond that Congress had substantial evidence of the federal government's role in discrimination against MBEs when it enacted the 8(a) program [Doc. 72, pgs. 20-21]. Defendants assert that evidence of statistical disparity is sufficient to show discrimination when

paired with evidence of past discrimination in which the government actively or passively participated [Docs. 62, pg. 10; 72, pgs. 24-25]. Ultima replies that none of Defendants' statistical evidence rules out the possibility that the disparities are attributable to non-discriminatory factors [Doc. 76, pg. 17].

Here, Defendants primarily offer evidence of national disparities across different industries [*See generally* Docs. 61-10, 61-12, 85]. They do not offer further evidence to show that those disparities are tied to specific actions, decisions, or programs that would support an inference of intentional discrimination that the use of the rebuttable presumption allegedly addresses. Although the odds ratios in Mr. Chow's study show that participation in the 8(a) program coincides with a higher likelihood of winning a federal contract, that data does not establish that the rebuttable presumption itself remedies discrimination [Doc. 59-2, pg. 12]. Instead, the data stands for the simple proposition that participation in a program designed to facilitate the award of federal contracts to small businesses does, in fact, help those participating small businesses win federal contracts [*See id.*]. Mr. Chow's data showing a lower likelihood of winning a federal contract for SDBs not participating in the 8(a) program also is unavailing because that data cannot explain why those SDBs do not succeed at the same rate as SDBs participating in the 8(a) program [*Id.*]. Mr. Chow's expert report provides a useful description of the landscape for SDBs but cannot definitively link the failure of SDBs not participating in the 8(a) program to intentional discrimination [*See generally id.*].

Moreover, Dr. Guryan noted that Defendants' evidence did not eliminate other variables that could explain the disparities on which they rely [Doc. 59-4, pg. 5]. Defendants cannot affirmatively link those disparities to intentional discrimination because they also cannot eliminate all variables that could account for the disparities [*Id.*]. That the Sixth Circuit's precedents create

28

a high bar to justify the use of racially conscious programs does not relieve Defendants from meeting that burden. Indeed, the Sixth Circuit in *Vitolo* did not equivocate, cautioning that "broad statistical disparities . . . are not nearly enough" to show intentional discrimination. *Id.*

Third, the Sixth Circuit reasoned that the government must show that it participated in the past discrimination it seeks to remedy, such as by demonstrating it acted as a "passive participant in a system of racial exclusion practiced by elements of [a] local . . . industry[.]" *Id.* (quoting *J.A. Croson Co.*, 488 U.S. at 492) (internal quotations omitted). It explained that the government must identify "prior discrimination by the governmental unit involved" or "passive participation in a system of racial exclusion." *Id.* (quoting *J.A. Croson Co.*, 488 U.S. at 492) (alteration adopted). In *Shaw*, the Supreme Court explained that the government must have evidence that remedial action was necessary "*before* it embark[ed] on an affirmative-action program." *Shaw*, 517 U.S. at 909 (citing *J.A. Croson Co.*, 488 U.S. at 499, 500, 505, 507, 509) (emphasis added). Additionally, in her opinion in *J.A. Croson Co.*, Justice O'Connor reasoned that the government could show passive participation in discrimination by compiling evidence of marketplace discrimination and then linking its spending practices to private discrimination. *J.A. Croson Co.*, 488 U.S. at 492 (O'Connor, J., joined by Rehnquist, C.J., and White, J).

Ultima contends that Defendants do not show that they have been passive participants in discrimination [Docs. 60-2, pg. 24; 70, pgs. 22-23]. Ultima further contends that Defendants improperly rely on anecdotal evidence of discrimination and evidence of societal discrimination to support their compelling interest [Doc. 70, pgs. 21-22]. Defendants respond they have presented substantial quantitative and qualitative evidence of discrimination against MBEs both at the enactment of the 8(a) program and today [Doc. 72, pg. 25]. Specifically, Defendants note their experts' reports, a report from the DOJ that compiled evidence of discriminatory barriers that

29

impede MBEs in government contracting, and a report from the United States' Department of Commerce that analyzed 100 disparity studies about MBEs [Doc. 62, pgs. 14-15]. They assert that anecdotal evidence in combination with disparity studies is sufficient to show discrimination [Doc. 74, pg. 12]. According to Defendants, that evidence showed that the federal government was a passive participant in "this long-standing system of racial exclusion." [Doc. 62, pg. 9].

