## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## GREENEVILLE DIVISION

| | |
|---|---|
| ULTIMA SERVICES CORPORATION, | Case No.: 2:20-cv-00041-DCLC-CRW |
| Plaintiff, | **[PROPOSED] AMICUS CURIAE BRIEF OF TRIBAL AMICI IN RESPONSE TO PLAINTIFF'S MOTION FOR ADDITIONAL EQUITABLE RELIEF** |
| v. | |
| UNITED STATES OF AMERICA, et al., | |
| Defendants. | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... ii

INTERESTS OF AMICI CURIAE ........................................................................... 1

INTRODUCTION .................................................................................................... 3

ARGUMENT ............................................................................................................ 4

I.      Tribal classifications are political in nature and subject to a unique
and deferential equal protection analysis ........................................................... 7

II.     Plaintiff's requested relief improperly sweeps in tribal and ANC
businesses .................................................................................................. 12

CONCLUSION ....................................................................................................... 19

# TABLE OF AUTHORITIES

**CASES**

*AFL-CIO v. United States*, 330 F.3d 513 (D.C. Cir. 2003) .......................................... 13

*Alaska Chapter, Associated General Contractors of America, Inc. v. Pierce*, 694 F.2d 1162 (9th Cir. 1982) ...................................................... 13

*Association of America Physicians & Surgeons v. United States Food & Drug Administration*, 13 F.4th 531 (6th Cir. 2021) .............................................. 17

*Cobell v. Babbitt*, 91 F. Supp. 2d 1 (D.D.C. 1999), *aff'd and remanded sub nom. Cobell v. Norton*, 240 F.3d 1081 (D.C. Cir. 2001) .................................... 4

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006) ................................................ 18

*Davis v. Colerain Township*, No. 21-3723, 2022 WL 4351074 (6th Cir. Sept. 20, 2022) ............................................................................. 17

*Delaware Tribal Business Committee v. Weeks*, 430 U.S. 73 (1977) .......................... 8

*East Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026 (9th Cir. 2019) ..................... 17

*Fisher v. District Court of Sixteenth Judicial District of Montana*, 424 U.S. 382 (1976) ............................................................................ 8

*Gill v. Whitford*, 138 S. Ct. 1916 (2018) ....................................................... 15

*Haaland v. Brackeen*, 143 S. Ct. 1609 (2023) ................................................... 8

*Hampton v. Wong*, 426 U.S. 88 (1976) ........................................................... 7

*Johnson v. M'Intosh*, 21 U.S. (8 Wheat.) 543 (1823) ............................................ 5

*Kentucky v. Yellen*, 54 F.4th 325 (6th Cir. 2022) .............................................. 17

*Lewis v. Casey*, 518 U.S. 343 (1996) ....................................................... 15, 17

*Mathews v. Diaz*, 426 U.S. 67 (1976) ........................................................... 7

*Moe v. Confederated Salish & Kootenai Tribes of Flathead Reservation*, 425 U.S. 463 (1976) ......................................................................... 8

*Morton v. Mancari*, 417 U.S. 535 (1974) ............................................. 7, 8, 9, 10, 13

*Nordlinger v. Hahn*, 505 U.S. 1 (1992) ......................................................... 7

Case 2:20-cv-00041-DCLC-CRW    Document 100    Filed 10/04/23    Page 3 of 26
PageID #: 3459

*Santa Clara Pueblo v. Martinez*, 436 U.S. 49 (1978) ................................................... 9

*Trump v. United States*, No. 22-13005, 2022 WL 4366684 (11th Cir.
    Sept. 21, 2022) ...................................................................................................... 18

*Ultima Services Corp. v. United States Department of Agriculture*, No.
    2:20-cv-00041, 2023 WL 4633481 (E.D. Tenn. July 19, 2023) ............... 3, 4, 14, 18

*United States v. Antelope*, 430 U.S. 641 (1977) ...................................................... 8, 9

*United States v. Cohen*, 733 F.2d 128 (D.C. Cir. 1984) ............................................... 9

*United States v. Jicarilla Apache Nation*, 564 U.S. 162 (2011) ................................. 5

*United States v. Rogers*, 45 U.S. (4 How.) 567 (1846) ............................................... 9

*United States v. Vaello Madero*, 142 S. Ct. 1539 (2022) ........................................... 7

*Vance v. Bradley*, 440 U.S. 93 (1979) ........................................................................ 7

*Washington v. Confederated Bands & Tribes of Yakima Indian Nation*,
    439 U.S. 463 (1979) .............................................................................................. 8

*Washington v. Washington State Commercial Passenger Fishing Vessel
    Ass'n*, 443 U.S. 658 (1979) .................................................................................. 8

