# SBIC POOLED DEBENTURE PREPAYMENT SCHEDULE THROUGH MARCH 10, 2024 (unaudited and subject to revision and update)

| POOL SERIES | PREPAYMENT PENALTY FEATURE | CUSIP | ISSUE DATE | MATURITY DATE | COUPON | NUMBER OF SBIC | NUMBER OF DEBENTURES | ORIGINAL PRINCIPAL | ACCELERATION PAYMENTS | ACCELERATION PAYMENTS PAID AT MATURITY | VOLUNTARY PREPAYMENTS | CURRENT POOL SIZE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1986-A | yes | 831641AA3 | 9/24/1986 | 9/1/1996 | 8.750% | 36 | 36 | $67,190,000 | $0 | | $25,700,000 | MATURED |
| 1987-A | yes | 831641AB1 | 2/4/1987 | 2/1/1997 | 7.950% | 25 | 25 | $49,230,000 | $30,000,000 | | $7,020,000 | MATURED |
| 1987-B | yes | 831641AC9 | 4/29/1987 | 4/1/1997 | 8.950% | 10 | 10 | $37,950,000 | $5,600,000 | | $3,350,000 | MATURED |
| 1987-C | yes | 831641AD7 | 9/29/1987 | 9/1/1997 | 10.350% | 35 | 39 | $84,170,000 | $34,690,000 | | $41,560,000 | MATURED |
| 1988-10A | yes | 831641AE5 | 2/17/1988 | 2/1/1998 | 8.850% | 16 | 20 | $19,610,000 | $8,250,000 | $1,000,000 | $5,260,000 | MATURED |
| 1988-10B | yes | 831641AG0 | 6/8/1988 | 6/1/1998 | 9.800% | 19 | 23 | $54,905,000 | $21,605,000 | | $24,150,000 | MATURED |
| 1988-10A | yes | 831641AJ4 | 9/28/1988 | 9/1/1998 | 9.625% | 13 | 18 | $19,710,000 | $7,500,000 | | $4,950,000 | MATURED |
| 1988-10B | yes | 831641AK1 | 12/21/1988 | 12/1/1998 | 9.750% | 7 | 7 | $9,500,000 | $5,500,000 | | $1,200,000 | MATURED |
| 1989-10A | yes | 831641AL9 | 3/21/1989 | 3/1/1999 | 10.050% | 5 | 5 | $9,500,000 | $1,750,000 | | $0 | MATURED |
| 1989-10B | yes | 831641AM7 | 6/20/1989 | 6/1/1999 | 8.950% | 11 | 12 | $10,250,000 | $4,950,000 | | $0 | MATURED |
| 1989-10C | yes | 831641AP0 | 9/27/1989 | 9/1/1999 | 8.800% | 13 | 19 | $19,760,000 | $6,810,000 | | $2,000,000 | MATURED |
| 1989-10A | yes | 831641AQ8 | 12/20/1989 | 12/1/1999 | 8.600% | 7 | 7 | $18,400,000 | $16,750,000 | | $0 | MATURED |
| 1990-10A | yes | 831641AR6 | 3/29/1990 | 3/1/2000 | 9.350% | 7 | 7 | $11,080,000 | $2,500,000 | | $6,580,000 | MATURED |
| 1990-10B | yes | 831641AS4 | 6/27/1990 | 6/1/2000 | 9.300% | 12 | 16 | $12,390,000 | $4,210,000 | | $1,000,000 | MATURED |
| 1990-10C | yes | 831641AT2 | 9/26/1990 | 9/1/2000 | 9.600% | 10 | 11 | $17,460,000 | $5,260,000 | | $5,600,000 | MATURED |
| 1990-10D | yes | 831641AU7 | 12/19/1990 | 12/1/2000 | 8.700% | 6 | 10 | $20,240,000 | $2,000,000 | | $7,140,000 | MATURED |
| 1991-10A | yes | 831641AW5 | 3/27/1991 | 3/1/2001 | 8.850% | 7 | 7 | $6,100,000 | $550,000 | | $900,000 | MATURED |
| 1991-10B | yes | 831641AX3 | 6/26/1991 | 6/1/2001 | 9.080% | 12 | 12 | $27,380,000 | $8,140,000 | $2,000,000 | $1,600,000 | MATURED |
| 1991-10C | yes | 831641AY1 | 9/25/1991 | 9/1/2001 | 8.330% | 10 | 10 | $13,460,000 | $600,000 | | $2,250,000 | MATURED |
| 1991-10D | yes | 831641AZ8 | 12/17/1991 | 12/1/2001 | 7.890% | 8 | 8 | $17,740,000 | $8,640,000 | | $6,500,000 | MATURED |
| 1992-10A | yes | 831641BA2 | 3/25/1992 | 3/1/2002 | 8.250% | 8 | 9 | $7,920,000 | $3,290,000 | | $1,800,000 | MATURED |
| 1992-10B | yes | 831641BC8 | 6/24/1992 | 6/1/2002 | 8.000% | 9 | 9 | $19,390,000 | $3,500,000 | | $6,590,000 | MATURED |
| 1992-10C | yes | 831641BD6 | 9/23/1992 | 9/1/2002 | 7.150% | 8 | 18 | $21,300,000 | $2,000,000 | | $17,400,000 | MATURED |
| 1992-10D | yes | 831641BE4 | 12/16/1992 | 12/1/2002 | 7.510% | 8 | 8 | $13,160,000 | $2,000,000 | | $5,000,000 | MATURED |
| 1993-10A | yes | 831641BF1 | 3/24/1993 | 3/1/2003 | 6.800% | 9 | 9 | $24,890,000 | $9,420,000 | | $5,000,000 | MATURED |
| 1993-10B | yes | 831641BG9 | 6/22/1993 | 6/1/2003 | 6.590% | 5 | 5 | $15,960,000 | $150,000 | | $10,000,000 | MATURED |
| 1993-10C | yes | 831641BH7 | 9/22/1993 | 9/1/2003 | 6.120% | 8 | 11 | $20,370,000 | $0 | | $11,250,000 | MATURED |
| 1993-10D | yes | 831641BJ3 | 12/15/1993 | 12/1/2003 | 6.350% | 6 | 7 | $14,750,000 | $4,650,000 | | $9,100,000 | MATURED |
| 1994-10A | yes | 831641BK0 | 3/30/1994 | 3/1/2004 | 7.100% | 4 | 4 | $6,650,000 | $0 | | $5,150,000 | MATURED |
| 1994-10B | yes | 831641BL8 | 6/29/1994 | 6/1/2004 | 7.800% | 5 | 5 | $19,180,000 | $0 | | $16,180,000 | MATURED |
| 1994-10C | yes | 831641BM6 | 9/28/1994 | 9/1/2004 | 8.200% | 13 | 14 | $67,190,000 | $17,000,000 | $15,000,000 | $47,790,000 | MATURED |
| 1994-10D | yes | 831641BN4 | 12/20/1994 | 12/1/2004 | 8.500% | 4 | 4 | $25,070,000 | $0 | | $25,070,000 | MATURED |
| 1995-10A | yes | 831641BQ7 | 3/29/1995 | 3/1/2005 | 7.840% | 6 | 6 | $13,700,000 | $0 | | $13,700,000 | MATURED |
| 1995-10B | yes | 831641BS3 | 6/28/1995 | 6/1/2005 | 6.690% | 4 | 6 | $25,220,000 | $3,100,000 | $3,100,000 | $22,120,000 | MATURED |
| 1995-10C | yes | 831641BU8 | 9/27/1995 | 9/1/2005 | 6.875% | 22 | 28 | $64,030,000 | $2,380,000 | | $60,590,000 | MATURED |
| 1995-10D | yes | 831641BW4 | 12/14/1995 | 12/1/2005 | 6.540% | 14 | 14 | $24,610,000 | $7,180,000 | | $8,230,000 | MATURED |
| 1996-10A | yes | 831641BY0 | 3/14/1996 | 3/1/2006 | 7.080% | 7 | 7 | $23,960,000 | $2,600,000 | | $21,360,000 | MATURED |
| 1996-10B | yes | 831641CA1 | 6/26/1996 | 6/1/2006 | 7.710% | 11 | 11 | $36,870,000 | $5,400,000 | | $23,970,000 | MATURED |
| 1996-10C | yes | 831641CC7 | 9/25/1996 | 9/1/2006 | 7.590% | 10 | 10 | $29,030,000 | $0 | | $21,430,000 | MATURED |
| 1996-10D | yes | 831641CE3 | 12/18/1996 | 12/1/2006 | 7.080% | 15 | 15 | $43,940,000 | $8,320,000 | | $33,100,000 | MATURED |
| 1997-10A | yes | 831641CG8 | 3/26/1997 | 3/1/2007 | 7.380% | 7 | 7 | $21,385,000 | $6,225,000 | | $6,140,000 | MATURED |
| 1997-10B | yes | 831641CJ2 | 6/25/1997 | 6/1/2007 | 7.070% | 8 | 8 | $29,220,000 | $15,730,000 | | $11,540,000 | MATURED |
| 1997-10C | yes | 831641CL7 | 9/24/1997 | 9/1/2007 | 6.760% | 8 | 8 | $30,980,000 | $12,100,000 | | $17,360,000 | MATURED |
| 1997-10D | yes | 831641CN3 | 12/17/1997 | 12/1/2007 | 6.550% | 13 | 13 | $29,650,000 | $7,150,000 | | $16,000,000 | MATURED |
| 1998-10A | yes | 831641CQ6 | 3/25/1998 | 3/1/2008 | 6.320% | 17 | 19 | $67,340,000 | $30,500,000 | $6,000,000 | $29,840,000 | MATURED |
| 1998-10B | yes | 831641CS2 | 6/23/1998 | 6/1/2008 | 5.940% | 13 | 20 | $27,135,000 | $12,135,000 | $1,000,000 | $15,000,000 | MATURED |
| 1999-10A | yes | 831641CW3 | 3/24/1999 | 3/1/2009 | 6.240% | 22 | 34 | $76,350,000 | $42,500,000 | | $27,400,000 | MATURED |
| 1999-10B | yes | 831641CY9 | 9/29/1999 | 9/1/2009 | 7.220% | 29 | 52 | $98,900,000 | $43,250,000 | $1,500,000 | $53,650,000 | MATURED |
| 2000-10A | yes | 831641DA0 | 3/29/2000 | 3/1/2010 | 7.640% | 33 | 85 | $154,585,000 | $45,075,000 | | $109,510,000 | MATURED |
| 2000-10B | yes | 831641DC6 | 9/27/2000 | 9/1/2010 | 7.452% | 32 | 78 | $127,460,000 | $22,590,000 | | $104,870,000 | MATURED |

**SBIC POOLED DEBENTURE PREPAYMENT SCHEDULE THROUGH MARCH 10, 2024 (unaudited and subject to revision and update)**

| POOL SERIES | PREPAYMENT PENALTY FEATURE | CUSIP | ISSUE DATE | MATURITY DATE | COUPON | NUMBER OF SBICs | NUMBER OF DEBENTURES | ORIGINAL PRINCIPAL | ACCELERATION PAYMENTS | ACCELERATION PAYMENTS PAID AT MATURITY | VOLUNTARY PREPAYMENTS | CURRENT POOL SIZE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2001-10A | yes | 831641DE3 | 3/28/2001 | 3/1/2011 | 6.353% | 42 | 93 | $133,845,000 | $50,850,000 | $2,000,000 | $83,995,000 | MATURED |
| 2001-10B | yes | 831641DG7 | 9/26/2001 | 9/1/2011 | 5.886% | 41 | 81 | $192,535,000 | $48,780,000 | $0 | $140,955,000 | MATURED |
| 2002-10A | yes | 831641DJ1 | 3/27/2002 | 3/1/2012 | 6.343% | 44 | 84 | $148,280,000 | $32,720,000 | $0 | $113,560,000 | MATURED |
| 2002-10B | yes | 831641DL6 | 9/25/2002 | 9/1/2012 | 4.670% | 43 | 97 | $140,775,000 | $21,060,000 | $0 | $118,215,000 | MATURED |
| 2003-10A | yes | 831641DN2 | 3/26/2003 | 3/1/2013 | 4.628% | 43 | 95 | $151,985,000 | $69,920,000 | $4,050,000 | $51,015,000 | MATURED |
| 2003-10B | yes | 831641DR3 | 9/24/2003 | 9/1/2013 | 4.875% | 43 | 118 | $153,485,000 | $31,105,000 | $1,300,000 | $114,690,000 | MATURED |
| 2004-10A | yes | 831641DT9 | 3/24/2004 | 3/1/2014 | 4.120% | 45 | 117 | $184,520,000 | $39,565,000 | $0 | $135,955,000 | MATURED |
| 2004-10B | yes | 831641DV4 | 9/22/2004 | 9/1/2014 | 4.684% | 43 | 152 | $254,320,000 | $24,690,000 | $0 | $230,930,000 | MATURED |
| 2005-10A | yes | 831641DX0 | 3/23/2005 | 3/1/2015 | 5.038% | 38 | 107 | $204,800,000 | $27,100,000 | $0 | $165,450,000 | MATURED |
| 2005-10B | yes | 831641DZ5 | 9/28/2005 | 9/1/2015 | 4.941% | 34 | 113 | $197,095,000 | $14,800,000 | $0 | $161,120,000 | MATURED |
| 2006-10A | yes | 831641EB7 | 3/22/2006 | 3/1/2016 | 5.535% | 34 | 102 | $185,470,000 | $11,150,000 | $0 | $172,320,000 | MATURED |
| 2006-10B | yes | 831641ED3 | 9/27/2006 | 9/1/2016 | 5.376% | 28 | 88 | $198,475,000 | $13,150,000 | $0 | $159,545,000 | MATURED |
| 2007-10A | no | 831641EF8 | 3/28/2007 | 3/1/2017 | 5.376% | 34 | 136 | $240,295,000 | $15,800,000 | $0 | $224,495,000 | MATURED |
| 2007-10B | no | 831641EJ0 | 9/26/2007 | 9/1/2017 | 5.528% | 29 | 111 | $238,295,000 | $21,245,000 | $0 | $217,050,000 | MATURED |
| 2008-10A | no | 831641EL5 | 3/26/2008 | 3/1/2018 | 5.471% | 36 | 140 | $289,550,000 | $21,805,000 | $0 | $267,745,000 | MATURED |
| 2008-10B | no | 831641EN1 | 9/24/2008 | 9/1/2018 | 5.729% | 38 | 156 | $360,745,000 | $44,425,000 | $0 | $316,320,000 | MATURED |
| 2009-10A | no | 831641EQ4 | 3/25/2009 | 3/1/2019 | 4.620% | 45 | 160 | $261,620,000 | $31,280,000 | $0 | $230,340,000 | MATURED |
| 2009-10B | no | 831641ER2 | 9/23/2009 | 9/1/2019 | 4.233% | 42 | 183 | $319,020,000 | $36,530,000 | $8,500,000 | $262,570,000 | MATURED |
| 2010-10A | no | 831641ES0 | 3/24/2010 | 3/1/2020 | 4.108% | 51 | 173 | $339,035,000 | $56,525,000 | $0 | $282,510,000 | MATURED |
| 2010-10B | no | 831641ET8 | 9/22/2010 | 9/1/2020 | 3.215% | 54 | 217 | $562,985,000 | $80,035,000 | $1,900,000 | $443,350,000 | MATURED |
| 2011-10A | no | 831641EU5 | 3/29/2011 | 3/1/2021 | 4.084% | 60 | 312 | $822,685,000 | $87,950,000 | $0 | $690,235,000 | MATURED |
| 2011-10B | no | 831641EV3 | 9/21/2011 | 9/1/2021 | 2.877% | 49 | 261 | $558,685,000 | $12,750,000 | $0 | $545,935,000 | MATURED |
| 2012-10A | no | 831641EW1 | 3/21/2012 | 3/1/2022 | 2.766% | 51 | 242 | $571,165,000 | $17,210,000 | $0 | $553,505,000 | MATURED |
| 2012-10B | no | 831641EY7 | 9/19/2012 | 9/1/2022 | 2.245% | 66 | 349 | $802,260,000 | $15,350,000 | $0 | $782,160,000 | MATURED |
| 2013-10A | no | 831641EZ4 | 3/27/2013 | 3/1/2023 | 2.351% | 66 | 458 | $1,063,910,000 | $69,940,000 | $2,750,000 | $972,970,000 | MATURED |
| 2013-10B | no | 831641FA8 | 9/25/2013 | 9/1/2023 | 3.644% | 65 | 294 | $622,505,000 | $11,000,000 | $0 | $611,505,000 | MATURED |
| 2014-10A | no | 831641FB6 | 3/26/2014 | 3/1/2024 | 3.191% | 78 | 478 | $996,205,000 | $10,825,000 | $0 | $919,080,000 | MATURED |
| 2014-10B | no | 831641FC4 | 9/24/2014 | 9/1/2024 | 3.015% | 77 | 484 | $1,007,590,000 | $35,680,000 | $0 | $950,910,000 | $21,000,000 |
| 2015-10A | no | 831641FE0 | 3/25/2015 | 3/1/2025 | 2.517% | 84 | 537 | $1,159,625,000 | $59,305,000 | $0 | $1,014,820,000 | $85,500,000 |
| 2015-10B | no | 831641FF7 | 9/23/2015 | 9/1/2025 | 2.829% | 90 | 574 | $1,192,235,000 | $17,120,000 | $0 | $1,078,270,000 | $96,845,000 |
| 2016-10A | no | 831641FG5 | 3/23/2016 | 3/1/2026 | 2.507% | 87 | 577 | $1,106,500,000 | $40,360,000 | $0 | $960,770,000 | $105,370,000 |
| 2016-10B | no | 831641FH3 | 9/21/2016 | 9/1/2026 | 2.051% | 76 | 467 | $992,955,000 | $23,810,000 | $0 | $792,610,000 | $176,530,000 |
| 2017-10A | no | 831641FJ9 | 3/29/2017 | 3/1/2027 | 2.845% | 82 | 495 | $1,071,645,000 | $8,400,000 | $0 | $890,235,000 | $173,010,000 |
| 2017-10B | no | 831641FK6 | 9/20/2017 | 9/1/2027 | 2.518% | 66 | 396 | $854,630,000 | $3,000,000 | $0 | $533,355,000 | $318,275,000 |
| 2018-10A | no | 831641FL4 | 3/21/2018 | 3/1/2028 | 3.187% | 72 | 432 | $1,086,275,000 | $18,000,000 | $0 | $864,945,000 | $203,330,000 |
| 2018-10B | no | 831641FM2 | 9/19/2018 | 9/1/2028 | 3.548% | 74 | 409 | $923,050,000 | $0 | $0 | $615,055,000 | $307,995,000 |
| 2019-10A | no | 831641FN0 | 3/20/2019 | 3/1/2029 | 3.113% | 70 | 399 | $986,840,000 | $0 | $0 | $552,305,000 | $434,535,000 |
| 2019-10B | no | 831641FP5 | 9/25/2019 | 9/1/2029 | 2.283% | 63 | 436 | $991,595,000 | $7,465,000 | $0 | $240,525,000 | $743,605,000 |
| 2020-10A | no | 831641FQ3 | 3/25/2020 | 3/1/2030 | 2.078% | 64 | 389 | $1,007,335,000 | $15,320,000 | $0 | $156,365,000 | $835,650,000 |
| 2020-10B | no | 831641FR1 | 9/23/2020 | 9/1/2030 | 1.034% | 57 | 285 | $685,450,000 | $4,350,000 | $0 | $10,010,000 | $671,090,000 |
| 2021-10A | no | 831641FS9 | 3/24/2021 | 3/1/2031 | 1.667% | 68 | 423 | $1,095,675,000 | $52,900,000 | $0 | $87,735,000 | $955,040,000 |
| 2021-10B | no | 831641FT7 | 9/22/2021 | 9/1/2031 | 1.304% | 74 | 524 | $1,360,355,000 | $6,400,000 | $0 | $2,350,000 | $1,351,605,000 |
| 2022-10A | no | 831641FU4 | 3/23/2022 | 3/1/2032 | 2.938% | 86 | 730 | $2,077,850,000 | $0 | $0 | $27,215,000 | $2,050,635,000 |
| 2022-10B | no | 831641FU4 | 9/21/2022 | 9/1/2032 | 4.262% | 72 | 456 | $1,276,565,000 | $0 | $0 | $59,605,000 | $1,216,960,000 |
| 2023-10A | no | 83162CS79 | 3/20/2023 | 3/1/2033 | 5.168% | 87 | 588 | $1,737,675,000 | $0 | $0 | $71,855,000 | $1,665,820,000 |



# SBA's "8(a) Program":
# Overview, History, and Current Issues

Updated July 29, 2022

**Congressional Research Service**
https://crsreports.congress.gov
R44844

Case 2:20-cv-00041-DCLC-CRW    Document 105-2    Filed 09/27/24    Page 3 of 78
PageID #: 3512

# Summary

The 8(a) Business Development Program—commonly known as the "8(a) Program"—provides participating small businesses with training, technical assistance, and contracting opportunities in the form of set-aside and sole-source awards. A *set-aside* award is a contract in which only certain contractors may compete, whereas a *sole-source* award is a contract awarded, or proposed for award, without competition. In FY2021, 8(a) firms were awarded $34.4 billion in federal contracts, including $8.7 billion in 8(a) set-aside awards and $11.3 billion in 8(a) sole-source awards. Other programs provide similar assistance to other types of small businesses (e.g., women-owned, HUBZone, and service-disabled veteran-owned).

8(a) Program eligibility is generally limited to small businesses "unconditionally owned and controlled by one or more socially and economically disadvantaged individuals who are of good character and citizens of and residing in the United States" that demonstrate "potential for success."

Members of certain racial and ethnic groups are presumed to be *socially disadvantaged*, although individuals who do not belong to these groups may prove they are also socially disadvantaged.

To be economically disadvantaged, an individual must have a net worth of less than $750,000 (excluding ownership interest in the applicant's business, equity in their primary personal residence, and funds invested in an official retirement account), no more than $350,000 in average adjusted gross income over the preceding three years, and no more than $6 million in assets (excluding funds invested in an official retirement account).

In determining whether an applicant has *good character*, the SBA takes into account any criminal conduct, violations of SBA regulations, or debarment or suspension from federal contracting. For a firm to demonstrate *potential for success*, it generally must have been in business in its primary industry classification for two years immediately prior to applying to the program. However, small businesses owned by Alaska Native Corporations, Community Development Corporations, Indian tribes, and Native Hawaiian Organizations are eligible to participate in the 8(a) Program under somewhat different terms. Each of these terms is further defined by the Small Business Act, Small Business Administration (SBA) regulations, and judicial and administrative decisions.

This report examines the 8(a) Program's historical development, key requirements, administrative structures and operations, and the SBA's oversight of 8(a) firms. It also discusses two SBA programs designed to support 8(a) firms, the 7(j) Management and Technical Assistance Program and the All Small Mentor-Protégé Program, and provides various program statistics. It concludes with an analysis of the following current 8(a) Program issues:

- Reported deficiencies in the oversight of 8(a) Program participant's continuing eligibility.
- Disagreements concerning the financial thresholds used to determine economic disadvantage.
- The adequacy of the program's performance measures.

Case 2:20-cv-00041-DCLC-CRW    Document 105-2    Filed 09/27/24    Page 4 of 78
PageID #: 3513

# Contents

Introduction ........................................................................................................................ 1

Historical Development ...................................................................................................... 3

  Program Origins ................................................................................................................ 3

    Federal Programs for Small Businesses ...................................................................... 3

    Federal Programs for Racial and Ethnic Minorities .................................................. 4

    1978 Amendments to the Small Business Act and Subsequent Regulations .............. 5

  Adding "Disadvantaged" Groups ..................................................................................... 8

Program Requirements ....................................................................................................... 9

  General Requirements ..................................................................................................... 10

    Program Eligibility .................................................................................................... 10

    Set-Asides and Sole-Source Awards Under Section 8(a) .......................................... 13

    Other Requirements .................................................................................................. 16

  Requirements for Tribally, ANC-, NHO-, and CDC-Owned Firms .................................. 18

    Program Eligibility .................................................................................................... 18

    Set-Asides and Sole-Source Awards ......................................................................... 21

    Other Requirements .................................................................................................. 22

Organizational Structure .................................................................................................. 23

The Application Process .................................................................................................... 24

Business Opportunity Specialists and Reporting Requirements ......................................... 27

7(j) Management and Technical Assistance Program .......................................................... 30

All Small Mentor-Protégé Program .................................................................................. 31

Program Statistics ............................................................................................................ 33

Current Issues .................................................................................................................. 36

    Oversight of 8(a) Program Participant's Continuing Eligibility ............................... 36

    Financial Thresholds for Economically Disadvantaged Status .................................. 38

    Measuring Program Success ...................................................................................... 39

# Tables

Table 1. Groups Presumed to Be Socially Disadvantaged ................................................... 6

Table 2. 7(j) Management and Technical Assistance Program Statistics, FY2010-FY2021 ......... 31

Table 3. 8(a) Program Statistics, Selected Years ................................................................ 33

Table 4. Federal Contract Amount Awarded to 8(a) Firms, by Award Type, FY2010-
  FY2021 ......................................................................................................................... 35

Table A-1. Requirements for Different Types of 8(a) Firms ................................................ 43

# Appendixes

Appendix. Comparison of the Requirements Pertaining to Different Types of 8(a) Firms ........... 43

# Contacts

Author Information..................................................................................................................... 48

Case 2:20-cv-00041-DCLC-CRW    Document 105-2    Filed 09/27/24    Page 6 of 78
PageID #: 3515

# Introduction

The 8(a) Business Development Program—commonly known as the "8(a) Program"—provides participating small businesses with training and technical assistance designed to enhance their ability to compete effectively in the private marketplace.[1] One of the program's major benefits is that 8(a) firms can receive federal contracting preferences in the form of set-aside and sole-source awards. A *set-aside* award is a contract in which only certain contractors may compete, whereas a *sole-source* award is a contract awarded, or proposed for award, without competition. As a business development program, its overall goal is for 8(a) firms to graduate from the program and continue to do well in a competitive business environment.

8(a) Program eligibility is generally limited to small businesses which are "unconditionally owned and controlled by one or more socially and economically disadvantaged individuals who are of good character and citizens of and residing in the United States" and demonstrate "potential for success."[2] However, small businesses owned by Alaska Native Corporations (ANCs), Community Development Corporations (CDCs), Indian tribes, and Native Hawaiian Organizations (NHOs) are also eligible to participate in the 8(a) Program under somewhat different terms. In FY2021, the federal government awarded $34.4 billion to 8(a) firms:

- nearly $20 billion was awarded with an 8(a) preference ($8.7 billion through an 8(a) set-aside and $11.3 billion through an 8(a) sole-source award);
- $7.8 billion was awarded with another small business preference (e.g., set-asides and sole-source awards for small businesses generally and for HUBZone firms, women-owned small businesses, and service-disabled veteran-owned small businesses); and
- $6.6 billion was awarded to an 8(a) firm in open competition with other firms or through some other award mechanism.[3]

Other programs provide similar assistance to other types of small businesses (e.g., women-owned, HUBZone, and service-disabled veteran-owned).

Congress has a perennial interest in small business programs, including the 8(a) Program. As stated in the Small Business Act

> It is the declared policy of the Congress that the Government should aid, counsel, assist, and protect, insofar as is possible, the interests of small-business concerns in order to preserve free competitive enterprise, to insure that a fair proportion of the total purchases and contracts or subcontracts for property and services for the Government (including but not limited to contracts or subcontracts for maintenance, repair, and construction) be placed with small-business enterprises, to insure that a fair proportion of the total sales of

---

[1] The 8(a) Program takes its name from one of the sections of the Small Business Act that authorizes it. The program is also governed by Section 7(j) of the act. The Clinton Administration changed the program's name from the Minority Small Business and Capital Ownership Development Program to the 8(a) Business Development program in 1988 "to emphasize that individuals need not be members of minority groups and to stress the importance of assisting participating firms in their overall business development." See SBA, "Small Business Size Regulations: 8(a) Business Development/Small Disadvantaged Business Status Determinations; Rules of Procedure Governing Cases Before the Office of Hearings and Appeals," 63 *Federal Register* 35727, June 30, 1998.

[2] 13 C.F.R. §124.101.

[3] Data generated using U.S. General Services Administration (GSA), "Sam.Gov data bank," July 26, 2021, at https://sam.gov/reports/awards/adhoc.

