# SBIC POOLED DEBENTURE PREPAYMENT SCHEDULE THROUGH MARCH 10, 2024 (unaudited and subject to revision and update)

| POOL SERIES | PREPAYMENT PENALTY FEATURE | CUSIP | ISSUE DATE | MATURITY DATE | COUPON | NUMBER OF SBICS | NUMBER OF DEBENTURES | ORIGINAL PRINCIPAL | ACCELERATION PAYMENTS | ACCELERATION PAYMENTS PAID AT MATURITY | VOLUNTARY PREPAYMENTS | CURRENT POOL SIZE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1986-A | yes | 83164AA3 | 9/24/1986 | 9/1/1996 | 8.750% | 36 | 36 | $67,190,000 | $19,970,000 | $0 | $25,700,000 | MATURED |
| 1987-A | yes | 83164AB1 | 2/4/1987 | 2/1/1997 | 7.950% | 25 | 25 | $49,230,000 | $30,000,000 | $0 | $7,020,000 | MATURED |
| 1987-B | yes | 83164AC9 | 4/29/1987 | 4/1/1997 | 8.950% | 10 | 10 | $5,600,000 | $0 | $0 | $3,350,000 | MATURED |
| 1987-C | yes | 83164AD7 | 9/29/1987 | 9/1/1997 | 10.350% | 35 | 39 | $84,170,000 | $34,690,000 | $1,000,000 | $41,560,000 | MATURED |
| 1988-10A | yes | 83164AE5 | 2/17/1988 | 2/1/1998 | 8.850% | 16 | 20 | $19,610,000 | $13,610,000 | $0 | $8,230,000 | MATURED |
| 1988-10B | yes | 83164AG0 | 6/8/1988 | 6/1/1998 | 9.800% | 19 | 23 | $54,905,000 | $21,605,000 | $0 | $24,150,000 | MATURED |
| 1988-10C | yes | 83164AH8 | 9/26/1988 | 9/1/1998 | 9.625% | 13 | 18 | $19,710,000 | $7,500,000 | $0 | $4,950,000 | MATURED |
| 1988-10D | yes | 83164AJ4 | 12/21/1988 | 12/1/1998 | 9.750% | 7 | 7 | $8,410,000 | $5,500,000 | $0 | $1,200,000 | MATURED |
| 1989-10A | yes | 83164AM7 | 3/21/1989 | 3/1/1999 | 10.050% | 5 | 5 | $9,500,000 | $1,750,000 | $0 | $0 | MATURED |
| 1989-10B | yes | 83164AN5 | 6/20/1989 | 6/1/1999 | 8.950% | 11 | 12 | $10,250,000 | $4,950,000 | $0 | $0 | MATURED |
| 1989-10C | yes | 83164AP0 | 9/27/1989 | 9/1/1999 | 8.800% | 13 | 19 | $19,760,000 | $6,810,000 | $0 | $2,000,000 | MATURED |
| 1989-10D | yes | 83164AQ8 | 12/20/1989 | 12/1/1999 | 8.600% | 7 | 7 | $18,400,000 | $16,750,000 | $0 | $0 | MATURED |
| 1990-10A | yes | 83164AR6 | 3/29/1990 | 3/1/2000 | 9.350% | 7 | 7 | $11,080,000 | $2,500,000 | $0 | $6,580,000 | MATURED |
| 1990-10B | yes | 83164AS4 | 6/27/1990 | 6/1/2000 | 9.300% | 12 | 16 | $12,390,000 | $4,210,000 | $0 | $1,000,000 | MATURED |
| 1990-10C | yes | 83164AT2 | 9/26/1990 | 9/1/2000 | 9.600% | 10 | 11 | $17,460,000 | $5,260,000 | $0 | $5,690,000 | MATURED |
| 1990-10D | yes | 83164AV7 | 12/19/1990 | 12/1/2000 | 8.700% | 6 | 10 | $20,240,000 | $2,000,000 | $0 | $7,140,000 | MATURED |
| 1991-10A | yes | 83164AW5 | 3/27/1991 | 3/1/2001 | 8.850% | 7 | 7 | $6,100,000 | $550,000 | $0 | $900,000 | MATURED |
| 1991-10B | yes | 83164AX3 | 6/26/1991 | 6/1/2001 | 9.089% | 12 | 12 | $27,380,000 | $8,140,000 | $2,000,000 | $1,600,000 | MATURED |
| 1991-10C | yes | 83164AY1 | 9/25/1991 | 9/1/2001 | 8.330% | 10 | 10 | $13,460,000 | $600,000 | $0 | $2,250,000 | MATURED |
| 1991-10D | yes | 83164AZ8 | 12/17/1991 | 12/1/2001 | 7.890% | 8 | 8 | $17,740,000 | $8,640,000 | $0 | $6,500,000 | MATURED |
| 1992-10A | yes | 83164BA2 | 3/25/1992 | 3/1/2002 | 8.250% | 8 | 9 | $7,920,000 | $3,290,000 | $0 | $1,800,000 | MATURED |
| 1992-10B | yes | 83164BB0 | 6/24/1992 | 6/1/2002 | 8.000% | 9 | 9 | $19,390,000 | $3,500,000 | $0 | $6,590,000 | MATURED |
| 1992-10C | yes | 83164BD6 | 9/23/1992 | 9/1/2002 | 7.150% | 8 | 18 | $21,300,000 | $2,000,000 | $0 | $17,400,000 | MATURED |
| 1992-10D | yes | 83164BE4 | 12/16/1992 | 12/1/2002 | 7.510% | 8 | 8 | $13,160,000 | $2,000,000 | $0 | $5,000,000 | MATURED |
| 1993-10A | yes | 83164BF1 | 3/24/1993 | 3/1/2003 | 6.800% | 9 | 9 | $24,890,000 | $9,420,000 | $0 | $5,000,000 | MATURED |
| 1993-10B | yes | 83164BG9 | 6/22/1993 | 6/1/2003 | 6.590% | 5 | 5 | $15,960,000 | $150,000 | $0 | $10,000,000 | MATURED |
| 1993-10C | yes | 83164BH7 | 9/22/1993 | 9/1/2003 | 6.120% | 11 | 11 | $20,370,000 | $0 | $0 | $11,250,000 | MATURED |
| 1993-10D | yes | 83164BJ3 | 12/15/1993 | 12/1/2003 | 6.350% | 6 | 6 | $13,460,000 | $4,650,000 | $0 | $9,100,000 | MATURED |
| 1994-10A | yes | 83164BK0 | 3/30/1994 | 3/1/2004 | 7.100% | 4 | 4 | $14,750,000 | $0 | $0 | $5,150,000 | MATURED |
| 1994-10B | yes | 83164BL8 | 6/29/1994 | 6/1/2004 | 7.800% | 5 | 5 | $6,650,000 | $0 | $0 | $16,180,000 | MATURED |
| 1994-10C | yes | 83164BM6 | 9/28/1994 | 9/1/2004 | 8.200% | 13 | 14 | $19,180,000 | $17,000,000 | $15,000,000 | $47,790,000 | MATURED |
| 1994-10D | yes | 83164BN4 | 12/20/1994 | 12/1/2004 | 8.500% | 4 | 4 | $67,190,000 | $0 | $0 | $25,070,000 | MATURED |
| 1995-10A | yes | 83164BQ7 | 3/29/1995 | 3/1/2005 | 7.840% | 6 | 6 | $25,070,000 | $3,100,000 | $0 | | MATURED |
| 1995-10B | yes | 83164BS3 | 6/28/1995 | 6/1/2005 | 6.690% | 4 | 6 | $13,700,000 | $2,380,000 | $0 | $22,120,000 | MATURED |
| 1995-10C | yes | 83164BT1 | 9/27/1995 | 9/1/2005 | 6.875% | 22 | 28 | $25,220,000 | $7,180,000 | $0 | $60,590,000 | MATURED |
| 1995-10D | yes | 83164BV6 | 12/14/1995 | 12/1/2005 | 6.540% | 14 | 14 | $64,030,000 | $0 | $0 | $8,230,000 | MATURED |
| 1996-10A | yes | 83164BW4 | 3/14/1996 | 3/1/2006 | 7.080% | 7 | 7 | $24,610,000 | $2,600,000 | $0 | $21,360,000 | MATURED |
| 1996-10B | yes | 83164BY0 | 6/26/1996 | 6/1/2006 | 7.710% | 11 | 11 | $23,960,000 | $5,400,000 | $0 | $23,970,000 | MATURED |
| 1996-10C | yes | 83164CA1 | 9/25/1996 | 9/1/2006 | 7.590% | 10 | 10 | $36,870,000 | $0 | $0 | $21,430,000 | MATURED |
| 1996-10D | yes | 83164CC7 | 12/18/1996 | 12/1/2006 | 7.080% | 15 | 15 | $29,030,000 | $8,320,000 | $0 | $33,100,000 | MATURED |
| 1997-10A | yes | 83164CE3 | 3/26/1997 | 3/1/2007 | 7.380% | 7 | 7 | $43,940,000 | $6,225,000 | $0 | $6,140,000 | MATURED |
| 1997-10B | yes | 83164CG8 | 6/25/1997 | 6/1/2007 | 7.070% | 8 | 8 | $21,385,000 | $15,730,000 | $0 | $11,540,000 | MATURED |
| 1997-10C | yes | 83164CJ2 | 9/24/1997 | 9/1/2007 | 6.760% | 8 | 8 | $29,220,000 | $12,100,000 | $0 | $17,360,000 | MATURED |
| 1997-10D | yes | 83164CL7 | 12/17/1997 | 12/1/2007 | 6.550% | 13 | 13 | $30,980,000 | $7,150,000 | $0 | $16,000,000 | MATURED |
| 1998-10A | yes | 83164CN3 | 3/25/1998 | 3/1/2008 | 6.320% | 17 | 19 | $29,650,000 | $30,500,000 | $6,000,000 | $29,840,000 | MATURED |
| 1998-10B | yes | 83164CQ6 | 9/23/1998 | 9/1/2008 | 5.940% | 13 | 20 | $67,340,000 | $12,135,000 | $1,000,000 | $15,000,000 | MATURED |
| 1999-10A | yes | 83164CS2 | 3/24/1999 | 3/1/2009 | 6.240% | 22 | 34 | $27,135,000 | $42,350,000 | $0 | $27,400,000 | MATURED |
| 1999-10B | yes | 83164CW3 | 9/29/1999 | 9/1/2009 | 7.220% | 29 | 52 | $76,350,000 | $43,250,000 | $1,500,000 | $53,650,000 | MATURED |
| 2000-10A | yes | 83164CY9 | 3/29/2000 | 3/1/2010 | 7.640% | 33 | 85 | $98,900,000 | $45,075,000 | $0 | $109,510,000 | MATURED |
| 2000-10B | yes | 83164DC6 | 9/27/2000 | 9/1/2010 | 7.452% | 32 | 78 | $127,460,000 | $22,590,000 | $0 | $104,870,000 | MATURED |

Case 2:20-cv-00041-DCLC-CRW   Document 105-3   Filed 09/27/24   Page 1 of 141 PageID #: 3588

# SBIC POOLED DEBENTURE PREPAYMENT SCHEDULE THROUGH MARCH 10, 2024 (unaudited and subject to revision and update)

| POOL SERIES | PREPAYMENT PENALTY FEATURE | CUSIP | ISSUE DATE | MATURITY DATE | COUPON | NUMBER OF SBICs | NUMBER OF DEBENTURES | ORIGINAL PRINCIPAL | ACCELERATION PAYMENTS | ACCELERATION PAYMENTS PAID AT MATURITY | VOLUNTARY PREPAYMENTS | CURRENT POOL SIZE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2001-10A | yes | 83164DE2 | 3/28/2001 | 3/1/2011 | 6.353% | 42 | 93 | $133,845,000 | $50,850,000 | $2,000,000 | $83,995,000 | MATURED |
| 2001-10B | yes | 83164DG7 | 3/26/2001 | 9/1/2011 | 5.886% | 41 | 81 | $192,535,000 | $48,780,000 | $0 | $140,955,000 | MATURED |
| 2002-10A | yes | 83164DJ1 | 3/27/2002 | 3/1/2012 | 6.343% | 44 | 84 | $146,280,000 | $32,720,000 | $0 | $113,560,000 | MATURED |
| 2002-10B | yes | 83164DL6 | 9/25/2002 | 9/1/2012 | 4.670% | 43 | 97 | $140,775,000 | $21,060,000 | $0 | $118,215,000 | MATURED |
| 2003-10A | yes | 83164DN2 | 3/26/2003 | 3/1/2013 | 4.628% | 43 | 95 | $151,985,000 | $69,920,000 | $4,050,000 | $51,015,000 | MATURED |
| 2003-10B | yes | 83164DR3 | 9/24/2003 | 9/1/2013 | 4.875% | 43 | 118 | $153,485,000 | $31,205,000 | $1,300,000 | $114,690,000 | MATURED |
| 2004-10A | yes | 83164DT9 | 3/24/2004 | 3/1/2014 | 4.120% | 45 | 117 | $184,520,000 | $39,565,000 | $0 | $135,955,000 | MATURED |
| 2004-10B | yes | 83164DV4 | 9/22/2004 | 9/1/2014 | 4.684% | 43 | 152 | $255,820,000 | $24,890,000 | $0 | $230,930,000 | MATURED |
| 2005-10A | yes | 83164DX0 | 3/23/2005 | 3/1/2015 | 5.038% | 38 | 107 | $204,800,000 | $27,100,000 | $0 | $165,450,000 | MATURED |
| 2005-10B | yes | 83164DZ5 | 9/28/2005 | 9/1/2015 | 4.941% | 34 | 113 | $197,095,000 | $14,800,000 | $0 | $161,120,000 | MATURED |
| 2006-10A | yes | 83164EB7 | 3/22/2006 | 3/1/2016 | 5.524% | 34 | 102 | $185,470,000 | $11,150,000 | $0 | $172,320,000 | MATURED |
| 2006-10B | yes | 83164ED3 | 9/27/2006 | 9/1/2016 | 5.535% | 28 | 88 | $198,475,000 | $13,150,000 | $0 | $159,545,000 | MATURED |
| 2007-10A | no | 83164EG6 | 3/28/2007 | 3/1/2017 | 5.376% | 34 | 136 | $240,295,000 | $15,800,000 | $0 | $224,495,000 | MATURED |
| 2007-10B | no | 83164EJ0 | 9/26/2007 | 9/1/2017 | 5.528% | 29 | 111 | $238,295,000 | $21,245,000 | $0 | $217,050,000 | MATURED |
| 2008-10A | no | 83164EL5 | 3/26/2008 | 3/1/2018 | 5.471% | 36 | 140 | $289,550,000 | $21,805,000 | $0 | $267,745,000 | MATURED |
| 2008-10B | no | 83164EN1 | 9/24/2008 | 9/1/2018 | 5.725% | 38 | 156 | $360,745,000 | $44,425,000 | $0 | $316,320,000 | MATURED |
| 2009-10A | no | 83164EQ4 | 3/25/2009 | 3/1/2019 | 4.620% | 45 | 160 | $261,620,000 | $31,280,000 | $0 | $230,340,000 | MATURED |
| 2009-10B | no | 83164ER2 | 9/23/2009 | 9/1/2019 | 4.233% | 42 | 183 | $319,020,000 | $36,530,000 | $0 | $262,570,000 | MATURED |
| 2010-10A | no | 83164ES0 | 3/24/2010 | 3/1/2020 | 4.108% | 51 | 173 | $339,035,000 | $56,525,000 | $0 | $282,510,000 | MATURED |
| 2010-10B | no | 83164ET8 | 9/22/2010 | 9/1/2020 | 3.215% | 54 | 217 | $562,985,000 | $80,035,000 | $1,900,000 | $443,350,000 | MATURED |
| 2011-10A | no | 83164EU5 | 3/29/2011 | 3/1/2021 | 4.084% | 60 | 312 | $822,685,000 | $87,950,000 | $0 | $690,235,000 | MATURED |
| 2011-10B | no | 83164EV3 | 9/21/2011 | 9/1/2021 | 2.877% | 49 | 261 | $558,685,000 | $12,750,000 | $0 | $545,935,000 | MATURED |
| 2012-10A | no | 83164EW1 | 3/21/2012 | 3/1/2022 | 2.766% | 51 | 242 | $571,165,000 | $17,210,000 | $0 | $553,505,000 | MATURED |
| 2012-10B | no | 83164EX9 | 9/19/2012 | 9/1/2022 | 2.245% | 65 | 349 | $802,260,000 | $15,350,000 | $0 | $782,160,000 | MATURED |
| 2013-10A | no | 83164EY7 | 3/27/2013 | 3/1/2023 | 2.351% | 82 | 458 | $1,063,910,000 | $69,940,000 | $2,750,000 | $972,970,000 | MATURED |
| 2013-10B | no | 83164EZ4 | 9/25/2013 | 9/1/2023 | 3.644% | 65 | 294 | $622,505,000 | $11,000,000 | $0 | $611,505,000 | MATURED |
| 2014-10A | no | 83164FA8 | 3/26/2014 | 3/1/2024 | 3.191% | 78 | 478 | $996,205,000 | $10,825,000 | $0 | $919,980,000 | MATURED |
| 2014-10B | no | 83164FB6 | 9/24/2014 | 9/1/2024 | 3.015% | 77 | 484 | $1,007,590,000 | $35,680,000 | $0 | $950,910,000 | $21,000,000 |
| 2015-10A | no | 83164FC4 | 3/25/2015 | 3/1/2025 | 2.517% | 84 | 537 | $1,159,625,000 | $59,305,000 | $0 | $1,014,820,000 | $85,500,000 |
| 2015-10B | no | 83164FD2 | 9/23/2015 | 9/1/2025 | 2.829% | 90 | 574 | $1,192,235,000 | $17,120,000 | $0 | $1,078,270,000 | $96,845,000 |
| 2016-10A | no | 83164FF7 | 3/23/2016 | 3/1/2026 | 2.507% | 87 | 577 | $1,106,500,000 | $40,360,000 | $0 | $960,770,000 | $105,370,000 |
| 2016-10B | no | 83164FG5 | 9/21/2016 | 9/1/2026 | 2.051% | 76 | 467 | $992,955,000 | $23,810,000 | $0 | $792,615,000 | $176,530,000 |
| 2017-10A | no | 83164FH3 | 3/29/2017 | 3/1/2027 | 2.845% | 82 | 495 | $1,071,645,000 | $8,400,000 | $0 | $890,235,000 | $173,010,000 |
| 2017-10B | no | 83164FJ9 | 9/20/2017 | 9/1/2027 | 2.518% | 66 | 396 | $854,630,000 | $3,200,000 | $0 | $533,355,000 | $318,275,000 |
| 2018-10A | no | 83164FK6 | 3/21/2018 | 3/1/2028 | 3.187% | 72 | 432 | $1,086,275,000 | $18,000,000 | $0 | $864,945,000 | $203,330,000 |
| 2018-10B | no | 83164FL4 | 9/19/2018 | 9/1/2028 | 3.548% | 74 | 409 | $923,050,000 | $18,000,000 | $0 | $615,055,000 | $307,995,000 |
| 2019-10A | no | 83164FM2 | 3/20/2019 | 3/1/2029 | 3.113% | 70 | 399 | $986,840,000 | $0 | $0 | $552,305,000 | $434,535,000 |
| 2019-10B | no | 83164FN0 | 9/25/2019 | 9/1/2029 | 2.283% | 63 | 436 | $991,595,000 | $7,465,000 | $0 | $240,525,000 | $743,605,000 |
| 2020-10A | no | 83164FP5 | 3/25/2020 | 3/1/2030 | 2.078% | 64 | 389 | $1,007,335,000 | $15,320,000 | $0 | $156,365,000 | $835,650,000 |
| 2020-10B | no | 83164FQ3 | 9/23/2020 | 9/1/2030 | 1.034% | 57 | 285 | $685,450,000 | $4,350,000 | $0 | $10,010,000 | $671,090,000 |
| 2021-10A | no | 83164FR1 | 3/24/2021 | 3/1/2031 | 1.667% | 68 | 423 | $1,095,675,000 | $52,990,000 | $0 | $87,735,000 | $955,040,000 |
| 2021-10B | no | 83164FS9 | 9/22/2021 | 9/1/2031 | 1.304% | 74 | 524 | $1,360,355,000 | $6,400,000 | $0 | $2,350,000 | $1,351,605,000 |
| 2022-10A | no | 83164FT7 | 3/23/2022 | 3/1/2032 | 2.938% | 86 | 730 | $2,077,850,000 | $0 | $0 | $27,215,000 | $2,050,635,000 |
| 2022-10B | no | 83164FU4 | 9/21/2022 | 9/1/2032 | 4.262% | 72 | 456 | $1,276,565,000 | $0 | $0 | $59,605,000 | $1,216,960,000 |
| 2023-10A | no | 83162C5T9 | 3/20/2023 | 3/1/2033 | 5.168% | 87 | 588 | $1,737,675,000 | $0 | $0 | $71,855,000 | $1,665,820,000 |




# Small Business Investment Companies:
## An Investment Option for Banks

Comptroller of the Currency
Administrator of National Banks

Wednesday, February 15, 2012
2:00 pm – 3:30 pm

# Small Business Investment Companies: An Investment Option for Banks

## Presented by:

- Barry Wides, Moderator and Presenter
  Office of the Comptroller of the Currency

- Sean Greene
  U.S. Small Business Administration

- Robert McE. Stewart
  Spring Capital Partners II, LP

- Carl Kopfinger
  TD Bank

2



# Agenda

Welcome by John Walsh

Opening Remarks by Barry Wides

PowerPoint Presentation

Questions and Answers



3

# John Walsh

**John Walsh**
*Acting Comptroller of the Currency*

John Walsh became acting Comptroller of the Currency on August 15, 2010. The Comptroller of the Currency is the chief executive of the Office of the Comptroller of the Currency (OCC), which supervises approximately 2,000 national banks and federal savings associations as well as 50 federal branches and agencies of foreign banks in the United States. These institutions comprise nearly two-thirds of the assets of the commercial banking system. The Comptroller also is a director of the Federal Deposit Insurance Corporation and NeighborWorks® America.

Mr. Walsh joined the OCC in October 2005 and previously served as Chief of Staff and Public Affairs.

Prior to joining the OCC, Mr. Walsh was the Executive Director of the Group of Thirty, a consultative group that focuses on international economic and monetary affairs. He joined the Group in 1992, and became Executive Director in 1995. Mr. Walsh served on the Senate Banking Committee from 1986 to 1992 and as an International Economist for the U.S. Department of the Treasury from 1984 to 1986. Mr. Walsh also served with the Office of Management and Budget as an International Program Analyst, with the Mutual Broadcasting System, and in the U.S. Peace Corps in Ghana.

Mr. Walsh holds a masters in public policy from the Kennedy School of Government, Harvard University (1978), and graduated magna cum laude from the University of Notre Dame in 1973. He lives in Catonsville, Maryland. He is married with four children.

# Barry Wides



**Barry Wides**
*Deputy Comptroller for Community Affairs*

Barry Wides is the OCC's Deputy Comptroller for Community Affairs, in which capacity he leads a department of community development professionals located in Washington, D.C., and the four OCC districts. The Community Affairs staff is responsible for outreach to banks and their community partners, the administration of the Public Welfare Investment authority, the development of policy, and the creation and distribution of educational materials on community development issues.

Prior to joining the OCC in 1999, Mr. Wides was Director of Affordable Housing Sales at Freddie Mac. He led a nationwide sales team responsible for developing products and strategies to achieve the company's congressionally mandated affordable housing goals. He previously served as Deputy Director of the Resolution Trust Corporation's Affordable Housing Program. Mr. Wides began his career in Washington as a presidential management intern and budget examiner at the Office of Management and Budget.

Mr. Wides is a Certified Public Accountant and holds a B.S. in accounting and an M.B.A. from Indiana University.

# Sean Greene



**Sean Greene**

*Associate Administrator for Investment and Special Advisor for Innovation*

Sean Greene is the Associate Administrator for Investment and Special Advisor for Innovation at the U.S. Small Business Administration (SBA). He is responsible for the Small Business Investment Company program, a growth capital program with approximately $16 billion of assets under management, and the Small Business Investment Research program, one of the government's largest innovation programs, which provides more than $2 billion of research and development funding to small businesses each year. He also leads SBA's efforts to stimulate high-growth entrepreneurship and has been one of the leaders in the administration's Startup America initiative.

Mr. Greene brings 20 years of experience as an entrepreneur, investor, and business strategist to the SBA. He was the founder and CEO of Away.com, an online travel company that he sold to Orbitz. He was a co-founder of Rock Creek Ventures and LaunchBox Digital, a seed-stage investment firm in Washington, D.C. Previously Mr. Greene was a management consultant with McKinsey and Co.

Mr. Greene holds a bachelor of arts degree from Princeton University and a master of business administration degree from Yale University's School of Management. He was a Fulbright Scholar at the National University of Singapore.

