

Obi Ukwu                                                                                          09/24/2024
Attendants

Subject: Debriefing for Solicitation No. *15F06724Q0000241 Laboratory Cleanup Services*

Dear Obi Ukwu,

The Government is providing this written debriefing in accordance with Federal Acquisition Regulation (FAR) 15.506, Post award debriefing of offerors, and this serves as *Attendants*' only debriefing.

**The Evaluation Factors and Ratings are:**

Factor 1, Technical Capability, offerors were assigned one of the following ratings:

| Rating | Description |
|---|---|
| Acceptable | Quote meets the requirements of the solicitation |
| Unacceptable | Quote does not meet the requirements of the solicitation |

Factor 2, Past Performance, offerors were assigned one of the following ratings:

| Rating | Description |
|---|---|
| Acceptable | Based on the offeror's performance record, the Government has a reasonable expectation that the offeror will successfully perform the required effort, or the offeror's performance record is unknown*. |
| Unacceptable | Based on the offeror's performance record, the Government does not have a reasonable expectation that the offeror will be able to successfully perform the required effort. |

Factor 3, Price, did not receive an adjectival rating, instead this factor was assessed for proposal completeness and reasonableness using the proposal analysis techniques described in FAR 15.404, Proposal Analysis.

**Basis of Award:**

The government evaluated submitted quotes against the criteria set forth above and awarded an order to the responsible offeror whose quote was conforming to the solicitation and was Lowest Price Technically Acceptable. Award was made in accordance with the basic contract ordering procedures, the procedures specified in the request for quote and on the basis of the lowest priced quote meeting the acceptability standards for non-price factors.

**Evaluation Results:**

For Factor 1, Technical Capability, Attendants received an Unacceptable rating. The rationale for the received rating is as follows:
> "The quote provided lacks technical detail indicating that the vendor would be able to meet the requirements of the Statement of Work (SOW). The quote does not address section 3.12 of the SOW. The quote lacks information regarding section 3.2.A.i which addresses all areas within the cubicles

- 1 -

(Chases, crevices, drawers, and openings) that are to be disinfected. The quote doesn't reference CDC requirements or standards mentioned in the SOW. Section 4 of the Statement of Work (SOW) states "Key personnel must include a Project Manager (PM) who will remain onsite while work is being performed and will have responsibility to maintain communication with an FBI counterpart to provide updates on contract progress." The quote does not indicate that the vendor will include a Project Manager in the Key Personnel to remain onsite while work is being performed. Section 6 states "The Contractor shall provide weekly status reports to the Contracting Officer (CO) and the Contracting Office Representative (COR)." The quote does not indicate that the vendor will provide weekly status reports to the CO and COR."

For Factor 2, Past Performance, Attendants did not receive a rating. Due to the quote receiving an unacceptable rating for the Factor 1 Technical Capability, the quote was deemed unacceptable, and evaluation of this quote ceased.

For Factor 3, Price, *Attendants'* proposed price was $20,000.00. Attendants' proposed price was not evaluated for completeness or reasonableness.

*Attendants'* evaluation results compared to the successful offeror are as followings:

| Evaluation Factor | *Attendants* | *Lean Professional Services* |
|---|---|---|
| Factor 1 – Technical Capability | Unacceptable | Acceptable |
| Factor 2 – Past Performance | Not Evaluated | Acceptable |
| Factor 3 - Price | $20,000.00 | $52,364.00 |

This evaluation did not rank offerors. The Government made an award to the offeror whose proposal represents the best value to the Government based upon Lowest Price Technically Acceptable. Attendants' quote was not Technically Acceptable.

The FBI appreciates *Attendants'* participation in this competition and encourages *Attendants* to participate in future FBI solicitations.

The point of contacts for this action are:

**Contract Specialist**
Javia Warner
Jswarner@fbi.gov

**Contracting Officer**
Maureen Murdock
mmurdock@fbi.gov

Sincerely,

*Maureen Murdock*
Contracting Officer


U.S. Small Business
Administration

September 24, 2024

Lynette T. Stevenson
DALS Credit Solutions Co DBA DALS Economic & Strategic Co
DALS Notary Services
5246 Simpson Ferry Road
Mechanicsburg, PA. 17055

Dear Ms. Lynette T. Stevenson,

This letter is written in response to your Freedom of Information Act ("FOIA") request, # 2024-005962.   You have requested the following:

1. ***A list of the 298 small businesses that received funding through SBICs during the 2020-2023 period***, *including the names and contact information of the licensing partners associated with each SBIC.*
2. ***Information on any small businesses that received funding during this period*** *that fall under the designations of Native Hawaiian Organizations (NHO), Community Development Corporations (CDC), Indian Tribes, and any related partners and those who are Joint Ventures as well.*
3. ***Verification of the current 8(a) program participation rate***, *which is reported to be 11.32%, specifically for the aforementioned designations (NHO, CDC, Indian Tribes). We aim to ensure that this rate accurately reflects the program's performance and inclusivity.*

    4. *Please provide a list of all currently licensed Small Business Investment Companies (SBICs) as of 2020-2023*
- *"Please include the names, addresses, and contact information for each SBIC." If any are missing, please the remainder according to the request.*
    - *Siguler Guff SBIC Fund II, L.P. 8/18/2023 2.0x*
    - *Champlain Capital Partners IV, L.P. 9/21/2023 2.0x*
    - *Firmament Partners SBIC IV, L.P. 9/21/2023 2.0x*
    - *IMB Partners SBIC I, L.P. 10/17/2023-Non-leveraged o15*
    - *Emerging America Credit Opportunities Fund, LP. 10/17/2023 2.0x*
    - *Cyprium SBIC I, L.P. 11/05/2023 2.0x*
    - *Everside SBIC I, L.P. 11/28/2023 2.0x*
    - *MCM Capital Partners IV, L.P. 12/13/2023 0.5x*
    - *Farragut SBIC Fund III, L.P. 12/20/2023 2.0x*
    - *Pelion Ventures VIII Financial Institutions Fund 12/29/2023 1.25x*
- *"Please include the date of licensing and the type of license issued (e.g., Debenture SBIC, Non-leveraged SBIC)."*


U.S. Small Business
Administration

5. "*Please provide data on the total amount of capital under management by each licensed SBIC as of 2020-2023.*"

6. "*Please provide information on the types of investments made by these SBICs, including the sectors or industries they are focused on.*"

7. "*Please provide the most recent annual performance reports for each licensed SBIC, including investment activity, portfolio companies, and financial performance.*"

8. "*Please provide data on the number of small businesses financed by each SBIC and the total financing provided during FY2023.*"
***Compliance and Oversight Information***

9. "*Please provide records of any compliance reviews, audits, or investigations conducted by the SBA on licensed SBICs within the past three years.*"

10. "*Please provide details on any enforcement actions taken against SBICs, including suspensions, revocations, or penalties.*"

11. "*Please provide a historical list of all SBICs that have been licensed by the SBA since the program's inception, including the years of operation and reasons for closure (if applicable).*"

12. "*Please provide a timeline of significant changes to the SBIC program, including policy changes or updates to licensing requirements.*"

13. "*Please provide all records about the licensing, operation, and performance of those listed above and not listed including any communications between the SBA and the SBIC.*"
14. "*Please provide details on the application and approval process for the following SBIC: All listed above and those not mentioned during the time period requested.*

15. *Please provide copies of all current policies, guidelines, and procedures related to the licensing and oversight of SBICs.*"

16. *Please record any public comments or feedback received during the most recent review or revision of SBIC program guidelines.*

17. *Please provide how the companies are selected to participate in the investment programs.*

For the purposes of processing your Freedom of Information Act request, this office has classified your requestor category as All Others. As you did not include a dollar amount that you



U.S. Small Business Administration

are willing to pay, we treat the request as if you are willing to pay $0, and SBA estimates the costs of processing your FOIA request exceeds your current willingness to pay $0. In accordance with 13 CFR § 102.8, SBA charges direct costs of $100 per computer search for the records, $83 per hour to review by managerial staff and $46 per hour to review records by professional staff. Please see estimates for individual questions where applicable.

With respect to questions 1, 5, 6, 7, and 8, SBA is withholding in full all responsive records pursuant to FOIA Exemption 4 (5 U.S.C. § 552(b)(4)). FOIA Exemption 4 protects "trade secrets and commercial or financial information obtained from a person and privileged or confidential." Based upon the ruling in Food Marketing Institute v. Argus Leader Media, 139 S. Ct. 2356 (2019), the Supreme Court has directed agencies to withhold confidential commercial or financial information when (1) the submitter of the information customarily treats the information as private and (2) there is an implied or express assurance of confidentiality by the agency receiving the information. The information being requested is customarily treated as private information by the SBICs. Additionally, the agency has a long history of protecting this type of commercial or financial information in the SBIC program, providing submitters of the information an assurance of confidentiality.

With respect to questions 2 and 3, those requests are being answered by a separate office under separate cover.

With respect to questions 4, 11, and 16, we estimate that this will take approximately 6 hours for computer time, 5 hours to review the records by professional staff and 4 hours to review by managerial staff. We estimate processing fees to total $1,162. Please note this fee estimate is subject to change depending on the time necessary to process this request, and there is no guarantee that SBA has responsive records for the entirety of the time period requested. Please also be aware that many SBICs choose to be included in SBA's online directory of SBICs that contains much of the information you are requesting; you may access that directory for free at https://www.sba.gov/funding-programs/investment-capital/sbic-directory , and public comments in regards to changes in the SBIC program guidelines are published in the Federal Register: https://www.federalregister.gov/ .

With respect to questions 9, 10, 13, and 14, SBA is withholding in full all responsive records pursuant to FOIA Exemptions 4 (cited above), Exemption 5 (5 U.S.C. § 552(b)(5)) allowing agencies the discretion to withhold "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency," and Exemption 8 (5 U.S.C. § 552 (b)(8)) protecting matters that are "contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions."

With respect to question 12, SBA has no records that are responsive.

With respect to question 15, that information is available at https://www.sba.gov/partners/sbics/resource-library .

U.S. Small Business
Administration

With respect to question 17, that information is available at
https://www.sba.gov/partners/sbics/apply-be-sbic .

You have the right to appeal this decision to the Chief, Freedom of Information/ Privacy Acts
Office, U.S. Small Business Administration, 409 3rd Street, S.W. Washington, D.C. 20416. You
must submit a written, signed appeal within 90 calendar days of the date of the notice of denial.
Your appeal should contain a description of the information denied, the name and title of the
SBA employee who denied the request, the reason for the denial, and other pertinent facts you
deem appropriate.

Please be advised that the 2007 FOIA amendments created the Office of Government
Information Services (OGIS) to offer mediation services to resolve disputes between FOIA
requesters and Federal agencies as a non-exclusive alternative to litigation. Using OGIS services
does not affect your right to pursue litigation. You may contact OGIS in any of the following
ways:

Office of Government Information Services
National Archives and Records Administration
8601 Adelphi Road – OGIS
College Park, MD 20740-6001
E-mail: ogis@nara.gov
Telephone: 202-741-5770
Toll-free: 1-877-684-6448

Please note that using OGIS services does not affect the timing of filing an appeal with the
SBA's FOI/PA Officer.

If you have any questions about or need assistance with your request, you may contact the Chief,
Freedom of Information/ Privacy Acts Office, U.S. Small Business Administration by phone at
202-401-8203, by fax at 202-205-7059, by email at foia@sba.gov, or by mail at 409 Third St.,
SW, Washington, DC 20416.


Sincerely,



Jacob Lewis
Director of Secondaries and Liquidation
Office of Investment and Innovation
Small Business Administration

 **U.S. Small Business Administration**

September 24, 2024

Lynette T. Stevenson
DALS Credit Solutions Co DBA DALS Economic & Strategic Co
DALS Notary Services
5246 Simpson Ferry Road
Mechanicsburg, PA. 17055

Dear Ms. Lynette T. Stevenson,

This letter is written in response to your Freedom of Information Act ("FOIA") request, # 2024-005962. You have requested the following:

1. ***A list of the 298 small businesses that received funding through SBICs during the 2020-2023 period***, *including the names and contact information of the licensing partners associated with each SBIC.*
2. ***Information on any small businesses that received funding during this period*** *that fall under the designations of Native Hawaiian Organizations (NHO), Community Development Corporations (CDC), Indian Tribes, and any related partners and those who are Joint Ventures as well.*
3. ***Verification of the current 8(a) program participation rate***, *which is reported to be 11.32%, specifically for the aforementioned designations (NHO, CDC, Indian Tribes). We aim to ensure that this rate accurately reflects the program's performance and inclusivity.*

    4. *Please provide a list of all currently licensed Small Business Investment Companies (SBICs) as of 2020-2023*
- *"Please include the names, addresses, and contact information for each SBIC." If any are missing, please the remainder according to the request.*
  - *Siguler Guff SBIC Fund II, L.P. 8/18/2023 2.0x*
  - *Champlain Capital Partners IV, L.P. 9/21/2023 2.0x*
  - *Firmament Partners SBIC IV, L.P. 9/21/2023 2.0x*
  - *IMB Partners SBIC I, L.P. 10/17/2023-Non-leveraged o15*
  - *Emerging America Credit Opportunities Fund, LP. 10/17/2023 2.0x*
  - *Cyprium SBIC I, L.P. 11/05/2023 2.0x*
  - *Everside SBIC I, L.P. 11/28/2023 2.0x*
  - *MCM Capital Partners IV, L.P. 12/13/2023 0.5x*
  - *Farragut SBIC Fund III, L.P. 12/20/2023 2.0x*
  - *Pelion Ventures VIII Financial Institutions Fund 12/29/2023 1.25x*
- *"Please include the date of licensing and the type of license issued (e.g., Debenture SBIC, Non-leveraged SBIC)."*


U.S. Small Business
Administration

5. *"Please provide data on the total amount of capital under management by each licensed SBIC as of 2020-2023."*

6. *"Please provide information on the types of investments made by these SBICs, including the sectors or industries they are focused on."*

7. *"Please provide the most recent annual performance reports for each licensed SBIC, including investment activity, portfolio companies, and financial performance."*

8. *"Please provide data on the number of small businesses financed by each SBIC and the total financing provided during FY2023."*
***Compliance and Oversight Information***

9. *"Please provide records of any compliance reviews, audits, or investigations conducted by the SBA on licensed SBICs within the past three years."*

10. *"Please provide details on any enforcement actions taken against SBICs, including suspensions, revocations, or penalties."*

11. *"Please provide a historical list of all SBICs that have been licensed by the SBA since the program's inception, including the years of operation and reasons for closure (if applicable)."*

12. *"Please provide a timeline of significant changes to the SBIC program, including policy changes or updates to licensing requirements."*

13. *"Please provide all records about the licensing, operation, and performance of those listed above and not listed including any communications between the SBA and the SBIC."*
14. *"Please provide details on the application and approval process for the following SBIC: All listed above and those not mentioned during the time period requested.*

15. *Please provide copies of all current policies, guidelines, and procedures related to the licensing and oversight of SBICs."*

16. *Please record any public comments or feedback received during the most recent review or revision of SBIC program guidelines.*

17. *Please provide how the companies are selected to participate in the investment programs.*

For the purposes of processing your Freedom of Information Act request, this office has classified your requestor category as All Others. As you did not include a dollar amount that you

2 | P a g e
Case 2:20-cv-00041-DCLC-CRW    Document 106    Filed 10/03/24    Page 8 of 298
PageID #: 3737



U.S. Small Business
Administration

are willing to pay, we treat the request as if you are willing to pay $0, and SBA estimates the costs of processing your FOIA request exceeds your current willingness to pay $0. In accordance with 13 CFR § 102.8, SBA charges direct costs of $100 per computer search for the records, $83 per hour to review by managerial staff and $46 per hour to review records by professional staff. Please see estimates for individual questions where applicable.

With respect to questions 1, 5, 6, 7, and 8, SBA is withholding in full all responsive records pursuant to FOIA Exemption 4 (5 U.S.C. § 552(b)(4)). FOIA Exemption 4 protects "trade secrets and commercial or financial information obtained from a person and privileged or confidential." Based upon the ruling in Food Marketing Institute v. Argus Leader Media, 139 S. Ct. 2356 (2019), the Supreme Court has directed agencies to withhold confidential commercial or financial information when (1) the submitter of the information customarily treats the information as private and (2) there is an implied or express assurance of confidentiality by the agency receiving the information. The information being requested is customarily treated as private information by the SBICs. Additionally, the agency has a long history of protecting this type of commercial or financial information in the SBIC program, providing submitters of the information an assurance of confidentiality.

With respect to questions 2 and 3, those requests are being answered by a separate office under separate cover.

With respect to questions 4, 11, and 16, we estimate that this will take approximately 6 hours for computer time, 5 hours to review the records by professional staff and 4 hours to review by managerial staff. We estimate processing fees to total $1,162. Please note this fee estimate is subject to change depending on the time necessary to process this request, and there is no guarantee that SBA has responsive records for the entirety of the time period requested. Please also be aware that many SBICs choose to be included in SBA's online directory of SBICs that contains much of the information you are requesting; you may access that directory for free at https://www.sba.gov/funding-programs/investment-capital/sbic-directory , and public comments in regards to changes in the SBIC program guidelines are published in the Federal Register: https://www.federalregister.gov/ .

With respect to questions 9, 10, 13, and 14, SBA is withholding in full all responsive records pursuant to FOIA Exemptions 4 (cited above), Exemption 5 (5 U.S.C. § 552(b)(5)) allowing agencies the discretion to withhold "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency," and Exemption 8 (5 U.S.C. § 552 (b)(8)) protecting matters that are "contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions."

With respect to question 12, SBA has no records that are responsive.

With respect to question 15, that information is available at https://www.sba.gov/partners/sbics/resource-library .


U.S. Small Business
Administration

With respect to question 17, that information is available at
https://www.sba.gov/partners/sbics/apply-be-sbic .

You have the right to appeal this decision to the Chief, Freedom of Information/ Privacy Acts
Office, U.S. Small Business Administration, 409 3rd Street, S.W. Washington, D.C. 20416. You
must submit a written, signed appeal within 90 calendar days of the date of the notice of denial.
Your appeal should contain a description of the information denied, the name and title of the
SBA employee who denied the request, the reason for the denial, and other pertinent facts you
deem appropriate.

Please be advised that the 2007 FOIA amendments created the Office of Government
Information Services (OGIS) to offer mediation services to resolve disputes between FOIA
requesters and Federal agencies as a non-exclusive alternative to litigation. Using OGIS services
does not affect your right to pursue litigation. You may contact OGIS in any of the following
ways:

Office of Government Information Services
National Archives and Records Administration
8601 Adelphi Road – OGIS
College Park, MD 20740-6001
E-mail: ogis@nara.gov
Telephone: 202-741-5770
Toll-free: 1-877-684-6448

Please note that using OGIS services does not affect the timing of filing an appeal with the
SBA's FOI/PA Officer.

If you have any questions about or need assistance with your request, you may contact the Chief,
Freedom of Information/ Privacy Acts Office, U.S. Small Business Administration by phone at
202-401-8203, by fax at 202-205-7059, by email at foia@sba.gov, or by mail at 409 Third St.,
SW, Washington, DC 20416.


Sincerely,

JACOB LEWIS
2024.09.23
11:29:54 -04'00'

Jacob Lewis
Director of Secondaries and Liquidation
Office of Investment and Innovation
Small Business Administration

**SBA**                                   **SOP 10 10 0**

# Small Business Investment Companies (SBIC) Program

U.S. Small Business Administration

Office of Investment and Innovation

1

# Small Business Administration

---

## Standard Operating Procedure

## Small Business Investment Companies

**Subject:** Text

**S.O.P. Number:** 10 10 0

**Revision Number:** 01

**Purpose:** To outline the SBA guidelines for issuing and administering small business investment companies (SBICs).

**Personnel Concerned:** Prospective SBIC managers, management of current SBIC licenses and SBA personnel involved in the administration and oversight of SBICs.

**SOP Editions This Replaces:** This SOP replaces all prior SBIC-related SOPs and Technotes, including, but not limited to, 10 04, 10 06, 10 07, 10 09, and Technotes 2 – 17.

**Originator:** Office of Investment and Innovation

**Authorized By:** Office of Executive Management, Installations & Support Service

**Effective Date:** September 5, 2023

---

2

## Table of Contents

Table of Contents ........................................................................................................3
Chapter 1: Investment Policy Statement ...................................................................8
    1. Mission and Objectives .......................................................................................8
        a. Small Business Act of 1953 ............................................................................8
        b. Small Business Investment Act of 1958 (the Act) .........................................8
        c. SBIC Program Mission and Objectives ...........................................................8
    2. SBIC Program Prioritization / Asset Allocation ..................................................9
    3. Statutory Requirements .....................................................................................9
    4. Investment Policy Statement & Governance ....................................................10
        a. Prioritization Review ....................................................................................10
        b. Investment Committee .................................................................................10
        c. SBIC Agency Licensing Committee ...............................................................10
        d. SBA Administrator Oversight ......................................................................11
        e. Risk Management Committee .......................................................................11
Chapter 2: Licensing Application and Due Diligence ................................................12
    1. Manager Eligibility ...........................................................................................12
    2. General Management Qualifications .................................................................13
        a. Management Team Qualifications ................................................................13
        b. Track Record ................................................................................................14
        c. Non-Leveraged Applicants ..........................................................................16
        d. Emerging Manager Collaboration ...............................................................16
        e. Evaluation of Management Qualifications ...................................................18
        f. Foreign Principals ........................................................................................21
        g. Requirements for Criminal History Checks ..................................................22
        h. Disclosure Requirements .............................................................................24
    3. Entity Formation and Eligibility ........................................................................24
        a. Limited Partnerships ...................................................................................25
        b. Investment Adviser / Investment Manager .................................................25
        c. Non-Principal Ownership of the General Partner or Investment
        Advisor/Management Company ......................................................................25
    4. Investment Strategy and Operations ...............................................................27
    5. SBIC Signature Policy ........................................................................................27
        a. Technical Requirements ...............................................................................27
        b. Electronic Form of Signature .......................................................................28
        c. Electronic Signature Eligible Documents .....................................................28
        d. Not permitted ..............................................................................................29
        e. Vendor/Technology Requirements for Electronic Signatures .....................29
        f. Compliance, Quality Control, And Record Retention ...................................29
    6. Side Letters .......................................................................................................29

3

7. SEC Regulations ................................................................................................ 32

8. Management-Ownership Diversification Requirements ........................................ 33

9. Opinions of Counsel ......................................................................................... 34

10. Private Capital, Regulatory Capital, and Leverageable Capital Requirements ............ 36

    a. Private Capital ............................................................................................ 36

    b. Regulatory Capital ...................................................................................... 37

    c. Leverageable Capital .................................................................................... 38

    d. Limit on Leverageable Capital from State or Local Government Entities ............... 38

    e. Institutional Investors ................................................................................... 38

    f. Adequate & Minimum Capital Requirements ...................................................... 39

    g. Guaranty Agreements for Certain Investors ...................................................... 39

11. Application and Licensing Process Overview ......................................................... 40

    a. Applicant Intake .......................................................................................... 40

    b. Pre-screen Process ....................................................................................... 41

    c. Application and Green Light Process for Applicants ............................................. 41

    d. Green Light Approval and Duration ................................................................. 46

    e. Fund Closing ............................................................................................... 46

    f. Reassessment Requests ................................................................................ 48

Chapter 3: Investment Portfolio Management and Monitoring ......................................... 50

1. Investment Portfolio Monitoring .......................................................................... 50

    a. Quarterly Portfolio Updates ........................................................................... 51

    b. Quarterly and Annual Regulatory Filings and Valuation Guidelines ....................... 51

    c. Guidance for the Computation of Reporting Time Periods .................................. 52

    d. Portfolio Financing Report (SBA Form 1031) .................................................... 52

    e. SBIC Financial Statement and Investment Performance (SBA Form 468) ............... 52

    f. Investment Performance Reporting and Metrics ............................................... 53

    g. Other reports to be filed with SBA (see 13 CFR § 107.660) ............................... 53

    h. Reporting Changes to SBICs Not Subject to SBA Prior Approval (see 13 CFR § 107.680): .................................................................................................... 53

    i. Risk Management and Metrics ....................................................................... 54

2. Portfolio Operations and Management ................................................................. 64

    a. Management Team Changes ........................................................................... 64

    b. GP Stakes / Management Company Stakes ....................................................... 65

    c. Investment Adviser/Manager .......................................................................... 67

    d. Management Expenses .................................................................................. 67

    e. Management Fees ........................................................................................ 71

    f. Investment Adviser/Management Agreements .................................................. 75

    g. Changes in Ownership, Control or Structure ..................................................... 76

    h. Secured Third-Party Debt .............................................................................. 82

3. Funding, Distributions, and Interest ..................................................................... 84

    a. Leverage Commitment Applications/Requests and Leverage Management ............ 84

4

b. Leverage fees and additional charges payable by Licensee. ...................................87
c. SBICs' acceptance of SBA remedies under §§ 107.1800 through 107.1820. ..........88
d. Distributions and Reductions in Regulatory Capital § 107.585................................88
e. Maximum Amount of Leverage for Section 301(c) Licensees ................................90
f. Leverage Reaching Maturity.................................................................................94
g. Leverage Draw Requests ....................................................................................95
h. Interest and Annual Charge Payments ...............................................................97
i. Leverage Prepayments .......................................................................................98
4. Investor Reporting, Data and Agreements .................................................................100
a. Amending Legal Agreements and Side Letters ....................................................100
b. Investor Reports and Other Items That Licensees Must Submit............................100
5. Portfolio Company Services and Value Add Support .....................................................101
1. License Surrenders...................................................................................................102
2. Documents Management and Federal Register Notices ...............................................105
a. Case Files in OII Customer Relationship Management System (CRM)....................105
b. Published Federal Register Notices ....................................................................106
Chapter 4: Regulatory Examinations ................................................................................106
1. The Purpose of SBIC Examinations............................................................................106
2. Examination Schedule ..............................................................................................106
3. Preparing for an Examination...................................................................................107
4. Correspondence.......................................................................................................107
5. Prior to the Examination...........................................................................................108
6. On-Site or Virtual Licensee Visit ...............................................................................108
7. Onsite Portfolio Company Visit(s) .............................................................................109
8. Data and Reporting Requests....................................................................................111
9. Form and Report Reviews .........................................................................................111
a. Financial Review................................................................................................111
b. Capital Accounts and Changes in Ownership .....................................................112
c. Cash Disbursements and Receipts .....................................................................113
d. Idle Funds ........................................................................................................113
e. Inactivity ......................................................................................................114
f. Delinquencies...................................................................................................114
g. Management Expenses......................................................................................114
h. Other Financial Review Steps............................................................................114
i. Non-Financial Records .......................................................................................115
10. Licensee's Portfolio Investments .............................................................................116
11. Examining Non-Leveraged Licensees .......................................................................120
12. Examining Section 301(d) Licensees........................................................................122
13. Examination Report ................................................................................................123
14. Resolution of Findings ............................................................................................128
15. Secondary Review Requests....................................................................................135

5

16. Examination Fees and Invoices ..................................................................138
Chapter 5: Secondaries and Liquidations .........................................................139
  1. LP Secondaries (Sales and Transfers) ......................................................139
  2. SBIC Restructuring, Conversions, and Continuation Funds ...........................142
    a. Changes in Ownership, Control, or Structure of Licensee; Transfer of License ...142
    b. Reorganizations, Restructurings and Conversions..............................144
    c. Quasi-Reorganizations ....................................................145
    d. Continuation Funds ........................................................145
  3. Defaults ......................................................................146
  4. Transfers to Liquidation Status .................................................146
    a. Pre-Liquidation Conference Memo ........................................147
    b. Liquidation Conference. ..................................................147
  5. Liquidation Strategy Determination ...........................................148
    a. Self-Liquidation Settlement Process .......................................151
    b. Receivership ..............................................................158
    c. Litigation Outside of Receivership .........................................166
  6. Sale of SBA's Interests ........................................................171
  7. Follow On Investments .......................................................177
  8. SBA Acquired Assets ..........................................................179
  9. Asset Liquidation Procedures...................................................183
  10. Sale of Judgments............................................................190
  11. Sale and Preservation of Collateral .............................................190
  12. Collections, Charge-offs, and Closeouts ........................................196
  13. Correspondence, Documentation, Reports, And Controls .......................198
  14. Other Liquidation Matters ....................................................200
    a. Compromising Claims Against SBICs and SBIC Portfolio Companies ..........200
    b. Wind Down Agreements for Participating Securities SBICs ..................204
Chapter 6: Library of Forms, Instructions and Templates.......................................211
  Licensing Forms .................................................................211
    Optional Pre-Screen Form (Short Form 2181).................................211
    Management Assessment Questionnaire and Final Licensing Application (SBA Form 2181)- SBIC Program Application ...............................................211
    Model Limited Partnership Agreement (LPA) Version 3.0........................212
    Commitment Guaranty Template..........................................213
    Sample Green Light Approval Letter ........................................221
    Sample License Approval Letter .............................................224
  Private Capital Forms ............................................................225
    SBA Form 2181, Exhibit F - Capital Certificate ...............................225
    Request for Approval of Transfer Certificate .................................225
    SBA Form 468 - SBIC Financial Report ......................................225
    SBA Leverage Commitment Forms..........................................225

Case 2:20-cv-00041-DCLC-CRW   Document 106   Filed 10/03/24   Page 16 of 298
PageID #: 3745

SBA Form 652 – Assurance of Compliance for Nondiscrimination ...............................226
SBA Form 2181 – Exhibit G, Transferor's Liability Contract...........................................226
SBA Form 2181, Exhibit F Capital Certificate ............................................................226
SBA Form 1065 – Licensee's Assurance of Compliance for the Public Interest..........226
SBA Form 1846 - Statement Regarding Lobbying for Loan Guarantees and Loan
Issuance ....................................................................................................................226
SBA Form 27 – Opinions of Counsel ..............................................................................226
SBA Form 34 – Bank Identification..................................................................................226
Debit Authorization......................................................................................................226
SBA Form 33 – Instructions for the Authorization to Disburse Proceeds .................226
SBA Leverage Draw Forms ....................................................................................................227
Memorandum of Instructions for SBIC Draw Request Against SBA's Leverage
Commitment ...............................................................................................................227
SBA Form 468 – SBIC Financial Report .........................................................................227
SBA Form 27 – Opinions of Counsel ..............................................................................227
Leverage Security Instruments ......................................................................................227
SBA Leverage Pre-Payment Forms ......................................................................................227
Instructions for Prepayment of SBIC Pooled Debentures ...........................................227
Prepayment Notice Template .........................................................................................228
SBIC Financing Forms.............................................................................................................228
Financing forms required by all Licensees for each financing. ...................................228
Financing Forms Required for Specific Situations.........................................................228
SBA Form 1941 – Financing Eligibility Statements (Only applies to Section 301(d)
Licensees) ...................................................................................................................229
SBIC Examination Forms........................................................................................................229
SBA Form 856 – Disclosure Statement..........................................................................229
SBA Form 857 – Request for Information Concerning Portfolio Financing ................229
SBA Form 1405 – Ownership Confirmation ..................................................................229

Chapter 1: Investment Policy Statement

1.  Mission and Objectives
a.  Small Business Act of 1953

The U.S. Small Business Administration (SBA), as established by Congress in 1953, is charged with supporting the essence of the American economic system of private enterprise through free competition. Only through full and free competition can free markets, free entry into business, and opportunities for the expression and growth of personal initiative and individual judgment be assured. The preservation and expansion of such competition is basic not only to the economic well-being but to the security of this Nation. Such security and well-being cannot be realized unless the actual and potential capacity of small business is encouraged and developed. It is the declared policy of the Congress that the Government should aid, counsel, assist, and protect, *insofar as is possible*, the interests of small-business concerns in order to preserve free competitive enterprise…and to maintain and strengthen the overall economy of the Nation[1].

b.  Small Business Investment Act of 1958 (the Act)

It is declared to be the policy of the Congress and the purpose of this Act to improve and stimulate the national economy in general and the small-business segment thereof in particular by establishing a program to stimulate and supplement the flow of private equity capital and long-term loan funds which small-business concerns need for the sound financing of their business operations and for their growth, expansion, and modernization, and which are not available in adequate supply: Provided, however, that this policy shall be carried out in such manner as to insure the maximum participation of private financing sources. It is the intention of the Congress that in the award of financial assistance under this Act, when practicable, priority be accorded to small business concerns which lease or purchase equipment and supplies which are produced in the United States and that small business concerns receiving such assistance be encouraged to continue to lease or purchase such equipment and supplies. It is the intention of the Congress that the provisions of this Act shall be so administered that any financial assistance provided hereunder shall not result in a substantial increase of unemployment in any area of the country[2].

c.  SBIC Program Mission and Objectives

To fulfill the declaration of Congress as set forth in the Small Business Investment Act of 1958, the SBIC Program's mission is:

*To stimulate and supplement the flow of private equity and private long-term loans to small businesses who require financing to support their creation, growth, and long-term sustainability and to do so in a manner that preserves and expands our national security and economic well-being.*

---

[1] COMPS-1834.pdf (govinfo.gov)
[2] COMPS-1835.pdf (govinfo.gov)

To achieve its mission, the SBIC Program seeks to enable the flow of private capital to entities committed to financing small businesses in a manner that advances:

    (1) Domestic Small Business Financing;
    (2) Small Business Job Creation and Sustainability;
    (3) Small Business Domestic Manufacturing and Production;
    (4) U.S. National Security;
    (5) Broad Economic Growth and Innovation.

To meet this mission, the SBIC Program may serve the role of an Outsourced Chief Investment Officer (OCIO), working with other federal government agencies to increase the availability of capital for small businesses and startups advancing these objectives. These programs may be called "SBIC Interagency Partnership Initiatives," and one example is the SBIC Critical Technologies Initiative (SBICCT Initiative), whereby the SBIC program issues SBICCT licenses.

2.   SBIC Program Prioritization / Asset Allocation

Achieving program mission and objectives requires consideration of the allocation of federal dollars. SBA sets priorities aligned to the mission and intent of Congress in the establishment of the Agency and the SBIC Program. Priority investment themes enable SBA to implement objectives and diversify small business financing in terms of:

- Communities,
- Industries and Sectors,
- National Security Concerns, and
- Economic Development Areas.

Across:

- Asset Class,
- Stage of Investment,
- Investment Strategy, and
- Size and Duration of Investment.

SBA has established the following strategic priority investment themes to be implemented through licensed SBICs:

- Underserved and Under-licensed Communities,
- National Security,
- Domestic Manufacturing and Production,
- Climate Change Mitigation, Adaptation and Renewable Energy, and
- Adequacy of Financing Types and Sources.

3.   Statutory Requirements

13 CFR 107.100 introduces the defined term "Section 301(c) Licensee,", which means a company licensed under section 301(c) of the Act. An SBIC licensed under section 301(c) must be a for-profit

entity. The for-profit licensee may be owned and managed by non-profit entities. All current applicants can only apply for licensing under section 301(c) of the Act. In the past, certain "specialized" SBICs investing only in disadvantaged businesses were licensed under section 301(d) of the Act; however, that section was repealed in 1996 and no new licenses are being issued under that section.  Some specialized SBICs remain in existence, and they are referred to in part 107 as "Section 301(d) Licensees" and guided by PPR 2017 which remains in effect.

An SBIC may be organized as a limited partnership, a limited liability company, or a corporation. Limited partnerships may be organized under the laws of any State. A limited liability company must be organized under Delaware law. As a practical matter, the vast majority of SBIC applicants are organized as limited partnerships.

4.  Investment Policy Statement & Governance

a. Prioritization Review

SBA will review and publish current strategic priorities every 3-5 years. In response to Executive Orders, SBA may consider establishing a process for additional tactical priority theme reviews on an annual basis.

b. Investment Committee

Based on MAQ review and Licensing Unit recommendation, the Investment Committee decides whether to invite the management team for an interview.  Following the interview, the Investment Committee makes a recommendation to the Agency SBIC Licensing Committee on whether to issue a "green light" letter prequalifying the management team for an SBIC license. The Investment Committee is comprised of the following SBA staff:

1) Associate Administrator for Investment and Innovation
2) Deputy Associate Administrator for Investment and Innovation
3) Director of Patient Capital Investments (Committee Chair)
4) Director of Licensing
5) Director of Examinations
6) Director of Secondaries and Liquidation
7) Director of Investment Portfolio Monitoring

Additional committee members can be added to the committee on nomination by the Director of Patient Capital Investments and approval of the Associate Administrator of Investment and Innovation.

c. SBIC Agency Licensing Committee

SBIC Agency Licensing Committee reviews applicants recommended by the Investment Committee and formalizes a recommendation to the SBA Administrator for final approval of both SBIC Green Light decision and Licensing decision contingent upon final legal due diligence and no material adverse changes post-Green Light decision.

SBIC Agency Licensing Committee Members include:

10

(1) Associate Administrator for Investment and Innovation (Committee Chair)
(2) General Counsel
(3) Associate Administrator for Capital Access
(4) Associate Administrator for Field Operations
(5) Chief Financial Officer
(6) DoD Office of Strategic Capital (OSC) Chief Investment Officer**
(7) Administrator Appointed Observer(s)**

Agency Licensing Committee Members reserve the right to delegate voting rights to their deputy or other interoffice senior official.

** DoD Office of Strategic Capital Chief Investment Officer will only participate in Licensing Committee decisions that pertain to SBICCT Applicants and serve as an Administrator Appointed Observer.

d. SBA Administrator Oversight

The SBA Administrator is responsible for final approval of both SBIC Green-Light decisions and Licensing decisions.

e. Risk Management Committee

The Risk Management Committee's (RMC) purpose is to assist the Associate Administrator of the Office of Investment and Innovation and the SBA Administrator in the oversight of the SBIC Program's risk assessment and risk management framework.

The Risk Committee's responsibility is one of oversight and review of:

- Policy decisions
- Policy implementation and operational practices
- SBIC portfolio risk management, risk tolerance and risk metrics
- Commitment pacing and monitoring

Policy decisions, policy implementation considerations and operational practices will be evaluated and monitored on an on-going basis by the Risk Management Committee. Any policy decisions, policy implementation considerations and operational practices must be brought forth by a voting member of the Risk Management Committee, and any decisions made by the Risk Management Committee must be made by a majority approval of voting members. The Risk Management Committee may review SBIC Licensing and Examinations determinations when a Licensee or SBIC applicant submits a formally approved request for a secondary review, as detailed in the Licensing and Examinations portions of the SOP. The Chair of the Risk Management Committee is informed of all formally approved requests for secondary review. Secondary review requests raised for subsequent review with the Risk Committee are at the discretion of the Chair or the applicable Office Director. The Committee is kept informed for awareness purposes of all formal requests for secondary reviews. Risk Management Committee meetings shall be held no less than quarterly and may be called more frequently to address outstanding issues before the Risk Committee.

11

Committee members include:

    (1) Director of Patient Capital Investments (Committee Chair)
    (2) Associate Administrator for Investment and Innovation
    (3) Director of Examinations
    (4) Director of Licensing
    (5) Director of Investment Portfolio Management and Operations
    (6) Director of Secondaries and Liquidation
    (7) Deputy Associate Administrator for Investment and Innovation
    (8) Director of Fund Administration and Fund Accounting
    (9) DoD Office of Strategic Capital Chief Investment Officer or Delegate*

Additional committee members can be added to the committee on nomination by the Director of Patient Capital Investments and approval of the Associate Administrator of Investment and Innovation.

Committee member observers include:

    (1) SBA Office of the General Counsel (OGC) Representative (2)
    (2) Director of Policy
    (3) Director of IT & Data Strategy
    (4) Director of Investment and Innovation Ecosystem Development

* DoD Office of Strategic Capital Chief Investment Officer or Delegate will only participate in Risk Committee decisions that pertain to SBICCT Licensees.


Chapter 2: Licensing Application and Due Diligence


1. Manager Eligibility

Section 301(c)(3) of the Act requires SBA to consider, in reviewing and processing any license application, "whether the management of the applicant is qualified and has the knowledge, experience and capability necessary to comply with this Act" and to consider "the general business reputation of the owners and management of the applicant" and "the probability of successful operations of the applicant, including adequate profitability and financial soundness."

Qualified management is also required under 13 CFR 107.130: "When applying for a license, you must show, to the satisfaction of SBA, that your current or proposed management is qualified and has the knowledge, experience, and capability necessary for investing in the types of businesses contemplated by the Act, these regulations and your business plan. You must designate at least one individual as the official responsible for contact with SBA."

In addition, an applicant must meet the "economic viability" requirement of 13 CFR 107.200(b): "In SBA's sole discretion, you must be economically viable, taking into consideration actual and anticipated

income and losses on your Loans and Investments, and the experience and qualifications of your owners and managers."

2. General Management Qualifications

a. Management Team Qualifications

SBA looks for the following characteristics in evaluating the qualifications of proposed management teams:

(1) Experience investing or providing long-term loans to private small businesses and evidence of potential for strong "deal flow" relevant to the proposed investment strategy of the fund. In evaluating the relevance of prior investment experience to the investment strategy for the proposed SBIC, SBA considers such factors as the size, stage and structure of deals planned by the fund, as well as the targeted industries, geographic areas, and company characteristics.

(2) An applicant management team must, at a minimum, include two named senior principals (general partner or equivalent) with meaningful time commitments and substantial professional experience supportive of the fund's proposed investment strategy and business plan. A "meaningful" time commitment does not have to be full-time, but it will be evaluated by SBA in the context of the proposed team as a whole, the applicant's business plan, and the investment strategy of the fund. At least one of these principals must possess substantial relevant investing or long-term lending experience aligned to the investment strategy proposed by the applicant. Senior level industry operator experience, commercial banking, investment banking, private equity investor relations, and merger and acquisition experience may also be considered in SBA's evaluation of a management team's overall qualifications, provided it is relevant to, and supportive of, the applicant's investment strategy and business plan.

(3) In alignment with the proposed investment strategy of the fund, evidence of a combined track record that contains a meaningful proportion of successful financial transactions, full or partial realizations or portfolio valuation mark-ups by unaffiliated outside third-parties which have occurred within the ten years prior to application, and overall evidence of professional performance outcomes that are indicative of strong investment acumen, ability to manage an investment organization, and good stewardship of investor capital. Among other things, SBA will consider such factors as the asset class, strategy of investments, expected duration, and performance on an absolute and relative basis compared to standard industry benchmarks for similar types of investment strategies (median net IRR; median MOIC, median DPI, and median TVPI for the vintage year) to assess track record. SBA will also consider the age of the investment, transaction, and operations track record and, for investments and transactions, such "quality" factors as the number of deals, the manager's involvement in deals from start to finish, and whether the overall returns are largely dependent on a single deal.

13

(4) Cohesive management team, with complementary skills and alignment of incentivizes and structure to maintain such cohesion over the life of the fund. The management team preferably will include principals who have previously worked together in some capacity in a corporate, investment, or non-profit capacity. SBA will consider a history of co-investing or other successful working relationships. SBA will evaluate the balance in the skills, experience, and influence among each of the team members as well as the potential influence of any anchor investors or other outside parties having ownership interests in the applicant's GP/management company.

(5) Managerial, operational, investor relations, or technical experience that can add value at the portfolio company level or to the limited partnership. In assessing management teams, SBA focuses on teams with a history of building companies and adding value above and beyond merely providing capital. This experience is particularly critical for equity-oriented applicants.

(6) Specific to the type of Debenture SBIC applicant, a track record that demonstrates management's ability and understanding of the requirement to generate sufficient liquidity to service contemplated SBA-guaranteed debt payments. For debt-oriented Debenture SBIC applicants seeking 2:1 SBA Leverage, principal track records should contain evidence of a sufficient number of successful, income-generating investments or transactions. Debenture applicants with an equity-orientated focus that are seeking less than 2:1 SBA Leverage should present principal track records that contain a sufficient number of mark-ups, partial or full realizations or transactions relative to losses to demonstrate ability to generate long-term cash-on-cash returns at an aggregate portfolio level.


b. Track Record

Assessing the Investment Track Record is critical to the analysis of an applicant's qualifications for an SBIC license and should be completed with care. SBA will treat your investment track record submission as a representation of your complete investment experience. The investment track record should be used to present experience that meets the SBIC program regulations under section § 107.305 outlined below and should align to the investment strategy of the proposed Applicant fund:

### § 107.305 Evaluation of license applicants.

(a) *Management Qualifications.* Management qualifications, including demonstrated investment skills and experience as a principal investor, or a combination of investment skill and relevant industry operational experience; business reputation; adherence to legal and ethical standards; record of active involvement in making and monitoring investments and assisting portfolio companies; managing a regulated business, if applicable; successful history of working as a team; and experience in developing appropriate processes for evaluating investments and implementing best practices for investment firms.

(b) *Demonstrated Investment Acumen.* Performance of proposed investment team's prior relevant industry investments as well as any supporting operating experience, including investment returns measured both in percentage terms and in comparison to appropriate industry benchmarks; the extent to which investments have been realized as a result of sales, repayments, or other exit mechanisms;

14

evidence of previous investment or operational experience contributing to U.S. domestic job creation and, when applicable, demonstrated past adherence to statutory and regulatory SBIC program requirements.

**Investment Track Record Eligibility**

Prepare an Investment Track Record for all funds or individual investments in which your decision-making role meets the following criteria:

- You were a voting member of the investment or credit committee responsible for approving the investment, or

- You were the "deal lead," responsible for conducting the due diligence, structuring the investment, presenting the opportunity to the investment committee, and monitoring the transaction post-close.

If the principals of the Applicant do not have investments for which they held responsibilities as a voting member or deal lead, clearly indicate the role each principal had relative to the investments listed on the "Track Record" tab.

- Financial Analysis/Market Research
- Lead Structuring
- Lead Due Diligence
- Made Investment Recommendation to Investment or Credit Committee
- Member of Investment or Credit Committee
- Negotiation of Deal Terms
- Member of Board of Directors of the Portfolio Company
- Officer of the Portfolio Company
- Board Observer of the Portfolio Company Board
- Managed the Exit Process

While SBA places the greatest weight on investment experience gained as a principal in a traditional fund environment, we recognize that other types of experience may be relevant based on the investment strategy of the Applicant. If you have made investments on a "one-off" basis, but your track record lends itself to being viewed as if it were an actual fund, you may present a "synthesis" of those transactions. A Synthetic track record should include all qualifying investments currently held or which were terminated within the last ten years. You may include investments made:

- Individually with your personal funds.

- Through an entity for which you had discretionary voting authority, such as a trust of which you were the trustee.

15

- Through an entity (such as a limited partnership or LLC) that was formed for the specific purpose of making the investment, where you had decision-making authority over all aspects of the investment as general partner or managing member and were primarily responsible for raising the entity's capital from investors.

A prospective SBIC applicant may include a deal in his/her track record only if he or she:

(i) served on the Investment/Credit Committee that approved the transaction, OR

(ii) was a named member of the deal team responsible for performing due diligence, deal structuring, and the post-close monitoring of the investment for a meaningful period of time, OR

(iii) acted in a direct fiduciary role with authority over the full range of analysis and consummation of a transaction (for qualifying deals done outside of a formal investment fund environment).

In addition to possessing professional experience, team characteristics, and an investment track record that are acceptable to SBA, prospective SBIC fund managers must be individuals who have demonstrated good character and adherence to legal and ethical standards in their professional and personal lives. SBA will assess the individual characteristics of every team to determine whether the team merits approval for a green-light and ultimate licensure as an SBIC.

c. Non-Leveraged Applicants

Prospective managers of a non-leveraged licensee (i.e., a fund that does not intend ever to seek SBA leverage) must meet the same standards for character and integrity as any other applicant. They also must show that they have experience in sourcing, making, and monitoring investments, and that their experience is applicable or translatable to an investment strategy that is suitable and aligned with the mission of the SBIC program. However, because a non-leveraged fund presents no credit risk to SBA, managers are not required to demonstrate the same level of fully or partially realized investments or mark-ups. SBA will generally view private investors' willingness to capitalize the fund as a significant (although not determinative) indicator of management's investment capabilities. For non-leveraged funds, SBA is flexible with respect to managers' time commitments, although there must be sufficient staffing and resources in place to carry out the business plan and operate the fund in accordance with applicable regulatory requirements.

d. Emerging Manager Collaboration

SBA recognizes that the historical apprenticeship nature of the private investment industry creates structure barriers for aspiring new fund management teams. SBA has therefore established "The Emerging Manager Collaboration" structure as an acceptable means for emerging managers to address experiential and/or track record requirements in qualifying for a Leveraged SBIC license.

(1) "Emerging Manager Funds" are funds managed by individuals who do not have sufficient private investment experience which they can claim as an attributable track record to support an SBIC application. Such funds may choose to establish a formal, contractual arrangement ("Collaboration Agreement") with either:

16

a) An established SBIC Licensee that is managed by one or more individuals who are or were previously employed as a principal in an SBIC Licensee within the last ten years whereby one or more experienced SBIC principals ("Advisors") agrees to function as voting members of the applicant's investment committee, or

b) An Investment Adviser/Manager ("Advisor Firm") that has both a demonstrated investment track record aligned with the asset class and strategy of the proposed SBIC and sufficient regulatory and operational experience managing an SBIC.

(2) Advisors and Advisor Firms may function in a part-time capacity, provided that their time commitment is sufficient to allow regular, meaningful participation in the applicant's investment committee deliberations or support the regulatory and operational requirements of the SBIC. An Advisor or an Advisor Firm must be a voting member of the applicant's investment committee with commiserate fiduciary responsibilities to the fund and SBA.

(3) Advisors and Advisor Firms will be vetted by SBA in similar fashion to applicant principals, requiring full submission of prior professional experience, investment track record, and personal history disclosures. SBA will only approve Advisors and Advisor Firms who demonstrate a satisfactory prior track record of financial returns, regulatory compliance, and good character within the SBIC program. Prospective Advisors and Advisor Firms should have experience making investments within the asset class contemplated by the applicant.

(4) Advisors and Advisor Firms may be approved by SBA if they satisfy the track record requirements of the "Emerging Manager Collaboration" section paragraphs 1 and 2 above and if at least one principal of the applicant has demonstrated private investment industry experience, success leading and growing a private business, a record of repeated successful angel investments, or transaction experience that qualitatively meets all the requirements of the "Management Team Qualifications" set forth in section II, paragraph (F).

(5) Advisors and Advisor Firms must make a meaningful personal investment in the applicant fund or in the management company of the licensee, commensurate with their time commitment in relation to the other fund principals.

(6) In connection with their services, Advisors are entitled (but not required) to receive an appropriate allocation of carried interest and reimbursement of reasonable expenses related to their participation as an investment committee member of the applicant.

(7) Applicants may also contract with Advisor Firms for various other forms of support (e.g., administrative/back-office services, office space, etc.). All such agreements must be submitted for SBA's review and approval and must reflect fair market rates.

(8) SBA will not determine participants in an approved Collaboration Agreement to be under Common Control for the purposes of Maximum Leverage Ceiling calculations solely on the basis of participation as an Advisor or Advisor Firm (*i.e.,* other factors indicating Common Control must be present for a Common Control designation to be made).

17

(9) Proposed Collaboration Agreements must be submitted with the initial MAQ submission, and the Applicant should indicate in the submission the application is for an "Emerging Manager Collaboration."

e. Evaluation of Management Qualifications

All prospective SBIC fund managers must complete a "personal history" in SBA Form 2181 Exhibit D of the Management Assessment Questionnaire (MAQ) and answer all questions relating to such personal history. The personal history asks for:

(1) personal identifying information;
(2) professional and educational background;
(3) criminal history;
(4) involvement in civil legal proceedings and/or professional disciplinary proceedings;
(5) investment/transaction experience and track record;
(6) relevant business, community, and personal affiliations; and
(7) an authorization for SBA to obtain a personal credit report.

Additionally, references for each principal of the applicant must be included in the Form 2181 on the "references" tab. References should be from the following categories: supervisors or partners, peers, portfolio company executives, portfolio company co-investors, fund investors, and general character references.

The subset of MAQ worksheets and exhibits that must be submitted to cover **each principal** are:

(1) Investment Track Record
(2) Principal Bios
(3) Applicant Economics and Time
(4) References
(5) Exhibit A – Activities and SBIC Relationships
(6) Exhibit B – Individual Declarations
(7) Exhibit D – Individual Legal Questionnaire

In addition to completing the MAQ workbook and related exhibits and attachments, Applicants are to include draft copies of the Limited Partnership Agreement (LPA), the General Partner Operating Agreement (or other governing General Partner Agreement), the Private Placement Memorandum (PPM), the management agreement between the SBIC and the Investment Adviser/Manager (Manager Agreement), and any draft side letters at the time of initial MAQ Application to streamline the review process. Other relevant draft or executed legal agreements should be provided at the time of initial MAQ Application as well (e.g., placement agreement, service agreements, etc.). Please note, in order to reduce processing and review time, SBA encourages applicant to closely adhere to SBA's Model Limited Partnership Agreement, which may be found at https://www.sba.gov/document/support--model-

debenture-sbic-lp-model-partnership-agreement-version-30. Exhibits that must be submitted by each principal with the Final License Application filing include:

    a. Submission of fingerprints through an SBA-contracted channeler via either online scan or Fingerprint Cards (Form FD-258)
    b. Final versions of all forms and exhibits listed above for the MAQ submission, including the Form 2181, Exhibit E

An individual who submits an exhibit that contains a false statement, a misrepresentation of a material fact, or a failure to disclose of a material fact may not serve as a principal of the proposed SBIC; depending upon the seriousness of the false statement/non-disclosure, this bar from the program can be permanent. There are **no** exceptions to this policy.

The major elements of the due diligence process are as follows:

(1) <u>References</u>. Contacting listed references and developing and contacting unlisted references to verify information provided by the prospective managers regarding their background, experience, authority level and involvement in particular deals, and to evaluate their character, business reputations and ability to operate a successful fund. This process begins with verification of factual information and includes an assessment of qualitative factors, such as the team members' individual strengths and weaknesses, complementary skills, ability to work together and stay together as a team, and ability to function in a regulated environment.

(2) <u>Electronic Records Review</u>. Performing electronic records searches to identify issues that may reflect on an individual's suitability to serve as an SBIC fund manager, such as indications of criminal activity, breach of fiduciary duty, or financial irresponsibility in either a personal or business context. The analyst must perform a general background review of each prospective manager using open internet search and must review the available public records; these searches should be performed during the Green Light review phase and should then be updated at Fund Closing (as defined below). Searches should cover not only the individual managers, but also any entities in which the manager has past or present involvement as an equity owner, board member, lender, or member of senior management; such entities may be identified in the personal history exhibits or may come to light during the search process.

(3) <u>Experience/Track Record</u>. Reviewing the investment/transaction track record claimed by each prospective manager, including evaluation of the validity of valuation, financial returns claimed on key deals (those that drive the overall rate of return), and the cumulative track record; the role claimed by the individual with respect to particular investments, transactions and organizational responsibilities; and whether the cumulative experience track record aligns with the strategy of the proposed fund. Past performance will also be reviewed for any material adverse changes at Fund Closing.

(4) <u>Legal Disclosures</u>. Evaluating the significance of legal proceedings disclosed by prospective fund managers in Exhibit D or discovered through due diligence. The licensing analyst will request guidance from the SBA OGC attorney assigned to the application concerning the type of documentation that should be obtained from the applicant. Both the licensing analyst and the OGC attorney should then review the submitted material and any other relevant information obtained through the due diligence process. In the case of unresolved litigation, investigations, disciplinary proceedings or other issues, SBA must consider a "worst-case" outcome in evaluating how the matter affects an individual's suitability to manage an SBIC and assess how likely that outcome appears to be.

(5) <u>FBI Criminal History Check</u>. Completion of FBI criminal history checks based on electronically submitted Fingerprints and Exhibit D. The applicant's principals have their fingerprints scanned as per instructions at SBA's online portal (www.applicantservices.com/sba) and submit Exhibit D as part of the initial MAQ filing. An SBA contractor manages the electronic submission of scanned fingerprints to the FBI and communicates results back to Licensing. The Licensing program specialist forwards the Exhibit D to the Office of Personnel Security, which in turn transmits them to the FBI. The FBI conducts two separate checks:

    a) The fingerprint check will indicate whether the subject has any type of criminal record.

    b) The "name check" will indicate whether the subject is or has been under investigation, even if no charges have been filed.

    c) Charges that have been dismissed, discharged, expunged, or not prosecuted may still appear on FBI records; accordingly, the license application instructs applicants to disclose them.

(6) <u>Personal Credit Report</u>. Obtaining and reviewing a personal credit report on each prospective fund manager. The licensing unit has an account with a credit reporting bureau for this purpose. SBA must obtain a signed authorization (SBA Form 2181, Exhibit D) from the subject before running any credit report. If an individual's credit report contains unfavorable information, SBA will contact that individual (and no other individuals involved with the application) to provide him or her with an opportunity to explain or rectify the problem. Prior disclosure of such information is recommended.

(7) <u>Outside Positions and Affiliations</u>. Determining whether prospective fund managers hold positions or have affiliations that suggest the possibility of direct State or local government control of the applicant. Such positions or affiliations are not prohibited as 107.230(d) does not prohibit state or local government control of an applicant. However, 107.230(d) excludes certain state or local entities from qualifying as Private Capital or limits the amount of Private Capital which such entities can contribute to a Licensee, and SBA requires awareness of these facts to conduct full due diligence.

(8) <u>Examinations Database</u>. SBA maintains an examinations database as part of the ID information system to which all licensing analysts have access. This database provides the dates on which SBICs have been examined and summarizes the findings noted in each report. For more detail,

the actual examination reports can be found in the individual SBIC's operations file, which also includes all correspondence related to the resolution of findings.

(9) <u>Unresolved Examination Violation</u>. SBIC Licensing does not recommend an applicant for licensing if members of its management team operate an existing SBIC that has an unresolved regulatory examination violation. If members of an applicant's management team operate or have operated an SBIC with an overall record of poor compliance, that is sufficient reason to not recommend licensing the applicant, even if the violations were corrected. However, in formulating its recommendation, SBIC Licensing may consider such factors as whether the compliance record improved over time, the nature of the violations, the promptness with which violations were corrected, and repetitiveness of violations.

(10) <u>Legal Agreements and Marketing Materials</u>. All LPAs, side letter agreements, general partner agreements, management agreements, offering documents and other legal agreements are subject to SBA review and comment, and SBA reserves the right to require appropriate modification of such documents.

f. Foreign Principals

A foreign principal (i.e., a non-resident alien) may be part of an SBIC's management team, subject to the following conditions:

(1) The foreign principal must meet all the same requirements that US citizens or permanent residents—*i.e.,* he or she must:

a) be qualified from the standpoint of experience, and

b) be a person of demonstrated character and high ethical standards as assessed by background investigations performed through the Office of Personnel Security and by due diligence performed by SBA Investment Division staff.

(2) The applicant must have at least one other fund manager who satisfies the direct investing/transaction experience requirement and would fully qualify the fund to be an SBIC even if the fund lacked the foreign principal. The foreign principal cannot hold, directly or indirectly, more than 49 percent of the ownership interests of the general partner or other managing entity of the applicant. The US citizens or resident alien principals must hold at least 51 percent of the ownership interests of the general partner or other managing entity of the applicant.

(3) SBA must confirm that the foreign principal has an appropriate US work visa permitting him or her to be in the country throughout the life of the fund, if the applicant's business plan contemplates that he or she will enter the US to participate in the SBIC's domestic operations. SBA should also ask foreign principals for a written representation concerning how much time they intend to spend in the US during each year of the SBIC's active investment period. Formal written notice must be given to the principal indicating that SBA approval as a principal does not constitute authority to enter the United States.

(4) Due diligence on the foreign principal must be performed by an expert private security firm, acceptable to SBA, with experience doing background checks in the principal's native country. The cost of the private due diligence must be borne by the principal of the fund, the applicant's

21

management company, or its general partner or equivalent managing entity, not by SBA or the SBIC (unless reflected as a reduction of the SBIC's Regulatory Capital). The private security firm must be engaged by a third party, typically the applicant's law firm (which can bill the cost of the investigation back to the individual principal, management company, or GP), to avoid potential conflicts of interest that could arise if the private security firm were hired to investigate its own client.

(5) SBA must be satisfied that the ownership and profit interests of the US principals of the SBIC are sufficient to ensure that the SBIC would be managed safely and soundly in the event the foreign principal were no longer involved in the management of the SBIC.

g. Requirements for Criminal History Checks

The following individuals and entities must submit Form 2181 Exhibits A, B and D, as appropriate:

(1) All officers and directors of a corporate SBIC, general partners of a limited partnership SBIC, or managers of an LLC SBIC. (Note that if the general partner, in the case of a limited partnership SBIC, or the manager in the case of an LLC SBIC is an entity, then all of the individual managers or members of the entity must be listed.) This includes non-principals with any ownership stakes in the Investment Adviser/Manager.

(2) All individuals or entities that exercise "Control" or who are "Control Persons" (both as defined in 13 CFR 107.50) of the Licensee, the General Partner of the Licensee, including limited partners with greater than fifty percent (50%) or more of the unfunded and funded commitments to the Licensee.

(3) All investment committee members and any individual whose role is highly influential (SBA liaison, compliance officer, officers and employees of the applicant's Investment Adviser/Manager with day-to-day management responsibility and/or signing authority for the applicant).

(4) The three ranking managers or officers of any entity described in (a) or (b) above.

(5) SBA will submit completed Forms 2181 Exhibits B and D to the FBI, which will conduct a name check to determine whether the subject is or has been under investigation. In addition, an individual in any of the above categories must also submit fingerprints (Form FD-258), unless they are one of the three ranking managers of an entity that qualifies for one of the following exemptions.

**EXEMPTIONS:** The entities listed below are exempt from the requirement that their three ranking managers submit fingerprint cards. However, if one of the three ranking managers of such entity has an arrest record, that individual must submit fingerprint cards regardless of these exemptions. Furthermore, the three ranking managers must submit a Form 2181, Exhibit D even if they are not required to submit fingerprint cards.

(1) Companies registered under the Investment Company Act of 1940.

(2) Advisors registered under the Investment Advisers Act of 1940.

(3) Broker-Dealers registered under the Securities and Exchange Act of 1934.

(4) Federal Home Loan Banks.

(5) National banks regulated by the Office of the Comptroller of the Currency, FDIC members, or federal savings associations regulated by the Office of Thrift Supervision.

(6) Any company subject to regulation under the Bank Holding Company Act or regulated as a Financial Holding Company under the Gramm-Leach-Bliley Act.

(7) U.S. subsidiaries of foreign banks that take deposits in the US, provided the subsidiary has a net worth of at least $10 million.

(8) Foreign banks that do NOT accept deposits in the U.S. and which have a net worth of $50 million or greater and have publicly available audited financial statements.

(9) Domestic insurance companies with a minimum of $10 million of surplus.

(10) Any corporation (domestic or foreign) whose stock (or ADRs) trades on the New York Stock Exchange.

(11) Any company required to file periodic reports with the Securities and Exchange Commission under Section 15(d) or 12(g) of the Securities and Exchange Act of 1934 *and* whose net worth is $20 million or greater, *and* whose stock trades on the American Stock Exchange or the NASDAQ National Market.

(12) State and local government agencies.

(13) State and local government retirement plans.

(14) Employee benefit plans covered by ERISA with assets of at least $50 million.

(15) Entities tax-exempt under §501(c)(3) of the Internal Revenue Code with assets of $10 million or greater, net of liabilities.

(16) Foreign entities substantially equivalent to those exempted above, as determined by SBA.

(17) Other domestic institutional investors subject to SBA approval.

When a subsidiary of an exempt entity invests in an SBIC, the subsidiary cannot rely on the fingerprint exemption unless it is subject to the same requirements as its parent company with respect to the approval of top managers and general regulatory oversight.

In determining whether a foreign entity is substantially equivalent to an exempt domestic entity, the analyst should consider how the foreign entity is regulated; whether the ranking managers were required to undergo background checks or other approval procedures; and whether any independent outside agency (e.g., the International Monetary Fund) has evaluated the adequacy of the regulatory oversight environment in which the foreign entity operates.

23

h. Disclosure Requirements

Exhibit F of SBA Form 2181, "Capital Certificate," contains additional requirements for disclosure concerning investors in an applicant.

The Capital Certificate must identify investors who:
  (1) invest in the equity interests of the Applicant,
  (2) are the beneficial owners of equity interests of the Applicant, or
  (3) control* the equity interests of the Applicant.

*For purposes of identifying control, defined as 50% or greater ownership, the equity interests of all affiliates must be aggregated.

i. Due Diligence for SBIC Interagency Partnership Initiatives

Applicants of an SBIC Program Interagency Partnership Initiative, whereby SBA acts in an "outsourced CIO (OCIO) capacity" in support of the investment and mission objectives of another federal agency, may be subject to additional due diligence.

An example of an SBIC Program Interagency Partnership Initiative is SBA and Department of Defense (DoD)'s SBIC Critical Technologies Initiative (SBICCT). SBIC Applicants for the SBICCT will undergo additional security screening on foreign influence, ownership and capital, conducted by the DoD. The SBA SBIC Licensing team may also coordinate with the DoD to evaluate the critical technologies that SBICCT Applicants propose to invest in order to confirm that the proposed investment strategy areas align with SBICCT objectives.

3. Entity Formation and Eligibility

SBA allows a licensed SBIC to be:

1. A Limited Partnership entity which is managed by its affiliated General Partner, which may be affiliated with a separate Management Company.
2. An LLC entity, provided that SBIC applicants are not eligible for leverage and must be organized under Delaware law.
3. Managed and owned as a stand-alone investment corporation (SBA notes that corporations are generally not utilized within the SBIC structure, and an SBIC licensee formed as a corporation may result in an extended review and due diligence process).
4. An entity that is affiliated with a broader investment firm or an entity which is a subsidiary, sleeve, or sidecar of a non-SBIC licensed entity.

An entity licensed as an SBIC cannot invest in entities licensed as SBICs, except as permitted under 13 CFR § 107.720(i)(1).

Applicants forming an entity as a sleeve or sidecar will be requested to provide a rationale for the structure. Additionally, management fees for any entities formed as a sidecar fund must be reasonable (i.e., no greater than the management fees charged to the primary fund).

24

a. Limited Partnerships

An SBIC organized as a limited partnership is subject to the requirements of 13 CFR 107.160. This section also includes the regulatory requirements applicable to the general partner of a limited partnership SBIC (as well as any general partner of the SBIC's general partner). SBA has an existing model limited partnership agreement that includes bolded, mandatory provisions that SBICs must include in their organizational documents without modification or additions. A copy of the model limited partnership agreement can be found at

b. Investment Adviser / Investment Manager

An SBIC is not required to have a separate management company but is permitted to do so by 13 CFR 107.510. Specifically, 13 CFR 107.510 allows a licensee to employ an "Investment Adviser/Manager" ("IAM"), subject to SBA's approval of the management contract. The creation of a separate company to manage an investment fund's administrative and financing activities is a standard practice in the private equity industry and most SBIC program applicants employ this structure.

(1) An SBIC typically pays its management company a fee subject to SBA approval. The management company is then responsible for paying all of the SBIC's "Management Expenses" as defined in 13 CFR 107.520. Specific examples of such Management Expenses are found in section 3.07(a) of the Model Debenture Limited Partnership Agreement. Costs that are excluded from the Management Expense definition, such as the cost of services provided by outside lawyers and accountants (if and to the extent that they perform services not generally performed by a venture capital company), may be paid directly by the SBIC. These costs, which are usually referred to as "partnership" or "fund" expenses, must be clearly defined in the SBIC's partnership or operating agreement and must not include costs that are properly includible in Management Expenses.

(2) An applicant's management company will usually have the same or similar ownership as its general partner (or equivalent entity); the applicant must explain the reasons for any major differences. If the management company is 100 percent owned by a single individual, SBA will ask for detailed information regarding any special powers held by that individual, such as the ability to remove other managers unilaterally. In general, SBA will look for meaningful checks and balances to ensure that the applicant is not under the control of only one person.

c. Non-Principal Ownership of the General Partner or Investment Advisor/Management Company

Limitations on Non-Principal Ownership

As a general matter, SBA permits up to 25% of the equity of an applicant's Investment Adviser/Manager to be held by one or more non-Principals of the fund. Although exceptions to this policy may be considered at licensing, requests for approval of such exceptions may significantly impact licensing time.

SBA recognizes that there are scenarios where an applicant management team may find it advantageous, for example, to grant some form of participation in the general partner's economics as an inducement to secure the commitment of an anchor limited partner. Similarly, there can be scenarios, such as with an Emerging Manager Collaboration, where it could be desirable to grant to a non-Principal some form of ownership in either the applicant's general partner or investment adviser/manager. In such circumstances

where alignment of incentives between the Licensee, its investors, and the SBA can be maintained, SBA is generally supportive.

To ensure alignment in maintained and program mission and intent upheld, in reviewing approval requests SBA will consider:

    (1) How the arrangement upholds the core mission and integrity of the SBIC program;
    (2) Impact on the durability of the firm managing the SBIC; and
    (3) Retention and incentivization of the principals of the SBIC.

Allocations of Carried Interest
The applicant's proposed allocation of the general partner/manager's carried interest should conform with the following guidelines:

    (1) The allocation must reasonably reflect each principal's value to the fund, which typically reflects the principal's professional qualifications and experience, professional network, and role in fundraising.
    (2) The fund managers in general, and particularly any individual principal whose qualifications SBA considers to be essential to the success of the fund, must have adequate economic incentive to remain with the fund and to maximize its performance. Although a principal may direct a portion of his/her carried interest to a family trust or similar entity, SBA will normally require a significant portion to be received directly by the principal.
    (3) SBA policy does not allow any one individual to receive more than 50 percent of the carried interest.
    (4) SBA policy allows no more than 25 percent of the carried interest to be allocated (in the aggregate) to parties other than principals and employees.

d. Common Control of a Licensee

If a Person Controls one SBIC Licensee but not another, SBA will not consider the SBIC Licensees to be under Common Control. SBA will generally consider a Person to have Control of a Licensee if any of the following circumstances exist:

    (1) The Person has significant direct ownership in the Licensee or the General Partner of the Licensee as follows:
        a) The Person owns or controls (by contract or otherwise) 50% or more of the Private Capital in the Licensee (i.e., 50% or more of the limited partner investment) or the General Partner of the Licensee; or.
        b) The Person owns or controls (by contract or otherwise) 33% or more of the Licensee or the General Partner of the Licensee and participates in the investment decisions of the Licensee; or

    c) The Person owns or controls (by contract or otherwise) a portion of the General Partner as described above with the exception of passive equity ownership as a non-managing member for the purposes of receiving carried interest no greater than 25%.

(2) The Person's participation in carried interest is over 25%.

(3) The Person is part of the General Partner's management team.

(4) The Person participates in the investment decisions of the Licensee, unless it can be clearly demonstrated to SBA's satisfaction that the Person does not have significant influence in those decisions. Such considerations may include:

    a) Whether the remainder of the Investment Committee would qualify for a license without the Person.

    b) Whether the Person has veto power or a significant voice in the Committee's decision making. In determining whether a Person has Control, SBA will also consider other relevant factors, including but not limited to whether the Person's ownership interest in the Licensee, its GP or its management company is disproportionately large when compared to other ownership interests in the Licensee, its GP or its management company.

## 4. Investment Strategy and Operations

Applicants are required to submit information regarding the prospective SBIC's investment strategy and operations in the "Narrative" tab of SBA's Form 2181, MAQ Form.

The responses in the Narrative are assessed for financial viability and alignment with SBIC Program mission and objectives, operational feasibility, and compliance with SBIC program regulations.

In addition to Form 2181, applicants must submit all applicable documents provide on the "Attachment Checklist" set forth in the SBA Form 2181, MAQ Form (see License Application Instructions for further details).

## 5. SBIC Signature Policy

On SBA forms and other program documents, SBIC Applicants and Licensees may use and accept (a) "wet ink" signatures (including facsimile, scan, or photocopies of such signatures, subject to the retention requirements, below), and/or (b) electronic signatures; provided that such electronic signatures comply with the requirements outlined below. Electronic signatures meeting these requirements will be treated as equivalent to wet ink signatures. Nothing herein affects existing SBA requirements as to who is required to sign any specific document or which documents an SBIC Applicant, Licensee, or Investor is required to sign.

### a. Technical Requirements

SBIC Applicants and Licensees electing to use or accept electronic signatures must ensure and attest to compliance with "Use of Electronic Signatures in Federal Organization Transactions," Version 1.0, January

Case 2:20-cv-00041-DCLC-CRW    Document 106    Filed 10/03/24    Page 37 of 298
PageID #: 3766

25, 2013, section D: "Requirements for Legally Binding Electronic Signatures" and the current version of the National Institute of Standards and Technology (NIST) <u>Digital Identity Guidelines, inclusive of any subsequent updates</u>. SBA also requires compliance with Identity Assurance Level 2 (IAL2), as described in the NIST Digital Identity Guidelines.

b. Electronic Form of Signature

The Electronic Records and Signatures in Global and National Commerce Act (ESIGN Act) defines electronic signature as "any electronic sound, symbol, or process attached to or logically associated with a contract or record and executed or adopted by a person with the intent to sign the record." Signatories should follow this definition of electronic signature with the exception that SBA will not accept an electronic signature that is solely voice or audio. Electronic signatures include digital signatures.

c. Electronic Signature Eligible Documents

    a) Unless otherwise prohibited by law, SBIC Applicants and Licensees may use and accept electronic signatures on all SBIC program documents, including those referenced below (collectively referred to as "Eligible Documents"), unless the applicable OII office otherwise requires the use of wet signatures on documents which are not subject to section 101(a) of the ESIGN Act.

        i. License application documents, including the MAQ and related documents.

        ii. Investor subscription and capital commitment documents, including commitment guaranties, provided, however, that where one or more electronic signatures are provided on the capital commitment or subscription documentation of any investor, such documentation must be accompanied by the written opinion of the outside legal counsel of such Applicant or Licensee, providing as follows:

> I have reviewed the signature pages on the commitment/subscription documentation for each investor of _____ [FUND], evidencing each such investor's capital commitment to _____ [FUND]. Each electronic signature is compliant with applicable SBA guidance for such signatures. Moreover, each page which contains an electronic signature also contains or is accompanied by sufficient information or data, in legible form, which, at a trial or evidentiary hearing conducted under the Federal Rules of Evidence, would permit the proponent seeking admission of such page into evidence to make a *prima facie* showing that such electronic signature is indeed an authentic manifestation of such investor intent to be bound by the statements and commitments on the document signed and to overcome any reasonable authenticity objection to such electronic signature.

        iii. Applications for Leverage Commitments and draws of Leverage.

        iv. Any instruments evidencing an SBIC's draw of Leverage, including SBIC Debentures.

     v.  Program reports required from Licensees (*e.g.*, Forms 468 and 1031).

    b) Except as may be otherwise expressly permitted, electronic signatures may not be used for filings with any authority or jurisdiction or with any judicial or administrative adjudicative body that does not otherwise permit such use or have the capacity to accept such signatures.

d. Not permitted

Electronic signatures may not be used for transactions that require filing of security or other documents with a jurisdiction that does not have electronic filing capabilities. SBICs must comply with Uniform Commercial Code (UCC) Article 9-105, which outlines the requirements for electronic chattel paper, and article 3 of the UCC, which outlines the electronic equivalent of a paper promissory note, known as a "Transferrable Record".

e. Vendor/Technology Requirements for Electronic Signatures

An SBIC Applicant or Licensee must ensure and attest that any electronic signature technology vendor it uses:

- Confirms its ongoing compliance with the Technical Requirements outlined in Paragraph 1, above, and all other requirements outlined herein;
- Has the experience, capabilities, and expected longevity to meet all SBA electronic signature requirements;
- Follows appropriate disaster recovery and archiving protocols; and
- Has adequate quality control processes.

f. Compliance, Quality Control, And Record Retention

The use of electronic signatures is entirely voluntary; however, SBIC Applicants and Licensees which choose to use or accept electronic signatures must ensure their electronic signature policies and procedures meet all requirements outlined herein, including their own oversight of the electronic signature process. OII will review compliance with the ESIGN Act as well as the Technical Requirements outlined above as components of its oversight of SBIC Licensees.

SBA's record retention requirements are the same for both wet ink and electronic signatures. For documents and records signed electronically, the audit trail as well as any computer systems (including hardware and software), controls, documentation, and any digital information necessary to the evidentiary authentication of electronic signatures must be retained by the SBIC and readily available for, and subject to, SBA inspection during the entire period of SBIC licensure. Wet ink signatures must be retained for the same period. An SBIC's system must be able to reproduce electronic records as accurately as if they were paper when printed or viewed. Such records must be made available to SBA on request.

6. Side Letters

    (1) SBA strongly encourages SBIC applicants and licensees to avoid the use of side letters.

(2) Terms that (i) apply to all of a fund's investors; (ii) impose restrictions on the activities of the fund or general partner; (iii) require the fund to engage or refrain from engaging in particular activities; (iv) require the managers to make best or reasonable efforts to achieve a particular result; or (v) may be construed to provide preferential treatment to or adversely affect certain investors should be included in the limited partnership agreement, not in a side letter. For example, a side letter agreement provision stating that the voluntary or involuntary bankruptcy of the General Partner will constitute a withdrawal by the General Partner should be included in the applicant's limited partnership agreement.

(3) If a fund or its general partner determines that a side letter will contain terms that are appropriate for a side letter and not more properly included in the fund's limited partnership agreement, the fund's limited partnership agreement must be amended to include a provision that specifically authorizes the fund and the general partner to enter into side letters and sets forth any conditions under which the fund or GP may do so. The provision must state that all side letters require SBA's prior written approval.

(4) An applicant must submit drafts of all contemplated side letters with the MAQ submission and all draft side letter agreement for SBA's written approval during the Fund Closing stage. If an applicant negotiates a side letter with an investor after licensure, the applicant must submit a draft to its assigned SBA Investment Analyst as soon as possible to minimize delay.

In addition, SBA notes the following with respect to certain provisions in the side letter agreements:

Most-Favored Nations

In order to effectively regulate the program, SBA must be able to readily determine the rights and obligations of Limited Partners, the General Partner, and the Investment Adviser/Manager. Therefore, SBA will not permit a "Most Favored Nation" clause which permits an automatic extension of MFN rights upon an investor. However, SBA will permit a "Most Favored Nation" clause that provides an investor must (i) affirmatively accept such favorable rights (ii) within a reasonable, time-limited period (e.g., 30 days) and (iii) any amendment to the side letter incorporating such rights must be presented to SBA for approval.

Conflicts with Partnership Agreement

Applicants may not submit any side letter that contains a general or blanket conflict of terms provision in favor of the side letter (e.g., "In the event of any conflict between the side letter and the partnership agreement, the side letter shall control.").

State Banking Laws

SBA carefully reviews any changes to the definition of Banking Acts and, in general, objects to material changes in which SBA cannot perform adequate diligence. SBA has determined that side letter provision that include a general reference to state banking laws in the definition of Banking Acts is overly broad and SBA cannot perform adequate diligence on such an extensive topic. Accordingly, side letter

provisions revising the definition of Banking Acts should narrowly target a specific section of the applicable state law that SBA can perform diligence on.

<u>Withdrawal Provisions</u>

(1) Opt-out provisions provide LPs the right to withdraw, without penalty, from the partnership under specified circumstances. SBA's Model Limited Partnership Agreement contains mandatory provisions that provide withdrawal rights for certain types of investors. For example, an LP that is exempt from taxation under Section 501(a) or 501(c)(3) of the Internal Revenue Code may elect to withdraw from the Partnership if it must withdraw in order to avoid loss of its tax-exempt status. An LP that is an "employee plan" or "government plan" within the meaning of ERISA or an "investment company" subject to registration under the 1940 Act similarly can elect to withdraw to avoid violations of applicable laws or 1940 Act registration requirements. See sections 8.06 to 8.11 of the Model Limited Partnership Agreement. In all of the cited sections, the right to withdraw must be supported by an acceptable opinion of counsel.

(2) In addition to the withdrawal provisions noted in paragraph 1, SBA may approve a provision that permits an LP to withdraw from the partnership if the partnership or general partner violates a stated written policy adopted by the LP. In determining whether to approve such a provision, SBA will consider whether the LP's policy promotes best practices and ethical behavior in the management of SBICs; whether it has been widely adopted by a significant important class of institutional investors; and whether it is compatible with the laws, regulations and policies governing the SBIC program. For example, many State pension funds have implemented a policy prohibiting the undisclosed use of placement agents, and SBA will generally approve a withdrawal right for a pension fund investor triggered by a violation of that policy. However, SBA will apply the following restrictions to the capital committed by an investor that has a withdrawal right approved under this paragraph:

   a) The unfunded commitments subject to the withdrawal right will not be considered "Regulatory Capital" as defined in 13 CFR §107.50 (capital contributed by the investor will be included in Regulatory Capital as it is paid in). The exclusion of unfunded commitments from Regulatory Capital will affect the SBIC's overline limit, capital impairment percentage calculation, and management fee.

   b) Although the investor's unfunded commitment is excluded from Regulatory Capital, SBA may allow the SBIC to include the investor's entire commitment in its Management Fee Base if SBA determines that the full amount of the investor's commitment is likely to be collectable. However, SBA will not allow the Management Fee Base to include any Assumed Leverage on the investor's unfunded commitment.

   c) If the investor requires not only the right to withdraw, but also the right to a refund of management fees in the event of a violation, the limited partnership agreement must provide that (1) the general partner or management company, not the SBIC, must pay the required refund to the investor; (2) the general partner or management company must refund to the SBIC the management fees paid by the SBIC based on the

31

investor's unfunded commitment; and (3) if the general partner or management company should fail to make the payments required under (1) or (2), the SBIC's principals will be personally liable to make the payments.

(3) If a prospective investor in an SBIC requires, as a condition of investing, that the SBIC either will or will not engage in certain activities, those conditions should be negotiated and set forth in the SBIC's limited partnership agreement. For example: The SBIC must maintain an office in a specified location; must make a certain percentage of its investments within a specified region; must not invest in any business involving alcohol or tobacco. SBA will not approve a special withdrawal right for a particular LP based on the SBIC's failure to fulfill such requirements. In addition, SBA will not approve a provision that allows an LP to opt out of funding a particular investment.

### 7. SEC Regulations

13 CFR 107.115 permits a "1940 Act Company" or a "1980 Act Company" to apply for an SBIC license; that section also permits an existing Licensee to convert, with SBA approval, to a "1940 Act Company" or a "1980 Act Company". The terms "1940 Act Company" and "1980 Act Company" refer, respectively, to companies registered under the Investment Company Act of 1940 and the Small Business Investment Incentive Act of 1980. Both types of companies are regulated by the Securities and Exchange Commission (SEC).

The 1940 Act regulates "investment companies," defined as companies that issue securities and engage primarily in investing in securities of other companies. Examples of regulated investment companies include mutual funds and closed-end funds. Even though SBICs issue securities (usually in the form of limited partnership interests) and are primarily engaged in the business of investing in securities, most are exempt from the requirement to register under the 1940 Act because they do not make public offerings of their securities and have fewer than 100 investors. SBICs with 100 or more investors are also exempt if all their investors are "Qualified Purchasers" as defined in the 1940 Act.

The 1980 Act created a type of investment company known as a "business development company" or "BDC" to encourage investment in "eligible portfolio companies". Eligible portfolio companies are generally private or thinly traded public US companies. BDCs operate as public, closed-end investment companies with shares that trade on a stock exchange or NASDAQ. They are regulated under the 1940 Act, but with some provisions different than those applicable to other investment companies. Unlike most investment companies which receive capital commitments from private investors and call the capital over time, a BDC receives investors' capital contributions up front through a public stock offering (although additional capital can also be raised through subsequent offerings). Although an SBIC itself can be a BDC, the more typical structure is for the SBIC to be formed as a subsidiary of a BDC.

Guidelines Concerning Debenture Applicants Structured as a Business Development Company or BDC Subsidiary:

32

(1) SBA will generally count a parent BDC's unfunded capital commitment as Regulatory Capital SBA will consider the SBIC eligible to obtain a Total Intended Leverage Commitment up to two times its Regulatory Capital if (1) the parent's funded net worth is at least ten times its total capital commitment to the SBIC, and (2) SBA is comfortable that sufficient liquidity exists to fund the commitment, taking into account such factors as cash on hand, access to additional equity capital and non-SBA credit facilities, operating income and expenses, historical and expected portfolio cash projections, and current and long term liabilities.

(2) If a parent BDC has (1) funded net worth at least six times its total capital commitment to the SBIC, and (2) SBA is comfortable that sufficient liquidity exists to fund the commitment, SBA will consider the SBIC eligible to receive a Total Intended Leverage Commitment up to two times its Regulatory Capital, but the SBIC's leverage draw will initially be limited to a single tier and a 1:1 leverage ratio until Regulatory Capital is fully paid-in. For example, if the SBIC has $50 million of Regulatory Capital, it can obtain a $100 million Total Intended Leverage Commitment from SBA but may only draw one dollar of leverage for every dollar of Leverageable Capital. The SBIC would call capital in this manner until such time as the full $50 million of Regulatory Capital is fully invested in qualified small businesses or used to pay permissible fund expenses. The second $50 million of leverage would become available only after the Regulatory Capital is fully paid-in

(3) If a parent BDC has funded net worth less than six times its total capital commitment to the SBIC and/or if the Investment Division determines that liquidity is insufficient, its commitment will only be counted as Regulatory Capital to the extent that it is paid-in.

(4) The SBIC program is not set up to increase leverage commitments incrementally over time as new Regulatory Capital becomes available to a licensee. SBA allows SBICs to apply for leverage commitments a maximum of 2 times per calendar year.

(5) 13 CFR 107.740 requires that no financing or commitment to a small business may exceed 30% of a SBIC BDC's Regulatory Capital without prior written approval.

(6) As a general rule, SBA will only license BDC funds that satisfactorily link, either directly or indirectly, incentive compensation of the principals responsible for the SBIC portfolio to the performance of the SBIC

## 8. Management-Ownership Diversification Requirements

An SBIC that intends to seek leverage must meet the capital diversification, "management-ownership diversification," requirements of 13 CFR 107.150. These requirements were adopted to provide for a degree of independence between the investors and the management of an SBIC. In general, this requires:

(1) Limitation on maximum investor capital percentage: No single investor or group of affiliated investors can own or control more than 70 percent of an SBIC's Regulatory or Leverageable Capital. This limit addresses SBA's concern of a super-majority investor, even a passive limited partner, controlling the managers of the SBICs such that the management team can no longer be said to have the ability to act independently.

(2) Exception for "traditional investment companies": An exception to the 70 percent limit may be made in SBA's discretion for a "traditional investment company," which SBA defines as a

33

professionally managed firm organized exclusively to pool capital from more than one source for the purpose of investing in a diversified pool of businesses that are expected to generate substantial returns to the firm's investors. The management of the SBIC must hold a fiduciary responsibility to the investors in the SBIC.

(3) Non-affiliation requirement which requires at least 30 percent of the Regulatory Capital and Leverageable Capital of the SBIC must come from investors who are unaffiliated with management of the SBIC, as detailed in 13 CFR 107.150(c). The general rule is that there must be at least three investors, unaffiliated with each other, each of whom has made a "significant" investment in both dollar and percentage terms as determined by SBA. The exceptions to this as "traditional investment companies" and certain types of "acceptable" Entity Institutional Investors which can qualify as an SBIC's sole capital diversifying investor. Such entities generally are subject to government oversight or regulation (e.g., banks, insurance companies, public or corporate pensions, endowments, and foundations).

   a) What factors may indicate control affiliation among diversifying investors? Affiliation, as defined in 13 CFR 121.103, exists between two parties when one party controls or has the power to control another, or a third party controls or has the power to control both. It is the power to control rather than the exercise of control that creates affiliation. Affiliation may arise based on such factors as the majority investor in an SBIC, majority control over SBIC management, or "identity of interests" (such as familial relationships).

   b) What is a "significant" investor? SBA evaluates significance on a case-by-case basis, depending on the size of the SBIC and the number of diversifying investors. The investment of each diversifying investor should be compared to the amounts invested by other diversifying investors for this purpose. An investment that is either less than $250,000 or less than 1 percent of Regulatory Capital is not considered significant.

(4) "Look-through" or "master funds" of traditional investment firm: As previously referenced, a subsidiary held by a traditional investment firm, often referred to as a "drop-down SBIC," typically has as its only investor a parent or master fund that is managed by the same individuals who manage the SBIC, and therefore cannot show direct ownership of 30 percent of its capital by investors unrelated to management. Under 13 CFR 107.150(c)(2), SBA may, in its discretion, consider the non-affiliation requirement to be satisfied if at least 30 percent of the SBIC's Regulatory and Leverageable Capital is indirectly owned, through a traditional investment company (i.e., the parent or master fund), or by investors unaffiliated with management. This "look-through" provision is available to a traditional investment firm that owns more than 70 percent of an SBIC.

## 9. Opinions of Counsel

All SBIC applicants are required to provide SBA with certain opinions of counsel, which should be included as an attachment with SBA Form 2181 MAQ submission.

(1) If an opinion is reliant on one or more certifications made by the applicant or its managers, SBA must be provided with a copy of the certification(s).

(2) During the license application process, OGC reviews required opinions of counsel in draft form. The opinions must be approved by OGC in final form before a license will be issued. SBA must receive an executed copy of any such opinion, identical to the approved draft, before the application is sent to the Administrator for final approval.

(3) Opinions must be rendered by "independent" legal counsel for the applicant. A law firm is not considered independent if any of its employees are involved in the management of the applicant. If the firm (or any of its affiliates) has a limited partnership interest or other ownership interest in the applicant, it will generally not be considered independent; however, SBA may make an exception for a *de minimis* investment.

(4) "Formation" opinions: All applicants must submit an opinion of independent counsel, addressed to SBA, stating the following:

a) The applicant has complied with all applicable local, state, and federal laws in the formation and organization of the applicant.

b) The applicant is chartered or registered by the appropriate authorities to conduct, in its proposed operating territory or area, only the activities described under Title III of the Small Business Investment Act of 1958, as amended.

c) The applicant is authorized and entitled to conduct said franchise powers in full in each jurisdiction to be named in its license as part, or all, of its operating territory, or area, immediately upon the issuance of a license. This means that the applicant, once licensed, will be legally able to operate in any location where it conducts business, even if the applicant is organized under the laws of a different state.

(5) Securities Opinions: All applicants must also submit evidence issued by the Securities and Exchange Commission ("SEC") that the securities of the applicant sold or proposed to be sold, as set forth in the license application, are not required to be registered under the Securities Act of 1933 and that the applicant is not required to register as an investment company under the Investment Company Act of 1940, or, if registration is required in either case, evidence satisfactory to SBA that the applicant has complied with such requirements. If counsel for an applicant believes that the applicant is not subject to the registration provisions of the Securities Act of 1933 or the Investment Company Act of 1940, SEC clearance is not required, and in such event, the applicant must provide an opinion to the effect that it is not so subject to such registration provisions.

(6) Tax Opinions: If the applicant is a partnership, an opinion must be provided that the partnership will be classified as a partnership for federal income tax purposes, stating that the partnership is not a publicly-traded partnership, as defined in Section 7704 of the Internal Revenue Code.

10. Private Capital, Regulatory Capital, and Leverageable Capital Requirements

a. Private Capital

Private Capital is defined in 13 CFR 107.230 as follows: Private Capital means the contributed capital of a Licensee, plus unfunded binding commitments by Institutional Investors (including commitments evidenced by a promissory note) to contribute capital to a Licensee.

(a) **Contributed capital.** For purposes of this section, contributed capital means the paid-in capital and paid-in surplus of a Corporate Licensee, or the partners' contributed capital of a Partnership Licensee, in either case subject to the limitations in paragraph (b) of this section.

(b) **Exclusions from Private Capital.** Private Capital does not include:

(1) Funds borrowed by a Licensee from any source.

(2) Funds obtained through the issuance of Leverage.

(3) Funds obtained directly or indirectly from any Federal, State, or local government agency or instrumentality, except for:

(i) Funds invested by a public pension fund;

(ii) Funds obtained from the business revenues (excluding any governmental appropriation) of any federally chartered or government-sponsored corporation established before October 1, 1987, to the extent that such revenues are reflected in the retained earnings of the corporation; and

(iii) "Qualified Non-private Funds" as defined in paragraph (d) of this section.

(4) Any portion of a commitment from an Institutional Investor with a net worth of less than $10 million that exceeds 10 percent of such Institutional Investor's net worth and is not backed by a letter of credit from a State or National bank acceptable to SBA.

(c) **Non-cash capital contributions.** Capital contributions in a form other than cash are subject to the limitations in § 107.240.

(d) **Qualified Non-private Funds.** Private Capital includes "Qualified Non-private Funds" as defined in this paragraph (d); however, investors of Qualified Non-private Funds must not control, directly or indirectly, a Licensee's management, or its board of directors or general partner(s). Qualified Non-private Funds are:

(1) Funds directly or indirectly invested in any Licensee on or before August 16, 1982 by any Federal agency except SBA, under a statute explicitly mandating the inclusion of such funds in "Private Capital";

36

(2) Funds directly or indirectly invested in any Licensee by any Federal agency under a statute that is enacted after September 4, 1992, explicitly mandating the inclusion of such funds in "Private Capital";

(3) Funds invested in any Licensee or license applicant by one or more State or local government entities (including any guarantee extended by such entities) in an aggregate amount that does not exceed 33 percent of Regulatory Capital; and

(4) Funds invested in or committed in writing to any Section 301(d) Licensee prior to October 1, 1996, from the following sources:

   (i) A State financing agency, or similar agency or instrumentality, if the funds invested are derived from such agency's net income and not from appropriated State or local funds; and

   (ii) Grants made by a state or local government agency or instrumentality into a nonprofit corporation or institution exercising discretionary authority with respect to such funds, if SBA determines that such funds have taken on a private character and the nonprofit corporation or institution is not a mere conduit.

(e) You may not accept any capital contribution made with funds borrowed by a Person seeking to own an equity interest (whether direct or indirect, beneficial or of record) of at least 10 percent of your Private Capital. This exclusion does not apply if:

   (1) Such Person's net worth is at least twice the amount borrowed; or

   (2) SBA gives its prior written approval of the capital contribution.


b. Regulatory Capital

Regulatory Capital is defined in 13 CFR § 107.50.

   (1) *General. Regulatory Capital* means Private Capital, excluding non-cash assets contributed to a Licensee or a license applicant and non-cash assets purchased by a license applicant, unless such assets have been converted to cash or have been approved by SBA for inclusion in Regulatory Capital. For purposes of this definition, sales of contributed non-cash assets with recourse or borrowing against such assets shall not constitute a conversion to cash. Regulatory Capital becomes Leverageable Capital when it is paid in.

   (2) *Exclusion of questionable commitments.* An investor's commitment to a Licensee is excluded from Regulatory Capital if SBA determines that there is a lack of enforceable legal agreements under United States law or there is an issue of collectability for financial or any other reason, *provided, however,* that the unfunded commitment of an investor that has satisfied the applicable net worth

37

test set forth in the definition of Institutional Investor will not be of questionable collectability (for financial reasons) if the Licensee's limited partnership agreement (or other governing agreement) contains sufficient provisions to ensure collectability.

c. Leverageable Capital

Leverageable Capital is a subset of Regulatory Capital. It is defined in 13 CFR 107.50 as "Regulatory Capital, excluding unfunded commitments." In other words, it is the capital actually paid in to an SBIC by its investors. Applicants must meet a minimum Leverageable Capital requirement ($2.5 million) to be licensed, as required by 13 CFR § 107.210. Following licensing, the level of Leverageable Capital determines the maximum amount of SBA leverage that a licensee is eligible to draw.

d. Limit on Leverageable Capital from State or Local Government Entities

13 CFR § 107.230(d)(3) permits capital contributions, Private Capital, from State or Local Government Entities:

*"Funds invested in any Licensee or license applicant by one or more State or local government entities (including any guarantee extended by such entities) in an aggregate amount that does not exceed 33 percent of Regulatory Capital"*

Since only 33% of aggregate capital contributions from such entities can be included in Regulatory Capital, only 33% of such capital contributions can become Leverageable Capital.


e. Institutional Investors

The definition of Institutional Investors is set forth in 13 CFR 107.50 and includes traditional institutions, such as banks or pension funds, as well as variety of entities and individuals meeting certain net worth requirements. The intent of defining Institutional Investors is to define certain categories of investors that SBA has determined have sufficient financial means to indicate a high probability that they will be able to fully fund their commitments to an SBIC licensee.

The definition of Institutional Investor also establishes minimum "net worth" criteria for various categories of entities and individuals. For most entities, net worth should be interpreted as total assets minus total liabilities, as presented on a balance sheet prepared in accordance with generally accepted accounting principles applicable to the entity. In the case of an entity that has unfunded capital commitments from its owners or investors, these commitments must be excluded from the net worth calculation. For individuals, net worth does not include the value of any equity in his/her most valuable residence. SBA, in its discretion, may accept financial statements prepared in accordance with applicable non-U.S. GAAP if the investor can satisfactorily explain how its financial statements equate to statements prepared under U.S. accounting principles.

SBA notes that (1)(xi) of the definition includes among the list of qualified entity Institutional Investors, "Any other entity that SBA determines to be an Institutional Investor." In practice, SBA uses this provision only to approve entities that do not meet the criteria for any other category based on their own net

38

worth, but has demonstrated to SBA's satisfaction that such entity will be able to fully fund their commitment to the SBIC licensee.

SBA notes that paragraphs (2)(B) and (2)(C) of the Institutional Investor definition, are not mutually exclusive; some individuals qualify under both (2)(B) and (2)(C). Where paragraph (2)(B) refers to an "individual whose net worth is at least $2 million", it should be understood as referring to an individual whose net worth is at least $2 million and less than $10 million so as to avoid overlap with paragraph (2)(C). Accordingly, any individual whose net worth is $10 million or more should be treated as qualifying under paragraph (2)(C).

A license applicant must certify, for every Institutional Investor listed on its Capital Certificate, the paragraph of the Institutional Investor definition under which the entity or individual qualifies.

### f. Adequate & Minimum Capital Requirements

All SBIC applicants must satisfy the minimum capital requirements set forth in the Act and 13 CFR 107.210. SBA requires SBIC applicants have initial paid-in and/or committed Private Capital equal to the greater of: (1) statutory minimum of $5 million (or $3 million if the applicant meets the requirement for "good cause"), or (2) any minimum amount stipulated in the applicant's own SBIC license application for an initial closing of the fund. In addition, SBA may decline to license an application if it determines that the applicant's initial capitalization is not reasonably sufficient to carry out its stated business plan effectively (see discussion of adequate capitalization below).

Irrespective of the amount of Regulatory Capital, an SBIC applicant must have a minimum of $2.5 million of Leverageable Capital prior to licensure. As a practical matter, SBA must receive documentation showing that the $2.5 million requirement has been satisfied during the Fund Closing stage.

SBIC applicants must also satisfy the adequate capital requirements set forth in Section 302(a)(3)(A) of the Act and 13 CFR 107.200. 13 CFR 107.200 states that the applicant must have enough Regulatory Capital to provide reasonable assurance that it "will operate soundly and profitably over the long term" and "will be able to operate actively in accordance with [its] Articles and within the context of [its] business plan, as approved by SBA." SBA notes that this requirement for adequate capital means that it is not necessarily sufficient for an applicant to meet the minimum capital requirements set forth in the Act and 13 CFR § 107.210. SBA must determine that the applicant has enough capital to make an appropriate number of investments in the targeted size range; to hire adequate staff with the skills and experience needed to source, structure, monitor, and exit those investments; and to provide the staff with the resources needed to perform these functions. Many applicants develop an initial business plan based on a particular fund-raising goal; if actual fund-raising is significantly less than the targeted level, then adequacy of the capital with respect to the business plan must be re-evaluated.

### g. Guaranty Agreements for Certain Investors

Guarantees are relevant to entities or individuals who wish to invest in an applicant and do not meet the criteria for any Institutional Investor category, but who have an Institutional Investor willing to back their commitment. Examples of investors utilizing guarantees may include:

(1) A family trust that does not have the $10 million of net worth needed for it to qualify as an entity Institutional Investor, but that is controlled by an individual Institutional Investor.

(2) A special-purpose investment vehicle with little or no funded net worth, created by a group of individuals who are all Institutional Investors in their own right.

(3) An investment fund that has large unfunded commitments from a number of Institutional Investors, but currently has no funded net worth of its own.

Such an entity may use a guarantee to have its commitment included as part of Regulatory Capital. In order to be included in Regulatory Capital, a non-Institutional Investor's commitment must be guaranteed in full by one or more Institutional Investors; while SBA will permit multiple Institutional Investors to guarantee an entity investor's commitment, SBA will not accept guarantees that cover (in aggregate) only part of a non-Institutional Investor's commitment. For example, SBA will not permit guarantees from multiple Institutional Investors that cover 50% of such entity investor's commitment. Additionally, any entities utilizing such guaranty agreements must fully complete the Guaranty Agreement set forth in the templates below. SBA reserves the right, in its sole discretion, to review and approve all proposed guaranty agreements – such agreements will not automatically qualify unfunded commitments from investors that do not qualify as Institutional Investors for inclusion in Regulatory Capital.

Adverse tax consequences may result for such investors, however, so SBICs and investors are cautioned to consult with legal counsel before using a guarantee in this situation.

## 11. Application and Licensing Process Overview

The formal SBIC license application process consists of two stages: an initial application, known as the "Green Light" stage, and a "Fund Closing" stage, both of which are described below. Applicants that receive a Green Light letter are given up to 12 months to raise capital from private investors and finalize the fund's organizational documents. During this period, no active review or other actions are carried out by SBA, and the fund-raising timetable is driven completely by the applicant and is not assessed as SBA processing time.

Once the applicant has completed its capital raise and fund formation processes, it may then submit a complete set of final draft documentation, along with Form 2181, Exhibit E "Certification of no Material Adverse Change," and Final Licensing Fee to initiate the Fund Closing stage, which concludes with issuance of an SBIC license to applicants that satisfy all program requirements.


### a. Applicant Intake

A prospective applicant may submit an "Applicant Interest Form" on SBA.gov to express interest in learning about the SBIC program. Based on the information that the prospective applicant provides in the "Applicant Interest Form", the applicant will receive a response and follow-up within 2-4 business days.

b. Pre-screen Process

If the prospective applicant's proposal appears to fit the criteria of the SBIC program, the prospective applicant may choose to submit a short form Pre-screen Manager Assessment Questionnaire (MAQ) which can be emailed to SBIC_Applications@SBA.gov. SBIC Program Staff will review the Pre-screen MAQ. If not all fields in the Pre-screen Manager Assessment Questionnaire (MAQ) are complete, SBIC program staff will contact the submitter to ask them to complete missing fields in the Pre-screen MAQ.

If all information in the Pre-screen MAQ is complete, SBIC program staff will contact the submitter and offer to have an optional "Pre-screen Conversation" to discuss the management team's investment experience, track record, and proposed SBIC investment strategy. This process is optional and non-binding; it is offered strictly as a professional courtesy to interested managers.

In the optional Pre-Screen Conversation, SBIC program staff or SBIC Interagency Partnership Initiative members will provide an indication as to whether the applicant appears to meet the goals and standards of the SBIC program. Following the optional pre-screen conversation, the prospective applicant will decide whether to move forward with the application process.

c. Application and Green Light Process for Applicants

After the pre-screen, or as the first step if the pre-screen is omitted, the prospective applicant completes SBA Form 2181, the *Management Assessment Questionnaire* (MAQ), including relevant legal documentation that is required to be submitted as set forth in the Form 2181 Attachment Checklist. This documentation must be filed, in its entirety, during one of four quarterly filing windows designated below. Contemporaneously, the non-refundable Initial Licensing Fee must be paid on Pay.gov.

Incomplete MAQ submissions will not be accepted for processing. If an applicant fails to file by the deadline date for a quarterly filing window, it must wait until the next quarterly window to refile – late applications will not be accepted. MAQ submissions should be emailed to SBIC_Applications@SBA.gov. The four quarterly filing windows are as follows:

| | |
|---|---|
| (1) | December 31 |
| (2) | March 31 |
| (3) | June 30 |
| (4) | September 30 |

SBA will hold **an interim filing window on November 1, 2023.** SBA, may at the approval of the AA/OII and Director of Patient Capital Investment, select to add and publicly announce in the Federal Register additional filing windows. Application filings should be made on the actual window date; filings made between window dates will be held in abeyance until the next window opens. If the quarterly filing date falls on a Saturday, Sunday or U.S. Federal Government holiday, the applicant may file the MAQ submission by 5:00 pm EST on the following day which is not a Saturday, Sunday or U.S. Federal Government holiday.

SBA has published a document, "SBIC Application Instructions" to help guide applicants through the application process and walk through considerations and expectations for completing the MAQ and related Exhibits. Importantly, you will be asked to specify the type of SBIC License you are applying for:

(1) Standard Debenture SBIC
(2) Accrual SBIC
(3) Reinvestor SBIC
(4) Non-Leveraged SBIC

The **Standard Debenture SBIC License** requires the Licensee to pay semi-annual interest payments on Outstanding Leverage and is appropriate for investment strategies with a current-pay component (examples include mezzanine, private credit, multi-strategy credit, venture debt etc.).

The **Accrual SBIC License and Reinvestor SBIC** License do not require the Licensee to pay semi-annual interest payments on Outstanding Leverage. Instead, interest accrues over the life of the outstanding loan to the Licensee. Accrual SBIC and Reinvestor SBIC Licensees must pay the Annual Charge and accrued interest on Outstanding Leverage within six months of any non-tax distribution to your private investors. Details of the distribution waterfall requirements can be found in SBIC program regulations under CFR 13 § 107.585(c)

The **Reinvestor SBIC License** is a license type designed for fund-of-funds strategies. It requires the Licensee to invest the majority of the portfolio in underserved underlying funds. Reinvestor SBIC Licensees invest equity capital as a limited partner in underlying funds and may also directly invest or co-invest in portfolio companies which may or may not be held by the underlying funds. Reinvestor SBIC Licensees may not invest in underlying funds which are themselves Leveraged SBICs. However, Reinvestor SBIC Licensees may invest in underlying funds which are Non-Leveraged SBICs and funds which do not hold an SBIC license, so long as they meet SBA size standards and are underserved. Details regarding the Reinvestor SBIC License can be found in the SBIC program regulations under CFR 13 § 107.720(a)(2)(i).

The **Non-Leveraged SBIC License** is a license type designed for Applicants that will not be seeking SBA debenture leverage.

**a. Subsequent Fund Applications:**
Management teams that are already operating one or more licensed SBICs must be in good operational and regulatory compliance standing with SBA in order to submit a license application for a subsequent fund. Subsequent fund license applicants must have at least two full years of operations from date of licensing of the most recently licensed SBIC (a longer or shorter operating history may be merited based on track record and prior performance). The financial performance and portfolio valuations of the current licensee(s) must demonstrate adequate security for any outstanding SBA Leverage. The current licensee(s) must also be able to present a clean audit opinion from the SBIC's independent public accountant, covering the most recent, full year of operations, and no unresolved regulatory violations for the most recent SBA exam covering a period ended within 12 months of the request being filed.

Case 2:20-cv-00041-DCLC-CRW    Document 106    Filed 10/03/24    Page 52 of 298
PageID #: 3781

Each quarterly batch of applicants will be prioritized by SBA, with priority being assigned to applicants headquartered in Under-licensed States and priority investment areas as outlined in the SBIC Program Investment Policy Statement. In addition, Licensing will consider the following additional factors when determining processing priority for subsequent license applicants that have demonstrated a commitment to best practices within the SBIC program, as evidenced by:

(1) **Mission Alignment:** Strong advancement of SBA's mission in terms of job creation statistics.
(2) **Track Record:** An exemplary track record of regulatory compliance with consistently clean reports of examination for the most recent Licensee under management.
(3) **Organizational Stability:** Indicators of strong organizational cohesion and bandwidth, in terms of demonstrated practice of promoting-from-within and appropriate sharing of GP economics across the investment team.
(4) **Financial Management:** Prudent repayments of outstanding SBA leverage principal and interest amounts in-step with private distributions, and satisfactory benchmarking against asset-class peers (net IRR, net Distributions to Paid-In Capital and net Total Value to Paid-In Capital).

Applicants that open a secondary office in an Underlicensed State (but maintain their primary office in a state not designated as Underlicensed State) will be considered for priority status provided at least one applicant principal is physically domiciled and employed full-time in the state the secondary office is located within.

**b. Streamlined Application Requirements for Subsequent Fund Prospective Licensees**

Applicants operating an active Licensee, can apply under a "Modified MAQ" application by meeting the following eligibility criteria:

(1) **Consistent strategy and fund size**—proposed fund size is ≤133% the size of their most recent SBIC fund (inflation adjustments will be considered). Same asset class and investment strategy as most recent license.
(2) **Clean Regulatory History**—no major findings, significant "other matters" or unresolved "other matters" related to licensees managed by the principals of applicant in the previous 10 years.

(3) **Consistent LP-GP Dynamics**—a new limited partner will not represent ≥33% of the Private Capital of the licensee upon reaching final close at target fund size or hard cap. The two largest investors in terms of committed capital have verbally committed to invest in the new fund pending receipt of license. The most recent of active Licensee Limited Partnership Agreement and any Side Letters are not materially changing for the applicant fund.

(4) **Investment Performance Stability**—the most recent licensee net DPI and net TVPI are at or above median Cambridge performance benchmarks for the relevant asset class and strategy for the prior 3 quarters. The principals of the applicant are not managing a licensee in default or with high Capital Impairment (CIP).

43

(5) **Consistent or Reduced Leverage Management**— the applicant is requesting a leverage to Private Capital ratio ≤ the current or most recent SBIC licensee at target fund size or hard cap.

(6) **Firm stability**—subject to SBA's determination, no material changes to the broader firm to include resignations, terminations, or retirements by members of the General Partnership, investment committee, broader investment team or key finance and operations personnel that have a material adverse impact on the stability of the SBIC.

(7) **Promotions from within**—demonstration of promoting internal <u>investment team</u> talent from the firm/organization sponsoring the license.

(8) **Inclusive equity**—demonstration of increased sharing of carry and/or management company economics with promoted talent or distribution of more equitable economics among the partnership.

(9) **Clean Criminal Record**— the sponsoring entity and all principals of the Licensee do not have an FBI criminal record and do not have IRS violations from the date of their most recent SBIC fund licensure.

(10) **No Outstanding or Unresolved Material Litigation Matters** – no outstanding or unresolved litigation matters involving allegations of dishonesty, fraud, or breach of fiduciary duty or otherwise requiring a report under § 107.660(c) or (d) as to a prior Licensee, the prospective Applicant's general partner, or any other person who was required by SBA to complete a personal history statement in connection with the license application.

(11) **No Outstanding Tax Liens**—on the principals applying to manage the licensee, on the most recent or active licensee, and on the sponsoring entity of the licensee.

Should an applicant fulfill and formally attest to meeting all of the above eligibility criteria, the applicant can submit a streamlined "MAQ Sub Funds Form", subject to SBA's discretion that the applicant meets the eligibility criteria above. Such MAQ Sub Funds Form must be completed in its entirety, as well as relevant documentation and redlines set forth in the MAQ Sub Funds Form Attachment Checklist.

All named principals of the applicant will be subject to FBI criminal and IRS background checks as well as reference checks. Applicants with minimal and non-material changes to the active or most recent licensee LPA and any side letters can be prioritized for accelerated processing. Redlined versions, highlighting any changes to prior versions of such documents for the most recent or active licensee must be submitted.

Subsequent fund license applicants qualifying for accelerated processing will receive priority in the Licensing queue ahead of most other applicants, with the exception of SBIC applicants located in Underlicensed states with below median financing and applicants States targeting a priority investment theme identified by SBA under Section I (B) above. Prioritized applicants will receive priority review from

44

SBA staff, subject to any headcount/resource constraints, as well as ongoing precedence for committee consideration and approval.

**c. New Manager Applications:**
Similar to subsequent fund applications, each quarterly batch of applicants will be prioritized by SBA, with priority being assigned to applicants headquartered in Underlicensed States with below median financing and priority investment areas as outlined in the SBIC Program Investment Policy Statement.

**d. Applications for SBA Interagency Partnership Initiatives:**
Applications for SBA Interagency Partnership Initiatives will be processed by SBA Licensing Team. If an applicant for an SBA Interagency Partnership Initiative met with SBA Interagency Partnership Initiative Staff for either an Intake or a Pre-screen conversation, SBA Licensing team may contact those Program Staff that participated in those meetings for any additional context on the application.

**e. Post-Filing Process:**
Once the application has been filed and accepted for processing, Licensing and SBA Legal will review the MAQ submission, performing operational and investment due diligence and legal review of the relevant documents. Upon completion of due diligence and reviews, Licensing will make a recommendation to the Investment Committee as to whether the applicant appears to have the minimum qualifications necessary to manage the proposed SBIC.

If the Investment Committee concludes, by majority vote, that the management team is qualified, the applicant is invited for a one-hour formal interview.

Following the interview, the Investment Committee votes on whether to recommend approval of a Green Light letter. If a majority of the Investment Committee is not in favor, the applicant will be denied and notified by telephone call from the Chief of Licensing or Director of Licensing. If a majority of the Investment Committee is in favor, the Licensing Unit will then present the applicant and recommendation to the Agency SBIC Licensing Committee for consideration.

The Agency SBIC Licensing Committee will review the recommendations of the Investment Committee and Licensing staff as well as pose additional questions as needed in order to assess an applicant's qualifications and support of SBA's mission. If the Agency Committee by majority vote disagrees with the Investment Committee's recommendation, the applicant will be denied and notified by a telephone call from the Chief of Licensing or Director of Licensing. If a majority of the Agency SBIC Licensing Committee is in favor, the applicant will be forwarded on to the SBA Administrator for final approval of a Green Light.

If the Agency SBIC Licensing Committee is reviewing a recommendation pertaining to an SBICCT applicant, the Office of Strategic Capital (OSC) Chief Investment Officer will participate in the Committee Meeting for Green Light Approval for SBICCT Applicants.

If approved by the SBA Administrator, the applicant will be issued a Green Light Approval letter and

indication of the Total Intended Leverage Commitment by email. If the Administrator declines issuance of a Green Light Approval, the AA/OII or Director Patient Capital Investment will notify the management team of the decision in writing.

d. Green Light Approval and Duration
When an applicant is issued a green light by SBA, this is a certification that the management team will be issued an SBIC license and the intended financial commitment from SBA at Fund Closing, provided the following terms and conditions are met:

a. The applicant's final legal documents are reviewed and approved by SBA for legal sufficiency.

b. The applicant's final Capital Certificate represents both Leverageable and Regulatory Capital in sufficient amounts to satisfy both financial and legal requirements to the satisfaction of SBA.

c. The applicant does not present any material adverse changes from the profile originally reviewed and approved during the Green Light stage. Material adverse changes include, but are not limited to, issues such as key principal departures, shifts in investment strategy, subsequent deterioration of prior investment track record and subsequent records of arrests, litigation or governmental enforcement actions against the principals or fund. SBA in its sole discretion determines whether changes in an applicant's profile are material and adverse.

Applicants have 12 months from the date of issuance of the green light letter to file for Fund Closing. This is considered a "quiet period" relative to SBA engagement; SBA does not involve itself in the fund-raising activities of applicants nor does it perform any type of review or processing while applicants during this period. Green-lit applicants should be focused solely on fund-raising; this stage is not to be utilized for submission of interim changes to legal documents or commencement of any form of investment operations.

**During this Green Light Phase, SBA will not permit as Regulatory Capital or Leverageable Capital any management fees accrued or paid-in capital commitments investments made by an applicant prior to licensure and will generally not permit pre-licensure investments in the portfolio of an applicant fund.** Applicants should complete their fundraising during the term of their active Green Light letter so that a complete and finalized application package may be submitted at the Fund Closing stage.

If an applicant decides to pursue an SBIC license after the expiration of its Green Light, it must refile a MAQ and start the process anew. SBA will grant up to a two-week "grace period" following green light expiry for receipt of final closing documents, but no other extensions of a green light letter will be permitted.

e. Fund Closing
When an applicant has secured sufficient Private Capital and is prepared to hold an initial close on the fund, its principals may file their submission for the final "Fund Closing" stage of the licensing process. Upon the date of receipt of Final Licensing Fee payment, the application will be considered 'received' by

SBA. The following documents must be filed as part of the applicant's submission:

(1) Complete set of final legal documents, including limited partnership agreement, general partner's operating agreement, investment advisory services agreement, general partner's certificate of formation/incorporation, opinions of counsel, and any proposed side letters or other agreements applicable to the proposed SBIC. These documents must be redlined against the draft versions originally approved by SBA during the Green Light stage of the process. All proposed documentation must be submitted in a single filing at Fund Closing; subsequent amendments (other than those required by SBA) or additional side letters/agreements will not be accepted. Fund Closing is intended to be an abbreviated verification process, not an ongoing series of negotiations and redrafting. Wet signatures are not required. Electronic signatures that are compliant with SBA's electronic signature policy (described above) are acceptable.

(2) An executed Capital Certificate representing both Leverageable and Regulatory Capital in sufficient amounts to satisfy both financial and legal requirements to the satisfaction of SBA. All subscribed limited partner investors are subject to SBA review and approval. Investors that appear to exercise undue control over the management team, exhibit questionable collectability of their commitment amounts, or that present potential reputational concerns for the program may not be counted toward Regulatory Capital or, in certain instances, be disqualified by SBA from investing in the applicant. If such circumstances result in the applicant no longer having sufficient Leverageable/Regulatory Capital, the applicant will be removed from the Fund Closing process. This Capital Certificate will determine the Regulatory Capital base upon which SBA's Leverage Commitment (if any) to the new licensee will be calculated. While new licensees may hold subsequent closings for up to 12 months post-licensure or its initial closing (whichever comes first), SBA strongly encourages applicants to maximize their fundraising prior to filing for the final Fund Closing stage of the process.

(3) If applicable, a complete schedule of any organizational expenses that are being requested for SBA approval for inclusion in the applicant's Leverageable/Regulatory Capital.

(4) A bank letter certifying the requisite minimum $2.5 million in Leverageable Capital, minus any SBA-approved organizational expenses. Such bank letter must be signed by a senior officer of the bank (e.g., Senior Vice President or above) and must include **only** the following language:

> "This certifies that there is on deposit in the name of _____ the sum of _____. This bank has no right, written or otherwise, to restrict the use of or the withdrawal of funds from this account, or to apply the funds in this account against any indebtedness owed to it; and it has no knowledge of any agreements with other parties restricting the right of withdrawal from, or concerning the use of, the funds in this account.

(5) A certification of no material adverse changes in the qualifications of the management team. This shall be evidenced by a newly signed and dated version of the original MAQ submission

Case 2:20-cv-00041-DCLC-CRW    Document 106    Filed 10/03/24    Page 57 of 298
PageID #: 3786

accompanied by a certification letter asserting there have been no such material adverse changes (any changes that have occurred in the MAQ filings should be redlined for SBA's attention and summarized in the certification letter). Failure to disclose a material adverse change will be deemed a willful filing of a false statement, disqualifying the applicant from further consideration as an SBIC licensee.

Applicants that are unable to respond satisfactorily within 30 days of receipt of SBA's comment letter(s) after starting the Fund Closing process, or those that have not demonstrated acceptable amounts of Leverageable and Regulatory Capital within the same period, will be notified in writing by the Director or Chief of Licensing that they are being removed from the Fund Closing process. An applicant may, if subsequently able to remedy prior deficiencies, resubmit for Fund Closing at a future date within the effective duration of their original Green Light letter. Such applicants will be assessed a refiling penalty fee as outlined in 13 CFR 107.300. If the Green Light has expired, the applicant will need to refile a MAQ and restart the Green Light Process anew.

f. Reassessment Requests
   I.    Eligible Reassessment Categories

Applicants may request a reassessment of an adverse SBIC Green Light or licensing decision that was based on one or more of the following circumstances:

(1) **Ownership Diversification:** SBA's determination that applicant does not possess Management Ownership Diversification as required under 13 C.F.R. § 107.150.

(2) **Sufficient Regulatory Capital:** SBA's determination that applicant does not possess adequate Regulatory Capital as required under 13 C.F.R. § 107.200.

(3) **Private Capital:** SBA's disqualification of investor commitments as Private Capital pursuant to 13 CFR 107.230(b) or (d).

(4) **Business Plan Viability:** SBA's determination that applicant's business plan is in non-compliant, in whole or in part, with 13 C.F.R. § 107.720.

(5) **Mission Alignment:** SBA's determination that applicant business plan does not support the Agency's mission.

(6) **Unresolved Examination Findings:** SBA's determination that open, unresolved findings/other matters identified by the OII Examinations Division preclude approval of a subsequent fund license/green-light.

(7) **Unresolved Litigation:** SBA's determination that open, unresolved litigation related to the applicant or its principals presents a barrier to approval (not applicable to litigation that was not properly disclosed to SBA).

(8) **Legal Sufficiency of Applicant:** SBA's determination that legal sufficiency has not been achieved relative to the applicant's legal/ organizational documents.

II.    Forms and Required Documentation for Processing

All materials supporting a reassessment request must be submitted to SBIC_Reviews@SBA.gov. The following documentation is required for any request for a reassessment of a Green Light or license denial decision:

    (1) Cover letter specifying:
        a) The decision for which a reassessment is requested
        b) Eligibility category from the list of eight above which applies
    (2) The cover letter must be signed by all principals of the applicant
    (3) For each reassessment scenario cited, applicant must present a detailed written narrative including the following:
        a) Summary excerpt of SBA communication(s) identifying one of the eight scenarios as causative for the unfavorable decision
        b) Applicant's detailed rebuttal of the decision, with appropriate citation of relevant program regulations, prior precedents and supporting legal analysis
        c) Applicant's detailed proposal for addressing/remediation/mitigation of cited issue(s), if applicable

    (3) Presentation of any material previously withheld or not properly disclosed by the applicant is not eligible for submission supplemental information the applicant believes supportive of its position (does not apply to subsequent disclosures of litigation or other filings required by SBA that were not properly disclosed previously by the applicant).
    (4) All documentation relative to the reassessment request must be submitted by the applicant in writing, and under single cover. This will constitute the totality of items to be considered by the Director of Licensing and, as appropriate, the Risk Committee.

III.    Internal Review and Communication Expectations

The Director of Licensing shall promptly review (within 10 business days) each applicant reassessment request and shall within such 10-day period notify the Risk Committee of the request and its summary content. The Risk Committee shall have the right to request a full copy of any reassessment requests.

The Director of Licensing shall consider the applicant's petition and supporting arguments, conferring with other SBA staff as they deem necessary and appropriate. Reassessment requests that are incomplete, unresponsive, or cite issues outside of the eight defined categories may be summarily rejected by the Director of Licensing.

Based on the merits of the review request, the Director of Licensing shall forward a full copy of the applicant's submission to the Risk Committee for deliberation. The Director of Licensing will provide biweekly updates to the Risk Committee on status of all pending reassessment requests.

Reassessment requests forwarded to the Risk Committee for deliberation will be considered as soon as practicable, with a general goal of a decision within 30 business days of submission. If the Risk Committee determines that a reassessment request has merit, the applicant will be remanded to the appropriate decisional Committee for a reconsideration vote at the next available meeting.

Case 2:20-cv-00041-DCLC-CRW    Document 106    Filed 10/03/24    Page 59 of 298
PageID #: 3788

If the Risk Committee determines the reassessment request is without merit, or the Investment/Agency Licensing Committee votes to deny a reconsideration, the matter will be considered formally closed. No subsequent review requests will be considered for a closed matter.

IV.     External Communications Expectations

The Director of Licensing, copying the Director of Patient Capital Investments, will confirm receipt of an applicant's reassessment request upon delivery via email. Reassessment requests will be processed as-is; it will not be the responsibility of SBA to identify missing or incomplete submission items.

The Director of Licensing will communicate the results of the reassessment request (i.e., summary denial or a decision by the appropriate Committee) to the applicant in writing upon conclusion of the review. If for any reason the review is expected to take longer than 30 business days, the Director shall communicate this fact to the applicant, along with a reasonable projection for when the process is expected to conclude.

Chapter 3: Investment Portfolio Management and Monitoring

Effective portfolio management paired with a rigorous operational oversight plan are essential in protecting SBA's financial interests. Having a dedicated monitoring framework in place ensures the mission and objectives of the Act are met.

After an SBIC is licensed by SBA, the Agency is responsible for monitoring the licensee's investment portfolio, operations, investment performance and risk. This function is performed by the Investment Portfolio Management Division (IPM). Leveraged SBICs frequently seek, on a proactive basis, SBA approval and/or clarification concerning obtaining commitments/leverage, portfolio investment decisions or compliance matters relative to SBIC program regulations.

IPM is managed by a Director, a team of Investment Officers, and a team of Investment Analysts.

The Director is responsible for management and oversight of active SBICs. These responsibilities include:

(1) Overall goals and priorities for investment and portfolio monitoring and operations.
(2) Policies and procedures related to portfolio monitoring and operations.
(3) Coordinating activities with other OII offices.
(4) Monitoring team workflow to ensure items are completed in a timely manner.

Investment analysts work in teams or individually on a portfolio of licensees to assess, monitor, and manage licensee relationships and portfolio oversight.

1. Investment Portfolio Monitoring

SBA monitors SBICs to:

(1) Assess SBIC ability to make leverage payments as du and protect against potential SBA loss.
(2) Control for investment, operational and regulatory compliance risks.

a. Quarterly Portfolio Updates

SBA routinely conducts quarterly portfolio reviews and update calls/meetings with licensees, which includes periodic investment and/or and financial reports concerning the SBIC. Attendance at an SBIC's Annual General Meeting ("AGM") may replace a quarterly portfolio review call during the quarter the AGM occurs.

If SBA determines that an SBIC's risk profile is high or has the strong potential to become high, SBA may increase communication with the SBIC, which may involve additional requests for information and meetings with the SBIC to closely monitor performance.

Conducting portfolio reviews help SBA assess and monitor the investment performance, future potential, risk, and operations of the SBIC. The objectives of these meetings are to assess whether the SBIC's activities are in alignment with their stated investment strategy, understand value drivers, and identify portfolio management concerns that may require further review.

These meetings are scheduled and led by the Investment Analyst in coordination with the Area Chief, who may also attend as needed. In preparation for the meeting, the Analyst will identify items for discussion based on the SBIC's most recent quarterly submission. When requesting the meeting, the Investment Analyst will set expectations with the SBIC on the meeting agenda and goals.

If a licensee is participating in an SBIC Interagency Partnership Initiative, team members from the partner agency may participate in Quarterly Portfolio updates for licensees of their respective programs. As a part of the SBIC Critical Technologies (SBICCT) initiative, Interagency Partners will review the fund to ensure it is on track to invest an appropriate percentage (consistent with the relevant investment policy statement for the SBICCT initiative) of the fund's assets in critical technologies. This is calculated by dividing the total amount of investment to-date in critical technologies by the total paid-in capital. As a part of this effort, Interagency Partners will ensure the fund has the remaining committed Private Capital in reserve to reach such percentage.

b. Quarterly and Annual Regulatory Filings and Valuation Guidelines

SBICs are required to file financial statements (SBA Form 468), valuation reports, portfolio financing reports (SBA Form 1031) and other items to be filed with SBA in a timely manner pursuant to the requirements set forth in 13 C.F.R. § 107.600 through 13 CFR § 107.660. All required filings must be submitted to SBA using the electronic reporting program. Filings submitted directly to an Investment Analyst via email will not be considered valid. Copies of and guidance related to the quarterly and annual SBA Form 468, quarterly SBA Form 1031, and SBA Valuation Guidelines can be found in the SBIC *Forms and Guides Library* at https://www.sba.gov/partners/sbics/forms-guides.

Case 2:20-cv-00041-DCLC-CRW    Document 106    Filed 10/03/24    Page 61 of 298
PageID #: 3790

*c.* Guidance for the Computation of Reporting Time Periods

The following guidance is provided for the computation of the time periods applicable to the submission to SBA of any report or document due under 13 C.F.R. § 107.640, § 107.650, § 107.1220, or § 107.1230(e)(1) where such period is stated in days. The length and running of such period shall be computed as follows:

(1) The date of the event which triggers the running of the period ("Trigger Date") is excluded from computation of the period;

(2) Each day following the Trigger Date shall be counted, including intermediate Saturdays, Sundays, and legal holidays; and

(3) The last day of the stated period shall also be counted, provided that if such last day is a Saturday, Sunday, or federal legal holiday, the period shall be extended to the next day that is not a Saturday, Sunday, or federal legal holiday.

In addition, any report which under 13 C.F.R. § 107.630 is due on a Saturday, Sunday, or federal legal holiday shall be due on the next day which is not a Saturday, Sunday, or federal legal holiday.

d. Portfolio Financing Report (SBA Form 1031)

All SBICs must submit SBA Form 1031 within 30 days of the close of the quarter during which a new financing to a small business concern occurred. One Form 1031 may be submitted per quarter including all financings to occur within the quarter.

Portfolio Company Financings made by Small Business Investment Company Critical Technologies (SBICCT) Initiative Licensees, an SBIC Interagency Partner Initiative, may be subject to additional due diligence conducted by the SBICCT Initiative Program Team.

SBA reserves the right to request SBICs that are on the Watchlist to file Form 1031s on a more frequent basis. The basis for such a request may be dependent upon Capital Impairment, Regulatory Examination Findings, Defaults or other material adverse changes to the Licensee.

e. SBIC Financial Statement and Investment Performance (SBA Form 468)

The Form 468 is intended to provide critical financial and investment information to help SBA assess the SBIC's financial and investment performance and regulatory status. The Form 468 consists of financial statements, schedules, Licensee investment performance, and portfolio company information. SBA also uses this information in aggregate to report on the overall SBIC program's small business and broader economic impact.

All SBICs are required to submit the annual Form 468 within 90 calendar days following the end of their fiscal year and quarterly Form 468 filings within 45 calendar days following the end of the quarter excluding the fourth fiscal quarter of the year.

Detailed instructions and requirements regarding the annual and quarterly Form 468 are available on the *SBIC Program Forms and Guides* page on SBA.gov at https://www.sba.gov/partners/sbics/forms-guides.

Case 2:20-cv-00041-DCLC-CRW    Document 106    Filed 10/03/24    Page 62 of 298
PageID #: 3791

f. Investment Performance Reporting and Metrics

SBA collects and reviews all investment performance metrics provided in quarterly and annual Form 468s and from financial reports provided to all investors. These metrics are reviewed relative to standard industry benchmarks for the relevant investment strategy and vintage year of the licensee.

SBA will not publicly disclose individual Licensee investment performance metrics. SBA may publish aggregate vintage year and strategy metrics for the SBIC Program portfolio based on quarterly and annual Form 468 filings.

g. Other reports to be filed with SBA (see 13 CFR § 107.660)

   a. *Reports to owners (investors).* An SBIC must provide SBA a copy of any and all reports furnished to the SBIC's investors, including any prospectus, quarterly or annual valuation data, fund management demographic information, letter, or other publication concerning the SBIC's financial operations or those of any Portfolio Concern no later than 30 days after the report is provided to private investors.

   b. *Documents filed with Securities and Exchange Commission (SEC).* An SBIC must provide SBA a copy of any reports, applications, or documents the SBIC files with the SEC no later than 30 days after date of the filing.

   c. *Litigation reports.* When an SBIC become a party to litigation or other proceedings, it must give SBA a written report within 30 days of notice that describes the proceedings, identifies the other parties involved and the SBIC's relationship to them.

      i. The proceedings covered by this paragraph (c) include any action by an SBIC, or by an SBIC's security holder(s) in a personal or derivative capacity, against the SBIC's officer, director, Investment Adviser or other Associate for alleged breach of official duty.

      ii. Where proceedings have been terminated by settlement or final judgment, the SBICs must promptly advise SBA of the terms.

      iii. SBA may require an SBIC to submit copies of the pleadings and other documents SBA may specify.

      iv. Paragraph (c) does not apply to collection actions or proceedings to enforce an SBIC's ordinary creditor rights.

   d. *Notification of criminal charges.* If any officer, director, or general partner of an SBIC, or any other person who was required by SBA to complete a personal history statement in connection with that SBIC's license, is charged with or convicted of any criminal offense other than a misdemeanor involving a minor motor vehicle violation, the SBIC must report the incident to SBA within 5 calendar days. Such report must fully describe the facts which pertain to the incident.

   e. *Other reports:* An SBIC must file any other reports that SBA may require by written directive.

h. Reporting Changes to SBICs Not Subject to SBA Prior Approval (see 13 CFR § 107.680):

   (1) *Changes to be reported for post approval.*

a) An SBIC must report any changes to its articles, ownership, capitalization, management, operating area, or investment policies that do not require SBA's prior approval to SBA within 30 days for post approval. A processing fee of $200 will be charged for each request for post approval of new officers, directors, or Control Persons.

b) *Exception for Non-Leveraged SBICs.* An SBIC that does not have any outstanding Leverage or Earmarked Assets is not required to:

    i. Obtain post approval of new directors or new officers other than its chief operating officer or chief financial officer; however, SBA must be notified of the new directors or officers within 30 days of the effective date.
    File an updated capital certificate within 30 days of an investor capital call or distribution.

(2) *Approval by SBA.* SBICs may consider any change submitted under 13 CFR §107.680 to be approved unless SBA provides notification to the contrary within 90 days after receiving it. SBA's approval is contingent upon your full disclosure of all relevant facts and is subject to any conditions SBA may prescribe.

i. Risk Management and Metrics

Each SBIC with outstanding Leverage or Leverage Commitment is assigned a risk rating. The methodology for calculating this rating is described below. The level of oversight required for an SBIC will be principally dependent upon the assigned rating. The rating will be calculated, and the level of oversight assigned whenever a quarterly or annual Form 468 report is received.

Individual ratings are kept in strict confidence. The individual ratings will not be disclosed to the public although Analysts may disclose and discuss an individual SBIC's rating with management of that SBIC. The individual ratings may change based on the current circumstances of an SBIC and therefore have no binding effect on the handling of future regulatory or financial situations.

The ratings assigned to an SBIC represents a "snapshot" of a particular SBIC's performance at a particular time. Financial analysis relates to the investment performance of an SBIC and its underlying investments and helps in assessing the SBIC's end of life performance and distributions to investments and SBA.

The following list contains all the materials used for preparing the annual and/or quarterly risk assessments of the SBIC.

(1) Net TVPI, Net DPI, MOIC, Net IRR and Net Asset Value (NAV) from financial reports provided to all investors. Current and historical audited annual financial statements (SBA Form 468) provided by the SBIC.

(2) Current and historical Examination Reports and examination comment letters prepared by the Office of SBIC Examinations and the OSO, respectively.

(3) Current and historical workflow provided by the SBIC's management in the form of prior and post approvals regarding financings and other operational activities of the SBIC during each annual cycle.

54

(4) Current and historical Leverage requests submitted during the annual cycle.

(5) Current and historical financing data provided on SBA Form 1031, "Portfolio Financing Report," for each investment made by the SBIC.

(6) The SBIC's original or updated business plan.

If SBA reasonably believes that a Licensee's valuations, individually or in the aggregate, are materially misstated, SBA may engage an independent third-party valuation firm to value Licensee's investments. Investment Analysts should request valuations from the Financial Specialist in FAFA through their Area Chief and Director. Investment Analysts should provide the full name of the Licensee and the underlying small businesses in which they wish to have valued.

Investment Analysts, Senior Investment Analysts, and/or the Director may reach out to OII's accounting subject matter expert, FAFA's Financial Specialist for any Accounting or Auditing questions.

I.    Risk Management Committee and Committee Review Requests

The Risk Management Committee (RMC) is described in **Chapter 1 Section 4e.** The RMC generally meets monthly, with ad hoc meetings as necessary.

*Program Performance and Risk Assessment*

In addition to oversight of the SBIC Watchlist, the RMC is responsible for program performance oversight and identification of possible risk factors and areas for monitoring. The following factors may be used in assessing risk of active SBICs, as well as possible policy determinations.

- Investment performance
- Limited partner exposure review
- Manager exposure review
- Strategy exposure review
- Industry exposure review
- Leverage aging

*Process for submitting items to the RMC*

Investment Analysts and Investment Officers may raise issues to the RMC that impact policy and have implications across the SBIC portfolio. These items include (but are not limited to) policy interpretations, regulatory interpretations, valuation matters, or newly identified issues that could impact multiple SBICs.

The SBIC Program Directors will assess issues raised and determine whether to recommend inclusion on the RMC agenda.

The Director Patient Capital Investments has final determination about which items the RMC will address.

II.  Watchlist

SBA maintains a "Watchlist" per 13 CFR § 107.1850 to help identify areas of potential future risk to the SBIC Program so that SBA may work with Licensees to reduce risk and support Licensees' successful management of SBA Leverage and compliance with program regulations and policies. SBA *may* consider placing a Licensee on the Watchlist for the following reasons:

a.  Performance Metrics
   o  Bottom quartile performance relative to SBIC's benchmark (strategy and vintage year) on TVPI and DPI.
   o  Capital Impairment Percentage approaching your threshold set forth in 13 CFR § 107.1830.
   o  Leverage Coverage Ratio ≤ 1.25x.

b.  Strategy Drift
   o  Investments that are direct violation of SBA's stated investment policy.
   o  Investments that are in violation of the Licensee's limited partnership agreement (LPA) and outside the scoop of the strategy as defined in the narrative section of the Form 2181.
   o  As general matter SBA will assess compliance at the earlier of the end of two years of your investment period or 40% of capital invested.

c.  Regulatory compliance
   o  Outstanding or unresolved violation(s)
   o  Repeated violations:
      i.  Intent of this provision is that one serious outstanding violation as determined by SBA may constituted sufficient reason for being placed on the Watchlist.
      ii.  For less serious violations, as determined by SBA, multiple repeated violations would be required for placement on Watchlist.

d.  Other
   o  Default on Leverage interest payment.
   o  Key person clause is invoked.
   o  General partner named in litigation brought by Federal Agency.
   o  Violation of material provision in LPA (or other governing document) or side letter.
   o  Other significant management issues.
   o  Other matters as determined by SBA.

Procedurally, SBA will maintain the Watchlist and review quarterly through a sub-committee of the Risk Management Committee (RMC). The sub-committee will propose additions/removals. Licensees on the Watchlist can expect increased communication with their IPM Investment Analyst and are required to file Form 1031s within 30 days of each financing instead of following the end of the quarter. SBA will notify a Licensee if it is added to the Watchlist and will notify the Licensee when no longer on the Watchlist.

III.    Capital Impairment

The Capital Impairment Percentage ("CIP") calculation applies to SBICs with outstanding Leverage and/or Commitments. 13 CFR §§ 107.1830 and 1840 define and established maximum permitted CIP Licensees may incur before triggering an event of default under 13 CFR 107.1810. CIP is SBA's primary regulatory tool for determining the financial health of an SBIC. The calculation of the maximum permitted CIP results in higher maximum CIPs for SBICs with greater percentages of Equity Capital Investments (ECI) in their portfolios. This reflects the expectation that SBICs that make more equity investments will have a greater degree of volatility. In determining an SBIC's CIP, SBA may exclude an investment from total ECI if the original investment did not qualify as ECI but was converted to ECI due to a distressed restructuring or for the purposes of increasing the SBIC's maximum permitted CIP. Also, SBA has the right pursuant to 13 CFR § 107.1830(f) to make its own determination of an SBIC's CIP. For example, if SBA determines that an SBIC overvalued an investment or incorrectly recognized income, SBA may determine that the SBIC's CIP is higher.

Capital Impairment is the degree to which the Regulatory Capital of an SBIC has deteriorated because of accumulated losses. If an SBIC has positive Undistributed Net Realized Earnings and Net Unrealized Appreciation, it is considered to have no impairment, and SBA may consider SBA's Leverage position to be protected.

When SBA determines that you have a condition of Capital Impairment, SBA will take the following steps:

(1) SBA will send you a notice of default letter upon the Agency's determination that the SBIC has a condition of Capital Impairment. Capital Impairment is listed in the regulations under § 107.1810(f)(5) as an "event of default with opportunity to cure." The letter will provide you with at least 15 calendar days from the date of the letter to cure the impairment.

(2) If the SBIC is unable to cure the impairment by the expiration of the given timeframe or submit an acceptable plan to cure SBIC to the Office of Secondaries and Liquidation, SBA may immediately transfer the SBIC to the Office of Liquidation pursuant to 13 CFR § 107.1810(g). At that time, SBA may also exercise any or all of the other rights noted in § 107.1810(g) or all of the other rights noted in the Regulations.

Though the circumstances of each SBIC's impairment may be different, SBA's general requirements for a cure plan are:

a. Cash flow forecast for the next two years, including anticipated Leverage draw downs, Leverage interest payments, and any voluntary expense reductions

b. Exit forecast for each of the remaining investments in your portfolio

c. Capital Impairment forecast for the next two years

d. Leverage repayment plan

e. Plan, if any, to raise additional Regulatory Capital

The cure plan should note specific milestones for each component of the plan. You should highlight any anticipated event or action that would cure impairment.

If SBA determines that the cure plan is reasonable, SBA will allow the SBIC to remain under the oversight of the Office of SBIC Operations. SBA will require you to submit monthly written status reports until the SBIC cures its condition of Capital Impairment. There is no standard reporting format, but the reports should convey how the SBIC and its investments are performing against the cure plan.

Based on the SBIC's monthly reports and other communication with the SBIC, SBA will evaluate how you are progressing against the milestones established in the cure plan. SBA will consider the SBIC's financial performance, the status of its portfolio companies, and any deviations from the cure plan. SBA may transfer the SBIC to the Office of Liquidation at any time if it remains impaired, if it is not performing in accordance with the cure plan, or if there is another reason to transfer the SBIC.

A Section 301(c) SBIC whose Leverage was received prior to April 25, 1994, must also comply with the provisions of 13 CFR Part 107.1830(e) and (f).

If the impaired SBIC is part of a fund family under Common Control with combined outstanding Leverage of $175 million or more, then pursuant to §107.1120(d), the impaired SBIC and its affiliated SBICs are ineligible for additional Leverage draws.

If §107.1120(d) is not applicable to the impaired SBIC, then it may continue to submit Leverage draw applications. However, SBA expects an impaired SBIC to utilize its own funds first prior to seeking additional Leverage. This includes calling all remaining private investor commitments. SBA does not routinely approve Leverage draw applications from impaired SBICs. SBA will consider each Leverage draw application based on the circumstances and merits of the request. The SBIC should provide supporting justification with each Leverage draw application until it is able to cure impairment.

IV.    Leverage and interest coverage

The leverage and interest coverage ratios, calculated from figures reported in the SBA Form 468, assist SBA in evaluating an SBIC's ability to service and repay its outstanding Leverage.

The leverage coverage ratio calculation is:

$$\text{Leverage Coverage Ratio} = \frac{(\text{Total Assets} - \text{Liabilities Excluding SBA Leverage} - \text{Other Assets}) + \text{Unfunded Private Commitments}}{\text{Outstanding Leverage}}$$

The interest coverage ratio calculation is:

$$\text{Interest Coverage Ratio} = \frac{\text{Operating Activities Cash Inflows}}{\text{Interest Expense on SBA Debentures}}$$

SBA may adjust the ratios based on an analysis of the inputs, as well as perform other analytical calculations, as necessary. For example, a questionable valuation could result in an adjustment to total assets and change the leverage coverage ratio.

V.   Conflicts of Interest

There are various types of conflict-of-interest transactions that require SBA approval under 13 CFR §107.730. There is a distinction between financing an Associate (governed by 13 CFR §107.730 (a)) and co-investing with an Associate (governed by 13 CFR §107.730(d)). The former requires a prior written exemption from SBA for special instances in which a Financing may further the purposes of the Act despite presenting a conflict of interest and requires public notice of the exemption being sought. The latter may or may not require SBA's prior written approval and does not require public notice. It is possible for both §§107.730 (a) and 107.730(d) to be applicable to the same transaction; in such cases SBA applies the requirements of §107.730(a).

**(1) Financing an Associate**

SBA's primary concern in reviewing transactions that involve financing an Associate is that the managers of a Licensee may enter into such a transaction with motives that do not include the maximization of the Licensee's profits, and thus may accept terms inferior to those that would have resulted from an arm's length transaction. The essential consideration is whether the terms are comparable to those that would be obtained in a similar transaction not involving an Associate.

SBA also considers whether there is an appearance of impropriety in Associate financing transactions. SBA generally will not grant a conflict-of-interest exemption for the financing of a business that is owned or operated by individuals who are relatives of persons owning or operating the SBIC. This is particularly true in cases where the circumstances may create a strong perception that the transaction is motivated primarily by personal relationships.

**(2) Financing With an Associate**

These are typically transactions where a Licensee and its Associate invest in the same small business, either at the same time or at different times, but where the small business is not considered an Associate of the Licensee. The general rule in 13 CFR §107.730(d)(1) is that SBA's prior written approval is required if (see Conflict of Interest approval request), at the time of the Licensee's investment, the Associate has an ownership interest of at least 5 percent. In cases where the Associate does not have an ownership interest of a least 5 percent, the applicable regulation is 13 CFR §107.730(d)(2), under which the Licensee must be able to demonstrate to SBA that it received terms that were fair and equitable (i.e., that the Licensee was not disadvantaged relative to its Associate).

However, there is a "safe harbor" provision in §107.730(d)(3). If one of the §107.730(d)(3) conditions is satisfied, SBA's prior written approval is not required for a transaction falling under §107.730(d)(1), and a transaction falling within §107.730(d)(2) is presumed to be fair and equitable to the Licensee.

**(3) Requesting a Conflict-of-Interest Exemption/Approval**

59

To initiate an approval request for a Conflict of Interest (COI), provide the following information via email to the Licensee's respective Investment Analyst copying SBIC_IPM@sba.gov:

**(i) Licensee Information**
   a) Licensee contact requesting change [First Name Last Name]
   b) Licensee contact phone number
   c) Licensee contact email
   d) SBIC License number
   e) Request date

**(ii) COI Request Information**
   a. Date by which a response to the COI request is required
   b. Associate entity name, description of Associate relationship, and provision(s) of Associate definition (13 C.F.R. § 107.50) which cover this person
   c. Is this a follow-on investment related to a previously approved COI request? [yes / no]
   d. Type of Security: [Equity/Debt/Loan]
   e. Total Size of Financing Round (All Investors): $
   f. Dollar Amount of Investment from Licensee (Cumulative): $
   g. Dollar Amount of Investment from Associate (Cumulative): $
   h. Dollar Amount of Investment from Licensee (in this transaction): $
   i. Cumulative Dollar Amount of Investment from Associate (in this transaction): $
   j. Describe the terms of the Financing
   k. Stage of investment
   l. Non-Associate Significant third-party investor participation? [yes / no]
   m. If yes, significant third-party investor name and relationship (if any) to the Licensee, its partners, or its Principals, including prior involvement in other Licensee Financings
   n. Is this the first financing round for the Significant third-party investor named above? [yes/no]
   o. Is the Associate participating in this round of financing? [yes / no]
   p. Are the terms of the Licensee's investment comparable to the Associate's terms? [yes / no]
   q. If no, please explain why
   r. Will the parties participating in this Financing be investing in the same proportionate dollar amounts as their respective investments in previous rounds of financing?
   s. Does the contemplated financing result in effective control of the portfolio concern by the Licensee and/or its Associate? [yes / no]
   t. Do the terms of the financing disadvantage the Licensee in a manner inconsistent with the Licensee's approved investment strategy? [yes/no]
   u. Has Licensee received previous conflict of interest waivers? [yes/no]
   v. Is the Associate a direct investor in their own name or through a nominee, personal holding company, or estate, trust, or family member or is the Associate an indirect investor via a fund? [yes/no]
   w. Does the Associate benefit, either directly or indirectly, from any part of the SBIC's financing? [yes /no]

   x.   Has Licensee ever received a conflict-of-interest waiver? [yes/no]

   y.   Associate continuing to maintain an investment in the Small Business? [yes/no]

   z.   Is the Licensee's investment Senior to the Associate's Investment? [yes /on par/ subordinate]

  aa.  Is the portfolio concern performing as expected? [yes/no]

  bb.  If no, is the portfolio concern at risk of near-term bankruptcy?

  cc.  Is the Associate receiving proceeds from the Licensee's investment? [yes/no]

  dd.  Does this Financing provide a clear benefit to the small business portfolio company to further the purpose of the Act? [yes / no] (Briefly describe any such benefit.)

  ee.  Narrative commentary to supplement the above [free text]

**(iii) Pre & Post Tables**

  a)  Licensee [Financing $ and equity %, pre- and post-]

  b)  Capital structure

  c)  Terms & conditions

  d)  Interest Rate [%] (if applicable)

  e)  What is the conflict?

  f)  What is the purpose of the Financing?

  g)  How would the proposed Financing or conflict-of-interest transaction further the purposes of the Act?

**(iv) Company Information**

  a)  Company Name

  b)  Company Location

  c)  NAICS code

  d)  Date of initial Financing

  e)  Initial Financing amount ($)

  f)  Business Description

  g)  Security Type

  h)  Revenue ($)

  i)  EBITDA ($)

  j)  Interest Charges

  k)  Total Assets ($)

  l)  Total Debt ($)

**(5) Approval Process for Conflicts of Interest**

Once a Conflict-of-Interest request and required filings have been submitted, SBA uses the following process to review the request.

Conflicts of Interest requests are received and processed by the Investment Analyst, who reconciles any issues with the SBIC. The Investment Analyst prepares a recommendation memorandum, response letter and notice of conflict-of-interest financing for submission the AA, OII.

The Investment Analyst forwards the recommendation memo, response letter and notice of conflict-of-interest financing to the Investment Officer for review. The Investment Officer reviews and reconciles any issues with the Investment Analysts.

After all issues have been addressed, the recommendation memo, response letter and notice of conflict-of-interest financing are forwarded to Director IPM for review.

The Director IPM will review recommendation memo, response letter and notice of conflict-of-interest financing and forward the AA, OII for review and signature.

The AA, OII will sign and forward the response letter to the SBIC. The response letter and all related files are stored in SBA OII's CRM file management system. As of the date of this SOP publication, automated emails with request decisions do not exist. However, in the future, Licensees may be automatically notified of decision.

The IPM Director, will forward the electronically signed Notice of Conflict-of-Interest Financing to the Records Management Division for publication in the Federal Register.


VI.     Portfolio Diversification and Overline Requests
    a)   Portfolio Diversification

Section 306 of the Act sets aggregate limitations on the amount of financial assistance that a Licensee can provide to a Small Business and its Affiliates as a way of managing program risk. A similar limitation is addressed in 13 CFR § 107.740 Portfolio diversification ("overline" limitation), which determines the maximum Financing Licensees may provide to Small Business without obtaining SBA's prior approval. To obtain approval to provide Financing to a Small Business and its Affiliates in excess of the "overline" limitation, Licensee must obtain SBA's prior written approval. The requirements for obtaining SBA's prior written approval are set forth in 13 CFR § 107.1920. Licensees must demonstrate to SBA's satisfaction that the exemption would not be contrary to the purposes of the Act, that the proposed action is fair and equitable, and that the exemption is reasonably calculated to advance the best interests of the SBIC program.

Section 306 of the Act defines the "overline" limitation as 10 percent of the sum of: (1) the Regulatory Capital of the Licensee and (2) the total amount of leverage projected by the Licensee in its business plan that was approved at the time of licensure. All Licensees are required to comply with section 306 and with 13 CFR § 107.740, and to the extent of inconsistency between these two provisions, Licensees are required to comply with both provisions. Where there is such a discrepancy, SBA will consider requests for prior approval of a lower limit, pursuant to either Section 306 or under 13 CFR § 107.1920 (applicable to the limit set forth in 13 CFR § 107.740).

    b)   Overline Requests

Case 2:20-cv-00041-DCLC-CRW     Document 106     Filed 10/03/24     Page 72 of 298
PageID #: 3801

To initiate a regulatory exemption under §107.1920 for an Overline investment, the Licensee must submit a request to their respective Investment Analyst, copying SBIC_IPM@sba.gov. As of the date of this SOP publication, a webform for Overline requests does not exist. However, in the future, Licensees may submit the following required information via webform. The Licensee must provide the following information in their email request:

a) Licensee contact requesting change: [First Name Last Name]
b) Licensee contact phone number:
c) Licensee contact email:
d) SBIC License number:
e) Written Request: Should provide a detailed explanation of the need for the overline investment, including a description of the Small Business' requirements for the funds, use of proceeds, how the Financing will benefit the Small Business and increase the likelihood of repayment to the SBIC. In addition, Licensee should discuss the effect on the SBIC and the Small Business if the SBIC does not participate in the Financing. The request must adequately address the requirements listed in §107.1920 as well as the information required by Items 2 through 8 listed below.
f) Schedule of All Overline Investments: A schedule of all Loans and Investments that are in an overline status. The schedule should include the names of the Small Businesses and Affiliates, the current outstanding balance of the investments, the amounts and dates of planned subsequent Financings and a brief update on the financial and operating status of the Small Businesses and Affiliates.
g) Proposed Investment: A summary of key terms of the proposed overline Financing and a complete description of all investments made by the SBIC in the Small Business and its Affiliates.
h) Other Participants in the Financing: A pre- and post-Financing capitalization table and identify who is participating in the overline Financing.
i) Anticipated exit: A description of the anticipated exit from this investment (or the source of the reduction of the overline investment) including the approximate timing of the exit/closing date, identification of the parties (or types of parties) involved in the expected exit, and the amounts and timing of subsequent Financing expected. Provide a waterfall analysis for both debt and equity investments.
j) Statement of no material adverse change to the portfolio.
k) Description of all fees related to the transaction.

`

In addition to answering the questions above, the Licensee should also submit SBIC Financial Statements: An interim Form 468 not more than 30 days old from the date the overline request is submitted to SBA, *if the most recently submitted Form 468 is more than 30 days outdated.*
When reviewing a request for an overline exemption, SBA assesses the following factors:

a) The explanation for the need for the overline investment.

b) Whether the proposed overline Financing is consistent with the Licensee's investment strategy.

Case 2:20-cv-00041-DCLC-CRW    Document 106    Filed 10/03/24    Page 73 of 298
PageID #: 3802

c) The Licensee's financial condition including liquidity and asset concentration.

d) The Licensee's investment stage (is the Licensee still making new investments or is it only making follow on investments).

e) The status of the Licensee's current portfolio including the financial condition of the Small Businesses, diversification of the portfolio overall, and the number of potential new and follow-on investments.

f) The amount and the funding of return of capital distributions.

g) The number of overline investments previously approved for the Licensee's portfolio.

*Approval Process for Overline Investments*

Once an Overline Request and required exhibits have been received and processed by the Investment Analyst. The Investment Analyst reconciles any issues with the SBIC. The Investment Analyst prepares a recommendation memorandum and response letter of Overline Investment for submission the AA, OII.

The Investment Analyst forwards the recommendation memo and response letter to the Investment Officer for review. The Investment Officer reviews and reconciles any issues with the Investment Analysts.

After all issues have been addressed, the recommendation memo and response letter are forwarded to Director IPM for review.

The Director IPM reviews recommendation memo and response letter, then forwards the AA, OII for review and signature.

The AA, OII will sign and forward the response letter to the SBIC.

2. Portfolio Operations and Management
a. Management Team Changes
A management team change is a change to the officers, directors, managers, or general partners of a Licensee's management entity (typically a partnership Licensee's general partner. This includes departures from and additions to management team approved by SBA at the time of licensure. SBA is concerned with management team changes because SBA has conducted extensive due diligence during the licensing process to entrust the approved management team with operating the Licensee in accordance with the laws and regulations of the SBIC program. SBA is particularly sensitive to changes to the management team shortly after licensure. SBA contemplates the following regulations when evaluating management team changes:

(1) 13 CFR §107.130
(2) 13 CFR §107.160

To initiate a request for a Management Team Change, the Licensee must submit a request to their respective analyst, copying SBIC_IPM@sba.gov. The following information must be included in an email request:
  (1) Licensee Contact requesting change [First Name Last Name]
  (2) Licensee phone number
  (3) Licensee email
  (4) SBIC License Number
  (5) Description of changes to economics
  (6) A description of the changeover of duties / responsibilities due to the management change
  (7) Track record of departing/incoming Partner


In addition, the Licensee must attach the following exhibits:
  (1) Separation Agreement to the list of legal documents
  (2) Fingerprint card if applicable


When processing a management team change, the Investment Analyst will:

  (1) Perform requisite due diligence commensurate with the vetting of applicant principals during the regular license application process. This may include fingerprint checks.
  (2) Prepare a management team change recommendation memorandum to present to the Investment Committee: The memorandum must clearly state the recommendation being made (approve, deny or other) and discuss the factors supporting the recommendation.

  (3) Distribute the memorandum to the Investment Committee, through the Investment Officer, for consideration.

  (4) Present on Management Team Change to Investment Committee; The committee's decision will be memorialized in minutes to the meeting.

  (5) Investment Analyst will prepare a response letter that reflects the Investment Committee's decision for signature by the Director, IPM and forwards through the Investment Officer.

b. GP Stakes / Management Company Stakes

In circumstances where alignment of incentives between the Licensee, its investors, and the SBA can be maintained, a Licensee may submit a request for approval of a GP Stake or Management Company Stake (investment) transaction. Please note, that the process for approving a GP and/or Management Company Stakes transaction is limited to those transactions which would result in one or more non-Principals owning, in the aggregate, no more than ≤25% of the either the management company or the General Partner. Transactions which would result in such ownership in excess of 25% are subject to SBA's SBIC Change of Control approval process. The approval process should be initiated prior to transaction close.

To ensure alignment is maintained and program mission and intent upheld, in reviewing approval requests SBA will consider:

(1) How the arrangement upholds the core mission and integrity of the SBIC program;
(2) Impact on the durability of the firm managing the SBIC; and
(3) Retention and incentivization of the principals of the SBIC.

To initiate a request for a GP Stake and/or Management Company Stake approval, the Licensee submits the request to their respective investment analyst, copying SBIC_IPM@sba.gov. The Licensee should answer the following questions in their email request:

(1) Licensee contact initiating request [First Name Last Name]
(2) Licensee contact phone number
(3) Licensee contact email
(4) SBIC License number
(5) Date of request
(6) Date decision from SBA requested by *(please anticipate a decision within 30 days of recipient of request)*
(7) Will the transaction result in the non-Principal ownership, in aggregate, of more than 25% of an applicant's General Partner? [yes / no]
(8) Will the transaction result in the non-Principal ownership, in aggregate, of more than 25% of an applicant's management company? [yes/no]
(9) Will the principals of the Licensee be subject to earn-outs or retention agreements? [yes/no]

    i. If yes, for how many years?
    ii. Please describe the agreements

(10) Attach the draft transaction documents with all schedules to this email.
(11) If impacted, attach a draft version of Form 2181 Capital Certificate Exhibit F "All Investors" tab and "Significant Owner Associates" tab including information on the new non-Principal owners and changes to other owners <u>only.</u>

Once a GP Stake and/or Management Company Stake approval request and required documents have been submitted, SBA will do the following:

(1) GP/Management Company Stake approval requests are received and processed by the Investment Analyst, who confirms completeness and may request additional information as necessary. The Investment Analyst will coordinate with the Office of the General Counsel in review of the request.

(2) The Investment Analyst then prepares a recommendation memorandum which is provided to the Investment Officer for review. The Investment Officer reviews and reconciles any issues with the Investment Analyst and the Office of the General Counsel.

(3) If upon the recommendation by the Investment Analyst, Investment Officer, and Office of the General Counsel the Director of IPM then approves, then the Licensee will receive notification of approval from the Director of IPM.

(4) To the extent the proposed transaction either exceeds the 25% limit stated above or is deemed to result in a change of control, then the request is subject to the Change of Control Approval Process.

c. Investment Adviser/Manager

SBA defines Investment Adviser/Manager as any Person who furnishes advice or assistance with respect to operations of a Licensee under a written contract and approved by SBA in accordance with the provisions of 13 CFR §107.510.

d. Management Expenses

SBA must approve management expenses for leveraged SBICs. The following clarifies:
(1) the conditions under which SBA would approve management expenses and
(2) clarify regulations, policies, and reporting related to such expenses. This includes clarifying what is considered a management expense, to be paid out of the management fee, outsourcing management expense activities, and SBA's position on management fee offsets and waivers, and disclosures.

SBA recognizes the critical role that an SBIC's management team plays in a fund's performance. In licensing new SBICs, SBA places great emphasis on establishing that the proposed management team is qualified. SBA also recognizes the importance of SBICs providing adequate compensation to the members of the management team and having adequate revenue to pay for all other management expenses, if permitted to be paid under SBA regulations. SBA, however, also has a statutory obligation to ensure that SBICs utilizing government-guaranteed leverage are financially sound and that the government's financial interests are protected. SBIC expenses are an important consideration in this regard since management expenses are typically the largest SBIC expense.

The following are for determining the maximum management expenses permitted by SBA. SBA recognizes that management expenses are an important business issue negotiated between fund managers and investors and that investors may wish to negotiate a lower fee. SBA generally looks favorably fees commensurate with industry standards and practices but may decline to approve an alternative fee structure that is excessively complex or lacking in transparency.

Management Expenses (as defined in 13 CFR 107.520(a)) include the following:
 (1) Salaries;
 (2) Office expenses;
 (3) Travel;
 (4) Business development;
 (5) Office and equipment rental;
 (6) Bookkeeping; and

(7) Expenses related to developing, investigating and monitoring investments.

Management Expenses do not include services provided by specialized outside consultants, outside lawyers and independent public accountants, if they perform services not generally performed by a venture capital company. (13 FCR 107.520(b)). In general, SBA considers expenses related to the routine operations and overhead of the SBIC to be Management Expenses. Such expenses include the cost of document preparation, postage and delivery, costs of communication and internet services, and the costs of establishing and maintaining any webpages or investor portals necessary for such operations.

SBICs that plan to obtain SBA leverage must obtain SBA's approval of its Management Fee and planned Management Expenses at the time of licensing. This approval is obtained through SBA's approval of an SBIC's limited partnership agreement (LPA). In addition to the initial approval, SBA must approve any increases in Management Fees or changes to the plan of intended Management Expenses for SBICs with outstanding leverage or commitments.

SBA's Model LPA sets forth standardized language addressing the calculation and payment of Management Compensation (used interchangeably with "Management Fee"), offsets of certain Financing fees and management fees which SBICs may charge to a portfolio company, as well as the expenses that SBA considers to be management expenses or partnership expenses (*i.e.*, those which may be paid by the Licensee).

Most SBICs pay a Management Fee to the General Partner (GP) or, more typically, the Investment Adviser/ Manager, which in turn pays all Management Expenses. SBA's Model LPA Section 3.05 allows SBICs to insert a formula for the calculation of the Management Fee. SBA will generally not approve a Management Fee that exceeds the <u>Maximum SBIC Management Fee</u>, as defined below.

Model LPA Section 3.07(a) requires that the entity receiving the Management Fee must pay all Management Expenses. Model LPA Section 3.07(b) identifies all authorized partnership expenses, including the Management Fee paid to the GP or Investment Adviser/ Manager. Any expenses not expressly authorized under Model LPA Section 3.07(b) must be paid by the entity receiving the Management Fee.

Although the Model LPA sets forth the expenses paid by the GP or Investment Adviser/Manager out of the Management Fee and those paid out of the partnership, the table below is meant to provide further clarification:

- ***Column A – Covered by Management Fee*** provides examples of expenses SBA considers to be Management Expenses as set forth in §107.520(a) and which ***must*** be paid out of the Management Fee. These are the type of expenses identified in Model LPA Section 3.07(a).[3]

---

[3] Section C below describes the limited circumstances in which SBA will permit an SBIC to pay for a Management Expense as a partnership expense, offsets that must be applied against the Management Fee, and other guidance relevant to compliance with SBA's Management Expense regulations.

Case 2:20-cv-00041-DCLC-CRW    Document 106    Filed 10/03/24    Page 78 of 298
PageID #: 3807

- ***Column B – Not Required by SBA to be Covered by Management Fee*** provides examples of expenses SBA does not consider to be Management Expenses and which are not required to be paid out of the Management Fee.  These are the type of expenses identified in Model LPA Section 3.07(b).[4]

---

[4] SBA would likely approve any LPA in which these expenses were paid by the Investment Adviser/Manager out of the Management Fee and included in LPA Section 3.07(a), but SBA does not require these expenses to be covered by the Management Fee.

69

| Table 1 - Examples of Partnership Expenses Covered and Not Required to be Covered by the Management Fee ||
|---|---|
| **Column A - Covered by Management Fee** | **Column B - <u>Not Required</u> by SBA to be Covered by Management Fee** |
| <ul><li>Salaries</li><li>Compensation of employees of the SBIC, general partner and the Investment Adviser/Manager, including salaries and fringe benefits. (SBA will consider distributions to personnel from the Investment Adviser/Manager to be part of compensation)</li><li>Office expenses</li><li>Office related expenses including supplies, postage, computers, software, and communications (e.g., telephone, facsimile, internet, SBIC website, and investor portal[5]).</li><li>Dues and subscriptions not in Column B.</li><li>Travel, other than-portfolio company related travel this is reimbursed by a portfolio concern</li><li>Business development</li><li>Office and equipment rental</li><li>Office rent, furniture, and equipment rental</li><li>Bookkeeping and related activities such as accounting[6] and financial reporting (for limited partners or SBA), including preparation of annual and interim financial statements of the SBIC, portfolio financing reports, and capital certificates.</li><li>Capital management, including the cost of preparing leverage requests, capital calls, and distributions[7].</li><li>Activities related to preparation for SBA examinations and audits.</li><li>All other general accounting services, except as specified in Column B.</li><li>Expenses related to developing, investigating and monitoring investments[8] (This includes without limitation finder's fees, underwriting activities, activities generally performed by the manager including review of a prospective portfolio company's financial statements, due diligence activities, routine valuations, such as semi-annual valuations, manager or in-house counsel[9] review of purchase/credit agreements and investment memoranda. This excludes outside legal services and other specialized consultants as noted in Column B.)</li></ul> | <ul><li>Specialized accounting services (to the extent that such services are not generally performed by a venture capital company)<ul><li>Audit of SBIC financial statements.</li><li>Preparation of Federal, state and local tax return, including preparation of K-1s.</li><li>Other consulting services requiring specialized expertise, such as accounting or tax treatments regarding a transaction or those services related to an industry or technology (like environmental consulting, where required by a transaction), to the extent that such services are not generally performed by a venture capital company.</li></ul></li><li>Legal services provided to the Licensee by outside counsel, including those associated with Financing transactions.</li><li>If required by SBA, valuations by a third-party consultant.</li><li>SBA fees, including SBA examination fees and Debenture fees.</li><li>Taxes payable by the SBIC to Federal, state, local, and other government agencies.</li><li>Expenses incurred with the actual or proposed acquisition or disposition of assets (excluding due diligence), such as accounting fees, brokerage fees, legal fees, and necessary registration.</li><li>Insurance and premiums protecting the SBIC, the General Partner, the Investment Adviser/Manager, and any of their officers, directors, managers, owners, and employees.</li><li>Reasonable costs and expenses associated with limited partner and limited partner advisory board meetings, excluding costs of travel.</li><li>Reasonable costs of indemnification permitted under the Partnership Agreement.</li><li>Organizational expenses (including licensing fees), to the extent permitted in the SBIC's organizational documents and deemed reasonable by SBA (presently, the lesser of $500,000 or 2% of Regulatory Capital[10]).</li><li>Fees and dues in connection with the membership of the SBIC in any trade association primarily representing the interests of SBICs.</li><li>Fund liquidation or dissolution expenses (third parties used to liquidate or dissolve the fund) only after SBA leverage is fully repaid.</li></ul> |

---

[5] An investor portal has the same meaning as set forth in Model LPA Section 9.02(f), meaning "a database or other forum hosted on a website designated by the General Partner" and used to transmit financial reports and other information to one or more Limited Partners.
[6] If the SBIC's LPA specifies that bookkeeping is a Management Expense and accounting is paid by the partnership, SBA will accept the SBIC's current arrangement without a finding, assuming such expenses are deemed reasonable by SBA.
[7] Other expenses associated with leverage are still Partnership Expenses under Model LPA 3.07(b)(iii), which includes as Partnership Expenses "all amounts payable in connection with any Leverage commitment, Leverage issuance, and Outstanding Leverage."

Case 2:20-cv-00041-DCLC-CRW    Document 106    Filed 10/03/24    Page 80 of 298
PageID #: 3809

See 13 CFR 107.520 and 107.860 for further regulatory guidance.

    e.   Management Fees

        I. Maximum SBIC Management Fee

The Maximum SBIC Management Fee allowed by SBA for Leveraged SBICs is determined in accordance with the following formula:

Maximum SBIC Management Fee = <u>Management Fee Base</u> x <u>Management Fee Rate</u>

The <u>Management Fee Base</u> varies based on whether the SBIC is in its <u>Management Fee Initial Period</u> or in a period thereafter. Absent special circumstances justifying a higher fee (which justification must be approved by SBA at the time of application), the <u>Management Fee Rate</u> during the Management Fee Initial Period must not exceed 2%. After the Management Fee Initial Period, the Management Fee Rate is also capped at 2%, *provided, however*, that the maximum Management Fee Rate which a Reinvestor SBIC may charge on its underlying fund investments may not exceed 1% on underlying fund investments. Funds seeking a higher management fee rate must show special circumstances for approval prior to licensing.

The Maximum SBIC Management Fee formula assumes a stand-alone licensee that bears all of the expenses of its operations. In determining whether to approve an SBIC's proposed Management Fee, SBA will take into account other relevant factors, including whether the Investment Adviser /Manager is advising more than one investment fund. Based on those factors, SBA may determine in appropriate cases that a lower maximum allowable Management Fee will apply (e.g., 1.75% may be the applicant's maximum allowable Management Fee Rate at Licensing).

This calculation is meant to identify a maximum allowable Management Fee. As noted above, an SBIC may propose a fee or formula in its LPA that results in a lower fee. Examples of generally acceptable alternate structures include:

    (1) Using "Outstanding Leverage" instead of "Assumed Leverage" in the definition of Management Fee Base during the Management Fee Initial Period,
    (2) Setting a lower Management Fee Rate than the maximum permitted,
    (3) Decreasing the Management Fee Rate after the Management Fee Initial Period, or
    (4) Decreasing the Management Fee Rate upon a specified event, such as an SBIC exceeding its maximum capital impairment percentage or the manager of the SBIC forming a new fund.

---

[8] SBA considers these activities and expenses to be Management Expenses, regardless of whether a letter of intent, term sheet, or similar document expressing interest in an investment has been signed.
[9] In house counsel includes employees of the Manager of the SBIC or in the case of a drop-down SBIC, the parent of the SBIC.
[10] Organizational expenses in excess of the amount deemed reasonable by SBA may be treated as a reduction of the SBIC's Regulatory Capital, paid by an entity other than the SBIC, or paid by the SBIC and reimbursed through offsets to the Management Fee over a period of not more than two years from the SBIC's final close.

71

If an SBIC chooses to use an alternative formula for calculation of the Management Fee, it must include in its LPA the following statement: "The Partnership will not pay any Management Compensation with respect to any fiscal quarter in excess of the Maximum SBIC Management Fee agreed upon by the Licensee and SBA at the time of Licensing."

### II. Management Fee Initial Period

SBICs typically have a five-year active investment period during which the SBIC is permitted to make new investments. Management Fees typically decrease after an SBIC's investment period has ended, since the managers are no longer spending time sourcing, negotiating or underwriting new investments. Note that although certain types of SBICs may have longer investment periods, such as SBICs that are BDC subsidiaries, fund-of-funds strategies or evergreen funds these SBICs must also use a formula that results in lower Management Fees during the later years of the SBIC's lifecycle.

In computing the Maximum SBIC Management Fee, an SBIC's "Management Fee Initial Period" (which typically coincides with an SBIC's five-year investment period) commences on the earliest of the following:

(1) Date of SBIC license approval,
(2) Date on which the SBIC or the applicant acquires its first portfolio securities, or
(3) First date any Management Fee based on assumed leverage begins to accrue or is paid.

The Management Fee Initial Period ends on the date five (5) years from the start of the Management Fee Initial Period, or any earlier date specified in the SBIC's LPA. SBA generally will not approve an extension of the Management Fee Initial Period even if SBA approves an extension of the investment period. However, SBA will consider this at the time of Licensing on a case-by-case basis permitted the Management Fee calculated over the life of the fund averages out to less that then maximum permitted fee.)

### III. Recommended Management Fee Base

**During the Management Fee Initial Period**

Management Fee Base =      Management Fee Unreduced Private Capital
+ Assumed Leverage

a) **Management Fee Unreduced Private Capital** is defined as the sum of:

i)   Regulatory Capital at the time the fee is paid or begins to accrue (whichever is earlier).

ii)  Any Distributions previously made under §107.585 which reduced Private Capital and, specifically, Regulatory Capital by no more than two percent or which SBA approves for inclusion in the Management Fee calculation. (Note that this approval is separate from SBA approval required for the distribution itself; in other words, SBA can approve a

72

distribution under §107.585, but disapprove the inclusion of the distribution amount in Unreduced Private Capital).

The effect of increases in Management Fee Unreduced Private Capital on Management Fees must be recognized no earlier than the first day of the fiscal quarter in which the SBIC notifies SBA of the increase as evidenced by an executed Capital Certificate (i.e., the submission date of the Capital Certificate, not the date of the Capital Certificate). Such increases cannot be applied retroactively to previous quarters. The effect of decreases in Management Fee Unreduced Private Capital must be recognized as of the first day of the fiscal quarter in which the decrease occurs.

b) **Assumed Leverage** means the maximum amount of SBA-guaranteed Leverage that the SBIC may apply for consistent with the SBIC's business plan approved by SBA. This amount may not exceed two (2) times the SBIC's Regulatory Capital, with exceptions. In addition, an SBIC that receives SBA approval for Leverage commitment greater than two times Regulatory Capital under 13 CFR §107.1150(a) may add that additional amount to its Management Fee Base.

## After the **Management Fee Initial Period**

Management Fee Base = Cost of loans and investments for all "active" portfolio companies, not to exceed the highest Management Fee Base during the Management Fee Initial Period

An "active" portfolio company is defined as a company that remains an ongoing concern and in which the SBIC's investment has not been written off or written down to zero. Loans and investments valued at zero are considered written off for the purposes of calculating the Management Fee. The "active" status of a portfolio company is subject to SBA's review. In determining whether to write-down or write-off an investment, the SBIC must adhere to the Valuation Guidelines for Small Business Investment Companies which state, "[w]hen a decline in Asset Value appears permanent, a complete or partial write-off of the asset (i.e., recording a realized loss rather than unrealized depreciation) should occur."

The cost of loans and investments used in this calculation will be the cost as of the first day of the fiscal quarter for which the fee is paid or begins to accrue (whichever is earlier), as reported on the Form 468, excluding any noncash capitalized interest, such as Payments in Kind (PIK) that is included in the reported cost. (Capitalized interest should not be included in the cost of loans and investments for the purposes of calculating the Management Fee Base since this does not reflect the SBIC's original cost.) If SBA determines the cost of assets to be overstated, SBA may require the portion of the Management Fee related to the overstatement to be repaid to the SBIC.

SBA requires any party utilizing a Management Fee Waiver to fund at least 50% of its capital contributions to an SBIC in cash. Moreover, such a party may not satisfy any portion of a current capital call obligation with the waiver of management fees which are not yet due to be paid. The Management Fee from using the waiver of future management fees to satisfy the GP's current

obligations to fund its capital commitments. Cumulative capital contributions (i.e., capital contributions from the commencement date of the SBIC) for all SBICs, from GPs, Investment Adviser/Managers or other affiliates, must be funded at least 50% in cash.

For example: Assume the GP's commitment is $5 million, and the LPA approved by SBA allows the GP to contribute waived Management Fees for up to 50% of its commitment to satisfy capital calls. If the SBIC calls 20% of Private Capital at the first capital call, the GP would owe $1 million, of which at least $500,000 must be funded in cash. Alternatively, the GP may fund $1 million in cash at the first capital call and at the next capital call apply waived fees to the next $1 million. SBA policy is satisfied if the GP's cumulative capital contribution is at least 50% in cash at any point in time.

## Disclosures on Form 468

(1) *Outsourced Services*. SBICs directly paying outsourced service providers must disclose in the notes of the Form 468 the activities performed by each service provider, the associated costs, and whether the provider is performing Management Expense activities and, if so, the portion of the cost associated with such activities. Upon SBA request, SBICs must also provide appropriate documentation to verify what services were provided and the associated cost.

(2) *Management Fee Offsets*. It is the SBIC's responsibility to disclose all fees required to be paid to the SBIC or offset against the Management Fee in accordance with this document. Furthermore, SBA and SBICs will agree to acceptable scope of Management Fees at the time of Licensing. For any SBIC that reports Management Fee expense net of offsets on the SBA From 468, Statement of Operations Realized, the notes to the financial statements must include a disclosure of the total Management Fee expense (calculated in accordance with the SBIC's LPA and any applicable side letters) and the amounts of all offsets for fees received by Associates of the SBIC under §§107.860 and 107.900. In addition, all fees earned by the SBIC or Investment Advisor/Manager under §§107.860 and 107.900 must be appropriately disclosed in the Form 468 under one or more notes to the financial statements (footnotes) for the reporting period in which fees are earned. Appropriate footnotes would include such information as the recipient of such fees (whether SBIC or Associates), type of fees earned, amount of fee earned, total fees earned for the reporting period, and the amount of such fees or part of it, and if any were used to offset management expenses payable to the Investment Adviser/Manager by the SBIC. Upon SBA request, SBICs must make available for SBA's review, all records associated with any fees from portfolio companies of the SBIC that are earned and retained by an Associate so SBA can monitor compliance with the agreed upon Management Fee Offset scope and plan established at the time of Licensing.

(3) *Management Fee Waivers*. SBICs must report contributions associated with Management Fee Waivers as "Partnership Interests Issued for Services" in both the Form 468 Statement of Partner's Capital and Part II – Schedule of Regulatory and Leverageable Capital. For any SBIC that utilizes a Management Fee Waiver, the notes to the financial statements must include a disclosure of the total capital committed by the SBIC's GP (or affiliate), the amount of Management Fees waived during the reporting year and cumulatively, and the amount of waived

74

fees that were used to reduce the GP's (or affiliate's) capital commitment during the reporting year and cumulatively.

**Approval Process for Management Expenses Post Licensure**

(1) Management Expense approval requests are received and processed by the Investment Analyst, who reconciles any issues with the SBIC. The Investment Analyst prepares a recommendation memorandum for presentation to the Investment Committee.

(2) The Analyst then forwards the recommendation memorandum to the Investment Officer for review. The Investment Officer reviews and reconciles any issues with the Investment Analysts.

(3) After all issues have been addressed, the recommendation memorandum is presented to the Investment Committee for decision.

(4) The Investment Analyst will memorialize the Investment Committee's decision in minutes and prepare the response letter reflecting the Investment Committee's decision.

(5) The Investment Analyst will forward, through the Investment Officer, the response letter to the Director IPM for review and signature.

f. Investment Adviser/Management Agreements
Pursuant to 13 CFR Part 107.510 SBA must approve an SBIC's investment advisor. The SBIC must submit a written request for SBA's approval of the management contract including the following information:

(1) The name of the person or firm that will be the Investment Adviser/Manager and a summary of the person's or firm's general qualifications and relevant experience.

(2) A copy of the proposed contract between the Licensee and the Investment Adviser/Manager, which must include the following:

a) A description of the specific services the Investment Adviser/Manager will provide to the Licensee and its portfolio small businesses.

75

    b) The basis for computing management expenses, and the maximum amount payable annually under the contract.

    c) The duration of the contract.

    d) A prohibition against assignment of the contract by the Investment Advisor/Manager without prior SBA approval and a provision for automatic termination in the event of such assignment.

    e) A requirement for full disclosure to the Licensee of services performed for portfolio small businesses, and the compensation received for the services.

(3) A "Statement of Personal History and Qualifications of Management," SBA Form 21812, Exhibit D, and Form FD-258, "F.B.I. Applicant Fingerprint Clearance Form," from each officer, director, partner, or manager of the investment adviser who will operate on behalf of or be responsible for the management of the Licensee.

(4) Both SBA and the Licensee must give prior written approval to any material change in an approved management contract.

g. Changes in Ownership, Control or Structure

In connection with a proposed transfer or issuance of ownership interests that are 10 percent or greater but less than 33 percent of the licensed entity and do not involve a Change in Control, the Licensee must file a written request for prior SBA approval, but the investors are not required to file SBA Form 2181 References.

Any ownership interest to be held by an entity requires that a statement disclosing the proposed owner's 10% and greater owners be included. If a transfer of interests is approved, SBA's prior written approval is required for release of the transferor's unfunded commitment. For transfers or secondary sales of limited partnership interests only, the transaction will be considered approved if the Licensee does not receive a formal response from SBA within 30 days of initial requests. All transfers or secondary sales of limited partnership interests should be submitted via the SBIC website and **emailed to** SBIC_Secondaries@SBA.gov.

In connection with a proposed transfer or issuance of 33 percent or more ownership of any class of stock or other ownership interests, the Licensee must file a written request for prior SBA approval, including, but not necessarily limited, to the following:

    (1) The name and address of each present owner making the transfer and of each proposed new owner.

(2) A draft purchase and sale agreement reflecting the number of shares to be purchased, price per share, and basis for determining price. If the new owner is a corporation, partnership, or other legal entity, the Licensee must provide information identifying the State of incorporation or registration, the principals, and any other individuals exercising direct or indirect control over the entity, the nature of its major business activities, and its current financial statements.

(3) A detailed explanation of any affiliations between the proposed new owner(s) and the Licensee, any other Licensee, and any portfolio concern of any Licensee.

(4) SBA Form 2181 Exhibit D, Form FD-258, and a $200 processing fee for each proposed new owner and whose ownership of the Licensee would, amount to 33 percent or more.

(5) For entities owning 33 percent or more, Form 2181 Exhibit D and Form FD-258 are required for the entity's three ranking officials unless the entity is exempt as detailed earlier in this SOP, in which case only Exhibit D is required for the three ranking officials.

(6) A statement identifying the source of funds required for the transaction for each proposed new owner.

(7) A statement disclosing the proposed owner's 10% and greater owners.

(8) The Licensee must file a complete amendment to the Management and Control item of its license application upon approval of new owners.

Please note that changes of ownership may require review and approval by the SBIC Investment Committee.

Approval recommendations for a proposed change in control must be contingent upon full disclosure of:

(1) The real parties in interest.
(2) The source of funds for the new owner's interest.
(3) Other pertinent data Analysts request.

A proposed change in control may only be approved if the resulting SBIC meets the minimum capital requirements set forth in 13 CFR §107.210 and complies with §§107.1150 through 1170. In addition, appropriate due diligence must be performed for all new management team members. A change in control or a transfer of license occurs when there is a change of the Control Persons, as defined in 13 CFR 107.50, who were initially approved at the time of licensure for an SBIC. This may occur by acquisition of 50% or greater ownership of an SBIC by a limited partner, the addition of a new management team member or the transfer of the license to new Control Persons. SBICs must obtain SBA's prior approval

Case 2:20-cv-00041-DCLC-CRW    Document 106    Filed 10/03/24    Page 87 of 298
PageID #: 3816

before any change in control or transfer of the license takes effect. SBICs must submit the following items to support a request for a Change in Control.

(1) A complete MAQ SBA Form 2181 and accompanying exhibits.
(2) A processing fee equal to the Initial Licensing Fee and Final Licensing Fee, as required by 13 CFR § 107.410(b).
(3) If applicable, a completed Management Assessment Questionnaire (MAQ) for any proposed new management team members.
(4) If applicable, an executed Transferor's Liability Contract, SBA Form 2181 Exhibit G (see instructions attached to the Transferor's Liability Contract for further clarification of who is required to execute the TLC as well as 13 CFR Part 107.440).
(5) If the proposed new owner is a corporation, partnership, or other legal entity, the most recent audited financial statements together with a statement describing the principal business activity. If audited financial statements are not available or are more than 90 days old, SBA will request updated interim financial statements.

If the change in control is not considered tantamount to a new license application (for example, if there is a change in ownership, but no change in management or investment strategy), the Investment Committee can waive the requirement for a MAQ, and the licensing committees can waive their review of the application.

Approval recommendations for a proposed change in control must be contingent upon full disclosure of:

(1) The real parties in interest.
(2) The source of funds for the new owner's interest.
(3) Other pertinent data Analysts request.

A proposed change in control may only be approved if the resulting SBIC meets the minimum capital requirements set forth in 13 CFR §107.210 and complies with §§107.1150 through 1170. In addition, appropriate due diligence must be performed for all new management team members.

I. LP Secondaries/Transfers
See Chapter 5 Section 1 for detailed instructions on requirements and approval process.

II. Reorganizations/Restructurings

Reorganizations or restructurings are defined as significant changes in the structure of an existing SBIC e.g., the conversion of a corporate SBIC to a limited partnership, or the creation of new classes of stock in an existing corporate SBIC. Conversions and reorganizations come in many forms. In most cases, they involve the creation of a new legal entity which succeeds to the net assets and business operations of one or more SBICs. The nature and the mechanics of conversions and reorganizations dictate the specific information required for SBA consideration of a request for approval. Processing a conversion or reorganization is a two-step process that involves a conditional approval and a final approval.

78

To receive conditional approval of a reorganization, the SBIC must submit a request for the proposed reorganization which must contain the following:

1) Agreement and plan of reorganization containing evidence (such as corporate resolutions of the parties involved) of its approval by all parties.
2) $5,000 processing fee.
3) The new entity must file a complete license application, SBA Form 2181, with items such as the required legal opinions, provided in draft form.
4) A draft contribution agreement or other applicable operative document of conversion.
5) SBA Form 468 as of a date not more than 60 days prior to the date of the request for SBA approval.
6) Pro forma SBA Form 468, as of the same date as the Form 468 referenced above, as if the reorganization has already occurred.
7) An adjustments worksheet which reflects the difference between the SBA Form 468 and the pro forma SBA Form 468.

To process a reorganization or restructuring request for conditional approval, email SBIC_Secondaries@SBA.gov copying the Investment Analyst.

1) SBA OII will forward the agreement, plan of reorganization and any other documents related to the reorganizations to SBA OGC for review.
2) All issues identified by OGC will be addressed in a timely manner. The following are the requirements necessary for a reorganization to be approved:
   - The conversion of corporate SBIC into limited partnerships must result only in a change to the organizational structure of the SBIC.
   - The stockholders of the corporate SBIC may not take advantage of the conversion to transfer control over the SBIC, to distribute corporate assets to themselves or to others, or to capitalize the partnership with unrealized appreciation in corporate assets.
   - All expenses associated with the conversion be borne by the stockholders of the corporate Licensee individually rather than by the corporation or by the successor partnership.
   - The resulting SBIC meets the minimum capital requirements set forth in 13 CFR §107.210 and complies with §§107.1150 through 1170 based on the surviving SBIC's Leverageable Capital.
   - The surviving SBIC must comply with all requirements under the Act and SBA regulations (13 CFR §107).

III. Quasi-Reorganizations

A quasi-reorganization is frequently described as a means by which a "fresh start" may be obtained in terms of recorded accounting values for an SBIC. It involves the realignment of the capital balances in such a way that an accumulated deficit may be eliminated without a formal legal reorganization of the company; thereby avoiding the expense of creating a new corporate entity. Quasi-reorganizations reflect recognition by corporate management that part of the company's capital has been irretrievably lost.

Generally, an SBIC may request approval for a quasi-reorganization if it has an accumulated deficit, yet ample Leverageable Capital, and the deficit is preventing the payment of dividends even as operations become profitable. Final approval may be given subject to conditions deemed appropriate on a case-by-case basis.

The accounting entries to affect a quasi-reorganization are:

1) A debit to Capital and a credit to Paid-in Surplus (if applicable); and
2) A debit to Paid-in Surplus (if applicable) and a credit to Retained Earnings, thereby eliminating the deficit.

After a quasi-reorganization, all SBICs must retain:

The minimum capital requirements set forth in 13 CFR §107.210 and complies with §§107.1150 through 1170 based on the surviving SBIC's Leverageable Capital.

In all financial statements of the SBIC filed subsequent to the quasi-reorganization, the Retained Earnings should be dated, that is, the statements should show that the Retained Earnings have been accumulated since a stated date as of which the reorganization took place, and the operating deficit was eliminated from this account. This dating should continue until the company has demonstrated that it is operating profitably, but no less than 3 full years. There must be full disclosure of all details of the quasi-reorganization in the notes to the financial statements.

### IV. GP Stakes/Management Company Stakes

In circumstances where alignment of incentives between the Licensee, its investors, and the SBA can be maintained, a Licensee may submit a request for approval of a GP Stake or Management Company Stake (investment) transaction. Please note, that the process for approving a GP and/or Management Company Stakes transaction is limited to those transactions which would result in one or more non-Principals owning, in the aggregate, no more than ≤25% of the either the management company or the General Partner. Transactions which would result in such ownership in excess of 25% are subject to SBA's SBIC Change of Control approval process. The approval process should be initiated prior to transaction close.

To ensure alignment is maintained and program mission and intent upheld, in reviewing approval requests SBA will consider:

(1) How the arrangement upholds the core mission and integrity of the SBIC program;
(2) Impact on the durability of the firm managing the SBIC; and
(3) Retention and incentivization of the principals of the SBIC.

To initiate a request for a GP Stake and/or Management Company Stake approval, the Licensee submits the request to their respective investment analyst, copying SBIC_IPM@sba.gov. The Licensee should answer the following questions in their email request:

   (1)     Licensee contact initiating request [First Name Last Name]
   (2)     Licensee contact phone number
   (3)     Licensee contact email
   (4)     SBIC License number
   (5)     Date of request
   (6)     Date decision from SBA requested by *(please anticipate a decision within 30 days of recipient of request)*
   (7)     Will the transaction result in the non-Principal ownership, in aggregate, of more than 25% of an applicant's General Partner? [yes / no]
   (8)     Will the transaction result in the non-Principal ownership, in aggregate, of more than 25% of an applicant's management company? [yes/no]
   (9)     Will the principals of the Licensee be subject to earn-outs or retention agreements? [yes/no]
           i.  If yes, for how many years?
           ii. Please describe the agreements
   (10)    Attach the draft transaction documents with all schedules to this email.
   (11)    If impacted, attach a draft version of Form 2181 Capital Certificate Exhibit F "All Investors" tab and "Significant Owner Associates" tab including information on the new non-Principal owners and changes to other owners only.

Once a GP Stake and/or Management Company Stake approval request and required documents have been submitted, SBA will do the following:

(5)  GP/Management Company Stake approval requests are received and processed by the Investment Analyst, who confirms completeness and may request additional information as necessary. The Investment Analyst will coordinate with the Office of the General Counsel in review of the request.

(6)  The Investment Analyst then prepares a recommendation memorandum which is provided to the Investment Officer for review. The Investment Officer reviews and reconciles any issues with the Investment Analyst and the Office of the General Counsel.

(7)  If upon the recommendation by the Investment Analyst, Investment Officer, and Office of the General Counsel the Director of IPM then approves, then the Licensee will receive notification of approval from the Director of IPM.

(8) To the extent the proposed transaction either exceeds the 25% limit stated above or is deemed to result in a change of control, then the request is subject to the Change of Control Approval Process.

h. Secured Third-Party Debt

*Secured third-party debt* means any non-SBA debt secured by any of your assets, including secured guarantees and other contingent obligations that you voluntarily assume, and secured lines of credit.

(b) *General rule.* With the exception of a *Capital Call Line (defined under 13 CFR § 107.550) ,* if you are a Leveraged Licensee, you must get SBA's written approval before you incur any secured third-party debt or refinance any debt with secured third-party debt, including any renewal of a secured line of credit, increase in the maximum amount available under a secured line of credit, or expansion of the scope of a security interest or lien. For purposes of this paragraph (b), "expansion of the scope of a security interest or lien" does not include the substitution of one asset or group of assets for another, provided the asset values (as reported on your most recent annual Form 468) are comparable.

(c) *Capital Call Line.* Without obtaining SBA's written approval, a Leveraged Licensee may obtain from a federally regulated financial institution, a line of credit ("Capital Call Line") that meets all the following conditions:

   (1) The maximum amount available under the Capital Call Line is no more than your unfunded Regulatory Capital, as reflected on your most recent Capital Certificate;

   (2) Your payment obligations under the Capital Call Line may be secured, but only by your unfunded Regulatory Capital;

   (3) The lender under the Capital Call Line may have a right to debit your depository account(s) at the lender's institution, so long as such lender's right to debit is limited to circumstances involving a default of your obligation to pay principal, interest, or fees due ("Payment Default") under the Capital Call Line and only to the amount of such Payment Default;

   (4) Each borrowing under the Capital Call Line must be repaid, in full, within 120 days after it is drawn;

   (5) The term of the Capital Call Line may not exceed 12 months, but may be renewable, provided that each renewal does not exceed 12 months and you remain in compliance with the conditions of this paragraph (c); and

   (6) Consistent with § 107.410, the Capital Call Line contains no provision permitting the lender to dictate when capital calls are made or otherwise ceding to the lender any control of the Licensee or its operations; provided, however, that the Capital Call Line may include a provision authorizing the lender, in the event of a Payment Default, to endorse, on your behalf, checks and other forms of payment in the Lender's possession and to apply the proceeds of such instruments to such Payment Default, with unapplied and remaining proceeds promptly to be paid to you.

(d) *Conditions for SBA approval.* Excluding Capital Call Lines defined in paragraph (c) of this section, SBA approval is required for secured third-party debt. As a condition of granting such approval under this

82

section, SBA may impose such restrictions or limitations as it deems appropriate, taking into account your historical performance, current financial position, proposed terms of the secured debt and amount of aggregate debt you will have outstanding (including Leverage). SBA will not favorably consider any requests for approval which include a blanket lien on all your assets, or a security interest in your investor commitments in excess of 125 percent of the proposed borrowing.

To initiate a request to incur Secured Third-Party Debt, the Licensee must submit a request to their assigned Investment Analyst, copying SBIC_IPM@sba.gov utilizing the request template below:

    a. Licensee Contact requesting change [First Name Last Name]
    b. Licensee Contact phone number
    c. Licensee Contact email
    d. SBIC License Number
    e. Request Date
    f. Date Seeking Approval By
    g. Debt Provider Institution Name
    h. Amount of Debt Requesting Approval for ($)
    i. Interest Rate on Debt
    j. Amount of all outstanding non-SBA Debt ($)

In addition, the Licensee must attach the following exhibits <u>in their email request:</u>

- A copy of the loan agreement
- If the applicant/licensee if relying on the exception set forth in 13 CFR § 107.550(c), a certification from the applicant/licensee that the Capital Call Line meets the conditions set forth in sub-paragraphs (1) – (6).

*Approval Process for Secured Third-Party Debt*

Once a Secured Third-Party Debt request and required filings have been submitted, SBA uses the following process to review the request:

- Third Party Debt Requests are received and processed by the Investment Analyst, who reconciles any issues with the SBIC.
- The Investment Analyst then forwards all legal documents OGC for Legal sufficiency review.
- Once Legal sufficiency is obtained from OGC, the Investment Analyst prepares a recommendation memo and response letter for submission to the Investment Officer for review and signature.
- After all issues have been addressed, the response letter is signed and forwarded to the SBIC.

Case 2:20-cv-00041-DCLC-CRW    Document 106    Filed 10/03/24    Page 93 of 298
PageID #: 3822

- The response letter and all related files are stored in SBA OII's CRM file management system. As of the date of this SOP publication, automated emails with request decisions do not exist. However, in the future, Licensees may be automatically notified of decision.

## 3. Funding, Distributions, and Interest

SBA provides SBA-guaranteed Leverage to Leveraged Licensees. Since SBA guarantees 100% of the principal of and interest on SBIC Debentures, Debenture Leverage interest rates are set at a spread above the ten year treasury, as shown in its historical rates. As part of SBA's guarantee, SBA receives a 1% commitment fee, a 2% draw fee and an Annual Charge that is determined at the time of commitment and is due and payable on the same terms and conditions as the interest. The annual charge may not exceed 1.38%, but it has historically been less than 1% and has averaged approximately 0.57% over the last 20 years.

Fund managers seeking to issue Leverage must apply to become a Leveraged Licensee. As part of its application, applicants must demonstrate their experience and that their plan has a reasonably high probability of success. SBA will determine whether a Licensee is eligible for SBA-guaranteed Leverage when and how much Leverage the Licensee will be eligible to receive based on the applicant's business plan, investment strategy, and track record, as well as SBA's leverage diversification policies.

If approved for a Green Light letter and requesting SBA Leverage, SBA will indicate the Total Intended Leverage Commitment amount.

After being licensed, Leveraged Licensees must still formally apply for a Leverage Commitment as described later in this section. Once approved, Licensees may draw on that commitment for up to four years after the government fiscal year (twelve-month period ending each September 30) in which the commitment was approved. For example, if a Licensee was approved for a Leverage Commitment in January 2022, it would be able to issue Leverage on that Commitment until September 30, 2026, up to the amount of the commitment. The process for drawing Leverage is described later in this section.

Leveraged Licensees have substantially more requirements with regards to Financings, distributions, reporting, and operations, since SBA has credit risk associated with these Licensees.

### a. Leverage Commitment Applications/Requests and Leverage Management

SBA can issue aggregate leverage commitments up to the budget authority allocated for each fiscal year. If SBA is operating under a Continuing Resolution (CR), the available budget authority under a CR may impact the amount and/or timing of commitment approvals.

Licensees may apply for/request Leverage from SBA in the form of a purchase or guarantee of their Debentures. The Leverage application process has two parts. The Licensee must first apply for SBA's conditional commitment to reserve a specific amount of Leverage for their future use. The Licensee may then apply to draw down Leverage against the commitment. SBICs licensed before August 17, 2023 may apply for a conditional commitment up to two times per year. SBICs licensed after August 17, 2023 may

84

apply up to two times per year where the cumulative aggregate amount does not exceed its Total Intended Leverage Commitment approved by SBA.

**SBICs Licensed prior to August 17, 2023**, should continue to follow the requirements for applying for Leverage Commitments updated November 1, 2022. APPLICATION INSTRUCTIONS FOR COMMITMENT OF SBIC DEBENTURES (sba.gov).  SBICs licensed after August 17, 2023, will request a Commitment package to make use of the Total Intended Leverage Commitment amount established at time of Green Light approval and finalized within 12 months for Licensure. To request a Commitment package, the Licensee will submit to SBICFunding@sba.gov copying the IPM Analyst:

- A signed certification letter including:
    - the Total Intended Leverage Commitment amount,
    - the amount of Leverage Commitment being requested in the Commitment package, disclosure of all outstanding third-party debt (see appendix)
- SBA Form 25
- SBA Form 2182 - Transferor's Liability Contract
- SBA Form 652
- SBA Form 1065
- SBA Form 1846
- Proposed legal opinion for draws
- Selling documents including:
    - Bank Identification, SBA Form 34. This form provides SBA with the necessary routing instructions to credit your designated account with the appropriate amounts by electronic funds transfer (after your commitment application and subsequent draw request(s) have been approved). If your account is not with a member bank of the Federal Reserve System, you must identify the member bank whose routing code is utilized as your correspondent or affiliate bank. All Licensees applying for a commitment must complete this form. File using the most recent version of SBA Form 34 that is provided on SBA's website. SBA advises that SBICs take appropriate measures to secure this information when submitting this form to SBA.
    - Debit Authorization. Debit Authorization establishes an efficient and low-cost way for licensees to make the scheduled payments after pooling on SBA Form 444C Debentures ("Standard Debentures") by Automated Clearinghouse (ACH) debit. The covering instructions to this authorization explain its purpose in more detail. It must be properly completed and executed. Please submit a Debit Authorization even if you expect to issue only non-pooled Debentures under your commitment, so that you will have the option of issuing Standard Debentures as well. File using the most recent version of the form that is provided on SBA's website. SBA advises that SBICs take appropriate measures to secure this information when submitting this form to SBA.
    - Authorization to Disburse Proceeds, SBA Form 33 [Refunding Maturing Debenture(s)]. Only those applying for SBA's commitment of guaranteed Debenture Leverage for the purpose of refunding maturing Debenture(s) are to file this form. File using the SBA Form

that is provided SBA's website. Form number and revision date must be visible on executed submission.

**SBICs Licensed on or after August 17, 2023**, the Licensee submits a commitment request per the instructions on SBA's website. The cumulative aggregate amount requested may not exceed the Licensee's established Total Intended Leverage Commitment. To initiate a Commitment Request, the Licensee must submit a request to SBICFunding@sba.gov and their respective analyst, copying SBIC_IPM@sba.gov.

**Approval Process for Leverage Commitments (SBICs Licensed prior to August 17, 2023)** Leverage Commitment requests are received and processed by the Investment Analyst, who reconciles any issues with the SBIC. The Investment Analyst prepares the Leverage Commitment action memo for presentation to the Credit Committee.

The Investment Analyst forwards the Leverage Commitment action memo to the Investment Officer for review. The Investment Officer reviews and reconciles any issues with the Investment Analysts.

After all issues have been addressed, the Leverage Commitment action memo is presented to the Credit Committee for decision. The Investment Analyst will memorialize the Credit Committee's decision in minutes and prepare the Leverage Commitment approval letter.

The Investment Analyst will forward, through the Investment Officer, the Leverage Commitment action memo, minutes and Leverage Commitment approval letter to the Director IPM for review.

The Director IPM will review and forward, through the Funding Division, the Leverage Commitment action memo, minutes and Leverage Commitment approval letter to the AA, OII for review and signature.

After the AA/OII signs the Leverage Commitment action memo and the Leverage Commitment approval letter, the Funding Division is notified, and the Leverage Commitment approval letter is forwarded to the SBIC.

The Leverage Commitment approval letter and all related files are stored in SBA OII's CRM file management system.

**Approval Process for Leverage Commitments (SBICs Licensed after August 17, 2023)**

Leverage Commitment requests are received and processed by the Investment Analyst, who reconciles any issues with the SBIC. The Investment Analyst prepares the Leverage Commitment action and Leverage Commitment approval letter for the AA/OII's signature.

The Investment Analyst forwards the Leverage Commitment materials to the Investment Officer for review. The Investment Officer reviews and reconciles any issues with the Investment Analysts.

The Investment Officer forwards the Leverage Commitment materials to the Director IPM for review. The Director IPM will review and forward, through the Funding Division, the Leverage Commitment materials to the AA, OII for review and signature.

After the AA/OII signs the Leverage Commitment action and the Leverage Commitment approval letter, the Funding Division is notified, and the Leverage Commitment approval letter is forwarded to the SBIC.

The Leverage Commitment approval letter and all related files are stored in SBA OII's CRM file management system.

b.  Leverage fees and additional charges payable by Licensee.

    i    Leverage fee. SBICs must pay a leverage fee to SBA for each Leverage commitment and each issuance of a Debenture. The total leverage fee is 3 percent, comprised of a 1% commitment fee and a 2% draw fee on the Leverage issued.

    ii    Payment of leverage fee.

        1. If the SBIC issues a Debenture to repay or redeem existing Leverage, the SBIC must pay the leverage fee before SBA will guarantee or purchase the new Leverage security.

        2. If the SBIC issues a Debenture that is not used to repay or redeem existing Leverage, SBA will deduct the 2% draw fee from the proceeds remitted to the SBIC, unless the SBIC prepaid the fee under § 107.1210.

        3. The 1% commitment fee must be paid by the SBIC within 30 days of issuance of the commitment or before the SBIC submits a draw application against that commitment, whichever is earlier.

    iii    Refundability. The leverage fee is not refundable under any circumstances.

    iv    Additional charge for Leverage -

        1. Debentures. You must pay to SBA an Annual Charge, not to exceed 1.38 percent per annum and no less than the amount set forth in 13 CFR §107.1130, on the outstanding amount of your Debentures issued on or after October 1, 1996, payable under the same terms and conditions as the interest on the Debentures. This Charge does not apply to Debentures issued pursuant to a Leverage commitment obtained from SBA on or before September 30, 1996.

    v    Other Leverage fees. SBA may establish a fee structure for services related to the pooling of Debentures. SBA will not collect any fee for its guarantee of the related Trust Certificates.  As of the writing of this SOP, the other leverage fees, which are withheld from draw proceeds, are:

        1. 0.375% Underwriter fee

        2. 0.05% Selling Agent Fee

    vi    0.01% Trustee Fee

Case 2:20-cv-00041-DCLC-CRW    Document 106    Filed 10/03/24    Page 97 of 298
PageID #: 3826

c. SBICs' acceptance of SBA remedies under §§ 107.1800 through 107.1820.

If SBICs issue Leverage after April 25, 1994, SBICs automatically agree to the terms and conditions in §§ 107.1800 through 107.1820 as they exist at the time of issuance. The effect of these terms and conditions is the same as if they were fully incorporated in the terms of your Leverage.

d. Distributions and Reductions in Regulatory Capital § 107.585

Distributions and reductions in Regulatory Capital (§ 107.585) occur when Licensees return a portion of previously paid-in Private Capital and/or profits to investors in the Licensee, typically limited partners. Distributions reduce the Regulatory Capital, and consequently the Leverageable Capital, of a Licensee by an equal amount. Regulatory Capital and Leverageable Capital are the basis for SBA determining a Licensee's leverage eligibility, overline limits, and compliance with the approved management fee. Licensees with Outstanding Leverage or Commitments are required to obtain SBA's prior written approval to reduce Regulatory Capital by more than two percent in any fiscal year. SBA anticipates distributions as part of the regular Licensee operations and seeks to efficiently approve regulatory compliant reductions in capital. Licensees with no Outstanding Leverage or Commitments do **not** require SBA's prior written approval to reduce Regulatory Capital by more than two percent. However, all Licensees must report changes to capitalization and ownership to SBA within 30 days of the effective date of the change on the Capital Certificate (Form 2181 Exhibit F) by uploading the document to the SBIC website electronic reporting system.

To follow is guidance related to distributions based on Licensee type:

**(a)** *Non-Leveraged Licensees.* If you are a Non-leveraged Licensee, you may make distributions to your private investors without SBA prior approval. At all times, you must retain sufficient Regulatory Capital to meet the minimum capital requirements in the Act and in § 107.210, unless such amounts are in accordance with your SBA approved Wind-down Plan (see § 107.590). You must report any reductions of Regulatory Capital to SBA within 30 days via an updated Capital Certificate (see § 107.300).

**(b)** *Non-Accrual Leveraged Licensees.* If you are a Standard Debenture Leveraged Licensee that is also an Early Stage SBIC, you are subject to the distributions identified in § 107.1180. If you are a Standard Debenture Leveraged Licensee, you may distribute READ to your private investors without SBA approval only after considering any material adverse changes to your portfolio. You must obtain SBA's prior written approval to reduce your Regulatory Capital by more than two percent in any fiscal year. Such approved reduction amount may, for a period of five years after the reduction, be included in the sum determined under § 107.740(a). In seeking SBA's prior approval, you must disclose any material adverse changes or certify that you have no material adverse changes and provide an updated Wind-down Plan. You must retain sufficient Regulatory Capital to meet the minimum capital requirements of § 107.210 and sufficient Leverageable Capital to avoid having excess Leverage in violation of section 303 of the Act and § 107.1150. You must report any reductions of Regulatory Capital to SBA within 30 days via an updated Capital Certificate (see § 107.300).

**(c) *Accrual SBICs and Reinvestor SBICs.*** If you are an Accrual SBIC or Reinvestor SBIC, unless you receive prior approval from SBA for the purposes of covering a tax distribution you may only distribute as follows:

(1) *Payment of Annual Charges and Accrued Interest.* Prior to any distributions to your private investors, you must pay to SBA any Annual Charges and all accrued interest on outstanding Leverage at the next available repayment window but no later than six months following a distribution to your private investors. Within six months of any non-tax distribution to your private investors, you must pay any Annual Charges owed to SBA and all accrued interest on your outstanding Leverage.

(2) *Calculate SBA's share of distribution.* Within six months of any non-tax distribution to your private investors, you must make payments to SBA on a pro rata basis with any distributions to your private investors based on your SBA Total Intended Leverage Commitment relative to your Total Private Capital Commitments, inclusive of Qualified Non-Private Funds, determined within 12 months of Licensure calculated as follows: SBA's Share = Total Distributions x [Total Intended Leverage Commitment / (Total Intended Leverage Commitment + Total Private Capital Commitments)] where:

(i) Total Distributions means the total amount of distributions (whether profit or return of capital) you intend to make after paying all accrued interest and Annual Charges plus any prior tax distributions.

(ii) Total Intended Leverage Commitment is as defined in § 107.300.

(iii) Total Private Capital Commitments is as defined in § 107.300.

(3) *Apply SBA Share.* You must repay SBA outstanding Leverage in an amount no less than SBA's Share to the extent of Outstanding Leverage and report the SBA calculation to SBA. If SBA's Share is greater than Outstanding Leverage and you have unfunded Leverage commitments, you must submit a Leverage commitment cancellation equal to SBA's Share minus the SBA Leverage redemption up to the unfunded Leverage commitments.

(4) *Distribute to private investors.* You must report SBA's Share calculation to SBA prior to distributing READ to your private investors without SBA approval and only after considering any adverse changes to your portfolio. You must pay Annual Charges to SBA prior to distributing READ. After repaying all accrued interest, Annual Charges, and outstanding Leverage calculated as SBA's Share, you may distribute READ to your private investors without SBA approval only after considering any adverse changes to your portfolio. You must obtain SBA's prior written approval to reduce your Regulatory Capital by more than two percent in any fiscal year. Such approved reduction amount may, for a period of five years after the reduction, be included in the sum determined under § 107.740(a). In seeking SBA's prior written approval, you must disclose any material adverse changes or certify that you have no material adverse changes and provide an updated Wind-down Plan. You must retain sufficient Regulatory Capital to meet the minimum

89

capital requirements of § 107.210 and sufficient Leverageable Capital to avoid having excess Leverage in violation of section 303 of the Act and § 107.1150. You must report any reductions of Regulatory Capital to SBA within 30 days. Prior to any reduction in Regulatory Capital, if you have made a tax distribution, you must make a distribution to SBA pursuant to the formula set forth in paragraph (c)(2) of this section, as if you had made a non-tax distribution.

　　　(5) *Report distribution to SBA*. You must report to SBA the distribution, the calculations, and the amounts distributed to each party as part of your annual and quarterly Form 468 (see §§ 107.630 and 107.1220).

*Example 1 to paragraph (c):* Your Total Intended Leverage Commitment is $50 million, and your Total Private Capital Commitments are $25 million. You currently have $25 million in Outstanding Leverage, $25 million in unfunded Leverage commitments, and $15 million in Leverageable Capital. You owe $1 million in accrued interest and Annual Charges. You have $61 million to distribute.

Step 1: Payment of Annual Charges and all accrued interest. You would first pay the $1 million in accrued interest and Annual Charges. *Annual Charge is paid first, then accrued interest.*

Step 2: Calculate SBA's Share of Distribution. SBA's share is calculated as: $60 million x [$50 million / ($50 million + $25 million)] = $40 million.

Step 3: Apply SBA Share. You would repay $25 million in Outstanding Leverage and cancel $15 million of your unfunded Leverage commitments.

Step 4: Distribute to Private Investors. You would distribute $35 million to Private Investors.

Step 5: Report Distribution to SBA. You would then report the distribution to SBA, detailing the amounts and calculations from steps 1 through 4 of this example 1.


e.　Maximum Amount of Leverage for Section 301(c) Licensees

SBICs can qualify for Standard Debentures and Accrual Debentures. Accrual Debentures are **only** available to Accrual SBICs and Reinvestor SBICs. The following table shows the maximum amount of Leverage an SBIC or group of SBICs under Common Control ("family of funds") may have outstanding at any time.

| Number of SBICs | Maximum Amount |
| --- | --- |

90

| | |
|---|---|
| Individual SBICs | • **Standard Debenture SBIC:** The lesser of 200% of Leverageable Capital or $175 million in principal<br>• **Reinvestor SBICs:** The lesser of 200% of Leverageable Capital or $175 million in principal and interest.<br>• **Accrual SBICs:** The lesser of 125% of Leverageable Capital or $175 million in principal and interest. |
| Multiple SBICs under Common Control | Maximum aggregate Leverage of $350 million. |
| [1]NOTE: SBICs may seek leverage for more than the limits set forth above for investments in low-income geographic areas and Energy Saving Qualified Investments subject to SBA credit policies. | |

For purposes of the Accrual SBIC, a "tier of leverage" is defined as 100% of an SBIC applicant's Regulatory Capital.

As described in 13 CFR § 107.1150, SBA will approve Leverage commitment requests in excess of 200 percent of Regulatory Capital and draw requests in excess of 200 percent of Leverageable Capital **only** after a Licensee has demonstrated consistent, sustainable profitability based on a conservative investment strategy that limits downside risk. Any such Leverage request must be supported by a current business plan that reflects continuation of the Licensee's proven successful investment strategy and demonstrates the Licensee's ability to pay all SBA obligations in accordance with their terms.

Given this requirement under 13 CFR § 107.1150, SBA will consider approving qualified **Subsequent Funds ONLY for** additional Leverage for investment in (1) low-income geographic areas and (2) Qualifying Energy Savings Investments based on a proven demonstrated historical ability to meet regulatory requirements for additional leverage as a licensed SBIC.

Any investment a Licensee uses as a basis to seek additional Leverage based on its qualification in a low income geographic area cannot also be used to seek additional Leverage As an Energy Saving Qualified Investment.

I.    Additional Leverage for Investments in Smaller Enterprises located in low-income geographic areas.

For purposes of this section, "Low income geographic areas" are as defined in 13 CFR § 108.50. To determine whether you may request a Leverage that could cause you to have Outstanding Leverage in excess of the amount determined under the individual Licensee and family of funds limit:

(i) Determine the cost basis, as reported on your most recent filing of SBA Form 468 for your most recently licensed fund, of any investments in the Equity Securities of a Smaller Enterprise located in a low-income geographic area.

91

(ii) Calculate the amount that equals 50 percent of your Leverageable Capital in the Licensee.

(iii) Subtract from your outstanding Leverage

(iv) If the amount calculated is less than the maximum permitted leverage, the difference equals your additional Leverage availability which can be requested for consideration at the time of Licensing for SBICs licensed after August 17, 2023. For SBICs licensed prior to August 17, 2023, base your calculations on the most recent filing of SBA Form 468 for the current active Licensee and request as part of the Commitment Application process.

II.    Additional Leverage based on Energy Saving Qualified Investments in Smaller Enterprises. *Energy Saving Qualified Investment,* defined in 13 CFR § 107.50, means a Financing which:

(1) Is made by a Licensee licensed after September 30, 2008;

(2) Is in the form of a Loan, Debt Security, or Equity Security, each as defined in this section;

(3) Is made to a Small Business that is primarily engaged in Energy Saving Activities. A Licensee must obtain a determination from SBA prior to the provision of Financing as to whether a Small Business is primarily engaged in Energy Saving Activities. SBA will consider the distribution of revenues, employees and expenditures, intellectual property rights held, and Energy Saving Activities described in a business plan presented to investors as part of a formal solicitation in making its determination. However, a Small Business is presumed to be primarily engaged in Energy Saving Activities, and no pre-Financing determination by SBA is required, if:

(i) The Small Business derived at least 50% of its revenues during its most recently completed fiscal year from Energy Saving Activities; or

(ii) The Small Business will utilize 100% of the Financing proceeds received from a Licensee to engage in Energy Saving Activities.

To determine whether you may request Leverage that would cause you to have Outstanding Leverage in excess of the amount determined under the individual Licensee and family of funds limit to finance investments in Energy Saving Qualified Investments:

(i) Determine the cost basis, as reported on your most recent filing of SBA Form 468 for your most recently licensed fund, of any Energy Saving Qualified Investments in a Smaller Enterprise that individually do not exceed 20% of your Regulatory Capital.

(ii) Calculate the amount that equals 33% of your Leverageable Capital.

(iii) Subtract from your Outstanding Leverage the lesser of paragraph (i) or (ii) above.

(iv) If the amount calculated in paragraph (iii) above is less than the maximum Leverage limit , the difference between the two amounts equals your additional Leverage availability which can be requested for consideration at the time of Licensing for SBICs licensed after August 17, 2023.

For SBICs licensed prior to August 17, 2023, base your calculations on the most recent filing of SBA Form 468 for the current active Licensee and request as part of the Commitment Application process.

**Regulatory Non-Compliance—Financial Statements.** No Leverage Commitment request can be approved until all deficiencies or delinquencies regarding the most recently required or filed SBA Form 468 have been resolved.

**Regulatory Non-Compliance—Examination Findings.** Generally, SBA will not approve Leverage Commitments if:

a. There is an unresolved Category 1 ("big nine") regulatory violation finding or an unresolved regulatory violation that may result in an automatic transfer to the Office of SBIC Liquidation,

b. There is an alleged Category 1 regulatory violation, or an alleged regulatory violation that may result in an automatic transfer to the Office of SBIC Liquidation, that is discovered by the analyst or brought to the attention of the analyst by an SBA examiner or other OII employee in advance of release of the most recent Examination Report or apart from its release, or

c. Additional facts are necessary for SBA to determine that a violation of any sort has actually occurred and that it is serious enough to warrant a recommendation to deny a Leverage Commitment. However, an outstanding regulatory violation does not automatically disqualify an SBIC from eligibility for a Leverage Commitment.

SBICs may be ineligible for Leverage Commitments under the following circumstances:

a. *Mergers, Reorganization, Changes of Control.* If there is a pending reorganization, merger, or Change of Control, SBA generally will not approve Leverage Commitments or Leverage draws until SBA has approved the transaction and it has been consummated.

b. *Investigations.* An SBIC may not be eligible for a Leverage Commitment or for funding under such Leverage Commitment if it is under investigation by the SBA's Inspector General or if an investigation report has been issued by the Inspector General and its findings have not been resolved. Without the approval of the Office of Inspector General, Analysts will not disclose the existence of an investigation to the SBIC.

**For Licenses issued prior to August 17, 2023,** SBA may issue additional leverage commitments beyond the leverage commitment approved at the time of the Green Light Letter to refund maturing debentures if adequate budget authority is available and required conditions are met by the Licensee. Applications for refunding Leverage must meet SBA's standard Leverage requirements regarding eligibility; regulatory compliance; need for funds and activity; credit and financial condition; and performance. However, generally no Leverage draws will be approved by SBA to prepay outstanding Leverage well in advance of maturity dates. If an SBIC wishes to refund maturing Leverage, the SBIC should draw the funds slightly before the maturity date and indicate refunding of maturing Leverage in the statement of need which accompanies the draw request.

93

f. Leverage Reaching Maturity

An SBIC may submit a request to rollover existing debentures in the months leading up to maturity. When part or all of the proceeds of a Leverage draw are to be used to rollover one or more maturing debentures, the SBIC issuing the new debenture(s) must submit to SBA an executed SBA Form 33. The new rollover debenture(s) must be drawn before the maturity date of the maturing debentures. The proceeds of the draw will be wired at the direction of SBA for distribution to the pool Trust Certificate holders. The SBIC must wire to SBA any deficiency between the net draw proceeds and the total amount of maturing principal. SBA generally seeks for such requests to be submitted to SBA approximately 12 months prior to maturity to permit time for analysis of the residual holdings in the portfolio. SBA will generally not accept rollover requests made within 90 days of maturity.

a. Evergreen Licensees. An "evergreen licensee" refers to a licensee that (i) has no time restriction limiting the life of the licensee and (ii) intends to employ a continuous investment strategy. SBA has not licensed "evergreen licensees" since the 1990s.

For existing evergreen licensees, SBA will consider rollover and/or cumulative leverage commitments in excess of that approved at licensing on a case-by-case basis, provided that

i. the amount of leverage requested does not exceed the maximum leverage permitted under 13 CFR §107.1150;

ii. the leverage request is consistent with the licensee's business plan approved at the time of licensing; and

iii. the evergreen licensee meets SBA's credit standards for leverage commitments.

b. Limited Life SBICs. SBA will consider issuing rollover commitments within 12 months of the maturity of the SBIC's oldest currently outstanding debenture. In evaluating the SBIC's request, SBA will consider the following factors:

i. The SBIC has provided a wind down plan that, in SBA's sole discretion, provides for the full payment of all debenture interest and principal, and

ii. The SBIC must have no outstanding regulatory violations, and

iii. The management team must have proven experience exiting and realizing profits from their investments, and

94

iv. Management must not have acted in a manner which is contrary to SBA's objectives, nor shall management have a history of prioritizing distributions to their LPs to the detriment of SBA's creditor position.

g. Leverage Draw Requests

Licensees with Outstanding Leverage Commitments may submit requests to draw against SBA's commitments pursuant to 13 CFR §107.1230. In addition, *Memorandum of Instructions - SBIC Draw Request Against SBA's Leverage Commitment* provides guidance to Licensees and outlines the items that must be submitted to draw leverage against SBA's commitment.

Licensees may electronically submit a request to draw Leverage on either the first or third Wednesdays of each month. From time to time, SBA may change draw application dates to adjust for Federal holidays. SBA will notify Licensees in advance of such changes. Licensees must provide all required documentation for all Debenture draw requests pursuant to Memorandum of Instructions - SBIC Draw Request Against SBA's Leverage Commitment.

If an SBIC has more than one Leverage Commitment with an outstanding balance, SBA will apply takedowns against the SBIC's oldest Commitment first. Takedowns cannot be split across Commitments, so takedown amounts should be calculated such that Commitment balances can be fully utilized. Each Debenture must have an original electronic signature compliant with this SOP.

If SBA approves the Licensee's draw request, SBA will e-mail an Approval Notice for each approved takedown to the Licensee one week later (on the second or fourth Wednesday of each month). Once received, Licensees may then issue Leverage against that Approval Notice up to the amount approved at any time prior to the expiration date of the issued Approval Notice. Draws must be in increments of $5,000. Approval Notices expire approximately 58 days after issuance.

The funding process differs based on the type of Debenture:

- **Standard Debenture.** The Standard Debenture is issued at face minus Leverage and servicing fees requires current semi-annual interest and annual charge payments and has a ten-year maturity from pooling date.
- **Accrual Debenture.** The Accrual Debenture is issued at face and does **not** require current semi-annual interest and annual charge payments. Rather, interest and annual charge accrue across the term of the Debenture. Annual charge payments must be paid and all accrued interested paid prior to an SBIC distributing payments to investors and making principal payments on the Debentures. Prepayments are permissible, but only after annual charge payments and all accrued interest is paid. The Debenture has a ten-year maturity from the first payment date following the draw date.
- **Discounted Debentures.** LMI Debenture and Energy Saving Debenture proceeds may only be used for Low-and-Moderate Income ("LMI") Investments or Energy Saving Qualified Investments

("ESQI")[11], as defined in 13 CFR §107.50.  These Debentures are issued at a discount and mature to full face value by the 5th year after issuance.  This enables the Licensee to not have to make interest and annual charge payments for the first 5 years, which may be helpful for longer term equity investments.   Discounted Debentures are available in both 5-and 10-year maturities. For 10-year maturities, the Debentures convert to current pay after 5 years.

The processes for each type of Debenture are described below.

**Standard Debenture Funding Process**

The Standard Debenture is funded via a two-part process using an interim funding provider to enable Licensees to issue approved Leverage draws at any time ("Interim Debentures") and then pooling Interim Debentures on a semi-annual basis. The process associated with the Standard Debenture is as follows:

**Part 1 – Interim Funding:**
- Licensees must email the executed Approval Notice (see Leverage Draw Requests) by 2 PM Eastern Time to Bank of New York Mellon to have funds wired to the SBIC's bank account by the afternoon of the next business day.
- Funds will be wired to the SBIC's bank account, which is printed on the Approval Notice.  The bank information is taken from the SBIC's most recently submitted SBA Form 34.
- The amount of net draw proceeds = face amount of Debenture – 2% draw fee – 0.375% Underwriter fee – 0.05 Selling Agent fee – 0.01 Trustee Fee.  The SBIC is responsible for repaying the face amount.
- The Bank of New York Mellon will send the SBIC an Interest & Fee Notice for each Debenture.  The interest rate on the notice is applicable only during the interim period until pooling. The interim interest rate is currently the Federal Home Loan Bank of Chicago's Advance Rate + 41 basis points.
- Interim Debentures may not be prepaid.
- Payment of Interest and annual charges for Interim Debentures:
  - SBICs must wire interim interest and annual charge to Bank of New York Mellon the day prior to pooling (see Step 2 below).  About 7 – 10 days in advance of each pooling, SBA will e-mail the SBIC an interim interest and annual charge statement which will indicate the amount due.
  - The annual charge associated with a Debenture is the annual charge established at the time of the commitment against which it was drawn.   The annual charge generally changes each fiscal year.

**Part 2 - Pooling**
- SBA will pool Interim Debentures semi-annually in March and September, at which time a long-term fixed interest rate is determined.  The pooled interest rate is a market-driven spread over the 10-year Treasury rate.
- The interest rate is normally determined about 1 week prior to the scheduled pooling date.  SBICs in the pool can access the pooled interest rate on SBA's website.

---

[11] Only SBICs licensed after September 30, 2008 may utilize the Discounted Debenture for the purposes of ESQI.

- For Standard Debentures, SBICs receive a copy of the Debenture with the long-term features filled-in after the Debenture is placed in the long-term pool. More information on the funding mechanism for Standard Debentures may be found in <u>Funding the SBIC Program</u>.

**Discounted Debenture Funding Process**

Because proceeds from Discount Debentures must be used for either LMI or ESQI financings, these Debentures are limitedly used. The Federal Home Loan Bank of Chicago ("FHLBC") purchases these securities and holds them to maturity.  The process is as follows:

- Licensees must email the executed Approval Notice (see Leverage Draw Requests) by 2PM Eastern Time to the Bank of New York Mellon to have funds wired to the SBIC's bank account by the afternoon of the next business day.
- Funds will be wired to the SBIC's bank account, which is printed on the Approval Notice.  The bank information is taken from the SBIC's most recently submitted SBA Form 34.
- The amount of net draw proceeds will be discounted for the first 5 years based on the interest rate determined by FHLBC less the future value of SBA's annual charge and the 2% draw fee on the face value of the debenture.  <u>FHLBC's Debenture Calculator</u> provides an estimate on actual net proceeds.

**Accrual Debenture Funding Process**

As market supply and demand for Accrual Debentures forms, SBA intends to work with a purchaser for these securities and hold them to maturity. SBA intends to pool Accrual Debentures when sufficient supply exists to pool and sell Accrual Debenture Trust Certificates on the secondary market. SBA expects to issue guidance on the funding process in the Fall of 2023.

h.Interest and Annual Charge Payments

For Standard Debentures:

- Pooled debentures have a 10- year term with interest and annual charge payable semi-annually on the Payment Dates 3/1 and 9/1.
- Bank of New York Mellon (as successor to Colson Financial Services) will debit interest and annual charge from the SBIC's bank account on the 3/1 and 9/1 Payment Dates.  The debit account information is from the SBIC's most recently submitted Debit Authorization Form.
- Amounts to be debited are noted on the Debenture Amortization Report(s), which SBA e-mails to SBICs after each pooling.

For Discount Debentures:

- Terms are based on the security issued, but generally do not require payments for the first five years.

97

- For 5-year Debentures: After 5 years, the SBIC must wire the face amount of the Debenture e to the Bank of New York Mellon one business day prior to either the 3/1 or 9/1 maturity date.
- For 10-Year Debentures: After 5 years, the Debenture converts to a current pay instrument, and interest and annual charge on the face amount of the Debenture must be wired to the Bank of New York Mellon one day prior to each 3/1 and 9/1 Payment Date, with the full face amount principal also due one day prior to maturity.

For Accrual Debentures:
- Debentures have a 10-year term (from the first payment date following draw) with interest and annual charge due at maturity on the face amount of the Debenture. Payment must be wired to the Bank of New York Mellon one day prior to maturity.
- Prepayment of principal is allowed after all accrued interest and annual charge is paid and after the expiration of any lockout period. Partial prepayments of Debentures are allowed.

i. Leverage Prepayments

Discounted Debenture Leverage payments are pursuant to the terms of their security with FHLBC. Standard Debentures which have been pooled may be prepaid prior to maturity. Debentures must be prepaid in full. Debentures need not be prepaid in any particular order – SBICs may choose which debenture(s) to prepay. Prepayments may be made on the dates when the semi-annual interest and SBA annual charge payments are due (Payment Dates) or at certain time periods in between Payment Dates. Full semi-annual interest and SBA annual charge that would be owed as of the next Payment Date are due even if prepayments are made prior to the next Payment Date.

The below instructions are for payment **on Standard Debentures** only. **SBA will issue instructions for payment on Accrual Debentures in the fall of 2023.**

There are two types of prepayments:
1) Regular Prepayment (prepayment made on Payment Date); and
2) Advanced Prepayment (prepayment made at least one month in advance of Payment Date).

Please refer to the chart below for more detailed instructions applicable to the two types of prepayments.

|  | **REGULAR PREPAYMENT** | **ADVANCED PREPAYMENT** |
|---|---|---|
| What is the first step in the process? | SBIC must e-mail a written notice of its intent to prepay debentures to SBA at SBICFunding@sba.gov. The subject of the email should be entitled "Notice of Prepayment from [SBIC Name] [License Number]" (Enter appropriate information within brackets). | |
| When must SBICs e-mail the prepayment notice? | Notice must be e-mailed no later than five business days in advance of the next Payment Date. | Notice must be e-mailed no later than five weeks in advance of the next Payment Date. |

98

| | REGULAR PREPAYMENT | ADVANCED PREPAYMENT |
|---|---|---|
| Any additional e-mail notification requirements? | No | A copy of the notice should be sent to the SBIC's assigned Investment Analyst. |
| **What must be included in the e-mail notice?** | Using the **SBA-provided Regular Prepayment Notice in Excel**:<br>• SBIC name<br>• License number<br>• Prepayment Type: Regular<br>• List of debentures to be prepaid, with the following for each:<br> o Pool Series<br> o ID Control Number<br> o Principal Amount of each debenture to be prepaid | Using the **SBA-provided Advanced Prepayment Notice in Excel**:<br>• SBIC name<br>• License number<br>• Prepayment Type: Advanced<br>• List of debentures to be prepaid, with the following for each:<br> o Pool Series<br> o ID Control Number<br> o Principal Amount, interest, and SBA annual charge due for each debenture to be prepaid<br>• The scheduled date and total amount of the advanced prepayment |
| **What happens after SBA receives the notice?** | SBA will confirm in a reply e-mail that the prepayment information and amounts due are correct. SBA will notify The Bank of New York Mellon and Colson Financial Services of the planned prepayment. | |
| **When is the prepayment wire due?** | On or before the next Payment Date [1] | At least one month prior to the next Payment Date |
| **How is the prepayment made?** | SBIC wires funds to BNY Mellon | |
| **What amount is wired?** | Principal amount of the debenture(s) being prepaid. If more than one debenture is being prepaid, aggregate the principal amounts into one wire.<br><br>(Interest and SBA annual charge will be debited from the SBIC's bank.) | Principal amount of the debenture(s) being prepaid + interest and SBA annual charge due on the next Payment Date. Refer to the debenture amortization report(s) for interest and SBA annual charge amounts due. If more than one debenture is being prepaid, aggregate all amounts, including interest and SBA annual charges, into one wire. |
| **What are the wiring instructions?** | SBA will provide the prepayment and wiring instructions to SBICs after their debentures are pooled. SBICs may also request the wiring instructions in their prepayment notice or by sending an e-mail to SBICFunding@sba.gov. | |
| **When will SBA apply the prepayment to the SBIC's outstanding leverage balance?** | As of the Payment Date. | On the day that SBA or BNY Mellon confirms receipt of the wire from the SBIC. |

99

After confirmation from BNY Mellon that the prepayment amount has been received, SBA instructs Colson to discontinue all future ACH debit collection on the prepaid debenture(s).

**Additional Information for Advanced Prepayments**

Advanced prepayments are not allowed after the first business day of the month prior the next semi-annual payment date. Any SBIC wishing to prepay its debenture(s) after that time must make a regular prepayment.

After confirmation from BNY Mellon that the wire of the advanced prepayment amount has been received, SBA instructs:
1) Colson to discontinue all future ACH debit collection on prepaid debenture(s);
2) BNY Mellon to hold the prepayment amounts in trust until the next scheduled Distribution Date to respective pool holders – then release funds appropriately to pool holders and SBA; and
3) BNY Mellon that advanced prepayments cannot be rescinded without BNY Mellon first receiving formal notice from SBA of such rescission signed by the Associate Administrator of SBA's Office of Investment and Innovation.

**Maturing Leverage**

Note that principal due at maturity must also be wired. Payment is due on the maturity date. There is no notification requirement for debentures paid at maturity.

4. Investor Reporting, Data and Agreements

a. Amending Legal Agreements and Side Letters
Side letter agreements are used by limited partners to obtain certain rights and privileges under an SBIC's limited partnership agreement that other limited partners do not have. The limited partners seeking these rights and privileges could be existing limited partners or new limited partners to the SBIC. Side letter agreements are legal agreements and must be reviewed by SBA for legal sufficiency.

In terms of amendments to legal documents and legal agreements, an SBIC's legal documents (including the limited partnership agreement (LPA) establish and confirm certain legal and financial rights of SBA. SBA will review all requests to amend legal documents or proposed agreements for legal sufficiency. **All draft LPAs, GPAs, side letters and other legal agreements should be submitted to SBA when filing the MAQ application**.

b. Investor Reports and Other Items That Licensees Must Submit
Per §107.660, Licensees are required to submit certain items to SBA that are important to monitoring activities. The table below identifies the items due and when they should be submitted.

| §107.660 Paragraph | Description of Item to be submitted to SBA by Licensee | When Due |
|---|---|---|
| (a) | Reports to owners. This includes any reports Licensee provides to all its investors or limited partners, including any prospectus, valuation reports, management demographic information, publications, or reports regarding a portfolio concern, the fund manager, or the licensee. | No later than 30 calendar days after licensee provides to investor. |
| (b) | Documents filed with Securities and Exchange Commission (SEC). This includes any reports, applications, or documents provided to the SEC. | No later than 30 calendar days after licensee provides to SEC. |
| (c) | Litigation reports. If Licensee becomes a party to litigation or other proceedings (with the exception of any proceedings to enforce your ordinary creditor rights), it must provide a report to SBA that describes the proceedings, identifies other parties involved, and describes Licensee's relationship to the other parties. | No later than 30 calendar days after licensee becomes involved with litigation or proceedings. |
| (d) | Criminal charges. If any officer, director, general partner, or any other person who was required by SBA to complete a personal history statement in connection with your license is charged with any criminal offense other than minor motor vehicle violation misdemeanor, the Licensee must submit a report to SBA that fully describes the incent and the facts regarding that incident. | No later than 5 calendar days after the incident. |
| (e) | Other reports. SBA may request other reports as needed. | Request dependent. |

5. Portfolio Company Services and Value Add Support

SBA regulations permit Licensees and Associates of a Licensee (typically the Investment Adviser/ Manager, but which may also include parallel funds or other entities, all as defined in § 107.50) to charge certain fees to portfolio companies under §§107.860 and 107.900. SBA believes that any fees received by a Licensee or Associate under these sections must benefit the SBIC. Accordingly, except as provided in this section, any fees charged to a portfolio company by an SBIC or its Associate under §§107.860 and 107.900 must be paid directly to the SBIC or treated as an offset to the Management Fee. Any fees paid into the SBIC must be recorded and reported to SBA as fee income included in Gross Investment Income (not net of management expenses) on SBA Form 468. Any offset required to be applied against Management Fees remaining unapplied as of the liquidation of the SBIC must be paid in cash to the SBIC by the GP or Investment Adviser.

**Exceptions**

a.     **Expense Reimbursements**. Expense reimbursements under §107.860(f) may be paid to an SBIC or SBIC Associate (whichever party incurred the expense) with no corresponding offset to the Management Fee, unless otherwise specified in the SBIC's LPA. Note that if an SBIC or its Associate

receives expense reimbursements for activities that are considered Management Expenses, such amounts must be included in the Cost of Money calculation defined in §107.855. If SBA determines that any reimbursed expenses are unreasonable or if Cost of Money does not apply (e.g., equity investments), SBA will require you to refund such amounts to the portfolio company to the extent such amounts are unreasonable, exceed the Cost of Money calculation, or the Cost of Money does not apply. See 13 CFR 107.860(f).

b.      **Investment Banking.**  The Management Fee offset requirement does not apply to investment banking fees earned and received by an SBIC's Associate under § 107.900(e)(2), provided that the Associate is an entity that (a) is regularly engaged in the business of providing investment banking services, and (b) is a broker-dealer registered with the Securities and Exchange Commission in accordance with section 15(b) of the Securities Exchange Act of 1934. For any Associate that earns and retains investment banking fees pursuant to this exception, the SBIC must maintain in its files, available for SBA's review, evidence of the Associate's status as a registered broker-dealer and documentation of the investment banking services performed and the fees earned.

c.      **Co-Investment.**  If any fees that are required to be offset against the Management Fee arise from an investment by the Licensee and an investment by one or more Associates of the Licensee (e.g., a non-SBIC parallel fund) the amount of such fees that must be offset against the Management Fee must be no less than the Licensee's proportion of the investments as identified in the following equation:

SBIC Management Fee Offset Minimum = Amount of Fees x (Investment by Licensee/Aggregate Amount of Investments by the Licensee and its Associate(s) in Portfolio Company Paying Fees)

This formula should also be used for the purpose of allocating/offsetting broken-deal fees among a Licensee and any Associate co-investor(s).

1.   License Surrenders
SBA will process a surrender of an SBIC license only after the Licensee has repaid all its Outstanding Leverage, has canceled all Outstanding Leverage commitments, and/or has arranged for all its Outstanding Leverage to be paid on the next payment date with the Funding Administration Division.

To initiate a request for a License Surrender, the Licensee must submit a request to their respective Investment Analyst, copying SBIC_IPM@sba.gov using the following template to submit a complete request:

- Licensee Contact requesting change: [First Name Last Name]
- License Contact phone number:
- Licensee Contact email:
- SBIC License Number:
- Date of Outstanding Leverage Payoff: MM/DD/YYYY
- Private Capital Invested as of Date of Surrender Request:
- Total Capital Distributed to Investors as of Date of Surrender Request:
- Date of Request: MM/DD/YYYY

- Date Seeking Surrender Approval by: MM/DD/YYYY
- The Licensee affirms that on behalf of the Board of Directors or the General Partner, that the charter of the corporation or the articles of limited partnership will be amended to delete any reference to the company's powers or privileges to operate as an SBIC. [Yes/No]
- The Licensee affirms that the company will no longer operate as an SBIC or hold itself out to the public as an SBIC. [Yes/No]
- The Licensee affirms that, in consideration of SBA's acceptance of the license surrender, the Licensee will take no action detrimental to the interests of the portfolio small businesses except as may be necessary in the proper exercise of the Licensee's rights under the related Financing agreements. [Yes/No]

In addition, the Licensee must certify that the following:

- The SBIC fund's limited partnership agreement contains the following language: "If, for any reason the Partnership's SBIC license is surrendered, (in compliance with 13 CFR § 107.1900, including the repayment of Outstanding Leverage) withdrawn, revoked, or otherwise ceases to be in effect, then (x) all references in this [Partnership Agreement] to SBA, the SBIC Act, and other terms and provisions relating to the Partnership's operation as an SBIC shall no longer be applicable.

Once the Investment Analyst receives the request for the License Surrender, along with all required exhibits, SBA follows the process below:

The Investment Analyst will review the affirmations and reconcile any issues with the SBIC.

The Investment Analyst must obtain documentation confirming that the Licensee:

    a) Does not owe any SBIC Examination or other fees to SBA,
    b) Has repaid all Outstanding Leverage or has arranged an escrow for all its Outstanding Leverage to be paid on the next available payment date, and
    c) Has canceled all Outstanding Leverage Commitments, if any.

If the Licensee has made all required affirmations and requirements listed in Item 1 above are satisfied, the Investment Analyst will recommend to the Investment Officer and Director, IPM approval of the License Surrender and prepare notice of surrender for publication in the Federal Register for the AA, OII's (or designee) signature. The AA/OII (or designee) must sign the notice of surrender for publication in the Federal Register.

Once the notice of surrender is signed, the License Surrender approval letter is sent to the SBIC, and the signed Notice of Surrender is forwarded to the Records Management Division for publication in the Federal Register to the Licensee via email (records@sba.gov), copying the Director, PCI and Director, IPM.

The License Surrender approval letter and all related files are stored in SBA OII's CRM file management system.

**Events of Default and Transfers to the Office of Secondaries and Liquidation**

13 CFR §107, Subpart J discusses SBA's rights and remedies when Licensees become noncompliant with the terms of Leverage that result in events of default. The type of noncompliance determines the course(s) of action to take. In general, if an SBIC is unable to cure the event of default within the required timeframe (cure period), the SBIC should be transferred to Liquidation as soon as possible after the expiration of the cure period, if any. If there is good reason to consider delaying the transfer of an SBIC to the Office of Secondaries and Liquidation, prepare a memo for presentation to the AA, OII. The memo must include a discussion of the SBIC's plan to cure the event(s) of default.

In general, when Investment Analysts become aware that a licensee has violated the Act or the regulations, they must notify the Investment Officer to determine an appropriate course of action. 13 CFR §107.1810 of SBA regulations lists events of default for Licensees issuing debentures and the remedies available to SBA. When a licensee cannot or does not cure a violation, it must recommend to the AA, OII that the Licensee be transferred to the Office of Secondaries and Liquidation. Certain violations, however, may result in automatic transfer to the Office of Secondaries and Liquidation. For example, the occurrence of one of more events under 13 CFR Part 107.1810(b) can lead to an immediate transfer to the Office of Secondaries and Liquidation.

*Automatic Events of Default*

13 CFR §107, 1810 (b) lists automatic events of defaults. In these instances, SBA may avail itself of its remedies upon the occurrence of one or more of the events in this section without providing the SBIC written notice or an opportunity to cure the default(s).

Upon determination of an event of default under 13 CFR §107.1810 (b), the Investment Analyst will do the following:

> (a) Prepare Recommendation Memo and SBA Form 327. The memo must identify the appropriate regulatory citation and discuss the event(s) that triggered the default.
> (b) Forward the recommendation memo and SBA Form 327 to the following SBA officials for concurrence and signature:
>> (1) Investment Officer
>> (2) Office of General Counsel (OGC will review for legal sufficiency)
>> (3) Director, IPM
>> (4) Director, Office of Secondaries and Liquidation
>> (5) Director, Office of Patient Capital Investments

Upon concurrence from all the above SBA officials, the memo and signed SBA Form 327 is forwarded to the AA, OII for approval and signature.

Once the AA, OII signs the SBA Form 327, IPM will do the following:

104

   a) Notify the Licensee by telephone that they have been transferred to the Office of Secondaries and Liquidation. In most cases, the Investment Analysts should notify the licensee of the possible transfer to the Office of Secondaries and Liquidation. In certain situations, however, it may not be appropriate to notify the licensee in advance. For example, if an Analyst suspects that fraud or criminal activity is involved, it is probably not appropriate to contact the licensee. Analysts should consult with their Area Chiefs before contacting the Licensee. Once a licensee has been transferred, the Office of SBIC Liquidation will send a letter notifying the licensee of the transfer. Usually, OSO will also call the licensee to inform the licensee of the action.
   b) Notify the Office of Secondaries and Liquidation of the Licensee's transfer and conduct a transfer meeting.
   c) Notify Data Management of the Licensee's transfer to Office of SBIC Liquidation

*Events of Default with Notice*

13 CFR §107.1810(d) lists events of default where upon written notice to SBICs of the occurrence (as determined by SBA) of the default. In these instances, SBA may avail itself of its remedies upon written notice to the SBIC. Upon determination of an event of default under 13 CFR §107.1810(d), the Investment Analyst will do the following:

A signed notice of default letter will be sent to the Licensee. If the Licensee does not cure the default(s) within the allotted time, prepare SBA Form 327 to transfer the Licensee to the Office of Liquidation.

Events of Default with Opportunity to Cure

13 CFR 107.1810(f) lists events of default or which SBICs are allowed an opportunity to cure the default(s). In these instances, SBA may invoke its rights and remedies only after the Licensee has been given an opportunity to cure the default(s).

A notice of default letter will be sent to the Licensee, clearly identifying the event of default(s) and allowing the SBIC at least 15 days to cure the default(s). If the Licensee does not cure the default(s) within the allotted time, an SBA Form 327 will be prepared to transfer the Licensee to the Office of Secondaries and to Liquidation.

2. Documents Management and Federal Register Notices
a. Case Files in OII Customer Relationship Management System (CRM)
SBA SOP 00 41 requires SBA to make and preserve records containing adequate and proper documentation of decisions and essential transactions designed to furnish the information necessary to protect the legal and financial rights of SBA and of persons directly affected by the SBA activities. For each action that Analysts process for their assigned SBICs, they must create a Case File, (as defined in SBA SOP 00 41). OII uses a Customer Relationship Management System (CRM), "Fund Hub", to maintain Case Files under Licensee Accounts. Analysts are required to store or provide accessible links to all

emails, correspondence, files, records, meeting minutes, letters, internal memorandum, and documentation pertaining to the Licensee during the lifecycle of the SBIC in the CRM system for the requisite time period under SBA SOP 00 41.

b.  Published Federal Register Notices

For purposes of regulatory oversight and compliance, certain actions require SBA to publish notices in the Federal Register.  The following must be published in the Federal Register:

- License Approvals
- Conflicts-of-Interest Approvals
- License Surrenders

All notices prepared for publication in the Federal Register must be signed by an SBA official with the authority pursuant to the Delegation of Authority.


Chapter 4: Regulatory Examinations

1. The Purpose of SBIC Examinations

The purpose of examinations of Small Business Investment Companies ("SBICs" or "Licensees") is to:

(1) Determine whether Licensees are complying with the Small Business Investment Company Act of 1958, as amended ("Act"), and implementing regulations.
(2) Review the financial condition of Licensees and SBA's financial vulnerability.
(3) Evaluate the reasonableness and accuracy of information that Licensees submit to SBA.

The role of an <u>Examiner</u> is to independently gather and report objective, factual information to effectively monitor and regulate the SBIC program. The <u>Examiner</u>'s authority to conduct examinations of SBICs is defined in Section 310 of the Act, and in 13 CFR §107.690.

2. Examination Schedule

Section 310(c) of the Act requires SBA to examine each Licensee **at least every two years**.  An examination is considered commenced as of the date on which the Notification Letter is sent by SBA to the Licensee. A new Licensee will be scheduled for examination within six to twelve months of licensing, or sooner, if needed and sufficient investment activity has been conducted. The Associate Administrator, OII, may waive the two-year examination requirement in unique circumstances (e.g., based on leverage, repayment record, prior operating experience, the results of the last examination, management of the Licensee, and/or if the Licensee has had its operations suspended while in litigation or in receivership).

To ensure compliance with the Act, OII schedules examinations as follows:

1. All Leveraged Licensees scheduled on a 12 – 15-month cycle.
2. All non-Leveraged Licensees scheduled up to an 18-month cycle.

Case 2:20-cv-00041-DCLC-CRW    Document 106    Filed 10/03/24    Page 116 of 298
PageID #: 3845

In addition, *Special Examinations* may be scheduled in situations that involve the immediate necessity to protect federal funds and safeguard the integrity of the SBIC program upon request from OII's Associate Administrator, Director of Patient Capital Investments (PCI), or the Director of Examinations.

Requests to postpone or cancel an examination may be made to the Examiner and are considered when the examination would cause undue inconvenience, hardship, or conflict with other activities of the Licensee, or when a Licensee intends to surrender its SBIC license.

3. Preparing for an Examination

Thorough pre-exam planning is vital to the process. The amount of work necessary to prepare for an examination of a Licensee depends on a variety of factors, including the Licensee's organizational structure, size, type of leverage, investment policy, and level of investment activity.

In preparing for an exam, it is useful to note that the Examiner will:

(1) Review existing documentation on the Licensee, including for example, items such as prior regulatory matters raised, management fee limits, previous asset valuations, etc.
(2) Select the Financings and portfolio valuations to be sampled.
(3) Request and review preliminary information for Financings and valuations selected as part of sample.
(4) Identify appropriate site visits to be conducted with small concerns.
(5) Obtain credit reports for selected Financings, as appropriate.
(6) Send confirmations to selected portfolio concerns using SBA Form 857 (*Request for Information Concerning Portfolio Financing by SBICs*).
(7) Identify changes in the Licensee's capitalization and the on-site work necessary to determine compliance, including sending confirmations to selected investors.

The Examiner will access information available on SBA's information systems as part of the pre-examination planning process, in order to minimize requests from Licensees for information already possessed by SBA.

The Examiner will also consult with the Licensee's assigned IPM Investment Analyst (or Liquidation Analyst if there is a special exam request for a fund in the Office of Secondaries and Liquidation) to determine any specific concerns or issues that they would like the Examiners to address during the examination, or to identify specific Financings, or to make sure that the Examiner has all the pertinent correspondence involving the licensee.

4. Correspondence

The Examiner will inform the Licensee of the examination by standard notification letter.

The Examiner will contact the Licensee to arrange dates the Examiner will be working on-site or performing desk review.

The Examiner will notify the Licensee in writing (generally email) at least 30 days before the start of the on-site visit to the Licensee. The notification letter must inform the Licensee's management of the examination dates, as well as request specific information required during and prior to the on-site visit.

107

The Examiner will request that all documents be provided in electronic format via OCIO-approved file sharing protocols at least two weeks before the on-site visit to permit significant review work ahead of on-site visit.

5. Prior to the Examination

The Examiner will review and compare, with information previously obtained by SBA and as requested of the Licensee:

1. Prior examination reports and related workpapers.
2. Actions taken by SBA and the Licensee on prior examinations.
3. License application and any amendments to the application.
4. Correspondence between the Licensee and SBA.
5. Reports submitted to SBA, such as financial reports, reports to all investors, and the audit report of the Independent Public Accountant (IPA).
6. *Schedule of Officers, Directors and Stockholders*, or the *Schedule of Partners* from the prior examination report with information shown on the Licensee's latest SBA *Form 468* (*Annual Financial Report*) and review any changes in management or ownership for appropriate SBA approval.
7. Form 468 Schedules relating to Financings and portfolio companies.
8. As necessary and appropriate, SEC reports and financial statements of the parent entity, management company, manager, or general partner and workpapers of the independent public accountant (IPA).

In addition, the Examiner will select Financings to be reviewed. If sufficient time is not available to review all Financings made during the period, after reviewing the existing documentation and the pre-examination response, the Examiner will select the Financings to be reviewed during the examination.

1. If there are more than five Financings made during the period, the Examiner will review a minimum of five Financings representing at least 50% of the total dollar amount invested during the period.
2. If there are more than five Financings, the Examiner will notify the Licensee by email which specific Financings have been selected for review within 10 days of the notification letter, so that the Licensee can forward the small business concern's financial statements (past two years) and Financing documentation relating to those sampled Financings with adequate time to review prior to the on-site visit.

6. On-Site or Virtual Licensee Visit

Generally, an examination will include a site visit to the subject Licensee, with much of the documentation being reviewed before going on site. However, OII may direct that certain Licensees be

108

examined without travel to Licensees' offices by performing virtual or desk examinations. A virtual desk examination requires that a Licensee electronically transmit all documentation to the Examiner, and that the examination take place virtually.

A desk examination generally only deviates from the standard procedures to the extent of not travelling to the Licensee's offices. However, being on site can help expedite document and information exchange and broaden access to records and Licensee personnel at the office location. In any case, all other examination procedures will be performed consistent with this SOP.

A typical on-site visit may be up to five days, depending on factors such as leverage, complexity, and scope of the examination. The onsite or virtual licensee visit will consist of:

1. **Entrance Conference**. At this conference, the Examiner will meet with the principals of the Licensee to give an overview of the examination process and inform them of what information, documentation and facilities will be needed to conduct the examination.
2. **Form and Report Reviews**. This will consist of reviews of financial information, capital accounts and changes in ownership, cash disbursements and receipts, idle funds, inactivity, delinquencies, management expenses and other Licensee calculations and selected documentation.
3. **Exit Conference**. At the close of the examination, the Examiner will conduct an exit conference with a Licensee official such as a corporate officer or general partner. During this meeting, the Examiner will present the results of the examination, obtain comments from the Licensee on each finding, and clarify any questions relating to the facts. The Examiner will generally hold the exit conference in person, not by telephone, unless the examination is being performed remotely (virtual/desk exam). The Examiner will allow the Licensee official the opportunity to respond to the preliminary examination Findings in writing within one week. Regulatory issues will always be addressed in person or by telephone (if necessary) with the Licensee official.

### 7. Onsite Portfolio Company Visit(s)

Field visits to portfolio concerns are done at the discretion of the Examiner. For Leveraged Licensees, while not required, the Examiner may consider scheduling a portfolio concern visit when the visit would meaningfully enhance the examination process (e.g., provide documentation or clarification regarding a significant regulatory issue), and where budgetary and time constraints permit. These visits are especially useful in confirming the existence of portfolio concerns and verifying the use of Financing proceeds.

A visit to a portfolio concern will verify the use of proceeds by reviewing the small business's books and records. The Examiner will always review Financings made for working capital to make sure the proceeds were used for legitimate business purposes.

The Examiner will be alert for Financings that appear excessive in relation to the working capital needs of the portfolio concern, or where evidence suggests proceeds may have been used for paying debts not owed by the portfolio concern. As a general rule, the Examiner will review the portfolio concern's bank statements and deposits, its canceled checks, the cash disbursement ledger, and any vendor invoices.

The Examiner is under no obligation to notify the Licensee that a particular visit will be made, nor is the Examiner obliged to explain the reason for making a visit. The Examiner may coordinate arrangements for the visit with a Licensee official if that involvement will not jeopardize the integrity of the information sought. The Examiner should not encourage Licensee officials to accompany these visits; however, the Examiner cannot prevent the Licensee official from being present during the visit.

In general, whenever the Examiner anticipates reviewing the books and records of a small business portfolio concern, it should be made clear to both the Licensee official and the small business owner what specific documents are to be made available during the site visit.

The Examiner may make additional visits to a portfolio concern. For example, the Examiner may visit a portfolio concern whenever facts indicate the company may be involved in a serious regulatory violation or there are other factors such as:

1. Questions have arisen about a portfolio concern's address including, for example: credit reports indicating that no business exists at the reported address; the portfolio concern only has a P.O. box address; or there are other portfolio concerns at same address (especially at Licensee's location).
2. A Licensee is closely held and has minimal capitalization.
3. A Licensee has inadequate documentation to support its Financings.
4. A Licensee has a high number of delinquent or charged-off loans.
5. A Licensee's files do not contain periodic financial statements (at least annually) from portfolio concerns.
6. A Licensee has a portfolio of small businesses that have been non-responsive to requests for information from the Licensee.


The Examiner may:

1. Document any possible conflicts of interest.
2. Determine whether the Licensee or its Associates provide management services to the small business, and the nature of any payments.
3. Obtain copies of any relevant records. Specifically, §107.620(c) gives SBA access to the books and records of portfolio concerns receiving Financing from Licensees. This regulation requires Licensees to:
   a. Obtain any information that SBA requests to verify certifications made by portfolio concerns, including those concerning the use of proceeds.
   b. Ensure that Financing documents contain provisions giving SBA access to the portfolio concern's books and records.

If the small business owner denies or restricts access to the portfolio concern's records, or is uncooperative with a request for access, this will be promptly reported to the Examination Manager. In these situations, the Examiner should consider having a Licensee official call the business owner in an effort to obtain cooperation. If the portfolio concern does not comply with requests for information, the

Examiner will document problems in obtaining information in the Other Matters section of the examination report.

The Examiner will document the results of each field visit in a memorandum.

8. Data and Reporting Requests

An Examiner may obtain and review:

1. **Agency Records.** Examiners have access to all Agency records that relate to the SBIC program, including reports, audits, documents, correspondence, recommendations, and other material.
2. **Licensee Records.** Under 13 CFR §107.691, Examiners have access to a Licensee's books, records, and other pertinent documents. Examiners also have access, upon request, to the working papers of the Licensee's independent public accountant ("IPA"). Likewise, under 13 CFR §107.160, an Entity General Partner is subject to the same examination and reporting requirements as a Licensee.
3. **Records of Portfolio Concern.** 13 CFR §107.620(c), gives Examiners access to the books and records of portfolio concerns receiving Financing from Licensees. This regulation requires Licensees to:
   a. Obtain any information that SBA requests to verify certifications made by portfolio concerns, including those concerning the use of proceeds.
   b. Ensure that Financing documents contain provisions giving SBA access to the portfolio concern's books and records.

**Please note that there are restrictions on disclosing information. The information obtained during examinations, including the contents of examination reports, is sensitive and confidential information. SBA employees, including Examiners, will never disclose such information to anyone outside the Agency without prior approval of the Director of PCI.**

At times OII staff may receive requests for examination reports and workpapers under the Freedom of Information Act and the Privacy Act. These requests must be promptly referred to the Director of PCI and will involve consultation with the Office of General Counsel for appropriate review and coordination of response.

9. Form and Report Reviews

The Examiner's review of forms and reports will entail the following.

a. Financial Review

Because the examination does not constitute an audit on the financial statements, the Examiner will be reviewing and relying on financial statements as audited by the IPA. The primary objectives of the financial review are to:

   a. Verify that the Licensee's funds and unfunded commitments qualify as Private Capital and Regulatory Capital.
   b. Document changes in Private Capital.

111

c. Determine whether Private Capital requirements have been met or maintained.

d. Verify the accuracy of reported Financings. accuracy of reported Financings. Licensee is adhering to the SBA approved valuation policy and guidelines approved at time of Licensing.

e. Verify and document the timely payment of funds due SBA as reflected in SBA's internal accounting/data records, including whether exam fees have been paid.

f. Determine whether internal controls adequately safeguard the Licensee's assets, particularly portfolio securities. As part of this determination, the Examiner will confirm that Licensee has appropriate access to assets. For example, if there is a custodial account, the Examiner will ensure that the Licensee is a signatory to such. If assets are physically housed in a safe with assets of related entities, the Examiner will ensure that there is appropriate separation, and that the Licensee's assets are identifiable and accessible by the Licensee.

g. Review and reconcile the Licensee's cash and invested idle funds deposits.

h. Review management expense accounts to verify the Licensee is adhering to the SBA approved management fee and expense plan approved at time of Licensing.

i. Review other revenue or expense accounts, as appropriate, where regulatory issues have been implicated.

b. Capital Accounts and Changes in Ownership
 The Examiner will review the Licensee's capital accounts and document any changes in its Regulatory or Leverageable Capital as described in §107.585. The level of review and confirmation of capital will depend on whether it is the first examination or subsequent examinations.

**Initial Examination**- During the first examination, the Examiner will confirm that the initial capital with which the Licensee began operations matches the amount shown in its license application. As part of this confirmation, the Examiner will be sure to request direct confirmations of all investors in the Licensee.

**Subsequent Examinations**- During subsequent examinations, the Examiner will confirm any reported increases in Private Capital. When a Licensee has more than 20 investors, the Examiner will confirm the interests of only those investors who are also owners, officers or directors of the management company of the Licensee, members of the general partnership, or represent 10% of greater of the Private Capital commitments to the Licensee.; otherwise, the Examiner will confirm them all. The confirmations the Examiner receives will also be supported by information received independently from the Licensee's bank (i.e., periodic bank statements or, if necessary, separate bank confirmations).

The above requirements regarding the number and sources of capital confirmations may be modified if, after consultation about the particular circumstances, the Examination Manager determines that there is a more appropriate threshold for capital confirmation.

For Non-Leveraged Licensees, the review will be based on the most recent annually reported Private Capital.

112

### c. Cash Disbursements and Receipts

The Examiner will review the Licensee's cash disbursement journals and bank statements to identify those disbursements relating to the Financings selected for review. While confirming disbursement transactions, the Examiner will document the date, payee, endorsement, check number, amount, purpose, and electronic transfer or wire authorization. For any questionable disbursements, the Examiner will review additional documentation. For example, other material cash disbursements would be reviewed to identify:

   a. Any Financings not shown on the schedule submitted.
   b. Any payments which appear to be unusual, irregular or excessive based on payee, amount, purpose, or other factors (e.g., improper payments to Associates or excessive management expenses).
   c. Any unpaid amounts due SBA (in conjunction with SBA records).

The Examiner will verify the disbursements that have been identified in the above step to the source documents (cancelled checks or wire transfer documents, and bank statements if necessary).

The Examiner will review the cash receipts journals and bank statements to identify:

   a. Receipt of additional Private Capital due or claimed by the Licensee.
   b. Receipts and deposits of SBA Leverage in a timely manner
   c. Amounts received that indicate possible Cost of Money violations.

Lastly, the Examiner will obtain and compare the Licensee's bank reconciliations with the bank statements, book balances and the trial balance provided as of the examination cut-off date, resolving any discrepancies, as necessary.

### d. Idle Funds

The Examiner will review documentation relating to idle funds deposits and compare the balances with the amounts shown on the trial balance. The Examiner will also resolve any discrepancies and make any necessary copies of bank statements and idle funds documentation.

For Licensees with Leverage or applying for Leverage, the Examiner will determine whether cash accounts are in federally insured institutions and whether idle funds are held in investments permitted under §107.530. Where deposits are in excess of the insured amounts pursuant to §107.530(c), the Examiner will document in the workpapers whether the institution is "well capitalized" in accordance Federal Deposit Insurance Corporation regulations (the Examination Manager may limit documentation to local and regional financial institutions).

If during a review of cash and idle funds the Examiner finds that there appears to be insufficient liquidity to meet future SBA payments (or other significant future obligations), then the Examiner may inform the Investment Portfolio Management Analyst about the liquidity issue, as appropriate.

**e.** Inactivity

For all Licensees, the Examiner will determine whether the Licensee's cash and idle funds amount to more than 20 percent of its total assets (at cost) for the most recent fiscal year end. If the amount exceeds 20 percent, the Examiner will perform the inactivity calculations required under §107.590.

f. Delinquencies

The Examiner will review the Licensee's SBA *Form 468* (*Annual Financial Report*) and the schedule of delinquencies within the *Form 468* provided by the Licensee, and note instances where interest continues to be accrued on investments delinquent more than 120 days (Appendix 15: Valuation Guidelines for Small Business Investment Companies, III., B., 3.; and Appendix 14 Accounting Standards and Financial Reporting Requirements for Small Business Investment Companies, V., E. For Non-Leverage Licensees, FASB GAAP Accounting Standards are acceptable as an alternative to SBA Valuation Guidelines and Accounting Standards). The Examiner will analyze whether significant delinquencies suggest a need for accounting adjustments, such as putting debt on non-accrual status, adjusting valuations, adding additional allowances or deferring income. The Examiner will record the analysis in the workpapers, and specifically address the extent to which accounting and valuation adjustments are required, and whether the delinquencies are materially affecting the Licensee's financial condition.

Where necessary to complete an adequate analysis of portfolio delinquencies, the Examiner may consider requesting an accounts receivable aging report from the Licensee. For example, discrepancies between Form 468 reported delinquencies and other records may require additional supporting documentation.

g. Management Expenses

The Examiner will review the Licensee's expense accounts for compliance with its SBA-approved scope and level of management expenses confirmed at the time of Licensing through the information submitted in the MAQ and as described in §107.140; §107.250 and §107.520. The Examiner will also review the limited partnership agreement or other governance documents, as well as any approved amendments, to verify the Licensee is adhering to the management expense plan and fee level approved at time of licensing, for determination of appropriate fee formula. Finally, the examiner will ensure that management expenses also meet requirements of specific management fee policy guidance in effect (e.g., Technotes).

h. Other Financial Review Steps

Excluding Capital Call Lines described in §107.550(c), SBA's prior written approval prior to a Licensee incurring secured third-party debt under §107.550. The Examiner will review the Licensee's liability accounts for any secured third-party debt, excluding Capital Call Lines, not approved by SBA.

The Examiner will review the Capital Impairment calculations prepared by the Licensee in conjunction with the relevant Capital Impairment limits according to §§107.1830-107.1850. As necessary to analyze the Licensee's calculations, the Examiner may perform one or more Capital Impairment calculations.

The Examiner will review the calculation of Retained Earnings Available for Distribution (READ) on the Form 468 to determine allowable distributions to investors during the period. The Examiner will also compare with actual distributions as evidenced in other documentation.

If the Licensee, not the management company of the Licensee but rather the Licensee itself, has any subsidiaries, the Examiner will review those entities' financial records and confirm that the entities have been formed and meet the requirements of §107.720(b).

If the Licensee is a limited partnership, the Examiner will review the financial records of the Entity General Partner under §107.160(b)(2) (the Entity General Partner includes any general partner of the Licensee's general partner).

The Examiner will prepare an unaudited comparative balance sheet for the cut-off dates of the current and prior examinations using the trial balances provided by the Licensee. The Examiner will also reconcile and explain any significant deviations between amounts shown on the two balance sheets.

The Examiner will review any other general ledger accounts which, based on their nature, description, or amount, appear unusual and may suggest regulatory issues. Whenever the Examiner finds discrepancies, inconsistencies, errors or omissions that cannot be satisfactorily resolved, the Examiner may contact the IPA to get additional information or contact the Examination Manager for guidance.

i. Non-Financial Records
The Examiner will review the original approved SBIC license application which includes the MAQ and all related exhibits and the SBA licensing approval letter (§107.501), as well as the SBA-approved contract of the Licensee's Investment Adviser/ Manager for material changes (§107.510).

In addition, for each Financing selected for review, the Examiner may confirm that the Licensee has electronically filed and received SBA confirmation of the SBA *Form 1031* (*Portfolio Financing Report*), as well as the related SBA *Form 1031A* (*Certification*), for the filing dates required during the examination period, as well as the following Licensee records required under §107.600 and §107.660:

   a. Any minutes of meetings of directors, stockholders, executive committees, partners, or other officials.
   b. All documents evidencing the ownership held by the Licensee, including ownership ledgers, and transfer registers.
   c. All correspondence files and emails for the examination period involving the Licensee and SBA, as well as the Licensee and its IPA, attorneys (to the extent such correspondence is not subject to privilege), and portfolio concerns.
   d. Any quarterly or annual reports, prospectuses, letters, publications or any other communications issued by the Licensee to its investors.
   e. Any report, application, or document filed with the SEC.
   f. Any litigation reports required to be filed with SBA.
   g. Any other reports that SBA required the Licensee to file.

115

10. Licensee's Portfolio Investments

The purpose is to determine whether the Licensee is providing Financings to eligible small businesses for legitimate purposes.

a. Financings

Time permitting, the Examiner will review all Financings made since the last examination. The Examiner will review the Licensee's Financing documents and prepare a *Loan and Investment Information Summary* for each Financing that shows:

    i.    Name, address, industry, and type of business of the portfolio concern.

    ii.    Stage of investment, type of Financing, type of investment, ownership percentage (for equity investments including SAFE notes and through convertible debt), interest rate (for loans and debt investments).

    iii.    Information on disbursements of Financing proceeds, including the date, check number, amount, wire information and payee (if other than the small business).

    iv.    Information on the portfolio concern's financial condition, collateral, management and owners (including ownership/control of corporate owners or entity partners).

    v.    Relevant summaries of final Financing closing documents, legal binders and closing statements required by §107.691. The Examiner will note any deficiencies in Financing documentation.

    vi.    Summaries of the latest updated financial information for each portfolio investment selected for review, to determine compliance with §107.620.

    vii.    Any necessary background information on the portfolio concern from the report by business reporting service obtained prior to the on-site.

    viii.    Any additional documentation regarding sources and uses of funds.

In addition, the Examiner will review and include any relevant information from the following:

    i.    The certification of the use of proceeds required under §107.610(d) and SBA *Forms 480* (*Size Status Declaration*)*, 652* (*Assurance of Compliance of Nondiscrimination*) and *1031* (*Portfolio Financing Report*)*, as required under §107.610 and §107.640 (Forms 480 and 652 are reviewed at initial Financing).

    ii.    Financial statements of the sampled small concerns prior to Financing, and Financing and compare them with the *SBA Form 480* (*Size Status Declaration*) and the requirements of §107.700.

    iii.    Correspondence between the Licensee and the portfolio concern regarding the Financing, or any other sources of correspondence (SBA or otherwise) related to Financing.

    iv.    Portfolio concern confirmations (Form 857). In order to increase likelihood of response by the small concern, the Examiner will inform the Licensee about the confirmation process and suggest follow-up, as appropriate, during the exit conference.

116

b. Eligibility

The Examiner will use the information above to determine if the portfolio concern was eligible for SBIC Financing. This includes verifying that the business meets the size standards under §107.700 and §107.760, and does not involve prohibited investments such as:

    i. <u>Ineligible</u> relenders or reinvestors; passive businesses; real estate businesses farmland purchases, foreign investments and project financings under §107.720.

    ii. Conflicts of interest and dispositions of assets to Associates under §107.730 and §107.885.

    iii. Activities not contemplated by the Act under §107.500 and §107.700.

c. Specific Regulatory Restrictions

The Examiner will also determine if the terms of the Financing violate any of the following regulations:

    i. Restrictions on control of small business under §107.865.

    ii. Minimum Financing term under §107.830; §107.835; §107.845 and §107.850(a).

**NOTE I:** *For purposes of evaluating prepayment restrictions under §107.830(c)(2), financing terms which merely allocate payment distributions to lenders in a transaction will not be considered prepayment restrictions. For example, a distribution clause in a loan financing agreement which provides priority allocation among lenders or pro rata distribution of prepayments will not be considered a prepayment restriction which requires prior SBA approval.*

**NOTE II:** *For purposes of evaluating minimum financing term, convertible notes and SAFEs (Simple Agreements for Future Equity) which convert to equity meet the definition of Equity Capital Investments under §107.50. If the convertible note or SAFE converts to equity in less than 12 months and the equity position continues to be held by the Licensee, the financing term is based on the date of initial financing of the convertible note or SAFE note plus the time period held as equity. The combined time period must meet the minimum financing term of 12 months.*

    iii. Portfolio diversification (overline limitation) under §107.740; §107.760 and §107.880.

    iv. Interest rate ceiling and limitations on fees charged to small businesses (Cost of Money) under §107.855, §107.830, §107.850 and §107.860.

The Examiner will take the following additional steps:

117

   i.   Determine if financings for a change in the ownership of a portfolio concern meet the requirements of §107.750.

   ii.   Determine if financings in the form of Equity Securities meet the requirements of §107.800.

   iii.   Determine whether there are any restrictions on the redemption of Equity Securities, as detailed in §107.850.

   iv.   Determine if financings in the form of Debt Securities meet the requirements of §107.815.

   v.   Determine whether the terms of the financing include management services and related fees to the portfolio concern, and whether the Licensee has complied with the requirements under §107.900.

   vi.   Determine if financings made in the form of guarantees meet the requirements of §107.820.

   vii.   Review any securities purchased by the Licensee from or through an underwriter for compliance with §107.825(a), (b) and (c).

   viii.   Review any securities purchased from, or exchanged with, another SBIC or from SBA under §107.825(d). Determine whether Licensee has contingent liabilities based on put rights or any other guarantees.

   ix.   Determine if the Licensee has met the requirement to finance "smaller enterprises" under §107.710.

### d. Commitments

Where a Licensee uses commitments to finance specific small businesses in order to qualify for SBA funding, the Examiner will review documentation of those commitments. This may include reviewing the commitment letter, verifying the terms of the commitment and confirming that the letter was signed by the small business owner.

SBA will compare the commitments shown on the SBA *Form 856 or 856A* (*Disclosure Statement*) with those shown on the SBA *Form 468* (*Annual Financial Report*) filed during the examination period, as well as with those shown on the SBA *Form 856 or 856a* (*Disclosure Statement*) from the prior examination. Multiple commitments to the same small business, and commitments which have been outstanding for more than 3 months, will be scrutinized to verify their legitimacy.

### e. Valuation of Portfolio Investments

Licensees must adhere to SBA's approved accounting standards and valuation policies (Appendix 14 and Appendix 15). Non-Leveraged Licensees are permitted to follow FASB GAAP accounting standards and valuation policies.

Case 2:20-cv-00041-DCLC-CRW    Document 106    Filed 10/03/24    Page 128 of 298
PageID #: 3857

A Licensee's portfolio of loans and investments usually represents the bulk of its assets. A realistic and timely valuation of these assets is necessary because the performance of these loans and investments affects the Licensee's financial condition. The Licensee therefore must have procedures in place to ensure that its portfolio is properly valued, with sufficient documentation to support each valuation.

Other segments of the examination may reveal indicators of valuation problems— for example, Capital Impairment, delinquent loans, operating losses and significant amounts of unrealized appreciation for the business plan and strategy approved at the time of Licensing. The purpose of this phase of the examination is not to arrive at a specific valuation for each of the Licensee's assets, but rather, to determine whether the Licensee has a written valuation policy approved by SBA, and whether that policy is being implemented, maintained, and adequately documented.

The Examiner will review the following documents to determine whether verify the Licensee's valuations have been completed in accordance with the SBA-approved valuation policy (which includes FASB GAAP for Non-Leveraged Licensees) and whether the valuations have been reported timely to SBA (§107.503 and §107.650):

a. The written SBA-approved valuation policy, together with relevant SBA guidance (Appendix 15).
b. The quarterly and annual Form 468 reports submitted to SBA.
c. If necessary, the IPA's workpapers showing the latest review of valuations (otherwise, the Examiner will review the IPA's audit report for the statement that the Licensee's valuations were prepared in accordance with its valuation policy established in accordance with Section 310(d)(2) of the Act).
d. Licensee's latest delinquency listing. Delinquencies over 120 days must be in the review sample. The Examiner will also review internal receivable aging reports prepared by the Licensee or other documents, as needed, to determine any other non-performing assets.
e. Updated financial statements and any other documents required by end of year reporting for each portfolio concern for those sampled (reviewing relevant waterfall analyses, capital tables, and liquidation preferences).
f. Current collateral appraisals (if necessary and available).
g. Valuations of portfolio co-investments with other SBIC's.
h. Minutes of meetings documenting discussion and approval of portfolio valuations (signed approval by the board of directors, General Partner, or LLC managing members, as required).

The Examiner will generally select at least five portfolio companies for a valuation review. Finally, the Examiner will also ensure that the valuation workpapers answer the following questions concerning each portfolio valuation selected for examination review:

119

a. What section of the SBA-approved valuation policy did the Licensee follow in determining the appropriate valuation of the investment?
b. What specific methodology did the Licensee employ to value the investment? <u>Was this the methodology approved at the time of licensing?</u>
c. What documentary evidence within the Licensee's files supports the valuation?
d. Whether the Licensee reported to SBA any material adverse within 30 days of the close of the quarter. Material adverse change is defined as any decrease of more than 20 percent in asset value of any individual security since the end of the immediately prior fiscal year, excluding changes due to repayment of principal by the portfolio company.

Where the SBA-approved valuation policy was grossly or materially misinterpreted, the specific valuation methodology was unreasonable or materially improper, or the documentary evidence was plainly insufficient to support the stated valuation, that will be noted in the workpapers.

The Examiner should not talk to prospective purchasers of small businesses when the Licensee's valuation is based on a proposed sale price (i.e., for depreciation). Instead, the Examiner should indicate that the valuation is based on a proposed sale, and that the Examiner was unable to verify the terms of the proposed sale.

11. Examining Non-Leveraged Licensees

Non-Leveraged Licensees have a number of exceptions and Examiners have discretion to eliminate steps associated with Leveraged exams.

For Licensees having no outstanding Leverage or Earmarked Assets, §107.1000 exempts these SBICs from the following regulations:

- Overline limitation in §107.740.
- Idle funds investment restrictions in §107.530.
- Third party debt restrictions in §107.550.
- Expense restrictions for maintaining or improving assets acquired in liquidation of portfolio concerns under §107.880.
- Record keeping requirements and fee limitations under §107.825(b) and (c), respectively, for securities purchased through or from an underwriter.

SBA regulations also exempt Licensees with no outstanding Leverage or Earmarked Assets from having to obtain SBA's prior approval for:

120

- Decreases in Regulatory Capital of more than 2 percent under §107.585, but not below the minimum required by the Act or the regulations.
- Disposition of any asset to an Associate under §107.885.
- Contracts to employ an Investment Adviser/Manager under §107.510.
- Initial management expenses under §107.140 and increases in these expenses under §107.520.
- Options obtained from a portfolio concern by Licensee management or employees under §107.815(b).
- SBA's post approval of new directors and officers, other than the Chief Operating Officer. (Licensees still must notify SBA within 30 days of new officers and directors joining.)
- Filing with SBA changes in regulatory capital associated with capital calls or distributions 30 days post change. (Additionally, Non-Leveraged Licensees inform SBA of changes through annual Form 468 reporting.)

SBA's policy is to conduct limited-scope examinations of Non-Leveraged Licensees. These examinations will focus on major regulatory violations and the workpapers necessary to support them. For examinations of Non-Leveraged Licensees, the Examination Manager has the discretion to eliminate the following steps from the examination process:

- Visit and inventory of safe deposit box.
- Verification of securities held by third parties.
- Review of control procedures.
- Analysis of Private Capital.
- Review of capital stock certificate book.
- Analysis of the financial condition of the Licensee.
- Analysis of trial balance accounts.
- Analysis of provisions for losses.
- Analysis of accrued interest receivable.
- Reconciliation and analysis of retained earnings.
- Review of valuation procedures and specific valuations.
- Review of the IPA's workpapers.
- Review of SEC reports.
- Conducting visits to portfolio concerns.

With Non-Leveraged Licensees, the Examiner will review no more than five new financings to different portfolio concerns and obtain a credit report only for Financings selected for review.

121

12. Examining Section 301(d) Licensees

The Examiner will review the SBA Form 1941 (Financing Eligibility Statement) required by §107.610(c) for each portfolio Financing reviewed. There are three distinct versions of this form:

- SBA Form 1941A: Financing Eligibility Statement - "Social Disadvantage" (For Individuals Who Are Members of a Designated Group)
- SBA Form 1941B: Financing Eligibility Statement - "Social Disadvantage" (For Individuals Who Are Not Members of a Designated Group)
- SBA Form 1941C: Financing Eligibility Statement - Economic Disadvantage.

The Examiner will:

- Review the level of the Licensee's Financings to disadvantaged businesses that are relenders or reinvestors under §107.720(a)(2) and determine whether the total of these Financings outstanding at the fiscal year end exceed the Licensee's Regulatory Capital.
- Review the term of Financings for any which are less than one year. Along with exceptions for interim financing, protection of prior investments and change of ownership, a Financing may qualify for a short-term under §107.835(d) where the purpose is to aid in performing a contract under a set-aside program for "minority" or "disadvantaged" contractors.
- Determine whether the Licensee has paid its dividends or distributions due to SBA under §107.1400 and §107.1440.
- In calculating Capital Impairment for a 301(d) Licensee, the Examiner should be aware that a condition of Capital Impairment occurs only when the impairment percentage exceeds 75 percent.

a. Examining Licensees with Other Special Requirements

From time to time, SBICs may have the ability to be licensed for or participate in unique programs that are enacted to meet specific policy goals of the agency. This may include, by way of example, such programs as Early Stage SBICs, Impact Investment SBICs, Energy Savings Qualified Investments, etc. Such programs will come with any number of special regulatory requirements, such as additional certifications, fund reserves, specific investment requirements, distribution limitations, or other capital impairment requirements. The Examiner will determine if the SBIC has been licensed or approved for participation in any special programs and evaluate compliance with the relevant sections of the SBA regulations and other policy documents covering oversight of those programs.

Visiting a Licensee's Independent Public Accountant. On occasion, it may be beneficial to contact or visit the Licensee's Independent Public Accountant. –Consulting with or visiting the IPA may be helpful, for example, when developing findings concerning valuations of specific portfolio concerns. As authorized

122

in §107.691, the Examiner may review the workpapers that support the IPA's opinion in the financial statements. The Examiner must always document the interview with the IPA in the workpapers. If the Examiner finds instances of substandard IPA work product, the Examiner may, after consultation with the Examination Manager, refer the matter to the relevant state licensing board, as appropriate.

### 13. Examination Report

The examination report communicates the results of the examination to the Licensee and to SBA officials responsible for taking action. The report must be clear, concise, factual, accurate, objective, and in sufficient depth to allow understanding of the reported matters and to take appropriate action. To ensure fairness, the Examiner's reports will include pertinent comments and explanations to the Licensee.

The Licensee will receive one of two types of reports via e-mail from the Examiner copying Examinations Division leadership and the Licensee's Investment Portfolio Management Analyst:

> (i) if there are no Findings or Other Matters, a "No Finding Report";

> (ii) if there are Findings or Other Matters, a "Findings Report".

A No Finding Report is a brief memorandum report to document the examination sent by SBA's Examinations Division to the Licensee.

A Findings Report is more detailed. Regulatory violations are categorized and reported based upon the relative seriousness of the underlying issue. Major regulatory infractions are categorized as "Findings," while all other issues are reported as "Other Matters."

### a. Major Findings

Major Findings identified by the Examinations Division are considered major violations of SBA Regulations, Policies, Procedures, or the Act discovered during an SBIC Examination. In addition, the Examiner will also report as Findings any unresolved or repeat issues linked to previous examinations, as well as any other violations that could be considered an event of default on a Licensee's leverage. Whether a particular transaction justifies a Finding depends on the statutory requirements of the Act, SBA regulations, and other policy documents in effect at the time of the action or transaction.

SBA has identified **11 specific Major Findings** that are of special concern. The following sections describe the categories of Findings and the typical examination coverage involved for each one.

A. <u>Activities Not Contemplated by the Act </u>(§107.500; §107.700)

123

The Act contemplates that small businesses will be assisted in specific ways. The principal issues of concern in this area, as specified in the Act, are:

1.  Financing a business that is not a "Small Business" under §107.700.

2.  Financing provided by a 301(d) Licensee to a small business that is not owned, controlled, and managed by disadvantaged persons.

3.  A Licensee conducting operations of any business other than that for which it was licensed.

In reviewing this area, the Examiner will analyze the Licensee's Financing records and other documentation, including background information on the small business being financed and the owners of the small business.

B.  Conflicts of Interest (§107.730; §107.885)

Licensees and those persons operating Licensees must not self-deal to the prejudice of a small business, the Licensee itself, investors in the Licensee, the owners of the Licensee, or SBA. A Finding in this area usually involves Licensees providing financing to Associates or otherwise providing the Licensee's assets for the use of an Associate either directly or indirectly to the prejudice of the small business portfolio concern, without SBA approval. In addition, Licensees with outstanding Leverage or Earmarked Assets may not sell (or transfer) to Associates title to assets without permission from SBA.

As certain types of financings with Associates directly or indirectly are permitted and Licensees are provided safe harbor, in situations of financing with an Associate, the Examiner may look to confirm safe harbor conditions under § 107.730 for an independent third party to be investing in the Small Business at the same time as the Licensee. The Examiner will review the terms of Financings provided to portfolio concerns and records pertaining to their principals, owners, and directors. The Examiner will also review the disposition of assets not now on the Licensee's books, but those shown on the books during the prior examination. Finally, the Examiner will review investment memos, credit reports and written confirmations from portfolio concerns, and where appropriate, contact or visit a small business concern involved in a conflict-of-interest situation.

C.  Unapproved Control of a Small Business (§107.865)

Licensees, either directly or with Associates, may exercise control over a small business, through ownership of voting securities, management agreements, voting trusts, majority representation on the board of directors, or otherwise. However, the period of that control is limited to seven years from the date on which it control was initially acquired, unless Licensee's request to extend control period is

124

formally received by SBA. With SBA's prior written approval, control may be extended for an additional period as necessary to complete divestiture of control or ensure the financial stability of the portfolio company.

The Examiner will review the SBA *Form 856 or 856a* (*Disclosure Statement*)*,* terms of Financings, ownership, stock voting rights, shareholders' agreements, and board membership or partner rights, to determine if control exists and the period of control. The Examiner may also need to contact the small business when there is a question of prohibited control.

D. <u>Short-term Financings</u> (§107.830; §107.835; §107.845; §107.750)

A Licensee may not make a Financing to a small business where the duration or term is shorter than one year. However, under §107.835, there are exceptions to the minimum one-year term where:

1. It is an interim financing in contemplation of long-term financing <u>such as a convertible note to equity or a SAFE (Simple Agreement for Future Equity) note issued by the portfolio concern in which case the shorter duration can be to the benefit of the small business, a bridge loan and the combined holding period of the note and equity meets the minimum one-year term;</u>

2. If it is for protection of the Licensee's prior investments;

3. Or it is for the purpose of aiding a small business in performing a contract awarded under a Federal, State, or local government set-aside program for minority or disadvantaged contractors.

The Examiner will review the terms of the Financing provided to determine whether the terms of the Financing, or any prepayment or redemption provisions, result in a prohibited short-term financing.

E. <u>Overline Investments</u> (§107.740; §107.760; §107.880)

Leveraged Licensees or those intending to issue Leverage have investment concentrations in a single business (including affiliates) restricted by an overline limitation. For each portfolio concern, the Examiner will compare the Licensee's total outstanding financings and commitments (including amounts written off) to the appropriate overline limit.

There are provisions for making follow-on investments where there is a change in size or activity of a portfolio concern, also subject to overline limitations under §107.760. Also, there are additional limits for expenditures on assets acquired in the liquidation of a small business under §107.880(c).

125

F. <u>Ineligible Relending, Foreign, Passive or Other Prohibited Investments, Including Prohibited Real Estate Financings</u> (§107.720)

Certain types of small businesses are ineligible for Financing by a Licensee. Subject to the exceptions set forth in §107.720, a Licensee is generally not permitted to provide Financing to relenders or reinvestors (with exceptions), passive businesses, real estate businesses, project finance businesses, farmland purchases, any investment contrary to the public interest, or foreign investments. There are exceptions to these rules set forth in §107.720.

The Examiner will determine the general nature of the small business receiving the financing, as well as how the proceeds of the Financing were used. The nature of the business is determined by reviewing the Licensee's Financing files, and may be confirmed by a credit report or, if appropriate, a visit to the small business. Should the Examiner decide to visit the concern, it is appropriate to discuss the use of proceeds directly with the small business's management during the visit. In most cases, the Examiner will also review the small business's bank records and other documentation to confirm the use of proceeds. If the small business's use of proceeds differs from the conditions of the Financing, the Examiner will determine whether the Licensee has approved this change.

G. <u>Excessive Cost of Money</u> (§107.830; §107.850; §107.855; §107.860)

Licensees are restricted in the interest they can charge on Loans and Debt Securities. The Cost of Money includes stated interest rates, discounts, and fees charged. Licensees also may charge reasonable prepayment penalties. The regulations describe which fees and charges are included, as well as excluded, from the Cost of Money calculation.

The Examiner will determine the rate of interest and any discount or fee charged on Financings provided to portfolio concerns by examining the note and any other related financing agreements. Examiners will look to confirm fees were disclosed to portfolio concerns in Financing contract terms.

H. <u>Excessive Management Expenses, Improper Distributions or Reductions in Regulatory Capital, and Excessive Expenditures</u> (§107.520; §107.585; §§107.1520- 107.1580; §107.1810; §107.1820)

Licensees are restricted in the types and amounts of capital and earnings distributions they may make. Management fees, operating expenses, and earnings distributions are restricted for leveraged Licensees. All Licensees are subject to restrictions on reducing paid-in capital.

The Examiner will analyze capital accounts (paid-in and earned) for changes since the prior examination. In addition, the Examiner will compare earnings distributions with restrictions imposed by the

regulations. <u>The</u> Examiner <u>will additionally confirm management expenses comply with the</u> <u>management fee and expense policy approved at the time of licensing.</u>

I.  <u>Impairment and Valuation Issues</u> (§§107.1830-107.1850; §107.503; §107.650)

For those Licensees with Leverage, Capital Impairment occurs when a Licensee's losses reach a threshold as defined in the regulations. Such impairment is directly affected by both operating and investment losses, as well as unrealized losses on portfolio assets. The Examiner will review capital accounts, the reported unrealized appreciation and depreciation of the portfolio, and calculate any Capital Impairment based on regulatory requirements.

Licensees are required to have a portfolio valuation policy approved by their boards of directors or general partners, and by SBA. Most Licensees have adopted SBA's "Model Valuation Policy." Licensees with Leverage are required to value their portfolios at the end of the second quarter and at the end of the fiscal year, and to provide valuation reports to SBA within specified time periods. Licensees without Leverage must value their portfolios only at the end of the fiscal year.

The Examiner will determine if portfolio valuations have been completed in accordance with the approved valuation policy and whether the valuations have been reported timely to SBA. The Examiner will also ensure that the valuation workpapers answer the following questions regarding a Licensee's valuations:

1) What section of the SBA-approved valuation policy did the Licensee follow in determining the appropriate valuation of the investment?

2) What specific methodology did the Licensee employ to value the investment?

3) What documentary evidence within the Licensee's files supports the valuation?

Where the SBA-approved valuation policy was grossly or materially misinterpreted, the specific valuation methodology was unreasonable or materially improper, or the documentary evidence was plainly insufficient to support the stated valuation, that will be noted in the workpapers. Under such circumstances, the examination report should include a detailed description of the failure to follow the valuation policy and an analysis of improper methodologies employed by the Licensee in arriving at the valuation. The Examiner may also provide, as appropriate, any potential adjustments to the Capital Impairment calculation, if such adjustments are clear and appropriate under the circumstances. For example, where a portfolio company has ceased operations or has otherwise become permanently impaired to the point of total realized loss, but the Licensee has not reported such, the examination report may include an illustration of the Capital Impairment percentage *had* the Licensee recorded the loss properly.

127

J. <u>Events of Default Not Otherwise Cited (</u>§107.1810).

If there are any other incidents of regulatory non-compliance which would be considered an event of default under the terms and conditions of Leverage, the examination report will cite these matters as Findings. This may include, for example, issues like inadequate Regulatory Capital, unapproved transfer of control, fraud, or willful non-compliance with substantive provisions of the Act or regulations. It may also include serious non-compliance with program requirements, such as substantial misreporting on the Form 468 financial statements submitted to SBA. For example, a material misstatement of capital, expenses, portfolio valuations etc., which results in gross misstatement of the Licensee's financial condition would be categorized as a Finding rather than an Other Matter.

K. <u>Unresolved or Repeat Issues</u>.

Regulatory issues falling outside the Major Findings are generally reported as Other Matters. However, even these matters will be categorized as Findings if they were raised in a previous examination and are unresolved by the Licensee or if the violations are repeated issues for the Licensee. The Examiner will determine whether all previously reported Other Matters have been resolved to the satisfaction of SBA and report as Findings those issues which remain unresolved or are new instances of the same issue reported in any of the last five examination reports.

b. Other Matters

The *Other Matters* section of the examination report is used to present regulatory issues that appear to be violations but <u>do not rise to the level of</u> are less serious than the Major Findings <u>as</u> discussed above.

The Examiner should also use the *Other Matters* section to describe situations in which the small business owner either does not produce records in a timely manner or refuses to produce the records. In these cases, the Examiner should note that the records were requested, and that sufficient time was given to produce the records, but that the owner did not comply (or refused to comply) with the request. In general, SBA considers five days from the date of a request to be sufficient time for the small business owner to produce the requested records.

14. Resolution of Findings

The Examinations Division will prepare a Resolution Letter in which all findings cited are referenced and an appropriate recommended resolution for each violation is communicated to the Licensee. The letter will be issued within 30 days after the Examination Report has been issued. Ideally, all regulatory violations should be resolved within 30 days from the date SBA notifies the Licensee they must take corrective action, per the Resolution Letter. SBA reserves the right to modify the 30-day resolution timeframe for Licensee compliance to an amount deemed necessary by the Examinations Division, depending on the requested corrective actions required for the Licensee to resolve the cited SBA regulation or policy violation. Often, Other Matters, such as late submissions or submitting missing records, will be resolved prior to issuance of the Resolution Letter.

Case 2:20-cv-00041-DCLC-CRW    Document 106    Filed 10/03/24    Page 138 of 298
PageID #: 3867

If the Licensee would like to communicate actions taken to address the violation, they will be considered for inclusion prior to issuance of the Resolution Letter. In addition to oral responses provided by the Licensee at the Exit Conference, the Licensee may also provide written responses to the Examiner upon completion of the Exit Conference. All applicable verbal and written responses may be included in the Examination Report and Resolution Letter, receipt of the Examination Report, and before the issuance of the Resolution Letter. The Examinations Division will determine whether subsequent the additional information, proposed resolutions, or any additional information provided, or actions taken by the SBIC subsequent to the examination that it has taken are satisfactory to resolve the violation issues and are sufficient to bring the Licensee back into compliance with the SBIC program regulations.

The Licensee's resolution of findings will be tracked by the Examinations Division. If the Licensee fails to resolve Findings within the specified time frame, as indicated in the Resolution Letter, the SBIC may be subject to additional actions by SBA. These actions should recognize the severity of the Finding, what steps may have already been initiated to resolve the Finding and may include suspension of leverage draws, transfer of the fund to Liquidation or revocation of the license.

The Tracking System maintained by the Examinations Division tracks the resolution of outstanding examination findings, interim actions, and associated dates.

   a. **If a resolution is satisfactory**, a Notice of Resolution will be issued to the Licensee.
   b. **If a resolution is not satisfactory**, a Notice of Deficiency may be issued to the Licensee. This notice may request additional information or action, as appropriate. The Notice must direct the Licensee to resolve the violation(s) within 30 days from the date of the Notice of Deficiency.

Pursuant to §107.692(c)(3)  For any regulatory violation that remains unresolved 90 days from the date SBA notified the Licensee that they must take corrective action (as established by the date of the Resolution notification letter) or such later date as SBA sets forth in the notice, the SBIC will pay an additional charge equal to 5% of the Base Fee for every 30 days or portion thereof that the violation remains unresolved after the cure period, unless SBA resolves the finding in your favor.

a. Resolution of Major Findings
An illustrative and non-exclusive list of the 11 Major Findings, common violations, and commonly associated resolutions are provided in the Table below. SBA manages resolutions on a case-by-case basis reviewing the totality of the circumstances, and SBA may deviate from this list as deemed appropriate.

All deviations related to the 11 Major Findings will be reviewed by the Director of Examinations and may be deemed reviewable by the Director of PCI and the Risk Committee.

| Regulations | Common Violations | Common Resolutions |
|---|---|---|
| #1:  Activities Not Contemplated by the Act (§107.500; §107.700) | • SBIC provided Financing to a business that does not meet the size standards for an eligible Small Business. | • Sale of investment to third-party on the same terms of the Financing provided to the ineligible business. |
| | • SBIC provided Financing to an ineligible Small Business as discussed in § 107.720. | • Sale of investment to third-party on the same terms of the Financing provided to the ineligible Small Businesses. |
| #2: Conflicts of Interest (§107.730; §107.885) | § 107.730 Financings which constitute conflicts of interest:<br><br>• SBIC provided Financing to an Associates without SBA's prior written exemption.<br>• SBIC1 provided Financing to an Associate of SBIC2 where an Associate of SBIC1 received or will receive any direct or indirect Financing or a Commitment from SBIC2 or a third SBIC.<br>• SBIC borrowed money from: (i) A Small Business Financed by the SBIC; (ii) An officer, director, or owner of at least a 10 percent equity interest in such business; or (iii) A Close Relative of any such officer, director, or equity owner.<br>• SBIC provided Financing to a Small Business to discharge an obligation to an Associate or free other funds to pay such obligation. | • Sale of investment to third-party on the same terms as the conflict-of-interest transaction.<br>• Seek exemption under §107.1920 and obtain post approval from SBA.<br>• Return all proceeds borrowed from the Small Business. |

130

| | | |
|---|---|---|
| | • SBIC provided Financing to a Small Business for the purpose of purchasing property from an Associate, except as permitted under 720. | |
| | § 107.885 Disposition of assets to Licensee's Associates or to competitors of Portfolio Concern<br><br>• SBIC sold an asset to an Associate without SBA prior approval. | • Obtain post approval from SBA.<br>• Reverse/undo transaction. |
| #3: Unapproved Control of a Small Business (§107.865) | • SBIC maintained Control of a Small Business for more than seven years. | • Relinquish Control of the small business (under 50% ownership)<br>• Request extension of Control under (d).<br>• Sale of investment to third-party on terms and conditions that are no less favorable to the Small Concern receiving such Financing. |
| #4: Short-term Financings (§107.830; §107.835; §107.845; §107.750) | § 107.830 Minimum duration/term of Financing.<br>• SBIC structures the duration/term of a Financing for less than one year. | • Revise terms for extended duration and competitive interest rates.<br>• Sale of investment to third-party on terms and conditions that are no less favorable to the Small Concern receiving such Financing.<br>• Terminate the contract. |
| | § 107.835 Exceptions to minimum duration/term of Financing.<br><br>• SBIC fails to meet one of the exceptions to minimum duration/term of Financing. for a term of less than a year. | • Revise terms for extended duration and competitive interest rates.<br>• Sale of investment to third-party on terms and conditions that are no less favorable to the Small Concern receiving such Financing.<br>• Terminate the contract. |

| | § 107.845 Maximum rate of amortization on Loans and Debt Securities.<br><br>• SBIC structured a Loan with a term of one year or less that amortizes faster than straight line.<br>• SBIC structured a Loan with a term greater than one that amortizes faster than straight line for the first year. | • Revise terms so that the Loan does not amortize faster than straight line for the first year.<br>• Terminate the contract. |
|---|---|---|
| #5: Overline Investments (§107.740; §107.760; §107.880) | § 107.740 Portfolio diversification ("overline" limitation).<br><br>• SBIC provided Financings to a Small Business and its Affiliates that resulted in more than 30% of the sum of the SBIC's Regulatory Capital as of the date of the Financing plus return of capital distribution during the preceding five years. | • Seek post approval from SBA.<br>• Divest enough of the Financing to bring below 30%.<br>• Sale of investment to third-party or transfer of assets to an associate on the same terms of the overline Financing round. |
| #6: Relending, Foreign, Passive or Other Prohibited Investments, Including Prohibited Real Estate Financings (§107.720) | • SBIC provided Financing to an ineligible Small Business as discussed in § 107.720. | • Sale of investment to third-party without material changes to the terms that adversely affect the Small Concern. |

132

| #7: Excessive Cost of Money (§107.830; §107.850; §107.855; §107.860) | § 107.855 Interest rate ceiling and limitations on fees charged to Small Businesses<br><br>• SBIC structures a Financing where the interest rate on its Loan Financing exceeds 19% and the interest rate on a Debt Financing exceeds 14%.<br>• SBIC charges fees to Small Business that exceeds the limits discussed in 860.<br>• SBIC did not disclosed fees to portfolio company in financing agreement. | • Revise terms so that the interest rates do not exceed the maximum allowed under the regulations and reimburse the Small Business the excess amount.<br>• Reimburse the Small Business the excess fees charged under 860.<br>• Financing agreement addendum disclosing fees accepted by portfolio company and submitted to SBA.<br>• If not agreed to by portfolio company, documentation of agreed upon portfolio company <> SBIC remediation. |
|---|---|---|
| | § 107.850 Restrictions on redemption of Equity Securities<br>• SBIC structured an Equity Financing with a required redemption earlier than one year from the date of closing.<br><br>• SBIC structured an Equity Financing with a fixed redemption price higher than cost. | • Revise terms so as to allow the required redemption after one year from the date of closing.<br>• Revise terms so that the fixed redemption price is not higher that cost.<br>• Reimburse Small Business for ineligible gains collected under 107.850 |
| #8: Excessive Management Expenses, Improper Distributions or Reductions in Regulatory Capital, and Excessive Expenditures (§107.520; §107.585; | § 107.585 Voluntary decrease in Licensee's Regulatory Capital.<br><br>• SBIC distributes more than 2% of Regulatory Capital in any fiscal year without pre-approval from SBA.<br>• SBIC has outstanding Leverage in excess of the amount allowed by the Act and regulations. | • Seek post approval from SBA for the return of capital distribution.<br>• SBIC redeems leverage to outstanding leverage not in compliance with the Act and regulations. |

133

| | | |
|---|---|---|
| §§107.1520-107.1580; §107.1810; §107.1820) | § 107.520 Management Expenses of a Licensee.<br><br>• SBIC paid management expenses in excess of the amount approved by SBA or for expense types not approved by SBA.<br>• SBIC did not benefit from 107.860 and 107.900 fees collected by an associate | • Management company reimburses excess management fee.<br>• Management company waives future management fees. |
| #9: Impairment and Valuation Issues (§§107.1830-107.1850; §107.503; §107.650) | § 107.1830 Licensee's Capital Impairment - definition and general requirements.<br><br>• SBIC advises SBA that its capital impairment percentage (CIP) for an upcoming quarter will exceed its maximum permitted CIP.<br>• SBA determines that an SBIC's CIP exceeds its maximum permitted for a recent quarter. | • SBIC increases Regulatory Capital (capital raise) to lower CIP below its maximum permitted.<br>• SBIC generates significant realized gains from the sale of an asset(s) that offset negative UNRE. |
| #10: Events of default not otherwise cited (§107.1810) | § 107.1810 Other Regulatory Non-Compliance considered an event of default.<br>• May include inadequate Regulatory Capital, unapproved transfer of control, fraud, or willful non-compliance with substantive provisions of the Act or regulations.<br>• May also include serious non-compliance with program requirements, such as substantial misreporting on the Form 468 financial statements submitted to SBA.<br>• May also include material misstatement of capital, | • SBA manages resolutions on a case-by-case basis reviewing the totality of the circumstances |

| | expenses, portfolio valuations etc., which results in gross misstatement of the Licensee's financial condition. | |
|---|---|---|
| #11: Significant Other Matters | Includes Unresolved/Repeat Violations (Other Matters) | • SBA manages resolutions on a case-by-case basis reviewing the totality of the circumstances. |

15. Secondary Review Requests

In specific cases described below, the Licensee or the Examinations Division may request a Secondary Review of all or part of an SBIC examination report issued by the Examinations Division. The merit of a Secondary Review request is based on several factors, as described below, and is limited to specific areas related to the Examinations Division interpretation and/or application of applicable regulations, policies, and/or documentation present at the time of the SBIC's examination period.

a. Eligibility & Timing

Secondary Review of an Exam Report by the Office of SBIC Examinations is limited to:

1. The Examinations Division interpretation of an applicable regulation or policy or;
2. The Examinations Division application of an applicable regulation or policy.

All requests for a Secondary Review made by the Licensee must be submitted to the Examinations Division no later than 10 federal business days after notification of the Resolution Letter from the Examinations Division.

Properly submitted Secondary Review requests are screened for completeness and if found eligible for review, are forwarded to the Examinations Division Reviewing Officials, and Director of Examinations.

The Examinations Division will provide notification to the SBIC of an accepted or declined review request within 10 federal business days of request receipt.

A request for Secondary Review will extend the resolution compliance start date from the notification date of the Resolution Letter to the notification date of either a declined Secondary Review request, or the notification date of the results from an accepted Secondary Review Request.

b. Documentation

All Secondary Review documentation provided by the Licensee is limited to documentation originally supplied to SBA, Examinations Division, or other program office within OII prior to the close of the Licensee's applicable examination. All documentation provided in a secondary review request which was

135

not originally provided to the Examinations Division or other program office within OII will be viewed for informational and clarification purposes only. New documentation will not be used in the reviewing official's determinations regarding a Finding or Other Matter's validity.

Failure to supply all documentation in full will result in a declined Secondary Review request due to incomplete disclosure of materials. Subsequent requests for Secondary Review are not permitted, as a declined Secondary Review Request results in a final closure of the matter.

All Secondary Review requests must include the following:

1. Cover Letter: Licensee must include a cover letter addressed to the Office of SBIC Examinations (or designee) including:
   a. The Findings or Other Matters from the Licensee's Exam Report for which review is being requested.
   b. The regulations or policies from the Licensee's Exam Report for which review is being requested.
   c. Signatures from general partner or officers with appropriate authority to act on behalf of the Licensee, and any legal counsel involved in the Licensees request.
2. Supporting Narrative: Applicant must present a supporting ~~detailed written~~ narrative for each contested Finding or Other Matter requesting review. Supporting narratives for each Finding or Other Matter are limited to 2000 words per Finding and 1000 words per Other Matter. Word extensions may be approved by the Examinations Division under limited circumstances when requested by the Licensee prior to the 10 federal business day timeline for Secondary Review submission. Each supporting narrative is to include the following:
   a. Issue: The issue(s) being brought before the reviewing parties.
   b. Rule: The regulation or policy cited for review, and the Licensee's interpretation of the applicable regulation or policy.
   c. Application: The Licensee's proposed application of the regulation or policy to the facts presented in this case
   d. Conclusion: The Licensees requested outcome based on the supporting narrative, and why the Licensee believes the Examinations Division erred in their original determination.

4. Supplemental Documentation: The Licensee may provide supplemental documentation in support of its narrative. Presentation of any supplemental information the Licensee believes supportive of its position (does not apply to subsequent disclosures of litigation or other filings required by SBA that were not properly disclosed previously by the applicant).

All documentation relative to the Secondary Review request must be submitted by the Licensee in writing, under single cover within 10 federal business days of receipt of the Examination Report and emailed to SBIC_Reviews@SBA.gov. This will constitute the totality of items to be considered by the Director of Examinations and, as appropriate, the Director of PCI and the Risk Committee.

c. Standards of Review

136

The Standard of Review used by reviewing officials will be determined by the issue raised in the review request.

Clearly Erroneous: The reviewing officials will uphold the original regulatory or policy interpretation made by the Examinations Division unless there is a definite and firm conviction that a mistake has been committed by the Examinations Division in its original interpretation of a regulation or policy.

Substantial Evidence: If the matter in dispute rests on an Examiner's resolution of a material factual question required for the application of a regulation or policy to the case, then the reviewing officials will use substantial evidence standard, which requires a finding to be supported by sufficient evidence. This type of review simply considers whether the Examiner had evidentiary support for the determination made in the case at hand.

Abuse of Discretion: Applies to non-substantive issues, generally involving matters not clearly defined in the regulations or policies, which prompts an Examiner and Regional Exam Manager to use their discretion in assessing the outcome of a case. The Director of Examinations is likely included in these types of matters prior to the original issuance of the examination report. This standard prompts the reviewing official to not set aside the original decision unless it was unreasonable under the circumstances.

d. Internal Review and Communication Expectations

The Examinations Division Reviewing Officials shall promptly review (ideally within 10 business days) all applicant Secondary Review submissions for completeness and notify the Licensee of their decision to review the Secondary request or decline it due to an incomplete submission. requests. and notify the Director of PCI, and Risk Committee of their receipt and summary content. The Risk Review Committee shall have the right to request a full copy of any secondary review request should they wish.

The Examinations Division Reviewing Officials shall consider the applicant's petition and supporting arguments, conferring with other SBA staff as he or she deems necessary and appropriate. Secondary Review requests that are incomplete, unresponsive, or cite issues outside the grounds regarding interpretation or application of applicable regulations or policies of the four defined categories may be summarily rejected by the Examinations Division.

To the extent the Director of Examinations is persuaded that the applicant's request has merit, The Director of Examinations and the Examinations Division Reviewing Officials will review requests as soon as practicable, with the general goal of a decision within 30 days of notification of an accepted Secondary Review submission. All decisions made by the Director of Examinations and the Examinations Division Reviewing Officials will be shall forward to the Director of PCI for his or her information and optional review. Forwarded documentation is to include all decisions and supporting rationale made by the Examinations Division and a full copy of the applicant's submission. full copy of the applicant's submission, to the Director of PCI for consideration.

The Director of PCI maintains the option to review will review requests Secondary Review decisions made by the Examinations Division as soon as practicable, with a general goal of a decision withing 30

days of submission at his or her discretion. Additionally, the Director of PCI's review recommended action may be provided to the Risk Committee for their information, and may be subject to approval by majority vote from by the voting members of the Risk Committee if deemed necessary or appropriate by the Director of PCI.

In the event a Secondary Review overturns, in whole or in part, the initial Examinations Division exam report, the applicable resolution of the overturned findings or other matters will be amended or removed from the SBICs required compliance actions and a notification of such will be provided to the Licensee by the Examinations Division.

If the Director of Examinations, Director of PCI or the Risk Committee determines the secondary review request is without merit, the matter will be considered formally closed. No subsequent review requests will be considered for a closed matter. The ability to reject requests for review is in the sole discretion of SBA.

e. External Communications Expectations

The Examinations Division Director of Examinations will confirm receipt of an applicant's Secondary Review request upon delivery via email. Secondary Review requests will be processed as-is; it will not be the responsibility of SBA to identify missing or incomplete submission items.

The Director of Examinations will communicate the results of the Secondary Review request to the applicant via email in writing upon conclusion of the review. If for any reason the review is expected to take longer than 30 days after notification of receipt and an accepted Secondary Review submission, the Examinations Division Director shall communicate this fact to the applicant, along with a reasonable projection for when the process is expected to conclude.

16. Examination Fees and Invoices

When the draft of the examination is completed by the Examiner, OII will send an electronic invoice which may precede the issuance of the final report. In accordance with §107.692, the fee is based on the Licensee's latest certified financial statement, including if requested by SBA in connection with the examination, a more recently submitted interim statement. The examinations fee table is based on the examination start date which corresponds to the date the notification letter is issued to commence the examination process.

1. SBA normally does not assess fees for special examinations because these examinations are limited in scope and are made to obtain specific information for SBA officials.
2. Pursuant to §107.692, there are fee adjustments and/or additional fees which may be assessed by SBA as part of an examination. These include the following:
   a. Under §107.692(c)(1), if a Licensee is not fully responsive to the notification letter for examination (i.e. it did not provide all requested documents and information within the time

138

period stipulated in the notification letter in a complete and accurate manner, or it did not prepare or did not have available all information requested by the Examiner) after a written warning, SBA will assess an additional charge equal to 15% of the Licensee's Base Fee.

b. Under §107.692(c)(2), if a Licensee maintains its records/files in multiple locations (as permitted under §107.600(b)), it will pay an additional charge equal to 10% of the Licensee's Base Fee.

c. Under §107.692(c)(3), for any regulatory violation that remains unresolved 90 days from the date SBA notified the Licensee that it must take corrective action (as established by the date of the notification letter) or such later date as SBA sets forth in the notice, the Licensee will pay an additional charge equal to 5% of the Base Fee for every 30 days or portion thereof that the violation remains unresolved after the cure period, unless SBA resolves the finding in the Licensee's favor. (Assessed by OSO.)

d. Under §107.692(e), if in the judgment of SBA, the time required to complete an examination is delayed due to a Licensee's lack of cooperation or the condition of its records, SBA may assess an additional fee. The Associate Administrator, OII has the authority to assess this additional fee, up to $8700 (subject to further inflationary adjustment beginning October 1, 2022).

Finally, any time a Licensee's lack of cooperation results in an additional fee assessment, the report will include the issue as an Other Matter as well.

Chapter 5: Secondaries and Liquidations

1. LP Secondaries (Sales and Transfers)

Secondary sales or transfers of limited partnership interests are when Licensees facilitate transfers of limited partnership interests from existing limited partner(s) ("Transferor(s)") to new or existing limited partner(s) ("Transferee(s)") and the release of the Transferor(s) from its obligations to the Licensee. 13 CFR §107.400 of the regulations requires Licensees to obtain SBA's prior written approval for any proposed transfer or issuance of ownership interests that results in the ownership (beneficial or of record) by any Person, or group of Persons acting in concert, of at least 10 percent of any class of the Licensees' stock or partnership capital. For transfers of limited partnership interests that do not result in changes of at least 10 percent of any class of the Licensees' stock or partnership capital, Licensee must report such changes to SBA pursuit to 13 CFR §107.680.

To facilitate the process for transfers of limited partnership interests, Licensees may submit an executed Request for Approval of Transfer Certificate ("Transfer Certificate") for transfers of limited partnership interests that do not result in a change of Control (see 13 CFR §107.410). Otherwise, Licensees may submit their own legal documentation. Transfers of limited partnership interests using documentation other than the Transfer Certificate must be reviewed by SBA's Office of General Counsel ("OGC"). Section §10.0l(f) of SBA's Model Limited Partnership Agreement ("Model LPA") may eliminate the need for SBA's

139

prior approval and a Transfer Certificate when the transfer of limited partnership interest is less than 10% of Licensee's Private Capital. All transfers of limited partnership interest approval requests and reports are emailed to SBIC_Secondaries@SBA.gov.

To initiate a request for LP Secondaries, the Licensee must submit a request to their respective analyst, copying SBIC_IPM@sba.gov. As of the date of this SOP publication, a webform for LP Secondaries does not exist. However, in the future, Licensees may submit the following required information via webform. The Licensee must answer the following questions in their email request:

- Licensee contact requesting change [First Name Last Name]
- Licensee contact phone number
- License contact email
- SBIC License Number
- Seeking Post Approval or Seeking Prior Approval
  - If seeking prior approval, percentage change ownership being transferred (%)
- Date that the change has occurred or will occur
- Is the transfer greater than 10% of interest (yes / no)

Licensee must attach the following exhibits:

a. <u>Request for Approval of Transfer Certificate or Transfer Certificate</u>: Licensee may submit either an executed Transfer Certificate or its own legal documentation that documents the transfer of limited partnership interests. If Licensee submitted its own legal documentation, forward the legal documentation to OGC for legal sufficiency review. Must include a signature page.

b. <u>Statement by Licensee Confirming that Transfer Certificate was not altered:</u> If Licensee submitted an executed Transfer Certificate to document the transfer of limited partnership interest, Licensee's general partner must submit a statement certifying that the Transfer Certificate submitted was obtained from the SBA's website and was not changed, altered, or modified in any manner.

c. <u>Evidence Licensee adopted the language of SBA's Model LPA §10.0l(f):</u> If Licensee's LPA has the provision §10.0l(f) or similar provision acceptable to SBA, a copy of §10.0l(f) or the similar provision of its limited partnership agreement. If Licensee's LPA does not have the provision or acceptable similar provision, an original Transfer Certificate signed by the Transferor, Transferee(s), and Licensee must be submitted.

d. <u>Other Than Model LPAs:</u> For Licensees utilizing a provision with language similar to but not the same as the §10.0l(f) Model LPA provision, SBA requires that the language be sent to SBA for prior review to determine if it is acceptable. For Licensees that do not have the provision or similar language and wish to add §10.0l(f), a request to amend the limited partnership agreement can be submitted to SBA for prior written approval. These submissions must be sent to SBA in advance

140

of a transfer approval request and will not be considered if submitted in conjunction with a transfer approval request.

e. <u>Revised Schedule A to Licensee's Limited Partnership Agreement</u>: The revised Schedule A must reflect the transfer of limited partnership interest and be reviewed by OGC for legal sufficiency.

f. <u>Executed Limited Partnership Agreement Signature Page</u>: The limited partnership agreement signature page verifies that the Transferee(s) agrees to the partnership terms. The signature page must be signed by the Transferee and any Back Up Investor, if applicable.

g. <u>Updated Capital Certificate Reflecting Transfer of Interest</u>: Licensees must submit an updated Capital Certificate accurately reflecting the transfer of limited partnership interest. The date on the Capital Certificate should be the same date noted on the Transfer Certificate. The Transferor's and Transferee's names listed on the Capital Certificate and the Transfer Certificate and all other submitted documents should be identical.

h. <u>List of 10 Percent or Greater Owners of Transferee (if applicable)</u>: If, following the transfer, Transferee will hold 10 percent or more limited partnership interest, Licensee must complete Table K (list of all 10% and greater owners of the Transferee) on the updated Capital Certificate.

i. <u>Processing Fee</u>: If applicable, $200 processing fee pursuant to 13 CFR §107.400(b).

**Approval or Post-Approval of Transfers**

Transfers of limited partnership interests that meet all the following conditions may be submitted to SBA for post approval.

a. The transfer of limited partnership interest involves less than 10 percent ownership interest by the Transferor; and

b. The transfer does not result in Transferee acquiring 10 percent or more limited partnership interest in Licensee; and

c. Licensee remains in compliance with all capital requirements outlined 13 CFR §107.585; and

d. The transfer is in compliance with all other provisions of the licensee's limited partnership agreement.

Transfers of limited partnership interests that do not meet all the requirements for post approval above must receive prior approval. SBA OGC must review all legal documents for legal sufficiency.

*Explain to Licensees the role Secondaries team will play in review and approvals vs. the role of IPM team.*

**Approval or Post-Approval Process for Transfers**

141

Once the SBA analyst receives the email or webform request for the LP Transfer, along with all required exhibits. SBA follows the process below:

- Analyst creates an LP Secondaries Memo which contains:
  - Whether the request is approved or denied.
  - If denied, the criteria that the request violates.
- Analyst submits LP Transfer Memo to the Area Chief.
- Area Chief either approves or denies the request.
- Analyst is notified of LP Transfer decision.
- Analyst notifies Licensee of decision via email.
  - As of the date of this SOP publication, automated emails with request decisions do not exist. However, in the future, Licensees may be automatically notified of decision.

2. SBIC Restructuring, Conversions, and Continuation Funds

a. Changes in Ownership, Control, or Structure of Licensee; Transfer of License

In connection with a proposed transfer or issuance of ownership interests that are 10 percent or greater but less than 33 percent and do not involve a Change in Control, the Licensee must file a written request for prior SBA approval, but the investors are not required to file SBA Form 2182, Exhibit C-1 (for individuals) or C-2 (for entities) or fingerprint cards. A $200 fee is collected. Any ownership interest to be held by an entity requires that a statement disclosing the proposed owner's 10% and greater owners be included and the nature of the investment (e.g., investment in the management company, advisor, general partnership or limited partnership of the Licensee). If a transfer of interests is approved, SBA's prior written approval is required for release of the transferor's unfunded commitment. In connection with a proposed transfer or issuance of 33 percent or more ownership of any class of stock or other ownership interests, the Licensee must file a written request for prior SBA approval, including, but not necessarily limited, to the following:

a. The name and address of each present owner making the transfer and of each proposed new owner.
b. A draft purchase and sale agreement reflecting the number of shares to be purchased, price per share, and basis for determining price. If the new owner is a corporation, partnership, or other legal entity, the Licensee must provide information identifying the State of incorporation or registration, the principals, and any other individuals exercising direct or indirect control over the entity, the nature of its major business activities, and its current financial statements.
c. A detailed explanation of any affiliations between the proposed new owner(s) and the Licensee, any other Licensee, and any portfolio concern of any Licensee.
d. SBA Form 2181 References, Form FD-258, and a $200 processing fee for each proposed new owner and whose ownership of the Licensee would, amount to 33 percent or more.
e. For entities owning 33 percent or more, Form 2181 References and Form FD-258 are required for the entity's three ranking officials unless the entity is exempt.
f. A statement identifying the source of funds required for the transaction for each proposed new

142

owner.

g. A statement disclosing the proposed owner's 10% and greater owners.
h. The Licensee must file a complete amendment to the Management and Control item of its license application upon approval of new owners.
i. Please note that changes of ownership may require review and approval by the SBIC Investment Committee.
j. Approval recommendations for a proposed change in control must be contingent upon full disclosure of:

   i. The real parties in interest.
   ii. The source of funds for the new owner's interest.
   iii. Other pertinent data Analysts request.

k. A proposed change in control may only be approved if the resulting SBIC meets the minimum capital requirements set forth in 13 CFR §107.210 and complies with §§107.1150 through 1170. In addition, appropriate due diligence must be performed for all new management team members.

When processing a change in control, SBA will refer to Subpart D, 13 CFR 107.

A change in control or a transfer of license occurs when the Control Persons, as defined in 13 CFR 107.50, initially approved at the time of licensure for an SBIC changes. This may occur by acquisition of 33% or greater ownership of an SBIC by a new outside investment in the management company, general partnership, or limited partnership, the addition of a new management team member or the transfer of the license to new Control Persons. SBICs must obtain SBA's prior approval before any change in control or transfer of the license takes effect. SBICs must submit the following items to support a request for a Change in Control.

a. A complete "License Application," SBA Form 2181 and accompanying exhibits.
b. Initial plus Final Licensing Fee pursuant to 13 CFR §107.410(b).
c. If applicable, a completed Management Assessment Questionnaire (MAQ) for any proposed new management team members.
d. If applicable, an executed Transferor's Liability Contract, SBA Form 2181, Exhibit G.
e. If the proposed new owner is a corporation, partnership, or other legal entity, the most recent audited financial statements together with a statement describing the principal business activity. If audited financial statements are not available or are more than 90 days old, Analysts should request updated interim financial statements.

If the change in control is not considered tantamount to a new license application (for example, if there is a change in ownership, but no change in the principals of the Licensee or investment strategy), the Investment Committee can waive the requirement for a MAQ, and the licensing committees can waive their review of the application.

Approval recommendations for a proposed change in control must be contingent upon full disclosure of:

143

- The real parties in interest.
- The source of funds for the new owner's interest.
- Any Affiliate or Associates of the Licensee invested in connected with the change in control.
- Other pertinent data requested by SBA.

A proposed change in control may only be approved if the resulting SBIC meets the minimum capital requirements set forth in 13 CFR §107.210 and complies with §§107.1150 through 1170. In addition, appropriate due diligence must be performed for all new management team members.

b. Reorganizations, Restructurings and Conversions

Reorganizations (also known as "restructurings") are defined as significant changes in the structure of an existing SBIC that does not involve the merger or consolidation of two or more entities, e.g., the conversion of a corporate SBIC to a limited partnership, or the creation of new classes of stock in an existing corporate SBIC. Conversions and restructurings come in many forms. In most cases, they involve the creation of a new legal entity which succeeds to the net assets and business operations of one or more SBICs. The nature and the mechanics of conversions and restructurings dictate the specific information required for SBA consideration of a request for approval. Processing a conversion or restructuring is a two-step process that involves a conditional approval and a final approval.

To receive conditional approval for restructuring, the SBIC must submit a request for the proposed restructuring which must contain the following:

a. Agreement and plan of reorganization containing evidence (such as corporate resolutions of the parties involved) of its approval by all parties.
b. $5,000 processing fee.
c. The new entity must file a complete license application, SBA Form 2181, with items such as the legal opinion provided in draft form.
d. A draft contribution agreement.
e. SBA Form 468 as of a date not more than 60 days prior to the date of the request for SBA approval.
f. Pro forma SBA Form 468, as of the same date as the Form 468 referenced above, as if the reorganization has already occurred.
g. An adjustments worksheet which reflects the difference between the SBA Form 468 and the pro forma SBA Form 468.

To process a conversion for conditional approval, SBA will take into consideration that:

a. The conversion of corporate SBIC into limited partnerships must result only in a change to the organizational structure of the SBIC.
b. The stockholders of the corporate SBIC may not take advantage of the conversion to transfer control over the SBIC, to distribute corporate assets to themselves or to others, or to capitalize the partnership with unrealized appreciation in corporate assets.
c. All expenses associated with the conversion be borne by the stockholders of the corporate

144

Licensee individually rather than by the corporation or by the successor partnership.

    d. The resulting SBIC meets the minimum capital requirements set forth in 13 CFR §107.210 and complies with §§107.1150 through 1170 based on the surviving SBIC's Leverageable Capital.

    e. Any condition of capital impairment must be eliminated by the merger, either by the investment of additional Private Capital or by the combination of an impaired SBIC with an unimpaired SBIC.

    f. The surviving SBIC must comply with all requirements under the Act and SBA regulations (13 CFR §107).

c. Quasi-Reorganizations

A quasi-reorganization is frequently described as a means by which a "fresh start" may be obtained in terms of recorded accounting values for an SBIC. It involves the realignment of the capital balances in such a way that an accumulated deficit may be eliminated without a formal legal reorganization of the company; thereby avoiding the expense of creating a new corporate entity. Quasi-reorganizations reflect recognition by corporate management that part of the company's capital has been irretrievably lost.

Generally, an SBIC may request approval for a quasi-reorganization if it has an accumulated deficit, yet ample Leverageable Capital, and the deficit is preventing the payment of dividends even as operations become profitable.  Final approval may be given subject to conditions deemed appropriate on a case-by-case basis.

The accounting entries to affect a quasi-reorganization are:

    a. A debit to Capital and a credit to Paid-in Surplus (if applicable); and

    b. A debit to Paid-in Surplus (if applicable) and a credit to Retained Earnings, thereby eliminating the deficit.

After a quasi-reorganization, all SBICs must retain the minimum capital requirements set forth in 13 CFR §107.210 and comply with §§107.1150 through 1170 based on the surviving SBIC's Leverageable Capital.

In all financial statements of the SBIC filed subsequent to the quasi-reorganization, the Retained Earnings should be dated, that is, the statements should show that the Retained Earnings have been accumulated since a stated date as of which the reorganization took place, and the operating deficit was eliminated from this account. This dating should continue until the company has demonstrated that it is operating profitably, but no less than 3 full years.  There must be full disclosure of all details of the quasi-reorganization in the notes to the financial statements.

d. Continuation Funds

SBA permits the Investment Adviser/Manager of a Licensee to form and manage special purpose vehicle ("SPV") Continuation Funds to extend the duration of financial assistance and/or increase financial assistance to a portfolio concern of a Licensee. Continuation Funds must be pre-approved in writing by SBA for exception from Control and Affiliation restrictions. Requests for pre-approval are submitted to SBIC_Secondaries@SBA.gov and must include:

145

1. Cover letter signed by all principals of the Licensee
2. Rationale for establishing the Continuation Fund
3. Explanation of carry economics, management fees and GP commitment
4. List of all investors in the Continuation Fund, new and existing investors in the Licensee
5. Last audited valuation of asset to be transferred to the Continuation Fund and proposed value at transfer including the justification for the valuation
6. Target date of Continuation Fund close

3. Defaults

13 CFR 107 Subpart J discusses SBA's rights and remedies when Licensees become noncompliant with the terms of Leverage that result in events of default. The type of noncompliance determines the course(s) of action to take. In general, if an SBIC is unable to cure the event of default within the required timeframe (cure period), the SBIC should be transferred to Liquidation as soon as possible after the expiration of the cure period, if any.

If there is good reason to consider delaying the transfer of an SBIC to Liquidation, a Recommendations Memo will be presented to the AA/OII and will include a discussion of the SBIC's plan to cure the event(s) of default.

Section 107.1810 of SBA regulations lists events of default for Licensees issuing debentures and the remedies available to SBA. When a licensee cannot or does not cure a violation, the analyst must recommend to the AA/OII that the Licensee be transferred to the Division of Secondaries and Liquidation (DSL). Certain violations, however, may result in automatic transfer to the DSL. For example, the occurrence of one of more events under 13 CFR Part 107.1810(b) can lead to an immediate transfer to the DSL.

Other violations may lead to a transfer to Restricted Operations if the licensee is a participating securities issuer.

4. Transfers to Liquidation Status

The purpose of transferring SBICs to Liquidation status is to maximize net recoveries, taking into consideration the time value of money, while recognizing the interests of other parties affected (such as Small Business Concerns (SBCs) funded by SBICs), and furthering program integrity. The choice of an appropriate liquidation strategy and the particular course of action (the Liquidation Plan), and effective implementation of such actions, must ensure that the funds due SBA are recovered in a prompt and orderly manner.

A number of critical success factors guide decisions, including but not limited to the following:

1. Promoting the timely transfer of SBICs to the Division of Secondaries and Liquidations.
2. Determining and implementing the proposed method of liquidation in a timely manner.
3. Ensuring that SBICs and/or others comply with terms of agreements.

146

4. Ensuring that SBA complies with SBA's obligations under agreements.
5. Obtaining and marshaling Assets.
6. Success in addressing problems.
7. Complying with all legal, statutory and regulatory requirements.
8. Establishing appropriate plan(s) for disposition of Assets.
9. Completing transactions.
10. Responding to SBICs, SBCs, individuals or others to protect or enhance program integrity e.g. (regulatory compliance, licensing, criminal/Office of Inspector General (OIG) referrals, Congressional requests and inquiries, news-information reports).
11. Calculating recoveries from the liquidation of SBICs.  and
12. Ensuring, when appropriate, that the SBIC's license has been revoked.

IPM will typically take the first action toward a transfer to liquidation.  IPM recommends actions to the AA/OII and /or Director PCI to assure compliance with and invoke the protective sanctions provided in the Act and Regulations. Responsible for regulating active SBICs, IPM analyzes all submitted audited and unaudited financial statements, annual tax returns, and examination and investigative reports covering operations and practices of the individual Licensees, to evaluate the Licensees' financial stability, reliability, and compliance with the Act and the Regulations.


a. Pre-Liquidation Conference Memo

IPM will make the determination of probable removal of an SBIC from active status and of its subsequent liquidation. The Transfer Memorandum, prepared by IPM, will provide a concise summary of all pertinent information available to the Agency concerning the current status of the SBIC and its history and operations.


b. Liquidation Conference.

The AA/OII will direct the conference, which will be attended by the Directors of PCI, IPM and DSL, and by a representative of OGC, to propose transfer of the SBIC. Any of these attendees may request that the AA/OII include in the meeting any other SBA official or employee who may have special knowledge or information concerning the matters to be discussed.


a. <u>General Discussion Approach</u>. The conferees will discuss the relevant history of the SBIC, the events of default, regulatory violations of the SBIC, possible third-party liability, etc. The conferees will decide whether the supporting information is sufficient for the Agency to proceed with removal and/or liquidation actions.

b. <u>Additional Information and Review</u>. If additional information is deemed necessary, the conferees may agree to have further review conducted by IPM prior to transfer, may authorize transfer of the case with further review to be made by DSL, or may request a special examination or

147

investigation by the OE.

c.   <u>Analyst Meeting.</u> Within 5 working days of receipt of the SBA Form 327 transferring an SBIC to DSL, there shall be a meeting between the IPM Analyst who transferred the case and the DSL Analyst to discuss the case in further detail. At this time, all case files should be transferred to the DSL Analyst who will acknowledge receipt. If there are outstanding regulatory issues, the Analyst must invite a representative of OGC to the meeting.

d.   <u>Referral to Office of Inspector General (OIG).</u>  If there is any indication of fraud or abuse, or criminal violations in connection with an SBIC, its principals, or its operations, the Analyst must prepare a referral to the OIG for the AA/OII' or Director PCIs s signature. The referral memo will specify the intended scope and purpose of the examination/investigation and any critical time requirements. Further, the memo will ask the OIG for advice on whether liquidation action should be restricted. If the referral to OIG is for an investigation of possible criminal activity, the AA/OII may recess the Liquidation Conference until OIG advises how to proceed. If the referral is for developing supplemental information not essential to proceeding to liquidation, the Liquidation Conference should determine a course of action, taking explicit note of the pending activity of OIG.

e.   <u>Transfer and Documentation.</u>  If all the parties to the Liquidation Conference determine that there are sufficient grounds for liquidation the AA/OII will immediately transfer the case to DSL by SBA Form 327 action classifying the case In Liquidation, signed by the AA/OII, the Director, PCI, the Director, DSL, the Director, IPM and OGC (for legal sufficiency), making specific reference to an attached copy of the Pre-Liquidation Conference Memorandum and the Memorandum of Proceedings, (the Liquidation Transfer Package).  The IPM analyst will prepare the SBA Form 327 to be available for signature at the conference if the case transfer is approved. The SBA Form 327 will cite the regulatory violation that caused the transferring of the SBIC to DSL.  The original SBA Form 327 will be filed by the Analyst assigned to the case in the official liquidation case file with a copy to be filed with DM.

     <u>Additional Administrative Requirements Upon Transfer.</u> Within 5 working days of receipt of the SBA Form 327 transferring an SBIC to the DSL, DM will request that the Office of the Chief Financial Officer (OCFO) change the SBIC's status from Operating to Liquidation on SBA's Loan Accounting System (LAS).

5.  Liquidation Strategy Determination

The Analyst will recommend a liquidation strategy after evaluating the alternative liquidation methods available. For Debenture SBICs, the options include (but may not be limited to, a Self-Liquidation Settlement Agreement or a Receivership. For PS SBICs, the options are a Wind-Down or a Receivership. The strategy will be determined based upon the Analyst's analysis, considering the costs of the various methods of liquidation, the feasibility of each method, the rationales for the liquidation method being recommended.  Approval of the plan is by the Rule of Two.

Rule of Two means that all actions taken under delegated authority must reflect concurrence in the final action by at least two individuals in the chain of command. If there is disagreement between the original recommender and the approving official, the decision must be elevated through the chain of command until two successive individuals agree.

When an SBIC is transferred to liquidation, a liquidation transfer package will be provided to DSL. Upon receipt, the Analyst, for a debenture SBIC, the Analyst must issue an acceleration and demand letter to the SBIC. Except in the most unusual case, i.e., if OGC, the Director PCI, or the AA/OII determine that notice of acceleration may hamper SBA's ability to move quickly to obtain a Receivership of an SBIC, SBA's claim will be accelerated and demand will be made for immediate payment prior to any move to establish a liquidation strategy or plan, and prior to such negotiations with the SBIC. OGC must approve any deviations from the standard acceleration letters previously approved by OGC.

The Analyst will communicate with a Debenture SBIC to determine a liquidation strategy and will establish with the SBIC what its obligations will be during this period. For example, the SBIC should submit monthly income statements, obtain prior SBA approval for the sale or disposition of any asset, remit the proceeds from such sale or disposition to SBA and continue to comply with the Regulations. The SBIC shall not incur any new obligations or make any further investments without prior SBA approval.

The Analyst must never have a conversation or meeting directly with an SBIC's counsel without an OGC representative, and unless OGC otherwise directs the Analyst should never have a conversation or meeting with an SBIC's managers where their counsel is present, but an OGC representative is not.

The Analyst will bring a careful analysis of the SBIC's assets and the Analyst's possible remedies, such as method of liquidation, to their negotiations with the SBICs.

1. <u>Analysis and Valuation of SBIC Assets</u>. The Analyst should use all available sources to verify the status and amount invested in each SBC and the other assets of the SBIC, and the current interest in and value of these assets. The valuation of these assets may be performed either in house by DSL staff or by qualified outside parties as the Analyst deems necessary. The Analyst should evaluate each investment for collection potential or for convertibility to cash or credit on the SBIC account. Valuation of hard collateral, such as real and personal property, should be based upon appraisals.

2. <u>Review of Current Financial Data.</u>

   a. The Analyst should attempt to identify every creditor of the SBIC and should know the SBIC's position on the validity and the amount of its debt.

   b. The Analyst should prepare an analysis of the SBIC's current financial position (including financial solvency) and should obtain the most current available financial

report of the SBIC.

3. <u>Cooperation of SBIC.</u>  If the SBIC fails to cooperate in providing current financial information or fails to cooperate in other material ways, the Analyst should transfer the case for Receivership or other legal action.

4. <u>Field Visit(s).  Consultation with Debtor.</u>  Concurrent with DSL review and analysis and subject to the availability of travel funds, the Analyst should meet with the SBIC's principals at the SBIC's offices to verify the Analyst's initial findings and to inspect the records and assets. The Analyst should conduct an on-site review of the SBIC, including site visits to Impact Investments, and possibly the SBIC's accounting firm (note: in many instances it may make more sense to meet with the SBIC's principals at the SBCs' location(s) than at the SBIC's offices). The Analyst may also want to use an examiner from the Office of SBIC Examinations (OE) either prior to the visit or take one with the Analyst on the field visit(s).  The Analyst may also want or need to have an OGC representative on the field visit(s).

5. <u>Assessment of Alternative Methods of Liquidation.</u>  After the Analyst analyzes the financial and situational information, the Analyst must assess alternative methods of liquidation and develop a Liquidation Plan. Consider the following alternative methods:

   a. Immediate payment in full and revocation of SBIC license.

   b. Settlement Agreement between the SBIC and SBA providing for self-liquidation and full-term payout of the debt (including preferred stock and all accrued dividends) under close supervision of SBA and ultimate revocation of the SBIC license.

   c. Receivership, under the direction of the U.S. District Court, to operate the SBIC or liquidate the assets of the SBIC and distribute the proceeds to creditors before revocation of SBIC license.

   d. Action for a money judgment in favor of SBA followed by the marshal's seizure and sale of SBIC assets for application on the judgment, with license revocation.

   e. Sale of the SBIC's debentures to a third party.


If the Analyst decides to refer the case for Receivership or other litigation, they will give a copy of the approved liquidation plan, together with a memorandum requesting the Receivership or other litigation, to OGC and the Chief of the Branch to which the case is being referred. Prepare an SBA Form 327 action referring the case, prepare and send a DM Liquidation status code, etc.


a. Self-Liquidation Settlement Process

SBA uses Self-Liquidation Settlement Agreements (Settlement Agreements) as a method of controlling the liquidation of a Debenture SBIC. Generally, the SBIC's indebtedness to SBA is

151

restructured into a new note extending the time for the SBIC to pay SBA in full. These agreements allow the SBIC to maintain control of its portfolio, to determine the best time to sell or otherwise dispose of sufficient assets to pay the SBA claim in full, and then to surrender its license and exit the program. In some cases, the DSL may recommend that the SBIC re-enter the program after completing the Settlement Agreement.

a.    The Analyst will decide whether an SBIC is a candidate for this type of voluntary liquidation.

b.    The Analyst will negotiate the terms and conditions of the Settlement Agreement and other related documents.

c.    The Analyst will retain jurisdiction over and servicing responsibility for the case until the completion or termination of the Settlement Agreement, or until authorized and directed by the Director, DSL, to transfer the case to another Branch.

**Settlement Agreement**

The Analyst will consider, at a minimum, the following items when recommending a Settlement Agreement.

i.    <u>Full Disclosur</u>e.  The Agency will not enter into, nor be bound by a Settlement Agreement which is not based upon full disclosure of all essential information by the SBIC and its principals.

ii.    <u>No Fraud, Misrepresentation, etc.</u>  There must be no unresolved concerns or indications of fraud, misrepresentation, insider dealing, or other     civil or criminal misconduct by the SBIC or its management.

iii.    <u>Management Expertise and Performance.</u>  The Analyst should consider the SBIC principals' special expertise in effecting a timely and efficient liquidation, especially of complex assets or those assets with a limited market. In addition, the Analyst must have confidence in the SBIC management's ability to operate within the Regulations and to meet the terms, timetables and conditions of the Settlement Agreement. The Analyst should consider management's past performance. The Analyst should, if feasible, negotiate a reduction in management's overall expenses, including salaries.

iv.    <u>Overview Capability</u>.  The Analyst must include adequate provisions in the Settlement Agreement to monitor the account and appropriate protective covenants, in the manner of a prudent lender, during the term of the Settlement Agreement. For example, the Analyst should require a monthly review of operating data, including cash receipts and disbursements, year-end audited financial statements and aging reports on notes.

152

v.   Protection of Viable SBC's. While the SBIC's operating license is still in effect, the SBIC will be bound by the Regulations, including those provisions which pertain to the protection of SBCs.

vi.   Adequate Net Recovery/Note Receivable. In the Settlement Agreement the Analyst must provide for a full recovery of the SBIC's current outstanding principal indebtedness owed to SBA plus interest or dividends accrued through the date of settlement and thereafter. Payment of less than 100 percent of the full SBA obligation is a compromise that must be approved by the SBIC Claims Review Committee. If a note receivable restructures indebtedness, the note should either be a term note with specific payments due or a demand note.

vii.   Interest Rate. The interest rate on a note receivable should be the blended rate of interest on the outstanding debentures of the SBIC. However, if circumstances dictate, the Director, DSL, may approve another rate based upon written justification included in the Liquidation Plan.

viii.   Payment of Accrued Debenture Interest. The Analyst must verify that all accrued interest owed by the SBIC is paid at the time the new note is executed. If the SBIC is unable to pay the accrued interest at settlement, the Analyst must recapitalize the interest into the note. The Analyst must not create a second, non-interest-bearing note for the accrued interest. Note: If any of the SBIC's outstanding debentures are public debentures, SBA may not purchase those debentures from the public market until the next semi-annual due date. If that date will not occur until after the settlement date, calculate how much interest SBA will have to pay and include that amount in the interest to be paid by the SBIC even though that interest has not yet actually accrued.

ix.   Limited Time. Generally, the Analyst should base Settlement Agreements on a limited but reasonable time frame, usually no longer than 48 months. A Settlement Agreement for a longer period must be justified in the recommendation memorandum and approved by the AA/OII or DPCI as an exception to policy.

x.   Protection of SBA Priority/Collateral Position. The Analyst must state in the Settlement Agreement that a material adverse change in the SBIC's financial condition or management will be considered an event of default. Material adverse changes include, but are not limited to, any material reduction in the value of the assets, or any act of the SBIC which SBA believes, in its reasonable opinion, imperils the prospect of full performance or satisfaction of the SBIC's obligations to SBA (e.g., a 50 percent decrease in the value of the assets, such value to be determined at the time of the execution of the Settlement

153

Agreement).

  xi.  <u>Assurance of Adequate Insurance</u>. If the SBIC assets include real and personal property, directly or as collateral to portfolio claims, the Analyst must require evidence that such properties are adequately insured against loss or damage, with appropriate clauses protecting the SBIC.

  xii.  <u>Surrender of License and Removal from Program</u>. The Settlement Agreement must provide for surrender of the license and for removal from the SBIC's business documents (i.e., Articles of Incorporation, by-laws, Partnership Agreements, stationery letterhead, and office walls and exteriors) of all references to SBA, to the Small Business Investment Act, and to the SBIC program upon termination or completion of the Settlement Agreement. No surrender of the license will be necessary if the SBIC requests a return to the active program either during, or at the conclusion of, the term of the Settlement Agreement, and certain conditions are met.

  xiii.  <u>Receivership Option on Default.</u> The Analyst must obtain, as part of the Settlement Agreement, a signed consent to Receivership to be filed in the event the SBIC breaches or defaults on the Settlement Agreement. The language of the Settlement Agreement will indicate that a receivership is merely one of the remedies available to SBA. The consent language should provide that the consent may not be utilized until one year after the transfer to liquidation status—although the receivership action can take place prior to a year without utilization of the consent.

  xiv.  <u>Option to Terminate.</u> The Settlement Agreement should state that SBA may, at its discretion, terminate the Agreement for default, misrepresentation, bankruptcy or other insolvency, and other acts or events which could jeopardize the Agency's position or the SBIC's ability to perform under the terms of the Agreement.

**Negotiating, Approval and Closing**

The steps to negotiating, obtaining approval and closing the settlement agreement are as follows:

  i.  <u>Negotiating the Settlement Agreement.</u> The Analyst should negotiate the terms and conditions of the Settlement Agreement with the assistance of OGC, as necessary. When dealing with the SBIC's counsel, OGC must participate. The Analyst must negotiate terms favorable to SBA. If appropriate, the Analyst should obtain personal, corporate, or other guaranties of payment. In addition, if possible, the Analyst should negotiate a term payment plan. It may be appropriate to obtain a demand note when payments are dependent on the disposition of the SBIC's assets, so the Agency can declare default. Each

154

Settlement Agreement will have its own set of conditions, determined on a case-by-case basis.

ii. <u>Opinion Letter.</u> If the Analyst chooses to obtain a security interest in any SBIC asset, the Analyst must obtain an opinion letter from the SBIC's counsel that the pledging of the SBIC's Asset as security for the note to SBA will not trigger any negative covenants in any of the SBIC's underlying subscription/shareholder agreements to the detriment of SBA. If such a negative covenant would be triggered, a decision must be made by the Analyst and the Analyst's Chief as to whether it is appropriate to forego a security interest on that particular asset. The Analyst should request this opinion letter as soon as possible as it could take several months to obtain.

iii. <u>Obtaining Agency Approval</u>. For Agency approval of the Settlement Agreement, the Rule of Two applies.

iv. <u>Closing.</u>

    a. <u>Preparation and Closing of the Agreement.</u> Prepare the Settlement Agreement to be executed and any other documentation required, including, but not limited to, notes receivable, security agreements, and guarantees for OGC review. If the Agreement or any collateral document requires a public or private filing or registry, ensure that such filings are made. If the loan agreement is to be secured by collateral, such as stocks, bonds, notes, etc., the collateral must be properly pledged to SBA at the closing by the execution of the appropriate blank stock/bond power or note assignment with a signature guaranty.

    b. <u>Safekeeping of Documents</u>. Deliver instruments requiring safekeeping (such as an original debt instrument, guaranty agreement, or other collateral documents) to DSL's designated Collateral Clerk using SBA Form 649. (See appendix 14).

    c. <u>Receipt of the Completed Settlement Agreement</u>. Provide a copy of SBA Form 515, "Note Receivable Report", indicating rescheduled payment terms together with copies of the note receivable and the Settlement Agreement to the Denver Finance Center, Programmatic Accounting Division (DFC PAD). In addition, prepare an SBA Form 327, indicating that the debentures have been satisfied by the execution of a new note receivable. Attach a copy of the SBA Form 515.

    d. <u>Notification of the Settlement Agreement</u>. Use the Liquidation Status Code Change Form indicating that the case has been transferred from Pending to Settled status to notify DM of the Settlement Agreement.

155

The Analyst will retain oversight and servicing responsibility for the case until the termination of the Settlement Agreement. Servicing responsibilities include, but are not limited to:

i. Monitoring compliance with the terms and conditions of the Settlement Agreement.

ii. Monitoring the financial condition of SBCs in the SBIC's portfolio.

iii. Monitoring the condition of any collateral held as security.

iv. Monitoring the SBIC's disposition of assets Such monitoring includes, but is not limited to, verifying that the disposition of Assets occurred at fair and reasonable terms and whether or not the disposition was in compliance with the SBA Regulations and the Settlement Agreement.

v. Reviewing the SBIC's financial statements.

vi. Preparing fiscal year end liquidation reports, including estimated recovery reports of the SBIC's performance and how the SBIC is conforming to the terms and conditions of the Settlement Agreement.

vii. Dependent upon SBA budgets and if deemed beneficial, regular site visits to the SBIC's office and/or their Impact Investment SBC location(s). If the SBIC has an annual meeting of its limited partners the Analyst should, at a minimum, call in to the meeting if that is an option, and attend in-person if travel funds are available.

The following are the steps taken in the event of a default:

i. <u>Acceleration and Demand Letter Upon the Default of the Settlement Agreement.</u> Most Settlement Agreements require that an Acceleration and Demand Letter be sent to the SBIC upon default. (See appendix 16.) Prepare the letter and have the Analyst's Chief and OGC review it. Email the letter with a signature blank for the SBIC to acknowledge receipt, if the signed acknowledgement is not received within 3 business days, then mail the letter by certified mail, return receipt requested, to the SBIC, any guarantors and any other interested parties.

ii. <u>Remedies</u>. Look to the Settlement Agreement to determine what remedies, in addition to those provided by law or regulation, are available to SBA upon default.

(1) <u>Receivership</u>. If the Analyst decides that a receivership would be in the

156

best interest of SBA, prepare a referral for receivership in the same manner as outlined in this SOP. If the SBIC agreed to the receivership prior to the default, include that fact in the referral, together with a copy of the signed consent.

(2)   Asset Foreclosure: Strict Foreclosure. If SBA has a perfected security interest in the SBIC's Assets, and a Uniform Commercial Code (UCC) foreclosure and sale of those Assets is the only remedy available to SBA, after consulting with OGC, determine the appropriate method of foreclosure. The available methods include strict foreclosure or resale of collateral.  A strict foreclosure requires that the SBIC surrender the collateral to SBA to satisfy its debt after default. The SBIC will be released of its obligation without liability for any deficiency upon SBA's disposition of the Assets. In turn, SBA will not have to account to the SBIC for any surplus upon disposition of the Assets. If the Analyst elects to pursue strict foreclosure, notify the debtor and any other party in interest, after the Analyst consults with OGC. If the Analyst receives no objection within 21 days of the notice, SBA may keep the collateral in satisfaction of the debt, with no further requirements of notice to the SBIC.

(3)   Asset Foreclosure: Non-Strict Foreclosure:  If SBA has a perfected security interest in the SBIC's assets and, after consulting with OGC, the Analyst determines that strict foreclosure is not an option, the Analyst may sell the collateral. However, the sale is subject to the notice and sale requirements of the UCC. All sales must be commercially reasonable as discussed in UCC 9-507. In both types of foreclosures, consult OGC to determine the appropriate foreclosure method. OGC will assist in the preparation of the documents and letters necessary to affect the foreclosure.

(4)   Restructure. Prior to, or at the time of, a default to a Settlement Agreement, the Analyst may determine that it is in the best interests of SBA and the SBIC to restructure the terms of the Settlement Agreement. The Rule of Two is applicable to decisions to restructure debt.

(5)   Compromise. Prior to, or at the time of, a default to a Settlement Agreement, the SBIC's principals or some other party in interest may ask the Analyst to consider a compromise of the SBIC's debt to SBA.

(6)   Sale. Selling the Note to a third party. See section on Liquidation Secondary Sales.

157

A Debenture SBIC in liquidation may be transferred back to IPM as an operating SBIC only after the Analyst determines that a transfer is in the best interests of SBA.

i. <u>General Requirements.</u>

    a. The SBIC must repay its obligations to SBA in full prior to transfer.

    b. The SBIC must be in complete compliance with all regulatory requirements prior to the transfer.

ii. <u>IPM's Requirements for Accepting the Transfer of an SBIC from the Division of Secondaries and Liquidations.</u>

    a. <u>Licensing Requirements.</u> The SBIC must meet all current licensing requirements for a new SBIC Licensee including, but not limited to, current capitalization requirements, management and business plan requirements. The Analyst must coordinate with IPM in determining whether the SBIC meets these requirements.

    b. <u>Management/Ownership Review.</u> IPM must find the management and ownership of the SBIC suitable for purposes of owning and operating an SBIC. IPM must consider current regulatory guidelines in determining the suitability of management/ownership as well as OSO and DSL's past experience with the SBIC's managers/owners. The SBIC may be found acceptable (or unacceptable) for readmittance to the SBIC program based, in part, upon SBA's past experiences with the SBIC's current and former owners/managers.

    c. If a debenture SBIC is transferred back to IPM, IPM should change the SBIC back to regular servicing.

b. Receivership

SBA also conducts SBIC liquidations through the use of Federal court receiverships authorized by 15 U.S.C. Section 687c and 15 U.S.C. Section 687d. Upon the finding of a regulatory or statutory violation, a Federal District Court, upon request of SBA, can appoint SBA or other entity to serve as Receiver of an SBIC.

    a. <u>Nature of a Receivership</u>. For purposes of this SOP, a receivership may be defined as a proceeding in which a federal court takes control of the SBIC and possession of all its assets and appoints an entity (typically SBA), to serve as Receiver. The Receiver serves as an officer of the court and, at the direction of the court, collects, cares for, administers, and, in most instances, disposes of the property of the SBIC in accordance with pertinent law and the orders of the appointing court. The appointing court, acting as a court of equity, may provide virtually any lawful or equitable remedy to achieve its mission.

b.  <u>Types of Receiverships</u>.  A Receivership may be established for any legitimate purpose. The order of appointment should state that purpose.  In most instances, the following types of receiverships are established for SBICs.

  (1)  <u>Temporary, or caretaker, receivership</u> used where a receiver is appointed to:

    (a)  Take control of and operate the SBIC until a thorough review, an accounting, or a hearing on the merits for permanent appointment occurs.

    (b)  Monitor, maintain, and operate an SBIC while taking corrective actions to right a failing SBIC or while determining the feasibility of taking corrective steps.

  (2)  <u>Permanent or liquidating receivership</u> used when a receiver is appointed to liquidate the assets of the SBIC to satisfy the creditors of the SBIC in order of priority as determined by the appointing court.

  (3)  <u>Operating receivership</u> in novel circumstances to protect the SBIC's Assets pursuant to Section 107.1820 (d) of the Regulations.

## SBA's Role in SBIC Receivership

  i.  <u>SBA-Agency</u>.  SBA, as an Agency (SBA-Agency), is the regulator of SBICs in operation and in liquidation.  In its role as regulator, SBA's concerns are with its programs and with the statutes and regulations governing those programs.

  ii.  <u>SBA-Creditor</u>.  As creditor (SBA-Creditor), SBA must react to each proposal or action of the Receiver in light of SBA's responsibility to recover its loans and investments and to protect the viable SBCs in the Debtor SBIC's portfolio.

  iii.  <u>SBA-Receiver</u>.  After SBA is appointed as Receiver (SBA-Receiver), SBA is a fiduciary, responsible to the court and to <u>all</u> creditors, including SBA-Creditor, and parties in the interest of the proper operation and/or liquidation of the debtor. The Receiver is a separate legal capacity and the receivership estate is a separate legal entity and, as such, its funds, records, claims, assets, and liabilities <u>are not</u> the funds, records, claims, assets, and liabilities of SBA or the Government. SBA-Receiver's decisions must be made for the benefit of the entire Receivership estate.  In liquidating the assets of the estate, SBA-Receiver is bound by the orders of the appointing court, Federal receivership and other statutes, court rules, applicable state laws, etc., rather than the regulations of SBA.

  iv.  <u>Authority to Take Official Actions</u>.  The actions of SBA-Receiver may be taken by

159

the Analyst, the Analyst's Chief, or the Director, DSL, through delegation provided to those positions. In particular cases or for particular Receivership functions, other SBA employees or the Receiver's agents may have authority to act for SBA-Receiver as a result of redelegation or specific memorandum, contract, or letter from the Director, DSL or SBA counsel.

    a) <u>Supervision and oversight</u> of Receiverships within DSL will be the responsibility of the Chief RO.

    b) <u>Counsel of Record</u>. A receivership is a case in litigation and is under the jurisdiction of a federal court so all actions must be approved by OGC. SBA's OGC will be the Receiver's counsel of record for each case in which SBA is the Receiver. Outside counsel may represent SBA as Receiver

## Receivership Utilization as a Liquidation Alternative

    i.    <u>SBA Remedy</u>. DSL will refer an SBIC to OGC to request that a receivership be obtained, when the SBIC has been transferred to DSL, is in violation of the Act or Regulations, and does not meet the requirements for a Settlement Agreement or a Wind Down Agreement, and a more advisable liquidation method given the facts and circumstances is not available and advisable.

    ii.    <u>Factors Tending to Support Receivership</u> include, but are not limited to:

    a.  Violations of the Small Business Act or Regulations.

    b.  Inability to effectuate a Settlement Agreement, or Wind Down Agreement. with SBA.

    c.  A default in a Settlement Agreement or termination of a Wind Down Agreement.

    d.  Known or suspected fraud or other wrongdoing by the SBIC or its principals.

    e.  Active or pending litigation against the SBIC or its principals.

    f.  Assets or investments requiring specialized liquidation expertise.

    g.  Known or suspected environmental problems of SBIC assets.

    h.  The operation of subsidiaries or businesses controlled by the SBIC.

160

       i.    The lack of necessary information or likelihood of large SBA losses necessitating the need to find out what has taken place with SBIC funds.

a.    <u>Advantages of Receivership</u>.  The court can establish a receivership tailored to fit the needs of a particular SBIC.  For example, the court can devise remedies to compel individuals to provide information to the Receiver, can stay and enjoin legal and administrative actions that may affect the Receivership estate, and enable the Receiver to obtain whatever resources and expertise are required to affect the Receivership.

## *Obtaining a Receivership*

a.    <u>Consensual Receivership.</u> Usually, SBA will try to obtain the SBIC's consent to the Receivership and to SBA's appointment as Receiver. In some instances, the Regulations mandate automatic consent. (See Section 107.1810 (i) and 1810 (d) of the Regulations).  Such a consensual receivership is preferable to SBA because the receivership will start sooner, require less SBA staff time, and avoid litigation expenditures by the SBIC.  Once a case is referred for Receivership, OGC will initiate all discussions of consensual receivership with the SBIC.

b.    <u>Litigated Receivership.</u>  If the SBIC does not consent to a receivership or SBA's appointment as Receiver, or has not automatically consented pursuant to the Regulations, SBA will seek a court ordered receivership with the Agency as receiver. SBA's appointment as Receiver is usually granted on the basis of:

    (1)    Its expertise and experience in liquidating SBICs.

    (2)    Its resources which limit cost expended in receivership operations.

    (3)    Its incentive to maximize receivership recoveries.

    (4)    Its access to additional funds for operating the receivership or recovering on assets if the Agency approves an advance.

## The Duties and Responsibilities of the DSL Staff Pre-Receivership

a.    <u>Interaction with OGC</u>.  The Analyst will be assigned the Receivership case by the Analyst's Chief and will work with OGC in obtaining a Receivership.  The Analyst's responsibilities include reviewing all offers from the SBIC and any substantive changes proposed in the relief being sought.  Although all procedural and litigation matters are the responsibility of OGC, the Analyst may be called in to assist in such activities as

161

preparing documents, reviewing regulatory violations, executing affidavits, and testifying at hearings or trials.

b. <u>Communication with SBIC</u>.  While obtaining a Receivership, communication between the Analyst and the SBIC's personnel may be restricted. The Analyst should seek OGC's guidance on the extent and level of communication.

c. <u>Identification of Independent Contractor as Principal Agent</u>. Prior to obtaining the Receivership order, the Analyst and the Chief, RO, in consultation with OGC litigation counsel, should identify a qualified individual or company to serve as the Principal Agent of the Receivership (Principal Agent).  The Principal Agent is an independent contractor engaged directly by the Receivership under the authority provided by the appointing court.  The contractor is not a government employee, but is retained, compensated, and terminated in accordance with a contract, executed between SBA-Receiver (<u>not</u> SBA-Agency) and the Principal Agent.  Considerations in selecting the Principal Agent include, but are not limited to:

   (1)  The expertise that will be required to liquidate the SBIC's specific investments and assets, address the problems of the SBIC, and manage the partnership or corporation during the Receivership.

   (2)  The expertise of the SBA staff assigned to the receivership.

   (3)  The compensation negotiated.

   (4)  Prior court supervised liquidation experience.

**The Commencement of a Receivership**

a. <u>Entry of Receivership Order.</u>  The Federal Court Order appointing SBA as Receiver (the Receivership Order) establishes the Receivership and grants the power and authority under which the receivership operates.  The Receivership Order may grant the Receiver broad authorities and powers.  It also may specifically list the Receiver's powers.  Typically, the Receivership Order provides that the court take jurisdiction over the SBIC and all its assets wherever located.  The Receivership Order also typically grants the Receiver the authority to:

   (1)  Liquidate all assets and satisfy the claims of creditors.

   (2)  Exercise the powers of former SBIC officers, general partners, managers or directors.

     (3)     Borrow and disburse funds for administration of the estate and open Receivership bank accounts.

     (4)     Compel discovery.

     (5)     Procure outside resources and expertise. The Receivership Order also typically dismisses the SBIC's officers, directors, general partner, management company, managers, employees, members, and agents and stays and enjoins all legal proceedings.

b.     <u>Authority for Receivership.</u>  The Receivership Order is typically the primary source of authority for the SBA-Receiver. SBA-Receiver derives its authority from the Receivership Order of appointment, subsequent court orders and directives, rules of court (local court rules should routinely be checked), and statutes.  Additional requests to the Court should be a coordinated effort between the Analyst, OGC, and the retained agents.

c.     <u>Receiver's Agents, Contracted Parties, Equipment, Facilities, Services, Etc.</u>

     (1)     Pursuant to the Receivership Order, SBA-Receiver may contract and compensate for services.

     (2)     If contract assistance is retained, ensure that a contract and/or letter of retention setting forth the activities of the retained party is executed by the Chief, RO or the Director, DSL.

**The Duties of the Receiver**

a.     <u>Source of Receiver's Responsibilities</u>.  Typically, the Receivership Order sets forth certain duties and responsibilities of the Receiver.  Additional duties and responsibilities may be imposed by subsequent orders of the appointing court, court rules, Federal statutes applicable to Federal court receivers and receiverships, state statutes applicable to the SBIC in receivership because it is incorporated in that state, and applicable local regulations and ordinances. The Receiver also has duties as a fiduciary to the creditors, shareholders and/or partners of the SBIC and as a servant of the court to the appointing court.

b.     <u>Obligations Imposed on the Receiver by Statute.</u>

     (1)     The Receiver must manage and operate the Receivership estate according to the requirements of the federal and state law as applicable in accordance with 28 U.S.C. §959(b) or as ordered by the Court.

(2)     The Receiver must make appropriate filings with applicable Federal, State, and local taxing authorities as required under 28 U.S.C. §960 if reasonably possible.

(3)     If the Receiver has possession or title to all or substantially all of the assets of a corporation, it is required to file a federal income tax return for the corporation, if reasonably possible, even if the corporation is no longer operating in accordance with 26 U.S.C. § 6012(b)(3).

(4)     The Receiver must ensure the accurate and timely preparation of IRS Form 1099 for each service provider that receives payment from the Receivership in excess of $600 and Forms 1096 for each SBIC in Receivership.

164

(5)     The Receiver must follow the procedures set out in 28 U.S.C. §§ 2001-2005 in arranging for the orderly liquidation of certain assets of the Receivership estate specified in the statute.

## Establishing Control of the Receivership

a.     <u>Ten-Day Notice Requirements</u>

(1)     <u>Notice to Federal District Courts Under 28 U.S.C. Section 754</u>. Within 10 days of the date of entry of the order, the Receiver must file a copy of the complaint and the Receivership Order with every Federal district court. This Section 754 filing enables the appointing court to exercise jurisdiction and control over all assets of the SBIC in any jurisdiction where the filing is made. Late filings should still be made as courts have given effect to such filings.

(2)     <u>Notice to the Internal Revenue Service</u>. Section 301.6036-1(a)(2) of the Treasury Regulations requires that, within 10 days of appointment, the Receiver must give notice of appointment to the District Director for the Internal Revenue District in which the debtor is/was required to file a return.

(3)     <u>Notice to United States Post Office.</u> Within 10 days of appointment, the Receiver must send notice to the Post Office in the jurisdiction where the SBIC was located of the change of address of the SBIC.

(4)     <u>Responsibility for Notice</u>. The Analyst and, in some cases, the Principal Agent are responsible for ensuring that the notices in (1) and (2) above are sent in a timely fashion.

b.     <u>Control of SBIC Bank Accounts</u>. The Receivership Order should provide the authority for the Receiver to exercise dominion over the SBIC's accounts. Find out the location and account numbers as early as possible from the SBIC's most recent SBA Form 468 and/or from an officer, director, partner, manager or other employee of the SBIC.

(1)     Seizing the accounts. As soon as practical after the Receivership Order is entered, the Receiver must serve a copy of the Receivership Order upon each bank with which the SBIC has been doing business. This freezes the accounts and notifies the bank of the cancellation of the authority of prior signatories on the account(s).

(2)     Obtaining statements. The Analyst or the Principal Agent must obtain statements of each account as of the date of notice. In addition, the Analyst or the agent should request a written statement from the bank listing all other accounts, certificates of deposit, investment accounts, etc. of the SBIC at the bank, as well as any safekeeping or safety deposit boxes. Obtaining codes,

signature cards, and keys. The Analyst and a Principal Agent must obtain signature cards, account numbers and codes, keys, box numbers, etc., necessary for exercise of control.

(3) Obtaining codes, signature cards and keys – The analyst or agent must obtain signature cards, account #'s, etc. necessary for exercise of control.

(4) Closing the accounts. As soon as practical, at least two parties (the Chief, RO the Principal Agent, or designees) must ask the bank to close the account(s) and issue cashier check(s) or wire funds for the remaining balance(s), payable to the Receivership. Request a final statement from the bank to ensure that accounts are closed. To avoid penalties, the Analyst may allow fully insured certificates of deposit to transfer at maturity. As soon as practical, the Analyst and the Principal Agent, together, or with another person, must close any safekeeping account or safety deposit box and retrieve the deposited items.

c. Control of SBIC property, records, assets, and portfolio. The Receivership Order should provide that upon its entry, the former officers, directors, general partner, management company, managers, employees, members, and agents are dismissed. At that time the court has exclusive jurisdiction over the SBIC and its assets. The Analyst, the court-appointed receiver, or the Principal Agent should take physical possession of the SBIC and its property as soon after the entry of the Receivership Order as possible. (See "Initial Checklist for New Receiverships.")

c. Litigation Outside of Receivership

This section applies to SBIC cases transferred to Office of Secondaries and Liquidation which will be litigated outside of receivership. Cases are classified as in litigation and OGC will represent or monitor the Agency's interest in such cases when one or more of the following events occur.

a. Commencement of litigation involving the Agency or an Agency official in any matter relating to the SBIC. Take the original process or notice of litigation served upon or received by Agency personnel to OGC immediately. The Analyst must receive prior approval from OGC to accept or waive service of process. Also, report informal notices or information of any litigation affecting SBA, the SBIC, an official of either, or affecting an SBIC portfolio company or asset promptly to OGC.

b. Litigation instituted against an SBIC which could affect adversely SBA interest, or which could affect ownership or management of the SBIC.

c. Voluntary Federal or State Insolvency Proceedings, such as reorganization or debt restructuring, involving the SBIC or subsidiary company.

166

d.   Involuntary Proceeding of any kind instituted by a third party against the SBIC or a subsidiary company which remain undismissed or unstayed for a period of 60 days.

e.   Non-Judicial Assignment/Foreclosure Actions, such as an assignment for benefit of creditors or a summary or quasi-judicial foreclosure action which could adversely affect the SBA interest in the SBIC or its assets.

f.   The opening or administration of an estate or information received concerning the death of an SBIC guarantor or other obligor.

g.   A determination that SBA should pursue judgment for money, revocation of license, or other relief.

## Legal representation in non-receivership litigation

Within the Agency, responsibility for SBIC/claims litigation lies with OGC. All claims litigation must be referred to OGC. OGC will prepare the necessary pleadings, memoranda, and related documents to effect referral to the appropriate DOJ or U.S. Attorney's Office and will pursue the litigation.

## Seeking a Money Judgment Against an SBIC Outside of Receivership

The Office of Secondaries and Liquidation may ask OGC to seek a money judgment and levy and sale under execution of judgment where, for example, virtually all of the SBIC's recoverable assets are unencumbered real and personal property not requiring extensive collection, storage, or maintenance. A money judgment without Receivership may also be pursued where SBA holds a claim against a guarantor.

a.   <u>To Refer a Matter for Money Judgment to OGC</u>. To refer a case to OGC for a money judgment, include a description of property or funds which may be reached if a judgment is obtained as part of the referral package to OGC. Also provide a certified Certificate of Indebtedness from DFC PAD and photocopies of the pertinent loan documents.

b.   <u>Collections of Judgments are</u> coordinated with DOJ and OGC or SBA field office counsel. Work with OGC to coordinate the referral to the appropriate DOJ office or SBA field office counsel.

c.   <u>Particular Considerations for Judgment Collection.</u>

(1)   <u>Evaluation of Collectability Prior to Referral</u>. Before litigation is referred, the

Analyst must evaluate potential collectability and analyze the SBIC's recoverable assets to determine whether extensive collection and marshaling is required. Consider the amount of legal fees and expenses of seeking a judgment or other relief.

(2)     Reporting to DFC PAD. Upon entry, filing, and recording of a final judgment, report the judgment information to DFC PAD on SBA Form 489, "Judgment Report," (appendix 20), with a copy of the judgment attached. Provide copies of SBA Form 489 to DFC PAD, OGC, and the liquidation case file. Also, add the judgment to the AIDB.

(3)     Collection Actions. Assist OGC in developing and implementing the collection strategy by, for example, identifying funds for attachment or offset, discovery proceedings, possible recovery from fidelity bonds or officer/director liability policies, or a regular program of offset, garnishment, and continual follow-up.

(4)     Compromise Settlement. Compromise settlements of judgments obtained by DOJ is reserved to the Department of Justice, which redelegates authority to the U.S. Attorneys who seek the advice of the client agency before agreeing to a settlement of judgment. If a viable settlement offer is received, OL, through the Rule of Two, will advise OGC of SBA's position, so OGC can inform DOJ.

(5)     Judgment Classification. After a money judgment is entered into Agency fiscal records, via SBA Form 489, it remains an active, separate account classified Judgment In Litigation until it is:

(a)     paid in full

(b)     settled by compromise or

(c)     closed as uncollectible by the U.S. Attorney/DOJ.

When one of these events occurs, change the account classification by SBA Form 327 action.


**SBA Claims Against Obligors in Bankruptcy**

a.     Automatic Stay. The filing of a bankruptcy petition activates an automatic stay which prohibits many acts involving the debtor, its property, and the property of the estate. For example, a pending repossession, a public foreclosure sale, or any other commencement or continuation of any type of collection activity must cease or be suspended upon the filing of the petition. The stay remains in effect until the property no longer belongs to the estate or debtor, until the case is closed or dismissed, until discharge is granted or denied, or until the court lifts the stay upon request of an

interested party. The Analyst must consult with OGC prior to continuing any action with respect to the debtor in bankruptcy. A relief of stay may be granted by the court, in its discretion:

(1)     when the debtor has no equity in the property.

(2)     when the property is unnecessary for reorganization.

(3)     when the secured party does not have adequate protection.

(4)     for other good cause.

b.     <u>Offset.</u> The Analyst must review available information to determine whether there may be an offset available in the case. The Bankruptcy Code recognizes the right of offset of a pre-bankruptcy debt owed by the creditor to the debtor, against a pre-bankruptcy claim of the creditor against the debtor. This issue is most common between the bank of deposit and the debtor. Use of offset requires relief from the stay.

c.     <u>Analyst Responsibilities in Bankruptcy Cases.</u> When the Analyst receives notice of a bankruptcy filing and the first meeting of creditors, notify OGC promptly and begin compiling information on SBA's claim.

(1)     <u>Obtaining Information.</u> The filing of the petition places the debtor under the protection of the court and serves to protect the business and   financial assets and information. They are available or visible to creditors only under conditions prescribed by the Act and by the court. OGC will advise on proper methods of contacting interested persons and of obtaining information.

(2)     <u>Documentation of Claim.</u> Obtain a certificate of indebtedness and a statement of account from DFC PAD showing the amount of debt due on the date of the filing of the petition. Prepare and sign the Proof of Claim. Provide the proof of claim and attached copies of the debt instrument, collateral documents, and computer printout to OGC for filing with the Bankruptcy Court.

(3)     <u>Cooperative Efforts.</u> Assist OGC in determining the Agency's position on actions related to cash collateral, adequate protection, and other such mixed legal/financial issues. The Analyst is responsible for evaluating, analyzing, and preparing, with OGC, the Agency's position on bankruptcy proceedings as they are issued.

**Claims Against Deceased Obligors**

When the Agency learns of the death of a person obligated to SBA either as an obligor or guarantor of an SBA loan, ask OGC to file a claim in the decedent's estate.

**Resolution of Claims Against the Receivership Estate**

a. <u>Claims Against the Estate</u>. Generally, the Receivership Order provides that the Receiver will liquidate the assets of the SBIC and pay the SBIC's creditors in a priority established by the Court. The Receiver will identify the creditors and claimants of the estate so that it may defend against unjustified claims and recommend acceptance of proper obligations.

**Bar Date Procedure**

a. <u>Court Approval</u>. OGC or the Principal Agent should prepare a motion requesting a court order (the Claims Bar Date Order) providing for a procedure for notifying all potential claimants. The Order should also seek an expedited process for handling any claims received and establishing a date by which all claimants must properly file a claim or be barred from sharing in the proceeds of the receivership estate (the Bar Date). After review, the Analyst should submit the petition to OGC for filing with the court.

b. <u>Timing</u>. Begin the bar date procedure after the Analyst and the Principal Agent are familiar with the SBIC's finances and investments and with the individuals and businesses with which the pre-Receivership SBIC had contact. The Principal Agent should assemble a list of such parties based on records and information obtained from the SBIC. This should generally occur about 6 to 12 months after commencement of the Receivership.

c. <u>Compliance with order</u>. Upon receipt of the Claims Bar Date Order, the Principal Agent and Analyst should ensure prompt publication in a newspaper of general circulation and mailing of notice.

d. <u>Notification to the Court of Claims and Recommendations regarding Payment</u>. The Analyst, the OGC attorney assigned to the receivership and the Principal Agent will review the claims and any supporting documentation which were submitted in accordance with notice of the Bar Date. After close of the Bar Date, make sure that a Receiver's petition/motion notifying the court of the claims filed, recommending the payment or non-payment of the claims, and requesting an order approving the Receiver's recommendations is prepared.

e. <u>Final Determination as to Claimants</u>. The court will review the Receiver's recommendations and any other pleadings, and make the final determination of the priority, amount, or payment of a claim.

## 6. Sale of SBA's Interests

Participating Securities are securities issued in the form of a "Preferred Limited Partnership Interest" with SBA as the preferred limited partner. Participating Securities are used by SBA to provide Leverage to Participating Security SBICs.

### The Benefits of Selling SBA's Interest in an SBIC

The benefits from a sale of SBA's Interest are:

    a.    A significant increase in the speed of SBA's recovery (all funds are received at one point in time).

    b.    A savings in transactional costs by effectuating one sale as opposed to multiple sales of portfolio Assets.

    c.    Avoidance of negative covenants and rights of first refusal in the SBC's Financing documents.

When a fair price can be obtained for SBA's Interest, this approach is the preferred manner of resolving the case in liquidation.

### The Drawbacks to Selling SBA's Interest

The drawbacks to selling SBA's Interest include:

    a.    SBA relinquishes the opportunity to maximize the potential recovery from a sale of each individual Asset in the SBIC's portfolio.

    b.    There are many potential difficulties in concluding a sale of SBA's Interest which arise from provisions in the Participating Security and Debenture instruments. (See paragraph 8-5 and 8-6 of this SOP)

    c.    SBA, SBIC or the Receiver has no ability to recover costs if the sales efforts do not succeed.

As a result of these drawbacks, a sale of SBA's Interest should only be pursued in cases in which there is a substantial likelihood of success.

Factors that Should be Considered for a Successful Sale of SBA's Interest.

There is a secondary market for the sale of limited partnership interests. The secondary market currently requires, at a minimum:

a.     A marketable deal size, as measured by value, not cost.

b.     Portfolio Characteristics including, but not limited to:

    (1)     Significant Upside potential.

    (2)     More than one Impact Investment.

c.     An experienced and competent management team.

d.     A willingness by the SBIC's GP and its private LPs to sell their position in the SBIC and/or to amend the SBIC's Partnership Agreement. (See paragraphs 8-5 through 8-7 of this SOP).

e.     The Absence of Negative Factors such as regulatory violations, internal disputes or litigation.

The Analyst needs to be aware that the secondary market criteria may change over time.

### Considerations to a Sale of SBA's Interest in Standard and Accrual Debenture SBICs.

a.     Because, by its very nature, debenture leverage is debt, there is no potential for profit beyond the defined interest rate for any potential purchaser of the leverage unless

    (1)     It is sold at a discount (and SBA incurs a loss), or

    (2)     The private limited partners in the SBIC agree to give the purchaser some participation in the upside of the fund, which requires amending the partnership agreement, or

    (3)     A combination of 1 and 2.

    In practice the second possibility is extremely rare, and the third is more likely because often the SBICs are in need of additional capital that the purchaser would bring to the transaction above and beyond the sale price of the debt.

b.     The Debenture instruments themselves do not contain protective covenants that are enforceable by potential purchasers. Consequently, the Debentures must be restructured into a single saleable note which is then sold to the buyer.

c.     Most debenture oriented SBIC's portfolio lack considerable upside-downside risk which greatly reduces the opportunity for a successful transaction, as purchasers are usually seeking a much greater rate of return than SBA's cost of money.

172

## Amending the Partnership Agreement

The requirements for amending the partnership agreement will be set out in the actual partnership agreement. Amending the partnership agreement typically requires the approval of the GP, and a threshold percentage of the LP economic interests. SBA's approval is always required (see Reg. Section 107.400-470). The Analyst must consult with OGC to determine what is required to amend the Partnership Agreement for each SBIC.

## Evaluating the Prospects for a Sale of SBA's Interest

In order to determine if a sale of SBA's Interest in the secondary market is feasible, the Analyst must weigh certain critical factors.

a.    The Analyst should gather information on:

(1)    Portfolio Valuations including current valuations, future expectations, upside potential and exit opportunities.

(2)    The anticipated cash flows including anticipated management fees and Follow On Investment needs for SBCs.

(3)    The number of Impact Investments.

(4)    Management quality and experience.

(5)    The anticipated cooperation of the SBIC's partners with SBA.

(6)    How to amend the partnership agreement including the approval requirements.

(7)    The prospects of successfully amending the limited partnership agreement.

(8)    The expectations the LPs have concerning future distributions.

(9)    Claims pending against the SBIC.

(10)    Ongoing or anticipated litigation in which the SBIC is or will be a party.

(11)    Any outstanding regulatory violations.

(12)    Any current disputes among partners.

(13)    The amount of any unfunded commitments.

b.    <u>Communicate with the GP</u> to ascertain if the GP is willing and committed to a sale of SBA's Interest. The Analyst needs to ascertain whether the GP believes the necessary LP approvals can be obtained.  In most instances, the GP will be crucial in procuring the approval of the LPs.

## The Approval Process for a Sale of SBA's Interest

<u>Meet with the Analyst's Chief and the Director, DSL</u>. to determine, based on the Analyst's review of all the factors listed above, if there is potential for a sale of SBA's Interest in the secondary market. However, if a sale is:

a.    Unlikely now or in the future to meet the factors listed above for a successful sale of SBA's Interest, then terminate consideration of the sale.

b.    Unlikely now, but may meet the factors in the future, then the Analyst should continue with the approved method of liquidation. However, the Analyst should revisit the factors periodically as part of the Receivership or Wind Down Status Meetings to determine if the factors have changed such that a sale might be appropriate.

## Retention of a Secondary Market Broker

a.    If it has been determined that it is appropriate to proceed with the effort to sell SBA's Interest, the Analyst may consider retaining the services of a Secondary Market Broker.  The Analyst should consider the following in making this determination:

(1)    The willingness of the SBIC's GP and LPs to retain a broker.

(2)    The existence of a viable purchase offer (see paragraph 8-10 of the SOP) for SBA's Interest.

(3)    The time and cost of a marketing effort.

b.    If the Analyst's Chief or the Director, OL concludes that a broker should be retained, the Analyst must ensure that the broker is engaged at terms acceptable to SBA.  A broker may be retained:

(1)    By the SBIC subject to SBA's approval and oversight. This will typically apply to those cases in a Wind-Down status.

(2)    By SBA pursuant to an agency contract.

174

(3)     By SBA as Receiver subject to prior approval from the Receivership court, which may require the consent of all LPs.

If no broker is engaged, sales efforts will be undertaken by the SBIC's management team or by the Receivership agent subject to the Analyst's oversight.

## Assessing Offers to Purchase SBA's Interest

a.     <u>Discounted Cash Flows</u>:  In assessing an offer to purchase SBA's Interest, the Analyst must weigh the purchase offer against SBA's anticipated recoveries from the liquidation/sale of the portfolio Assets over time, discounted for the time value of money.  The Analyst should attempt to obtain cash flow estimates from the current management of the SBIC including anticipated management fees and costs if the current liquidation method was continued.

b.     <u>Current Valuations</u>:  The Analyst must obtain current portfolio valuations to support the Analyst's determination of a fair price.  Typically, one complete valuation of all significant assets should be obtained.  A second valuation should be obtained of at least the impact assets. If unfunded commitments remain outstanding, they are considered Assets of the SBIC and need to be included in the analysis.

c.     <u>Requirements concerning the GP/LP:</u>  The proposal for sale should not allow for  any improvement in the GP's current position or for any distributions to the GP or LPs until SBA, at a minimum, has received payment for its outstanding principal leverage and earned prioritized payments.

## Warranties Provided by SBA Upon the Sale of its Interest

SBA typically provides the following warranties:

a.     That SBA owns the Interest.

b.     That SBA has not previously sold or pledged its Interest.

c.     That SBA has the ability to sell its interest.

Any additional warranties must be approved, in writing, by the Director, Secondaries and Liquidation and by OGC for legal sufficiency.

**Documents are Needed to Complete a Sale of SBA's Interest**

The documents necessary to complete a sale of SBA's Interest will depend upon the SBIC's partnership structure and the needs of the Buyer, the SBIC, and SBA. Typically, the documents required include a purchase and sale agreement, a security opinion(s) of Counsel, an amendment to the partnership agreement, and an assignment of SBA's Interest. Documents may require execution by SBA, the Buyer, the GP, and some or all of the LPs. These documents will need to be prepared and reviewed by the attorneys for the Buyer, the SBIC, and SBA. The Analyst needs to consult with the assigned attorney in the OGC to determine what specific documents need to be prepared to complete a sale.

**Time is of the Essence in Completing a Sale of SBA's Interest.**

Time is of the essence in completing an Interest sale because a narrow window of opportunity exists in which to close the sale at an acceptable price. This opportunity can be lost due to delays in the due diligence process and/or significant changes in the valuation of portfolio Assets.

a.  Delays in the Due Diligence process: The due diligence process required by buyers of partnership interests is frequently a very lengthy process. SBA and the SBIC's GP and /or the Receiver will facilitate the contact between potential buyers and the managers of the most valuable SBCs in the portfolio. Obtaining valuations and consents of the LPs, the security opinions of counsel, necessary consents of the SBCs to the disclosure of confidential information and other necessary items may also require significant time commitments.

b.  Significant Changes in Valuation: A sale of SBA's Interest can be negatively impacted as a result of events which can occur during the sales process, and which affect the value of the portfolio Assets. If the portfolio declines significantly in value, then the buyer likely will walk away from the sale. If the portfolio experiences significant exits or increases significantly in value, then obtaining the necessary approvals from SBA or from the other Partners may not occur.

**Servicing Requirements While Attempting to Complete a Sale**

Closing the sale of SBA's Interest even when an acceptable offer has been obtained may be beyond SBA's control. The inability to obtain the agreement of numerous parties, particularly LPs, may result in the sale not being completed. Additionally, the buyer may change its mind as a result of its due diligence, the occurrence of negative portfolio events or disputes within the buyer group.

As a result, the Analyst needs to continue the chosen method of liquidation (Receivership or Wind Down) for each case while simultaneously continuing with efforts to sell the Interest. All the requirements of the case in Wind Down or Receivership must continue to be observed.

7.      Follow On Investments

A Follow On Investment is a subsequent investment in a small business concern made by an SBIC to protect and/or further enhance potential recovery from its earlier investment. SBICs in liquidation status must obtain SBA's approval before funding Follow On Investments.

Follow On Investments may be funded in two ways:

   a.     by the SBIC's available cash reserves (SBIC Funded) or

   b.     by the SBIC's borrowing of additional funds from SBA (SBA Funded).

**Commencing the Follow On Investment process**

   a.     SBIC management must submit to the Analyst a request for approval for a Follow On Investment. (See appendix 32) Requests should be sent to the Analyst with at least a 20-working day notice.

   b.     The Analyst will assess the information provided and either:

      (1)     Asks the Licensee for additional information if needed or

      (2)     Submits the request to the Analyst's Chief and/or Director, Secondaries and Liquidation for approval or denial, as appropriate, together with a memorandum which provides detail of the request and the Follow On Investment Cover Sheet. (See appendix 33.)

Other information that may be required

         In some instances, the Analyst may require that an assessment of the potential Follow On Investment be performed by an independent valuation company as additional support for the request. This assessment will be paid for by the SBIC. Follow-On requests for $2,000,000 or more may require an outside valuation. SBA must approve the SBIC's choice of outside valuation company as well as the scope of work to be performed.

**Authoring Follow On Investments**

   a.     For SBIC funded Follow On Investments, approvals are issued pursuant to the Rule of Two.

   b.     For SBA funded Follow On Investments of $2,000,000 or less, approvals are issued pursuant to the Rule of Two.

177

c.   For SBA funded Follow On Investments exceeding $2,000,000, approvals are sought from and issued by the Follow On Investment Committee (FOIC).

Members of the Follow On Investment Committee (FOIC) and how is approval is granted.

a.   The FOIC is comprised of five members with backgrounds and/or experience relevant to venture capital and/or the SBIC program. Standing members include the Director, DSL, the Deputy Associate Administrator for Investment, and the DPCI. The other members and an alternate will be nominated by the Director, DSL and appointed by the Associate Administrator for Investment.

b.   Typically, three votes are necessary for approval. However, emergencies may arise, such as the need for the SBIC to fund the payroll of an SBC, that do not allow the time for the FOIC to meet. If the FOIC is unavailable to meet and make a decision, the Analyst must:

    (1)   attempt to speak to the SBIC and determine if an extension of the SBIC's commitment deadline to fund the SBC is possible.

    (2)   attempt to arrange an emergency meeting of the FOIC.

    (3)   place a memorandum in the file memorializing the Analyst's efforts to achieve (1) and (2) above and the reasons a decision had to be made in the absence of a full FOIC meeting. Any decision that is made under these circumstances will be subject to the Rule of Two with the recommendation to be approved by the Deputy AA/OII. If the Deputy AA/OII is unavailable, then the Analyst's recommendation may be approved, in descending order, by the following persons, the DPCI, the Director, OL, the longest serving member of the FOIC available and finally, the Acting Director, OL.

c.   A majority of the votes of the FOIC is required to approve the Follow On Investment. The votes can be obtained via email or during a meeting of the FOIC.

Following clearance from the Analyst's Chief and/or the Director DSL, the Analyst will email the Analyst's recommendation memo and any supporting materials to the FOIC members and give the FOIC an option to meet virtually or in person, or to discuss and vote via email. The default is to discuss and vote via email. If possible, given the required timing of the request, the Analyst should give the FOIC at least 3, and preferably 5, business days to hold a meeting and/or discuss and vote via email.

d.   Once a request has been approved or denied the decision will be noted via signature blocks on the Analyst's recommendation memo. A Follow On Investment request for

any dollar amount to be funded by any funding source may be presented to the FOIC if the Analyst or an approving official believe such presentation to be beneficial.

Additional documents required for SBA Funded Follow On Investments.

a. For <u>all</u> SBA funded Follow On Investments, the following documents must be executed:

  (1) a note payable to SBA from the SBIC.

  (2) a loan agreement.

  (3) a consent to Receivership to be filed in the event the SBIC is in default under the terms of the note and loan agreement.

b. For approved Follow-On Investments of $2,000,000 or more, SBA may require that the Financing be secured by some or all of the SBIC's portfolio investments. In making the determination concerning collateral requirements, the Analyst will consult with OGC and outside counsel as appropriate to consider the effect of any negative covenants. In the event collateral is required, the following additional documents must be executed:

  (1) security agreement and

  (2) an opinion from the SBIC's counsel regarding, among other things, potential negative covenants in the underlying collateral documents that could adversely impact SBA's interest.

8. SBA Acquired Assets

Generally, SBA acquires an SBIC's Assets three ways:

  a. From agreements (including security agreements) with SBICs as part of a settlement, typically when the fund is discontinuing operations,

  b. From executing on a lien or levying on a Judgment.

  c. From a closed Receivership.

Each asset must be recorded (set up) on SBA's LAS so that SBA can keep track of its owned Assets.

***Valuing Acquired Assets***

179

a.   <u>General Policy.</u> To set up an asset on the LAS, the Analyst must provide a value for that asset. If the value is not immediately obtainable, the Analyst must initially set up the asset at book value until a more formal valuation is performed. Only assets determined to have some realizable or recoverable value will be set up.

b.   <u>Valuation Guidelines for Notes Receivable and Judgments.</u>  When the Analyst sets up notes receivable or judgments on the LAS, use as a value the outstanding balance on the note or judgment unless all or a portion of the asset is being charged off by SBA Form 327 action.

c.   <u>Valuation Guidelines for Collateral Purchased (Colpur).</u> DFC PAD has established valuation guidelines for entering asset values on LAS. The value to be used is Net Realizable Value (NRV). (See appendix 34 for OFO's guidelines). Net Realizable Value is generally computed by subtracting from fair market value all estimated costs for servicing, valuing, and selling the Asset, and adding any estimated income from the asset through the estimated sale date. DFC PAD requires that Assets be entered into the LAS at book value until the NRV value is established. The following guidelines should help the Analyst determine fair market value:

(1)   For publicly traded equities, for the initial fair market value calculation, use 95 percent of average closing price for the last 5 days.

(2)   For privately held equity securities, a written analysis or valuation is required.

(3)   For all debt security instruments (notes with convertibility features), a written analysis or valuation is required.

(4)   For real or personal property not included 1,2 or 3. above, an appraisal should be obtained.

(5)   Minimal Value Assets. Certain debt, equity, judgments, or real or personal property acquired by SBA may have little recoverable value.  However, proper tracking, monitoring and marketing of these assets must continue until collections occur or evidence of no collectability is established. In such cases, these assets will be set up for accounting and tracking purposes at a nominal value of $1.00.

d.   <u>Valuation Responsibility.</u> The Analyst may be asked to prepare financial valuations of SBCs. Other sources, such as independent contractors and outside counsel also may be retained if procurement (and payment by BLIF or other means) requirements are met. The final decision whether to use outside resources rests with the Analyst's Chief. The Analyst are responsible for reviewing the valuations for completeness and reasonability.

The Analyst should maintain up-to-date financial information on acquired assets to enable OL to update valuations periodically.

e.   Use of Valuations. In addition to using the valuation as the basis for determining value, valuations are necessary for establishing the starting point for the negotiated sale or compromise of Assets, to determine if an Asset should be charged-off or written down. Valuations, coupled with other factors, help the Analyst determine the best liquidation alternative for the Asset.

### Setting Up Acquired Assets on the SBA LAS

a.   What Types of Assets Are Set Up on the LAS? The assets set up within the LAS fall into two categories: (1) Notes Receivable and (2) Colpur. All debt instruments (agreements where there are specific terms and conditions regarding repayment, interest charged, etc.) are considered notes receivable. Colpur includes all other assets acquired by SBA from SBICs (equity interests, limited partnership interests, real estate, and other property).

b.   How are Note Receivables Set Up on the LAS?  To record a note receivable on SBA's LAS, prepare an SBA Form 515, which will include the outstanding principal balance and the outstanding accrued interest.  The SBA Form 515 must be transmitted to DFC PAD who will set up an asset account in LAS and record the value of the assets. A copy of the Form 515 must be given to DM. The original must be placed in the OL file.

c.   How is Colpur Set Up on the LAS?  To set up Colpur on the LAS, use an SBA Form 297, Collateral Purchase Report (see appendix 35) and send to DFC PAD, who will set up a separate asset account in LAS and record the value of the asset. A copy of the Form 297 must be given to DM. The original must be placed in the OL file.

### Preparing the Liquidation Strategy

a.   General. After the acquired SBIC assets have been valued and set up on the LAS, the Analyst must provide a recommended liquidation strategy based on two primary objectives:

(1)   Maximizing net recoveries to SBA.

(2)   Minimizing adverse impact to the SBC resulting from SBA's liquidation efforts.

b.   Analysis. The Analyst must recommend which liquidation strategy to follow for each asset or for an entire acquired SBC portfolio. The Analyst should:

(1)     Provide a short write-up on each asset transferred including payment/operating status and its current balance (document justification for conclusion that asset is not collectible, if applicable).

(2)     Recommend a disposition method for each asset.

(3)     Provide an analysis estimating the anticipated costs associated with implementing the recommended disposition method.

(4)     Provide an estimate of total net recoveries in dollars and percentages for the individual SBIC case.

### *Servicing SBA Acquired Assets*

Servicing of acquired Assets, including monitoring, marketing, and sale is primarily the Analyst's responsibility or the responsibility of a designated SBA field office. If the Analyst determine that the servicing, monitoring, or sale (liquidation) of an Asset may be expedited through an SBA servicing center, seek approval for the transfer of servicing authority from the Director, OL, using SBA Form 327. The Analyst may recommend a transfer when there are short-term performing and/or non-performing notes requiring servicing or other corrective action, small parcels of real estate, and fixed or other assets requiring liquidation/litigation. The Analyst must continue to monitor liquidation of such assets.

a.     <u>Equity And Debt Securities</u>.

(1)     <u>Information Collection</u>. The Analyst must make reasonable efforts to ensure that adequate information is available to effectively monitor equity and debt securities. Collect the following information for such assets:

(a)     For public companies, order all publicly available financial information (annual report, 10K, 10Q, proxy, other relevant    shareholder information) and ask to be placed on the SEC's mailing list.

(b)     For private companies, request from the SBC financial information (audited and unaudited), management reports, and other relevant shareholder information. If the Analyst believes the information collected is insufficient, the Analyst should consider obtaining an outside valuation.

(2)     <u>Protection of SBA's interest</u>. SBA may elect to exercise maturing warrants or options or to participate in a new debt or equity issue if SBA believes such action is necessary to protect the value of its current investment or if an

182

opportunity to significantly increase recovery is about to lapse. Such participation requires the approval of the Director, OL.

b.  <u>Legal Recourse</u>. The Analyst will work with OGC to determine whether and what legal action is required. The Analyst must refer any legal actions to OGC. After a matter has been referred for litigation, all contact with the debtor or opposing parties will be through OGC, unless OGC directs otherwise.

c.  <u>Third Party Collection</u>. The Analyst may recommend the use of a collection agency to recover amounts owed to SBA on uncollateralized, nonperforming debt instruments, or judgments. Before submitting any debt instrument to the SBA contracted collection agencies, the Analyst must compile all relevant loan information such as principal outstanding, interest rate, repayment terms, accrued interest, penalty fees, payment history, etc., and collect the original loan documents.

## 9. Asset Liquidation Procedures

Liquidation of real and personal property, including securities, bought and sold by the Federal Government is done through fair notice, full disclosure, public offering, or solicitation basis, to ensure fairness and openness in Government operations.

a.  <u>Claims/Collection Statutes</u>. Claims of the Federal Government will be collected by the head of the responsible agency. If the debtor is insolvent, the Federal claim must be paid first. However, some debt instruments specifically subordinate the Government's claim to that of other creditors.

b.  <u>SBIC Regulations</u> provide that SBA, upon such conditions and for such consideration as it deems reasonable, will collect or compromise all claims relating to Preferred or Participating Securities or obligations held or guaranteed by SBA, and all legal or equitable rights accruing to SBA (13 CFR Section 107.1710).

### *Issues that Must be Considered Prior to the Sale of Assets*

a.  For all methods of liquidation, the Analyst must complete or facilitate the necessary due diligence on the assets to be liquidated. This is done primarily to determine the value of the Asset, who has title to it, and how title can be transferred. The primary due diligence is to determine whether SBA or the relevant party has an unencumbered right or title to the Asset and whether the planned liquidation action complies with all applicable State and Federal laws and the covenants and other terms or conditions of the existing financing and contractual agreements.

b.  <u>Appraisals</u>. SBA must not engage in the sale of Assets unless it has a reasonable understanding of the current market and liquidation values of the property. As a general rule, an appraisal within 6 months may be considered to be a current

183

appraisal. However, judgment must be used to determine whether a reappraisal or a confirmation of values (a quick recheck rather than a full appraisal) is appropriate. Changes in the national, regional, or local economies may warrant a new appraisal. A slow market may require simply a confirmation or update of a previously prepared analysis. In receivership cases, some jurisdictions have local rules of practice which guide the use of appraisals.

c.   <u>Bid and Release Values or Prices.</u>  The Analyst must establish such values to determine whether SBA should enter a bid to protect its interest in the asset (a "protective bid"). In addition, the Analyst should generally set a minimum bid price. Values must be based on a current appraisal of market and liquidating values and recommended and approved using an SBA Form SBA 327. In establishing bid values and release prices, the Analyst must consider:

   (1)   The circumstances of the pending sale.

   (2)   The costs and expenses of owning and maintaining the property.

   (3)   How long it will probably take to resell the asset, if bought in.

   (4)   Whether the property is subject to prior liens, including accrued or accruing taxes.

   (5)   The legal requirements, foreclosure decree, or the contract by which the property is to be sold.

   (6)   The effect of the bid-in or release on persons obligated for a deficiency balance.

d.   <u>Protective Bids.</u> When establishing a protective bid, the Analyst must deduct from the estimated liquidating value of the property the following items if applicable.

   (1)   <u>Senior security Interests</u>.  Deduct the amount of all <u>prior liens</u> which must be paid.

   (2)   <u>Tax liens</u>.  Deduct the amount of all tax liens, e.g., local or Federal, which will not be discharged either by SBA/IRS agreement or by operation of law and which must be paid by the purchaser.

   (3)   <u>Acquisition cost</u>.  Deduct any cost of acquisition such as administrative expenses, court costs, or stamp or filing charges which the purchaser must pay.

(4) <u>Net cost of ownership</u>. Calculate any expected income and expected gain in resale price. Deduct from that figure the cost of maintenance, protection, necessary upgrade costs, and the expenses of resale. Then add to or deduct this net cost of ownership from the proposed bid or release price.

(5) <u>Pertinent appraisal factors</u>. Make sure that the liquidation value established by the appraiser has taken into account pertinent factors such as: whether the property has a limited purpose, whether the Asset is easily removed, and what economic effect the removal of buildings or machinery and equipment will have, and whether economic use of the property depends upon special license, permit, zoning, and other such requirements, and whether such items are reasonably available at a stated cost.

(6) <u>No Bid Position or Limited Consideration Sales.</u> As a result of this analysis of values, costs, and expenses the Analyst may find that it is not appropriate to enter any bid to purchase the property, i.e., that no reasonable recovery is likely to come from resale. If so, the property should be sold at whatever sale price can be achieved. If the Agency or SBA-Receiver already owns the property, it should be sold for whatever price it may bring. It is not in the best interests of SBA or the Receivership estate to own or maintain useless property or collateral with no value which could become a liability.

(7) <u>Extinguishment</u>. A procedure for extinguishment of lien upon request of a prior lien holder is set forth in 28 U.S.C. Section 2410(e). The Administrator can extinguish a lien under his/her general powers, even without receipt of money or property as collateral. The lien holders may consider giving a partial release for minimal consideration.

(8) <u>Abandonment</u>. Sometimes, such as when the cost of sale could exceed proceeds, it is appropriate for an owner of real property to abandon real property. When abandonment is appropriate, the Analyst should contact both Federal and state governments regarding possible receipt of such property.

(9) <u>Environmental Costs</u> if information is available.

e. <u>Disbursement of Protective Bid.</u> If a disbursement is required for a protective bid, the CPC system should be utilized to request the disbursement of funds from Treasury. The Administrative Accounting Division of DFC processes the disbursement requests coming through the CPC system.

f. <u>Responsibility for Maintaining Fire and Extended Coverage Insurance</u> on buildings, equipment, and contents should be considered.

(1) <u>Maintenance of Insurance by SBA.</u> SBA will not,

185

(2)     on its own, insure real or personal property it owns or is liquidating. However, participating lenders or investors may, in cases they are handling, decide to maintain insurance and SBA may share in the cost of such insurance.

(3)     <u>Maintenance of Insurance by Debtors</u>. SBA requires its debtors to maintain fire and extended insurance on insurable collateral, with the equivalent of the New York Standard mortgagee clause in favor of SBA. This clause ensures payment of loss to SBA, even if the insured's acts preclude payment to insured, notice to SBA before cancellation, and option to continue policy in force following notice of cancellation upon payment of premium. An 80 percent co-insurance clause is generally acceptable. The Analyst should get evidence of premium-paid acceptable insurance. Upon receipt of any notice of proposed cancellation of coverage, immediately contact the insured and other obligors to require maintenance of proper coverage.

(4)     <u>Maintenance of Insurance by SBA-Receiver</u>. SBA-Receiver must protect the receivership assets without undue expense to the estate. The statute, 28 U.S.C. Section 959, requires that the receiver is to maintain insurance required by the contracts of the creditors. The insurance decision is a business determination based on the merits of risk and potential returns.

### The Procedures for the Sale of Real Property Owned by SBA

Agency policy permits the disposition of real property by public auction or private sale.

a.     <u>Public Auction</u>. A public auction of real property may not be the preferred course of action in circumstances if:

(1)     The expected aggregate expenses associated with the sale of the property may exceed more than 20 percent of SBA's minimum bid price on the property.

(2)     The net proceeds to SBA after payment of all expenses is less than $10,000.

b.     <u>Private Sales</u>. A private sale of real property may be approved when the sales price will equal 80 percent of the appraised fair market value on residential property, 70 percent of the appraised fair market value on commercial property, or 50 percent of appraised fair market value on raw land.

c.     <u>Property with a Large (Multi-State) or National Market (Major Properties)</u>. Major properties may be offered for sale through Headquarters or as determined by the Director, Secondaries and Liquidation.

186

**The Procedures for the Sale of Real Property Held as Security by SBA**

Real property held as security for SBA as creditor shall be sold in accordance with the terms of the debt and security instruments and with the applicable state law. Ask OGC about local law and practice regarding sales and bidding practices as well as the requirements for confirmation, deficiency judgment, and redemption.

    a.    <u>Deeds of Trust</u> (with power of sale). The deed of trust, itself, and state law direct how the required notices are to be given, when and how the property may be redeemed or the debt maturity reinstated, and how the sale will be conducted. Typically, there is a notice of default and acceleration of maturity, a demand notice from the trustee, 30 days' notice by publication of time, place, and terms of sale, a public auction sale by the trustee, and a trustee's deed and settlement. If there is an IRS tax lien on the property, follow the procedures noted in paragraph 448(4)(d) of the Internal Revenue Code (IRC).

        (1)    <u>State requirements</u>. States or localities may impose different or additional requirements, such as having the creditor prove the debt and the default before a court official and giving the debtor an opportunity to correct the default. Some states require judicial confirmation of the sale for validating the sale or as a condition precedent for collecting any deficiency.

        (2)    <u>SBA employees as trustee on deeds of trust.</u> An SBA employee may not serve as a trustee of a trust deed.

        (3)    <u>Substitute trustees/fees.</u> SBA should determine if there is a right to replace the named trustee or to negotiate for limited duties and limited compensation. Such agreement must clearly state the duties to be performed by the trustee.

        (4)    <u>Use of a professional auctioneer.</u> In many trusts deed jurisdictions, it is possible for the trustee to be a professional auctioneer, or for the named trustee to employ a professional auctioneer to assist in the promotion and sale.

    b.    <u>Real estate mortgage with power of sale</u>. Foreclosure sales of real property secured by a mortgage are governed by local law and the terms of the mortgage. Either an official of the mortgagee or a designated public official will conduct the sale. Required procedures typically include:

        (1)    Formal written notice of default, acceleration of maturity, and demand.

(2)     Newspaper publication and on-site posting of notice of dates, time, place, terms of sale, and description of the property, usually published 30 days prior to sale.

(3)     A public auction sale, usually at the courthouse or on premises.

(4)     A settlement including delivery of deed.

If an IRS tax lien is on the property, consult with OGC to determine whether the taxes must be paid and the priority of the liens.

c.     Additional variations by jurisdiction. Many different variations and additional procedures are used in different jurisdictions. Some jurisdictions have quasi-judicial procedures for proof of debt and proof of notice, opportunities to reinstate the terms of payment, and notice of statutory or Constitutional right of redemption after sale. Some require a confirmation of sale either to validate the sale or to allow collection of deficiency balances.

(1)     Right of redemption.  This right may be waivable, but in some states, it is not.

(2)     Use of a professional auctioneer.  In many jurisdictions the Analyst may employ a professional auctioneer to handle the sale for the mortgagee or for the sheriff or other official who ordinarily would conduct the sale.

(3)     On-premises sales.  The Analyst should also consider the appropriateness of an on-premises sale, and, whenever feasible and cost effective, conduct the sale at the property.

d.     Recoverable Expenses.  In all cases involving the liquidation of SBA real estate collateral, SBA will seek to recover attorneys' fees and costs of litigation.

**The Procedures for the Sale of Personal Property (Including Securities)**

a.     Definition.  Personal property refers to Assets other than real estate.

b.     General Categories of Personal Property.  Personal property is generally divided into five basic categories:

(1)     Straight debt instruments - Primarily loan or notes receivable.

(2)     Debt with equity conversion instruments - Primarily loans or debentures with exercisable warrants or conversion to equity features within the financing agreement(s).

(3)     Equity instruments - Both publicly and privately held stocks, partnership

interests, warrants, etc.

(4)    <u>Tangible property</u> - Fixed assets such as furnishings, equipment, machinery, etc.

(5)    <u>Other Property</u> - Leases, liquid assets, judgments in favor of the SBIC, patents, etc.

c.    <u>Selling Debt or Equity Securities: General Rule.</u> Generally, before the Analyst sells any debt or equity security the Analyst must review the applicable Federal and State laws and the covenants and restrictions in the financing agreements. Consult with the Analyst's Chief to determine if outside counsel should be retained to prepare an opinion letter on the proposed sale. Unrestricted, publicly traded securities may be sold through a brokerage firm, and no opinion of counsel is necessary.

d.    <u>Rule of Two.</u> Sales of personal property, other than unrestricted, publicly traded securities, must be approved under the Rule of Two.

e.    <u>Alternatives Exist for the Disposition of Personal Property</u>. Use the following general guidelines to dispose of personal property.

(1)    <u>UCC Requirements.</u> If Assets were acquired pursuant to a foreclosure under a Security Agreement, the Analyst must sell those Assets in accordance with UCC requirements. (See paragraph 4-5 of this SOP.) The Analyst must consult with OGC about any UCC requirements that might be applicable to the sale and what procedures need to be followed.

(2)    <u>Servicing</u>. Often the most viable liquidation option is for SBA to hold, and service acquired Assets. These include notes receivable with relatively short maturities (typically less than 2 years), where the terms and conditions are not attractive to outside investors, or where it is in the best interests of the SBC to accelerate repayment or tender an offer in compromise.

(3)    <u>Negotiated Sale(s) Back to SBCs or their Affiliates (i.e., Directors, Officers, Other Shareholders, Partners, or Investors).</u> For equity instruments, this alternative may provide access to the only market or interest in a given SBC.

(4)    <u>Negotiated Sales of Assets to Qualified Investors.</u> The Analyst may, subject to SEC restrictions, negotiate the sale of single or grouped assets to qualified investors.

(5)    <u>Public Auction of SBIC Assets.</u> Because of the complexity of investments and ownership and resale restrictions on the typical SBC debt and equity

financings, public auction is usually not recommended for disposing of these types of securities. Generally, a public auction may be used for the disposition of tangible and other property.

(6) <u>Forced Sale or Collection.</u> Foreclosure, seeking a judgment, levying on assets, executing on collateral, pursuing a guarantor, etc., are viable disposition alternatives when an SBC is in default.

## 10. Sale of Judgments

SBA may sell SBA-owned judgments. If the judgment was obtained by SBA or DOJ, the judgment must be sent to Treasury offset program in accordance with 31 USC 3711(g), prior to sale.

## 11. Sale and Preservation of Collateral

The Analyst must fully justify expenditures for the sale, care, and preservation of collateral. The total of such expenditures, including the purchase of prior liens, should not exceed 75 percent of the current appraised liquidation value of the asset. The AA/OII or Director, PCI must approve expenditures exceeding $400,000 (not including the purchase of prior liens).

a. <u>Definitions.</u>

(1) <u>BLIF.</u> The "Business Loan Investment Fund" (BLIF) is a Congressional appropriation used for liquidating financings by the Government, including SBA financings of the SBIC Program.

(2) <u>Federal Credit Reform Act of 1990.</u> This legislation was designed to more accurately measure the costs of Federal credit programs and make the cost of credit programs equal to other Federal spending programs. For SBA's purposes, an SBIC in liquidation is deemed to be pre-credit reform debt <u>if any one</u> of its unpaid Financings was approved prior to October 1, 1991.

(3) <u>Recoverable Expenses.</u> Recoverable expenses are those that can be charged by SBA to the obligor/debtor if authorized by agreement, by law or by court order. Typically, they include costs related to the foreclosure, management, or sale of collateral and can include auctioneer fees and appraisal expenses.

(4) <u>Non-Recoverable Expenses.</u> Non-recoverable expenses are those that cannot be charged back to the obligor/borrower. Typically, they are expenses associated with the cost of doing business and are administrative in nature, such as the Analyst's wages.

b. <u>Accounting for Recoverable and Non-Recoverable Expenses.</u> Use the following table to

determine how SBA is to account for expenditures associated with the sale, care, and preservation of collateral assets.

### HOW SBA ACCOUNTS FOR EXPENDITURES
### ASSOCIATED WITH THE SALE, CARE AND PRESERVATION
### OF COLLATERAL ASSETS

| If the Expenditure is a: | Then the expense will be paid through SBA: | And the expense will be charged to SBA's: |
|---|---|---|
| Recoverable Expense | Automated Misc. Disbursement System (CPC) | BLIF account |
| Non-Recoverable Expense (with pre-credit reform debt outstanding) | Federal Financial System (FFS) | BLIF account |
| Non-Recoverable Expense (with no pre-credit reform debt outstanding) | FFS | Salary and Expense Fund |

## Care and Preservation of Collateral

This section prescribes safeguards necessary to ensure adequate control of all collateral and other negotiable instruments held by OL.

Two or more employees of the OL will serve as Headquarters OL Collateral Clerk (OL CC) and alternate(s) for SBICs in liquidation. An OL CC or alternates(s) does not have the authority to add or remove collateral or to process checks for any case on which OL CC is assigned as Analyst.

### *Safeguarding Negotiable Instruments*

a. <u>Facilities</u>. The Director, OL, must provide appropriate facilities for the OL CC(s) to properly safeguard the documents.

(1) <u>A Locking File Cabinet(s)</u>. This file cabinet will be under the exclusive control of the OL CC(s) and will be locked when documents are not being accessed. A copy of the combination and/or spare key to the file cabinet will be kept in a sealed envelope in a secure place available in an emergency only to the Director, OL, or designee. The OL CC will initial and date the envelope across

the sealed flap and will place transparent tape across the top flap in such a manner as to detect tampering. The Director, OL, will be responsible for keeping the envelope in a secure place.

(2)     <u>Physical Location</u>. The file cabinet must be located so that unauthorized personnel do not have access to the OL CC area without being observed by other SBA employees.

**Collateral Documents**

a.     <u>Collateral</u>. Collateral is defined as those items pledged by a borrower to SBA to secure the repayment of an indebtedness owed to SBA, and those items which are held by, or assigned to, SBA. Such items include, but are not limited to:

(1)     Collateral notes.

(2)     Original mortgages.

(3)     Stocks.

(4)     Bonds.

(5)     Debentures.

(6)     Guarantees.

(7)     Pledged inventories.

(8)     Assigned contracts.

(9)     Assigned accounts receivable.

(10)     Assigned life insurance policies.

(11)     Original Partnership Agreements.

(12)     Original Financing Agreements.

(13)     Original assignment documents, stock powers, and appropriate corporate resolutions.

(14)     SBIC Debentures.

(15)     Original assignment documents, stock powers and appropriate corporate resolutions.

b.     <u>Negotiable Collateral</u>.  Negotiable collateral is collateral evidenced by a document which, when presented, may be converted to cash or other assets in the ordinary course of business.  Examples of such items are:

(1)     Bearer instruments.

(2)     Instruments endorsed in blank.

(3)     Instruments endorsed or executed in favor of SBA.

(4)     All stocks, bonds, and debentures.

c.     <u>Custody Documents</u>.  Custody documents are documents which do not represent collateral, and which are returned to the borrower or third parties when the loan (or debt) is paid in full.  Examples are:

(1)     SBIC's original promissory notes to SBA and other like obligating instruments.

(2)     Security agreements.

(3)     Loan agreements.

(4)     Standby agreements.

(5)     Abstracts of title.

(6)     Title policies.

d.     <u>Non-Custody Documents</u>.  Non-custody documents are original documents, other than collateral or custody documents, which are required under the loan authorization and closing schedule, but which are not returned to the borrower or third party when the loan is paid in full, such as lists of assets or letters.

## *Controlling and Safeguarding Collateral and Custody Documents*

a.     <u>Collateral Listing</u>.  The Analyst must prepare in duplicate SBA Form 649, Listing of Collateral Documents and forward the form to the OL CC.  The OL CC will sign the original SBA Form 649 and place it in the collateral file folder. The OL CC will also sign the copy and return it to the Analyst to place in the liquidation file.

b.     <u>Missing Collateral</u>.  Identify any missing documents on SBA Form 649. When the

Analyst receives a missing item, list it on the inventory for the case and have it placed in the proper collateral file by forwarding an SBA Form 649 to OL collateral CC.

c.   <u>Action by CC</u>.  Upon receipt of the SBA Form 649, the OL CC will:

    (1)   Review the form and all original documents to ensure that the listing is accurate.

    (2)   Sign the original of the SBA Form 649 and return a signed copy to the Analyst.

    (3)   Complete a log sheet, Office of Liquidation Schedule of Original Documents (see appendix 38) and place the log sheet on the left side of the collateral file folder.

    (4)   Keep the original of the SBA Form 649 in front of all original documents on the right side of the collateral file.

d.   <u>OL CC's Responsibility</u>.  The OL CC controls and safeguards all collateral and custody documents in OL, including negotiable items, from the time they are received in OL until they are released.

e.   <u>Permanent Removal of Collateral Items</u>.  When collateral items are to be removed from inventory permanently (i.e., paid in full, released, exchanged, charged-off, etc.):

    (1)   The Analyst must prepare an SBA Form 219, "Collateral Record" (see appendix 39), obtain the Analyst's chief's signature on the form, and give the form to the OL CC.

    (2)   The OL CC must remove the item(s) from the collateral file and mark the log sheet in the collateral file accordingly.

    (3)   The OL CC must return the original item(s) along with a copy of SBA Form 219 to the Analyst for disposition.

f.   <u>Proper Recording on the Permanent Removal of Collateral Items</u>.  The OL CC maintains the original of SBA Form 219 in a binder labeled Office of Liquidation, Removal of Collateral and SBA Form 223, Register of Collateral Items Permanently Released (see appendix 40).  The item(s) on this register must be kept in consecutive date order. This register tracks all collateral items removed from inventory and the disposition of those items.

g.   <u>Temporary Removal of Collateral items</u>.  When items are temporarily removed from the collateral file, the following procedures will be followed.

(1)　　<u>Temporary removal of the items</u> will be listed on the Collateral File Cabinet Logout Sheet (see appendix 41).  The removal of any file or item(s) requires two signatures: the Analyst's and the OL CC's.

(2)    Replacement of the same items in the collateral file will also be recorded on the Collateral File Cabinet Logout Sheet.  The date of the return must be noted, and both the Analyst and the OL CC must sign the logout sheet.

### Inspection of Collateral

During the last quarter of the fiscal year, and whenever key personnel responsible for collateral items change, all collateral items and records must be examined to determine that the inventory of such items agrees with the control records.

a.    Designated Employee.  The employee designated by the Director, OL, to make the inspection will be someone other than an employee responsible for custody and control of collateral items.

b.    Presence of OL CC.  Personnel responsible for custody of these items will be present and observe the entire verification.

c.    Certification.  The inspection will be documented by means of SBA Form 989A, "Annual Inspection of Facilities for Safeguarding Custodial Items" (see appendix 42).  Any instructions for corrections and exceptions will be noted and provided to the OL CC for reconciliation.  The annual inspection report will be maintained in a separate folder and be stored in an area designated by the Director, OL.

12.    Collections, Charge-offs, and Closeouts

When a loan, note receivable, or debenture is paid in full or compromised, the loan document will be marked as Paid-In-Full or satisfied, as appropriate, and the date and the Analyst's signature and the signature of the Director, Secondaries and Liquidation will be included, (if necessary, under delegations of authority), and returned the original to the debtor. Copies will be kept for SBA's asset and liquidation case file.  The asset file should be retained for 1 year and then sent to off-site storage.  Notify DM, via the status code change form, of the change of status of the asset and note the payment on applicable internal tracking reports.

a.    Charge-Off of Notes or Colpur.

If the Analyst determines that there will be no further recovery from an SBC due to the SBC's cessation of business, bankruptcy, or prior disposal of its assets, the Analyst must obtain third party verification. This verification may be a letter from the SBC's legal counsel, bankruptcy trustee, etc., and should include proof of corporate dissolution. If the Analyst cannot verify the SBC's situation by these means, request a letter from the principal(s) and copies of the SBC's signed final tax returns.  Whether the documentation is sufficient for verification is subjective and requires that the Analyst and the Analyst's Chief exercise judgment in each situation.

The Analyst's decision about how much effort to expend in seeking to verify an SBC's situation

196

will depend on the facts of the particular case. Sometimes the amount of the indebtedness will not justify extensive verification efforts on the Analyst's part. In other cases, using all reasonable methods available, the Analyst may be unable to locate the SBC or some of its principals. In these cases, the Analyst may determine that SBA's investment is not collectible, and the asset should be charged-off.

b.    <u>Charge-Off of the Remaining Balance on Notes Receivable Acquired via a Settlement Agreement.</u>

If a note receivable executed by an SBIC pursuant to a Settlement Agreement is in default, all reasonable legal efforts should be made to collect the indebtedness. If all legal means of recovery, including pursuit of guarantors, have been exhausted, the balance of the indebtedness should be charged-off.

c.    <u>Charge-Off of Judgment Balance after the Close of a Receivership.</u>
Upon the closing of the receivership, SBA may receive assets. The judgment SBA maintains against the SBIC will be charged off and the assets SBA receives will be set up on SBA's accounting system.

d.    <u>Charge-Off of Principal and Interest on Debentures and Principal on Participating Securities.</u>

Once a determination is made that there is no further recovery available against the principal and interest on an SBIC's debentures or against an SBIC's participating securities, The Analyst must prepare an SBA Form 327 action charging-off the balance. (See paragraph 14-3 for procedures to effectuate a charge-off.)

e.    <u>Charge-Off of Prioritized Payments</u>

Once a determination is made that there is no further recovery available against the principal and interest on an SBIC's debentures or against an SBIC's participating securities, The Analyst must prepare an SBA Form 327 action charging-off the balance. (See paragraph 14-3 for procedures to effectuate a charge-off.)

f.    If the Analyst contemplates using TOPs (Treasury Offset Program, see www.fiscal.treasury.gov/top/) as a final collection effort, then the Analyst needs to consider delaying a charge-off until completion of the TOPs effort, because if the balance is charged down Treasury will not pursue the full amount owed and may not accept the referral.

**Procedures Required to Effectuate a Charge-Off**

a.    Debentures, <u>Loans/Notes Receivable/Prioritized Payments.</u>

197

When a debenture, loan, note receivable or prioritized payment is charged-off, complete an SBA Form 327, documenting the indebtedness, the amount due, and the efforts made to obtain recovery. Recommend charge-off by SBA Form 327 action and obtain approvals from the Analyst's Chief and the Director, OL, and concurrence by OGC. Send SBA Form 327 to DFC PAD to record the charge-off in the Agency's loan accounting system. Retain case files for 2 years after charge-off and then forward them to off-site storage.

b.    <u>Colpur.</u>

Complete SBA Form 297 to abandon Colpur. Send the form to DFC PAD to record the abandonment in the Agency's loan accounting system.

## Closing a Case

After the Analyst disposes of all assets obtained from an SBIC in liquidation, or the SBIC pays its obligation in full, or the balance due on a note receivable is charged-off, the SBIC case will be considered closed. Send DM status code change form to DM indicating that the case is closed.  Retain the SBIC case file on-site for a period of 2 years after the case is closed and then forward it to off-site storage.

## Notification of License Surrender

When an SBIC surrenders its operating license, either pursuant to a completed settlement agreement, or otherwise, prepare a Federal Register Notification After Surrender of License Form and bring it to SBA's Administrative Information Branch (AIB), requesting that it publish a Notice of License Surrender in the Federal Register. OGC will sign and date the Federal Register Notification form.  The Analyst must then forward the Federal Register Notification After Surrender of License Form together with a Federal Register Notice of License Surrender to the AA/OII for signature. After the AA/OII returns the form to the Division of Secondaries and Liquidations, forward one original Federal Register Notice and 5 copies to AIB together with a computer disk which contains a copy of the notice, and a memo stating that the document is the same on disk as on paper. (See SOP 00 03, Federal Register Documents.)

13.  Correspondence, Documentation, Reports, And Controls

The general policy and procedure for communications are as follows:

a.    <u>Incoming and outgoing letters, e mail, correspondence, and internal memoranda</u> involving a liquidation account must be filed in the official liquidation electronic case file.

b.    <u>Signature Authority and Limitations.</u>  The Analyst may sign routine correspondence concerning work in the Analyst's area which does not require approval of or clearance by another SBA official. Correspondence stating possible Agency policy, the Agency's financial or legal position,

either as a general statement or as applicable to a specific pending matter, must be signed by an official who has authority in the matter.

Official actions taken by SBA under delegated authority may be affected by use of SBA Form 327. OGC must review all SBA Form 327s involving legal matters. Complete the SBA Form 327 including all information essential to an informed decision on the action under consideration. Each SBA Form 327 will cite the authority for the action to be taken, usually by noting the applicable paragraphs of this SOP, or by citing the applicable Delegation of Authority. Copies of all executed SBA Form 327s will be distributed to Data Management, as well as to those persons listed on the bottom of the form.

## Fiscal Year-End Required Reports

a.  <u>Branch Requirements.</u>  Periodically, during the fiscal year, each branch Chief will prepare an annual report, in concise narrative form, to the Director, Secondaries and Liquidations, comparing the fiscal year's activities to the Office's goals for each of the primary liquidation methods managed by the Branch.  The report should address goals and indicators that measure the efficiency, effectiveness and timeliness of collective efforts of each of the settlement agreements, wind down agreements and receiverships. The report may include but is not limited to,

   (1)    The number of SBIC accounts scheduled to be concluded compared to those actually concluded.

   (2)    The number of portfolio accounts scheduled to be concluded compared to those actually concluded.

   (3)    The dollars projected to be collected compared to the dollars actually collected.

   (4)    The costs projected to be incurred compared to the costs actually incurred.

   (5)    The number of time milestones met (such as bar dates, dates for execution of agreements, etc.).

b.  <u>Analyst Requirements.</u>

   Prepare a mid-year and an annual report, in concise narrative form, to the Analyst's Chief, analyzing the Analyst's activities for the period. At a minimum, include a brief overview of the progress of the Analyst's casework, functions and projects.

## Asset Inventory Data Base OL Date Report formerly AIDB

199

The Analyst must notify the DMB of any relevant changes to the Analyst's assigned cases at the end of each fiscal year. All assets must be maintained on the Division of Secondaries and Liquidation's Asset Report until sold or charged off. In addition, if information on an Asset change at any other time during the year, the Analyst may immediately E-mail notice of the change to DM, rather than waiting for the annual update.

**Collection Objectives**

At the beginning of the fiscal year, the Division of Secondaries and Liquidation will establish collection objectives. These collection objectives will be the result of a mathematical calculation which includes the subsidy model, expected recovery rates, the Leverage transfer balances, age of the accounts in the Division of Secondaries and Liquidation and past collections for each SBIC financing instrument type (debenture, participating security or preferred stock).

**Annual Assessments**

The Director, Secondaries and Liquidations, Chiefs, designated analysts and OGC representative(s), if appropriate, will meet and review the data captured in paragraph 5 above, and will identify cases which require further inquiry and/or corrective action. Corrective action concerning specific cases will be addressed and follow up will occur at quarterly Receivership status meetings and semiannual Wind Down status meetings. Corrective action could include, but not be limited to, a recommendation that the liquidation method being utilized be changed. Additionally, the Director, Secondaries and Liquidations, Chiefs and designated Analysts will attempt to ascertain, on an annual basis, if the information gathered reveals or suggests the need to amend substantive liquidation processes, such as altering the wind down criteria. At the conclusion of the fiscal year, SBA, utilizing the information captured by all other year end reports, will review the performance of each SBIC utilizing agency collections, SBIC receipts and expenditures, assets resolved and anticipated recovery results. Additionally, the Director, Secondaries and Liquidations, Chiefs and designated Analysts will periodically, during the fiscal year, compare the Division of Secondaries and Liquidation's performance against the overall goal(s) and performance indicators established at the beginning of the fiscal year. The Division of Secondaries and Liquidations will utilize this review to make changes to the address the efficiency, effectiveness and timeliness of the liquidation of SBICs.

14. Other Liquidation Matters
a. Compromising Claims Against SBICs and SBIC Portfolio Companies

This chapter deals with the compromise/settlement of claims due SBA from SBICs (including SBA's claim against an SBIC in receivership), as well as claims due SBA from SBIC portfolio companies.

In some cases, a compromise is the most effective recovery. A compromise settlement of a claim is appropriate when the obligor cannot pay the obligation in full or when other circumstances indicate that a compromise settlement will result in the best recovery for the Agency. The principal criterion for determining whether to settle a debt is whether it is in the best interests of the Government. The amount received through compromise

200

settlement must bear a reasonable relationship to the present value of the projected net recovery available through other means of collection. Net recovery includes, but is not limited to, gross estimated recovery, less the estimated costs of forced collection, the risks of forced collection, the litigative risks, liquidation value, the time value of money, and other appropriate information.

### *The Authority for Compromise of Claims*

a. <u>Delegation of Compromise Authority</u>. The Administrator has authority to compromise claims of the Small Business Administration under the Small Business Act of 1958 and the SBIA. The Administrator has delegated that authority to specific Claims Review Committees at field office and Headquarters levels. Authority to compromise claims in connection with the Small Business Investment Company Program has been delegated to the AA/OII, and re-delegated to the SBIC Claims Review Committee in Headquarters.

b. <u>The Federal Claims Collection Act.</u> (31 U.S.C. 3701 et.seq.) This Act provides a means for settling, adjusting, and compromising claims by Federal agencies. The Code of Federal Regulations (31 CFR §285.1 et.seq.) provides guidance for compromising claims under the Federal Claims Collection Act.

c. <u>Limits on SBA's Compromise Authority.</u>

    1. <u>The person or committee</u> taking final action on a compromise offer <u>must have delegated authority</u> to take the action or else the settlement is not binding on the United States.

    2. <u>DOJ Authority</u>. SBA will recommend action on an offer to compromise a debt, but the authority to take final action rests with DOJ in the following cases:

        a. SBA claims referred to DOJ for collection.

        b. A judgment in favor of the Administrator, or of the Agency, or of the United States in favor of either, including judgments against SBICs and judgments which have been returned to SBA for collection.

c. In accordance with the Federal Claims Collection Act, claims which are fraudulent, false, or are misrepresented by a party in interest, or which violate antitrust law (these may be referred through OGC or OIG to the DOJ).

### *The SBIC Claim's Review Committee*

The SBIC Claims Review Committee, established in Headquarters by delegation of authority from the AA/OII, is comprised of the DAA/OII the Director PCI, the Director, Secondaries and Liquidations, the Director, OSO, and the Associate General Counsel for Litigation, or those officially acting on their behalf.

a. <u>Committee Authority.</u> The Claims Review Committee has authority, upon unanimous vote, to approve a compromise settlement of SBA claims against SBICs, provided that, for claims held by the DOJ, the committee's final action will be a recommendation to DOJ on the compromise proposal.

b. <u>Appeals of Committee Decisions.</u> The AA/OII, or designee, can take final Agency action on appeals from committee decisions submitted by the Chiefs and on requests for reconsideration of committee actions. In such cases, the committee will review the appeal or request and will forward it to the AA/OII with the committee's rationale and recommendation.

c. <u>Compromise of SBIC Portfolio Accounts (Debt Financings) Acquired by SBA.</u> These compromises will be processed through the SBIC Claims Review Committee.

*Compromise Offers from Individual Obligors*

a. <u>General Requirements.</u>

   1. Inform obligors how the compromise process works, and how important full disclosure and accurate information are for a fair result.

   2. Consider the following information when evaluating a compromise:

      a. SBA Form 1150, Offer in Compromise (see appendix 36).

      b. SBA Form 770, Financial Statement of Debtor (see appendix 37), plus inheritance and trust information.

      c. Signed copies of the obligor's/guarantor's Federal tax returns for the past 3 years (if deemed necessary).

b. <u>Analysis of Compromise Offers.</u> The Analyst's analysis must conclude that the proposed compromise would be the most effective recovery, serve the best interests of the Government on both a monetary and non-monetary basis, and be reasonable compared to the net recovery available through other means. Determine the following.

   1. <u>Liquidation Value.</u> First, determine the gross estimated recovery, i.e., the liquidation value or the net forced sale value of obligor's assets, together with the net recoverable sum of obligor's anticipated earnings over a reasonable period of time.

      a. <u>Real Property</u>. The liquidation value calculations require a realistic view of a

202

liquidation or forced-sale value of obligor's property (like a residence) <u>regardless</u> of whether the property could actually be seized and sold.

b.  <u>Personal Property</u>.  The Analyst must establish an equivalent forced sale value for property with value.  High value antiques, motor vehicles, or other items of special value must be independently valued.  Cash and cash equivalents (checking, savings, IRA, Keoghs, and Cash Value of life insurance) are valued only to the extent that they exceed basic living expenses (per SBA Form 770).

c.  <u>Obligor's Income</u>.  The Analyst's evaluation is primarily based on the present value of the property but may also include potential recovery from obligor's income.  The Agency has not established a formula for determining what portion of income should be considered reasonable normal living expense.  Suggested reference points are the Federal Consumer Credit Protection Act and the Bankruptcy Code limitations on the amount of income subject to garnishment.

2.  <u>Risks of Collection</u>.  Determining a net recovery figure requires an evaluation of the risks of collection. For example:

a.  A parcel of realty may be jointly owned or under a long-term uneconomical lease or use which renders the realty undesirable for another owner or co-owner.

b.  Income may be from sources not susceptible to garnishment or may be fully exempt under State law.

3.  <u>Costs of Collection</u>.  Consider the Analyst's time, and the attorney's time, costs of appraisal, promotion, protection and sale, court costs, and related expenses, as well as the contractual or statutory ability to charge and collect such costs from the obligor.

4.  <u>Litigative Risks</u>.  Determining projected net recovery requires consideration of litigative risk. OGC or outside counsel will estimate the extent of this risk based on such factors as referability, legal validity of claim, specific legal obstacles to collection, equities of the case, and jury appeal.

5.  <u>Time Value of Money</u>.  After the Analyst has made a reasonable estimate that forced recovery will produce specific cash flows for credit on the debt, the <u>present</u> cash value of those cash flows must be calculated.  This is useful for immediate cash settlement of the debt, and for negotiation of a "base plus interest" for a term settlement.

**The Compromise Report**

When the Analyst receives a final, firm offer and have evaluated all relevant information, prepare a report on SBA

203

Form 327 with a narrative attachment. This report, with copies of the financial and valuation data relied upon, is a complete profile of the obligor's ability to repay the debt with the likely results. The report must include the Analyst's recommendation.

**Distributing and Acting on the Compromise Report**

a. A complete report, including narrative and other attachments, will be provided for each member of the SBIC Claims Review Committee. The Chief will forward the report to the committee members via email. It will be at the committee's discretion whether to have a meeting or to discuss and vote via email. In any case, the Chief will indicate and arrange for a final vote of the committee within 7 business days.

b. The committee may vote in person or via email, if an in-person meeting is held the Analyst should prepare minutes that are approved by the committee. The committee members' votes will be indicated via signature (wet or electronic) on a signature block on the 327.

c. The initiating branch will be responsible for making sure that the approved actions are signed, giving appropriate notices of the actions, placed in the electronic case file, and furnishing necessary copies of the action to DFC and BOO.

d. If the committee declines the recommendation, it must state the reasons for decline and offer guidance for further handling of the claim. The initiating branch must follow any directions or advice to conclude collection activity in the proper manner.

e. The Chief, or the DOJ, if applicable, may request reconsideration of the Committee action, by filing a written request with the chairperson within 30 days after date of the action. The Committee will make a recommendation on the request within 10 days after receipt and deliver such recommendation to the AA/OII. The AA/OII will take final action on the reconsideration and promptly advise the requesting party of the decision.

b. Wind Down Agreements for Participating Securities SBICs

**Participating Security Wind Down Agreement**

The DSL uses participating security wind down agreements (Wind Down Agreements) as one method of liquidating PS SBICs. These agreements allow the PS SBIC to maintain control of its portfolio, to determine the best time to sell or otherwise dispose of assets and, with SBA's permission, to make Follow On Investments. Once it is determined that the PS SBIC meets the criteria outlined below, a Wind Down Agreement may be recommended.

a. The Analyst will review the Wind Down Plan prepared by the PS SBIC to be sure it is feasible and

204

that it meets the criteria for Wind Down Agreements.

b.      The Analyst will negotiate the terms and conditions of the Wind Down.

c.      The Analyst will retain jurisdiction over and servicing responsibility for the case until transferred to another Analyst.

**Considering When to Recommend a Wind Down Agreement**

PS SBICs must meet <u>all</u> the criteria listed below in order to be allowed to Wind Down:

a.      Management must be deemed to be competent, as evidenced both by their behavior prior to and after transfer to the Secondaries and Liquidations Division. The management team must have proven experience exiting and realizing profits from venture investments.

b.      Management must not have acted in a manner which is contrary to SBA's objectives and there is neither strong indication nor substantive evidence of fraud, misrepresentation, insider dealing, civil or criminal misconduct, or other information raising significant doubts about the integrity or honesty of the SBIC management.   (As a general rule, if there is evidence of criminal misconduct or civil fraud by the SBIC, the Analyst should immediately move to put the SBIC into receivership.

c.      The PS SBIC must have a clean regulatory record with no outstanding regulatory violations, with the exception of capital impairment.

d.      The PS SBIC must have submitted an acceptable Wind Down Plan.

e.      Management has agreed to adjust management fees.

f.      Management has agreed to call all unfunded commitments, unless an agreement has been reached with SBA to defer calling the commitment.

g.      Management must have agreed not to make any Follow On Investments without SBA's prior written approval.

h.      Management has agreed not to make any distributions to any partners without SBA's prior written approval, with the exception of distributions to SBA.

**Items That Must Be Considered in Order to Allow a Wind Down.**

PS SBICs must meet <u>at least one</u> of the following criteria in order to be allowed to Wind Down:

a.      It is determined by OL that the PS SBIC's assets, including unfunded commitments, are likely to

205

pay SBA, in full, the principal balance of its outstanding participating security Leverage. In some instances, valuations from third parties may be necessary to confirm reported asset values.

b.    The PS SBIC's prior distributions to partners would have paid SBA's principal Leverage in full, had the PS SBIC not made distributions to its limited partners pursuant to SBA's regulations. This is an indicator that the fund managers have the ability to manage a fund and exit portfolio investments profitably.

c.    The PS SBIC has experienced significant realization on assets while in OL and the Analyst expects this trend to continue.

d.    Very little of the PS SBIC's original portfolio remains and changing management would have little effect on the liquidation of the remaining portfolio. For example: there may only be a single asset remaining or the ownership percentage in the remaining few assets would not allow management to impact the exit process.

e.

The Analyst has determined that there is something unique about the PS SBIC which would make a Wind Down the appropriate liquidation method. The Analyst must specifically identify what it is about the PS SBIC which makes it unique. Such unique factors could include a portfolio whose primary asset is under the control of the PS SBIC where the manager is one of the few recognized experts in the field.

**A Valuation should be Ordered**

Concurrent with the Analyst's analysis of the Wind-down Plan, the Analyst may find it appropriate to order a valuation of one or more Impact Investments, if this has not been done by the OSO analyst, to ensure the Analyst has the most accurate and timely profile of the SBIC. If a valuation is deemed necessary, the Analyst should require that the SBIC, at its expense, engage a valuation contractor to be approved by SBA. The valuation analysis should take into account market conditions, prospects for, and timing of, a liquidity event using appropriate metrics and the probability of different exit scenarios.

**The Steps in Obtaining a Wind Down Agreement**

Within 60 days of receipt of the Wind Down Plan and all other critical documents the Analyst will review the Wind Down plan, determine if the PS SBIC meets the criteria for a Wind Down Agreement, and negotiate the terms of the Wind Down Agreement, with the assistance of OGC as necessary. When dealing with the PS SBIC's counsel, OGC must participate. As part of the final Wind Down agreement, the PS SBIC must agree, at a minimum to:

a.    Abide by the terms and conditions of the Restricted Operations Conditions as stated in Section 107.1820(f).

b.    Obtain SBA's prior written approval for all Follow On Investments (see Section 5.10 of this SOP).

c.    Agree not to make any distributions to partners without SBA's prior written approval, with the

206

exception of distributions to SBA.

d.    Agree to a reduction in management fees, if SBA requests it and agree that SBA may, at any time, further readjust management fees.

e.    Agree not to borrow any money without SBA's prior written approval.

f.    Agree to sign a consent to receivership should SBA, in its discretion, determine that the PS SBIC is no longer meeting the terms of the Wind Down Plan or that circumstances have changed such that the Wind Down is no longer advisable and that a Receivership is the appropriate option. The consent may only be utilized by SBA after the expiration of 1 year from the signing of the Wind Down Letter Agreement.  This does not preclude SBA from seeking a non-consensual receivership pursuant to the SBIA and Regulations if appropriate. SBA may seek a receivership without the consent of the SBIC at any time. A form of Wind Down letter agreement is shown in appendix 15. The Analyst must make it clear to the PS SBIC that final approval of the Wind Down Agreement must be obtained from the Analyst's supervisor.

## Liquidation Memorandum

Once the Analyst has finalized negotiations with the PS SBIC, the Analyst will recommend to the Analyst's Chief a liquidation strategy in a liquidation memorandum (the Liquidation Memorandum). The Liquidation Memorandum will recommend a liquidation method after evaluating the alternative liquidation methods available to the PS SBIC. At a minimum, the recommendation needs to discuss each liquidation method available and potential costs associated with each. Costs should encompass current and future management fees and expenses for no more than 3 years taking into account reduced management fees, based on an established percent of declining portfolio value.  For receiverships, that cost should be an approximation of an average yearly cost to operate a receivership having similar numbers of assets and of a like nature, i.e., debt or equity, or a mixture of debt and equity and if possible, in similar industries.  Cost factors should be discussed only as they are available or can be reasonably approximated.  Costs shall never be the sole determining factor in choosing a liquidation method.

## SBA's Principal Role in a Wind Down

SBA's principal role in a Wind Down is to ensure that progress on the liquidation of the SBIC through the wind down period is proceeding in an acceptable and beneficial manner in order to maximize repayment of outstanding SBA Leverage, Prioritized Payments and/or Profit Participation.

## The PS SBIC's Duties and Responsibilities in a Wind Down

For the duration of the wind down period the PS SBIC's management team is responsible for, but not limited to, the following activities:

a.    Reporting to SBA the financial condition of SBCs in the PS SBIC's Portfolio.

207

b. Reporting to SBA the PS SBIC's Disposition of Assets.

   c. Preparing (or obtaining) the PS SBIC's Financial Statements.

   d. Reporting and Remitting Asset Proceeds to SBA for Repayment of Outstanding Leverage.

   e. Ensuring that the PS SBIC complies with the Act, Regulations and its partnership agreement.

   f. Complying with the Wind Down Agreement.

**SBA's Servicing/Monitoring Requirements for a Wind Down**

The Financial Analyst will retain oversight and monitoring responsibility for the case until the termination of the Wind Down Agreement. Servicing and monitoring responsibilities include, but are not limited to, the following:

   a. Monitoring compliance with the Wind Down Plan and SBIC regulatory requirements.

   b. Monitoring the performance and compensation of the PS SBIC's management team.

   c. Reviewing the PS SBIC's financial statements, including their cash flow projections.

   d. Monitoring the financial condition of the SBCs in the PS SBIC's portfolio.

   e. Monitoring the PS SBIC's disposition of assets.

   f. Monitoring any legal action brought by or taken against PS SBIC.

Preparing fiscal year end reports, including estimated recovery reports of the PS SBIC's performance and how the PS SBIC is conforming the terms and conditions of the Wind Down Plan.

**Monitoring the Wind Down Agreement**

<u>Oversight and Status Meetings</u>. The Financial Analyst has responsibility for maintaining oversight of Wind Down activities. Such oversight includes, but is not limited to:

   (1) Communication. The Financial Analyst manages ongoing communication with all parties involved with the operation of the SBIC.

   (2) Interim reports. The Financial Analyst should obtain from the SBIC a report of any material developments from the SBIC. Such reports should be provided either monthly or quarterly, depending on the circumstances of the case.

208

(3) Status Meetings.  Every Wind Down case should be evaluated during a semiannual status meeting ("Status Meeting") at which time the Financial Analyst, Section Chief (when requested or as needed), and the SBIC principal(s) meet to determine whether the Wind Down Plan is on track and to review the operations of the PS SBIC.

(4) Prior to the Status Meeting, the PS SBIC must prepare a status meeting memorandum (the "Status Meeting Memo), as shown in appendix 18, which must be submitted to the Analyst at least 10 business days prior to the Status Meeting.

(5) Special Examinations.  If needed, the Analyst will be responsible for coordinating with the Office of SBIC Examinations a special examination of the PS SBIC, evaluating the examination report prepared by the Examiner, and reporting any substantive findings to DSL management and OGC.

(6) Third-Party Evaluation.  The Financial Analyst shall require that the PS SBIC retain, for SBA's benefit, the services of an SBA approved outside contractor to evaluate the PS SBIC's compliance with the Wind Down Plan and the PS SBIC management team's optimization of exit strategies. See Appendix 19 for those items to be included in the review. The initial review shall occur approximately 1 year after the Wind Down Letter Agreement has been signed. Thereafter, a determination shall be made, by the Analyst, in concurrence with the Analyst's Chief, as to whether further reviews are necessary. Waiver of the initial review must be approved by the Director, OL.

<u>SBA Records Maintenance.</u>  All case related materials produced during the Wind Down period should be maintained according to the manner recommended in this SOP.

<u>Authorization of SBIC Actions</u>.  For the duration of the Wind Down period, the SBIC is required to submit a written request to SBA for authorization for the below listed activities.  Upon receipt of such a request, it is the Analyst's responsibility to evaluate the request and to recommend a decision on the action based on the Rule of Two.  In a Wind Down the PS SBIC must obtain Agency approval for the following activities:

(1) Making Follow On Investments in portfolio companies.

(2) Borrowing funds or pledging Assets.

(3) Entering into any arrangement other than the immediate payment of Unfunded Commitments owed to the PS SBIC.

(4) Altering Management Fee expenses or accruals.

**Deferring a Decision to Wind Down a PS SBIC**

209

There may be cases for which deferring the Wind Down decision is appropriate. This may allow time for the portfolio to mature to a greater extent, as in the case of early stage or start-up investment portfolios or achieve specific milestones so the most appropriate decision can be reached. A memorandum recommending a deferral of a decision is subject to the Rule of Two.

A Wind Down decision may be deferred when ALL of the following terms are met:

a. The fund's remaining assets were predominately early stage or start-up investments at the time of the investment.

b. At least half of the remaining Impact Investments received significant funding within the last four years.

c. A sufficient number of viable Impact Investments remain.

d. The Impact Investments have either (1) reached positive cash flow, (2) project to be cash flow positive within 12 months, or (3) have sufficient cash to achieve profitability within a reasonable time. Exceptions can be made for investments in particular fields where cash flow is typically not positive prior to sale such as life sciences, health care, or a specialized technology (such as nanotechnology). In instances such as these, assessment should follow industry standards.

e. The PS SBIC's management team has proven demonstrated experience exiting and realizing profits from venture investments of a type present in this portfolio.

A Wind Down decision should be deferred long enough to allow the PS SBIC's portfolio time to mature or meet specified milestones but should not exceed 18 months. However, if a major event occurs that leads the Analyst to conclude either positively or negatively that a Wind Down should or should not be continued, there is no reason to wait until the conclusion of the deferral period.

### Monitoring a PS SBIC During the Deferral Period

During the deferral period, the PS SBIC is subject to the same monitoring requirements as a PS SBIC in an approved Wind Down, as set forth in this 3-1 c of this SOP.

### Conclusion of the Deferral Period

Upon conclusion of the deferral period, the PS SBIC must be able to meet the Wind Down eligibility requirements outlined in this SOP to be allowed to proceed in an approved Wind Down process.

### When a PS SBIC Does Not Meet the Wind Down Criteria

If the PS SBIC does not meet the Wind Down eligibility requirements and a secondary sale is not appropriate and a better choice, a referral for receivership should be prepared in the same manner as outlined in this SOP.

210

**When a PS SBIC Fails to Meet the Terms of the Wind Down**

If the Analyst determines that the PS SBIC is no longer meeting the terms of the Wind Down Agreement or that circumstances have changed such that the Wind Down is no longer advisable, SBA may immediately alter the liquidation course as a result of a change in circumstances or reach a different conclusion as to the advisability of continuing the Wind Down Plan.

The following remedies are available for a PS SBIC in such circumstances:

a. Restructure liquidation course. The liquidation course can be altered to address the changing circumstances, thus allowing the SBIC to continue in a Wind Down.

b. Consider if Secondary sale is a possibility and in the best interests of SBA. Note: it may not be in SBA's best interest to allow a secondary sale when it was not pursued earlier in the liquidation.

<u>Refer for Receivership</u>. If the liquidation course cannot be altered or if it is determined that a receivership is in the best interest of SBA, a referral for receivership should be prepared in the same manner as outlined in Section 5.7 of this SOP.

Chapter 6: Library of Forms, Instructions and Templates

Licensing Forms

<u>Optional Pre-Screen Form (Short Form 2181)</u>

Potential applicants to the program can use this optional template to help SBA assess your experience to help determine if a fund manager and investment strategy would be a good fit for the SBIC program.

<u>Management Assessment Questionnaire and Final Licensing Application (SBA Form 2181)- SBIC Program Application</u>

➢ Phase I – Green Light Phase. Applicants submit the Management Assessment Questionnaire (MAQ) and related exhibits and attachments. Application forms request qualitative and quantitative information on an applicant SBIC's management team, the proposed strategy for the SBIC, and the principals' investment track record(s).

➢ <u>Phase II – Fund Closing</u>. After applicants raise sufficient Private Capital, applicants submit an updated MAQ (newly signed, dated, and redlined against the original MAQ submitted in the Green Light Phase), along with a cover letter certification of no material adverse changes. The submission must also include a complete set of final draft legal documents for the fund (LPA, GP Operating agreement, etc.) redlined against the draft versions approved by SBA during the Green Light Phase as well as a Capital Certificate evidencing the applicant's Leverageable and Regulatory Capital subscribed.

211

<u>Model Limited Partnership Agreement (LPA) Version 3.0.</u>

Applicants formed as limited partnerships should use this LPA as the starting point for their limited partnership and submit to SBA during the Green Light Phase. Please note that Applicants must submit the final draft legal documents to SBA during the Fund Closing Phase and must be accompanied by a redline against the draft limited partnership agreement approved by SBA during the Green Light Phase.

Commitment Guaranty Template

## GUARANTY OF PAYMENT

This Guaranty of Payment (this "Guaranty") is entered into by the undersigned Guarantor(s) as of_____, 20[●].

Guarantor agrees as follows:

1. <u>Definitions</u>. When used in this Guaranty, capitalized terms have the meanings set forth in Exhibit A. In addition, the following terms have the following meanings:

    a. "Guarantor" means: _____

    b. "Partner" means: _____

    c. "Partner's Capital Commitment" means: $_____

    d. "SBIC" means: _____

2. <u>Relationship</u>. Guarantor is _____
                     *(Describe relationship to Limited Partner)*

3. <u>Guaranty of Payment of Obligation</u>. In order to induce the SBIC and SBA to treat the Partner's Unpaid Capital Commitment as "Regulatory Capital" as defined in 13 CFR § 107.50, Guarantor absolutely, unconditionally and irrevocably guarantees to the SBIC and its respective successors, indorsees, transferees and assigns, the prompt and complete payment when due of the Obligation. The obligations of Guarantor hereunder shall be the same as those that would exist if Guarantor were the Partner under the Partnership Agreement and other Partner Documents. Guarantor will pay the Obligation in full to the SBIC, without set-off or counterclaim, in lawful currency of the United States of America at the office of the SBIC as set forth in the Partnership Agreement. THIS IS A GUARANTY OF PAYMENT, NOT OF COLLECTION. THE SBIC MAY SEEK TO COLLECT PAYMENT OF THE OBLIGATION FROM GUARANTOR AS THOUGH THE OBLIGATION WERE THE DIRECT AND PRIMARY OBLIGATION OF GUARANTOR WITHOUT MAKING ANY DEMAND FOR PAYMENT OF THE OBLIGATION FROM THE PARTNER OR TAKING ANY OTHER ACTION TO COLLECT THE OBLIGATION.

213

4.   _Consent_. Guarantor hereby consents that, with the consent of SBA to the extent required by the SBIC Act or the Partnership Agreement (including the Partnership Agreement), the Obligation may, from time to time, in whole or in part, be renewed, extended, amended, modified, accelerated, compromised, waived, surrendered or  released by the SBIC, and any of the Partnership Documents may be amended, modified, supplemented or terminated, in whole or in part, and any collateral security or guaranty or right of offset at any time held by the Partnership for the payment of the Obligation may be sold, exchanged, waived, impaired, surrendered or released, all without the necessity of any reservation of rights against Guarantor and without notice to or further assent by Guarantor, who will remain bound  under  this Guaranty, notwithstanding any such renewal, extension, modification, acceleration, compromise, amendment, supplement, termination, sale, exchange, waiver, impairment, surrender or release. However, this Guaranty shall not be applicable to any increase in the amount of the Capital Commitment without the prior written consent of Guarantor. The SBIC shall not have any obligation to protect, secure, perfect or insure any collateral security document or property subject thereto at any time held as security for the Obligation or this Guaranty.   When making any demand under this Guaranty against Guarantor, the SBIC may, but shall be under no obligation to, make a similar demand on Partner or any other guarantor, and any failure by the SBIC to make any such demand or to collect any payments form Partner or any such other guarantor or any release of Partner or such other guarantor shall not relieve Guarantor of Guarantor's obligations or liabilities under this Guaranty, and shall not impair or affect the rights and remedies, express or implied, or as a matter of law, of the SBIC against Guarantor. For the purposes hereof, "demand" shall include the commencement and continuance of any legal proceedings.

5.   _Subrogation_. Notwithstanding any payment or payments made by Guarantor under this Guaranty or any set-off or application of funds of guarantor by the SBIC, Guarantor shall not be entitled to be subrogated to any of the rights of the SBIC against Partner or any collateral security or guaranty or right of offset held by the SBIC for the payment of the Obligation, nor shall Guarantor seek any reimbursement from the Partner in respect of payments made by the Guarantor under this Guaranty, until all amounts owing to the SBIC by Partner for or on account of the Obligation are paid in full. Any claim, set-off or recoupment against Partner and/or the SBIC to which Guarantor may become entitled shall be and hereby is made subordinate to the prior payment in full of all amounts owed to the SBIC by Partner, Guarantor will not seek to collect any such claim, set-off or recoupment, and any such amounts collected shall be held by Guarantor in trust for the SBIC and shall be paid over to the SBIC and credited against the amount owed to the SBIC by Partner.

6.   _Enforcement_.  No act of commission or omission of any kind or at any time upon the part of the SBIC or SBA in respect of any matter whatsoever shall in any way affect or impair the rights of the SBIC to enforce any right, power or benefit under this Guaranty.

7.   _Continuing Effect_. This Guaranty shall continue to be effective, or be reinstated, as the case may be, if at any time payment, or any part thereof, of the Obligation is rescinded or must  otherwise be restored or returned by the SBIC upon the insolvency, bankruptcy dissolution, liquidation or

reorganization of Partner, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee, custodian or similar officer for Partner or any substantial part of its property, or otherwise, all as though such payments had not been made.

8. <u>Notice</u>. Guarantor hereby waives notice of default of Partner under the Partnership Agreement, notice of acceptance of this Guaranty or reliance thereon, notice of the non-payment of the Partner's Capital Commitment, and any other notices to which Partner or Guarantor may be entitled and which may be legally waived.

9. <u>Representations of Guarantor</u>. Guarantor hereby represents and warrants to and covenants with the SBIC as follows:

    a. The Guaranty is binding and enforceable in accordance with its terms;

    b. The certifications as to the Guarantor's status as an Institutional Investor and other matters as set forth on Exhibit B attached hereto and incorporated herein are true and correct;

    c. Guarantor has read the Partnership Documents, including, but not limited to, the Partnership Agreement, and is aware of the rights of the SBIC and SBA to enforce payment by the SBIC of the Unpaid Capital Commitment and knows that this Guaranty gives the SBIC and SBA the right to require Guarantor to pay such amount to the SBIC as provided in the Partnership Agreement as if Guarantor were the Partner;

    d. Guarantor has no defense to any suit, action, or proceeding at law, or otherwise, that may be instituted on this Guaranty; and

    e. Guarantor's execution of this Guaranty will not result in a default under or conflict with any other agreement to which Guarantor is a party or any instrument, judgment, decree, code, statute, rule or regulation applicable to Guarantor.

10. <u>Delay</u>. No failure to exercise and no delay in exercising, on the part of the SBIC any right, power or privilege shall preclude any other or further exercise thereof, or the exercise of any other power or right. The rights and remedies herein provided are cumulative and not exclusive of any rights or remedies provided by law.

11. <u>SBA Provisions</u>.

    a. SBA shall be deemed an express third party beneficiary of the provisions of this Guaranty to the extent of the rights of SBA, its successors and/or assigns, as provided in the Partnership

Agreement, and SBA, its successors and assigns shall be entitled to enforce the provisions of this Guaranty for their respective benefit, as if each were a party hereto.

b.  No provision of this Guaranty may be waived, amended, supplemented or released except with the prior written consent of SBA.

c.  Notwithstanding anything to the contrary contained herein, this Guaranty shall not be construed so as to permit the SBIC to waive, release, forgive, terminate or discharge the obligation of the Partner to pay the Obligation to the SBIC without the consent of SBA as provided in the Partnership Agreement.

12.  <u>Associate Status</u>. Guarantor shall be an "Associate" (as defined in 13 CFR § 107.50)of the SBIC to the extent Partner is an "Associate" of the SBIC.

13.  <u>Consideration</u>. Guarantor acknowledges the adequacy, sufficiency and receipt of the consideration given for this Guaranty.

14.  <u>Defenses</u>. Guarantor hereby waives any and all defenses to the enforcement of this Guaranty based upon (a) the capacity or authority of Partner to execute, deliver or perform any of the Partnership Documents, (b) the due execution and delivery of any of the Partnership Documents by Partner, (c) lack of consideration, (d) duress or coercion, (e) release or discharge of any party primarily or secondarily liable for the Obligation, whether or not notice is given to Guarantor, (f) the preservation of rights by the partnership or SBA against any other persons, and (g) the bankruptcy, dissolution or liquidation of Partner.

15.  <u>Waiver, Amendment and Assignment</u>. No provision of this Guaranty shall be waived, amended, supplemented or released except by written instrument executed by Guarantor and the Partnership and with the consent of SBA as provided in Section 11.b. Guarantor may not assign this Guaranty or any obligations under this Guaranty except with the prior written consent of the Partnership and SBA.

16.  <u>Governing Law</u>. This Guaranty shall be governed by and be construed  and interpreted in accordance with federal law and the laws of the State of [*insert State*].

17.  <u>Subsequent Changes</u>.  Guarantor will give prompt notice to the Partnership and to SBA if any of the representations or warranties given by the Guarantor cease to be true.

18.  <u>Entire Agreement</u>. This Guaranty represents the entire understanding andincorporates all discussions and negotiations between Guarantor, the SBIC and Partner and supersedes all prior agreements with respect to the subject matter hereof.

IN WITNESS WHEREOF, the undersigned has caused this Guaranty to be duly executed and delivered as of the date first set forth above.

"Guarantor"

_____
(Print Name)

_____
(Signature)

_____
(Address)

_____
_____

## Exhibit A

## DEFINITIONS

"Institutional Investor" has the meaning set forth in the SBIC Act.

"Obligation" means the sum of (i) the Unpaid Capital Commitment, including, without limitation, any portion thereof called by the SBIC, and (ii) any amount which becomes due and payable by the Partner to the Partnership on account of the Partner's failure to pay all or any part of the Unpaid Capital Commitment when due, including, but not limited to, the payment of interest, costs of collection, and attorneys' fees. Obligation includes any renewal, extension, refunding, replacement or modification thereof.

"Partner Documents" means the Partnership Agreement, any subscription agreement or other agreements pertaining to the Partner's obligation to pay the Unpaid Capital Commitment to the SBIC.

"Partnership Agreement" means the agreement of limited partnership pursuant to which the SBIC is formed, including all exhibits, SBA Annexes and amendments thereto.

"Person" means a natural person or any other legal entity.

"SBA" means the United States Small Business Administration.

"SBA Annex" means such of SBA Annex, GDP, SBA Annex PS and/or SBA Annex OP which are attached to and form a part of the Partnership Agreement.

"SBIC Act" means the Small Business Administration Act of 1958, as amended, and the rules and regulations promulgated thereunder by SBA, as in effect from time to time.

"Unpaid Capital Commitment" means the amount of the Partner's Capital Commitment which has not been paid to the SBIC. Payment by a Note or other form of indebtedness shall not be considered to have been paid.

# Exhibit B

## GUARANTOR CERTIFICATE

Capitalized terms defined in the Guaranty of Payment to which this Certificate is attached shall have the same meaning in this Certificate.

1. <u>Institutional Investor</u>. Guarantor certifies, represents and warrants that Guarantor is an "Institutional Investor" as such term is defined in Title 13, Part 107, Section 107.50 of the Code of Federal Regulations, in that the Guarantor qualifies under one of the following categories *(please check all that apply)*:

*For Individual Institutional Investors*

The Investor is a permanent resident of the United States AND:

❑   (i) An individual who is an Accredited Investor (as defined in the U.S. Securities Act of 1933, as amended (15 U.S.C. §77a-77aa)) and whose commitment to the Partnership is backed by a letter of credit from a State or National bank acceptable to SBA.

❑   (ii) An individual whose personal net worth is at least Two Million Dollars ($2,000,000) and at least ten times the amount of his or her commitment to the Partnership. The individual's personal net worth must not include the value of any equity in his or her most valuable residence

❑   (iii) An individual whose personal net worth (determined in accordance with paragraph (B) of this definition) is at least Ten Million Dollars ($10,000,000).

*For Entity Institutional Investors*

The Investor is an entity with a net worth (excluding unfunded commitments from investors) of at least One Million Dollars ($1,000,000) ***AND***:

❑   (i) A state or national bank, trust company, savings bank, or savings and loan association.

❑   (ii) An insurance company.

❑   (iii) A 1940 Act Investment Company or Business Development Company (each as defined in the U.S. Investment Company Act of 1940, as amended (15 U.S.C. §8a-1 *et seq*.).

❑   (iv) A holding company of any entity described in paragraph (i), (ii) or (iii).

❑   (v) An employee benefit or pension plan established for the benefit of employees of the federal government, any state or political subdivision of a state, or any agency or instrumentality of such government unit.

❑   (vi) An employee benefit or pension plan (as defined in the U.S. Employee Retirement Income Security Act of 1974, as amended (Pub. L. 93-406, 88 Stat.

829) excluding plans established under section 401(k) of the Internal Revenue Code of 1986 (26 U.S.C. 401(k)), as amended).

☐   (vii) A trust, foundation, or endowment exempt from federal income taxation under the U.S. Internal Revenue Code of 1986, as amended.

☐   (viii) A corporation, partnership, or other entity with a net worth (exclusive of unfunded commitments from investors) of more than Ten Million Dollars ($10,000,000).

☐   (ix) A state, political subdivision of a state, or an agency or instrumentality of a state or its political subdivision.

☐   (x) An entity whose primary purpose is to manage and invest non-federal funds on behalf of at least three Institutional Investors described in paragraphs (i) through (ix) of this definition, each of whom must have at least a ten percent (10%) ownership interest in the entity.

2.   <u>Residency</u>. *Please check a or b as applicable.*

        a. Is a permanent resident of the United States.

        b. Is not a permanent resident of the United States, but hereby irrevocably appoints the following person as Guarantor's agent for service of process to enforce the obligation of Guarantor pursuant to the Guaranty:

        _____

3.   <u>Net Worth</u>. If the Guarantor has a net worth of less than $10 million, the Unpaid Capital Commitment of the Partner does not exceed 10% of Guarantor's net worth (which does not include the value of the equity in Guarantor's most valuable residence).

4.   <u>No Government Funds</u>. No part of Guarantor's funds used to satisfy the Guaranty will be obtained directly or indirectly from any Federal, State or local government, or an agency or instrumentality thereof, unless such funds are qualified non-private funds.

IN WITNESS WHEREOF, the undersigned has signed this Certificate as of the date set forth below.

Date: _____      _____
                                             (*Signature*)

Sample Green Light Approval Letter

DATE

Via e-mail: [Email address]

[Principal Contact]

[Applicant Name]
[Street Address]

[City/State/Zip]

Re:     Status of the Proposed SBIC License
        Application of[Applicant Name]

Dear [Principal Name]:

The U.S. Small Business Administration's ("SBA") Investment Division has received the subject applicant's Management Assessment Questionnaire (MAQ) and attendant request for a [Standard Debenture] [Accrual Debenture] [Accrual Debenture/Critical Technology Investment] [Non-Leveraged] SBIC license. Based upon the experience and qualifications of the management team, financial and regulatory history of current/prior funds, and the content of your Presentation on [DATE], we are pleased to report that this applicant has been determined to meet SBA's qualification standards and that the business plan and accompanying legal structure detailed in the MAQ submission is in compliance with SBIC program regulations.

A Total Intended Leverage Commitment of $xxx,xxx,xxx or 1.25x Regulatory Capital is conditionally approved by SBA at this time.

We therefore invite you to hold an initial closing of the applicant fund and file your finalized investor and legal documentation for final processing by SBA, also known as the Fund Close Stage, within 12 months from the date of this letter, which will be [DATE]. Leverage Commitment amount from SBA which will be either the dollar amount listed above if the fund achieves the stated target fund size of $xxx,xxx,xxx or 1.25x Regulatory Capital should the final Regulatory Capital of the applicant be less than the target. When filed and accepted, the license application will be processed according to the steps detailed below. Due to the high demand for SBIC licenses, the Office of Investment and Innovation has set the following criteria, all of which must be met in order for an applicant to proceed to the Fund Close Stage:

- **Legal Documentation:** Complete set of all final legal documents, including limited partnership agreement, limited partner's certificate of limited partnership, general partner operating agreement, investment advisory services agreement, general partner's certificate of incorporation/formation, opinions of counsel, and any proposed side letters or other agreements applicable to the proposed SBIC. These documents must be redlined against the draft versions originally approved by SBA during the Green Light process. All legal documentation must be submitted in a single filing at the Fund Closing; subsequent amendments (other than those required by SBA), or additional side letters/agreements will

not be accepted. Fund Closing is intended to be an abbreviated verification process, not a continuation of negotiation and drafting.

- **Capital:** An executed Capital Certificate representing both Regulatory and Leverageable Capital in sufficient amounts to fulfill both financial and legal requirements to the satisfaction of SBA. All subscribed limited partners are subject to SBA review and approval. SBA is conditionally approving the applicant for an intended Leverage Commitment of up to $[INSERT AMOUNT]; however, actual SBA Leverage availability will be limited to eligible Regulatory/Leverageable Capital represented on the applicant's Capital Certificate (but under no circumstances will it exceed the intended Leverage Commitment amount referenced in this letter).

- **Bank Letter:** The applicant must provide a bank letter certifying the requisite $2.5 million in Leverageable Capital, minus any SBA approved organizational expenses.

- **No Material Adverse Change:** The applicant must provide a signed certification of no material adverse changes to the qualifications of its management team; its business plan; or legal structure and documentation from what was originally Green Light approved by SBA. This shall be evidenced by a newly signed and dated version of the original MAQ with any changes redlined and summarized in an accompanying certification letter. A material adverse change in an applicant's profile may, in SBA's sole discretion, result in revocation of the previously approved Green Light. Failure to disclose a material adverse change will be deemed a willful filing of a false statement, disqualifying the applicant from further consideration as an SBIC licensee and potentially resulting in criminal prosecution and other penalties as outlined in the MAQ.

**Upon successful completion of the Fund Close process, the applicant will receive its official SBIC license and number, at which point you may initiate active investment operations and begin drawing SBA Leverage (if a Leveraged licensee).**

Please feel free to contact me directly at Jason.Powers@sba.gov if you have any general questions regarding the SBIC program. Thank you for your and the Applicant's interest in the SBIC program.

Sincerely,


Jason Powers Chief of Licensing

Office of Investment and Innovation


cc:     Bailey DeVries, Associate Administrator for Investment & Innovation

        Thomas Morris, Director of Patient Capital

        Art Spivey, Director, Licensing

        Paul Salgado, Director of Investment Portfolio Management

        Heath Morris, Director of Examinations

Jake Lewis, Acting Director of Liquidation

Erikka Robinson, Program Manager, Licensing

[Applicant Counsel]

Sample License Approval Letter

**Office of Investment and Innovation**
**409 3rd Street, SW-6th Fl**
**Washington, DC 20416**

License No.: [INSERT]

Via email: [Email Address]

[Name]

[Licensee Name]

[Address]

[City, State Zip]


Dear [Name]:


The Small Business Administration (SBA) has approved your company's license application to operate as a Small Business Investment Company (SBIC) under the provisions of Section 301(c) of the Small Business Investment Act of 1958, as amended, effective [Date]. SBA further confirms its Total Intended Leverage Commitment to the Licensee of $xxx,xxx,xxx or 1.25x Regulatory Capital in the event the ultimate fund size of the Licensee is lower than the target fund size of $xxxx,xxx,xxx submitted in the MAQ and Final License Application. The final value of SBA's Total Intended Leverage Commitment will be finalized 12 months from the date of this letter. Up until that time, you may continue to raise additional capital up to the hard cap specified in the Final License Application.

This approval does not constitute agreement by SBA with any specific elements of the Licensee's financial projections or assumptions. All financing and investing activities of the Licensee and all distributions shall be governed by SBA regulations.

We are pleased to have you in the SBIC Program. We hope that this association will be long and rewarding with the resultant benefits to the small business concerns throughout your area of operation.

Sincerely,


Bailey G. DeVries
Associate Administrator
Office of Investment and Innovation

Private Capital Forms

<u>SBA Form 2181, Exhibit F - Capital Certificate</u>

Certificate of Leverageable Capital and Regulatory Capital – Provides assurances an Applicant SBIC has met Regulatory and Leverageable Capital requirements. Licensed SBICs must have a current, updated, and signed Capital Certificate on file with SBA for SBA Leverage Commitments and Debenture Draw requests. This form must be updated whenever Regulatory and Leverageable Capital changes, including changes to limited partners, capital calls, and distributions that decrease Leverageable or Regulatory Capital.

<u>Request for Approval of Transfer Certificate</u>

Guidance for an SBIC to request SBA consent for the transfer of a limited partnership interest.

<u>SBA Form 468 - SBIC Financial Report</u>

Provides financial information at an SBIC's fund, portfolio company, and investment levels for SBA to monitor and examine SBICs from both a financial and regulatory perspective. There is a quarterly "short form" version and an annual "long form" version of the Form 468. Reinvestor SBICs are required to complete the Form 468 Reinvestor exhibit.

SBA Leverage Commitment Forms

Guidance for an SBIC to apply for or request SBA Leverage Commitment.

- <u>Instructions for Commitment Requests (Licensed after August 17, 2023)</u>
- <u>Instructions for Commitment Application (Licensed before August 17, 2023)</u>

Licensees should submit the following exhibit with its Commitment Application:

- <u>SBA Form 468 (if requiring update)</u>
- SBA Form 25 – Resolution of the Board of Directors or General Partner

Provides certain resolutions with Leverage Commitment. Licensees should select the SBA Form 25 based on its organizational structure as follows:

| SBIC Organizational Structure | SBA Form |
|---|---|
| Partnership Licensees with individual general partners | SBA Form 25 LLGP |
| Partnership Licensees with a corporate general partner | SBA Form 25 PCGP |
| Corporate Licensees | SBA Form 25 PC |

**SBA Form 652 – Assurance of Compliance for Nondiscrimination**
    Provides SBA assurances that an SBIC will not discriminate on the grounds of age, color, handicap, marital status, national origin, race, religion, or sex.

**SBA Form 2181 – Exhibit G, Transferor's Liability Contract**
    Provides SBA with certain assurances against an Impermissible Change of Control as a condition for SBA Commitment of Leverage.

**SBA Form 2181, Exhibit F Capital Certificate**
    Provides assurances an applicant SBIC has met Regulatory and Leverageable Capital requirements.

**SBA Form 1065 – Licensee's Assurance of Compliance for the Public Interest**
    Provides SBA assurances against an SBIC's use of SBA Leverage for purposes contrary to the public interest including, but not limited to, adverse influences on employment in any area, activities not consistent with free competitive enterprise, operations contributing to water, air, and solid waste pollution, and construction in designated flood hazard areas.

**SBA Form 1846 - Statement Regarding Lobbying for Loan Guarantees and Loan Issuance**
    Provides SBA assurances against an SBIC's use of SBA Leverage for lobbying purposes.

**SBA Form 27 – Opinions of Counsel**
    Provides model guidance of opinion of independent counsel for SBIC draw requests against SBA Leverage Commitment.  Licensee should use the form based on the type of Debenture, as follows:

| Type of Debenture | SBA Form |
|---|---|
| Standard Debenture | SBA Form 27B |
| Low and Moderate Income (LMI) Debenture | SBA Form 27C |
| Energy Saving Debenture | SBA Form 27F |

**SBA Form 34 – Bank Identification**
    Provides SBIC account information for the wire transfer disbursement of funds related to issuance of SBA-Guaranteed Debentures.

**Debit Authorization**
    Provides SBA with SBIC authorization to initiate Automated Clearinghouse (ACH) debits from designated accounts for purposes of scheduled, semiannual debenture payments.

**SBA Form 33 – Instructions for the Authorization to Disburse Proceeds**
    Provides SBICs with instructions when part or all of the proceeds of an SBA-Guaranteed Debenture funding are to be used to refund (refinance) one or more maturing Debentures.

SBA Leverage Draw Forms

<u>Memorandum of Instructions for SBIC Draw Request Against SBA's Leverage Commitment</u>
Guidance for an SBIC to submit a Draw Request against SBA's Leverage Commitment in connection with the SBIC's issuance of SBA-Guaranteed Debentures.

<u>SBA Form 468 – SBIC Financial Report</u>
Provides financial information on Licensee.

SBA Form 27 – Opinions of Counsel
Provides model guidance of opinion of independent counsel for SBIC draw requests against SBA Leverage Commitment based on the type of Leverage used.

<u>Form 27B</u> Standard Debenture Opinion of Counsel
<u>Form 27C</u> LMI Debenture Opinion of Counsel
<u>Form 27F</u> Energy Saving Debenture Opinion of Counsel

Leverage Security Instruments
Provides authorization by a principal of an SBIC to SBA and just-in-time funding partners for execution of Debenture.  Licensee should use the form based on the type of Debenture, as follows:

| Type of Leverage | SBA Form |
|---|---|
| Standard debenture | <u>Form 444C</u> Debenture Certification |
| LMI debenture | <u>Form 2163</u> 5-Year LMI Debenture Certification<br>or<br><u>Form 2162</u> 10-Year LMI Debenture Certification |
| Energy Saving debenture | <u>Form 2434</u> 5-Year Energy Saving Debenture Certification<br>or<br><u>Form 2433</u> 10-Year Energy Saving Debenture Certification |

SBA Leverage Pre-Payment Forms
<u>Instructions for Prepayment of SBIC Pooled Debentures</u>
Guidance for an SBIC to prepay (in-full) pooled debentures prior to maturity.

227

<u>Prepayment Notice Template</u>
> Excel Spreadsheet for enumerating debenture(s) to be prepaid by an SBIC.


SBIC Financing Forms
Financing forms required by all Licensees for each financing.
<u>SBA Form 1031 – Portfolio Financing Report</u>
> Submitted to SBA within 30 calendar days of the end of the quarter in which a Financing occurs. Provides SBA with certain information, per SBIC financing, for evaluating compliance of an SBIC's investment activities and for compiling statistics on the SBIC program as a provider of capital to small businesses. **SBA reserves the right to request Form 1031s be submitted by Licensees on a more frequent basis. Failure to comply with SBA's request for more frequent reporting can be considered grounds for revocation of license.**

<u>SBA Form 480 Size Status Declaration</u>
> Per §107.610, retained by Licensees and provided to SBA when examined or as requested. Provides SBA with determination that a business is eligible to receive financing or consulting and advisory services from an SBIC.

<u>SBA Form 652 – Assurance of Compliance for Nondiscrimination</u>
> Per §107.610, retained by Licensees and provided to SBA when examined or as requested. Provides SBA assurances that the portfolio concern will not discriminate on the grounds of age, color, handicap, marital status, national origin, race, religion, or sex.


Financing Forms Required for Specific Situations
<u>SBA Form 355 – Application for Small Business Size Determination</u>
> Used if Licensee needs a determination from SBA on whether a small business qualifies as a small business.   Provides SBA with information necessary for an SBIC to obtain a size determination from SBA.

<u>SBA Form 2428 – Financing Eligibility Statement for Usage of Energy Savings Debentures</u>
> Used if Licensee is using an Energy Saving Debenture and needs pre-financing determination of eligibility.  Provides SBA with necessary information to make determination.

<u>SBA Form 1926 – SBA Success Story</u>
> Provides SBA with voluntary information that may be included in a database of small businesses that have succeeded with SBA assistance, including from the SBIC program.

SBA Form 1941 – Financing Eligibility Statements (Only applies to Section 301(d) Licensees)
Provides SBA with information to determine eligibility for Section 301(d) Licensee Financings as follows:

| Qualifying Requirement | SBA Form |
|---|---|
| Qualifying as social disadvantage as member of a designated group. | SBA Form 1941A |
| Qualifying as social disadvantage but are NOT members of a designated group. | SBA Form 1941B |
| Qualifying as economic disadvantage | SBA Form 1941C |

SBIC Examination Forms

SBA Form 856 – Disclosure Statement
Provides SBIC Examiners with information from the management of a Licensee regarding certain obligations, transactions, and relationships. Specific form based on Leveraged Status as follows:

➤ Leveraged: SBA Form 856
➤ Non-Leveraged: SBA Form 856A

SBA Form 857 – Request for Information Concerning Portfolio Financing
Provides SBIC Examiners with voluntary representations from the management of small businesses receiving SBIC financing.

SBA Form 1405 – Ownership Confirmation
Provides SBIC Examiners with voluntary representations from an SBIC's investors. Specific form based on organizational structure as follows:

➤ Corporate: SBA Form 1405
➤ Partnership: SBA Form 1405A

U.S. Small Business Administration
Office of Inspector General

# Top Management and Performance Challenges Facing the Small Business Administration in Fiscal Year 2024



October 16, 2023

Report 24-01

# Contents

Message From the Inspector General ..................................................................................... iii

FY 2024 Challenges and Issues .............................................................................................. v

    Table 1: Top Management and Performance Challenges Facing SBA in FY 2024 ............... v

    Table 2: Color Code Definitions ....................................................................................... vi

Challenge 1: SBA's Economic Relief Programs Are Susceptible to Significant Fraud Risks and Vulnerabilities .......................................................................................................... 1

    Why This Is a Challenge ................................................................................................... 1

    Paycheck Protection Program ......................................................................................... 2

    Issue: Paycheck Protection Program Susceptible to Abuse and Fraud ............................ 3

    Remaining Challenges ..................................................................................................... 7

    Issue: Paycheck Protection Program Eligibility ............................................................... 7

    Issue: Paycheck Protection Program Data Reliability ...................................................... 9

    COVID-19 Economic Injury Disaster Loan ..................................................................... 11

    Issue: SBA Must Review COVID-19 EIDLs and Grants for Potential Fraud Identified in OIG Reports ....................................................................................................................... 12

    Issue: Unprecedented Increase in Servicing COVID-19 EIDLs ........................................ 16

Challenge 2: Eligibility Concerns in Small Business Contracting Programs Undermine the Reliability of Contracting Goal Achievements ................................................................. 19

    Why This Is a Challenge ................................................................................................. 19

    Issue: Agencies Receive Credit for Ineligible Firms or Those Not Participating in SBA's Contracting Programs .................................................................................................. 20

    Issue: Women-Owned Small Business Federal Certification Program Susceptible to Abuse ..................................................................................................................................... 23

Challenge 3: SBA Faces Significant Challenges in IT Investments, System Development, and Security Controls ........................................................................................................... 25

    Why This Is a Challenge ................................................................................................. 25

    Issue: SBA's IT Investment Controls Need Improvement ............................................... 25

    Issue: Existing System Development and Monitoring Controls Need to Reflect Changing IT Design Risks ................................................................................................................ 27

    Issue: Additional Progress Needed in IT Security Controls ............................................ 29

Challenge 4: SBA Risk Management and Oversight Practices Need Improvement to Ensure the Integrity of Loan Programs ...................................................................................... 30

    Why This Is a Challenge ................................................................................................. 30

    Issue: SBA's Oversight of High-Risk Lending Participants .............................................. 32

    Issue: Increased Risk Introduced by Loan Agents ......................................................... 32

    Issue: Increased Risk Introduced by Lender Service Providers ...................................... 33

**Challenge 5: SBA's Management and Monitoring of the 8(a) Business Development Program Needs Improvement** ...................................................................................**35**
   Why This Is a Challenge ........................................................................... 35
   Issue: SBA Continues to Address Its Ability to Develop Firms in the 8(a) Program and Measure Results ........................................................... 35

**Challenge 6: Identification of Improper Payments in SBA's 7(a) Loan Program Remains a Challenge** .......................................................................................................**38**
   Why This Is a Challenge ........................................................................... 38
   Issue: Improvements Needed to Ensure High-Risk 7(a) Loan Reviews Reduce the Risk of Losses ...................................................................... 38

**Challenge 7: SBA's Disaster Assistance Program Must Balance Competing Priorities to Deliver Prompt Assistance but Prevent Fraud** ...........................................................**40**
   Why This Is a Challenge ........................................................................... 40
   Issue: Reserve Staff Need Training to Sustain Productivity During Mobilization .............. 40
   Issue: Improper Payment Quality Assurance Process Needs Strengthening.................... 41

**Challenge 8: SBA Needs Robust Grants Management Oversight** .............................................**43**
   Why This Is a Challenge ........................................................................... 43
   Issue: SBA's Grants Management System Needs Improvement ....................................... 43
   Issue: Better Performance Measurements Needed to Monitor Grant Program Achievements ................................................................................... 45
   Issue: Comprehensive Oversight Plan with Strong Controls Will Help SBA Better Assess Risk, Distribute Payments, and Audit the Shuttered Venue Operators Grant and Restaurant Revitalization Fund ........................................................ 47
   Issue: Leveraging SBA's Workforce to Ensure Effective Administration of New and Significantly Expanded Grant Programs to Aid Small Businesses ......................... 49



# Message From the Inspector General

SBA's role in the nation's pandemic response was unprecedented and immense. Even before the pandemic, SBA faced major challenges in its internal control environments for large financial lending programs, information technology, and business development assistance programs. The strain on the agency's capacity to meet the needs of delivering more than $1.2 trillion in pandemic assistance to America's small businesses laid bare these challenges. SBA continues to be responsive to OIG's recommended corrective actions to promote efficiency and effectiveness in the programs and mitigate the eight challenges identified in this report.



Major consequences of internal controls that do not provide assurance of identity and eligibility include a loss of public trust, improper payments, and fraud. OIG's white paper *COVID-19 Pandemic EIDL and PPP Loan Fraud Landscape* estimated that SBA disbursed over $200 billion in potentially fraudulent COVID-19 Economic Injury Disaster Loans (EIDL), EIDL Targeted Advances, Supplemental Targeted Advances, and Paycheck Protection Loans (PPP) loans. Every fraudulent transaction also is an improper payment. With SBA's flagship contracting, capital, and counseling programs having identified challenges in mitigating improper payments and ensuring only eligible entities gain access to its programs, action to eliminate self-certification as a practice and strengthen internal controls is at the forefront of our recommended corrective actions.

OIG also shares SBA's concern in its capacity to service its EIDL portfolio. SBA is now servicing about 4 million outstanding disaster loans — 15 times the amount the agency was managing before the pandemic. SBA must be responsive to recipients of these loans and perform its due diligence to mitigate loss to the taxpayer.

SBA's pandemic response also offered an opportunity to learn new ways to meet America's small business owners in underserved areas. This principally involved SBA lending partners leveraging financial technology and SBA expanding the reach of its Supervised Lenders, which are Non-Federally Regulated Lenders. Technology must be integrated within programs in a manner that assures eligibility criteria are met, to include identity, and that robust verification and validation are inherent in the internal control framework. SBA must fully meet its lender oversight responsibilities to avoid missteps that occurred in its pandemic response.

The nation can depend on OIG to provide independent, objective, and timely oversight of SBA. We will focus our resources on systems and processes that present serious management and performance challenges within SBA programs with a goal of improving the integrity, accountability, and performance of those programs for the benefit of the American people.

Hannibal "Mike" Ware

SBA Inspector General

# FY 2024 Challenges and Issues

Identification of an issue as a top challenge does not necessarily denote significant deficiencies or lack of attention on SBA's part. Many of the top management challenges are longstanding, inherently difficult, and will likely continue to be challenges in the coming years. Addressing the challenges will require consistent attention from agency management and ongoing engagement with Congress, the public, and other stakeholders.

## Table 1: Top Management and Performance Challenges Facing SBA in FY 2024

| Challenge | Issue |
|---|---|
| **Challenge 1** <br> SBA's Economic Relief Programs Are Susceptible to Significant Fraud Risks and Vulnerabilities | Paycheck Protection Program Susceptible to Abuse and Fraud <br><br> Paycheck Protection Program Eligibility <br><br> Paycheck Protection Program Data Reliability <br><br> SBA Must Review COVID-19 EIDLs and Grants for Potential Fraud Identified in OIG Reports <br><br> Unprecedented Increase in Servicing COVID-19 EIDLs |
| **Challenge 2** <br> Eligibility Concerns in Small Business Contracting Programs Undermine the Reliability of Contracting Goal Achievements | Agencies Receive Credit for Ineligible Firms or Those Not Participating in SBA's Contracting Programs <br><br> Women-Owned Small Business Federal Certification Program Susceptible to Abuse |
| **Challenge 3** <br> SBA Faces Significant Challenges in IT Investments, System Development, and Security Controls | SBA's IT Investment Controls Need Improvement <br><br> Existing System Development and Monitoring Controls Need to Reflect Changing IT Design Risks <br><br> Additional Progress Needed in IT Security Controls |
| **Challenge 4** <br> SBA Risk Management and Oversight Practices Need Improvement to Ensure the Integrity of Loan Programs | SBA's Oversight of High-Risk Lending Participants <br><br> Increased Risk Introduced by Loan Agents <br><br> Increased Risk Introduced by Lender Service Providers |

| | |
|---|---|
| **Challenge 5**<br>SBA's Management and Monitoring of the 8(a) Business Development Program Needs Improvement | SBA Continues to Address Its Ability to Develop Firms in the 8(a) Program and Measure Results |
| **Challenge 6**<br>Identification of Improper Payments in SBA's 7(a) Loan Program Remains a Challenge | Improvements Needed to Ensure High-Risk 7(a) Loan Reviews Reduce the Risk of Losses |
| **Challenge 7**<br>SBA's Disaster Assistance Program Must Balance Competing Priorities to Deliver Prompt Assistance but Prevent Fraud | Reserve Staff Need Training to Sustain Productivity During Mobilization<br><br>Improper Payment Quality Assurance Process Needs Strengthening |
| **Challenge 8**<br>SBA Needs Robust Grants Management Oversight | SBA's Grants Management System Needs Improvement<br><br>Better Performance Measurements Needed to Monitor Grant Program Achievements<br><br>Comprehensive Oversight Plan with Strong Controls Will Help SBA Better Assess Risk, Distribute Payments, and Audit the Shuttered Venue Operators Grant and the Restaurant Revitalization Fund<br><br>Leveraging SBA's Workforce to Ensure Effective Administration of New and Significantly Expanded Grant Programs to Aid Small Businesses |

The management challenges report is an important tool to help the agency prioritize its work to improve program performance and enhance operations. OIG remains committed to protecting the interests of American taxpayers by promoting positive change within SBA and across government, ensuring taxpayer dollars are spent efficiently according to intent. I am confident SBA leaders are willing partners in ensuring their programs have integrity and meet the needs of the nation's small businesses.

# Table 2: Color Code Definitions

We use a color gauge as a visual indicator of the agency's progress in confronting the issues that make a particular function a top management challenge. The color gauge indicates whether the agency has made little, no, or significant progress on the issue to date.

| Color | Definition | Color Indicator |
|-------|-----------|-----------------|
| Green | Issue Resolved or Appropriately Reduced | |
| Yellow | Substantial Progress | |
| Orange | Moderate or Limited Progress | |
| Red | No Progress | |
| N/A | New, Not Rated | |
| N/A | Not Rated (extenuating circumstances) | |

# Challenge 1: SBA's Economic Relief Programs Are Susceptible to Significant Fraud Risks and Vulnerabilities

## Why This Is a Challenge

In the wake of the Coronavirus Disease 2019 (COVID-19) pandemic, action was needed to avert an economic crisis caused by lockdowns, business closures, and other economic impediments. More than 30 million small businesses in the United States were adversely affected by the economic crisis. In March 2020 the Coronavirus Aid, Relief, and Economic Security (CARES) Act was enacted, authorizing the U.S. Small Business Administration (SBA) to administer an unprecedented amount of funds through the Paycheck Protection Program (PPP) and COVID-19 Economic Injury Disaster Loan (EIDL) program. These funds were intended to help eligible small business owners and entrepreneurs adversely affected by the economic crisis.

Executive and legislative actions intended to expedite aid during the crisis led SBA to reduce or eliminate key internal controls that could have helped to mitigate fraud and misuse of taxpayer funds. The agency also relied on a mandated self-certification of eligibility for PPP loans to expedite aid. We have determined the agency has made progress in strengthening internal controls, but several issues remain open, which we highlight in this report, and should be considered for future economic relief programs like the PPP and COVID-19 EIDL.

Our PPP and EIDL investigative work has resulted in 1,090 indictments, 906 arrests, and 576 convictions as of August 31, 2023. The Office of Inspector General (OIG) has received more than 250,000 Hotline complaints since the start of SBA's pandemic relief programs. Additionally, OIG collaboration with SBA and the U.S. Secret Service has resulted in the seizure of more than $1 billion stolen from the EIDL program. OIG played a key role in assisting financial institutions in the return of another $8 billion to SBA's EIDL program. SBA has received over $20 billion in EIDL funds returned by borrowers prior to the deferment period ending. We are also aware of approximately $168 million in additional PPP seizures and funds that may have been returned. However, due to the informal, ad hoc nature of SBA's tracking, the full scope of PPP seized and returned funds is not presently known, as detailed in our management advisory *Serious Concerns Regarding the Return of Paycheck Protection Program Funds* (Report 23-08). To date, we have issued 12 reports related to the PPP program and 12 reports related to the COVID-19 EIDL program.

Since both programs have closed to new loans, the challenge has evolved from preventing fraud to bringing wrongdoers to justice and identifying and recovering funds that were misused or illegally obtained. Thanks to swift congressional action, the statute of limitations for COVID-19 EIDL and PPP

fraud was increased to 10 years. As SBA conducts automated and manual reviews of PPP loans regarding forgiveness and guaranty purchasing, it could still identify ineligible loans, work to recover funds, and refer potential fraud for investigation. Fraud can be identified in these loans at any stage, even after they have been forgiven. See Figure 1 for important stages of these programs that are ongoing through 2026 and beyond.

## Figure 1: Current and Ongoing Actions Relating to the PPP and COVID-19 EIDL



PPP borrowers can continue to apply for loan forgiveness for up to 5 years for loans issued after June 2020

SBA conducts automated and manual reviews of PPP loans

SBA ends collections on delinquent purchased PPP loans with an outstanding balance of ≤ 100,000. SBA ceases active collections and referring delinquent COVID-19 EIDLs ≤ $100,000 to Treasury

SBA purchases the guaranteed portion of PPP loans that have defaulted or are unpaid

SBA continues to service COVID-19 EIDLs

*Source*: OIG generated from SBA data

## Paycheck Protection Program

As a result of the pandemic's widespread economic effects on the U.S. economy, Congress approved legislation to create and fund SBA's PPP, which was gradually increased to $813.7 billion in 2021.

PPP loans were made through more than 5,400 private lenders and can be fully forgiven if proceeds were used in accordance with law. Often, the lenders had existing relationships with the borrowers. PPP loans were made through existing SBA lenders and non-traditional lenders, including online financial technology companies (fintechs), which did not have the same relationships with borrowers as traditional lenders.

The pandemic radically affected the agency tasked with economic assistance to America's small businesses. From FY 2000 to 2019, before the pandemic, SBA-guaranteed 7(a) lending amounted to about 1.2 million loans, totaling $333 billion. By the end of the PPP program, SBA had processed 11.8

million PPP loans, totaling $800 billion. In just over a year the agency handled more demand than in the previous 20 years combined. The unprecedented demand and stress on SBA systems were considerable challenges for the agency, and fraudsters took advantage.

## Issue: Paycheck Protection Program Susceptible to Abuse and Fraud



SBA's fraud risk management approach in 2020 for PPP loans was intentionally developed with more fraud risk controls at the loan forgiveness phase, the final phase, rather than at application. For funds disbursed on a fraudulent loan, the back-end controls established for the forgiveness stage may never be applied because it is unlikely that forgiveness will be sought. This has led to the current environment, where we and other law enforcement partners are chasing taxpayer funds that have already been stolen.

We explored this issue in detail in our *COVID-19 Pandemic EIDL and PPP Loan Fraud Landscape* (Report 23-09) white paper. We estimated that SBA disbursed $64 billion in potentially fraudulent PPP loans, which represents 8 percent of total disbursed funds.

Based on the various fraud schemes identified in our ongoing and adjudicated criminal investigations, we expanded rule-based analytics through link analysis — an investigative technique that identifies fraud clusters through shared data attributes. As a result, we identified multiple fraud indicators and schemes fraudsters used to steal from the American taxpayer and exploit programs meant to help those in need. The potential fraud estimates directly correlate to our investigative casework, adjudicated and ongoing criminal cases, and to schemes OIG and other oversight agencies are continuing to unravel and then prosecute. These indicators will continue to evolve as more data becomes available to us.

Indicators of potential PPP fraud include:

- Hold codes — loans flagged by SBA or third-party lenders that identified potential indicators of fraud.

- Internet Protocol (IP) addresses — loan applications submitted from a foreign country, so likely ineligible, or from an IP address that matches another application found to have a higher likelihood of fraud.

- Defaulted/no loan forgiveness — borrowers have not made any payments, are in default, or have not asked for loan forgiveness because they never intended to use the loan according to program requirements.

- Employer Identification Numbers (EIN) — borrowers who appeared to have established their business after the qualifying date; EINs that match those of other PPP loans.

- Hotline complaints — the loan was the subject of an OIG Hotline complaint with a high probability of fraud, such as a business misusing funds or identity theft.

- Suspicious email addresses — borrowers whose email addresses are from potentially temporary domains, have modifications such as dots, dashes, or pluses, or match those in other applications found to have a higher likelihood of fraud.

- Bank accounts — SBA lenders disbursed PPP loan funds to bank accounts matching other applications found to have a higher likelihood of fraud.

See Figure 2 for the total disbursed dollar value estimate of each PPP fraud indicator. The aggregate of each group total differs from the total potential fraud estimate because duplicates across groups may exist, while duplicates are removed from the total potential fraud estimate.

## Figure 2: Summary of Potentially Fraudulent PPP Loans by Fraud Indicator



Hold Codes
$17.1 billion

Internet Protocol (IP) Addresses
$16.4 billion

Defaulted/No Loan Forgiveness
$16.4 billion

EINs
$13.9 billion

Hotline Complaints
$4.2 billion

Suspicious Email Addresses
$683.2 million

Bank Accounts
$138.2 million

*Source*: OIG analysis of PPP data

We have several concerns from past audit work that falls under this issue, so we highlight here major concerns which are still being addressed by the agency.

## Returning Potentially Fraudulent Paycheck Protection Program Funds

In our management advisory *Serious Concerns Regarding the Return of Paycheck Protection Program Funds* (Report 23-08), we found SBA's guidance to borrowers and lenders on returning PPP funds was insufficient. SBA did not explain how funds could be returned after forgiveness was approved. Also, SBA did not have specific guidance for financial institutions that needed to return PPP funds. At the time, SBA was tracking return of PPP funds on an ad hoc basis using a spreadsheet. Due to the informal and ad hoc nature of SBA's tracking, the full scope of returned PPP funds is not presently known.

When an agency implements a process ad hoc, it means program managers have no set procedure, which could lead to financial loss. We made four suggestions related to SBA establishing clear and detailed guidance for borrowers, lenders, and financial institutions on how to return PPP funds and implementing a process to accurately handle and track the returned funds to mitigate the risk of financial loss.

## Duplicate Paycheck Protection Program Loans

Because SBA did not always have sufficient controls in place to detect and prevent duplicate PPP loans (see *Duplicate Loans Made Under the Paycheck Protection Program*, Report 21-09), OIG and other federal agencies have worked to track criminal fraud cases related to duplicate loans made to the same business. Based on our review of PPP loan data as of August 31, 2020, we found that lenders made more than one PPP disbursement to 4,260 borrowers, which totaled about $692 million and involved 8,731 loans. These disbursements were made during rounds 1 and 2 when only one PPP loan was permitted.

We made four recommendations to SBA to strengthen controls related to detecting and preventing duplicate loans to include ensuring duplicate PPP loans are not forgiven, taking action to recover improper payments, and ensuring appropriate controls are in place for future PPP type programs.

## Program Changes Expanded the Opportunity for Sole Proprietor and Independent Contractor Fraud

In our evaluation report *SBA's Paycheck Protection Program Loan Review Processes* (Report 22-09), we noted changes SBA made to expand access to the program for certain borrowers could have been exploited by unscrupulous applicants. In March 2021, SBA issued an interim final rule that allowed individuals who filed an Internal Revenue Service (IRS) Form 1040, Schedule C, to calculate their maximum loan amount using gross income rather than net income. This change led to a significant increase in the number of loans of $20,833 or less, the maximum allowable loan amount for a Schedule C business with no employees.

Based on our analysis of the PPP loan data, many of the Schedule C loans were made by lenders that relied exclusively on third-party loan processing or software platform vendors (i.e., loan service providers) they hired to complete loan processes. Data shows that 7 of the top 15 lenders made more than 2.4 million loans in 2021, or more than 18,000 loans per day, after having made fewer than 22,000 PPP loans combined in 2020. These seven lenders included fintech lenders, Community Development Financial Institutions, and small business lending companies. SBA Lenders should be providing oversight of their third-party vendors.

We believe that these lenders and their reliance on third-party vendors could present SBA with several challenges moving forward, including access to loan documents. Within the context of the PPP eligibility

and forgiveness process, we believe it is important for SBA to focus targeted efforts on these types of loans and review appropriate documentation to ensure these smaller loans were made to eligible businesses and minimize the losses associated with forgiveness of fraudulent loans.

## Managing the Oversight of Potentially Fraudulent Paycheck Protection Program Loans

We found SBA did not have an organizational structure with clearly defined roles, responsibilities, and processes to manage and handle potentially fraudulent PPP loans in our inspection *SBA's Handling of Potentially Fraudulent Paycheck Protection Program Loans* (Report 22-13). The agency did not establish a centralized entity to design, lead, and manage fraud risk because it did not establish a sufficient fraud risk framework. This was partly due to the speed in which SBA was required to launch the PPP, which was 15 days after enactment of the CARES Act, and the continuous and rapid discovery of different kinds of fraud schemes.

In addition, lenders were not always clear on how to handle PPP fraud or recover fraudulently obtained funds that remained in the borrower's account. SBA did not provide lenders sufficient and specific guidance to effectively handle potentially fraudulent PPP loans. To better mitigate fraud, we made two recommendations for SBA to establish clearly defined and detailed roles, responsibilities, and processes and provide lenders formal guidance for managing and handling potentially fraudulent loans.

## Agency Progress

SBA has made substantial progress in reducing fraud risk moving forward, including:

- Establishing a Fraud Risk Management Board in 2022;
- Developing a webpage dedicated to preventing fraud and identity theft, which includes a section titled "Lenders and Fraud Response";
- Developing aggregate review processes to identify different fraud scenarios;
- Developing and implementing a Master Review Plan that established guidelines for loan and forgiveness reviews;
- Increasing antifraud controls for loans originating in 2021, including checking application data against Treasury's Do Not Pay database before loans were approved;
- Developing and implementing SBA and contractor fraud risk management policy and framework;
- Increasing post-disbursement antifraud controls for loans that originated in 2020;
- Commencing manual loan and forgiveness reviews;

- Engaging a contractor with expertise in detection and identification of potential fraud;
- Using a contractor's automated review tool and the SBA Paycheck Protection Platform to analyze loans for fraud and eligibility;
- Implementing machine learning functionality to focus on areas of higher risk;
- Providing outreach and training;
- Implementing processes to refer potential fraud to SBA OIG;
- Developing a plan for recovering PPP funds; and
- Developing and implementing controls to enhance the loan review process, specifically for loans with a no further action decision made by contractors.

## Remaining Challenges

Although SBA has made substantial progress in this area, the need to establish and use a clearly defined and comprehensive approach for managing and handling potentially fraudulent PPP loans, to include sufficient guidance when implementing similar future programs, remains an ongoing challenge.

SBA's plans and actions to reduce fraud risks and prevent further losses will determine how this challenge will continue to be rated in the future. Our investigations into suspected fraud and suspicious activities continue. We have ongoing or planned audit work on PPP loan eligibility, loan forgiveness, guaranty purchase, and lender activities to determine the effectiveness of agency implemented controls. We will continue to monitor agency actions to assess and reduce fraud risk and address vulnerabilities in the PPP. Strong internal controls will help reduce fraud risk and enhance program integrity for the PPP and similar programs enacted in the future.

## Issue: Paycheck Protection Program Eligibility



PPP funds could still be returned to Treasury as loan forgiveness reviews continue. SBA's PPP risk management approach was intentionally developed with eligibility controls at the loan forgiveness phase, the final phase, rather than at application.

OIG reviews have found deficiencies with internal controls related to eligibility of borrowers. Our review of SBA's implementation of the PPP identified thousands of loans provided to potentially ineligible borrowers. SBA lenders also inappropriately approved loans for businesses that exceeded maximum loan amounts for the number of employees and exceeded the maximum size allowed. Also, SBA lenders approved loans for nonprofit organizations that did not meet SBA's eligibility requirement for size standards.

We have several concerns from past audit work that falls under this issue, so we are highlighting here major concerns which are still being addressed by the agency.

## Businesses Exceeding Maximum Loan Amounts

In our *Inspection of SBA's Implementation of the Paycheck Protection Program* (Report 21-07), we found tens of thousands of approved and disbursed loans were made to borrowers for amounts that exceeded the loan maximum based on the number of employees and compensation rates, as defined in the CARES Act. The CARES Act states that the maximum loan amount is generally obtained by multiplying the average total monthly payments by the applicant for payroll costs incurred during the 1-year period before the date on which the loan is made times 2.5, plus any outstanding amounts of Economic Injury Disaster Loans made beginning January 31, 2020. We made six recommendations to improve SBA's program and reduce the risk of financial loss from PPP loans made to ineligible or fraudulent borrowers.

## Businesses that Exceeded Maximum Size Standards

In Report 21-07, we also identified hundreds of businesses that exceeded the maximum size standard and may have been erroneously approved for PPP loans. These businesses exceeded both 500 employees and the applicable employee-based size standard for the business industry. Under the CARES Act, an eligible business cannot exceed the greater of 500 employees or the SBA size standard for number of employees in the industry, if applicable.

## Eligibility for Nonprofit Organizations

In our inspection report *Paycheck Protection Program Eligibility for Nonprofit Organizations* (Report 22-21), we identified 179 PPP loans, totaling approximately $684 million, made to potentially ineligible nonprofits that may have exceeded SBA's requirements for business size at the time of application.

We also reviewed PPP loans for three large nonprofits. We determined that two of the three large nonprofits met the eligibility requirements and one of the large nonprofits did not meet the eligibility requirements. We recommended SBA review the 179 PPP loans to ensure eligibility requirements were met and seek remedy or repayment for all loans deemed ineligible.

## Borrowers with Treasury's Do Not Pay Data Matches

In our management alert *Paycheck Protection Program Loan Recipients on the Department of Treasury's Do Not Pay List* (Report 21-06), we found SBA did not use Treasury's Do Not Pay system data to screen borrowers for eligibility before approving PPP round one loans. Following OIG oversight and communication with the agency, SBA started checking loan applicants against Treasury's Do Not Pay database. The U.S. Department of the Treasury's Do Not Pay system is the designated source of centralized data and analytics services to help agencies verify eligibility. The Payment Integrity

Information Act of 2019 requires agencies to establish pre-award procedures to determine eligibility and prevent improper payments before the release of any federal funds. The law further specifies the use of Do Not Pay data sources as a control to determine program or award eligibility.

## Agency Progress

SBA has initiated several corrective actions to enhance and develop additional controls to address loan reviews, loan forgiveness, and fraud, including:

- Developing the Master Review Plan, establishing guidelines for loan and forgiveness reviews;
- Implementing SBA and contractor fraud risk management policy and framework;
- Developing machine learning models to focus on areas of higher risk;
- Implementing automated screening to detect potentially ineligible loans;
- Developing a plan for recovering PPP funds; and
- Continuing manual reviews of loans flagged for potential eligibility issues.

The fraud control framework also includes a variety of antifraud controls in place designed to detect and mitigate possible instances of eligibility fraud. These controls include approved lender lists, verification with the Treasury Do Not Pay database, and compliance checks.

SBA also integrated affiliation data, which shows business affiliation through ownership and maximum number of employees, as well as maximum loan amount. SBA instituted an affiliation worksheet for PPP loan and forgiveness reviews. Swift management action to identify and review potentially ineligible loans could prevent improper payments to lenders because the associated loan forgiveness may still be in process.

As we complete current reviews and conduct future audit work, SBA's plans and actions to reduce and prevent improper payments in addition to SBA's corrective actions to address OIG recommendations will determine how we will rate this challenge in the future.

## Issue: Paycheck Protection Program Data Reliability



OIG's flash report *SBA's Implementation of the Paycheck Protection Program Requirements* (Report 20-14) found the data SBA reported and the loan-level PPP data was inaccurate and incomplete. Without accurate and complete data, SBA cannot reliably and accurately inform SBA management and Congress about program effectiveness and measures needed to inform program decisions.

## Underserved Market Data Was Incomplete

At the beginning of the PPP program, our flash report found that SBA's demographic information for underserved markets for PPP borrowers was incomplete. SBA's borrower application for PPP did not include standard SBA fields to request demographic information. One week after we issued our flash report, SBA issued the initial PPP loan forgiveness application, which included an optional page for borrower demographic information. We believe sufficient data still may not be collected.

Some borrowers may not apply for loan forgiveness while others may choose not to complete the optional page. Although ethnic demographic information is optional for SBA's traditional loan programs and the PPP, SBA generally requests the demographic information as a section on a mandatory form. Borrowers have the option to decline to provide the information.

## North American Industry Classification System Data Was Incomplete

In our *Inspection of SBA's Implementation of the Paycheck Protection Program* (Report 21-07), we found SBA's loan-level data on PPP NAICS codes was incomplete. SBA did not require the borrower to provide the industry classification code on the application, so lenders did not have the information to put in the loan processing platform. As of June 30, 2020, there were 222,096 loans, totaling approximately $9.9 billion, identified as unclassified establishments because there was no industry classification data on the application.

## Job Statistics Were Inaccurate and Incomplete

Also in Report 21-07, we found SBA's loan-level data for job statistics was inaccurate and incomplete. We found that 191,003 loans approved in 2020, totaling about $11 billion, did not include employment information in the required job field for the number of current employees. SBA officials said because of a backlog of loan applications before the beginning of the second round of PPP funding, lenders were allowed to submit loan applications in bulk. The officials said they turned off system controls to allow for faster approval. Of the 191,003 applications that did not have data for the number of current employees, 83,374 were approved during the first week of the second round of funding. Because SBA removed the internal control to check data for the number of current employees, these loans, totaling about $4 billion, were not validated before approval and issuance of loan numbers to PPP lenders.

## Agency Progress

SBA implemented additional controls to ensure the integrity of the key data fields noted above, including:

- Adding mandatory fields in borrower and lender application processes;

- Updating controls to ensure data accuracy of lender-reported data;

- Instituting a procedure for lenders and borrowers to correct publicly available PPP loan data provided to SBA by delegated PPP lenders; and

- Launching a new data reporting webpage for public and SBA stakeholders with links to several public SBA reports and datasets.

We have an ongoing audit reviewing PPP loan eligibility, loan forgiveness, and guaranty purchase. We will continue to assess the reliability of PPP loan data and monitor the agency's efforts to ensure data reliability.

## COVID-19 Economic Injury Disaster Loan

As a result of the pandemic's widespread economic effects on the U.S. economy, Congress approved legislation that increased funding to SBA's disaster assistance program, providing $470 billion in funding to the Economic Injury Disaster Loan (EIDL) program and $20 billion for emergency grants for eligible entities, which was then increased to $35 billion in 2021.

This program was different from the PPP in that a COVID-19 EIDL was a direct loan from the government, requiring collateral or personal guarantees from borrowers depending on the amount of the loan. SBA relied initially on a quick online application and self-certification of eligibility. Later, once authorized by Congress to do so, the agency required Internal Revenue Service (IRS) tax transcripts to confirm business income and expenses.

The COVID-19 EIDL represented a significant increase over all disaster loan funding disbursed in the agency's 70-year history. Since the agency's inception in 1953, SBA has approved 2.2 million disaster assistance loans, totaling $66.7 billion. From March 2020 to the end of the program in May 2022, so in a little over 2 years, SBA approved approximately 4 million COVID-19 EIDLs totaling $387 billion.

Like the PPP, the significant increase in demand for disaster funding and the stress on SBA systems created considerable challenges. Again, fraudsters took advantage of the crisis and weak internal controls in SBA's programs. The magnitude of fraud in this program will become more apparent as delinquent loans are liquidated and charged-off and investigations are adjudicated.

# Issue: SBA Must Review COVID-19 EIDLs and Grants for Potential Fraud Identified in OIG Reports

 Because the COVID-19 EIDL program has closed, the issue has evolved from preventing fraud in the program to identifying and remedying fraud that has already occurred. In our white paper *COVID-19 Pandemic EIDL and PPP Loan Fraud Landscape* (Report 23-09), we estimated SBA disbursed over $136 billion in potentially fraudulent COVID-19 EIDLs, which represents 33 percent of total disbursed funds.

As described above in the PPP section of this report, we identified multiple fraud indicators and schemes used by fraudsters to steal from the American taxpayer and exploit programs meant to help those in need. The potential fraud estimates directly correlate to our investigative casework, adjudicated and ongoing criminal cases, and to schemes OIG and other oversight agencies are continuing to unravel and then prosecute. These indicators will continue to evolve as more data becomes available to us.

Indicators of potential COVID-19 EIDL fraud include:

- Internet Protocol (IP) addresses — loan applications submitted from a foreign country, so likely ineligible, or from an IP address that matches another application, indicating possible duplication of loan requests.

- Hold codes — loans flagged by SBA or a third party that identified potential indicators of fraud.

- Bank accounts — SBA disbursed funds for multiple loans to the same bank account; borrowers who changed their bank account information during the application process, or those whose bank account matches other applications.

- Employer Identification Numbers (EIN) — borrowers who appeared to have established their business after the qualifying date, EINs matching those of other COVID-19 EIDLs, and borrowers with an EIN that is improperly formatted or begins with an invalid prefix, masking a nonexistent or ineligible business.

- Sole proprietors/independent contractors without an EIN — borrowers who claim to employ more than one person but did not use an EIN in their application. The IRS requires all businesses that employ more than one person to register for an EIN.

- Hotline complaints — the loan was the subject of an OIG Hotline complaint.

- Suspicious phone numbers — borrowers whose phone numbers match those in other applications.

- COVID-19 EIDL Targeted Advances — applicants who received advances SBA identified as potentially fraudulent.

- Suspicious physical addresses — borrowers whose addresses match other applications found to have a higher likelihood of fraud.

- Suspicious email addresses — borrowers whose email addresses are from potentially temporary domains, have modifications or match those in other applications.

See Figure 3 for the total disbursed dollar value estimate of each COVID-19 EIDL fraud indicator. The aggregate of each group total differs from the total potential fraud estimate because duplicates across groups may exist, while duplicates are removed from the total potential fraud estimate.

## Figure 3: Summary of Potentially Fraudulent COVID-19 EIDLs by Fraud Indicator



*Source:* OIG analysis of COVID-19 EIDL data

We have several concerns from past audit work that falls under this issue, so we are highlighting here major concerns which have not yet been addressed by the agency. Although the loans and grants we have cited may overlap with each other, the total potential fraud estimate presented in our fraud landscape white paper removed duplicate loans. Per our estimate, there are over $136 billion in COVID-19 EIDLs and grants that require further investigation.

## Ending Collections

In our management advisory *Ending Active Collections on Delinquent COVID-19 Economic Injury Disaster Loans* (Report 23-16), we reported that in April 2022, SBA decided to cease some active collection activities, such as foreclosure on property collateral and wage garnishment, on all delinquent COVID-19

EIDLs with an outstanding balance of $100,000 or less. While SBA indicated it will not end collection efforts on any amount that appears to be, or has been, reported as fraudulent, false, or misrepresented, these loans only represent $11.2 billion of the $70.9 billion COVID-19 EIDLs that are $100,000 or less.

As indicated in our fraud landscape white paper, $136 billion COVID-19 EIDLs were determined to be potentially fraudulent. Of this amount, $25.9 billion were for loans valued at $100,000 or less. We estimate that SBA will cease active collection activities on $14.7 billion potentially fraudulent COVID-19 EIDLs valued at $100,000 or less, which could violate the federal law that prohibits agencies from ending collections on fraudulent, false, or misrepresented claims.

## Foreign IP Applications

Our evaluation report *COVID-19 Economic Injury Disaster Loan Applications Submitted From Foreign IP Addresses* (Report 22-17) found that SBA approved and disbursed 41,638 potentially fraudulent COVID-19 EIDLs, advances, and grants totaling $1.3 billion that were submitted from foreign IP addresses.

Although applicants that reside overseas may qualify for this assistance, transnational crime entities in foreign countries have fraudulently obtained funding from this and other U.S. programs in the past. The numerous applications submitted from foreign IP addresses are an indication of potential fraud that could involve international criminal organizations. OIG has ongoing investigations into international organized crime operations that applied for and stole pandemic relief funds.

We recommended the agency review the loans in our test sample and the $1.3 billion disbursed to applicants from foreign IP addresses. We also recommended SBA recover any disbursed loans and advances determined to be ineligible or fraudulent. Additionally, we recommended that the agency examine controls related to foreign IP addresses and ensure these controls are more effective in future disaster processing systems.

## Treasury's Do Not Pay List

Our management advisory *COVID-19 EIDL Program Recipients on the Department of Treasury's Do Not Pay List* (Report 22-06) identified over $3.1 billion in EIDLs and over $550 million in emergency EIDL grants to potentially ineligible applicants in the Department of Treasury's Do Not Pay database. OIG has launched numerous investigations into the suspect loans identified in this report.

We made three recommendations for SBA to use the Do Not Pay system to prevent improper payments, including for SBA to use the batch match or continuous monitoring functions available in Treasury's Do Not Pay portal to identify potentially ineligible applicants. We are currently assessing whether SBA effectively implemented controls, utilizing the Treasury Do Not Pay databases to ensure only eligible recipients received COVID-19 EIDLs and grants.

## Fraudulent Advances and Grants

Our inspection of *SBA's Emergency EIDL Grants to Sole Proprietors and Independent Contractors* (Report 22-01) found SBA provided $4.5 billion more in advances and grants than the applicants were entitled to receive. Eligible applicants were entitled to receive $1,000 per employee up to the CARES Act mandated maximum amount of $10,000. The report identified 542,897 sole proprietors and 161,197 independent contractors who received a grant of more than $1,000 but did not have an Employer Identification Number (EIN). The absence of a provided EIN may indicate the applicants should have claimed no employees. We recommended SBA remedy $4.5 billion in funds disbursed in excess of its statutory allowance to sole proprietors and independent contractors.

## Control Weaknesses

Since the start of the pandemic, we have identified potential fraud resulting from serious control weaknesses in the system SBA used to process COVID-19 EIDL and grants. Our *Inspection of SBA's Initial Disaster Assistance Response to the Coronavirus Pandemic* (Report 21-02) identified $78.1 billion in potentially fraudulent loans and grants to borrowers who changed their bank account from the original account listed on the loan application prior to disbursement; borrowers who used the same IP address, email address, bank account, or physical address; and potentially ineligible businesses. We made 10 recommendations to SBA to strengthen its controls to lower fraud risk and recover funds from ineligible businesses. Of those, seven recommendations have been closed.

Our *Follow-up Inspection of SBA's Internal Controls to Prevent COVID-19 EIDLs to Ineligible Applicants* (Report 22-22) found that SBA did not implement the IRS tax transcript requirement in a timely manner, potentially disbursing COVID-19 EIDLs to ineligible entities. In the 4 months after Congress removed the tax return prohibition, SBA disbursed $92 million to businesses with suspect tax ID numbers. Also, SBA approved and disbursed 20 loans totaling $1.9 million to businesses that did not exist on or before January 31, 2020, had an unknown start date, or had other red flags, including change of registered agent shortly before the application date, evidence of falsified documents, or evidence that the applicant did not own the business. Ten of these loans were flagged by SBA for suspected fraud. We recommended SBA recover funds disbursed to ineligible applicants identified in our sample and review the remaining COVID-19 EIDL disbursements with suspect tax ID numbers to determine if the business applicant was legitimate.

## Agency Progress

SBA made some progress in addressing this issue, implementing new controls in the EIDL program in 2021, such as:

- Reviewing correspondence and making loan referrals to OIG in response to identity theft complaints;

- Validating business addresses with the U.S. Postal Service and location indicators; and

- Implementing multi-factor authentication and automated reviews, such as checking Treasury's Do Not Pay database.

In addition, the fraud review team within the SBA Office of Performance, Planning, and the Chief Financial Officer collaborated with the Office of Capital Access on a data analytics project to help identify COVID-19 EIDLs that may be associated with identity theft or fraud. The results of this project are being used by the fraud review team to research suspected cases of identity theft and fraud.

According to SBA, if it is determined that a file should be flagged for suspected fraud or identity theft, an agency hold is added to the processing system. Holds are added to an application at any stage. They alert staff that special attention is required and that it should be reviewed. SBA is still reviewing loans that have been on hold for review to make a fraud determination. The agency hold review system allowed staff to review and recategorize or refer agency holds to the disaster fraud review team.

SBA has made progress in identifying and reviewing fraud and agency holds, but the sheer volume of potential fraudulent loans and grants discovered in OIG reports will be a continuing challenge for the agency. The deferment period ended for some COVID-19 EIDLs in October 2022, and borrowers were expected to begin making payments on these loans. As of October 2023, approximately 20 percent of active performing loans, totaling $77 billion, are past due, delinquent, or in liquidation. SBA anticipates the majority of these loans will require liquidation and charge-off. Another $47.7 billion in COVID-19 EIDLs has already been charged-off. We discuss this issue to a greater extent in this report. OIG's ongoing reviews will continue to assess SBA's progress in addressing potential fraud in the COVID-19 EIDL program.

## Issue: Unprecedented Increase in Servicing COVID-19 EIDLs



Before the COVID-19 pandemic, SBA was servicing about 263,000 outstanding disaster loans, totaling approximately $9 billion, across the three servicing centers. SBA maintains two Disaster Loan Servicing Centers, one in Birmingham, Alabama and the other in El Paso, Texas, to service disaster loans that have been approved and fully disbursed. The two centers manage the portfolio and provide customer service, including accepting and processing loan payments, making routine collection efforts by phone, email, and postal letters, and handling any loan-related issues, such as insurance, title, or lien matters.

After a disaster loan becomes 90 days delinquent, it is transferred to a third center known as the National Disaster Loan Resolution Center in Santa Ana, California. The loan resolution center manages the portfolio of defaulted disaster loans with increased collection efforts, including foreclosure when necessary.

The center also handles other loan servicing activities, such as processing loan payments. When disaster loans are deemed ultimately uncollectable and charged-off, or removed from the agency's loan portfolio, the borrowers and guarantors are referred to the Treasury Department.

Treasury has the authority to take stronger efforts to collect, including offset of other federal payments. In this context, offset means diverting federal payments to satisfy the delinquent loan.

As a result of the unprecedented number of pandemic relief loans, SBA is now servicing about 3.7 million outstanding disaster loans — 15 times what the agency was doing before the pandemic. A total of 30 months of payment deferment was instituted for all COVID EIDLs. The end of this deferment period began in October 2022. Because the COVID-19 EIDLs were approved with repayment terms of 30 years, the expected servicing duration of this portfolio is long term.

SBA indicated there were over 764,000 COVID-19 EIDLs, totaling $77 billion, that are either past due, delinquent, or in liquidation as of October 2023. In addition, $47.7 billion in COVID-19 EIDLs have been charged-off. We have not yet validated this data.

## Agency Progress

SBA officials have made some progress to service a historic number of outstanding loans, such as:

- Establishing the standalone COVID-19 EIDL Servicing Center in Fort Worth, Texas, which became fully functional in the first quarter of FY 2023 with 500 employees handling the first loans that entered repayment status. Hiring continued at an intentionally measured pace as more loans reentered repayment status. By the first quarter of FY 2024, 1,841 employees were servicing over 3.7 million loans with a total value of $349 billion. Recently, SBA stated it is servicing more than 90 percent of the COVID-19 EIDL portfolio after deferments were ended.

- Establishing a dedicated phone number (1-833-853-5638) and general email address inbox (covideidlserviciing@sba.gov). Loan servicers use an internal tracking system with controls to administer and monitor servicing in a timely manner.

- Transitioning to a borrower portal, MySBA Loan Portal, active as of the second quarter of 2023, that allows all SBA borrowers to access their loan details, obtain billing notices, and make payments and includes a link for submitting suspected identity theft claims. The loan

portal is automated to mail letters, send emails, and call past-due borrowers at regular intervals.

- Enabling a pay-by-phone capability in the third quarter of 2023.

- Issuing Policy Notice 5000-840468, COVID-19 EIDL Servicing and Liquidation, effective December 2022, giving specific requirements on collecting documentation and deciding on different servicing requests.

- Implementing a new hardship accommodation process in November 2022, which allows COVID-19 EIDL borrowers to obtain 6 months of reduced payments, which remains available in FY 2023.

This issue remains a significant challenge for SBA because it is still unclear if the agency will be able to service and collect its entire COVID-19 EIDL portfolio.

# Challenge 2: Eligibility Concerns in Small Business Contracting Programs Undermine the Reliability of Contracting Goal Achievements

## Why This Is a Challenge

The government-wide goal of the Small Business Act is to ensure that 23 percent of all prime contracts are awarded to small businesses each fiscal year. Since FY 2013, SBA has reported in its annual Small Business Procurement Scorecard that the federal government has met or exceeded that goal. This year, SBA announced the federal government exceeded the FY 2022 goal, awarding 26 percent of prime contracts to small businesses. Though the overall percentage awarded decreased from FY 2021 goaling achievements, the contracts awarded to small businesses in FY 2022 totaled $162.9 billion, an $8.7 billion increase from the previous fiscal year. SBA reported the federal government earned an "A" on this year's government-wide scorecard.

SBA's achievement reports do not portray federal contracting dollars ultimately earned by small businesses, and this reduces the ability of Congress and other federal policymakers to determine whether the government is maximizing contracting opportunities for small businesses.

This risk is revealed in OIG audits on how federal agencies award contracts to small firms with provisions or other contract language that allows larger companies to do most of the work. Although the agencies report these awards as part of their small business contracting goaling achievements, the true percentage of work performed is misreported in these instances. We found this to be the case in our *Evaluation of SBA's Contract for Disaster Assistance Loan Recommendation Services* (Report 22-10). SBA awarded the contract using procedures that restricted the competition for the award to small businesses. The business SBA made the award to then subcontracted with a large business. SBA did not adequately assess whether the relationship between the small and large businesses made them affiliated. Also, we found the contractor exceeded the limit for how much of the work it could subcontract.

We found the subcontracting limits were exceeded in another recent evaluation of an SBA agreement that was awarded as a set-aside for an 8(a) small business in *SBA's Awards for Staffing Support for COVID-19 Economic Relief Loan Programs* (Report 23-11). Specifically, we found SBA did not ensure the small business complied with the subcontracting limitations for 5 of the 29 contracts we reviewed. For those five orders, the small business subcontracted an average of 93 percent of the work to firms that were not similarly situated and exceeded the 50 percent limitations on subcontracting.

As the federal government's primary advocate for small business, SBA must continue to strive to ensure federal agencies award small business contracts only to eligible entities and that those qualifying businesses are counted in the assessment.

## Issue: Agencies Receive Credit for Ineligible Firms or Those Not Participating in SBA's Contracting Programs



SBA program success and integrity could be adversely affected if the agency admits ineligible firms into programs intended for disadvantaged small businesses. OIG continues to find that SBA does not consistently detect ineligible firms in its small business contracting certification programs. SBA needs to further strengthen its controls in reviewing eligibility to ensure that only businesses meeting program requirements are awarded contracts.

Agency contracting officers have incorrectly reported awards were made to firms certified as HUBZone or 8(a) Business Development program businesses in the System for Award Management (SAM.gov). In 2020, the General Services Administration (GSA) Office of Inspector General found $89 million in contracting dollars erroneously recorded as awarded to small businesses in the Federal Procurement Data System—Next Generation, the contract reporting system of record at the time of the audit.

The Small Business Act requires that 5 percent of all prime and all subcontracts for the federal government be awarded to contractors with small, disadvantaged business status. In December 2021, the Office of Management and Budget raised the prime contracting goal for small, disadvantaged businesses to 11 percent for FY 2022. Participants in the 8(a) program are considered small, disadvantaged businesses and awards made to them are also counted toward agency goals.

We also found SBA's Dynamic Small Business Search database did not consistently update when SBA made decisions on applicants' WOSB certifications. Contracting officers throughout the government rely on the certification status reported in the database, the system of record for SBA's small business contracting programs. The Dynamic Small Business Search database integrates with SAM.gov. Without reliable information, contracting officers may be awarding contracts set aside for disadvantaged small businesses to ineligible firms.

We have several concerns from past audit work that falls under this issue, so we are highlighting here major concerns which are still being addressed by the agency.

## HUBZone Eligibility Requirement

GAO's *Small Business Administration Could Further Strengthen HUBZone Eligibility Reviews in Puerto Rico and Programwide* (GAO-18-666) and OIG's audit *SBA's HUBZone Certification Process* (Report 19-08) found SBA did not ensure only eligible firms entered the HUBZone program.

This program was created to bring more economic opportunity to small, disadvantaged businesses and workers located in areas categorized as historically underutilized business zones. In late 2019, SBA changed a HUBZone requirement allowing the businesses to employ a large percentage of its workforce outside the HUBZone, widening eligibility and, we believe, deviating from congressional intent. Under the new requirement, the business continues to qualify as long as it has employees who lived in a HUBZone for at least 180 days leading up to the date of recertification. This means HUBZone businesses could have no employees residing in the HUBZone and still qualify.

## Small, Disadvantaged Business Goaling

Federal agencies will need to expand procurement activities to deliver on the President's goal of increasing the share of federal contracts awarded to small, disadvantaged businesses from 5 to 15 percent by 2025. SBA program success and integrity could be adversely affected if the agency admits ineligible firms into programs intended for disadvantaged small businesses. SBA terminated its small, disadvantaged business certification program in 2008 as a result of past court decisions. Since then, firms have been allowed to self-certify, opening up the designation to risk. As of September 2023, SBA's Dynamic Small Business Search database included 300,836 firms that self-certified as small, disadvantaged businesses. Firms that falsely certify they are socially and economically disadvantaged may receive federal contracts counting toward the agency's goal achievements.

Based on FY 2022 contract data retrieved from SAM.gov, as much as $16.5 billion in prime contracts was awarded to small, disadvantaged businesses without a certification overseen by SBA. Given the large amount of federal contracting dollars awarded to these self-certified small, disadvantaged businesses, it is crucial for SBA to ensure that only eligible firms are counted.

Even though self-certification is inherently risky, SBA removed regulations allowing for protests of a firm's small, disadvantaged business status in FY 2020. SBA manages a protest process, which means interested parties to the contract that had been set aside for small businesses can challenge the size or status of an entity in line to receive the award. This process is intended to instill integrity within SBA's small business contracting programs.

While firms were still subject to protests related to their small business size, business owners' status as socially or economically disadvantaged could not be challenged. We discovered this oversight and reported it to SBA. In September 2022, SBA proposed to authorize reviews and protests of the small,

disadvantaged business status in connection with prime contracts and subcontracts to a federal prime contract. SBA requested comments on that proposal and others by November 8, 2022. The agency recently issued a final rule, effective May 30, 2023, to allow for reviews of the small, disadvantaged businesses status.

## Agency Progress

SBA has made substantial progress in adding controls to detect ineligible firms in the HUBZone program, such as:

- Updating procedures and training staff on its HUBZone policy directives to standardize analysis and oversight;
- Requiring each firm complete a program examination every 3 years;
- Taking action to decertify firms that are no longer eligible for the program, decertifying 3,750 firms as of June 1, 2023; and
- Educating HUBZone firms on meeting part-time employee requirements.

While recent regulatory and procedural changes improved SBA's oversight of firms in the HUBZone program, the changes also removed a certain control that we believe is essential for proper oversight. The new HUBZone employee residency requirement could reduce the program's ability to meet legislative intent. Allowing certified businesses to count employees who are not current HUBZone residents does not help provide economic opportunity to HUBZone residents.

SBA has achieved significant progress on the issue involving small, disadvantaged business goaling by making the following improvements during FY 2023:

- SBA recently issued a final rule, effective May 30, 2023, to allow for reviews of the small, disadvantaged businesses status.
- SBA strengthened the process it uses to alert other federal agencies of potentially inaccurate contracting data in SAM.gov, the system SBA relies on to assess government-wide goaling achievements and grading federal agencies using the small business contracting scorecard.
- SBA improved its regulations for handling protests, requiring that program officials review entities representing themselves as a small, disadvantaged business on a federal prime contract or subcontract whenever the agency receives credible information.
- SBA also worked with GSA to add clarifying language to SAM.gov so that business owners self-certifying as a small, disadvantaged businesses are prompted to review the definition in the Federal Acquisition Regulation.

# Issue: Women-Owned Small Business Federal Certification Program Susceptible to Abuse

 SBA's Women-Owned Small Business (WOSB) program is intended to give eligible companies greater access to federal contracting opportunities, ensuring a level playing field for women business owners. Both OIG and GAO have reported weaknesses in SBA's controls intended to ensure only eligible firms receive federal contracts set aside for these businesses.

The federal government's annual contracting goal for WOSBs is 5 percent of all federal contracting dollars. The WOSB program is a subset of this larger goal, but not the sole driver. The government limits competition for set-aside WOSB and economically disadvantaged women-owned small business federal contracts to participants in the WOSB Federal Contracting Program. Some contracts are awarded directly with no competitive bidding. Such contracts are known as sole-source awards. This means significant contracting dollars and taxpayer funds are at stake, beginning with program eligibility and certification of the designation.

The 2015 National Defense Authorization Act required qualifying small businesses to be certified by a federal agency, a state government, SBA's Administrator, or a national certifying entity approved by the Administrator.

Women business owners seeking to participate in the WOSB program may submit an application and supporting documents to SBA at no cost via WOSB.Certify.sba.gov, or pay a fee to be certified by an official third-party organization. As mandated in FY 2015, SBA has four approved third-party certifiers that are allowed to charge a fee to certify the WOSB or the economically disadvantaged women-owned small business.

In our audit *SBA's Implementation of the Women-Owned Small Business Certification Program* (Report 22-20), we reported that SBA established its WOSB certification process to collect documents to verify applicants met most program eligibility requirements, but did not require any documentation to ensure businesses met SBA size standards. SBA analysts also did not always ensure women were the majority owners and controlled the business. In our analysis, we found 3 of the 25 firms we reviewed did not have documentation showing that a woman controlled the business. To ensure that only small businesses owned and controlled by women benefit from the WOSB certification program, SBA must create a control environment requiring all eligibility requirements to be verified.

SBA and other agencies rely on a third party for many WOSB certifications, but SBA is still not conducting consistent reviews of these organizations to make sure only qualifying women-owned businesses

receive the benefit. This has been a challenge for the agency since 2014, when GAO first recommended SBA establish procedures to assess the performance of the third-party certifiers.

## Agency Progress

SBA has made progress toward addressing risks in the Women-Owned Small Business program, including:

- Launching WOSB.Certify.sba.gov, the operational platform used to manage the certification process for the WOSB and economically disadvantaged women-owned small business programs in July 2020;

- Conducting WOSB certification determinations in October 2020;

- Hiring additional WOSB analysts, a program director, and increased the number of staff supporting the program;

- Holding bi-weekly webinars to help prepare the firms whose applications were returned for a more successful reapplication;

- Implementing new measures to verify WOSB program data and develop repairs or workarounds to reduce the risk of reporting inaccurate data in FY 2023;

- Cross-checking data between databases to identify and remedy errors on a semi-annual basis; and

- Establishing a desk guide in December 2022 for staff to follow when reviewing applications.

Although SBA has drafted standard operating procedures for application reviews, SBA managers determined they would not implement OIG's recommendations to review documentation to verify that applicants meet small business size standards. SBA disagreed with OIG's interpretation that the 2015 National Defense Authorization Act required SBA to verify that the business was small in addition to the requirement that the business be owned and controlled by a woman. We alerted the Audit Follow-up Official of our concerns in accordance with our policy. The Audit Follow-Up official decided the agency would continue to allow applicants to self-certify that the business met size standards. While OIG believes that removing self-certification from the WOSB program is essential to reducing the risk, OIG will not take further action and has closed the recommendation.

# Challenge 3: SBA Faces Significant Challenges in IT Investments, System Development, and Security Controls

## Why This Is a Challenge

The inherent risks and related internal controls related to this challenge are included on the Government Accountability Office's (GAO) federal high-risk list: IT investments, SBA's emergency loan process, and cybersecurity. According to GAO, this list comprises federal programs and operations that need reform because they are vulnerable to waste, fraud, abuse, and mismanagement.

SBA uses third-party providers to provide application processing services for multiple assistance programs, including veteran assistance and loan processing. Federal guidance, such as OMB Circular A-123 and the Federal Information Security Modernization Act (FISMA), requires agency management to validate the adequacy of controls by third-party service providers. Commercial software development requires transparency, ability to resist attack, and controls to prevent tampering by malicious actors. Moreover, SBA needs to implement rigorous and predictable programs to monitor supply chain security over this software.

IT investments, system development, and security controls are managed primarily through entity-level control activities. These activities allow the agency to meet its objectives, address related risks, and ensure information technology continues to properly operate. SBA must maintain and establish IT design and security control baselines essential to protect information and preserve data integrity.

## Issue: SBA's IT Investment Controls Need Improvement



Effective IT system design and development improve business processes and reduces the cost of providing essential government services. SBA must establish effective IT investment controls to ensure the agency meets performance metrics, projected schedules, and estimated costs.

The SBA Business Technology Investment Council (BTIC) oversees significant IT investments and monitors system development, design, and security controls. The BTIC is responsible for implementing key provisions of the Clinger-Cohen Act, also known as the Information Technology Management Reform Act. It charges chief information officers with the duty to monitor, evaluate, and report agency performance of IT programs. The BTIC monitors development performance against requirements and baseline controls, facilitates corrective actions, and provides transparency to the investment control process. This oversight is critical to ensure systems are delivered in a cost-effective manner and that SBA's technical infrastructure is designed and maintained properly.

The BTIC met in September 2022 to start a re-design of its oversight controls. These controls will address project investment cost, schedule, and performance. The re-design will provide improved oversight of project schedules and costs.

Standard Operation Procedure (SOP) 90 82, Procedure for Managing SBA IT Investments Investment Review Board, requires an investment control framework to integrate investment planning and execution. This policy specifically requires reviews be conducted on an annual basis to determine the overall health of an existing investment, approve project level requests, and assign project resources if needed. SBA's SOP IT Investment Performance Baseline Management Policy requires that the BTIC be involved for the whole life of the IT project/investment. The policy further states the BTIC should provide direction on reviewing and approving the SBA IT portfolio. The council should be helping the agency create the optimum return on its IT investment. The BTIC should be supporting the agency's mission and ensuring the accountability of SBA business and IT investments.

## Agency Progress

After reviewing February 2023 SBA BTIC meeting minutes, we found many investment controls previously identified as missing in the FY 2020 – 2022 timeframe, were still not in place. We found the BTIC did not consistently report on the performance of previous IT investments or provide the basis of its acceptance or continuation of new and existing investments.

Until this process is implemented there will be little oversight over SBA's IT investments. The agency made progress in designing a new investment oversight framework, but preliminary implementation of this re-design is not planned until the second quarter of FY 2024.

SBA can improve in these specific areas:

- Full adherence to preliminary design criteria and agency SOPs, which includes approval by the BTIC and Architectural Review Board.

- Effective project baseline management, which allows planned results to be assessed against investment performance and then actions taken to improve performance.

- Ongoing quality assurance reviews to assess development progress, improvement, baseline management policy controls.

- Periodic analysis of investment performance throughout the project lifecycle to identify improvement areas.

Full implementation of the above controls will allow senior agency leaders, Congress, and other stakeholders to better gauge SBA's IT oversight and performance. These controls will deter fraud and better protect the identity of taxpayers who have received SBA assistance.

# Issue: Existing System Development and Monitoring Controls Need to Reflect Changing IT Design Risks



Our past audit work identified multiple areas in system development and monitoring controls requiring improvement. Through our FISMA evaluations and monitoring of open recommendations, we found the agency made progress in these areas. SBA updated its policy for System and Organization Controls (SOC) 1 Type 2 reports. Yet we found these issues with SBA's system development methodology and system acceptance controls. Many of the control areas identified below will be tested in our ongoing audits and evaluations.

## Communication and Mitigation of Privacy Risks

In the last 3 years, OIG has identified potential privacy and identity internal control weaknesses. In *COVID-19 and Disaster Assistance Information Systems Security Controls* (Report 22-19), we recommended that a process be established to communicate identified privacy and identity risks. FISMA criteria recommends the development of performance metrics to monitor the effectiveness of SBA's privacy internal controls. The agency has revised its privacy impact assessment process to address this issue.

## Coordination of System Contracts and Data Management Oversight

In our Report 22-19, we also found SBA managers did not fully implement controls to show that external service providers adhered to federal cybersecurity and supply chain risk management requirements. Also, SBA management did not document assessment and review of the supply chain-related risks as required by FISMA guidance.

We recommended that SBA enforce the requirement to establish and implement internal controls to ensure program officials perform and document contract reviews. This will ensure that information security is addressed in the contract language, as required by OMB Circular A-130 and SBA SOP 90 47 6.

FISMA guidance requires continuous monitoring of third-party software security controls. SBA officials stated they would revise their IT Governance Framework to ensure contracts are updated with the appropriate security language.

## Monitoring of Third-Party Systems

In our Repot 22-19, we recommended SBA fully update its policy to provide a roadmap for the purchase, launching, and management of software and related application development activities. Updated system guidance is crucial for monitoring third-party systems used to process transactions integral to

the mission of SBA. The agency must update its guidance for purchasing and related system development to validate essential controls exist before a system is put into production.

In response to Report 22-19, SBA plans to revise the agency's SBA System Development Methodology and provide procedural guidance over supply chain risk management practices including applications with high-value asset system designation.

## Updated System and Organization Controls Reports

In the *Independent Auditors' Report on SBA's Fiscal Year 2022 Financial Statements* (Report 23-02), the OIG's independent public accountant was unable to obtain reasonable assurance regarding the reliability and integrity of reported financial data for critical third-party systems, which contributed to two disclaimer audit opinions for FYs 2020 and 2021. The SOC 1 Type 2 report provides assurance that reported financial data is complete and reliable.

SBA has updated its policies to ensure that prior to issuing a contract, SOC 1 has been reviewed and impact assessed on SBA internal controls as well as modify ongoing contracts where a SOC 1 may be necessary.

## System Acceptance Controls and Monitoring to Limit Risk

In our Repot 22-19, we recommended SBA meet federal guidance in delivering program funds to eligible taxpayers. Testing protocols must be fully implemented, even within limited timeframes, and then independently tested to ensure they operate as designed. Acceptance criteria must also specify the minimum desired functionality acceptable for a system to be put into operation.

## Agency Progress

Through our FISMA evaluations and monitoring of open recommendations, we found the agency made progress updating its polices to ensure that prior to issuing a contract, security controls have been reviewed and impact assessed and modifying ongoing contracts where a SOC 1 may be necessary.

In response to OIG Report 22-19, SBA plans to revise the agency's System Development Methodology; and provide procedural guidance over supply chain risk management practices, including applications with high-value asset system designation.

The agency stated it will update policy to require that all systems include an assessment of security risk management activities via the Cyber Risk Management Platform by July 31, 2024.

# Issue: Additional Progress Needed in IT Security Controls



Inspectors general are required by FISMA to assess the effectiveness of information security programs on a maturity model spectrum and assess security capability in eight domains.

For FY 2023, the scope of the FISMA evaluation included a core set of 20 metrics and a supplemental set of an additional 23 metrics. The maturity model criteria places SBA at an overall level of "not effective."

## Agency Progress

The current benchmark for an effective program within the context of the maturity model is managed and measurable. SBA quickly responds to identified vulnerabilities but continues to experience reoccurring control challenges in the areas of user access, configuration management, and security training and risk management.

# Challenge 4: SBA Risk Management and Oversight Practices Need Improvement to Ensure the Integrity of Loan Programs

## Why This Is a Challenge

SBA's Office of Credit Risk Management manages credit risk for the agency's loan portfolio of approximately $173 billion (as of December 2022), and this includes the remaining outstanding loans made through the Paycheck Protection Program (PPP). As discussed in Management Challenge 1, SBA's lack of internal controls led to significant fraud risk and vulnerabilities. Additionally, we found SBA did not have an organizational structure with clearly defined roles, responsibilities, and processes to manage and handle potentially fraudulent PPP loans. As of December 2022, SBA has made forgiveness payments exceeding $750 billion to over 4,700 PPP lenders, which the SBA Office of Credit Risk Management has the responsibility to oversee. PPP loans were originated by lenders and other companies that often have a low degree of expertise in SBA loan program requirements, which is why this continues to be a challenge for FY 2024.

Lenders often rely on the services of fee-based and other third-party agents to help originate, close, service, and liquidate SBA loans. Most traditional SBA-guaranteed 7(a) and 504 Certified Development Company loans are originated by lenders with delegated approval authority. Generally, these lenders are subject to only limited SBA oversight and quality control unless a borrower defaults on a loan.

Our previous audits have found SBA has not adequately recognized or managed significant lender weaknesses. In our *Audit of SBA's Oversight of High-Risk Lenders* (Report 20-03), we identified additional internal control weaknesses in lender oversight.

Previous OIG audits have also shown that SBA did not effectively identify and track third-party agent involvement in its 7(a) and 504 loan portfolios. Tracking such agents is crucial in managing the portfolios because many lenders rely on the services of fee-based and other third-party agents to help originate, close, service, and liquidate SBA loans.

## Issue: SBA's Oversight of High-Risk Lending Participants



The risks inherent in delegated lending require effective oversight to monitor compliance with SBA policies and procedures and corrective actions to address noncompliance. However, in Report 20-03, we found that the SBA Office of Credit Risk Management did not always effectively oversee high-risk lenders to identify and mitigate risks. Specifically, SBA did not always:

- Conduct planned high-risk lender reviews,

- recommend appropriate and consistent risk mitigation actions for the deficiencies identified during the oversight reviews of high-risk lenders, and

- communicate loan deficiencies noted during high-risk lender reviews to SBA approval and purchase loan centers.

## Agency Progress

SBA has worked to address issues with its oversight of lenders in response to our audit recommendations and, in FY 2021, improved its ability to oversee high-risk lenders by:

- Issuing the Final 7(a) Lending Oversight Rule and publication of Standard Operating Procedure (SOP) 50 53 (2) on supervision and enforcement,

- Realigning the organizational structure of the Office of Credit Risk Management to strengthen lender oversight and add resources to the review teams for effective oversight, and

- Implementing quarterly meetings to ensure adequate oversight of lenders with elevated risk profiles.

In FY 2023, SBA continues to revise SOP 51 00 2, On-Site Lender Reviews/Examinations, and document the process for on-site lender reviews and examinations, which is planned to be finalized by the agency in December. This revision will include the communications protocol that was developed by SBA to document deficiencies identified during loan file reviews and to then share this information with SBA loan centers and other internal stakeholders.

In FY 2023, SBA took additional actions to improve its ability to oversee high-risk lenders by issuing SOP 50 56, Lender Participation Requirements. The agency increased frequency of review activities for 7(a) Lenders with portfolios of $350 million or greater and SBA Supervised Lenders. It increased review activity with the Office of Performance and Systems Management and Fiscal and Transfer Agent to assist lenders with loan reporting compliance.

The agency implemented a scaled down review for 7(a) lenders with delegated authority and 7(a) loan portfolios between $1 million and $10 million to review between one and three recently disbursed loans. It implemented quarterly reviews where the sample is taken from high-dollar loans coded as early defaults. SBA formalized quarterly high-risk lender meetings where lenders with an elevated risk profile are discussed and SBA leaders ensure that oversight activity is adequate.

Although SBA has made substantive progress, it has not addressed the remaining three recommendations in Report 20-03. Agency management has indicated it needs time to finalize and

implement oversight policies and procedures, including SOP 51 00 2. Agency managers need to obtain additional information to confirm that identified deficiencies have been corrected.

While SBA has made substantial progress in its oversight of high-risk lending participants, in Report 23-05, *White Paper: 7(a) Loan Program During SBA's Response to the COVID-19 Pandemic*, we found oversight staffing levels in the Office of Credit Risk Management decreased from 42 to 26 employees, or by 38 percent. This staff reduction could affect SBA's FY 2023 goal for oversight reviews, which help ensure lender compliance with program requirements and sustain the progress SBA has achieved addressing this issue. The report indicated that to ensure 7(a) loan program integrity and reduce the risk of financial loss, SBA should consider potential risks related to staffing shortages in its 7(a) risk strategy. Since Report 23-05 was issued, SBA stated that the Office of Credit Risk Management has been successful in recruiting additional staff and utilizing staff from other departments and contract personnel.

OIG will continue to monitor SBA's ongoing efforts to address open recommendations in this report, including developing effective oversight policies and procedures and a comprehensive database or workflow management tool to manage oversight of high-risk lenders.

## Issue: Increased Risk Introduced by Loan Agents



Previous OIG audits and investigations have shown SBA could not effectively identify and track loan agent involvement in its 7(a) and 504 loan portfolios. OIG investigations have also revealed a pattern of fraud by loan packagers and other fee-based agents in the 7(a) loan program involving hundreds of millions of dollars. Despite the prevalence of fraud in its loan portfolios, SBA's oversight of loan agents was limited.

SBA requires lenders to provide a loan agent disclosure form (Form 159) to SBA's fiscal and transfer agent for 7(a) loans that involve a loan agent. The fiscal and transfer agent is a contractor who supports SBA by serving as paying agent for all investor payments, processes lender loan reporting, and payment remittance reconciliations. The fiscal and transfer agent also serves as the central registry for all guaranteed secondary-market interests. The fiscal and transfer agent must enter the data into a database accessible to SBA. Prior OIG audits identified significant issues in the data quality of Form 159 being tracked by the fiscal agent. We also found that SBA had not begun tracking Form 159 in the 504-loan program.

## Agency Progress

SBA's oversight of loan agents has been a long-standing challenge that the agency has made great progress in resolving. SBA took actions to improve the information collected on loan agents by enhancing Form 159, which improved its ability to oversee loan agents. The improvements included:

- Requiring lenders to electronically submit Form 159s through the Capital Access Financial System,

- Developing application and follow-up controls to ensure critical fields on each form are completed,

- Aggregating and reporting on loan agent activity to analyze lender portfolios, and

- Considering the loan agent activity for lenders under review and regularly reporting on risks associated with loan agents across the 7(a) portfolio.

Because loan agent involvement in the 7(a) program is significant, it is important for SBA to have oversight tools that monitor loan agent involvement in this sizeable program. SBA also needs to effectively manage the risk introduced by high-risk loan agents. OIG plans to conduct work related to agents involved in the PPP and monitor risks related to SBA's oversight of loan agents.

## Issue: Increased Risk Introduced by Lender Service Providers



In August 2021, an SBA OIG investigation resulted in the conviction of five people on all charges in a 13-year conspiracy to defraud SBA in connection with programs to guarantee loans made to small businesses.

The five people fraudulently obtained guarantees for loans SBA deemed ineligible. They hid signs of ineligibility from SBA by misrepresenting the use of SBA loan proceeds and unlawfully diverting previously denied loan applications into expedited approval channels. They originated dozens of loans, totaling more than $10 million in disbursements, that were not eligible for SBA guarantees. SBA has had to contend with risks introduced by the outsourcing of traditional lender functions to lender service providers, a type of loan agent, for some time.

The number of SBA-approved lender service provider agreements has grown significantly, in part because of SBA's effort to better control access to its systems by lender service providers. SBA assigns an identifying number to all lender service providers that access SBA systems and records all SBA-approved agreements. The limited oversight capacity within the Office of Credit Risk Management to

oversee its lenders also may challenge its ability to monitor the Lender Service Providers operating on behalf of these lenders.

## Agency Progress

Since we first reported on these issues in 2015, SBA has implemented internal controls related to the tracking and monitoring of lender service provider involvement in SBA's loan programs. Specifically, SBA:

- Established a method to track lender service provider involvement at the loan level;

- Established procedures to assess provider activities and oversight, as part of lender risk-based reviews that include file inspection; and

- Worked with a contractor to aggregate lender usage of lender service providers and to develop a performance analysis for lender service provider portfolios to identify any high-risk providers and identify the lender with whom they are aligned.

SBA's analyses since 2021 have indicated that loans with a lender service provider generally performed worse than those without provider involvement in both guaranty purchase and early default rates.

It remains critically important for SBA to continue to evaluate performance and act when necessary to effectively reduce the incurred risks. We will continue to assess risks and conduct further audits and reviews as necessary.

# Challenge 5: SBA's Management and Monitoring of the 8(a) Business Development Program Needs Improvement

## Why This Is a Challenge

SBA's 8(a) Business Development Program was created to provide business development assistance to eligible small, disadvantaged businesses seeking to compete in the federal marketplace. A major benefit of the 8(a) program is that these certified firms can receive sole source and set-aside contracts. Sole-source awards are contracts proposed for award without competition. A set-aside award is a proposed contract with competition limited to small businesses. This means small businesses do not have to compete against large businesses that may have an industry advantage.

The goals of these contracts and certification programs are that the federal government receives the needed services for the benefit of taxpayers and also helps diversify the economy by supporting small business. In looking ahead to how courts are weighing in on the aspect of social disadvantage, we anticipate effects to several of SBA's certification programs like the 8(a) program. A review of SBA's process for determining eligibility will be planned in the future. The agency continues to address the challenges in providing effective business development assistance, as well as measuring and reporting the outcomes of the program.

## Issue: SBA Continues to Address Its Ability to Develop Firms in the 8(a) Program and Measure Results



SBA has historically emphasized business development to enhance the ability of 8(a) firms to better compete for federal contracts. SBA offers individualized development assistance to program participants and also makes referrals to its resource partners, Small Business Development Centers, a volunteer mentor network composed of retired executives and entrepreneurs, Women's Business Centers, Veterans Business Outreach Centers, and affiliate Apex Accelerators (formerly known as Procurement Technical Assistance Centers).

Despite this, SBA has not fully established an information technology system to perform regular performance monitoring and reporting for 8(a) participants to ensure progress within their business plans. Without an effective IT system to monitor 8(a) participant progress in meeting individualized business development goals, SBA may not be able to consistently determine if 8(a) participants have demonstrated the ability to compete in the open marketplace without program assistance.

SBA has not finalized next steps for IT development that would facilitate tracking, measuring, and monitoring individual business progress. To bridge the gap in the interim, SBA in FY 2020 revised the Business Opportunity Specialist Annual Review Workbook. The specialist uses this Excel workbook for each firm during annual reviews to evaluate business development, competitive business mix of 8(a) and non-8(a) revenue, and financial condition. The specialist also reviews other business proficiencies, such as marketing and government contracting goals.

SBA's IT challenge is not the sole reason the 8(a) program has not improved in measuring the development of firms over the years. In our report *SBA's Business Development Assistance to 8(a) Program Participants* (Report 22-08), we found SBA's processes did not consistently allow for SBA or stakeholders to determine whether firms met their individual goals to successfully complete the 9-year program.

SBA did not ensure specialists regularly monitored a participant's business goals, assessed business development needs, and followed up with actions for training and accountability. We found that 15 of the 40 firms tested did not have approved business plans with identified goals, making them ineligible to receive 8(a) contracts. We questioned $93 million in 8(a) set-aside or sole-source contracts that four of the firms were awarded.

SBA also did not establish performance measures at the program level to know whether the 8(a) program was successful as an SBA program. There are no relevant performance metrics to gauge the outcomes of the program or to know the effects the program is having on small businesses.

Without consistent procedures, there is no assurance that participants received the business development assistance needed for them to become viable competitors in the contracting arena. As a result, the agency continues to face challenges on how it can best manage a program that will effectively increase the participation of small businesses in the American economy.

## Agency Progress

Notwithstanding the issues noted above, SBA has made substantial progress to improve its ability to develop firms in the 8(a) program and measure results. The agency has completed these things:

- Implemented a standard process to ensure initial business plans are monitored and annual reviews capture the 8(a) participant's business plan updates;

- Issued Procedural Notice 6000-836899 (effective August 2022), which standardized 8(a) business processes and required all district offices to ensure that 8(a) firms obtain their business plan approval prior to the first contract being awarded; and

- Mandated the use of the updated Business Opportunity Specialist Annual Review Workbook that track development of firms throughout the 9-year program, across all district offices when conducting annual reviews.

Officials added sections for capturing data on a firm's competencies in marketing, human resources, financial condition, sales trends, management experience, and government contracting goals. The agency is initiating plans to include a business proficiency matrix in the workbook so the specialist can use stated metrics to evaluate a firm's skill level in each competency and make referrals to resource partners or training available through SBA's 7(j) Management and Technical program, in line with the firm's business development needs.

The enhancements to the workbook will allow SBA to aggregate and analyze the data to identify trends at the 8(a) program level, which will improve SBA's ability to provide timely and accurate results of program measures and outcomes for an annual congressional report. SBA is developing a long-term strategic plan that aims to provide all 8(a) certified firms throughout the country with equitable business development assistance. When fully implemented, the enhanced processes could help emphasize business development rather than solely focusing on eligibility and annual compliance.

# Challenge 6: Identification of Improper Payments in SBA's 7(a) Loan Program Remains a Challenge

## Why This Is a Challenge

OIG audits and reviews have identified 7(a) loans that were made to ineligible borrowers, given to borrowers who did not have the ability to repay, or were not properly closed, resulting in improper payments. Improper payments occurred in part because SBA did not adequately review related loans, which is why this remains a management challenge this year.

In FY 2022, the dollar amount of SBA's 7(a) loan approvals totaled $25.9 billion. Most of these loans were made by lenders with delegated approval authority. When a loan goes into default, SBA reviews the lender's actions on the loan to determine if it is appropriate to pay the lender the guaranty, which SBA refers to as a guaranty purchase.

About 9 years ago, OIG established a High-Risk 7(a) Loan Review Program to evaluate lender compliance with SBA requirements for high-dollar, early defaulted 7(a) loans. High-dollar, early defaulted loans are $500,000 or more and default within the first 18 months of initial disbursement. The 7(a) loan program has been the agency's largest financing program for general business needs, so it is vital that SBA identify and reduce the risk of improper payments to meet its objectives for the program.

## Issue: Improvements Needed to Ensure High-Risk 7(a) Loan Reviews Reduce the Risk of Losses



Between 2014 and 2019, OIG conducted risk-based reviews of 7(a) loans and recommended recoveries on 17 loans totaling more than $19.3 million. In addition, we identified suspicious activity on five loans totaling nearly $4 million, which were ultimately referred to our Investigations Division. Although SBA completed purchase and quality control reviews on all the loans, the agency did not identify or fully address the material deficiencies noted in the OIG review.

The OIG High-Risk 7(a) Loan Review Program used an internal scoring system to prioritize loans for review by level of risk. This evaluation included a review of high-risk loans purchased by SBA to determine whether lenders complied with SBA requirements and identified suspicious activity.

Our reviews of high-risk loans have consistently identified issues regarding eligibility, repayment ability, size standards, franchise agreements, business valuations, appraisals, equity injection, and debt

refine. Our review program also has helped us identify concerns with change of ownership transactions and SBA's identification of improper payments.

In May 2023, we reported that SBA did not demonstrate improvements to payment integrity for 7(a) loan guaranty purchases as the improper payment estimate increased between FYs 2021 and 2022, as detailed in the *Independent Auditors' Report on SBA's Fiscal Year 2022 Compliance with the Payment Integrity Information Act of 2019* (Report 23-07).

## Agency Progress

Despite the issues identified in the May 2023 report, we noted that SBA has made progress in addressing the identification of improper payments in the 7(a) program since FY 2020, including:

- Allowing loan specialists more time to review complex early defaulted loans;

- Improving its review of loans;

- Training loan specialists and updating the loan review checklist;

- Providing regular feedback to loan center management and staff regarding improper payments, root causes, and corrective actions;

- Internally evaluating its purchase process and quality control reviews for 7(a) guaranteed loans to determine why the loan center reviews did not identify or correct lenders' noncompliance with SBA requirements;

- Conducting a training session at the loan center focused on the requirements and SBA review of documentation related to the source of funds used for equity injection; and

- Providing training at lender conferences on the most common root causes of the improper payments.

SBA revised and issued SOP 50 57 3, 7(a) Loan Servicing and Liquidation Standard Operating Procedure, in August 2023. SBA will provide training to staff and lenders on the new SOP.

We continue to communicate with the agency about previous recommendations for recoveries as part of the audit follow-up process. We will monitor risks in this area and conduct audits and reviews as necessary.

# Challenge 7: SBA's Disaster Assistance Program Must Balance Competing Priorities to Deliver Prompt Assistance but Prevent Fraud

## Why This Is a Challenge

SBA contributes to disaster recovery by providing long-term, low-interest loans to affected homeowners, renters, businesses of all sizes, and nonprofits. SBA must continually balance the priority of quickly assisting survivors in the immediate aftermath of a disaster with the need to mitigate fraud risk and ensure program integrity. To do so, the agency faces challenges in staffing, quality assurance, and increased loan servicing requirements.

## Issue: Reserve Staff Need Training to Sustain Productivity During Mobilization



The magnitude of the pandemic relief demand (27.7 million applications received as of December 31, 2021) required SBA to rapidly increase and train staff; staffing numbers rose to historic levels. The number of personnel needed to serve during the pandemic was almost twice the previous record high staff total. In addition, the agency had to develop the needed training to address the new criteria for COVID-19 EIDLs.

Effective July 3, 2022, the agency reorganized its Office of Disaster Assistance. SBA moved the entire disaster lending program from the Office of Disaster Assistance to the Office of Capital Access. The Office of Disaster Recovery and Resilience manages the agency's non-lending aspects of the disaster program (such as the immediate response group).

SBA's Office of Disaster Assistance increased its trained staff from 800 to more than 5,000 employees in December 2017 to respond to hurricanes Harvey, Irma, and Maria. In response to the COVID-19 pandemic, the Office of Disaster Assistance increased its permanent and temporary staff size from about 1,200 at the onset of the pandemic to more than 11,500 by December 2020. In those 9 months, the staff was increased nearly 10 times.

## Agency Progress

SBA management made good progress on this long-term issue during the pandemic. SBA implemented a cross-functional training plan, as well as online and automated tutorials, a change that resulted from a

previous report. The COVID-19 pandemic required SBA to train and mobilize the largest number of new employees ever in its history.

Bringing on a large temporary staff in response to a major natural disaster will always be a challenge for any organization, including SBA. However, during the past couple of years, SBA was able to increase its staff by almost tenfold to provide COVID-19 pandemic financial assistance. The new disaster assistance employees expanded the pool of reserve staff that can be activated for future disasters. The lessons learned from this surge inform the agency's current hiring and training practices; therefore, this issue has achieved a rating of yellow.

Although the agency has now achieved a rating of yellow, the Office of Capital Access is urged to keep monitoring the need to revise and update its plan for rapid staff surge and the associated need to update its training. This is needed to ensure a high level of customer service with reduced applicant processing times, and to ensure eligible applicants receive the federal assistance they need in a timely manner. The strain of the pandemic response effort made these concerns more evident. This is significant because SBA is developing a new computer system to process disaster loan applications. SBA is currently running a test of its Unified Lending Platform, with full implementation planned to roll out in late 2023.

## Issue: Improper Payment Quality Assurance Process Needs Strengthening



SBA received a historic number of loan applications during FY 2020 through FY 2022 when COVID-19 relief programs were established. SBA tests a statistical sample of these loans for improper payments. Because the total of the number of loans that have been approved and disbursed is so large, the statistical sample also is large, which has highlighted issues in SBA's improper payment process. As a result, providing an accurate estimate of the improper payment poses a significant challenge to the disaster program.

An improper payment is any federal government payment made to an ineligible recipient or for an ineligible good or service, duplicate payment, or payment for goods or services not received (except for such payment authorized by law). While not every improper payment is fraudulent; every fraud is an improper payment. This highlights the need to ensure internal controls result in eligible recipients gaining access to programs.

In our *Audit of the Office of Disaster Assistance Improper Payment Appeal Process* (Report 20-07), we found the improper payments appeal process effectively assessed improper payments, but the initial review process was inefficient.

41

Our *Independent Auditors' Report on SBA's Fiscal Year 2022 Compliance with the Payment Integrity Information Act of 2019* (Report 23-07) found the sampling and estimation methodology plans were not statistically acceptable for SBA disaster assistance loans, COVID-19 Economic Injury Disaster Loans, and Economic Injury Disaster Loan Targeted advanced programs and activities. The population of outlays reported in the agency financial report were not reconciled to the general ledger and were not complete. Consequently, certain transactions were omitted from the population and excluded from SBA's review procedures. As a result, these programs and activities did not comply with the requirement of the Payment Integrity Information Act of 2019 to publish improper and unknown payment rates of less than 10 percent.

The Payment Integrity Information Act of 2019 requires agencies to publish improper payments information within an agency financial report or performance accountability report for each fiscal year. To be in compliance with the act, SBA must report an estimated gross improper payment rate of less than 10 percent for each program.

## Agency Progress

While SBA had previously made significant progress to improve the quality assurance process, the results of our report regarding SBA's compliance with the Payment Integrity Information Act for FY 2022 indicate that issues continue to exist in the improper payment estimation process. To address the findings of that report, SBA entered into a contract with an independent statistician in December 2022, who has:

- Developed a statistically valid sampling and estimation plan. The plan for FY 2023 has been developed with sufficient documentation to support the methodology identified in the plan.

- Performed monthly reconcilements of the agency's outlays for the disaster assistance loan program. The contractor will continue to perform monthly reconcilements for the upcoming fiscal year. This action has been completed for FY 2023 and is ongoing for FY 2024.

- Developed a statistically valid sample of outlays in the disaster assistance loan program. This action has been completed for FY 2023 and is ongoing for FY 2024.

- Plans to develop statistical estimates of improper and unknown payment rates. This action will be completed to report rate estimates in the agency's annual financial report, as of September 2023.

Overall, while SBA has stated that it took actions to address our recent findings, it is too early to assess the agency's progress. OIG will perform its annual audit of the agency's compliance with the Payment Integrity Information Act for FY 2023. We will assess, at that time, whether the actions taken above addressed our concerns. At this time, we consider the agency to have made limited progress.

# Challenge 8: SBA Needs Robust Grants Management Oversight

## Why This Is a Challenge

In FY 2021, pandemic relief legislation authorized new, multibillion-dollar grant programs in addition to SBA's existing entrepreneurial development grant program portfolio. Congress authorized $45.3 billion for SBA to administer as grants to provide economic relief and technical assistance, nearly doubling SBA's existing technical assistance programs. This remains a challenge because SBA must ensure more than 111,000 grant recipients used the funds appropriately and measure the performance results of the pandemic grant programs. SBA administers grants to organizations that aid in counseling and training small business owners and emerging entrepreneurs. These entrepreneurial development programs are part of SBA's core mission to support and grow small businesses.

Because of the government-wide emphasis on grants management reform, it is SBA's responsibility to maximize the value of its grant funding to ensure its programs accomplish program objectives. In recent OIG audits, we have found ineffective oversight of grant recipients and systemic issues with the accuracy of SBA grant data in both financial and performance reporting.

## Issue: SBA's Grants Management System Needs Improvement



Previous OIG reports have found SBA used an inefficient and error-prone system to manage its grant awards. The grant management system SBA used to award, monitor, and report on technical assistance programs required substantial manual data entry, which can lead to input errors.

Data inaccuracies inhibit the ability to effectively track federal spending. Errors also affect the agency's ability to report complete and accurate information on time, as required by the Digital Accountability and Transparency Act of 2014. Our advisory memorandum *Improvement Needed in the Accuracy of SBA Data Reported on USASpending.gov* (Report 18-15) detailed material weaknesses identified by an independent accounting firm in SBA's controls over the accuracy of grant award data reported on USASpending.gov.

Immediately after our alert was issued, program officials requested a review of the internal controls of the grant management process to assess and verify OIG's findings. SBA's internal auditors found that all 45 of the sampled awards included inaccuracies and deficiencies.

The grant management system was not completely integrated with SBA's financial system and required additional manual entry to obligate funds and authorize payments to grant recipients. Without a fully integrated system, the agency must continue manual and burdensome processes to manage compliance requirements. Manual workarounds were the main cause for the errors in the data reported on USASpending.gov. Reliable data in a grants management system ensures the federal funds are awarded to eligible recipients, disbursements are accurate, and that management can make informed decisions to effectively administer programs.

## Agency Progress

SBA has made substantial progress in modernizing its grants management system over the last 5 years. It entered into an interagency agreement in 2019 with the U.S. Department of Health and Human Services for transition analysis, infrastructure setup, and training services to launch GrantSolutions.gov. SBA spent $2.5 million to implement the system to help the agency do these things:

- Improve funding management, award of grants, and process payments and closeouts;

- Enhance ability to develop accurate performance metrics reporting;

- Reduce compliance violations; and

- Increase auditability, accountability, and transparency.

The SBA Office of Grants Management implemented the GrantSolutions system for program office use, providing training to program officials on how to use the system during FY 2023. The office also works with each program office to identify program-specific system customizations that ensure the agency complies with federal and SBA policies.

As of FY 2023, the GrantSolutions management system is used by all grant making program offices, excluding those offices issuing pandemic related grants. The Shuttered Venue Operators Grant (SVOG) program opted to use a contracted customer relationship management system to manage its grants. The Restaurant Revitalization Fund (RRF) program developed its own application portal that interfaced with the SBA Office of Capital Access's systems to manage the application intake, processing, and award approvals. Both the SVOG and RRF programs were integrated into SBA's Joint Administrative Accounting Management System.

Since 2020, SBA has been working to integrate the SBA's Joint Administrative Accounting Management System with GrantSolutions.gov. Until the agency integrates the financial interface, program offices are still required to use the grant management system that they used prior to GrantSolutions, which was also not completely integrated with SBA's financial system. It requires manual entry to obligate funds and authorize payments to grant recipients. While SBA continues to have to work around the

44

limitations, grants management officials perform monthly data quality assessments of the manually input data, reporting deficiencies.

## Issue: Better Performance Measurements Needed to Monitor Grant Program Achievements

 Our management alert on *Serious Concerns About SBA's Control Environment and the Tracking of Performance Results in the Shuttered Venue Operators Grant Program* (Report 21-13) found SBA did not establish performance goals and measurements for the grant recipients before disbursing $14.6 billion in SVOG funds.

After our management alert, SBA created a logic model in March 2021. The model helped identify outputs and outcomes to assess whether the program successfully aided small businesses in the live arts and entertainment industry.

We found in our *Evaluation of SBA's Award Procedures for the CARES Act Entrepreneurial Development Cooperative Agreements* (Report 21-11) that the agency did not establish clearly defined goals with targets for the award recipients. Because of this, SBA cannot effectively measure and accurately report performance results to assess whether the award recipient's performance met objectives, ensuring the pandemic relief programs were effective.

Federal regulations require awards to include performance goals. The agency must provide a standard to effectively measure grantee performance, such as the estimated number of jobs saved or created, tax revenue generated, or entity operational status.

GAO reported similar concerns about how SBA took limited steps in enforcing RRF reporting. Thirty-two percent of RRF recipients have not yet reported how they used their funds for 2021 (GAO-22-105442). Our audit report on *SBA's Oversight of Restaurant Revitalization Fund Recipients* (Report 23-15) found that as of June 2023, 20 percent of all recipients, with awards totaling $3.5 billion, had not yet filed the required report.

Program officials did establish performance goals and indicators for the supplemental CARES Act funds provided to Small Business Development Centers, Women's Business Centers, and the Resource Partner Training Portal, but SBA should have clearly defined the goals and set targets to more effectively ensure they were achieved as intended.

We first identified oversight of grant program performance as a top management challenge in FY 2019. To address these weaknesses, SBA updated its grant management policies and procedures. The agency required grant officers to enforce performance requirements and verify reported information as well as

45

to ensure applicants' proposals include plans to measure performance in a way that will help SBA achieve program goals.

The SBA Office of Entrepreneurial Development had until September 2020 to fully adopt the updated policies, which are not reflected in the CARES Act entrepreneurial development grants. Without clearly defined performance goals and targets, SBA cannot effectively measure and accurately report performance results. Our evaluation *SBA's Oversight of the Grant Recipient's Implementation of the CARES Act Resource Partners Training Portal* (Report 22-07) found that SBA and its grant recipient that implemented the Resource Partner Training Portal, an initiative authorized under the CARES Act, did not set targets for performance goals to assess whether the portal met the intended purpose. We reported the portal did not serve as a major source for COVID-19 information. SBA awarded the grant recipient $18.6 million and less than 1 percent of 30 million eligible small businesses used the portal within the first year of the pandemic. Only about 62 resource partner counselors and mentors out of approximately 13,000 completed any of the training modules.

Without performance targets, program officials could not hold the Resource Partner Training Portal grant recipient accountable for ensuring the information hub served as a major source of COVID-19 related resources for small businesses and a training portal for resource partner counselors and mentors.

## Agency Progress

SBA has made substantial progress in establishing performance measures for its grant programs. In FY 2022, the SBA Office of Grants Management collaborated with all of SBA's grants-making program offices to oversee an overall approach for implementing effective performance monitoring.

The SBA Office of Entrepreneurial Development applied lessons learned from our *Evaluation of SBA's Award Procedures for the Coronavirus Aid, Relief, and Economic Security Act Entrepreneurial Development Cooperative Agreements* (Report 21-11). The office established a variety of output and outcome-focused measures for the Community Navigator pilot program, authorized by the American Rescue Plan Act of 2021.

In the announcement for the program, SBA required grant applicants to establish realistic targets for the goals to measure achievements during grant performance. The Office of Entrepreneurial Development enforced its procedures by requiring clearly defined performance goals. The office included performance targets in all future Small Business Development Centers and Women's Business Centers cooperative agreements to objectively measure performance results.

In June 2021, SVOG program officials finalized a program evaluation framework. This framework examined venue survival and other outcomes across industry, geographic location, and business owner

demographics. Additionally, program officials implemented SVOG performance metrics, such as revenue dollars earned, a shuttered entity's capacity to continue operation, and planned versus actual expenditures. This information will be collected as part of the close-out process.

SVOG program officials developed a customer experience and award outcomes survey. As of June 5, 2023, nearly 9,000 award recipients have received invitations to complete the survey. SBA expects a final report of the survey results and program evaluation by the end of FY 2024.

## Issue: Comprehensive Oversight Plan with Strong Controls Will Help SBA Better Assess Risk, Distribute Payments, and Audit the Shuttered Venue Operators Grant and Restaurant Revitalization Fund



In our management alert on *Serious Concerns About SBA's Control Environment and the Tracking of Performance Results in the Shuttered Venue Operators Grant Program* (Report 21-13), we alerted management to concerns about SBA's initial plans for assessing applicant risk and setting payment disbursements.

Since the majority of SVOG grant awards were under a certain dollar threshold, they were categorized as low risk. These awards were disbursed in lump sum payments with minimal financial reporting requirements and expectations for post-award accountability.

SBA reported that as of July 5, 2022, the agency completed processing applications for the SVOG program. In total, SBA awarded $14.6 billion to 13,011 grant recipients, of which 9,800 received supplemental awards.

The Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act of 2020 required SBA to submit the policies and procedures used to conduct oversight and audits of the grants to Congress. It also required measurement standards to determine which grants should undergo an audit. The SBA Office of Disaster Recovery and Resilience based its audit plan for this program on the risk level established for the payment distributions and financial reporting requirements for the grant recipients.

All grant recipients who received $10 million, which is the maximum amount for any single award, were going to be audited. It is likely a minimal number of recipients will be subject to an audit. The office's initial audit plan exposed the $16.25 billion grant program to potential misuse of funds because the bulk of grant funds will not be subject to a reasonable degree of scrutiny. SBA has finalized its oversight plan to include monitoring, audit, and closeout strategies that address the agency's obligation to uphold federal grant regulations and other applicable requirements.

In our inspection *SBA's Award and Payment Practices in the Shuttered Venue Operators Grant Program* (Report 22-15), we reported that even after determining multiple disbursements would better protect grant funds from fraud or misuse, SBA switched to a riskier single advance payment for all grantees. This lump sum payment method may have hastened award disbursement, but multiple disbursements are a better way to protect taxpayer funds. Multiple disbursements enable program officials to verify that grant recipients used initial award funds for allowable activities, before then disbursing the remaining award. Because SBA made this change, program officials will not be able to monitor grantees' use of the proceeds until the end of the award, when closing out the grant, after all the funds have been disbursed.

Some of the issues we identified in SVOG were also identified in the Restaurant Revitalization Fund program. In FY 2022, GAO reported that SBA had emphasized putting pre-award controls in place to manage risk but identified weaknesses in the design and operation of the internal controls (GAO-22-105442). As a result, the agency did not effectively prevent systemic control weaknesses throughout the award process.

Our inspection *SBA's Administrative Process to Address Potentially Fraudulent Restaurant Revitalization Fund Awards* (Report 23-10) found SBA designed the RRF application validation and approval processes using the GAO's *A Framework for Managing Fraud Risks in Federal Programs*. However, 3,790 applications submitted through a point-of-sale partner were processed without verifying gross sales, a key control designed to prevent ineligible entities from receiving awards.

In our recent audit of *SBA's Oversight of Restaurant Revitalization Fund Recipients* (Report 23-15), OIG identified issues with SBA's post-award process for the RRF program. The Office of Capital Access developed a post award report process to monitor the use of funds by awardees. All RRF awardees are expected to submit a post-award report to SBA itemizing the use of funds.

SBA is also performing a manual audit of approximately 10 percent of the 10,000 awards to confirm eligibility, award calculation, and use of funds. Although SBA developed a plan for monitoring and auditing RRF recipients, program officials did not implement the process as planned.

OIG found program officials did not obtain sufficient information to monitor the RRF program to ensure funds were used as intended. RRF recipients were required to submit their final use of funds report to SBA by April 30, 2023. As of June 2023, 20 percent of all recipients, with awards totaling $3.5 billion, had not yet filed the required report.

In addition, program officials selected 10 percent of the awards to review; however, they did not select all awards considered to be potentially fraudulent or ineligible, as originally planned. We identified 210 awards with indicators of potential fraud or ineligibility were not included in SBA's sample selection

plan. We also found program officials did not implement procedures for recipients to return unused or improperly awarded funds to Treasury.

## Agency Progress

SBA has made progress in its oversight of the SVOG and RRF programs. For the SVOG program, agency officials accomplished these things:

- Finalized a revised oversight plan and established procedures to monitor, audit, and close out awards;

- Drafted standard operating procedures to identify and recover improper payments;

- Modified the SVOG budget form to include constraints on budget submissions for certain cost categories to help recipients comply with program requirements;

- Contracted with a firm to help develop the strategy and oversight plan;

- Trained staff and SVOG grant recipients on audit and grant management policies and procedures; and

- Established a plan to audit a statistically significant sample of low, moderate, and high-risk level SVOG recipients.

For the RRF program, agency officials accomplished these things:

- Approved the RRF Award Recovery Plan in May 2023, which detailed the process for notifying awardees when funds must be returned;

- Developed an outreach strategy to notify awardees who did not file the final financial report to comply or return funds. SBA alerted awardees through all known contact information.

- Initiated plans with the RRF platform developers to identify the most efficient way to implement the plan and begin notifying awardees of the intent to recover funds.

# Issue: Leveraging SBA's Workforce to Ensure Effective Administration of New and Significantly Expanded Grant Programs to Aid Small Businesses



SBA will need to leverage and maintain a skilled workforce to meet the demands of ongoing grant management and administration of awards. SBA did not have enough staff to handle the new and significantly expanded grant programs to aid and assist small businesses during the pandemic. When SBA began implementing the

SVOG program, it had only one official and a few temporary staff to start the program. Once implemented, SBA had to onboard and train a substantial workforce to review and approve applications. SBA awarded 13,011 grants, totaling $14.6 billion. With more than 13,000 grants to service through monitoring, audit, and closeout.

To oversee the RRF program, SBA selected 10,050 RRF recipients, or 10 percent, to manually verify that awarded funds were used for allowable costs. In our audit *SBA's Oversight of Restaurant Revitalization Fund Recipients* (Report 23-15), we found that SBA was not on track to review awards in a prompt manner. We identified imbalances in the number of personnel assigned to review a single award, leading to an inefficient review process that will need to be addressed in the near term. The agency assigned a team of 22 reviewers and 6 approvers to complete the 10,050 reviews. As of August 2023, program officials have completed over 1,400 reviews. At this rate of review, we estimate it will take nearly 5 years to complete the remaining reviews, which raises concerns because the reviews would extend beyond the required timeframe for retaining award records.

## Agency Progress

SBA had made the following progress on ensuring the SVOG had staff to support grant monitoring activities in FY 2023:

- SVOG realigned its workforce to better use the workforce strengths and skills and provided opportunities for staff members to participate in cross-functional training and knowledge sharing.

- Program officials trained staff on oversight procedures now that it has transitioned to monitoring the 13,011 shuttered venue grants.

- The agency detailed a grants management specialist to provide strategic guidance on all monitoring, auditing, and closeout activities.

For the RRF program, SBA made the following progress:

- SBA increased the staff assigned to conduct the 10,050 planned post-award reviews.

- SBA plans to maintain current staffing levels of 40 employees to complete post-award reviews through Q1 FY25.

- As of August 2023, SBA completed over 1,400 or 14 percent of the planned post-award reviews.

FROM: (901) 752-0200
FedEX Office

1130 N Germantown Pkwy

Cordova TN 38016
US

SHIP DATE: 25SEP24
ACTWGT: 1.00 LB
CAD: 251115902/WSXI3600

BILL 3rd PARTY

TO Jason Keeton

220 West Depot Street, Suite 416

**Nashville TN 37743** (US)

(423) 783-2626        REF:
INV:
PO:                    DEPT:



**FedEx**
Ground

**G**

TRK# **2798 8586 4117**

**37743**

9622 0417 3 (000 000 0000) 0 00 2798 8586 4117