Although the Court does not doubt the persistence of racial barriers to the formation and success of MBEs, Defendants' evidence does not show that the government was a passive participant in such discrimination in the relevant industries in which Ultima operates. As evidence of passive participation, Defendants note that Congress found MBEs lacked access to "capital, bonding, and business opportunities" because of discrimination [*Id.*, pg. 12]. Defendants further note that Congress found that MBEs faced "outright blatant discrimination directed at disadvantaged and minority business people by majority companies, financial institutions, and government at every level." [*Id.*, pg. 13]. Those examples, however, relate broadly to the federal government's actions in different areas of the national economy. They do not show that the federal government allowed discrimination to occur in the industries relevant to Ultima. Because the Court must determine whether the use of racial classifications is supported with precise evidence, examples of the federal government's passive participation in areas other than the relevant industries do not support Defendants' use of the rebuttable presumption here. *See Vitolo*, 999 F.3d at 361. Accordingly, Defendants have failed to show a compelling interest for their use of the rebuttable presumption as applied to Ultima. Even if Defendants could establish a compelling interest, the rebuttable presumption is not narrowly tailored to serve the asserted interest.

30

## 2. Whether the rebuttable presumption is narrowly tailored

Ultima contends that the rebuttable presumption is not narrowly tailored to serve Defendants' alleged compelling interest [Doc. 60-2, pg. 24]. Defendants respond that the 8(a) program is narrowly tailored to redress the effects of ongoing and past discrimination [Doc. 72, pg. 26]. "Even in the limited circumstance when drawing racial distinctions is permissible to further a compelling state interest, government is still 'constrained in how it may pursue that end: [T]he means chosen to accomplish the [government's] asserted purpose must be specifically and narrowly framed to accomplish that purpose.'" *Grutter v. Bollinger*, 539 U.S. 306, 333 (2003) (quoting *Shaw v. Hunt*, 517 U.S. 899, 908 (1996)) (alterations in original). This requirement is aimed at ensuring "the means chosen 'fit' th[e] compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Id.* (quoting *Croson*, 488 U.S. at 493) (alteration in original).

To determine whether the government's use of a racial classification is narrowly tailored, the Court examines several factors, including the necessity for the race-based relief, the efficacy of alternative remedies, the flexibility and duration of the relief, the relationship of the numerical goals to the relevant labor market, and the impact of the relief on the rights of third parties. *See Aiken v. City of Memphis*, 37 F.3d 1155, 1164 (6th Cir. 1994) (quoting *United States v. Paradise*, 480 U.S. 149, 171 (1987) (plurality opinion)). The Supreme Court held that courts also should consider whether the governmental entity considered race-neutral alternatives prior to adopting a program that uses racial classifications, the program does not presume discrimination against certain minority groups and, if the program involves a set-aside plan, the plan is based on the number of qualified minorities in the area capable of performing the scope of work identified. *See J.A. Croson*, 488 U.S. at 507–08.

31

### a. Whether the 8(a) program is flexible and limited in duration

Ultima asserts that the rebuttable presumption is not flexible because every individual in the preferred groups receives the benefit of the presumption [Doc. 60-2, pg. 26]. Ultima argues that the presumption has never been rebutted and is dispositive in practice [Docs. 60-2, pg. 26; 70, pg. 25]. It further argues that Defendants' requirements for showing "economic disadvantage" only disqualify the richest individuals and that Defendants do not assess whether an applicant to the 8(a) program has less access to capital than others in the same line of business during the application process [Doc. 70, pg. 25].

Defendants respond that the 8(a) program is flexible because no one is automatically included or excluded from the program on the basis of race alone [Doc. 72, pg. 27]. Defendants assert that the 8(a) program is one of many ways that the federal government can reach its goals for small business utilization in contracting [Doc. 62, pg. 28]. Defendants contend that the presumption is flexible because it may be overcome with evidence that an individual is not socially disadvantaged, individuals who are not presumptively disadvantaged can still qualify for the 8(a) program, and each applicant to the program must meet race-neutral economic requirements [Doc. 62, pg. 28]. Additionally, Defendants contend that a contract will not be set aside for the 8(a) program if it would have an adverse impact on a small business already performing the work [*Id.*, pgs. 28-29].