## CONSTITUTIONAL PROVISIONS AND STATUTES

U.S. Const. art. I, § 8, cl. 3 ......................................................................................... 8

U.S. Const. art. II, § 2, cl. 2 ....................................................................................... 9

U.S. Const. art. VI, cl. 2 ............................................................................................. 9

Const. of the Kiowa Tribe art. IV, § 1(b) ..................................................................... 9

Act of July 22, 1790, ch. 33, 1 Stat. 137 ................................................................... 10

15 U.S.C. § 637(a) ....................................................................................................... 5

15 U.S.C. § 637(a)(4)(A) ........................................................................................... 3, 5-6

15 U.S.C. § 637(a)(4)(A)(i)(II) .................................................................................. 3, 10

15 U.S.C. § 637(a)(4)(A)(ii)(II) ................................................................................. 3, 10

15 U.S.C. § 637(a)(4)(B) ........................................................................................... 3, 5-6

15 U.S.C. § 637(a)(4)(B)(ii) ............................................................. 3, 10

15 U.S.C. § 637(a)(5) .......................................................................... 5

15 U.S.C. § 637(a)(6)(A) ................................................................. 5, 11

15 U.S.C. § 637(a)(13) ..................................................................... 3, 10

25 U.S.C. § 391 ................................................................................... 10

25 U.S.C. § 1601 ................................................................................. 10

25 U.S.C. § 2000 ................................................................................. 10

25 U.S.C. § 3102 ................................................................................. 10

LEGISLATIVE MATERIALS

*Indian Economic Development-Part I: Oversight Hearing Before the H. Subcomm. on Native American Affairs of the H. Comm. on Natural Resources*, 103d Cong. (1993) (statement of Fort Peck Tribes Chairman Caleb Shields) ........................................................................ 6

*Contracting Preferences for Alaska Native Corporations: Hearing Before the Subcomm. on Contracting Oversight of the S. Comm. on Homeland Security and Gov't Affairs*, 111th Cong. (2009) (written statement of Sarah Lukin) .................................................................... 6

OTHER AUTHORITIES

13 C.F.R. § 124.102(a) ........................................................................ 12

13 C.F.R. § 124.103(a) .......................................................................... 5

13 C.F.R. § 124.104(a) .......................................................................... 5

13 C.F.R. § 124.104(c) ........................................................................ 11

13 C.F.R. § 124.109 ............................................................................. 15

13 C.F.R. § 124.109(a) ........................................................................ 10

13 C.F.R. § 124.109(a)(2) .................................................................... 10

13 C.F.R. § 124.109(b) ........................................................................ 11

13 C.F.R. § 124.109(b)(1) .................................................................... 10

13 C.F.R. § 124.109(b)(2) .................................................... 11

13 C.F.R. § 124.109(c)(2)(iii) ............................................ 11-12

*Cohen's Handbook of Federal Indian Law* (Nell Jessup Newton et al. eds., 2012) .................................................................... 4

Matthew Gregg & Elijah Moreno, *Examining Tribal Enterprises to Determine Native Economic Development*, Center for Indian Country Development (July 14, 2021) ................................................... 2

Jacqui Baldwin-LeClair et al., *Native Entities and the Federal Contracting Landscape*, Center for Indian Country Development (June 21, 2023) ............................................................................ 2

Small Business Administration ............................................... 19

# INTERESTS OF AMICI CURIAE[1]

Amici are a federally recognized Indian tribe and a national organization that represents and advances Native American, Alaska Native, and Alaska Native Corporation (ANC) interests.

The amicus Indian tribe is the Tunica-Biloxi Tribe of Louisiana, which owns and operates businesses that participate in the Small Business Administration (SBA) 8(a) Business Development Program (the 8(a) Program) and/or plan to apply for the 8(a) Program in the future. The core services provided by those businesses are managed and technical support services. Tunica-Biloxi intends to provide administrative and technical services to agencies and reviews such 8(a) opportunities when posted by any agency—including the Natural Resources Conservation Service (NRCS)—to submit bids for such contracts.

The amicus organization—the National Center for American Indian Enterprise Development (NCAIED)—is a non-profit organization with over 50 years of experience in assisting American Indian/Alaska Native-owned businesses and American Indian tribes and their enterprises with business and economic development. NCAIED actively assists American Indian and Alaska Native communities to develop economic self-sufficiency through business ownership,

---

[1] No counsel for a party authored this brief in whole or in part; and no person or entity, other than amici and their counsel, made a monetary contribution intended to fund the preparation and submission of this brief.

increased workforce participation, viable businesses, and positive impacts on reservation communities.