Case 2:20-cv-00041-DCLC-CRW     Document 105-2     Filed 09/27/24     Page 7 of 78
PageID #: 3516

Government property be made to such enterprises, and to maintain and strengthen the overall economy of the Nation.[4]

The Small Business Act also indicates "that the opportunity for full participation in our free enterprise system by socially and economically disadvantaged persons is essential if we are to obtain social and economic equality for such persons and improve the functioning of our national economy."[5] To help achieve these goals, the 8(a) Program's stated statutory purposes are to

(A) promote the business development of small business concerns owned and controlled by socially and economically disadvantaged individuals so that such concerns can compete on an equal basis in the American economy;

(B) promote the competitive viability of such concerns in the marketplace by providing such available contract, financial, technical, and management assistance as may be necessary; and

(C) clarify and expand the program for the procurement by the United States of articles, supplies, services, materials, and construction work from small business concerns owned by socially and economically disadvantaged individuals.[6]

Recent Congresses have had particular interest in the 8(a) Program largely because of its effects on minority-owned small businesses and small businesses' overall role in job creation.[7]

8(a) business development assistance has many forms, including business counseling and mentoring, both in online and traditional face-to-face settings; access to capital and surety bond guarantees; contract marketing guidance; and assistance with acquiring federal government surplus property. In addition, the Small Business Administration (SBA) reviews and certifies eligible clients; assigns SBA personnel (Business Opportunity Specialists, BOSs) to monitor and measure each firm's progress through annual reviews, business planning collaboration, and systematic evaluations; helps to identify potential contract opportunities; and markets each firm's technical capabilities to federal agency procurement officials.

This report examines the 8(a) Program's historical development, key requirements, administrative structures and operations, and the SBA's oversight of 8(a) firms. It also discusses two SBA programs designed to support 8(a) firms, the 7(j) Management and Technical Assistance Program and the All Small Mentor-Protégé Program, and provides various program statistics.[8]

It concludes with an analysis of the following current 8(a) Program issues:

- Reported deficiencies in the oversight of 8(a) Program participant's continuing eligibility.
- Disagreements concerning the financial thresholds used to determine economic disadvantage, including the SBA's decision to exclude equity in a primary residence from the calculation of an individual's net worth.[9]
- The adequacy of the performance measures used to evaluate the program's effectiveness in meeting its statutory goals.

---

[4] P.L. 85-536, Small Business Act of 1958, §2(a), 72 Stat. 384 (July 18, 1958) (codified at 15 U.S.C. §631(a)).

[5] P.L. 85-536, §2(f)(1)(a), 72 Stat. 384 (July 18, 1958) (codified at 15 U.S.C. §631(f)(1)(a)).

[6] P.L. 85-536, §2(f)(2)(A-C), 72 Stat. 384 (July 18, 1958) (codified at 15 U.S.C. §631(f)(2)(A-C)).

[7] See CRS Report R41523, *Small Business Administration and Job Creation*, by Robert Jay Dilger and CRS Report R40985, *Small Business: Access to Capital and Job Creation*, by Robert Jay Dilger.

[8] For additional information and analysis of federal Mentor-Protégé programs, see CRS Report R41722, *Small Business Mentor-Protégé Programs*, by Robert Jay Dilger.

[9] SBA, OIG, *Report on the Most Serious Management and Performance Challenges in Fiscal Year 2017*, p. 12.

Case 2:20-cv-00041-DCLC-CRW    Document 105-2    Filed 09/27/24    Page 8 of 78
PageID #: 3517

# Historical Development

## Program Origins

The current 8(a) Program is the result of the merger of two distinct types of federal programs: those seeking to assist small businesses in general and those seeking to assist racial and ethnic minorities. The merger first occurred, as a matter of executive branch practice, in 1967 and was given a statutory basis in 1978.

## Federal Programs for Small Businesses

In 1942, Congress first authorized a federal agency to enter into prime contracts with other agencies and subcontract with small businesses for the performance of these contracts. The agency was the Smaller War Plants Corporation (SWPC), which was partly created for this purpose, and Congress gave it these powers to ameliorate small businesses' financial difficulties while "mobiliz[ing] the productive facilities of small business in the interest of successful prosecution of the war."[10] The SWPC's subcontracting authority expired along with the SWPC at the end of the World War II. However, in 1951, at the start of the Korean War, Congress created the Small Defense Plants Administration (SDPA), which was generally given the same powers that the SWPC had exercised.[11] Two years later, in 1953, Congress transferred the SDPA's subcontracting authorities, among others, to the newly created SBA,[12] with the intent that the SBA would exercise these powers in peacetime, as well as in wartime.[13] When the Small Business Act of 1958 transformed the SBA into a permanent agency, this subcontracting authority was included in Section 8(a) of the act.[14] At its inception, the SBA's subcontracting authority was not limited to small businesses owned and controlled by the socially and economically disadvantaged. Under the original Section 8(a), the SBA could contract with any "small-business concerns or others,"[15] but it reportedly seldom, if ever, employed this subcontracting authority, focusing instead upon its loan and other programs.[16]

---

[10] P.L. 77-603, Small Business Mobilization Act, §4(f), 56 Stat. 351 (June 11, 1942).

[11] P.L. 82-96, An Act To amend and extend the Defense Production Act of 1950 and the Housing and Rent Act of 1947, as amended, §110, 65 Stat. 131 (July 31, 1951).

[12] P.L. 83-163, Reconstruction Finance Corporation Liquidation Act, §207(c)-(d), 67 Stat. 230 (July 30, 1953).

[13] See U.S. Congress, House Committee on Banking and Currency, *Small Business Act of 1953*, report to accompany H.R. 5141, 83rd Cong., 1st sess., May 28, 1953, H.Rept. 83-494 (Washington: GPO, 1953), p. 2 (stating that the SBA would "continue many of the functions of the [SDPA] in the present mobilization period and in addition would be given powers and duties to encourage and assist small-business enterprises in peacetime as well as in any future war or mobilization period"); and U.S. Congress, Senate Committee on Banking and Currency, *Small Business Act*, report to accompany H.R. 7963, 85th Cong., 2nd sess., June 16, 1958, pp. 9, 10 (stating that the act would "put the procurement assistance program on a peacetime basis").

[14] P.L. 85-536, as amended, §8(a)(1)-(2), 72 Stat. 384 (July 18, 1958).

[15] P.L. 85-536, as amended, §8(a)(1)-(2), 72 Stat. 384 (July 18, 1958).

[16] Thomas Jefferson Hasty, III, "Minority Business Enterprise Development and the Small Business Administration's 8(a) Program: Past, Present, and (Is There a) Future?," 145 *Military Law Review* pp. 1, 8 (Summer 1994). ("[B]ecause the SBA believed that the efforts to start and operate an 8(a) program would not be worthwhile in terms of developing small business, the SBA's power to contract with other government agencies essentially went unused. The program actually lay dormant for about fifteen years until the racial atmosphere of the 1960s provided the impetus to wrestle the SBA's 8(a) authority from its dormant state.")

## Federal Programs for Racial and Ethnic Minorities

Federal programs for racial and ethnic minorities began developing at approximately the same time as those for small businesses, although there was initially no explicit overlap between them. The earliest programs were created by executive orders, beginning with President Franklin Roosevelt's order on June 25, 1941, requiring that all federal agencies include a clause in defense-related contracts prohibiting contractors from discriminating on the basis of "race, creed, color, or national origin."[17] Subsequent Presidents followed Roosevelt's example, issuing a number of executive orders seeking to improve the employment opportunities for various racial and ethnic groups.[18] These executive branch initiatives took on new importance after the Kerner Commission's report on the causes of the 1966 urban riots concluded that African Americans would need "special encouragement" to enter the economic mainstream.[19]

Presidents Lyndon Johnson and Richard Nixon laid foundations for the present 8(a) Program in the hope of providing such "encouragement." Johnson created the President's Test Cities Program (PTCP), which involved a small-scale use of the SBA's authority under Section 8(a) to award contracts to firms willing to locate in urban areas and hire unemployed individuals, largely African Americans, or sponsor minority-owned businesses by providing capital or management assistance.[20] However, under the PTCP, small businesses did not have to be minority-owned to receive subcontracts under Section 8(a).[21] Nixon's program was larger and focused more specifically on minority-owned small businesses.[22] During the Nixon Administration, the SBA promulgated its earliest regulations for the 8(a) Program. In 1970, the first of these regulations articulated the SBA's policy of using Section 8(a) to "assist small concerns owned by disadvantaged persons to become self-sufficient, viable businesses capable of competing effectively in the market place."[23] A later regulation, promulgated in 1973, defined *disadvantaged persons* as including, but not limited to, "black Americans, Spanish-Americans, oriental Americans, Eskimos, and Aleuts."[24] However, the SBA lacked explicit statutory authority for focusing its 8(a) Program on minority-owned businesses until 1978,[25] although courts generally

---

[17] Executive Order No. 8802, "Reaffirming Policy of Full Participation in the Defense Program by All Persons, Regardless of Race, Creed, Color, or National Origin, and Directing Certain Action in Furtherance of Said Policy," 6 *Federal Register* 3109, June 25, 1941. Similar requirements were later imposed on nondefense contracts. See Executive Order No. 9346, "Further Amending Executive Order No. 8802 by Establishing a New Committee on Fair Employment Practice and Defining its Powers and Duties," 8 *Federal Register* 7182, May 29, 1943.

[18] See Executive Order No. 10308, "Improving the Means for Obtaining Compliance With the Nondiscrimination Provisions of Federal Contracts," 16 *Federal Register* 12303, December 3, 1951 (Truman); Executive Order No. 10557, "Approving the Revised Provision in Government Contracts Relating to Nondiscrimination in Employment," 19 *Federal Register* 5655, September 3, 1954 (Eisenhower); Executive Order No. 10925, "Establishing the President's Committee on Equal Employment Opportunity," 26 *Federal Register* 1977, March 6, 1961 (Kennedy); and Executive Order No. 11458, "Prescribing Arrangements for Developing and Coordinating a National Program for Minority Business Enterprise," 34 *Federal Register* 4937, March 7, 1969 (Nixon).

[19] The National Advisory Commission on Civil Disorders (known as the Kerner Commission after its chair, Governor Otto Kerner Jr. of Illinois), *Report of the National Advisory Commission on Civil Disorders* (U.S. GPO, 1968), p. 21.

[20] See Thomas Jefferson Hasty, III, "Minority Business Enterprise Development and the Small Business Administration's 8(a) Program: Past, Present, and (Is There a) Future?," 145 *Military Law Review*, pp. 11, 12.

[21] See Jonathan J. Bean, *Big Government and Affirmative Action: The Scandalous History of the Small Business Administration* (Lexington, KY: University Press of Kentucky, 2001), p. 66.

[22] See Executive Order No. 11625, "Prescribing Additional Arrangements for Developing and Coordinating a National Program for Minority Business Enterprise," 36 *Federal Register* 19967, October 13, 1971.

[23] 13 C.F.R. §124.8-1(b) (1970).

[24] 13 C.F.R. §124.8(c) (1973).

[25] U.S. Congress, Senate Select Committee on Small Business, *Amending the Small Business Act and the Small

---

rejected challenges alleging that SBA's implementation of the program was unauthorized because it was "not specifically mentioned in statute."[26]

## 1978 Amendments to the Small Business Act and Subsequent Regulations

In 1978, Congress amended the Small Business Act to give the SBA express statutory authority for its 8(a) Program for minority-owned businesses.[27] Under the 1978 amendments, the SBA can only subcontract under Section 8(a) with "socially and economically disadvantaged small business concerns,"[28] or businesses that are least 51% owned by one or more socially and economically disadvantaged individuals and whose management and daily operations are controlled by such individual(s).[29]

The 1978 amendments established a basic definition of *socially disadvantaged individuals*, which included those who have been "subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities."[30] They also included congressional findings that "Black Americans, Hispanic Americans, Native Americans, and other minorities" are socially disadvantaged.[31] Thus, if an individual was a member of one of

---

*Business Investment Act of 1958*, 95th Cong., 2nd sess., August 8, 1978, S.Rept. 95-1070 (Washington: GPO, 1978), p. 14 ("One of the underlying reasons for the failure of this effort is that the program has no legislative basis."); and U.S. Congress, House Committee on Small Business, *Amending the Small Business Act and the Small Business Investment Act of 1958*, report to accompany H.R. 11318, 95th Cong., 2nd sess., March 13, 1978, H.Rept. 95-949 (Washington: GPO, 1978), p. 4 ("Congress has never extended legislative control over the activities of the 8(a) program, save through indirect appropriations, thereby permitting program operations…. [The] program is not as successful as it could be.").

[26] See Ray Billie Trash Hauling, Inc. v. Kleppe, 477 F.2d 696, 703-05 (5th Cir. 1973). In this case, the court particularly noted that the SBA's program was supported by congressional and presidential mandates issued after enactment of the Small Business Act in 1958.

[27] P.L. 95-507, To amend the Small Business Act and the Small Business Investment Act of 1958, 92 Stat. 1757 (October 24, 1978).

[28] P.L. 95-507, To amend the Small Business Act and the Small Business Investment Act of 1958, §202.

[29] P.L. 95-507, To amend the Small Business Act and the Small Business Investment Act of 1958, §202 (codified at 15 U.S.C. §637(a)(4)(A)-(B)). Firms that are owned and controlled by Indian tribes, ANCs, or NHOs were later included within the definition of a "socially and economically disadvantaged small business concern."

[30] P.L. 95-507, To amend the Small Business Act and the Small Business Investment Act of 1958, §202 (codified at 15 U.S.C. §637(a)(5)).

[31] P.L. 95-507, To amend the Small Business Act and the Small Business Investment Act of 1958, §202 (codified, as amended, at 15 U.S.C. §631(f)(1)(C)). The meaning of *socially disadvantaged individuals* was the subject of much debate at that time. Some Members of Congress viewed the 8(a) Program as a program for African Americans and would have defined *social disadvantage* accordingly. See Parren J. Mitchell, "Federal Affirmative Action for MBE's: An Historical Analysis," 1 *National Bar Association Magazine* 46 (1983). (Mitchell was a Member of the U.S. House of Representatives and leader of the Congressional Black Caucus at that time.) Others favored including both African Americans and Native Americans arguing that only those who did not come to the United States seeking the "American dream" should be deemed socially disadvantaged. See U.S. Congress, House Committee on Small Business, Minority Enterprise and General Oversight, *General Review of Major SBA Programs and Activities*, 95th Cong., 2nd sess., June 20, 1978, H721-41 (Washington: GPO, 1978), p. 21. Yet others suggested that groups that are not racial or ethnic minorities, such as women, should be able to qualify as "socially disadvantaged," or that individuals ought to be able to prove they are personally socially disadvantaged even if they are not racial or ethnic minorities. See U.S. Congress, House Committee on Small Business, *Amending the Small Business Act and the Small Business Investment Act of 1958*, report to accompany H.R. 11318, 95th Cong., 2nd sess., March 13, 1978, H.Rept. 95-949 (Washington: GPO, 1978), p. 9. The House-passed version of the bill defined socially disadvantaged individuals, in part, by establishing a rebuttable presumption that African Americans and Hispanic Americans are socially disadvantaged, but the Senate-passed bill did not reference any racial or ethnic groups in defining social disadvantage. See U.S. Congress, House Committee of Conference, *Amending the Small Business Act and the Small Business Investment Act of 1958*, report to accompany H.R. 11318, 95th Cong., 2nd sess., October 4, 1978, Conf. Rept. 95-1714 (Washington: GPO, 1978), p. 20; and U.S. Congress, Senate Select Committee on Small Business, *Amending the Small Business Act and the Small Business*

---

these groups, he or she was presumed to be socially disadvantaged. Otherwise, the amendments were generally seen to grant the SBA discretion to recognize additional groups or individuals as socially disadvantaged based upon criteria promulgated in regulations.[32] Under these regulations, which include a three-part test for determining whether minority groups not mentioned in the amendment's findings are disadvantaged,[33] the SBA recognized the racial or ethnic groups listed in **Table 1** as socially disadvantaged for 8(a) purposes.[34] The regulations also established standards of evidence to be met by individuals demonstrating personal disadvantage and procedures for rebutting the presumption of social disadvantage accorded to members of recognized minority groups.[35]

### Table 1. Groups Presumed to Be Socially Disadvantaged

| Group | Countries of Origin Included Within Group |
| --- | --- |
| Black Americans | n/a |
| Hispanic Americans | n/a |

*Investment Act of 1958*, 95th Cong., 2nd sess., August 8, 1978, S.Rept. 95-1070 (Washington: GPO, 1978), pp. 13-16. The conference committee reconciling the House and Senate versions ultimately arrived at a definition of socially disadvantaged individuals that included "those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group." See P.L. 95-507, at §202. The conference committee also included congressional findings that "Black Americans, Hispanic Americans, Native Americans, and other minorities" are socially disadvantaged. See P.L. 95-507, at §201.

Congress subsequently added "Asian Pacific Americans" (P.L. 96-302, An original bill to provide authorizations for the Small Business Administration, and for other purposes), "Indian tribes" (P.L. 99-272, the Consolidated Omnibus Budget Reconciliation Act of 1985 (Title XVIII—Small Business Programs), and "Native Hawaiian Organizations" (P.L. 100-656, the Business Opportunity Development Reform Act of 1988) to the groups whom it finds to be socially disadvantaged. See 15 U.S.C. §631(f)(1)(C)). For additional information concerning the SBA's administrative decisions on groups seeking to be presumed socially disadvantaged, see George R. LaNoue, and John C. Sullivan, "Presumptions for Preferences: The Small Business Administration's Decisions on Groups Entitled to Affirmative Action," *Journal of Policy History*, vol. 6, no. 4 (1994), at https://www.cambridge.org/core/journals/journal-of-policy-history/article/presumptions-for-preferences-the-small-business-administrations-decisions-on-groups-entitled-to-affirmative-action/99AFFC9D3FF1C1F1D520D9D3600B1E32.

[32] P.L. 95-507, at §201 (stating that the groups Congress finds to be socially disadvantaged include, but are not limited to, those specified here); P.L. 95-507, at §202 (authorizing the award of contracts to socially disadvantaged individuals); and U.S. Congress, House Committee on Small Business, *Amending the Small Business Act and the Small Business Investment Act of 1958*, report to accompany H.R. 11318, 95th Cong., 2nd sess., March 13, 1978, H.Rept. 95-949 (Washington: GPO, 1978), p. 9 (expressing the view that §201 and §202 of the bill provide "sufficient discretion … to allow SBA to designate any other additional minority group or persons it believes should be afforded the presumption of social … disadvantage").

[33] See 13 C.F.R. §124.103(d)(2)(i)-(iii)(1980).

[34] 13 C.F.R. §124.103(b). Different groups are sometimes recognized as socially disadvantaged for purposes of other programs, such as those of the Department of Commerce's Minority Business Development Agency (MBDA). See 15 C.F.R. §1400.1(b). The SBA has rejected petitions from certain groups, including Hasidic Jews, women, disabled veterans, and Iranian-Americans. See George R. La Noue and John C. Sullivan, "Gross Presumptions: Determining Group Eligibility for Federal Procurement Preferences," 41 *Santa Clara Law Review* 103, 127-129 (2000). However, Hasidic Jews are eligible to receive assistance from the MBDA, whereas women are deemed to be disadvantaged for purposes of the Department of Transportation's Disadvantaged Business Enterprise (DBE) program. See 49 U.S.C. §47113(a)(2) (DBE program); and 15 C.F.R. §1400.1(c) (MBDA program).

[35] 13 C.F.R. §124.103(c)(2) (standards of evidence for showing personal disadvantage); and 13 C.F.R. §124.103(b)(3) (mechanisms for overcoming the presumption of social disadvantage).

| Group | Countries of Origin Included Within Group |
|---|---|
| Native Americans (including American Indians, Eskimos, Aleuts, Native Hawaiians) | n/a |
| Asian Pacific Americans | Burma, Thailand, Malaysia, Indonesia, Singapore, Brunei, Japan, China (including Hong Kong), Taiwan, Laos, Cambodia, Vietnam, Korea, The Philippines, U.S. Trust Territory of the Pacific Islands (Republic of Palau), Republic of the Marshall Islands, Federated States of Micronesia, Commonwealth of the Northern Mariana Islands, Guam, Samoa, Macao, Fiji, Tonga, Kiribati, Tuvalu, Nauru |
| Subcontinent Asian Americans | India, Pakistan, Bangladesh, Sri Lanka, Bhutan, the Maldives Islands, Nepal |

**Source:** Congressional Research Service, based on 13 C.F.R. §124.103(b).

The 1978 amendments also defined *economically disadvantaged individuals*, for purposes of the 8(a) Program, as "those socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged."[36] Initially, the SBA determined economic disadvantage by examining

- the applicant's personal financial condition (including their personal net worth, personal income for at least the past two years, and the total fair market value of their assets);
- the applicant's access to credit and capital;
- the business's financial condition; and
- the business's access to credit, capital, and markets.[37]

Over the years, many small business owners and others recommended that the SBA create objective monetary thresholds for determining how the applicant's personal financial condition affects economic disadvantage. In response, in 1989, the SBA announced in the *Federal Register* that applicants needed personal net worth of less than $250,000 (excluding ownership in the 8(a) firm and equity in his or her primary residence) at the time of entry into the program, and less than $750,000 for continuing eligibility.[38] Objective monetary thresholds for personal income and total assets were not added.

In 2011, the SBA announced in the *Federal Register* that it would no longer count funds invested in an official retirement account that are unavailable to the applicant without a significant penalty in determining the applicant's net worth. Also, the SBA announced that the applicant's average adjusted gross income over the preceding three years generally cannot exceed $250,000 at the time of application and $350,000 for continuing eligibility. In addition, the fair market value of the applicant's assets (excluding funds invested in an official retirement account that are

---

[36] P.L. 95-507, at §202.

[37] SBA, "Minority Small Business and Capital Ownership Development Program: Final Rule," 54 *Federal Register* 34719, August 21, 1989.

[38] SBA, "Minority Small Business and Capital Ownership Development Program: Final Rule," 54 *Federal Register* 34696, August 21, 1989 (codified, as amended, at 13 C.F.R. §124.104(c)). Some commentators have estimated that 80% to 90% of Americans are economically disadvantaged under the SBA's net-worth requirements. See La Noue and Sullivan, "*Gross Presumptions: Determining Group Eligibility for Federal Procurement Preferences*," 41 *Santa Clara Law Review*, p. 108.

unavailable to the applicant without a significant penalty) cannot exceed $4 million at entry and $6 million for continued eligibility.[39]

On May 11, 2020, the SBA announced in the *Federal Register* that, as of July 15, 2020, personal net worth of less than $750,000, both at the time of entry into the 8(a) program and for continuing eligibility, will constitute economic disadvantage.[40] The SBA indicated that it was eliminating the $250,000 personal net worth threshold at the time of entry into the 8(a) program to bring the 8(a) program into conformity with the personal net worth threshold used for determining the status of economically disadvantaged women-owned small businesses (EDWOSBs) in the SBA's Women-Owned Small Business (WOSB) federal contracting program.[41] That program uses less than $750,000 in personal net worth for determining economic disadvantage. The SBA noted that a small business applying for EDWOSB and 8(a) program status simultaneously

> could thus be found economically disadvantaged for EDWOSB purposes, but not economically disadvantaged for the 8(a) BD [Business Development] program. This result would introduce unnecessary confusion and uncertainty into the application and certification process. To remedy this, this final rule makes economic disadvantage consistent across programs.[42]

The SBA also announced that

- funds invested in an official retirement account will not be considered in determining net worth (eliminating the requirement that the funds are subject to a significant withdrawal penalty);
- the applicant's average adjusted gross income over the three preceding years cannot exceed $350,000 (eliminating the $250,000 personal income threshold at the time of application); and
- the fair market value of the applicant's assets (excluding funds invested in an official retirement account) cannot exceed $6 million (eliminating the $4 million asset threshold at entry).[43]

## Adding "Disadvantaged" Groups

Although the 8(a) Program was originally established for the benefit of disadvantaged *individuals*, in the 1980s, Congress expanded the program to include small businesses owned by four disadvantaged *groups*.

The first owner-group to be included was Community Development Corporations (CDCs). A CDC is

> a nonprofit organization responsible to residents of the area it serves which is receiving financial assistance under part A of this subchapter [42 U.S.C. §§9805 *et seq.*] and any

---

[39] SBA, "Small Business Size Regulations; 8(a) Business Development/Small Disadvantaged Business Status Determinations," 76 *Federal Register* 8229-8231, February 11, 2011.

[40] SBA, "Women-Owned Small Business and Economically Disadvantaged Women-Owned Small Business Certification," 85 *Federal Register* 27650-27665, May 11, 2020.

[41] For additional information and analysis of the Women-Owned Small Business (WOSB) federal contracting program, see CRS Report R46322, *SBA Women-Owned Small Business Federal Contracting Program*, by Robert Jay Dilger.

[42] SBA, "Women-Owned Small Business and Economically Disadvantaged Women-Owned Small Business Certification," 85 *Federal Register* 27650, May 11, 2020.

[43] SBA, "Women-Owned Small Business and Economically Disadvantaged Women-Owned Small Business Certification," 85 *Federal Register* 27660, May 11, 2020.

organization more than 50 percent of which is owned by such an organization, or otherwise controlled by such an organization, or designated by such an organization for the purpose of this subchapter [42 U.S.C. §§9801 *et seq*.].[44]

Congress created CDCs with the Community Economic Development Act of 1981 and instructed the SBA to issue regulations ensuring that CDCs could participate in the 8(a) Program.[45]

In 1986, two additional owner-groups, Indian tribes and Alaska Native Corporations (ANCs), became eligible for the program when Congress passed legislation providing that firms owned by Indian tribes, which include ANCs, were to be deemed socially disadvantaged for 8(a) Program purposes.[46] In 1992, ANCs were further deemed to be "economically disadvantaged."[47]

The final owner-group, Native Hawaiian Organizations (NHOs), was recognized in 1988.[48] An NHO is defined as

> any community service organization serving Native Hawaiians in the State of Hawaii which (A) is a nonprofit corporation that has filed articles of incorporation with the director (or the designee thereof) of the Hawaii Department of Commerce and Consumer Affairs, or any successor agency, (B) is controlled by Native Hawaiians, and (C) whose business activities will principally benefit such Native Hawaiians.[49]

# Program Requirements

Detailed statutory and regulatory requirements govern 8(a) Program eligibility, set-aside and sole-source awards, and related issues. These requirements are generally the same for all 8(a) firms, although there are instances where there are "special rules" for group-owned 8(a) firms.[50] An **Appendix** to this report compares the requirements applicable to individual owners of 8(a) firms to those applicable to groups owning 8(a) firms (i.e., ANCs, CDCs, NHOs, and Indian tribes).

---

[44] 42 U.S.C. §9802.

[45] P.L. 97-35, Omnibus Budget Reconciliation Act of 1981, Ch. 8, Subchapter A, 95 Stat. 489 (August 13, 1981) (codified at 42 U.S.C. §§9801 et seq.); and P.L. 97-35, Omnibus Budget Reconciliation Act of 1981, at §626, 95 Stat. 496 (codified at 42 U.S.C. §9815(a)(2)). ("Not later than 90 days after August 13, 1981, the Administrator of the Small Business Administration, after consultation with the Secretary, shall promulgate regulations to ensure the availability to community development corporations of such programs as shall further the purposes of this subchapter, including programs under §637(a) of title 15.")

[46] P.L. 99-272, Consolidated Omnibus Budget Reconciliation Act of 1985, §18015, 100 Stat. 370 (April 7, 1986) (codified at 15 U.S.C. §637(a)(13) and 15 U.S.C. §637(a)(4)).

[47] P.L. 102-415, Alaska Land Status Technical Corrections Act of 1992, §10, 106 Stat. 2115 (October 14, 1992) (codified at 43 U.S.C. §1626(e)).

[48] P.L. 100-656, Business Opportunity Development Reform Act of 1988, at §207, 102 Stat. 3861 (November 15, 1988) (codified at 15 U.S.C. §637(a)(4)).

[49] P.L. 100-656, Business Opportunity Development Reform Act of 1988, at §207 (codified at 15 U.S.C. §637(a)(15)). A Native Hawaiian is "any individual whose ancestors were natives, prior to 1778, of the area which now comprises the State of Hawaii." 13 C.F.R. §124.3.