# Robert McE. Stewart

**Robert McE. Stewart**
*General Partner*
*Spring Capital Partners, LP*

Robert McE. Stewart is a General Partner and co-founder of Spring Capital Partners which was started in 1999. The firm provides expansion and acquisition capital to growing and medium-size businesses. Mr. Stewart has over 20 years of experience as a commercial lender, investment banker, and merchant banker. He is responsible for generating new investment opportunities, negotiating and structuring investments, monitoring current investments, and overall fund management. The firm operates two funds – Spring Capital Partners LP and Spring Capital Partners II, L.P. - both Small Business Investment Company funds ("SBIC").

Mr. Stewart has initiated, invested, and closed numerous transactions involving various financing techniques, including subordinated debt with warrants, bridge loans with warrants, convertible and preferred stock, and common stock. He has closed merger and acquisition transactions ranging from $5 million to $350 million; completed initial public offerings and follow-on equity offerings ranging from $25 million to $150 million; and conducted overall analysis, due diligence, valuation, investment negotiation, and ongoing oversight of these investments.

He has served as board observer to the firm's portfolio companies and has been a director of numerous companies. He is the Chairman of the Small Business Investor Alliance (formerly the National Association of Small Business Investment Companies), and his professional affiliations include the Association for Corporate Growth, the Mid-Atlantic Venture Association, and the Florida Venture Forum.

Mr. Stewart holds a bachelor of arts (cum laude) from Hampden-Sydney College and a master of business administration from Wake Forest University.

# Carl Kopfinger



**Carl Kopfinger**
*Senior Vice President*
*TD Bank*

Carl Kopfinger is a Senior Vice President of TD Bank, based in Philadelphia, Pa. He is responsible for managing the bank's venture capital and mezzanine investment portfolio, which comprises more than 70 funds from Maine to Florida. He joined TD Bank and its predecessor bank in 2004.

He also represents the bank as a limited partner, advisory, and/or valuation committee member in many of its venture and mezzanine fund investments, including Argosy Capital, BIA Digital, Boathouse Capital, CapitalSouth Partners, CEI Ventures, Commerce Health Ventures, Edison Ventures, First New England, Greycroft Partners, Ironwood Equity, Ironwood Mezzanine, High Peaks, Liberty Ventures, Long River Ventures, NewSpring Health Ventures, NewSpring Mezzanine, North Atlantic Capital, Pine Street Capital, Plexus Capital, Point Judith Ventures, Praesidian Opportunity Fund, Seacoast Capital, and Village Ventures.

Mr. Kopfinger has more than 30 years of progressive financial experience. He has coached and judged venture-backed companies for the Mid-Atlantic Venture Conference, the Three Rivers Venture Fair, Early Stage East, and the NJ Venture Conference. Before joining TD Bank, Mr. Kopfinger worked for FleetBoston Financial, now Bank of America, and with Comerica Bank's Technology & Life Sciences Division. While with previous employers—Bank Hapoalim, PNC Bank, and Mellon Bank—he worked with Fortune 1000 companies, providing them with structured finance and other credit and non-credit products.

Mr. Kopfinger is on the board of the Small Business Investor Alliance (formerly the National Association of Small Business Investment Companies), the Delaware Tamanend Foundation, the University City Science Center, and the NJ Technology Council. His professional affiliations include the Association for Corporate Growth and the Greater Philadelphia Alliance for Capital & Technologies.

Case 2:20-cv-09041-DCLC-CRW    Document 105-3    Filed 09/27/24    Page 10 of 141
PageID #: 3597

# Welcome

## John Walsh
## Acting Comptroller of the Currency

# Opening Remarks

## Barry Wides
## Deputy Comptroller for Community Affairs




# Investing With the SBA

## The Small Business Investment Company (SBIC) Program



Sean Greene
*Associate Administrator for Investment and*
*Special Advisor for Innovation*
sean.greene@sba.gov

harry.haskins@sba.gov



# Why Invest in SBICs

- Compelling market need and opportunity
- Attractive returns and strong economics
- Unique considerations for bank investors – Volcker rule and CRA
- Long-established program with long history and recent momentum

# The SBIC Program in Brief



- and traditional sources of financing:

SBA invests long-term capital in privately owned and managed investment firms licensed as Small Business Investment Companies (SBICs)

Once capitalized, SBICs make debt and equity investments in some of America's most promising small businesses, helping them grow

SBIC SUCCESS STORIES












Case 2:20-cv-00041-DCLC-CRW    Document 105-3    Filed 09/27/24    Page 15 of 141
PageID #: 3602

# SBIC Program: Snapshot



**Committed capital: Private and SBA**

Billions

- Debenture
- Participating Securities
- Unleveraged & Other

Debenture: FY 2007 $11.20, FY 2008 $8.80, FY 2009 $7.40, FY 2010 $5.70, FY 2011 $4.50

Participating Securities: FY 2007 $6.0, FY 2008 $6.90, FY 2009 $7.60, FY 2010 $9.10, FY 2011 $11.10

Y-axis: $12.00, $10.00, $8.00, $6.00, $4.00, $2.00, $0.00

X-axis: FY 2007, FY 2008, FY 2009, FY 2010, FY 2011

Case 2:20-cv-00041-DCLC-CRW    Document 105-3    Filed 09/27/24    Page 16 of 141
PageID #: 3603

14

# How SBIC Leverage Works

## Private Investor

- *LPA defines partnership structure, including management fees. SBA strongly recommends using SBA's model LPA*
- *Minimum of $5 million in private capital*

## Financing

- *Generally 2x private capital (but up to 3x); max of $150 million*
- *Semi-annual interest payments*

## SBA

- *Licenses Funds*
- *Regulates and monitors funds*
- *Guarantees Leverage*
- *Leverage Fees:*
  - ✓ *1% at commitment & 2% at draw*
  - ✓ *Annual fee set at commitment (no higher than 1.38%; historically lower)*
- *Other Fees: Licensing & Exam*

## Fund (SBIC)

- *Sets Strategy*
- *Makes Investment Decisions*
- *Monitors Investments*
- *Manages Fund*

*Private Capital $*

*SBA-Guaranteed Leverage $*

*SBA Fees $*

*Financing $*

*Zero Cost to Taxpayers*

## Small businesses

15

# SBIC Structure

guaranteed capital in the form of debentures.



## Standard License

**Investment Strategy:**
Applicants have broad mandate to invest in U.S. small businesses, with few restrictions on their strategy or capital allocation.

**Application Process:**
- *Rolling*

**Leverage Available:**
- *Two Tiers*
- *Cap of $150 million*

## Standard Terms of SBA Debentures

**Amount:** Typically 2x (but up to a maximum of 3x) the capital raised from private investors

**Term:** 10 years with principal payment due at maturity; NO prepayment penalty

**Interest:** Semi-annual payment based on a spread above the 10-year Treasury note

**Fees:** 1% commitment fee; 2% drawdown fee Annual fee due semi-annually

**Uses:** Investments in "small businesses" as defined by the SBA Office of Size Standards and federal regulations, generally in later stage and "buyout" transactions. Real estate and project finance generally prohibited.

Case 2:20-cv-09041-DCLC-CRW    Document 105-3    Filed 09/27/24    Page 18 of 141
PageID #: 3605

# Step 1: Licensing

## Initial Review

- Submit MAQ
- Fund Strategy
- Track Record
- Review track record
- Due Diligence
- Investment Committee Decision

- Target Time Frame: 8 weeks

## Raise Capital

- Must raise $5 million minimum prior to submitting Licensing application. (Applicants must raise sufficient capital to execute business plan prior to licensing decision.)

- Time: Up to 18 months

## Licensing

- Submit Licensing Application
- Due Diligence
- Legal Review
- FBI Background Check
- Committees:
  - Divisional
  - Agency
  - Administrator approves.

- Target Time Frame: 6 months

Questionnaire ("MAQ")

Green Light Letter

Licensing Application & Minimum Capital

Licensing Decision

# Step 2: Operating as SBIC

- Process leverage commitments & draws
- Process requests (conflicts of interests, transfer of LP interests, etc...)
- Monitor regulatory compliance and financial health.

**Monitoring Regulatory Compliance & Financial Health**

## Key SBIC Reporting:

- Financing Forms (Form 1031)
- Annual & Quarterly financials (SBA Form 468)

## Examinations

- Annual for SBICs with leverage
- Every two years for SBICs with no leverage

## Key Monitoring Metrics

- Portfolio company performance
- Portfolio Values relative to leverage
- Capital Impairment Percentage ("CIP")

Case 2:20-cv-00041-DCLC-CRW    Document 105-3    Filed 09/27/24    Page 20 of 141
PageID #: 3607

# Program Data

## Typical Fund Strategies

- Mezzanine
- Senior Debt
- "One Stop"
- Venture Debt
- Leasing

SBIC Program Debenture
Portfolio: FY '07-'11



43%

12%

45%

■ Equity  ■ Debt with equity  ■ Debt

# SBIC Program Debenture Portfolio: FY'07–'11



Case 2:20-cv-09041-DCLC-CRW    Document 105-3    Filed 09/27/24    Page 22 of 141
PageID #: 3609

# SBIC Program Debenture Portfolio: FY '07-'11



New England
9%

Middle Atlantic
22%

South Atlantic
17%

E. North Central
11%

E. South Central
3%

W. North Central
5%

W. South Central
11%

Mountain
7%

Pacific
14%

Note: Percentage total does not sum to 100% due to rounding

Case 2:20-cv-00041-DCLC-CRW     Document 105-3     Filed 09/27/24     Page 23 of 141
PageID #: 3610

# Low Cost Capital

government-backed securities called "trust certificates." Every March and September, these commitments are pooled and sold on the open market at a premium over 10-year Treasury Notes.



SBIC Regular Debenture Coupon Rates: 3/00 – 9/11

SBA Trust Certificate Rate

Yield on 10-Year Treasury

Sept. '11
2.88%

Case 2:20-cv-00041-DCLC-CRW    Document 105-3    Filed 09/27/24    Page 24 of 141
PageID #: 3611

# Historical Impact of SBA Leverage



# Strong Historical Returns

## Returns by Vintage Year 1998 – 2008



SBIC Debenture Funds Pooled IRR (1)

Thomson Sm. & Med. Buyout & Mezzanine Pooled (3)

Preqin US Mezzanine Pooled IRR (2)

Preqin US Sm. Buyout Pooled IRR (2)

\* 2006 – 2008 data is presented as an arithmetic mean of the pooled IRRs for those years

(1) SBIC Vintage Year determined by date of license. Data as of 12/31/10. Returns calculated based on information collected as part of annual financial statement submissions to SBA; Returns include an assumed 20% carried interest payment to the GP after LPs have received distributions equal to paid-in capital.

(2) Source: Preqin Ltd. www.preqin.com. Data includes "Most up-to-date" figures and was accessed 12/12/11; Benchmark may include some funds licensed as SBICs

(3) Source: Thomson Reuters. www.thomsonone.com. Data as of 12/31/10. Data includes US funds from $5M to $500M categorized as Small Buyout, Medium Buyout, or Mezzanine.

Case 2:20-cv-00041-DCLC-CRW    Document 105-3    Filed 09/27/24    Page 26 of 141
PageID #: 3613

# 2011 SBIC Debenture Program – Another Record Year

...apital ... ... ... mitt... ... ...BIC

...and more dollars have been channeled to small businesses than at any other point in the program's 53 year history.



**Financings to Small Businesses**

2.0x Growth

- Avg. FY06 - FY09 FY 2010: $1.3 / $1.6
- FY 2011: $2.6

Billions: $3.00, $2.50, $2.00, $1.50, $1.00, $0.50, $0.00



**% of applicants that are women and minority run funds**

- 2007: 11%
- 2011: 26%

30%, 25%, 20%, 15%, 10%, 5%, 0%



**SBA Commitments to Funds**

2.4x Growth

- Avg. FY06 - FY09 FY 2010: $.75 / $1.2
- FY 2011: $1.8

Billions: $2.00, $1.50, $1.00, $0.50, $0.00



**Licensing Time (months)**

- 2009: 14.6
- 2010: 5.8
- 2011: 5.5

16, 14, 12, 10, 8, 6, 4, 2, 0

25

# Where We Are Going



## The Opportunity

**New Initiatives:**
- Impact Investing
- Early Stage
- Energy-Savings

**Better Outreach:**
- Changes to the SBA's Model Limited Partnership Agreement (LPA)
- Creation of a single point of contact for Limited Partners (LP)
- Increase in the use and availability of SBIC Program data
- Taking a more proactive approach to outreach

**Internal Improvements:**
- Continued focus on speed
- Technology upgrade
- Data-driven decision-making
- Communication

Case 2:20-cv-05041-DCLC-CRW    Document 105-3    Filed 09/27/24    Page 28 of 141
PageID #: 3615

# Additional initiatives

- **Unleveraged licensees**
  - CRA and Volcker rule benefits
  - Could be bank owned, or bank funded

- **Impact Investing program**
  - $1 Billion commitment over 5 years
  - Focus on 1) underserved communities (LMI or economically distressed or 2) Sectors of national priority (e.g. education, energy)

- **Early Stage Program**
  - $1 Billion commitment over 5 years
  - Focus on early stage venture funds
  - 1:1 leverage, max leverage of $50 mil

Case 2:20-cv-00041-DCLC-CRW     Document 105-3     Filed 09/27/24     Page 29 of 141
PageID #: 3616

# Advantages of an SBIC

➤ Low cost of capital: SBA Debenture leverage interest rates based on 10-year Treasury plus a market-based spread for liquidity and prepayment risk. See website for historic rates.

➤ Enhanced Returns to Private Investors: The low cost of capital increases returns to private investors in good performing funds. See appendix for historic SBIC Debenture performance.

➤ Rapid Deployment of Funds: Ability to raise typically two-thirds of a fund's capital from SBA, thereby minimizing the time they spend fundraising and focusing their efforts on investing.

➤ Flexible terms: Ten year debenture term with semi-annual interest payments avoids problem of duration mismatch.

➤ Increased Financial Scale: SBA leverage provides increased capital from which SBICs may fund more investments or increase funding to portfolio companies.

## Friendly to Bank Investors

➤ Volcker Rule Exemption Benefits: Bank investments into SBICs are exempt, from the 3% cap set forth by the Volcker Rule enacted by the Dodd-Frank Wall Street Reform and Consumer Protection Act (PL-111-203)

➤ Community Reinvestment Act: Investments in Small Business Investment Companies are presumed qualified for Community Reinvestment Act credits.

## The Opportunity of "Small Business"

➤ Despite being the bedrock of the American economy, the small business community is underserved and represents a value opportunity for investors.

Case 2:20-cv-00041-DCLC-CRW    Document 105-3    Filed 09/27/24    Page 30 of 141    PageID #: 3617



# How SBICs Operate

Robert McE. Stewart
*General Manager*
*Spring Capital Partners II, LP*
rms@springcap.com



Case 2:20-cv-09041-DCLC-CRW    Document 105-3    Filed 09/27/24    Page 31 of 141
PageID #: 3618

# Mission

- To contribute materially to the success of small businesses by providing critical components of investment capital

- To generate superior risk-adjusted returns for the Fund's limited partners

30

# SCP Overview

- Investments in 39 portfolio companies

- Investments of $148.4 million

  - -- SBA leverage used of $77.8 million

  - -- Limited partner capital used $49.7 million

- 21 active portfolio companies

Industry sectors for the 39 Portfolio Companies:

| | |
|---|---|
| Manufacturing (11) | Retailers (3) |
| Aviation Services (7) | Software (3) |
| IT Outsourcing (6) | Healthcare Services (1) |
| Telecom (6) | Logistics (2) |

Case 2:20-cv-09041-DCLC-CRW    Document 105-3    Filed 09/27/24    Page 33 of 141
PageID #: 3620

# Different Types of Funds



*Investment Strategy*

- Senior debt–stretch, cash flow, or "air ball"

- Purchase money financing–primarily for capital expenditures

- Enterprise value–mezzanine or second lien with equity upside through warrants

- Equity-oriented–unsecured, higher risk, higher return

32

# Use of Proceeds

- Growth and expansion capital

- Acquisition/buyout financing

- Debt refinancing

- Recapitalizations

Case 2:20-cv-09041-DCLC-CRW    Document 105-3    Filed 09/27/24    Page 35 of 141
PageID #: 3622

# SBA Relationship



- $102.0 million of leverage commitments

- $45.0 million of leverage outstanding

- $32.8 million of leverage repaid

- Just-in-time funding with permanent 10-year fixed-rate takedowns market-based off of 10-year Treasuries

- Weighted average cost of funds: SCP I–5.36%

- Weighted average cost of funds: SCP II–4.77%

34

Case 2:20-cv-00041-DCLC-CRW     Document 105-3     Filed 09/27/24     Page 36 of 141
PageID #: 3623

# Investment Philosophy

- Strong products and market positions (execution risk, not product or market risk)

- Quality management with a significant equity stake

- Sound credit position ▸ equity sponsor, ample liquidity, or other identified source of additional junior capital if needed

- Minimum revenue of $10 million (most recent fiscal year or projected for the next fiscal year based on contracts or current run rate)

- Profitable and predictable financial performance

- Exit strategy, realization of equity value

35

Case 2:20-cv-00041-DCLC-CRW    Document 105-3    Filed 09/27/24    Page 37 of 141
PageID #: 3624

# Excluded Investments

- Start-ups or seeds

- Turnarounds or bankruptcies

- Real estate companies

- Finance or investment companies

- Foreign companies

36

Case 2:20-cv-00041-DCLC-CRW    Document 105-3    Filed 09/27/24    Page 38 of 141
PageID #: 3625

# SCP I Investment Statistics



**By Use of Proceeds**

- Expansion/Acq 5.3%
- Expansion 29.2%
- Change of Control 65.5%

**By Sponsorship**

- Unsponsored 40.9%
- Fundless Sponsor 10.2%
- Sponsored 49.0%

- Average Revenue at Close: ~$26 million
- Average EBITDA at Close: ~$1.9 million
- Average Investment per Company: ~$3.0 million

37

# SCP II Investment Statistics



By Use of Proceeds

- <5.0%
- Expansion/Acq 13.2%
- Expansion 24.2%
- Change of Control 57.6%

By Sponsorship

- Unsponsored 11.4%
- Fundless Sponsor 17.6%
- Sponsored 71.0%

- Average Revenue at Close: ~$41.5 million
- Average EBITDA at Close: ~$4.5 million
- Average Investment per Company: ~$4.2 million

38

Case 2:20-cv-00041-DCLC-CRW    Document 105-3    Filed 09/27/24    Page 40 of 141
PageID #: 3627

# Fund Operations

- Origination

- Deal structuring

- Due diligence

- Investment approval

- Investment monitoring

- LP communications/reporting

39

# Origination

- Approximately 2,500 referrals

*Referral By Source........*



Equity Investors, 31.0%

Direct, 10.2%

Commercial Bank, 4.8%

Business Broker, 2.6%

Accountant, 1.5%

SCP Limited Partner, 2.9%

Other Mezzanine, 5.1%

Other, 4.2%

Lawyer, 2.9%

Investment Bank, 34.8%

## Active participation in industry organizations

- Small Business Investor Alliance (SBIA)
- Association for Corporate Growth (ACG)
- Mid-Atlantic Venture Association (MAVA)
- Alliance of Merger & Acquisition Advisors (AMAA)

## Strategic partnering

# Deal Structuring

Standard terms: Subordinated Debt with Warrants

- 12%–14% interest rate
- Warrants to achieve an expected return of 20+% with 5 year put right
- 5-year maturity
- 2% closing fee

Alternative Structure

- Coupon-only subordinated debt
- Minority equity position

Significant current return and redeemable equity upside on all investments

# Due Diligence

Site visits and management interviews by at least two principals

- Extensive business and legal due diligence checklists customized for each transaction

- Frequent utilization of knowledgeable network resources

- Background checks of key managers and investors

- Audited financials or independent accounting review

- Customer calls

- Investment memorandums and follow-up on Investment Committee questions

42

# Investment Approval

- Investment committee of the General Partner: the principals and two outside members

- Unanimous approval required for all investments

- Advisory Board: 5-7 outsiders

- Quarterly meetings

- Review current portfolio companies, valuations, fund operations, and prospective investments

Case 2:20-cv-00041-DCLC-CRW    Document 105-3    Filed 09/27/24    Page 45 of 141
PageID #: 3632

# Investment Monitoring

- Monthly financial packages
- Board observation rights–quarterly attendance
- Quarterly covenant compliance certification
- Consent rights on key events
- Advisory role as needed

44

# LP Communications/Reporting

- Biweekly partners' meetings

- Investment Committee meetings as needed
  - Transaction approval
  - Approval of material changes in investment terms

- Quarterly Advisory Board meetings

- Quarterly reports to limited partners
  - Financial reports
  - Portfolio company reports
  - Letter from the General Partner

- Annual limited partners' meetings

Case 2:20-cv-00041-DCLC-CRW    Document 105-3    Filed 09/27/24    Page 47 of 141
PageID #: 3634

# Case Study

- Well-known government contractor providing high-end technical application software with underutilized IP

- Revenues at time of investment slightly over $17.0 million
  - EBITDA approximately $1.0 million
  - Investment of $3.75 million sub-debt and $750k of equity
  - New management /employees invested alongside venture fund

- After transaction company grew dramatically
  - Strong organic growth–domestic/international
  - Developed strong commercial products
  - Provided additional $2.0 million for growth capital
  - Increased employee base over 100% - largest small business contract

- Revenues/EBITDA at exit approximately $60 million/$3 million
  - Conducted extensive sale process
  - Global Fortune 100 acquired all stock
  - Management /employees retained by acquirer

- IRR in excess of 33% and cash-on-cash of 1.5x

46




# Investing in SBICs:
# A Bank LP's Perspective

Carl Kopfinger
*Senior Vice President*
*Community Capital Group*
*TD Bank*
carl.kopfinger@td.com

# History With SBIC Program

- TD Bank has been investing in the SBIC asset class for more than a decade.

- TD Bank has a blended investment in both the mezzanine and participating securities programs within the bank's footprint from Maine to Florida.

- The participating securities program was terminated in October 2004 and expired on September 30, 2008, following the technology bubble burst.

48

# Bank Investment Considerations

- Permissible bank investment under Dodd-Frank/ Volcker Rule–carve out for SBICs.

- Equally important is the expected economic returns generated for each bank's shareholders.

- Evaluate strong investment managers with a dependable track record of delivering solid results.

49

# Other Investment Considerations

- Banking relationships that develop with the fund, the fund manager, the General Partners and the fund's portfolio companies.

- Investment asset diversification.

- An attraction for a bank is the CRA-qualified opportunity.

50

# Due Diligence – Checklist

- Prior Track Record

- Management

- Investment Process

- Partnership Terms

- References

- Document Checklist

- Portfolio Monitoring

51

Case 2:20-cv-00041-DCLC-CRW     Document 105-3     Filed 09/27/24     Page 53 of 141
PageID #: 3640

# Due Diligence – Track Record

- Evaluate prior invesment track record of Fund managers

  – Assess prior IRR returns

  – Contrast the team's deal underwriting to its stated strategy

    ▪ Is it consistent or does the team deviate from its stated underwriting approach, e.g., investing in equity securities when its skill set is mezzanine lending?

52

# Due Diligence - Management

- Team cohesiveness
  - How long has the team worked together and in what capacity?
- Team departures
  - Understand why there are changes
- Conduct face-to-face meeting with team
- Perform Lexis-Nexis background checks on senior professionals
- Understand how management communicates with its Limited Partners—e.g., does it provide quarterly LP updates?

# Due Diligence - Fund Investment Process

- What are the fund's key competitive differentiators?

- Decision-making process

- For new investments

  – What is the exit strategy thought process on the front end?

- Formal procedures managing portfolio risk

- Valuation process & policies

- Lessons learned & measures taken to avoid future risks

# Due Diligence–Partnership Terms

- Limited partnership terms
  - Investment period
  - Recycling of returned capital
  - Diversification

- Fund capitalization–private LP capital vs. SBA match

- How much are the general partners contributing to the fund?

- Any preferred return to the limited partners

- How are losses/ gains distributed

- Investment Committee/ Advisory Board roles

Case 2:20-cv-00041-DCLC-CRW    Document 105-3    Filed 09/27/24    Page 57 of 141
PageID #: 3644

# Limited Partnership Structure



Limited Partners: A B C

General Partner (LLC)

Management Company

Fund (Limited Partnership)

Portfolio Companies: A B C D E

99% Investment

1% Investment

- Capital repayment
- Return of invested capital

- Capital repayment
- Return on invested capital
- Management fees
- Carried Interest

Back-office support

Management fees

- Firm name
- Office equipment
- Payroll system
- Staff

Case 2:20-cv-00041-DCLC-CRW    Document 105-3    Filed 09/27/24    Page 58 of 141
PageID #: 3645

# Due Diligence–Background References

- Co-investors
- Other limited partners (talk with LPs who are not returning LPs)
- Former partners
- Former employers
- Portfolio company CEOs
- Senior lenders

57

Case 2:20-cv-00041-DCLC-CRW    Document 105-3    Filed 09/27/24    Page 59 of 141
PageID #: 3646

# Due Diligence–Document Checklist

- Limited Partnership Agreement

- Subscription Agreement

- Private Placement Memo

- Management Assessment Questionnaire (MAQ)

- Most Recent PowerPoint Presentation

- Audited Financial Statements, if available

58

# Portfolio Monitoring – Best Practices

- Conduct annual in-person meeting and more frequent telephonic meetings with the investment team

- Review fund communications–quarterly and audited annual financial statements, K-1s, etc.