Here, certain minority groups receive a presumption that others do not. 13 C.F.R. § 124.103(b)(1). Although that presumption technically can be overcome, the Court struggles to see how that process would work in practice [Doc. 73, ¶ 28]. *Id.* § 124.103(b)(3). Indeed, Klein, an employee of Defendant SBA, testified that "[t]here's no process for a third party to question someone's social disadvantage as part of the application process." [Doc. 65-7, pg. 29]. As the

32

Sixth Circuit in *Vitolo* noted, "[because] proving someone else has *never* experienced racial or ethnic discrimination is virtually impossible, this 'presumption' is dispositive." *Vitolo*, 999 F.3d at 363 (emphasis in original). Individuals who do not receive the presumption must show both economic disadvantage *and* discrimination that have negatively impacted their advancement in the business world and caused them to suffer chronic and substantial social disadvantage. *Id.*; 13 C.F.R. § 124.103(c)(6). In effect, individuals who do not receive the presumption must put forth double the effort to qualify for the 8(a) program.

Ultima next contends that use of the rebuttable presumption in the 8(a) program does not have a termination date, which perpetuates undue harm on those not in the program [Doc. 60-2, pgs. 26-27]. Ultima asserts that Defendants reserve contracts for the 8(a) program even after the participant fulfilling that contract left the program [Doc. 70, pg. 26]. Defendants admit that there is no time limit applicable to the 8(a) program but assert that participants can remain in the 8(a) program only for nine years [Docs. 62, pg. 29; 72, pg. 28]. They state that program members can participate only once and that members must exit the program early if they are no longer eligible [Docs. 62, pg. 29; 72, pg. 28]. They state that they review the program annually and provide a report to Congress [Doc. 62, pg. 29]. Ultima replies that Defendants do not assess the continuing need for the 8(a) program, showing that the program is not narrowly tailored [Doc. 76, pgs. 21-22].

In *Drabik*, the Sixth Circuit held that as an aspect of narrow tailoring, a race-conscious government program "must be appropriately limited such that it will not last longer than the discriminatory effects it is designed to eliminate." *Drabik*, 214 F.3d at 737–38 (quoting *Adarand*, 515 U.S. at 238. More recently, the Supreme Court reaffirmed that racially conscious government

33

programs must have a "'logical end point.'" *Students for Fair Admissions, Inc.*, 143 S. Ct. at 2170 (quoting *Grutter*, 539 U.S. at 342).[8]

Defendants concede that "the 8(a) program has no termination date," necessarily meaning there is no temporal limit on the use of the rebuttable presumption [Doc. 62, pg. 29; *see also* Doc. 72, pg. 28]. Such a boundless use of a racial classification exceeds the concept of narrow tailoring as explained by Sixth Circuit and Supreme Court precedents. *See id.*; *Drabik*, 214 F.3d at 737–38. Although Defendants note that participation in the 8(a) program itself is limited to nine years, that limit does not show that the use of the rebuttable presumption is similarly constrained [*See* Doc. 62, pg. 29]. Defendants conceivably could use the rebuttable presumption for as long as the 8(a) program itself is in place, regardless of how many program participants have timed out. "In short, there is no reason to believe that [Defendants] will—even acting in good faith—comply with the Equal Protection Clause any time soon." *Students for Fair Admissions, Inc.*, 143 S. Ct. at 2173.

### b. Whether the 8(a) program is necessary

Ultima next argues that there are no specific remedial objectives for the 8(a) program [Doc. 60-2, pg. 27]. It contends that Defendants have not shown the necessity for race-conscious relief [Doc. 70, pg. 23]. Defendants respond that the program's lack of remedial objectives contributes to its narrow tailoring because it is flexible [Doc. 72, pg. 29]. Defendants note that the program is a government-wide program and does not target a particular agency [*Id.*, pg. 30].