Tribal 8(a) contracts are critical drivers of tribal economies. More than three-quarters of non-gaming tribal enterprises operate in the four industries most represented in government contracting.[2] And over the last 20 years, 8(a) sole-source contracts have been the top revenue producer across all Native contracting entities.[3] Plaintiff's pending motion now threatens these critical contracts. Amici thus respectfully submit this brief in support of neither party and in opposition to Plaintiff's overbroad request for additional equitable relief that goes beyond the rebuttable presumption.[4]

---

[2] Matthew Gregg & Elijah Moreno, *Examining Tribal Enterprises to Determine Native Economic Development*, Center for Indian Country Development (July 14, 2021), https://www.minneapolisfed.org/article/2021/examining-tribal-enterprises-to-understand-native-economic-development.

[3] Jacqui Baldwin-LeClair et al., *Native Entities and the Federal Contracting Landscape*, Center for Indian Country Development (June 21, 2023), https://www.minneapolisfed.org/article/2023/native-entities-and-the-federal-contracting-land scape.

[4] At this stage, amici take no position on the merits of Plaintiff's equal protection arguments directed at defendants' use of a rebuttable presumption or on the propriety of additional equitable relief directed specifically at the rebuttable presumption.

## INTRODUCTION

"This case concerns whether, under the Fifth Amendment's guarantee of equal protection, Defendants . . . may use a 'rebuttable presumption' of social disadvantage for certain minority groups to qualify for inclusion in" the 8(a) Business Development Program. *Ultima Servs. Corp. v. U.S. Dep't of Agric.*, No. 20-cv-00041, 2023 WL 4633481, at *1 (E.D. Tenn. July 19, 2023). Yet Plaintiff seeks relief that goes far beyond this case's subject matter. It asks this Court to "enjoin defendants from using the Section 8(a) Program" *at all* "in the administrative and technical support industry." Pl.'s Mot. for Additional Equitable Relief (Pl.'s Mot.) at 1 (Sept. 15, 2023), ECF No. 93.

That broad request should be rejected. The 8(a) Program is much more than just its rebuttable presumption. Most importantly, Native American tribes and ANCs also participate in the 8(a) program. *See* 15 U.S.C. § 637(a)(4)(A)(i)(II), (a)(4)(A)(ii)(II), (a)(4)(B)(ii), (a)(13). And unlike individuals, tribes and ANCs do *not* need to demonstrate that they are socially disadvantaged to participate. *See* 15 U.S.C. § 637(a)(4)(A), (B). Thus, the "rebuttable presumption"—which helps determine whether *individual applicants* are socially disadvantaged, *see Ultima Servs.*, 2023 WL 4633481, at *4—has nothing to do with the administration of the tribal component of the 8(a) Program. Plaintiff nevertheless asks this Court to enjoin *entirely* defendants from using the 8(a) Program in the administrative and technical support industry—including in the tribal context. *See* Pl.'s Mot. at 1.

3

Plaintiff has not justified such sweeping relief. Tribal classifications are political classifications subject to a unique and deferential equal protection analysis, and the equal protection arguments that Plaintiff has advanced cast no doubt on the constitutionality of the 8(a) Program for tribes and ANCs. This Court in granting Plaintiff's motion for summary judgment thus properly limited its remedy to the harm that Plaintiff identified—the rebuttable presumption. *Ultima Servs.*, 2023 WL 4633481, at *1. Any relief that stymies tribal or ANC 8(a) contracts is beyond what this Court should—and in fact, can—order. For these reasons and those that follow, amici respectfully urge this Court to deny Plaintiff's motion for additional equitable relief to the extent it seeks a remedy not directed at the 8(a) Program's rebuttable presumption.

## ARGUMENT

From its earliest days, the United States has assumed a commitment to protect Indian tribes. When tribes made peace with the United States and ceded lands that today constitute the United States, treaties promised "protection" in return.[5] When the United States seized Indian lands, it "placed Native Americans in a state of coerced dependency," a relationship that the United States "forcibly established." *Cobell v. Babbitt*, 91 F. Supp. 2d 1, 7 (D.D.C. 1999), *aff'd and remanded sub nom. Cobell v. Norton*, 240 F.3d 1081 (D.C. Cir. 2001). Even still, the United States

---

[5] *Cohen's Handbook of Federal Indian Law*, § 1.02[3], at 20–21 (Nell Jessup Newton et al. eds., 2012).

4

promised "to . . . protect[]" the Indian occupants. *Johnson v. M'Intosh*, 21 U.S. (8 Wheat.) 543, 591 (1823). Today we call that commitment the "general trust relationship" between the United States and Indians, encompassing "a fiduciary obligation . . . owed to all Indian tribes." *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 182–83 (2011) (quotation marks omitted). This relationship represents "'moral obligations of the highest responsibility and trust,' obligations 'to the fulfillment of which the national honor has been committed.'" *Id.* at 176 (citations omitted).