[50] 13 C.F.R. §124.109(a) ("*Special rules for ANCs.* Small business concerns owned and controlled by ANCs are eligible for participation in the 8(a) program and must meet the eligibility criteria set forth in §124.112 to the extent the criteria are not inconsistent with this section.") (emphasis in original).

---

# General Requirements

## Program Eligibility

As mentioned previously, 8(a) Program eligibility is limited to "small business[es] which [are] unconditionally owned and controlled by one or more socially and economically disadvantaged individuals who are of good character and citizens of and residing in the United States, and which demonstrates potential for success."[51] Each of these terms is defined by the Small Business Act; SBA regulations; and judicial and administrative decisions.[52] The eligibility requirements are the same at the time of entry into the program and throughout the program unless otherwise noted.[53]

### Business

Except for small agricultural cooperatives, a *business* is a for-profit entity that has a place of business located in the United States and operates primarily within the United States or makes a significant contribution to the U.S. economy by paying taxes or using American products, materials, or labor.[54] For 8(a) Program purposes, businesses are individual proprietorships, partnerships, limited liability companies, corporations, joint ventures, associations, trusts, or cooperatives.[55]

### Small

A business is *small* if it is independently owned and operated; is not dominant in its field of operations; and meets any definitions or standards established by the SBA Administrator.[56] These standards focus primarily upon the size of the business as measured by the number of employees or average annual receipts (gross income for sole proprietorships), but they also take into account the size of other businesses within the same industry.[57] For example, businesses in the field of scheduled passenger air transportation are small if they have 1,500 or fewer employees, whereas those in the data processing field are small if they have average annual receipts of $32.5 million or less.[58]

---

[51] 13 C.F.R. §124.101. The Office of Legal Counsel at the Department of Justice has opined that SBA regulations limiting eligibility for the 8(a) Program to citizens do not deprive resident aliens of due process in violation of the Fifth Amendment to the U.S. Constitution. See U.S. Department of Justice, Office of Legal Counsel, Constitutionality of 13 C.F.R. §124.103 Establishing Citizenship Requirement for Participation in 8(a) Program, 20 Op. O.L.C. 85 (1996).

[52] The SBA's Office of Hearings and Appeals has, for example, developed a seven-part test for determining whether a small business is *unusually reliant* on a contractor that is used in determining affiliation. See Valenzuela Eng'g, Inc. & Curry Contracting Co., Inc., SBA-4151 (1996).

[53] 13 C.F.R. §124.112(a).

[54] 13 C.F.R. §121.105(a)(1). "Business" is separately defined for small agricultural cooperatives. See 13 C.F.R. §121.105(a)(2).

[55] 13 C.F.R. §121.105(b).

[56] 15 U.S.C. §632(a)(1)-(2)(A).

[57] 13 C.F.R. §§121.101-121.109. The number of employees is the average number in each pay period for the preceding 12 calendar months. Receipts means *total income* (or in the case of a sole proprietorship, *gross income*) plus *cost of goods sold* as these terms are defined and reported on Internal Revenue Service tax return forms. Where possible, receipts are based on the average for the last three completed fiscal years. It includes all revenues, not just those from the firm's primary industry. See 13 C.F.R. §121.104.

[58] 13 C.F.R. §121.201.

Affiliations among businesses, or relationships allowing one party control or the power of control over another, generally count in size determinations, with the SBA considering "the receipts, employees, or other measure of size of the concern whose size is at issue and all of its domestic and foreign affiliates, regardless of whether the affiliates are organized for profit."[59] Businesses can thus be determined to be other than small because of their involvement in joint ventures, subcontracting arrangements, or franchise or license agreements, among other things, provided that their income or personnel numbers, plus those of their affiliate(s), are over the pertinent size threshold.[60]

### Unconditionally Owned and Controlled

8(a) firms must be "at least 51% unconditionally and directly owned by one or more socially and economically disadvantaged individuals who are citizens of the United States" unless they are owned by an ANC, CDC, NHO, or Indian tribe.[61] Ownership is *unconditional* when it is not subject to any conditions precedent or subsequent, executory agreements, voting trusts, restrictions on or assignments of voting rights, or other arrangements that could cause the benefits of ownership to go to another entity.[62] Ownership is *direct* when the disadvantaged individuals own the business in their own right and not through an intermediary (e.g., ownership by another business entity or by a trust that is owned and controlled by one or more disadvantaged individuals).[63] Nondisadvantaged individuals and nonparticipant businesses that own at least 10% of an 8(a) business may generally own no more than 10% to 20% of any other 8(a) firm.[64] Nonparticipant businesses that earn the majority of their revenue in the same or similar line of business are likewise barred from owning more than 10% (increasing to 20%-30% in certain circumstances) of another 8(a) firm.[65]

In addition, 8(a) firms must be controlled by one or more disadvantaged individuals.[66] "Control is not the same as ownership" and includes both strategic policy setting and day-to-day management and administration of business operations.[67] Management and daily business operations must be conducted by one or more disadvantaged individuals unless the 8(a) business is owned by an ANC, CDC, NHO, or Indian tribe.[68] These individuals must have managerial experience "of the extent and complexity needed to run the concern" and generally must devote themselves full-time to the business "during the normal working hours of firms in the same or similar line of business."[69] A disadvantaged individual must hold the highest officer position within the business.[70] Nondisadvantaged individuals may otherwise be involved in the management of an

---

[59] 13 C.F.R. §121.103(a)(6).

[60] 13 C.F.R. §121.103(h); 13 C.F.R. §121.103(h)(4); and 13 C.F.R. §121.103(i).

[61] 13 C.F.R. §124.105 (defining unconditional ownership). See also 15 U.S.C. §637(a)(4)(A)(i)-(ii) (requiring at least 51% unconditional ownership).

[62] 13 C.F.R. §124.3.

[63] 13 C.F.R. §124.105(a).

[64] 13 C.F.R. §124.105(h)(1). Ownership is limited to 10% when the 8(a) firm in is the *developmental stage* of the 8(a) Program and 20% when it is in the *transitional stage*.

[65] 13 C.F.R. §124.105(h)(2).

[66] 15 U.S.C. §637(a)(4)(A)(i)-(ii) (requiring control of management and business operations); 13 C.F.R. §124.106.

[67] 13 C.F.R. §124.106.

[68] 13 C.F.R. §124.106.

[69] 13 C.F.R. §124.106 & §124.106(a)(3).

[70] 13 C.F.R. §124.106(a)(2).The individual must also be physically located in the United States.

Case 2:20-cv-00041-DCLC-CRW    Document 105-2    Filed 09/27/24    Page 17 of 78
PageID #: 3526

8(a) business, or may be stockholders, partners, limited liability members, officers, or directors of an 8(a) business.[71] However, nondisadvantaged individuals may not exercise actual control or have the power to control the firm or its disadvantaged owner(s), or receive compensation greater than that of the highest-paid officer (usually the chief executive officer or president) without the SBA's approval.[72]

## Socially Disadvantaged Individual

Socially disadvantaged individuals are "those who have been subjected to racial or ethnic prejudice or cultural bias within American society because of their identities as members of groups and without regard to their individual qualities."[73] Members of designated groups, listed in **Table 1**, are entitled to a rebuttable presumption of social disadvantage for 8(a) Program purposes, although this presumption can be overcome with "credible evidence to the contrary."[74] Individuals who are not designated-group members must prove they are socially disadvantaged by a preponderance of the evidence.[75] Such individuals must show (1) at least one objective distinguishing feature that has contributed to social disadvantage (e.g., race, ethnic origin, gender, physical handicap, long-term residence in an environment isolated from mainstream American society); (2) personal experiences of substantial and chronic social disadvantage in American society; and (3) negative impact on entry into or advancement in the business world.[76] In assessing the third factor, the SBA will consider all relevant evidence the applicant produces, but must consider the applicant's education, employment, and business history to see if the totality of the circumstances shows disadvantage.[77] Groups not included in **Table 1** may obtain eligibility by demonstrating disadvantage by a preponderance of the evidence.[78]

## Economically Disadvantaged Individual

Economically disadvantaged individuals are "socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same or similar line of business who are not socially disadvantaged."[79] Individuals claiming economic disadvantage must submit financial documentation for eligibility purposes.[80] As mentioned, the SBA examines the individual's personal income for the past three years, their net worth, and the fair market value of their assets.[81] To be economically disadvantaged, an individual must have a net worth of less than $750,000 (excluding ownership interest in the applicant's business, equity in their primary personal residence, and funds invested in an official retirement account), no more than $350,000

---

[71] 13 C.F.R. §124.106(e).

[72] 13 C.F.R. §124.106(e)(1) & (3).

[73] 13 C.F.R. §124.103(a). See also 15 U.S.C. §637(a)(5).

[74] 13 C.F.R. §124.103(b)(3).

[75] 13 C.F.R. §124.103(c)(1).

[76] 13 C.F.R. §124.103(c)(2)(i)-(iii).

[77] 13 C.F.R. §124.103(c)(2)(iii).

[78] 13 C.F.R. §124.103(d)(4). Groups petitioning for recognition as socially disadvantaged do not always obtain it. Over the years, the SBA has rejected petitions from Hasidic Jews, women, disabled veterans, and Iranian-Americans. See *supra* note 34.

[79] 13 C.F.R. §124.104(a). See also 15 U.S.C. §637(a)(6)(A).

[80] 13 C.F.R. §124.104(b)(1).

[81] 13 C.F.R. §124.104(c). See also 15 U.S.C. §637(a)(6)(E)(i)-(ii).

in average adjusted gross income over the preceding three years, and no more than $6 million in assets (excluding funds invested in an official retirement account).

### Good Character

In determining whether an applicant to, or participant in, the 8(a) Program possesses *good character*, the SBA considers any criminal conduct, violations of SBA regulations, current debarment or suspension from government contracting, managers or key employees who lack business integrity, and the knowing submission of false information to the SBA.[82]

### Demonstrated Potential for Success

For a firm to have demonstrated potential for success, it generally must have been in business in its primary industry classification for at least two full years immediately prior to the date of its application to the 8(a) Program.[83] However, the SBA may grant a waiver allowing firms that have been in business for less than two years to enter the program under specified circumstances.[84]

## Set-Asides and Sole-Source Awards Under Section 8(a)

Section 8(a) of the Small Business Act authorizes agencies to award contracts for goods or services, or to perform construction work, to the SBA for subcontracting to 8(a) firms. The act also authorizes the SBA to delegate the function of executing contracts to the procuring agencies and often does so.[85]

A set-aside award is a contract awarded in which only certain contractors may compete, whereas a sole-source award is a contract awarded, or proposed for award, without competition.[86] The Competition in Contracting Act (CICA) generally requires federal agencies to allow full and open competition through the use of competitive procedures when procuring goods or services. However, set-aside and sole-source awards to 8(a) firms are permissible under CICA under certain circumstances. In fact, an 8(a) set-aside is a recognized competitive procedure.[87] Agencies

---

[82] 13 C.F.R. §124.108(a)(1)-(5).

[83] 13 C.F.R. §124.107.

[84] A waiver to the two-year requirement may be granted when (1) the disadvantaged individual(s) upon whom eligibility is based have substantial business management experience; (2) the business has demonstrated the technical experience necessary to carry out its business plan with a substantial likelihood of success; (3) the firm has adequate capital to sustain its operations and carry out its business plan; (4) the firm has a record of successful performance on contracts in its primary field of operations; and (5) the firm presently has, or can demonstrate its ability to timely obtain, the personnel, facilities, equipment, and other resources necessary to perform 8(a) contracts. See 13 C.F.R. §124.107(b)(1)(i)-(v).

[85] 13 C.F.R. §124.501(a); Partnership Agreement Between the U.S. Small Business Administration and the U.S. Department of Defense, January 7, 2013, at http://www.sba.gov/sites/default/files/files/Department%20of%20Defense.pdf.

[86] Set-asides may be total or partial. See 48 C.F.R. §19.501(a).

[87] 10 U.S.C. §2304(b)(2), 41 U.S.C. §3303(b) (the Competition in Contracting Act (CICA) provisions authorizing set-asides for small businesses); and 48 C.F.R. §§6.203-6.207 (set-asides for small business generally, 8(a) small businesses, Historically Underutilized Business Zone [HUBZone] small businesses, service-disabled veteran-owned small businesses, and women-owned small businesses). CICA authorizes competitions excluding all sources other than small businesses when such competitions assure that a "fair proportion of the total purchases and contracts for property and services for the Federal Government shall be placed with small business concerns." 41 U.S.C. §3104. CICA also permits sole-source awards when such awards are made pursuant to a procedure expressly authorized by statute, or when special circumstances exist (e.g., urgent and compelling circumstances). See 10 U.S.C. §2304(c)(1) (defense agency procurements) and 41 U.S.C. §§3301 and 3304(a) (civilian agency procurements).

---

Case 2:20-cv-00041-DLC-CRW    Document 105-2    Filed 09/27/24    Page 19 of 78
PageID #: 3528

are effectively encouraged to subcontract through the 8(a) Program because there are government-wide and agency-specific goals regarding the percentage of procurement dollars awarded to small disadvantaged businesses, which include 8(a) firms (the current government-wide goal is 5% of all small business eligible federal contracts).[88]

## Discretion to Subcontract Through the 8(a) Program

There are few limits on agency discretion to subcontract through the 8(a) Program.[89] However, the SBA is prohibited by regulation from accepting procurements for award under Section 8(a) when

1. the procuring agency issued a solicitation for or otherwise expressed publicly a clear intent to reserve the procurement as a set-aside for small businesses not participating in the program prior to offering the requirement to the SBA for award as an 8(a) contract;[90]

2. the procuring agency competed the requirement among 8(a) firms prior to offering the requirement to the SBA and receiving the SBA's acceptance of it;[91] or

3. the SBA makes a written determination that "acceptance of the procurement for 8(a) award would have an adverse impact on an individual small business, a group of small businesses located in a specific geographical location, or other small business programs."[92]

---

[88] 13 C.F.R. §124.1002 (defining "small disadvantaged business").

The federal government uses aspirational procurement goals instead of requiring federal agencies to award specific percentages of federal contracts to various types of small businesses primarily to avoid legal challenges under the equal protection component of the Fifth Amendment's Due Process Clause. See, for example, City of Richmond v. J.A. Croson Co., 488 U.S. 469 (1989) (finding unconstitutional a municipal ordinance that required the city's prime contractors to award at least 30% of the value of each contract to minority subcontractors) and Adarand Constructors, Inc. v. Pena 515 U.S. 200 (1995) (finding that all racial classifications, whether imposed by federal, state, or local authorities, must pass strict scrutiny review).

[89] AHNTECH, Inc., B-401092 (April 22, 2009) ("The [Small Business] Act affords the SBA and contracting agencies broad discretion in selecting procurements for the 8(a) program.").

[90] Even in this situation, SBA may accept the requirement under "extraordinary circumstances." 13 C.F.R. §124.504(a); Madison Services, Inc., B-400615 (December 11, 2008) (finding that extraordinary circumstances existed when the agency's initial small business set-aside was erroneous and did not reflect its intentions).

[91] However, offers of requirements below the simplified acquisition threshold (generally $150,000) are assumed to have been accepted if SBA does not reply within two days. 13 C.F.R. §124.503(a)(4)(i). See also Eagle Collaborative Computing Services, Inc., B-401043.3 (January 28, 2011) (finding that an agency properly awarded a sole-source contract valued below the simplified acquisition threshold even though the SBA never formally accepted the requirements).

[92] 13 C.F.R. §124.504(a)-(c). The third provision applies only to preexisting requirements. It generally does not apply to new contracts, follow-on or renewal contracts, or procurements conducted using simplified acquisition procedures. Also, under its regulations, the SBA must presume an adverse impact when "(A) The small business concern has performed the specific requirement for at least 24 months; (B) The small business is performing the requirement at the time it is offered to the 8(a) ... program, or its performance of the requirement ended within 30 days of the procuring activity's offer of the requirement to the 8(a) ... program; and (C) The dollar value of the requirement that the small business is or was performing is 25 percent or more of its most recent annual gross sales (including those of its affiliates)." See 13 C.F.R. §124.504(c)(1)(i)(A)-(C).

Case 2:20-cv-00041-DCLC-CRW    Document 105-2    Filed 09/27/24    Page 20 of 78
PageID #: 3529

In addition, the SBA is barred from awarding an 8(a) contract, either via a set-aside or on a sole-source basis, "if the price of the contract results in a cost to the contracting agency which exceeds a fair market price."[93]

Otherwise, agency officials may offer contracts to the SBA "in [their] discretion," and the SBA may accept requirements for the 8(a) Program "whenever it determines such action is necessary or appropriate."[94] The courts and the Government Accountability Office (GAO) will generally not hear protests of agencies' determinations regarding whether to procure specific requirements through the 8(a) Program unless it can be shown that government officials acted in bad faith or contrary to federal law.[95]

## Monetary Thresholds and Subcontracting Mechanisms

Once the SBA has accepted a contract for the 8(a) Program, the contract is awarded through either a set-aside or on a sole-source basis, with the contract amount generally determining the acquisition method used. When the contract's anticipated total value, including any options, is less than $4.5 million ($7.5 million for manufacturing contracts), the contract is normally awarded without competition.[96] In contrast, when the contract's anticipated value exceeds these thresholds, the contract generally must be awarded via a set-aside with competition limited to 8(a) firms so long as there is a reasonable expectation that at least two eligible and responsible 8(a) firms will submit offers and the award can be made at fair market price.[97] Sole-source awards of contracts valued at $4.5 million ($7.5 million or more for manufacturing contracts) may be made only when (1) there is not a reasonable expectation that at least two eligible and responsible 8(a) firms will submit offers at a fair market price or (2) the SBA accepts the requirement on behalf of an 8(a) firm owned by an Indian tribe, an ANC or, in the case of Department of Defense contracts, an NHO.[98] Requirements valued at more than $4.5 million ($7.5 million for

---

[93] 15 U.S.C. §637(a)(1)(A); 48 C.F.R. §19.806(b). Fair market price is estimated by looking at recent prices for similar items or work, in the case of repeat purchases, or by considering commercial prices for similar products or services, available in-house cost estimates, cost or pricing data submitted by the contractor, or data from other government agencies, in the case of new purchases. 15 U.S.C. §637(a)(3)(B)(i)-(iii); 48 C.F.R. §19.807(b) & (c).

[94] 15 U.S.C. §637(a)(1)(A).

[95] See Rothe Computer Solutions, LLC, B-299452 (May 9, 2007).

[96] FAR §19.805-1; and 15 U.S.C. §637(a)(16)(A). A noncompetitive award may be made under this authority so long as (1) the firm is determined to be a responsible contractor for performance of the contract; (2) the award of the contract would be consistent with the firm's business plan; and (3) award of the contract would not result in the firm exceeding the percentage of revenue from 8(a) sources forecast in its annual business plan. 15 U.S.C. §637(a)(16)(A)(i)-(iii).

[97] 15 U.S.C. §637(a)(1)(D)(ii); 48 C.F.R. §19.805-1a). However, competitive awards for contracts whose anticipated value is less than $4.5 million ($7.5 million for manufacturing contracts) can be made with the approval of the SBA's Associate Administrator for 8(a) Business Development. 15 U.S.C. §637(a)(1)(D)(i)(I)-(II); 48 C.F.R. §19.805-1(d).

[98] 48 C.F.R. §19.805-1(b)(1)-(2) (sole-source awards to tribally or ANC-owned firms); and 48 C.F.R. §219.805-1(b)(2)(A)-(B) (sole-source awards to NHO-owned firms).

Prior to enactment of P.L. 111-84, the National Defense Authorization Act (NDAA) for FY2010, contracting officers making sole-source awards in reliance on the second exception did not have to justify such awards or obtain approval of them from higher-level agency officials. The NDAA changed this by requiring justifications, approvals, and notices for sole-source contracts in excess of $20 million awarded under the authority of §§(a) analogous to those required for sole-source contracts awarded under the general contracting authorities. The $20 million threshold was increased through a regulatory update to $22 million, effective October 1, 2015, and to $25 million, effective October 1, 2020, to account for inflation. P.L. 116-92, the National Defense Authorization Act for Fiscal Year 2020, increased this threshold to $100 million for the Department of Defense. See Department of Defense, General Services Administration, and National Aeronautics and Space Administration, "Federal Acquisition Regulation: Inflation Adjustment of Acquisition-Related Thresholds," 80 *Federal Register* 38296, July 2, 2015; and Department of Defense, General

---

manufacturing contracts) cannot be divided into several acquisitions at lesser amounts in order to make sole-source awards.[99]

In addition, the Federal Acquisition Regulatory Council has the responsibility of adjusting each acquisition-related dollar threshold (including those for the 8(a) Program), on October 1, of each year that is evenly divisible by five.[100] As a result, sole source thresholds may differ from those in statute. The next adjustment for inflation will take place on October 1, 2025.

## Other Requirements

Other key 8(a) Program requirements include the following:

- **Inability to protest an 8(a) firm's eligibility for an award.** When the SBA makes or proposes an award to an 8(a) firm, the firm's eligibility cannot be challenged or protested as part of the solicitation or proposed contract award. Instead, information concerning a firm's eligibility must be submitted to the SBA in accordance with separate requirements contained in Section 124.517 of Title 13 of the *Code of Federal Regulations*.[101]

- **Nine-year maximum participation.** Firms may participate in the program for no more than nine years from the date of their admission, although they may be terminated or graduate from the program before nine years have passed.[102] In an effort to assist small businesses adversely affected by the novel coronavirus (COVID-19) pandemic, P.L. 116-260, the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act (Division N, Title III of the Consolidated Appropriations Act of 2021), provides businesses participating in the 8(a) program on or before September 9, 2020, the option to extend their participation in the program for one year.[103]

---

Services Administration, and National Aeronautics and Space Administration, "Federal Acquisition Regulation: Inflation Adjustment of Acquisition-Related Thresholds," 85 *Federal Register* 62485, October 2, 2020.

[99] 48 C.F.R. §19.805-1(c).

[100] 13 C.F.R. §124.506 (a); and 41 U.S.C. §1908(c)(2).

[101] 48 C.F.R. §19.805-2(d).

[102] 15 U.S.C. §636(j)(15) (nine-year term); 15 U.S.C. §637(a)(9) (termination and early graduation); 13 C.F.R. §124.301 (exiting the program); 13 C.F.R. §124.302 (early graduation); and 13 C.F.R. §124.303 (termination).

H.R. 6395, the National Defense Authorization Act for Fiscal Year 2021, which has been passed by the House and Senate, would allow firms participating in the All Small Mentor-Protégé Program on or before September 9, 2020, to elect to extend their nine-year participation for up to an additional year.

[103] The SBA has determined by rule that this "extension authority does not extend to business concerns that graduated from or otherwise left the 8(a) BD [Business Development] program prior to March 13, 2020, or to business concerns that were admitted to the 8(a) BD program after September 9, 2020." Any extension under the act will be added to the participant's transitional stage of participation in the program. The SBA selected March 13, 2020, as the beginning date for the eligibility for an additional year in the program because the COVID-19 pandemic was declared a national disaster on that date. The SBA indicated that "it is SBA's understanding that Congress extended the term of participation in the 8(a) BD program because it believed that the pandemic adversely affected 8(a) concerns and their ability to participate in and receive the full benefits of the program. Thus, it is reasonable to conclude that any firms participating in the program as of the date the national disaster was declared due to the pandemic (i.e. March 13, 2020) should receive the program term extension authorized by Congress." Also, the extension will not apply to businesses that were participants in the 8(a) program at any point from March 13, 2020, through September 9, 2020, but were terminated, early graduated, or voluntarily withdrew from the program in lieu of being terminated or early graduated. See SBA, "Extension of Participation in 8(a) Business Development Program," 86 *Federal Register* 2530, January 13, 2021.

Case 2:20-cv-00041-DCLC-CRW   Document 105-2   Filed 09/27/24   Page 22 of 78
PageID #: 3531

- **One-time eligibility.** Once a firm or a disadvantaged individual upon whom a firm's eligibility was based has exited the program after participating in it for any length of time, neither the firm nor the individual is generally eligible to participate in the program again.[104] Firms are considered identical for purposes of program eligibility when at least 50% of the assets of one firm are the same as those of another firm.[105]

- **Ownership limitations on family members of current or former 8(a) firm owners.** Individuals generally may not use their disadvantaged status to qualify a firm for the program if the individual has an immediate family member who is using, or has used, the disadvantaged status to qualify a firm for the program.[106]

- **Award Limitations.** In general, 8(a) individually-owned firms may not receive additional 8(a) sole-source awards once they have been awarded a combined total of competitive and sole-source awards in excess of $100 million, in the case of firms whose size is based on their number of employees, or in excess of an amount equivalent to the lesser of (1) $100 million or (2) five times the size standard for the industry, in the case of firms whose size is based on their revenues.[107] In addition, 8(a) firms in the *transitional stage*, or the last five years of participation, must achieve annual targets for the amount of revenues they receive from non-8(a) sources.[108] These targets increase over time, with firms required to attain 15% of their revenue from non-8(a) sources in the fifth year, 25% in the sixth year, 30% in the seventh year, 40% in the eight year, and 50% in the ninth year.[109] Firms that do not display the relevant percentages of revenue from non-8(a) sources are ineligible for sole-source 8(a) contracts "unless and until" they correct the situation.[110]

- **Subcontracting Limitations.** Federal subcontracting limitations require small businesses receiving contracts under set-asides to perform work that equals certain minimum percentages of the amount paid under the contract.[111] Specifically, small businesses must generally perform at least 50% of the costs of the contract incurred for personnel with its own employees, in the case of service

---

[104] 15 U.S.C. §636(j)(11)(B)-(C); and 13 C.F.R. §124.108(b).

[105] 13 C.F.R. §124.108(b)(4).

[106] 13 C.F.R. §124.105(g)(1). SBA may waive this prohibition if the firms have no connections in terms of ownership, control, or contractual relationships and certain other conditions are met.

[107] 13 C.F.R. §124.519(a)(1)-(2). Contracts less than $100,000 are not counted in determining whether a firm has reached the applicable limit. 13 C.F.R. §124.519(a)(3). The SBA Administrator may waive this requirement if the procuring agency's head determines that a sole-source award to a firm is necessary "to achieve significant interests of the Government." 13 C.F.R. §124.519(e). Even after firms have received a combined total of competitive and sole-source awards in excess of $100 million, or other applicable amount, they may still receive competitive contracts under the 8(a) Program. 13 C.F.R. §124.519(b).

[108] 15 U.S.C. §636(j)(10)(I)(i)-(iii); 13 C.F.R. §124.509(b)(1).

[109] 13 C.F.R. §124.509(b)(2); and SBA, "Extension of Participation in 8(a) Business Development Program," 86 *Federal Register* 2533, January 13, 2021.

[110] 13 C.F.R. §124.509(d)(1). This prohibition may be waived if the Office of Business Development's director determines that denial of a sole-source contract would cause severe economic hardship for the firm, potentially jeopardizing its survival, or if extenuating circumstances beyond the firm's control caused it to miss its target. 13 C.F.R. §125.509(e).

[111] 15 U.S.C. §637(a)(14)(A)-(B); 15 U.S.C. §644(o); 13 C.F.R. §125.6; and 48 C.F.R. §52.219-14.

contracts; and at least 50% of the cost of manufacturing supplies or products (excluding the cost of materials), in the case of manufacturing contracts.[112]

# Requirements for Tribally, ANC-, NHO-, and CDC-Owned Firms

Tribes, Alaska Native Corporations (ANCs), Native Hawaiian Organizations (NHOs) or Community Development Corporations (CDCs) themselves generally do not participate in the 8(a) Program. Rather, businesses that are at least 51% owned by such entities participate in the program,[113] although the rules governing their participation are somewhat different from those for the program generally.[114]

## Program Eligibility

### Small

Firms owned by Indian tribes, ANCs, NHOs, and CDCs must be deemed small under the SBA's size standards.[115] However, certain affiliations with the owning entity or other business enterprises of that entity are excluded in size determinations *unless* the SBA Administrator determines that a small business owned by an ANC, CDC, NHO, or Indian tribe "[has] obtained, or [is] likely to obtain, a substantial unfair competitive advantage within an industry category" because of such exclusions.[116] Other affiliations of small businesses owned by ANCs, CDCs, NHOs, and Indian tribes may be included in size determinations, and ANC-owned firms, in particular, have been subjected to early graduation from the 8(a) Program because they exceeded size standards.[117]

### Business

Firms owned by ANCs, CDCs, NHOs, and Indian tribes must be "businesses" under the SBA's definition.[118] Although ANCs themselves may be for-profit or nonprofit, ANC-owned businesses must be for-profit to participate in the program.[119]

---

[112] 15 U.S.C. §657s(a)(1)&(2); and 13 C.F.R. §125.6(a)(1)-(2). There are separate provisions regarding the percentage of work to be performed under construction contracts. See generally 13 C.F.R. §125.6(a)(3)-(4).