- Obtain annual capital account statement

Case 2:20-cv-00041-DCLC-CRW    Document 105-3    Filed 09/27/24    Page 61 of 141
PageID #: 3648

# Risks



- Loss of capital–by far the greatest risk

- Fund impairment

  – Fund is required to provide SBA with quarterly Capital Impairment Worksheet.

- Timing of the "return of capital"

  – Understanding of when the SBA allows distributions of retained earnings available for distribution, or "READ," as it is referred to commonly

Case 2:20-cv-00041-DCLC-CRW    Document 105-3    Filed 09/27/24    Page 62 of 141
PageID #: 3649

# Risk Mitigants

- Mitigants

  - Meticulous due diligence process

  - Underwriting-experienced managers who have previously executed upon consistent strategy

  - Shallower J Curve for mezzanine funds

Case 2:20-cv-00041-DCLC-CRW    Document 105-3    Filed 09/27/24    Page 63 of 141
PageID #: 3650

# Return on Investor Capital

**Mezzanine Fund J-Curve**





Case 2:20-cv-00041-DCLC-CRW    Document 105-3    Filed 09/27/24    Page 64 of 141
PageID #: 3651

# Summary

- SBA and OCC have a tremendous opportunity to educate the banking sector with this investment class

- Understand the SBIC program—talk with SBA

- CRA credit for Fund investment—talk with your OCC examiner

- Perform your own due diligence—do not rely on others

- Comfort with Fund Management team and its past performance

- Patient capital

Case 2:20-cv-00041-DCLC-CRW    Document 105-3    Filed 09/27/24    Page 65 of 141
PageID #: 3652




# Investing in SBICs: Regulatory Considerations

Barry Wides
Deputy Comptroller for Community Affairs
Office of the Comptroller of the Currency
barry.wides@occ.treas.gov




64

# Identifying Suitable SBIC Investments

- Contact SBA to identify SBICs currently raising funds.
  - Send email to harry.haskins@sba.gov or sean.greene@sba.gov
  - The complete SBIC list is at http://www.sba.gov/content/all-sbic-licensees-state
- Choose a promising SBIC, and then review investment strategies with senior management
  - Investment should be consistent with bank's financial condition, risk profile, and risk tolerance
  - Industry sectors and geographies should align with bank's investment and business objectives
  - Evaluate risk/return thoroughly
    - Recognize invested capital is at risk
    - SBA leverage can increase return but also increases risk and delays return of capital
    - Equity funds pose greater risk than debt funds
    - Recognize the illiquid nature of the investment



Case 2:20-cv-00041-DCLC-CRW    Document 105-3    Filed 09/27/24    Page 67 of 141
PageID #: 3654

# Bank Due Diligence

- Steps for evaluating SBIC investment include reviewing:

  - Limited Partnership Agreement

  - Subscription Agreement

  - Private Placement Memo

  - Fund Marketing Package

  - Management Assessment Questionnaire

  - Performance/background of general partners

  - Audited financial statements for previous funds by the sponsor

66

# SBIC Due Diligence

- Higher level of due diligence for initial SBIC fund offering

  - 'Full' Management Assessment Questionnaire (MAQ)

    - Gathers comprehensive information on proposed SBIC

  - 'Abbreviated' MAQ for investment in repeat fund from existing SBIC

    - Also request 'Full' MAQ for the first SBIC issued by the sponsor

Case 2:20-cv-00041-DCLC-CRW    Document 105-3    Filed 09/27/24    Page 69 of 141
PageID #: 3656

# Process to Manage Investment

- Establish a sound process for ongoing management of SBIC investment—

  - Investment valuation

  - Performance Reviews

  - Mechanisms for reporting

68

# SBIC Investment Authority

- National banks and federal savings associations (FSA) may invest up to 5% of capital and surplus in SBICs (15 USC § 682[b]).

- SBICs are eligible public welfare investments

  - Public welfare authority for national banks (12 CFR 24)
  - *De minimus* public welfare investment authority for FSAs (12 CFR 160.36)

- FSAs also authorized to invest in service corporations engaged in a broad range of preapproved activities, including SBICs (12 CFR 159)

Case 2:20-cv-00041-DCLC-CRW    Document 105-3    Filed 09/27/24    Page 71 of 141
PageID #: 3658

# Capital Considerations for SBICs

- **Capital rules applying to SBIC investments**
  - **General risk-based capital rules for national banks**
    - SBICs fall into the category of nonfinancial equity investments.
    - 100% risk weight if, in aggregate, SBIC investments are less than 15% of a bank's Tier 1 capital.
    - Subject to deduction from capital if greater than 15% of a bank's Tier 1 capital.
  - **General risk-based capital rules for federal savings associations**
    - SBIC investments are risk-weighted at 100%.
  - **Advanced Approach capital rules for large national banks and FSAs**
    - 100% risk weight for SBIC equity exposures representing less than 10% of Tier 1 and Tier 2 capital (non-significant equity exposures).
    - 400% risk weight for equity exposures greater than 10% of Tier 1 and Tier 2 capital.

# SBIC Investments Under CRA

- SBIC investments are qualified community development investments under CRA.
  - Section 12(t)(4) of the Interagency Questions and Answers

- Assessment Area Issues—
  - CRA consideration is available if the SBIC plans to invest in a broader statewide or regional area that includes the institution's assessment area.
  - Assessment area(s) need not receive an immediate or direct benefit from the SBIC's investments, provided that the purpose, mandate, or function of the SBIC includes serving geographies or individuals located within the institution's assessment area.

- Dollar amount, innovativeness, complexity, and responsiveness are taken into consideration when evaluating an institution's investment in SBICs.

- Consideration Methods:
  - Firm information in fund's prospectus
  - Best efforts by fund manager
  - Specific earmarks in assessment areas

# SBIC Investment Under CRA (cont.)

**Investment Timing Treatment**

- Current period CRA consideration for the entire funded and unfunded commitment amount, if the bank's commitment to invest in an SBIC is—

  – Unconditional and legally binding, and

  – Is included on the bank's balance sheet in accordance with Generally Accepted Accounting Principles (GAAP)

  – Section 23(e)-2 of the Interagency CRA Qs&As

- Investment commitments in SBICs that received full credit in the prior period and remain unfunded will be considered as prior-period qualified investments.

**Small Bank Treatment**

- A small bank can request that examiners review its performance in making qualified investments, such as SBICs, to enhance a satisfactory rating.

  – Performance in making qualified investments may not be used to lower a rating.

  – Cannot raise a "needs to improve" or "substantial noncompliance" rating.

# Volcker Rule

Company Act to prohibit any banking entity from engaging in proprietary trading or from acquiring or retaining an ownership interest in or sponsoring a hedge fund or private equity fund ("covered fund")

Generally prohibits a "banking entity" from sponsoring, acquiring, or retaining an ownership interest in a "covered fund."

A "covered fund" is an issuer that would be an investment company but for sections 3(c)(1) or 3(c)(7) of the Investment Company Act.

Statutory exemption for investments in any SBIC that would otherwise qualify as a "covered fund" under Volcker Rule.

However, a banking entity may not enter into any "covered transaction" with a permitted covered fund that it manages, advises, or sponsors, including an SBIC.

- "Covered transaction" includes loan or extension of credit, a guarantee, or purchase of certain assets.

Express prohibition against any permitted activities that involve or result in:

- Material conflict of interest;
- Material exposures to a high-risk asset or trading strategy;
- Threat to the safety and soundness of the bank; or
- Threat to the financial stability of the United States

Case 2:20-cv-00041-DCLC-CRW     Document 105-3     Filed 09/27/24     Page 75 of 141
PageID #: 3662

# Resources



- Administration, September 2011 http://www.sba.gov/sites/default/ [...]
11%20FINAL%20for%20web.pdf.

- Office of the Comptroller of the Currency, Community Affairs, Small Business Resource Directory
http://www.occ.gov/topics/community-affairs/resource-directories/small-business/index-small-business.html

- Part 107 Small Business Investment Companies, Code of Federal Regulations, Title 13, Volume 1, Revised as of January 1, 2009, can be accessed from
http://www.access.gpo.gov/nara/cfr/waisidx_09/13cfr107_09.html

- Guidance on Equity Investment and Merchant Banking Activities of Financial Holding Companies and Other Banking Organizations Supervised by the Federal Reserve, June 22, 2000
http://www.federalreserve.gov/boarddocs/SRLetters/2000/sr0009a1.pdf

- Private Equity Glossary of Terms
http://mba.tuck.dartmouth.edu/pecenter/resources/glossary.html

- Small Business Administration Office of Investment
http://www.sba.gov/about-offices-content/1/2890

- Small Business Investor Alliance
http://www.nasbic.org/

- Staebler, Michael B., "Overview of the Small Business Investment Company Program", Pepper Hamilton, LLP, January 6, 2012 http://www.pepperlaw.com/publications_article.aspx?ArticleKey=13

Case 2:20-cv-00041-DCLC-CRW   Document 105-3   Filed 09/27/24   Page 76 of 141
PageID #: 3663



# Questions



# Questions and Answers

Push *1 on your telephone key pad to comment or ask your question

**OR**

Submit your comment/question in writing by clicking on the

**General Chat** tab below. Enter your comment/question in the box

below the chat area and press **Enter** or click **Send.**

**Submitted questions will be answered as time allows.**

Case 2:20-cv-09041-DCLC-CRW    Document 105-3    Filed 09/27/24    Page 78 of 141
PageID #: 3665

Thank you for joining us!

Interested in learning
about OCC
educational programs?

Interactive Seminars
Speaker Phones
Group Exercises
Internet Banking Security

Third-Party Relationships
Credit Risk
Privacy Regulation Compliance
Workshops
Web and Telephone Seminars
Strategic Approaches to Community Development Banking
Effective Anti-Money Laundering Program
Audit and Internal Controls
Condition of the Banking Industry
Audit Roundtable

Sign-up for email notifications at
www.occ.treas.gov/listserv3.htm

# Evaluation Form

- Please complete the evaluation form online,

**OR**

- Return it via fax

78





# United States Department of the Interior

OFFICE OF THE SOLICITOR
Tulsa Field Solicitor's Office
7906 East 33rd Street, Suite 100
Tulsa, OK 74145
(918) 669-7730
TELEFAX (918) 669-7736



October 22, 1998

**MEMORANDUM**

**TO:** Deborah Maddox, Director, Tribal Services, BIA

**FROM:** M. Sharon Blackwell, Tulsa Field Solicitor

**SUBJECT:** Existing Statutes and Regulations Relating to Indian Blood Quantum

## INTRODUCTION

In response to your request for participation by our office in addressing legal issues related to the proposed regulations governing Certificates of Degree of Indian Blood (CDIB), we have conducted a computerized legal search of various terms related to Indian blood quantum in the context of federal laws and federal regulations. This search, if not completely exhaustive of all references to Indian blood quantum in federal laws and regulations, is very close to being completely exhaustive, and indicates that Indian blood requirements are common in the area of federal Indian law.

## LEGAL ANALYSIS

### 1. ENROLLMENT AND ENROLLMENT APPEALS

Federal law, 25 U.S.C. § 163, authorizes the Secretary to establish a final membership roll for a tribe "whenever in his discretion such action would be in the best interest of the Indian," requires that the roll contain the ages and quantum of Indian blood, and provides that

1

"when approved by the said Secretary are declared to constitute the legal membership for the respective tribes" for the purpose of segregating the tribal funds as provided in 25 U.S.C. § 162, "and shall be conclusive both as to ages and quantum of Indian blood." Section 163 expressly excludes the Five Tribes, the Osage Tribe and the Chippewa Indians of Minnesota from its provisions.

Federal regulations 25 C.F.R. § 61.2 establishes guidelines for preparation of rolls by the Secretary of Interior "pursuant to statutory authority." These regulations do not apply to compilation of membership rolls for tribes which have the responsibility for preparation and maintenance of their membership rolls. *Id.* Under the regulations, the roll should contain degree of Indian blood for each person when required by law. 25 C.F.R. § 61.14.

Federal regulations also govern appeals of "adverse enrollment actions" by BIA officials and by tribal committees under two limited circumstances: when the adverse enrollment action is incident to the preparation of a tribal roll subject to Secretarial approval or when the tribal governing document requires appeals to the Secretary. These regulations define "adverse enrollment actions" as including a change in degree of Indian blood by a tribal committee which affects a tribal member when the tribal governing document provides for an appeal of the action to the Secretary, a change in degree of Indian blood by a Bureau official which affects an individual, and the certification of degree of Indian blood by a Bureau official which affects an individual. These regulations illustrate the significance of certificates of degree of Indian blood by referencing them in the procedure for appeals; however, they do not describe the method and type of documentation needed in making an initial determination of an individual's degree of Indian blood.

2

## 2. EDUCATIONAL/VOCATIONAL BENEFITS

Eligibility requirements for attendance of federal schools by Indian students include a "one-fourth or more" degree of Indian blood as a requirement under 25 C.F.R. § 31.1. The one-quarter blood requirement is also contained in 25 C.F.R. § 32.4(z) for purposes of Indian education policies, as follows (emphasis added):

> (z) Eligibility for services. Serve Indian and Alaska Native students who are recognized by the Secretary of the Interior as eligible for Federal services, because of their status as Indians or Alaska Natives, *whose Indian blood quantum is 1/4 degree or more...*

See also 25 U.S.C. § 2007(f) (defining "eligible Indian student" as a member or a descendent of "at least a 1/4 degree Indian blood). The quarter blood quantum requirement is also included in 25 C.F.R. § 36.3 for purposes of regulation of academic standards for basic education of Indian children, as follows (emphasis added):

> "Indian student" means a student who is a member of an Indian tribe and is *one-quarter (1/4) or more degree of Indian blood quantum.*

The quarter blood quantum requirement is also included in 25 C.F.R. § 40.1 for educational and vocational loans to students who reside on reservation, as well as students who reside near the reservation "when a denial of such loans or grants would have a direct effect upon Bureau programs within the reservation." It is also included for purposes of Adult Education programs under 25 C.F.R. § 46.2, which states (emphasis added):

> Indian means a person who is a member of, *or is at least a one-fourth degree Indian blood descendent of a member* of, an Indian tribe, and is eligible for the special programs and services provided by the United States through the Bureau of Indian Affairs to Indians because of their status as Indians;

A blood quantum requirement is included in 25 C.F.R. § 273.12 for student eligibility for educational benefits provided under Johnson O'Malley Act contracts, as follows (emphasis

3

added):

> Indian students, from age 3 years through grade(s) 12, except those who are enrolled in Bureau or sectarian operated schools, shall be eligible for benefits provided by a contract pursuant to this part *if they are 1/4 or more degree Indian blood and recognized by the Secretary as being eligible for Bureau services.* Priority shall be given to contracts (a) which would serve Indian students on or near reservations and (b) where a majority of such Indian students will be members of the tribe(s) of such reservations (as defined in 273.2(o)).

Methods of establishing eligibility for Indian Fellowship and Professional Development Programs are described in 34 C.F.R. § 263.21(a) as follows (emphasis added):

> (a) Evidence that the applicant is an Indian as defined in § 263.3. Evidence may be in the form of--
> (1)(i) A copy of the applicant's documentation of tribal enrollment or membership; or
> (ii) A copy of a parent's or grandparent's documentation of tribal enrollment or membership, with supporting birth certificates or similar documents showing the applicant's descendance from the enrolled member;
> (2) A letter of certification on official letterhead with the appropriate signature from a federally or State recognized tribe or band; or
> (3) *A certificate of degree of Indian blood (CDIB) issued by an authorized representative of the Bureau of Indian Affairs or an official of a federally recognized tribe;*

3. **EMPLOYMENT ASSISTANCE, VOCATIONAL TRAINING, AND INDIAN HIRING PREFERENCE**

The term "Indian" as defined in 25 C.F.R. § 26.1(G) for purposes of the Employment Assistance Program and as defined in 25 C.F.R. § 27.1(i) for purposes of vocational training includes blood quantum requirements as follows (emphasis added):

> (b) "Indian" means any person of Indian or Alaska native descent who is an enrolled member of any of those tribes listed or eligible to be listed in the Federal Register pursuant to 25 C.F.R. § 83.6 as recognized by and receiving services from the Bureau of Indian Affairs or *a descendant of one-fourth degree or more Indian blood of an enrolled member*; and any *person not a member of one of the listed or eligible to be listed tribes who possesses at least one-half degree of Indian blood* which is not derived from a tribe whose relationship is terminated by an Act of Congress.

4

Indian preference requirements do not appear to require membership in a federally recognized Indian tribe. For example, 25 C.F.R. § 5.1 list persons who may receive Indian hiring preference within the BIA as follows (emphasis added):

> For purposes of making appointments to vacancies in all positions in the Indian Health Service a preference will be extended to persons of Indian descent who are:
>
> (a)  Members of any recognized Indian tribe now under Federal jurisdiction;
> (b)  Descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation;
> (c)  *All others of one-half or more Indian blood of tribes indigenous to the United States*;
> (d)  Eskimos and other aboriginal people of Alaska; and
> (e)  For one (1) year or until the Osage Tribe has formally organized, whichever comes first, effective January 5, 1989, *a person of at least one-quarter degree Indian ancestry of the Osage Tribe* of Indians, whose rolls were closed by an act of Congress.

Provisions governing Indian preference within the Public Health Service, 42 C.F.R. § 36.41, contain similar provisions.[1]

## 4. SOCIAL SERVICES AND LOANS

For purposes of determining eligibility for financial assistance and social services programs, there is a blood quantum requirement only for Alaska natives and Oklahoma Indians pursuant to 25 C.F.R. § 20.20(a)(1), which states (emphasis added):

> (1)  The applicant must be an Indian, *except that in the States of Alaska and Oklahoma a one-fourth degree or more Indian or Native blood quantum* will be an additional eligibility requirement...

The term "Indian" is defined in 25 C.F.R. § 20.1(n) for purposes of financial assistance and social services programs to include a blood quantum requirement, as follows (emphasis

---

[1]  The main difference appears in sub-section (e) of 42 CFR § 36.41, which provides:  "(e) Until January 4, 1990 or until the Osage Tribe has formally organized, whichever comes first, a person of at least one-quarter degree Indian ancestry of the Osage Tribe of Indians, whose rolls were closed by an act of Congress."

5

added):

> (n) "Indian" means any person who is a member, *or a one-fourth degree or more blood quantum descendant of a member* of any Indian tribe.

Federal law, 25 U.S.C. § 480, provides that on and after May 10, 1939, "no individual of less than one-quarter degree of Indian blood" is eligible for a loan of funds made available in accordance with several other laws. Revolving loan funds also cannot be loaned to "Indians of less than one-quarter Indian blood." 25 U.S.C. § 482.

## 5. LAND ALLOTMENTS; NATURAL RESOURCES

The term "individual Indian" is defined in 25 C.F.R. § 151.2(c) for purposes of acquisitions of land in trust as follows (emphasis added):

> (1) Any person who is an enrolled member of a tribe;
> (2) Any person who is a descendant of such a member and said descendant was, on June 1, 1934, physically residing on a federally recognized Indian reservation;
> (3) Any other person *possessing a total of one-half or more degree Indian blood of a tribe*;

Provisions defining "Indian" for purposes of protection of Indians and conservation of resources, 25 U.S.C. § 479, contain similar, but not identical, provisions, including reference to "all other persons of one-half or more Indian blood."

Eligibility for an allotment of land from the public domain is governed in part by Indian status under 43 C.F.R. § 2531.1(b), which requires that any person desiring to file an application for an allotment of land on the public domain "must first obtain from the Commissioner of Indian Affairs a certificate showing that he or she is an Indian and eligible for such allotment." The certificate is required to bear a serial number, "record thereof to be kept in the Indian Office," and required forms must be obtained "as stated in § 2531.2(b)." Subsection (e) provides that the eligibility for allotments of Indian women married to non-Indians

6

"will be determined without reference to the quantum of Indian blood possessed by such women," but solely with reference as to whether they are recognized members of an Indian tribe or are entitled to such membership. 43 C.F.R. § 2531.1(e).

A definition of "Indian individual" is contained in 25 C.F.R. § 262.2(d) for regulation of the protection of archaeological resources, including a blood quantum requirement, as follows (emphasis added):

> (1) Any person who is an enrolled member of a Federal recognized Indian tribe;
> (2) Any person who is a descendent of such a member and was, on June 1, 1934, physically residing within the present boundaries of any Indian reservation; or
> (3) Any other person *of one-half or more Indian blood of tribes indigenous to the United States.*

## 6. TRIBAL REORGANIZATION

A definition of "Indian" contained in 25 C.F.R. § 81.1 (i), for purposes of tribal reorganization, includes a blood quantum requirement as follows (emphasis added):

> (i) "Indian" means (1) All persons who are members of those tribes listed or eligible to be listed in the FEDERAL REGISTER pursuant to 25 C.F.R. § 83.6(b) as recognized by and receiving services from the Bureau of Indian Affairs; provided, that the tribes have not voted to exclude themselves from the Act of June 18, 1934, 43 Stat. 984, as amended; and (2) *any person not a member of one of the listed or eligible to be listed tribes who possesses at least one-half degree of Indian blood.*

A blood quantum requirement is also contained in one of the definitions of "tribe" for purposes of tribal reorganization set forth in § 81.1(w) (emphasis added):

> ... (2) *any group of Indians whose members each have at least one-half degree of Indian blood* for whom a reservation is established and who each reside on that reservation. Such tribes may consist of any consolidation of one or more tribes or parts of tribes.

## 7. HOUSING

Requirements for the housing assistance improvement program set forth in 25 C.F.R. §

7

256.13 allow use of CDIB to establish Indian status as follows (emphasis added):

> (d) Fourth, you must furnish documentation proving tribal membership. Examples of acceptable documentation include a copy of your Certificate of Degree of Indian Blood (CDIB) or a copy of your tribal membership card.

## 8. LICENSED INDIAN TRADER

Under 25 U.S.C. § 264 and 25 C.F.R. § 140.3, any "person other than an Indian of the full blood" attempting to reside in Indian country as a trader without a license, is required to forfeit all merchandise offered for sale to the Indians, except persons residing among or trading with the Five Tribes.

## 9. BLOOD QUANTUM REQUIREMENTS FOR INDIVIDUAL TRIBES

### A. Oklahoma Tribes

### 1. Five Tribes

The degree of Indian blood of members of the Five Civilized Tribes (i.e., Cherokee, Chickasaw, Seminole, Muskogee-Creek and Choctaw Nations, hereinafter referred to as "Five Tribes") is determinative of the restricted or unrestricted lands owned by tribal members. Throughout this century, there have been a number of laws which define restricted status of Indian lands according to Indian blood quantum. See Act of April 6, 1906, 34 Stat. 137, § 19; Act of May 27, 1908, 35 Stat. 312, § 1; Act of June 14, 1918, 40 Stat. 606, § 2; Act of May 10, 1928, 45 Stat. 495, § 1.

The most recent of these laws, the Act of August 4, 1947, 61 Stat. 731, currently governs the restricted status of thousands of acres of Indian lands in eastern Oklahoma. Section 1(a) of the 1947 Act provides (emphasis added):

> (a) That...no conveyance, including an oil and gas or mineral lease, of any interest in land acquired before or after the date of this Act by *an Indian heir or devisee*

8

*of one-half or more Indian blood*, when such interest in land was restricted in the hands of the person from whom such Indian heir or devisee acquired same, shall be valid unless approved in open court by the county court of the county in Oklahoma in which the land is situated....

Section 2 of the 1947 Act requires use of the final rolls developed by federal officials during the allotment process at the beginning of the twentieth century to determine blood quantum for purposes of the restricted status of lands belonging to Five Tribes members, but it does not necessarily apply to tribal determinations of Indian blood quantum for other purposes. Section 2 provides (emphasis added):

> In determining the quantum of Indian blood of any Indian heir or devisee, the final rolls of the Five Civilized Tribes as to such heir or devisee, if enrolled, shall be conclusive of his or her quantum of Indian blood. If unenrolled, his or her degree of Indian blood shall be computed from the nearest enrolled paternal and maternal lineal ancestors of Indian blood enrolled on the final rolls of the Five Civilized Tribes.

Federal law authorizes leasing of restricted lands belonging to Five Tribes members "of one-half or more Indian blood," only under rules and regulations established by the Secretary of Interior. 25 U.S.C. § 393a (emphasis added).

Regulations governing the creation of trusts for restricted property of members of the Five Tribes, 25 C.F.R. § 116.4, contain a one-half degree of Indian blood quantum requirement consistent with the 1947 Act, requiring the following provision in the trust agreement (emphasis added):

> (a) That such of the current income from the corpus of the estate as may be payable to the Indians of the Five Civilized Tribes *of one-half or more Indian blood* shall be remitted by the trustee to the Secretary of the Interior or such other official as he may designate for appropriate disposition.

Regulations concerning leasing of restricted lands of members of the Five Civilized Tribes of Oklahoma for mining, 25 C.F.R. § 213.45, set standards for lands acquired by

9

"persons of one-half or more Indian blood," by "full blood Indians," by "Indians of less than full blood," and by "heirs of one-half or more Indian blood but less than full bloods."