The lack of specific remedial objectives for the use of the rebuttable presumption presents a double-edged sword for Defendants. On one hand, the lack of a specific objective provides

---

[8]    The facts in *Students for Fair Admissions, Inc.* concerned college admissions programs, but its reasoning is not limited to just those programs. *See Adarand Constructors, Inc.*, 515 U.S. at 215 (applying the reasoning in *Bolling*, 347 U.S. at 497, which discussed school desegregation, to a federal program designed to provide highway contracts to disadvantaged business enterprises).

34

Defendants with an amount of flexibility. As Defendants assert, "that every person in the designated group gets the benefit of the presumption, absent credible evidence to the contrary, is the entire point." [*Id.*, pg. 26].

On the other hand, the lack of a specific objective shows that Defendants are not using the rebuttable presumption in a narrow or precise manner. And the Sixth Circuit has held that Defendants must present "the most exact connection between justification and classification." *Michigan Road Builders Ass'n, Inc.*, 834 F.2d at 588. Here, Defendants admit that they do not have any specific objectives linked to their use of the rebuttable presumption, and such unbridled discretion counsels against a racial classification being narrowly tailored. *See id.*

### c. Whether the 8(a) program is both over and underinclusive

Ultima also contends that the use of the rebuttable presumption makes the 8(a) program both overinclusive and underinclusive [Doc. 60-2, pgs. 27-28]. Ultima asserts that the rebuttable presumption allows individuals who are not economically disadvantaged to participate in the 8(a) program [*Id.*]. It further asserts that the 8(a) program is underinclusive because Defendants do not explain why some groups are given a presumption while others are not [Doc. 70, pg. 27]. As an example, Ultima notes that Defendants exclude certain national-origin groups by characterizing them as white and that Defendants fail to explain why groups facing religious discrimination do not receive a rebuttable presumption [*Id.*].

Defendants respond that the 8(a) program is not overinclusive because the economic requirements for the program apply equally to all applicants and that those requirements allow the program to benefit business owners who have maintained a business for at least two years [Doc. 72, pg. 31]. Defendants also argue that any small business owner may apply if they have suffered discrimination based on objective criteria and that half of non-presumptively disadvantaged

35

applicants are successful [Doc. 62, pg. 30]. Ultima replies that Defendants do not assess whether the conditions for a particular group or in a particular industry warrant the continued participation of that group in the 8(a) program [Doc. 76, pgs. 22-23]. Ultima also contends that Defendants reserved many contracts in its industries without prior evidence that minorities were discriminated against in those industries [*Id.*, pg. 23].

Defendant SBA determines which groups receive the rebuttable presumption of social disadvantage. 13 C.F.R. § 124.103(b)(1). Some of those groups match the groups listed in the statute enacting the 8(a) program. *Compare* 15 U.S.C. § 631(f)(1)(C) *with* 13 C.F.R. § 124.103(b)(1). But Defendant SBA has added more groups since that time that appear underinclusive when compared with groups that do not receive the rebuttable presumption. *Compare* 15 U.S.C. § 631(f)(1)(C) *with* 13 C.F.R. § 124.103(b)(1). For example, Defendant SBA includes "Subcontinent Asian Americans" while excluding individuals from Central Asian nations, such as Mongolia, Afghanistan, and Uzbekistan. *See* 13 C.F.R. § 124.103(b)(1). Defendant SBA also does not include Arab Americans in its list of individuals entitled to the rebuttable presumption. The Court does not doubt that Central Asian Americans and Arab Americans have faced significant discrimination in a number of areas, including in business formation and development. Those individuals, however, are not considered presumptively socially disadvantaged. And as Ultima notes, Defendant SBA does not consider other groups, such as Hasidic Jews who have faced similarly appalling discrimination, eligible for the rebuttable presumption of social disadvantage [Doc. 64-9, pgs. 8-17, 21-27]. Defendants arbitrary line drawing for who qualifies for the rebuttable presumption shows that the "categories are themselves imprecise in many ways." *Students for Fair Admissions, Inc.*, 143 S. Ct. at 2167. Thus, the determination of which groups of Americans are presumptively disadvantaged compared with

others necessarily leads to such a determination being underinclusive because certain groups that could qualify will be left out of the presumption.