Recognizing the trust relationship, Congress has made tribal corporations and ANCs eligible for certification under the 8(a) Program. The Program arises out of Congress's longstanding efforts through Section 8(a) of the Small Business Act, 15 U.S.C. § 637(a), to ensure that government contracting neither reflects nor reinforces existing patterns of discrimination. The 8(a) Program aims to provide socially and economically disadvantaged businesses access to the economic mainstream.[6] Unlike individual applicants, Indian tribes and ANCs are subject to different standards in applying to the 8(a) Program, including that Indian tribes and ANCs need not demonstrate that they are socially disadvantaged to participate, *see* 15 U.S.C.

---

[6] 15 U.S.C. § 637(a)(5) ("[s]ocially disadvantaged" individuals are "those who have been subjected to racial or ethnic prejudice or cultural bias [within American society] because of their identit[ies] as members of a group"); 13 C.F.R. § 124.103(a); 15 U.S.C. § 637(a)(6)(A) ("[e]conomically disadvantaged" individuals are socially disadvantaged individuals whose economic potential "has been impaired due to diminished capital and credit opportunities"); 13 C.F.R. § 124.104(a).

§ 637(a)(4)(A), (B), and are thus not subject to the rebuttable presumption at issue in this case.

Participation in the 8(a) Program is integral to furthering Congress's policy of tribal self-governance.[7]  Any relief provided in this case—which relates to the rebuttable presumption used to evaluate certain *individual applicants* to the Program—should not sweep so broadly as to undermine the ability of Indian tribes and ANCs to access the contracting benefits of the 8(a) Program.

---

[7] *See Contracting Preferences for Alaska Native Corporations: Hearing Before the Subcomm. on Contracting Oversight of the S. Comm. on Homeland Security and Gov't Affairs*, 111th Cong. 77 (2009) (written statement of Sarah Lukin) (quoting Jovita Carranza, Deputy Administrator, SBA) ("8(a) is an important source of revenue for Native American firms in particular . . . Indian Reservations are the underserved communities of underserved communities. While it may be challenging to encourage lenders to expand their rural or inner city programs, we all know the challenges are much greater for Indian Reservations.  And this, we recognize, is crippling for small business ventures, which need capital to start, to grow and to create jobs and opportunities.  Successfully starting a small business under the most auspicious conditions is a Herculean task. But the additional challenges that Native Americans face make it all the more so.  Limited access to markets, limited access to an experienced workforce, and limited infrastructure are just a few problems.  For these reasons, 8(a) is an essential program for developing Native American economies."); *Indian Economic Development-Part I: Oversight Hearing Before the Subcomm. on Native American Affairs of the H. Comm. on Natural Resources*, 103d Cong. 4–5 (1993) (statement of Fort Peck Tribes Chairman Caleb Shields) ("The major Indian problem facing our country today is providing economic development - to bring economic justice to Indians, as part of the American Commonwealth."  The tribes' "brightest economics success" is in "the area of Federal contracting.").

I.    Tribal classifications are political in nature and subject to a unique and deferential equal protection analysis

Under the Due Process Clause of the Fifth Amendment, the federal government is prohibited from "deny[ing] equal protection of the laws." *Vance v. Bradley*, 440 U.S. 93, 94 n.1 (1979). This "equal-protection component" of the Fifth Amendment largely parallels the Equal Protection Clause of the Fourteenth Amendment. *United States v. Vaello Madero*, 142 S. Ct. 1539, 1541 (2022). But importantly, equal protection—whether under the Fifth Amendment or the Fourteenth—does not prohibit laws from drawing classifications. Rather, "[i]t simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). Moreover, equal protection is not in fact identical under the two amendments. Under the Fifth Amendment, in areas of "paramount federal power," *Hampton v. Wong*, 426 U.S. 88, 100 (1976), equal protection analysis "involves significantly different considerations," *Mathews v. Diaz*, 426 U.S. 67, 84 (1976). The result of these two tenets is that equal protection analysis under the Fifth Amendment varies significantly depending on the classification employed.