[113] 13 C.F.R. §124.109(c)(3)(i) (tribally and ANC-owned firms); 13 C.F.R. §124.110 (b) (NHO-owned firms); and 13 C.F.R. §124.111(c) (CDC-owned firms).

[114] 13 C.F.R. §§124.109-124.111.

[115] 13 C.F.R. §124.109(c)(2) (tribally and ANC-owned firms); 13 C.F.R. §124.110(b) (NHO-owned firms); and 13 C.F.R. §124.111(c) (CDC-owned firms).

[116] 13 C.F.R. §124.109(c)(2)(iii) (tribally and ANC-owned firms); 13 C.F.R. §124.110(b) (NHO-owned firms); and 13 C.F.R. §124.111(c) (CDC-owned firms).

[117] See Valenzuela Eng'g, Inc. & Curry Contracting Co., Inc., SBA-4151 (1996) (rejecting a challenge to the size of an ANC-owned firm because its subcontractor performed less than 25% of the work on the contract and was not its affiliate); and U.S. Government Accountability Office (GAO), *Increased Used of Alaska Native Corporations' Special 8(a) Provisions Calls for Tailored Oversight*, GAO-06-399, April 27, 2006, p. 29, at http://www.gao.gov/new.items/d06399.pdf (describing "early graduation" of ANC-owned 8(a) firms).

[118] 13 C.F.R. §124.109(a) and (b) (requiring tribally and ANC-owned firms to comply with the general eligibility requirements where they are not contrary to or inconsistent with the special requirements for these entities); 13 C.F.R. §124.110(a) (similar provision for NHO-owned firms); and 13 C.F.R. §124.111(a) (similar provision for CDC-owned firms).

[119] 13 C.F.R. §124.109(a)(3).

### Unconditionally Owned and Controlled

Firms owned by ANCs, CDCs, NHOs, or Indian tribes must be unconditionally owned and substantially controlled by the ANC, CDC, NHO, or Indian tribe, respectively.[120] However, under SBA regulations, tribally or ANC-owned firms may be managed by individuals who are not members of the tribe or Alaska Natives if the firm can demonstrate:

> that the Tribe [or ANC] can hire and fire those individuals, that it will retain control of all management decisions common to boards of directors, including strategic planning, budget approval, and the employment and compensation of officers, and that a written management development plan exists which shows how Tribal members will develop managerial skills sufficient to manage the concern or similar Tribally-owned concerns in the future.[121]

NHO-owned firms must demonstrate that the NHO controls the board of directors.[122] However, the individual who is responsible for the NHO-owned firm's day-to-day management need not establish personal social and economic disadvantage.[123] CDCs are to be managed and have their daily operations conducted by individuals with "managerial experience of an extent and complexity needed to run the [firm]."[124]

### Socially Disadvantaged

As owners of prospective or current 8(a) firms, Indian tribes, ANCs, NHOs, and CDCs are all presumed to be socially disadvantaged.[125]

### Economically Disadvantaged

By statute, ANCs are deemed to be economically disadvantaged, and CDCs are similarly treated as economically disadvantaged.[126] In contrast, Indian tribes and NHOs must establish economic disadvantage. Indian tribes must present data on, among other things, the number of tribe

---

[120] 13 C.F.R. §124.109(a) and (b) (requiring tribally and ANC-owned firms to comply with the general eligibility requirements where they are not contrary to or inconsistent with the special requirements for these entities); 13 C.F.R. §124.110(a) (similar provision for NHO-owned firms); and 13 C.F.R. §124.111(a) (similar provision for CDC-owned firms).

[121] 13 C.F.R. §124.109(c)(4)(B).

[122] 13 C.F.R. §124.110(d).

[123] 13 C.F.R. §124.110(d).

[124] 13 C.F.R. §124.111(b).

[125] 13 C.F.R. §124.109(b)(1) (tribally and ANC-owned firms); 15 U.S.C. §637(a)(4)(A)(i)(II) (NHO-owned firms); 13 C.F.R. §124.110(a) (same); 13 C.F.R. §124.111(a) (CDC-owned firms); and Small Disadvantaged Business Certification Application: Community Development Corporation (CDC) Owned Concern, OMB Approval No. 3245-0317 ("A Community Development Corporation (CDC) is considered to be a socially and economically disadvantaged entity if the parent CDC is a nonprofit organization responsible to residents of the area it serves which has received financial assistance under 42 U.S.C. 9805, et seq."). The SBA's authority to designate CDCs as socially and economically disadvantaged derives from Section 9815(a)(2) of Title 42 of the *United States Code*, which required SBA to "promulgate regulations to ensure the availability to community development corporations of such programs as shall further the purposes of this subchapter, including programs under §637(a) of title 15."

[126] 43 U.S.C. §1626(e)(1) ("For all purposes of Federal law, a Native Corporation shall be considered to be a corporation owned and controlled by Natives and a minority and economically disadvantaged business enterprise if the Settlement Common Stock of the corporation and other stock of the corporation held by holders of Settlement Common Stock and by Natives and descendants of Natives, represents a majority of both the total equity of the corporation and the total voting power of the corporation for the purposes of electing directors."); 13 C.F.R. §124.109(a)(2) (similar); and 13 C.F.R. §124.111(a).

Case 2:20-cv-00041-DCLC-CRW    Document 105-2    Filed 09/27/24    Page 25 of 78
PageID #: 3534

members; the tribe members' unemployment rate and per capita income; the percentage of the local Indian population above the poverty level; the tribe's access to capital and assets as disclosed in current financial statements; and all businesses wholly or partially owned by tribal enterprises or affiliates, as well as their primary industry classification.[127] Effective August 24, 2016, NHOs establish economic disadvantage in the same manner as Indian tribes.[128] Prior to this revision, the SBA considered "the individual economic status of NHO's members," the majority of whom had to qualify as economically disadvantaged, under the same standards as individual applicants to the program.[129]

Once a tribe or NHO has established that it is economically disadvantaged for purposes of one 8(a) business, it need not reestablish economic disadvantage in order to have other businesses certified for the program *unless* the Director of the Office of Business Development requires it to do so.[130]

### Good Character

The SBA's regulations governing tribally and ANC-owned 8(a) firms explicitly state that the good character requirement applies only to officers or directors of the firm, or shareholders owning more than a 20% interest.[131] NHO-owned firms may be subject to the same requirements in practice.[132] With CDC-owned firms, the firm itself and "all of its principals" must have good character.[133]

### Demonstrated Potential for Success

Firms owned by ANCs, CDCs, NHOs, and Indian tribes may provide evidence of *potential for success* in several ways:

1. The firm has been in business for at least two years, as shown by individual or consolidated income tax returns for each of the two previous tax years showing operating revenues in the primary industry in which the firm seeks certification.

2. The individuals who will manage and control the firm's daily operations have substantial technical and management experience; the firm has a record of successful performance on government or other contracts in its primary industry category; and the firm has adequate capital to sustain its operations and carry out its business plan.

---

[127] 15 U.S.C. §637(a)(6)(A); and 13 C.F.R. §124.109(b)(2)(i)-(vii).

[128] SBA, "Small Business Mentor Protégé Program," 81 *Federal Register* 48571, July 25, 2016.

[129] 13 C.F.R. §124.110(c)(1). Specifically, for the first 8(a) applicant owned by a particular NHO, individual NHO members had to meet the same initial eligibility economic disadvantage thresholds as individually-owned 8(a) applicants. For any additional 8(a) applicant owned by the NHO, individual NHO members had to meet the economic disadvantage thresholds for continued 8(a) eligibility. If the NHO had no members, then a majority of the members of the board of directors had to qualify as economically disadvantaged.

[130] 13 C.F.R. §124.109(b).

[131] 13 C.F.R. §124.109(c)(7)(ii).

[132] The regulations as to NHOs do not appear to address "good character." However, in practice, when this has happened in the past, NHO-owned firms have often been treated the same as firms owned by Indian tribes.

[133] 13 C.F.R. §124.111(g).

Case 2:20-cv-00041-DCLC-CRW     Document 105-2     Filed 09/27/24     Page 26 of 78
PageID #: 3535

3. The owner-group has made a firm written commitment to support the firm's operations and has the financial ability to do so.[134]

The first of these ways for demonstrating potential for success is the same for individually owned firms, and the second arguably corresponds to the circumstances in which the SBA may waive the requirement that individually owned firms have been in business for at least two years.[135] There is no equivalent to the third way for individually owned firms, and some commentators have suggested that this provision could "benefit ANCs [and other owner groups] by allowing more expeditious and effortless access to 8(a) contracts for new concerns without having to staff new subsidiaries with experienced management."[136]

### Report of Benefits for Firms Owned By ANCs, Indian Tribes, NHOs, and CDCs

8(a) firms owned by ANCs, CDCs, NHOs, and Indian tribes must submit information with its annual financial statement to the SBA showing

> how the Tribe, ANC, NHO or CDC has provided benefits to the Tribal or native members and/or the Tribal, native or other community due to the Tribe's/ANC's/NHO's/CDC's participation in the 8(a) ... program through one or more firms. This data includes information relating to funding cultural programs, employment assistance, jobs, scholarships, internships, subsistence activities, and other services provided by the Tribe, ANC, NHO or CDC to the affected community.[137]

### Set-Asides and Sole-Source Awards

Similar to other participants, firms owned by ANCs, CDCs, NHOs, and Indian tribes are eligible for 8(a) set-asides and may receive sole-source awards valued at less than $4.5 million ($7.5 million for manufacturing contracts). However, firms owned by ANCs and Indian tribes can also

---

[134] 13 C.F.R. §124.109(c)(6)(i)-(iii) (ANC- and tribally-owned firms); 13 C.F.R. §124.110(g)(1)-(3) (NHO-owned firms); and 13 C.F.R. §124.111(f)(1)-(3) (CDC-owned firms).

[135] 13 C.F.R. §124.107; and 13 C.F.R. §124.107(b)(1)(i)-(v).

[136] Daniel K. Oakes, "Inching Toward Balance: Reaching Proper Reform of the Alaska Native Corporations' 8(a) Contracting Preferences," 40 *Public Contract Law Journal* 777 (2011).

[137] 13 C.F.R. §124.604. SBA regulations promulgated in February 2011 provided that this reporting requirement would be effective "as of September 9, 2011, unless SBA further delays implementation through a Notice in the Federal Register." SBA, "Small Business Size Regulations; 8(a) Business Development/Small Disadvantaged Business Status Determinations: Final Rule," 76 *Federal Register* 8222-8264 (February 11, 2011). The SBA subsequently delayed the reporting requirement through at least five such notices. See SBA, "8(a) Business Development Program Regulations; Tribal Consultations," 76 *Federal Register* 12273, 12274 (March 7, 2011); SBA, "8(a) Business Development Program Regulations; Tribal Consultations," 76 *Federal Register* 27859, 27860 (May 13, 2011); SBA, "Data Collection Available for Public Comments and Recommendations: 60 Day Notice and Request for Comments," 76 *Federal Register* 63983, 63984 (October 14, 2011); SBA, "Data Collection Available for Public Comments and Recommendations: 60 Day Notice and Request for Comments," 77 *Federal Register* 73509, 73510 (December 10, 2012); and SBA, "Data Collection Available for Public Comments and Recommendations; Notice: Extension of Comment Period for New 8(a) Business Development Program Reporting Requirements," 78 *Federal Register* 9447 (February 8, 2013). GAO reports that until 2016 compliance with this reporting requirement varied because the SBA did not have an OMB-approved standard form to collect the data. In 2011, the SBA developed a seven page form, but after receiving comments that the form was too burdensome it was not adopted. After consultations with OMB, ANCs, and other groups, in June 2015, the SBA proposed a new one-page form. OMB approved the form on March 3, 2016. See SBA, "Data Collection Available for Public Comments: 60 Day Notice and Request for Comments," 80 *Federal Register* 31444, 31445 (June 2, 2015); SBA, "Reporting and Recordkeeping Requirements Under OMB Review: 30 Day Notice," 80 *Federal Register* 73035, 73036 (November 23, 2015); and GAO, *Alaska Native Corporations: Oversight Weaknesses Continue to Limit SBA's Ability to Monitor Compliance with 8(a) Program Requirements*, GAO-16-113, March 21, 2016, p. 36, at http://www.gao.gov/assets/680/675905.pdf.

receive sole-source awards in excess of $4.5 million ($7.5 million for manufacturing contracts) even when contracting officers reasonably expect that at least two eligible and responsible 8(a) firms will submit offers and the award can be made at fair market price.[138] NHO-owned firms may receive sole-source awards from the Department of Defense under the same conditions.[139]

## Other Requirements

Firms owned by ANCs, CDCs, NHOs, and Indian tribes are governed by the same regulations as other 8(a) firms in which certain of the "other requirements" are involved, including (1) inability to protest an 8(a) firm's eligibility for an award;[140] (2) maximum of nine years in the program (for individual firms);[141] and (3) limits on subcontracting.[142] However, requirements for such firms differ somewhat from those for other 8(a) firms, including the one-time eligibility for the 8(a) Program; limits on majority ownership of 8(a) firms; and limits on the amount of 8(a) contracts that a firm may receive. Firms owned by ANCs, CDCs, NHOs, and Indian tribes may participate in the 8(a) Program only one time.[143] However, unlike the disadvantaged individuals upon whom other firms' eligibility for the 8(a) Program is based, ANCs, CDCs, NHOs, and Indian tribes may confer program eligibility upon firms on multiple occasions and for an indefinite period.[144] In addition, ANCs, CDCs, NHOs, and Indian tribes may not own 51% or more of another firm that "either at the time of application or within the previous two years," obtains the majority of its revenue from the same "primary" industry as the applicant. However, there are no limits on the number of firms they may own that operate in other primary industries.[145] Moreover, ANCs,

---

[138] P.L. 100-656, §602(a), 102 Stat. 3887-88 (November 15, 1988) (codified at 15 U.S.C. §637 note); and 48 C.F.R. §19.805-1(b)(2).

As mentioned in footnote 98, P.L. 111-84 requires federal contracting officers to provide written justifications, obtain higher-level agency approvals, and provide notices for sole-source contracts in excess of $20 million awarded under the authority of §8(a) analogous to those required for sole-source contracts awarded under the general contracting authorities. The $20 million threshold was increased through a regulatory update to $22 million, effective October 1, 2015, and to $25 million, effective October 1, 2020, to account for inflation. P.L. 116-92 increased this threshold to $100 million for the Department of Defense.

[139] DOD's authority to make sole-source awards to NHO-owned firms of contracts valued at more than $4.5 million ($7.5 million for manufacturing contracts) even if contracting officers reasonably expect that offers will be received from at least two responsible small businesses existed on a temporary basis in 2004-2006 and became permanent in 2006. See P.L. 109-148, Department of Defense, Emergency Supplemental Appropriations to Address Hurricanes in the Gulf of Mexico, and Pandemic Influenza Act of 2006, §8020, 119 Stat. 2702-03 (December 30, 2005) ("[Provided] [t]hat, during the current fiscal year and hereafter, businesses certified as 8(a) by the Small Business Administration pursuant to section 8(a)(15) of Public Law 85-536, as amended, shall have the same status as other program participants under section 602 of P.L. 100-656 ... for purposes of contracting with agencies of the Department of Defense."); 48 C.F.R. §219.805-1(b)(2)(A)-(B).

[140] 48 C.F.R. §19.805-2(d).

[141] 13 C.F.R. §124.109(a) & (b) (requiring tribally and ANC-owned firms to comply with the general eligibility requirements where they are not contrary to or inconsistent with special requirements for these entities); 13 C.F.R. §124.110(a) (similar provision for NHO-owned firms); and 13 C.F.R. §124.111(a) (similar provision for CDC-owned firms).

[142] 15 U.S.C. §644(o); 15 U.S.C. §657s; 13 C.F.R. §125.6; and 48 C.F.R. §52.219-14.

[143] 13 C.F.R. §124.109(a) & (b) (ANC- and tribally-owned firms); 13 C.F.R. §124.110(a) (NHO-owned firms); and 13 C.F.R. §124.111(a) (CDC-owned firms).

[144] 15 U.S.C. §636(j)(11)(B)-(C).

[145] 13 C.F.R. §124.109(c)(3)(ii) (tribally and ANC-owned firms); 13 C.F.R. §124.110(e) (NHO-owned firms); and 13 C.F.R. §124.111(d) (CDC-owned firms). These regulations also provide that an 8(a) firm owned by an ANC, CDC, NHO, or Indian tribe may not, within its first two years in the 8(a) Program, receive a sole-source contract that is a follow-on to an 8(a) contract currently performed by an 8(a) firm owned by that entity, or previously performed by an 8(a) firm owned by that entity that left the program within the past two years. In addition, there are restrictions on the

---

Case 2:20-cv-00041-DCLC-CRW   Document 105-2   Filed 09/27/24   Page 28 of 78
PageID #: 3537

CDCs, NHOs, and Indian tribes may own multiple firms that earn less than 50% of their revenue in the same "secondary" industries.[146] Finally, firms owned by ANCs, CDCs, NHOs, and Indian tribes may continue to receive additional sole-source awards even after they have received a combined total of competitive and sole-source 8(a) contracts in excess of the dollar amount set forth in Section 124.519 of Title 13 of the *Code of Federal Regulations*. Individually owned firms may not exceed this threshold.[147] However, firms owned by any of these four types of entities are subject to the same requirements regarding the percentages of revenue received from non-8(a) sources at various stages of their participation in the program as other 8(a) firms.[148]

# Organizational Structure

The SBA's Office of Business Development (BD), housed within the Office of Government Contracts and Business Development, oversees the 8(a) Program. BD has three offices: the Office of Certification and Eligibility (OCE), the Office of Management and Technical Assistance (OMTA); and the Office of Program Review (OPR). Their functions are provided in the footnote below.[149]

---

percentage of work that may be performed by any non-8(a) venturer(s) in joint ventures involving 8(a) firms. See generally 13 C.F.R. §124.513.

[146] 13 C.F.R. §124.109(c)(3)(ii) (tribally and ANC-owned firms); 13 C.F.R. §124.110(e) (NHO-owned firms); 13 C.F.R. §124.111(d) (CDC-owned firms).

[147] 13 C.F.R. §124.519(a).

[148] 13 C.F.R. §124.509.

[149] The Office of Certification and Eligibility (OCE) provides program participants recommendations concerning initial and continuing program eligibility. OCE's functions include, but are not limited to, analyzing and processing: (1) applications for initial program participation, (2) requests for reconsideration of decisions declining initial program applications; (3) requests to graduate early or to terminate, voluntarily withdraw, or suspend program participation; (4) changes of ownership, business structure, business name, and/or management; (5) annual continuing eligibility review issues; and (6) general questions concerning eligibility and application processes. OCE also provides technical assistance and support to SBA district offices (DOs) regarding outreach to potential program participants, eligibility issues, and waivers for outside employment.

The Office of Management and Technical Assistance (OMTA) administers most of the services that are not provided by DOs and reviews certain actions recommended by DOs. These services include (1) servicing sole-source, competitive, and multiple-award contracts; (2) analyzing and processing termination waivers, requests for competition below the competitive thresholds, requests for sole source above the thresholds, requests for waivers of sole source prohibition, bona fide office determinations, and mentor/protégé applications and reconsiderations; (3) subcontracting assistance; (4) overseeing and coordinating 7(j) technical and management training assistance; (5) overseeing and executing national and local seminars, conferences, and other similar activities; (6) outreach to prime contractors, federal agencies, and the 8(a) program community; (7) reciprocating with other certification entities; and (8) promoting, training, and assisting the DOs with their overall program objectives and initiatives.

The Office of Program Review (OPR) supports both 8(a) headquarters and field office staff by (1) evaluating and responding to external program reviews that may be conducted by the SBA's Office of Inspector General (OIG), Office of Government Contracting (for agency surveillance reviews), Office of Field Operations (for SBA DO reviews), and the U.S. Government Accountability Office (GAO); (2) responding to agency controlled correspondence from the public and congressional offices, Freedom of Information Act requests from the public, and clearance requests from other SBA offices; (3) gaining approval of agency partnership agreements and providing training for buying activities; (4) creating marketing products and updating the 8(a) program web page; (5) managing all activities associated with the surplus property program; (6) maintaining program data on firm participation; and (7) preparing the annual report to Congress on program participation and contracting.

See SBA, Office of Business Development, "Standard Operating Procedure for the Office of Business Development," SOP 80 05 5, effective September 23, 2016, pp. 29-31, at https://www.sba.gov/sites/default/files/sops/SOP_80_05_5_.pdf.

Applications for the 8(a) Program are processed at one of two central office duty stations (CODS), one located in San Francisco, CA, and the other in Philadelphia, PA.[150] Applicants apply to the CODS that serve the territory where the applicant's principal place of business is located. Business Opportunity Specialists (BOSs) work directly with 8(a) firms in district offices under the general supervision of the SBA's Office of Field Operations (OFO). Although BOSs report to the SBA's OFO, they interact extensively with BD, which is located in the SBA's headquarters building in Washington, DC. As will be discussed, GAO and others have argued that this overlapping organizational structure may "create programmatic challenges."[151]

# The Application Process

Prior to applying for certification, firms must complete all requirements for contracting with the federal government (e.g., get a free D-U-N-S number—a unique nine-digit identification number of each physical business location from Dun and Bradstreet; obtain a free tax identification number or employer identification number from the Internal Revenue Service; create a profile in the federal System for Award Management, and get a free SBA general login system user ID).[152]

The SBA's district office staff generally encourage potential 8(a) Program applicants "to attend an information session to obtain information regarding the program and its eligibility criteria prior to filing an application ... [and] also refer the applicant to SBA's website for forms, specific eligibility criteria, pertinent regulatory sections in the Code of Federal Regulations, and overall information on the program."[153]

In an attempt to encourage more applicants, the SBA revised and streamlined the 8(a) Program's application process in 2016 by accepting online applications only (hard copy applications are no longer accepted) and eliminating the requirement for a wet signature application; a completed IRS Form 4506T, Request for Copy or Transcript of Tax Form, in every case; and narrative statements in support of the applicants' claims of economic disadvantage. That determination is now based solely on an analysis of objective financial data relating to the individual's net worth, income and total assets.[154] In addition, to prevent what it viewed as unnecessary delays for minor infractions that may have "occurred many years ago" and may have "nothing to do with the individual's business integrity," the SBA made optional the automatic suspension of consideration and referral to the SBA OIG of all applications with adverse information regarding the applicant's or any of its principals' possible criminal conduct.[155]

Despite these changes, applicants still have a relatively long list of supporting documents (and required SBA Forms)[156] that they must submit, including the following:

---

[150] The San Francisco, California CODS screens and processes all applications submitted by Alaska Native Corporations (ANCs), regardless of where the concern is located.

[151] GAO, *Small Business Administration: Leadership Attention Needed to Overcome Management Challenges*, GAO-15-347, September 22, 2015, p. 59, at http://www.gao.gov/assets/680/672648.pdf.

[152] SBA, "Steps to Applying to the 8(a) Program," at https://www.sba.gov/contracting/government-contracting-programs/8a-business-development-program/how-apply. D-U-N-S is the data universal number system that businesses are required to register with the federal government when competing for contracts or grants.

[153] SBA, Office of Business Development, "Standard Operating Procedure for the Office of Business Development," SOP 80 05 5, effective September 23, 2016, p. 35, at https://www.sba.gov/sites/default/files/sops/SOP_80_05_5_.pdf.

[154] SBA, "Small Business Mentor Protégé Program," 81 *Federal Register* 48569, July 25, 2016.

[155] SBA, "Small Business Mentor Protégé Program," p. 48570.

[156] Firms must submit SBA Form 1010, 8(a) Business Development (BD) Program Application along with supporting documentation. Individuals must submit SBA Form 1010-IND, Individual Information; SBA Form 912, Statement of

- Signed and dated federal income tax returns for the firm and all individuals that either own more than 10% of the firm or have a key position in the firm for the past three years preceding the date of application (including all forms, statements, schedules and attachments).

- The firm's financial statements, balance sheet, and profit and loss statements for the past three years (including the most recent balance sheet, current within 90 days of application).

- A completed personal financial statement form (from all principals and their spouses), including a list of all assets, liabilities, real estate and other personal property, including transferred assets, information on delinquent federal obligations, past due taxes or liens, bankruptcy filings and pending civil lawsuits, and a list of any SBA loans for the firm and other businesses owned by the principal(s).

- A list or chart of the firm's current and past federal and nonfederal contracts within the most recently completed fiscal year.

- A list of any lease agreements.

- Proof of signature authority on the firm's bank account(s) (i.e., signature card(s) for firm bank account(s) or letter from the bank).

- Documented proof of contributions: (1) used to acquire ownership (for each owner), (2) of any transfer of assets to or from the firm, and (3) of any transfer of assets to or from any of the firm's owners over the past two years.

- State filings (signed, dated and stamped by the state where the firm does business) and certificate of good standing.[157]

- List of any foreign corporation filings.

- Articles of incorporation, articles of organization, any DBA ("doing business as") filings, governing documents signed by the principals, bylaws, operating agreements, partnership agreements, and meeting minutes.

- Any stock certificates and ledgers.

- Proof of social disadvantage from majority owners and firm managers.

- Background information and personal information from all principals, including a resume, a completed Statement of Personal History form, proof of U.S. citizenship or naturalization, duties within the firm and time devotion, a list of other business interests and time devotion, and the nature of outside employment and time devotion.[158]

- Documentation addressing how the firm meets specified objectives, if it is applying for a two-year waiver.[159]

---

Personal History; any individual who responds 'Yes' to questions 7, 8 or 9 on the SBA Form 912 must submit a completed SBA Fingerprint Card (FD 258, Fingerprint Card); and SBA Form 413, Personal Financial Statement. See SBA, Office of Business Development, "Standard Operating Procedure for the Office of Business Development," SOP 80 05 5, effective September 23, 2016, pp. 37-39, at https://www.sba.gov/sites/default/files/sops/SOP_80_05_5_.pdf.

[157] A certificate of good standing is issued by the Secretary of State's Office evidencing that a business has complied with the applicable provisions of the laws of the state, is in good standing, and authorized to transact business or to conduct affairs within the state.

[158] Principals include owner(s) of more than 10%, officers, directors, members, partners, and key employees.

[159] The specified objectives are "substantial demonstration of business management experience; demonstrated technical

Case 2:20-cv-00041-DCLC-CRW    Document 105-2    Filed 09/27/24    Page 31 of 78
PageID #: 3540

As mentioned, applications are processed at the San Francisco or Philadelphia CODS. In general, the SBA processes an application and issues a decision letter within 90 days of the receipt of an application package. The processing time will be suspended only if an applicant is referred to the SBA OIG, for a formal size determination, or both.[160]

Applicants are notified within 15 days of receipt whether the application package is complete or incomplete. The SBA will not process an incomplete application.[161] *Complete* means that the application is ready to be processed.

A BOS, at one of the CODS, initially reviews the application. If, during the eligibility review process, it is determined that an application is incomplete, the BOS may request additional information or clarification "via a delivery method that tracks delivery and provides return receipt capability."[162] The applicant must provide the requested information within five calendar days of receipt of the request. Failure to meet the deadline may result in the applicant's ineligibility to participate in the program. However, a request for additional information does not stop the 90-day processing clock. "Once the requested information is provided, the case may require priority handling in order for the CODS to complete the eligibility review within the required timeframe."[163]

After the initial review, the BOS submits the case file, the BOS analysis, and a decision letter to the CODS' chief for review. The chief examines the BOS analysis and decision letter to verify that all required steps and regulations have been properly applied. Upon completing the examination, the chief returns the case file and attachments to the BOS along with any applicable comments and recommendations.[164]

The BOS then makes any changes or corrections to the analysis or decision letter as requested by the chief. The chief then signs and returns the case file to the processing BOS. The chief makes his or her recommendation in the electronic application system (which is equivalent to transmitting it to the OCE's director, who approves or declines the application largely based on the CODS' review).[165]

After the OCE review, the associate administrator for Business Development (AA/BD) ultimately approves or declines the application in writing.[166] The electronic application system notifies the

---

expertise to carry out its business plan; adequate capital; record of successful performance on contracts (including copies of contracts that will reflect the different sizes the firm can handle); and ability to obtain the personnel, facilities, equipment, and any other requirements to perform on contracts. Applicants seeking this waiver must also provide a list of the different services/products provided by the firm; billing invoices and bank statements reflecting deposit of receipts; and letters of reference from the firm's clients." See SBA, "8(a) Application Checklist," at https://sbaone.atlassian.net/wiki/spaces/CKB/pages/96370728/8+a+Initial+Application+Document+Checklist.