## 2. Osage Tribe

With a few exceptions,[2] federal regulations governing Osage members generally contain a one-half degree of Indian blood requirement for a variety of purposes. See 25 C.F.R. § 117.26 (extension of credit for certain purposes pending qualification of personal representative of an estate of a deceased Indian "of one-half or more Indian blood" who did not have a certificate of competency at his death"); § 117.27(a) (certain payments to personal representative of the estate of a deceased Indian "of less than one-half Indian blood who had a certificate of competency;" § 117.27(b) (payment of certain classes of judgment funds to personal representative of the estate of a deceased "Indian of one-half or more Indian blood" who did not have a certificate of competency); § 117.28 (payment of certain claims against the estate of "a deceased Indian of one-half or more Indian blood" who had no certificate of competency); and § 152.9 (issuance of certificates of competency to adult members of the Osage Tribe "of one-half or more Indian blood").

Federal regulations rely heavily on BIA records for purposes of determining blood quantum of Osage persons for purposes of preparation of a competency roll for unallotted

---

[2] Federal law governing disposition of Osage judgment funds, 25 U.S.C. §§ 883, 883a, 883b, reference allottees and heirs of Osage blood, and contain no blood quantum requirements. Consistent with federal law, the definition of an Osage tribal member contained in 25 C.F.R. § 91.2 expressly eliminates an Indian blood quantum as follows: (d) 'Tribal Member' means any person of Osage Indian blood of whatever degree, allotted or unallotted." See also 121.3 (claims by "heirs of Osage Indian blood of deceased allottees); See also 25 C.F.R. §§ 121.5, 121.6, 121.9 (referencing "heirs of Osage Indian blood" with regard to judgment fund distributions); and § 122.5 (Osage Indian blood requirement for members of Osage Tribal Education Committee).

10

members of the Osage Tribe "of less than one-half Indian blood" who has not received a certificate of competency. See 25 C.F.R. §§ 154.1 - 154.5. The competency roll must include the "total quantum of Osage blood and non-Osage Indian blood" of each person listed on the competency roll. 25 C.F.R. § 154.2. In certain circumstances, the Osage Agency register of Indian families for the year ending December 31, 1901, must be accepted "as prima facie evidence of the quantum of Indian blood." 25 C.F.R. § 154.3(b)(1) and (2). Where Indian blood of a different tribe is involved, "the certification of the superintendent or other officer in charge" of the Indian Agency having jurisdiction over the affairs of that tribe "shall be accepted as prima facie evidence in determining the quantum of non-Osage Indian blood." 25 C.F.R. § 154.3(b)(3). If the superintendent or other officer in charge of the other Agency is unable to certify as to the quantum of Indian blood of a non-Osage parent of an unallotted Osage member of less than one-half Indian blood, "affidavits as to such parent's quantum of Indian blood, when properly executed by two qualified individuals, may be accepted." 25 C.F.R. § 154.3(b)(4).

The federal regulations governing the Osage competency roll contain provisions affording due process to a person, when the superintendent determines that the person is of less than one-half Indian blood. The superintendent must notify that person and inform the person that if objection is not received within 20 days from date of notification a certificate of competency will be used. 25 C.F.R. §154.4. The party may dispute the finding by submitting "two affidavits or other evidence in support of his claim." The "claim affidavits or other evidence of the person as to his quantum of blood" must be submitted to the Commissioner of Indian Affairs "for a ruling before the certificate of competency is issued."

11

## B. Alaskan Tribes

While some federal laws and regulations concerning Alaskan Natives have no blood quantum requirements,[3] the Alaska Claims Settlement Act, 43 U.S.C. § 1602(b) includes a blood quantum requirement in its definition of "Native" for its purposes as follows:

> "Native" means a citizen of the United States who is a *person of one-fourth degree or more Alaskan Indian* (including Tsimshian Indians not enrolled in the Metlaktla Indian Community), Eskimo, or Aleut blood, or a combination thereof. The term includes any Native as so defined either or both of whose adoptive parents are not Natives. It also includes, *in the absence of proof of a minimum blood quantum,* any citizen of the United States who is regarded as an Alaska Native by the Native village or Native group of which he claims to be a member and whose father or mother is (or, if deceased, was) regarded as Native by any village or group. *Any decision of the Secretary regarding eligibility for enrollment shall be final*;

Other definitions of Alaskan Natives contained in various federal regulations are not identical, but contain similar blood quantum requirements: 13 C.F.R. § 124.100 (minority small business and capital ownership development); 50 C.F.R. § 17.3 (concerning endangered wildlife and plants); 50 C.F.R. § 18.3 (relating to sale of marine mammals); and 50 C.F.R. § 216.3 (regulating the taking and importing of marine mammals). *See also* 43 C.F.R. § 2561.0-3 (degree of Indian blood is irrelevant to rights related to native allotments by an Indian who resides in Alaska); 43 C.F.R. § 4300.0-5.

## C. Canadian Born Indians

Federal law, 25 U.S.C. § 1359 contains the following blood quantum requirement for Indians born in Canada who cross the border (emphasis added):

> Nothing in this subchapter shall be construed to affect the right of American

---

[3] Federal law, 25 U.S.C. § 500n, defines a "native of Alaska" as including native Indians, Eskimos and Aleuts "of whole or part blood," for purposes of laws governing a reindeer industry.

12

Indians born in Canada to pass the borders of the United States, but such right shall extend only to persons who possess *at least 50 per centum of blood of the American Indian race*.

Federal immigration regulations, 8 C.F.R. § 289.1, provide (emphasis added):

> The term "American Indian born in Canada" as used in section 289 of the Act includes *only persons possessing 50 per centum or more of the blood of the American Indian race*. It does not include a person who is the spouse or child of such an Indian or a person whose membership in an Indian tribe or family is created by adoption, unless such person possesses at least 50 per centum or more of such blood.

Other federal regulations governing visa and passport requirements as applied to nonimmigrants, 22 C.F.R. §§ 41.1(b) and 42.1(f), define the term "American Indians born in Canada," as (emphasis added):

> ...An American Indian born in Canada, *having at least 50 per centum of blood of the American Indian race* (Sec. 289, 66 Stat. 234; 8 U.S.C. 1359).

The Legal Services Corporation regulations, 45 C.F.R. § 1626.10 also include a blood quantum requirement for eligibility for legal aid to Indians born in Canada as follows (emphasis added):

> (b) All Canadian-born American Indians *at least 50% Indian by blood* are eligible to receive legal assistance provided they are otherwise eligible under the Act.

## D. Other Specified Tribes

The following laws and regulations include blood quantum requirements related to enrollment of members of specific Indian tribes for judgment fund distribution purposes, as follows: 25 U.S.C. § 585 (Northwestern Bands of Shoshone Indians); 25 U.S.C. §§ 961, 967a (descendants of allottees of Omaha Tribe who possess "Omaha blood *of the degree of one-fourth or more*"); 25 U.S.C. § 1142 (New York Indians, including those who are Brotherton Indians of Wisconsin of *at least one-fourth degree* Emigrant New York Indian blood...") Federal law

13

also has included blood quantum requirements with regard to specific tribes for many other purposes.[4]

## CONCLUSION

Currently existing federal laws and regulations require some form of proof of Indian blood for various purposes. Some of these regulations even expressly refer to Certificates of Degree of Indian blood. Unless these laws and regulations are amended to eliminate the need for a method of proving Indian blood or Indian blood quantum, uniform standards for issuance, amendments and denials of Certificates of Degree of Indian blood are essential for compliance with the law.

---

[4] See 25 U.S.C. §§ 677, 677a(b)(defining a "full-blood" as a tribal member who possesses "one-half degree of Ute Indian blood and a total of Indian blood in excess of one-half") and 677a(c) (defining a "mixed-blood" as a tribal member who does not possess sufficient Indian or Ute Indian blood to fall within the full-blood class, and those who became mixed-bloods by choice). See also 25 U.S.C. §§ 677v, 677w, 677aa (relating to partition and distribution of tribal assets between mixed blood and full blood members of the Ute Indians of Utah); 25 U.S.C. § 715e (one-eighth blood quantum requirement for compilation of membership rolls relating to restoration of federal supervision over Coquille Indian Tribe of Oregon); 25 U.S.C. § 903b(c) (updating of Menominee Tribe membership roll, and requiring a one-quarter degree of Menominee Indian blood for heirs of allottees); 25 U.S.C. § 971 (termination of federal supervision and distribution of tribal assets to persons on membership roll of the Ponca Tribe of Nebraska, including descendants of enrollees "of not less than one-quarter degree Indian blood of the Ponca Tribe"); 25 U.S.C. § 1300g-7(a) (restoration of supervision over Ysleta Del Sur Pueblo and definition of tribal members, including descendant of an enrollee who has "1/8 or more degree" of Tigua-Ysleta del Sur Pueblo Indian blood); 25 U.S.C. § 1300 h-3 (federal recognition of Lac Vieux Desert Band of Lake Superior Chippewa, and establishment of membership roll, including persons who are "at least one-quarter Chippewa Indian blood..."); 25 C.F.R. § 61.4 (preparation of rolls of various Tribes, some of which have blood quantum requirements); 25 C.F.R. § 75.6 (revision of rolls of Eastern Band of Cherokee Indians, North Carolina); 25 C.F.R. § 153.3 (degree of Indian blood required on enrollment application for Crow Tribe); and 25 U.S.C. § 1300i-5(3) ("The Secretary shall determine the quantum of 'Indian blood' or 'Hoopa Indian blood,' if any, of each person enrolled in the Hoopa Valley Tribe under this subsection pursuant to the criteria established in the March 31, 1982 decision of the United States Court of Claims in the case of Jesse Short et al. v. United States, (CL.Ct. No. 102-63).

14

If you have questions related to this memorandum, please contact me at (918) 669-7730, ext. 228.

FIELD SOLICITOR

*L. Susan Work*

L. Susan Work
Attorney

15

**USDA** **Farm Production and Conservation**
U.S. DEPARTMENT OF AGRICULTURE

Business Center
Appeals and Litigation Division
1400 Independence Avenue SW
Room 3243-S - Stop 0570
Washington, DC 20250-0501

*VIA ELECTRONIC MAIL*

Lynette Stevenson
ls@dalscreditsolutions.com

## ACKNOWLEDGMENT OF YOUR FREEDOM OF INFORMATION ACT/PRIVACY ACT APPEAL

Date Received:     August 28, 2024

Date of Appeal:     August 28, 2024

Log Number:     24 - 24

This is an interim response to your recent Freedom of Information Act/Privacy Act appeal. We received your appeal on the date noted above and assigned your appeal the log number indicated. We will process your appeal and decide as quickly as possible in accordance with Federal Statutes and Departmental Regulations. The actual processing time will depend upon the complexity of the appeal, the volume of responsive records, and any existing administrative backlog.

Thank you for your correspondence. If you have any questions or wish to check on the status of your appeal, please contact the Farm Production and Conservation Business Center (Enterprise Services), Appeals and Litigation Division, at (202) 690-3297 or by email at gwen.sellman@usda.gov.

Sincerely,

Jose R
Gonzalez

Digitally signed by Jose R
Gonzalez
Date: 2024.08.29 13:34:37
-04'00'

Jose R. Gonzalez, Team Lead
Freedom of Information Act/Privacy Act
Appeals Staff
Appeals and Litigation Division





# United States Department of the Interior

OFFICE OF THE SOLICITOR
Tulsa Field Solicitor's Office
7906 East 33rd Street, Suite 100
Tulsa, OK 74145
(918) 669-7730
TELEFAX (918) 669-7736



October 22, 1998

MEMORANDUM

TO:      Deborah Maddox, Director, Tribal Services, BIA

FROM:    M. Sharon Blackwell, Tulsa Field Solicitor

SUBJECT: Existing Statutes and Regulations Relating to Indian Blood Quantum

## INTRODUCTION

In response to your request for participation by our office in addressing legal issues related to the proposed regulations governing Certificates of Degree of Indian Blood (CDIB), we have conducted a computerized legal search of various terms related to Indian blood quantum in the context of federal laws and federal regulations. This search, if not completely exhaustive of all references to Indian blood quantum in federal laws and regulations, is very close to being completely exhaustive, and indicates that Indian blood requirements are common in the area of federal Indian law.

## LEGAL ANALYSIS

## 1. ENROLLMENT AND ENROLLMENT APPEALS

Federal law, 25 U.S.C. § 163, authorizes the Secretary to establish a final membership roll for a tribe "whenever in his discretion such action would be in the best interest of the Indian," requires that the roll contain the ages and quantum of Indian blood, and provides that

1

"when approved by the said Secretary are declared to constitute the legal membership for the respective tribes" for the purpose of segregating the tribal funds as provided in 25 U.S.C. § 162, "and shall be conclusive both as to ages and quantum of Indian blood." Section 163 expressly excludes the Five Tribes, the Osage Tribe and the Chippewa Indians of Minnesota from its provisions.

Federal regulations 25 C.F.R. § 61.2 establishes guidelines for preparation of rolls by the Secretary of Interior "pursuant to statutory authority." These regulations do not apply to compilation of membership rolls for tribes which have the responsibility for preparation and maintenance of their membership rolls. *Id.* Under the regulations, the roll should contain degree of Indian blood for each person when required by law. 25 C.F.R. § 61.14.

Federal regulations also govern appeals of "adverse enrollment actions" by BIA officials and by tribal committees under two limited circumstances: when the adverse enrollment action is incident to the preparation of a tribal roll subject to Secretarial approval or when the tribal governing document requires appeals to the Secretary. These regulations define "adverse enrollment actions" as including a change in degree of Indian blood by a tribal committee which affects a tribal member when the tribal governing document provides for an appeal of the action to the Secretary, a change in degree of Indian blood by a Bureau official which affects an individual, and the certification of degree of Indian blood by a Bureau official which affects an individual. These regulations illustrate the significance of certificates of degree of Indian blood by referencing them in the procedure for appeals; however, they do not describe the method and type of documentation needed in making an initial determination of an individual's degree of Indian blood.

2

## 2. EDUCATIONAL/VOCATIONAL BENEFITS

Eligibility requirements for attendance of federal schools by Indian students include a "one-fourth or more" degree of Indian blood as a requirement under 25 C.F.R. § 31.1. The one-quarter blood requirement is also contained in 25 C.F.R. § 32.4(z) for purposes of Indian education policies, as follows (emphasis added):

> (z) Eligibility for services. Serve Indian and Alaska Native students who are recognized by the Secretary of the Interior as eligible for Federal services, because of their status as Indians or Alaska Natives, *whose Indian blood quantum is 1/4 degree or more...*

See also 25 U.S.C. § 2007(f) (defining "eligible Indian student" as a member or a descendent of "at least a 1/4 degree Indian blood). The quarter blood quantum requirement is also included in 25 C.F.R. § 36.3 for purposes of regulation of academic standards for basic education of Indian children, as follows (emphasis added):

> "Indian student" means a student who is a member of an Indian tribe and is *one-quarter (1/4) or more degree of Indian blood quantum.*

The quarter blood quantum requirement is also included in 25 C.F.R. § 40.1 for educational and vocational loans to students who reside on reservation, as well as students who reside near the reservation "when a denial of such loans or grants would have a direct effect upon Bureau programs within the reservation." It is also included for purposes of Adult Education programs under 25 C.F.R. § 46.2, which states (emphasis added):

> Indian means a person who is a member of, *or is at least a one-fourth degree Indian blood descendent of a member* of, an Indian tribe, and is eligible for the special programs and services provided by the United States through the Bureau of Indian Affairs to Indians because of their status as Indians;

A blood quantum requirement is included in 25 C.F.R. § 273.12 for student eligibility for educational benefits provided under Johnson O'Malley Act contracts, as follows (emphasis

3

added):

> Indian students, from age 3 years through grade(s) 12, except those who are enrolled in Bureau or sectarian operated schools, shall be eligible for benefits provided by a contract pursuant to this part *if they are 1/4 or more degree Indian blood and recognized by the Secretary as being eligible for Bureau services.* Priority shall be given to contracts (a) which would serve Indian students on or near reservations and (b) where a majority of such Indian students will be members of the tribe(s) of such reservations (as defined in 273.2(o)).

Methods of establishing eligibility for Indian Fellowship and Professional Development Programs are described in 34 C.F.R. § 263.21(a) as follows (emphasis added):

> (a) Evidence that the applicant is an Indian as defined in § 263.3. Evidence may be in the form of--
> (1)(i) A copy of the applicant's documentation of tribal enrollment or membership; or
> (ii) A copy of a parent's or grandparent's documentation of tribal enrollment or membership, with supporting birth certificates or similar documents showing the applicant's descendance from the enrolled member;
> (2) A letter of certification on official letterhead with the appropriate signature from a federally or State recognized tribe or band; or
> (3) *A certificate of degree of Indian blood (CDIB) issued by an authorized representative of the Bureau of Indian Affairs or an official of a federally recognized tribe;*

## 3. EMPLOYMENT ASSISTANCE, VOCATIONAL TRAINING, AND INDIAN HIRING PREFERENCE

The term "Indian" as defined in 25 C.F.R. § 26.1(G) for purposes of the Employment Assistance Program and as defined in 25 C.F.R. § 27.1(i) for purposes of vocational training includes blood quantum requirements as follows (emphasis added):

> (b) "Indian" means any person of Indian or Alaska native descent who is an enrolled member of any of those tribes listed or eligible to be listed in the Federal Register pursuant to 25 C.F.R. § 83.6 as recognized by and receiving services from the Bureau of Indian Affairs or *a descendant of one-fourth degree or more Indian blood of an enrolled member*; and any *person not a member of one of the listed or eligible to be listed tribes who possesses at least one-half degree of Indian blood* which is not derived from a tribe whose relationship is terminated by an Act of Congress.

4

Indian preference requirements do not appear to require membership in a federally recognized Indian tribe. For example, 25 C.F.R. § 5.1 list persons who may receive Indian hiring preference within the BIA as follows (emphasis added):

> For purposes of making appointments to vacancies in all positions in the Indian Health Service a preference will be extended to persons of Indian descent who are:
>
> (a) Members of any recognized Indian tribe now under Federal jurisdiction;
> (b) Descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation;
> (c) *All others of one-half or more Indian blood of tribes indigenous to the United States*;
> (d) Eskimos and other aboriginal people of Alaska; and
> (e) For one (1) year or until the Osage Tribe has formally organized, whichever comes first, effective January 5, 1989, *a person of at least one-quarter degree Indian ancestry of the Osage Tribe* of Indians, whose rolls were closed by an act of Congress.

Provisions governing Indian preference within the Public Health Service, 42 C.F.R. § 36.41, contain similar provisions.[1]

## 4. SOCIAL SERVICES AND LOANS

For purposes of determining eligibility for financial assistance and social services programs, there is a blood quantum requirement only for Alaska natives and Oklahoma Indians pursuant to 25 C.F.R. § 20.20(a)(1), which states (emphasis added):

> (1) The applicant must be an Indian, *except that in the States of Alaska and Oklahoma a one-fourth degree or more Indian or Native blood quantum* will be an additional eligibility requirement...

The term "Indian" is defined in 25 C.F.R. § 20.1(n) for purposes of financial assistance and social services programs to include a blood quantum requirement, as follows (emphasis

---

[1] The main difference appears in sub-section (e) of 42 CFR § 36.41, which provides: "(e) Until January 4, 1990 or until the Osage Tribe has formally organized, whichever comes first, a person of at least one-quarter degree Indian ancestry of the Osage Tribe of Indians, whose rolls were closed by an act of Congress."

5

added):

> (n)  "Indian" means any person who is a member, *or a one-fourth degree or more blood quantum descendant of a member* of any Indian tribe.

Federal law, 25 U.S.C. § 480, provides that on and after May 10, 1939, "no individual of less than one-quarter degree of Indian blood" is eligible for a loan of funds made available in accordance with several other laws.  Revolving loan funds also cannot be loaned to "Indians of less than one-quarter Indian blood."  25 U.S.C. § 482.

## 5.  LAND ALLOTMENTS; NATURAL RESOURCES

The term "individual Indian" is defined in 25 C.F.R. § 151.2(c) for purposes of acquisitions of land in trust as follows (emphasis added):

> (1)  Any person who is an enrolled member of a tribe;
> (2)  Any person who is a descendant of such a member and said descendant was, on June 1, 1934, physically residing on a federally recognized Indian reservation;
> (3)  Any other person *possessing a total of one-half or more degree Indian blood of a tribe*;

Provisions defining "Indian" for purposes of protection of Indians and conservation of resources, 25 U.S.C. § 479, contain similar, but not identical, provisions, including reference to "all other persons of one-half or more Indian blood."

Eligibility for an allotment of land from the public domain is governed in part by Indian status under 43 C.F.R. § 2531.1(b), which requires that any person desiring to file an application for an allotment of land on the public domain "must first obtain from the Commissioner of Indian Affairs a certificate showing that he or she is an Indian and eligible for such allotment."  The certificate is required to bear a serial number, "record thereof to be kept in the Indian Office," and required forms must be obtained "as stated in § 2531.2(b)."  Sub-section (e) provides that the eligibility for allotments of Indian women married to non-Indians

6

"will be determined without reference to the quantum of Indian blood possessed by such women," but solely with reference as to whether they are recognized members of an Indian tribe or are entitled to such membership. 43 C.F.R. § 2531.1(e).

A definition of "Indian individual" is contained in 25 C.F.R. § 262.2(d) for regulation of the protection of archaeological resources, including a blood quantum requirement, as follows (emphasis added):

(1) Any person who is an enrolled member of a Federal recognized Indian tribe;
(2) Any person who is a descendent of such a member and was, on June 1, 1934, physically residing within the present boundaries of any Indian reservation; or
(3) Any other person *of one-half or more Indian blood of tribes indigenous to the United States.*

## 6. TRIBAL REORGANIZATION

A definition of "Indian" contained in 25 C.F.R. § 81.1 (i), for purposes of tribal reorganization, includes a blood quantum requirement as follows (emphasis added):

(i) "Indian" means (1) All persons who are members of those tribes listed or eligible to be listed in the FEDERAL REGISTER pursuant to 25 C.F.R. § 83.6(b) as recognized by and receiving services from the Bureau of Indian Affairs; provided, that the tribes have not voted to exclude themselves from the Act of June 18, 1934, 43 Stat. 984, as amended; and (2) *any person not a member of one of the listed or eligible to be listed tribes who possesses at least one-half degree of Indian blood.*

A blood quantum requirement is also contained in one of the definitions of "tribe" for purposes of tribal reorganization set forth in § 81.1(w) (emphasis added):

... (2) *any group of Indians whose members each have at least one-half degree of Indian blood* for whom a reservation is established and who each reside on that reservation. Such tribes may consist of any consolidation of one or more tribes or parts of tribes.

## 7. HOUSING

Requirements for the housing assistance improvement program set forth in 25 C.F.R. §

7

256.13 allow use of CDIB to establish Indian status as follows (emphasis added):

>   (d) Fourth, you must furnish documentation proving tribal membership. Examples of acceptable documentation include a copy of your Certificate of Degree of Indian Blood (CDIB) or a copy of your tribal membership card.

## 8. LICENSED INDIAN TRADER

Under 25 U.S.C. § 264 and 25 C.F.R. § 140.3, any "person other than an Indian of the full blood" attempting to reside in Indian country as a trader without a license, is required to forfeit all merchandise offered for sale to the Indians, except persons residing among or trading with the Five Tribes.

## 9. BLOOD QUANTUM REQUIREMENTS FOR INDIVIDUAL TRIBES

### A. Oklahoma Tribes

### 1. Five Tribes

The degree of Indian blood of members of the Five Civilized Tribes (i.e., Cherokee, Chickasaw, Seminole, Muskogee-Creek and Choctaw Nations, hereinafter referred to as "Five Tribes") is determinative of the restricted or unrestricted lands owned by tribal members. Throughout this century, there have been a number of laws which define restricted status of Indian lands according to Indian blood quantum. See Act of April 6, 1906, 34 Stat. 137, § 19; Act of May 27, 1908, 35 Stat. 312, § 1; Act of June 14, 1918, 40 Stat. 606, § 2; Act of May 10, 1928, 45 Stat. 495, § 1.

The most recent of these laws, the Act of August 4, 1947, 61 Stat. 731, currently governs the restricted status of thousands of acres of Indian lands in eastern Oklahoma. Section 1(a) of the 1947 Act provides (emphasis added):

>   (a) That...no conveyance, including an oil and gas or mineral lease, of any interest in land acquired before or after the date of this Act by *an Indian heir or devisee*

8

*of one-half or more Indian blood*, when such interest in land was restricted in the hands of the person from whom such Indian heir or devisee acquired same, shall be valid unless approved in open court by the county court of the county in Oklahoma in which the land is situated....