Conversely, the rebuttable presumption sweeps broadly by including anyone from the specified minority groups, regardless of the industry in which they operate.[9] Defendants respond that there is no authority requiring them to analyze whether MBEs are underutilized in specific industries or sectors [Doc. 72, pgs. 31-32]. They further argue that they have presented evidence in the administrative and technical support services industries, which are the only industries at issue here [*Id.*, pg. 32]. But Defendant SBA is not making specific determinations as to whether certain groups in certain industries have faced discrimination. *See Michigan Road Builders*, 834 F.3d at 588. It instead applies Congress's nationwide findings to all members of the designated minority groups. *See* 13 C.F.R. § 124.103(b)(1). Such an application of the presumption proves overinclusive by failing to consider the individual applicant to the 8(a) program and the industries in which they operate.

### d. Whether Defendants considered race-neutral alternatives to the rebuttable presumption

Ultima next asserts that Defendants have not used race-neutral alternatives since beginning to apply the rebuttable presumption [Doc. 60-2, pgs. 29-30]. Ultima further argues that Defendants failed to consider "the most obvious race-neutral alternative: eliminating any presumption." [Doc. 70, pg. 24]. Defendants respond that evidence shows discrimination against the groups entitled to the rebuttable presumption [Doc. 72, pg. 32]. They state that Congress continuously made findings of racial discrimination for each group presumed socially disadvantaged [*Id.*, pg. 32]. Defendants

---

[9]     Additionally, the specified minority groups include entire populations that cannot be neatly categorized according to Defendant SBA's definition for those minority groups. *See, e.g.*, *Students for Fair Admissions, Inc.*, 143 S. Ct. at 2210–12 (Gorsuch, J., concurring).

assert that Congress previously tried race-neutral alternatives [Docs. 62, pgs. 26-27; 72, pg. 33]. They state that Ultima's suggestion to remove the rebuttable presumption from the 8(a) program is unnecessary because Congress previously tried that method in 1986 and it proved ineffective [Docs. 72, pg. 33; 74, pg. 22]. Ultima replies that Defendants, not Congress, are required to consider race-neutral alternatives [Doc. 76, pg. 20].

For a policy to survive narrow-tailoring analysis, the government must show "serious, good faith consideration of workable race-neutral alternatives" to promote the stated interest but need not exhaust every conceivable race-neutral alternative. *Grutter*, 539 U.S. at 333, 339 (citing *Croson*, 488 U.S. at 507; *Wygant*, 476 U.S. at 280 n.6). But in *Vitolo*, the Sixth Circuit reasoned that "a court must not uphold a race-conscious policy unless it is 'satisfied that no workable race-neutral alternative' would achieve the compelling interest." *Vitolo*, 999 F.3d at 362 (quoting *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 312 (2013)). Up until 1986, Defendant SBA reviewed eligibility for participation in the 8(a) program on a case-by-case basis [*See* Doc. 73, ¶ 90]. After 1986, Defendant SBA implemented the rebuttable presumption of social disadvantage for certain minority groups as part of its review of applications to the 8(a) program [*See* Docs. 73, ¶ 90; 65-7, pgs. 41-43]. Only three years later, the Supreme Court clarified the constitutionality of racially conscious programs—like the 8(a) program with the rebuttable presumption—in *City of Richmond v. J.A. Croson Co.*, when it determined that government actors could use racial classifications only if the classifications survived strict scrutiny. 488 U.S. at 498–506. And the Supreme Court again recently reaffirmed that "[a]ny exception to the Constitution's demand for equal protection must survive a *daunting* two-step examination known in our cases as 'strict scrutiny.'" *Students for Fair Admissions, Inc.*, 143 S. Ct. at 2162 (emphasis added). Defendant SBA has not revisited the use of the rebuttable presumption since 1986 and insists that the

presumption remains workable under the Supreme Court's precedents [Doc. 65-7, pgs. 41-43]. Because of Defendant SBA's failure to review race-neutral alternatives in the wake of the Supreme Court's precedents, the Court cannot conclude that "no workable race-neutral alternative would achieve the compelling interest." *Vitolo*, 999 F.3d at 362 (internal quotations omitted).