1.    Applying these principles, the U.S. Supreme Court has long held that the federal government's use of tribal classifications is subject to its own, unique equal protection analysis. In the seminal *Morton v. Mancari*, 417 U.S. 535 (1974), the Court rejected an equal protection challenge to a Bureau of Indian Affairs employment preference for qualified Indians. *Id.* at 537–38. Observing that "[o]n numerous occasions" it had "upheld legislation that singles out Indians for particular

and special treatment," the Court explained that tribal classifications are permissible so long as they are "tied rationally to the fulfillment of Congress' unique obligation toward the Indians." *Id.* at 554–55. Since then, the Supreme Court has upheld every tribal classification it has considered that was challenged on equal protection grounds. *See Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 673 n.20 (1979) (special fishing rights for individual Indians); *Washington v. Confederated Bands & Tribes of Yakima Indian Nation*, 439 U.S. 463, 500–02 (1979) (state regulation of criminal conduct in Indian country); *United States v. Antelope*, 430 U.S. 641, 646 (1977) (federal prosecution of Indians); *Del. Tribal Bus. Comm. v. Weeks*, 430 U.S. 73, 84–90 (1977) (distribution of funds to certain Indians); *Moe v. Confederated Salish & Kootenai Tribes of Flathead Rsrv.*, 425 U.S. 463, 479–80 (1976) (preemption of state taxes as applied to Indians); *Fisher v. Dist. Ct. of Sixteenth Judicial Dist. of Mont.*, 424 U.S. 382, 390–91 (1976) (per curiam) (exclusive tribal court jurisdiction over on-reservation Indian adoptions); *see also Haaland v. Brackeen*, 143 S. Ct. 1609, 1638 (2023) (rejecting equal protection challenge to federal Indian Child Welfare Act for lack of standing).

Tribal classifications are subject to deferential equal protection review for good reasons. *First*, "classifications expressly singling out Indian tribes as subjects of legislation are expressly provided for in the Constitution." *Antelope*, 430 U.S. at 645. The Constitution, for instance, grants Congress the "Power . . . [t]o regulate Commerce . . . with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. It also authorizes treaties and incorporates into federal law those treaties that were already made at

the Founding, including tribal treaties. *See id.* art. II, § 2, cl. 2; art. VI, cl. 2. As then-Judge Scalia thus observed, "Indians" are "a proper subject for separate legislation." *United States v. Cohen*, 733 F.2d 128, 139 (D.C. Cir. 1984) (en banc) (op. by Scalia, J.) (quoting *Antelope*, 430 U.S. at 649 n.11).

*Second*, tribal classifications are "political rather than racial." *Mancari*, 417 U.S. at 553 n.24. It is well established that "Indian tribes are 'distinct, independent political communities, retaining their original natural rights' in matters of . . . self-government." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 55 (1978) (quoting *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 559 (1832)). "They have the power to make their own substantive law in internal matters and to enforce that law in their own forums." *Id.* at 55–56 (internal citation omitted). And they "pre-exist[] the Constitution" itself. *Id.* at 56. Laws directed at tribal entities are thus equivalent to laws directed at foreign sovereigns, not laws that single out racial groups.[8]

*Third*, the "history of the Federal Government's relations with Indians" confirms the United States' ability to draw tribal classifications. *Antelope*, 430 U.S. at 645. Congress from the beginning has enacted legislation protecting Indians'

---

[8] The makeup of tribal entities, moreover, does not cleanly correlate with race. Tribal classifications "exclude many individuals who are racially . . . 'Indians.'" *Mancari*, 417 U.S. at 553 n.24. And they can include individuals who lack Native American ancestry. *E.g.*, Const. of the Kiowa Tribe art. IV, § 1(b) (extending membership to descendants of "Kiowa Captive[s]," which includes persons who are not racially Native American); *United States v. Rogers*, 45 U.S. (4 How.) 567, 572–73 (1846) (noting that "a white man" was "adopted in an Indian tribe").

9

lands, regulating their trade, punishing crimes against them, managing their resources, and providing education, housing, and healthcare—all in reliance on the principle that Congress may legislate specifically for Indians. *E.g.*, Act of July 22, 1790, ch. 33, §§ 1, 4–5, 1 Stat. 137, 137–38; 25 U.S.C. §§ 391, 1601, 2000, 3102. "If these laws, derived from historical relationships and explicitly designed to help only Indians, were deemed invidious racial discrimination, an entire Title of the United States Code (25 U.S.C.) would be effectively erased and the solemn commitment of the Government toward the Indians would be jeopardized." *Mancari*, 417 U.S. at 552.

2. Consistent with this distinction, the 8(a) Program sets forth different requirements for businesses owned by Indian tribes and ANCs than the requirements for businesses owned by individuals.

*First*, both Indian tribes and ANCs are considered socially disadvantaged by statute, and thus are not subject to the rebuttable presumption of social disadvantage at issue in this case. *See* 15 U.S.C. § 637(a)(4)(A)(i)(II), (a)(4)(A)(ii)(II), (a)(4)(B)(ii), (a)(13); *see also* 13 C.F.R. § 124.109(a), (b)(1), entitled "*Do Indian tribes and Alaska Native Corporations have any special rules for applying to and remaining eligible for the 8(a) BD program?*.