[160] SBA, Office of Business Development, "Standard Operating Procedure for the Office of Business Development," SOP 80 05 5, effective September 23, 2016, p. 73, at https://www.sba.gov/sites/default/files/sops/SOP_80_05_5_.pdf; and 13 C.F.R. §124.204(a).

[161] 13 C.F.R. §124.204(a).

[162] SBA, Office of Business Development, "Standard Operating Procedure for the Office of Business Development," SOP 80 05 5, effective September 23, 2016, p. 73, at https://www.sba.gov/sites/default/files/sops/SOP_80_05_5_.pdf.

[163] SBA, Office of Business Development, "Standard Operating Procedure for the Office of Business Development," SOP 80 05 5, p. 73.

[164] SBA, Office of Business Development, "Standard Operating Procedure for the Office of Business Development," SOP 80 05 5, p. 75.

[165] SBA, Office of Business Development, "Standard Operating Procedure for the Office of Business Development," SOP 80 05 5, p. 75.

[166] 13 C.F.R. §124.204(f).

Case 2:20-cv-00041-DCLC-CRW    Document 105-2    Filed 09/27/24    Page 32 of 78
PageID #: 3541

firm by issuing an approval or declination letter. All declination letters must clearly explain the reason(s) why the firm was found to be ineligible, including a direct reference to regulatory provisions that the applicant failed to satisfy. The letter must also include the applicant's right to request reconsideration and, if applicable, to appeal the decision to the SBA's Office of Hearings and Appeals.[167]

As discussed below in the "Current Issues" section, the SBA and others have identified the application process, and its relatively high rate of rejection, as an impediment to the 8(a) Program's growth.

# Business Opportunity Specialists and Reporting Requirements

The SBA's 117 BOSs assist both prospective and existing 8(a) firms with questions related to the application process, required forms, and the program's various eligibility, reporting, and performance requirements.[168] BOSs also provide general business development assistance, assist with the firm's planning and establishment of goals, work with the firm as it develops and submits its required business plan, and ensure that the firm is on track regarding anticipated business growth.[169] BOSs "on-going responsibility is to assist the Participant in developing its business to the fullest extent possible so that it attains competitive viability during its program participation term, and maintains viability thereafter."[170] As directed, BOSs accomplish this by (1) helping the firm identify its strengths and weaknesses; (2) providing advice, counsel, and guidance in the areas of marketing to the federal government, prime contracting, and contract administration; (3) referring the firm to appropriate internal and external resources for assistance in technical, management, and financial matters; and (4) monitoring the firm's progress in the program and its compliance with program requirements.[171]

8(a) firms must demonstrate program compliance by reporting specific information to the SBA on an as needed, periodic, or requested basis. Much of the reporting is accomplished through the required annual review, which focuses on the firm and its business development, and the continuing eligibility review.[172]

---

[167] SBA, Office of Business Development, "Standard Operating Procedure for the Office of Business Development," SOP 80 05 5, effective September 23, 2016, p. 74, at https://www.sba.gov/sites/default/files/sops/SOP_80_05_5_.pdf; SBA, Office of Inspector General, "SBA's 8(a) Business Development Program Eligibility," Audit Report, Number 16-13, April 7, 2016, p. 2, at https://www.sba.gov/sites/default/files/oig/16-13_SBAs_8a_Business_Development_Program_Eligibility.pdf; 13 C.F.R. §124.205; and 13 C.F.R. §124.206.

[168] SBA, OIG, *SBA Business Development Assistance to 8(a) Program Participants*, Report No. 22-08, February 14, 2022, pp. 21-22, at https://www.sba.gov/document/report-22-08-sbas-business-development-assistance-8a-program-participants.

[169] SBA, Office of Government Contracting and Business Development, "Supplemental Workbook, May 2013, Module 3 Winning Contracts Pre-8(a) Business Development Program Training Series," at https://www.sba.gov/content/pre-8a-business-development-program-training-series.

[170] SBA, Office of Business Development, "Standard Operating Procedure for the Office of Business Development," SOP 80 05 5, effective September 23, 2016, pp. 131, 132, at https://www.sba.gov/sites/default/files/sops/SOP_80_05_5_.pdf.

[171] SBA, Office of Business Development, "Standard Operating Procedure for the Office of Business Development," SOP 80 05 5, p. 132.

[172] SBA, Office of Government Contracting and Business Development, "Pre-8(a) Business Development Program Module 4—Business Planning and Operational Management, transcript," February 2015, p. 9, at https://www.sba.gov/

The annual review requires numerous forms and documentation, including the following:

- Form 1450—8(a) Annual Update Review (information about the firm, including its tenure in the program, current financial data, business development targets, loans and other sources of capital, and applicable bonding information);

- Form 1623—Certification Regarding Debarment, Suspension, and Other Responsibility Matters Primary Covered Transactions (detailed information regarding any debarments, suspensions, or other potentially adverse matters);

- Form 1790—Representatives Used and Compensation Paid for Services in Connection with Obtaining Federal Contracts (required semiannually, includes a list of any agents, representatives, accountants, consultants, etc. that receive fees, commissions, or compensation of any kind to assist the firm in obtaining or seeking federal contracts);

- Form 912—Statement of Personal History (information related to claiming disadvantaged status for all officers, directors, general partners, managing members, and holders of more than 10% ownership in the firm); and

- Form 413—Personal Financial Statement (information concerning the owner's and their spouse's personal net worth).[173]

8(a) firms are also required to provide any updates or modifications to their business plan.[174] If the firm participates in the All Small Mentor-Protégé Program (see below) it must provide "a narrative report detailing the contracts it has had with its mentor and benefits it has received from the mentor/protégé relationship."[175] In addition, the firm must provide a report for each 8(a) contract performed during the year "explaining how the performance of work requirements are being met for the contract, including any 8(a) contracts performed as a joint venture."[176]

In 2010, GAO reported that the district staff's "dual role of advocacy for and monitoring of the firms may have contributed in part to the retention of ineligible firms."[177] In response, in 2012, the SBA shifted responsibility for processing the continued eligibility of the required annual review from BOSs located in the SBA district offices to its Washington, DC, office. While BOSs continue to perform other components of the annual review, "shifting the responsibility for

sites/default/files/Pre8a_module4_transcript.pdf; and SBA, Office of Business Development, Standard Operating Procedure for the Office of Business Development," SOP 80 05 5, effective September 23, 2016, p. 212, at https://www.sba.gov/sites/default/files/sops/SOP_80_05_5_.pdf. ...Continuing eligibility reviews are conducted by the District Office and OCE. ...OCE conducts continuing eligibility review on 8(a) Participant firms that are considered high risk/complex and those that are requested from the field staff. See SBA, Office of Business Development, "Standard Operating Procedure for the Office of Business Development," SOP 80 05 5, effective September 23, 2016, p. 212, at https://www.sba.gov/sites/default/files/sops/SOP_80_05_5_.pdf.

[173] SBA, Office of Government Contracting and Business Development, "Pre-8(a) Business Development Program Module 4—Business Planning and Operational Management, transcript," February 2015, pp. 9, 10, at https://www.sba.gov/sites/default/files/Pre8a_module4_transcript.pdf.

[174] SBA, Office of Government Contracting and Business Development, "Pre-8(a) Business Development Program Module 4—Business Planning and Operational Management, transcript," p. 10.

[175] 13 C.F.R. §124.112(b)(6).

[176] 13 C.F.R. §124.112(b)(8).

[177] GAO, *Small Business Administration: Steps Have Been Taken to Improve Administration of the 8(a) Program, but Key Controls for Continued Eligibility Need Strengthening*, GAO-10-353, March 30, 2010, pp. 9, 10, 26, at http://www.gao.gov/assets/310/302582.pdf.

processing continued eligibility to headquarters was designed to eliminate conflict of interest for district offices associated with performing both assistance and oversight roles."[178]

8(a) firms may leave the program by any of the following means:

- voluntary withdrawal;
- voluntary early graduation (where the firm voluntarily decides to leave the program after the SBA has determined that the firm has substantially achieved its business plan's targets, objectives, and goals and has demonstrated the ability to compete in the marketplace without program assistance);
- involuntary early graduation (where the SBA requires a firm to leave the program because it has determined that the firm has substantially achieved its business plan's targets, objectives, and goals and has demonstrated the ability to compete in the marketplace without program assistance; or one or more of the disadvantaged owners upon whom the firm's eligibility is based are no longer economically disadvantaged);[179]
- termination for good cause;[180]

---

[178] GAO, *Small Business Administration: Leadership Attention Needed to Overcome Management Challenges*, GAO-15-347, September 22, 2015, p. 63, at http://www.gao.gov/assets/680/672648.pdf. …a. Upon completion of the analysis, the District Office BOS will forward the completed annual review to the District Director through the Assistant District Director for final disposition; b. After the review of the District Office BOS recommendation, the District Director must then enter his/her recommendation in the 8(a) electronic tracking system to complete the Annual Review reporting. …The District Office will send a letter to the 8(a) Participant notifying the firm that their annual review is complete and that the Participant continues to be eligible to participate in the 8(a) BD Program. See SBA, Office of Business Development, Standard Operating Procedure for the Office of Business Development," SOP 80 05 5, effective September 23, 2016, p. 200, at https://www.sba.gov/sites/default/files/sops/SOP_80_05_5_.pdf.

[179] 13 C.F. R. §124.302. "In determining whether a Participant has substantially achieved the targets, objectives and goals of its business plan and in assessing the overall competitive strength and viability of a Participant, SBA considers the totality of circumstances, including the following factors: (1) Degree of sustained profitability; (2) Sales trends, including improved ratio of non-8(a) sales to 8(a) sales since program entry; (3) Business net worth, financial ratios, working capital, capitalization, and access to credit and capital; (4) Current ability to obtain bonding; (5) A comparison of the Participant's business and financial profiles with profiles of non-8(a) BD businesses having the same primary four-digit SIC code as the Participant; (6) Strength of management experience, capability, and expertise; and (7) Ability to operate successfully without 8(a) contracts." See 13 C.F. R. §124.302(b).

[180] Examples of termination for good cause include submission of false information in the firm's application materials; failure to maintain eligibility for program participation; failure, for any reason, to maintain ownership, full-time day-to-day management, and control by disadvantaged individuals; failure to obtain prior written approval from the SBA for any changes in ownership or business structure, management or control; failure to disclose the extent to which nondisadvantaged persons or firms participate in the firm's management; failure by the concern or one or more of the concern's principals to maintain good character; failure to provide required financial statements, requested tax returns, reports, updated business plans, information requested by the SBA's Office of Inspector General, or other requested information or data within 30 days of the request; cessation of business operations; failure to pursue competitive and commercial business in accordance with its business plan, or failure in other ways to make reasonable efforts to develop and achieve competitive viability; a pattern of inadequate performance of awarded Section 8(a) contracts; failure to pay or repay significant financial obligations owed to the federal government; failure to obtain and keep current any and all required permits, licenses, and charters needed to operate the business; excessive withdrawals that are detrimental to the achievement of the targets, objectives, and goals contained in the participant's business plan; unauthorized use of SBA direct or guaranteed loan proceeds or violation of an SBA loan agreement; submission by or on behalf of a participant of false information to the SBA; debarment, suspension, voluntary exclusion, or ineligibility of the concern or its principals pursuant to 2 C.F.R. parts 180 and 2700 or FAR subpart 9.4 (48 C.F.R. part 9, subpart 9.4); conduct by the concern, or any of its principals, indicating a lack of business integrity; willful failure to comply with applicable labor standards and obligations; material breach of any terms and conditions of the 8(a) participation agreement; willful violation by a concern, or any of its principals, of any SBA regulation pertaining to material issues. See 13 C.F.R. 124.303(a)(1-20) and (b).

---

Case 2:20-cv-00041-DLC-CRW    Document 105-2    Filed 09/27/24    Page 35 of 78
PageID #: 3544

- expiration of the program term (maximum of nine years) without meeting the SBA's graduation requirements;[181] or
- graduation at the expiration of the program term.

# 7(j) Management and Technical Assistance Program

The SBA's 7(j) Management and Technical Assistance Program assists 8(a) firms by providing management and technical assistance training. The program's origin dates back to 1970 when the SBA issued regulations creating the 8(a) contracting program to "assist small concerns owned by disadvantaged persons to become self-sufficient, viable businesses capable of competing effectively in the market place."[182] Using its statutory authority under Section 7(j) of the Small Business Act to provide management and technical assistance through contracts, grants, and cooperative agreements to qualified service providers, the regulations specified that "the SBA may provide technical and management assistance to assist in the performance of the subcontracts."[183]

On October 24, 1978, P.L. 95-507, To amend the Small Business Act and the Small Business Investment Act of 1958, provided the SBA explicit statutory authority to extend financial, management, technical, and other services to socially and economically disadvantaged small businesses. The SBA's current regulations indicate that the 7(j) Management and Technical Assistance Program will, "through its private sector service providers [deliver] a wide variety of management and technical assistance to eligible individuals or concerns to meet their specific needs, including: (a) counseling and training in the areas of financing, management, accounting, bookkeeping, marketing, and operation of small business concerns; and (b) the identification and development of new business opportunities."[184] Eligible individuals and businesses include "8(a) certified firms, small disadvantaged businesses, businesses operating in areas of high unemployment or low income, or small businesses owned by low income individuals."[185]

As shown in **Table 2**, 11,900 small businesses received 7(j) program assistance in FY2021. The SBA has been marketing the 7(j) program to 8(a) firms in an effort increase awareness of the program, to help those small businesses better prepare themselves for federal contracting opportunities, and to retain 8(a) firms in the 8(a) program.[186]

**Table 2** also shows the amount of total administrative resources the SBA provides the 7(j) program each year.

---

[181] 13 C.F.R. §124.2.

[182] 13 C.F.R. §124.8-1(b) (1970); and Notes, "Minority Enterprise, Federal Contracting, and the SBA's 8(a) Program: A New Approach to an Old Problem," *Michigan Law Review*, vol. 71, no. 2 (December 1972), pp. 377, 378.

[183] 13 C.F.R. §124.8-1(d) (1970).

[184] 13 C.F.R. §124.702.

[185] SBA, *FY2017 Congressional Budget Justification and FY2015 Annual Performance Report*, p. 50, at https://www.sba.gov/sites/default/files/FY17-CBJ_FY15-APR.pdf, and SBA, *FY2019 Congressional Budget Justification and FY2017 Annual Performance Report*, pp. 73, 74, at https://www.sba.gov/sites/default/files/aboutsbaarticle/SBA_FY_19_508Final5_1.pdf.

[186] SBA, *FY2023 Congressional Budget Justification and FY2021 Annual Performance Report*, p. 71, at https://www.sba.gov/sites/default/files/2022-04/FY%202023%20SBA%20Congressional%20Budget%20Justification-508-2022-0413%20updated.pdf.

---

Case 2:20-cv-00041-DLC-CRW    Document 105-2    Filed 09/27/24    Page 36 of 78
PageID #: 3545

**Table 2. 7(j) Management and Technical Assistance Program Statistics, FY2010-FY2021**

| Fiscal Year | Number of Small Businesses Assisted | Actual Total Administrative Resources (Program Cost; $ in millions) |
|---|---|---|
| 2021 | 11,900 | $3.894 |
| 2020 | 9,941 | $5.139 |
| 2019 | 8,032 | $4.591 |
| 2018 | 6,483 | $4.098 |
| 2017 | 4,100 | $3.081 |
| 2016 | 5,245 | $2.422 |
| 2015 | 5,360 | $4.444 |
| 2014 | 4,104 | $5.614 |
| 2013 | 3,913 | $5.793 |
| 2012 | 3,272 | $5.356 |
| 2011 | 3,550 | $6.502 |
| 2010 | 3,480 | $5.478 |

**Source:** U.S. Small Business Administration, *FY2023 Congressional Budget Justification and FY2021 Annual Performance Report*, p. 21, https://www.sba.gov/document/report-congressional-budget-justification-annual-performance-report.

**Note**: The 7(j) program is funded through a combination of directed appropriations, typically in the language accompanying annual appropriations measures, and the SBA's salaries and expenses (operating) budget account.

# All Small Mentor-Protégé Program[187]

On July 30, 1998, the SBA established the 8(a) Mentor-Protégé Program to "enhance the capabilities" of 8(a) firms and "improve [their] ability to successfully compete for contracts."[188] The program, which was merged into the SBA's All Small Mentor-Protégé Program on November 16, 2020, provided various forms of assistance, including technical or management training, financial assistance in the form of equity investments or loans, subcontracts, trade education, and assistance in performing prime contracts with the federal government through joint venture agreements.[189] The All Small Mentor-Protégé Program's requirements and benefits are essentially identical to those that were in place for the 8(a) Mentor-Protégé Program. The only major difference is that the All Small Mentor-Protégé Program is available to all small businesses, whereas the 8(a) Mentor-Protégé Program was limited to firms participating in the 8(a) program. The SBA merged the programs in an effort to "eliminate confusion regarding perceived

---

[187] For additional information and analysis of federal Mentor-Protégé Programs, see CRS Report R41722, *Small Business Mentor-Protégé Programs*, by Robert Jay Dilger.

[188] SBA, "Small Business Size Regulations; 8(a) Business Development/Small Disadvantaged Business Status Determinations; Rules of Procedure Governing Cases Before the Office of Hearings and Appeals: Final Rule," 63 *Federal Register* 35739, June 30, 1998.

[189] 13 C.F.R. §124.520(a). See also GAO, *Small Business: SBA Could Better Focus Its 8(a) Program to Help Firms Obtain Contracts*, GAO/RCED-00-196, July 20, 2000, p. 14, at http://www.gao.gov/new.items/rc00196.pdf; and SBA, "Consolidation of Mentor-Protégé Programs and Other Government Contracting Amendments," 85 *Federal Register* 66146-66199, October 16, 2020.

Case 2:20-cv-00041-DCLC-CRW    Document 105-2    Filed 09/27/24    Page 37 of 78
PageID #: 3546

differences between the two programs, remove unnecessary duplication of functions within SBA, and establish one, unified staff to better coordinate and process mentor-protégé applications."[190]

The SBA's Office of Business Development (BD) administers the All Small Mentor-Protégé Program. This makes it somewhat different from agency-specific mentor-protégé programs, which are generally administered by the agency's Office of Small and Disadvantaged Business Utilization (OSDBU) and may involve coordination with agency contracting offices.[191]

SBA regulations govern various aspects of the All Small Mentor-Protégé Program, including who may qualify as a mentor or protégé, the content of written agreements between mentors and protégés, and the SBA's evaluation of the mentor-protégé relationship. For example, a protégé must

- be a small business with industry experience,
- have a proposed mentor prior to applying for the program,
- be organized for profit or as an agricultural cooperative, and
- have no more than two mentors in the business's lifetime.[192]

A mentor must

- be organized for profit or as an agricultural cooperative,
- demonstrate that it is capable of carrying out its responsibilities to assist the protégé,
- possess good character and a favorable financial position,
- not be on the federal list of debarred or suspended contractors or affiliated with the protégé at the time of application or for any reason other than the mentor-protégé agreement, and
- have no more than three protégés at a time.[193]

The SBA must determine that the mentor-provided assistance will promote real developmental gains for the protégé and not be merely a vehicle to receive federal small business set-asides and sole source contracts.[194]

Protégé benefits include

- guidance on internal business management systems, accounting, marketing, manufacturing, and strategic planning;
- financial assistance in the form of equity investments (of up to 40% of the protégé's business), loans, and bonding;

---

[190] SBA, "Consolidation of Mentor-Protégé Programs and Other Government Contracting Amendments," 84 *Federal Register* 60846, November 8, 2019; and SBA, "Consolidation of Mentor-Protégé Programs and Other Government Contracting Amendments," 85 *Federal Register* 66146-66199, October 16, 2020.

[191] GAO, *Mentor-Protégé Programs Have Policies That Aim to Benefit Participants But Do Not Require Postagreement Tracking*, GAO-11-548R, June 15, 2011, p. 3, at http://www.gao.gov/new.items/d11548r.pdf. GAO identified mentor-protégé programs in 13 federal agencies.

[192] SBA, "All Small Mentor-Protégé program," at https://www.sba.gov/federal-contracting/contracting-assistance-programs/all-small-mentor-protege-program. For additional information concerning the All Small Mentor-Protégé Program's requirements, see 13 C.F.R. §125.9.

[193] 13 C.F.R. §125.9; and SBA, "All Small Mentor-Protégé program."

[194] SBA, "All Small Mentor-Protégé program."

---

- assistance navigating federal contract bidding, acquisition, and performance process;
- education about international trade, strategic planning, and finding markets;
- business development, including strategy and identifying contracting and partnership opportunities; and
- general and administrative assistance, such as human resource sharing or security clearance support.[195]

Mentor-protégé agreements may last for no more than six years, and any changes to the agreement must be approved by the SBA in advance.

The primary benefit for mentors is that they may form joint ventures with their protégés that qualify for small business set-aside contracts for which the small business is eligible, including contracts set aside for 8(a) program participants, service-disabled veteran-owned small businesses, women-owned small businesses, and HUBZone small businesses.[196]

As of March 1, 2022, there were 1,501 active All Small Mentor-Protégé Program mentor-protégé agreements, including 733 agreements with 8(a) firms.[197]

# Program Statistics

As shown in **Table 3**, the number of 8(a) firms assisted by SBA Business Opportunity Specialists (BOS) generally declined from FY2005 through FY2014 and has generally increased in recent years, reaching a high of 11,150 in FY2020. The number of federal contracts awarded to 8(a) firms has also increased in recent years, as has the amount of federal contracts awarded with an 8(a) preference. The 8(a) program's administrative costs have varied somewhat, with increases in some years and decreases in others.

### Table 3. 8(a) Program Statistics, Selected Years

| Fiscal Year | Number of 8(a) Small Businesses Assisted by SBA Business Opportunity Specialists | Number of 8(a) Firms Awarded Federal Contracts | Amount of Federal Contracts Awarded with an 8(a) Preference ($ in billions) | SBA Administrative Costs for 8(a) program ($ in millions) |
|---|---|---|---|---|
| 2021 | 9,322 | NA | $19.964 | $48.595 |
| 2020 | 11,150 | NA | $20.471 | $50.002 |
| 2019 | 7,958 | 3,871 | $18.558 | $63.117 |
| 2018 | 6,789 | 3,709 | $18.514 | $71.456 |
| 2017 | 6,655 | 3,421 | $17.369 | $54.099 |
| 2016 | 8,010 | NA | $17.432 | $47.281 |
| 2015 | 6,948 | NA | $16.747 | $55.600 |
| 2014 | 6,660 | NA | $17.151 | $53.824 |

---

[195] 13 C.F.R. §125.9; and SBA, "All Small Mentor-Protégé program."

[196] 13 C.F.R. §125.9; and SBA, "All Small Mentor-Protégé program."

[197] SBA, "Active mentor-protégé agreements," November 1, 2021, at https://www.sba.gov/document/support-active-mentor-protege-agreements.

Case 2:20-cv-00041-DCLC-CRW    Document 105-2    Filed 09/27/24    Page 39 of 78
PageID #: 3548

| Fiscal Year | Number of 8(a) Small Businesses Assisted by SBA Business Opportunity Specialists | Number of 8(a) Firms Awarded Federal Contracts | Amount of Federal Contracts Awarded with an 8(a) Preference ($ in billions) | SBA Administrative Costs for 8(a) program ($ in millions) |
|---|---|---|---|---|
| 2013 | 6,661 | NA | $14.689 | $51.649 |
| 2012 | 7,388 | NA | $16.570 | $60.855 |
| 2011 | 7,814 | NA | $17.397 | $58.274 |
| 2010 | 8,442 | NA | $18.718 | $56.817 |
| 2005 | 9,458 | NA | $11.790 | $31.387 |
| 2000 | 6,383 | NA | $5.780 | $31.741 |
| 1995 | 6,002 | 2,755 | $5.820 | $32.668 |
| 1990 | 3,645 | 2,054 | $3.830 | $25.656 |
| 1987 | 2,938 | 1,713 | $3.014 | $20.788 |
| 1980 | 2,138 | 1,391 | $1.600 | $6.008 |
| 1977 | 1,482 | 1,044 | $0.533 | $3.916 |

**Source**: U.S. Congress, Senate Committee on Appropriations, Subcommittee on State, Justice, Commerce, the Judiciary, and Related Agencies, *Departments of State, Justice, and Commerce, the Judiciary, and Related Agencies Appropriations for Fiscal Year 1978, Part 3-Justifications*, hearing, 95th Cong., 1st sess., January 1, 1977 (Washington: GPO, 1977), p. 889; U.S. Congress, Senate Committee on Appropriations, Subcommittee on State, Justice, Commerce, the Judiciary, and Related Agencies, *Departments of State, Justice, Commerce, the Judiciary, and Related Agencies Appropriations for Fiscal Year 1979, Part 3-Justifications*, hearing, 95th Cong., 2nd sess., January 1, 1978 (Washington: GPO, 1978), pp. 1154, 1155; U.S. Congress, House Committee on Appropriations, Subcommittee on the Departments of State, Justice, and Commerce, the Judiciary, and Related Agencies, *Departments of State, Justice, and Commerce, the Judiciary, and Related Agencies Appropriations for 1980, Part 6*, hearing, 96th Cong., 1st sess., March 27, 1979 (Washington: GPO, 1979), pp. 606, 629; U.S. General Accounting Office, *The SBA 8(a) Procurement Program—A Promise Unfulfilled*, CED-81-55, April 8, 1981, pp. 7, 28, at https://www.gao.gov/products/ced-81-55; U.S. Congress, House Committee on Appropriations, Subcommittee on Commerce, Justice, State, and the Judiciary, *Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations for 1982, Part 7*, hearing, 97th Cong., 1st sess., March 16, 1981 (Washington: GPO, 1981), p. 74; U.S. General Accounting Office, *Small Business Administration: Status, Operations, and Views on the 8(a) Procurement Program*, GAO/RCED-88-148BR, May 24, 1988, pp. 2, 11, 12, at https://www.gao.gov/products/rced-88-148br; U.S. Congress, House Committee on Appropriations, Subcommittee on the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies, *Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations for Fiscal Year 1992, Part 6-Related Agencies*, hearing, 102nd Cong., 1st sess., March 14, 1991 (Washington: GPO, 1991), p. 283; U.S. General Accounting Office, *Small Business: Problems in Restructuring SBA's Minority Business Development Program*, GAO/RCED-92-68, January 31, 1992, p. 30, at https://www.gao.gov/products/rced-92-68; U.S. General Accounting Office, *Small Business: Status of SBA's 8(a) Minority Business Development Program*, GAO/RCED-96-259, September 18, 1996, pp. 2, 4, at https://www.gao.gov/products/t-rced-96-259; U.S. Congress, House Committee on Appropriations, Subcommittee on the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies, *Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations for Fiscal Year 1997, Part 4-Justification of the Budget Estimates*, hearing, 104th Cong., 2nd sess., January 1, 1996 (Washington: GPO, 1996), p. 770; U.S. Congress, House Committee on Small Business, *Small Business: Opportunity Denied, Scorecard III*, Democratic Committee Staff Report, 107th Cong., 2nd sess. May 15, 2002, pp. 7, 11; U.S. Small Business Administration, *FY2005 Congressional Performance Budget Request*, pp. 91, 95; U.S. General Services Administration, Sam.Gov, Data Bank, "FY2005 Small Business Goaling Report," at https://sam.gov/reports/awards/static; U.S. Small Business Administration, *FY2017 Congressional Budget Justification and FY2015 Annual Performance Report*, pp. 47, 101, at https://www.sba.gov/sites/default/files/FY17-CBJ_FY15-APR.pdf; U.S. Small Business Administration, *FY2022 Congressional Budget Justification and FY2020 Annual Performance Report*, p. 73; U.S. Small Business Administration, *FY2023 Congressional Budget Justification and FY2021 Annual Performance Report*, pp. 21, 69, at https://www.sba.gov/document/report-congressional-budget-justification-annual-performance-report; and U.S. General Services Administration, "Sam.Gov data bank: ad hoc

Case 2:20-cv-00041-DCLC-CRW    Document 105-2    Filed 09/27/24    Page 40 of 78
PageID #: 3549

report," July 26, 2021, at https://sam/reports/awards/adhoc (contract award data with an 8(a) preference generated for FY2010-FY2021).