Section 2 of the 1947 Act requires use of the final rolls developed by federal officials during the allotment process at the beginning of the twentieth century to determine blood quantum for purposes of the restricted status of lands belonging to Five Tribes members, but it does not necessarily apply to tribal determinations of Indian blood quantum for other purposes. Section 2 provides (emphasis added):

> In determining the quantum of Indian blood of any Indian heir or devisee, the final rolls of the Five Civilized Tribes as to such heir or devisee, if enrolled, shall be conclusive of his or her quantum of Indian blood. If unenrolled, his or her degree of Indian blood shall be computed from the nearest enrolled paternal and maternal lineal ancestors of Indian blood enrolled on the final rolls of the Five Civilized Tribes.

Federal law authorizes leasing of restricted lands belonging to Five Tribes members "of one-half or more Indian blood," only under rules and regulations established by the Secretary of Interior. 25 U.S.C. § 393a (emphasis added).

Regulations governing the creation of trusts for restricted property of members of the Five Tribes, 25 C.F.R. § 116.4, contain a one-half degree of Indian blood quantum requirement consistent with the 1947 Act, requiring the following provision in the trust agreement (emphasis added):

> (a) That such of the current income from the corpus of the estate as may be payable to the Indians of the Five Civilized Tribes *of one-half or more Indian blood* shall be remitted by the trustee to the Secretary of the Interior or such other official as he may designate for appropriate disposition.

Regulations concerning leasing of restricted lands of members of the Five Civilized Tribes of Oklahoma for mining, 25 C.F.R. § 213.45, set standards for lands acquired by

9

"persons of one-half or more Indian blood," by "full blood Indians," by "Indians of less than full blood," and by "heirs of one-half or more Indian blood but less than full bloods."

## 2. Osage Tribe

With a few exceptions,[2] federal regulations governing Osage members generally contain a one-half degree of Indian blood requirement for a variety of purposes. See 25 C.F.R. § 117.26 (extension of credit for certain purposes pending qualification of personal representative of an estate of a deceased Indian "of one-half or more Indian blood" who did not have a certificate of competency at his death"); § 117.27(a) (certain payments to personal representative of the estate of a deceased Indian "of less than one-half Indian blood who had a certificate of competency;" § 117.27(b) (payment of certain classes of judgment funds to personal representative of the estate of a deceased "Indian of one-half or more Indian blood" who did not have a certificate of competency); § 117.28 (payment of certain claims against the estate of "a deceased Indian of one-half or more Indian blood" who had no certificate of competency); and § 152.9 (issuance of certificates of competency to adult members of the Osage Tribe "of one-half or more Indian blood").

Federal regulations rely heavily on BIA records for purposes of determining blood quantum of Osage persons for purposes of preparation of a competency roll for unallotted

---

[2] Federal law governing disposition of Osage judgment funds, 25 U.S.C. §§ 883, 883a, 883b, reference allottees and heirs of Osage blood, and contain no blood quantum requirements. Consistent with federal law, the definition of an Osage tribal member contained in 25 C.F.R. § 91.2 expressly eliminates an Indian blood quantum as follows: (d) 'Tribal Member' means any person of Osage Indian blood of whatever degree, allotted or unallotted." See also 121.3 (claims by "heirs of Osage Indian blood of deceased allottees); See also 25 C.F.R. §§ 121.5, 121.6, 121.9 (referencing "heirs of Osage Indian blood" with regard to judgment fund distributions); and § 122.5 (Osage Indian blood requirement for members of Osage Tribal Education Committee).

10

members of the Osage Tribe "of less than one-half Indian blood" who has not received a certificate of competency. See 25 C.F.R. §§ 154.1 - 154.5. The competency roll must include the "total quantum of Osage blood and non-Osage Indian blood" of each person listed on the competency roll. 25 C.F.R. § 154.2. In certain circumstances, the Osage Agency register of Indian families for the year ending December 31, 1901, must be accepted "as prima facie evidence of the quantum of Indian blood." 25 C.F.R. § 154.3(b)(1) and (2). Where Indian blood of a different tribe is involved, "the certification of the superintendent or other officer in charge" of the Indian Agency having jurisdiction over the affairs of that tribe "shall be accepted as prima facie evidence in determining the quantum of non-Osage Indian blood." 25 C.F.R. § 154.3(b)(3). If the superintendent or other officer in charge of the other Agency is unable to certify as to the quantum of Indian blood of a non-Osage parent of an unallotted Osage member of less than one-half Indian blood, "affidavits as to such parent's quantum of Indian blood, when properly executed by two qualified individuals, may be accepted." 25 C.F.R. § 154.3(b)(4).

The federal regulations governing the Osage competency roll contain provisions affording due process to a person, when the superintendent determines that the person is of less than one-half Indian blood. The superintendent must notify that person and inform the person that if objection is not received within 20 days from date of notification a certificate of competency will be used. 25 C.F.R. §154.4. The party may dispute the finding by submitting "two affidavits or other evidence in support of his claim." The "claim affidavits or other evidence of the person as to his quantum of blood" must be submitted to the Commissioner of Indian Affairs "for a ruling before the certificate of competency is issued."

11

## B. Alaskan Tribes

While some federal laws and regulations concerning Alaskan Natives have no blood quantum requirements,[3] the Alaska Claims Settlement Act, 43 U.S.C. § 1602(b) includes a blood quantum requirement in its definition of "Native" for its purposes as follows:

> "Native" means a citizen of the United States who is a *person of one-fourth degree or more Alaskan Indian* (including Tsimshian Indians not enrolled in the Metlaktla Indian Community), Eskimo, or Aleut blood, or a combination thereof. The term includes any Native as so defined either or both of whose adoptive parents are not Natives. It also includes, *in the absence of proof of a minimum blood quantum,* any citizen of the United States who is regarded as an Alaska Native by the Native village or Native group of which he claims to be a member and whose father or mother is (or, if deceased, was) regarded as Native by any village or group. *Any decision of the Secretary regarding eligibility for enrollment shall be final;*

Other definitions of Alaskan Natives contained in various federal regulations are not identical, but contain similar blood quantum requirements: 13 C.F.R. § 124.100 (minority small business and capital ownership development); 50 C.F.R. § 17.3 (concerning endangered wildlife and plants); 50 C.F.R. § 18.3 (relating to sale of marine mammals); and 50 C.F.R. § 216.3 (regulating the taking and importing of marine mammals). *See also* 43 C.F.R. § 2561.0-3 (degree of Indian blood is irrelevant to rights related to native allotments by an Indian who resides in Alaska); 43 C.F.R. § 4300.0-5.

## C. Canadian Born Indians

Federal law, 25 U.S.C. § 1359 contains the following blood quantum requirement for Indians born in Canada who cross the border (emphasis added):

> Nothing in this subchapter shall be construed to affect the right of American

---

[3] Federal law, 25 U.S.C. § 500n, defines a "native of Alaska" as including native Indians, Eskimos and Aleuts "of whole or part blood," for purposes of laws governing a reindeer industry.

12

Indians born in Canada to pass the borders of the United States, but such right shall extend only to persons who possess *at least 50 per centum of blood of the American Indian race.*

Federal immigration regulations, 8 C.F.R. § 289.1, provide (emphasis added):

> The term "American Indian born in Canada" as used in section 289 of the Act includes *only persons possessing 50 per centum or more of the blood of the American Indian race.* It does not include a person who is the spouse or child of such an Indian or a person whose membership in an Indian tribe or family is created by adoption, unless such person possesses at least 50 per centum or more of such blood.

Other federal regulations governing visa and passport requirements as applied to non-immigrants, 22 C.F.R. §§ 41.1(b) and 42.1(f), define the term "American Indians born in Canada," as (emphasis added):

> ...An American Indian born in Canada, *having at least 50 per centum of blood of the American Indian race* (Sec. 289, 66 Stat. 234; 8 U.S.C. 1359).

The Legal Services Corporation regulations, 45 C.F.R. § 1626.10 also include a blood quantum requirement for eligibility for legal aid to Indians born in Canada as follows (emphasis added):

> (b) All Canadian-born American Indians *at least 50% Indian by blood* are eligible to receive legal assistance provided they are otherwise eligible under the Act.

## D. Other Specified Tribes

The following laws and regulations include blood quantum requirements related to enrollment of members of specific Indian tribes for judgment fund distribution purposes, as follows: 25 U.S.C. § 585 (Northwestern Bands of Shoshone Indians); 25 U.S.C. §§ 961, 967a (descendants of allottees of Omaha Tribe who possess "Omaha blood *of the degree of one-fourth or more*"); 25 U.S.C. § 1142 (New York Indians, including those who are Brotherton Indians of Wisconsin of *at least one-fourth degree* Emigrant New York Indian blood...") Federal law

13

also has included blood quantum requirements with regard to specific tribes for many other purposes.[4]

## CONCLUSION

Currently existing federal laws and regulations require some form of proof of Indian blood for various purposes. Some of these regulations even expressly refer to Certificates of Degree of Indian blood. Unless these laws and regulations are amended to eliminate the need for a method of proving Indian blood or Indian blood quantum, uniform standards for issuance, amendments and denials of Certificates of Degree of Indian blood are essential for compliance with the law.

---

[4] See 25 U.S.C. §§ 677, 677a(b)(defining a "full-blood" as a tribal member who possesses "one-half degree of Ute Indian blood and a total of Indian blood in excess of one-half") and 677a(c) (defining a "mixed-blood" as a tribal member who does not possess sufficient Indian or Ute Indian blood to fall within the full-blood class, and those who became mixed-bloods by choice). See also 25 U.S.C. §§ 677v, 677w, 677aa (relating to partition and distribution of tribal assets between mixed blood and full blood members of the Ute Indians of Utah); 25 U.S.C. § 715e (one-eighth blood quantum requirement for compilation of membership rolls relating to restoration of federal supervision over Coquille Indian Tribe of Oregon); 25 U.S.C. § 903b(c) (updating of Menominee Tribe membership roll, and requiring a one-quarter degree of Menominee Indian blood for heirs of allottees); 25 U.S.C. § 971 (termination of federal supervision and distribution of tribal assets to persons on membership roll of the Ponca Tribe of Nebraska, including descendants of enrollees "of not less than one-quarter degree Indian blood of the Ponca Tribe"); 25 U.S.C. § 1300g-7(a) (restoration of supervision over Ysleta Del Sur Pueblo and definition of tribal members, including descendant of an enrollee who has "1/8 or more degree" of Tigua-Ysleta del Sur Pueblo Indian blood); 25 U.S.C. § 1300 h-3 (federal recognition of Lac Vieux Desert Band of Lake Superior Chippewa, and establishment of membership roll, including persons who are "at least one-quarter Chippewa Indian blood..."); 25 C.F.R. § 61.4 (preparation of rolls of various Tribes, some of which have blood quantum requirements); 25 C.F.R. § 75.6 (revision of rolls of Eastern Band of Cherokee Indians, North Carolina); 25 C.F.R. § 153.3 (degree of Indian blood required on enrollment application for Crow Tribe); and 25 U.S.C. § 1300i-5(3) ("The Secretary shall determine the quantum of 'Indian blood' or 'Hoopa Indian blood,'if any, of each person enrolled in the Hoopa Valley Tribe under this subsection pursuant to the criteria established in the March 31, 1982 decision of the United States Court of Claims in the case of Jesse Short et al. v. United States, (CL.Ct. No. 102-63).

14

If you have questions related to this memorandum, please contact me at (918) 669-7730, ext. 228.

FIELD SOLICITOR

L. Susan Work
Attorney

15



**U.S. SMALL BUSINESS ADMINISTRATION**
WASHINGTON, D.C. 20416

September 10, 2024

Lynette T. Stevenson
DALS Credit Solutions Co.
5246 Simpson Ferry Road
Mechanicsburg, PA 17055
ls@dalscreditsolutions.com

Dear Ms. Stevenson:

This letter is in response to your Freedom of Information Act ("FOIA") request No. SBA-2024-005961, in which you requested the following:

> My name is Lynette T. Stevenson, founder of DALS Credit Solutions Co a non-participate of the 8A program.  I have assisted 8A participates with Business development strategies to execute Federal opportunities. With the SBA 8A Business Development program according to FAR & DFARS regulations is the current rating 11.32%?- Our research questioned the current rating. Due to the SBA not modernized, an evaluation of 8A without designations of CDC, NHO, etc, is small percentage of which is currently reported.

> Congressional data, supports "The SBA is barred from awarding an 8(a) contract, either via a set-aside or on a sole-source basis, if the cost to the contracting agency exceeds "a fair market price" (15 U.S.C. §637(a)(1)(A)). Additional prohibitions on the SBA accepting 8(a) contracts exist, although agencies can offer contracts to the SBA "in [their] discretion," and the SBA may accept them "whenever it determines such action is necessary or appropriate" (15 U.S.C. §637(a)(1)(A)).  With Top Management and Performance Challenges Facing the Small Business Administration in Fiscal Year 2024 challenges and new applications halted as of 08/01/2024.

> For the following reasons above, others not noted; I am submitting a FOIA request to obtain detailed information regarding Small Business Investment Companies (SBICs) and the SBA for the following calendar years 2020 -2023.

Specifically, I am requesting:

1.  A list of the 298 small businesses that received funding through SBICs during the 2020-2023 period, including the names and contact information of the licensing partners associated with each SBIC.
2.  Information on any small businesses that received funding during this period that fall under the designations of Native Hawaiian Organizations (NHO), Community Development Corporations (CDC), Indian Tribes, and any related partners and those who are Joint Ventures as well.
3.  Verification of the current 8(a) program participation rate, which is reported to be 11.32%, specifically for the aforementioned designations (NHO, CDC, Indian Tribes). We aim to ensure that this rate accurately reflects the program's performance and inclusivity.
4. Please provide a list of all currently licensed Small Business Investment Companies (SBICs) as of 2020-2023
•    "Please include the names, addresses, and contact information for each SBIC." If any are missing, please the remainder according to the request.
•    Siguler Guff S

The Office of Business Development has been assigned to respond to items two and three of your request. Please be advised that SBA is currently experiencing a backlog of requests. Therefore, we are invoking a ten working day extension of time pursuant to 5 U.S.C. § 552(a)(6)(B)(iii)(II), 13 C.F.R. § 102.5.

If you have any questions about this matter or need assistance with your request, you may contact the FOIA office at U.S. Small Business Administration, 409 Third Street SW, Washington DC 20416, or by email at foia@sba.gov.

Sincerely,

Van Tran
Acting Associate Administrator
Office of Business Development

**OFFERING CIRCULAR**

**$1,737,675,000**

(Approximate)

# U.S. Small Business Administration

Guaranteed 5.168% Debenture

Participation Certificates, Series SBIC 2023-10 A

Evidencing Fractional Undivided Interests in a Pool of 5.168% Debentures Due March 1, 2033

Issued by

# Small Business Investment Companies

*Distributions of interest payable September 10 and March 10, commencing September 10, 2023*

**The Certificates:**

U.S. Small Business Administration Guaranteed 5.168% Debenture Participation Certificates, Series SBIC 2023-10 A.

- The Certificates represent fractional undivided interests in a pool of debentures which will be issued, simultaneously with the Certificates, by small business investment companies licensed by the U.S. Small Business Administration, an independent agency of the United States.
- The Certificates are issued by SBA, through its agent The Bank of New York Mellon, as Trustee.

**SBICs:**

Small Business Investment Companies, licensed by the U.S. Small Business Administration.

**The Pool:**

The Pool will be composed of $1,737,675,000 aggregate principal amount of 5.168% debentures to be issued on or about March 22, 2023, by 87 SBICs.

**Payment Dates:**

Payment of interest on the debentures in the Pool will be made on each September 1 and March 1, commencing September 1, 2023.

**Distribution Dates:**

Distributions of interest will be made on the Certificates, on each September 10 and March 10, commencing September 10, 2023.

Each debenture is scheduled to mature on March 1, 2033, and final distribution in retirement of the Certificates is scheduled for March 10, 2033.

Capitalized terms used on this page and in this Offering Circular have the meanings given to them in the text of this Offering Circular.

SBA is guaranteeing the timely payment of principal and interest when due on the debentures and the timely pass-through of such principal and interest to Holders of the Certificates.

**The full faith and credit of the United States is pledged to honor SBA's Guarantee. See "*Full Faith and Credit Guarantees.*"**

The principal amount of a debenture in the Pool will be immediately due and payable when there is an event of default by an SBIC and SBA accelerates the debenture. When such an acceleration happens, SBA will make a payment pursuant to its Guarantee of 100% of the principal amount of the debenture together with accrued interest to the next Payment Date. The amount of any acceleration payment will be distributed pro rata to the Holders of the Certificates on the Distribution Date for such Payment Date. See "*Acceleration of Debentures.*"

An SBIC currently has the option to prepay its debentures, in whole but not in part, on any Payment Date on or after September 1, 2023, at a prepayment price of 100% of the principal amount of the debenture, together with accrued interest. The amount of any Optional Prepayment will be distributed pro rata to the Holders of the Certificates on the Distribution Date for such Payment Date. See "*Optional Prepayment of Debentures.*"

|  | Price to Public[1] | Underwriting Discount | Proceeds of the Offering[1][2] |
|---|---|---|---|
| Per Certificate | 100% | 0.375% | 99.625% |
| Total[3] | $1,737,675,000 | $6,516,281.25 | $1,731,158,718.75 |

[1] Plus accrued interest, if any, from date of original issue.
[2] Before deduction of expenses, estimated at $50,000.
[3] May vary by up to plus or minus 5%.

Delivery of the Certificates will be made in New York, New York through the book-entry system of The Depository Trust Company on or about March 22, 2023.

The Certificates are exempt from the registration requirements of the Securities Act of 1933, so no registration statement has been filed with the Securities and Exchange Commission. Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of the Certificates or passed upon the accuracy or adequacy of this Offering Circular. Any representation to the contrary is a criminal offense.

**Goldman Sachs & Co. LLC**                                    **J.P. Morgan**

The date of this Offering Circular is March 16, 2023.

## OFFERING CIRCULAR SUMMARY

The following summary is qualified in its entirety by more detailed information appearing elsewhere in this Offering Circular.

| | |
|---|---|
| **Guarantor** ............................................. | The U.S. Small Business Administration ("SBA"), an independent agency of the United States. |
| **The Certificates** ..................................... | Guaranteed 5.168% Debenture Participation Certificate, Series SBIC 2023-10 A. Each Certificate represents a fractional undivided interest in the Pool of these debentures. |
| **The Pool** ................................................. | The Series SBIC 2023-10 A Pool is composed of (i) $1,737,675,000 aggregate principal amount of five hundred eighty-eight 5.168% debentures, (ii) the guarantee agreement pursuant to which timely payment of principal and interest on each debenture in the Pool will be guaranteed by SBA and (iii) an account into which payment by the SBICs and SBA with respect to the debentures in the pool will be deposited. |
| **The Debentures** ..................................... | The debentures in the Pool have been issued by 87 small business investment companies, or SBICs, licensed by SBA pursuant to Section 301 of the Small Business Investment Act of 1958, as amended. Each debenture will mature on March 1, 2033. |
| **Optional Prepayment**.............................. | Each debenture in the Pool is subject to Optional Prepayment, in whole but not in part, at the option of an SBIC on any Payment Date on or after September 1, 2023, at a prepayment price of 100% of the principal amount of the debenture, together with accrued interest. See "*Optional Prepayment of Debentures.*" |
| **Acceleration Event and Acceleration Payment** ...................... | An Acceleration Event with respect to a debenture in the Pool will occur upon an event of default and transfer of the SBIC into liquidation status by SBA. See "*Acceleration of Debentures.*" Upon an Acceleration Event, pursuant to its Guarantee, SBA will make a payment of 100% of the principal amount of a debenture in the Pool, together with interest accrued to the Payment Date next following an Acceleration Event. |
| | **The anticipated frequency and amount of Acceleration Payments cannot be predicted and will be influenced by a variety of factors. See "*Acceleration of Debentures.*"** |
| **Full Faith and Credit Guarantees** ............................................. | Pursuant to Sections 303 and 319 (formerly Section 321) of the Small Business Investment Act of 1958, as amended, SBA guarantees the timely payment of principal and interest on the debentures in the Pool and the timely pass-through of principal and interest to the Holders of the Certificates. The |

2

full faith and credit of the United States is pledged to SBA's Guarantees. See "*Full Faith and Credit Guarantees.*"

**Distributions of Interest**............................ Interest on the debentures in the Pool will accrue from the date of original issue of the Certificates at the rate of 5.**168**% per annum and will be paid on each September 1 and March 1, commencing September 1, 2023. The interest will be passed through on each September 10 and March 10 (unless such day is not a business day, in which case payment will be made on the next applicable business day), commencing September 10, 2023, to holders in whose names the Certificates are registered in the certificate register maintained by the Trustee at the close of business on the related Record Date. Interest on the Certificates is calculated on the basis of a year of 365 days (regardless of whether the year is composed of 365 or 366 days) and the actual number of days elapsed (including the first day but excluding the last day) from the date of pooling of the related debentures to the first payment date and thereafter from payment date to payment date until maturity.

**Distributions of Principal** ........................ Principal is scheduled to be distributed to the Holders of the Certificates on March 10, 2033. However, upon an Optional Prepayment, the prepayment price will be passed through pro rata to the Holders on the Distribution Date for such Payment Date. Acceleration Payments, if any, will be passed through pro rata to the Holders on the next succeeding Distribution Date following such Acceleration Payment. See "*Acceleration of Debentures.*"

**Trustee** ...................................................... The Bank of New York Mellon, as successor in interest to JPMorgan Chase Bank, N.A. (formerly The Chase Manhattan Bank), or any successor trustee appointed under the Trust Agreement, dated as of February 1, 1997, as amended from time to time, will act as Trustee. The Trustee will hold legal title to the debentures and the other assets constituting the Pool, collect payments of principal and interest due on the debentures in the Pool and distribute such payments to the Holders of the Certificates.

**Denominations** ........................................ Certificates will be issued in multiples of $5,000 with minimum original principal amounts of $100,000. The denomination signifies a Holder's pro rata share of the aggregate principal amount of the debentures on the pooling date.

**Registration of Certificates** .................... The Certificates will initially be offered through the facilities of The Depository Trust Company in book-entry or certificated form. Persons acquiring beneficial ownership interests in the Certificates will hold their interests through The Depository Trust Company.

Transfers within The Depository Trust Company will be made in accordance with its usual rules and operating procedures. Upon request, a purchaser of Certificates is also entitled to receive a physical certificate representing such

person's interest. See "*Description of Participation Certificates — Book-Entry and Physical Certificates.*"

**Information Concerning Acceleration Events and Optional Prepayments** ............................ The Trustee will maintain a record of all debentures in the Pool which have been subject to an Acceleration Event or Optional Prepayment (to the extent the Trustee has been notified by SBA of such Acceleration Event or Optional Prepayment). Such information will be made available by dialing (212) 815-6258 during the Trustee's normal business hours.

**Tax Status** ................................................ The Pool will be treated as a grantor trust for U.S. federal income tax purposes, and the beneficial owners of Certificates will be treated as the beneficial owners of undivided pro rata interests in the income on each debenture in the Pool for such purposes. Ownership of the Certificates will be treated as ownership of "government securities" and "obligations of the United States" for purposes of certain provisions of the U.S. federal income tax laws. See "*Tax Status.*"

**Legality of Investment** ............................ Under federal law, the Certificates are:

- acceptable for purchase by and as security for advances to member banks of the Federal Reserve System; and

- eligible as security for the deposit of public monies of the United States and as collateral for Treasury Tax and Loan Accounts.

**ERISA Considerations** ........................... Fiduciaries of employee benefit plans subject to the Employee Retirement Income Security Act of 1974, as amended, should consult their tax and legal advisors to determine whether the acquisition of a Certificate could result in prohibited transactions or other violations of the fiduciary responsibility provisions of ERISA and Section 4975 of the Code. See "*ERISA Considerations*" herein.

**Future Issuances of SBIC Debentures** ............................................ The formation of additional pools of SBA-guaranteed SBIC debentures and the offering of certificates representing fractional undivided interests in such pools are required at periodic intervals of not less than every twelve months or shorter intervals as deemed appropriate. See "*Description of SBIC Program — Guaranteed Pools*" herein. The frequency and size of such offerings may vary due to such factors as the level of demand for funds by SBICs and changes in the law, in market conditions and in SBA policy.

**SBIC Participating Securities.** ................ The Small Business Investment Act of 1958, as amended, was amended in 1992 to authorize SBA to guarantee a participating security. Consequently, in addition to pools of

SBA-guaranteed SBIC debentures, the formation of pools primarily comprised of an assignment of certain interests in SBA-guaranteed participating securities and the offering of certificates representing fractional undivided interests in such pools were required at periodic intervals of not less than every twelve months or shorter intervals as deemed appropriate. See *Description of SBIC Program — Participating Securities*" and "*Description of SBIC Program — Guaranteed Pools*" herein. After September 30, 2008, SBICs can no longer issue participating securities. As a result, the last offering of SBA-guaranteed participating securities participation certificates occurred in February 2009. Investors are advised that any redemption experience of SBA-guaranteed participating securities is not relevant or material to the offering of the Certificates hereunder.

# RISK FACTORS

The following information, which you should carefully consider, identifies certain significant sources of risk associated with a purchase of Certificates.

***Certificates have limited liquidity and market disruption may adversely affect the value of the Certificates*** ......................................