### e. Whether the rebuttable presumption impacts third parties

Lastly, Ultima argues that Defendants do not consider the impact of the rebuttable presumption on third parties and that Defendants do not review whether groups remain socially disadvantaged once they receive the benefit of the presumption [Doc. 60-2, pgs. 30-31]. It states that Defendants did not make any contracts in its industries open to competition after cancelling the IDIQs [Doc. 70, pg. 31]. Defendants respond that the relevant inquiry is whether the burden on third parties is "too intrusive" or "unacceptable." [Doc. 72, pg. 34]. They state that the record shows the burden on non-8(a) businesses is slight, with "[o]nly 3.7% of federal contracting dollars eligible for small businesses [] obligated through the 8(a) program." [Docs. 62, pgs. 33-34; 72, pg. 34]. Further, Defendants contend that evidence only some groups possibly cease to need the rebuttable presumption is insufficient to support invalidating the presumption as a whole [Doc. 72, pgs. 35-36]. They contend that the 8(a) program is designed to mitigate impact on businesses outside the program [*Id.*, pg. 32]. Defendants argue that any burdens Ultima suffered are unrelated to the 8(a) program [Doc. 62, pg. 34].

Ultima's experience with Mississippi's NRCS offices shows that Defendants failed to consider the impact of the rebuttable presumption on Ultima here. Defendants placed the Mississippi NRCS contract Ultima previously fulfilled into the 8(a) program through a series of contradictory actions: Defendant SBA first concluded that Ultima would suffer an adverse impact by losing that contract and declined to move that contract into the 8(a) program as such, before

eventually placing the Mississippi NRCS contract into the 8(a) program after a review by a different unit within Defendant SBA [*Compare* Doc. 61-19, pgs. 1-2 *with* Doc. 70-14, pgs. 7, 12-13]. Defendants' actions with regard to the Mississippi NRCS contract led to Ultima losing a significant portion of its business. Their explanation for why that contract was placed in the 8(a) program does not shed light on how they considered the impact of that decision on Ultima, particularly when the rebuttable presumption would double the work for Ultima to apply to the 8(a) program and eventually become eligible to fulfil that contract again [Doc. 70-14, pgs. 12-13]. Not only would the rebuttable presumption present an obstacle to fulfilling the Mississippi contract, it also would hamper Ultima's ability to compete for the other contracts that Defendants set aside for the 8(a) program after cancelling the IDIQ contracts.

Defendants' assertion that the rebuttable presumption presents only a slight burden because a minor amount of all national federal contracting dollars is eligible for small businesses offers cold comfort. Ultima operates within a specific set of industries and the Mississippi contract, as well as others like it, represent a substantial amount of revenue. National statistics do not lessen the burden that the rebuttable presumption places on Ultima. Defendants have failed to show that the use of the rebuttable presumption in the 8(a) program is narrowly tailored. Thus, Ultima's motion [Doc. 60] is **GRANTED** in this respect, and Defendants' motion [Doc. 61] is **DENIED** in this respect.

## IV.     CONCLUSION

Accordingly, for the reasons stated herein, Ultima's Motion for Summary Judgment [60] is **GRANTED IN PART AND DENIED IN PART**, and Defendants' Motion for Summary Judgment [61] is **DENIED**. The Court **DECLARES** that Defendants' use of the rebuttable presumption violates Ultima's Fifth Amendment right to equal protection of the law. It is

40

**ORDERED** that Defendants are **ENJOINED** from using the rebuttable presumption of social disadvantage in administering Defendant SBA's 8(a) program.[10] The Court reserves ruling on any further remedy subject to a hearing on that issue. To that end, a hearing via videoconference on the issue of any potential further remedies is set for **August 31, 2023, at 1:30 p.m. EST.** The parties will receive an email containing instructions regarding connection information.

        **SO ORDERED:**

                                 s/ Clifton L. Corker
                                 United States District Judge

---

[10] Although the Court construed Ultima's challenge as an as-applied challenge, "the distinction between facial and as-applied challenges is not so well defined that it has some automatic effect." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010). Thus, the Court may enjoin Defendants from using the rebuttable presumption because that remedy is "necessary to resolve a claim[.]" *Id.* (citing approvingly Richard H. Fallon, Jr., *As-Applied and Facial Challenges and Third-Party Standing*, 113 Harv. L. Rev. 1321, 1339 (2000) ("[O]nce a case is brought, no general categorical line bars a court from making broader pronouncements of invalidity in properly 'as-applied' cases.")).