*Second*, ANCs that meet certain equity and voting requirements are "deemed economically disadvantaged under 43 U.S.C. [§] 91626(e) and need not establish economic disadvantage." *See* 13 C.F.R. § 124.109(a)(2).

*Third*, while tribes do have to demonstrate economic disadvantage, the standards for establishing economic disadvantage for tribes differ from those for

individuals. A tribe can demonstrate economic disadvantage by presenting data related to the tribal unemployment rate, the number of tribal members, the per capita income of tribal members, and other similar data, without any express thresholds to meet. 13 C.F.R. § 124.109(b)(2); *see also* 15 U.S.C. § 637(a)(6)(A) ("In determining the economic disadvantage of an Indian tribe, the Administration shall consider, where available, information such as the following: the per capita income of members of the tribe excluding judgment awards, the percentage of the local Indian population below the poverty level, and the tribe's access to capital markets."). An individual, by contrast, must submit financial information including income for the past three years, personal net worth, and the fair market value of all assets; if certain thresholds are exceeded, the individual will be deemed not economically disadvantaged. *See* 13 C.F.R. § 124.104(c).

*Fourth*, unlike businesses owned by individuals, "[o]nce an Indian Tribe establishes that it is economically disadvantaged in connection with the application for one Tribally-owned firm, it need not reestablish such status in order to have other businesses that it owns certified for [8(a) Program] participation, unless specifically requested to do so by the [SBA Associate Administrator, Office of Business Development]." 13 C.F.R. § 124.109(b).

*Fifth*, Indian tribes are exempt from the normal affiliation rules governing small businesses, such that a Tribally-owned firm's size is generally determined independently without regard to its affiliation with the tribe, any entity of the tribal government, or any other business enterprise owned by the tribe. 13 C.F.R.

§ 124.109(c)(2)(iii).  By contrast, businesses owned by a disadvantaged individual are subject to the SBA's standard rules governing size status, and multiple companies owned by the same individual will be deemed affiliated (and therefore their employee counts and/or revenue aggregated) for purposes of determining whether the business is small.  *See* 13 C.F.R. § 124.102(a).[9]

## II.    Plaintiff's requested relief improperly sweeps in tribal and ANC businesses

1.    In this case, Plaintiff challenges the use of the rebuttable presumption in identifying socially disadvantaged *individuals* for participation in the 8(a) Program.  *See* Complaint ¶ 18 (Mar. 4, 2020), ECF 1 (Compl.) (challenging the definitions in 13 C.F.R. § 124.103, which defines "'socially disadvantaged' *individuals*" and sets forth a rebuttable presumption of social disadvantage for such individuals (emphasis added)).  Plaintiff's legal theory is that "[b]y presuming that members of certain racial groups are socially disadvantaged, defendants and the Section 8(a) Program discriminate on the basis of race."  Compl. ¶ 41.  Nowhere, however, does Plaintiff challenge the *political* classifications of Indian tribes or ANCs as prescribed by statute in 15 U.S.C. § 637(a) and as set forth in regulation by 13 C.F.R. § 124.109.  Nor could it.

---

[9] These examples are not intended to encompass all differences between Indian tribes and individually-owned business who participate in the 8(a) Program.

Under the proper equal protection framework, *see* Section I, *supra*, the 8(a) Program is plainly constitutional as applied to Indian tribes and ANCs. Allowing tribal participation in the 8(a) Program is "tied rationally to the fulfillment of Congress' unique obligation toward the Indians," *Mancari*, 417 U.S. at 555, because it is "intended to benefit" them and "further[] the congressional policy of Indian self-government," *Fisher*, 424 U.S. at 391. Indeed, cases that considered similar tribal preferences have found that they easily survive equal protection scrutiny. *E.g.*, *AFL-CIO v. United States*, 330 F.3d 513, 516, 519 (D.C. Cir. 2003) (holding that regulation allowing Air Force to bypass usual procedure for awarding a civil engineering contract and grant the contract to a tribally owned firm did not violate equal protection); *Alaska Chapter, Associated Gen. Contractors of Am., Inc. v. Pierce*, 694 F.2d 1162, 1163 (9th Cir. 1982) (same for regulation implementing a preference to Indian-owned economic enterprises for contracts to build housing for Indians). Plaintiff has not argued otherwise; in fact, it has never even targeted the 8(a) Program's tribal provisions.[10]

Plaintiff nevertheless sought relief over the course of this litigation that impacts 8(a) contracts for Indian tribes and ANCs. For example, the Complaint sought "[i]njunctive relief precluding defendants from reserving NRCS [Natural Resources Conservation Service] contracts for the Section 8(a) Program." Compl. at

---

[10] For purposes of this brief, Amici's analysis is limited to the 8(a) provisions that apply to tribes and ANCs, not individual tribal members.