As shown in **Table 4**, in FY2021, 8(a) firms were awarded $34.364 billion in federal contracts (5.4% of all federal contracts awarded). Of that amount, these firms received $8.693 billion through an 8(a) set-aside award, $11.271 billion through an 8(a) sole-source award, and $14.400 billion through either open competition or with another small business preference applied (e.g., small business set-aside and HUBZone set-aside or sole-source award) ($7.756 billion).

From FY2010 through FY2021, 8(a) firms were awarded, on average, approximately 5.46% of the total amount of federal contracts awarded, ranging from a low of 5.09% of all federal contracts in FY2011 to a high of 6.16% in FY2014.

During this period, 8(a) firms received about $348.326 billion in federal contracts: $97.335 billion through an 8(a) set-aside (27.9% of all 8(a) contracts), $116.242 billion through an 8(a) sole-source award (33.4% of all 8(a) contracts), and $134.747 billion through either open competition or with another small business preference applied (38.7% of all 8(a) contracts).

### Table 4. Federal Contract Amount Awarded to 8(a) Firms, by Award Type, FY2010-FY2021

($ in billions)

| Fiscal Year | 8(a) Set-Aside | 8(a) Sole-Source | Other 8(a) Awards | 8(a) Total | 8(a) Total as a % of All Federal Contracts Awarded |
|---|---|---|---|---|---|
| 2021 | $8.693 | $11.271 | $14.400 | $34.364 | 5.40% of $636.105 |
| 2020 | $9.335 | $11.136 | $13.574 | $34.045 | 5.11% of $665.733 |
| 2019 | $8.625 | $9.932 | $11.859 | $30.418 | 5.15% of $590.162 |
| 2018 | $9.208 | $9.306 | $11.633 | $30.147 | 5.43% of $555.402 |
| 2017 | $8.671 | $8.697 | $10.623 | $27.992 | 5.48% of $510.668 |
| 2016 | $8.601 | $8.832 | $10.290 | $27.722 | 5.83% of $475.286 |
| 2015 | $8.174 | $8.573 | $9.741 | $26.488 | 6.02% of $440.205 |
| 2014 | $8.002 | $9.149 | $10.358 | $27.509 | 6.16% of $446.220 |
| 2013 | $6.875 | $7.813 | $9.897 | $24.585 | 5.31% of $463.425 |
| 2012 | $7.158 | $9.411 | $12.055 | $28.625 | 5.50% of $520.787 |
| 2011 | $6.892 | $10.505 | $10.091 | $27.487 | 5.09% of $539.775 |
| 2010 | $7.101 | $11.617 | $10.226 | $28.944 | 5.36% of $540.121 |
| **Total** | **$97.335** | **$116.242** | **$134.747** | **$348.326** | **5.46% of $6,383.889** |

**Source:** Data generated using U.S. General Services Administration, "Sam.Gov data bank: ad hoc report," July 26, 2021, at https://sam.gov/reports/awards/adhoc (for FY2021).

**Notes:** Other 8(a) awards include contracts awarded through open competition or with other small business preferences applied (e.g., small business set-aside and HUBZone set-aside or sole-source award). The Federal Procurement Data System (FPDS), which is accessed through Sam.Gov, is the most comprehensive data system available for federal contract awards and is updated continuously.

Case 2:20-cv-00041-DCLC-CRW    Document 105-2    Filed 09/27/24    Page 41 of 78
PageID #: 3550

# Current Issues

The SBA faces several challenges concerning the 8(a) Program, including oversight of 8(a) participant's continuing eligibility, disagreements related to the program's financial thresholds used to determine economic disadvantage, and concerns related to the performance measures used to evaluate the program's success.

## Oversight of 8(a) Program Participant's Continuing Eligibility

Two SBA offices, the Office of Government Contracting and Business Development (GCBD) and the Office of Field Operations (OFO), share responsibility for overseeing the 8(a) Program. Within GCBD, BOSs assigned to the Office of Certification and Eligibility (OCE) evaluate all 8(a) program applications and conduct annual continuing eligibility reviews of those firms "high-risk" or "complex" 8(a) firms, including those firms with total 8(a) revenue exceeding $10 million, are part of a joint venture, are party to a mentor-protégé agreement, or are an entity-owned firm such as an Alaska Native Corporation, and those that are requested from district office field staff.[198] However, an SBA OIG audit found that the OCE reviewed the continuing eligibility of less than half of the firms identified as high risk in FY2016 (352 of 859 firms, or 41%) and in FY2017 (350 of 798 firms, or 44%).[199]

Within OFO, BOSs in each of the SBA's 68 district offices work directly with their assigned 8(a) firms and, among other duties, conduct annual reviews of those firms' progress toward achieving the targets, objectives, and goals set forth in their business development plan. According to the 8(a) Program's Standard Operating Procedures (SOP) manual, BOSs in each of the SBA's 68 district offices conduct continuing eligibility reviews for all 8(a) firms not reviewed by the GCBD to ensure their compliance with all continuing eligibility requirements during the annual review process.[200] However, in practice, the SBA OIG's audit found that district office BOSs assess continuing eligibility as part of the annual review process for all 8(a) firms, including those deemed to be high risk or complex.[201]

The SBA is also required to review the participant's continuing eligibility "upon receipt of specific and credible information alleging that a participant no longer meets the eligibility requirements."[202] Generally, the SBA receives this information from the SBA OIG's Hotline.[203] However, the SBA OIG's audit found that the OCE did not conduct continuing eligibility reviews for any of the 44 OIG Hotline complaints that were referred to the GCBD from October 1, 2015, through May 4, 2017. In addition, GCBD did not inform district office BOSs of complaints filed

---

[198] SBA OIG, *Improvements Needed in SBA's Oversight of 8(a) Continuing Eligibility Processes*, Report Number 18-22, September 7, 2018, pp. 1, 2, at https://www.sba.gov/sites/default/files/oig/SBA-OIG-Report_18-22.pdf; and SBA, Office of Business Development, "Standard Operating Procedure for the Office of Business Development," SOP 80 05 5, effective September 23, 2016, p. 212, at https://www.sba.gov/sites/default/files/sops/SOP_80_05_5_.pdf.

[199] SBA OIG, *Improvements Needed in SBA's Oversight of 8(a) Continuing Eligibility Processes*, Report Number 18-22, September 7, 2018, p. 4, at https://www.sba.gov/sites/default/files/oig/SBA-OIG-Report_18-22.pdf.

[200] SBA, Office of Business Development, "Standard Operating Procedure for the Office of Business Development," SOP 80 05 5, effective September 23, 2016, p. 212, at https://www.sba.gov/sites/default/files/sops/SOP_80_05_5_.pdf.

[201] SBA OIG, *Improvements Needed in SBA's Oversight of 8(a) Continuing Eligibility Processes*, Report Number 18-22, September 7, 2018, p. 2, at https://www.sba.gov/sites/default/files/oig/SBA-OIG-Report_18-22.pdf.

[202] SBA OIG, *Improvements Needed in SBA's Oversight of 8(a) Continuing Eligibility Processes*, p. 2.

[203] The SBA OIG's Hotline is a web page that provides visitors the option of filing a written complaint by clicking on a link on the web page or by sending the complaint to the SBA OIG by mail or courier. The Hotline also provides a toll-free telephone number (800) 767-0385. See SBA, OIG, "Hotline," at https://www.sba.gov/oig/hotline

Case 2:20-cv-00041-DCLC-CRW    Document 105-2    Filed 09/27/24    Page 42 of 78
PageID #: 3551

against firms within their purview. As a result, district office BOSs took no action regarding the complaints.[204]

The SBA OIG's audit reviewed the continuing eligibility of two samples of 8(a) firms to determine whether the SBA's continuing eligibility review process "consistently identify ineligible firms enrolled in the program": the 15 individually owned 8(a) firms with the highest set-aside dollars in FY2016 that were scheduled to have continuing eligibility reviews within the first half of FY2017 and 10 individually owned 8(a) firms that were identified as being ineligible in Hotline complaints received between October 1, 2015, and May 4, 2017.[205]

The SBA OIG found that "despite OCE and district offices having shared responsibility for assessing 8(a) firms' continuing eligibility, they did not detect that 4 of the 15 individually-owned 8(a) firms we reviewed were ineligible for the 8(a) Program," and "our review of the 10 firms referred by the OIG Hotline revealed that they were all ineligible for the 8(a) program, based on issues such as excessive income and lack of good character."[206] In addition, the SBA OIG found that the SBA had identified eligibility concerns through its annual reviews and continuing eligibility reviews for 6 of the 15 individually owned 8(a) firms the OIG had reviewed, but "did not take timely action to remove these firms from the 8(a) Program or document resolution of eligibility issues."[207]

The SBA OIG concluded that 20 of the 25 firms it reviewed should have been removed from the 8(a) Program and made 11 recommendations "to improve the overall management and effectiveness" of the 8(a) Program's continuing eligibility review process.[208] SBA management agreed with seven of the recommendations, partially agreed to the other four recommendations,

---

[204] SBA OIG, *Improvements Needed in SBA's Oversight of 8(a) Continuing Eligibility Processes*, Report Number 18-22, September 7, 2018, p. 9, at https://www.sba.gov/sites/default/files/oig/SBA-OIG-Report_18-22.pdf.

[205] SBA OIG, *Improvements Needed in SBA's Oversight of 8(a) Continuing Eligibility Processes*, p. 14.

[206] SBA OIG, *Improvements Needed in SBA's Oversight of 8(a) Continuing Eligibility Processes*, pp. 4, 9.

[207] SBA OIG, *Improvements Needed in SBA's Oversight of 8(a) Continuing Eligibility Processes*, p. 7.

[208] The recommendations are (1) Coordinate with the Associate Administrator for the Office of Field Operations to improve the transfer of continuing eligibility review documents for high risk firms from the district offices to the Office of Certification and Eligibility; (2) Revise its current process to ensure that it accurately identifies all high risk firms to receive continuing eligibility reviews from the Office of Certification and Eligibility; (3) Establish and implement clear policies and procedures for evaluating 8(a) continuing eligibility, including ensuring that district offices use standardized analysis tools that conform with 8(a) continuing eligibility requirements found in 13 C.F.R. 124, and train employees on these procedures; (4) Develop and implement a comprehensive oversight plan to ensure completion of continuing eligibility reviews of all 8(a) firms, monitor the quality of continuing eligibility reviews, and eliminate duplication between the Office of Certification and Eligibility and the district offices; (5) Conduct continuing eligibility reviews for the firms that we identified as ineligible that are still active in the 8(a) program, and take timely action to remove firms found to be ineligible; (6) Develop and implement a centralized process to track and document all adverse actions and voluntary withdrawals from the 8(a) program, from recommendation through resolution; (7) Establish and implement clear policies and procedures that include timelines for sending Notices of Intent to Terminate and to Graduate Early firms after eligibility issues are first identified; (8) Conduct continuing eligibility reviews for the firms we identified as ineligible that are still active in the 8(a) program, and take timely action to remove firms found to be ineligible; (9) Establish and implement clear policies and detailed procedures, consistent with 13 C.F.R. 124.112(c), to timely and effectively review and address complaints regarding 8(a) continuing eligibility, including communicating the content of the complaint to the district office, and train employees implementing the 8(a) program on the updated procedures; (10) Develop a robust system for tracking complaints that are received regarding firms' continuing eligibility for the 8(a) program, and tracking the actions taken to address the complaints; and (11) Conduct continuing eligibility reviews, including assessing the allegations in the 77 OIG Hotline complaints, for the firms that were the subject of the complaints that are still active in the 8(a) program, and for which the complainant provided specific and credible information, and, if necessary, take appropriate action to remove ineligible firms from the 8(a) program. See SBA OIG, *Improvements Needed in SBA's Oversight of 8(a) Continuing Eligibility Processes*, pp. 5, 6, 8, 11-13.

Case 2:20-cv-00041-DCLC-CRW    Document 105-2    Filed 09/27/24    Page 43 of 78
PageID #: 3552

and indicated that it would conduct continuing eligibility reviews for the firms identified in the SBA OIG's audit as ineligible and take appropriate action.[209]

## Financial Thresholds for Economically Disadvantaged Status

Section 8(a)(6)(A) of the Small Business Act defines economically disadvantaged individuals as "socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged." In determining the degree of diminished credit and capital opportunities, Section 8(a)(6)(A) authorizes the SBA to "consider, but not be limited to, the assets and net worth of such socially disadvantaged individual."

The SBA uses a three-part test for determining economic disadvantage relating to the degree of applicant's diminished credit and capital opportunities: the applicant's net worth, personal income, and total assets. As mentioned, the SBA began transitioning to the use of objective monetary thresholds to assess these personal financial characteristics in 1989. At that time, the SBA established by regulation that the applicant's personal net worth had to be less than $250,000 at the time of entry into the program and less than $750,000 for continuing eligibility.[210]

In 2011, the SBA added monetary thresholds for the applicant's personal income (generally cannot exceed $250,000, averaged over the previous three years, at the time of application, and $350,000, averaged over the previous three years, for continuing eligibility) and total assets (cannot exceed $4 million at entry and $6 million for continued eligibility).[211]

On May 11, 2020, the SBA set the following monetary thresholds, which are currently in effect:

- net worth of less than $750,000 (excluding ownership interest in the applicant's business, equity in their primary personal residence, and funds invested in an official retirement account);
- generally no more than $350,000 in average adjusted gross income over the preceding three years; and
- no more than $6 million in assets (excluding funds invested in an official retirement account).[212]

Prior to the SBA's decision to eliminate the $250,000 personal net worth threshold at the time of entry into the 8(a) program and increase the thresholds for personal income and total assets, some Members of Congress had argued that the 8(a) program's financial thresholds should be increased or periodically adjusted for inflation. During the 112th Congress, H.R. 3754, the Not Too Small to Succeed in Business Act of 2011, would have increased the net worth thresholds to $750,000 for 8(a) Program admission and $2.25 million for continued participation after admission. H.R. 2424, the Expanding Opportunities for Main Street Act of 2011, would have amended Section 8(a)(6)(A) by inserting after "disadvantaged individual" the following: "For purposes of this

---

[209] SBA OIG, *Improvements Needed in SBA's Oversight of 8(a) Continuing Eligibility Processes*, pp. 11-13. SBA management concurred with recommendations (2), (3), (6), (7), (9), (10), and (11) and partially concurred with recommendations (1), (4), (5), and (8) listed above.

[210] SBA, "Minority Small Business and Capital Ownership Development Program: Final Rule," 54 *Federal Register* 34692, August 21, 1989 (codified, as amended, at 13 C.F.R. §124.104(c)).

[211] SBA, "Small Business Size Regulations; 8(a) Business Development/Small Disadvantaged Business Status Determinations," 76 *Federal Register* 8229-8231, February 11, 2011.

[212] SBA, "Women-Owned Small Business and Economically Disadvantaged Women-Owned Small Business Certification," 85 *Federal Register* 27650-27665, May 11, 2020.

Case 2:20-cv-00041-DCLC-CRW   Document 105-2   Filed 09/27/24   Page 44 of 78
PageID #: 3553

section, an individual having a net worth of more than $1,500,000 is not economically disadvantaged." Legislation with provisions similar to those in H.R. 2424 was also introduced during the 113th Congress (H.R. 2550, the Minority Small Business Enhancement Act of 2013, and H.R. 2551, the Expanding Opportunities for Main Street Act of 2013).

Advocates for increasing the program's personal net worth threshold noted that the Department of Transportation (DOT) increased the personal net worth threshold for determining eligibility for the Disadvantaged Business Enterprise (DBE) program in 2011 to account for inflation. The DBE threshold was increased from $750,000 (which was set by DOT in 1999, and was based on the 8(a) Program's $750,000 threshold) to $1.32 million.[213] DBE firms, which are provided special consideration in the awarding of federal transportation contracts, argued that the limit penalized success and imposed "a glass ceiling on the growth and competitiveness of DBE firms."[214] Opponents argued that the $1.32 million limit was too high and would include business owners who were not truly disadvantaged and that raising the limit would favor larger, established, and richer DBEs at the expense of smaller, start-up firms because the larger companies would be able to stay in the program longer.[215]

More recently, the SBA's OIG has argued that the SBA's decision to exclude equity in a primary residence from an individual's net worth calculation "serves as a loophole allowing affluent business owners to shelter wealth in personal real estate, while taking advantage of a program designed to help the socially and economically disadvantaged."[216]

## Measuring Program Success

Pursuant to P.L. 100-656, the Business Opportunity Development Reform Act of 1988, the SBA is required to "develop and implement a process for the systematic collection of data on the operations of the [8(a)] Program" and to report this data, not later than April 30 of each year, to Congress.[217] The act requires the report to include the following:

---

[213] U.S. Department of Transportation (DOT), Office of the Secretary, "Disadvantaged Business Enterprise: Program Improvements," 75 *Federal Register* 25817, May 10, 2010; and DOT, Office of the Secretary, "Disadvantaged Business Enterprise: Program Improvements," 76 *Federal Register* 5085, January 8, 2011 (codified at 49 C.F.R. §26.67(a)(2)(i)).

The DBE program's personal net worth inflation adjustment in 2011 used 1989 as the base year, even though DOT adopted the personal net worth limit in 1999. DOT argued that it was appropriate to use 1989 as the base year because the SBA's standard, which DOT used, was adopted in 1989 and had not been adjusted for inflation at any time. See DOT, Office of the Secretary, "Disadvantaged Business Enterprise: Program Improvements," 76 *Federal Register* 5086, January 8, 2011.

[214] U.S. Department of Transportation, Office of the Secretary, "Disadvantaged Business Enterprise: Program Improvements," 75 *Federal Register* 25817, May 10, 2010.… DBE regulations require state and local transportation agencies that receive DOT financial assistance, to establish goals for the participation of DBEs. Each DOT-assisted State and local transportation agency is required to establish annual DBE goals, and review the scopes of anticipated large prime contracts throughout the year and establish contract-specific DBE subcontracting goals.… There has been, since 1983, a statutory provision requiring DOT to ensure that at least 10% of the funds authorized for the highway and transit financial assistance programs be expended with DBEs. DOT has established a single DBE goal, encompassing both firms owned by women and minority group members. See U.S. Department of Transportation, "Disadvantaged Business Enterprise (DBE) Program," at https://www.transportation.gov/civil-rights/disadvantaged-business-enterprise.

[215] U.S. Department of Transportation, Office of the Secretary, "Disadvantaged Business Enterprise: Program Improvements," 76 *Federal Register* 5085, January 8, 2011.

[216] SBA, Office of Inspector General (SBA OIG), *Report on the Most Serious Management and Performance Challenges in Fiscal Year 2017*, Report Number 17-02, October 14, 2016, p. 12, at https://www.sba.gov/sites/default/files/oig/FY_2017_-_Management_Challenges_-_10_14_16_7.pdf.

[217] P.L. 100-656, the Business Opportunity Development Reform Act of 1988, §408. Data Collection, 102 Stat. 3877, 15 U.S.C. §636(j)16(A)(B)(C).

---

Case 2:20-cv-00041-DCLC-CRW    Document 105-2    Filed 09/27/24    Page 45 of 78
PageID #: 3554

- The average personal net worth of individuals who own and control concerns that were initially certified for program participation during the immediately preceding fiscal year and the dollar distribution of each of these individual's net worth, at $50,000 increments.

- A description and estimate of the benefits and costs that have accrued to the economy and the federal government in the immediately preceding fiscal year due to the operations of those business concerns that were performing 8(a) contracts.

- A compilation and evaluation of those business concerns that have exited the program during the immediately preceding three fiscal years, including the number of concerns actively engaged in business operations, those that have ceased or substantially curtailed operations, including the reasons for such actions, and those concerns that have been acquired by other firms or organizations owned and controlled by other than socially and economically disadvantaged individuals. For those businesses that have continued operations after they exited from the program, the SBA Administrator is required to separately detail the benefits and costs that have accrued to the economy during the immediately preceding fiscal year due to their operations.

- A listing of all program participants during the preceding fiscal year identifying, by state and region, for each firm: the concern's name, the race or ethnicity, and gender of the disadvantaged owners, the dollar value of all contracts received in the preceding year, the dollar amount of advance payments received by each concern pursuant to contracts awarded under Section 8(a), and a description including (if appropriate) an estimate of the dollar value of all benefits and loans received during such year.

- The total dollar value of 8(a) contracts and options awarded during the preceding fiscal year and such amount expressed as a percentage of total sales of all firms participating in the program during such year; and of firms in each of the nine years of program participation.

- A description of additional resources or program authorities required to provide the types of services needed over the next two-year period to service the expected portfolio of 8(a) certified firms.

- The total dollar value of 8(a) contracts and options, at such dollar increments as the SBA Administrator deems appropriate, for each four digit standard industrial classification code under which such contracts and options were classified.

The SBA's FY2015 report (the latest one available) indicated that 5,399 businesses participated in the 8(a) program in FY2015 and "contributed an estimated 116,006 jobs to the Nation's economy," and that 2,381 of the 2,453 firms that had exited and completed the program during the three preceding fiscal years (October 1, 2011 through September 30, 2014) were still active, 48 had ceased operations, and 24 did not have data available for determining their status as reported by Dun and Bradstreet. Of the active firms, "two were acquired by another firm or organization owned and controlled by other than socially and economically disadvantage[d] individuals and 34 firms were substantially curtailed."[218] In addition, the 2,381 still active firms

---

[218] SBA, Office of Business Development, "FY2015 408 Report to the Congress," p. 4, at https://www.sba.gov/document/report-408-report-us-congress-minority-small-business-capital-ownership-development.

Case 2:20-cv-00041-DCLC-CRW   Document 105-2   Filed 09/27/24   Page 46 of 78
PageID #: 3555

reported FY2015 revenue of approximately $5.21 billion and provided jobs for approximately 77,753 persons.[219]

In 2000, GAO recommended that the SBA augment its data collection activities by periodically surveying a nationwide sample of 8(a) firms. GAO argued that a survey would improve the SBA's ability to determine how well the program is working, further arguing that "at a minimum, the survey should assess whether SBA assistance is meeting the firms' expectations and needs."[220]

Previously, the SBA contracted with a third party to conduct an annual client satisfaction survey of small businesses that received management training and technical assistance from Small Business Development Centers, SCORE, and Women Business Centers. The survey's objective was to measure these programs' impact "on the creation, financial development and survival of client firms."[221] The wording of many of that survey's questions, which focused on client satisfaction and the programs' impact on client behavior and economic success, is available on the SBA's website and could prove useful should the SBA decide to conduct a nationwide survey of 8(a) firms.[222]

In a related development, on February 22, 2022, the SBA OIG issued an audit of the 8(a) Program focusing on the SBA's measurement and monitoring of 8(a) participants' progress in achieving their individual business development goals and on the SBA's efforts to ensure that 8(a) participants receive business assistance necessary to meet their individual goals.

The OIG found that the SBA "did not consistently monitor 8(a) firms' progress in achieving their individual business development goals," "did not establish outcome-based performance measures for the program or its leaders to determine the success of the program," and that 15 of the 40 firms that the OIG reviewed "did not have approved business plans that identified the firms' goals."[223] For example, instead of relying on "performance measures that reflected the program's business development objectives and intended outcomes in order to understand program effects on small businesses," the SBA "reported only on the 1) percentage of annual reviews completed and 2) the number of small businesses assisted by the 8(a) program."[224]

The OIG provided eight recommendations for improving SBA's oversight of 8(a) participants and for measuring the program's success. The SBA agreed with five of the recommendations, including the recommendation "to establish outcome-based performance goals and measurements to assess whether the program achieved business development objectives."[225] The SBA partially

---

[219] SBA, Office of Business Development, "FY2015 408 Report to the Congress," p. 4.

[220] GAO, *Small Business: SBA Could Better Focus Its 8(a) Program to Help Firms Obtain Contracts*, GAO-RCED-00-196, July 20, 2000, p. 23, at http://www.gao.gov/assets/240/230496.pdf.

[221] SBA, "Impact Study of Entrepreneurial Dynamics: Office of Entrepreneurial Development Resource Partners' Face-to-Face Counseling," Concentrance Consulting Group, Inc., September 2013, p. 1, at https://www.sba.gov/sites/default/files/files/OED_ImpactReport_09302013_Final.pdf.

[222] Concentrance Consulting Group, Inc, "Impact Study of Entrepreneurial Dynamics: Office of Entrepreneurial Development Resource Partners; Face-to-Face Counseling," September 2013, at https://www.sba.gov/sites/default/files/2020-11/Impact_Study_of_Entrepreneurial_Development_Resources_2013_09.pdf. Previous reports can be found at SBA, "Entrepreneurial Development Impact Report," at https://www.sba.gov/document/report—entrepreneurial-development-impact-report.

[223] SBA, OIG, *SBA Business Development Assistance to 8(a) Program Participants*, Report No. 22-08, February 14, 2022, p. 5, at https://www.sba.gov/document/report-22-08-sbas-business-development-assistance-8a-program-participants.

[224] SBA, OIG, *SBA Business Development Assistance to 8(a) Program Participants*, Report No. 22-08, February 14, 2022, p. 9.

[225] SBA, OIG, *SBA Business Development Assistance to 8(a) Program Participants*, Report No. 22-08, February 14,

---

Case 2:20-cv-00041-DCLC-CRW   Document 105-2   Filed 09/27/24   Page 47 of 78
PageID #: 3556

agreed with two of the recommendations, and disagree with a recommendation to use outcome-based, data-driven reviews of program leaders' personal performance plans.[226]

---

2022, p. 10.

[226] SBA, OIG, *SBA Business Development Assistance to 8(a) Program Participants*, Report No. 22-08, February 14, 2022, pp. 9-13.