The guaranteed debenture participation certificates have been offered twice a year and have historically had a limited secondary market. Due to recent developments in the credit markets, there is currently a very limited secondary market for the Certificates. If a secondary market does develop for the Certificates, market prices may be below or substantially below the principal amounts of such Certificates. In addition, if a secondary market does develop, it might not continue or it might not be sufficiently liquid to allow Holders to resell Certificates. Consequently, Holders may not be able to sell Certificates readily or at prices that will enable Holders to realize a desired yield. In addition, the lack of a defined secondary market may make it difficult to determine the fair value of Certificates even if a Holder does not intend to sell. The market values of the Certificates are likely to fluctuate. Any of these fluctuations may be significant and could result in significant losses to Holders desiring to sell in the secondary market.

*Illiquidity can have a severely adverse effect on the prices of securities, including the Certificates, that are especially sensitive to prepayment, credit or interest rate risk.*

***The rate of prepayment on the debentures is uncertain and may adversely affect the average life of and yield on the Certificates*** ..................

The anticipated frequency and amount of principal prepayments on the debentures cannot be predicted and may be influenced by a variety of factors. Any prepayment can impact the yield on the Certificates. The debentures are subject to prepayment either as an Optional Prepayment or as the result of an Acceleration Event.

- Each debenture in the Pool is subject to Optional Prepayment, in whole but not in part, at the option of an SBIC on any Payment Date on or after September 1, 2023, at a prepayment price of 100% of the principal amount of the debenture, together with accrued interest. See "*Optional Prepayment of Debentures.*"

- An Acceleration Event with respect to a debenture in the Pool will occur upon an event of default and transfer of the SBIC into liquidation status by SBA. Upon an Acceleration Event, pursuant to its Guarantee, SBA will make a payment of 100% of the principal amount of a debenture in the Pool, together with interest accrued to the Payment Date next following an Acceleration Event. See "*Acceleration of Debentures.*"

The anticipated rate and amount of prepayments of principal, if any, to the Holders of the Certificates as a result of Optional Prepayments or Acceleration Events cannot be determined. The amount of Optional Prepayments may be influenced by a variety of economic factors, including a decrease in interest rates, which may make the prepayment of a debenture attractive to an SBIC. An Acceleration Event may result upon the occurrence of the events of default described under "*Acceleration of Debentures — Procedure for Acceleration of Debentures.*" The rate at which Acceleration Events are experienced may be influenced by a variety of economic factors, including but not limited to the weakening of national, regional and local economic conditions, changes or continued weakness in specific industry segments or the capability of management of an SBIC.

**The Coronavirus Disease 2019 (COVID-19 or coronavirus) will have an uncertain impact on the rate of prepayment on the debentures and may adversely affect the average life of and yield on the Certificates**...............

There has been a widespread outbreak of coronavirus disease (COVID-19) in the United States (the "COVID-19 Outbreak"). The COVID-19 Outbreak has been declared a pandemic by the World Health Organization, and on March 13, 2020, former President Trump declared a national emergency in the United States. The COVID-19 Outbreak (and any future outbreaks of coronavirus) has led (and may continue to lead) to a significant disruption in the economy of the United States and the economies of other nations. In certain cities and states, the COVID-19 Outbreak caused periods of near total cessation of all non-essential economic activities. The COVID-19 Outbreak caused substantial disruption and volatility in the credit markets that resulted in a recessionary effect on the U.S. and/or global economy. However, a significant number of small businesses that moved to a remote working environment, temporarily suspended operations, laid-off a significant percentage of their workforce, or shut down completely have been re-opening and re-staffing. As recovery from the COVID-19 pandemic and increased vaccination in the United States gains traction, the circumstances that adversely affected the performance and/or value of the Certificates may begin to stabilize. The restrictions put in place by national, state and local governmental authorities are easing. However, the effect of the COVID-19 Outbreak on small business concerns has been significant and may continue to impact the economic recovery for the near future, particularly with the unpredictability of the appearance of coronavirus variants. No assurance can be given as to the timing and number of accelerations and prepayments, which may vary from historical acceleration and prepayment experience described under "*Optional Prepayment of Debentures*" and "*Acceleration of Debentures.*"

## DESCRIPTION OF SBA

The U.S. Small Business Administration ("SBA"), an independent agency of the United States, was created by the Small Business Act, as amended (15 U.S.C. §§631 *et. seq.*) (the "Small Business Act"), and derives its present authority from the Small Business Act and the Small Business Investment Act of 1958, as amended (15 U.S.C. §§661 *et. seq.*) (the "Act").

The basic mission of SBA is to aid, counsel, assist and protect the interests of small business concerns; to ensure that small business concerns receive a fair portion of government purchases and contracts as well as of the sales of government property; to make or guarantee loans to small business concerns, state and local development companies, and the victims of floods or other catastrophes, and of economic injury caused thereby; and to license, regulate, and provide financial assistance to small business investment companies.

## DESCRIPTION OF THE SBIC PROGRAM

SBA licenses, regulates, and provides financial assistance to small business investment companies licensed pursuant to Section 301(c) and former Section 301(d) of the Act. The sole function of these privately owned and managed investment companies, hereinafter referred to as "SBICs," is to provide capital in the form of equity financing, long-term loan funds and management services to small business concerns, for their growth, expansion and modernization. Regulations for the SBIC Program (or, "Program"), including the regulations governing issuance by an SBIC of SBA-guaranteed debentures and participating securities, as further described below, are codified at 13 C.F.R. Part 107, and may be amended from time to time.

SBICs can be formed as for-profit corporations, limited partnerships, limited liability companies or, in the case of SBICs licensed pursuant to former Section 301(d) of the Act ("Specialized SBICs"), non-profit corporations. Specialized SBICs are restricted to investments in "small business concerns which will contribute to a well-balanced national economy by facilitating ownership in such concerns by persons whose participation in the free enterprise system is hampered because of social or economic disadvantage" and, prior to October 1, 1996, could qualify for SBA financial assistance on more favorable terms than SBICs licensed pursuant to Section 301(c) of the Act.

From the inception of the SBIC program to December 31, 2022, all SBICs, including Specialized SBICs, have invested approximately $123.8 billion in approximately 192,286 financings to small businesses. During calendar year 2022, SBICs, excluding Specialized SBICs, made approximately 3,182 financings aggregating approximately $7.8 billion to small businesses, and Specialized SBICs made approximately two financings aggregating approximately $0.9 million to disadvantaged small businesses.

*Debentures.* The Act permits SBA to guarantee debentures issued by SBICs, the proceeds of which are used to augment other funds available to SBICs for investment. Such debentures may have terms of up to 15 years, although currently no outstanding SBIC debenture guaranteed by SBA has an original term of more than 10 years and twenty-nine weeks. Debentures guaranteed by SBA after July 1, 1991 are subordinated only to loans to the issuing SBIC from non-associated lenders in an amount not to exceed the lesser of $10 million or 200% of the SBIC's combined private paid-in capital, paid-in surplus and unfunded binding commitments from investors that meet certain criteria established by SBA ("Private Capital"), unless otherwise determined by SBA. As more fully described under "Full Faith and Credit Guarantees" below, the full faith and credit of the United States is pledged to the guarantee by SBA of the timely payment of principal and interest due on each debenture.

On March 7, 2023, there were a total of 302 licensed and operating SBICs, other than Specialized SBICs, with Private Capital of $22.8 billion. Of these SBICs, 128 had no outstanding debenture borrowings guaranteed by SBA, and 174, with Private Capital of $14.7 billion, had $12.5 billion of outstanding debenture borrowings guaranteed by SBA (exclusive of the $22.0 million in aggregate currently outstanding LMI debentures and the $32.5 million in aggregate outstanding Early Stage debentures, as discussed below under "—*Regulatory and Legislative Developments*").

On March 7, 2023, there were a total of six licensed and operating Specialized SBICs with Private Capital of $48.1 million. Of these Specialized SBICs, five had no outstanding government financings guaranteed by SBA, and one, with Private Capital of $20.0 million, had $24.0 million of outstanding debenture borrowings guaranteed by SBA. On March 7, 2023, there were no outstanding LMI debentures issued by Specialized SBICs.

In accordance with the Consolidated Appropriations Act, 2023, Pub. L. 117-328, Division E, Title V, commitments to guarantee loans for debentures cannot exceed $5 billion during fiscal year 2023.

Until March 29, 1990, debentures issued by Specialized SBICs were only funded directly by SBA. Until April 7, 1986, debentures issued by other SBICs were funded through and held by the Federal Financing Bank, an instrumentality of the United States under the general supervision of the Secretary of the Treasury. Since April 7, 1986, the Federal Financing Bank has not been authorized to purchase SBA-guaranteed SBIC debentures.

*Participating Securities.*     On September 4, 1992, the President signed into law Public Law 102-366, the "Small Business Credit and Business Opportunity Enhancement Act of 1992." Title IV of the statute amended the Act and authorized SBA to guarantee a participating security (each, a "participating security," or collectively, "participating securities"), which could be issued by those SBICs that made equity-type investments in small business concerns. Since October 1, 2004, however, SBA has not been able to issue new commitments for participating securities leverage. The fees payable by SBICs for participating securities leverage are not sufficient to cover the projected net losses in the participating securities program and no funds have been appropriated for this program. SBA's authority to guarantee participating securities issued under commitments made by SBA prior to October 1, 2004, including participating securities issued under such commitments after October 1, 2004, is not affected by this change. Between February 22, 1995 and February 25, 2009, inclusive, $10,263,495,000 aggregate principal amount of SBA-guaranteed SBIC participating securities Participation Certificates were sold in underwritten public offerings. The effect of the passage of the Small Business Credit and Business Opportunity Enhancement Act of 1992 on the volume of debentures issued under the current program cannot be predicted with certainty. After September 30, 2008, SBICs can no longer issue participating securities. As a result, the last offering of SBA-guaranteed participating securities participation certificates occurred in February 2009. **Investors are advised that any redemption experience of SBA guaranteed participating securities is not relevant or material to the offering of the Certificates hereunder.**

*Interim Funding.*     In May 1998, SBA began making financial assistance available to SBICs more frequently than the currently scheduled semi-annual offerings of SBA guaranteed participation certificates. SBA now guarantees SBIC debentures for an "Interim Period," which begins at the time of the sale of such instruments to a designated financial institution (the "Interim Funding Provider") and continues until the date of the next applicable participation certificate issuance. The Interim Funding Provider receives a rate of interest for the Interim Period, which will generally not exceed six months and two weeks. At the end of the relevant Interim Period the debentures are repriced, repurchased and pooled for the sale of participation certificates. SBA expects that all SBIC debentures (other than LMI debentures as discussed below under "—*Regulatory and Legislative Developments*") will be funded in this manner. Although such "Interim Funding" will not affect the terms of the Certificates, Interim Funding effectively extends the term of the debentures prior to pooling by the length of the Interim Period.

*Regulatory and Legislative Developments.*     In response to a Presidential directive to all federal agencies to simplify their regulations, SBA published a final rule on January 31, 1996, which streamlined the regulations governing the SBIC Program (61 Fed. Reg. 3177, January 31, 1996). In general, the rule eliminated obsolete regulations and made a number of substantive changes intended to reduce the regulatory burden on SBICs and to make the SBIC Program more cost-effective. The substantive changes included: (1) allowing SBICs to charge a higher interest rate on the loans they make to small businesses; (2) increasing the license application fee, the examination fee and certain processing fees; (3) requiring all new SBICs that obtain SBA financial assistance to have diversity between the

management and the ownership of the SBIC; (4) expanding the permitted sources of Private Capital for Specialized SBICs; and (5) requiring SBICs licensed after January 31, 1996 to have Private Capital of at least $5 million in order to apply for debenture financing unless such SBICs can demonstrate long-term financial viability at a lesser amount.

On September 30, 1996, the President signed Public Law 104-208, Division D of which is the Small Business Programs Improvement Act of 1996 (the "Improvement Act"). The Improvement Act made a number of changes to the Act and the SBIC Program, including the repeal of SBA's authority to license Specialized SBICs and to provide such companies with financial assistance on terms different than those available to other SBICs. The Improvement Act also required all new SBICs to have at least $5 million of Private Capital to issue debentures and at least $10 million of Private Capital to issue participating securities, although SBA had the discretion under the Improvement Act to license and to approve leverage for a participating securities issuer with Private Capital ranging from $5 million to $10 million. An exception to this provision was enacted on December 2, 1997, in the Small Business Reauthorization Act of 1997 (the "Reauthorization Act"). The exception permits certain SBICs with Private Capital of less than $5 million but not less than $3 million to issue debenture leverage in an amount not to exceed their Private Capital. The exception is available to any SBIC that is located in a state not served by another licensee.  On December 19, 2018, the President signed the Spurring Business in Communities Act of 2017, Public Law 115-333, which amended the Act to extend this exception to applicants located in any underlicensed state—a state in which the number of SBICs per capita is less than the median number of SBICs per capita for all states.  That law also requires SBA to give first priority in the SBIC licensing process to an SBIC applicant located in an underlicensed state with below median financing.

The Improvement Act and the Reauthorization Act also changed the fees payable by SBICs issuing debentures or participating securities. First, effective October 1, 1997, the leverage fee of 3% of the face amount of the leverage may be paid in two stages: 1% at the time the SBIC obtains an SBA leverage commitment and 2% at the time the leverage is drawn under the commitment. Second, SBICs were required to pay SBA an annual fee equal to 1% of the debentures or participating securities issued after October 1, 1996.

On December 21, 2001, the President signed the Small Business Investment Company Amendments Act of 2001, which changed the annual fee for debentures and participating securities obligated after September 30, 2001.  For debentures, the fee is the lower of (1) a percentage established by SBA that reduces to zero the cost of their purchase and guarantee and (2) 1.38%.  The annual fee is payable on the same terms and conditions as interest on the debentures.

In 1999, SBA introduced an initiative to encourage SBICs to invest in small businesses that are located in, or that provide employment for people residing in, inner cities and rural areas. As outlined in 64 Fed. Reg. 52641 (September 30, 1999), this initiative is known as the low- or moderate-income ("LMI") investments initiative and is a program of narrowly-tailored regulatory and financial incentives for investments by SBICs in qualifying small businesses. Under the initiative, eligible SBICs may issue an SBA-guaranteed deferred-interest debenture and use the proceeds to make equity-type investments in businesses in the targeted areas. There are no LMI debentures in the Pool and SBA expects that LMI debentures will not be pooled for sale. LMI debentures are funded out of the same program level that is available for SBA's guarantee of other debenture leverage. SBA cannot predict the amount of LMI debentures that will be issued in the future, but does not expect it to be significant relative to the amount of standard SBIC debentures.

On December 19, 2007, the President signed Public Law 110-140 which is the Energy Independence and Security Act of 2007 (the "Energy Act"). The Energy Act authorizes eligible SBICs licensed on and after October 1, 2008 to issue SBA-guaranteed deferred interest debentures and use the proceeds to make investments in small business concerns that are primarily engaged in researching, manufacturing, developing, or providing products, goods, or services that reduce the use or consumption of non-renewable energy resources ("Energy Saving Debentures"). There are no Energy Saving Debentures in the Pool and SBA expects that Energy Saving Debentures will not be pooled for sale.

Energy Saving Debentures will be funded out of the same program level that is available for SBA's guarantee of other debenture leverage. SBA cannot predict the amount of Energy Saving Debentures that will be issued in the future, but does not expect it to be significant relative to the amount of standard SBIC debentures.

On February 17, 2009, the President signed the American Recovery and Reinvestment Act of 2009 ("Recovery Act"), which changed the maximum amount of SBA financial assistance available to an SBIC or group of commonly controlled SBICs. The maximum amount of SBA financial assistance available to a group of commonly controlled SBICs was further increased by Division E, Title V, of Pub. L. 114-113, the Consolidated Appropriations Act, 2016. The Recovery Act also requires all SBICs applying for financial assistance to certify that not less than 25% of their future investments will be made in smaller businesses.

On April 27, 2012, SBA published the final rule to create the Early Stage SBIC initiative to focus equity investments in early stage small businesses. Under the initiative, outlined in the final rule (77 Fed. Reg. 25042 (April 27, 2012)) and in the proposed rule (76 Fed. Reg. 76907 (December 9, 2011)), from the effective date of the final rule through September 30, 2016, applicants could apply to become licensed as Early Stage SBICs. Early Stage SBICs are eligible to issue SBA-guaranteed debentures, the proceeds of which are used to make equity-type investments in early stage small businesses. The final rule for the initiative was effective April 27, 2012 and the first Early Stage debenture was issued on September 27, 2013. None of the Early Stage debentures issued under the initiative are included in this pool, and SBA expects that Early Stage debentures issued under the initiative in the future will not be pooled for sale. SBA does not expect the amount of Early Stage debentures issued in the future to be significant relative to the amount of standard SBIC debentures. SBA expects that no Early Stage debentures will be issued after September 30, 2020.

On March 27, 2020, the President signed the Coronavirus Aid, Relief, and Economic Security Act or "CARES Act," Public Law 116-136, which added a temporary new business loan program, titled the "Paycheck Protection Program" ("PPP") to SBA's 7(a) Program. The PPP was created by the CARES Act to provide forgivable loans to eligible small businesses to keep American workers on payrolls during the COVID-19 Outbreak. The CARES Act waived SBA's affiliation rules for certain companies applying for PPP loans, including among others, any business concern that receives financial assistance from an SBIC. On December 27, 2020, the President signed the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act, Public Law 116-260 (the "Economic Aid Act"), which, among other things, was created to provide forgivable loans to certain eligible small businesses that previously received PPP loans (a "second draw PPP loan"). As under the CARES Act, the Economic Aid Act waives SBA's affiliation rules for certain companies applying for second draw PPP loans, including among others, any business concern that receives financial assistance from an SBIC. On March 30, 2021, the President signed into law the PPP Extension Act of 2021, Public Law 117-6, which extended SBA's PPP program authority through June 30, 2021.

On October 19, 2022, the SBA issued a proposed rule to revise the regulations for the SBIC Program. 87 Federal Register 63436 (October 19, 2022). The proposed rulemaking intends to significantly reduce barriers to program participation for new SBIC fund managers and funds investing in underserved communities and geographies, capital intensive investments, and technologies critical to national security and economic development. The proposed rulemaking introduced an additional type of SBIC ("Accrual SBICs") to increase program investment diversification and patient capital financing for small businesses and modernize rules to lower financial barriers to program participation. The proposed rulemaking also incorporates the statutory requirements of the Spurring Business in Communities Act of 2017, Public Law 115-333, which was enacted on December 19, 2018, to prioritize new SBIC licenses in under-licensed states. Stakeholders had until December 19, 2022, to submit comments on the proposed rulemaking to the SBA. SBA expects to issue a final rule later this spring after the March 2023 debenture offering is closed.

*Capital Requirements.*    The current statutory minimum Private Capital requirement for the licensing of new SBICs which issue debentures is $5 million. SBA may license an SBIC with Private Capital between $3 million and $5 million, however, if the applicant demonstrates special circumstances and good cause, has a viable business plan for achieving profitability and has a reasonable timetable for achieving the required level of Private Capital. In general, such SBICs will not be eligible for SBA financial assistance until they meet the required level of Private Capital. However, if such an SBIC is located in either an underlicensed state or a state not served by another SBIC, then the SBIC will be eligible to issue debentures in an amount not to exceed its Private Capital. SBICs licensed before October 1, 1996 that do not meet the current statutory minimum Private Capital requirements are eligible to issue debentures only if: (i) the licensee certifies that at least 50% of the aggregate dollar amount of its financings after October 1, 1996 will be provided to smaller businesses and (ii) SBA determines that allowing the licensee to issue debentures would not create or otherwise contribute to an unreasonable risk of default or loss to the United States Government.

The total principal amount of outstanding debentures guaranteed by SBA and issued by an SBIC may not, in general, exceed at any one time an amount equal to three times such SBIC's Private Capital or $175 million, whichever is less.  In the case of two or more commonly controlled SBICs, the total principal amount of outstanding debentures guaranteed by SBA and issued by the commonly controlled SBICs may not exceed $350 million.

Prior to October 1, 1996, Specialized SBICs investing in venture capital financing may have qualified for financial assistance in an amount equal to four times their Private Capital up to an aggregate of $35 million and, for financial assistance in excess of $35 million, in those ratios applicable to other SBICs. Since October 1, 1996, new financial assistance has been made available to Specialized SBICs only on the same terms and conditions available to other SBICs.

As of September 4, 1992, the definition of Private Capital was broadened to include investments in SBICs by all pension funds, whether public or private; direct investments in an SBIC by a State or local government entity provided such investments do not exceed 33 percent of an SBIC's Private Capital. Specialized SBICs may also include in Private Capital funds indirectly obtained from State or local governments provided that such funds were contributed to the Specialized SBIC prior to October 1, 1996.

*Guaranteed Pools.*    Section 319 (formerly Section 321) of the Act authorizes the formation of pools of SBIC debentures guaranteed by SBA and the issuance of guaranteed participation certificates representing fractional undivided interests in such pools (see "*Description of the Pool of Debentures*" below). As more fully described under "*Full Faith and Credit Guarantees,*" pursuant to Section 319 of the Act the full faith and credit of the United States is pledged to the guarantee by SBA of the timely pass-through of payments of principal and interest due on such debentures.

As envisioned under Section 319, the offering hereby of Guaranteed 5.168% Debenture Participation Certificates, Series SBIC 2023-10 A (the "Certificates"), representing fractional undivided interests in a pool (the "Pool") of SBA-guaranteed SBIC debentures (the "Debentures"), is being undertaken by SBA to provide SBICs with funds for investment activities. The Certificates represent the ninety-fifth issue of 10-year SBA-guaranteed SBIC Debenture Participation Certificates pursuant to Section 319. From September 24, 1986 through September 21, 2022, $30,757,345,000 aggregate principal amount of 10-year SBA-guaranteed SBIC Debenture Participation Certificates were sold in underwritten public offerings. On June 24, 1992, $6,000,000 aggregate principal amount of 5-year SBA-guaranteed SBIC Debenture Participation Certificates were sold in an underwritten public offering. On June 8, 1988, September 28, 1988, December 21, 1988 and December 19, 1990, $38,770,000 aggregate principal amount of 3-year SBA-guaranteed SBIC Debenture Participation Certificates were sold in underwritten public offerings.

Prior to October 1, 1997, Section 320 (formerly Section 322) of the Act required SBA to issue and guarantee SBIC participation certificates at periodic intervals of not less than every three months. Effective October 1, 1997, such requirement was changed to allow for the semi-annual issuance and

guarantee of SBIC participation certificates. Effective April 5, 1999, such requirement was changed again to allow for the annual issuance and guarantee of SBIC participation certificates. SBA currently anticipates the formation of additional pools of 10-year SBA-guaranteed SBIC debentures, on a semi-annual basis, and the semi-annual offering of SBA-guaranteed SBIC debenture participation certificates representing fractional undivided interests in such pools. SBA currently contemplates that semi-annual offerings under the Debenture Program will occur each March and September. The offering of SBA-guaranteed participating securities participation certificates in February 2009 was the final offering under the Participating Security program. SBA's plans with respect to future offerings of certificates representing fractional undivided interests in pools of debentures are subject to change due to such factors as the level of demand for funds by the SBICs and changes in the law, in market conditions and in SBA policy.

## DESCRIPTION OF THE POOL OF DEBENTURES

The Pool is composed of (i) $1,737,675,000 aggregate principal amount of 5.168% Debentures issued by a total of 87 SBICs licensed by SBA pursuant to Section 301 of the Act together with the guarantee agreement pursuant to which timely payment of principal and interest on each Debenture in the Pool will be guaranteed by SBA (the "Guarantee Agreement") and (ii) an account into which payment by the SBICs and SBA with respect to the Debentures will be deposited. The Trustee is the holder of legal title to each Debenture and the funding of the Debentures is being effected by the sale of the beneficial interest in the principal and interest of each Debenture to the holders (the "Holders") of the Certificates. The largest Debenture in the Pool is in the amount of $10,000,000; the smallest Debenture in the Pool is in the amount of $120,000; and the median of the Debentures in the Pool is in the amount of $2,675,000. None of the Debentures in the Pool have been issued by Specialized SBICs.

## DESCRIPTION OF DEBENTURES

*General.*   Each Debenture contained in the Pool has been guaranteed by SBA as to timely payment of principal and interest pursuant to the Guarantee Agreement. Each Debenture requires repayment of its entire principal amount on March 1, 2033. Each Debenture requires payment of interest semiannually on September 1 and March 1 of each year, commencing September 1, 2023 (the "Payment Dates") and bears interest at the rate of 5.168% per annum on the basis of a year of 365 days (regardless of whether the year is composed of 365 or 366 days) for the actual number of days elapsed (including the first day but excluding the last day), from the date of issuance of the Debenture to the first Payment Date and thereafter from Payment Date to Payment Date until its maturity. The SBICs are required to make all scheduled Debenture payments to the Trustee on the applicable Payment Dates.