10 (Demand for Judgment (B)). And Plaintiff's Motion for Summary Judgment doubled down on the Complaint's "claim for declaratory relief and an injunction precluding defendants from reserving contracts for administrative and technical support to the 8(a) program" with no recognition of the separate eligibility for Indian tribes and ANCs. Pl.'s Mem. ISO Mot. for Summ. J. at 1 (June 21, 2022), ECF 60-2 (Mot. for Summ. J.).

Rather than accept such overbroad relief when it ruled on the parties' dueling motions for summary judgment, this Court properly tailored its remedy to the equal protection theory Plaintiff advanced. This Court declared *the rebuttable presumption* unconstitutional. *Ultima Servs.*, 2023 WL 4633481, at *18. And it enjoined defendants from using *that presumption. Id.*

In the motion now pending before this Court, Plaintiff again demands relief that is far broader than its legal theory permits. Plaintiff asks this Court for "an additional injunction protecting it from Section 8(a) set asides within the industry in which it participates, the administrative and technical support industry." Pl.'s Mem. of L. with Respect to Equitable Relief at 6 (Sept. 15, 2023), Dkt. 93-1; *id.* at 9 (Plaintiff is seeking "an order precluding defendants from using the 8(a) Program in her industry"); *id.* at 12 (asking the court to "enjoin defendants from using the Section 8(a) Program in the administrative and technical support industry"). Plaintiff further requests "a temporary halt to contract approvals until its application for resolution of the scope of the July 19 injunction and its request for additional equitable relief is resolved." *Id.* at 6–7.

The relief requested in Plaintiff's motion fails to distinguish between contracts awarded to *individuals*—the part of the 8(a) Program that Plaintiff challenges and that employs the rebuttable presumption—from contracts awarded to Indian tribes and ANCs—which do not involve the rebuttable presumption. *See* 13 C.F.R. § 124.109.[11] To the extent it applies to contracts unaffected by the challenged rebuttable presumption for individuals, the broad scope of the relief Plaintiff demands is improper.

2. Article III principles dictate that "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018); *Lewis v. Casey*, 518 U.S. 343, 357 (1996) (explaining that permitting a remedy that sweeps further than a plaintiff's injury would undermine the purpose of the "actual-injury requirement" of the standing inquiry, which is to "prevent[] courts from undertaking tasks assigned to the political branches").

The particular injury of which Plaintiff complains is premised on an alleged race-based classification, not any political classification, and Plaintiff complains of the Program as it pertains to individually-owned (not tribally- or ANC-owned) businesses. Plaintiff's legal theory is that "[b]y presuming that members of certain

---

[11] It its brief in support of its Motion for Summary Judgment, Plaintiff acknowledges that "[t]he rules for entity-owned companies differ from those for businesses owned by individuals." Mot. for Summ. J. at 10 (noting that "Indian tribes (including ANCs) and NHOs are deemed socially disadvantaged"). However, Plaintiff never accounts for these differences in its requests for relief.

racial groups are socially disadvantaged, defendants and the Section 8(a) Program *discriminate on the basis of race.*" Compl. ¶ 41 (emphasis added); *see also id.* ¶ 44 (alleging that "defendants' *race discrimination* in the Section 8(a) Program violates the Fifth Amendment to the United States Constitution" (emphasis added)).

Indeed, throughout both the Complaint and its subsequent filings, Plaintiff makes clear that the theory of the case is premised on race-based distinctions. *See* Compl. ¶ 31 ("Even assuming there was evidence of underrepresentation *of particular racial groups* in the administrative and/or technical support service industry, defendants have no evidence that such underrepresentation was a consequence of discrimination either by the federal government or in which the federal government was a passive participant." (emphasis added)); *id.* ¶ 32 ("In amending Section 8(a) of the Small Business Act in 1978, Congress did not have any evidence that any underrepresentation of *particular racial groups* in federal government contracting was a consequence of discrimination either by the federal government or in which the federal government was a passive participant." (emphasis added)).[12]

_____

[12] *Id.* ¶ 35 ("USDA has had a racial motive in reserving NRCS administrative and/or technical support service contracts for the Section 8(a) Program."); *id.* ¶ 38 ("As operated by the SBA, the Section 8(a) Program has no criteria by which the SBA can determine that specific racial groups should no longer have its members presumed to be socially disadvantaged."); Pl.'s Mem. in Opp'n to Defs.' Mot to Dismiss at 7 (July 31, 2020), ECF 25 ("the Complaint alleges that defendants have a racial motive in using the Section 8(a) Program"); *id.* at 3 (explaining that the Complaint "alleges that the USDA has had a racial motive in utilizing the Section 8(a) Program for contracts in Ultima's industry"); *see also* Mot. for Summ. J. at 20 (continually

To the extent this Court concludes that Plaintiff is entitled to a remedy, that remedy "must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Lewis*, 518 U.S. at 357; *Kentucky v. Yellen*, 54 F.4th 325, 341 n.12 (6th Cir. 2022) (same); *see also E. Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019) ("An injunction must be narrowly tailored to remedy the specific harm shown." (internal quotation mark omitted)).