Case 2:20-cv-00041-DCLC-CRW    Document 105-2    Filed 09/27/24    Page 48 of 78
PageID #: 3557

# Appendix. Comparison of the Requirements Pertaining to Different Types of 8(a) Firms

## Table A-1. Requirements for Different Types of 8(a) Firms

| Category | 8(a) Firms Generally | Tribally Owned | ANC-Owned | NHO-Owned | CDC-Owned |
|---|---|---|---|---|---|
| "Small" | Independently owned and operated; not dominant in field of operation; meets size standards (15 U.S.C. §631(a)) All affiliations count (13 C.F.R. §121.103) | Independently owned and operated; not dominant in field of operation; meets size standards (15 U.S.C. §631(a)) Affiliations based on the tribe or tribal ownership, among others, do not count (15 U.S.C. §636(j)(10)(J)(ii); 13 C.F.R. §124.109(c)(2)) | Independently owned and operated; not dominant in field of operation; meets size standards (15 U.S.C. §631(a)) Affiliations based on the ANC or ownership by the ANC, among others, do not count (15 U.S.C. §636(j)(10)(J)(ii); 13 C.F.R. §124.109(c)(2)) | Independently owned and operated; not dominant in field of operation; meets size standards (15 U.S.C. §631(a)) Affiliations based on the NHO or ownership by the NHO, among others, do not count (15 U.S.C. §636(j)(10)(J)(ii); 13 C.F.R. §124.110(c)) | Independently owned and operated; not dominant in field of operation; meets size standards (15 U.S.C. §631(a)) Affiliations based on the CDC or ownership by the CDC, among others, do not count (15 U.S.C. §636(j)(10)(J)(ii); 13 C.F.R. §124.111(c)) |
| "Business" | For-profit entity with its place of business in the United States; operates primarily within the United States or makes a significant contribution to the U.S. economy (13 C.F.R. §121.105(a)(1)) | For-profit entity with its place of business in the United States; operates primarily within the United States or makes a significant contribution to the U.S. economy (13 C.F.R. §121.105(a)(1)) | For-profit entity with its place of business in the United States; operates primarily within the United States or makes a significant contribution to the U.S. economy (13 C.F.R. §121.105(a)(1)) Although ANC may be nonprofit, ANC-owned firms must be for-profit to be eligible for 8(a) Program (13 C.F.R. §124.109(a)(3)) | For-profit entity with its place of business in the United States; operates primarily within the United States or makes a significant contribution to the U.S. economy (13 C.F.R. §121.105(a)(1)) | For-profit entity with its place of business in the United States; operates primarily within the United States or makes a significant contribution to the U.S. economy (13 C.F.R. §121.105(a)(1)) |
| "Unconditionally owned and controlled" | At least 51% unconditionally and directly owned by one or more disadvantaged individuals who are U.S. citizens (13 | At least 51% tribally owned (13 C.F.R. §124.109(b)) Management may be conducted by individuals who are not members of the tribe provided that the SBA determines | At least 51% ANC-owned (13 C.F.R. §124.109(a)(3)) Management may be conducted by individuals who are not Alaska Natives provided that SBA determines that | At least 51% NHO-owned (13 C.F.R. §124.110(a)) NHO must control the board of directors, but individual who | At least 51% CDC-owned (13 C.F.R. §124.111(a)) Management and daily business operations to be conducted |

| Category | 8(a) Firms Generally | Tribally Owned | ANC-Owned | NHO-Owned | CDC-Owned |
|---|---|---|---|---|---|
| | C.F.R. §124.105) Management and daily business operations must be conducted by one or more disadvantaged individuals (13 C.F.R. §124.106) | that such management is necessary to assist the business's development, among other things (13 C.F.R. §124.109(c)(4)(B)) | such management is necessary to assist the business's development, among other things (13 C.F.R. §124.109(c)(4)(B)) | is responsible for day-to-day management need not establish personal social and economic disadvantage (13 C.F.R. §124.110(d)) | by individuals having managerial experience of an extent and complexity needed to run the firm (13 C.F.R. §124.111(b)) |
| "Socially disadvantaged individual" | Members of designated groups presumed to be socially disadvantaged; other individuals may prove personal disadvantage by a preponderance of the evidence (13 C.F.R. §124.103) | Indian tribes presumed to be socially disadvantaged (43 U.S.C. §1626(e); 15 U.S.C. §637(a)(4)(A)-(B); 13 C.F.R. §124.109(b)(1)) | ANCs presumed to be socially disadvantaged (43 U.S.C. §1626(e); 15 U.S.C. §637(a)(4)(A)-(B); 13 C.F.R. §124.109(b)(1)) | NHOs presumed to be socially disadvantaged (43 U.S.C. §1626(e); 15 U.S.C. §637(a)(4)(A)-(B); 13 C.F.R. §124.109(b)(1)) | CDCs presumed to be socially disadvantaged (42 U.S.C. §9815(a)(2)) |
| "Economically disadvantaged individual" | Financial information (e.g., personal income, personal net worth, fair market value of assets) must show diminished financial capital and credit opportunities (13 C.F.R. §124.104) | Tribe must prove economic disadvantage the first time a tribally owned firm applies to the 8(a) Program; thereafter, a tribe need only prove economic disadvantage at the request of the SBA (13 C.F.R. §124.109(b)(2)) | Deemed to be economically disadvantaged (43 U.S.C. §1626(e); 13 C.F.R. §124.109(a)(2)) | NHO must prove economic disadvantage the first time a NHO owned firm applies to the 8(a) Program; thereafter, a NHO need only prove economic disadvantage at the request of the SBA (13 C.F.R. §124.110(c) | CDCs presumed to be economically disadvantaged (42 U.S.C. §9815(a)(2)) |

Case 2:20-cv-00041-DCLC-CRW    Document 105-2    Filed 09/27/24    Page 50 of 78
PageID #: 3559

| Category | 8(a) Firms Generally | Tribally Owned | ANC-Owned | NHO-Owned | CDC-Owned |
|---|---|---|---|---|---|
| "Good character" | Criminal conduct or violations of SBA regulations may result in denial of participation; cannot be debarred or suspended from government contracting (13 C.F.R. §124.108(a)) | Criminal conduct or violations of SBA regulations may result in denial of participation; cannot be debarred or suspended from government contracting (13 C.F.R. §124.108(a)) Requirement applies only to officers, directors, and shareholders owning more than a 20% interest in the business, not to all members of the tribe (13 C.F.R. §124.109(c)(7)(B)(ii)) | Criminal conduct or violations of SBA regulations may result in denial of participation; cannot be debarred or suspended from government contracting (13 C.F.R. §124.108(a)) Requirement applies only to officers, directors, and shareholders owning more than a 20% interest in the business, not to all ANC shareholders (13 C.F.R. §124.109(c)(7)(B)(ii)) | Criminal conduct or violations of SBA regulations may result in denial of participation; cannot be debarred or suspended from government contracting (13 C.F.R. §124.108(a)) Regulations do not address to whom requirements apply[a] | Criminal conduct or violations of SBA regulations may result in denial of participation; cannot be debarred or suspended from government contracting (13 C.F.R. §124.108(a)) Requirements apply to the firm and "all its principals" (13 C.F.R. §124.111(g)) |
| "Demonstrated potential for success" | Firm must generally have been in business in primary industry for at least two full years prior to date of application to 8(a) Program unless SBA grants a waiver; waiver based on 5 conditions [b] (13 C.F.R. §124.107) | Firm must have been in business in primary industry for at least two full years prior to date of application to 8(a) Program; individuals who will manage the firm must have substantial experience, and firm must have had successful performance and adequate capital; or Tribe must have made written commitment to support the firm and have the financial ability to do so (13 C.F.R. §124.109(c)(6)(i)-(iii) | Firm must have been in business in primary industry for at least two full years prior to date of application to 8(a) Program; individuals who will manage the firm must have substantial experience, and firm must have had successful performance and adequate capital; or ANC must have made written commitment to support the firm and have the financial ability to do so (13 C.F.R. §124.109(c)(6)(i)-(iii) | Firm must have been in business in primary industry for at least two full years prior to date of application to 8(a) Program; individuals who will manage the firm must have substantial experience, and firm must have had successful performance and adequate capital; or NHO must have made written commitment to support the firm and have the financial ability to do so (13 C.F.R. §124.110 (g)(1)-3) | Firm must have been in business in primary industry for at least two full years prior to date of application to 8(a) Program; individuals who will manage the firm must have substantial experience, and firm must have had successful performance and adequate capital; or CDC must have made written commitment to support the firm and have the financial ability to do so (13 C.F.R. §124.111 (f)(1)-(3) |
| Sole-source awards | With contracts valued at over $4.5 million ($7.5 million for manufacturing | Can be made with contracts valued at over $4.5 million ($7.5 million for manufacturing contracts) even if there is a reasonable | Can be made with contracts valued at over $4.5 million ($7.5 million for manufacturing contracts) even if there is a reasonable | Can be made with Department of Defense contracts valued at over $4.5 million | With contracts valued at over $4.5 million ($7.5 million for manufacturing contracts), sole-source awards |

| Category | 8(a) Firms Generally | Tribally Owned | ANC-Owned | NHO-Owned | CDC-Owned |
|---|---|---|---|---|---|
| | contracts), sole-source awards permissible only if there is not a reasonable expectation that at least two eligible 8(a) firms will submit offers and the award can be made at fair market price (48 C.F.R. §19.805-1(b)(1)-(2)) | expectation that at least two eligible 8(a) firms will submit offers and the award can be made at fair market price (15 U.S.C. §637(a)(1)(D)(i)-(ii); 48 C.F.R. §19.805-1(b)(1)-(2)) | expectation that at least two eligible 8(a) firms will submit offers and the award can be made at fair market price (15 U.S.C. §637(a)(1)(D)(i)-(ii); 48 C.F.R. §19.805-1(b)(1)-(2)) | ($7.5 million for manufacturing contracts) even if there is a reasonable expectation that at least two eligible 8(a) firms will submit offers and the award can be made at fair market price (48 C.F.R. §219.805-1(b)(2)(A)-(B)). Otherwise cannot be made unless there is not a reasonable expectation that at least two eligible 8(a) firms will submit offers and the award can be made at fair market price (48 C.F.R. §19.805-1(b)(1)-(2)) | permissible only if there is not a reasonable expectation that at least two eligible 8(a) firms will submit offers and the award can be made at fair market price (48 C.F.R. §19.805-1(b)(1)-(2)) |
| Inability to protest eligibility for award | Firm's eligibility for award cannot be challenged or protested as part of the solicitation or proposed contract award (48 C.F.R. §19.805-2(d)) | Firm's eligibility for award cannot be challenged or protested as part of the solicitation or proposed contract award (48 C.F.R. §19.805-2(d)) | Firm's eligibility for award cannot be challenged or protested as part of the solicitation or proposed contract award (48 C.F.R. §19.805-2(d)) | Firm's eligibility for award cannot be challenged or protested as part of the solicitation or proposed contract award (48 C.F.R. §19.805-2(d)) | Firm's eligibility for award cannot be challenged or protested as part of the solicitation or proposed contract award (48 C.F.R. §19.805-2(d)) |
| Maximum of nine years in the 8(a) Program | Firm receives "a program term of nine years" but could be terminated or graduated early (13 C.F.R. §124.2) One year extension available for | Firm receives "a program term of nine years" but could be terminated or graduated early (13 C.F.R. §124.2) One year extension available for firms participating in the program from March 13, 2020, | Firm receives "a program term of nine years" but could be terminated or graduated early (13 C.F.R. §124.2) One year extension available for firms participating in the program from March 13, 2020, | Firm receives "a program term of nine years" but could be terminated or graduated early (13 C.F.R. §124.2) One year extension available for firms | Firm receives "a program term of nine years" but could be terminated or graduated early (13 C.F.R. §124.2) One year extension available for firms |

Case 2:20-cv-00041-DCLC-CRW   Document 105-2   Filed 09/27/24   Page 52 of 78
PageID #: 3561

| Category | 8(a) Firms Generally | Tribally Owned | ANC-Owned | NHO-Owned | CDC-Owned |
|---|---|---|---|---|---|
| | firms participating in the program from March 13, 2020, through September 9, 2020 | through September 9, 2020 | through September 9, 2020 | participating in the program from March 13, 2020, through September 9, 2020 | participating in the program from March 13, 2020, through September 9, 2020 |
| One-time eligibility for 8(a) Program | Applies to both disadvantaged owners and firms (13 C.F.R. §124.108(b)) | Applies only to tribally owned firms, not tribes (15 U.S.C. §636(j)(11)(B)-(C)) | Applies only to ANC-owned firms, not ANCs (15 U.S.C. §636(j)(11)(B)-(C)) | Applies only to NHO-owned firms, not NHOs (15 U.S.C. §636(j)(11)(B)-(C)) | Applies only to CDC-owned firms, not CDCs (15 U.S.C. §636(j)(11)(B)-(C)) |
| Limits on the amount of 8(a) contracts that a firm may receive | No sole-source awards possible once the firm has received combined total of competitive and sole-source 8(a) contracts in excess of the dollar amount set forth in 13 C.F.R. §124.519 (13 C.F.R. §124.519(a)) Firms must receive an increasing percentage of revenue from non-8(a) sources throughout their participation in the 8(a) Program (13 C.F.R. §124.509(b)) | Can make sole-source awards even when a firm has received combined total of competitive and sole-source 8(a) contracts in excess of the dollar amount set forth in 13 C.F.R. §124.519 (13 C.F.R. §124.519(a)) Firms must receive an increasing percentage of revenue from non-8(a) sources throughout their participation in the 8(a) Program (13 C.F.R. §124.509(b)) | Can make sole-source awards even when a firm has combined total of competitive and sole-source 8(a) contracts in excess of the dollar amount set forth in 13 C.F.R. §124.519 (13 C.F.R. §124.519(a)) Firms must receive an increasing percentage of revenue from non-8(a) sources throughout their participation in the 8(a) Program (13 C.F.R. §124.509(b)) | Can make sole-source awards even when a firm has combined total of competitive and sole-source 8(a) contracts in excess of the dollar amount set forth in 13 C.F.R. §124.519 (13 C.F.R. §124.519(a)) Firms must receive an increasing percentage of revenue from non-8(a) sources throughout their participation in the 8(a) Program (13 C.F.R. §124.509(b)) | Combined total of competitive and sole-source 8(a) contracts in excess of the dollar amount set forth in 13 C.F.R. §124.519 not explicitly addressed in regulation Firms must receive an increasing percentage of revenue from non-8(a) sources throughout their participation in the 8(a) Program (13 C.F.R. §124.509(b)) |

**Source:** Congressional Research Service, based on 8(a) Program statutory and regulatory requirements.

a.  The rules governing NHO- or CDC-owned firms do not address this issue, and although the general rules apply where no "special rules" exist, it seems unlikely that NHO- or CDC-owned firms are treated differently than tribally or ANC-owned firms in this regard.

b.  These criteria include (1) the management experience of the disadvantaged individual(s) upon whom eligibility is based; (2) the business's technical experience; (3) the firm's capital; (4) the firm's performance record on prior federal or other contracts in its primary field of operations; and (5) whether the firm presently has, or can demonstrate its ability to timely obtain, the personnel, facilities, equipment, and other resources necessary to perform contracts under Section 8(a).

Case 2:20-cv-00041-DCLC-CRW    Document 105-2    Filed 09/27/24    Page 53 of 78
PageID #: 3562

# Author Information

Robert Jay Dilger
Senior Specialist in American National Government

R. Corinne Blackford
Analyst in Small Business and Economic Development Policy

# Acknowledgments

Kate Manuel, who has left CRS, authored a previous version of this report.

# Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.

Case 2:20-cv-00041-DCLC-CRW     Document 105-2     Filed 09/27/24     Page 54 of 78
PageID #: 3563



Updated May 29, 2024

# The SBA's 8(a) Business Development Program

## Background

Through the 8(a) Business Development Program, Congress aims to help small "socially and economically disadvantaged" business owners overcome barriers to participating in federal contracting. The program, established under Section 8(a) of the Small Business Act in 1978, gives explicit statutory authority for program activities previously implemented through regulations. For eligible businesses, the 8(a) program creates federal contracting preferences such as contract set-asides and sole-source contracts. Set-asides limit contract competition to businesses in the 8(a) program. Sole-source awards are made to selected 8(a) program participants without competition.

Agency purchasing officials may choose to award contracts under this program in order to reach annual goals for contracting with small disadvantaged businesses (SDBs; see CRS Insight IN12018, *Federal Small Business Contracting Goals*). Under the authority of the Small Business Act, the Small Business Administration (SBA) accepts procurements from other federal agencies and may then award contracts to program participants through either a set-aside or a sole-source award, typically depending on the value of the contract award.

In addition to contracting preferences, the program provides participants with business development support, including mentorship, training, and counseling. These services are intended to enhance participants' competitiveness and their long-term viability as businesses. Statutory authority for the program is contained in Sections 7(j), 8(a), and 8(d) of the Small Business Act. This In Focus provides an overview of the program's requirements as well as issues for Congress.

### Definition of Economically Disadvantaged

Economically disadvantaged individuals are those whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities (15 U.S.C. §637(a)(6)). They must have a net worth of less than $850,000 and an adjusted gross income averaged over the three preceding years of $400,000 or less. Funds invested in an Individual Retirement Account (IRA) or other official retirement account will not be considered in determining an individual's net worth. Ownership interest in the applicant firm and the equity in the individual's primary personal residence is excluded from net worth calculations as well. In addition, the fair market value of all his or her assets (including his or her primary residence and the value of the applicant firm) must not exceed $6.5 million.

### Definition of Socially Disadvantaged

Socially disadvantaged individuals have been subjected to racial or ethnic prejudice or cultural bias within American society because of their identities as members of groups and without regard to their individual qualities (15 U.S.C. §637(a)(5)). Prior to a July 2023 ruling in a federal district court case (*Ultima Servs. Corp. v. U.S. Department of Agriculture*), the SBA applied a "presumption of social disadvantage" to individuals applying for its 8(a) program from the following groups: Asian Pacific Americans, Black Americans, Hispanic Americans, Subcontinent Asian Americans, and Native Americans. Due to the district court ruling that the SBA cannot presume social disadvantage based on ethnic or racial group membership, the SBA stopped presuming social disadvantage. All program applicants must now submit a personal narrative to the SBA that demonstrates their social disadvantage, a procedure that had already been required of individuals who were not members of one of the racial groups listed above. For more information on the SBA's response to the legal challenge, see CRS Insight IN12245, *SBA's 8(a) Business Development Program Responds to District Court Ruling.*

## Program Details

### Eligibility Requirements

Businesses that meet eligibility criteria and obtain 8(a) program certification may participate in the program for nine years, at which point they are no longer eligible for contracting preferences. Eligible firms must meet all of the following criteria, described at 13 C.F.R. §124:

1. Are small in size, according to size standards established by the SBA;

2. Are of good character, which relates to an applicant's criminal conduct, their incarceration, parole, or probation pursuant to crimes involving business integrity, their violations of any SBA regulations, and their submission of false information to the SBA;

3. Demonstrate potential for success, which a firm can generally do by operating and receiving contracts in the private or public sectors, in its primary industry, for at least two full years immediately prior to applying for the program (although the SBA may waive this two-year requirement under certain conditions);

4. Are at least 51% unconditionally and directly owned by one or more **socially and economically disadvantaged** individuals who are citizens of the United States (or owned by an Alaska Native

Case 2:20-cv-00041-DCLC-CRW Document 105-2 Filed 09/27/24 Page 55 of 78
PageID #: 3564
https://crsreports.congress.gov

Corporation [ANC], Native Hawaiian Organization [NHO], Community Development Corporation [CDC], or Indian tribe).

## Selected Program Features

The SBA also provides various forms of business assistance to program participants. To enhance their ability to manage federal contracts, firms may receive training, individual counseling, and management assistance and executive development—all provided through SBA District Office staff and SBA partners such as Small Business Development Centers (SBDCs), trade and professional associations, local service providers, and SCORE—a nonprofit business mentor network. The Small Business Act also authorizes the SBA to provide direct or guaranteed loans to program participants, on its own or with lenders.

During their nine years in the program, participants complete a developmental stage in the first four years and a transitional stage over the last five years. In the transitional stage, program participants must actively pursue non-8(a) contracts in order to reach required annual targets for non-8(a) revenue. These targets increase over time, as described at 13 C.F.R. §124.509(b): 15% of their revenue from non-8(a) sources in the fifth year, 25% in the sixth year, 30% in the seventh year, 40% in the eighth year, and 50% in the ninth year. The goal is for firms to successfully compete for federal contracts without 8(a) program assistance after completing the program by the ninth year. If the SBA determines that a participant did not make good faith efforts to meet these targets, the participant becomes ineligible for sole-source awards.

A participating business may "graduate" from the program by reaching its business development goals or may exit the program after nine or fewer years. Once a participant has left the program, neither the firm nor the owner of that firm is eligible to participate in the program again. However, if ANCs, CDCs, NHOs, and Indian tribes own multiple businesses, these groups may participate more than once via a firm that has not previously participated in the program.

## 8(a) Contract Award Limitations

The SBA is barred from awarding an 8(a) contract, either via a set-aside or on a sole-source basis, if the cost to the contracting agency exceeds "a fair market price" (15 U.S.C. §637(a)(1)(A)). Additional prohibitions on the SBA accepting 8(a) contracts exist, although agencies can offer contracts to the SBA "in [their] discretion," and the SBA may accept them "whenever it determines such action is necessary or appropriate" (15 U.S.C. §637(a)(1)(A)).

When an 8(a) contract's anticipated value, including options, is less than $4.5 million (or $7 million for manufacturing contracts), the contract is typically awarded on a sole-source basis without competition. When the anticipated value exceeds these thresholds, it generally must be awarded via a set-aside.

Sole-source awards in excess of the above thresholds may be made only when (1) there is not a reasonable expectation that at least two eligible and responsible 8(a) firms will submit offers at a fair market price, or (2) the SBA accepts the contract on behalf of certain group-owned firms, such as those owned by Indian tribes. Participant firms owned by ANCs and Indian tribes may receive sole-source awards in excess of the thresholds from any agency, and NHO-owned firms may receive such sole-source awards from the Department of Defense.

Once they have been awarded more than $168,500,000 in 8(a) contract awards, participant firms owned by individuals may not receive any additional 8(a) sole-source awards, though they can still receive set-asides. This amount is set forth at 13 C.F.R. §124.519. The SBA will not count awards less than $250,000 toward this limit. Firms owned by ANCs, CDCs, NHOs, and Indian tribes are not subject to this maximum total award amount and may continue to receive sole-source awards beyond it.

## Issues for Congress

Since program eligibility and application changes occurred following the district court ruling in *Ultima Servs. Corp. v. U.S. Department of Agriculture*, Congress may be interested in program application processing issues as well as whether agency contracting with SDBs has been affected by 8(a) program changes. The government seeks to award a percentage of contracting dollars to SDBs each fiscal year, and while all 8(a) participants meet the definition of SDB, not all SDBs are in the 8(a) program; 8(a) program changes may impact contracting not just with program participants but with SDBs overall.

Additional issues of potential congressional concern for the 8(a) program include performance measurement and program reporting and oversight. The SBA may require technical support or additional resources to fully implement recommended solutions.

The SBA's Office of Inspector General (OIG) identified the "management and monitoring" of the 8(a) Business Development Program as a top management and performance challenge for the agency in FY2023. The OIG highlighted the lack of an effective information technology (IT) system to monitor program participants' progress as a key issue. It also noted the need for consistent procedures for measuring business development. In 2022, the OIG found, "There was no mechanism in place to ensure that SBA consistently reviewed business plans and goals and then objectively monitored business development progress." According to the OIG, the SBA has begun to build a system to track participant progress but would need to complete this effort for the agency to effectively evaluate firm progress and program outcomes.

In addition to measuring participant and program outcomes, issues with reporting those outcomes present an oversight challenge for Congress. The Government Accountability Office (GAO) has reported a pattern of multiyear delays in 8(a) program reporting.

**R. Corinne Blackford**, Analyst in Small Business and Economic Development Policy

IF12458

https://Document-105-2.rev

# Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.

**19.804-3 SBA acceptance.**

(a) Upon receipt of the *contracting office*'s offering letter, SBA will determine whether to accept the requirement for the 8(a) program. SBA's decision whether to accept the requirement will be transmitted to the *contracting office in writing* within 10 working days of receipt of the *offer* if the contract is likely to exceed the *simplified acquisition threshold* and within two working days of receipt if the contract is at or below the *simplified acquisition threshold*. The *contracting office may* grant an extension of these time periods, if requested by SBA.

(1) For *acquisitions* exceeding the *simplified acquisition threshold*, if SBA does not respond to an offering letter within ten working days, the *contracting office may* seek SBA's acceptance through the Associate Administrator for Business Development. The *contracting office may* assume that SBA has accepted the requirement into the 8(a) program if it does not receive a reply from the Associate Administrator for Business Development within five calendar days of receipt of the *contracting office*'s request.

(2) For *acquisitions* not exceeding the *simplified acquisition threshold*, when the *contracting office* makes an *offer* to the 8(a) program on behalf of a specific 8(a) participant and does not receive a reply to its offering letter within two working days, the *contracting office may* assume the *offer* is accepted and proceed with award of an 8(a) contract.

(b) As part of the acceptance process, SBA will review the appropriateness of the NAICS code designation assigned to the requirement by the *contracting officer*.

(1) SBA will not challenge the NAICS code assigned to the requirement by the *contracting officer* if it is reasonable, even though other NAICS codes *may* also be reasonable.

(2) If SBA and the *contracting officer* are unable to agree on a NAICS code designation for the requirement, SBA *may* refuse to accept the requirement for the 8(a) program, appeal the *contracting officer*'s determination to the *head of the agency* pursuant to 19.810, or appeal the NAICS code designation to the SBA Office of Hearings and Appeals under subpart C of 13 CFR part 134.

(c) *Sole source 8(a) awards*. If an appropriate match exists, SBA will advise the *contracting officer* whether it will participate in contract negotiations or whether SBA will authorize the *contracting officer* to negotiate directly with the identified 8(a) participant. Where SBA has delegated its contract execution functions to a *contracting* agency, SBA will also identify that delegation in its acceptance letter. For a joint venture, SBA will determine eligibility as part of its acceptance of a sole-source requirement and will approve the joint venture agreement prior to award in accordance with 13 CFR 124.513(e).

(1) Sole source award where the *contracting officer* nominates a specific 8(a) participant. SBA will determine whether an appropriate match exists where the *contracting officer* identifies a particular participant for a sole source award.

(i) Once SBA determines that a *procurement* is suitable to be accepted as an 8(a) sole source contract, SBA will normally accept it on behalf of the 8(a) participant recommended by the *contracting officer*, provided that the 8(a) participant complies with the requirements of 13 CFR 124.503(c)(1).

(ii) If an appropriate match does not exist, SBA will notify the 8(a) participant and the *contracting officer*, and *may* then nominate an *alternate* 8(a) participant.

(2) Sole source award where the *contracting officer* does not nominate a specific 8(a) participant. When a *contracting officer* does not nominate an 8(a) participant for performance of a sole source 8(a) contract, SBA will select an 8(a) participant for possible award from among two or more eligible and qualified 8(a) participants. The selection will be based upon relevant factors, including business development needs, compliance with competitive business mix requirements (if applicable), financial condition, management ability,

technical capability, and whether award will promote the equitable distribution of 8(a) contracts. (For *construction* requirements see 13 CFR 124.503(d)(1)).

**Parent topic:** 19.804 Evaluation, offering, and acceptance.

**19.803 Selecting acquisitions for the 8(a) Program.**

Through their cooperative efforts, the SBA and an agency match the agency's requirements with the capabilities of 8(a) participants to establish a basis for the agency to contract with the SBA under the program. Selection is initiated in one of three ways:

(a) The SBA advises the *contracting activity* of an 8(a) participant's capabilities through a search letter and requests the *contracting activity* to identify *acquisitions* to support the participant's business plans. In these instances, the SBA will provide at a minimum the following information in order to enable the *contracting activity* to match an *acquisition* to the participant's capabilities:

(1) Identification of the participant and its owners.

(2) Background information on the participant, including any and all information pertaining to the participant's technical ability and capacity to perform.

(3) The participant's present production capacity and related facilities.

(4) The extent to which *contracting* assistance is needed in the present and the future, described in terms that will enable the agency to relate the participant's plans to present and future agency requirements.

(5) If *construction* is involved, the request *shall* also include the following:

(i) A participant's capabilities in and qualifications for accomplishing various categories of *construction* work typically found in North American Industrial Category System subsector 236 (*construction* of buildings), subsector 237 (heavy and civil engineering *construction*), or subsector 238 (specialty trade contractors).

(ii) The participant's capacity in each *construction* category in terms of estimated dollar value (*e.g.*, electrical, up to $100,000).

(b) The SBA identifies a specific requirement for one or more 8(a) participant(s) and sends a requirements letter to the agency's *Office of Small and Disadvantaged Business Utilization*, or for the Department of Defense, Office of Small Business Programs, requesting the *contracting office offer* the *acquisition* to the 8(a) program. In these instances, in addition to the information in paragraph (a) of this section, the SBA will provide-

(1) A clear identification of the *acquisition* sought; *e.g.*, project name or number;

(2) A statement as to how the required equipment and real property will be provided in order to ensure that the participant will be fully capable of satisfying the agency's requirements;

(3) If *construction*, information as to the bonding capability of the participant(s); and

(4) Either-

(i) If a sole source request-

(A) The reasons why the participant is considered suitable for this particular *acquisition*; *e.g.*, previous contracts for the same or similar supply or service; and

(B) A statement that the participant is eligible in terms of its small business size status relative to the assigned NAICS code, business support levels, and business activity targets; or

(ii) If competitive, a statement that at least two 8(a) participants are considered capable of satisfying the agency's requirements and a statement that the participants are also eligible in terms of their small business size status relative to the assigned NAICS code, business support levels, and business activity targets. If requested by the

*contracting office*, SBA will identify at least two such participants and provide information concerning the participants' capabilities.

(c) Agencies *may* also review other proposed *acquisitions* for the purpose of identifying requirements which *may* be offered to the SBA. Where agencies independently, or through the self marketing efforts of an 8(a) participant, identify a requirement for the 8(a) program, they *may offer* on behalf of a specific 8(a) participant, for the 8(a) program in general, or for 8(a) competition.