*Prepayment of Debentures.*   The Debentures are subject to prepayment in whole but not in part as a result of either Optional Prepayments (as defined herein) or Acceleration Events (as defined herein). See "*Optional Prepayment of Debentures*" and "*Acceleration of Debentures.*"

## DESCRIPTION OF PARTICIPATION CERTIFICATES

The Certificates are offered hereby pursuant to Section 319 of the Act and represent fractional undivided interests in a Pool of Debentures. The fractional undivided interest of each Certificate is calculated by dividing the original principal amount stated on the face of the Certificate by the aggregate principal amount of the Debentures as of the date of issuance. The principal amount represented by the Certificates and the aggregate unpaid principal amount of the Debentures will decline proportionately to the extent principal is paid pursuant to Optional Prepayments or Acceleration Payments. Certificates will be issued in original principal amounts of $100,000 or integral multiples of $5,000 in excess thereof.

Payments of principal and interest due under the Debentures will be made by the SBICs to the Trustee. In the event an SBIC fails to make timely payment of principal or interest due under a Debenture, SBA will make payment of such amount of principal or interest directly to the Trustee on or before the Distribution Date, in accordance with SBA's Guarantee. See "*Full Faith and Credit Guarantees.*"

The Trustee will collect payments of principal and interest due on the Debentures (including payments made as the result of an Optional Prepayment, if any) and remit such payments, together with any necessary additional amounts received from SBA under its Guarantee, to the Holders of the Certificates on the Distribution Dates, September 10 and March 10 (unless such day is not a business day, whereupon payment shall be made upon the next applicable business day), of each year, beginning September 10, 2023. The Certificates will accrue interest from the date of pooling of the related Debentures to the first Payment Date and thereafter from Payment Date to Payment Date until maturity. Late payments of interest made by SBICs will be paid directly to SBA as reimbursement for payments pursuant to its Guarantee.

**Book-Entry and Physical Certificates**

The Certificates will be issued in registered form (i) in the form of beneficial interests in one or more restricted global certificates (the "Book-Entry Certificates"), deposited with a custodian for The Depository Trust Company ("DTC" and, together with any successor depository, the "Depository") and (ii) upon request, in certificated form (the "Physical Certificates"). Such a request for Physical Certificates is made to the Trustee or a Participant or Indirect Participant (each as defined below), as applicable. The Book-Entry Certificates and Physical Certificates will be issued in denominations of $100,000 or any integral multiples of $5,000 in excess thereof. The registered holders of the Certificates are referred to as "Holders" and the owners of beneficial interests in the Book-Entry Certificates as "*Book-Entry Owners*."

*Book-Entry Certificates.* Book-Entry Certificates will be deposited with DTC or its custodian and registered in the name of Cede & Co., as nominee of DTC. DTC is a limited purpose trust company organized under the laws of the State of New York, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code and a "clearing agency" registered pursuant to Section 17A of the Securities Exchange Act of 1934, as amended. DTC was created to hold securities for its participating organizations ("Participants") and to facilitate the clearance and settlement of securities transactions between Participants through electronic book-entries, thereby eliminating the need for physical movement of certificates. Participants include securities brokers and dealers, banks, trust companies and clearing corporations. Indirect access to the DTC system also is available to others such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a Participant, either directly or indirectly ("Indirect Participants").

Book-Entry Owners that are not Participants or Indirect Participants of DTC who desire to purchase, sell or otherwise transfer ownership of or other interests in Certificates may do so only through Participants and Indirect Participants. In addition, Book-Entry Owners will receive all distributions of principal of and interest on the Certificates through Participants, as described below. It is anticipated that the only "Holder" of record of the Book-Entry Certificates will be Cede & Co., as nominee of DTC. Book-Entry Owners will not be recognized by the Trustee as Holders, as such term is used in the Trust Agreement, and Book-Entry Owners will be permitted to exercise the rights of Holders only indirectly through DTC and its Participants.

Under the rules, regulations and procedures creating and affecting DTC and its operations (the "Rules"), DTC is required to make book-entry transfers of Book-Entry Certificates among Participants on whose behalf it acts with respect to the Book-Entry Certificates. Participants and Indirect Participants with which Book-Entry Owners have accounts with respect to the Certificates similarly are required to make book-entry transfers and receive and transmit such distributions on behalf of their respective Book-Entry Owners. Accordingly, although Book-Entry Owners will not hold physical certificates representing their interests in Book-Entry Certificates, the Rules provide a mechanism by which Book-Entry Owners will receive payments and will be able to transfer their interests in such Certificates.

*Because DTC can act only on behalf of Participants, who in turn act on behalf of Indirect Participants and certain banks, the ability of a Book-Entry Owner to pledge its interest in Certificates to persons or entities that do not participate in the DTC system, or to otherwise act with respect to such Certificates, may be limited due to the lack of a physical certificate.*

DTC generally will take any action permitted to be taken by a Holder under the Trust Agreement only at the direction of one or more Participants to whose accounts with DTC interests in the Book-Entry Certificates are credited. DTC may take conflicting actions with respect to other undivided interests to the extent that such actions are taken on behalf of Participants whose holdings include such undivided interest.

*None of SBA, SBIC Funding Corporation, the Underwriters or the Trustee will have any liability for any aspect of the records relating to or distributions made on account of beneficial ownership interests in the Book-Entry Certificates held by Cede & Co., as nominee for DTC, or for maintaining, supervising or reviewing any records relating to such beneficial ownership interests.*

*Physical Certificates.* Ownership of certificates may be evidenced by Physical Certificates, registered in the name of the purchaser thereof or any nominee of such purchaser upon request of such purchaser to the Trustee or the purchaser's Participant or Indirect Participant, as applicable. Physical Certificates will also be issued to a Book-Entry Owner (or its nominee) at any time (subject to the rules and procedures of DTC) upon the request of such Book-Entry Owner that its interest in a Book-Entry Certificate be exchanged for a Physical Certificate or Certificates.

The holder of any Physical Certificate may exchange the same in whole or in part (in an original principal amount equal to $100,000 or any integral multiple of $5,000 in excess thereof) for other Physical Certificates or, if such holder is entitled to hold an interest in Book-Entry Certificates (subject to the rules and procedures of DTC), for a beneficial interest in Book-Entry Certificates by surrendering such Physical Certificate to the Trustee (and completing the form of transfer on the reverse thereof) together with any certificate or other required documentation. A nominal charge will be imposed for any registration of transfer or exchange, and the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge imposed in connection therewith. See "*Trust Agreement — Registration of Transfer and Exchange of Certificates.*"

*Distributions.* Distributions of principal of and interest on the Book-Entry Certificates will be made to Cede & Co. as the registered owner of the Book-Entry Certificates. Book-Entry Owners will receive all distributions of principal and interest through Participants. It is expected that Cede & Co., upon receipt of any distribution of principal or interest in respect of a Book-Entry Certificate held by it, as nominee for DTC, will immediately credit Participants' accounts with amounts proportionate to their respective beneficial interests in such Book-Entry Certificate as shown on the records of Cede & Co. It is also expected that distributions by Participants to Book-Entry Owners will be governed by standing instructions and customary practices, as is now the case with securities held for the accounts of customers registered in the names of nominees for such customers. Such distributions will be the responsibility of such Participants. Under a book-entry format, therefore, Book-Entry Owners may experience some delay in their receipt of payments since such payments will be forwarded by the Trustee to Cede & Co., and by Cede & Co. to Participants, which thereafter will forward them to Indirect Participants or Book-Entry Owners.

Holders of Certificates evidencing in the aggregate a minimum original principal amount of $1 million shall be paid by wire transfer for the account of such person in immediately available funds to a commercial bank located in the continental United States having appropriate facilities therefor upon written request received by the Trustee on or before the Record Date, as defined herein, prior to the applicable Distribution Date. For other Holders, distributions on the Certificates will be made by check mailed to the address of the person in whose name the Certificate is registered at the close of business on the Record Date.

## YIELD CONSIDERATIONS

The effective yield to Holders will be reduced below the yield otherwise produced by the rate of interest payable on the Debentures because the distribution of interest that accrues on the Debentures in respect of any semiannual interest period ending September 1 or March 1, as the case may be, will not

Case 2:20-cv-00041-DCLC-CRW    Document 105-3    Filed 09/27/24    Page 128 of 141
PageID #: 3715

be made until the related Distribution Date, which occurs on September 10 or March 10. An Optional Prepayment or Acceleration Payment will include all interest to the relevant Payment Date and will be passed through pro rata to the Holders on the Distribution Date for such Payment Date.

## FULL FAITH AND CREDIT GUARANTEES

Pursuant to Section 303 of the Act, SBA guarantees the timely payment of principal and interest due under each Debenture (the "Section 303 Guarantee"). The Section 303 Guarantee is stated in the Guarantee Agreement, executed on behalf of the United States by an SBA official, which covers the Debentures. The full faith and credit of the United States is pledged to the Section 303 Guarantee. In the event that an SBIC fails to make payment of principal or interest due upon its Debenture on a Payment Date, SBA, pursuant to the Section 303 Guarantee, will make payment of such principal or interest on or before the Distribution Date for such Payment Date.

Pursuant to Section 319 of the Act, SBA guarantees to the Holders the timely pass-through of payments of principal and interest actually received on the Debentures by the Trustee (the "Section 319 Guarantee"). The Section 319 Guarantee is stated on the Certificates and is executed on behalf of the United States by the Administrator or Acting Administrator of SBA. The full faith and credit of the United States is pledged to the Section 319 Guarantee.

Collectively, the Section 303 Guarantee and the Section 319 Guarantee form SBA's guarantee (the "Guarantee") of timely payment to the Holders of principal and interest due on the Debentures. However, in light of the Section 303 Guarantee, it is anticipated that payments by SBA under the Section 319 Guarantee will not be necessary. In the event that a Debenture is prepaid as a result of Optional Prepayment or is paid upon an Acceleration Event, SBA's Section 319 Guarantee will be reduced in proportion to the amount of principal and interest such prepaid Debenture represents in the Pool upon the pass-through of such payments to the Holders.

Should there be any change in the status of SBA as an independent agency or in the Program, the SBA Guarantee and the full faith and credit of the United States pledged to the Guarantee on the Certificates will not be altered or impaired.

The Guarantee is backed by the full faith and credit of the United States and will be performed through payments from the Business Loan Guarantee Financing Account, which is backed by SBA's permanent and definite authority to borrow from the United States Treasury to satisfy all outstanding obligations of SBA.

## OPTIONAL PREPAYMENT OF DEBENTURES

Debentures issued between September 24, 1986 and March 25, 1992 were subject to prepayment (an "Optional Prepayment") in whole but not in part at the option of an SBIC at a declining premium after the first five years from the date of issuance. Debentures issued between September 24, 1986 and March 25, 1992 could not be prepaid by an SBIC at its option during the first five years of their terms. Debentures issued between June 24, 1992 and September 12, 2006 were subject to an Optional Prepayment, in whole but not in part, on any Payment Date, at the option of an SBIC at a declining premium.

SBA changed the Optional Prepayment terms for Debentures issued on or after September 13, 2006 to allow for Optional Prepayments on any Payment Date without requiring a prepayment premium. For Debentures issued on or after September 13, 2006, an SBIC may, without prior notice, elect an Optional Prepayment, in whole, but not in part, on any Payment Date at a prepayment price of 100% of the principal amount of the Debenture being prepaid, together with interest accrued thereon to the Payment Date. Therefore, the past Optional Prepayment experience of Debentures issued between September 24, 1986 and March 25, 1992 and Debentures issued between June 24, 1992 and September 12, 2006 may not be relevant or material to this Offering. Investors should note that rapid rates of Optional Prepayments on Debentures are likely to coincide with periods of low prevailing interest

rates, and therefore, the yields at which an investor may be able to reinvest amounts received from Optional Prepayments may be lower than the interest rate on the Debentures subject to such Optional Prepayments. Conversely, slow rates of Optional Prepayments on the Debentures are likely to coincide with periods of high prevailing interest rates, and therefore, the amount of Optional Prepayments available to an investor for reinvestment may be relatively low.

*Investors should be advised that the prepayment experience of Debentures cannot be predicted and will be influenced by a variety of factors.*

The Trustee will distribute all Optional Prepayments pro rata to the Holders of the Certificates on the Distribution Date, as defined herein, for such Payment Date.

**Additional statistical information on Optional Prepayments can be found in the prepayment schedules on the SBA's website under the heading "Debenture Prepayment Schedule" at:** https://www.sba.gov/document/support-debenture-prepayment-schedule

## ACCELERATION OF DEBENTURES

*Acceleration Event.* A default by an SBIC as specified in SBA's regulations may result in either an automatic or a discretionary acceleration of such SBIC's Debenture. Upon the occurrence of an SBA administrative action to transfer the applicable SBIC from operating status into liquidation status (an "Acceleration Event"), SBA will pay to the Trustee 100% of the principal amount of such Debenture together with interest accrued to the applicable Payment Date (the "Acceleration Payment"). The Acceleration Payment will be made on or before the Distribution Date for such Payment Date. The Trustee will distribute such Acceleration Payments pro rata to the Holders on the Distribution Date for such Payment Date. Upon an acceleration, the principal amount of the Debenture and interest accrued to the next Payment Date following such acceleration shall be immediately due and payable to SBA. Payments, if any, made by an SBIC with respect to an acceleration will be made directly to SBA.

Despite an event of default which could trigger a discretionary acceleration, SBA may, in its sole discretion, refrain from transferring an SBIC into liquidation status and thereby avoid or delay an Acceleration Event. See "— *Procedure for Acceleration of Debentures.*" However, such a decision by SBA will not affect SBA's obligation to make all payments as due under such Debenture pursuant to its Guarantee in the event of an SBIC's failure to make timely payments. See "— *Full Faith and Credit Guarantees.*"

*Procedure for Acceleration of Debentures.* SBA's Office of SBIC Operations continually monitors the condition and performance of SBICs through established reporting systems, examination reports of SBA's Office of SBIC Examinations, correspondence with the SBICs and reports filed by SBICs.

SBA may, in its sole discretion, declare an acceleration of the debenture upon the occurrence of any one or more of the following: (i) an SBIC commits a fraudulent act which causes detriment to SBA's position as a creditor or a guarantor; (ii) an SBIC makes any transfer or incurs any obligation that is fraudulent under the terms of 11 U.S.C. 548 (the Bankruptcy Code); (iii) an SBIC willfully engages in self-dealing or other conflicts of interest; (iv) an SBIC willfully violates any substantive provision of the Act or any substantive regulation promulgated thereunder; (v) after being notified of a curable event of default, an SBIC engages in similar behavior which results in another occurrence of the same default; (vi) an SBIC transfers a license or willfully transfers ownership or control of the SBIC; (vii) after repeatedly failing to comply with any non-substantive provision of the Act or the regulations promulgated thereunder, an SBIC also fails to take steps to accomplish an action required by SBA; (viii) an SBIC fails to notify SBA as soon as it knows or reasonably should have known that an event of default exists; (ix) an SBIC fails to notify SBA within ten days of a declaration of default under any non-SBA indebtedness; (x) an SBIC pays fees in excess of those permitted by SBA; (xi) an SBIC makes improper distributions; (xii) an SBIC fails to make timely payment on any obligation held or guaranteed by SBA; (xiii) an SBIC fails to maintain the required minimum capital; (xiv) an SBIC is capitally impaired; (xv) an SBIC defaults under non-SBA

Case 2:20-cv-00041-DCLC-CRW   Document 105-3   Filed 09/27/24   Page 130 of 141 PageID #: 3717

indebtedness in excess of $100,000 unless contested by the SBIC in good faith by appropriate proceedings; (xvi) an SBIC fails to perform under any obligation held or guaranteed by SBA under any agreement with SBA; (xvii) an SBIC fails to comply with any substantive provision of the Act or any substantive regulation promulgated thereunder; or (xviii) an SBIC fails to maintain required investment ratios. Before an acceleration may be declared for any of the events of default set forth in (x) through (xviii) above, SBA must provide the SBIC with a cure period of not less than fifteen days. In addition, before any acceleration is declared, SBA's standard operating procedures call for the transfer of the SBIC from operating status to liquidation status.

When the Office of SBIC Operations determines that an SBIC Debenture is in default, the staff may seek to resolve the problems through cooperative efforts with the SBIC. In such circumstances, SBA will forbear the acceleration of SBA-held or -guaranteed debt during the work-out period. SBA will make Guarantee Payments with respect to the Debentures during this forbearance period and will seek to recover those payments from the SBIC. There is no set time limit for the forbearance. The SBA decides how long to continue the period of forbearance based upon the facts of each case. If efforts to cure the default fail, SBA will transfer the SBIC from operating status into liquidation status in order to protect the creditor position of SBA.

Upon a determination by SBA to transfer an SBIC into liquidation status, jurisdiction over the SBIC is transferred to the Office of SBIC Liquidation whereupon the SBIC is considered in liquidation status. At this point, an acceleration letter is sent to the SBIC citing violations and defaults, making demand for payment of the accelerated obligations and advising the SBIC that it has been transferred to liquidation status. SBA will make a Guarantee Payment of the outstanding principal and accrued interest with respect to such SBIC Debenture to the next scheduled Payment Date on or before the next scheduled Distribution Date for such Payment Date.

Notwithstanding the above, SBA regulations provide that a Debenture is automatically accelerated without prior notice to the defaulting SBIC whenever: (i) an SBIC is insolvent; (ii) not having sufficient property to pay all of its debts, an SBIC makes a voluntary assignment thereof; or (iii) a petition is filed in commencement of any bankruptcy or reorganization proceeding, receivership, dissolution or other similar creditors' rights proceeding, by or against an SBIC, whichever event shall first occur. Whenever SBA learns of the occurrence of such an event of default it must transfer the SBIC into liquidation status. In such event, the administrative procedures described in the preceding paragraph are followed except that SBA may exercise no discretion with respect to the decision to liquidate the SBIC. Likewise, SBA will make a Guarantee Payment of the outstanding principal and accrued interest with respect to such SBIC Debenture to the next scheduled Payment Date on or before the next scheduled Distribution Date for such Payment Date.

SBA applies the same procedures and standards for acceleration of a Specialized SBIC's Debenture as it applies to Debentures issued by other than Specialized SBICs.

The anticipated rate of prepayment of principal, if any, to the Holders of the Certificates as a result of Acceleration Events cannot be determined. Acceleration of a Debenture may result from a variety of factors including the occurrence of any one or more of the events of default set forth above, none of which are predictable. Commencing in May of 1998, SBIC debentures are funded for an Interim Period of not more than twenty-nine weeks prior to pooling. See "*Description of the SBIC Program — Interim Funding*." Although acceleration may occur during the Interim Period, no debentures were accelerated during their related Interim Period as of March 7, 2023.

**Additional statistical information on Acceleration Events can be found in the prepayment schedules on the SBA's website under the heading "Debenture Prepayment Schedule" at:** https://www.sba.gov/document/support-debenture-prepayment-schedule

## DESCRIPTION OF PROGRAM MANAGEMENT AND OPERATION

Section 102 of the Act sets forth the policy of the Congress to establish the SBIC program to stimulate and supplement the flow of private equity capital and long-term loan funds to small business concerns. Pursuant to the Act and the regulations established thereunder, SBA provides financial assistance to SBICs through the purchase or guarantee of SBIC debentures ("Leverage").

*Management of SBA.* The Administrator of SBA, its Deputy Administrator, its Chief Counsel for Advocacy, and its Inspector General are appointed by the President of the United States with the advice and consent of the Senate. The major small business assistance programs of SBA and the general administration of SBA are managed by officials appointed by the Administrator. The Presidential appointees together with the major program managers establish SBA policy with respect to operations under the Small Business Act and the Act and applicable regulations. Career personnel at various levels constitute the middle management of SBA and make the preponderance of program operations decisions in conformance with the applicable laws, regulations, and policies. Additionally, the Office of Management and Budget guides SBA's policies directly through the senior management officials and through circulars issued from time to time. The SBA Inspector General audits the SBIC program and the administration of the Debenture Program within SBA.

*Investment Division of SBA.* The Investment Division of SBA, which is headed by the Associate Administrator for Investment, is the organizational element within SBA with the authority and responsibility for administering the SBIC Program. Within the Investment Division is the Office of SBIC Operations, headed by a Director who supervises and directs Area Chiefs, all located in Washington, D.C. Each Area Chief supervises and directs the activities of several financial analysts. This Office regulates and provides leverage to SBICs. Also within the Investment Division are the Office of Licensing and Program Standards, which is responsible for licensing new SBICs and for the development of regulations for SBICs, the Office of SBIC Liquidation, which is responsible for liquidating SBICs, and the Office of SBIC Examinations, which is responsible for examining the books and records of the operating SBICs.

*Underwriting Standards and Procedures.* Consistent with the legislative intent of the Act, SBA grants Leverage for the purpose of providing financing to small business concerns that are not dominant in their fields and that are unable to obtain equity and long-term debt financing on reasonable terms. See "*Description of the SBIC Program.*"

Section 310 of the Act, as amended by Public Law 100-590, requires that each SBIC be examined at least every two years, except that, under certain circumstances, SBA may waive the examination for up to one additional year. As a general policy, SBA will not process an SBIC's application for Leverage if the SBIC has not been examined by SBA's Office of SBIC Examinations during the 24-month period immediately preceding the date of the application. However, because of resource limitations, for SBICs that have been examined at least once, SBA may determine that prior experience with an SBIC and other relevant circumstances justify processing an application where the SBIC has not been examined during the 24-month period immediately preceding the date of the application. Newly licensed SBICs may be leveraged prior to any examination by the Office of SBIC Examinations. It is the policy of SBA not to approve Leverage where there is an unanswered alleged regulatory violation, where there is a regulatory violation on which SBA and the SBIC have not agreed to a compliance plan, or where SBA and the SBIC disagree on the facts surrounding such an allegation or the interpretation of the facts as they relate to the regulation alleged to have been violated. However, SBA may accept an application under these circumstances if ample justification exists. An applicant SBIC's capital adequacy, asset quality, management performance, earnings capability, and liquidity characteristics are the principal measurements that are to be used in reaching the financial decision to approve Leverage.

SBICs present different degrees and types of risk and vary widely in their characteristics, many of which could affect the performance of an SBIC in meeting its payment obligations under a debenture. These characteristics include age (newly licensed or seasoned), form of business (corporation or partnership), location, type of financing (loan oriented, equity oriented or balanced), stage of financing,

industry preference, size, management types, structure (proximity of management to ownership), and ownership (individual, financial parent, institutional, foreign, domestic, passive or active).

The Act requires a certain degree of diversification of an SBIC's portfolio. In general, without the approval of SBA, Specialized SBICs with outstanding Leverage and other Leveraged SBICs may not invest an amount exceeding 30% of their Private Capital in any single enterprise. An SBIC's sources of liquidity are generally limited to the following: current revenues from and amortization of assets, maturity and redemption of assets, sales of assets, collections of receivables, Private Capital increases, new and refunding borrowings from SBA, and cash and idle fund balances.

*SBA believes the possible risks presented by these factors are so interrelated as not to be separately quantifiable. Accordingly, no effort has been made to isolate or compare the effects of any of these factors on the overall risk in the granting of Leverage. The impact of this risk to investors is that each Debenture is subject to acceleration and payment at 100% of its principal amount at any time prior to the stated maturity upon an Acceleration Event. See "Acceleration of Debentures."*

*Use of Proceeds of Debentures.* SBICs use the proceeds of Debentures principally in combination with their Private Capital to invest in or make loans to small business concerns. SBICs may also use the proceeds of Debentures for operating purposes to provide interim funds during periods in which liquidity is not available from portfolio flows or from the sale of investments. SBICs are permitted, however, under certain circumstances, to develop bank lines of credit or other sources of liquidity so that it will not be necessary for them to depend upon the issuance of the Debentures for short-term needs. See "*Description of the SBIC Program.*"

## TRUST AGREEMENT

The Certificates will be issued pursuant to a Trust Agreement dated as of February 1, 1997 (as amended from time to time, the "Trust Agreement"), among SBA, The Bank of New York Mellon, as Trustee, and SBIC Funding Corporation, as Fiscal Agent (as defined below). Holders will be entitled to the benefits of such Trust Agreement to the full extent provided therein. No Holder is intended to have, nor shall any Holder have any right by virtue of any provision of the Trust Agreement, to institute any suit, action or proceeding in equity or at law upon or under or with respect to the Trust Agreement. The rights of a Holder against SBA under the Guarantee are direct, and not through the Trustee. The responsibilities of the Trustee, summarized below, are limited to those set forth in the Trust Agreement, and no further responsibilities should be inferred. All references to time herein refer to New York City time.

The Trust Agreement will be available for reasonable inspection and copying by any Holder or its designee, at such person's expense at the Trustee's Corporate Trust Office, 240 Greenwich, FL7E New York, New York 10286 Attention: Corporate Trust Services (ABS).

*Purchase, Pooling and Exchange of Debentures; Issuance of Certificates.* The Underwriters have agreed to purchase the Debentures from the SBICs together with the Guarantee Agreement of SBA and to combine the Debentures and the Guarantee Agreement into a Pool; pursuant to a Supplement to the Trust Agreement, the Underwriters will then assign to the Trustee without recourse all of their right, title and interest in and to such Debentures and Guarantee Agreement. In exchange therefor, SBA, through its agent, The Bank of New York Mellon, acting in its capacity as Trustee, will issue Certificates representing fractional undivided interests in such Pool to or upon the order of the Underwriters.