As the Sixth Circuit recently recognized, "when a plaintiff has been injured by one part of a law, the plaintiff cannot invoke that injury to challenge other parts of the law that have done nothing to the plaintiff." *Davis v. Colerain Twp.*, No. 21-3723, 2022 WL 4351074, at *3 (6th Cir. Sept. 20, 2022); *see also Ass'n of Am. Physicians & Surgeons v. U.S. Food & Drug Admin.*, 13 F.4th 531, 540 (6th Cir. 2021) ("a plaintiff cannot 'combin[e] a request for injunctive relief for which he has standing with a request for injunctive relief for which he lacks standing'" (quoting *Salazar v. Buono*, 559 U.S. 700, 731 (2010) (Scalia, J., concurring in the judgment))). Here, Plaintiff cannot combine injunctive relief related to the rebuttable presumption for individuals with an injunction that halts the Program's application to Indian tribes and ANCs. A federal court's equitable powers do not sweep so far as to over an injunction that chokes an entirely separate arm of the 8(a) Program that is not covered by Plaintiff's

referring to the rebuttable presumption as a "racial presumption" or "racial preference"); Pl.'s Resp. in Opp'n to Defs.' Mot. for Summ. J. at 17, 33 (July 12, 2022), ECF 70 (calling the rebuttable presumption a "racially-preferential presumption" and the 8(a) Program a "racially-discriminatory program").

legal theory. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006) (plaintiffs' injury "with respect to their municipal taxes, . . . does not entitle them to seek a remedy as to the state taxes"); *accord Trump v. United States*, No. 22-13005, 2022 WL 4366684 (11th Cir. Sept. 21, 2022) (finding abuse of discretion in exercise of equitable jurisdiction in connection with criminal investigation).

Amici ask this Court to apply the same restraint in connection with the present motion that it applied when it ruled on the parties' motions for summary judgment. Because none of Plaintiff's theories implicate Indian tribes or ANCs, any relief granted in response to the pending motion should not impact tribal or ANC 8(a) contracts.

*      *      *

A final note: Both parties have improperly burdened Indian tribes and ANCs in their approach to this case.[13]

In response to this Court's injunction at summary judgment—which enjoined the Defendants "from using *the rebuttable presumption* of social disadvantage in administering Defendant SBA's 8(a) program," *Ultima*, 2023 WL 4633481, at *18— SBA has suspended all new 8(a) application submissions while it revises the application questionnaire to comply with the Court's decision, including those from

---

[13] For that reason, Amici submit this brief in support of neither party.

18

Indian tribes and ANCs.[14]  Because Indian tribes and ANCs are not subject to the rebuttable presumption, the Court's existing injunction plainly does not prohibit the Defendants from accepting 8(a) submissions from Indian tribes and ANCs.  Amici ask that this Court remain aware of the different certification process for Indian tribes and ANCs, and treat with skepticism any position (from either party) that obscures this distinction.

## CONCLUSION

For the foregoing reasons, Amici respectfully ask this Court to deny Plaintiffs' motion to the extent it seeks relief not directed at the 8(a) Program's rebuttable presumption.

---

[14] *See* Small Business Administration, https://certify.sba.gov/ (last visited Sept. 27, 2023) ("On July 19, 2023, the United States District Court for the Eastern District of Tennessee enjoined SBA from applying a rebuttable presumption of social disadvantage to individuals of certain racial groups applying to the 8(a) Business Development program.  SBA has temporarily suspended new 8(a) application submissions to comply with the Court's decision.").

Dated: September 29, 2023

Respectfully submitted,

/s/ Benjamin K. Raybin

Charlie Galbraith*
Michelle S. Kallen*
Leonard R. Powell*
JENNER & BLOCK LLP
1099 New York Ave NW, Suite 900
Washington, DC 20001
(202) 639-6000
cgalbraith@jenner.com
mkallen@jenner.com
leonardpowell@jenner.com
*Pro hac vice applications forthcoming

Benjamin K. Raybin (TN BPR #29350)
RAYBIN & WEISSMAN, P.C.
424 Church Street, Suite 2120
Nashville, Tennessee 37219
(615) 256-6666
BRaybin@NashvilleTNLaw.com

*Counsel for Amici Curiae*

20