**Parent topic:** Subpart 19.8 - Contracting with the Small Business Administration (The 8(a) Program)

**19.804-1 Agency evaluation.**

In determining the extent to which a requirement *should* be offered in support of the 8(a) program, the agency *should* evaluate-

(a) Current and future plans to acquire the specific items or work that 8(a) participants are seeking to provide, identified in terms of-

(1) Estimated quantities of the *supplies* or services required or the estimated number of *construction* projects planned;

(2) Length of contract, including *option* periods (see 19.812(d)); and

(3) Performance or delivery requirements, including–

(i) Required monthly production rates, when applicable; and

(ii) For *construction*, the geographical location where work is to be performed;

(b) The impact of any delay in delivery;

(c) Whether the items or work have previously been acquired using small business set-asides, and the date the items or work were acquired;

(d) Problems encountered in previous *acquisitions* of the items or work from the 8(a) participants or other contractors; and

(e) Any other pertinent information about known 8(a) participants, the items, or the work. This includes any information concerning the participants' *products* or capabilities. When necessary, the *contracting* agency *shall* make an independent review of the factors in 19.803(a) and other aspects of the participants' capabilities which would ensure the satisfactory performance of the requirement being considered for commitment to the 8(a) program.

**Parent topic:** 19.804 Evaluation, offering, and acceptance.

**19.804-3 SBA acceptance.**

(a) Upon receipt of the *contracting office*'s offering letter, SBA will determine whether to accept the requirement for the 8(a) program. SBA's decision whether to accept the requirement will be transmitted to the *contracting office in writing* within 10 working days of receipt of the *offer* if the contract is likely to exceed the *simplified acquisition threshold* and within two working days of receipt if the contract is at or below the *simplified acquisition threshold*. The *contracting office may* grant an extension of these time periods, if requested by SBA.

(1) For *acquisitions* exceeding the *simplified acquisition threshold*, if SBA does not respond to an offering letter within ten working days, the *contracting office may* seek SBA's acceptance through the Associate Administrator for Business Development. The *contracting office may* assume that SBA has accepted the requirement into the 8(a) program if it does not receive a reply from the Associate Administrator for Business Development within five calendar days of receipt of the *contracting office*'s request.

(2) For *acquisitions* not exceeding the *simplified acquisition threshold*, when the *contracting office* makes an *offer* to the 8(a) program on behalf of a specific 8(a) participant and does not receive a reply to its offering letter within two working days, the *contracting office may* assume the *offer* is accepted and proceed with award of an 8(a) contract.

(b) As part of the acceptance process, SBA will review the appropriateness of the NAICS code designation assigned to the requirement by the *contracting officer*.

(1) SBA will not challenge the NAICS code assigned to the requirement by the *contracting officer* if it is reasonable, even though other NAICS codes *may* also be reasonable.

(2) If SBA and the *contracting officer* are unable to agree on a NAICS code designation for the requirement, SBA *may* refuse to accept the requirement for the 8(a) program, appeal the *contracting officer*'s determination to the *head of the agency* pursuant to 19.810, or appeal the NAICS code designation to the SBA Office of Hearings and Appeals under subpart C of 13 CFR part 134.

(c) *Sole source 8(a) awards.* If an appropriate match exists, SBA will advise the *contracting officer* whether it will participate in contract negotiations or whether SBA will authorize the *contracting officer* to negotiate directly with the identified 8(a) participant. Where SBA has delegated its contract execution functions to a *contracting* agency, SBA will also identify that delegation in its acceptance letter. For a joint venture, SBA will determine eligibility as part of its acceptance of a sole-source requirement and will approve the joint venture agreement prior to award in accordance with 13 CFR 124.513(e).

(1) Sole source award where the *contracting officer* nominates a specific 8(a) participant. SBA will determine whether an appropriate match exists where the *contracting officer* identifies a particular participant for a sole source award.

(i) Once SBA determines that a *procurement* is suitable to be accepted as an 8(a) sole source contract, SBA will normally accept it on behalf of the 8(a) participant recommended by the *contracting officer*, provided that the 8(a) participant complies with the requirements of 13 CFR 124.503(c)(1).

(ii) If an appropriate match does not exist, SBA will notify the 8(a) participant and the *contracting officer*, and *may* then nominate an *alternate* 8(a) participant.

(2) Sole source award where the *contracting officer* does not nominate a specific 8(a) participant. When a *contracting officer* does not nominate an 8(a) participant for performance of a sole source 8(a) contract, SBA will select an 8(a) participant for possible award from among two or more eligible and qualified 8(a) participants. The selection will be based upon relevant factors, including business development needs, compliance with competitive business mix requirements (if applicable), financial condition, management ability,

technical capability, and whether award will promote the equitable distribution of 8(a) contracts. (For *construction* requirements see 13 CFR 124.503(d)(1)).
**Parent topic:** <u>19.804 Evaluation, offering, and acceptance.</u>



DEPARTMENT OF THE TREASURY
WASHINGTON, D.C.

**Acquisition Bulletin No. 23-03**
**Deviation No. 2023-00003**

**Date: <u>August 29, 2023</u>**

**MEMORANDUM FOR TREASURY ACQUISITION PERSONNEL**

**FROM:** NICOLE EVANS *Nicole Evans*
DEPUTY ASSISTANT SECRETARY FOR ACQUISITION
SENIOR PROCUREMENT EXECUTIVE

**SUBJECT:** Class Deviation No. 2023-00003 from the Federal Acquisition Regulation
(FAR) Verification of Eligibility for the 8(a) Program

1. **<u>PURPOSE</u>:** To implement a court injunction issued by the United States District Court
   for the Eastern District of Tennessee on July 19, 2023, enjoining the use of the
   rebuttable presumption of social disadvantage in administering the Small Business
   Administration's (SBA) business development program (8(a) Program), and SBA's
   memorandum issued on August 18, 2023. Accordingly, this policy memorandum
   establishes deviations from FAR 19.804-3 and 52.219-18 and makes necessary policy
   changes to the guidance in the Treasury-SBA Partnership Agreement.

2. **<u>EFFECTIVE DATE</u>:** Upon issuance.

3. **<u>EXPIRATION DATE</u>:** Until superseded or otherwise rescinded.

4. **<u>POLICY</u>:**

   a. Effective immediately, Contracting Officers shall:

      i. Use the procedures in this class deviation to verify a concern's
         eligibility for the 8(a) Program in lieu of using the System for Award
         Management or presuming acceptance of a requirement by the Small
         Business Administration (SBA) prior to making an award under the
         8(a) Program; and

      ii. Use the attached deviation clause **52.219-18, Notification of
          Competition Limited to Eligible 8(a) Participants (Class Deviation
          2023-00003)**, in lieu of the clause at FAR 52.219-18, Notification of
          Competition Limited to Eligible 8(a) Participants.

b. Notwithstanding FAR 19.804-3 and the SBA and Treasury 8(a) Partnership Agreement, Contracting Officers shall not make an award to an 8(a) participant unless:

    i. They receive from SBA an eligibility determination for the 8(a) participant including an 8(a) partner to a joint venture;

    ii. The apparently successful offeror provides a copy of the SBA qualification letter for the 8(a) participant including an 8(a) partner to a joint venture; or

    iii. They document that the 8(a) participant (including an 8(a) partner to a joint venture) appears on the SBA's "8(a) Social Disadvantage Qualification List[1]" which is updated daily and available for government-only review on the OMBMAX platform at <u>SBA OPPL Collaboration Page - Small Business Administration - MAX Federal Community</u>.

c. This restriction applies to the following actions:

    i. Competitive or sole-source 8(a) contract

    ii. 8(a) sole-source orders placed against existing or new 8(a) set-aside multiple-award contracts, including Governmentwide acquisition contracts (GWACS) and Federal Supply Schedule (FSS) contracts.

    iii. 8(a) orders placed against existing or new non-8(a) set-aside multiple-award contracts, including GWACS and FSS contracts.

    iv. 8(a) orders under blanket purchase agreements or basic ordering agreements.

    v. Out-of-scope modifications and unpriced options under existing 8(a) contracts.

d. Except as noted above, existing 8(a) contracts are not impacted by this class deviation, and Contracting Officers may award in-scope modifications and exercise priced options without obtaining SBA acceptance or requiring the contractor to provide a copy of the SBA qualification letter, unless verification of eligibility would otherwise be required (see FAR 19.812(d)). In addition, Contracting Officers may place competitive 8(a) orders against existing 8(a) set-aside multiple-award contracts, GWACS, and FSS contracts without obtaining SBA acceptance or requiring the contractor to provide a copy of the SBA

---

[1] SBA is maintaining an "8(a) Social Disadvantage Qualification List" of participants that are eligible for award for one of three reasons: (1) SBA has made an affirmative determination that the individual-owned small business participant is socially disadvantaged; (2) The small business participant did not use the rebuttable presumption of social disadvantage and does not require affirmation; or (3) The participant is an entity-owned business and therefore affirmation is not required.

2

qualification letter.

e. The restrictions in this class deviation do not apply to 8(a) entity-owned businesses owned by Indian tribes, Alaska Native Corporations, Native Hawaiian Organizations, or Community Development Corporations.

5. **BACKGROUND:** This memorandum and the FAR class deviation are in response to the recent court decision in Ultima Services Corporation vs. USDA et al.[2] and SBA guidance issued Friday, August 18, 2023, and supplemented on Friday, August 25, 2023.

The SBA Memorandum requires that, before an award can be made to an individual-owned small business participant that previously relied on a presumption of social disadvantage to support its eligibility, SBA must make an affirmative determination that the individual upon whom eligibility is based has established personal social disadvantage without the presumption. When required, SBA will make their affirmative determination of eligibility as a part of the offer and acceptance process.

6. **DEVIATION:** See attached

7. **ADDITIONAL INFORMATION:** The primary point of contact for this Acquisition Bulletin is Steve Kvalevog who can be reached at Steven.Kvalevog@treasury.gov.

Attachments:
- FAR 19.804-3(a) Deviation
- FAR 52.219-18 Deviation
- SBA Memorandum, "Impact of Recent Court Decision (*Ultima Servs. Corp. v. Dep't of Ag. (E.D. Tenn.))* on the use of the 8(a) Program," August 18, 2023
- SBA Memorandum, "Continued Use of the 8(a) Program During the Ultima Injunction: Frequently Asked Questions," August 25, 2023

---

[2] SBA regulations allow applicants to be admitted to the 8(a) program using a "rebuttable presumption" that certain groups are socially disadvantaged, while other entities could submit a narrative demonstrating social disadvantage which SBA would review to determine if they were also socially disadvantaged. Social disadvantage and economic disadvantage are components of 8(a) program participant eligibility. In response to a challenge that the "rebuttable presumption" violated constitutional rights to equal protection, the Court enjoined SBA from using the "rebuttable presumption" in administering the 8(a) program.

3

Attachment 1 - Deviation to FAR Text

Baseline is accurate through FAC 2023-05, to be effective September 22, 2023.
Changes to baseline shown as **[bolded, bracketed additions]** and ~~struck through deletions~~.
FAR text unchanged shown as asterisks.

## Part 19 - Small Business Programs

* * * * *

### Subpart 19.8 - Contracting with the Small Business Administration (The 8(a) Program)

* * * * *

### 19.804 Evaluation, offering, and acceptance.

* * * * *

### 19.804-3 SBA acceptance.

(a) Upon receipt of the contracting office's offering letter, SBA will determine whether to accept the requirement for the 8(a) program. SBA's decision whether to accept the requirement will be transmitted to the contracting office in writing within 10 working days of receipt of the offer if the contract is likely to exceed the simplified acquisition threshold and within two working days of receipt if the contract is at or below the simplified acquisition threshold. The contracting office may grant an extension of these time periods, if requested by SBA.

(1) For acquisitions exceeding the simplified acquisition threshold, if SBA does not respond to an offering letter within ten working days, the contracting office may seek SBA's acceptance through the Associate Administrator for Business Development. The contracting office **[must receive SBA's decision of acceptance before proceeding with award of an 8(a) contract]** ~~may assume that SBA has accepted the requirement into the 8(a) program if it does not receive a reply from the Associate Administrator for Business Development within five calendar days of receipt of the contracting office's request.~~

(2) For acquisitions not exceeding the simplified acquisition threshold, **[the contracting office must receive SBA's decision of acceptance before proceeding with award of an 8(a) contract]** ~~when the contracting office makes an offer to the 8(a) program on behalf of a specific 8(a) participant and does not receive a reply to its offering letter within two working days, the contracting office may assume the offer is accepted and proceed with award of an 8(a) contract.~~

* * * * *

Attachment 2
Class Deviation 2023-00003 Verification of Eligibility for the 8(a) Program
Changes are indicated by a change bar in the right-hand margin.

**52.219-18 Notification of Competition Limited to Eligible 8(a) Participants (DEVIATION 2023-00003).**

The contracting officer shall insert the following clause in competitive solicitations and contracts when the acquisition is accomplished using the procedures of FAR 19.805. This deviation incorporates the guidance in Department of the Treasury Acquisition Regulation (DTAR) 1019.811-3(d)(3) to use substitute language for the paragraph (c) in FAR 52.219-18. Use the following clause with its Alternate I when competition is to be limited to 8(a) participants within one or more specific SBA districts pursuant to FAR 19.804-2.

NOTIFICATION OF COMPETITION LIMITED TO ELIGIBLE 8(A) PARTICIPANTS (AUG 2023) (DEVIATION 2023-00003)

(a) Awards will only be made to—

　(1) Small business concerns that are expressly certified by the Small Business Administration (SBA) for participation in SBA's 8(a) program and which meet the following criteria at the time of submission of offer—
　　(i) The Offeror is in conformance with the 8(a) support limitation set forth in its approved business plan; and
　　(ii) The Offeror is in conformance with the Business Activity Targets set forth in its approved business plan or any remedial action directed by SBA;

　(2) A joint venture, in which at least one of the 8(a) program participants that is a party to the joint venture complies with the criteria set forth in paragraph (a)(1) of this clause, that complies with 13 CFR 124.513(c); or

　(3) A joint venture—
　　(i) That is comprised of a mentor and an 8(a) protégé with an approved mentor-protégé agreement under the 8(a) program;
　　(ii) In which at least one of the 8(a) program participants that is a party to the joint venture complies with the criteria set forth in paragraph (a)(1) of this clause; and
　　(iii) That complies with 13 CFR 124.513(c).
(b) By submission of its offer, the Offeror represents that it meets the applicable criteria set forth in paragraph (a) of this clause.

(c) Any award resulting from this solicitation will be made directly by the contracting officer to the successful 8(a) offeror selected through the evaluation criteria set forth in this solicitation.

(End of clause)

5

*Alternate I* (MAR 2023). If the competition is to be limited to 8(a) participants within one or more specific SBA regions or districts, add the following paragraph (a)(1)(iii) to paragraph (a) of the clause:

(iii) The offeror's approved business plan is on the file and serviced by __ *[Contracting Officer completes by inserting the appropriate SBA District and/or Area Office(s) as identified by the SBA]*



U.S. Small Business
Administration

## Memorandum

**Date:** August 18, 2023

**To:** Federal Chief Acquisition Officers & Senior Procurement Executives
**From:** Dr. Donna Peebles
Associate Administrator, Office of Business Development
Small Business Administration

**Subject:** Impact of Recent Court Decision (*Ultima Servs. Corp. v. Dep't of Ag.* (E.D. Tenn.)) on the use of the 8(a) Program

## <u>Background</u>

On July 19, 2023, a district judge enjoined the Small Business Administration (SBA) "from using the rebuttable presumption of social disadvantage in administering" the 8(a) Business Development Program (8(a) Program). *Ultima Servs. Corp. v. Dep't of Ag., No. 20-cv-0041* (E.D. Tenn.). The rebuttable presumption assumes, unless there is evidence to the contrary, that members of certain racial and ethnic groups qualify as socially disadvantaged within the meaning of the 8(a) Program requirements. See 13 C.F.R. § 124.103(b). The Court held that the SBA's use of the rebuttable presumption violated the plaintiff's Fifth Amendment right to equal protection of the law.

On August 31, the Court will hold a hearing on its ruling and may provide additional direction to SBA. SBA, in conjunction with the Department of Justice (DOJ), has prepared the following interim guidance for agencies to follow. This guidance may be updated as necessary based on any further developments at or after the August 31 hearing.

## <u>Guidance for Federal Agencies</u>

This guidance is intended to address:

1. Which 8(a) Program participants are impacted by this decision;
2. How federal agencies may continue to issue 8(a) contract awards during this critical period of the end of the fiscal year; and
3. The impact on existing contracts with 8(a) Program participants.

We note that SBA and DOJ are not interpreting the injunction to limit contract awards to 8(a) participants executed outside the 8(a) Program authority; 8(a) participants remain eligible for

other types of prime contracts, including unrestricted, small business set-aside, and other socio-economic procurements.

**Categories of 8(a) Participant Impacted by this Injunction**

There are three categories of 8(a) Program participants:

1. Individual-owned small businesses which used the rebuttable presumption of social disadvantage to establish eligibility;
2. Individual-owned small businesses which did not use the rebuttable presumption of social disadvantage and therefore have already provided SBA with documentation to establish social disadvantage; and
3. Entity-owned small businesses which do not have to establish social disadvantage to participate in the program (these businesses must only establish economic disadvantage at the Entity level). These entity-owned businesses are owned by Indian tribes, Alaska Native Corporations, Native Hawaiian Organizations, or Community Development Corporations.

SBA and DOJ do not interpret the injunction to apply either to individual-owned small businesses that previously established social disadvantage without the use of the presumption (Group 2) or to small businesses that are entity-owned (Group 3). The processing of 8(a) awards made to these two groups of 8(a) participants will not be affected.

**Submission of New Requirements to the 8(a) Program**

- Agencies can and should continue to submit new requirements for acceptance into the 8(a) Program. Before an award can be made to an individual-owned participant that previously relied on the presumption of social disadvantage to support its eligibility, SBA must make an affirmative determination that the individual upon whom eligibility is based has established personal social disadvantage without the presumption.
- Agencies can immediately continue to send offering letters to SBA. Until the new process outlined below is in place, SBA will process individual claims of social disadvantage under the existing (narrative) process. SBA has already done that in several instances and turned those cases around within only a few days.
- For sole source 8(a) awards, the procuring agency typically offers the procurement on behalf of a specific 8(a) nominee. SBA will verify the nominee's eligibility for award as part of its acceptance of the procurement into the 8(a) Program. SBA will verify that the nominee meets the social disadvantage requirement in connection with its acceptance.
- For competitive 8(a) awards, the procuring agency will request an eligibility determination of the identified apparent successful offeror or offerors. SBA will verify

that the nominee(s) meets the social disadvantage requirement in connection with the contract eligibility determination.

- SBA anticipates that it should be able to complete this process and, if social disadvantage is established, to authorize the award in 5 business days.
- If the business owner cannot establish social disadvantage as part of this new process, SBA will not be able to reconsider the business owner's eligibility for this specific proposed award due to operational constraints. The requesting agency will be required to award the requirement to a different 8(a) firm that has established social disadvantage without reliance on the presumption or award the contract through an alternative means.
- We understand that some agencies have partnership agreements with SBA that authorize the agency to deem procurement requirements offered to the 8(a) Program as accepted based on SBA's inaction. As a result of the injunction, agencies may not rely on SBA inaction as approval. For individual-owned participants, agencies may not proceed to finalizing a contract with the participant until SBA has affirmatively indicated that the individual-owned participant has demonstrated its social disadvantage.
- As referenced above, awards to individual-owned participants which did not rely on the rebuttable presumption to establish social disadvantage and awards to entity-owned participants may proceed as usual.
- SBA will communicate directly to existing 8(a) participants the method and procedures for establishing social disadvantage. This communication will take place on Monday, August 21, 2023.
- Acquisition personnel should expect to see a letter from SBA which indicates the identified 8(a) participant meets the social disadvantage requirements. This letter will minimally contain the 8(a) participant business name, Unique Entity ID (UEI), Program entrance date, and anticipated Program exit date.
- Consistent with existing regulations, SBA's initial determination of social disadvantage will continue to form the basis of continued eligibility determinations. In other words, once a firm has demonstrated social disadvantage via the new process, SBA will not ask firms to complete the new process again with respect to a different contract award.

## Existing Contracts and Options/Modifications with 8(a) Participants

Contracts that were placed into the 8(a) Program prior to July 19, 2023, are not affected by the injunction. Performance on such contracts, as well as most future actions such as issuing priced options and in-scope modifications, may continue as usual.

As explained above, however, if an eligibility determination is required in connection with an 8(a) contract to an individual-owned participant, SBA must make an affirmative finding of

social disadvantage. Agencies cannot deem SBA to have made that determination through inaction and instead should await affirmative confirmation from SBA.

Where a contracting action under a previously awarded 8(a) contract or agreement requires SBA acceptance, including an 8(a) sole source order awarded against an 8(a) Multiple Award Contract (MAC) or Governmentwide Acquisition Contract (e.g., STARS III), a discretionary 8(a) task order competed against a non-8(a) MAC, or call orders placed against Blanket Purchase Agreements or Basic Ordering Agreements, SBA will determine the qualifying individual's social disadvantage in accordance with the procedures above.

Conversely, the injunction does not affect contracting actions under previously awarded 8(a) contracts or agreements which do not require SBA acceptance, including in-scope modifications and competitively awarded task orders under 8(a) MACs and GWACs. For these actions, SBA will not make an eligibility determination and agencies should continue to execute these as normal.

Replacing one 8(a) participant with another 8(a) participant (novating) on an 8(a) contract is considered a new contracting action to the firm receiving the award. As such, SBA will assess whether the receiving firm meets the social disadvantage requirement in connection with the novation.

### Further Information Regarding SBA Activities

SBA has temporarily suspended the initiation of new applications into the 8(a) Program and suspended the final evaluation of all pending applications that sought to rely on the rebuttable presumption. SBA is currently updating its new applicant process and system to comply with the Court's order. SBA anticipates that the new application process and system changes will be completed soon. At that time, the agency will reopen the new application process and resume making final evaluation determinations.

### Questions

Questions from the acquisition community regarding this guidance should be directed to 8aquestions@sba.gov. Please use "Memo on Recent Court Decision Question" as the subject to assist with routing.

[8/25/23]

## Continued Use of the 8(a) Program During the Ultima Injunction

## Frequently Asked Questions

The questions and answers in this document are intended to help the federal workforce as it implements SBA's guidance on the impact of the district court's July 19, 2023 decision in *Ultima Servs. Corp. v. Dep't of Ag.* (E.D. Tenn.) on the 8(a) Program. These FAQs may be updated based on further developments. Additional questions may be sent to 8aquestions@sba.gov, with "8.25 FAQs" as the subject line.

### A. New requirements

### 1. Does the guidance require agencies to pause or otherwise slow their submission of new requirements for acceptance into the 8(a) Program?

No. Under the guidance, agencies can and should continue to submit new requirements for acceptance into the 8(a) Program.

### 2. Are all new 8(a) requirements subject to an affirmative determination by SBA prior to award that social disadvantage has been established without the presumption?

No. The *Ultima* injunction does not apply either to individual-owned small businesses that previously established social disadvantage without the use of the presumption or to small businesses that are entity-owned, which do not have to establish social disadvantage to participate in the program. Entity-owned small businesses include business concerns owned by Alaska Native Corporations, Indian tribes, Native Hawaiian Organizations, or Community Development Corporations (CDCs). SBA is publishing and updating a MAX.gov list of the 8(a) participants that fall into these categories. The processing of 8(a) awards made to these businesses will not be affected.

### 3. Is there a list of small businesses in the 8(a) program that have established social disadvantage without the use of the presumption which currently qualify for awards under 8(a) authorities?

SBA is making a list available for government-only review within OMB's MAX.gov platform. The MAX.gov list includes both individual-owned 8(a) participants and entity-owned participants. SBA also will send a letter to every current Program Participant that it has identified as having established its individual social disadvantage and entity-owned businesses which do not have to establish social disadvantage in response to this injunction. This will include Participants that established their individual social

disadvantage at the time of their application to the program and those that have established their individual social disadvantage in response to the *Ultima* decision. All Participants will be able to share that letter with procuring agencies before an 8(a) award occurs.

**4. Are competitive 8(a) set-aside orders conducted under an existing 8(a) multiple award contract or government-wide acquisition contract with individual-owned small businesses subject to an affirmative determination of eligibility by SBA prior to award?**

No. Eligibility for a competitive 8(a) order under an existing 8(a) multiple award contract or an 8(a) government-wide acquisition contract flows down from the underlying contract. Agencies do not offer and SBA does not accept individual orders into the 8(a) program. SBA does not make a new eligibility determination with respect to such orders.

Agencies may compete orders amongst 8(a) contractors, at any dollar level, when using the 8(a) MAS Pool on the GSA Federal Supply Schedule and when using GSA's government-wide IDIQs for 8(a) firms, including GSA's 8(a) STARS III GWAC, without affirmation of eligibility from SBA prior to award. More than 1,100 8(a) contractors are qualified to compete on the STARS GWAC and provide a wide range of IT services. These order awards do not require eligibility determinations by SBA.

Note that for competitive 8(a) awards outside of 8(a) ordering vehicles (e.g., an 8(a) competitive order under a multiple award contract that is not itself an 8(a) contract), the procuring agency must request an eligibility determination of the identified apparent successful offeror or offerors. SBA will verify that the nominee(s) meets the social disadvantage requirement in connection with the contract eligibility determination. This does not apply to awards that are made to 8(a) participants after full and open competition.

**5. If an agency seeks to place a directed (sole source) award with an individual-owned small business – either on the open market or on an existing government-wide or agency contract – must SBA first verify the nominee's eligibility for award as part of its acceptance of the procurement into the 8(a) program?**

Yes. For every sole source 8(a) award, SBA must verify that the nominee meets the social disadvantage requirement in connection with its acceptance. This includes the award of any 8(a) sole-source order, regardless of whether the underlying contract is an 8(a) contract.

**B. Existing requirements**

**6. Must SBA make an affirmative determination of eligibility regarding ongoing contracts with individual-owned small businesses?**

For any contract placed into the 8(a) Program prior to July 19, 2023 (the date of the *Ultima* injunction), agencies may allow continued performance under the existing contract period, exercise priced options, and execute in-scope modifications without consulting with SBA.

**7. If a contract was placed in the program after July 19, 2023, may an agency exercise a priced option or execute an in-scope modification without first receiving affirmation from SBA regarding the business' eligibility?**

If a contract was placed into the program after July 19, 2023, it must either be awarded to a firm that doesn't need a social disadvantage determination (i.e., entity-owned Participants, or individual-owned Participants that previously established their personal social disadvantage in their application to participate in the program) or to one whose social disadvantage has been affirmatively determined by SBA prior to award. In either case, as with 8(a) contracts existing prior to July 19, 2023, agencies may allow continued performance under the existing contract period, exercise priced options, and execute in-scope modifications without consulting with SBA.

**C. Contracting with Small Disadvantaged Businesses (SDBs) outside of the 8(a) Program**

**8. Are there any restrictions on contracting with SDBs outside of the 8(a) program as a result of the injunction?**

No. The injunction does not limit contract awards to 8(a) participants executed outside the 8(a) Program authority; 8(a) participants remain eligible for other types of prime contracts, including unrestricted, small business set-aside, and other socio-economic procurements without additional verifications.

**9. How can contracting officers maximize opportunities for SDBs outside the 8(a) Program?**

Agencies should consider set-asides with WOSBs (see FAR 19.1505), HUBZone small business contractors (FAR 19.1305), and SDVOSBs (see FAR 19.1405). Approximately 65 percent of certified WOSBs, HUBZone, and certified SDVOSB small business contractors also self-represent as SDBs. Small business set-asides should also be considered – historically, about 30 percent of small business set-asides are won by SDBs.

### D.  Reducing procurement lead-time and barriers to entry for small businesses

**10. What strategies might be used when conducting competitive small business set-asides to reduce procurement lead-times and improve accessibility to the marketplace for small businesses?**

FAR 1.102-4 provides authority to use flexible business strategies in procurements unless noted otherwise. Sample use cases and examples of tested innovative acquisition techniques can be found in the Periodic Table of Acquisition Innovations (PTAI): https://fai.gov/periodic-table.  More than half of the listed strategies have been demonstrated to reduce burden and facilitate access for small businesses.  Agency designated Acquisition Innovation Advocates can provide additional resources.