*SBA to Act as Servicer.* As guarantor of the Debentures, SBA will service and administer the Debentures and will have full power and authority, acting alone, to do any and all things in connection with such servicing and administration which it may deem necessary or desirable, and will have the sole and exclusive right to take action and assert claims with respect to the Debentures. Such servicing may include enforcing of representations, warranties and covenants, collecting payments, accelerating maturity in the event of a default, taking action to enforce payments and otherwise exercising the rights and pursuing the remedies available to a holder of a Debenture. Without limiting the generality of the

Case 2:20-cv-00041-DCLC-CRW    Document 105-3    Filed 09/27/24    Page 133 of 141
PageID #: 3720

foregoing, SBA may execute and deliver, on behalf of the Trustee and the Holders, any and all instruments of satisfaction or cancellation, or of partial or full release or discharge and all other comparable instruments, with respect to the Debentures.

SBA may perform its servicing obligations through such entity as it may designate, provided that at the time of such designation SBA shall give written notice to the Trustee, signed by an authorized official, of such designation.

*Collection of Debenture Payments — Certificate Account.* The Trustee will receive the payments due on the Debentures (other than payments made on a Debenture by an SBIC after the Trustee has received notice of an Acceleration Event with respect to such Debenture) and deposit such payments in the Certificate Account as described hereinafter. SBA has directed SBIC to make such payments, including any Optional Prepayments, directly to the Trustee by noon on the relevant Payment Date. No later than 2:00 P.M. on the third business day preceding each Distribution Date, the Trustee will notify SBA in writing of any required Guarantee Payment and the amount thereof. SBA will make any required Guarantee Payment by wire transfer to the Certificate Account, as defined herein, not later than 10:00 A.M. on the relevant Distribution Date.

The Trustee will establish and maintain a separate non-interest-bearing trust account (the "Certificate Account") into which the Trustee will deposit the following payments and collections received by it in respect of principal of and interest on the Debentures: (i) all regular interest payments on the Debentures, including those made by SBA pursuant to the Guarantee Agreement; (ii) all payments on account of principal on the Debentures at their stated maturity, including those made by SBA pursuant to the Guarantee Agreement; (iii) all Optional Prepayments; and (iv) all Acceleration Payments.

The Trustee will not deposit into the Certificate Account any payment received from an SBIC on account of an Optional Prepayment unless such payment conforms to all of the requirements specified in the Trust Agreement for an Optional Prepayment; provided, however, that the receipt of any non-conforming payment will not in any way reduce the obligation of SBA under the Guarantee Agreement. Any late interest payments made by an SBIC and payments on a Debenture, if any, made by an SBIC after an Acceleration Event will be made directly to SBA and will not be deposited into the Certificate Account or otherwise constitute part of the Pool.

*Distributions to the Holders.* On each Distribution Date, the Trustee will distribute to the Holders of record as of the close of business on the first calendar day of the month in which the Distribution Date occurs (the "Record Date"), other than as described herein respecting the final distribution, each such Holder's pro rata share (based on the aggregate fractional undivided interest represented by Certificates held by such Holder) of all amounts credited to the Certificate Account relating to the Pool as of 10:00 A.M. on the applicable Distribution Date.

*Statements to the Holders.* At the time of each distribution, the Trustee will furnish to each Holder a statement setting forth the following information with respect to the Certificates owned of record by such Holder:

     (i)   the amount of such distribution allocable to principal (including a separate breakdown of any Optional Prepayments and Acceleration Payments);

    (ii)   the amount of such distribution allocable to interest; and

   (iii)   the aggregate amount of the Holder's fractional undivided interest in the aggregate unpaid principal amount of Debentures in the Pool as of the opening of business on the business day next succeeding the Distribution Date, after giving effect to payments on such Debentures due on the Distribution Date and distributed either as collections or as Guarantee Payments.

In addition, within a reasonable period of time after the end of each calendar year, the Trustee will furnish a report to each Holder at any time during such calendar year as to the aggregate of amounts reported pursuant to (i) and (ii) above for such calendar year or, in the event such person was a Holder of record during a portion of such calendar year, for the applicable portion of such year.

*Information Concerning Acceleration Events and Optional Prepayments.* The Trustee will maintain a record of the aggregate principal amount of all Debentures which have been subject to an Acceleration Event or Optional Prepayment (to the extent the Trustee has been notified by SBA of such Acceleration Event or Optional Prepayment). Such information is generally available from the Trustee to Holders of Certificates by dialing (212) 815-6258 during the Trustee's normal business hours.

*Waivers and Modifications of Debentures.* SBA may waive, modify or vary any term of any Debenture or consent to the postponement of strict compliance with any such term or in any manner grant indulgence to any SBIC; provided that SBA may not, without the consent of all Holders, permit any modification with respect to any Debenture that would decrease the interest rate, change the terms of prepayment of principal or interest, reduce the outstanding principal amount (except by reason of actual payment of all principal due thereon), change the final maturity date on such Debenture or terminate or otherwise reduce the benefits of the Guarantee Agreement with respect thereto. See "*Acceleration of Debentures.*" Without the consent of all Holders, no change in the payment schedule of any Debenture will alter or affect SBA's Guarantee of timely payment of principal and interest on such Debenture in accordance with the Guarantee Agreement. See "*Full Faith and Credit Guarantees.*"

*Registration of Transfer and Exchange of Certificates.* The Trustee has been appointed Certificate Registrar for the purpose of registering the ownership of Certificates and any transfers and exchanges of Certificates as herein provided. The Trustee will maintain at its Corporate Trust Office a Certificate Register in which, subject to such requirements as it may prescribe, the Trustee will provide for the registration of the Certificates and of transfers and exchanges of Certificates.

A service charge equal to a reasonable fee for the expenses of the Trustee will be charged to the person presenting a Certificate for transfer or exchange, as the case may be, for any registration of transfer or exchange of such Certificate. SBA or the Trustee may require payment of a sum sufficient to cover any tax or governmental charge that may be imposed in connection with any transfer or exchange of Certificates. All fees charged by the Trustee are subject to SBA's prior written approval. The initial fee for transfer or exchange of a Certificate is $9.50 unless any part of the transaction is handled by mail, in which case the initial fee is $14.50.

*Disclosure Requirement.* The Act requires each seller of a Certificate, prior to any sale thereof, to disclose to a purchaser information on the terms, conditions and yield of such Certificate. Each Holder, by virtue of its acquisition of a Certificate, will be deemed to agree to such requirements.

*Persons Deemed Owners.* Prior to due presentation of a Certificate for registration of transfer, the Trustee and any agent of the Trustee may treat the person in whose name any Certificate is registered as the owner of such Certificate for the purpose of receiving distributions as described herein and for all other purposes whatsoever, and neither the Trustee nor any agent of the Trustee shall be affected by notice to the contrary.

*Amendments to the Trust Agreement.* The Trust Agreement may be amended from time to time by SBA, the Trustee and the Fiscal Agent, without the consent of any of the Holders; provided, however, that no such amendment shall reduce in any manner the amount of, or delay the timing of, payments received on Debentures, including Guarantee Payments, which are required to be distributed on any Certificate without the consent of the Holder of such Certificate. No amendment, modification, waiver or consent affecting any provision of the Trust Agreement by the parties thereto shall adversely affect the rights of the Holder of any Certificate outstanding at the time of such amendment, modification, waiver or consent.

*Termination.*   The respective obligations and responsibilities of SBA and the Trustee with respect to the Pool (other than the obligation of SBA to make payments to Holders as hereafter set forth) shall terminate upon the final payment of the last Debenture in the Pool, whether at the stated maturity of the Debentures, upon an Acceleration Payment or Optional Prepayment of all Debentures constituting the Pool or otherwise.

With respect to any termination on a date other than the stated maturity of the Debentures, the Trustee will give notice of any such termination by letter to the Holders (with a copy thereof to SBA) mailed not later than the fifth business day subsequent to the Payment Date on which all outstanding principal and accrued interest for the Debentures remaining in the Pool have been paid in full as a result of Optional Prepayments, are payable by SBA as a result of Acceleration Events, or a combination of both. Such notice will specify that final payment will be made from the Certificate Account upon presentation and surrender of Certificates at the Corporate Trust Office of the Trustee, on or after the Distribution Date for such Payment Date. If termination occurs upon the stated maturity of the Debentures, no notice will be given and final payment will be made from the Certificate Account on the next following Distribution Date upon presentation and surrender of Certificates at the Corporate Trust Office of the Trustee.

Any monies held by the Trustee for the payment of any Certificate upon termination which remain unclaimed by any Holder for six months after the date the final payment was made, will be repaid to SBA. Holders must thereafter look to SBA for payment of such amounts, and all liability of the Trustee with respect to such amounts will thereupon cease.

## TRUSTEE

The Bank of New York Mellon, as successor in interest to The Bank of New York, which is in turn the successor in interest to JPMorgan Chase Bank, N.A., a national banking association organized under the laws of the United States, or any successor trustee appointed under the Trust Agreement will serve as trustee (the "Trustee") and will perform such duties as specified in the Trust Agreement and as described herein. The Corporate Trust Office of The Bank of New York Mellon where its duties under the Trust Agreement shall be performed is located at 240 Greenwich Street, FL7E, New York, New York 10286 Attention: Corporate Trust Services (ABS).

## SBIC FUNDING CORPORATION

The SBIC Funding Corporation is a District of Columbia not-for-profit corporation organized to serve as the fiscal agent ("Fiscal Agent") of SBA to oversee the implementation and continued operation of the Program. SBIC Funding Corporation has been appointed by the SBICs participating in the Program to serve as their selling agent ("Selling Agent"). The SBIC Funding Corporation was organized by the Small Business Investor Alliance, a trade association based in the Washington, D.C. area which represents the interests of the SBIC industry before SBA, Congress, and the financial community.

SBIC Funding Corporation, as Fiscal Agent, provides advice and counsel to SBA relating to the development and conduct of the Program. In this regard, the Fiscal Agent consults with the SBIC industry, monitors the financial markets, makes cost reduction recommendations to SBA and assists in assuring that all regulatory requirements of the Program are met. SBIC Funding Corporation, as Selling Agent, reviews and evaluates on a continuing basis underwriting candidates for the Program, manages the offerings of Certificates under the Program, which includes participation in the preparation of appropriate documentation and the acquisition of necessary regulatory clearances, and executes, with SBA's written approval, agreements for the purchase of the Debentures and the issuance of the Certificates. For its services to the Program, the SBIC Funding Corporation is compensated by the SBICs and from a fee levied by SBA upon the funding of the Debentures pursuant to Section 319 of the Act.

## LEGALITY OF INVESTMENT

The Certificates are acceptable as security for the deposit of public monies subject to the control of the United States or any of its officers, agents or employees, and are eligible as collateral for Treasury Tax and Loan Accounts. Under federal law, national banks and state banks which are members of the Federal Reserve System may deal in, underwrite, and purchase for their own account Certificates without regard to any limitation based on capital and surplus.

The Certificates are eligible as security for advances to member banks by Federal Reserve Banks.

## TAX STATUS

The following is a general discussion of certain of the anticipated U.S. federal income tax consequences of the purchase, ownership and disposition of the Certificates under the Internal Revenue Code of 1986, as amended (the "Code"), without consideration of the particular facts and circumstances of each prospective investor's special tax situation. This discussion addresses only a beneficial owner of a Certificate that acquires the Certificate at original issuance and that holds the Certificate as a capital asset (generally, property held for investment) for U.S. federal income tax purposes, and does not address a taxpayer that is not a "United States Person" (as defined below). This discussion is based on interpretations of laws, regulations, rulings and decisions, all of which are subject to change. Any such change may be applied retroactively and may adversely affect the U.S. federal income tax consequences described herein. Such discussion is not binding on the IRS, which may take a contrary view as to the matters discussed herein.

**This discussion is not intended or written to be used, and cannot be used, for the purpose of avoiding U.S. federal income tax penalties that may be imposed. Accordingly, each prospective investor is urged to consult its own tax advisor with respect to the U.S. federal income tax consequences of holding a Certificate, as well as any consequences arising under the laws of any other taxing jurisdiction.**

*United States Person.*     A "United States Person" is a citizen or resident of the United States, a corporation, partnership or other entity organized in or under the laws of the United States or state thereof, including, for this purpose, the District of Columbia (other than a partnership that is not treated as a United States Person under any applicable Treasury regulations), an estate the income of which is includible in gross income for U.S. federal income tax purposes regardless of its source, or a trust if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States Persons have the authority to control all substantial decisions of the trust. Notwithstanding the preceding sentence, to the extent provided in Treasury regulations, certain trusts in existence on August 20, 1996, and treated as United States Persons prior to such date, and that timely elect to continue to be treated as United States Persons shall also be United States Persons.

*The Pool.*     The IRS has issued a number of revenue rulings regarding the characterization, for U.S. federal income tax purposes, of pooling arrangements. Based on these rulings, the Pool will be classified for such purposes as a "grantor" trust of which the beneficial owners of Certificates are the grantors. As a consequence, the Pool will not be subject to federal income tax, and each beneficial owner of a Certificate will be treated for U.S. federal income tax purposes as the beneficial owner of a fractional undivided interest in the corpus of the Pool and the income and deductions allocable to such interest. Each beneficial owner of a Certificate will be required to report on its federal income tax returns, consistent with its method of accounting, such income, including interest.

The Trustee will furnish to each Holder a statement with respect to each distribution, setting forth the amount of such distribution allocable to principal and interest and the source thereof. In addition, the Trustee will furnish, within a reasonable time after the end of each calendar year, to each person who was a Holder at any time during such year, a statement setting forth such Holder's share of interest received.

*Characterization of Certificates.* Ownership of the Certificates will be treated as ownership, for U.S. federal income tax purposes, of (i) "obligations of the United States" within the meaning of Section 7701(a)(19)(C)(ii) of the Code, relating to the definition of federal and domestic savings and loan associations and certain other financial institutions; (ii) "government securities" within the meaning of Section 851(b)(3) of the Code, relating to the definition of regulated investment companies; and (iii) "government securities" within the meaning of Section 856(c)(4)(A) of the Code, relating to the definition of real estate investment trusts. Income from the Certificates, for U.S. federal income tax purposes, will be treated as income from "obligations of the United States or of any agency or instrumentality thereof" within the meaning of Section 895 of the Code, relating to the exemption from withholding tax for foreign central banks of issue in certain circumstances, but will not be treated as interest on "obligations secured by mortgages on real property or interests in real property" within the meaning of Section 856(c)(3)(B) of the Code, relating to the definition of real estate investment trusts.

*State and Local Taxes.* Under Title 31, Section 3124 of the United States Code, as amended, "obligations of the United States" are exempt from state, municipal or local taxes, other than estate or inheritance taxes and nondiscriminatory taxes or other nonproperty taxes imposed on corporations. The United States Supreme Court in 1987 held that certain federally guaranteed trust or pool certificates should not be treated as "obligations of the United States" for purposes of Section 3124, principally because such certificates are secondary, and not primary, obligations of the United States. *Rockford Life Insurance Co. v. Illinois Department of Revenue,* 482 U.S. 182 (1987). The Certificates issued by the agent of SBA, which is an instrumentality of the United States, arguably can be distinguished from the guaranteed certificates under consideration in *Rockford*, which were issued by a private entity. However, the Certificates may be considered to be merely guaranteed by SBA and not clearly direct and certain obligations of SBA. At least one court has held that the certificates do not constitute "obligations of the United States" for purposes of Section 3124. *Sumitomo Trust & Banking Co. v. Commissioner of Taxation And Finance,* 720 N.Y.S. 2d 251 (2001). Accordingly, although there are some factual distinctions between the Certificates and the guaranteed certificates in *Rockford*, no opinion is expressed as to the treatment of the Certificates under Section 3124. Nevertheless, the laws of particular states may specifically exempt federally guaranteed securities from some state and local taxes, and prospective investors are urged to consult their own tax advisors to determine the tax treatment of the Certificates in their states.

*Sale or Other Disposition.* If a beneficial owner of a Certificate sells, exchanges or otherwise disposes of a Certificate, the beneficial owner of the Certificate will recognize gain or loss for U.S. federal income tax purposes in an amount equal to the difference between the amount realized by the beneficial owner upon the sale, exchange or other disposition and the beneficial owner's adjusted tax basis in the Certificate. The adjusted tax basis of a Certificate to a particular beneficial owner generally will equal the beneficial owner's cost for the Certificate, increased by any discount previously included by such beneficial owner in income with respect to the Certificate and decreased by the amount of principal payments previously received by such beneficial owner with respect to the Certificate. Any such gain or loss will be capital gain or loss if the Certificate was held as a capital asset, except for gain representing accrued interest and accrued discount not previously included in income. Capital losses generally may be used only to offset capital gains.

*Backup Withholding.* A backup withholding tax may be imposed on any reportable payment unless the recipient (i) has furnished under penalties of perjury an accurate taxpayer identification number or (ii) is exempt from the backup withholding provisions of the Code. Corporations and certain other entities are, and individuals are not, exempt from the backup withholding provisions. In the case of an individual, the individual's social security number is his or her taxpayer identification number. A reportable payment would include interest payments to a beneficial owner of a Certificate, and proceeds from the sale of a Certificate to or through a broker or dealer in securities prior to the maturity of the underlying Debentures. A reportable payment also would include proceeds from the retirement of an underlying Debenture, paid or credited to an account by a broker or dealer in securities. Backup withholding is not an additional tax. Any amount withheld under the backup withholding rules from a reportable payment to a

beneficial owner of a Certificate would be allowed as a credit against the beneficial owner's U.S. federal income tax, provided that the required information is furnished to the IRS in a timely manner.

## PURCHASES BY EMPLOYEE BENEFIT PLANS — ERISA CONSIDERATIONS

The acquisition of a Certificate by an employee benefit plan or other retirement arrangements including individual retirement accounts subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or Section 4975 of the Code (a "Plan"), could result in prohibited transactions or other violations of the fiduciary responsibility provisions of ERISA and Section 4975 of the Code if, by virtue of such acquisition, the Debentures were deemed to be assets of the Plan. For example, if an employer whose employees are covered by a Plan had entered into a loan with an SBIC whose Debenture was contained in the Pool, the purchase and holding of Certificates by the Plan would constitute prohibited transactions if the Debentures in the Pool were deemed to be assets of the Plan.

Under the United States Department of Labor regulations, the assets of a Plan will be deemed to include any of the underlying assets of an entity, such as a grantor trust, for purposes of the fiduciary responsibility provisions of ERISA, when a Plan acquires an equity interest in such entity. Under these regulations as effectively amended by Section 3(42) of ERISA under the Pension Protection Act of 2006, the assets in the Pool would not be assets of a Plan if, at all times, less than 25% of the Certificates are held by Plans and entities whose underlying assets include plan assets by reason of investment by Plans in the entities. However, there can be no assurance that this limit will not be exceeded because there are no limitations on who may purchase the Certificates.

Even if the Debentures are deemed to be assets of a Plan, there are class exemptions, including the following, issued by the Department of Labor that may apply to any prohibited transactions resulting therefrom or from the purchase and holding of Certificates. These exemptions are for transactions that meet the requirements of the exemption and that are effected by independent qualified professional asset managers or "in-house" asset managers and for certain transactions involving insurance company general and pooled separate accounts and bank collective investment funds (DOL Prohibited Transaction Exemptions 84-14, 96-23, 95-60, 90-1 and 91-38). There is also a statutory exemption that may be available under Section 408(b)(17) of ERISA and Section 4975(d)(20) of the Code to a party in interest that is a service provider to a Plan investing in the Certificates for adequate consideration, provided such service provider is not (i) the fiduciary with respect to the Plan's assets used to acquire the Certificates or an affiliate of such fiduciary or (ii) an affiliate of the employer sponsoring the Plan. Also, all state and local government employee benefit plans and certain church plans are exempt from ERISA and therefore are not subject to the ERISA plan asset regulations, irrespective of the treatment of the Certificates. However, such plans could be subject to laws that are substantially similar to ERISA.

Any Plan or other plan fiduciary considering the purchase of Certificates should consult its tax and legal advisors regarding the applicability of the exemptions and the issues described above and their potential consequences.

## INVESTMENT COMPANY ACT

Upon issuance of the Certificates, counsel to the Underwriters will deliver its opinion generally to the effect that the Pool is not required to register under the Investment Company Act of 1940, as amended (the "Investment Company Act"), by reason of the exclusion provided by Section 2(b) of the Investment Company Act, although other exemptions or exclusions may be available. The Pool is being structured so as not to constitute a "covered fund" for purposes of Section 619 under the Dodd-Frank Act (the "Volcker Rule").

## LEGAL OPINIONS

The legality of the sale of the Certificates will be passed upon for SBA by the Office of the General Counsel of SBA and for the Underwriters by Morgan, Lewis & Bockius LLP, Washington, D.C.

## NOTICE

The statements herein with respect to the Certificates and related documents are subject to the detailed provisions of such Certificates and documents, and the statements made herein are qualified in their entirety by reference thereto. Copies of these documents are available at the Trustee's Corporate Trust Office.

## UNDERWRITING

The Underwriters named below have severally agreed, subject to the terms and conditions of the Debenture Purchase, Pooling and Exchange Agreement between SBIC Funding Corporation, as Selling Agent of the SBICs, and the Underwriters, to purchase the Debentures together with the related Guarantee Agreement and to exchange such Debentures and Guarantee Agreement for the principal amount of Certificates set forth below opposite their respective names.

| Underwriter | Principal Amount of Certificates |
|---|---|
| Goldman Sachs & Co. LLC | $ 868,840,000 |
| J.P. Morgan Securities LLC ..................................................................... | 868,835,000 |
| Total................................................................................................ | $ 1,737,675,000 |

The Debenture Purchase, Pooling and Exchange Agreement provides that the obligations of the Underwriters are subject to certain conditions precedent, and that the Underwriters will be obligated to purchase all of the Certificates if any are purchased.

SBA has been advised by the Representative of the Underwriters that the Underwriters propose to offer the Certificates to the public initially at the offering price set forth on the cover page of this Offering Circular and to certain dealers at such price less a concession of 0.30% of the principal amount of the Certificates; that the Underwriters and such dealers may allow a discount of 0.25% of such principal amount on sales to other dealers; and that the public offering price and concession and discount to dealers may be changed by the Underwriters.

The Underwriters are permitted to engage in certain transactions that stabilize the price of the Certificates. Such transactions consist of bids or purchases for the purpose of pegging, fixing or maintaining the price of the Certificates.

If an Underwriter creates a short position in the Certificates in connection with the offering, i.e., if it sells more Certificates than are set forth opposite its name above, such Underwriter may reduce that short position by purchasing Certificates in the open market. In general, purchases of a security for the purpose of stabilization or to reduce a short position could cause the price of the security to be higher than it might be in the absence of such purchases.

Neither SBA nor any of the Underwriters makes any representation or prediction as to the direction or magnitude of any effect that the transactions described above may have on the price of the Certificates. In addition, neither SBA nor any of the Underwriters makes any representation that such Underwriters will engage in such transactions or that such transactions, once commenced, will not be discontinued without notice.

The Underwriters and their affiliates may, from time to time, have equity investments in SBICs.

No dealer, salesman or other person has been authorized to give any information or to make any representation other than the information and representations contained in this Offering Circular. This Offering Circular does not constitute an offer to sell or a solicitation of an offer to buy any of the securities offered hereby in any jurisdiction to any person to whom it is unlawful to make such offer in such jurisdiction. Delivery of this Offering Circular does not imply that the information contained in it is correct any time after its date.

————————

### TABLE OF CONTENTS

OFFERING CIRCULAR SUMMARY ................................ 2

RISK FACTORS .................................................. 6

DESCRIPTION OF SBA ........................................ 8

DESCRIPTION OF THE SBIC PROGRAM ..................... 8

DESCRIPTION OF THE POOL OF DEBENTURES ....... 13

DESCRIPTION OF DEBENTURES ............................. 13

DESCRIPTION OF PARTICIPATION CERTIFICATES .. 13

YIELD CONSIDERATIONS ............................... 15

FULL FAITH AND CREDIT GUARANTEES ................... 16

OPTIONAL PREPAYMENT OF DEBENTURES ........... 16

ACCELERATION OF DEBENTURES ........................... 17

DESCRIPTION OF PROGRAM MANAGEMENT AND OPERATION ..................................................... 19

TRUST AGREEMENT ..................................... 20

TRUSTEE ....................................................... 23

SBIC FUNDING CORPORATION ............................. 23

LEGALITY OF INVESTMENT .......................... 24

TAX STATUS .............................................. 24

PURCHASES BY EMPLOYEE BENEFIT PLANS — ERISA CONSIDERATIONS .......................... 26

INVESTMENT COMPANY ACT ....................... 26

LEGAL OPINIONS ........................................ 26

NOTICE .......................................................... 27

UNDERWRITING ......................................... 27

$1,737,675,000 (Approximate)

# U.S. Small Business Administration

Guaranteed 5.168% Debenture Participation Certificates,

Series SBIC 2023-10 A

————————

### OFFERING CIRCULAR

————————

# Goldman Sachs & Co. LLC
# J.P. Morgan

March 16, 2023